## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 21-1592-CJB |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 22-57-CJB |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## <u>JOINT CLAIM CONSTRUCTION BRIEF</u>

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Brandon R. Harper (#6418)
Andrew L. Brown (#6766)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
bharper@potteranderson.com
abrown@potteranderson.com

*Attorneys for Plaintiff The Nielsen Company (US), LLC*

Dated: April 14, 2023
10688152 / 14944.00004

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com

*Attorneys for Defendant TVision Insights, Inc.*

# TABLE OF CONTENTS

**Page**

I. INTRODUCTIONS ............................................................................................. 1

    A.    Plaintiff's Opening Introduction ............................................................ 1

    B.    Defendant's Answering Introduction...................................................... 1

    C.    Plaintiff's Reply Introduction ............................................................... 2

    D.    Defendant's Surreply Introduction ........................................................ 2

II. PLAINTIFF'S OVERVIEW OF THE PATENTS-IN-SUIT ........................... 3

    A.    U.S. Patent No. 7,783,889 B2 ............................................................. 3

           1.    General Background ................................................................... 3
           2.    Frequency Decompositions........................................................ 4
           3.    Descriptors and Signatures ....................................................... 5
           4.    Comparison of Monitored Signatures with Known Reference
                 Signatures ................................................................................. 6

    B.    U.S. Patent No. 9,020,189 B2 ............................................................. 6

III. DEFENDANT'S OVERVIEW OF THE PATENTS-IN-SUIT ........................ 7

    A.    U.S. Patent No. 7,783,889 B2 ............................................................. 7

           1.    General Background ................................................................... 7
           2.    Nielsen Misunderstands the Output of a Spectral Transformation........... 9

    B.    U.S. Patent No. 9,020,189 B2 ........................................................... 12

IV. DISPUTED CLAIM CONSTRUCTIONS ................................................... 12

    A.    "frequency component" ('889 Patent, claims 1, 8, 13, 14, and 17).................... 12

           1.    Plaintiff's Opening Position.................................................... 13
           2.    Defendant's Answering Position ............................................. 16
           3.    Plaintiff's Reply Position ....................................................... 18
           4.    Defendant's Sur-Reply Position ............................................. 23

    B.    "identify[ing] a first frequency component having a first spectral power
           and a second frequency component having a second spectral power by
           performing a spectral transform operation on the first frame of media
           samples" ('889 Patent, claim 1, 8 and 14) ........................................ 24

i

| | | |
|---|---|---|
| | 1. | Plaintiff's Opening Position................................................................ 24 |
| | 2. | Defendant's Answering Position ....................................................... 25 |
| | 3. | Plaintiff's Reply Position ................................................................... 31 |
| | 4. | Defendant's Sur-Reply Position ........................................................ 36 |

C.   "first data analyzer" / "second data analyzer" ('189 Patent, claim 9) ................ 40

| | | |
|---|---|---|
| | 1. | Plaintiff's Opening Position................................................................ 40 |
| | 2. | Defendant's Answering Position ....................................................... 44 |
| | 3. | Plaintiff's Reply Position................................................................... 49 |
| | 4. | Defendant's Sur-Reply Position ........................................................ 55 |

D.   "wherein at least one of the first data analyzer, the second data analyzer or the counter is implemented via a logic circuit" ('189 Patent, claim 9)................ 59

| | | |
|---|---|---|
| | 1. | Plaintiff's Opening Position................................................................ 59 |
| | 2. | Defendant's Answering Position ....................................................... 61 |
| | 3. | Plaintiff's Reply Position................................................................... 67 |
| | 4. | Defendant's Sur-Reply Position ........................................................ 68 |

DEFENDANT'S CONCLUSION ............................................................................. 69

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

CASES

*Absolute Software, Inc. v. Stealth Signal, Inc.*,
 Case No. CIV.A. H-05-1416, 2008 WL 6745389, (S.D. Tex. Feb. 8, 2008), *aff'd*, 659 F.3d
 1121 (Fed. Cir. 2011) ................................................................................................................. 64

*Advanced Ground Info. Sys., Inc. v. Life360, Inc.*,
 830 F.3d 1341 (Fed. Cir. 2016).................................................................................................46

*Amgen Inc. v. Amneal Pharms. LLC*,
 945 F. 3d 1368 (Fed. Cir. 2020).................................................................................................25

*Amgen Inc. v. Vidal*,
 No. 2019-2171, 2022 WL 1112817 (Fed. Cir. Apr. 14, 2022) ..................................................24

*Apple Inc. v. Motorola, Inc.*,
 757 F.3d 1286 (Fed. Cir. 2014)........................................................................................ *passim*

*Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*,
 521 F.3d 1328 (Fed. Cir. 2008)..................................................................................................48

*Bell Atlantic Network Services, Inc. v. Covad Commcn's. Grp., Inc.*,
 262 F.3d 1258 (Fed. Cir. 2001)..................................................................................................14

*Bicon, Inc. v. Straumann Co.*,
 441 F.3d 945 (Fed. Cir. 2006)....................................................................................................31

*Cellular Commc'ns Equip. LLC v. HTC Corp.*,
 Case No. 6:13-CV-507, 2015 WL 10741012, (E.D. Tex. Mar. 9, 2015)....................................64

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
 438 F.3d 1374, 1381 (Fed. Cir. 2006) .......................................................................................66

*Cupp Computing AS v. Trend Micro Inc.*,
 53 F.4th 1376 (Fed. Cir. 2022) ...........................................................................................34, 36

*DataTreasury Corp. v. Ingenico S.A.*,
 Case No. 5:02CV95, 2006 WL 6222493 (E.D. Tex. Apr. 14, 2006)...........................................41

*Digital Ally, Inc. v. Taser Int'l, Inc.*,
 810 F. App'x 873 (Fed. Cir. 2020) .......................................................................................13, 41

*Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.*,
 257 F.3d 1364 (Fed. Cir. 2001)..................................................................................................60

*Dyfan, LLC v. Target Corp.*,
    28 F.4th 1360 (Fed. Cir. 2022) .................................................................. *passim*

*E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*,
    849 F.2d 1430 (Fed. Cir. 1988) ............................................................... 31

*Finjan, Inc. v. Sonicwall*, Inc.,
    Case No. 17-CV-04467-BLF, 2019 WL 1369938 (N.D. Cal. Mar. 26, 2019) ............................ 46

*GE Lighting Sols., LLC v. AgiLight, Inc.*,
    750 F.3d 1304 (Fed. Cir. 2014) ............................................................... 18, 21

*Grecia v. Samsung Elecs. Am., Inc.*,
    780 F. App'x 912 (Fed. Cir. 2019) ........................................................... 48

*Hoganas AB v. Dresser Indus., Inc.*,
    9 F.3d 948 (Fed. Cir. 1993) .................................................................. 31

*Infinity Comput. Prods. v. Oki Data Ams., Inc.*,
    987 F.3d 1053 (Fed. Cir. 2021) ............................................................... 39

*Inventio AG v. Thyssenkrupp Elevator Americas*,
    649 F.3d 1350 (Fed. Cir. 2011) ............................................................... 53

*Lighting World, Inc. v. Birchwood Lighting, Inc.*,
    382 F.3d 1354 (Fed. Cir. 2004) ............................................................. 50, 51, 52

*M2M Sols. LLC v. Sierra Wireless Am., Inc.*,
    Case No. 12-30-RGA, 2015 WL 5826816 (D. Del. Oct. 2, 2015) ................................... 43, 47

*M2M Sols. LLC v. Sierra Wireless Am., Inc.*,
    Case No. 12-30-RGA, 2016 WL 1298961 (D. Del. Mar. 31, 2016) ................................... 50

*Multiform Desiccants, Inc. v. Medzam, Ltd.*,
    133 F.3d 1473 (Fed. Cir. 1998) ............................................................... 59

*Nichia Corp. v. TCL Multimedia Tech. Holdings, Ltd.*,
    No. C.A. No. 16-681-RGA, 2017 WL 5719267 (D. Del. Nov. 28, 2017) ................... 45, 54, 56

*NobelBiz, Inc. v. Glob. Connect, L.L.C.*,
    701 Fed. App'x. 994 (Fed. Cir. 2017) ........................................................ 24

*Phillips v. AWH Corp.*,
    415 F.3d 1303 (Fed. Cir. 2005) ............................................................... 39, 54

*Purdue Pharma L.P. v. AL Vogen Pine Brook, LLC*,
    Case No. 15-687-GMS, 2017 WL 1943957 (D. Del. May 10, 2017) ................................ 41

iv

*S.I.SV.EL. Societa Italiana Per Lo Sviluppo Dell'elettronica S.P.A. v. Rhapsody Int'l, Inc.*,
   C.A. No. 18-69-CJB, 2020 U.S. Dist. LEXIS 142557 (D. Del. Aug. 10, 2020) ....................31

*Shire Dev., LLC v. Watson Pharm., Inc.*,
   787 F.3d 1359 (Fed. Cir. 2015).....................................................................................30

*StrikeForce Techs. Inc. v. PhoneFactor Inc.*,
   C.A. No. 13-490-RGA, 2015 WL 5708577 (D. Del. Sept. 29, 2015) ..............................46, 58

*Summit 6 LLC v. HTC Corp.*,
   Case No. 7:14-cv-00014-O, 2015 WL 11117868 (N.D. Tex. Mar. 21, 2015).........................41

*Synchronoss Techs., Inc. v. Dropbox, Inc.*,
   987 F.3d 1358 (Fed. Cir. 2021).....................................................................45, 53, 54, 56

*Takeda Pharm. Co. Ltd. v. Actavis Labs. FL, Inc.*,
   Case No. 15-451-RGA, 2016 WL 3193188 (D. Del. June 6, 2016).......................................24

*Techno View IP, Inc. v. Facebook Techs., LLC*,
   Case No. 17-386-CFC-CJB, 2018 WL 6427874 (D. Del. Dec. 7, 2018) .........................42, 49

*Thorner v. Sony Comput. Entm't Am. LLC*,
   669 F.3d 1362 (Fed. Cir. 2012).....................................................................................55

*TQ Delta, LLC v. 2Wire, Inc.*,
   Case No. 1:13-cv-01835 ........................................................................................50, 51, 55

*Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*,
   15 F.4th 1136 (Fed. Cir. 2021) .....................................................................................29

*Triplay, Inc. v. Whatsapp, Inc.*,
   Case No. 13-1703-LPS-CJB, 2016 WL 3574012 (D. Del. June 30, 2016) ................42, 47, 50

*V-Formation, Inc. v. Benetton Grp. SpA*,
   401 F.3d 1307 (Fed. Cir. 2005).....................................................................................13

*Vitronics Corp. v. Conceptronic, Inc.*,
   90 F.3d 1576 (Fed. Cir. 1996)..........................................................................13, 14, 41

*Vstream Techs., LLC v. PLR Holdings, LLC*,
   No. 6:15-CV-974-JRG-JDL, 2016 WL 6211550 (E.D. Tex. Sept. 27, 2016) ............. 46-47, 58

*Wasica Fin. GmbH v. Cont'l Auto. Sys.*,
   853 F.3d 1272 (Fed. Cir. 2017).....................................................................................37

*Widevine Techs., Inc. v. Verimatrix, Inc.*,
   Case No. 2:07-CV-321, 2009 WL 3734106 (E.D. Tex. Nov. 4, 2009) ............................54, 58

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) (en banc)......................................................................*passim*

*WSOU Invs., LLC v. Xilinx, Inc.*,
   C.A. No. 20-1228-GBW-JLH, 2022 WL 16707078 (D. Del. Nov. 4, 2022) ....................46, 58

**STATUTES**

35 U.S.C. §112.....................................................................................................................*passim*

**TABLE OF EXHIBITS**

**EXHIBITS TO JOINT CLAIM CHART ("JCC" D.I. 82)**

| EXHIBIT | DESCRIPTION |
|---|---|
| A | U.S. Patent 7,783,889 B2 |
| B | U.S. Patent 9,202,189 B2 |
| C | Excerpts of File History of U.S. Patent 7,783,889 B2 |
| D | U.S. Patent 6,061,793 B2 |
| E | U.S. Patent 8,489,884 B2 |

**EXHIBITS TO JOINT APPENDIX ("JA")**

| EXHIBIT | DESCRIPTION |
|---|---|
| F | Microsoft Computer Dictionary 318 (5th ed. 2002) |
| G | Barron's Dictionary of Computer and Internet Terms (11th Ed. 2012) |
| H | Declaration of David Anderson |
| I | Declaration of Pierre Moulin |
| J | Ruben Puche-Panadero et al., R., *New Method for Spectral Leakage Reduction in the FFT of Stator Currents: Application to the Diagnosis of Bar Breakages in Cage Motors Working at Very Low Slip.*, 70 IEEE Trans. Instrum. Meas. 1–11 (2021) |
| K | Answering Declaration of David Anderson |
| L | Mar. 16, 2023 e-mail from Andrew Russell to Steven Yovits |

## I.     INTRODUCTIONS

### A.     Plaintiff's Opening Introduction

Nielsen's proposed constructions of the disputed claim terms come from a straightforward reading of the claims and the specification.  In fact, in most instances, Nielsen's constructions are taken nearly verbatim from definitional language in the specification or in the claims themselves.  In contrast, TVision's proposed constructions ignore the express language of the specification and the claims.  For the reasons set forth below, the Court should adopt Nielsen's straightforward proposals and reject TVision's attempt to ignore the language of the specification and the claims.

### B.     Defendant's Answering Introduction

All of the asserted claims of U.S. Patent No. 7,783,889 (the "'889 patent") require an accused product to: (1) identify two or more of frequency components to be compared, *and* (2) perform a spectral transform operation to determine their respective spectral powers. During prosecution, Nielsen overcame a rejection by arguing that the prior art did not perform the *identification* step simply by performing the *transformation* step. Now, however, Nielsen seeks to read the identification step out of the claims so it can assert infringement against a product that does not perform it.

With respect to U.S. Patent No. 9,020,189 (the "'189 patent"), Nielsen again attempts improperly to expand the scope of the claims beyond their plain meaning in a way that would sweep in all manner of devices that the patentee never invented. The "data analyzer" terms should clearly be construed as "means plus function" terms because a "data analyzer" is not a known structure in the art; and the terms are indefinite because there is no algorithm disclosed in the specification to perform the claimed functions. As for the term requiring "implement[ation] via a logic circuit," Nielsen seeks to nullify the term's plain meaning by construing it so broadly that it would include even "purely software" implementations.

### C.     Plaintiff's Reply Introduction

For the '889 Patent, the parties dispute two terms, "frequency component" and "identify[ing] a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples." For both terms, TVision seeks to add unnecessary and unsupported limitations to the construction.

For the terms from the '189 Patent, TVision disputes that the terms can have the breadth to which they are entitled. In particular, TVision argues that the "data analyzer" terms are in means-plus-function form, even though TVision has not overcome the presumption against such treatment for terms that do not use the word "means." And TVision argues that the "logic circuit" term cannot include a software implementation, contradicting its own admission that software implementations contain a "logic circuit."

### D.     Defendant's Surreply Introduction

As to the '889 patent, Nielsen reverses itself regarding "frequency component," yet still fails to offer a construction that resolves the dispute. Nielsen then tries to read out "identify[ing] . . . ," which would be contrary to the claims, the specification, and prosecution history.

For both disputed terms for the '189 patent, Nielsen stands either the case law or the claim language on its head. For the "data analyzer" terms, while the controlling case *Williamson v. Citrix* bars a patentee from using functional language to claim ***any possible structure*** to perform a function, Nielsen nevertheless argues for that result here. For the "implement[ation] via a logic circuit" term, even though this term plainly requires a hardware implementation, Nielsen construes it to include software implementations. Nielsen is arguing that up is down and day is night. Its positions should be rejected and TVision's proposals should be adopted.

## II.     PLAINTIFF'S OVERVIEW OF THE PATENTS-IN-SUIT

### A.     U.S. Patent No. 7,783,889 B2

#### 1.     General Background

The asserted claims[1] of the '889 Patent (Ex. A to JCC (D.I. 82)) are directed to methods, apparatuses, and tangible machine-accessible media for generating "signatures" relating to media content streams (*e.g.*, television programs).   (*See, e.g.*, '889 Patent, Claims 1, 8, 14.)   Such "signatures" are representations of the media content that can, for example, take the form of a series of bits that is generated according to observed characteristics of the content.   Audience measurement systems then identify the content being consumed by matching those signatures to known reference signatures.   (*See id.*, 3:30-46.)

To create a signature of monitored media content (*i.e.*, a "monitored signature"), an audio stream produced by a television, radio, or other media device is observed, either with a particular audio monitoring interface or a microphone.   (*Id.*, 4:61-5:6, 7:51-54.)   The audio stream is then divided into pieces or segments known as "frames."   (*Id.*)   Figure 2 of the '889 Patent illustrates an example monitored audio stream and the frames into which it is divided:



FIG. 2

---

[1] Claims 1, 2, 4-6, 8, 9, and 11-17 of the '889 Patent are asserted.

Here, the monitored audio stream is represented by waveform 202.  (*Id.*, 7:51-54.)  The frames (*i.e.*, the segments of the audio stream) are represented as 204, 206, 208, and 210.  (*Id.*)

## 2.    Frequency Decompositions

For a given monitored frame, a "***descriptor***" (which will become a basis of a signature) is derived.  (*Id.*, 7:62-8:4.)  The first step in generating a descriptor is to perform a "frequency decomposition" on the audio signal in the corresponding frame.  (*Id.*, 2:66-3:5, 8:1-17.)

To understand "frequency decomposition," it is necessary to recognize that all audio signals[2] are composed of various frequency components, each of which has a different strength. Accordingly, a frequency decomposition is an operation in which the various frequency components and their strengths (or "amplitudes")[3] are separated out and identified.  (*Id.*, 2:66-3:13, 13:39-45, 14:15-19.)

A mathematical operation by which a frequency decomposition is accomplished is known as a Fourier Transform.  The Fourier Transform has several varieties and implementation algorithms, including the Fast Fourier Transform ("FFT") and the Sliding FFT, which are implementations performed on sampled data instead of continuous data streams.  (*Id.*, 2:66-3:13, 13:39-45, 14:15-19.) A Fourier Transform of an audio stream results in coefficients that identify the ***frequency components*** of that stream – *i.e.*, the ***individual frequencies*** present in the audio stream and the ***amplitude*** (or strength) of each of those frequency components.  (*Id.*, 2:66-3:13, 8:5-11, 13:39-45, 14:15-19.)  Accordingly, Fourier Transforms convert (or "transform") signals from the "time domain" (the domain of the experienced real world) to the "frequency domain" (a mathematical

---

[2] In the real world, we experience these audio signals as time-varying signals, and we therefore call them "time domain" signals.

[3] The amplitude of a frequency component can be used to calculate the power level associated with it.  This is known as the "spectral power" associated with the frequency component.

domain that identifies the individual frequency components of a signal and the amplitude of each). (*See id.*, 3:6-9.)  For this reason, the Fourier Transform is also known as a "time domain to frequency domain transform" or simply a "frequency domain transform."

Fourier Transforms do <u>not</u> result in coefficients that represent ranges of frequencies, which are known as "frequency bands."  When it is necessary to ascertain information about frequency bands, other types of mathematical operations are used – for example, the "wavelet transform."  (*Id.*, 16:61-17:6.)

Using a Fourier Transform to obtain the frequency components of a signal can be understood as analogous to light that is emitted from an atom and passed through a prism, as shown below:



As shown, the light entering the left side of the prism undergoes a frequency decomposition by being broken into its component colors (*i.e.*, light frequencies, as shown at the right of the prism). The light entering the prism can be considered analogous to the monitored audio stream, while the various colors coming out of the prism can be considered analogous to the frequency components produced by a Fourier Transform.  The brightness of each of the colors can be considered analogous to the strengths or amplitudes of the frequency components generated by the Fourier Transform.

### 3.    Descriptors and Signatures

The frame "***descriptor***" mentioned above is generated by comparing the spectral powers of two frequency components within a particular frame.  (*Id.*, 11:24-28, 16:19-54.)  In the simplest case, if the first spectral power is greater than the second one, then the descriptor can be a single bit that

is set to 1.  If the second spectral power is greater, then the descriptor can be a bit set to 0.  (*Id.*, 16:49-54.)  That descriptor, in turn, is then used as part (or all) of a signature.  (*Id.*, 7:62-8:4, Claims 1, 8, 14.)

### 4.      Comparison of Monitored Signatures with Known Reference Signatures

A signature generated at the monitoring site (the "monitored signature") can be sent to a central data collection facility for comparison to known reference signatures.  (*Id.*, 3:27-46.)  A match between a monitored signature and a reference signature can, in turn, be used to determine the title or other information about the audio stream.  (*Id.*)

The reference signatures at the central data collection facility are created in the same way as the monitored signatures.  Accordingly, a monitored signature corresponding to particular media content will contain the same information as the reference signature corresponding to the same content.  (*Id.*, 8:11-16.)

### B.      U.S. Patent No. 9,020,189 B2

The asserted claim (Claim 9) of the '189 Patent (Ex. B to JCC) is directed to an audience measurement device that improves the accuracy of detection of individuals who are watching particular television content.  ('189 Patent, 1:6-8, 4:1-10, Claim 9.)  In particular, the claim recites: **(a)** using a three-dimensional sensor to detect a person that is within a threshold distance of the sensor; **(b)** using a two-dimensional sensor to detect a person that is outside that threshold distance; and **(c)** combining the detection of those people to generate a people count.  (*Id.*)

In the prior art, many audience measurement systems used only two-dimensional sensors and data to detect people, and others used only three-dimensional sensors and data.  (*Id.*, 3:10-25.)  But those systems encountered technical problems that resulted in the inaccurate counting of people.  In particular, when two-dimensional sensors and data were used, people – even those in close range –

6

sometimes went undetected due to the two-dimensional sensors' relative weakness in dealing with poor lighting conditions, rotation of the person's head, or obscuring of the person's face due to eating or drinking.  (*Id.*, 2:27-53.)  Moreover, two-dimensional sensors were susceptible to incorrectly interpreting photographs of human faces as actual human beings.  (*Id.*)  Three-dimensional sensors, on the other hand, did not experience those problems, but they could only operate within a threshold distance.  (*Id.*)  Outside that range, three-dimensional sensors could not reliably detect people.  (*Id.*)

The invention claimed in Claim 9 of the '189 Patent is the use of a three-dimensional sensor within its operating threshold distance (thereby eliminating the problems associated with two-dimensional data in that distance range) and a two-dimensional sensor outside that threshold distance (where a three-dimensional sensor might not operate reliably).  (*Id.*, 4:1-10, 14:55-15:3, Claim 9.)  The people detected by the two types of sensors are then combined into a people count.  (*Id.*, Claim 9.)  Accordingly, the invention takes advantage of the relative strengths of three-dimensional sensors in the distance ranges in which they operate well, and two-dimensional sensors elsewhere.  (*See id.*, 4:1-10, 14:55-15:3, Claim 9.)

## III. DEFENDANT'S OVERVIEW OF THE PATENTS-IN-SUIT

### A. U.S. Patent No. 7,783,889 B2

#### 1. General Background

The '889 patent claims "methods and apparatus for generating signatures for use in identifying media information." '889 patent, 1:15-17. Most of the techniques disclosed in the patent were known in the art, including generating signatures based on spectral data. *See id.*, 1:21-26, 2:55-60. The '889 patent purports to improve on prior art techniques by forming a signature based on comparisons of spectral powers within a single frame of samples, rather than comparing spectral powers across multiple frames of samples. *Id.*, 2:55-3:5, 8:1-4.

As shown in Figure 3 of the '889 patent, the method disclosed in the patent splits the audio signal into overlapping "frames." *Id.*, 1:53-55, 7:58-61. Each frame is transformed from the "time domain" to the "frequency domain" by performing a spectral transformation such as a "Fast Fourier Transform," or "FFT." *Id.*, 13:37-45, 14:12-20, 14:40-50, 22:31-37. An FFT is a well-known mathematical operation used to determine the energy, or "spectral power," of individual frequency components of a signal. *Id.*, 13:37-45. Performing an FFT results in a frequency spectrum that can be used to obtain the spectral power for each frequency component. *Id.*, 14:41-44, 16:45-48.

The method disclosed in the '889 patent generates a "signature" for a sample by comparing the spectral power of frequency components within the frequency spectrum generated by the FFT. *Id.*, 16:19-60; 22:66-23:6. The software first identifies two or more frequency components within the frequency spectrum for the frame. *Id.*, 16:30-44; 22:38-58. It then compares those components to create a "descriptor" of the frame. *Id.*, 16:49-60, 22:66-23:6. The descriptor may, for example, be a single-bit descriptor consisting of a 1 or a 0, corresponding to a comparison of the relative spectral powers of the components. *Id.*, 16:49-60. In that case, if the spectral power of the first identified frequency component is greater than that of the second component, the resulting descriptor bit is 1; if not, it is 0. *Id.*

This process is repeated, if necessary, identifying and comparing additional sets of frequency components to form additional descriptors. *Id.*, 16:55-60, Fig. 5. These descriptors are then joined (or "concatenated") together to form a signature.[4] *Id.*, 16:6-18, 23:7-10. For example,

---

[4] The patent describes that, once the device generates the first signature, the same process may repeat, generating a second signature. *Id.*, 16:15-18. This second signature is the signature of an overlapping frame (i.e., a frame that shares some samples with the first frame). *Id.*, 10:3-6.

if the descriptors are 1, 0, 1, 1, 1, 0, 1, and 1, then the resulting 8-bit signature would be 10111011. (Anderson Decl. at ¶¶ 30-32.) For the method to work, the *same* frequency components must be identified to form both the reference signature used at the reference site and the monitored signature at the monitoring site. '889 patent, 16:37-41; 8:9-17. Otherwise, the signature generated at the monitoring site would not match the reference signature. *Id.*

### 2. Nielsen Misunderstands the Output of a Spectral Transformation

Fundamentally, an FFT does not work in the way that Nielsen describes. (Opening Brief ("Op.") at 4-5.) The Court should disregard Nielsen's attorney argument to the contrary as unsupported by the intrinsic record or expert testimony. (*Id.*) TVision instead offers the explanation below, which is consistent with the intrinsic record and supported by a declaration from Dr. David Anderson, an expert in the field. Dr. Anderson is an award-winning professor in the School of Electrical and Computer Engineering at the Georgia Institute of Technology, with extensive experience in industry. (Anderson Decl. at ¶¶ 6, 8-9, 11, 14.) He has experience not only in the research, design, and implementation of speech and audio processing systems, but also in software design for embedded systems and various aspects of real-time signal processing. (*Id.* at ¶¶ 8-9.)

### i. The '889 Patent Discloses a Spectral Transform Operation That Results in a Frequency Spectrum with Frequency Components that Represent Multiple Frequencies

An FFT operation converts a signal from the time domain to the frequency domain by returning the magnitude of a signal in certain predetermined frequency component "bins," each identified by an index. (Anderson Decl. at ¶¶ 16-21.) Each bin corresponds to a frequency range

within a signal. (*Id.* at ¶ 23.) For example, here is a sample of an audio signal in the time domain:



*Figure 1: Time Domain Audio Signal*

(*Id.* at ¶¶ 17-18, Figure 1.)

Performing an FFT on the above signal generates a frequency spectrum like the following, showing the magnitude of frequency components referred by a "bin number" (or "index") from 0-64:



*Figure 2: Result of FFT*

(*Id.* at ¶¶ 19-20, Figure 2.) Each frequency component in the frequency spectrum from an FFT, *i.e.*, the red points in the example above, corresponds to a band or range of frequencies in the actual signal. (*Id.* at ¶¶ 21-23.) The components are evenly spaced, and the number of components that result from the FFT depends on how it is performed, not on the content of the sample. (*Id.* at ¶ 24.) The above spectrum shows 65 components (including bin 0), and running different audio samples through the same FFT would likewise result in 65 components each representing the same frequencies, but with different magnitudes. (*Id.* at ¶¶ 19-22, 25, 28.) Moreover, any number of bins can be used, resulting in ten, a hundred, a thousand, or more frequency components that correspond to different frequency ranges. (*Id.* at ¶ 24.)

10

While these frequency components are sometimes referred to by a single frequency identifier, they actually represent the contribution of a range or band of frequencies, as shown below:



*Figure 3: An FFT Component Overlaid with the Range of Frequencies that Contribute to It*

(*Id.* at ¶¶ 23-28, Figure 3.)

### ii.     Nielsen Ignores the Context of the Patent to Arrive at an Impossible Conclusion

Nielsen argues that "[a] Fourier Transform of an audio stream results in coefficients that ***identify*** the frequency components of that stream – *i.e.*, the individual frequencies present in the audio stream and the amplitude (or strength) of each of those frequency components." (Op. at 4 (emphasis added and omitted).) But the FFT merely reveals the spectral power of the signal attributable to each frequency component in each bin. (Anderson Decl. at ¶¶ 22-23, 29.) It is up to the software or apparatus performing the method to identify the relevant bins and their components. *Id.*

As the '889 patent's claims and specification make clear, the method is divided into two steps. First, "[a]n initial FFT operation is performed on the initial audio sample set to establish an initial ***frequency spectrum*** (block 408)." '889 patent, 14:15-17 (emphasis added); *see id.*, 22:31-37 (similarly describing how an FFT results in a frequency spectrum). Second, "[t]he example method . . . **selects** a first pair of frequency components [which] **may be selected from any location in the frequency spectrum** of an audio sample frame." *Id.*, 16:30-35 (emphasis added);

*see id.*, 22:50-53 ("the frequency identifier 908 identifies frequency pairs ***from the frequency spectrum data***.") (emphasis added). The spectral power of each of those frequency components is then "obtained based on the results of the sliding FFT." *Id.*, 16:45-48; *see id.*, 22:59-62 ("The spectral power value identifier 910 may then determine or identify the spectral power of each frequency component of the frequency pairs . . . from the frequency spectrum data").

Nielsen's analogy to a prism that splits a beam of light is incomplete. (Op. at 5.) Projecting a beam of light through a prism results in colored beams that make up the light. (*Id.*) In contrast, performing an FFT on a set of samples results in a spectrum of energy values for a predetermined list of frequency components—some of which may not have corresponding spectral powers in the underlying signal. (Anderson Decl. at ¶ 22.) Thus, the FFT does not *identify* the frequency components. (Id. at ¶ 29.) Instead, it provides a frequency spectrum of an audio signal which relates predetermined frequency components to their spectral powers. (*Id.* at ¶¶ 19, 24-25, 29.) As set forth in the '889 patent, the frequency components can then be identified—*i.e.*, ***selected***—for comparison from within that spectrum. '889 patent, 16:33-35, 22:50-53.

### B.    U.S. Patent No. 9,020,189 B2

TVision addresses any relevant background for the '189 patent in its arguments below.

## IV.    DISPUTED CLAIM CONSTRUCTIONS

### A.    "frequency component" ('889 Patent, claims 1, 8, 13, 14, and 17)

| Nielsen's Proposed Construction | TVision's Proposed Construction |
|---|---|
| Plain and Ordinary Meaning:<br><br>Component of a signal generated by transforming the signal data from the time domain to the frequency domain | Plain meaning, i.e., a single frequency or single band of frequencies |

### 1.      Plaintiff's Opening Position

The '889 Patent uses "frequency component" in accordance with its plain and ordinary meaning.  TVision agrees, but the parties disagree about what that plain and ordinary meaning is.

### i.      Nielsen's proposed construction comes directly from the specification

Nielsen's proposed definition of "frequency component" comes directly from the specification, which leaves no doubt as to the meaning of the term.  *See Digital Ally, Inc. v. Taser Int'l, Inc.*, 810 F. App'x 873, 876 (Fed. Cir. 2020) (quoting *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[The specification] is the single best guide to the meaning of a disputed term.")); *V-Formation, Inc. v. Benetton Grp. SpA*, 401 F.3d 1307, 1310 (Fed. Cir. 2005).  Below, the language of the specification is compared to Nielsen's proposed construction, with the common language in bold:

| Nielsen's Proposed Construction | '889 Patent Specification, 3:6-9 |
|---|---|
| **Component of a signal generated by transforming the signal data from the time domain to the frequency domain** | Frequency **components of a**n audio **signal** are typically **generated by transforming the** audio **signal data** (e.g., an audio stream) **from the time domain to the frequency domain** |

As the table above shows, Nielsen's proposed construction adopts the language of the specification nearly verbatim, except that Nielsen's construction does not specify that the signal must be an "audio" signal because neither party deems it appropriate to limit the definition in this way.[5]

Even if the specification of the '889 Patent had not given such a clear definition to the term,

---

[5] In any event, it is not appropriate to narrow the term's definition to "audio" only, as the specification makes clear that the term applies to "an audio stream, a video stream, or any other media information for which the digital spectral signatures are generated."  ('889 Patent, 2:41-43.) Moreover, as shown above, the specification's definition of "frequency component" references "audio stream" only as an example.  (*Id.*, 3:6-9 ("***e.g.***, an audio stream" (emphasis added)).)

Nielsen's proposed construction would be the correct one because the specification *exclusively* uses the term "frequency component" to refer to the result of transforming (or decomposing) signal data from the time domain to the frequency domain.  (*See* '889 patent, 3:6-13, 13:34-45, 15:51-16:5, 16:19-60, 22:31-65; Figs. 4, 5.)  For example, at 13:40-45, the specification states that:

> [A]n FFT may be used to **convert a time domain signal … into a frequency domain** representation of the same signal which may then be **used to analyze the frequency components** of the converted signal.

(Emphasis added.)  As the Federal Circuit has explained, "when a patentee uses a claim term throughout the entire patent specification, in a manner consistent with only a single meaning, he has defined that term 'by implication.'"  *Bell Atlantic Network Services, Inc. v. Covad Commcn's. Grp., Inc.*, 262 F.3d 1258, 1271 (Fed. Cir. 2001) (quoting *Vitronics*, 90 F.3d at 1582).

### ii.    TVision's proposed construction is wrong

TVision proposes that the plain meaning of "frequency component" is "a single frequency or single band of frequencies," but this construction is wrong.  *First*, a "frequency component" is not "a single frequency."  In proposing its construction, TVision incorrectly treats the claim term as only "frequency" instead of "frequency component."  The term "frequency," alone, may refer to a "single frequency," but TVision's construction does not address the word "component."  A "frequency component," as explained above, is what is generated by performing a time domain to frequency domain transform.  (*See, e.g.*, '889 Patent, 3:6-9, 13:40-45.)  Each frequency component that results from a frequency domain transform consists, as explained above, of coefficients corresponding to individual frequencies and their amplitudes.[6]  (*Id.*, 2:66-3:13, 8:5-11, 13:39-45,

---

[6] In addition to individual frequencies and their amplitudes, time domain to frequency domain transforms also provide phase information associated with each frequency.  For purposes of this brief, phase information can be ignored.

14:15-19.)

*And second*, a "frequency component" is not a "band of frequencies."  As explained above, "frequency components" are generated by frequency domain transforms and identify coefficients of particular frequencies.  (*Id.*, 2:66-3:13, 8:5-11, 13:39-45, 14:15-19.)  TVision attempts to support its position by citing portions of the specification that discuss "sub-bands."  But all of those citations refer to a different embodiment of the invention – not claimed in the '889 Patent[7] – namely, the so-called "wavelet" embodiment.  In particular, that embodiment is described at 3:14-16:

> Digital spectral signatures may also be generated based on *wavelet transforms* which transform audio data *from the time domain to the wavelet domain*.

(Emphasis added.)  Then, at 3:16-18, the specification then explains that:

> *wavelet transforms* may be used to decompose blocks or frames of data (*e.g.*, time domain audio samples) into multiple sub-*bands*.

(Emphasis added.)

As explained above, when the term "frequency component" is used in the specification, it is used exclusively in association with time domain to frequency domain transforms.  (*See, e.g.*, *id.*, 13:40-45, Figs. 4-5.)  In contrast, the specification uses the term "bands" (or "sub-bands") exclusively in association with wavelet transforms.  (*See id.*, 3:14-18) ("[W]avelet transforms may be used to decompose blocks or frames of data (*e.g.*, time domain audio samples) into multiple sub-bands."); 17:2-6 ("[W]avelet transforms may be employed to analyze data … by separating blocks or frames of data … into multiple sub-bands."); 17:50-53 ("For each level wavelet decomposition, the energy of the audio signal for each sub-band is determined… ."); Fig. 7 (showing "WAVELET DECOMPOSITION" and "SUB-BAND FILTERED VALUES").)

---

[7] Instead, that embodiment is claimed in the related U.S. Patent No. 8,489,884 B2. (Ex. E to JCC.)

Thus, the Court should adopt the plain and ordinary meaning of "frequency component" as Nielsen has proposed: "Component of a signal generated by transforming the signal data from the time domain to the frequency domain."

### 2. Defendant's Answering Position

Nielsen's proposed "plain meaning" for "frequency component" does not address what a frequency component *is*, and does not resolve the parties' disputes about that term. Instead, it addresses only how a frequency component is *generated*, and incorporates the requirement for a spectral transform operation that is already present in the remainder of the claim.

TVision agrees that frequency components are *generated* by a spectral transform operation that converts the signal in the captured samples from the time domain to the frequency domain, as required by the language of the claim. The only remaining dispute regarding "frequency component" is whether a frequency component is limited to representing only an "individual" frequency (Nielsen's position), or whether it can represent either a single frequency or a single *band* of frequencies (TVision's position).

### i. Nielsen Concedes That a Frequency Component Can Correspond to an "Individual" Frequency

In its brief, Nielsen faults TVision's proposal for failing to address the word "component," but that word is unnecessary to resolve the parties' dispute about whether a frequency component can represent only a single frequency or a range of frequencies. (Op. at 14-15.) In fact, Nielsen's construction likewise offers no meaning for the term "component," and instead merely parrots the word while importing the requirement that the component be generated by converting the signal from the time domain to the frequency domain—a requirement that is already in the claims via the language "by performing a spectral transform

16

operation on the first frame of media samples." '889, Claims 1, 8, 14; *see also id.*, Abstract, 2:65-3:13.

Nielsen argues in its brief that "a 'frequency component' is not 'a single frequency,'" but admits that "[e]ach frequency component . . . consists . . . of coefficients corresponding to *individual* frequencies . . . ." (Op. at 14.) Thus, Nielsen appears to agree with TVision that a frequency component can represent or correspond to a *single* or *individual* frequency—even if that property is not set forth in Nielsen's construction. (*Id.* at 13-16.)

### ii.    A Frequency Component Can Correspond to a Band of Frequencies

The only remaining dispute is whether a frequency component can also represent a single *band* or *range* of frequencies. As described below, the output of the spectral transform operation is a value that corresponds to a *band* or *range* of frequencies determined by the size of the analyzed spectrum and the number of frequency bins. Nothing in the patent specification or claims departs from this plain meaning. Thus, a frequency component can correspond to more than a single or individual frequency.

In the art, a frequency component normally represents the contribution of multiple frequencies, not just a single frequency. (Anderson Decl. at ¶¶ 23-28.) This is shown in the chart in Figure 3, repeated below, which identifies a frequency component and the frequencies that contribute to it:



*Figure 4: An FFT Component Overlaid with the Range of Frequencies that Contribute to It*

(*Id.* at ¶¶ 25-28, Figure 3.) Depending on how the FFT is performed, a single frequency component could correspond to, for example, frequencies between 1500 and 2500 Hz. (*Id.* at ¶ 27.)

The '889 patent specification states, consistent with this plain meaning, that "the frequency components may be selected from any location in the frequency spectrum of an audio sample frame." '889 patent, at 16:33-35. It does not limit frequency components to representing a single or "individual" frequency within that spectrum, or to frequencies corresponding to whole numbers. Nielsen has not set forth any reason to depart from the plain meaning of frequency component. None of Nielsen's citations to the specification even suggest—let alone require— that frequency components represent only a single frequency. (Op. at 14-15); *see, e.g.*, '889 patent, 2:65-3:13 (discussing frequency components without discussing whether they correspond to a single frequency or a range), 8:5-11 (noting that descriptors "may be generated based on frequency decompositions"), 13:39-45 (discussing how an FFT converts a time domain signal to the frequency domain), 14:15-19 (discussing how an FFT is well known in the art). Thus, the plain meaning should apply, and a "frequency component" can represent a band of frequencies.

Even if the embodiments in the specification *did* involve frequency components representing a single frequency, it would be error to import that limitation into the claims. *See GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014) (reversing grant of summary judgment, and holding that the lower court erred in importing a limitation from the specification into the claims absent lexicography or disavowal).

### 3.    Plaintiff's Reply Position

TVision now indicates it <u>agrees</u> with Nielsen's construction. Specifically, TVision states that it "agrees that frequency components are *generated* by a spectral transform operation that converts

the signal in the captured samples from the time domain to the frequency domain" (TVision Ans. Br. at 16 (emphasis in original)), which is essentially Nielsen's proposed construction (and which is the plain and ordinary meaning to one of ordinary skill in the art). (Declaration of Dr. Pierre Moulin ("Moulin Decl.")[8], ¶ 49.) But TVision asserts a different proposed construction (namely, "a single frequency or a single band of frequencies") and two disputes remain for the Court to resolve.

The first dispute concerns the fact that, contrary to TVision's proposed construction, a "frequency component" is not a frequency or set of frequencies. Rather, frequency components in the frequency domain <u>correspond to</u> (or represent) certain characteristics of frequencies in the "real world" time domain. The specification makes this clear, distinguishing between a frequency and a "frequency component." ('889 Patent, 22:56–58 ("The spectral power value identifier 910 may be configured to obtain the indexes associated with the frequency components of the frequency pairs from the frequency identifier 908.").) And even TVision's expert admits that a frequency component is a vector that consists of both a magnitude and a phase of a frequency and not a frequency itself (or set of frequencies). (*See* Anderson Decl., ¶¶ 19, 21; *see also* Moulin Decl. ¶ 51 ("A frequency component is not the same as a frequency. A 'frequency component' is characterized not just by a frequency index but also by a magnitude and a phase.").) In fact, TVision's brief acknowledges that frequency components "represent" (or correspond to) frequencies but are not the frequencies themselves. (TVision Ans. Br. at 17 ("The only remaining dispute is whether a frequency component can also represent a single ***band*** or ***range*** of frequencies.") (emphasis in original).)

The second dispute is whether a "frequency component" can correspond to a "band of frequencies." To understand this dispute, some background is necessary. A frequency component (also called a "coefficient") of a Discrete Fourier Transform, or "DFT," (*i.e.,* a time domain to

---

[8] Moulin Declaration is attached as Exhibit I to the Joint Appendix.

frequency domain transform that is performed on a sampled signal) contains information about the frequencies that are present in the time domain signal. (*See* Moulin Decl., ¶¶ 34–46.) A DFT coefficient, however, does not correspond to (*i.e.*, its value is not solely influenced by) a precise frequency present in the time domain signal. (*Id.,* ¶ 36.) Rather, the DFT coefficient "is influenced by <u>all</u> the frequencies present in the time domain signal." (*Id.* (emphasis added).) One source of such influence is the "frequency bin" that is associated with the coefficient. (Moulin Decl., ¶¶ 37–38.) A "frequency bin" is the result of the fact that frequency components (*i.e.*, DFT coefficients) have a particular spacing. (*Id.*, ¶ 37.) This spacing is calculated by dividing the sampling frequency (*i.e.*, the rate at which samples are taken) by the number of samples used in the DFT. (*Id.*) As an example, if the sampling frequency is 48,000 samples per second (48 kHz), and the number of samples is 128, then the spacing of the DFT coefficients (frequency components) is 48,000/128 = 375 Hz. (*Id.*) Accordingly, each "bin" is 375 Hz wide, with the first coefficient (referred to as coefficient 0) associated with 0–375 Hz. (*Id.*) The next bin (coefficient 1) is also 375 Hz wide, corresponding to 375–750 Hz. The succeeding bins are also 375 Hz wide. (*Id.*)

The parties agree that a frequency component reflects information about time domain frequencies in the coefficient's bin.[9] (*See* TVision Ans. Br. at 23.) But Nielsen disputes that a

---

[9] In particular, the component reflects, in part, lumped-together, aggregate information associated with the frequencies in its bin. (Moulin Decl., ¶ 42.) In the example above, the first component would, in part, reflect information about the frequencies from 0 to 375 Hz.

frequency component may correspond to a "band" of frequencies.[10] Specifically, a frequency component is influenced not only by its own bin, but also by <u>all other frequencies</u> in the original time-domain signal. (Moulin Decl., ¶¶ 36, 39.) Thus, a frequency component does not correspond to some defined "band" of frequencies to the exclusion of other frequencies. (*Id., ¶* 50 ("[A] 'frequency component' would not be understood by one of ordinary skill in the art in the field of the '889 patent to mean a 'band of frequencies.'").)

To understand why a frequency component reflects information about <u>all</u> frequencies in the time domain signal, it is necessary to look no further than the figure TVision's expert, Dr. Anderson, has provided. (Moulin Decl., ¶ 40; *see also id.*, ¶¶ 41–45.) In particular, TVision's figure is intended to be an illustration of "spectral leakage"—*i.e.,* the extent to which a frequency component contains information that is "leaked" from all the other frequency bins (*i.e.,* from all the other frequencies present in the time domain signal). (*Id.*, ¶ 40; *see also id.* ¶¶ 41–45.)



(TVision Ans. Br. at 11, 17.) The figure indicates that example frequency component 4

---

[10] To adopt Nielsen's proposed construction, with which TVision agrees (at least as far as it goes), the Court need not decide the issue of whether a frequency component may correspond to a "band of frequencies." Nielsen's proposed construction is silent on the issue. And although TVision's construction explicitly states (incorrectly) that a frequency component may correspond to a "band of frequencies," TVision appears to agree that the construction should be silent on the issue: "Even if the embodiments in the specification *did* involve frequency components representing a single frequency, it would be error to import that limitation into the claims." (TVision Ans. Br. at 18 (emphasis in original) (citing *GE Lighting Sols., LLC v. AgiLight, Inc.*, 750 F.3d 1304, 1309 (Fed. Cir. 2014)).)

(which is associated with bin 4) is "contributed to" by all (or nearly all) frequencies present in the time domain signal. (Moulin Decl., ¶¶ 40–41.). Indeed, the figure's title confirms this: "FFT component overlaid with the frequencies that contribute to it." As shown by the decreasing heights of the graph's bumps (known as "side lobes") with increasing distance from component 4, the influence of other frequency bins decreases with greater distance from component 4.[11] (*Id.*, ¶ 40. *See also id.*, ¶¶ 41–43.)

Spectral leakage is caused by the finite length of the sampled signal and can be avoided only in very special cases. (*Id.*, ¶ 45.) The effect of spectral leakage is very significant and cannot be ignored. (*Id.*, ¶ 44.) In fact, for a particular coefficient, the energy leaked into other coefficients exceeds the energy of that coefficient. (*Id.*)

Thus, as confirmed by TVision's figure, each frequency component is influenced by all frequencies in the original time-domain signal, not just a defined "band." More specifically, any single DFT coefficient is influenced by (a) lumped-together aggregate information over an entire frequency bin; and (b) "leaked" information from all frequencies present in the time-domain signal. (*Id.,* ¶ 42; s*ee also* Ruben Puche-Panadero et al., R., *New Method for Spectral Leakage Reduction in the FFT of Stator Currents: Application to the Diagnosis of Bar Breakages in Cage Motors Working at Very Low Slip.*, 70 IEEE Trans. Instrum. Meas. 1–11 (2021). ("[E]ach component gives rise to a function with defined values for all frequencies.") (Ex. J to JA.)

---

[11] Dr. Anderson provides no explanation as to how the figure was generated or what precisely it represents, but it appears to indicate that a coefficient contains significant contributions from not only its own bin, but also from all the other frequency bins. (Moulin Decl., ¶¶ 40–45.) Dr. Anderson's failure to provide a clear description of the figure makes it difficult to comment on its correctness. (*Id.* at ¶ 40.) But the point that it apparently tries to make regarding spectral leakage— that each frequency component is significantly influenced by all the other frequencies—is correct. (*Id.*) A better illustration of the effect of spectral leakage is shown in Paragraph 41 of Dr. Moulin's Declaration.

### 4.      **Defendant's Sur-Reply Position**

In its opening brief, Nielsen argued that "[e]ach frequency component . . . consists . . . of coefficients corresponding to ***individual frequencies and their amplitudes***." (Op. at 15 (emphasis added).) Nielsen now reverses, admitting that "a frequency component reflects information about . . . ***frequencies in the coefficient's bin***," and that each bin corresponds to a contiguous ***range*** of frequencies. (Rep. at 20-21 (emphasis added).) Nielsen offers an example where each frequency component corresponds to a single "bin" of frequencies that is "375 Hz wide," *e.g.* a contiguous range from "0-375 Hz" or "375-750 Hz." (*Id.* at 19-20) But in the art, the term for a contiguous range of frequencies is a "band"—*i.e.*, TVision's proposed "single ***band*** of frequencies." (Ex. K ("Anderson Ans. Decl."), ¶ 16; Ans. at 17-18.)

Nielsen now argues that instead of frequency components corresponding to "individual frequencies" (Op. at 4, 11), "each frequency component is influenced by ***all*** frequencies in the original time-domain signal" due to spectral leakage. (Rep. at 20-22 (emphasis added).) TVision agrees that leakage is a known effect in the art. (Anderson Decl., ¶ 25; Anderson Ans. Decl., ¶¶ 19, 21.) As such, before Nielsen's reply brief, TVision proposed a compromise construction that accounts for leakage:

> Component of a signal generated by transforming the signal data from the time domain to the frequency domain, which corresponds to a single frequency or single band of frequencies present in the signal ***(aside from leakage)***.

(Ex. L at 1-2 (Mar. 16, 2023 e-mail from Andrew Russell to Steven Yovits) (emphasis added).) The parties met and conferred, but Nielsen rejected TVision's compromise proposal based on its use of the word "band," offering no alternative and no counter-proposal. (*See id.* at 1.)

Ultimately, the parties agree that a frequency component is a term of art (Ex. I at ¶ 54), that each frequency component has a "corresponding 'frequency bin'" (Ex. I at ¶ 37-38), which is a single contiguous range of frequencies such as "0 – 375 Hz" (*Id.*; Rep. at 20), and that spectral leakage is

a known effect in which other frequencies influence each frequency component's corresponding bin (Ex. I at ¶ 39, 42, 45.) Nielsen offers no reason other than leakage to dispute TVision's proposed compromise construction—and TVision's compromise construction accounts for leakage. As such, TVision submits that its compromise construction best represents the meaning of the term "frequency component."

**B.** **"identify[ing] a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples" ('889 Patent, claim 1, 8 and 14)**

| Nielsen's Proposed Construction | TVision's Proposed Construction |
|---|---|
| Plain and ordinary meaning: Generate first and second frequency components by performing a spectral transform operation on the first frame of media samples | This claim term requires selecting at least two frequency components to the exclusion of others; more than just "performing a spectral transform operation on the first frame of media samples" |

**1.** **Plaintiff's Opening Position**

The term "identify[ing] a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples" should be given its plain and ordinary meaning. If a construction is needed, Nielsen proposes: "Generate first and second frequency components by performing a spectral transform operation on the first frame of media samples."

Nielsen's proposal is correct because it is required by a straightforward reading of the claim term. *See Amgen Inc. v. Vidal*, No. 2019-2171, 2022 WL 1112817, at *2 (Fed. Cir. Apr. 14, 2022) (adopting "[a] straightforward reading of the claim language"); *Takeda Pharm. Co. Ltd. v. Actavis Labs. FL, Inc.*, Case No. 15-451-RGA, 2016 WL 3193188, at *5 (D. Del. June 6, 2016); *NobelBiz, Inc. v. Glob. Connect, L.L.C.*, 701 Fed. App'x. 994, 998 (Fed. Cir. 2017). Specifically, the claim

term explicitly states that the way to "identify a first frequency component … and a second frequency component" is "by performing a spectral transform operation on the first frame of media samples."

TVision's proposed construction is wrong because it requires doing something "more than just 'performing a spectral transform operation on the first frame of media samples.'" This ignores the language of the claim term, which indicates that "performing a spectral transform operation on the first frame of media samples" is ***precisely*** how to identify the frequency components. TVision contradicts the language of the claim by proposing that the term requires "more than" that.

Moreover, TVision's proposal that the term "requires selecting at least two frequency components to the exclusion of others" is confusing and has no basis. There is nothing in the intrinsic evidence that requires the "exclusion" of anything. In effect, TVision is improperly seeking to convert the claims (which use the word "comprising" in their preambles) from open to closed (which would use the words "consisting of" or the like). *See Amgen Inc. v. Amneal Pharms. LLC*, 945 F. 3d 1368, 1377 (Fed. Cir. 2020).

### 2.    Defendant's Answering Position

Nielsen attempts to read the "identifying" limitation out of the claim, so that it can accuse TVision's product which does not identify frequency components. (Op. at 24-25.) But, as set forth below, the claim language, specification, and prosecution history are clear that "identifying" requires selecting at least two frequency components to the exclusion of others, and that merely performing a spectral transformation to "generate" those components is insufficient.

### i.    The '889 Patent's Specification Shows that "Identifying" Means Selecting to the Exclusion of Others

As explained in TVision's General Background section (*infra*, Section III.A), a spectral transform operation returns a frequency spectrum with a predetermined number of frequency components, each representing a frequency band. The number of frequency components the FFT

returns is the same regardless of the content of the signal, and each frequency component is typically assigned a "bin number" or "index."

The method disclosed in the '889 patent's specification works by first "select[ing]" pairs of frequency components:

> The example method initially **selects** a first pair of frequency components $f_{00}$ and $f_{10}$ . . . . Although consecutive frequency components are selected (*i.e.*, $f_{0b}$ and $f_{1b}$, $f_{2b}$ and $f_{3b}$, etc.) in the example method, the frequency components **may be selected from any location in the frequency spectrum** of an audio sample frame . . . .

'889 patent, 16:30-35 (emphasis added). Likewise, in another embodiment, the specification specifically refers to this selection process as "identify[ing]" the frequency components, as performed by a "frequency identifier":

> The frequency identifier 908 may be configured to **identify one or more frequency pairs from frequency spectrum data** . . . [T]he frequency identifier 908 **identifies frequency pairs from the frequency spectrum data** in response to a new sample segment notification. The frequency identifier 908 may then be configured to **communicate indexes identifying the frequency components of the frequency pairs** to the spectral power value identifier 910.

*Id.*, 22:38-55. The "spectral power value identifier" then identifies the spectral power of each frequency component from the FFT data. *Id.*, 22:56-65.

The specification makes clear that the system works by identifying, and then comparing, the *same* frequency components for both the monitored signal and for the reference signal. *Id.*, 16:37-41, 8:9-17. This process results in a signature that permits identification of the monitored signal by comparing its signature to that of the reference signal, which will match. *Id.*, 8:9-17.

Likewise, the components are selected for comparison to the exclusion of the other components; the system does not select ***all*** components for comparison (as Nielsen's proposal would permit). *Id.*, 16:30-37, 22:38-55. A construction that permitted the identification or selection of *all* components in the frequency spectrum would essentially read the limitation out

of the claim, because the identification would mean nothing. In other words, the claim uses "identify" in a way that is similar to a witness to a crime identifying a suspect from a lineup: the witness identifies the suspect by selecting him or her to the exclusion of other suspects in the lineup, and the claimed system identifies frequency components by selecting them to the exclusion of the other frequency components in the spectrum. If the witness were instead to simply select *all* of the suspects, that would not be an identification of any particular suspect. Likewise, simply selecting *all* frequency components does not "identify" any of them. The system must select at least two frequency components to the exclusion of other components.

In the context of Nielsen's prism analogy, a light source might have red, blue, green, yellow, orange, and red components, with varying intensities. (Op. at 5.) Applying the '889 patent's method to match one beam of light to another, the computer would first identify two of the components (*i.e.*, select them to the exclusion of the other colors): for example, "red" and "green." It would then analyze the reference sample, comparing the intensity of the red light to that of the green, resulting in a 1-bit descriptor of "1" if red is higher-intensity, and "0" if green is higher-intensity. The computer might then identify and compare other specific color relationships to build a signature. It would perform the same operation, comparing the same components, on the monitored sample. If the reference and monitored samples have the same relationships between the same components, it would register a match.

Thus, the "identification" is not performed by the prism—or the FFT. It is a function performed by the system when it chooses some components, to the exclusion of others, to create a descriptor and ultimately a signature.

###### ii.  TVision's Construction Does Not "Convert the Claims . . . from Open to Closed"

TVision proposes to construe "identify[ing]" as selecting at least two frequency components to the exclusion of others because that is the plain meaning of "identify" in the context of the claims, and because selecting *all* frequency components would not "identify" any of them. Nielsen accuses TVision of somehow converting the claim to a "closed" claim, (Op. at 25), but that is incorrect. TVision's construction recognizes that the claims require identifying "at least" two frequency components, meaning two *or more*. Thus, the claim remains an open claim, and TVision's construction permits the identification of any number of frequency components—as long as each component is "identified," *i.e.*, selected to the exclusion of others. That is the plain meaning of the word "identify" as used in the context of the specification and the claims, as set forth above. An interpretation of "identify" that is nothing more than selecting "all frequency components" would not constitute an identification at all.

###### iii.  The Prosecution History Confirms that "Identifying" Means Something More Than Performing a Spectral Transform Operation

If there were any doubt about what the patentee meant by "identify[ing]," it is resolved by the prosecution history. During prosecution, the patent office rejected the claims of the '889 patent as obvious over U.S. Pat. No. 6,061,793 to Tewfik et al. (the "'793 patent"). Ex. C at 56[12] (December 30, 2008 Office Action). The '793 patent disclosed a method that involved, in the examiner's words, "computing [a] plurality of spectral/ spread-spectrum, frequency subbands for FFT, or DCT transformation." *Id.* The applicant pushed back, acknowledging that the '793 patent disclosed a conversion to the frequency domain, but arguing that working in the frequency

---

[12] Citations to Exhibit C refer to the CM/ECF page numbers of D.I. 82-1.

domain **was not enough**, because the '793 patent did not then identify components of that FFT for comparison:

> [A]lthough Tewfik et al. [the '793 patent] **describe working in the frequency domain**, Tewfik et al. **do not teach or suggest identifying any particular frequency components having respective spectral powers**, much less determining a first descriptor of a first frame of media samples based on a comparison of the first spectral power and the second spectral power.

Ex. C at 72 (Response to Dec. 30, 2008 Office Action) (emphasis added). The patentee further rejected the idea that computing an FFT is sufficient to identify frequency components:

> Other than stating generally "**computing plurality of spectral/ spread-spectrum, frequency subbands for FFT, or DCT transformation**," the official action is **devoid of any specific and particular evidence, reasoning, or guidance to support the position that Tewfik et al. teach or suggest identifying a first frequency component** having a first spectral power and a second frequency component having a second spectral power and determining a first descriptor of a first frame of media samples based on a comparison of the first spectral power and the second spectral power as recited in claim 1.

*Id.* (emphasis added). According to the applicant, merely "describe[ing] processes performed in the frequency domain" is not enough. *Id.* at 73.

Thus, during prosecution, the patentee clearly and unmistakably disclaimed the idea that merely "working in the frequency domain" involved "identifying particular frequency components having respective spectral powers" sufficient to satisfy the claims. *See Traxcell Techs., LLC v. Nokia Sols. & Networks Oy*, 15 F.4th 1136, 1141 (Fed. Cir. 2021) ("prosecution disclaimer . . . preclud[es] patentees from recapturing through claim interpretation specific meanings disclaimed during prosecution," when "a patentee 'has unequivocally disavowed a certain meaning to obtain [a] patent' in a way that is 'clear and unmistakable.'") (citations omitted). The Court should not permit Nielsen to recapture that claim scope by reading "identify[ing]" out of the claim.

Even if the applicant's statements did not rise to the level of unmistakable disavowal, they inform the construction of "identify[ing]" and show that it must have some meaning beyond merely performing an FFT or other spectral transformation that results in frequency components. *See Shire Dev., LLC v. Watson Pharm., Inc.*, 787 F.3d 1359, 1366 (Fed. Cir. 2015) ("Although the prosecution history statements do not rise to the level of unmistakable disavowal, they do inform the claim construction."). The applicant did not dispute that the '793 patent discloses "working in the frequency domain" via an FFT, and made clear that working in the frequency domain was not enough, by itself, to show the identification of frequency components. Thus, the applicant plainly did not intend a meaning of "identify" that would be satisfied merely by performing a spectral transformation operation.

### iv. Nielsen's Construction Reads Out "Identify[ing]" from the Claim Language

Finally, the parties agree that frequency components are "generated" by transforming signal data from the time domain to the frequency domain—a spectral transform operation. The portion of the specification that Nielsen relies on for its construction of "frequency component" makes that clear:

> Frequency components of an audio signal are typically **generated by transforming the audio signal data (e.g., an audio stream) from the time domain to the frequency domain using, for example, a Fourier Transform**. The Fourier Transform can be used to analyze the frequency components in an audio stream and identify the spectral power of each frequency component.

'889 patent, 3:6-13. A Fourier Transform and an FFT are spectral transform operations. *Id.*, 2:65-3:13.

Nielsen's construction for "identify[ing] . . ." simply restates the parties' agreed meaning of "frequency component": that the first and second frequency component are "generated" by performing a spectral transform operation. Nielsen's construction would be the same regardless

30

of whether the claim language included the word "identifying," because the frequency components must already be "generated" by a spectral transform operation. Thus, Nielsen improperly reads "identify[ing]" out of the claim language. *See Bicon, Inc. v. Straumann Co.*, 441 F.3d 945, 950-51 (Fed. Cir. 2006) (holding that "claims are interpreted with an eye toward giving effect to all terms in the claim," and that "read[ing] limitations . . . out of the claim" would be "contrary to the principle that claim language should not treated as meaningless"); *S.I.SV.EL. Societa Italiana Per Lo Sviluppo Dell'elettronica S.P.A. v. Rhapsody Int'l, Inc.,* C.A. No. 18-69-CJB, 2020 U.S. Dist. LEXIS 142557, at *17-18 (D. Del. Aug. 10, 2020) (declining to adopt a construction that would "render [a] portion of the claim a nullity," because that result is "disfavored") (citation omitted).

Nielsen's effort to read "identify[ing]" out of the claim runs contrary to Federal Circuit precedent, the claim language, the patent specification, and the patentee's statements during prosecution. TVision respectfully requests that the Court reject it.

### 3.    Plaintiff's Reply Position

Nielsen proposes construing the "identifying" term consistent with the words of the claim, which are "identifying … by performing a spectral transform operation…." This is the plain and ordinary meaning of the term to one of ordinary skill in the art. (Moulin Decl., ¶ 60.) In contrast, TVision improperly seeks to add limitations that are not present in the claim language. *See Hoganas AB v. Dresser Indus., Inc.*, 9 F.3d 948, 950 (Fed. Cir. 1993) ("It is improper for a court to add 'extraneous' limitations to a claim, that is, limitations added 'wholly apart from any need to interpret what the patentee meant by particular words or phrases in the claim.'") (quoting *E.I. du Pont de Nemours & Co. v. Phillips Petroleum Co.*, 849 F.2d 1430, 1433 (Fed. Cir. 1988)).

### i. The Claim Language and Specification Do Not Support "Selecting to the Exclusion of Others"

TVision's construction equates "identifying" with "selecting to the exclusion of others." (TVision Ans. Br. 25–27.) But there is no evidence to support such a construction. In supposed support of its position, TVision improperly cites portions of the specification relevant to the "determining a first descriptor" and "determining a second descriptor" steps, not the "identifying" step at issue here.[13] Specifically, TVision cites most of column 16, but that column describes a process for "generating descriptors" (16:19–20), not identifying or generating frequency components. (*See* '889 Patent, 16:2–5 ("An example method for generating descriptors based on frequency components is described in greater detail below in connection with FIG. 5."); 16:19–20 ("FIG. 5 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 4.").) Indeed, Column 16 describes using underlined previously-generated "frequency components $f_{00}$ and $f_{10}$,." (*See e.g.*, *id.,* 16:22–27; 16:2–5; 22:31–37; 22:66–23:6; Fig. 9 (showing different blocks 906 and 914 performing the FFT (*i.e.,* generating frequency components) and creating the descriptors).)

Moreover, TVision's argument that the "identifying" step must "select" some but not all frequency components (TVision Ans. Br. at 25) ignores the claim language. The claim says: "identifying … by performing a spectral transform operation…," meaning that the "identifying" is done by "performing a spectral transform operation." Nothing in the claim requires that "performing

---

[13] TVision's argument that the system must compare "the *same* frequency components for both the monitored signal and for the reference signal" (TVision Ans. Br. at 26 (emphasis in original)) is irrelevant to claim construction. "In the system described in the specification, no matter how many frequency components are identified or generated, a monitored signal's signature can still be generated that can be compared to a reference signature." (Moulin Decl., ¶ 58.)

a spectral transform operation" must result in any less than all the "frequency components" (although it permits identifying fewer than all the frequency components).[14]

Thus, because there is no support for TVision's proposed additional limitation "selecting at least two frequency components to the exclusion of others," the Court should reject TVision's proposed construction.

## ii.    TVision Misinterprets the Term "Identifying"

TVision proffers an unconvincing argument based on a misinterpretation of the word "identifying." In particular, TVision asserts that the "plain meaning" of "identifying" requires the Court to adopt TVision's "selecting frequency components to the exclusion of others" construction, arguing that "[a]n interpretation of 'identify' that is nothing more than selecting 'all frequency components' would not constitute an identification at all." (TVision Ans. Br. at 28.) This argument, however, ignores the ordinary meaning of "identifying." Analogously, if one arrives at a party and knows every guest there, one will be able to "identify[]" all the guests. Nothing inherent in the term "identifying" requires identifying only a subset of the frequency components.

Moreover, the claim language and the specification confirm that "identifying" can include identification of all frequency components. Specifically, the claim language defines "identifying" as being done "by performing a spectral transform operation on the first frame of media samples"—a process that "results in all the frequency components corresponding to the spectral transform operation." (Moulin Decl., ¶ 59 (emphasis added).) The specification, too, confirms that "identifying" can identify all the components from a spectral transform: "The Fourier Transform can

---

[14] Accordingly, TVision's analogy to a criminal lineup is inconsistent with the claim language. (*See* TVision Ans. Br. 27.) Moreover, the analogy is flawed because if every lineup participant were involved in the crime, the witness would identify all the suspects.

be used to analyze the frequency components in an audio stream and <u>identify the spectral power of</u> <u>each frequency component</u>." ('889 Patent, 3:9–12 (emphasis added).)

### iii.   The Prosecution History Has No Effect on Construction

In an apparent admission that the claim language requires Nielsen's proposed construction, TVision argues that prosecution history disclaimer overrides the claim language. (TVision Ans. Br. at 28-30.) In particular, TVision incorrectly asserts that the applicant argued during prosecution that "identifying" frequency components requires more than performing a frequency domain transform (or "working in the frequency domain").

First, as a threshold matter, TVision cannot point to anything that is even close to a "clear and unmistakable" prosecution disclaimer, as it is required to do. *See Cupp Computing AS v. Trend Micro Inc.*, 53 F.4th 1376, 1382 (Fed. Cir. 2022) (quotation omitted).

Second, the applicant did not "argu[e] that working in the frequency domain was not enough" to satisfy the "identifying" limitation, as TVision claims. (TVision Ans. Br. at 28-29.) In supposed support of its position, TVision points to the applicant's prosecution history statement that "although Tewfik et al. describe working in the frequency domain, Tewfik et al. do not teach or suggest identifying any particular frequency components having respective spectral powers, much less determining a first descriptor of a first frame of media samples based on a comparison of the first spectral power and the second spectral power." (*Id.* (quoting Ex. C to JCC at 72[15] (emphases and alterations added by TVision omitted).) TVision's argument—that the applicant disclaimed any construction of "identifying" that does not consist of more than just performing a frequency domain transform—ignores both the phrase "having respective spectral powers" in the cited sentence and

---

[15] Following TVision's pattern, citations to Exhibit C refer to the CM/ECF page numbers of D.I. 82-1.

the entire portion of the sentence after that phrase. Reading the entire cited sentence, two things are clear: *first*, the applicant distinguished the Tewfik reference based on the fact that Tewfik never discusses spectral power; ***and second***, the applicant also distinguished the Tewfik reference based on the fact that it does not teach identifying two spectral powers that will be used in a comparison to produce a descriptor. The applicant did <u>not</u> argue only that the Tewfik reference fails to teach generating frequency components.

Moreover, <u>every</u> other assertion the applicant made about Tewfik makes crystal clear that the applicant distinguished the Tewfik reference based on (1) its failure to discuss spectral power at all; and (2) its failure to teach the comparison of spectral powers to produce a descriptor:

- "The Applicant respectfully submits that independent claim 1 is allowable over Tewfik….Independent claim 1 recites identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power and determining a first descriptor of a first frame of media samples based on a comparison of the first spectral power and the second spectral power. …Tewfik [does not] teach or suggest the claimed method." (Ex. C to JCC at 71.)

- "[T]he official action is devoid of any specific and particular evidence…that Tewfik et al. teach or suggest identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power and determining a first descriptor of a first frame of media samples based on a comparison of the first spectral power and the second spectral power as recited in claim 1." (Ex. C to JCC at 72.)

- "[P]erforming processes in the frequency domain [as Tewfik does] does not necessitate identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power and determining a first descriptor of a first frame of media samples based on a comparison of the first spectral power and the second spectral power as recited in claim 1." (Ex. C to JCC at 73.)

Thus, TVision cannot establish a "clear and unmistakable" disclaimer that requires the "identifying" term to consist of more than performing a frequency domain transform or "working in the frequency domain." Even if the prosecution history were amenable to multiple reasonable

interpretations (which it is not), there would be no disclaimer. *See Cupp Computing*, 53 F.4th at 1382.

### iv.      Nielsen's Proposed Construction Does Not Read Out "Identifying"

TVision incorrectly argues that Nielsen's construction reads the word "identifying" out of the claim. (TVision Ans. Br. at 30-31.) More specifically, TVision states that "Nielsen's construction would be the same regardless of whether the claim language included the word 'identifying,' because the frequency components must already be 'generated' by a spectral transform operation." (TVision Ans. Br. at 30-31.)

TVision's argument ignores the claim language, which provides detail about "identifying" by explaining that it is done "by performing a spectral transform operation." Thus, "identifying" and "performing" are direct counterparts, with the latter providing more detail about how to do the former. Nielsen's proposed construction tracks this claim language: "Generate first and second frequency components by performing a spectral transform operation on the first frame of media samples."[16] The fact that the claim uses the term "identifying" and then provides more detail about how to perform that "identifying" offers no reason to add TVision's proposed "selecting at least two frequency components to the exclusion of others" limitation to the claim.

### 4.      Defendant's Sur-Reply Position

Rather than reading the "identify[ing]" term out of the claim, the Court should construe it to have its plain and ordinary meaning in this context, *e.g.*, selecting a frequency component to the exclusion of others. The claim language, specification, and prosecution history make clear that simply working in the frequency domain, without more, is not enough.

---

[16] With regard to Nielsen's use of the word "generate" in its proposed construction, the parties agree that "performing" means "generating." (*See* TVision Ans. Br. at 30-31.)

i.      **The claim language shows that working in the frequency domain, without more, is not enough.**

The claims require "identify[ing]" frequency components, not "generating" them, and identifying in this context means to select to the exclusion of others. (Ans. at 25-27.) Nielsen offers no serious rebuttal to the argument that its construction reads "identify[ing]" out of the claim because it requires only what the remainder of the claim already requires—performing a spectral transform operation. (Rep. at 35-36.) Nielsen substitutes "generate" for "identify," but offers no intrinsic support for that change. And the parties agree that the construction of "frequency component" already requires that they are ***generated*** by a spectral transformation. As such, Nielsen's proposal only serves to read "identify[ing]" out of the claim. *See Wasica Fin. GmbH v. Cont'l Auto. Sys.*, 853 F.3d 1272, 1288 n.10 (Fed. Cir. 2017) ("It is highly disfavored to construe terms in a way that renders them void, meaningless, or superfluous.").

ii.     **The specification shows that "identify[ing]" means more than just working in the frequency domain.**

Nielsen fails to point to any portions of the specification that support its effort to render "identify[ing]" a nullity, and ***admits*** that the specification describes identifying frequency pairs by "using <u>previously-generated</u> 'frequency components'"—*i.e.*, by performing a spectral transform operation, exactly as the claims describe. (Rep. at 32.) But the specification makes clear that "identify[ing]" has a meaning beyond the initial generation of the frequency components.

The specification says that the "frequency identifier 908" can "***identify*** one or more frequency pairs ***from frequency spectrum data***" and pass along "indexes ***identifying the frequency components of the frequency pairs***." '889 patent, 22:38-55 (emphasis added); (Ans. at 25-26.) This identification occurs *separately* from "perform[ing] a sliding FFT"—*i.e.*, *separately* from generating the frequency components. '889 patent, 22:31-55 (sliding FFT module, not the frequency identifier, performs the FFT). Nielsen argues that this language relates

37

to "determining" descriptors. (Rep. at 31-32.) But the step of determining a descriptor is performed *later*, by the "comparator 912" and the "descriptor generator 914," which "generate M-bit descriptors" for the *previously-identified* frequency components. '889 patent, 22:56-23:6.

Moreover, Nielsen fails to offer **any** specification support for its construction. Nielsen's **only** specification citation is to text from column 3 (Rep. at 33), which says that an FFT can "analyze" the frequency components—**not** identify them—and can "identify" the spectral powers, **not** the frequency components. Nothing in the specification uses the term "identification" in connection with performing an FFT generally, as Nielsen argues. Meanwhile, **every embodiment in the specification** involves performing an FFT to generate a frequency spectrum, and **then** identifying individual frequency components. *See, e.g.*, '889 patent, 16:30-35, 22:38-55. **None** of the embodiments in the specification operate as Nielsen suggests, without identifying (or selecting) any particular frequency components. In fact, the language TVision cites ('889 patent, 22:38-55) is the **only time** the specification uses "identify[ing]" in relation to frequency components, and Nielsen offers no basis to depart from the specification's own description of what it means to identify frequency components, and to nullify this requirement.

Likewise, contrary to Nielsen's arguments, the specification's discussion of identifying frequency components mirrors that of the claims. The claim language requires "identifying a first frequency component . . . and a second frequency component" which are then "compar[ed]" to "determin[e] a . . . descriptor." '889 patent, claims 1, 8, 14. Columns 16 and 22 both discuss an identical process: identifying pairs of frequency components (through selecting them, to the exclusion of others, from a frequency spectrum that was generated by a spectral transform operation) and then comparing them to determine a descriptor. (Ans. at 25-27.) Thus, the specification describes an identification step that extends beyond simply working in the

frequency domain via a spectral transform operation.

Finally, instead of citing the specification, Nielsen relies on a conclusory statement from its expert that one of skill in the art would understand Nielsen's proposed construction to be the same as the plain and ordinary meaning. (Rep. at 31; Ex. I at ¶ 60.) But conclusory expert statements bear no weight in the claim construction analysis. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1318 (Fed. Cir. 2005) ("[C]onclusory, unsupported assertions by experts as to the definition of a claim term are not useful to a court."). And, regardless, TVision's expert, Dr. Anderson, disagrees. (Anderson Ans. Decl., ¶ 28.)

### iii.    "All components" is not an identification.

TVision's proposal recognizes that, in the context of the claims, "identify[ing]" means to select each component to the exclusion of others. (Ans. at 27.) The claim does not cover a system that does not *identify* a first and second component, and instead (for example) performs mathematical operations across the entire frequency spectrum. Nielsen argues that "if one arrives at a party and knows every guest there, one will be able to 'identify[]' all the guests." (Rep. at 33.) But if the task is to identify a first guest and a second guest to compare their heights, replying "all the guests" is nonsensical. Instead, you would *select* guests to the exclusion of others—e.g., "Jim and John," or "Mary and Jim"—and then compare them. (Ans. at 27.)

### iv.    The prosecution history supports TVision's construction.

Finally, Nielsen argues that the Court should disregard the prosecution history (1) because the patentee also distinguished Tewfik on other grounds, which is irrelevant under the law; and (2) because the patentee used the phrase "having respective spectral powers," even though *all* FFTs of a sound generate frequency components having spectral powers. On the first point, it is irrelevant that the applicant distinguished Tewfik in "other" ways and did not "argue *only*" that Tewfik lacked "identify[ing]." (Rep. at 34 (emphasis modified)); *Infinity Comput.*

*Prods. v. Oki Data Ams., Inc.*, 987 F.3d 1053, 1062 (Fed. Cir. 2021) ("it is immaterial that [the patent owner] also distinguished [the reference] on another ground"). On the second point, Nielsen does not dispute that Tewfik discloses working in the frequency domain, *i.e.*, performing an FFT to generate frequency components. (Anderson Ans. Decl., ¶ 24.) A person of skill in the art understands that every FFT of an audible sound results in frequency components that *have* a spectral power value, even if those powers are not identified (much like every person has a height, even if it has not been measured). (*Id.* at ¶ 25.) A person of skill also understands that Tewfik discloses an FFT of an audible sound, resulting in frequency components having spectral powers. (*Id.* at ¶ 25) The patentee did not argue that Tewfik did not disclose identifying the *spectral power*; it argued that Tewfik did not disclose identifying the *frequency component* that has a spectral power, despite the fact that it performs an FFT. (Ex. C at 72-73.)

### C.   **"first data analyzer" / "second data analyzer" ('189 Patent, claim 9)**

| Nielsen's Proposed Construction | TVision's Proposed Construction |
|---|---|
| Not a means plus function term.<br><br>Hardware, software, firmware, and/or any combination thereof that executes an analysis tasked with recognizing and/or detecting one or more aspects of image data representative of an environment and/or occupants of the environment.<br><br>This expressly includes a tangible computer readable storage medium such as a storage device or storage disc storing software and/or firmware executing this operation. | Indefinite.  Means plus function term with no corresponding structure.<br><br>Function: "to execute a first/second recognition analysis on three-dimensional/two-dimensional data representative of a first/second object within/outside a threshold distance from a three-dimensional sensor, where such recognition analysis is able to detect a first/second person" |

### 1.   **Plaintiff's Opening Position**

#### i.   **Nielsen's proposed construction is taken directly from the specification**

Nielsen's proposed construction of the "data analyzer" terms is appropriately taken directly

from the specification.  *See Digital Ally*, 810 F. App'x at 876 (quoting *Vitronics*, 90 F.3d at 1582);

*Purdue Pharma L.P. v. AL Vogen Pine Brook, LLC*, Case No. 15-687-GMS, 2017 WL 1943957, at

*2 n.6 (D. Del. May 10, 2017).   That construction provides clear meaning for the terms, and

accordingly, the terms are ***not***, (as TVision asserts) indefinite.  *See, e.g.*, *Summit 6 LLC v. HTC Corp.*,

Case No. 7:14-cv-00014-O, 2015 WL 11117868, at *22 (N.D. Tex. Mar. 21, 2015) ("[T]he fact that

a given term has a clear meaning … means that the term is not indefinite."); *DataTreasury Corp. v.

Ingenico S.A.*, Case No. 5:02CV95, 2006 WL 6222493, at *29  (E.D. Tex. Apr. 14, 2006) (holding

that a claim term was not indefinite "in view of the clear meaning from the specifications").

The following table shows Nielsen's proposed construction compared to the language of the

specification (with matching language in bold):

| Nielsen's Proposed Construction | '189 Patent Specification |
| --- | --- |
| **Hardware, software, firmware**, and/or **any combination** thereof | '189 Patent, 10:11-19, 17:66-18:11 ("[T]he . . . analyzer . . . may be implemented by **hardware**, **software**, **firmware** and/or **any combination** of **hardware**, **software** and/or **firmware**.") |
| that **execute**s an **analysis** | '189 Patent, Claim 9 ("[D]ata analyzer to **execute** … [an] **analysis**") |
| **tasked with recognizing and/or detecting one or more aspects of image data representative of an environment and/or occupants of the environment** | '189 Patent, 2:10-13 ("As used herein, recognition systems include one or more devices, one or more applications, one or more algorithms, etc. **tasked with recognizing and/or detecting one or more aspects of image data representative of an environment and/or occupants of the environment**.") |
| This **expressly includes a tangible computer readable storage medium such as a storage device or storage disc storing software and/or firmware** executing this operation. | '189 Patent, 18:36-39 ("[A]nalyzer 208 of Fig. 3 [is] hereby **expressly** defined to **include a tangible computer readable storage medium such as a storage device or storage disc storing the software and/or** |

| Nielsen's Proposed Construction | '189 Patent Specification |
|---|---|
| | **firmware**.") |

Each of the above-listed quotations from the specification directly applies to the definition of "data analyzer."  This is clearly demonstrated in the first, second, and fourth rows of the table by the explicit use of the word "analyzer" (underlined in those rows).  As for the third row of the table, it does not explicitly say "analyzer."  Instead, it says "recognition systems."  But the language of Claim 9 makes clear that "recognition" is what is accomplished by the "data analyzer," and thus, the specification's reference to "recognition systems" applies to the "data analyzer."  (*See* '189 Patent, Claim 9 ("data analyzer to execute a … recognition analysis.").)

### ii.     TVision's proposal is wrong

TVision offers no construction for either "data analyzer" term.  Instead, TVision argues that the "data analyzer" terms should be construed as means plus function elements under § 112 ¶ 6.  TVision is wrong; the "data analyzer" terms are not means-plus-function limitations.

*First*, the Court should "presume[e] that Section 112, paragraph 6 does *not* apply, because the term 'means' is not found in the claim[] at issue." *Techno View IP, Inc. v. Facebook Techs., LLC*, Case No. 17-386-CFC-CJB, 2018 WL 6427874, at *7 (D. Del. Dec. 7, 2018) (emphasis in original) (citing *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347-49 (Fed. Cir. 2015) (en banc)); *see also Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022) ("[W]e presume that a claim limitation is not drafted in means-plus-function format in the absence of the term 'means.'").

*Second*, the "data analyzer" terms are not means-plus-function limitations because, as explained above, the properly construed terms recite definite structure.  *See Triplay, Inc. v. Whatsapp, Inc.*, Case No. 13-1703-LPS-CJB, 2016 WL 3574012, at *8-9 (D. Del. June 30, 2016)

("[T]he term 'access block,' as construed, connotes sufficient structure to … avoid application of Section 112, paragraph 6….").  More specifically, the language of the asserted claim makes clear how the "data analyzers" interact with, and are associated with the definite structure for, the other elements of the claim.[17]  *See M2M Sols. LLC v. Sierra Wireless Am., Inc.*, Case No. 12-30-RGA, 2015 WL 5826816, at *4-5 (D. Del. Oct. 2, 2015) (finding the claim term "authenticating" had sufficient structure to avoid means-plus-function treatment because the "surrounding claim language in the 'processing module' limitation expressly explains how th[e] authenticating function is to be performed.").

In particular, as explained above, the asserted claim recites that the "data analyzers" are associated with the structures that "execute a … recognition analysis."  ('189 Patent, Claim 9.)  And the claim also makes clear that the "recognition analysis" is what is obtained from "three-dimensional data representative of a first object within a threshold distance from a three-dimensional sensor" or from "two-dimensional data representative of a second object outside the threshold distance from the three-dimensional sensor."  (*Id.*)  Thus, the "data analyzers" have sufficient

---

[17]     Claim 9 of the '189 Patent recites as follows:

> 9. An audience measurement device, comprising:
>
> > a **first data analyzer** to execute a first recognition analysis on three-dimensional data representative of a first object within a threshold distance from a three-dimensional sensor;
> >
> > a **second data analyzer** to execute a second recognition analysis on two-dimensional data representative of a second object outside the threshold distance from the three-dimensional sensor; and
> >
> > a counter to combine a first detection of a first person provided by the first data analyzer and a second detection of a second person provided by the second data analyzer to generate a people count for an environment,
> >
> > wherein at least one of the first data analyzer, the second data analyzer or the counter is implemented via a logic circuit.

(Emphasis added.)

structure and are not means-plus-function terms.  Indeed, they are inextricably linked to the three-dimensional sensor, the distance threshold, and both three-dimensional and two-dimensional data. ('189 Patent, claim 9.)

### 2.  Defendant's Answering Position

"Data analyzer" is a classic means-plus-function term under *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (*en banc*). There is simply no **structure** known as a "data analyzer" in the image sensing field (or any other field within electrical engineering). (Anderson Decl. ¶¶ 35-37.) Rather, "data analyzer" is merely a **functional** term to describe literally **anything** in an electronic device that analyzes data. Indeed, Nielsen's proposal concedes as much, defining a "data analyzer" to include "hardware, software, firmware, and/or any combination thereof…expressly includ[ing] a tangible computer readable storage medium." That imposes no structural limitation. This is a classic case of functional claiming that requires a means-plus-function construction. Moreover, because the specification discloses no algorithm for performing the stated "recognition analyses," the "data analyzer" terms are indefinite.

### i.  The "data analyzer" Terms Are Means-Plus-Function Terms

Both parties agree that *Williamson* lays out the legal standard for whether a claim term is a means-plus-function term (*i.e.*, whether the term is governed by pre-AIA 35 U.S.C. §112 paragraph 6). (Op. at 42-43.) (citing cases relying on *Williamson*). Under *Williamson*:

> The standard is whether the words of the claim are understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure. When a claim term lacks the word "means," the presumption can be overcome and § 112, para. 6 will apply if the challenger demonstrates that the claim term fails to "recite sufficiently definite structure" or else recites "function without reciting sufficient structure for performing that function."

792 F.3d at 1349 (internal quotations omitted).

For the '189 patent, a person of ordinary skill has a bachelor's degree in electrical engineering (or a related field) and about a year of work or research experience in optics, image processing, or image sensing. (Anderson Decl. ¶ 34.)

And as Dr. Anderson explains, those of ordinary skill would ***not*** understand the term "data analyzer" to recite the name of a structure. (*Id.*, ¶¶ 35-37.) They do not use the phrase in common parlance and it does not appear in technical dictionaries. (*Id.*) Indeed, given the specification's express statement that the data analyzer can be implemented in "hardware, software, firmware, and/or any combination thereof . . . expressly includ[ing] a tangible computer readable storage medium" ('189 patent, 10:11-42, 17:66-18:11, 18:36-39), a person of ordinary skill in the art would understand that term to mean any structure that performs the function of data analysis. (Anderson Decl. ¶ 36.) Literally ***any*** structure that analyzes data would suffice. *Id.*

This is not a close case. Here the patent owner and the patent itself expressly acknowledge that there is ***no*** structural limitation (*i.e.*, ***any*** structure is possible) for the "data analyzer" terms. *See, e.g.*, *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1367 (Fed. Cir. 2021) (finding that, by identifying "nearly 20 different structures" that could serve as the corresponding structure for the claim term, "Synchronoss illustrated that the claim term 'user identifier module' does what the definiteness requirement prohibits. It is not enough that a means-plus-function claim term correspond to every known way of achieving the claimed function...); *Nichia Corp. v. TCL Multimedia Tech. Holdings, Ltd.*, No. C.A. No. 16-681-RGA, 2017 WL 5719267, at *8 (D. Del. Nov. 28, 2017) (finding that because plaintiff's expert "essentially opines that any structure made to disperse light could be a 'dispersive member,' and, similarly, any structure made to reflect light could be a 'reflective member,'" these terms were

not "understood as names for sufficiently definitive structures" and therefore qualified as means-plus-function terms). As a result, any presumption flowing from the fact that the "data analyzer" terms do not expressly use the term "means" is rebutted by the evidence that those of skill in the art do not consider "data analyzer" to be the name of a structure. "Data analyzer" should therefore be treated as a means-plus-function term.

More broadly, "data analyzer" falls within a category of terms where a patentee has simply taken a function (*e.g.*, "analyzing data") and turned it into a noun form (*e.g.*, "data analyzer"), but where that noun form is not a known structure to those of skill in the art. *See, e.g.*, *Advanced Ground Info. Sys., Inc. v. Life360, Inc.*, 830 F.3d 1341, 1348 (Fed. Cir. 2016) (finding that "symbol generator" is "simply an abstraction that describes the function being performed (*i.e.*, the generation of symbols)"); *Finjan, Inc. v. Sonicwall*, Inc., No. 17-CV-04467-BLF, 2019 WL 1369938, at *18 (N.D. Cal. Mar. 26, 2019) ("'rules accessor' simply takes the function being performed and states it in terms of a device.").

And more specifically, cases regularly find the formulation "____ analyzer" to invoke only a function; it therefore qualifies as a means-plus-function term, despite the absence of the term "means" in the claim. *See WSOU Invs., LLC v. Xilinx, Inc.*, C.A. No. 20-1228-GBW-JLH, 2022 WL 16707078, at *3 (D. Del. Nov. 4, 2022) (Finding that "analyzer" is a means-plus-function term because "[t]he claim recites no structure . . . besides the generic term 'analyzer' to perform the [stated] function of 'to analyze the power spectrum in a spectral band around a spectral null and generate a control signal based on the analysis.'") (internal citations and related quotation marks omitted); *StrikeForce Techs. Inc. v. PhoneFactor Inc.*, C.A. No. 13-490-RGA, 2015 WL 5708577, at *1, *3 (D. Del. Sept. 29, 2015) (adopting finding that "biometric analyzer" is "purely functional and subject to mean-plus-function treatment"); *Vstream Techs., LLC v. PLR*

*Holdings, LLC*, No. 6:15-CV-974-JRG-JDL, 2016 WL 6211550, at *14 (E.D. Tex. Sept. 27, 2016) ("On its face, the term 'pipe analyzer' has no common meaning. . . . Thus, the 'pipe analyzer' term is properly construed as a means plus function term."), *report and recommendation adopted*, 2016 WL 6159624 (E.D. Tex. Oct. 24, 2016). "Data analyzer," likewise qualifies for means-plus-function treatment.

None of Nielsen's arguments justify a different approach. *First*, Nielsen did not even address whether a person of ordinary skill in the art would understand "data analyzer" to name a structure. *Second*, as described above, Nielsen's observation that the specification provides that the data analyzers "may be implemented by hardware, software, firmware, and/or any combination" thereof ('189 Patent, 10:11-19, 17:66-18:11) effectively concedes that ***no*** structure is specified. It is worth noting that the statement Nielsen relies on from the specification is not a definition of what a data analyzer is, but merely a general description of how it (and practically any other component) can be implemented. *Third*, the cases Nielsen cites are clearly distinguishable. In *Triplay, Inc. v. Whatsapp, Inc.*, C.A. No. 13-1703-LPS-CJB, 2016 WL 3574012, at *8-9 (D. Del. June 30, 2016), the term "access block" was construed to mean a "computer" that "contains a user's gateway and a traffic manager." That is very different from the "data analyzers" claimed here that can literally have ***any*** structure and need only perform a "recognition analysis." Similarly distinguishable is the claim term "processing module" from *M2M Sols. LLC v. Sierra Wireless Am., Inc.*, C.A. No. 12-30-RGA, 2015 WL 5826816, at *4-5 (D. Del. Oct. 2, 2015), which is followed by a long paragraph of text, specifying the structure of the transmission to be authenticated and the precise basis for authentication (*i.e.*, "if the at least one transmission contains the coded number"). No such specificity exists here.

Accordingly, the "data analyzer" terms qualify for means-plus-function treatment.

### ii.      The "data analyzer" Terms Are Indefinite Because the Specification Supplies No Algorithm for the Stated Function

Once it is determined that a term qualifies for means-plus-function treatment, we next look to what structure or algorithm is disclosed in the specification. As *Williamson* explains:

> Construing a means-plus-function claim term is a two-step process. The court must first identify the claimed function. Then, the court must determine what structure, if any, disclosed in the specification corresponds to the claimed function. Where there are multiple claimed functions, as we have here, the patentee must disclose adequate corresponding structure to perform all of the claimed functions. If the patentee fails to disclose adequate corresponding structure, the claim is indefinite.

*Williamson*, 792 F.3d at 1351-52. Moreover, "[f]or a computer-implemented means-plus-function term, the corresponding structure is typically the algorithm disclosed in the specification for performing the claimed function." *Grecia v. Samsung Elecs. Am., Inc.*, 780 F. App'x 912, 916 (Fed. Cir. 2019) (citing *Williamson*, 792 F.3d at 1352 and *Aristocrat Techs. Austl. Pty Ltd. v. Int'l Game Tech.*, 521 F.3d 1328, 1333 (Fed. Cir. 2008)).

Here, the claim language clearly lays out the associated function for the first and second data analyzers. The function of the first data analyzer is: "to execute a first recognition analysis on three-dimensional data representative of a first object within a threshold distance from a three-dimensional sensor." '189 patent at Claim 9. And the function of the second data analyzer is: "to execute a second recognition analysis on two-dimensional data representative of a second object outside the threshold distance from the three-dimensional sensor." *Id.*

Importantly, Claim 9 subsequently clarifies that the data analyzers must be able to detect a person. Specifically, Claim 9 states: "a counter to combine *a first detection of a first person* provided by the first data analyzer and *a second detection of a second person* provided by the second data analyzer to generate a people count for an environment" (emphasis added). Accordingly, the data analyzers' stated functions—*i.e.*, executing recognition analyses—*must be adequate to detect a person*. (*See also* Anderson Decl. ¶ 39.)

But no such supporting structure or algorithm is disclosed in the specification. As explained in his declaration, Dr. Anderson so concluded after reviewing the relevant portions of the specification. (Anderson Decl. ¶¶ 40-44.) While Figure 3 does show high-level modules of 3D Data Analyzer 300 (the claimed "first data analyzer") and 2D Data Analyzer 302 (the claimed "second data analyzer"), these high-level modules (*e.g.*, depth filter, body recognizer, skeletal frame generator, face recognizer, gesture recognizer, and crossover detector, analysis trigger, and analysis limiter), are insufficient to glean an algorithm for a 3D "recognition analysis" or 2D "recognition analysis" that can detect a person. (Anderson Decl. ¶¶ 41.) Likewise, while the text corresponding to Figure 3's 3D Data Analyzer 300 and 2D Data Analyzer 302 repeatedly reference "3D recognition analyses" and "2D recognition analyses," the recognition analyses themselves are not disclosed, and certainly not at a level that is adequate to detect a person. (*Id.* at ¶¶ 42-43.) The same analysis applies for Figures 5 and 6 and their corresponding text. (*Id.* at ¶¶ 44.)

Accordingly, because there is no disclosed algorithm for performing the stated function—*i.e.*, performing "recognition analyses"—the "data analyzer" terms are indefinite.

### 3.     Plaintiff's Reply Position

#### i.     The "data analyzer" terms do not use the word "means"

As explained in Nielsen's opening brief, the "data analyzer" terms do not use the word "means." The Court should therefore presume that these terms are not in means plus function form and that Section 112, ¶ 6 does not apply. *Techno View IP, Inc. v. Facebook Techs.*, LLC, Case No. 17-386-CFC-CJB, 2018 WL 6427874, at *7 (D. Del. Dec. 7, 2018) (citing *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1347–49 (Fed. Cir. 2015) (en banc)); *see also Dyfan, LLC v. Target Corp.*, 28 F.4th 1360, 1365 (Fed. Cir. 2022) ("[W]e presume that a claim limitation is not drafted in means-plus-function format in the absence of the term 'means.'"). TVision provides no evidence to

overcome this presumption, as it is required to do. *See M2M Sols. LLC v. Sierra Wireless Am., Inc.*, Case No. 12-30-RGA, 2016 WL 1298961, at *5 (D. Del. Mar. 31, 2016) (the presumption "remains a presumption that Defendants must affirmatively overcome."). Instead, TVision relies only on the conclusory statements of its expert.

### ii.      TVision uses the wrong standard

In attempting to overcome the presumption against means-plus-function treatment, TVision uses the wrong standard. ***First***, TVision asserts that "those of ordinary skill would ***not*** understand the term 'data analyzer' to recite the name of a structure," but that is not the correct standard in assessing whether a term is a means-plus-function term. (TVision Ans. Br. at 45 (emphasis in original) (citations omitted).) To the contrary, the Federal Circuit has "not required the claim term to denote a specific [named] structure. Instead, [it has] held that it is sufficient if the claim term is used in common parlance or by persons of skill in the pertinent art to designate structure, <u>even if the term covers a broad class of structures and even if the term identifies the structures by their function</u>." *Lighting World, Inc. v. Birchwood Lighting, Inc.*, 382 F.3d 1354, 1359–60 (Fed. Cir. 2004), *overruled on other grounds by Williamson*, 792 F.3d at 1348–49 (emphasis added).[18] *See also Dyfan*, 28 F.4th at 1366 ("may instead 'describe a class of structures' and still recite 'sufficiently definite structure' to not invoke § 112 ¶ 6") (quoting *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1300 (Fed. Cir. 2014), *overruled on other grounds by Williamson*, 792 F.3d at 1348–49); *TQ Delta, LLC v. 2Wire, Inc.*, Case No. 1:13-cv-01835 et al., 2018 WL 4062617, *10 (D. Del. Aug. 24, 2018) ("a

---

[18] Although *Lighting World* was overruled on other grounds in *Williamson*, courts have continued to cite it, and other post-*Williamson* case law, for the reasons it is cited herein. *See e.g.*, *TriPlay, Inc. v. WhatsAPP, Inc.*, Case No. 13-1703-LPS-CJB, 2016 WL 3574012, *5 n.7 (D. Del. Jun. 30, 2016) ("Although *Williamson* altered the strength of the presumption, the Court agrees with TriPlay that it should still utilize *pre-Williamson* Federal Circuit caselaw in analyzing whether disputed terms convey sufficiently definite structure to a skilled artisan.").

person of ordinary skill in the art would understand this term as having sufficiently definite meaning as the name for structure, even if that structure covers a broad class of hardware or software that is used to perform the computation.") (citing *Lighting World*, 382 F.3d at 1359–60).

**And second**, TVision asserts the wrong standard in arguing that the <u>breadth</u> of the "data analyzer" terms somehow overcomes the presumption against construing them in means plus function form. (TVision Ans. Br. at 45.) *See Apple*, 757 F.3d at 1300 (Fed. Cir. 2014) ("even if the patent describes all structures that perform the recited function, this, by itself, does not overcome the…presumption that means-plus-function claiming does not apply when the term 'means' is not recited in the claim."); *Dyfan*, 28 F.4th at 1366 ("Claim terms 'need not connote a single, specific structure,' and may instead 'describe a class of structures' and still recite 'sufficiently definite structure' to not invoke § 112 ¶ 6.") (quoting *Apple*, 757 F.3d at 1300); *Lighting World*, 382 F.3d at 1361 ("While the terms 'connector' and 'connector assembly' are certainly broad, and may in the end include any structure that performs the role of connecting, the same could be said of numerous other terms, such as 'clamp,' or 'clip,' or even 'support member,' another term that is used in the '460 patent. Those terms are routinely treated as structural by patent practitioners and courts, and we conclude that there is no reason to treat the term 'connector assembly' any differently for purposes of section 112 ¶ 6.").

### iii.   Under the correct standard, the "data analyzer" terms are not means-plus-function terms

Contrary to TVision's incorrect standard, the correct questions to be decided are (1) whether the terms are used in common parlance or by persons of skill in the pertinent art to designate structure; and (2) whether the terms have structure in the context of the specification and the claim. *See, e.g., TQ Delta*, 2018 WL 4062617 at *10; *Apple*, 757 F.3d at 1299 ("Structure may also be provided by describing the claim limitation's operation, such as its input, output, or connections.").

Turning to the first question to be decided, the term "data analyzer" is used in "common parlance" and quite commonly describes particular structures. In fact, those of skill in the art use the term data analyzer to identify a wide variety of structures and software programs available from multiple companies. (Moulin Decl., ¶ 62–64.)

TVision argues that because the term "data analyzer" can indicate a number of different structures (*i.e.,* because the term is in fact used commonly for a number of different things), it effectively has no structure at all. (TVision Ans. Br. at 45.) For example, TVision's expert, Dr. Anderson, describes a search he purports to have performed for how one of skill in the art would understand "data analyzer" using "IEEE Xplore," which he describes as "contain[ing] academic articles and various technical dictionaries for electrical engineering." (Anderson Decl., ¶ 37.) He does not provide his results; instead, he merely says that they were "consistent" with his opinion and that they indicate that "data analyzer" could describe a number of structures. (*Id.*) But the fact that one of skill in the art would use a term to describe many different structures does not make it purely functional or merit means-plus-function treatment. *See Apple*, 757 F.3d at 1300; *Lighting World*, 382 F.3d at 1359–61. Indeed, re-running Dr. Anderson's search resulted in numerous articles describing software, hardware, and firmware structures for a "data analyzer." (Moulin Decl., ¶ 63; *see also id.*, ¶ 62 (Google search of term "data analyzer" returning products identified as "data analyzers."))

Turning to the second question to be decided by the Court, the "data analyzer" terms have sufficient structure in the context of the asserted claim to preclude means-plus-function treatment. TVision fails to look at "data analyzer" in context in the claim, instead incorrectly looking at the term in isolation. (*See* TVision Ans. Br. at 45–47; *Dyfan*, 28 F.4th at 1366 ("structure can be recited in various ways, including through the use of 'a claim term with a structural definition that is either provided in the specification or generally known in the art,' or a description of the claim limitation's

52

operation and 'how the function is achieved in the context of the invention.'") (quoting *Apple*, 757 F.3d at 1299).) But asserted Claim 9 describes the "first data analyzer" as accepting as input "three-dimensional data representative of a first object" and the "second data analyzer" as accepting as input "two-dimensional data representative of a second object." ('189 Patent, cl. 9.) The "data analyzers" then "execute a [first/second] recognition analysis" and send their output to the "counter," which acts on data "provided by the first data analyzer and…by the second data analyzer." (*Id.*) Thus, the "data analyzer" has sufficient structure as defined by "its input, output, or connections." *Apple*, 757 F.3d at 1299; *see also Inventio AG v. Thyssenkrupp Elevator Americas*, 649 F.3d 1350, 1358–59 (Fed. Cir. 2011), *overruled on other grounds by Williamson*, 792 F.3d at 1348–49.

Additionally, the "data analyzer" terms have sufficient structure in the context of the specification to preclude means-plus-function treatment. Specifically, the specification expressly identifies structure for the "data analyzers," including "one or more circuit(s), programmable processor(s), application specific integrated circuit(s) (ASIC(s)), programmable logic device(s) (PLD(s)) and/or field programmable logic device(s) (FPLD(s)), etc." ('189 Patent, 18:11–25.) This is more than sufficient. *See Inventio*, 649 F.3d at 1359–60 ("As the claim term implies, the written descriptions refer to the computing unit as a computer, where one of its functions is to store and execute a computer program product."); *see also id.* at 1358 ("[T]he written descriptions depict the modernizing device and its internal components, namely, the processor, signal generator, converter, memory, and signal receiver elements.").

### iv.     TVision cites inapposite cases

TVision's cited cases do not support means-plus-function treatment for the "data analyzer" terms. For instance, TVision cites *Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1367 (Fed. Cir. 2021). Unlike the present case, *Synchronoss* involved the sufficiency of a disclosed structure associated with a claim limitation that had already been determined to be in means-plus-

function form. *Id.* at 1367–68. The *Synchronoss* court did not, as TVision suggests, decide whether the disclosure of "20 different structures" meant the term was in means plus function form. *See id.* at 1367–69. And in *Nichia Corp. v. TCL Multimedia Tech. Holdings, Ltd.*, contrary to this case, patentee's expert "fail[ed] to show these terms are understood as the names for sufficiently definite structures." Case No. 16-681-RGA, 2017 WL 5719267, at *8 (D. Del. Nov. 28, 2017). As shown above, Nielsen (and its expert) have shown that "data analyzer" is a common term in the art for particular software and hardware products.

The cases TVision cites that concern the word "analyzer" are also inapposite. (TVision Ans. Br. at 46-47.) Each of those cases was decided based on its contextual claim language and specification, and the corresponding fact-specific issues in those cases, and not based on the simple fact that the claims used the word "analyzer." In fact, consistent with analyzing terms in the context of their claims and specification, other courts have found that "analyzer" terms are <u>not</u> in Section 112, ¶ 6 form. *See e.g.*, *Widevine Techs., Inc. v. Verimatrix, Inc.*, Case No. 2:07-CV-321, 2009 WL 3734106, at *17 (E.D. Tex. Nov. 4, 2009) (using claim context to construe "analyzer" to mean "software in the shim that analyzes monitors the properties or characteristics of a computing device").

### v.     Nielsen's proposed construction comports with the specification

In the face of all these reasons why "data analyzer" has sufficiently definite structure, TVision has failed to overcome the presumption that the "data analyzer" terms are not in means plus function form. As non-means plus function terms, they are construed with reference to the specification. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("[t]he best source for understanding a technical term is the specification from which it arose") (quoting *Multiform Desiccants, Inc. v. Medzam, Ltd.*, 133 F.3d 1473, 1478 (Fed. Cir. 1998)).

The specification provides examples of particular ways to implement the "data analyzer," which Nielsen has captured in its proposed construction. In particular, the specification defines "data analyzer" to include "[h]ardware, software, firmware, and/or any combination thereof that executes an analysis tasked with recognizing and/or detecting one or more aspects of image data representative of an environment and/or occupants of the environment," as Nielsen's proposed construction says. (*See* '189 Patent, 17:66–18:44.) Although TVision argues that "[l]iterally any structure that analyzes data would suffice" (TVision Ans. Br. at 45), breadth does not overcome a construction straight from the specification. *Thorner v. Sony Comput. Entm't Am. LLC*, 669 F.3d 1362, 1367 (Fed. Cir. 2012) ("The patentee is free to choose a broad term and expect to obtain the full scope of its plain and ordinary meaning…."); *see TQ Delta*, 2018 WL 4062617, *10 ("[A] person of ordinary skill in the art would understand this term as having sufficiently definite meaning as the name for structure, even if that structure covers a broad class of hardware or software that is used to perform the computation.").

Nielsen's proposed definition of the "data analyzer" terms is the same as the plain and ordinary meaning of the terms to one of ordinary skill in the art. (Moulin Decl., ¶ 64.)

### 4.   Defendant's Sur-Reply Position

On the "data analyzer" terms, Nielsen gets the law wrong. Relying primarily on pre-*Williamson v. Citrix* case law, Nielsen advances a view of the law that contradicts *Williamson*. Nielsen also seeks to ignore the three post-*Williamson* cases that find "analyzer" terms to warrant means-plus-functions treatment, citing instead to a single, highly inapposite pre-*Williamson* case. Nielsen's expert comes nowhere close to supporting the "up is down"-type argument that Nielsen advances. These terms warrant means-plus-function treatment, as TVision proposes.

### i.   Nielsen incorrectly argues for a legal standard that contradicts the binding precedent of *Williamson*.

On the legal standard, TVision agrees that a claim term would not necessarily qualify for means-plus-function treatment if it describes a "class of structures" (as opposed to a single structure). (Rep. at 50.) But Nielsen goes off the rails when it tries to extend pre-*Williamson* precedent ***even further*** to argue that "***even if the patent describes all structures*** that perform the recited function, this, by itself, does not overcome the . . . presumption[.]" Reply at 51 (quoting *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1300 (Fed. Cir. 2014) *overruled by Williamson*, 792 F.3d 1339 (Fed. Cir. 2015)) (emphasis added). No post-*Williamson* case has embraced that proposition, which directly contradicts *Williamson*. The purpose of 35 U.S.C. § 112 ¶ 6 is to permit claiming by describing a function, but only if the claim term is limited to those structures disclosed in the specification and their equivalents. *See Williamson*, 792 F.3d at 1347-48. To allow a patentee to circumvent this requirement by including a ***generic*** statement in the specification that ***any*** claim element "may be implemented by hardware, software, firmware and/or any combination [thereof]" ('189 patent at 10:11-19, 17:66-18:11) would lead back to the "proliferation of functional claiming untethered to § 112, para. 6 and free of the strictures set forth in the statute" that *Williamson* sought to avoid. *Williamson*, 792 F.3d at 1349. This is why *Williamson* finds that "nonce words" like "module" "can operate as a substitute for 'means' in the context of § 112, para. 6"—because "'module' is simply a generic description for software or hardware that performs a specified function." *Id.* at 1350; *see also Synchronoss Techs., Inc. v. Dropbox, Inc.*, 987 F.3d 1358, 1367 (Fed. Cir. 2021) ("It is not enough that a means-plus-function claim term correspond to every known way of achieving the claimed function"); *Nichia Corp. v. TCL Multimedia Tech. Holdings, Ltd.*, No. C.A. No. 16-681-RGA, 2017 WL 5719267, at *8 (D. Del. Nov. 28, 2017) (finding term to qualify for means-plus-function treatment because plaintiff's expert "essentially opines that any structure made to disperse light could be a 'dispersive member'").

Nielsen is therefore wrong when it contends that the "breadth of the 'data analyzer' terms" cannot "overcome[] the presumption." Rep. at 50-51 (emphasis in original.)

> ii.     Under the proper legal standard, the "data analyzer" terms are means-plus-function terms because they do not recite structure.

Once the proper legal standard is applied, it is apparent that the presumption against means-plus-function treatment has been overcome here.

*First*, on the question of "whether the terms are used in common parlance . . . to designate structure" (Rep. at 51), Nielsen's evidence falls flat. TVision's expert, Dr. Anderson, opined that the term "data analyzer" does not appear in technical dictionaries, which Nielsen's expert does not dispute. (Anderson Decl., ¶ 37.) Dr. Anderson also opines that "data analyzer" is not used in common parlance to designate structure, but instead would be understood to be ***any*** structure that analyzes data. (*Id.*, ¶¶ 35-37.) Nielsen and its expert miss the point. The question is not whether "data analyzer" is used in the art and shows up in Google searches, but rather, whether it is used in common parlance ***to designate structure***. All Nielsen and its expert contend is that "data analyzer" "identif[ies] a wide variety of structures and software programs". (Rep. at 51.) But that is exactly the problem. The term does not designate a known class of structures; instead, it refers to ***any*** structure that analyzes data. This is precisely what *Williamson* prohibits.

*Second*, on the question of "whether the terms have structure in the context of the specification of the claim," (*id.*) Nielsen mischaracterizes the inquiry. As the Federal Circuit stated in *Apple*: "Structure ***may*** also be provided by describing the claim limitation's operation, such as its input, output, or connections. ***The limitation's operation is more than just its function; it is how the function is achieved*** in the context of the invention." 757 F.3d at 1299 (emphasis added). Here, the claim language specifies merely that the "data analyzers" "execute a . . . recognition analysis on . . . data representative of a[n] . . . object." That language does not specify "how the function is

achieved," as *Apple* requires. '189 patent, claim 9. Moreover, the specification language on which Nielson focuses—which states that the data analyzers "may be implemented by hardware, software, firmware, and/or any combination [thereof]" (*id.* at 10:11-19, 17:66-18:11)—is ***not*** a description of the data analyzers' structure. Instead, it is a generic statement of structural ***non-limitation*** that applies equally to literally ***every*** component in the purported invention. *Id.* Moreover, Nielsen did not contest TVision's contention that the specification fails to disclose a corresponding structure for the data analyzers, which effectively concedes that the specification does not disclose how the data analyzers operate.

Lastly, Nielsen unsuccessfully attempts to distinguish the three cases that find terms styled as "____ analyzer" to require means-plus-function treatment. Nielsen never explains why the "contextual claim language" in those cases led to a different result. (Rep. at 54.) As explained earlier, those cases—*WSOU*, *StrikeForce*, and *Vstream*—rely on the same reasoning that TVision advances here: that "_____ analyzers" are generic terms, with no common meaning, that merely perform the function of analyzing. (Ans. at 46-47.) As for the sole contrary case that Nielsen cites, this case is pre-*Williamson* (*i.e.*, decided on a different legal standard), and involves an "analyzer" that is sub-part of a "shim," a very specific piece of software with an agreed upon structure, thus rendering the analyzer part of an agreed-upon structure. *Widevine Techs., Inc. v. Verimatrix, Inc.*, Case No. 2:07-CV-321, 2009 WL 3734106, at *17 (E.D. Tex. Nov. 4, 2009). By contrast, the "data analyzers" claimed here are not sub-parts of a specific structure, but, instead, can take any structure.

### iii.    If the Court determines that the "data analyzer" terms are governed by 35 U.S.C. § 112 ¶ 6, then they are indefinite.

Nielsen did not contest TVision's analysis that the specification does not disclose corresponding structures for the "data analyzer" terms. Thus, if the Court determines that these terms warrant means-plus-function treatment, then they are indefinite.

D.    **"wherein at least one of the first data analyzer, the second data analyzer or the counter is implemented via a logic circuit" ('189 Patent, claim 9)**

| Nielsen's Proposed Construction | TVision's Proposed Construction |
|---|---|
| Plain and ordinary meaning. To the extent a construction is needed, Nielsen proposes the following construction: Wherein at least one of the first data analyzer, the second data analyzer or the counter is implemented via one or more electronic circuits that process information by performing logical operations on the information. | Wherein the logic of at least one of the first data analyzer, the second data analyzer or the counter is implemented in the circuitry of a logic circuit |

1.    **Plaintiff's Opening Position**

Nielsen proposes that this term be given its plain and ordinary meaning and requires no construction.  In the alternative, Nielsen's proposed construction parrots the first portion of the term ("wherein at least one of the first data analyzer, the second data analyzer or the counter is implemented via") and construes only the phrase "logic circuit" at the end of the term.  Specifically, Nielsen proposes defining "logic circuit" as "one or more electronic circuits that process information by performing logical operations on the information."  (MICROSOFT COMPUTER DICTIONARY, 318 (5th ed. 2002) ("**logic circuit** *n.* An electronic circuit that processes information by performing a logical operation on it.") (Emphasis in original.).)  (Ex. F to JA.)

TVision's proposed construction does not define "logic circuit."  Instead, it seeks to add language to the claim limitation to require "the logic of at least one of first data analyzer, the second data analyzer, or the counter" to be "implemented in the circuitry" of the logic circuit.

TVision's construction is confusing.  It is certainly incorrect as contradicting the specification (a) if it is intended to exclude combinations of hardware (such as general processors) and software, and (b) if it is instead intended to require a specific special purpose, "hard-wired," logic circuit that is designed to implement the logic via only its circuitry and without resort to

59

software.  In particular, the specification states that the first data analyzer (3D), second data analyzer (2D), and the counter can be implemented by a combination of circuits, hardware, software, and firmware:

> Further, the example three-dimensional analyzer 300, the example two-dimensional analyzer 302 … the example body counter 316 … and/or, more generally, the example people analyzer 208 of FIG. 3 may be implemented by ***hardware, software, firmware and/or any combination of hardware, software and/or firmware***.

('189 Patent, 17:66-18:11 (emphasis added).)  In addition, the specification specifically mentions "programmable processors" in the list of items that could be used to implement the data analyzers or the counter:

> Thus, for example, any of the example three-dimensional analyzer 300, the example two-dimensional analyzer 302 … the example body counter 316 and/or, more generally, the example people analyzer 208 of FIG. 3 could be implemented by one or more circuit(s), ***programmable processor(s)***, application specific integrated circuit(s) (ASIC(s)), programmable logic device(s) (PLD(s)) and/or field programmable logic device(s) (FPLD(s)), etc.

(*Id.*, 18:11-25 (emphasis added).)  And finally, the specification specifically contemplates software implementations of the invention:

> [w]hen any of the system or apparatus claims of this patent are read to cover a ***purely software*** and/or firmware implementation, at least one of the example three-dimensional analyzer 300, the example two-dimensional analyzer 302 … example body counter 316, …and/or, more generally, the example people analyzer 208 of FIG. 3 are hereby expressly defined to include a tangible computer readable storage medium such as a storage device or storage disc storing the software and/or firmware.

(*Id.*, 18:26-39 (emphasis added).)  The Court should reject TVision's attempts to exclude the above-discussed embodiments of the claims.  *See Dow Chem. Co. v. Sumitomo Chem. Co., Ltd.*, 257 F.3d 1364, 1378 (Fed. Cir. 2001) ("[A] claim construction that excludes a preferred embodiment is '*rarely, if ever, correct*.'" (citations omitted; emphasis in original)).

### 2.    Defendant's Answering Position

This is a dispute where TVision's proposed construction faithfully captures the meaning of the claim term, whereas Nielsen seeks to render the claim's limitation a nullity. Claim 9 unambiguously imposes one very clear implementation requirement: that *at least one* of the three listed components—the first data analyzer, the second data analyzer, or the counter—*must be* implemented via a logic circuit. Nielsen's position, however, is that *all three* of these components can be implemented in *any* fashion—hardware, "purely software," firmware, or any combination thereof. That is nonsensical and a complete vitiation of the claim language.

Nielsen contends that the specification contemplates that the three listed components can be implemented in any form (hardware, software, firmware, or a combination). But that is irrelevant because these are unclaimed embodiments, whereas Claim 9 clearly specifies an implementation form (*i.e.*, a logic circuit). And in any event, TVision agrees (and Claim 9 contemplates) that any particular one of the three listed components *could* be implemented in any form, so long as one of the other two listed components is "implemented via a logic circuit." For example, the first data analyzer can be implemented purely in software, so long as the second data analyzer or counter is implemented in a logic circuit. But what Claim 9 unambiguously prohibits is implementing *all three* components in software (*i.e.*, implementing *none* of them via a logic circuit). Yet that is precisely what Nielsen seeks to construe the claim to encompass.

### i.    The Specification Distinguishes Between Circuits and Software

As a threshold matter, implementation via a logic circuit is different from a "software" implementation. The specification itself distinguishes between various implementation forms. A key passage of the specification ('189 patent, 17:62-18:44) lists numerous ways in which specific components can be implemented:

- *First*, it starts high-level, stating that a long list of components: "may be implemented by hardware, software, firmware, and/or any combination [thereof]." '189 patent, 17:66-18:11. Firmware is a type of software that uses lower-level commands to program hardware. (Anderson Decl. ¶ 48.)

- *Second*, it gives more specific implementation options that are forms of hardware or hardware/firmware combinations, stating that the list of components: "could be implemented by one or more circuit(s), programmable processor(s), application specific integrated circuit(s) (ASIC(s)), programmable logic device(s) (PLD(s)) and/or field programmable logic device(s) (FPLD(s)), etc." '189 patent, 18:11-25; *see also* Anderson Decl. ¶ 47.

- *Third*, it covers software and firmware implementations, by stating that: "***[w]hen any of the system or apparatus claims of this patent are read to cover a purely software and/or firmware implementation***," the listed components "are hereby expressly defined to include a tangible computer readable storage medium . . . ." '189 patent at 18:25-39 (emphasis added).

*See also* '189 patent, 10:6-47. The reason the specification provides all of these options is that they are ***different***. Some of these options may be subsets of others or semi-overlapping; but they are ***different***.

A logic circuit—*i.e.*, the implementation form required by Claim 9 for at least one component—is a type of hardware. (Anderson Decl. ¶ 49.) Notably, "circuits" are listed in the second sentence of the relevant passage (*i.e.*, the second bullet above). And while "logic circuits" are not specifically mentioned in that passage (or anywhere else in the specification), they are a known type of circuit. (Anderson Decl. ¶ 47.) As even Nielsen's own Microsoft Computer Dictionary definition—which Nielsen selectively quotes from—acknowledges, "[a] logic circuit is a collection of logic gates." Joint App'x. Ex. F; *see also id.* at Ex. G (BARRON'S DICTIONARY

OF COMPUTER AND INTERNET TERMS (11th Ed. 2012)) (defining "logic circuits" as "electronic circuits that accept binary digits (bits) as inputs and produce an output bit according to a specified rule. For examples *see* AND GATE; OR GATE; NAND GATE; NOR GATE; NOT GATE; FLIP-FLOP."); Anderson Decl. ¶¶ 49-51. Logic circuits use these logical gates—which are typically implemented by transistors—to perform operations. (Anderson Decl., ¶ 49-51.) Thus, logic circuits are a hardware implementation option that can perform logical operations. (*Id.*)

More importantly, logic circuits are ***not*** software (*id.*), and are certainly not "purely software," as Nielsen suggests. We know this because the specification distinguishes, at the least, between circuits and "purely software and/or firmware implementation[s]." The third bullet above makes clear that "[w]hen any of the system or apparatus claims of this patent are read to cover a purely software and/or firmware implementation," the listed components are "expressly defined to include a tangible computer readable storage medium…[for] storing the software and/or firmware." '189 patent, 18:25-39. ***Claim 1*** and its dependents require a "tangible machine readable storage medium" that include such "purely software and/or firmware implementations." Claim 9 does not. Instead, it requires a different implementation option, namely a logic circuit.

Accordingly, the specification distinguishes a circuit implementation from a "purely software and/or firmware implementation," which involves instructions stored on a computer readable medium.

> ## ii.   TVision's Proposal Correctly Requires Implementation Via a Logic Circuit

TVision's proposal correctly requires that "the logic of at least one" of the three listed components—*i.e.*, the first and second data analyzers and the counter—"is implemented in the circuitry of the logic circuit." This requires the logic gates of the logic circuit to perform the

specified data analysis or counting—which is the plain meaning of the claim term. Anderson Decl. ¶ 46 ("When a function or module is 'implemented via a logic circuit,' the logic of the function or module is implemented in the logic circuit's circuitry. By contrast, when a function or module is implemented in software, the logic of the function or module is implemented in the software's instructions."). TVision's proposal should therefore be adopted.

A construction is needed for this seemingly straightforward proposition to avoid a technical misunderstanding by the jury. In practice, even a "purely software implementation" will require some hardware or circuitry to run it, such as a general-purpose computer processor. *See* Anderson Decl. ¶ 55; *see also, e.g.*, *Cellular Commc'ns Equip. LLC v. HTC Corp.*, No. 6:13-CV-507, 2015 WL 10741012, at *13 (E.D. Tex. Mar. 9, 2015) (distinguishing between units "implemented as a hardware circuit" and those "implemented in software for execution by various types of processors"); *Absolute Software, Inc. v. Stealth Signal, Inc.*, No. CIV.A. H-05-1416, 2008 WL 6745389, at *30 (S.D. Tex. Feb. 8, 2008), *aff'd*, 659 F.3d 1121 (Fed. Cir. 2011) ("all functions of the invention at the remote site may be implemented entirely in hardware or in software running on the internal processor"). But such general-purpose processor circuitry should not be confused with the logic circuit referenced in Claim 9. (Anderson Decl. ¶ 55.) The Claim 9 "logic circuit" contains logic gates that are configured at the time they are designed to perform the data analysis or counting functions. (*Id.*, ¶¶ 50, 55.) By contrast, the circuitry of a general-purpose computer processor is configured to run any piece of software that a computer's user chooses. (*Id.*) Put another way, even the "purely software implementation" solution referenced in Claim 1 (*i.e.*, the "tangible machine readable storage medium" claim) will involve a logic circuit, because those software instructions are "execute[d]" by a "machine." (*Id.*) This is

why TVision's construction properly specifies that the "logic" of the data analyzers or counter must be "implemented in the circuitry of the logic circuit."

Nielsen's critique that TVision's proposal excludes disclosed embodiments by excluding certain implementations involving hardware/software combinations or pure software is misplaced. TVision's proposal, like the plain language of Claim 9 itself, allows combined hardware/software implementations or software-only implementations for any two of the components, so long as one component is implemented in a logic circuit. Moreover, the specification expressly contemplates that the patent's claims will impose limitations (not required by the specification) on how particular components are implemented. '189 patent, 18:25-28 ("When any of the system or apparatus claims of this patent are read to cover a purely software and/or firmware implementation…."). TVision's proposal is thus completely consistent with **both** the specification **and** Claim 9, while Nielsen is attempting to use an embodiment to expand the scope of claim 9 beyond its plain meaning.

### iii.    Nielsen's Construction Improperly Allows a Software-Only Implementation

Nielsen's proposal is wrong. It does not specify where the logic of a component that is "implemented via a logic circuit" resides. It would therefore allow the "logic" of both data analyzers and the counter to be implemented entirely in software, such that the only "logic circuit" involved is that of a general-purpose computer processor that is simply running the software. Notably, Nielsen readily admits that its proposal would allow a "purely software" implementation when it criticizes TVision's proposal for excluding such an implementation. (Op. at 59-60.) Nielsen's proposal is therefore contrary to the plain meaning of "implemented via a logic circuit" and would render the claim term a nullity.

This is particularly problematic given that Claim 1 and its dependents are expressly described by the patent to cover "purely software" implementations, whereas Claim 9 requires at least one component "implemented via a logic circuit. *See* '189 patent at Claim 1 (requiring a "tangible machine readable storage medium") & 18:25-39 ("When any of the system or apparatus claims of this patent are read to cover a purely software and/or firmware implementation, [the listed components] are hereby expressly defined to include a tangible computer readable storage medium"); *see also Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1381 (Fed. Cir. 2006) ("claim differentiation takes on relevance in the context of a claim construction that would render additional, or different, language in another independent claim superfluous"). Claim differentiation therefore also weighs against Nielsen's proposal.

A related problem with Nielsen's proposal is that it seeks to construe the wrong words in the claim term. The issue here is not that there is a (major) dispute between the parties as to what a logic circuit is (although Nielsen's proposal does omit key language from the dictionary it relies on, as set forth below). Rather, the issue is where the logic for the component (*e.g.*, the counter) that is "implemented via a logic circuit" resides. TVision's construction specifies that the logic for that component must reside in the logic circuit, whereas Nielsen's does not. Nielsen's proposal would therefore permit a component whose logic resides and is implemented entirely in software to be considered "implemented via a logic circuit." This is improper.

Finally, Nielsen's proposal omits critical information about a "logic circuit." The Microsoft Computer Dictionary that Nielsen relies on as the sole basis for its proposed definition goes on to include important details: "A logic circuit is a combination of logic gates. It produces output based on the rules of logic it is designed to follow for the electrical signals it receives as input." Joint App'x., Ex. F. By omitting these necessary details about logic circuits, Nielsen's

proposal increases the likelihood, under its proposal, that a jury would conclude that a "purely software" implementation nevertheless is "implemented via a logic circuit," so long as a general-purpose processor is used to run the software.

For these reasons, Nielsen's proposed construction should be rejected.

### 3.    Plaintiff's Reply Position

The parties' dispute about this term involves whether the "implemented via a logic circuit" limitation includes a software-only implementation. TVision says it does not, but admits that software runs on a logic circuit. This is effectively an admission that Nielsen's construction is correct.

TVision's top-level argument is that "Claim 9 unambiguously prohibits [] implementing *all three* components in software." (TVision Ans. Br. at 62 (emphasis in original).) But TVision also admits that "even the 'purely software implementation' solution referenced in Claim 1 (*i.e.*, the 'tangible machine readable storage medium' claim) will involve a logic circuit, because those software instructions are 'execute[d]' by a 'machine.'" (TVision Ans. Br. at 65.) In other words, TVision (and its expert) admit that a software-only implementation utilizes a "logic circuit." Claim 9 simply requires "<u>implementation via</u> a logic circuit." Thus, the parties apparently agree the claimed "implemented via a logic circuit" can include a software-only implementation.

Despite its admission, TVision argues that the "Claim 9 'logic circuit' contains logic gates that are configured at the time they are designed to perform the data analysis or counting functions" (TVision Ans. Br. at 65) (*i.e.,* that a "logic circuit" does not include software implementations). But there is with no support for this argument other than the expert's conclusory opinion. (*See, e.g.*, Anderson Decl., ¶ 50 ("their functionality is 'baked-in' at design time and not subject to change by software.").) Nothing in the specification supports limiting "logic circuits" to those "configured at the time they are designed," and indeed, the specification says the opposite—giving examples of

"logic circuits" configured well after their design. For instance, the specification identifies "programmable logic device(s) (PLD(s)) and/or field programmable logic device(s) (FPLD(s))" which, as TVision's expert admits, unquestionably include logic gates and circuitry but are not "configured at the time they are designed." To the contrary, "these devices are programmable hardware solutions and are either programmed when the system in which they are utilized is designed or programmed later during use of that system." (Moulin Decl., ¶ 66.)

Similarly, TVision's expert asserts with no support that "when Claim 9 recites a certain component being 'implemented via a logic circuit,' it is not referencing the logic circuit that might be part of a general-purpose processor that is running a software implementation." (Anderson Decl., ¶ 55.) This opinion lacks any support other than TVision's expert's bald statement—he cites nothing from the patent or elsewhere to exclude the "logic circuits" that he admits are in a software implementation.

Essentially, TVision and its expert have crafted an argument that relies on software implementations not using "logic circuits," despite admitting that software implementations use logic circuits. TVision offers no support for this extraordinary conclusion other than its expert's unsupported opinion that "logic circuits" in software implementations do not count because they are not configured when designed, even though this argument contradicts the specification. The Court should reject TVision's unsupported argument and adopt Nielsen's proposed construction.

Nielsen's proposed definition of "logic circuit" is the same as the plain and ordinary meaning of the term to one of ordinary skill in the art. (Moulin Decl., ¶ 67.)

### 4. Defendant's Sur-Reply Position

This is another "up is down" argument by Nielsen. Nielsen acknowledges that components implemented *entirely* in software may nevertheless run on logic circuits (because software must always run on hardware), and Nielsen admits that its construction would capture

68

such an implementation. So Nielsen openly admits that it seeks to define "implemented via a logic circuit" to include *purely* software implementations. '189 patent, claim 9.

Here, the patent clearly distinguishes between components that are implemented in "hardware, software, firmware, and/or any combination [thereof]." '189 patent at 10:11-19, 17:66-18:11. Those are four different things. And despite Nielsen's false charge that "TVision's expert" has "no support" for his proposition that logic circuit implementations exclude pure software implementations (Rep. at 68), Dr. Anderson supports this opinion at length, analyzing the language of the patent, the underlying technology, and Nielsen's own dictionary definition. (Anderson Decl., ¶¶ 45-55.) Thus, Nielsen's improper conflation of logic circuit (*i.e.*, hardware) implementations with software implementations should be rejected.

Finally, Nielsen's point that programmable logic devices can be re-programmed (Rep. at 67-68; Moulin Decl., ¶ 66) is much ado about nothing. It is both consistent with Dr. Anderson's opinion, and irrelevant, because TVision's construction encompasses programmable logic devices and any other logic circuit. (Anderson Ans. Decl., ¶ 33.)

Accordingly, Nielsen's proposal—which undisputedly defines "implement[ation] via a logic circuit" to include implementation purely in software—must be rejected. (Rep. at 67-68.)

**DEFENDANT'S CONCLUSION**

For these reasons, Nielsen's proposed construction should be rejected.

69

POTTER ANDERSON & CORROON LLP

By:  */s/ Bindu A. Palapura*
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Brandon R. Harper (#6418)
    Andrew L. Brown (#6766)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com
    bharper@potteranderson.com
    abrown@potteranderson.com

OF COUNSEL:

Steven Yovits
Constantine Koutsoubas
Melvin Gaddy
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
Tel:  (312) 857-7070

Clifford Katz
Malavika Rao
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  (212) 808-7800

*Attorneys for Plaintiff The Nielsen Company (US), LLC*

Dated:  April 14, 2023
10688152 / 14944-00004

SHAW KELLER LLP

By:  */s/ Andrew E. Russell*
    John W. Shaw (No. 3362)
    Andrew E. Russell (No. 5382)
    Nathan R. Hoeschen (No. 6232)
    I.M. Pei Building
    1105 North Market Street, 12th Floor
    Wilmington, DE 19801
    Tel:  (302) 298-0700
    jshaw@shawkeller.com
    nhoeschen@shawkeller.com
    arussell@shawkeller.com

OF COUNSEL:

Ajay S. Krishnan
Julia L. Allen
Bailey W. Heaps
Reaghan E. Braun
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
(415) 391-5400

*Attorneys for Defendant TVision Insights, Inc.*