IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 22-057-CJB |
| | ) | |
| v. | ) | |
| | ) | |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | **Redacted - Public Version** |

**LETTER TO THE HONORABLE CHRISTOPHER J. BURKE FROM ANDREW E.
RUSSELL REGARDING TVISION INSIGHTS, INC. MOTION TO SUPPLEMENT**

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
P.O. Box B113
150 Fayetteville St, Suite 2800
Raleigh, NC 27601-2960
(984) 960-2860

Michael F. Heafey
RIMÔN LAW P.C.
800 Oak Grove Avenue, Suite 250
Menlo Park, CA 94025
(650) 461-4433

Dated: February 2, 2024

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

Dear Judge Burke,

Defendant TVision Insights, Inc. ("TVision") moves to for leave to serve a supplemental expert report regarding source code produced by ACRCloud Ltd. ("ACRCloud") in *The Nielsen Company (US), LLC v. ACRCloud, Ltd.*, 22-1344 (D. Del.) (the "ACRCloud case"). TVision's devices use ACRCloud software, which is the basis for Nielsen's infringement contentions.

As background, in the Complaint in the ACRCloud case, Nielsen asserted infringement of U.S. Pat. No. 7,783,889 (the "'889 patent) (Ex. 1)—the same '889 patent that is at issue in this case. *See* ACRCloud case, D.I. 1. Nielsen withdrew the '889 patent claim from the ACRCloud case "to moot[] the question regarding the motion for a stay" of this case based on the customer suit exception. (*Id.*, D.I. 13, Ex. 6 at 1). On August 21, 2023, the parties agreed in this case, at the request of Nielsen's counsel, that the ACRCloud source code would not be used in this case. Ex. 7 at 1. Expert discovery closes on February 7, 2024 D.I. 128. The parties have not scheduled any depositions of the technical experts.

## I.   SUMMARY OF FACTS AND RELEVANT PROCEDURAL HISTORY

In this case, Nielsen based its initial September 2022 infringement contentions on Nielsen's analysis of the '889 patent "based on decompiling and evaluating the . . . ACRCloud binary that executes the ACRCloud fingerprint algorithm . . . ." Ex. 2 at 5. The "ACRCloud binary" is the ACRCloud software TVision's devices use.

Both parties' experts relied on decompiled code ("pseudocode"). The experts reached opposite conclusions regarding infringement, in part due to using different versions of the decompiling tool. The experts disagree as to whether the decompiling tool was properly used and whether they understand how to use it. *Compare* Ex. 4, ¶ 51 (stating that TVision's expert used a different version of the decompiling software than Nielsen's expert) *with* Ex. 5 ¶ 17 (arguing that TVision's expert "fails to understand how to use" the decompiling software). TVision is a customer of ACRCloud, does not have the right to require ACRCloud to permit use of ACRCloud source code in this case. Ex. 3, Liu Decl. ¶¶ 3-5. After reviewing Nielsen's initial infringement contentions, TVision believed that the decompiled code was sufficient to prove non-infringement. Nielsen filed the ACRCloud case on October 12, 2022. Counsel for Nielsen inspected the ACRCloud source code in the ACRCloud case on September 5-8, 2023.

When the technical experts submitted their reports in this case, the ACRCloud source code was not available for them to review. ACRCloud consented to the use of the relevant ACRCloud source code in this case within the last three weeks. Because of the experts' dispute over the use and understanding of the decompiler tool, it is in the interest of justice to permit the parties to use actual ACRCloud source code to determine infringement. Using actual source code will reduce uncertainty and eliminate extraneous jury issues involving how the experts decompiled and interpreted the executable code. Only a relatively small amount of source code needs to be reviewed by the experts to resolve the dispute in this case. There is enough time in the present schedule for the experts to provide supplemental reports based on the actual ACRCloud code.

## II.   THIS COURT SHOULD PERMIT SUPPLEMENTAL REPORTS REGARDING THE ACRCLOUD SOURCE CODE

All of the asserted claims of the '889 patent at issue in this case recite the following limitation: "determin[e][ing] a first descriptor *of the first frame* of media samples based on a comparison of the first spectral power and the second spectral power." Ex. 1, '889 patent (asserted claims).

The opening expert report of Dr. Tanksale, Nielsen's software expert, states that he used a tool to create pseudocode from downloaded ACRCloud software. Ex. 8, ¶¶ 23-24, 28, 30 (referring to decompiled code as "pseudo-code").   Using Dr. Tanksale's report, Nielsen's expert on infringement, Dr. Moulin, concludes that the ACRCloud pseudo-code performs the above-referenced limitation. Ex. 9, ¶ 174.  TVision's expert, Dr. Anderson, used "a more recent version of the [relevant] decompiler" that Dr. Tanksale used and concluded that the claim limitation is not performed by ACRCloud software. Ex. 4 ¶ 63. *See also*, Ex. 4 ¶¶ 61-65.  Dr. Tanksale claims that TVision's expert Dr. Anderson "fails to understand how to use the IDA Pro software" used to decompile the ACRCloud code. Nielsen's expert also states that TVision's expert "does not appear to understand the differences between decompiled pseudocode and source code."  Thus, the jury must resolve the experts' disagreements over the use of the decompiler tool and interpretation pseudocode produced by the decompiler tool. This issue would not need to be resolved by the jury if experts were to base their opinion on the relevant ACRCloud source code that has been produced in the ACRCloud case.

## III.  TVISION HAS BEEN DILIGENT AND NIELSEN WOULD NOT BE PREJUDICED BY USING ACTUAL ACRCLOUD SOURCE CODE

Within the last three weeks, ACRCloud agreed to permit the use in this case of the relevant actual source code it produced in the ACRCloud case.  TVision filed this motion within three weeks of ACRCloud's agreement to permit its relevant source code to be used in this case and after TVision's counsel met and conferred with Nielsen's counsel. Nielsen would not be prejudiced if this Court were to permit the use of the actual relevant ACRCloud source code in this case. First, ACRCloud produced the code to Nielsen in early September 2023 in the ACRCloud case. Second, the number of lines of code that the experts would need to review are relatively small. The expert reports rely only on about 1,100 lines of decompiled code. Thus, reviewing the actual source code and issuing a supplemental report should not take more than an additional 10 hours of the expert's time, given their familiarity with the pseudocode and the issues in this case.

Nielsen has indicated that it would oppose this motion because of the parties' prior agreement. *See* Ex. 10.  However, at the time TVision and Nielsen entered that agreement, Nielsen had not yet reviewed the actual ACRCloud source code. Nor did the parties anticipate the disagreements among the experts about the use and interpretation of the results of using the decompiler tool. There is sufficient time in the scheduling order to adjust some due dates to permit the experts to review the relevant ACRCloud source code, modify their opinions, if necessary, and adjust the briefing schedules for dispositive and *Daubert* motions without affecting the October trial date.

## IV.  CONCLUSION

For the reasons set forth above, TVision respectfully requests that the Court (1) permit TVision to serve a supplemental expert report regarding the relevant portions of the ACRCloud source code within 14 days of the date of the order; (2) permit Nielsen to serve a responsive report within 14 days of the supplemental report; and (3) direct the parties to meet-and-confer regarding any necessary schedule adjustments and to submit a stipulation amending the scheduling order within 14 days.

Respectfully submitted,

*/s/ Andrew E. Russell*

Andrew E. Russell (No. 5382)

cc:     Clerk of Court (by CM/ECF & Hand Delivery)
        All Counsel of Record (by CM/ECF & Email)

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | C.A. No. 22-057-CJB |
| | ) | |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**[PROPOSED] ORDER**

Having considered the motion of TVision Insights, Inc. for leave to serve a supplemental

expert report regarding source code produced by ACRCloud Ltd., IT IS HEREBY ORDERED,

this _____ day of _____, 2024, that:

(1) The Motion is GRANTED;

(2) TVision may serve its supplemental report, limited to discussion of ACRCloud's source

code, within 14 days of the date of this order;

(3) Nielsen may likewise serve a responsive supplemental expert report, limited to discussion

of ACRCloud's source code, within 14 days of TVision's supplemental report;

(4) The parties shall meet-and-confer regarding any necessary adjustment of case deadlines,

and shall file a stipulation amending the scheduling order within 14 days from the date of

this order.

_____
UNITED STATES MAGISTRATE JUDGE

Exhibit 1



US007783889B2

(12) **United States Patent**   (10) **Patent No.:**     **US 7,783,889 B2**
Srinivasan                        (45) **Date of Patent:**       **Aug. 24, 2010**

(54) **METHODS AND APPARATUS FOR GENERATING SIGNATURES**

(75) Inventor: **Venugopal Srinivasan**, Palm Harbor, FL (US)

(73) Assignee: **The Nielsen Company (US), LLC**, Schaumburg, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 199 days.

(21) Appl. No.: **11/676,452**

(22) Filed: **Feb. 19, 2007**

(65) **Prior Publication Data**

US 2007/0274537 A1     Nov. 29, 2007

**Related U.S. Application Data**

(63) Continuation of application No. PCT/US2005/029623, filed on Aug. 18, 2005.

(60) Provisional application No. 60/603,024, filed on Aug. 18, 2004.

(51) **Int. Cl.**
*H04L 9/00*              (2006.01)

(52) **U.S. Cl.** ......................... **713/179**; 713/176; 725/19; 725/20; 380/202; 380/239; 381/94.3

(58) **Field of Classification Search** ................. 713/160, 713/176, 179; 380/202, 206, 207, 239, 253, 380/229; 382/100, 232, 240, 191; 381/94.3; 375/134; 704/268, 273; 725/19, 20

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,230,990 A    10/1980 Lert, Jr. et al.

(Continued)

FOREIGN PATENT DOCUMENTS

AU          718227      11/1997

(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office, "PCT International Search Report," issued by the International Searching Authority of the United States Patent and Trademark Office on Feb. 6, 2008, in connection with a counterpart international application No. PCT/US2005/029623 (3 pages).

(Continued)

*Primary Examiner*—Nasser Moazzami
*Assistant Examiner*—Shanto M Abedin
(74) *Attorney, Agent, or Firm*—Hanley, Flight and Zimmerman, LLC

(57)          **ABSTRACT**

Methods, apparatus, and articles of manufacture for media monitoring are disclosed. In particular, the example methods, apparatus, and articles of manufacture generate digital spectral signatures for use in identifying media information. Initially, a frame of media samples is obtained. A first frequency component having a first spectral power and a second frequency component having a second spectral power are identified by performing a spectral transform operation on the frame of media samples. A descriptor of the first frame of media samples is determined based on a comparison of the first spectral power and the second spectral power. A first signature is then generated based on the descriptor.

**17 Claims, 12 Drawing Sheets**



**25**

with an unidentified audio stream (e.g., the example monitored audio stream **202** of FIG. **2**). For example, the media identification look-up table interface **1112** may be communicatively coupled to a media identification look-up table or a database that is used to cross-reference media identification information (e.g., movie title, show title, song title, artist name, episode number, etc.) based on reference signatures. In this manner, the media identifier **1110** may retrieve media identification information from the media identification database based on the matching reference signatures.

FIG. **12** is a block diagram of an example processor system **1210** that may be used to implement the apparatus and methods described herein. As shown in FIG. **12**, the processor system **1210** includes a processor **1212** that is coupled to an interconnection bus or network **1214**. The processor **1212** includes a register set or register space **1216**, which is depicted in FIG. **12** as being entirely on-chip, but which could alternatively be located entirely or partially off-chip and directly coupled to the processor **1212** via dedicated electrical connections and/or via the interconnection network or bus **1214**. The processor **1212** may be any suitable processor, processing unit or microprocessor. Although not shown in FIG. **12**, the system **1210** may be a multi-processor system and, thus, may include one or more additional processors that are identical or similar to the processor **1212** and that are communicatively coupled to the interconnection bus or network **1214**.

The processor **1212** of FIG. **12** is coupled to a chipset **1218**, which includes a memory controller **1220** and an input/output (I/O) controller **1222**. As is well known, a chipset typically provides I/O and memory management functions as well as a plurality of general purpose and/or special purpose registers, timers, etc. that are accessible or used by one or more processors coupled to the chipset. The memory controller **1220** performs functions that enable the processor **1212** (or processors if there are multiple processors) to access a system memory **1224** and a mass storage memory **1225**.

The system memory **1224** may include any desired type of volatile and/or non-volatile memory such as, for example, static random access memory (SRAM), dynamic random access memory (DRAM), flash memory, read-only memory (ROM), etc. The mass storage memory **1225** may include any desired type of mass storage device including hard disk drives, optical drives, tape storage devices, etc.

The I/O controller **1222** performs functions that enable the processor **1212** to communicate with peripheral input/output (I/O) devices **1226** and **1228** via an I/O bus **1230**. The I/O devices **1226** and **1228** may be any desired type of I/O device such as, for example, a keyboard, a video display or monitor, a mouse, etc. While the memory controller **1220** and the I/O controller **1222** are depicted in FIG. **12** as separate functional blocks within the chipset **1218**, the functions performed by these blocks may be integrated within a single semiconductor circuit or may be implemented using two or more separate integrated circuits.

The methods described herein may be implemented using instructions stored on a computer readable medium that are executed by the processor **1212**. The computer readable medium may include any desired combination of solid state, magnetic and/or optical media implemented using any desired combination of mass storage devices (e.g., disk drive), removable storage devices (e.g., floppy disks, memory cards or sticks, etc.) and/or integrated memory devices (e.g., random access memory, flash memory, etc.).

Although certain methods, apparatus, and articles of manufacture have been described herein, the scope of coverage of this patent is not limited thereto. To the contrary, this patent

**26**

covers all methods, apparatus, and articles of manufacture fairly falling within the scope of the appended claims either literally or under the doctrine of equivalents.

What is claimed is:

**1**. A method for generating signatures implemented using an apparatus comprising a processor, the method comprising:

obtaining a first frame of media samples;

identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

generating a first signature based on the first descriptor;

identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples;

identifying a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;

determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and

generating a second signature based on the second descriptor.

**2**. A method as defined in claim **1**, further comprising identifying media information based on the first signature.

**3**. A method as defined in claim **2**, wherein a Hamming distance is used to identify the media information based on the first signature.

**4**. A method as defined in claim **2**, wherein the media information is associated with at least one of audio information or video information.

**5**. A method as defined in claim **1**, wherein the first descriptor is associated with only the first frame of media samples.

**6**. A method as defined in claim **1**, wherein the second descriptor is of the second frame of media samples.

**7**. A method as defined in claim **1**, wherein the spectral transform operation is a sliding Fast Fourier Transform.

**8**. An apparatus for generating signatures, comprising:

a processor system including a memory; and

instructions stored in the memory that enable the processor system to:

obtain a first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

identify a third spectral power and a fourth spectral power; determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

US 7,783,889 B2

27

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

**9**. An apparatus as defined in claim **8**, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature.

**10**. An apparatus as defined in claim **9**, wherein a Hamming distance is used to identify the media information based on the first signature.

**11**. An apparatus as defined in claim **8**, wherein the first descriptor is associated with only the first frame of media samples.

**12**. An apparatus as defined in claim **8**, wherein the instructions stored in the memory enable the processor system to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

**13**. An apparatus as defined in claim **8**, wherein the third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

**14**. A tangible machine accessible medium having instructions stored thereon that, when executed, cause a machine to:

obtain a first frame first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

28

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

identify a third spectral power and a fourth spectral power;

determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

**15**. A tangible machine accessible medium as defined in claim **14**, wherein the first descriptor is associated with only the first frame of media samples.

**16**. A tangible machine accessible medium as defined in claim **14** having instructions stored thereon that, when executed, cause the machine to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

**17**. A tangible machine accessible medium as defined in claim **14**, wherein third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

*   *   *   *   *

# Exhibit 2

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE NIELSEN COMPANY (US), LLC, | |
| Plaintiff, | C.A. No. 21-1592-CJB |
| v. | **JURY TRIAL DEMANDED** |
| TVISION INSIGHTS, INC., | ██████████████████████ |
| Defendant. | |
| THE NIELSEN COMPANY (US), LLC, | C.A. No. 22-57-CJB |
| Plaintiff, | |
| v. | **JURY TRIAL DEMANDED** |
| TVISION INSIGHTS, INC., | ██████████████████████ |
| Defendant. | |

**THE NIELSEN COMPANY (US), LLC'S INITIAL CLAIM CHARTS**

Plaintiff The Nielsen Company (US), LLC ("Nielsen"), by and through its counsel, serves Defendant TVision Insights, Inc. ("TVision") with the following Initial Claim Chart pursuant to Paragraph 7(d) of the Court's Scheduling Order (D.I. 32, Case No. 1:21-cv-01592-CJB) and Paragraph 4(c) of the Default Standard for Discovery, Including Discovery of Electronically Stored Information ("Default Standard").

**I.     Preliminary Statement**

These Initial Claim Charts are based on information reasonably available to Nielsen at this time. On July 8, 2022, Nielsen provided its Paragraph 4(a) Disclosures "accusing all products, devices, systems or methods TVision makes, has made, licenses, purchases, practices,

███████████████████████████████

has practiced, uses, has used, sells, offers for sale, distributes, or imports, that perform audience measurement, including, but not limited to, audience measurement devices TVision provides to households that are to be associated with various household televisions or devices playing media. Nielsen specifically accuses the devices that TVision has identified as the 'Kinect-based device' and the 'Logitech-based device.'" To date, TVision has only produced 45 documents (TVSN_NLSN_00000228–TVSN_NLSN_00000511) and source code related to the Kinect-based system. TVision has refused to produce any documents or source code related to the Logitech-based system. While Nielsen continues to accuse both systems, the Initial Claim Chart directed to the '189 patent will only concern the Kinect-based system. Nielsen will supplement this claim chart to include allegations regarding the Logitech-based system after TVision produces relevant documents and source code. The Initial Claim Chart for the '889 patent will apply to both systems. Moreover, fact discovery has only just begun per the scheduling order. Accordingly, Nielsen reserves the right to amend, alter, or supplement its Initial Claim Charts based on further investigation, fact or expert discovery, evaluation of the scope and content of the prior art, any claim construction rulings by the Court, or TVision's  non-infringement contentions. These Initial Claim Charts do not constitute any concession by Nielsen for purposes of claim construction or (in)validity.

Furthermore, these Initial Claim Charts are provided without prejudice to Nielsen's rights to introduce at hearing or trial, any subsequently-discovered evidence or expert opinions relating to currently-known facts or Nielsen's rights to produce and introduce at trial all evidence relating to the proof of subsequently-discovered facts and evidence. Moreover, facts, documents, and things now known may be imperfectly understood, and accordingly, such facts, documents, and things may not be included in these Initial Claim Charts. Nielsen reserves the right to refer to,

conduct discovery with reference to, or offer into evidence at the time of trial, any and all facts, expert-opinion testimony, documents, and things notwithstanding the written statements herein.

The information set forth below is provided without waiving: (1) the right to object to the use of any statement for any purpose, in this action or any other action, on the grounds of privilege, relevancy, materiality, or any other appropriate grounds; (2) the right to object to any request involving or relating to the subject matter of the statements herein; or (3) the right to revise, correct, supplement, or clarify any of the statements provided herein at any time.

These Initial Claim Charts are subject to Nielsen's right to protect information subject to the attorney-client privilege and work-product doctrine. Nothing in these Initial Claim Charts should be understood as reflecting Nielsen's proposed claim constructions, which will be provided at the appropriate time as listed in the Scheduling Order.

## II.    The Asserted Claims

This disclosure of asserted claims remains preliminary and is based on the information that is available to Nielsen. Nielsen expressly reserves the right to amend and/or supplement this disclosure to include additional patents and/or claims. Nielsen expressly reserves the right to modify or amend the list of asserted claims based on the Court's claim constructions, any position taken by TVision in this action, any court orders, or to reflect additional information that becomes available to Nielsen as the case proceeds. Nielsen asserts the following claim:

- United States Patent No. 7,783,889 ("the '889 Patent") claims 1, 2, 4–6, 8, 9, 11–17.

- United States Patent No. 9,020,189 ("the '189 Patent") claim 9.

Ex. 2 page 3 of 55

███████████████████████████████████

### III.   The Accused Products, Systems, and Methods

Nielsen incorporates by reference and adopts the identification of accused products set forth in its Disclosures Pursuant to Paragraph 4(a) of the Delaware Default Standard for Discovery dated July 8, 2022. Nielsen further adds to the list of accused products and services those products and services identified in TVision's response, as it may be supplemented, to Nielsen's Interrogatory No. 1.

Specifically, this includes all products, devices, systems or methods TVision makes, has made, licenses, purchases, practices, has practiced, uses, has used, sells, offers for sale, distributes, or imports, that perform audience measurement, including, but not limited to, audience measurement devices TVision provides to households that are to be associated with various household televisions or devices playing media. Nielsen specifically accuses the devices that TVision has identified as the ███████████" and the ███████████" and the systems that include those devices. Nielsen also accuses TVision's servers and systems that collect and manipulate the data received from TVision's audience measurement devices such as the ███████████ and ███████████ Nielsen also accuses any versions or variations of the foregoing. Nielsen also accuses any embodiments of U.S. Patent Publication No. 2018/0007431. In addition to the aforementioned devices, systems, or methods, Nielsen identifies any data or other information that is based on or derived from the information retrieved from the aforementioned devices, systems, or methods as another proper basis for damages, whether through a convoyed sales theory or otherwise.

This disclosure remains preliminary and is based on the information that is available to Nielsen. Nielsen expressly reserves the right to amend and/or supplement this disclosure to include additional accused products, methods, or services as it learns of them. Nielsen expressly reserves the right to modify or amend the accused products, methods, or services based on the

███████████████████████████████████████

Court's claim constructions, any position taken by TVision in this action, any court orders, or to reflect additional information that becomes available to Nielsen as the case proceeds.

In addition, the analysis of the '889 patent is based on decompiling and evaluating the the Python versions of the ACRCloud binary that executes the ACRCloud fingerprinting algorithm, and are available on GitHub:

https://github.com/acrcloud/acrcloud_sdk_python/blob/master/docker_alpine/x86-64/python2.7/acrcloud/acrcloud_extr_tool.so. The binary was successfully decompiled using IDA Pro and the relevant functions and subroutines are included as Exhibit 1 to Appendix A and will be referenced in Appendix A.

## IV.   Initial Claim Charts

The full text of each claim of the '189 and '889 patents are set forth in the Initial Claim Charts in the Appendix A ('889 Patent) and Appendix B ('189 Patent). The applicable statutory subsection of 35 U.S.C. § 271 is subsection (a). Moreover, each claim limitation is present either literally or is present under the doctrine of equivalents. Nielsen reserves the right to amend this disclosure if warranted.

███████████████████████

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

Steven Yovits
Constantine Koutsoubas
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
Tel:  (312) 857-7070

Clifford Katz
Malavika Rao
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  (212) 808-7800

Dated:  September 8, 2022
10332289

By:  _/s/ Bindu A. Palapura_____
     David E. Moore (#3983)
     Bindu A. Palapura (#5370)
     Brandon R. Harper (#6418)
     Carson R. Bartlett (#6750)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, DE  19801
     Tel:  (302) 984-6000
     dmoore@potteranderson.com
     bpalapura@potteranderson.com
     bharper@potteranderson.com
     cbartlett@potteranderson.com

*Attorneys for Plaintiff The Nielsen Company
(US), LLC*

6

Ex. 2 page 6 of 55

## CERTIFICATE OF SERVICE

I, Bindu A. Palapura, hereby certify that on September 8, 2022, true and correct copies of

the within document were served on the following counsel of record at the addresses and in the

manner indicated:

## VIA ELECTRONIC MAIL

John W. Shaw
Nathan R. Hoeschen
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
jshaw@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant TVision Insights, Inc.*

Ajay S. Krishnan
Bailey W. Heaps
Julia L. Allen
Reaghan E. Braun
KEKER, VAN NEST & PETERS LLP
633 Battery Street
San Francisco, CA 94111-1809
akrishnan@keker.com
bheaps@keker.com
jallen@keker.com
rbraun@keker.com
*Attorneys for Defendant TVision Insights, Inc.*


            /s/ Bindu A. Palapura
              Bindu A. Palapura

10164932 / 14944-00004

# Exhibit 3

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 22-057-CJB |
| | ) | |
| v. | ) | |
| | ) | |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

**DECLARATION OF YAN LIU**

I, Yan Liu, declare under penalty of perjury as follows:

1.      I am a co-founder and CEO of Defendant TVision Insights, Inc. (TVision).  I have personal knowledge of the statements set forth below.  I hold a B.A. in industrial engineering from the Tokyo Institute of Technology, a degree in cost accounting from Hitotsubashi University, and an MBA in entrepreneurship and Innovation from the MIT Sloan School of Management.

2.      TVision was co-founded in 2014 by myself and another MIT graduate. TVision developed a system for measuring whether home viewers are paying attention to media in their home.  The system includes devices (including a meter, webcam and software) placed in a TV viewer's home.  The collection of homes in which TVision's devices are placed is called a "panel."

3.      I understand that Nielsen contends in this case that TVision infringes U.S. Pat. No. 7,783,889 ("the '889 patent") by using software in TVision devices licensed from ACRCloud.

**Ex. 3 page 1 of 2**

4.      ACRCloud is a company located in China that licenses ACR software to customers.  When TVision learned that Gracenote would refuse to renew TVision's license to Gracenote's ACR software, ACRCloud was one of several ACR software vendors that TVision evaluated to replace the Gracenote ACR software. ACRCloud's website, www.acrcloud.com, states, "We serve customers from all over the world" and lists a number of different customers of ACRCloud.  ACRCloud's ACR software is used by TVision in devices placed in consumers' homes  (the "ACRCloud Software").   The ACRCloud Software that TVision uses is "executable" code.  TVision has never had access to the source code for the ACRCloud Software.

5.      TVision does not have any right to access the source code for the ACRCloud Software. TVision does not have the right to require ACRCloud to provide the source code for the ACRCloud Software for use in this case.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: February 2__, 2024

_____
            Yan Liu

**Ex. 3 page 2 of 2**

Exhibit 4

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

THE NIELSEN COMPANY (US), LLC,    )
                                          )
               Plaintiff,         )     C.A. No. 22-057-CJB
                                          )
       v.                       )
                                          )
TVISION INSIGHTS, INC.,       )
                                          )
              Defendant.    )
                                          )
                                          )

---

**<u>REBUTTAL EXPERT REPORT OF DR. DAVID ANDERSON
REGARDING U.S. PATENT NO. 7,783,889</u>**

## TABLE OF CONTENTS

I.  INTRODUCTION ..................................................................................................1

II.  QUALIFICATIONS AND BACKGROUND ....................................................2

III.  METHODOLOGY USED ..................................................................................5

    1.  Infringement ...........................................................................................6

IV.  LEVEL OF ORDINARY SKILL ......................................................................7

V.  THE PATENT-IN-SUIT AND RELATED TECHNOLOGY ..........................7

    1.  Overview .................................................................................................7

    2.  The Asserted Claims ..............................................................................9

    3.  Spectral Transform Operations ............................................................11

VI.  CLAIM CONSTRUCTION .............................................................................16

VII.  SUMMARY OF OPINIONS ...........................................................................16

VIII.  NON-INFRINGEMENT ANALYSIS .............................................................16

    1.  Summary of the Accused Product Features ..........................................16

    2.  Independent Claim 1 .............................................................................23

        a.  "Reference Fingerprints" ...........................................................23

        b.  "determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power" ..................................................24

        c.  "generating a first signature based on the first descriptor" ......................27

        d.  "identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples" .........................................28

        e.  "determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power" ..................................29

        f.  "generating a second signature based on the second descriptor" ..............29

| | | | |
|---|---|---|---|
| | 3. | Claim 1 Dependent Claims ................................................................ | 30 |
| | 4. | Independent Claim 8 .......................................................................... | 31 |
| | 5. | Claim 8 Dependent Claims ................................................................ | 31 |
| | 6. | Independent Claim 14 ........................................................................ | 33 |
| | 7. | Claim 14 Dependent Claims .............................................................. | 33 |
| **IX.** | **OTHER ANALYSIS** ...................................................................................... | | **34** |
| | 1. | Alleged Innovations of the '889 Patent ........................................... | 34 |
| | 2. | Non-infringing Alternatives .............................................................. | 41 |
| | 3. | Comparability of Gracenote License ................................................ | 46 |
| **X.** | **MISCELLANEOUS** ...................................................................................... | | **48** |

**Ex. 4 page 3 of 55**

## I.      INTRODUCTION

1.      I understand that The Nielsen Company (US), LLC ("Nielsen") has alleged that TVision Insights, Inc. ("TVision") infringes claims 1, 2, 4–6, 8, 9, 11–17 ("asserted claims") of U.S. Patent No. 7,783,889 ("the '889 Patent" or "patent-in-suit").

2.      I have been retained by TVision as an expert in this case to provide opinions and conclusions regarding the asserted claims of the patents-in-suit and to evaluate and address the infringement opinions of Dr. Pierre Moulin, who has been engaged by Nielsen, as set forth in his report dated October 25, 2023 ("Moulin Report").   Dr. Moulin relies on the report of Dr. Vinayak Tanksale dated October 25, 2023 ("Tanksale Report").   To the extent my opinion applies differently to the Moulin Report and the Tanksale Report, I will address them separately. Otherwise, my opinions apply to both reports.

3.      This report provides the bases for my conclusion that accused TVision product(s) do not infringe any of the asserted claims.   I have reviewed the patent-in-suit, the respective prosecution histories for the patent-in-suit, the accused TVision product(s), and other documents in forming the opinions expressed in this report.   The materials I reviewed and/or relied upon are listed below.

4.      If Dr. Moulin, Dr. Tanksale, or Nielsen is permitted to offer any additional or different opinions regarding infringement in reply or for any other reason, I reserve the right to supplement my report or to otherwise address such opinions and to provide any rebuttal opinions in response.   To the extent Dr. Moulin or Dr. Tanksale is permitted to supplement or amend his reports to provide any such information, I reserve the right to address any such information or opinions and to supplement my report to the extent necessary.

51.     In his report, Dr. Tanksale identifies the **create_fp** function as the entry-point function for implementing the ACRCloud FP Algorithm. "As set forth above, the TVision "Muninn" code executes the **create_fingerprint_by_filebuffer** function of the ACRCloud Python SDK (acrcloud_extr_tool.so). This binary was decompiled to extract the ultimate function responsible for the creation of fingerprints that was common across all of the various 'create_fingerprint' functions discussed above in the ACRCloud Python SDK—**create_fp**. The function **create_fp** shall be referred to as the 'ACRCloud FP Algorithm' in this report." (Tanksale Report, ¶51).      However, later in his report, Dr. Tanksale states, that **create_fingerprint_by_filebuffer** is an alias for a different function, **create_fp_by_buffer**. While both functions perform the task of creating fingerprints of the audio, the ambiguity of the decompilation process shows **create_fp_by_buffer** calling the function **create_afp_session** with the wrong number of inputs.      I followed Dr. Tanksale's procedure for decompiling **create_fp_by_buffer** with a more recent version of the IDA Pro decompiler and the call to **create_afp_session** was similarly found in **create_fp**.      Accordingly, the analysis below is relevant to both functions identified by Dr. Tanksale as implementing the ACRCloud FP Algorithm and it assumes that the call to **create_afp_session** in **create_fp_by_buffer** is performed as shown in Dr. Tanksale's code for **create_fp**. If Dr. Moulin or Nielson argues that that is inappropriate, then their analysis has the flaw that their trace through the code does not properly identify relevant function parameters being passed.

52.     To create a fingerprint, the ACRCloud FP Algorithm uses a Fast Fourier Transform (FFT) to convert frames of audio from the time domain to the frequency domain. The procedure followed in the code follows these steps. The **create_fp** and/or the **create_fp_by_buffer** functions call the **gen_fp** function at Moulin Ex. 1, ln32 and ln. 1143

**Ex. 4 page 20 of 55**

to VidVita.  *See* Moulin Report at ¶154 ("TVision … provides VidVita with an ID (e.g.

tivo_source_id) that corresponds to the ID of the programming guide metadata.").

60.    As a result, I disagree with Dr. Moulin's opinion regarding Reference

Fingerprints (Moulin Report at §IX.1).  It is my opinion that the TVision does not infringe due to

VidVita's creating of reference fingerprints.

> **b. "determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power"**

61.    It is my opinion that this claim element requires a descriptor of a particular frame

to be determined by comparing the spectral powers of two frequency components from that same

frame.  I understand that Nielsen agrees.  *See* D.I. 75 (Joint Claim Construction Motion) at p. 5

("The frame "***descriptor***" mentioned above is generated by comparing the spectral powers of two

frequency components within a particular frame. (*Id.*, 11:24-28, 16:19-54.)") (emphasis in

original).

62.    Dr. Moulin also took the same position in his opinion when he stated "[t]his

descriptor uses information corresponding only to the frequency components in the first frame.

In other words, the descriptor is associated only with the first frame."  Moulin Report at ¶174.

Dr. Moulin's opinion is that the peak point determined by the **local_max** function is the claimed

"descriptor" of the first frame.  Moulin Report at ¶¶174-175.  I disagree.

63.    First, the ACRCloud FP Algorithm used by the accused TVision products

employs a local window to move one frame by one frame on the generated array of spectrum

values.  *See supra*. at §VIII.1.  The peak point is determined based on the points within the local

window.  *Id*.  When determining whether a particular point is a peak point, the **local_max**

function calls the **getRowMax** function to determine the maximum value of a row of ████

that is within the window.  *Id*. (Moulin Ex. 1, ln. 368).  Such determination is done by comparing

**Ex. 4 page 27 of 55**

the spectrum values of a frame ███████████████████████████

████████████        *See supra.* at §VIII.1 (Moulin Ex. 1, ln. 382; lns. 537; 565–70). █

████████████████████████████████████████████████████████

████████████████████████████████████████████



As a result, the accused TVision products determine a peak point of a local window by comparing the spectral powers of frequency points from ██████████████. This contradicts Dr. Moulin's opinion that "[t]his descriptor uses information corresponding only to the frequency components in the first frame." *See* Moulin Report at ¶174. Because the claim limitation requires <u>intraframe</u> calculation (the descriptor of a frame is calculated based on the two frequency components from the same frame), even assuming the peak point being calculated can be considered to be of the "frame," such <u>interframe</u> calculation does not practice the above-referenced claim element as confirmed by the '889 Patent specification at 2:56-65 ("**<u>Unlike known methods in the prior art that use interframe operations (e.g., operations based on sample data within different data sample frames)</u>** to generate digital spectral signatures, the

████████████████████████████████████

methods and apparatus described herein may be implemented using intraframe operations (e.g., operations based on sample data within a single frame).  Intraframe operations may include, for example, comparison operations, determining percentage differences between values, etc. that are performed on two or more values (e.g., spectral power values) that are uniquely associated with or derived from a single frame.") (Emphasis added).   Furthermore, Nielsen has not presented any argument that comparing values from different frames satisfies this claim limitation.

64.    Second, the ACRCloud FP Algorithm used by the accused TVision products employs a local window spanning over multiple frames.  *See supra*. at §VIII.1.  The peak point from the **local_max** function is the point with the maximum spectrum value for all the frames within the local window, not a single frame.  *See supra*. at §VIII.1 (the **local_max** function calling the **getRowMax** function and the **isListMax** function).  Contrary to Dr. Moulin's opinion that "the descriptor is associated only with the first frame," *see* Moulin Report at ¶174, even though the peak point eventually ends up in a frame, the peak point is the measurement of the local time-frequency window as illustrated below.

**Ex. 4 page 29 of 55**



Indeed, because each "peak point" is based off the calculation of the points from the local window, not a single frame, many frames would not have a peak point at all. As a result, the ACRCloud FP Algorithm used by the accused TVision products does not practice the "determining a first descriptor **of the first frame**" limitation.

65.    As a result, I disagree with Dr. Moulin's opinion regarding this element (Moulin Report at §IX.1.c). It is my opinion that the accused TVision products do not practice this claim element.

### c.  "generating a first signature based on the first descriptor"

66.    Because the accused TVision products do not have "the first descriptor [of the first frame]" as I explained above, they do not practice this claim element that requires "the first descriptor." *See supra*. at §VIII.2.b.

67.    Further, the **nice_max** function that Dr. Moulin pointed to as generating a signature does not have descriptors A, B, C, D as explained by Dr. Moulin. *Compare* Moulin

Dated:  November 21, 2023

_____

David Anderson, Ph.D.

-50-

Exhibit 5

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

|  |  |
|---|---|
| THE NIELSEN COMPANY (US), LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> TVISION INSIGHTS, INC., <br><br> *Defendant*. | C.A. No. 1:22-cv-0057-CJB <br> Magistrate Judge Christopher J. Burke <br><br> **JURY TRIAL DEMANDED** |

## REBUTTAL EXPERT REPORT OF DR. VINAYAK TANKSALE

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**I. INTRODUCTION**                                                                                     **3**

**II. QUALIFICATIONS**                                                                                  **4**

**III. SCOPE OF WORK**                                                                                  **4**

**IV. MATERIALS RELIED UPON**                                                                           **4**

**V. BACKGROUND AND INTRODUCTION**                                                                      **5**

    **A. MY ANALYSIS IS CORRECTLY FOCUSED ON THE ACRCLOUD METHOD
EMPLOYED BY TVISION**                                                                                   **5**

    **B. MY FINDINGS ARE CONSISTENT WITH ACRCLOUD'S DESCRIPTION OF ITS
TECHNOLOGY**                                                                                            **12**

    **C. MY ANALYSIS PROPERLY ANALYZES THE TREATMENT OF FRAMES AND
SAMPLES IN THE ACRCLOUD ALGORITHM**                                                                     **15**

    **D. MY ANALYSIS PROPERLY INTERPRETS THE DECOMPILED PSEUDOCODE
CREATED FROM THE ACRCLOUD SDK**                                                                         **19**

**VI. DR. ANDERSON'S REPORT IS DEEPLY FLAWED**                                                          **26**

    **A. DR. ANDERSON'S ANALYSIS IS RIDDLED WITH ERRORS AND FALSE
ASSUMPTIONS THAT LEAD HIM TO ERRONEOUS CONCLUSIONS**                                                    **27**

    **B. DR. ANDERSON'S CONCLUSIONS ARE UNSOUND**                                    **35**

        **1. DR. ANDERSON'S ANALYSIS IS BASED ON THE INCORRECT ACRCLOUD
METHOD**                                                                                                **36**

        **2. DR. ANDERSON'S CONCLUSIONS ARE INCONSISTENT WITH ACRCLOUD'S
OWN DESCRIPTION OF ITS TECHNOLOGY**                                                                     **37**

**VII. CONCLUSION**                                                                                     **40**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

## I.    INTRODUCTION

1. I, Vinayak Tanksale, submit this rebuttal expert report on behalf of Plaintiff The Nielsen Company (US), LLC ("Nielsen"). I have been retained by Nielsen to provide decompiled pseudocode from certain ACRCloud object code and to provide certain opinions relating to the decompilation.

2. I am not an employee of Nielsen or any affiliate or subsidiary of Nielsen. Nor do I have a financial interest in Nielsen or the outcome of this case.

3. My employer, Quandary Peak Research, Inc., has been compensated at a rate of $325 USD per hour for my time working on this matter. My compensation is in no way contingent on the outcome of this matter. I have been assisted in my work by qualified staff. However, the substance of the facts and opinions about which I am expected to testify reflect my personal opinions, based on my education and experience and review of various materials.

4. The bases for my opinions are discussed in detail below. If called as an expert witness in this matter, I anticipate that my testimony may concern the matters addressed below. Additionally, I anticipate that I may comment on materials relating to these topics that may later become available and I reserve the right to supplement or amend this report upon receipt of any new information made available to me, including documents yet to be produced or depositions yet to be taken. I also reserve the right to offer additional testimony in response to any matters raised by TVision or their experts, and/or in light of any relevant orders from the Court.

5. In connection with my testimony, I may present visual aids and demonstrative exhibits that illustrate the analysis discussed in this report.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

with respect to the call to the function **create_afp_session**. Dr. Anderson glosses over this difference, but as I explain in greater detail in following sections, the difference in how **create_afp_session** is called in the pseudocode for **create_fp** and **create_fp_by_buffer** illustrates deep flaws in Dr. Anderson's analysis.

17. At a high level, Dr. Anderson's analysis shows that he fails to understand how to use the IDA Pro software. A click of the mouse in the IDA Pro terminal confirms that both **create_fp_by_buffer** and **create_fp** load the function **create_afp_session** from the same memory address, **LOAD:0000000000013240**. The calls to **create_afp_session** in the pseudocode for **create_fp** and **create_fp_by_buffer** appear to differ, for example, in the position of the variable containing the value "0x1000200020002LL;" in **create_fp** this value is stored in the variable **v12**, Ex. 1, ln. 24, and is passed to **create_afp_session** as the 7th parameter. On the other hand, in **create_fp_by_buffer** this value is stored in variable **v17** and is passed to **create_afp_session** in the second parameter shown in the pseudocode.

18. Dr. Anderson's analysis of the **create_afp_session** function views this discrepancy as a justification for reviewing the **create_fp** function rather than the **create_fp_by_buffer** that is actually called by the TVision source code.

19. It appears to me that Dr. Anderson apparently reached this erroneous conclusion because he does not appear to understand the differences between decompiled pseudocode and source code. Specifically, Dr. Anderson does not understand that only those variables that are actually referenced in the compiled, executable version of the application will appear in the pseudocode created by decompiling the executable.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

compounds this error repeatedly, leading him to baseless and erroneous conclusions as a consequence of this false assumption.

106.    Dr. Anderson's description of the ACRCloud algorithm is substantially different from what is described in the ACRCloud White Paper. This is a bold claim, and Dr. Anderson does not explain the discrepancy between his version of the ACRCloud algorithm and the description of that algorithm in the ACRCloud White Paper. Given this failure, and the numerous errors in his analysis, detailed above, Dr. Anderson's analysis is fatally flawed, totally unreliable, and should be given no weight.

## VII.    CONCLUSION

107.    Based on the foregoing analysis I conclude that my analysis of the ACRCloud SDK is accurate and Dr. Anderson's analysis is fatally flawed as a consequence of numerous errors and false assumptions that have led him to baseless and incorrect conclusions.

I, Vinayak Tanksale, hereby declare under penalty of perjury under the laws of the United States of America, that the foregoing Report is true and correct to the best of my knowledge.

Date: 12/15/2023

_____

Vinayak Tanksale

Exhibit 6

| | |
|---|---|
| **From:** | Yovits, Steven |
| **To:** | Ajay Krishnan; Gaddy, Mel; Julia L. Allen; Nate Hoeschen; arussell@shawkeller.com |
| **Cc:** | Koutsoubas, Constantine; Palapura, Bindu A.; David Moore; Yovits, Steven |
| **Subject:** | RE: Motion to Stay |
| **Date:** | Wednesday, February 8, 2023 2:21:56 PM |

Hi Ajay,

We have decided to dismiss the '889 patent from the ACRCloud case.  I assume that moots the question regarding a motion to stay.

Thanks,
Steve


**STEVEN YOVITS**

**Kelley Drye & Warren LLP**
Tel: (312) 857-7099
Cell: (312) 593-3361


---

**From:** Ajay Krishnan <AKrishnan@keker.com>
**Sent:** Friday, February 3, 2023 1:02 PM
**To:** Gaddy, Mel <MGaddy@KelleyDrye.com>; Julia L. Allen <JAllen@keker.com>; Nate Hoeschen <nhoeschen@shawkeller.com>; arussell@shawkeller.com
**Cc:** Koutsoubas, Constantine <CKoutsoubas@KelleyDrye.com>; Yovits, Steven <SYovits@KelleyDrye.com>; Palapura, Bindu A. <bpalapura@potteranderson.com>; David Moore <dmoore@potteranderson.com>
**Subject:** RE: Meet & Confer - Amended Answer - Nielsen v. TVision (243 patent)

> **CAUTION: This message originated outside of Kelley Drye and was sent by:**
> **akrishnan@keker.com**

Mel – thanks, that works for us. We also saw that ACRCloud has waived service in their case. So we'd also like to discuss on the same call, with Delaware counsel present, TVision's contemplated motion to stay litigation of the 889 motion pending resolution of the ACRCloud case.

Thanks,

Ajay


---

**Ajay Krishnan**
Keker, Van Nest & Peters LLP

**Ex. 6 page 1 of 3**

633 Battery Street
San Francisco, CA 94111-1809
415 676 2267 direct | 415 391 5400 main
akrishnan@keker.com | vcard | keker.com

---

**From:** Gaddy, Mel <MGaddy@KelleyDrye.com>
**Sent:** Friday, February 3, 2023 7:22 AM
**To:** Julia L. Allen <JAllen@keker.com>; Ajay Krishnan <AKrishnan@keker.com>; Nate Hoeschen <nhoeschen@shawkeller.com>; arussell@shawkeller.com
**Cc:** Koutsoubas, Constantine <CKoutsoubas@KelleyDrye.com>; Yovits, Steven <SYovits@KelleyDrye.com>; Palapura, Bindu A. <bpalapura@potteranderson.com>; David Moore <dmoore@potteranderson.com>
**Subject:** Meet & Confer - Amended Answer - Nielsen v. TVision (243 patent)

[EXTERNAL]

---

Hi Julia & Ajay – Thank you for sending the amended pleading.

In light of the length of its additions, would your team be available to meet and confer next Monday, February 6 at 9:00 AM Pacific / 11:00 AM Central / 12:00 PM Eastern?

Thanks,
Mel

**MEL GADDY**

Kelley Drye & Warren LLP
Tel: (312) 857-2507
Cell: (312) 579-6449

---

**From:** Courtney Harris <charris@shawkeller.com>
**Sent:** Thursday, February 2, 2023 3:59 PM
**To:** bpalapura@potteranderson.com; Katz, Clifford <CKatz@KelleyDrye.com>; Koutsoubas, Constantine <CKoutsoubas@KelleyDrye.com>; Schenerman, Jolie <JSchenerman@KelleyDrye.com>; Gaddy, Mel <MGaddy@KelleyDrye.com>; Moore, David <dmoore@potteranderson.com>; Yovits, Steven <SYovits@KelleyDrye.com>
**Subject:** C.A. No. 22-1345-CJB The Nielsen Company (US), LLC, v. TVision Insights, Inc. - Amended Answer

---

| CAUTION: This message originated outside of Kelley Drye and was sent by: charris@shawkeller.com |
| --- |

Please find attached the following document:

- Amended Answer to Complaint for Patent Infringement

Courtney N. Harris
*Senior Paralegal*
**SHAW KELLER LLP**
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE  19801
(302) 298-0716- Telephone
(302) 300-4026- Facsimile

NOTE:  This email may contain PRIVILEGED and CONFIDENTIAL information and is intended only for the use of the specific individuals(s) to which it is addressed.  If you are not an intended recipient of this email, you are hereby notified that any unauthorized use, dissemination or copy of this email or the information contained in it or attached to it is strictly prohibited.  If you have received this email in error, please delete it and immediately notify the person named above by reply email.  Thank you.

This message is subject to Kelley Drye & Warren LLP's email communication policy.
KDW-Disclaimer

**Ex. 6 page 3 of 3**

Exhibit 7

| From: | Yovits, Steven |
|---|---|
| To: | Jason Xu; Eric Cohen |
| Cc: | Palapura, Bindu A.; Moore, David E.; Brown, Andrew L.; Lewis, Douglas; Koutsoubas, Constantine; Yovits, Steven |
| Subject: | RE: ACRCloud"s Source Code |
| Date: | Monday, August 21, 2023 4:42:55 PM |

Dear Jason,

Thank you for speaking with me this afternoon.  I will get back to you shortly regarding the dates you proposed.

Thank you also for confirming on our call that TVision will not attempt to use the ACRCloud source code for any purpose (per my email below).

Best regards,
Steve

**STEVEN YOVITS**

**Kelley Drye & Warren LLP**
Tel: (312) 857-7099
Cell: (312) 593-3361

---

**From:** Yovits, Steven
**Sent:** Monday, August 14, 2023 1:08 PM
**To:** Jason Xu <jason.xu@rimonlaw.com>; Eric Cohen <eric.cohen@rimonlaw.com>
**Cc:** 'Palapura, Bindu A.' <bpalapura@potteranderson.com>; 'Moore, David E.' <dmoore@potteranderson.com>; Brown, Andrew L. <abrown@potteranderson.com>; Lewis, Douglas <DLewis@kelleydrye.com>; Koutsoubas, Constantine <CKoutsoubas@KelleyDrye.com>; Yovits, Steven <SYovits@KelleyDrye.com>
**Subject:** ACRCloud's Source Code

Dear Jason,

Since the beginning of the 1:22-cv-00057-CJB case, TVision's position is and has been that it does not have ACRCloud's source code in its possession, custody, or control – and that therefore, it would be impossible for TVision to produce the code to Nielsen.

Nielsen has unsuccessfully attempted, through a Hague Convention request, to obtain ACRCloud's source code from ACRCloud directly.  In addition, as soon as Nielsen learned that there are or were ACRCloud entities in the U.S., Nielsen served a subpoena for the source code on those entities.  Those efforts, too, apparently have

been unsuccessful.  And finally, Nielsen asked you, in your role as counsel for ACRCloud in the 1:22-cv-01344-CJB case, to (1) help secure ACRCloud's compliance with the above-mentioned Hague Convention request; and (2) consider a cross-use agreement that would allow Nielsen to use, in the 1:22-cv-00057-CJB case, the ACRCloud source code it accesses in the 1:22-cv-01344-CJB case.  Your response was that you are unable to help with regard to the Hague Convention request and that you are unwilling to consider a cross-use agreement.

Given the extensive efforts Nielsen has made to obtain access to ACRCloud's source code, and TVision's (and its counsel's) continual insistence that it cannot produce or help Nielsen secure access to the code, it would be unfair and prejudicial for TVision to attempt to use ACRCloud's source code in the 1:22-cv-00057-CJB case for any purpose.  If TVision attempts to do so, Nielsen will ask the Court to disallow it.  We assume, unless you immediately tell us otherwise, that TVision will not attempt to do so.

Thank you.

Best regards,
Steve

**STEVEN YOVITS**
Chair, Patent Practice

**Kelley Drye & Warren LLP**
333 West Wacker Drive, 26th Floor
Chicago, IL 60606
Tel: (312) 857-7099
Cell: (312) 593-3361

syovits@kelleydrye.com

This message is subject to Kelley Drye & Warren LLP's email communication policy.
KDW-Disclaimer

**Ex. 7 page 2 of 2**

# Exhibit 8

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE NIELSEN COMPANY (US), LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> TVISION INSIGHTS, INC., <br><br> *Defendant*. | C.A. No. 1:22-cv-0057-CJB <br> Magistrate Judge Christopher J. Burke <br><br> **JURY TRIAL DEMANDED** |

## OPENING EXPERT REPORT OF VINAYAK TANKSALE

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**TABLE OF CONTENTS**

I. INTRODUCTION ................................................................................ 1

II. QUALIFICATIONS .......................................................................... 2

III. SCOPE OF WORK ........................................................................... 8

IV. MATERIALS RELIED UPON ......................................................... 8

V. BACKGROUND ............................................................................... 9

VI. TVISION'S USE OF THE ACRCLOUD SDK .............................. 14

VII. DESCRIPTION OF ACRCLOUD FUNCTIONALITY ................ 17

    A. Decompilation of the ACRCloud Python SDK ......................... 20

        1. Background ........................................................................... 20

        2. Methodology of Decompilation Using IDA Pro ................. 20

    B. Analysis of ACRCloud's Fingerprinting Algorithm. ............... 25

        1. Obtaining Frames of Media Samples ................................. 26

        2. Frequency Components ....................................................... 28

        3. Generating a Signature ....................................................... 31

    C. IDENTIFYING CONTENT ....................................................... 33

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

## I.  INTRODUCTION

1.  I, Vinayak Tanksale, submit this expert report on behalf of Plaintiff The Nielsen Company (US), LLC ("Nielsen"). I have been retained by Nielsen to provide decompiled pseudo-code from certain ACRCloud object code and to provide certain opinions relating to the process of decompilation.

2.  I am not an employee of Nielsen or any affiliate or subsidiary of Nielsen. Nor do I have a financial interest in Nielsen or the outcome of this case.

3.  I have never testified as an expert witness. My employer, Quandary Peak Research, Inc., has been compensated at a rate of $325 USD per hour for my time working on this matter. My compensation is in no way contingent on the outcome of this matter. I have been assisted in my work by qualified staff. However, the substance of the facts and opinions about which I am expected to testify reflect my personal opinions, based on my education and experience and review of various materials.

4.  The bases for my opinions are discussed in detail below. If called as an expert witness in this matter, I anticipate that my testimony may concern the matters addressed below. Additionally, I anticipate that I may comment on materials relating to these topics that may later become available and I reserve the right to supplement or amend this report upon receipt of any new information made available to me, including documents yet to be produced or depositions yet to be taken. I also reserve the right to offer additional testimony in response to any matters raised by TVision or their experts, and/or in light of any relevant orders from the Court.

5.  In connection with my testimony, I may present visual aids and demonstrative exhibits that illustrate the analysis discussed in this report.

1

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

- Outstanding Teaching Assistant Award. Computer Science, Purdue University. 2000 - 2001

- Outstanding Teaching Assistant Award. Computer Science, Purdue University. 1999 – 2000

20. I have also been a consultant for Quandary Peak since October 2021. In that role, I have conducted extensive code reviews on multiple software systems including assisting and leading the decompilation of software binary code such as the code discussed below.

## III. SCOPE OF WORK

21. I have been retained by Nielsen to render testimony regarding ACRCloud's automatic content recognition platform software development kit (hereinafter "ACRCloud SDK"). Specifically, I was asked to provide decompiled pseudo-code from certain ACRCloud object code and provide opinions relating to that pseudo-code.

22. I am the person solely responsible for the opinions contained in this report. I was assisted in my investigation by qualified staff. All analysis and other assistance in connection with the preparation of this report was performed and provided by me or my staff under my supervision and direction. The opinions expressed in this report, however, are my own. I reserve the right to amend or supplement any of the findings and opinions expressed in my reports if I receive additional information bearing on the issues I have been asked to address.

## IV. MATERIALS RELIED UPON

23. The materials relied upon to draft this report are cited throughout the text of this report and in Appendix B. This report principally deals with my reverse engineering and

8

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

analysis of fingerprinting functionality implemented in the ACRCloud SDK, which is based on my review of the following ACRCloud SDK library:

a. https://github.com/acrcloud/acrcloud_sdk_python/blob/master/docker_alpine/x86-64/python2.7/acrcloud/acrcloud_extr_tool.so

## V. BACKGROUND

24. My opinions are related to decompiled object (binary) code for the ACRCloud SDK identified above.[2] The decompiled object code for this library was created using a tool called IDA Pro, which "can generate assembly language source code from machine-executable code and make this complex code more human-readable."[3] Decompilation of Java and C++ applications is well established.[4] The following paragraphs provide additional background and my review methodology.

25. Source code is a set of instructions and statements written in a specific programming language. It serves as the foundation for computer programs or software applications. Programmers write source code to define the logic, behavior, and functionality of a program. This code is then translated or compiled into binary code, which the computer's processor can execute.

---

[2] Technically speaking, decompilation is the process by which assembly code is translated and transformed into pseudo-code, i.e., a plain language description of the steps in an algorithm that uses structural conventions of a normal programming language and is intended to be readable by a computer programmer of ordinary skill. Decompilation typically follows another step that is commonly referred to as "disassembly," in which the object code (binary) of an application is translated into a series of low-level instructions, i.e., an assembly language, that corresponds to the binary machine code instructions.

[3] *See* https://hex-rays.com/ida-pro/ (Exhibit 2).

[4] *See, e.g.,* Vinciguerra, Lori, et al. "An experimentation framework for evaluating disassembly and decompilation tools for C++ and Java." *10th Working Conference on Reverse Engineering, 2003. WCRE 2003. Proceedings.*. IEEE Computer Society, 2003. (presenting extensive study and empirical performance data); Cifuentes, Cristina. "Reverse engineering and the computing profession." *Computer* 34.12 (2001): 168-167 (addressing the reliability of reverse engineering as an approach to the study of software applications); Treude, Christoph, et al. "An exploratory study of software reverse engineering in a security context." *2011 18th Working Conference on Reverse Engineering.* IEEE, 2011 (outlining processes and tools for reverse engineering as well as the resulting creation of artifacts).

9

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

26. Binary code (also known as object code) is the set of instructions that a computer's
processor understands and uses to run software or programs. When software developers
write a computer program in a high-level language like Python or Java, the computer
cannot directly understand it. It needs to be translated into a format that consists of zeros
and ones (binary) for the computer's processor to execute. This translation process is
done by a special program called a compiler or interpreter. The ACRCloud SDK that I
reviewed in this case is made available to the public in the form of compiled binary files.[5]

27. A software library is a collection of pre-made tools or building blocks that programmers
can use to make their job easier. Software libraries save time and effort, making it faster
and more efficient to develop software. They also help ensure that common tasks are
handled reliably and consistently across different applications because the code in the
library has likely been thoroughly tested and refined. Software libraries are typically
compiled to improve the speed and performance of the functionality provided by the
library. In summary, software libraries typically provide a collection of related
functionality that has been tested, approved, and packaged into a compact, portable form
that can be used by other developers to implement functionality in their own applications.
In this way, a software library is similar to an appliance that can be purchased off the
shelf and installed in a home—the person buying the appliance does not have to know
how it works, only how to plug it in and use its controls.

28. As set forth in greater detail below, I reverse engineered the ACRCloud SDK using a
software tool called IDA Pro to create pseudo-code from ACRCloud SDK library object
code (identified above). Reverse engineering of software is an analytical process that

---

[5] *See* https://github.com/acrcloud/ (Exhibit 3) (native files produced in connection with this report).

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

involves dissecting a software application to uncover its underlying structure, functionality, and design. This practice is employed for various purposes, including understanding legacy systems, creating interoperable software, and identifying security vulnerabilities. Reverse engineering is particularly valuable when access to the original source code is unavailable or when the code has been deliberately obfuscated, for example, to protect intellectual property.[6]

29. The process I employed to reverse-engineer the ACRCloud SDK is typically referred to as the decompilation of that code.[7] Decompilation is the process of converting low-level binary code back into a higher-level programming language representation, making it easier for analysts to comprehend the functionality originally implemented in the source code. It is well understood that through techniques such as disassembly, decompilation, and dynamic analysis, researchers and analysts can gain insights into the internal workings of a program, allowing them to reconstruct its high-level logic and algorithms.[8]

30. In other words, decompilation is a reverse engineering process in which a software program's binary code, which is in a machine-readable format, is transformed back into a higher-level human-readable language, typically a form of source code that is referred to

---

[6]Colberg, C., and J. Nagra. Surreptitious Software: Obfuscation, Watermarking, and Tamperproofing for Software Protection. Addison-Wesley, 2011.

[7]See, e.g., Cifuentes, Cristina. "Reverse engineering and the computing profession." Computer 34.12 (2001): 168; *see also* Fokin, Alexander, Katerina Troshina, and Alexander Chernov. "Reconstruction of class hierarchies for decompilation of C++ programs." 2010 14th European Conference on Software Maintenance and Reengineering. IEEE, 2010 (demonstrating automatic reconstruction of C++ code from assembly code using function tables) (Fokin, et. al.'s work has been incorporated into IDA Pro interactive disassembler)

[8] *See, e.g.*, Cifuentes, Cristina. "Reverse engineering and the computing profession." Computer 34.12 (2001): 168; *see also* Fokin, Alexander, Katerina Troshina, and Alexander Chernov. "Reconstruction of class hierarchies for decompilation of C++ programs." *2010 14th European Conference on Software Maintenance and Reengineering*. IEEE, 2010 (demonstrating automatic reconstruction of C++ code from assembly code using function tables) (Fokin, et. al.'s work has been incorporated into IDA Pro interactive disassembler)

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

as "pseudo-code." This process is employed, for example, to understand or modify an existing program for which the original source code is unavailable or lost.

31. Consistent with the approach I have described, reverse engineering from object code files involves analyzing and understanding a program's behavior, design, and functionality by examining its source code. In this case, once decompiled code has been obtained, it is possible to ascertain the functionality and data structures used in the software, including the parameters passed to functions, return values of functions, and conditional and looping structures within each function.

32. While the availability of comments within the source code and README files enhance the readability of the underlying code, it does not necessarily represent what the compiled object code is actually doing. Comments, for example, are not compiled. README Files are also not compiled. Decompiling the actual object code binaries tells someone exactly what the code is doing.

33. For example, a function can be written in source code to multiply by the variable "X" and then divide by that same variable "X" many lines later in the same method. Since "X" is canceled out, the compiler may not include those steps in the actual instructions being sent to the processor. But, someone reading the source code could be misled into thinking that "X" is relevant to that function.

34. The source code is akin to the blueprints of a house drawn up by the architect. It will lay out the general dimensions of the house and provide instructions for the builder. Decompiled code is akin to recreating those blueprints from a survey of the actual house after it is built. These recreated blueprints will have the actual dimensions and other details of the house.

12

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**content_prediction_frame** function calls the **disambiguate_content_fingerprints** function at ln. 222.[95]

108.    The function **disambiguate_content_fingerprints** takes the raw linear data frame to disambiguate multiple choices of content fingerprints for the same device observation timestamp.[96]

> The chosen observation fingerprint obeys the following rules: - If there is a previous fingerprint for a previous timestamp on the same content ID, choose the least candidate fingerprint which is >= the previous one. –Otherwise choose the latest fingerprint which is <= the observation timestamp. Otherwise choose the earliest fingerprint.[97]

*        *        *

I, Vinayak Tanksale, hereby declare under penalty of perjury under the laws of the United States of America, that the foregoing Report is true and correct.


Date: 10/23/2023                                                  _____

                                                                                    Vinayak Tanksale

---

[95] Ar.py (ln. 222) (TVSN_NLSN_SC_00000349).

[96] Ar.py (lns. 161–199) (TVSN_NLSN_SC_00000348).

[97] Ar.py at lns. 163–169 at TVSN_NLSN_SC00000348. *See id.* lns. 175–199 (TVSN_NLSN_SC_00000349). *See also* ar.py (TVSN_NLSN_SC_00000347–52), lns. 202–224 (content_prediction_frame); lns. 227–67 (linear_fringe_map); lns. 270–299 (interpolate_fingerprints); lns. 301–71 (linear_predict_content); lns. 444–474 (predict_frame).

37

Exhibit 9

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

THE NIELSEN COMPANY (US), LLC,

    *Plaintiff,*

  v.

TVISION INSIGHTS, INC.,

    *Defendant.*

C.A. No. 1:22-cv-0057-CJB
Magistrate Judge Christopher J. Burke

**JURY TRIAL DEMANDED**

<u>**OPENING EXPERT REPORT OF PIERRE MOULIN**</u>

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

# TABLE OF CONTENTS

I.     INTRODUCTION ............................................................................................. 1

II.    PERSONAL BACKGROUND AND EXPERT QUALIFICATIONS........................... 2

III.   DOCUMENTS REVIEWED ............................................................................ 6

IV.   SUMMARY OF OPINIONS ........................................................................... 7

V.    PERSON OF SKILL IN THE ART ................................................................. 7

VI.   AUDIO SIGNATURES.................................................................................. 7

    A.   Background Information................................................................ 7

    B.   Frequency-Domain Transforms ................................................... 8

    C.   Signature Generation for Content Matching................................ 13

VII.  U.S. PATENT NO. 7,783,889 ..................................................................... 16

    A.   Background of the '889 patent.................................................... 16

    B.   Asserted Claims and their Meaning ........................................... 18

VIII. TVISION'S USE OF PROCESSORS AND ACRCLOUD............................... 19

    A.   Reference Fingerprints Background ........................................... 20

    B.   Device Fingerprints Background ............................................... 22

    C.   Decompilation of the ACRCloud FP Algorithm ......................... 26

    D.   Analysis of the ACRCloud FP Algorithm .................................. 27

         1.   Obtaining Overlapping Frames of Media Samples.................. 29

         2.   Frequency Components .......................................................... 31

         3.   Generating a Signature........................................................... 34

IX.   INFRINGEMENT OF THE ASSERTED CLAIMS ..................................... 36

         1.   Claim 1..................................................................... 37

         2.   Claim 2—"A method as defined in claim 1, further comprising identifying media information based on the first signature." ................. 63

         3.   Claim 4—"A method as defined in claim 2, wherein the media information is associated with at least one of audio information or video information."..................................................................... 70

         4.   Claim 5—"A method as defined in claim 1, wherein the first descriptor is associated with only the first frame of media samples."........................................................................... 71

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

5.      Claim 6—"A method as defined in claim 1, wherein the second descriptor is of the second frame of media samples." ............................ 72

6.      Claim 8 .................................................................................................. 73

7.      Claim 9—"An apparatus as defined in claim 8, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature." ........................ 81

8.      Claim 11—"An apparatus as defined in claim 8, wherein the first descriptor is associated with only the first frame of media samples." .................................................................................................. 82

9.      Claim 12—"An apparatus as defined in claim 8, wherein the instructions stored in the memory enable the processor system to: obtain a first plurality of media samples; and identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples." .................................................................................................. 83

10.     Claim 13—"An apparatus as defined in claim 8, wherein the third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples." .................................................................................................. 84

11.     Claim 14 ................................................................................................ 85

12.     Claim 15—"A tangible machine accessible medium as defined in claim 14, wherein the first descriptor is associated with only the first frame of media samples." ................................................................. 93

13.     Claim 16—"A tangible machine accessible medium as defined in claim 14 having instructions stored thereon that, when executed, cause the machine to: obtain a first plurality of media samples; and identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples." ........................................................... 94

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

14.    Claim 17—"A tangible machine accessible medium as defined in claim 14, wherein third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples." ........................................................... 95

X.    Alleged Alternatives ............................................................................. 97

   A.    Dat-Track ......................................................................................... 97

   B.    MRLMobile Research Labs (MRL) .................................................. 98

   C.    Axwave ........................................................................................... 100

   D.    Summary ......................................................................................... 101

XI.    CONCLUSION ..................................................................................... 102

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

## I.   INTRODUCTION

1.      I, Pierre Moulin, submit this expert report on behalf of Plaintiff The Nielsen Company (US), LLC ("Nielsen"). I have been retained by Nielsen to provide expert opinions regarding U.S. Patent No. 7,783,889 ("the '889 patent"). In this report, I provide opinions concerning infringement of claims 1, 2, 4–6, 8, 9, and 11–17 of the '889 patent by Defendant TVision Insights, Inc. ("TVision").

2.      I am not an employee of Nielsen or any affiliate or subsidiary of Nielsen. Nor do I have a financial interest in Nielsen or the outcome of this case. I am being compensated for my work at $500/hour. My compensation is not dependent on the outcome of this case or on the content of my opinions.

3.      The bases for my opinions are discussed in detail below. If called to testify as an expert witness in this matter, I anticipate that my testimony may concern the matters addressed below. Additionally, I anticipate that I may comment on materials relating to these topics that may later become available, and I reserve the right to supplement or amend this report upon receipt of any new information made available to me, including documents yet to be produced or depositions yet to be taken. I also reserve the right to offer additional testimony in response to any matters raised by TVision or their experts, and/or in light of any relevant orders from the Court.

4.      In connection with my testimony, I may present visual aids and demonstrative exhibits that illustrate the analysis discussed in this report.

5.      Unless otherwise noted, the statements made in this Report are based on my personal knowledge and experience, and if called to testify about this Report, I could and would do so competently and truthfully.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

171.    As detailed below, ACRCloud's FP Algorithm determines a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power. *See, supra*, ¶¶ 117–131 (Section VIII.D.2 Frequency Components) (incorporated by reference).

172.    As set forth above, for each "frame of media samples" that is being analyzed (including the "first frame of media samples"), the **gen_fp** function calls the **spectrogram** function. *See* Moulin Ex. 1, ln. 133; *see also* ¶¶ 109–113, 161 (describing execution path from **create_fp_by_buffer** to the execution of **spectrogram**). The **spectrogram** function calls function **kkfft** which results in an array data object that includes the identified frequency components, spectral powers, and a time index for the frame being evaluated. Moulin Ex. 1, lns. 863–1076. *See also id.*, lns. 216–28. *See, supra*, ¶¶ 166–167 (incorporated by reference).

173.    The **gen_fp** function calls the **local_max** function. Moulin Ex. 1, ln. 133; lns. 273–504 (**local_max** definition). The **local_max** function calls the **getRowMax** function for the first frame of samples with a given window size. Moulin Ex. 1, ln. 382; lns. 537–611 (**getRowMax** definition). The **getRowMax** function determines the first descriptor by applying a sequence of steps to the array data object containing the frequency components and spectral powers discussed above in paragraph 172.

174.    The first step consists of comparing the spectral power of the first frequency component in the given sample to the spectral power of the second frequency component, and retaining the largest one. Moulin Ex. 1, lns. 555–70. The second step consists of comparing the spectral power of the retained frequency component from step one with the spectral power of the next frequency component, and, again, retaining the largest one. Moulin Ex. 1, lns. 555–70. This goes on for all of the identified frequency components from the FFT. Once this procedure goes

47

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

I, PIERRE MOULIN, hereby declare under penalty of perjury under the laws of the United

States of America, that the foregoing Report is true and correct.

Date: ___October 25, 2023_____                 *Pierre Moulin*
                                         _____
                                              Pierre Moulin

103

# EXHIBIT 10

| From: | Lewis, Douglas |
|---|---|
| To: | Eric Cohen; Jason Xu |
| Cc: | Andrew Russell; Nate Hoeschen; Brown, Andrew L.; Moore, David E.; Palapura, Bindu A.; Yovits, Steven; Nielsen_TVision_team |
| Subject: | Nielsen v. TVision/follow up to M&C call |
| Date: | Tuesday, January 16, 2024 12:26:10 PM |

Eric and Jason,

I am writing about the issues discussed during our call last Friday, January 12, 2024.

First, as I indicated during our call, Nielsen does not agree to your proposal to consolidate its three pending cases against TVision and to stay them. You proposed staying all three cases and trying the last case filed, presumably 1:23-cv-01346, first in early 2026.  As I explained during the call, all three cases are at different parts of their lifecycle and consolidating them will necessitate moving the trial date scheduled for later this year in the 0057 case. We also do not agree with your assertion that the cases have significant factual overlap or that consolidating would advance judicial economy or lower the cost of proceeding. Indeed, consolidation, and your proposal in particular, would do nothing except allow TVision to put off a reckoning for its patent infringement.

Second, we do not agree to a stay in the 1345 case (involving the '243 patent). That case has been pending for about 15 months and has progressed significantly. It is too late to request a stay.

Third, regarding TVision's proposal to ask ACRCloud for its source code and to allow the parties' experts to review and opine on that, Nielsen notes that fact discovery closed some time ago. It is too late to bring new documents into the case and to reopen expert reports. Moreover, we sought your cooperation to get source code from ACRCloud during fact discovery, but you would not agree to even ask, even though you represent both TVision and ACRCloud. TVision cannot change its mind after discovery has closed, causing us to incur unnecessary expense and delay.

Finally, regarding Ms. Poppie's disclosure in our supplemented initial disclosures, we are willing to allow TVision to depose her. We are working to get dates in the next few weeks. Ms. Poppie is located in the Chicago area. We can make our Chicago office available for the deposition, if you'd like.

**DOUGLAS LEWIS**

**Kelley Drye & Warren LLP**
Tel: (312) 857-7073

This message is subject to Kelley Drye & Warren LLP's email communication policy.
KDW-Disclaimer

**Ex. 10**