IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) **Redacted - Public Version** |
| Plaintiff, | ) C.A. No. 22-057-CJB |
| v. | ) |
| TVISION INSIGHTS, INC., | ) |
| Defendant. | ) |

**LETTER TO THE HONORABLE CHRISTOPHER J. BURKE
FROM ANDREW E. RUSSELL REGARDING TVISION INSIGHTS, INC.
OPPOSITION BRIEF TO MIOTION TO ENFORCE DISCOVERY AGREEMENT**

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
P.O. Box B113
150 Fayetteville St, Suite 2800
Raleigh, NC 27601-2960
(984) 960-2860

Michael F. Heafey
RIMÔN LAW P.C.
800 Oak Grove Avenue, Suite 250
Menlo Park, CA 94025
(650) 461-4433

Dated: March 1, 2024

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

Dear Judge Burke,

[REDACTED]. During discovery, TVision objected to Nielsen's discovery requests on its proprietary project. Nielsen threatened to move to compel production of the material over TVision's objections. To avoid burdening the parties and the Court with a discovery dispute over material it did not intend to rely on (and has not relied on), TVision agreed not to use [REDACTED] for any purpose in this matter.

**TVision has not breached the agreement.** TVision's experts did not refer to [REDACTED] in their expert reports, by name or otherwise. TVision's damages expert, Joanne Johnson, explained that one of the *Georgia Pacific* factors for consideration in the hypothetical negotiation is "the costs associated with implementing a next-best alternative design," one of which could be "[REDACTED]" Ex. 1, Johnson Rebuttal Report at 49, ¶ 148, 149. She considered TVision's estimate, based on its own capabilities, of the time and up-front cost of developing such a system. *Id.* at 56-57, ¶¶ 167, 168 ("Mr. Sidhu estimates that it would take approximately [REDACTED]" [REDACTED] system, which includes [REDACTED]"). Dr. Anderson, TVision's technical expert, opined that [REDACTED] "could be completed [REDACTED] based on a discussion with TVision's Chief Technology Officer Inderbir Sidhu "to assess their technical capabilities and to discuss potential approach to such a project." D.I. 167-3.

**Nielsen's damages expert opened the door by referring to [REDACTED] in his reply expert report**. To rebut Ms. Johnson's report that TVision would have considered that it was economically and technologically feasible to [REDACTED] as part of the May 2018 hypothetical negotiation, Nielsen's damages expert, Dr. Keeley, stated the following: "[REDACTED]." Ex. 2, Keeley Reply Report at 9-10, ¶ 23 (emphasis added). Further, Nielsen's technical expert, Dr. Moulin stated in his reply expert report that [REDACTED]" Ex. 5 at 36, ¶ 107; *see also* Ex. 5 at 36-40. Having injected this issue back into the case on its own, Nielsen is in no position to complain that it lacks sufficient discovery to pursue it. "[W]hen one party introduces inadmissible evidence, the opposing party thereafter may introduce otherwise inadmissible evidence to rebut or explain the prior evidence." *Gov't of Virgin Islands v. Archibold,* 982 F.2d 180, 187 (3d Cir. 1993); *see also, U.S. v. Walker*, 421 F.2d 1298, 1299 (3d Cir. 1970).

**TVision's damages expert did not rely on [REDACTED] in her report.** Ms. Johnson made it clear during her deposition that her expert report did not rely on [REDACTED]. Ex. 3, Johnson Dep. at 79:8-20 ("Q. [REDACTED]"); *see also id.* at 105:4-106:18 (explaining that Mr. Sidhu's estimates were made for purposes of the hypothetical negotiation under the *Georgia Pacific* factors, and that Mr. Sidhu "noted that the estimate is

not what has historically happened because we are operating under two different assumptions"). Ms. Johnson also made it clear that she relied on both Mr. Sidhu and Dr. Anderson. *Id.* at 83:17-84:6.

**Mr. Sidhu's experience qualifies him to provide an estimate.** Mr. Sidhu is an engineer who has been a project leader for over 70 software development projects during his 20 plus year career. *Id*. at 64:5-20. He has an in-depth understanding of TVision and its development team's capabilities and limitations. Ms. Johnson opined, "Per my interview with Mr. Sidhu, I understand that TVision has the technical capabilities to develop ▬▬▬▬ ▬▬▬▬ . . . . Mr. Sidhu relied on his personal experience, as well as interviews with TVision's engineers, to estimate the ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬ . . . .

▬▬▬▬▬▬▬▬▬▬▬▬▬▬t." Ex. 1 at 56, ¶ 167.  There is no merit to Nielsen's argument that "Mr. Sidhu's opinions . . . necessarily rely on ▬▬▬▬▬▬ Ms. Johnson confirmed that her opinion in her expert report relied on Mr. Sidhu's experience: "you can provide an estimate of what you think something will take without actually doing it." Ex. 3, at 69:2-4. Further, TVision has "employed software development engineers who have demonstrated their technical capabilities in putting together very complex software. So given their demonstrated technical capabilities within other areas of TVision, Mr. Sidhu expressed that TVision had the technical capabilities." *Id*. at 74:16-75:1. ▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬▬" *Id.* at 75:8-15.



Ms. Johnson did respond to questions Nielsen's counsel asked about ▬▬▬▬▬▬ at her deposition.  To prepare for her deposition, and in view of Dr. Keeley raising ▬▬▬▬ ▬▬▬ in his reply report, Ms. Johnson had a conversation with Mr. Sidhu two days prior to her deposition to discuss ▬▬▬▬▬▬ in anticipation of questions she would be asked. *See* Ex. 3, 54:12-56:8 (reflecting a call with Mr. Sidhu two days before her deposition).  During her deposition, Nielsen's counsel asked Ms. Johnson several questions about ▬▬▬▬▬▬. *E.g.,* Ex. 3, 67:9-68:12; 77:7-78:14; 79:8-80:7; 106:2-107:13; 215:14-216:11.

In short, TVision has not breached the agreement.  TVision's experts relied on Mr. Sidhu's deep understanding of TVision's software development capabilities and limitations, as well as his general experience as a project leader in software development projects over a period of 20 years.  Nielsen's argument incorrectly assumes that Mr. Sidhu should be disqualified from providing TVision's experts with his estimates, but Ms. Johnson testified that the estimate that she received from Mr. Sidhu was with respect to the May 2018 hypothetical negotiation, which is different from ▬▬▬▬▬▬  Thus, the cases cited by Nielsen are inapposite.  When Nielsen took Mr. Sidhu's deposition, Nielsen asked Mr. Sidhu about ▬▬▬▬▬▬ and he answered every question to the best of his knowledge.  Ex. 4, Sidhu Dep. 125:14-139:13.

For the reasons set forth above, Nielsen's motion should be denied.

                                Respectfully submitted,

                                */s/ Andrew E. Russell*

                                Andrew E. Russell (No. 5382)

cc:    Clerk of Court (by CM/ECF & Hand Delivery)  
        All Counsel of Record (by CM/ECF & Email)

# Exhibit 1

Redacted in its entirety

# Exhibit 2

Redacted in its entirety

# Exhibit 3

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-------------------------------X
THE NIELSEN COMPANY (US), LLC,  )
         Plaintiff,             )
vs.                             ) No. 21-1592-CJB
TVISION INSIGHTS, INC.,         )
         Defendant.             )
-------------------------------)
THE NIELSEN COMPANY (US), LLC,  )
         Plaintiff,             )
vs.                             ) No. 22-57-CJB
TVISION INSIGHTS, INC.,         )
         Defendant.             )
-------------------------------X

Video-recorded deposition of JOANNE JOHNSON, at 333 West Wacker Drive, Chicago, Illinois, before Donna M. Kazaitis, IL-CSR, at 8:12 a.m. on Wednesday, January 24, 2024.

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

## Page 2

1  APPEARANCES:
2
3  ON BEHALF OF THE PLAINTIFF:
4      KELLEY DRYE & WARREN LLP
5      BY:  DOUGLAS LEWIS, ESQ.
6           333 West Wacker Drive
7           Chicago, Illinois 60606
            312.857.7070
8           dlewis@kelleydrye.com
9
10 ON BEHALF OF THE DEFENDANT:
11     RIMON LAW
12     BY:  ERIC C. COHEN, ESQ.
13          P.O. Box B113
14          150 Fayetteville Street, Suite 2800
15          Raleigh, North Carolina 27601-2960
16          984.960.2860
17          eric.cohen@rimonlaw.com
18
19
20 ALSO PRESENT:
21     Joseph Salinas (Legal Videographer)
22

## Page 3

```
                        INDEX
                                            PAGE
JOANNE JOHNSON
    Examination by Mr. Lewis                   6

                      EXHIBITS
JOHNSON                                       PAGE
Exhibit 1    Rebuttal expert report of          7
             Joanne Johnson
Exhibit 2    5/26/18 email,                    37
             TVSN_NLSN 00269606
Exhibit 3    2/2/18 email string,             111
             TVSN_NLSN 00660739 - 772
Exhibit 4    Tracxn web page                  170
Exhibit 5    crunchbase web page              173
Exhibit 6    "Start-ups and Early Stage       190
             Companies" article,
             TVision-JJ 00000015 - 25
Exhibit 7    Dr. Keeley's expert report       223
             on damages and Dr. Keeley's
             reply expert report on damages
```

## Page 4

```
                    EXHIBITS CON'T
JOHNSON                                       PAGE
Exhibit 8    Opening expert report of         223
             Dr. David Anderson regarding
             invalidity of U.S. Patent
             Number 7,783,889
Exhibit 9    Reply expert report of           224
             Pierre Moulin responding to
             report of Dr. David Anderson
             regarding infringement of U.S.
             Patent Number 7,783,889.
Exhibit 10   Rebuttal expert report of        224
             Dr. David Anderson regarding
             U.S. Patent Number 7,783,889
```

Page 5

1    THE VIDEOGRAPHER: This is File Number
2  1 of the videotaped deposition of Joanne Johnson
3  in the matter of The Nielsen Company US LLC v.
4  TVision in the United States District Court for
5  the District of Delaware, Case Number 21-1592-CJB
6  and Case Number 22-57-CJB.
7         This deposition is being held at
8  333 West Wacker, Chicago, Illinois, on
9  January 24, 2024. The time on the video screen is
10 now 8:12 a.m.
11        My name is Joseph Salinas. I'm the
12 videographer from Digital Evidence Group. The
13 court reporter is Donna Kazaitis also in
14 association with Digital Evidence Group.
15        Will counsel please introduce
16 themselves for the record.
17        MR. LEWIS: Douglas Lewis, Kelley Drye
18 & Warren, Chicago, for the plaintiff.
19        MR. COHEN: Eric Cohen, Rimon PC,
20 Chicago, for the defendant.
21        THE VIDEOGRAPHER: Will the court
22 reporter please swear in the witness.

Page 6

1         JOANNE JOHNSON,
2  having been first duly sworn, was examined and
3  testified as follows:
4              EXAMINATION
5  BY MR. LEWIS:
6      Q. Good morning, Ms. Johnson. How are
7  you?
8      A. Good morning.
9      Q. Are you -- please give your -- if you
10 would state your name for the record.
11     A. Joanne Johnson.
12     Q. And if you would state your business
13 address for the record.
14     A. 200 West Madison Street, Suite 1020,
15 Chicago, Illinois. Zip Code is 60606 perhaps?
16     Q. I just want to make sure I have the
17 right Johnson, so that's why I like the address on
18 there.
19        Are you associated with a firm of
20 some sort?
21     A. I am.
22     Q. And what firm is that?

Page 7

1      A. Ocean Tomo, a part of JSL.
2      Q. And you're the same Joanne Johnson who
3  submitted an expert report in the Nielsen v.
4  TVision case?
5      A. I am.
6      Q. So in front of you you have some
7  documents. If you could just state on the record
8  what you have in front of you there.
9      A. Sure. I have my rebuttal expert
10 report from November 21, 2023. I have Dr. Michael
11 Keeley's reports from October 25, 2023, as well as
12 his reply expert report dated December 15, 2023.
13        I also have the reply expert report
14 of Moulin, and the date is December 15, 2023. I
15 have the opening expert report of Dr. David
16 Anderson regarding invalidity dated October 25,
17 2023. I have the rebuttal expert report of
18 Dr. David Anderson regarding U.S. Patent Number
19 7,783,889 dated November 21, 2023.
20     Q. Great. I'm going to mark Exhibit 1.
21        (Deposition Exhibit 1 was marked
22           for identification.)

Page 8

1  BY MR. LEWIS:
2      Q. Ms. Johnson, the court reporter has
3  handed you what's been marked as Johnson Exhibit
4  1. Do you recognize that exhibit? (Document
5  tendered to the witness.)
6      A. Yes. It appears to be a copy of my
7  report, including the exhibits.
8      Q. Okay. Let me ask you then to turn to
9  Page 5 of the report, and I'm going to focus you
10 on Paragraph 12. Tell me when you're there.
11     A. I'm there.
12     Q. Is Paragraph 12 a summary of your
13 opinion as to damages in this case?
14     A. It is a very succinct summary of my
15 opinion. There's obviously more that could be
16 added.
17     Q. All right. Is it correct that your
18 opinion is that a reasonable royalty would be
19 appropriate in this case?
20     A. That's true.
21     Q. And is it your opinion that the
22 reasonable royalty would be a lump sum of, at

Page 53

1    MR. COHEN: Finish your answer.
2    MR. LEWIS: Please mark the time,
3  whoever of the two of you who do that.
4    THE WITNESS: The other factual
5  evidence, to answer your question, the other
6  factual evidence I rely on include Moulin's
7  report, Mr. Anderson's non-infringement report.
8        I also rely on publicly available
9  information, produced documents listed on Page 54,
10 additional produced documents that are referenced
11 on Page 55, and the narrative that relies on that,
12 additional deposition testimony regarding
13 different points going through at least Page 57.
14       And that's just in the section that
15 specifically addresses alternatives, but there are
16 other parts of my report that could also lend
17 itself to the factual evidence that feed into this
18 opinion.
19 BY MR. LEWIS:
20    Q.  Let me ask you to turn to Page 50 and
21 Paragraph 151.
22    A.  I'm there.

Page 54

1    Q.  So you are talking about the ACRCloud
2  vendor, is that right, in that paragraph?
3    A.  Yes.
4    Q.  And that's the vendor -- well, what's
5  your understanding of ACRCloud's role with respect
6  to TVision and this case?
7    A.  ACRCloud provides the software, the
8  SDK. And I would defer to the technical expert
9  for more of the specifics. But they are providing
10 the algorithm that is accused of infringing the
11 '889 Patent.
12    Q.  And you said here "per my interview
13 with Mr. Liu and Mr. Sidhu." Do you see that?
14    A.  Yes.
15    Q.  You had more than one interview with
16 Mr. Liu?
17    A.  Yes.
18    Q.  How many interviews did you have with
19 Mr. Liu?
20    A.  Around five I would say.
21    Q.  Over how long a period of time?
22    A.  Spanning from prior to the issuance of

Page 55

1  my report by perhaps a month or two up until this
2  Monday.
3    Q.  This past Monday?
4    A.  This past Monday.
5    Q.  The 22nd?
6    A.  If that's accurate.
7    Q.  Well, people read this record six
8  months from now. So I'm just trying to lock it
9  down.
10       So on or about the 22nd of January
11 2024; right?
12    A.  Sure.
13    Q.  Okay. And you talked to Mr. Sidhu as
14 well?
15    A.  Yes.
16    Q.  How many times did you talk to him?
17    A.  I've spoken with him more. So I
18 would, you know, maybe six or seven.
19       And Mr. Liu, you know, that five is
20 not a precise number. It might be four to five,
21 but it's in the general ballpark. And I had a few
22 more conversations where Mr. Sidhu was on the call

Page 56

1  but not Mr. Liu. So if Mr. Liu is four to five,
2  Mr. Sidhu is, you know, five to six, six to seven,
3  in that ballpark.
4    Q.  And the conversations with Mr. Liu
5  Mr. Sidhu was on that call too?
6    A.  Yes.
7    Q.  On all of them?
8    A.  I believe so.
9    Q.  Are you relying for your opinion on
10 the information that Mr. Liu told you during these
11 interviews?
12    A.  Yes. The information that I received
13 from Mr. Liu is a part of my opinion.
14    Q.  And are you relying for your opinion
15 on information that you received from Mr. Sidhu
16 during these interviews?
17    A.  Yes, the information I received from
18 Mr. Sidhu is also a part of the evidence I
19 considered in forming my opinion.
20    Q.  Okay. So let me ask you a little bit
21 about this what you call the ACRCloud
22 design-around. Do you know if TVision asked

Page 61

1  understand that ACRCloud would redesign its ACR
2  technology to avoid the '889 Patent?
3       A.  So it is a compilation of different
4  pieces of evidence.  So in part it is based on my
5  interview with Mr. Liu and Mr. Sidhu who noted
6  that ACR had been a flexible and cooperative
7  partner.  But it is also my understanding that
8  ACRCloud is required to indemnify TVision, and it
9  is that in combination with just bringing the
10 knowledge of the foundational assumptions of the
11 hypothetical if ACRCloud was faced with
12 alternative of not being able to offer its
13 algorithm due to infringement of the '889 Patent,
14 what would a reasonable firm be willing to do.
15      Q.  So is it your opinion that Mr. Liu and
16 Mr. Sidhu are experts in ACRCloud's willingness or
17 ability to redesign around the patents?
18      A.  Can you repeat that?
19         MR. LEWIS:  Could you read it?
20         THE REPORTER:  "So is it your opinion
21 that Mr. Liu and Mr. Sidhu are experts in
22 ACRCloud's willingness or ability to redesign

Page 62

1  around the patents?"
2         THE WITNESS:  No.  My opinion does not
3  focus on their expertise of ACR's ability to
4  design around the patent.  It is more focused on
5  understanding the relationship between TVision and
6  ACRCloud, they have generally been a receptive
7  partner.
8  BY MR. LEWIS:
9       Q.  What facts did Mr. Liu and Mr. Sidhu
10 tell you about ACRCloud's willingness to redesign?
11      A.  Mr. Liu and Mr. Sidhu had noted that
12 they believe and ACRCloud believes that their
13 products do not practice the '889 Patent.  So they
14 had not been willing to design around what they
15 think is a baseless lawsuit.
16      Q.  And the "they" in that answer is
17 ACRCloud or TVision?
18      A.  I believe it was both.
19      Q.  If you turn to Paragraph 152 on Page
20 51.  Tell me when you're there.
21      A.  I'm there.
22      Q.  So about halfway down the paragraph

Page 63

1  you write:  "Per my interview with Mr. Sidhu, I
2  understand that a company starting from scratch
3  could develop a new fingerprint algorithm and tune
4  the parameters in, at most, three months."  Do you
5  see that?
6       A.  I do.
7       Q.  So you're relying on Mr. Sidhu for
8  this point; right?
9       A.  For that particular point, yes.
10      Q.  Am I correct you have no expertise in
11 developing new fingerprint algorithms or tuning
12 its parameters?
13      A.  That is correct, which is why I rely
14 on interviews of people who are knowledgeable on
15 this topic.
16      Q.  And here you relied on Mr. Sidhu;
17 right?
18      A.  That is correct.
19      Q.  Did you ask Mr. Sidhu about his
20 expertise in developing new fingerprint algorithms
21 and tuning the parameters in them?
22      A.  I did.

Page 64

1       Q.  And had he done that before?
2       A.  Yes.
3       Q.  Did he do it -- well, tell me what he
4  told you about his expertise.
5       A.  So I will try to be as comprehensive
6  in my answer.  Mr. Sidhu noted that he had been in
7  the industry since 1996 in the software
8  development, software engineering field, and he's
9  worked full time, noting specifically that he
10 hasn't had a day of unemployment since that
11 timeframe.  He has been in leadership positions in
12 that exact field in the last 20 years, either
13 being chief architect or the CTO or the head of a
14 project leading groups of smaller teams from one
15 to two to large development teams of tens of
16 employees.  Over that timeframe it was hard for
17 him to put a refined estimate to the number of
18 projects that he had worked on developing from
19 beginning to end but it was on the magnitude of
20 around 70 projects.
21         Then specifically with algorithm
22 software development, TVision had undertaken

Page 65

1  developing their own ACR functionality in-house,
2  and Mr. Sidhu noted that they have deployed the
3  SDK that has TVision's algorithm in a few hundred
4  households as of a couple months ago -- or I
5  believe his phrasing was "a few months ago" -- and
6  they plan to deploy or use in production by the
7  first half of this year their fingerprinting
8  algorithm for all advertisements as well as CTV I
9  believe and that linear TV production would be
10 perhaps in the first half of this year but could
11 extend out to the second half of the year.  And
12 that's based on their current plan.  There could
13 be more specifics within that but I think that is
14 a good summary of our conversation.
15     Q.  So when Mr. Sidhu gave you information
16 about developing a new fingerprint algorithm and
17 tuning the parameters in it, did he rely on his
18 knowledge from his development of TVision's ACR
19 functionality in-house?
20     A.  I believed Mr. Sidhu relied on his
21 experience broadly within the software development
22 field and industry and his experience dating back

Page 66

1  to 1996 of broadly the amount of time and energy
2  and manpower it would take to design such a
3  system.
4          I do believe we're very fortunate
5  in this case that given that TVision has also
6  actually performed such an undertaking, there is a
7  natural reasonableness check to any estimates put
8  forth by Mr. Sidhu.
9     Q.  So is part of the basis for your
10 opinion Mr. Sidhu's experience in designing a new
11 fingerprint algorithm and tuning the parameters in
12 it?
13     A.  Can you repeat that?
14         MR. LEWIS:  Please.
15         THE REPORTER:  "So is part of the
16 basis for your opinion Mr. Sidhu's experience in
17 designing a new fingerprint algorithm and tuning
18 the parameters in it?"
19         THE WITNESS:  I believe, yes, that is
20 in part a consideration.
21 BY MR. LEWIS:
22     Q.  Did Mr. Sidhu tell you the name of the

Page 67

1  project that TVision has for its internal ACR
2  functionality?
3      A.  I pause in that I had known the name
4  of the project from reviewing the factual record.
5  It's referred to as Project Macro.  Whether that's
6  something that Mr. Sidhu communicated or I learned
7  from an alternative source, I can't speak to that
8  precision.
9      Q.  Okay.  But the project development
10 that Mr. Sidhu was relying on when he gave you
11 information that you're relying on was from
12 Project Macro; correct?
13     A.  Again, that's an oversimplification,
14 because it was not solely based on Project Macro.
15 It was also based on Mr. Sidhu's experience of
16 developing software programs dating back to 1996.
17     Q.  But his information that he gave you
18 that you're relying on was at least in part based
19 on Project Macro; right?
20     A.  I pause in that Mr. Sidhu's estimates
21 could have, Mr. Sidhu's assignment in my interview
22 was focused on what TVision's timing would have

Page 68

1  been back in the period leading up to the
2  hypothetical negotiation.
3          So to the extent that you're
4  suggesting that that estimate could not have been
5  provided without Project Macro experience, I take
6  issue with that.  But, you know, it is true that
7  TVision has had the experience of developing
8  Project Macro.  So that can serve as a
9  reasonableness check to Mr. Sidhu's estimates.
10 But the estimates he provided are under a
11 different context than TVision's historical
12 experience with Project Macro.
13     Q.  So I'm just trying to understand.  Do
14 you believe that Mr. Sidhu's information he
15 provided you about the development of fingerprint
16 algorithms and tuning the parameters in them was
17 at least based in part on his personal experience
18 in designing an ACR fingerprinting system for
19 TVision?
20     A.  I would imagine that in part it
21 considered TVision's historical experience
22 developing an ACR fingerprinting algorithm.  But

Page 69

1  it was also based on his experience broadly.
2         I take issue with -- you can
3  provide an estimate of what you think something
4  will take without actually doing it.  Here we do
5  have the benefit of TVision's actual experience.
6         MR. LEWIS:  We've been going a little
7  over an hour.  Why don't we take a short break.
8         MR. COHEN:  Okay.
9         THE VIDEOGRAPHER:  Going off the
10 record at 9:25 a.m.
11        (A recess was taken.)
12        THE VIDEOGRAPHER:  Going on the record
13 at 9:35 a.m.
14 BY MR. LEWIS:
15    Q.  Ms. Johnson, did you and counsel
16 discuss your testimony during the break?
17    A.  We did not.
18    Q.  Let me refer you to Page 51, Paragraph
19 153.
20    A.  I'm there.
21    Q.  So in that paragraph, broadly
22 speaking, there's a discussion of creating new

Page 70

1  signatures; is that right?
2     A.  Yes, creating new signatures for a
3  reference dataset.
4     Q.  Do you have any knowledge of whether
5  the original video from which TVision created its
6  signatures is still available to TVision?
7     A.  I take issue with how you have asked
8  that question in that TVision historically had not
9  been the entity that created the reference
10 database.  So I don't believe they ever had the
11 video.
12    Q.  With that caveat, do you have any
13 knowledge of whether the original video from which
14 TVision's vendor created its signatures is still
15 available to either TVision or that vendor?
16    A.  I would imagine that some of the
17 original material is available, but it's my
18 understanding that the reference database gets
19 continually updated with live broadcast content.
20    Q.  So if TVision or its vendor needed to
21 recreate the signatures, do you have knowledge
22 about whether the original videos are all

Page 71

1  available?
2     A.  That is a very broad question in that
3  there's no scope of time associated with it.  But
4  I understand the VidVita system is engineered in
5  such a way that in the future, if necessary
6  desired, they can swap ACR vendors without
7  rewriting the whole system.  So that, to me,
8  indicates that they had access to the video
9  content that would be relevant to its customers
10 and could be rewritten.
11    Q.  So are you relying on anything besides
12 your own interpretation of the facts for that
13 answer?
14    A.  That answer was specific to one
15 particular fact -- or sorry -- to one particular
16 source.  Can you reask the --
17    Q.  I meant another expert for example.
18    A.  Can you form that in a complete
19 question?
20    Q.  Are you relying on another expert for
21 your answer about VidVita?
22    A.  I am also taking into account

Page 72

1  Dr. Anderson's discussion on this point in his
2  expert report where he notes that reference
3  databases are continually updated with live
4  broadcast information.  So there is a natural
5  turnover of the reference database.
6         This notion was also discussed in
7  my interview with Mr. Sidhu.  So I would add him
8  to another of the sources that I am relying on.
9     Q.  What did Mr. Sidhu tell you about this
10 issue?
11    A.  Mr. Sidhu mentioned that for reference
12 database, especially with linear TV, it's
13 continuously updated to reflect the content that
14 is currently being broadcasted.
15    Q.  Did he tell you whether that content
16 was saved if the reference database needed to be
17 recreated using a different algorithm?
18    A.  Mr. Sidhu noted that if you were to
19 changeover a reference database, it would not be a
20 binary switch in that you would run the two
21 databases in parallel and start feeding more in
22 one into the other as you would transition the

Page 73

 1  databases.
 2          To the extent that there are
 3  connected TV offerings, you know, if you think
 4  syndicated shows, those audio files continue to be
 5  available.  To the extent that there is older
 6  technology that is in the past and no longer being
 7  aired, that is not something that TVision would be
 8  interested in having in a reference database if it
 9  was an obsolete broadcast that provided no value.
10      **Q.  So is it correct that there are shows**
11  **content that is not available if one needs to**
12  **recreate the reference database using a different**
13  **algorithm?**
14      A.  I would agree that anything that is
15  not available, it's not available because it's no
16  longer relevant to the consumers and what's being
17  utilized across these different viewing
18  mechanisms.  But to the extent that it's content
19  that a customer is interested in, it is still
20  available.
21      Q.  And are you relying on what Mr. Sidhu
22  told you for that answer?

Page 74

 1      A.  It's Mr. Sidhu, Dr. Anderson, as well
 2  as the contracts that have been produced in this
 3  case that note this transition for broadcast --
 4  or, I'm sorry -- that note the timeframes
 5  associated with the broadcast content.
 6      Q.  So if I can have you turn to Page 56
 7  of your report, Exhibit 1, Johnson Exhibit 1,
 8  Paragraph 167.  So you see there you said "Per my
 9  interview with Mr. Sidhu, I understand that
10  TVision has the technical capabilities to develop
11  this functionality in-house."  Do you see that?
12      A.  I do.
13      Q.  Is that your understanding because
14  TVision has actually developed an ACR technology
15  internally?
16      A.  No, it is also just the nature of
17  TVision's business.  They have employed software
18  development engineers who have demonstrated their
19  technical capabilities in putting together very
20  complex software.  So given their demonstrated
21  technical capabilities within other areas of
22  TVision, Mr. Sidhu expressed that TVision had the

Page 75

 1  technical capabilities.
 2      Q.  Is it your understanding that
 3  because -- strike that.
 4          Is it your understanding that
 5  TVision has the technical capabilities to develop
 6  ACR technology internally is because at least in
 7  part it has actually done so?
 8      A.  I think that is confirming.  But even
 9  prior to embarking on developing the technology
10  in-house, there had to be a belief that its team
11  would be capable of undertaking such a task or you
12  would have never undertaken it.  So I believe even
13  without the development of Project Macro,
14  Mr. Sidhu believed in the technical capabilities
15  of the team he ran.
16      Q.  Is it your understanding that software
17  development engineers who have worked on complex
18  software would necessarily be able to develop ACR
19  technology?
20      A.  I have not examined such a broad
21  question.  I was more focused on Mr. Sidhu as the
22  lead of the technology group at TVision, his

Page 76

 1  assessment of the technical capabilities of his
 2  team.
 3      Q.  And did he tell you that software
 4  development engineers who work on complex software
 5  would necessarily be able to develop ACR
 6  technology?
 7      A.  He did not answer such a broad
 8  question.  His answer was specific to the
 9  engineers that TVision, that the experience he had
10  with his team and their capabilities given his
11  knowledge of his team's capabilities.
12      Q.  Going back to Paragraph 167.  Do you
13  see the sentence where you write "Mr. Sidhu relied
14  on his personal experience as well as interviews
15  with TVision's engineers to estimate the cost
16  associated with developing and maintaining such a
17  system in-house from start to finish"?
18      A.  Yes.
19      Q.  What is Mr. Sidhu's quote "personal
20  experience" end quote?
21      A.  Mr. Sidhu had been in this industry
22  since 1996, specifically in the software

Page 77

1  development, software engineer niche.  And he in
2  the last 20 years has had leadership positions
3  whether as an architect or the chief technology
4  officer or a lead in approximately -- and we spoke
5  about this before -- you know, on the scale of 70
6  different software development projects.
7      Q.  Does Mr. Sidhu's personal experience
8  with developing ACR technology include Project
9  Macro?
10     A.  That would be additive to his personal
11 experience, in that, yes, he has historically
12 factually overseen the development of Project
13 Macro.  But, again, even before Project Macro,
14 before TVision embarked on Project Macro,
15 Mr. Sidhu was relying on his personal experience,
16 on his assessment whether TVision had the
17 capability.
18     Q.  Did Mr. Sidhu's personal experience
19 with Project Macro inform the information he
20 provided you about development costs and timelines
21 for an internally developed ACR system?
22     A.  I would say it was more so a

Page 78

1  reasonableness check as the question as posed to
2  Mr. Sidhu was not the time and cost to develop the
3  ACR functionality currently, I was asking
4  Mr. Sidhu to imagine himself in the period leading
5  up to May 2018 if TVision did not have access to
6  not just the '889 Patent but very broadly to
7  ACRCloud technology, that there were no other ACR
8  providers into the market, what would be his cost
9  estimate in that situation where there are
10 absolutely no other alternatives and this was the
11 only method of gaining ACR functionality, what
12 would be the time associated with getting a system
13 up and running, which is very different than his
14 historical experience, his actual experience.
15     Q.  Did Mr. Sidhu have any experience
16 developing ACR functionality in the period leading
17 up to May 2018?
18     A.  No, I believe he did not have
19 practical ACR technology experience until
20 embarking on developing Project Macro.  But as
21 mentioned, he had relied on his prior experience
22 in the software development field to assess his

Page 79

1  capability and his team's capability to do so.
2      Q.  So you write "Mr. Sidhu estimates that
3  it would take approximately seven months for a
4  total upfront development costs of approximately
5  $408,000"; right?
6      A.  Yes, under the construct that I set
7  forth.
8      Q.  Did Mr. Sidhu rely, at least in part,
9  on his experience with Project Macro to provide
10 you the numbers of approximately seven months and
11 approximately $408,000?
12     A.  No.  In my discussions with Mr. Sidhu,
13 I had asked him to use his -- he provided me
14 estimates under this hypothetical construct of if
15 TVision was in a situation where they had
16 absolutely no other alternative to any kind of ACR
17 technology, what they would undertake.  This
18 timeline and cost is not what had actually
19 unfolded at TVision in the actual real world given
20 that that was under a different context.
21         I would ask Mr. Sidhu questions
22 along the lines of I understand that we're putting

Page 80

1  these estimates together under different
2  assumptions but given your historical actual
3  experience do you still stand by the assumptions
4  that you previously provided, and he still
5  recognizing the different context agreed that the
6  estimates he provided were reasonable given the
7  background of the task.
8      Q.  When you say "actual experience," what
9  are you referring to?
10     A.  Project Macro.
11     Q.  Okay.  I just wanted to be clear for
12 the record.
13         So if you look at the sentence that
14 reads "TVision would have looked to well-known
15 fingerprint systems known in the industry."  Do
16 you see that?
17     A.  Yes.
18     Q.  What well-known fingerprinting systems
19 are you referring to?
20     A.  I know in part that it is the Wang
21 patent, but I also know that Mr. Sidhu discussed
22 relying on many industry, the knowledge that

Page 81

1  existed in the industry beyond any individual
2  patent to gain expertise in developing ACR
3  functionality.
4      Q.  Are you planning to tell the jury
5  anything about quote "well-known fingerprinting
6  systems known in the industry" close quote?
7      A.  Not beyond the sentence that I have
8  here.  So that would have been an avenue that
9  TVision would have explored.  I do not expect to
10 delve into the technical aspects of any one
11 particular fingerprinting system.
12     Q.  Can you explain your expertise to
13 understand that certain fingerprinting systems
14 known in the industry are well known?
15     A.  That is in reliance with my interview
16 with Mr. Sidhu that there are certain
17 fingerprinting systems that have been known in the
18 industry.  I am not bringing separate expertise on
19 that particular point.
20     Q.  Did you ask Mr. Sidhu whether those
21 fingerprinting systems were covered by any other
22 Nielsen patents?

Page 82

1      A.  I did not ask that question.
2      Q.  Do you have any knowledge regarding
3  that issue?
4      A.  I do not.
5      Q.  Did you ask Mr. Sidhu whether those
6  other fingerprinting systems were covered by any
7  patents owned by any third party?
8      A.  I did not ask that question.  But the
9  focus of the analysis was to build a
10 fingerprinting system that would not practice the
11 specifics of the '889 Patent.
12     Q.  Do you have any knowledge regarding
13 whether or not these other fingerprinting systems
14 are covered by any patents owned by any third
15 party?
16     A.  I do not have any knowledge of that.
17     Q.  Do you understand that an alternative
18 in a reasonable royalty analysis has to not
19 infringe the Nielsen patent to be an alternative?
20     A.  I understand it has to not infringe
21 the '889 Patent.  I have not -- or any other
22 patent that has been identified by Nielsen as

Page 83

1  being relevant for consideration.
2          Whenever tech companies operate,
3  they are operating in a field that has a plethora
4  of patents out there.  So this is something that
5  businesses navigate in the ordinary course of
6  developing software that they believe is free of
7  patent infringement.
8      Q.  So looking at Paragraphs 167 and 168,
9  those relate to the ACR technology being developed
10 internally; right?
11     A.  That's correct.
12     Q.  I don't see any citations to
13 Dr. Anderson in those paragraphs; is that correct?
14     A.  You're correct in that there is no
15 citation, but I am clearly aware of Dr. Anderson's
16 opinions on this point in his report.
17     Q.  So for your opinion relating to
18 developing ACR technology internally, are you
19 relying on Mr. Sidhu only or Mr. Sidhu and
20 Dr. Anderson?
21     A.  I would add Dr. Anderson into the mix.
22 I had specifically spoken with Dr. Anderson on

Page 84

1  this topic and had asked him to assess the
2  reasonableness of Mr. Sidhu's estimate which he
3  then put into his expert report.  So to the extent
4  that that's omitted from my report, I would like
5  to add that in, be explicit, because that was also
6  something I had considered.
7      Q.  All right.  If you would turn to
8  Exhibit 6.2 of your report, Johnson Exhibit 1.
9  The pages are -- it loses the page numbers.  Are
10 you there?
11     A.  I am.
12     Q.  So there's a breakdown of the cost to
13 develop the internal ACR system on this exhibit;
14 correct?
15     A.  Yes.
16     Q.  And for all the items on this page
17 except the labor costs, are you relying on
18 Mr. Sidhu?
19     A.  I am relying on Mr. Sidhu, but also
20 there is a reference to Georgia-Pacific Factors 9
21 and 10 in the footnotes.  So it would also
22 implicate the sources I rely on in those two

Page 105

1  the work that would need to be performed and the
2  time and personnel that would be required to do
3  the work.
4      Q.  Was Mr. Sidhu providing you his
5  opinion of the estimate of the work that would
6  need to be performed and the time and personnel
7  that would be required to do the work?
8      A.  There is some element of relying on
9  Mr. Sidhu's opinion given his background because,
10 again, this entire analysis is a hypothetical
11 analysis where there is no documentation that you
12 can go to in the period leading up to May of 2018.
13 It is under the assumption that all the parties
14 knew and agreed that the patent was valid, that
15 the product would infringe, and that there was no
16 way to design, for no way for ACRCloud to design
17 around the patent, that all the ACR providers that
18 are on the marketplace were not options.  It is in
19 that context that these estimates were provided,
20 which is not the factual reality of the world we
21 find ourselves in.  So this is not information
22 that exists in today's world because that is not

Page 106

1  the context that we're operating in.
2      Q.  And did Mr. Sidhu inform his opinion
3  based upon his work at TVision on Project Macro?
4      A.  I believe we spoke to this to some
5  extent now and I would refer back to my prior
6  answers.  But Mr. Sidhu's estimates were based on
7  his assessment of his team's technical
8  comparability.  And to the extent that TVision had
9  not done any work on Project Macro, he could still
10 provide an estimate based on his experience in the
11 industry.
12     I did explicitly ask Mr. Sidhu to
13 test his estimates as he has provided them for the
14 purposes I set forth with TVision's historical
15 experience with Project Macro, and Mr. Sidhu did
16 that upon my request but noted that the estimate
17 is not what has historically happened because we
18 are operating under two different assumptions.
19     Q.  Okay.  So you asked Mr. Sidhu to test
20 his opinion of these estimates against Project
21 Macro and he did that subject to the caveats that
22 you just provided; is that correct?

Page 107

1      A.  After the estimate was already formed
2  by Mr. Sidhu, and that was in place, after that
3  point -- and this was a topic of conversation that
4  came up on Monday given the progress that
5  Mr. Sidhu had conveyed to me that TVision had made
6  with Project Macro and its deployment, I had asked
7  him if his real-world experience would change the
8  estimate that he had previously provided.  And he
9  noted again that we're, you know, having different
10 assumptions underlying his estimate but that
11 there's nothing in the actual experience that
12 would render the estimate that he previously
13 provided as being unreasonable.
14     Q.  Let me take you to Paragraph 164 on
15 Page 55.  So in this paragraph you write "Per my
16 interview with Yan Liu, I have considered the
17 financial terms proposed by Moufin in January 2017
18 as a proxy to estimate the incremental expense for
19 TVision to use the more expensive alternative ACR
20 provider in lieu of contracting with ACRCloud in
21 2018."  Do you see that?
22     A.  I do.

Page 108

1      Q.  Have you seen the financial terms
2  proposed by Moufin?
3      A.  No.  Mr. Yan Liu was -- it appeared
4  when we had our discussion that he had the
5  agreement in front of him.  But as it had not been
6  produced in the litigation, he verbally conveyed
7  the information to me.
8      Q.  I see.  So you're relying just on
9  Mr. Liu's statement to you about the financial
10 terms proposed by Moufin?
11     A.  That is correct.
12     Q.  Okay.  And then if we take a look at
13 Exhibit 5.1.  What is Exhibit 5.1?
14     A.  This is laying out what the financial
15 payments to Moufin that TVision would pay given
16 the proposal that TVision received in I believe it
17 was January 2018, but I would refer back to the
18 paragraph number.
19     Q.  I believe you wrote in Paragraph 164
20 it was January 2017.
21     A.  Yes, then that would be correct, 2017.
22     Q.  Okay.  Now, going back to Exhibit 5.1.

Page 213

1  forming his estimate and he has confirmed that he
2  did.
3      Q.  When you say "that experience," what
4  do you mean?
5      A.  His experience dating back to 1996 of
6  being a software development engineer and in the
7  last 20 years being in a position of leadership
8  where he has directed teams of engineers to
9  achieve whatever the software development goal
10 would be.
11     Q.  So let me focus you on ACR system
12 development specifically, okay.  Is it your
13 understanding that Mr. Sidhu's experience being a
14 software development engineer and his years of
15 being in leadership in that area allows him to
16 provide information relating to ACR system
17 development specifically?
18     A.  So setting aside his actual experience
19 with developing Project Macro?
20     Q.  For the moment.
21     A.  Yes, to the extent that you have to
22 keep in mind the context that Mr. Sidhu and his

Page 214

1  technical team at TVision was embarking on a new
2  type of software development that was uncharted
3  territory.  So that requires an innovative team
4  that can execute on something where you can't
5  necessarily look to industry publications.
6          So his capabilities in kind of this
7  new arena does shed insight and provide an
8  indicator of what it would take to perform, to
9  design ACR functionality given that there are
10 known industry publications on this topic.
11     Q.  When you say "new arena," do you mean
12 the ACR system development?
13     A.  No.  I meant the eyes on screen
14 technology that TVision has developed, and that is
15 part of their differentiating factor for the firm.
16     Q.  So do you have the background
17 necessary to determine if general software
18 development experience and leadership experience
19 in that area are sufficient to allow someone to
20 provide information relating to ACR system
21 development specifically?
22     A.  Can you repeat that question?

Page 215

1      Q.  Do you have the background necessary
2  to determine if general software development
3  experience and leadership experience in that area
4  are sufficient to allow someone to provide
5  information relating to ACR system development
6  specifically?
7      A.  I do need to rely on a technical
8  understanding that is provided to me from
9  Mr. Sidhu.  But in this particular case, I did
10 discuss Mr. Sidhu's estimates with Dr. Anderson to
11 get his technical expertise and get Dr. Anderson's
12 validity that the estimates as set forth by
13 Mr. Sidhu were reasonable.
14     Q.  So did Mr. Sidhu tell you that his
15 general software development experience and
16 leadership experience in that area would be
17 sufficient to allow him to provide you information
18 relating to ACR system development specifically?
19     A.  That exact question was not asked and
20 answered in the exact way that you are proposing.
21 But Mr. Sidhu in the ordinary course had to rely
22 on his general expertise and leadership to be able

Page 216

1  to even put together a game plan in actuality of
2  whether TVision should embark on this path.  So
3  that was without a doubt the foundation of
4  Mr. Sidhu communicating to Mr. Yan Liu that
5  TVision had the capability to pursue ACR
6  functionality.  So here we have a perfect test
7  case that it has proven that that kind of
8  background is sufficient.
9      Q.  You're referring to his work on
10 Project Macro?
11     A.  Yes, in that answer I was.
12     Q.  Let me ask you about Factor 6,
13 Paragraph 127 in your report on Page 2.
14     A.  Okay, I'm there.
15     Q.  So you use the term "convoyed sales"
16 in the second sentence.  Do you see that?
17     A.  I do.
18     Q.  What did you mean by "convoyed sales"?
19     A.  It is in the factor itself of
20 derivative sales that are tied to the patent, or
21 additional sales, supplemental sales, that are
22 tied to the patented functionality.

# Exhibit 4

Redacted in its entirety

# Exhibit 5

Redacted in its entirety