IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | **Redacted - Public Version** |
| | ) | |
| v. | ) | C.A. No. 22-cv-0057-CJB |
| | ) | |
| TVISION INSIGHTS, INC., | ) | ▮▮▮▮▮▮▮▮▮ |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

**OPENING BRIEF IN SUPPORT OF TVISION INSIGHTS, INC.'S *DAUBERT* MOTION TO EXCLUDE THE UNRELIABLE OPINIONS AND TESTIMONY OF MICHAEL KEELEY**

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
P.O. Box B113
150 Fayetteville St, Suite 2800
Raleigh, NC 27601-2960
(984) 960-2860

Michael F. Heafey
RIMÔN LAW P.C.
800 Oak Grove Avenue, Suite 250
Menlo Park, CA 94025
(650) 461-4433

Dated: March 12, 2024

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

# TABLE OF CONTENTS

I.    Nature and Stage of the Proceedings ................................................................ 1

II.   Summary of Argument................................................................................... 1

III.   Relevant Facts ............................................................................................. 2

    A. TVision's Business.................................................................................. 2

    B. The '889 Patent .................................................................................... 3

    C. The Availability of Alternative ACR Systems ........................................... 3

       1. TVision licensed ACR software from ████████ until Nielsen acquired Gracenote and ███████████████████████████████ ................ 3

    D. Dr. Kelley's Damages Report ................................................................. 4

IV.   Legal Standard .......................................................................................... 6

    A. The Standard for *Daubert* Motions........................................................ 6

    B. Legal Principles Relating to Damages ..................................................... 7

V.    Argument .................................................................................................. 7

    A. Dr. Keeley does not perform a lost profits analysis ................................... 7

    B. Dr. Keeley's testimony regarding the Nash Bargaining Solution should be excluded because it is not tied to the facts and circumstances of this case ................................ 9

    C. Dr. Keeley should be precluded from testifying about a reasonable royalty because his report fails to apportion the value of the patent-in-suit from the value of ACR software .................................................................................................... 12

    D. Dr. Keeley should be precluded from testifying about a reasonable royalty because his report assumes that Nielsen would be unwilling to license the patented invention..... 15

    E. Dr. Keeley's report is unreliable because it incorrectly relies on a single, unsubstantiated forecast of TVision's revenues and profits, without taking into account that TVision ████████████████ ........................................... 16

VI.   Conclusion ............................................................................................... 16

ii

# TABLE OF AUTHORITIES

**Case**                                                                                                    **Page(s)**

*Bayer Healthcare LLC v. Baxalta Inc.*,
   2019 WL 330149 at *7 (D. Del., Jan. 25, 2019)……..………………………………….1, 8

*B. Braun Melsungen AG v. Terumo Med. Corp.*,
   749 F. Supp. 2d 210, 222 (D. Del. 2010)....................................................................6

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
   2018 WL 4691047 at 5, 6 (D. Del., Sept. 28, 2018)……………………………………9

*Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*,
   809 F.3d 1295, 1301 (Fed. Cir. 2015)…………………………………………….....7

*Daddio v. Nemours Found.*,
   399 F. App'x 711, 713 (3d Cir. 2010)…………………………………………………6

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)……………………………………………………………….…6

*Dow Chem. Co. v. Mee Indus., Inc.*,
   341 F.3d 1370, 1381 (Fed. Cir. 2003)…………………………………………………...7

*Elbit Sys. Land and C4I Ltd. v. Hughes Network Sys.,*
   *LLC,* 927 F.3d 1292, 1301 (Fed. Cir. 2019)…………………………………….…12

*Elcock v. Kmart Corp.*,
   233 F.3d 734, 741 (3d Cir. 2000)…………………………………………………….…6

Ericsson, Inc. v. D-Link Sys., Inc.,
   773 F.3d 1201, 1226 (Fed. Cir. 2014)…………………………………………………..12

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
   318 F.Supp. 1116, 1120 (S.D.N.Y. 1970)……………………………………………..2, 15

*Good Tech. Corp. v. Mobileiron, Inc.*,
   2015 WL 4090431, at *7 (N.D. Cal. July 5, 2015)…………………………………...11

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
   185 F.3d 1341, 1350-51 (Fed. Cir. 1999)……………………………………………8, 9

*IOENGINE, LLC v. PayPal Holdings, Inc.*,
   607 F. Supp.3d 464 503 (D. Del. 2022).........................................................................13, 15

*LaserDynamics, Inc. v. Quanta Comput., Inc.,*
   694 F.3d 51, 67 (Fed. Cir. 2012)…………………......................................................15

*Lucent Techs., Inc. v. Gateway, Inc.,*
   580 F.3d 1301, 1324 (Fed. Cir. 2009)……………………………………………..7

*Mentor Graphics Corp. v. EVE-USA, Inc.,*
    851 F.3d 1275, 1287 (Fed. Cir. 2017)………………………………………………12

N*umatics, Inc. v. Balluff, Inc.,*
   66 F. Supp. 3d 934, 961 (E.D. Mich. 2014)...............................................................11

*Pall Corp. v. Micron Separations, Inc.,*
   66 F.3d 1211, 1223 (Fed. Cir. 1995)……………………………………………….7

*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,*
   575 F.2d 1152, 1156 (6th Cir. 1978)……………………………………………… 7, 8, 9

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.,*
   904 F.3d 965, 977 (Fed. Cir. 2018)………………………………………………….12

*Presidio Components, Inc. v. American Technical Ceramics Corp.,*
   702 F.3d 1351, 1359-60 (Fed. Cir. 2012)………………………………………………7

*Rite-Hite Corp. v. Kelley Co., Inc.,*
   56 F.3d 1538, 1545 (Fed. Cir. 1995)………………………………………….......9

S*chneider ex rel. Estate of Schneider v. Fried,*
   320 F.3d 396, 404 (3d Cir. 2003)……………………………………………………….6

*Siemens Mobility Inc. v. Westinghouse Air Brake Tech. Corp.,*
   2019 WL 9698520 (D. Del., Jan. 2, 2019)……………………………………………8, 9

*WesternGeco L.L.C. v. ION Geophysical Corp.,*
   913 F.3d 1067, 1073 (Fed. Cir. 2019)…………………………………………………..8

*Virnetx, Inc. v. Cisco Sys., Inc.,* 7
   67 F.3d 1308, 1332-33 (Fed. Cir. 2014)……………………………………………… 1, 11

*Zimmer Surgical, Inc. v. Stryker Corp.,*
     365 F. Supp. 3d 466, 491 (D. Del. 2019) ....................................................................15

iv

## I.   NATURE AND STAGE OF THE PROCEEDINGS

Defendant TVision Insights, Inc. ("TVision") moves pursuant to Fed. R. Evid. 702 to exclude the following testimony of Michael Keeley, the damages expert for Plaintiff The Nielsen Company (US), LLC ("Nielsen"):

1.      Testimony relying on the Nash Bargaining Solution, which is not tied to the facts and circumstances of this case.

2.      Testimony relating to Nielsen's alleged lost profits.

3.      Testimony regarding a reasonable royalty, which is (a) improperly based on the value of ACR software to TVision, not on the incremental value of the '889 patent to an ACR system, and thus fails to properly apportion the value of the patent, (b) which improperly assumes that Nielsen would not be willing to license the '889 patent, and (c) improperly relies on a single unsubstantiated forecast of TVision's revenues and profits, instead of TVision's actual revenues and profits

## II.  SUMMARY OF ARGUMENT

1.      Dr. Keeley should be precluded from providing testimony about a reasonable royalty based on the Nash Bargaining Solution because his testimony is not tied to the facts in this case, but instead, relies on a "rule of thumb" that Nielsen would be entitled to ███████ ████████████████. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332-33 (Fed. Cir. 2014); *Bayer Healthcare LLC v. Baxalta Inc.*, No. 16-cv-1122-RGA (D. Del. Jan. 25, 2019).

2.      Dr. Keeley should be precluded from testifying about lost profits because he fails to provide a proper analysis applying the *Panduit* factors; fails to provide any analysis of the amount of lost profits that Nielsen allegedly lost; and fails to provide any analysis demonstrating that Nielsen's ██████████████████████████ were attributable in any way to the alleged infringement, as opposed to other factors.

3.    Dr. Keeley should be precluded from testifying about a reasonable royalty because (a) his report assumes that Nielsen would not have been a willing licensor, but a proper *Georgia Pacific* analysis requires an expert to assume a willing licensor; (b) he fails to apportion the value of the '889 patent from the value of ACR software and from the value of TVision's unique product offering, which t measures whether people are actually paying attention to media content as opposed to Nielsen's measurement of ███████████; and (c) Dr. Keeley's report is unreliable because it relies exclusively on a single projection made by TVision in 2018, and ignores TVision's actual balance sheets.

## III.  RELEVANT FACTS

### A.  TVision's Business

TVision is a startup audience measurement company, which also gathers data from panels.  Ex. 1 at 10, ¶ 22

TVision collects panel information using an ACR (automatic content recognition) system.  *Id.* at 10 ¶ 23.  In general, ACR systems (a) create and maintain a database of reference audio signatures; (b) acquire audio to be identified, (c) divide audio into "frames," (d) perform mathematical operations on those frames to create "fingerprints" or "signatures," (e) search a database for a matching signature, and (f) return results that identify the media to which the panel TV was tuned at the time the fingerprint was gathered.  Ex. 9 at 40, ¶ 100.

In addition to ACR systems, TVision uses sophisticated facial recognition technology to detect who is in the room and whether they are paying attention to the media identified by the ACR system.  Ex.11 at 24 ¶ 73.  TVision calls this product "Total View". Ex. 5 at 117:18-118:1.

████████████████████████████  Instead, ████████████████████████████████████████████. Ex. 11 at 10, ¶ 24.  ████████

2

███████████████████████  *Id.* at 18, ¶ 54.  TVision's revenues from VideoAmp and iSpot are about $1.5 million. Ex. 5 at 55:7-15.

### B.  The '889 Patent

The '889 patent is directed to "methods and apparatus for generating signatures for use in identifying media information." Ex. 2 ('889 patent), 1:15-17. The process of generating a signature is used in automatic content recognition ("ACR") software.  Ex. 1 at 3, ¶ 10. Many of the techniques claimed in the patent were known in the art, including generating signatures based on spectral data. *See id.*, 1:21-26, 2:55-60. The '889 patent admits, for example, that "[i]dentifying media information . . . using signature-matching techniques is well known." Ex. 2, 1:21-28.

The '889 patent claims a "method for generating signatures" (Ex. 2, claim 1), which is a very small part of an ACR system.  Ex. 9 at 40, ¶ 100.

### C.  The Availability of Alternative ACR Systems

**1.  TVision licensed ACR software from** ███████ **until Nielsen acquired Gracenote and** ████████████████
████████████████████

████████████████████████████████ Ex. 11 at 11, ¶ 27. After Nielsen acquired Gracenote in 2017, ████████████████████████████████
██████████████████████  *Id.* ¶ 28.  At that time, there were several ACR systems with roughly equivalent accuracy:  ACRCloud, Media Research Labs, Dat-Track (Ex. 10 (Webster Dep.) at 41:19-42:8), AXwave, Answer (Ex. 5 (Liu Dep.) at 75:8-15), Mufin and Source Digital. Ex. 11 at 53, ¶ 157, n. 309.

In January 2017, after hearing about Nielsen's acquisition of Gracenote, ████████
█████████████████████████████████████

███████████████████████████████  *Id.* ████████████

█████████████████████████████████████

███████████████████████████ Ex. 11 at 53, ¶158.

3

According to a company presentation, Mufin specializes in audio fingerprint technology for ACR and touted companies, such as Kantar, Ipsos, and Starz, as being among its customers and partners. Ex. 12 (TVSN_NLSN00662112-139) at 115, 121. In an October 2017 email, Dan Schiffman from TVision inquired whether Axwave had a solution for TVision's "primary issue [that] we are looking to solve for today is commercial detection and associated metadata," to which an Axwave replied in the affirmative that it did have such solutions. Ex. 13 (TVSN_NLSN_00725382-386) at 382-383.  In January 2018, ███████████

████████████████████████████████████████

███████████.  Ex.  8  (TVSN_NLSN_00660739-772)  at  746,  748,  753.  Email communications from this period indicates that ████████████████████

████████████████████. *Id.* (TVSN_NLSN_00660739-772) at 748, 756-757.

TVision ultimately decided to use ACRCloud ACR software. Ex. 11 at 12, ¶ 31. It is this ACRCloud software that Nielsen accuses of infringing the '889 patent.

### D. Dr. Kelley's Damages Report

In this case, Nielsen seeks damages in the form of a reasonable royalty. Ex. 1 at 4, ¶14. As noted above, the '889 patent does not cover ACR software generally, but claims only a specific method of generating "signatures." Ex. 2, claim 1.

Dr. Keeley states that he has "████████████████████████ but opines that Nielsen's lost profits "████████████████ Ex. 1 at 4, ¶ 14.

Dr. Keeley premises his reasonable royalty analysis on the proposition that "████

████████████████████████████████████████

█████████ Ex. 1 at 5, ¶ 17.  He also states, ████████████████████████

████████████████████████████████████████

████████." *Id.* at 27, ¶ 59.

4

Dr. Keeley assesses a reasonable royalty using "the construct of a hypothetical license negotiation between a willing licensor and willing licensee as outlined in the *Georgia Pacific* case." *Id.* at 4, ¶ 15.  According to Dr. Keeley, the hypothetical negotiation would have taken place "prior to TVision's first infringement on or about May 1, 2018 (*id.*), when ███████ ████████████████████████████████████████████████," (*id.*, ¶ 15, n.9), ████ ████████████████████████████████████. Ex. 5, 35:13-19.

Dr. Keeley opines, "based on the framework of Nash Bargaining . . . the parties would negotiate to a reasonable royalty of ███ of the net present value of TVision's expected incremental profits from practicing the patent-in-suit at the time of the hypothetical negotiation." *Id.* at 5, ¶ 19. "This ████ royalty arises as a solution to Nash Bargaining when the parties are in similar bargaining positions." *Id.* at 6, ¶ 21.

As of the date of the hypothetical negotiation, TVision ████████████. Ex. 11 at 44, ¶¶ 132, 133:

Figure 9: TVision Company-Wide Sales and Profitability 2016 – March 2023[245]



Ex. 11 at 44, ¶ 132.  Notwithstanding TVision's ████████████ at the time of the hypothetical negotiation, Dr. Keeley relies on a single projection TVision prepared for an investor, ignores TVision's actual financial condition, and concludes that ████████████████████████ ████████████████████████." Ex. 1 at 6 ¶ 23.  TVision's total revenues in 2018 were only ███████0, while it operated at a ████████████████. *See* Fig. 9, above.

5

## IV. LEGAL STANDARD

### A. The Standard for *Daubert* Motions

Rule 702 of the Federal Rules of Evidence governs the admissibility of qualified expert testimony, providing that an expert witness may testify if: "(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case." Fed. R. Evid. 702. Rule 702's requirements were examined in detail in *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993), and have been said to embody "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); *see also, B. Braun Melsungen AG v. Terumo Med. Corp.*, 749 F. Supp. 2d 210, 222 (D. Del. 2010).

As to this motion, at issue is the reliability and "fit" of the proposed expert testimony. With regard to the requirement of reliability, Rule 702 mandates that the relevant expert testimony "must be supported by appropriate validation—i.e., 'good grounds,' based on what is known," *Daubert*, 509 U.S. at 590; see also *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). Such testimony should amount to "more than subjective belief or unsupported speculation[,]" and a court's focus in examining this factor must be on "principles and methodology" rather than on the expert's conclusions. *Daubert*, 509 U.S. at 590, 595; *see also Daddio v. Nemours Found.*, 399 F. App'x 711, 713 (3d Cir. 2010). As to the "fit" requirement, it "goes primarily to relevance" as the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" and have "a valid ... connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 91-92 (internal quotation marks and citations omitted); *see also, Schneider*, 320 F.3d at 404.

6

### B. Legal Principles Relating to Damages

Upon a finding of infringement of a valid patent, a patentee is entitled to damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer[.]" 35 U.S.C. § 284. The purpose of compensatory damages in patent cases is "not to punish the infringer, but to make the patentee whole." *Pall Corp. v. Micron Separations, Inc.*, 66 F.3d 1211, 1223 (Fed. Cir. 1995). To that end, under 35 U.S.C. § 284 ("Section 284"), damages awarded for patent infringement "must reflect the value attributable to the infringing features of the product, and no more." *Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (internal quotation marks and citation omitted).

The burden of proving damages falls on the patentee. *Dow Chem. Co. v. Mee Indus., Inc.* 341 F.3d 1370, 1381 (Fed. Cir. 2003).

Generally, there are two alternative types of compensatory damages that may be recovered in a patent case: (1) the patentee's lost profits; or (2) the "reasonable royalty [the patentee] would have received through arms-length bargaining." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009).

## V.  ARGUMENT

### A. Dr. Keeley does not perform a lost profits analysis

To prove lost profits, Nielsen must show: (1) demand for the patented product; (2) absence of acceptable noninfringing substitutes; (3) manufacturing and marketing capability to exploit the demand; and (4) the amount of profit that would have been made. *Presidio Components, Inc. v. American Technical Ceramics Corp.*, 702 F.3d 1351, 1359-60 (Fed. Cir. 2012), citing *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.*, 575 F.2d 1152, 1156 (6th Cir. 1978).  Dr. Keeley fails to apply the four *Panduit* factors to this case.

███████████████████████████████████████████████████████

████████████████████████. Ex. 1 at 17-18, ¶ 46.  He opines that "████████████

███████████████████████████████████████████████████ █

████████████████████████████████████████████████████

████████████████████████████████████████████████████

███████████████████████████████████████ Ex. 1 at

21, ¶ 51. What is missing from Dr. Keeley's report is any analysis of the actual VideoAmp and iSpot products, and the contribution (if any) of the manner in which TVision creates "signatures" (allegedly in violation of the '889 patent) to those products.  "If the application of the Panduit factors does not result in the separation of profits attributable to the patented device and the profits attributable to [non-patented features], it appears that apportionment is necessary," *WesternGeco L.L.C. v. ION Geophysical Corp.*, 913 F.3d 1067, 1073 (Fed. Cir. 2019).

Dr. Keeley bases his opinion on the opinion from Dr. Moulin that "the record does not show that there were acceptable, non-infringing alternatives to the '889 patent for ACR available to TVision at the time of the hypothetical negotiation or even to this day." Ex. 1 at 19, ¶ 49.  This opinion ignores indisputable facts of record that there were several alternatives available to TVision as of May 1, 2018.  *See* Section III.C.1., *supra*.

In *Siemens Mobility Inc. v. Westinghouse Air Brake Tech. Corp.*, 2019 WL 9698520 (D. Del., Jan. 2, 2019), Judge Stark precluded a damages expert from testifying about lost profits, in part because of the damages expert's "failure to account for the alternative actions [the defendant] would foreseeably have undertaken had it not infringed," characterizing that as "a fatal flaw in his application of *Panduit*." *Id.* at *2; *see also, Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350-51 (Fed. Cir. 1999) ("[A] fair and accurate reconstruction of the 'but for' market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed.").  As Judge Stark observed, "it is 'hardly likely' that a company. . . would 'surrender its complete market

share when faced with a patent, if it can compete in some other lawful manner." *Siemens*, 2019 WL 9698520 at *2, citing *Grain.* It is not a reasonable assumption that TVision would "leave the market altogether." *Id.*

Dr. Keeley provides examples of business that ███████████████████████ (Ex. 1 at 22-25, ¶¶ 52-54) but at no point does he apply the *Panduit* factors to establish that those losses were due to TVision's alleged infringement. *See Siemens,* 2019 WL 9698520 at *2. Dr. Keeley admits that "███████████████████████████████." *Id.* at 25, ¶ 55. In short, Dr. Keeley does not perform a proper lost profits analysis. Among other things, Dr. Keeley fails to establish that there was any demand for the patented product. *See Rite-Hite Corp. v. Kelley Co., Inc..* 56 F.3d 1538, 1545 (Fed. Cir. 1995) (*en banc*) (approving application of *Panduit* four-factor test to establish "but for" causation necessary to obtain lost profits). Indeed, Dr. Keeley acknowledges that ███████████████████████████ ███████████████ Ex. 1 at 15, ¶ 39. Further, Dr. Keeley's analysis ignores the undisputed fact that ███████████████████████████ ██████████. There is no evidence that ███████████████████████ Thus, Dr. Keeley fails to establish, or even address, the "but-for causation" required to prove lost profits. *See Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 2018 WL 4691047 at 5, 6 (D. Del., Sept. 28, 2018) (excluding damages expert's testimony on lost profits for failure to adequately address "but for" causation.)

### B. Dr. Keeley's testimony regarding the Nash Bargaining Solution should be excluded because it is not tied to the facts and circumstances of this case

Dr. Keeley bases his entire royalty opinion on the Nash Bargaining Solution.

> The hypothetical licensing negotiation in this case fits the Nash Bargaining framework (under the constraints of the hypothetical negotiation construct): a licensing agreement between the parties provides an opportunity for mutual benefit. If Nielsen and TVision come to an agreement, TVision earns an incremental profit from licensing the patented technology, and Nielsen earns a royalty from

TVision.

Ex. 1 at 28, ¶ 65 (emphasis supplied).

The Nash Bargaining Solution would be:

Ex. 1 at 30-31, ¶ 69.

First, Dr. Keeley cites no evidence to support his assumption that TVision ███████ ████████████████████████████, and there is none.  Ex. 1 at 28, ¶ 65. .  The '889 patent admits that its method is not the only way to perform ACR, and Nielsen, itself, ████████████████████████████████.  Ex. 2, 1:21-26, 2:55-60; Ex. 1 at 15, ¶ 39.  Second, Dr. Keeley's use of the Nash Bargaining Solution is equivalent to an abstract ████ rule of thumb.  Dr. Keeley prefaces his Nash Bargaining Solution by stating that he will first "[simplify] the negotiation and then discuss the likely consequences of doing so."  Ex. 1 at 30-31, ¶ 69.  By placing Nielsen and TVision into a "simplified" world, Dr. Keeley wholly disregards any relevant facts that the parties would have considered at the hypothetical negotiation.

Dr. Keeley does not take into account in his Nash Bargaining analysis that TVision provides different data than Nielsen. TVision offers a product that measures "eyes on TV," rather than ████████████.  Ex. 3 (Green Dep at 77:12-78:7; 79:3-21; 91:7-92:6; 99:11-18; 101:4-102:11).  TVision's product is unique in this regard.  Ex. 4 (TVSN_NLSN_00624919-926) at 924; Ex. 5 (Liu Dep.) at 86:7-89:17.  Further, TVision's product is considered a complement to Nielsen's products, as opposed to a replacement. Ex. 5 at pp. 117:18-118:1.  In this regard, ████████████████████████████████████████

██████████████████████████████████████████████████████████████████████████ .

Ex. 5 at 92:11-93:10. *See also*, Ex. 6 (Schiffman Dep.) at 32:8-34:4.

In addition, Dr. Keeley failed to take into account evidence that Nielsen had historically licensed its ████████ metadata to ████████████████████████████████████ ████████████ . *See*, Ex. 7 at 1-4.

Dr. Keeley's application of the Nash Bargaining Solution in this case is equivalent to an abstract ████ rule of thumb, which has been rejected by the Federal Circuit and by this Court. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332-33 (Fed. Cir. 2014) (rejecting use of Nash Bargaining as an improper "rule of thumb"); *Bayer Healthcare LLC v. Baxalta Inc.*, 2019 WL 330149 at *7 - *8 (D. Del., Jan. 25, 2019) (excluding expert testimony that "a reasonable royalty rage is 'the mid-point of the bargaining range'"); *see also Numatics, Inc. v. Balluff, Inc.*, 66 F. Supp. 3d 934, 961 (E.D. Mich. 2014*);Good Tech. Corp. v. Mobileiron, Inc.*, 2015 WL 4090431, at *7 (N.D. Cal. July 5, 2015) (excluding expert testimony that "fails to tie the 50/50 split to the specifics of the case or to explain why such a split would be reasonable—other than to invoke a boilerplate assertion about the relative bargaining powers of the parties"); *Oracle Am., Inc. v. Google Inc.,* 798 F. Supp. 2d 1111, 1119 (N.D. Cal. 2011) (excluding expert testimony that purported to apply the Nash Bargaining Solution but "glossed over the axioms underlying the Nash solution without citing any evidence to show that those assumptions were warranted in the present case").

In short, Dr. Keeley should be precluded from testifying about a reasonable royalty because his entire report relies on the Nash Bargaining and uses a ████ rule of thumb that is untethered to the facts in this case.

**C. Dr. Keeley should be precluded from testifying about a reasonable royalty because his report fails to apportion the value of the patent-in-suit from the value of ACR software**

The Federal Circuit has explained that "apportionment is an important component of damages law generally, and ... it is necessary in both reasonable royalty and lost profits analysis." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1287 (Fed. Cir. 2017); see also *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("Indeed, apportionment is required even for non-royalty forms of damages[.]").

More specifically, with regard to reasonable royalty damages, "[a] patentee is only entitled to a reasonable royalty attributable to the infringing features" and therefore "[t]he patentee 'must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features.'" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)); *see also Elbit Sys. Land and C4I Ltd. v. Hughes Network Sys.*, LLC, 927 F.3d 1292, 1301 (Fed. Cir. 2019) ("[T]he apportionment requirement [dictates] that a royalty should reflect the value of patented technology."); *Ericsson*, 773 F.3d at 1226 ("As a substantive matter, it is the 'value of what was taken' that measures a 'reasonable royalty' under [Section] 284") (internal quotation marks and citation omitted).

Throughout his report, Dr. Keeley conflates the benefits attributable to the '889 patent's method of generating signatures, as compared to other methods, with the benefits of using ACR technology generally. *E.g.*, ███████████████████████████████████ ███████████████████ . . . ." (Ex. 1 at 20, ¶50); ████████████████████ ████████████████████████████████████████████████████ ████ ." Ex. 1 at 32, ¶ 73. Thus, Dr. Keeley mistakenly assumes that the '889 patent is equivalent to ACR technology generally, leading him to conclude that absent ACR technology,

TVision would have no revenues or profits. *Id.* But Dr. Keeley does not address whether the benefits of the "specific way" that the '889 patent contributes to ACR is a critical component of TVision's business. As noted above, the '889 patent admits that generating signatures or fingerprints was known in the prior art. Ex. 2, 1:21-26, 2:55-60. Moreover, Nielsen, itself, does not practice the patented invention, and there is no evidence that anyone else practices it. Ex. 1 at 15, ¶ 39.

Dr. Keeley's hypothetical negotiation framework is supposed to be based on the "incremental benefit the patent provides to the infringer compared to the next-best available non-infringing alternative" at the time of the hypothetical negotiation. *See IOENGINE, LLC v. PayPal Holdings, Inc.*, 607 F. Supp.3d 464 503 (D. Del. 2022) (Bryson, J.) (excluding expert testimony because expert did not apportion).

Neither Dr. Keeley nor Nielsen's technical expert, Dr. Moulin, address the benefits of the '889 patent in the period leading up to the hypothetical negotiation in May 2018. The '889 patent claims creating a "descriptor" by the mathematical operation (algorithm) of comparing different spectral values within a single "frame." Ex. 2, claim 1. The descriptor is then used to create a "signature." *Id.* TVision's technical expert, Dr. Anderson, opined that "the only advantage of the '889 *intraframe* processing is reduced computational complexity." Ex. 9 at 38 ¶ 97. However, this "purported computational advantage of only processing a small number of frequency components is irrelevant" because "a significant part of the computation requirements of creating signatures is the frequency transform" which "must be performed on every frame whether or not the descriptors are intra-frame operations or inter-frame operations." *Id.* at 38-39, ¶ 99. The computational advantage of the claimed invention is "negligible." *Id.* Further, "[i]f there were computational advantages to the '889 system . . ., advances in computer technology have dwarfed any possible algorithmic advantages." *Id.* In this regard, Nielsen offers no evidence that the functioning of the TVision devices would be

13

impeded in any way by a slower or more computationally intensive ACR algorithm that operates using the prior art methods.

The alleged contribution of the '889 patent due to computational efficiency is "only a very small part of an overall ACR system." *Id.* at 39-40, ¶ 100.  According to TVision's expert,

> The following steps are common across ACR systems:
>
> a. Create and maintain a database of reference audio signatures
> b. Acquire audio to be identified
> c. Divide audio into overlapping frames
> d. Perform a spectral or similar transform on the audio frames
> e. Create descriptors/signatures/hashes based on the spectral content of the frames
> f. Search a database for similar signatures
> g. Determine a best content match based on multiple approximate matches
> h. Process, return, or log results
>
> In addition to these steps, there are communications considerations, determination of the actual presence of audio to be matched (this may occur at different steps depending on implementation specifics), data and results analysis, database management and updates, server configuration, and other tasks concerning the operation of an ACR system as a whole. he only alleged contribution of the '889 patent is a specific method of performing only step (e), which method is very similar, if not identical, to prior art methods.

*Id.* at 40, ¶ 100.  Step (e) is not critical and may be substituted by other methods known in the art. *Id.*

Nowhere does Dr. Keeley consider the relative value of the patented invention, which is only a small part of ACR software, in the context of the value of ACR software. Further, there is no evidence that the patented invention drives the demand for TVision's products. Under these circumstances, Dr. Keeley should be prohibited from testifying about a reasonable royalty for failure to apportion the value of the patented invention from the other components

14

of TVision's products.   *See IOENGINE, LLC*, 607 F. Supp.3d at 503 (excluding expert testimony because expert did not apportion).[1]

### D. Dr. Keeley should be precluded from testifying about a reasonable royalty because his report assumes that Nielsen would be unwilling to license the patented invention

The hypothetical negotiation or "willing licensor-willing licensee" approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1324 (Fed. Cir. 2009), citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F.Supp. 1116, 1120 (S.D.N.Y. 1970).

Dr. Keeley's report gives lip service to the *Georgia Pacific* requirement that the hypothetical negotiation must be between a willing licensor and a willing licensee, but states several times that ████████████████████████████████████. Ex. 1 at 5, ¶ 17 ("███████████████████████████████████████████████████████████ ████████████████████ 27, ¶ 59 ("███████████████████████ ████████████████████████████████████████████████████ ████████ His testimony regarding reasonable royalty should be excluded because a proper analysis requires that an expert assume a willing licensor and a willing licensee. *Lucent* 580 F.3d at 1324.

---

[1] A narrow exception to the general rule requiring apportionment is the entire market value rule. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 67 (Fed. Cir. 2012). The entire market value rule "permits recovery of damages based on the value of a patentee's entire apparatus containing several features when the patent related feature is the basis for customer demand." *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 491 (D. Del. 2019) (applying entire market value rule to lost profits damages analysis); *see also*, *LaserDynamics*, 694 F.3d at 67 ("In effect, the entire market value rule acts as a check to ensure that [reasonable] royalty damages being sought under [Section] 284 are in fact 'reasonable' in light of the technology at issue."). In order to satisfy the entire market value rule, a patentee must "present evidence showing that the [patented feature] drove demand for the [entire apparatus][;] [i]t is not enough to merely show that the [patented feature] is viewed as valuable, important, or even essential to the use of the [entire apparatus]." *Id*. at 68. Dr. Keeley does not justify his failure to apportion based on the entire market value rule.

### E. Dr. Keeley's report is unreliable because it incorrectly relies on a single, unsubstantiated forecast of TVision's revenues and profits, without taking into account that TVision was operating ████

Dr. Keeley should be precluded because he relies on TVision's unsubstantiated projections and ignores TVision's actual balance sheet for the period immediately preceding the hypothetical negotiation. Ex. 1 at 32-41, ¶¶ 74-84. ████████████████████████

████████. Ex. 11 at 43-46, ¶¶ 129-139. Dr. Keeley, however, relied exclusively on a single 2018 forecast prepared by TVision for a prospective investor. Ex. 1 at 32-41, ¶¶74-84. From this single projection, Dr. Keeley opines that a royalty ████████ "is both reasonable and favorable to TVision." *Id*. at 41, ¶ 84.

However, a royalty of ████████ would have been over █████ TVision's total revenues for 2017. Ex. 11 at 44, ¶¶ 132, 133No rational party would agree to a royalty of multiple times its revenues for a period of █████ (until the expiration of the patent). This testimony is baseless and should be excluded.

## VI.  CONCLUSION

For the reasons set forth above, Dr. Keeley's testimony on damages should be excluded in its entirety.

16

Respectfully submitted,

/s/ Andrew E. Russell

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)

OF COUNSEL:

Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com

Eric C. Cohen
RIMÔN LAW P.C.
P.O. Box B113
150 Fayetteville St, Suite 2800
Raleigh, NC 27601-2960
(984) 960-2860

*Attorneys for Defendant TVision Insights, Inc.*

Michael F. Heafey
RIMÔN LAW P.C.
800 Oak Grove Avenue, Suite 250
Menlo Park, CA 94025
(650) 461-4433

Dated: March 12, 2024

17

## CERTIFICATE OF SERVICE

I hereby certify that on March 12, 2024, this document was served on the persons

listed below in the manner indicated:

**BY EMAIL:**

David E. Moore
Andrew L. Brown
Bindu A. Palapura
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000
dmoore@potteranderson.com
abrown@potteranderson.com
bpalapura@potteranderson.com

Clifford Katz
Malavika Rao
Jolie Brett Schenerman
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800
ckatz@kelleydrye.com
mrao@kelleydrye.com
jschenerman@kelleydrye.com

Steven Yovits
Constantine Koutsoubas
Mel W. Gaddy
Jason P. Greenhut
Douglas Lewis
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
(312) 857-7070
syovits@kelleydrye.com
ckoutsoubas@kelleydrye.com
mgaddy@kelleydrye.com
jgreenhut@kelleydrye.com
dlewis@kelleydrye.com

Joshua B. Long
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd. Suite 900
Houston, TX 77027
(713) 355-5054
jlong@kelleydrye.com

*/s/ Andrew E. Russell*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

18

# EXHIBIT 1

## Redacted in its Entirety

# EXHIBIT 2

US007783889B2

(12) **United States Patent**
Srinivasan

(10) **Patent No.:** **US 7,783,889 B2**
(45) **Date of Patent:** **Aug. 24, 2010**

(54) **METHODS AND APPARATUS FOR GENERATING SIGNATURES**

(75) Inventor: **Venugopal Srinivasan**, Palm Harbor, FL (US)

(73) Assignee: **The Nielsen Company (US), LLC**, Schaumburg, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 199 days.

(21) Appl. No.: **11/676,452**

(22) Filed: **Feb. 19, 2007**

(65) **Prior Publication Data**

US 2007/0274537 A1    Nov. 29, 2007

**Related U.S. Application Data**

(63) Continuation of application No. PCT/US2005/029623, filed on Aug. 18, 2005.

(60) Provisional application No. 60/603,024, filed on Aug. 18, 2004.

(51) **Int. Cl.**
**H04L 9/00** (2006.01)

(52) **U.S. Cl.** .......................... **713/179**; 713/176; 725/19; 725/20; 380/202; 380/239; 381/94.3

(58) **Field of Classification Search** ................. 713/160, 713/176, 179; 380/202, 206, 207, 239, 253, 380/229; 382/100, 232, 240, 191; 381/94.3; 375/134; 704/268, 273; 725/19, 20

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,230,990 A    10/1980  Lert, Jr. et al.

(Continued)

FOREIGN PATENT DOCUMENTS

AU        718227        11/1997

(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office, "PCT International Search Report," issued by the International Searching Authority of the United States Patent and Trademark Office on Feb. 6, 2008, in connection with a counterpart international application No. PCT/US2005/029623 (3 pages).

(Continued)

*Primary Examiner*—Nasser Moazzami
*Assistant Examiner*—Shanto M Abedin
(74) *Attorney, Agent, or Firm*—Hanley, Flight and Zimmerman, LLC

(57) **ABSTRACT**

Methods, apparatus, and articles of manufacture for media monitoring are disclosed. In particular, the example methods, apparatus, and articles of manufacture generate digital spectral signatures for use in identifying media information. Initially, a frame of media samples is obtained. A first frequency component having a first spectral power and a second frequency component having a second spectral power are identified by performing a spectral transform operation on the frame of media samples. A descriptor of the first frame of media samples is determined based on a comparison of the first spectral power and the second spectral power. A first signature is then generated based on the descriptor.

**17 Claims, 12 Drawing Sheets**



**Ex. 2**

US 7,783,889 B2

# METHODS AND APPARATUS FOR GENERATING SIGNATURES

## RELATED APPLICATIONS

This patent is a continuation of International Patent Application Ser. No. PCT/US2005/029623, filed Aug. 18, 2005, which claims priority to U.S. Provisional Application 60/603,024, filed on Aug. 18, 2004, both of which are hereby incorporated herein by reference in their entireties.

## FIELD OF THE DISCLOSURE

The present disclosure relates generally to media monitoring and, more particularly, to methods and apparatus for generating signatures for use in identifying media information.

## BACKGROUND

Identifying media information and more specifically audio streams (e.g., audio information) using signature-matching techniques is well known. Known signature-matching techniques are often used in television and radio audience metering applications and are implemented using several known methods for generating and matching signatures. For example, in television audience metering applications, signatures are generated at monitoring sites (e.g., monitored households) and reference sites. Monitoring sites typically include locations such as, for example, households where the media consumption of audience members is monitored. For example, at a monitoring site, monitored signatures may be generated based on audio streams associated with a selected channel, radio station, etc. The monitored signatures may then be sent to a central data collection facility for analysis. At a reference site, signatures, typically referred to as reference signatures, are generated based on known programs that are provided within a broadcast region. The reference signatures may be stored at the reference site and/or a central data collection facility and compared with monitored signatures generated at monitoring sites. A monitored signature may be found to match with a reference signature and the known program corresponding to the matching reference signature may be identified as the program that was presented at the monitoring site.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A and 1B illustrate example audio stream identification systems for generating digital spectral signatures and identifying audio streams.

FIG. 2 is a time-domain representation of an example monitored audio stream and a plurality of audio sample frames acquired from the monitored audio stream.

FIG. 3 is a time-domain representation of an example reference audio stream and a plurality of audio sample frames acquired from the example reference audio stream.

FIG. 4 is a flow diagram of an example method for generating digital spectral signatures based on spectral decompositions.

FIG. 5 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 4.

FIG. 6 is a flow diagram of another example method for generating digital spectral signatures based on spectral decompositions.

FIG. 7 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 6.

FIG. 8 is a flow diagram of an example method for comparing the digital spectral signatures generated using the example methods of FIGS. 4-7.

FIG. 9 is a block diagram of an example signature generation system for generating digital spectral signatures based on audio streams.

FIG. 10 is a block diagram of another example signature generation system for generating digital spectral signatures based on audio streams.

FIG. 11 is a block diagram of an example signature comparison system for comparing digital spectral signatures.

FIG. 12 is a block diagram of an example processor system that may be used to implement the methods and apparatus described herein.

## DETAILED DESCRIPTION

Although the following discloses example systems including, among other components, software executed on hardware, it should be noted that such systems are merely illustrative and should not be considered as limiting. For example, it is contemplated that any or all of these hardware and software components could be embodied exclusively in hardware, exclusively in software, or in any combination of hardware and software. Accordingly, while the following describes example systems, persons of ordinary skill in the art will readily appreciate that the examples provided are not the only way to implement such systems.

The methods and apparatus described herein generally relate to generating digital spectral signatures, which may be used to identify media information. In particular, the disclosed methods and apparatus are described with respect to generating digital spectral signatures based on audio streams (e.g., audio information). However, the methods and apparatus described herein may also be used to generate digital spectral signatures based on any other type of media information such as, for example, video information, web pages, still images, computer data, etc. Further, the media information may be associated with broadcast information (e.g., television information, radio information, etc.), information reproduced from any storage medium (e.g., compact discs (CD), digital versatile discs (DVD), etc.), or any other information that is associated with an audio stream, a video stream, or any other media information for which the digital spectral signatures are generated. In one particular example, the audio streams are identified based on digital spectral signatures that include monitored digital signatures generated at a monitoring site (e.g., a monitored household) and reference digital signatures generated and/or stored at a reference site and/or a central data collection facility.

As described in detail below, the methods and apparatus described herein identify media information including audio streams based on digital spectral signatures. The digital spectral signatures may be formed using digital descriptors that are generated based on the spectral components of an audio stream and that may be analyzed using frequency transforms and/or wavelet transforms.

Unlike known methods in the prior art that use interframe operations (e.g., operations based on sample data within different data sample frames) to generate digital spectral signatures, the methods and apparatus described herein may be implemented using intraframe operations (e.g., operations based on sample data within a single frame). Intraframe operations may include, for example, comparison operations, determining percentage differences between values, etc. that are performed on two or more values (e.g., spectral power values) that are uniquely associated with or derived from a single frame. For example, using the methods and apparatus described herein, a digital spectral signature may be generated by obtaining a frame of media samples, determining

**Ex. 2**

US 7,783,889 B2

25

with an unidentified audio stream (e.g., the example monitored audio stream 202 of FIG. 2). For example, the media identification look-up table interface 1112 may be communicatively coupled to a media identification look-up table or a database that is used to cross-reference media identification information (e.g., movie title, show title, song title, artist name, episode number, etc.) based on reference signatures. In this manner, the media identifier 1110 may retrieve media identification information from the media identification database based on the matching reference signatures.

FIG. 12 is a block diagram of an example processor system 1210 that may be used to implement the apparatus and methods described herein. As shown in FIG. 12, the processor system 1210 includes a processor 1212 that is coupled to an interconnection bus or network 1214. The processor 1212 includes a register set or register space 1216, which is depicted in FIG. 12 as being entirely on-chip, but which could alternatively be located entirely or partially off-chip and directly coupled to the processor 1212 via dedicated electrical connections and/or via the interconnection network or bus 1214. The processor 1212 may be any suitable processor, processing unit or microprocessor. Although not shown in FIG. 12, the system 1210 may be a multi-processor system and, thus, may include one or more additional processors that are identical or similar to the processor 1212 and that are communicatively coupled to the interconnection bus or network 1214.

The processor 1212 of FIG. 12 is coupled to a chipset 1218, which includes a memory controller 1220 and an input/output (I/O) controller 1222. As is well known, a chipset typically provides I/O and memory management functions as well as a plurality of general purpose and/or special purpose registers, timers, etc. that are accessible or used by one or more processors coupled to the chipset. The memory controller 1220 performs functions that enable the processor 1212 (or processors if there are multiple processors) to access a system memory 1224 and a mass storage memory 1225.

The system memory 1224 may include any desired type of volatile and/or non-volatile memory such as, for example, static random access memory (SRAM), dynamic random access memory (DRAM), flash memory, read-only memory (ROM), etc. The mass storage memory 1225 may include any desired type of mass storage device including hard disk drives, optical drives, tape storage devices, etc.

The I/O controller 1222 performs functions that enable the processor 1212 to communicate with peripheral input/output (I/O) devices 1226 and 1228 via an I/O bus 1230. The I/O devices 1226 and 1228 may be any desired type of I/O device such as, for example, a keyboard, a video display or monitor, a mouse, etc. While the memory controller 1220 and the I/O controller 1222 are depicted in FIG. 12 as separate functional blocks within the chipset 1218, the functions performed by these blocks may be integrated within a single semiconductor circuit or may be implemented using two or more separate integrated circuits.

The methods described herein may be implemented using instructions stored on a computer readable medium that are executed by the processor 1212. The computer readable medium may include any desired combination of solid state, magnetic and/or optical media implemented using any desired combination of mass storage devices (e.g., disk drive), removable storage devices (e.g., floppy disks, memory cards or sticks, etc.) and/or integrated memory devices (e.g., random access memory, flash memory, etc.).

Although certain methods, apparatus, and articles of manufacture have been described herein, the scope of coverage of this patent is not limited thereto. To the contrary, this patent

26

covers all methods, apparatus, and articles of manufacture fairly falling within the scope of the appended claims either literally or under the doctrine of equivalents.

What is claimed is:

1. A method for generating signatures implemented using an apparatus comprising a processor, the method comprising:
obtaining a first frame of media samples;
identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;
determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;
generating a first signature based on the first descriptor;
identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples;
identifying a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;
determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and
generating a second signature based on the second descriptor.

2. A method as defined in claim 1, further comprising identifying media information based on the first signature.

3. A method as defined in claim 2, wherein a Hamming distance is used to identify the media information based on the first signature.

4. A method as defined in claim 2, wherein the media information is associated with at least one of audio information or video information.

5. A method as defined in claim 1, wherein the first descriptor is associated with only the first frame of media samples.

6. A method as defined in claim 1, wherein the second descriptor is of the second frame of media samples.

7. A method as defined in claim 1, wherein the spectral transform operation is a sliding Fast Fourier Transform.

8. An apparatus for generating signatures, comprising:
a processor system including a memory; and
instructions stored in the memory that enable the processor system to:
obtain a first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;
identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;
identify a third spectral power and a fourth spectral power; determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;
determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

**Ex. 2**

US 7,783,889 B2

**27**

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

**9**. An apparatus as defined in claim **8**, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature.

**10**. An apparatus as defined in claim **9**, wherein a Hamming distance is used to identify the media information based on the first signature.

**11**. An apparatus as defined in claim **8**, wherein the first descriptor is associated with only the first frame of media samples.

**12**. An apparatus as defined in claim **8**, wherein the instructions stored in the memory enable the processor system to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

**13**. An apparatus as defined in claim **8**, wherein the third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

**14**. A tangible machine accessible medium having instructions stored thereon that, when executed, cause a machine to:

obtain a first frame first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

**28**

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

identify a third spectral power and a fourth spectral power;

determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

**15**. A tangible machine accessible medium as defined in claim **14**, wherein the first descriptor is associated with only the first frame of media samples.

**16**. A tangible machine accessible medium as defined in claim **14** having instructions stored thereon that, when executed, cause the machine to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

**17**. A tangible machine accessible medium as defined in claim **14**, wherein third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

* * * * *

**Ex. 2**

# EXHIBITS 3-6

# Redacted in their Entirety

# EXHIBIT 7

 Menu

**AdAge**

**Don't Miss** | AI marketing tracker | Creator, influencer news | Papa Johns hires Carat | 2024 Creativity Awards juries | Business of Brands



# NIELSEN PULLS ITS GRACENOTE DATA FROM RIVAL VIDEOAMP, OTHERS MULL ALTERNATIVES

Vizio's Inscape, which provides viewing data across the industry, also prepares to shift from Gracenote toward TiVo product

     

By 9'ack Neff. Published on September 26, 2023.

TVision-JJ00000803

**Ex. 7**



Vizio's Inscape provides smart TV viewership data to Nielsen, as well as rivals such as VideoAmp. Credit: Vizio

Nielsen, which dominates U.S. TV and digital audience measurement, has pulled its Gracenote metadata, long part of the backbone for processing and classifying vast amounts of commercial and program data, from rival VideoAmp. This has led other industry players to consider their alternatives in the wake of the move.

Nielsen's seeming move to yank Gracenote metadata away from rivals has been the subject of industry buzz for months and is seen by some as a way for Nielsen to disrupt and raise costs for competitors.

Vizio's Inscape, a provider of smart TV viewing data across the industry, is also preparing to drop Gracenote metadata for at least some customers, according to a client letter obtained by Ad Age.

## Ad Age Media Summit
### Hear from industry leaders during October event in NYC

Register here

TVision-JJ00000804

**Ex. 7**

That comes amid contract discussions nearing conclusion between Vizio and Nielsen on a new Gracenote contract, according to people familiar with the matter. Vizio's Inscape provides smart TV viewership data to Nielsen, as well as rivals such as VideoAmp.

Regardless of the outcome of those talks, Inscape's move from Gracenote to TiVo as its core metadata system will go forward, according to a person familiar with the matter. An Inscape client letter on Sept. 15 set a deadline of Oct. 15 for the switch to TiVo's metadata, but a new deal between Vizio and Nielsen could give customers more time to make that transition.

**Industry buzz**

So far, Nielsen's move to pare back Gracenote data from rivals is limited. The why behind the decision is being debated and raises concerns over antitrust issues. If Nielsen's goal is to disrupt competitors, it doesn't seem to be working, at least for VideoAmp, according to one executive.

Types of metadata where reporting details could be affected include IDs of content, titles, station call signs and networks that surround commercial airings, plus the IDs, titles, station call signs and networks assigned to programs themselves that run on TV, according to Inscape's letter to clients.

According to one person familiar with the matter, Inscape has said it will handle what can be extensive work to translate Gracenote and TiVo data for customers that have their own direct Gracenote contracts. That would no longer include VideoAmp.

A Vizio spokesman declined to comment. A Nielsen spokesman declined to comment on most aspects of the Gracenote contract moves.

**Recent news from Ad Age**

The CW names media AOR as it seeks live sports audience

Parker Herren

Jack in the Box hired Hollywood horror writers to make a creepy short for Halloween

Erika Wheless

TVision-JJ00000805

**Ex. 7**

**ISpot gets MRC accreditation for its ad catalog, in possible step toward broader audit**

9'ackNeff

"We're encouraged about Gracenote's current and future prospects," Nielsen said in a statement. "Understanding the evolving use cases for our data and the various innovations we enable in the market, we regularly review the ways we work with customers to establish mutually beneficial relationships. Gracenote is open to working with all companies from across the media and advertising ecosystem to help them create engaging content experiences and extract the most value from content assets."

Comscore, another Nielsen rival, doesn't use Gracenote metadata, according to a spokesman. ISpot.tv, another competitor, has been expecting a non-renewal notice of its own from Nielsen over Gracenote and is in talks to possibly shift to another metadata source and its Gracenote contract extends into next year, according to people familiar with the matter. An iSpot.tv spokesman declined to comment.

**Minimum of notification**

VideoAmp is glad to have made the switch, despite initial concerns, according to one executive.

"We got the bare minimum of notification," said Josh Hudgins, VP of product development at VideoAmp. "I think there was a concern. The market seemed to think that this was going to be disruptive. It turned out it was a minor inconvenience. I wouldn't grade it any higher than that."

VideoAmp built an integration to TiVo's metadata after evaluating alternatives, he said.

"We found it was a very reasonable replacement," Hudgins said. "There was not really any loss of data or functionality."

Gracenote has been "threaded through a lot of the plumbing" in the industry, Hudgins said. "This allowed us to take a step back and think about how do we make this more generic and over time layer in diverse sources of scheduling and metadata and not tie your system inextricably to a single data provider. So we're really happy with how that turned out."

TVision-JJ00000806

**Ex. 7**

# EXHIBITS 8-11

## Redacted in their Entirety

# EXHIBIT 12



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00662112

**Ex. 12**

 **company overview**

- **Founded in 2007**
  - Wholly owned, but independently operating subsidiary of the Bellevue Investments GmbH&Co.KGaA
  - Twelve employees; Headquartered in Berlin, Germany with 7 employees at the development department in Dresden

- **Best in-class digital signal processing technology based on sound analysis** which automates the process of recognizing, discovering, navigating and managing content
  - Specializes in audio fingerprint technology for ACR (automatic content recognition) and audio based music recommender systems
  - Vast selection of industry leading products; white label software solution for the B2B sector for integration in cutting edge consumer and professional products and business services
  - Wide variety of business scenarios: broadcast advertisement monitoring, TV audience metering, second screen synchronization and production music recommendation and discovery
  - Worldwide patented portfolio of audio fingerprinting and music recommendation technologies

- **Significant investment in technology and R&D** over the last couple of years
  - Continuous R&D assures mufin's technology remains cutting edge

- **Strategically positioned** in a large and **global market that is poised for rapid growth**

- **World-class, experienced management and technical team**
  - Excellent team of digital signal processing and software development experts

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00662115

**Ex. 12**



## business cases & product overview

## Customers & Partners

These are just a few selected B2B customers and partners we work with:

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

*Market Size (USD Million) in 2016

TVSN_NLSN_00662121

**Ex. 12**

# EXHIBIT 13

## Redacted in its Entirety