## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |  |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | C.A. No. 22-57-CJB |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## THE NIELSEN COMPANY (US), LLC'S BRIEF IN SUPPORT OF
## ITS DAUBERT AND SUMMARY JUDGMENT MOTIONS

OF COUNSEL:

Steven Yovits
Douglas Lewis
Constantine Koutsoubas
Jason P. Greenhut
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
Tel:  (312) 857-7070

Clifford Katz
Jolie Schenerman
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  (212) 808-7800

Dated: March 12, 2024
11374978 / 14944-00004
Public Version Dated: March 19, 2024

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew L. Brown (#6766)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
abrown@potteranderson.com

*Attorneys for Plaintiff The Nielsen Company
(US), LLC*

**TABLE OF CONTENTS**

I.    Introduction/Summary of Arguments ........................................................................ 1
II.   Background and Nature and Stage of the Proceedings........................................... 1
III.  Argument - *Daubert* Motions ................................................................................ 2

    A.    The Court Should Exclude Ms. Johnson's Opinion Relating to Nielsen's Foregone Profits Because She Applies The Wrong Legal Standard ..................... 4

    B.    Ms. Johnson Offers No Support for Her Opinion That The April 2018 Forecast is "Speculative and Unsubstantiated"........................................................ 5

    C.    The Court Should Exclude Ms. Johnson's Opinion about A Device-Based Running Royalty Because It Is Conclusory and Factually Unsupported............... 8

    D.    The Court Should Preclude Ms. Johnson from Offering Royalty Opinions Relying on The Gracenote Agreement ................................................................... 9

    E.    The Court Should Preclude Ms. Johnson from Opining That A Reasonable Royalty Can be Calculated from Information That Existed Only after The Hypothetical Negotiation ..................................................................................... 14

    F.    The Court Should Preclude TVision's Experts from Offering Opinions Relating to Proposed Alternatives to The Infringing System .............................. 16

        1.    The Court Should Preclude TVision's Experts from Offering Opinions Relating to the Alleged ACRCloud Alternative........................ 17

            a.    The Proposed ACRCloud Redesign Was Not Available.............. 18

                (i)    TVision's Experts' Proposed ACRCloud Alternative Is Entirely Speculative and Thus Not Available ................................................................. 18

                (ii)    TVision's Expert Do Not Even Assert That An ACRCloud Alternative Would Have Been Available in May 2018..................................................... 22

                (iii)    TVision Does Not Show That An ACRCloud Redesign Would Not Infringe Third-Party Patents.......... 23

            b.    TVision Lacks Any Evidence That An ACRCloud Redesign Would Be Acceptable ................................................... 24

        2.    TVision's Experts Should Be Precluded from Opining about a Proposed TVision Internal ACR Alternative........................................ 25

            a.    TVision's Experts Have Not Shown That The Proposed TVision Alternative Would Have Been Available at the Time of the Hypothetical Negotiation ........................................ 26

                (i)    TVision's Experts' Proposed TVision Internal Alternative is Entirely Speculative and Thus Not Available ................................................................. 26

                (ii)    TVision's Experts Do Not Assert That TVision Could Have Developed An Alternative in May 2018...... 27

                (iii)    TVision Does Not Show That a TVision Internal Design Would Not Infringe Third-Party Patents ............. 28

            b.    TVision Lacks Any Evidence That Its Proposed Internally-Developed Alternative System Would be Acceptable.................. 30

        3.    Opinions about Supposed Third-Party Alternatives Should be Precluded.............................................................................................. 31

             a.      TVision's Proposed Third Party ACR Solutions (MRL, Axwave, Mufin, and Source Digital) Are Not Available and Acceptable Alternatives ................................................................ 31

                  (i)      Mobile Research Labs ("MRL") Is Not an Acceptable Alternative....................................................... 31

                  (ii)     Axwave Is Not an Available, Acceptable Alternative.................................................................. 33

                  (iii)    Mufin Is Not an Available, Acceptable Alternative ........ 35

                  (iv)    Source Digital is Not An Available, Acceptable Alternative.................................................................. 36

             b.      TVision's Experts Should be Precluded from Opining about Proposed Third-Party Alternatives for Which They Provide No Information Other Than Their Names ....................... 37

                  (i)      "Answer" Is Not an Available, Acceptable Alternative.................................................................. 37

                  (ii)     Beatgrid Is Not an Available, Acceptable Alternative.................................................................. 38

                  (iii)    Audible Magic is Not An Available, Acceptable Alternative.................................................................. 38

                  (iv)    Dat-Track Is Not an Available, Acceptable Alternative.................................................................. 39

                  (v)      Soundhound Is Not an Available, Acceptable Alternative.................................................................. 40

                  (vi)    Civolution Is Not an Available, Acceptable Alternative.................................................................. 40

             c.      Ms. Johnson Should Be Precluded from Opining on Alternatives Based on A TVision Witness's Unsupported Statement That The ACR Provider Market is "Fairly Commoditized" with "Very Similar Capabilities." ...................... 41

        4.      Ms. Johnson Should be Precluded from Opining That A Reasonable Royalty Is Limited to The Cost of An Alternative ............... 42

    G.      Dr. Anderson's Opinions Relating to Haitsma US and Its Purported "Wavelet Transforms" Should Be Precluded ....................................... 43

    H.      Dr. Anderson Should Be Precluded from Improperly Comparing Prior Art to Embodiments in The '889 Patent Rather Than The Claims of The '889 Patent.............................................................................................. 45

IV.    Argument - Summary Judgment........................................................................ 46

    A.      The Court Should Enter Partial Summary Judgment That The Cheung Reference is Not Prior Art and Thus Does Not Invalidate The Patent in Suit ......................................................................................................... 46

V.    Conclusion ......................................................................................................... 48

iii

# TABLE OF AUTHORITIES

**Cases**                                                                 **Page(s)**

*Acceleration Bay LLC v. Activision Blizzard Inc.*,
C.A. No. 16-453-RGA, 2019 WL 4194060 (D. Del. Sept. 4, 2019) ............................3, 29, 34

*Ace Pallet Corp. v. Conrail*,
764 F. App'x 197 (3d Cir. 2019) ...................................................................... *passim*

*Amgen Inc. v. Sanofi*,
872 F.3d 1367 (Fed. Cir. 2017)....................................................................................46, 47

*Andrews v. Brethren Mut. Ins. Co.*,
No. 4:19-CV-02107, 2023 WL 6690710 (M.D. Pa. Oct. 12, 2023) .........................................3

*Asetek Danmark A/S v. CMI USA Inc.*,
852 F.3d 1352 (Fed. Cir. 2017).....................................................................................4, 5

*Asetek Danmark A/S v. CoolIT Systems Inc.*,
No. 19-cv-00410, 2022 WL 21306657 (N.D. Cal. Oct. 4, 2022) .................................. *passim*

*Astrazeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015)..................................................................................... *passim*

*Baran v. Medical Device Techs., Inc.*,
616 F.3d 1309 (Fed. Cir. 2010)................................................................................................43

*Baxalta v. Bayer Healthcare LLC*,
513 F. Supp. 3d 426 (D. Del. 2021)................................................................................. *passim*

*Chrimar Sys., Inc. v. Cisco Sys., Inc.*,
318 F. Supp. 2d 476 (E.D. Mich. 2004)...................................................................................45

*Cordis Corp. v. Boston Sci. Corp.*,
561 F.3d 1319 (Fed. Cir. 2009)..........................................................................................43, 44

*Daubert v. Merrell Dow Pharmaceuticals, Inc.*,
509 U.S. 579 (1993)..........................................................................................................1, 2

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
800 F.3d 1375 (Fed. Cir. 2015)..................................................................................1, 47, 48

*Eisenberg v. Gagnon*,
766 F.2d 770 (3d Cir. 1985)......................................................................................................6

*EMC Corp. v. Pure Storage, Inc.*,
C.A. No. 13-1985, 2016 WL 775742 (D. Del. Feb. 25, 2016) (Andrews, J.)..............43, 44, 45

*General Electric Co. v. Joiner*,
    522 U.S. 136 (1997)......................................................................................................3

*Griddine v. GP1 KS-SB, Inc.*,
    No. 2:17-CV-02138-JAR, 2019 WL 1002049 (D. Kan. Feb. 28, 2019) ................................35

*Gumbs v. Int'l Harvester, Inc.*,
    718 F.2d 88 (3d Cir. 1983)..........................................................................................3

*Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*,
    378 F. Supp. 2d 459 (D. Del. 2005)..............................................................................16

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001)............................................................................7, 15, 16

*Intuitive Surgical, Inc. v. Aurius Health, Inc.*,
    549 F. Supp. 3d 362 (D. Del. 2021)......................................................................3, 43, 44

*Kam Hing Enterprises Inc. v. Wal-Mart Stores Inc.*,
    359 F. App'x 235 (2d Cir. 2010) ..................................................................................35

*Koninklijke Philips N.V. v. Telit IOT Sols., Inc.*,
    C.A. No. 20-1708, 2023 U.S. Dist. LEXIS 219805 (D. Del. Dec. 11, 2023)...........................3

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
    694 F.3d 51 (Fed. Cir. 2012)......................................................................................12

*Lucent Technologies, Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)....................................................................................9

*M2M Solutions LLC v. Enfora, Inc.*,
    167 F. Supp. 3d 665 (D. Del. 2016)..........................................................................12, 42

*M2M Solutions LLC v. Motorola Solutions, Inc.*,
    C.A. No. 12-33-RGA, 2016 WL 767900 (D. Del. Feb. 25, 2016) ....................................12, 13

*Mahurkar v. C.R. Bard, Inc.*,
    79 F.3d 1572 (Fed. Cir. 1996).....................................................................................46

*Mars, Inc. v. Coin Acceptors, Inc.*,
    527 F.3d 1359 (Fed. Cir. 2008)....................................................................................42

*MiiCs & Partners, Inc. v. Funai Elec. Co.*,
    C.A. No. 14-804-RGA, 2017 WL 6268072 (D. Del. Dec. 7, 2017) ........................................4

*Novartis Corp. v. Ben Venue Laboratories, Inc.*,
    271 F.3d 1043 (Fed. Cir. 2001)..............................................................................5, 17, 27

*Panduit Corp. v. Stahlin Bros Fibre Works, Inc.*,
    575 F.2d 1152 (6th Cir. 1978) ................................................................................4, 5

*Power Integrations v. Fairchild Semiconductor*,
    711 F.3d 1348 (Fed. Cir. 2013)...................................................................................21

*Purdue Pharma L.P. v. Iancu*,
    767 Fed. App'x 918 (Fed. Cir., 2019)........................................................................47

*ResQNet.com, Inc. v. Lansa, Inc.*,
    594 F.3d 860 (Fed. Cir. 2010)......................................................................10, 11, 12

*Riles v. Shell Exploration and Prod. Co.*,
    298 F.3d 1302 (Fed. Cir. 2002)...........................................................................14, 15

*Robertson Transformer Co. v. General Electric Co.*,
    No. 12 C 8094, 2016 WL 4417019 (N.D. Ill. Aug. 19, 2016)...................................23

*Sherwin-Williams Company v. PPG Industries, Inc.*,
    No. 17-1023, 2020 WL 1283465 (W.D. Penn. Mar. 18, 2020) ..................................... *passim*

*Silicon Graphics, Inc. v. ATI Techs., Inc.*,
    607 F.3d 784 (Fed. Cir. 2010)....................................................................................45

*Sinorgchem Co., Shandong v. Int'l Trade Comm'n*,
    511 F.3d 1132 (Fed. Cir. 2007)..................................................................................43

*Spectralytics, Inc. v. Cordis Corp.*,
    649 F.3d 1336 (Fed. Cir. 2011).....................................................................18, 25, 30

*SRI Int'l Inc. v. Internet Sec. Sys., Inc.*,
    C.A. No. 04-1199-SLR, 2011 WL 5166436 (D. Del. Oct. 31, 2011).......................17

*Technology Licensing Corp. v. Videotek, Inc.*,
    545 F. 3d 1316 (Fed. Cir. 2008).................................................................................47

*Visteon Global Technologies v. Garmin Intern.*,
    903 F. Supp. 2d 521 (E.D. Mich. 2012)............................................................ *passim*

*Webasto Thermo & Comfort*,
    No. 16-cv-13456, 2019 WL 3334563 (E.D. Mich. Jul. 25, 2019)................................. *passim*

*WhereverTV, Inc. v. Comcast Cable Commc'ns, LLC*,
    No. 2:18-cv-529, No. 2:18-CV-529-JLB-NPM, 2022 WL 2751752 (M.D. Fla.
    Jul. 14, 2022)..................................................................................................... *passim*

*Zimmer Surgical, Inc. v. Stryker Corp.*,
    365 F.Supp.3d 466 (D. Del. 2019).............................................................................12

vi

**Statutes and Rules**

Delaware Code § 73-605(a)(2) ........................................................................................6

17 CFR §240.10b-5............................................................................................................6

Fed. R. Civ. P. 30(b)(6)....................................................................................................7

Fed. R. Evid. 104(a) .........................................................................................................3

Fed. R. Evid. 702 ...................................................................................... *passim*

**TABLE OF EXHIBITS**

| Ex. No. | Description |
|---|---|
| 1. | U.S. Patent No. 7,783,889 |
| 2. | Anderson Opening Report (October 25, 2023) |
| 3. | Anderson Rebuttal Report (November 21, 2023) |
| 4. | Anderson Reply Report (December 15, 2023) |
| 5. | Johnson Opening Report (November 21, 2023) |
| 6. | Moulin Opening Report (October 25, 2023) |
| 7. | Moulin Rebuttal Report (November 20, 2023) |
| 8. | Moulin Reply Report (December 15, 2023) |
| 9. | Keeley Opening Report (October 25, 2023) |
| 10. | OMITTED |
| 11. | Liu Dep |
| 12. | Johnson Dep. |
| 13. | Schiffman Dep. |
| 14. | Neumann Dep. |
| 15. | TVSN_NLSN_00641220–231 |
| 16. | U.S. Patent No. 6,990,453 |
| 17. | OMITTED |
| 18. | https://www.businesswire.com/news/home/20150412005036/en/Axwave's-Unique-Viewership-Numbers-Show-30-TV#.VTXuj_CLMdV) |
| 19. | Sidhu Dep. |
| 20. | TVSN_NLSN_00662112–39 |
| 21. | TVSN_NLSN_00660739-772 |
| 22. | https://beatgrid.co/platform/acr-automatic-content-recognition-technology |
| 23. | TVSN_NLSN_00399618-19 |
| 24. | https://www.audiblemagic.com/ |
| 25. | https://lookup.icann.org/en/lookup of www.dat-track.com |
| 26. | https://www.soundhound.com |
| 27. | https://www.civolution.com/ |
| 28. | U.S. Patent No. 8,468,183 |
| 29. | TVision's Supplemental Initial Invalidity Contentions, served April 10, 2023 |
| 30. | TVision's Final Invalidity Contentions, Served September 18, 2023 |
| 31. | TVSN_NLSN_00645277-95 |
| 32. | 8/17/23-8/23/23 Email Correspondence between D. Lewis and E. Cohen |

| 33. | OMITTED |
|-----|---------|
| 34. | Nielsen's Supplemental Response to Interrogatory No. 7, served September 1, 2023 |

## I.    Introduction/Summary of Arguments

This Court should exclude expert opinions that defendant TVision Insights, Inc. ("TVision") seeks to offer insofar as they are contrary to law and unsupported by any foundational facts. Fed. R. Evid. 702, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993) and its progeny, and case law from this District (and others) require TVision, as the proponent of an expert opinion, to show that its proffered opinions are based upon identified facts and follow the relevant legal regime. TVision fails to carry this burden, as many of its experts' opinions are based on nothing more than *ipse dixit* while others do not follow the law. As explained below, the Court should preclude TVision's experts from opining on such matters.

This Court should also grant partial summary judgment that the patent in suit is not invalid based on U.S. Patent No. 8,468,183 ("the Cheung reference"). TVision and its experts have not carried their burden to prove that the Cheung reference is prior art to the patent in suit. The Cheung reference would only be prior art only if TVision can show that the reference is entitled to claim priority to its provisional filing date. But TVision never proved priority to the Cheung reference's provisional filing date in the manner the Federal Circuit requires in *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.,* 800 F.3d 1375 (Fed. Cir. 2015). For that reason, the Court should enter summary judgment that the Cheung reference does not invalidate any claims of the patent in suit.

## II.    Background and Nature and Stage of the Proceedings

Nielsen filed this patent infringement lawsuit against TVision on January 14, 2022. (D.I. 1.) Nielsen alleges that TVision's panelist devices infringe claims 1, 2, 4–6, 8, 9, and 11–17 of Nielsen's U.S. Patent No. 7,783,889 ("the '889 patent" or "patent in suit") (Ex. 1).

The '889 patent concerns, among other things, the generation of audio signatures, which is a part of the automatic content recognition (ACR) process that TVision uses to recognize media

content playing on its panelists' televisions. TVision places its devices in panelists' homes in order to monitor those panelists' media consumption. TVision's devices run software from a third-party, ████████ TVision's use of ████████ ACR software infringes the '889 patent. Keeley Rep. ¶32; Johnson Rep. ¶¶31, 76; Moulin Op. Rep. ¶¶88–97, 140–150. ████████

████████████████████████████ Ex. 11, Liu Dep. 39:6-8. According to TVision's CEO, Mr. Yan Liu, ██████████████████████████████████ *Id.* 184:1-2.

████████████████████████████████████████

████████████████ *Id.* 62:1-8, 62:19-63:1.

TVision's technical expert, Dr. David Anderson, served reports on October 25, 2023 ("Anderson Op. Rep.") (Ex. 2), November 21, 2023 ("Anderson Rebuttal Rep.") (Ex. 3), and December 15, 2023 ("Anderson Reply Rep.") (Ex. 4). TVision's damages expert, Joanne Johnson, served a report on November 21, 2023 ("Johnson Rep.") (Ex. 5). Many of Ms. Johnson's damages opinions rely on technical matters in Dr. Anderson's report. Nielsen's technical expert, Dr. Pierre Moulin, served reports on October 25, 2023 ("Moulin Op. Rep.") (Ex. 6), November 21, 2023 ("Moulin Rebuttal Rep.") (Ex. 7), and December 15, 2023 ("Moulin Reply Rep.") (Ex. 8). And Nielsen's damages expert, Dr. Michael Keeley, served reports on October 25, 2023 ("Keeley Op. Rep.") (Ex. 9) and December 15, 2023. The Court construed certain claim terms on November 9, 2023 (D.I. 140; 141), fact discovery closed on September 11, 2023 (D.I. 100), and expert discovery closed on February 7, 2024 (D.I. 128).

## III.    Argument - *Daubert* Motions

Recent amendments to Federal Rule of Evidence 702 make clear that TVision, as the proponent of its experts' opinions, must "demonstrate[] to the court that it is more likely than not" that "the [expert's] testimony is based on sufficient facts or data" and "the expert's opinion reflects a reliable application of the principles and methods to the facts of the case." *Koninklijke*

*Philips N.V. v. Telit IOT Sols., Inc.*, No. 20-1708, 2023 U.S. Dist. LEXIS 219805, at \*2-\*3 (D. Del. Dec. 11, 2023) (quoting Fed. R. Evid. 702). Rule 702 was "amended to clarify and emphasize that expert testimony may not be admitted unless the proponent demonstrates to the court that it is more likely than not that the proffered testimony meets the admissibility requirements set forth in the rule." Fed. R. Evid. 702, Advisory Comm. Notes, 2023 Amendments. And it is "an incorrect application of Rules 702 and 104(a)" to find that "the critical questions of the sufficiency of an expert's basis, and the application of the expert's methodology, are questions of weight and not admissibility." *Id.*; *see also Andrews v. Brethren Mut. Ins. Co.*, No. 4:19-CV-02107, 2023 WL 6690710, \*5-\*6 (M.D. Pa. Oct. 12, 2023).

Courts routinely exclude expert opinions that either lack sufficient factual foundation, are speculative, or are divorced from the facts of the case. *See, e.g.*, *Gumbs v. Int'l Harvester, Inc.*, 718 F.2d 88, 98 (3d Cir. 1983); *Ace Pallet Corp. v. Conrail*, 764 F. App'x 197, 198 (3d Cir. 2019); *Acceleration Bay LLC v. Activision Blizzard Inc.*, C.A. No. 16-453-RGA, 2019 WL 4194060, at \*4 (D. Del. Sept. 4, 2019); *also General Electric Co. v. Joiner*, 522 U.S. 136, 146 (1997). And separate from any fact-based infirmities, courts exclude expert opinions that apply an incorrect legal standard. *See, e.g.*, *Baxalta v. Bayer Healthcare LLC*, 513 F. Supp. 3d 426, 448 (D. Del. 2021) ("The plain text of [expert's opinion] recites an erroneous legal standard and I must exclude any testimony based on it."); *Intuitive Surgical, Inc. v. Aurius Health, Inc.*, 549 F. Supp. 3d 362, 370-71 (D. Del. 2021) (excluding expert report as contrary to law).

As explained below, TVision seeks to offer expert opinions that either are not supported by foundational facts and/or fail to apply the proper legal standards. The Court should preclude TVision from offering such opinions to the jury.

3

A.    **The Court Should Exclude Ms. Johnson's Opinion Relating to Nielsen's Foregone Profits Because She Applies The Wrong Legal Standard**

Nielsen's damages expert, Dr. Michael Keeley, opines that, when determining a reasonable royalty using the hypothetical negotiation construct, one must consider the profits Nielsen would lose as a result of granting TVision a license. TVision's damages expert, Joanne Johnson, criticizes Dr. Keeley's opinion because Dr. Keeley did not consider the four factors required to prove lost profits in *Panduit Corp. v. Stahlin Bros Fibre Works, Inc.,* 575 F.2d 1152, 1156 (6th Cir. 1978).[1] Ms. Johnson, however, applies the wrong legal standard.

The *Panduit* factors are immaterial because Nielsen is not seeking lost profits. Rather, it is seeking a reasonable royalty based on TVision's infringement. The Federal Circuit has made clear that the *Panduit* factors are inapplicable in a reasonable royalty analysis, even where the analysis considers the profits the licensor would lose by granting a license. *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362 (Fed. Cir. 2017) ("[having to] prove that it would have made the infringer's sales 'but for' the infringement [is] a requirement not applicable to reasonable-royalty damages"); *MiiCs & Partners, Inc. v. Funai Elec. Co.*, C.A. No. 14-804-RGA, 2017 WL 6268072, at *4 (D. Del. Dec. 7, 2017) ("[The Court does not] agree with Defendants that [the expert] needed to establish 'but for' causation with respect to NEC's lost profits. There is no dispute that [the expert] does not offer an opinion on lost profits damages. Rather, he conducted a reasonable royalty analysis"). Dr. Keeley considers Nielsen's foregone profits as part of his analysis of Nielsen's negotiation posture in the hypothetical negotiation of a

---

[1] *See, e.g.*, Ex. 5, Johnson Rep. ¶244 (█████████████████████████████████████████████████████████████████████████████████████████████████████).

4

reasonable royalty because as the patent owner, Nielsen "would be 'unlikely' to be 'interested in' accepting a royalty rate lower than its profit margin on the patented products." *Asetek Danmark*, 852 F.3d at 1362.

Ms. Johnson's opinion that Dr. Keeley is wrong to have considered Nielsen's foregone profits without conducting a *Panduit* analysis cannot be squared with the law. Thus, Ms. Johnson cannot ask the jury to ignore Nielsen's foregone profits in determining a reasonable royalty. Because it contradicts the law, Ms. Johnson's opinion should be precluded, including opinions in Johnson Rep. ¶¶13 (bullet point 1), 241-42, 243 (bullet point 1), 244-48, 252, 260, 281 and Exhibits 18.1-18.3. *See Baxalta*, 513 F. Supp. 3d at 448.

**B.      Ms. Johnson Offers No Support for Her Opinion That The April 2018 Forecast is "Speculative and Unsubstantiated"**

Dr. Keeley used ██████████████████████████████████████████████ ████████████████████████████████████. In particular, the forecast informed his understanding of the hypothetical negotiation and TVision's negotiating posture, state of mind, and willingness to agree to the reasonable royalty that he calculates. Ex. 9, Keeley Rep. ¶¶74-76, 82 (citing TVSN_NLSN_00269608 ("the April 2018 forecast")). The parties do not dispute that the hypothetical negotiation would have taken place in May 2018. Ex. 5, Johnson Rep. ¶95; Ex. 9, Keeley Rep. ¶15. Nor has TVision disputed that the April 2018 forecast was TVision's most current and up-to-date forecast as of that May 2018 hypothetical negotiation.

Nonetheless, throughout her report, Ms. Johnson opines that Dr. Keeley "████████ ████████████████████████████████████████████████████." Ex. 5, Johnson Rep. ¶243; *see also, e.g., id.* ¶¶13, 139, 242, 286, 290-292, 304. Ms. Johnson's opinion about the April 2018 forecast should be excluded because it is unreliable and contradicts all the facts in the record. *Novartis Corp. v. Ben Venue Laboratories, Inc.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001);

*see also Ace Pallet*, 764 F. App'x at 198. Contrary to her opinion, the April 2018 forecast reflected TVision's expectations going forward and at the time of the May 2018 hypothetical negotiation. As explained below, ███████████████████████████████████████████, requiring it by law not to be "speculative and unsubstantiated."

**First**, Ms. Johnson does not dispute that ████████████████████████████████ ████████████████████████████████████████████████. Nor does she dispute that ██████████████████████████████████████████████████ ██████████████ Ex. 12, Johnson Dep. 37:2-7, 40:1-41:4. To the contrary, Ms. Johnson testified that █████████████████████████████████████████████████ █████████████████████████████████████. *Id.* 40:12-16. ██████████████ ████████████████████████████████████████████████████████████ ██████████████████████████████████████████████. *See e.g.*, 17 CFR §240.10b-5; Delaware Code § 73-605(a)(2); *also Eisenberg v. Gagnon*, 766 F.2d 770, 776 (3d Cir. 1985) ("there is an obligation to disclose data indicating that the opinion or forecast may be doubtful."). Thus, the April 2018 forecast was a substantiated, accurate, and reliable indication of TVision's expectations—as required by law—at the time of the hypothetical negotiation.

**Second**, Ms. Johnson ignores TVision's witness's unrebutted testimony about the forecast. Daniel Schiffman, TVision's ex-Chief Revenue Officer, testified that ██████████████ ████████████████████████████████████████████████████████████████ ██████████████ Ex. 13, Schiffman Dep. 20:20-22:6; 28:13-20, *also* 19:7-20. This is further unrebutted evidence of the reliability of the April 2018 forecast as an indicator of TVision's expectations at the time of the hypothetical negotiation.

**Third**, Ms. Johnson improperly opines that the April 2018 forecast is "unsubstantiated"

6

because "███████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████" Ex. 12, Johnson Dep. 31:4-12. Ms. Johnson's opinion is unsupported, and the

fact that ████████████████████████████████████. Forecasts are routinely used

in hypothetical negotiation analyses regardless of whether ████████████████████

██████. *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir.

2001). Moreover, as explained above, Ms. Johnson's opinion is inconsistent with ████████

█████████████████████████.

And *fourth*, Ms. Johnson improperly uses one witness's lack of knowledge to opine that

the forecast is unsubstantiated. She writes that: "████████████████████████████

████████████████████████████████████████████████████████

████████████████████" Ex. 5, Johnson Rep. ¶139. But Mr. Neumann's lack of knowledge—a

lack of evidence—cannot support her opinion that the forecast was "speculative and

unsubstantiated." All the evidence of record shows that the April 2018 forecast was TVision's

best estimate of its future financials at the time of the hypothetical negotiation. Ms. Johnson's

opinion on this point is unreliable because it attempts to counter actual evidence with one

witness's lack of knowledge.[2]

---

[2] Mr. Neumann was TVision's Rule 30(b)(6) witness for its financials (*e.g.*, Ex. 34 at 9-10 (Topic 40)), and TVision failed to adequately prepare him. ██████████████████████ ████████████████████████████████████████████████ ██████████████████████████████████ Ex. 32 at 1. Nonetheless, TVision failed to prepare Mr. Neumann, and he testified solely from his personal knowledge that █ █████████████████████████████████████████████████████ ██████████████████████████████ Ex. 14, Neumann Dep. 167:17-169:21. After TVision produced an unprepared corporate witness, Ms. Johnson cannot rely on that witness's

Because Ms. Johnson cannot factually support her opinion that the April 2018 forecast is "speculative and unsubstantiated," the Court should exclude those opinions, including those set forth in Johnson Rep. ¶¶13 (bullet 2), 106, 135-139, 232, 242, 243 (bullet 7), 285-94, 302, and 304-06, 309, Figures 10, 22, and Exhibits 11.0-11.2, and 15.0-15.4.

### C.    The Court Should Exclude Ms. Johnson's Opinion about A Device-Based Running Royalty Because It Is Conclusory and Factually Unsupported



Ms. Johnson opines that ███████████████████████████████

███████████████████████████████████████████████████

███████████████████████████. Ms. Johnson's only opinion, however, on

███████████████████████████ is conclusory: "████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

█████" Ex. 5, Johnson Rep. ¶104. She fails to explain why "████████████

███████████████████████" is a so-called "███████████" for a running royalty.

Throughout her report, Ms. Johnson calculates various lump sum royalties and then converts them into device-based running royalties without offering any justification. For example, ██████████████████████████████████████

██████████████████████████████████████████████████

██████. Ex. 5, Johnson Rep. ¶¶156, 167. ██████████████████████

██████████. *See id.* Similarly, ████████████████████████████

████████████████████ Ex. 5, Johnson Rep. ¶207.[3] For both the "cost" and

---

lack of knowledge (*i.e.*, a lack of evidence) for her opinion that TVision's own financial projections are "unsubstantiated."

[3] ████████████████████████████████████████████████

████████████████████████████████████████████████████

"market" approaches, without any rationale, ███████████████████████████

█████████████████████████████████████. Ex. 5, Johnson Rep. ¶¶156, 167,

207. She then ████████████████████████████████████████████████

███████████████████████████ *See* Ex. 5, Johnson Rep. ¶¶235-36, 239 & Fig. 16.

Dividing a lump sum by the number of TVision devices deployed per month, without any

indication of why that would be the result of the hypothetical negotiation, is improper. *Lucent*

*Technologies, Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1330 (Fed. Cir. 2009) ("For a jury to use a

running-royalty agreement as a basis to award lump-sum damages, however, some basis for

comparison must exist in the evidence presented to the jury."). Indeed, although Ms. Johnson

states that ████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████████████

██████████

The Court should preclude Ms. Johnson from offering any opinions about a device-based

running royalty, including those in Johnson Rep. ¶¶11, 103-06, 156, 163-67, 181-208, 232

(bullets 8 and 11), 235, 239, 270, 285, 288-89, Figures 1, 7, 16 and Exhibits 3.0-3.1, 5.0, 5.2-5.3,

7.0, 9.0, and 18.0-18.3.

**D.      The Court Should Preclude Ms. Johnson from Offering Royalty Opinions Relying on The Gracenote Agreement**

For her "Market Approach" to determining a reasonable royalty, Ms. Johnson states that ██

█████████████████████████████████████████████████████████████

███████████ and that █████████████████████████████████████████

_____

█████████████████████████████████████████████████████████████

██████████

9

███████████████████████████████████████████████████████ Ex. 5,

Johnson Rep. ¶181. However, Ms. Johnson improperly relies on an agreement under which non-party Gracenote supplied software and services to TVision but did not license any patents. *See* Ex. 5, Johnson Rep. ¶¶11, 236, Figs. 1 & 16. Specifically, Ms. Johnson uses TVision's agreement with Gracenote to calculate a proposed reasonable royalty based on the fees TVision paid under that agreement for data services and software, while asserting that the agreement "implicitly licensed" multiple Gracenote patents (not including the patent in suit). Ms. Johnson's opinion is unreliable and contrary to law for at least four reasons:

**First**, the Gracenote agreement was not a patent license and neither identified any Gracenote patents[4] nor provided an express license to any patents. Nor can Ms. Johnson show that the Gracenote agreement licensed any software that utilized any Gracenote patent. Consequently, there is no evidence that the Gracenote agreement licensed any patents, even implicitly, or was otherwise similar to a patent license from the hypothetical negotiation.

As Ms. Johnson acknowledges, the royalty from the hypothetical negotiation is for a bare patent license to the patent in suit. Ex. 5, Johnson Rep. ¶99; Johnson Dep. 166:13-17. Such a bare license would not include what the Gracenote agreement licensed, software and data services. In fact, Ms. Johnson admitted that ███████████████████████████████ ███████████████████████████████████████████████" Ex. 5, Johnson Rep. ¶27, ¶183. It is improper to use a non-patent agreement without linking it to the claimed technology, especially one that does not involve the patented technology or the patent in suit. *See* *ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 870 (Fed. Cir. 2010).

---

[4] The Gracenote agreement could not license the '889 patent in suit because Gracenote did not own (or practice) the '889 patent.

Ms. Johnson attempts to ███████████████████████████████████

███████████████████████████████████████████████████████████

███████████████████████████████████ Ex. 5, Johnson Rep. ¶185, 201. But her

argument fails because TVision would have received an "implicit license" only to patents that

the licensed software used, and Ms. Johnson cannot say which, *if any*, Gracenote patents the

Gracenote software actually used. *See* Ex. 5, Johnson Rep. ¶201. Instead, Ms. Johnson relies on

Dr. Anderson's *ipse dixit*: "███████████████████████████████████

███████████████████████████████████" Ex. 5, Johnson Rep. ¶201, citing

Anderson Rebuttal Rep. ¶111. But Dr. Anderson never compared Gracenote's patent claims to

Gracenote's products to determine whether Gracenote's products used any of its patents, and Ms.

Johnson did not do any independent analysis. Ex. 12, Johnson Dep. 131:21-132:7, 135:18-22,

136:8-13; Ex. 3, Anderson Rebuttal Rep. ¶¶111-12. Indeed, neither expert had access to the

Gracenote system. Ex. 12, Johnson Dep. 134:10-19. Dr. Anderson therefore has no basis for his

conclusion that ███████████████████████████████████████████████.

Consequently, Ms. Johnson cannot show that Gracenote provided TVision an

implicit/implied license to any patent under that agreement. She has therefore not shown that the

Gracenote agreement has any patent component at all. An agreement for software and services

that is not a patent license is significantly different from a hypothetical agreement for a bare

patent license. Thus, Ms. Johnson's opinion is fatally defective. *See ResQNet.com*, 594 F.3d at

871 ("In simple terms, the '075 patent deals with a method of communicating between host

computers and remote terminals — not training, marketing, and customer support services. The

re-bundling licenses simply have no place in this case.").

**Second**, Ms. Johnson does not meet her burden to show that the Gracenote agreement is

11

sufficiently comparable to the bare license from the hypothetical negotiation. *Adasa*, 55 F.4th 900 at 916 (Fed. Cir. 2022), cert. denied, 143 S. Ct. 2561, 216 L. Ed. 2d 1181 (2023) ("The party proffering a license bears the burden of establishing it is sufficiently comparable to support a proposed damages award."). In fact, Ms. Johnson admits that the Gracenote agreement is not comparable when she refers to "██████████████████████████████████████ ███████████████████████████" Ex. 5, Johnson Rep. ¶208.

Ms. Johnson "must account for differences in the technologies and economic circumstances" between the Gracenote agreement and a bare patent license to the patent in suit, which she did not do. *Adasa*, 55 F.4th at 916; *ResQNet.com*, 594 F.3d at 873; *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 79 (Fed. Cir. 2012) ("When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice."); *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F.Supp.3d 466, 495-96 (D. Del. 2019) (same); *M2M Solutions LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 678 (D. Del. 2016).

***Third***, Ms. Johnson contends that the Gracenote agreement is of greater value than the bare patent license from the hypothetical negotiation but does not analyze the technical and economic characteristics of each—or do anything else—to support such a conclusion. Instead, she states in conclusory fashion: "████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ████████████████████████████████████████████ ██████████" Ex. 5, Johnson Rep. ¶205 (emphasis added). But Ms. Johnson has not shown that "█████████████" Like the expert in *M2M Solutions LLC v. Motorola Solutions, Inc.*, C.A No.

12-33-RGA, 2016 WL 767900, at *8 (D. Del. Feb. 25, 2016), "the cited paragraphs of [the expert's] report provide little more than broad conclusions that the Company A and Company B licenses are surely worth more than a single U.S. Patent, which could easily be designed around. [The expert] provides no opinion that even attempts to describe the value of the patented technology in any specificity … He simply makes the bare assertion that these standard-essential, FRAND portfolios should intuitively be worth far more than a single asserted patent." *Id.* at *8 (citations omitted).

Ms. Johnson cannot opine that the Gracenote agreement is more valuable than a license from the hypothetical negotiation without doing a proper economic and technical analysis, which she did not do; rather, she just improperly assumes that the Gracenote agreement is worth more than the license resulting from the hypothetical negotiation.

And ***fourth***, Ms. Johnson's use of the Gracenote agreement countermands the facts because ███████████████████████████████████████████████████ — indeed, ███████████████████████████ *See* Johnson Dep. 127:5-128:1. TVision did not have the option of paying for the services offered under the Gracenote agreement at that time. The pricing of an unavailable deal does not inform the hypothetical negotiation because the benefits of that deal were not available to TVision at that time at that price. For this reason as well, the Gracenote agreement does not represent a royalty for the patent in suit.

In summary, Ms. Johnson's opinion is not supported by any facts or analysis showing that the Gracenote agreement is sufficiently comparable to a license resulting from the hypothetical negotiation, that the Gracenote agreement has any relevance to a patent license, or that its terms would have been available to TVision at the time of the hypothetical negotiation. As a result, Ms. Johnson's opinion about the "Market Approach" and the Gracenote agreement, as well as Dr.

13

Anderson's underlying opinions about the Gracenote agreement, should be precluded, including the opinions in the following paragraphs of Ms. Johnson's and Dr. Anderson's opinions relating to the Gracenote agreement: Johnson Rep. ¶¶27, 109, 111, 181-208, 232 (bullet 11), 235-36, 288, Figures 1 and 16, and Exhibits 3.0, 7.0 and Dr. Anderson Rebuttal Rep. ¶¶111-12.

**E.    The Court Should Preclude Ms. Johnson from Opining That A Reasonable Royalty Can be Calculated from Information That Existed Only after The Hypothetical Negotiation**

The Federal Circuit has held that the "reasonable royalty" inquiry in a patent suit "must relate to the time infringement occurred, and not be an after-the-fact assessment." *Riles v. Shell Exploration and Prod. Co.*, 298 F.3d 1302, 1313 (Fed. Cir. 2002). In accordance with this rule, Dr. Keeley considered TVision's April 2018 financial forecast to calculate a lump sum royalty to which the parties would have agreed one month later during the May 2018 hypothetical negotiation. Ex. 9, Keeley Rep. ¶¶74-75. In contrast, Ms. Johnson opines using TVision's ***actual*** financial results rather than the April 2018 forecast, even though the parties would not have had that information during the May 2018 hypothetical negotiation. *See* Ex. 5, Johnson Rep. ¶¶291, Exs. 15.1-4. Because the parties would not have had TVision's later-available financial results during the hypothetical negotiation, Ms. Johnson should be precluded from opining, contrary to the law, that a reasonable royalty could be calculated using TVision's actual financials rather than its April 2018 forecast. *See Baxalta*, 513 F. Supp. 3d at 448.

The hypothetical negotiation undisputedly would have taken place in May 2018, and the parties' knowledge at that time informs that negotiation. *See Riles*, 298 F.3d at 1313 ("A reasonable royalty determination for purposes of making a damages evaluation must relate to the time infringement occurred, and not be an after-the-fact assessment."). Subject to exceptions not relevant for TVision (as explained below), the parties' later knowledge, such as actual financial results, are not pertinent to the hypothetical negotiation. *Id.*

14

After improperly disputing Dr. Keeley's methodology in calculating a lump sum royalty from the April 2018 forecast, Ms. Johnson performs an analysis using TVision's "***actual revenue and profits.***" Ex. 5, Johnson Report ¶291 (emphasis added), *also* Figure 22 and Exs. 15.0-15.4; Ex. 12, Johnson Dep. 28:18-22, 183:21-185:10. Ms. Johnson readily admits that she relied on information that was unavailable to the parties at the time of the hypothetical negotiation (thereby ignoring the correct legal standard):



Ex. 12, Johnson Dep. 29:22-30:10.

Ms. Johnson's opinion that a reasonable royalty can be calculated using TVision's "actual revenues and profits" impermissibly uses hindsight instead of applying the proper legal standard for a hypothetical negotiation. Calculating a reasonable royalty requires analyzing a hypothetical negotiation "***as of the time infringement began,***" here May 2018. *Interactive Pictures*, 274 F.3d at 1384 ("the negotiation must be hypothesized as of the time infringement began.") (emphasis added); *Riles*, 298 F.3d at 1313. It is improper for the infringer to use post-negotiation, actual financial data, especially when data known at the time of the hypothetical negotiation is available. To hold otherwise "would essentially eviscerate the rule that recognizes sales expectations at the time when infringement begins as a basis for a royalty base as opposed to an after-the-fact counting of actual sales." *Interactive Pictures*, 274 F.3d at 1384.

Although post-negotiation information can be considered under the "book of wisdom" theory in certain circumstances, no such circumstances are present here. Indeed, Ms. Johnson does not address this theory, let alone provide the foundation to apply it. Regardless, Ms.

15

Johnson cannot use the book of wisdom because utilizing later-learned information is meant to discourage infringement. *See Honeywell Int'l, Inc. v. Hamilton Sundstrand Corp.*, 378 F. Supp. 2d 459, 465 (D. Del. 2005). Ms. Johnson improperly uses post-negotiation information for the opposite purpose— ████████████████████████████████████████████ ████████████████████████████████████████████████████████. *See id.*; *Interactive Pictures*, 274 F.3d at 1385.

Thus, Ms. Johnson's attempt to use post-hoc financials is inconsistent with the legal standard for a hypothetical negotiation. Her opinions about calculating a royalty using TVision's actual financials should be excluded, including her opinions in Johnson Rep. ¶¶13 (bullet 7), 130-34, 136-42, 174-80, 221-23, 225-26, 229, 242, 243 (bullets 7-8), 286, 288, 290-92, 294, 306, Figures 9-10, 22, and Exhibits 10.0-10.1, 11.0-11.2, 12.0-12.2, 15.0-15.4, and 18.0-18.3. *See* Ex. 12, Johnson Dep. 186:2-187:10 (confirming that Exhibits 15.1-15.4 use TVision's post-infringement actual income).

**F.      The Court Should Preclude TVision's Experts from Offering Opinions Relating to Proposed Alternatives to The Infringing System**

In her "cost" model, Ms. Johnson relies on Dr. Anderson's technical opinions regarding hypothesized alternative systems that TVision allegedly could have used instead of ACRCloud's infringing ACR software. *See* Ex. 5, Johnson Rep. ¶¶148-49. Ms. Johnson and Dr. Anderson rely on three theories relating to alternatives to the infringing technology: (1) that its current supplier of the infringing ACR technology, ███████, could have developed a non-infringing technology, (2) that TVision could have developed an alternative in-house, and (3) that TVision could have used one of a number of third party systems. But Ms. Johnson and Dr. Anderson have not shown that any of these posited alternatives existed and were available to TVision.

To be considered in the reasonable royalty analysis, a purported alterative must be

16

available, acceptable, and non-infringing. *See e.g.*, *WhereverTV, Inc. v. Comcast Cable Commc'ns, LLC*, No. 2:18-cv-529, No. 2:18-CV-529-JLB-NPM, 2022 WL 2751752 , at *7 (M.D. Fla. Jul. 14, 2022); *Astrazeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1340-41 (Fed. Cir. 2015); *SRI Int'l Inc. v. Internet Sec. Sys., Inc.,* C.A No. 04-1199-SLR, 2011 WL 5166436, at *2 (D. Del. Oct. 31, 2011). Moreover, courts impose a presumption or inference that products that did not exist in the marketplace at the time of the hypothetical negotiation are not available alternatives. *Sherwin-Williams Company v. PPG Industries, Inc.*, No. 17-1023, 2020 WL 1283465, *9 (W.D. Penn. Mar. 18, 2020) ("a court may reasonably infer that it was not available as a non-infringing substitute at that time"); *Asetek Danmark A/S v. CoolIT Systems Inc.,* No. 19-cv-00410, 2022 WL 21306657, *30 (N.D. Cal. Oct. 4, 2022) ("there is a reasonable inference that the alleged alternative was not available as a noninfringing substitute because it was not on the market during the accounting period.") (citations omitted).

TVision's experts rely on nothing more than *ipse dixit* for their opinions about their supposed alternatives. For each of proposed alternative, TVision's experts identify no foundational evidence sufficient to satisfy TVision's burden to show by a preponderance of the evidence that these proposed alternatives meet the legal test of being available, acceptable, and non-infringing at the time of the hypothetical negotiation. *See* Fed. R. Evid. 702(b); *Novartis Corp.*, 271 F.3d at 1051; *Ace Pallet*, 764 F. App'x at 198; *Astrazeneca*, 782 F.3d at 1340-41. The Court should therefore preclude Ms. Johnson's "cost" model, which is based on proposed alternatives that suffer from the infirmities discussed below, and all supporting opinions from Ms. Johnson and Dr. Anderson regarding the proposed alternatives.

### 1.    The Court Should Preclude TVision's Experts from Offering Opinions Relating to the Alleged ███████ Alternative

TVision's experts assert that ███████ might have developed a product that would have

been an acceptable, non-infringing alternative at the time of the hypothetical negotiation. In other words, they opine that ▮▮▮▮▮▮ could have designed around the patent in suit, even though it never actually did so. No foundational facts support this opinion.

Because ▮▮▮▮▮▮ has never developed a non-infringing alternative to the patent in suit, TVision bears the burden of establishing that a hypothetical ▮▮▮▮▮▮ redesign would have been available, acceptable, and non-infringing at the time of the hypothetical negotiation. *See* Fed. R. Evid. 702; *Sherwin-Williams*, 2020 WL 1283465, *9; *Asetek Danmark*, 2022 WL 21306657 at *30; *Spectralytics, Inc. v. Cordis Corp.*, 649 F.3d 1336, 1346 (Fed. Cir. 2011).

As explained below, TVision's experts fail to identify foundational facts that would meet its burden, and accordingly, they should be precluded from offering opinions that an ACRCloud alternative would have been available to TVision at the time of the hypothetical negotiation.

> **a.    The Proposed ▮▮▮▮▮▮ Redesign Was Not Available**
>
> > **(i)    TVision's Experts' Proposed ▮▮▮▮▮▮ Alternative Is Entirely Speculative and Thus Not Available**

Courts infer that proposed alternatives that did not exist at the time of the hypothetical negotiation were not available. *Sherwin-Williams*, 2020 WL 1283465 at *9; *Asetek Danmark*, 2022 WL 21306657 at *30. Overcoming this inference requires identifying facts showing that the maker of the supposed alternative had the "necessary materials, equipment, know-how, and experience to make an alternative product during the relevant time frame" and that the alternative "was more than 'theoretically possible'" and "'available' to be marketed." *See Asetek Danmark*, 2022 WL 21306657 at *30 ("Whether a purported noninfringing alternative was 'available' requires an assessment of whether [the accused infringer] had the 'necessary materials, equipment, know-how, and experience to make an alternative product during the relevant time frame.'"); *Visteon Global Technologies v. Garmin Intern.*, 903 F. Supp. 2d 521, 528 (E.D. Mich.

2012) ("The alleged infringer need not demonstrate that the noninfringing alternative in fact existed at the time but must establish that it was more than 'theoretically possible,' and in fact 'available' to be marketed").

TVision has not overcome the inference that an ▇▇▇▇ alternative was not available. In fact, TVision's experts identify no facts showing how ▇▇▇ could have redesigned its ACR system, what an ▇▇▇ alternative would look like, or that ▇▇▇ would or could have developed an acceptable, non-infringing alternative that would have been available to be marketed in May 2018. *See Visteon Global*, 903 F. Supp. 2d at 528. TVision's experts do not explain how such a proposed product would operate or anything beyond saying that ▇▇▇ could implement a different ACR algorithm that would presumably not infringe (because its current one infringes).

Ms. Johnson relies on Dr. Anderson and Mr. Sidhu, neither of whom even try to describe how an alternative system would operate. Dr. Anderson simply concludes that ▇▇▇ ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇.[5] Dr. Anderson's ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ *See Sherwin-Williams*, 2020 WL 1283465 at *9 ("Vague references by [defendant] that [a non-infringing alternative] might exist will not suffice…. Speculation that [defendant] might have been able to design a non-infringing

---

[5] *See* Ex. 3, Anderson Rebuttal Rep. ¶101 ("▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇"). This quote represents the entirety of Dr. Anderson's technical explanation of how to implement this proposed alternative.

alternative based on the [] patent will also not suffice…. It is undisputed that the [proposed alternative] was never commercialized. Even though the existence of an alternative product exists is a question of fact, the special master correctly recognized that where there is no evidence to support the availability or acceptability of an alternative product during the damages period, summary judgment is proper."); *WhereverTV*, 2022 WL 2751752 at *7 ("Using 'vague and general language' that does not identify proposed non-infringing alternatives by name and announcing the existence of certain employees 'having knowledge of alternatives is not a substitute for its obligation to identify alleged acceptable non-infringing alternatives.' Not only must the proposed alternatives be specifically noted, but their availability and acceptability must also be substantiated with record evidence.").

Nor does Ms. Johnson's recitation of her conversation with Mr. Sidhu and his conclusory statements about *what* could be done rather than *how* it would be done or how well it would perform provide the detail needed to overcome the inference that this proposed alternative was not available.[6] *Webasto Thermo & Comfort North America, Inc. v. BesTop, Inc.*, is instructive. There the court struck an expert opinion where the expert provided no information regarding "the critical factor of whether the non-infringing alternative provides all the same alleged benefits associated with [the patent-in-suit]." *Webasto Thermo & Comfort*, No. 16-cv-13456, 2019 WL 3334563, *5 (E.D. Mich. Jul. 25, 2019). The court noted that this is "the single most important

---

[6] *See* Ex. 5, Johnson Rep. ¶152 ("██████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

20

fact in a case where the alleged non-infringing alternative was in fact never produced or sold." *Id.* Other cases are in accord. *Cf. WhereverTV*, 2022 WL 2751752 at *7; *Sherwin-Williams*, 2020 WL 1283465 at *9.

It is not surprising that Dr. Anderson, Mr. Sidhu, and Ms. Johnson all failed to identify any facts about ████████ s "equipment, know-how, or experience" in implementing a redesigned ACR system or that the alternative "was more than 'theoretically possible'" and "'available' to be marketed." *See Asetek Danmark*, 2022 WL 21306657 at *30; *Visteon Global*, 903 F. Supp. 2d at 528; Ex. 5, Johnson Rep. ¶152; Ex. 3, Anderson Rebuttal Rep. ¶101. None of them indicated that they researched or have any knowledge of ████████ capabilities in May 2018 or otherwise.[7] Nor did any of them ask ████████ about a proposed redesign, despite the fact that ██████████████████████████████████ This highlights the speculative and inappropriate nature of the proffered "opinions" relating to what ████████ could and would do in May 2018. Ex. 5, Johnson Rep. ¶¶151-54; Ex. 3, Anderson Rebuttal Rep. ¶101.

Ms. Johnson's and Dr. Anderson's opinions relating to ████████ ability and willingness to offer an alternative (*i.e.*, whether one would be available) lack any factual basis and are nothing more than ungrounded speculation. *See* Fed. R. Evid. 702(b); *Power Integrations v. Fairchild Semiconductor*, 711 F.3d 1348, 1373 (Fed. Cir. 2013); *Ace Pallet Corp.*, 764 F. App'x at 198 ("To be admissible, expert testimony must be 'accompanied by a sufficient factual foundation.'"). The Court should preclude any opinions relating to this speculative ████████ developed alternative, including opinions in Anderson Rebuttal Rep. ¶101 and Johnson Rep.

---

[7] For example, ██████████████████████████████████ ██████████████████████████████████. Ex. 15, TVSN_NLSN_00641220–231. For this sum, ████████ may have been unwilling to take the time and expense of redesign, thereby either having to maintain two systems into the future or having to involuntarily switch its other customers to the new system as well. *See* Ex. 8, Moulin Reply Rep. at ¶102.

¶¶11-12, 13 (bullet 2), 103, 149, 151-156, 172-73, 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-70, and 281, Figures 1, 12, and 16, and Exhibits 3.0, 4.0, 6.3, and 18.0.

### (ii)   TVision's Expert Do Not Even Assert That An ▮▮▮▮▮▮ Alternative Would Have Been Available in May 2018

Notwithstanding the lack of evidence that an ▮▮▮▮▮▮ alternative would ever have been available, Ms. Johnson does not even attempt to assert (let alone provide the required detail and evidence) that the supposed ▮▮▮▮▮▮ alternative would have been available at the time of the May 2018 hypothetical negotiation. *Visteon Global*, 903 F. Supp. 2d at 528; *see* Ex. 3, Anderson Rebuttal Rep. ¶101; Ex. 5, Johnson Rep. ¶¶151-156. In Ms. Johnson's conversation with Dr. Anderson,

▮▮▮▮▮▮" Ex. 5, Johnson Rep. ¶152 (citing interviews with Dr. Anderson); Ex. 3, Anderson Rebuttal Rep. ¶101. But Dr. Anderson does not opine that this supposed re-design could have been achieved at the time of the May 2018 hypothetical negotiation. Similarly, in Ms. Johnson's conversations with Mr. Sidhu, he indicated that "▮▮▮▮▮▮ ▮▮▮▮▮▮" Ex. 5, Johnson Rep. ¶152 (citing interviews with Sidhu). Like Dr. Anderson, Mr. Sidhu does not opine that ▮▮▮▮▮▮ could have achieved any such re-design at the relevant time, May 2018. *Id.*

Dr. Anderson and Ms. Johnson fail to even assert that the ▮▮▮▮▮▮ re-design would have been available for the May 2018 hypothetical negotiation. Accordingly, the Court should preclude opinions about an ▮▮▮▮▮▮ alternative, including those in Johnson Rep. ¶¶11-12, 13 (bullet 2), 103, 149, 151-156, 172-173, 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-

70, and 281, Figures 1, 12, and 16, and Exhibits 3.0, 4.0, 6.3, and 18.0 and Anderson Rebuttal Rep. ¶101.

### (iii)    TVision Does Not Show That An ▮▮▮▮▮▮ Redesign Would Not Infringe Third-Party Patents

A proposed alternative is not "available" if it infringes a third-party patent. *See, Astrazeneca*, 782 F.3d at 1340-41; *Robertson Transformer Co. v. General Electric Co.*, No. 12 C 8094, 2016 WL 4417019, *10 (N.D. Ill. Aug. 19, 2016) (a product that "appears, during the infringement period, to infringe a third-party patent [. . .] may appropriately be considered 'unavailable' to the infringer.").

Dr. Anderson discusses  " Ex. 3, Anderson Rebuttal Rep. ¶101. Although he does not mention it, his referenced "▮▮▮▮" and "▮▮▮▮▮▮▮▮▮▮" come from the Wang 2003[8] reference, which he cites in his opinion on the posited TVision internally developed alternative (discussed below).[9] *See* Ex. 3, Anderson Rebuttal Rep. ¶102. The Wang 2003 technology is protected by the Wang patent, which expired in January 2024, long after the May 2018 hypothetical negotiation. Ex. 16, Wang

---

[8] Avery Wang, An Industrial Strength Audio Search Algorithm, Proceeding of 4th International Conference on Music Information Retrieval, Baltimore (2003) ("Wang 2003").

[9] *See e.g.*, Ex. 2, Anderson Op. Rep. Ex. 2 (Wang 2003 claim chart) at 8 ("spectral [i.e., frequency] peaks"); Ex. 16, U.S. Patent No. 6,990,453 ("the Wang patent") 10:51-55 ("In addition to spectral components, other spectral features can be extracted and used as fingerprints. Linear predictive coding (LPC) analysis extracts the linearly predictable features of a signal, such as spectral peaks, as well as spectral shape."); claim 73 ("The method of claim 64 wherein said fingerprints are selected from the group consisting of spectral slice fingerprints, LPC coefficients, and cepstral coefficients.").

patent, Face; Ex. 3, Moulin Reply Rep. ¶116.[10] Dr. Anderson never compares his thinly-described redesign with the Wang patent's claims or explain why any such hypothetical alternative would avoid using the patented Wang technology. Thus, TVision's experts fail to establish that the proposed ████████ redesign would not infringe the Wang Patent. *Astrazeneca*, 782 F.3d at 1340-41 ("[t]he patents held by [third party] were designed to protect its formulation. From that fact, the district court could reasonably infer that the [third party] formulation was not available to [defendant] as a non-infringing alternative. [Defendant's] conclusory assertion that it could have used [third party's] formulation without infringing [third party's] patents does not suffice to overcome that inference").

The proposed ████████ alternative was accordingly not available at the time of the hypothetical negotiation because Dr. Anderson does not show that his (sparingly described) variation on the Wang 2003 technology avoids the Wang patent. For this reason, the Court should preclude all opinions relating to an ████████ developed alternative, including Anderson Rebuttal Rep. ¶101 and, because she relies on Dr. Anderson for her opinion's technical foundation, Johnson Rep. ¶¶11-12, 13 (bullet two), 103, 149, 151-56, 172-73, 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-70, and 281, Figures 1, 12, and 16, and Exhibits 3.0, 4.0, 6.3, and 18.0.

### b.    TVision Lacks Any Evidence That An ████████ Redesign Would Be Acceptable

TVision's experts do not opine that an ████████ redesign would perform as well as the infringing ████████ system or any other system, how the re-design would perform in general,

---

[10] Dr. Anderson acknowledges that ███████████████████████████████████ ██████████████████████████████████████████████ *See* Ex. 3, Anderson Rebuttal Rep. ¶102.

or whether it would be good enough to substitute for the infringing technology. Ex. 5, Johnson Report ¶¶151-56; Ex. 3, Anderson Rebuttal Rep. ¶101. TVision's experts' opinions are therefore not reliable because an alternative's "availability and acceptability must [] be substantiated with record evidence." *WhereverTV*, 2022 WL 2751752 at *7; *Webasto Thermo*, 2019 WL 3334563 at *5; *Sherwin-Williams*, 2020 WL 1283465 at *9; *Spectralytics*, 649 F.3d at 1346.

TVision's experts do not even attempt to assert that an ACRCloud redesign would be acceptable. In fact, they provide no details about how such a system would work. TVision's technical expert, Dr. Anderson, opines that ██████████████████████████ ████████████████ *See* Ex. 3, Anderson Rebuttal Rep. ¶¶101. Ms. Johnson offers no opinion that such a system would be acceptable either. *See generally* Ex. 5, Johnson Rep. ¶¶151-56.

TVision has therefore failed to meet its burden to show that a non-existent ████████ redesign would be an acceptable alternative. *See* Fed. R. Evid. 702; *also Webasto Thermo*, 2019 WL 3334563 at *5; *Sherwin-Williams*, 2020 WL 1283465 at *9. The Court should preclude opinions about an ████████ redesign being an alternative, including opinions in Johnson Rep. ¶¶11-12, 13 (bullet 2), 103, 149, 151-56, 172-73, 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-70, and 281, Figures 1, 12, and 16, and Exhibits 3.0, 4.0, 6.3, and 18.0 and in Anderson Rebuttal Rep. ¶101.

### 2. TVision's Experts Should Be Precluded from Opining about a Proposed TVision Internal ACR Alternative

TVision's experts also contend that TVision itself could have developed an ACR system as an alternative to the infringing technology. Yet TVision has not shown through admissible evidence that it was capable of developing an acceptable, non-infringing alternative and that it could have done so by May 2018. As described below, the Court should preclude TVision's

experts from offering opinions about this supposed alternative.

        **a.**      **TVision's Experts Have Not Shown That The Proposed TVision Alternative Would Have Been Available at the Time of the Hypothetical Negotiation**

             **(i)**      **TVision's Experts' Proposed TVision Internal Alternative is Entirely Speculative and Thus Not Available**

It is undisputed that TVision never developed a production-ready non-infringing ACR system, so TVision bears the burden to overcome the inference that such a theoretical product was not available. *Sherwin-Williams*, 2020 WL 1283465 at *9; *Asetek Danmark*, 2022 WL 21306657 at *30. TVision and its experts can only overcome this inference by identifying facts showing that TVision had the "necessary materials, equipment, know-how, and experience to make an alternative product during the relevant time frame" and that the alternative "was more than 'theoretically possible'" and "'available' to be marketed." *See Asetek Danmark*, 2022 WL 21306657 at *30; *Visteon Global*, 903 F. Supp. 2d at 528. Indeed, TVision's experts' opinions are so speculative that it is impossible to determine whether their proposal would still infringe.

Ms. Johnson relies on TVision's Chief Technology Officer's *ipse dixit* "███████████ ███████████████████████████████████████████" Ex. 5, Johnson Rep. ¶167. This conclusory statement is legally insufficient because it does not provide any details about what those "█████████████" are or when or how TVision acquired them. Like the alleged infringer in *WhereverTV, LLC*, 2022 WL 2751752 at *7, TVision has failed to "identify and provide information regarding alleged acceptable non-infringing alternatives." *Id.* TVision, like that party, uses only "vague and general language that does not identify proposed non-infringing alternatives by name and announcing the existence of certain employees 'having knowledge of alternatives is not a substitute for its obligation to identify alleged acceptable non-infringing alternatives." *Id.* (quotations omitted); *see also Webasto Thermo*, 2019 WL 3334563 at *5; *Ace*

*Pallet Corp. v. Conrail*, 764 F. App'x at 198 ("To be admissible, expert testimony must be 'accompanied by a sufficient factual foundation.'"). Similarly, Dr. Anderson uses "vague and general language" and does not identify evidence showing how TVision would develop an alternative.[11] In fact, his opinion is so speculative Nielsen cannot even confirm that his alternative would not infringe the patent in suit—*i.e.*, whether his "different method for generating fingerprints" would change the Wang technology such that it would still infringe.

Consequently, neither expert cites any factual foundation to overcome the inference that this posited alternative was not available. At most, they offer speculative and conclusory *ipse dixit* about what TVision might have done. *See* Johnson Rep. ¶¶167-68; Anderson Rebuttal Rep. ¶102; *Novartis Corp.*, 271 F.3d at 1051; *Sherwin-Williams*, 2020 WL 1283465 at *9; *Ace Pallet Corp.*, 764 F. App'x at 198. The Court should preclude TVision's experts' opinions that an internally developed ACR system could be alternative to the patented system, including opinions in Johnson Rep. ¶¶11-12, 13 (bullet 2), 103, 149 (bullet 3), 150, 167-168, 172-173, 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-70, and 281, Figures 1, 12, 16, and 21, and Exhibits 3.0, 6.0-6.2, 18.0, and 18.3 and in Anderson Rebuttal Rep. ¶¶102-03.

### (ii)    TVision's Experts Do Not Assert That TVision Could Have Developed An Alternative in May 2018

In addition to not showing a TVision developed alternative was ever available, Dr. Anderson and Ms. Johnson do not even attempt to assert that TVision could have developed an alternative that would have been available at the time of the May 2018 hypothetical negotiation.

---

[11] *See* Ex. 3, Anderson Rebuttal Rep. ¶102 ("███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████").

27

*See Visteon Global*, 903 F. Supp. 2d at 528. Dr. Anderson's opinion that TVision could have developed an ACR system internally notably does not indicate that it could have done so in May 2018. *See* Ex. 3, Anderson Rebuttal Rep. ¶¶102-03. Ms. Johnson similarly states, using the present tense, as follows: "███████████████████████████████████████████ ████████████████████████████████████████████████████" Ex. 5, Johnson Rep. ¶167 (emphasis added). Ms. Johnson further admitted in her deposition testimony that Mr. Sidhu, TVision's CTO, had no ██████████████████████████ in the period leading up to May 2018 (*i.e.*, the time of the hypothetical negotiation). Ex. 12, Johnson Dep. at 78:15-79:1.

Dr. Anderson and Ms. Johnson therefore fail to even assert that TVision could have developed an alternative that would have been available for the hypothetical negotiation in May 2018. Accordingly, the Court should exclude their opinions about this alternative, including opinions in Johnson Rep. ¶¶ 11-12, 13 (bullet 2), 103, 149 (bullet 3), 150, 167-68, 172-73, 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-70, and 281, Figures 1, 12, 16, and 21, and Exhibits 3.0, 6.0-6.2, 18.0, and 18.3 and Anderson Rebuttal Rep. ¶¶102-03.

### (iii) TVision Does Not Show That a TVision Internal Design Would Not Infringe Third-Party Patents

As with the purported alternative from ██████████ TVision's experts do not show that their proposed internally developed system would not infringe the Wang patent—which TVision must do to show that the system was "available." *Astrazeneca*, 782 F.3d at 1340-41.



TVision alleges that ████████████████████████████████████████████ ██████████████████████████████████████████" *See* Ex. 5, Johnson Rep. ¶167; Anderson Rebuttal Rep. ¶¶102-03. The only "████████████████████████████████████████"

28

that TVision identifies is in the Wang 2003 reference.[12] But as TVision's technical expert acknowledges, the Wang 2003 fingerprinting system was patent-protected (until January 2024). *See* Ex. 3, Anderson Rebuttal Rep. ¶102; Ex. 16, Wang patent, Face; Moulin Reply Rep. ¶116.

Dr. Anderson makes a conclusory attempt to distinguish the Wang patent by stating that " ███████████████████████████████████████████████████████████████████ ███████████████████████████████████████████████████ " (Ex. 3, ¶102) (emphasis added), but he does not identify the referenced " ███████████ " or compare any alternative to the Wang patent's claims. Accordingly, Dr. Anderson fails to explain how TVision could implement an unspecified " ███████████ " such that it would avoid infringing the Wang patent. Thus, he fails to identify evidence sufficient to overcome the inference that this posited alternative was not available. *See Asetek Danmark*, 2022 WL 21306657 at *30; *Visteon Global*, 903 F. Supp. 2d at 529. TVision's damages expert, Ms. Johnson, relies on Dr. Anderson's and Mr. Sidhu's opinions and adds nothing of substance. Ex. 5, Johnson Rep. ¶167.

Ms. Johnson and Dr. Anderson thus fail to provide factual support for their opinions that a TVision internally-developed ACR system would be an available alternative. *Astrazeneca*, 782 F.3d at 1340-41; *Sherwin-Williams*, 2020 WL 1283465 at *9 ("Speculation that [defendant] might have been able to design a non-infringing alternative based on the [third-party] patent will also not suffice."); *WhereverTV*, 2022 WL 2751752 at *7; *Acceleration Bay*, 2019 WL 4194060 at *4 (excluding opinion because "[i]t is entirely speculative, untestable, and divorced from the

---

[12] *See* Ex.3, Anderson Rebuttal Rep. ¶102 (" ████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████ ").

29

facts of this case."). The Court should exclude both Ms. Johnson and Dr. Anderson's opinions about this proposed alternative, including those opinions in Johnson Rep. ¶¶11-12, 13 (bullet 2), 103, 149 (bullet 3), 150, 167-168, 172-173, 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-70, and 281, Figures 1, 12, 16, and 21, and Exhibits 3.0, 6.0-6.2, 18.0, and 18.3 and in Anderson Rebuttal Rep. ¶¶102-03.

> **b.   TVision Lacks Any Evidence That Its Proposed Internally-Developed Alternative System Would be Acceptable**

None of TVision's experts offers any opinion or identifies any evidence showing that a TVision internally-designed ACR system would perform as well as the infringing ▮▮▮▮▮ system or any other system, how the re-design would perform in general, or whether it would be good enough to substitute for the infringing technology. Ex. 5, Johnson Report ¶¶167-68; Ex. 3, Anderson Rebuttal Rep. ¶¶102-103. In fact, they provide no details about how such a system would work. TVision's experts' opinions are therefore not reliable because an alternative's "availability and acceptability must [] be substantiated with record evidence." *WhereverTV*, 2022 WL 2751752 at *7; *Webasto Thermo*, 2019 WL 3334563 at *5; *Sherwin-Williams*, 2020 WL 1283465 at *9; *Spectralytics*, 649 F.3d at 1346.

TVision's experts never even attempt to assert that a TVision developed alternative would be acceptable. TVision's technical expert, Dr. Anderson, only opines that ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ but offers no opinion about the effectiveness of his proposed (and cursorily described) change to avoid the Wang patent. *See* Ex. 3, Anderson Rebuttal Rep. ¶¶102-03. Nor does Ms. Johnson offer any opinion that such a system would be acceptable. *See generally* Ex. 5, Johnson Rep. ¶¶167-68.

Thus, TVision has failed to meet its burden to show that its speculative internally-developed redesign of Wang 2003 would be an acceptable alternative. *See* Fed. R. Evid. 702;

*also Webasto Thermo*, 2019 WL 3334563 at \*5; *Sherwin-Williams*, 2020 WL 1283465 at \*9. The Court should preclude opinions about a TVision internally developed ACR system being an alternative, including opinions in Johnson Rep. ¶¶11-12, 13 (bullet 2), 103, 149 (bullet 3), 150, 167-68, 172-73, 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-70, and 281, Figures 1, 12, 16, and 21, and Exhibits 3.0, 6.0-6.2, 18.0, and 18.3 and in Anderson Rebuttal Rep. ¶¶102-03.

### 3. Opinions about Supposed Third-Party Alternatives Should be Precluded

TVision's experts contend that TVision could have used various third party ACR systems instead of the infringing ▮▮▮▮ system. On this point, TVision and its experts appear to have listed any ACR company they have heard of, no matter how little they know about it. Ms. Johnson and Dr. Anderson should be precluded from offering such opinions because they have failed to show that any of these third-party products were available and acceptable at the time of the May 2018 hypothetical negotiation.

### a. TVision's Proposed Third Party ACR Solutions (MRL, Axwave, Mufin, and Source Digital) Are Not Available and Acceptable Alternatives

Ms. Johnson and Dr. Anderson speculate that certain third party ACR systems could be alternatives to the patented technology used in the ▮▮▮▮ system. But as described below, TVision's experts fail to identify any evidence to support a claim that these third-party ACR systems would have been available, acceptable alternatives to the patented system. As explained below, their opinions about the systems from Mobile Research Labs ("MRL"), Axwave, Mufin, and Source Digital should be precluded.

### (i) Mobile Research Labs ("MRL") Is Not an Acceptable Alternative

Dr. Anderson and Ms. Johnson identify a MRL ACR product as a possible alternative to

the infringing technology. Ex. 3, Anderson Rebuttal Rep. ¶¶107-08; Ex. 5, Johnson Rep. ¶¶157-60. But they cite to no facts supporting this opinion. In fact, the evidence shows the opposite is true.

███████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████ *See* Ex. 31, TVSN_NLSN_00645277-95 at 292; Ex. 6, Moulin Op. Rep. ¶¶370-71. TVision's experts point to no evidence showing that ███████████████████████████████████. *See* Ex. 5, Johnson Rep. ¶¶157-59; Ex. 3, Anderson Rebuttal Rep. ¶¶107-08; Ex. 8, Moulin Reply Rep. ¶¶129-30.[13]

In addition, MRL only operates with mobile operating systems such as Android and iOS, whereas TVision's panel devices use Windows and Linux based operating systems. *See* Ex. 6, Moulin Op. Rep. ¶374; Ex. 8, Moulin Reply Rep. ¶¶129-130. Ms. Johnson and Dr. Anderson do not address this issue or cite any evidence of how TVision would overcome that problem (such as whether the vendor would or could develop a product for a different platform). *See Visteon Global*, 903 F. Supp. 2d at 528 ("The alleged infringer need not demonstrate that the noninfringing alternative in fact existed at the time but must establish that it was more than 'theoretically possible,' and in fact 'available' to be marketed").

TVision's experts have thus not identified any facts showing that the MRL system was available at the time of the hypothetical negotiation. *See* Fed. R. Evid 702; Ex. 5, Johnson Rep.

---

[13] TVision's experts instead rely ██████████████████████████████████████ ███████ Ex. 5, Johnson Rep. ¶159; Ex. 3, Anderson Rebuttal Rep. ¶107. But there is no evidence that MRL offers a non-mobile product or that it could or would develop one, nor is there evidence that a compatible product would not have the same issues. *See* Ex. 6, Moulin Op. Rep. ¶374.

¶¶157-59; Ex. 3, Anderson Rebuttal Rep. ¶¶107-08. Accordingly, TVision's expert's opinion about the MRL system is entirely unsupported. Ms. Johnson's and Dr. Anderson's opinions regarding MRL should be precluded, including the opinions in Johnson Rep. ¶¶13 (bullet 2), 149-50, 157-160, and 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-70, 281, and Figures 1, 12, 16, 21, and Exhibits 3.0, 5.0, 18.0, and 18.2 and in Anderson Rebuttal Rep. ¶¶107-109.

> **(ii)    Axwave Is Not an Available, Acceptable Alternative**

TVision's experts also propose that an ACR product from Axwave could replace the infringing system. But TVision's experts identify no evidence showing that the Axwave ACR product was available and acceptable in May of 2018. Ex. 5, Johnson Rep. ¶¶157-60[14]; Ex. 3, Anderson Rebuttal Rep. ¶106. Ms. Johnson indicates that ████████████████████ ███████████████████████████████████████████████████████████████ ███████████████████████████████ Ex. 5, Johnson Rep. ¶158 & n.313; *also* Ex. 6, Moulin Op. Rep. ¶¶377-78. But the email chain she cites does not say that Axwave's product would work in TVision's environment. Ex. 8, Moulin Reply ¶126; Ex. 6, Moulin Op. Rep. ¶377.[15]

Neither Ms. Johnson nor Dr. Anderson cite any evidence showing that an Axwave ACR product would be acceptable (or work at all) in TVision's technical environment. Indeed, the record evidence shows the opposite, with the article Dr. Anderson cites describing "Axwave, [as] the leading **mobile** appcontent recognition experts." Ex. 18 (emphasis added). Neither Ms.

---

[14] Axwave was purchased by Samba, and Ms. Johnson refers to it by that name in her report. *See* Johnson Rep. ¶160.

[15] Indeed, it is so common for software to be announced but never get released that there is a term for it, "vaporware." *See* Ex. 8, Moulin Reply Rep. ¶128.

Johnson nor Dr. Anderson identify any facts to show that the Axwave <u>mobile</u> solution would work in TVision's ▮▮▮▮ and ▮▮▮▮▮▮▮▮ meters. Ex. 3, Anderson Rebuttal Rep. ¶106; Ex. 5, Johnson Rep. ¶159; Ex. 8, Moulin Reply Rep. ¶¶126-27. In fact, Dr. Anderson even argues elsewhere that mobile technology has shortcomings in recognizing television content. Ex. 3, Anderson Rebuttal Rep. ¶107. Dr. Anderson never explains why his concerns about mobile solutions are inapplicable to the Axwave system. Ex. 3, Anderson Rebuttal Rep. ¶106.

Furthermore, TVision has a process for determining the acceptability of an ACR solution, but neither its experts nor any TVision employees followed that process to demonstrate the acceptability of any Axwave system.[16] TVision's chief technology officer, Mr. Sidhu, testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ *See* Ex. 19, Sidhu Dep. Tr. at 138:8-19. But despite TVision's established process for testing potential ACR solutions, Dr. Anderson does not identify any evidence that either he or TVision tested any Axwave system. *See* Ex. 3, Anderson Rebuttal Rep. ¶¶104-10. Nor does Ms. Johnson cite any evidence of that. *See* Ex. 5, Johnson Rep. ¶¶157-166. Accordingly, neither Ms. Johnson nor Dr. Anderson have satisfied TVision's burden to show that any Axwave systems are acceptable as measured by TVision's own acceptance process. *Acceleration Bay*, 2019 WL 4194060 at *4 (excluding opinion because "[i]t is entirely speculative, untestable, and divorced from the facts of this case."); *Visteon Global*, 903 F. Supp. 2d at 528.

Thus, there is no evidence that Axwave's system is an available, acceptable alternative. Ms. Johnson's and Dr. Anderson's opinions regarding Axwave should be precluded, including the opinions in Johnson Rep. ¶¶13 (bullet 2), 149-50, 157-160 and 232 (bullet 8), 235-36, 239,

---

[16] Indeed, TVision could not have done so because Axwave's system is a mobile system that would not work at all in TVision's Linux and Windows technical environments.

243 (bullet 2), 251-55, 269-70, 281, and Figures 1, 12, 16, and 21 and Exhibits 3.0, 5.0, 18.0, and 18.2 and in Anderson Rebuttal Rep. ¶106.

<b>(iii)    Mufin Is Not an Available, Acceptable Alternative</b>

Ms. Johnson and Dr. Anderson fail to cite any evidence that the Mufin ACR product would be available or acceptable. Ex. 5, Johnson Rep. ¶¶157-58, 160; Ex. 3, Anderson Rebuttal Rep. ¶109. In arguing that the posited Mufin alternative was available in May 2018, Ms. Johnson represents that ███████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████ Ex. 5, Johnson Rep. ¶158. Johnson bases her opinion on her interview with Yan Liu. *Id.* n. 311 (citing interviews with Yan Liu). But during her deposition, Ms. Johnson admitted that ██

████████████████████████████████████████████████ *See* Ex. 12, Johnson Dep. at 107:14-108:11. Ms. Johnson also admitted that ██████████████████████████████████

██████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████████████

███████████████████████████ Ex. 12, Johnson Dep. 108:1-7. Indeed, Ms. Johnson confirmed that ███████████████████████████████████████████████████████████ *Id.* 108:8-11. Ms. Johnson cannot rely upon ████████████████████████████████████

██████ *See Kam Hing Enterprises Inc. v. Wal-Mart Stores Inc.*, 359 F. App'x 235, 238 (2d Cir. 2010) (affirming exclusion of expert testimony where "the District Court did not err in concluding that the spreadsheets were summary evidence culled from underlying data that [defendant] had not produced."); *Griddine v. GP1 KS-SB, Inc.*, No. 2:17-CV-02138-JAR, 2019 WL 1002049 *5 (D. Kan. Feb. 28, 2019) (excluding declaration statements for "rely[ing] on evidence that Defendants failed to produce prior to the discovery cut-off.").

Similarly, Dr. Anderson states that: ██████████████████████████████████████ Ex.

35

3, Anderson Rebuttal Rep. ¶109. But Dr. Anderson cites no evidence to support that statement, such as a proposal. The only document he cites is at TVSN_NLSN_00662112–39 (Ex. 20), which is █████████████████████████████████████████████—it is not specific to TVision and does not contain any proposed terms.

And finally, as explained above, TVision has a test procedure for assessing the acceptability of an ACR system. But TVision never followed that test procedure for any Mufin product.

Thus, there is no evidence that Mufin's system was an available, acceptable alternative at the time of the hypothetical negotiation. Ms. Johnson's and Dr. Anderson's opinions regarding Mufin should be precluded, including the opinions in Johnson Rep. ¶¶13 (bullet 2), 149-50, 157-58, 160, and 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-70, 281, Figures 1, 11-12, 16, 21 and Exhibits 3.0, 5.0-5.4, 18.0, and 18.2 and in Anderson Rebuttal Rep. ¶109.

### (iv)    Source Digital is Not An Available, Acceptable Alternative

Ms. Johnson and Dr. Anderson cite Source Digital as a possible ACR supplier for TVision but fail to identify any facts to support their opinions that this posited alternative was available at the time of the hypothetical negotiation. Dr. Anderson opines that ███████████████████ ████████████████████████████████████████████ citing TVSN_NLSN_00660739-772 at 746-762 (Ex. 21). Ex. 3, Anderson Rebuttal Rep. ¶109. Ms. Johnson cites the same document to support the same opinion. Ex. 5, Johnson Rep. ¶158. However, the cited document does not support the assertion that ███████████████ ████████████████████████████ In fact, this document is ███████████████ ████████████████████████████████████ *See* Ex. 21, TVSN_NLSN_00660739–772 at 746–62. Ms. Johnson admits that ███████████████

36

███████████ Ex. 12, Johnson Dep. 102:11-14. There is accordingly no evidence that Source Digital could or would have provided ACR services to TVision. In fact, Source Digital may not have provided a proposal to TVision for just that reason.

Moreover, as explained above, TVision has a test procedure for assessing the acceptability of an ACR system. But TVision never followed that test procedure for any Source Digital product.

There is no evidence that Source Digital's system is an available, acceptable alternative. Ms. Johnson's and Dr. Anderson's opinions regarding Source Digital should be precluded, including the opinions in Johnson Rep. ¶¶13 (bullet 2), 146, 149-50, 1579-58, 160, and 162 and 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-70, 281, Figures 1, 11-12, 16, 21 and Exhibits 3.0, 5.0, 18.0, and 18.2 and in Anderson Rebuttal Rep. ¶109.

> **b.    TVision's Experts Should be Precluded from Opining about Proposed Third-Party Alternatives for Which They Provide No Information Other Than Their Names**

Dr. Anderson and Ms. Johnson string cite several other companies, contending that they could provide an alternative ACR system. Ex. 3, Anderson Rebuttal Rep. ¶110; Ex. 5, Johnson Rep. ¶¶157, 160. For these companies, however, TVision's experts provide no information other than the companies' names—*i.e.*, they provide zero facts supporting their opinions. All opinions regarding these companies should be precluded.

> **(i)    "Answer" Is Not an Available, Acceptable Alternative**

Ms. Johnson identifies "Answer" as a potential source of an alternative to the infringing system with no more detail than this name.[17] Ex. 5, Johnson Rep. ¶157 (████████████████ ███████████████████████████████████████) The Court should

---

[17] Dr. Anderson ignores the "Answer" product completely.

preclude Ms. Johnson from offering any opinions about the "Answer" product, including in Johnson Rep. ¶¶13 (bullet 2), 149-50, 157 and 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-70, 281, Figures 1, 11-12, 16, 21, and Exhibits 3.0, 5.0, 18.0, and 18.2.

### (ii)    Beatgrid Is Not an Available, Acceptable Alternative

Ms. Johnson also opines about Beatgrid solely in a string cite of supposedly possible alternatives, citing her conversation with Mr. Liu.[18] Ex. 5, Johnson Rep. ¶160 (



). Ms. Johnson's data-less opinion fails to support this company as an alternative.[19] *See WhereverTV, LLC*, 2022 WL 2751752 at *7.

The Court should preclude Ms. Johnson's from providing any opinions about Beatgrid, including in Johnson Rep. ¶¶13 (bullet 2), 149-50, and 160 and 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-70, 281, Figures 1, 11-12, 16, 21, and Exhibits 3.0, 5.0, 18.0, and 18.2.

### (iii)    Audible Magic is Not An Available, Acceptable Alternative

Dr. Anderson mentions Audible Magic only in passing.[20] Ex. 3, Anderson Rebuttal Rep. ¶110 (



). Dr. Anderson's conclusory mention of Audible Magic does not support Audible Magic offering an available, acceptable alternative.[21] His opinion

---

[18] Dr. Anderson mentions nothing about Beatgrid.

[19] Beatgrid advertises its ACR product as "passive *mobile* ACR technology." Ex. 22 at 4-5, https://beatgrid.co/platform/acr-automatic-content-recognition-technology/) (emphasis added). Ms. Johnson cites nothing to indicate that a mobile ACR platform would work in TVision's Linux and Windows-based panel meters. *See* Ex. 5, Johnson Rep. ¶160.

[20] Ms. Johnson completely ignores Audible Magic.

[21] Audible Magic advertises a product for recognizing music. *See* Ex. 24, https://www.audiblemagic.com/. Dr. Anderson never provides any opinion or cites any evidence that Audible Magic's product would work with television or in TVision's technical environment.

should be precluded, including in Anderson Rebuttal Rep. ¶110.

### (iv)    Dat-Track Is Not an Available, Acceptable Alternative

Dr. Anderson mentions Dat-Track only in passing. Ex. 3, Anderson Rebuttal Rep. ¶110. Ms. Johnson similarly mentions Dat-Track in passing and provides no information about its business or products. *See* Ex. 5, Johnson Rep. ¶¶157, 160. Both experts thus fail to offer evidence that this product would work in TVision's environment or that the Dat-Track product would be acceptable. Ex. 5, Johnson Report ¶¶157, 160; Ex. 3, Anderson Rebuttal Rep. ¶110. Indeed, the record shows that ███████████████████████████████████████████

███████████████████████████████████████████████████████████████████

████ *See* Ex. 23, TVSN_NLSN_00399618-19.

In addition, TVision's experts fail to cite any evidence showing that the Dat-Track ACR product was available in May of 2018. *See* Ex. 6, Moulin, Op. Rep. ¶368; Ex, 8, Moulin Reply Rep. ¶141; Ex. 5, Johnson Rep. ¶¶157, 160; Ex. 3, Anderson Rebuttal Rep. ¶110. To the contrary, evidence shows that Dat-Track's product was not available in May 2018. Dat-Track's Internet domain was not registered until April of 2019, nearly a year after the hypothetical negotiation. *See* Ex. 25, https://lookup.icann.org/en/lookup of www.dat-track.com); Ex. 6, Moulin Op. Rep. ¶368. TVision's experts identified no evidence that Dat-Track had an ACR product in May 2018.

Dat-Track's system is accordingly not an available, acceptable alternative. Ms. Johnson's and Dr. Anderson's opinions regarding Dat-Track should be precluded, including those in Johnson Rep. ¶¶13 (bullet 2), 149-50, 157, 160 and 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-70, 281, Figures 1, 11-12, 16, 21, and Exhibits 3.0, 5.0, 18.0, and 18.2 and in Anderson Rebuttal Rep. ¶110.

39

### (v)    Soundhound Is Not an Available, Acceptable Alternative

Dr. Anderson mentions Soundhound only in passing.[22] Ex. 3, Anderson Rebuttal Rep. ¶110. Moreover, Soundhound advertises a voice recognition product for restaurant reservations and music recognition. *See* Ex. 26, https://www.soundhound.com. Dr. Anderson never provides any opinion or cites any evidence that Soundhound offers a product that would work with television or in TVision's technical environment. Ex. 3, Anderson Rebuttal Rep. ¶110.

Dr. Anderson's conclusory mention of Soundhound does not support Soundhound offering an available, acceptable alternative. His opinion should be precluded, including in Anderson Rebuttal Rep. ¶110.

### (vi)    Civolution Is Not an Available, Acceptable Alternative

Dr. Anderson mentions Civolution only in passing.[23] Ex. 3, Anderson Rebuttal Rep. ¶110. Civolution's ACR product was not available in May of 2018. *See* Ex. 27, https://www.civolution.com/). Civolution left the ACR market prior to that date. *Id.* Dr. Anderson offers no evidence or opinion that the Civolution product was otherwise available. *See* Ex. 3, Anderson Rebuttal Rep. ¶110. In addition, Dr. Anderson never provides any opinion or cites any evidence that Civolution offered a product that would work with television or in TVision's technical environment. Ex. 3, Anderson Rebuttal Rep. ¶110. Dr. Anderson's conclusory mention of Civolution does not support Civolution as an available, acceptable alternative. His opinion should be precluded, including Anderson Rebuttal Rep. ¶110.

---

[22] Ms. Johnson completely ignores Soundhound.

[23] Ms. Johnson completely ignores Civolution.

          **c.**        **Ms. Johnson and Dr. Anderson Should Be Precluded from Opining on Alternatives Based on a TVision Witness's Unsupported Statement That the ACR Provider Market is** ███████████████████████████████████████████████

Ms. Johnson improperly adopts a TVision employee's conclusory statement " ████████

████████████████████████████████████████████████████████████████████

████████ '" Ex. 5, Johnson Rep. ¶157. Dr. Anderson does the same. Anderson Rebuttal Rep.

¶105. This high-level, unsupported statement cannot support their opinions.

In *WhereverTV*, for example, the court precluded an expert from opining that there were

"many other alternative designs" where the expert did not identify "a ***specific*** proposed

alternative design." 2022 WL 2751752 at *7 (emphasis added). "Without research-and-

development documentation, deposition testimony, or sworn declarations attesting to the

potential existence of these many other alternatives," the court explained, "a factfinder would be

left to guess at [defendant]'s design and implementation capabilities." *Id.* The court found the

expert's reference to "many other alternative designs" to be "misleading[,] as it creates the

impression that [defendant] has identified with the requisite specificity, and substantiated with

the appropriate evidence, certain acceptable and non-infringing alternatives," and that "no

amount of cross-examination could cure the fundamental lack of reliability." *Id.*

As in *WhereverTV*, Ms. Johnson's and Dr. Anderson's opinions do not rest on a reliable

foundation. This statement by TVision's witness and adopted by TVision's experts does not

identify any specific ACR suppliers. Ex. 5, Johnson Rep. ¶157; Anderson Rebuttal Rep. ¶105.

Nielsen cannot challenge unknown vendors with unknown capabilities to determine if their

products have sufficient availability and acceptability to be alternatives in TVision's technical

environment at the time of the hypothetical negotiation. Moreover, TVision bears the burden of

41

showing that an alternative exists, which this general statement does not satisfy. *Visteon Global*, 903 F. Supp. 2d at 528.

Consequently, Ms. Johnson's opinion on this matter should be precluded, including in Johnson Rep. ¶¶150, 157, 169-70, 177, 223, 253, and Dr. Anderson's opinion on this issue, including in Anderson Rebuttal Rep. ¶105.

### 4.    Ms. Johnson Should be Precluded from Opining That A Reasonable Royalty Is Limited to The Cost of An Alternative

Ms. Johnson limits the proposed royalty from her "cost" approach to the alleged cost of implementing proposed alternatives to the patented technology. According to Ms. Johnson, TVision's supposed alternatives would have cost ███████, which she then adopts as her proposed royalty. *See* Ex. 5, Johnson Rep, ¶¶11, 156, 166, 167, 232, 235, and 238. She summarizes these conclusions in Figure 16:



Moreover, although she characterizes these numbers as the "Starting Point of the Hypothetical Negotiation," she finishes with them as well. *Compare* Ex. 5, Johnson Rep. Fig. 16, *with* ¶238.

Ms. Johnson's reliance on her estimated less-expensive alternatives is legally improper. The Federal Circuit has expressly held that a reasonable royalty may not be capped by the cost of a less-expensive proposed alternative. *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373

(Fed. Cir. 2008) ("Coinco is wrong as a matter of law to claim that reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, noninfringing alternative."); *Enfora*, 167 F. Supp. 3d at 682. Because Ms. Johnson cannot opine contrary to law, she should be precluded from offering opinions relating her "cost" approach, including the opinions in Johnson Rep. ¶¶11-12, 13 (bullet 2), 103, 148-49, 156, 161-73, 232 (bullet 8), 235-36, 238-39, 243 (bullet 2), 251-55, 269-70, and 281, Figures 1, 11, 12, 16, 21 and Exhibits 3.0-3.1, 4.0, 5.0-4, 6.0-3, 18.0. *See Baxalta*, 513 F. Supp. 3d at 448.

### G.    Dr. Anderson's Opinions Relating to Haitsma US and Its Purported "Wavelet Transforms" Should Be Precluded

The Court should preclude Dr. Anderson from rendering opinions about the construction of the claim term "spectral transform operation." *See Cordis Corp. v. Boston Sci. Corp.*, 561 F.3d 1319, 1337 (Fed. Cir. 2009) ("[I]t is improper to argue claim construction to the jury because the 'risk of confusing the jury is high when experts opine on claim construction.'") (quoting *CytoLogix Corp. v. Ventana Med. Sys., Inc.*, 424 F.3d 1168, 1172–73 (Fed. Cir. 2005)); *Intuitive Surgical*, 549 F. Supp. 3d at 369–70; *EMC Corp. v. Pure Storage, Inc.*, C.A. No. 13-1985, 2016 WL 775742 (D. Del. Feb. 25, 2016) (Andrews, J.).

Specifically, Dr. Anderson opines that the "spectral transform operation" of the '889 patent's claims should be construed to include "wavelet transforms" (such as those mentioned in the Haitsma US prior art reference). Ex. 4, Anderson Reply Rep. ¶¶ 6–11, 14. In support of his claim construction opinion, Dr. Anderson improperly uses an unclaimed "wavelet transform"

43

embodiment[24] in the '889 patent specification.[25] *Id.* Dr. Anderson's opinion that the definition of the claimed "spectral transform operation" includes "wavelet transforms" is an improper attempt to have the jury construe this claim term. *See, e.g.*, *Cordis*, 561 F.3d at 1337; *Intuitive Surgical*, 549 F. Supp. 3d at 369–70; *EMC Corp.*, 2016 WL 775742 at *4. The Court did not specifically construe the term "spectral transform operation," although the claim term is repeated in the Court's construction of the larger term "identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples." (D.I. 141.)

In *Intuitive Surgical*, Judge Noreika faced a similar situation. There, the Court construed the term "end effector" within the larger phrase "end effector mounting formation," but, as here, "the parties did not [previously] dispute the meaning of" the sub-phrase. 549 F. Supp. 3d at 369. The accused infringer's expert opined that the accused product lacked a "mounting formation" based on a construction of that term that was limited to a particular embodiment in the patent specification. *Id.* at 369. Judge Noreika excluded the opinion "because it relie[d] on belated

---

[24] The "wavelet" embodiment is claimed in a patent that is related to the patent-in-suit but not asserted against TVision in this case. It is improper to interpret claim terms to read on every embodiment in the patent specification. *See Baran v. Medical Device Techs., Inc.*, 616 F.3d 1309, 1316 (Fed. Cir. 2010) ("It is not necessary that each claim read on every embodiment."); *Sinorgchem Co., Shandong v. Int'l Trade Comm'n*, 511 F.3d 1132, 1138 (Fed. Cir. 2007); *Intamin Ltd. v. Magnetar Techs.*, Corp., 483 F.3d 1328, 1337 (Fed. Cir. 2007).

[25] Ex. 4, Anderson Reply Rep. ¶¶6–7, ¶8 ("The '889 patent describes multiple embodiments including embodiments in which a wavelet operation is used for the spectral transform. The wavelet operation was termed a spectral transform in the '889 specification.") (citations and quotations to the '889 patent omitted), ¶9 ("The'889 patent describes the wavelet as producing multiple sub-bands. Then the energy in each subband is determined by squaring and summing the wavelet subband values. The descriptor bit is then based on the comparisons of these energy values.") (citations to the '889 patent omitted); ¶10 ("Thus, the ''889 patent [sic] contemplates various methods for generating spectral powers…."), ¶11 ("Thus, the disclosure in Haitsma US mirrors the teachings and claims of the '889 patent as applied to the wavelet embodiments in the '889 patent"), ¶14 ("[T]he '889 patent discloses two major preferred embodiments, one of which uses logarithmically spaced bands produced a wavelet transform.") *See also* n.2.

44

claim construction arguments," which were improper to present to the jury. *Id.* at 370 (citing *Cordis*, 561 F.3d at 1337). Similarly, in *EMC Corp.*, Judge Andrews precluded an expert witness from testifying that the patent specification and certain embodiments supported their opinions regarding the plain and ordinary meaning of claim terms. In doing so, the court noted that such opinions "amount[ed] to arguing claim construction to the jury." *Id.* at *3–4. Judge Andrews further explained that "[t]estimony that embodiments in a patent specification support an expert's opinions regarding the plain and ordinary meaning of claim terms would amount to claim construction and suggest that literal infringement can be established by a comparison between accused products and specification embodiments." *EMC Corp.*, 2016 WL 775742 at *4.

Dr. Anderson seeks to have the jury construe the "spectral transform operation" claim element as part of his opinion that the Haitsma US prior art reference's "wavelet transforms" correspond to that claim element. *See* Ex. 4, Anderson Reply Rep. ¶¶8-11, 14. Dr. Anderson's only support is his extensive reference to the '889 patent specification and a specific unclaimed embodiment therein. Ex. 4, Anderson Reply Rep. ¶¶6-10. His opinion should therefore be precluded, including his opinions in Anderson Op. Rep. Exhibit 1 (limitation 1.b (referencing ¶¶29-30 of Haitsma US) and any cross-references to that paragraph for any other claims) and in Anderson Reply Rep. ¶¶6-11 and 14.

### H. Dr. Anderson Should Be Precluded from Improperly Comparing Prior Art to Embodiments in The '889 Patent Rather Than The Claims of The '889 Patent.

Dr. Anderson also improperly opines that the Haistma US reference invalidates the claims by comparing that reference to <u>embodiments</u> disclosed in the '889 patent specification rather than its claims. *See, e.g.,* Ex. 4, Anderson Reply Rep. ¶14 ("[T]he '889 patent *discloses two major preferred embodiments*, one of which uses logarithmically spaced bands produced a wavelet transform. [SIC]") (emphasis added). This opinion is contrary to law, and Dr. Anderson

45

should be precluded from offering such opinion. *Baxalta*, 513 F. Supp. 3d at 448

It is improper to compare the Haitsma US prior art reference to the specification's embodiments rather than to the claims. *Silicon Graphics, Inc. v. ATI Techs., Inc.*, 607 F.3d 784, 796 (Fed. Cir. 2010); *Chrimar Sys., Inc. v. Cisco Sys., Inc.*, 318 F. Supp. 2d 476, 502 (E.D. Mich. 2004) ("Thus, just as infringement is determined by comparing the allegedly infringing device with the asserted claim (not just the preferred embodiment), anticipation must also be determined by comparing the anticipatory reference to the language of the claim as interpreted by the Court (not just the preferred embodiment)."); *cf. EMC Corp.*, 2016 WL 775742 at *4 ("Testimony that embodiments in a patent specification support an expert's opinions regarding the plain and ordinary meaning of claim terms … suggest that literal infringement can be established by a comparison between accused products and specification embodiments."). Accordingly, Dr. Anderson should be precluded from offering this opinion, including in Anderson Op. Rep. Exhibit 1 (limitation 1.b (referencing ¶¶29-30 of Haitsma US) and any cross-references to that paragraph for any other claims) and in Anderson Reply ¶¶6-11 and 14.

## IV.    Argument - Summary Judgment

### A.    The Court Should Enter Partial Summary Judgment That The Cheung Reference is Not Prior Art and Thus Does Not Invalidate The Patent in Suit

TVision alleges that Cheung, U.S. Patent No. 8,468,183 ("the Cheung reference") (Ex. 28), invalidates various claims of the '889 patent under both anticipation and obviousness theories. Ex. 2, Anderson Op. Rep. ¶¶86-88. But TVision and its expert have failed to meet TVision's burden to prove that the Cheung reference is in fact prior art. *See Amgen Inc. v. Sanofi*, 872 F.3d 1367, 1380 (Fed. Cir. 2017); *Mahurkar v. C.R. Bard, Inc.*, 79 F.3d 1572, 1576 (Fed. Cir. 1996) ("By challenging the validity of the '155 patent, Bard bore the burden of persuasion by clear and convincing evidence on all issues relating to the status of the Cook catalog as prior art").

Accordingly, the Court should enter partial summary judgment that the Cheung reference does not invalidate the patent in suit.

The Cheung reference was filed on February 16, 2005, after the patent in suit's priority date of August 18, 2004.[26] Statement of Fact ("SOF") 1, 3. The Cheung reference, however, descends from a provisional application filed on February 26, 2004. SOF 1. Thus, the Cheung reference is only prior art to the patent in suit if it receives priority from its provisional application.

TVision and its expert assume that the Cheung reference receives such priority but have not satisfied their burden to ***prove*** that it does. The Federal Circuit has provided a very specific process for a reference to be accorded its provisional filing date, which TVision does not follow. In *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.,* 800 F.3d 1375 (Fed. Cir. 2015), the Federal Circuit held that "[a] provisional application's effectiveness as prior art depends on its written description support for the claims of the issued patent of which it was a provisional." *Id.* at 1382; *see also Purdue Pharma L.P. v. Iancu*, 767 Fed. App'x 918, 924 (Fed. Cir., 2019). In practice, to prove a reference is entitled to its provisional filing date, a party must "compare *the claims* of the [prior art] patent to the disclosure in the [] provisional application." *Dynamic Drinkware,* 800 F.3d at 1381 (emphasis in original); *also Amgen*, 872 F.3d at 1380.

Accordingly, TVision must demonstrate that the Cheung reference is prior art by showing that the Cheung reference's claims read on the Cheung provisional application. Neither TVision nor its expert has made any attempt to prove that the Cheung reference is prior art. Nor do TVision's invalidity contentions contain any comparison of the Cheung provisional disclosure to the Cheung patent claims. *See* Ex. 29, TVision's Supplemental Initial Invalidity Contentions,

---

[26] The '889 patent receives priority from its August 18, 2004 provisional filing. SOF 3.

served on April 10, 2023; Ex. 30, TVision's Final Invalidity Contentions, Served September 18, 2023, pp. 5, 7, Ex. A.8. Similarly, TVision' expert provides no such analysis. Anderson Op. Rep. ¶¶86-99; Anderson Reply Rep. ¶22. This is a complete failure of proof on TVision's part.

The Court should enter partial summary judgment that Cheung does not invalidate the patent in suit because TVision failed to prove that the Cheung reference should receive priority as of the filing date of its provisional application and thus that it is prior art to the patent in suit. *Technology Licensing Corp. v. Videotek, Inc.*, 545 F. 3d 1316, 1327 (Fed. Cir. 2008) ("Failure to prove the matter as required by the applicable standard means that the party with the burden of persuasion loses on that point"); *see also Dynamic Drinkware*, 800 F.3d at 1378-79. Accordingly, given TVision has not proved that the Cheung reference is prior art, the Court should enter partial summary judgment that the asserted claims of the patent in suit are not invalid as anticipated by the Cheung reference and are not obvious under any combination that includes the Cheung reference.

## V.    Conclusion

Because the Cheung reference has not been proven to be prior art, Nielsen asks the Court to grant partial summary judgment that it does not invalidate any claims of the patent in suit. In addition, Nielsen asks that the Court preclude TVision's experts from opining on the matters discussed above.

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:  */s/ David E. Moore*

    David E. Moore (#3983)

Steven Yovits

    Bindu A. Palapura (#5370)

Douglas Lewis

    Andrew L. Brown (#6766)

Constantine Koutsoubas

    Hercules Plaza, 6th Floor

Jason P. Greenhut

    1313 N. Market Street

KELLEY DRYE & WARREN LLP

    Wilmington, DE  19801

333 West Wacker Drive

    Tel:  (302) 984-6000

Chicago, IL 60606

    dmoore@potteranderson.com

Tel:  (312) 857-7070

    bpalapura@potteranderson.com

    abrown@potteranderson.com

Clifford Katz

Jolie Schenerman

*Attorneys for Plaintiff The Nielsen Company*

KELLEY DRYE & WARREN LLP

*(US), LLC*

3 World Trade Center

175 Greenwich Street

New York, NY 10007

Tel:  (212) 808-7800

Dated: March 12, 2024

11374978 / 14944-00004

Public Version Dated: March 19, 2024

49