# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

THE NIELSEN COMPANY (US), LLC,    )
       )
     Plaintiff,    )  C.A. No. 22-57-CJB
       )
   v.    )  **JURY TRIAL DEMANDED**
       )
TVISION INSIGHTS, INC.,    )
       )  **PUBLIC VERSION**
     Defendant.    )

## THE NIELSEN COMPANY (US), LLC's BRIEF IN OPPOSITION TO TVISION'S DAUBERT MOTION REGARDING MICHAEL KEELEY

<table>
<tr><td>

OF COUNSEL:

Steven Yovits
Douglas Lewis
Constantine Koutsoubas
Jason P. Greenhut
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
Tel: (312) 857-7070

Clifford Katz
Jolie Schenerman
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-7800

Dated: April 9, 2024
11438078 / 14944.00004
Public Version Dated: April 16, 2024

</td><td>

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew L. Brown (#6766)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
abrown@potteranderson.com

*Attorneys for Plaintiff The Nielsen Company (US), LLC*

</td></tr>
</table>

# TABLE OF CONTENTS

I.    Introduction.................................................................................................................. 1

II.   Dr. Keeley Properly Considered Nielsen's Foregone Profits In Connection With His Reasonable Royalty Analysis...................................................................................... 3

III.  Dr. Keeley Properly Applied The Nash Bargaining Solution............................................ 5

IV.   Dr. Keeley Both Apportioned Damages And Utilized Doctrines That Do Not Require Apportionment .................................................................................................... 10

    A.    Dr. Keeley Properly Apportioned in His Damages Analysis .............................. 10

    B.    Dr. Keeley Also Apportioned through His Consideration of the *Georgia Pacific* Factors ............................................................................................... 12

    C.    Dr. Keeley Properly Considered Convoyed Sales ............................................... 14

V.    Dr. Keeley Properly Considered Nielsen's Willingness To License In The Hypothetical Negotiation ............................................................................................... 17

VI.   Tvision's April 2018 Financial Forecast Is Not "Unsubstantiated" Or "Unreliable"...... 19

VII.  Conclusion ................................................................................................................... 21

# TABLE OF AUTHORITIES

**Cases**

**Page(s)**

*Asetek Danmark A/S v. CMI USA Inc.*,
  852 F.3d 1352 (Fed. Cir. 2017)....................................................................................3, 4

*AstraZeneca AB v. Apotex Corp.*,
  782 F.3d 1324 (Fed. Cir. 2015).........................................................................................11

*Bd. of Regents UT Sys. v. Boston Sci. Corp.*,
  645 F. Supp. 3d 324 (D. Del. 2022)...................................................................................12

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
  C.A. No. 15-152-RGA, 2018 WL 4691047 (D. Del. Sep. 28, 2018) .....................................11

*Daedalus Blue, LLC v. Microstrategy Inc.*,
  No. 2:20-CV-551, 2023 WL 5598456 (E.D. Va. Aug. 29, 2023) ...............................14, 15, 16

*Deere & Co. v. Int'l Harvester Co.*,
  710 F.2d 1551 (Fed. Cir. 1983).........................................................................................17

*Eisenberg v. Gagnon*,
  766 F.2d 770 (3d Cir. 1985)..............................................................................................19

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods.*,
  879 F.3d 1332 (Fed. Cir. 2018).........................................................................................13

*FloodBreak, LLC v. Art Metal Indus., LLC*,
  No. 3:18-CV-503 (SRU), 2020 WL 6060974 (D. Conn. Oct. 13, 2020)..................................3

*Genuine Enabling Tech. LLC v. Sony Corp.*,
  C.A. No. 17-135-MSG, 2022 WL 17325656 (D. Del. Nov. 28, 2022) .....................................5

*Interactive Pictures v. Infinite Pictures*,
  274 F.3d 1371 (Fed. Cir. 2001)................................................................................15, 20, 21

*MiiCs & Partners, Inc. v. Funai Elec. Co.*,
  C.A. No. 14-804-RGA, 2017 WL 6268072 (D. Del. Dec. 7, 2017). .......................................4

*Panduit Corp. v. Stahlin Bros Fibre Works, Inc.*,
  575 F.2d 1152 (6th Cir. 1978) ......................................................................................1, 18

*Roche Diagnostics v. Meso Scale Diagnostics*,
  503 F. Supp. 3d 156 (D. Del. 2020)...................................................................................17

*Shire Viropharma Incorporated v. CSL Behring LLC*,
  C.A. No. 17-414-MSG, 2021 WL 1227097 (D. Del. Mar. 31, 2021) .....................................12

*Shure Inc. v. ClearOne, Inc.*,
  C.A. No. 19-1343-RGA-CJB, 2021 WL 7209740 (D. Del. Oct. 5, 2021) ................................1

*SUMMIT 6, LLC v. Samsung Elecs. Co., Ltd.*,
  802 F.3d 1283 (Fed. Cir. 2015)....................................................................................................6

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*,
  750 F.2d 1552 (Fed. Cir. 1984)...........................................................................................15, 16

*Union Carbide Chem. & Plastics Tech. Corp. v. Shell Oil Co.*,
  425 F.3d 1366 (Fed. Cir. 2005), *overruled on other grounds*, *Cardiac
  Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348 (Fed. Cir. 2009) ...............................14

*VirnetX, Inc. v. Cisco Sys.*,
  767 F.3d 1308 (Fed. Cir. 2014)....................................................................................................6

**Statutes & Rules**

Delaware Code § 73-605(a)(2) ........................................................................................................19

17 CFR §240.10b-5...........................................................................................................................19

## TABLE OF EXHIBITS

| Ex. No. | Description |
|---|---|
| 1. | Keeley Opening Expert Report on Damages (October 25, 2023) |
| 2. | Keeley Reply Expert Report on Damages (December 15, 2023) |
| 3. | Moulin Opening Expert Report on Infringement (October 25, 2023) |
| 4. | Moulin Reply Expert Report on Infringement (December 15, 2023) |
| 5. | Yan Liu Deposition Transcript Excerpts (August 29, 2023) |
| 6. | Johnson Rebuttal Expert Report on Damages (November 21, 2023) |
| 7. | Document Produced by TVision as TVSN_NLSN_00269606 |
| 8. | Document Produced by TVision as TVSN_NLSN_00269608 |
| 9. | Joanne Johnson Deposition Transcript Excerpts (January 24, 2024) |
| 10. | Daniel Schiffman Deposition Transcript Excerpts (September 8, 2023) |

## I.    Introduction

TVision's *Daubert* motion is not grounded in applicable law[1] and is based on disputed

facts. TVision seeks to exclude five areas of testimony that Nielsen's expert, Dr. Michael

Keeley, intends to offer regarding the damages that Nielsen has suffered from TVision's

infringement of U.S. Patent No. 7,783,889 ("the '889 Patent"). The Court should deny TVision's

motion for at least the reasons discussed below.

*First*, TVision seeks to exclude Dr. Keeley's testimony because, in his analysis of the

reasonable royalties that would have resulted from the hypothetical negotiation in this case, he

took into account the profits Nielsen would have had to forgo in granting a license to TVision.

TVision incorrectly contends that Dr. Keeley's opinions in this regard are improper because he

did not apply the factors required to prove lost profits outlined in *Panduit Corp. v. Stahlin Bros*

*Fibre Works, Inc.*, 575 F.2d 1152 (6th Cir. 1978). But the Federal Circuit has rejected exactly

that argument. The Federal Circuit has held that the *Panduit* factors are inapplicable to

reasonable royalty analysis, even where the expert considers the hypothetical licensor's foregone

profits.

*Second*, TVision seeks to exclude Dr. Keeley's Nash Bargaining analysis by incorrectly

claiming that Dr. Keeley did not tie the facts and circumstances of this case to Nash Bargaining.

Instead, TVision incorrectly argues that Dr. Keeley applied an "abstract" "rule of thumb" that

Nielsen would be entitled to 50% of TVision's projected profits. TVision's characterization of

---

[1] Although TVision copies, without attribution, the "Legal Standard" outlined in *Shure Inc. v. ClearOne, Inc.*, C.A. No. 19-1343-RGA-CJB, 2021 WL 7209740, at *1 (D. Del. Oct. 5, 2021), TVision omits a critical component of that standard. In *Shure Inc.*, the court also held: "The standard for fit, however, is 'not high; it is met when there is a clear fit connecting the issue in the case with the expert's opinion that will aid the jury in determining an issue in the case.'" *Id.* (quoting *Meadows v. Anchor Longwall & Rebuild, Inc.*, 306 F. App'x 781, 790 (3d Cir. 2009)). As explained herein, Dr. Keeley clearly connects the issues in the case with his opinions.

Dr. Keeley's analysis ignores the fact that Dr. Keeley addressed the underlying facts and economic circumstances in detail and concluded that they supported a Nash Bargaining solution.

*Third*, TVision incorrectly contends that Dr. Keeley's reasonable royalty analysis failed to apportion the value of the patented invention. But Dr. Keeley *did apportion* the value of '889 Patent. He determined that TVision's incremental benefit from the '889 Patent included *all* of its forecasted profits, as TVision lacked an acceptable non-infringing alternative and therefore would have made no sales without using the '889 Patent. Moreover, Dr. Keeley properly applied the doctrine of convoyed sales, which obviates any need for apportionment.

*Fourth*, TVision improperly seeks to exclude Dr. Keeley's reasonable royalty analysis simply because he observes that Nielsen would not have wanted to license its competitor, TVision. This fact, Dr. Keeley opines, would increase the amount Nielsen would have demanded in the hypothetical negotiation. But Dr. Keeley expressly states in his hypothetical negotiation analysis that, notwithstanding Nielsen's preference, he assumes that Nielsen would willingly participate in that negotiation.

*And fifth*, TVision seeks to preclude Dr. Keeley from relying on TVision's financial forecast as of the hypothetical negotiation date, contending that it is "unsubstantiated" and "unreliable." But all record evidence shows that to the contrary, TVision's forecast was substantiated and reliable. Indeed, TVision distributed this forecast to prospective investors. This imposed a legal obligation – which TVision presumably met – to ensure that the forecast was accurate and made in good faith. It is immaterial that, after the hypothetical negotiation concluded, TVision failed to perform as forecasted.

For all these reasons, and those outlined below, the Court should deny TVision's motion.

2

**II.    Dr. Keeley Properly Considered Nielsen's Foregone Profits In Connection With His Reasonable Royalty Analysis**

TVision seeks to exclude Dr. Keeley's reasonable royalty analysis for failing to consider the *Panduit* lost profits factors, but in doing so, it ignores the controlling law. Considering the *Panduit* factors is only required where the patentee seeks to recover its lost profits. Nielsen, however, does not seek lost profits, and Dr. Keeley offers only a reasonable royalty analysis. *See e.g.*, Ex. 1[2], Keeley Op. Rep. ¶¶14, 84, 85, 110; Ex. 2, Keeley Reply ¶¶61-63. Even TVision appears to acknowledge this. D.I. 191 at 4 ("Dr. Keeley [presents a] reasonable royalty analysis… .").

Although Nielsen is not seeking lost profits, Dr. Keeley's reasonable royalty analysis properly considered the profits Nielsen would have foregone in licensing the '889 patent to TVision in the hypothetical negotiation. Ex. 1, Keeley Op. Rep. ¶51-55, 58-59; Ex. 2, Keeley Reply ¶¶61-68. Specifically, Dr. Keeley determined that, because Nielsen and TVision are competitors, Nielsen would forgo substantial profits by licensing the '889 Patent to TVision and that this fact would cause Nielsen to demand a higher royalty that it otherwise would. Ex. 1, Keeley Op. Rep. ¶¶51-55; Ex. 2, Keeley Reply ¶¶51-56, 65. Dr. Keeley's consideration of Nielsen's lost or foregone profits is appropriate because, as the patent owner, Nielsen "would be 'unlikely' to be 'interested in' accepting a royalty rate lower than its profit margin on the patented products." *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362 (Fed. Cir. 2017). *See also FloodBreak, LLC v. Art Metal Indus., LLC*, No. 3:18-CV-503 (SRU), 2020 WL 6060974, at *16 (D. Conn. Oct. 13, 2020) (allowing damages expert who "weighed lost profits

---

[2] Exhibits herein refer to the exhibits to the Declaration of Douglas Lewis in Support of Nielsen's Opposition to TVision's Daubert Motion, filed concurrently herewith.

more heavily than other factors in her hypothetical negotiation" to testify at trial); Ex. 1, Keeley Op. Rep. ¶59.

TVision's argument that Dr. Keeley is required to consider the *Panduit* factors in connection with his reasonable royalty analysis is legally unsupported. Indeed, the Federal Circuit has rejected the argument TVision makes here, holding that the *Panduit* factors are inapplicable in a reasonable royalty analysis—even where, as here, the patent owner's lost profits inform the parties' relative bargaining positions. In *Asetek Danmark*, the defendant challenged a reasonable royalty award that was based, in part, on an expert's analysis of the plaintiff's foregone profits. 852 F.3d at 1362. The defendant argued, as TVision does here, that the expert's analysis circumvented *Panduit*'s overarching requirement—namely, that when a patentee seeks lost-profits, it must prove that "but for the infringement," it would have made the infringer's sales. *Id.* at 1362. The Court rejected the defendant's argument and held that satisfying the *Panduit* lost profits factors to show "but for" causation is "not applicable to reasonable-royalty damages." *Id.* at 1362-63.

Likewise, in *MiiCs & Partners, Inc. v. Funai Elec. Co.*, this court rejected a defendant's argument that an expert "did nothing to establish 'but for' causation by [] proving each of the *Panduit* factors … ." C.A. No. 14-804-RGA, 2017 WL 6268072, at *4 (D. Del. Dec. 7, 2017). Relying on *Asetek Danmark*, the court explained: "I do not agree with Defendants that [the expert] needed to establish 'but for' causation with respect to [the patentee's] lost profits. There is no dispute that [the expert] does not offer an opinion on lost profits damages. Rather, he conducted a reasonable royalty analysis." *Id.* at *4.

The law requires the same result here. Because Dr. Keeley does not opine on (and Nielsen does not seek) lost profits damages, and because Dr. Keeley only considers forgone

4

profits to understand the parties' relative bargaining positions, he is not required to analyze the *Panduit* factors. Each of the cases that TVision cites are inapposite because they deal with situations where, unlike here, the patent holder sought to recover lost profits.

TVision also complains about Dr. Keeley's disagreement with *TVision's* incorrect contention that it is "indisputable" that acceptable non-infringing alternatives were available to TVision. D.I. 191 at 8. In reality, Dr. Pierre Moulin (Nielsen's technical expert) opines that TVision had **no** available alternatives in May 2018, thereby disputing TVision's "indisputable" facts. Ex. 3, Moulin Op. ¶¶365-80; Ex. 4, Moulin Reply ¶¶100-142. And as explained in Nielsen's opening *Daubert* brief, TVision's experts have no facts to support their opinions that such alternatives existed. *See* D.I. 188 at 16-40. At most, TVision has pointed to a purported factual dispute regarding the availability of acceptable non-infringing alternatives. Courts do not exclude expert opinions for taking a particular view of disputed facts. *See, e.g.*, *Genuine Enabling Tech. LLC v. Sony Corp.*, C.A. No. 17-135-MSG, 2022 WL 17325656, at *18 (D. Del. Nov. 28, 2022) ("These factual disputes cannot be resolved on a motion to exclude testimony.").

## III.   Dr. Keeley Properly Applied The Nash Bargaining Solution

TVision's contention that Dr. Keeley did not tie his Nash Bargaining analysis to the facts and circumstances of this case (and instead simply applied "an abstract 50% rule of thumb") contradicts even a cursory reading of Dr. Keeley's report.[3] D.I. 191 at 10. Dr. Keeley analyzed

---

[3] The Nash Bargaining Solution solves a profit-sharing problem that exists when two parties negotiate an agreement to collaborate for their mutual benefit. Ex. 1, Keeley Op. Rep. ¶¶63-67. Dr. Nash proved that so long as certain criteria are met that place the parties in equal bargaining positions, the solution to the problem will result in a split of any profits 50/50 between the two parties. *Id*. ¶¶66-67. Dr. Nash and other economists have also shown that if the parties are in unequal bargaining positions, "the Nash Bargaining Solution assigns a larger share to the bargainer who has little to lose if the negotiation fails." *Id.* ¶70. In other words, a party in a stronger negotiating position will receive a share greater than 50% of the profits from the mutual collaboration. *Id.* ¶¶70-71.

the facts and circumstances of the case in detail and explains how they satisfied the underlying

prerequisites for Nash Bargaining. From his analysis, he properly concluded that there should be

an even split of the incremental benefits TVision expected to receive from practicing the '889

Patent.

Courts routinely permit use of the Nash Bargaining Solution to calculate damages in a

patent case when it fits the facts of the case. *See SUMMIT 6, LLC v. Samsung Elecs. Co., Ltd.*,

802 F.3d 1283, 1297-98 (Fed. Cir. 2015) ("[The expert] testified that because neither party had a

stronger negotiating position, the parties would have split the $0.56 evenly to derive a reasonable

royalty of $0.28 per device … [The expert] cited three academic articles and the Nash

Bargaining Solution to support his theory of an even split. … In this case, [the expert's] damages

methodology was based on reliable principles and was sufficiently tied to the facts of the case.").

Contrary to TVision's assertion, Dr. Keeley demonstrates in detail how the Nash

Bargaining Solution fits the facts of this case and results in a 50/50 split of the profits resulting

from TVision's use of Nielsen's patented technology.[4] To begin, Dr. Keeley describes three

criteria that, *if satisfied*, would result in equal profit sharing in a negotiation between Nielsen and

TVision:

> (1) "Nielsen and TVision are identical (in terms of how they value
> profits and their negotiating ability and negotiating position)";

---

[4] TVision incorrectly argues that "Dr. Keeley's application of the Nash Bargaining Solution in
this case is equivalent to an abstract 50% rule of thumb, which has been rejected by the Federal
Circuit and by this Court." D.I. 191 at 11. But Nash Bargaining has been rejected only when the
expert has not shown that the circumstances of the hypothetical negotiation satisfy the predicate
to using the Nash Bargaining Theory—which is clear even from the cases TVision cites. *See,
e.g., VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1332-33 (Fed. Cir. 2014). As explained above,
contrary to TVision's contentions, Dr. Keeley ties the circumstances of the hypothetical
negotiation to the underlying conditions for applying the Nash Bargaining Theorem.

(2) "███████████████████████████████████████

████████████████████"; and

(3) "Nielsen would not lose any business by licensing the patented technology"

Ex. 1, Keeley Op. Rep. ¶69. Dr. Keeley explains that if some or all of these criteria are **not** met, but instead favor one of the parties, "the Nash Bargaining Solution assigns a larger share to the bargainer who has little to lose if the negotiation fails, which, in this case, is Nielsen." *Id.* ¶70.

Dr. Keeley then shows that factor (2) above is satisfied and that factors (1) and (3) are not met but favor Nielsen. With regard to factor (2), Dr. Keeley relies on Dr. Moulin's opinion that TVision had no available, acceptable non-infringing alternatives and concludes that ████████████

████████████████████████████████████ without a license to the '889

patent. Ex. 1, Keeley Op. Rep. ¶71 ████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████; *see also id.* ¶¶16, 49, 57, 103;

Ex. 2, Keeley Reply ¶¶4, 18-21, 23.

Dr. Keeley then addresses factors (1) and (3), and concludes that neither is met and both favor Nielsen. As to factor (1), Dr. Keeley concludes that the two companies are not equal in their negotiating positions or how they view profits: "Nielsen is a large, well-established firm, and TVision is a startup." Ex. 1, Keeley Op. Rep. ¶70. And as to factor (3), "Nielsen has already lost profits, and … is likely to lose more profits due to TVision providing its panel data (obtained through infringing the '889 Patent) to ████████████████████████████████ who sell products (i.e., big data calibrated by panel data) that directly compete with Nielsen*." Id.* ¶¶ 51, 71, ¶31 ("TVision competes with Nielsen with regard to panels"), ¶49 ("According to TVision documents, TVision competes with Nielsen by providing measurement data across linear TV and

7

CTV ('connected TV,' i.e., TV connected to the internet) through its Total View data dashboard product.").

As Dr. Keeley explains, when any of the three criteria supporting a 50/50 incremental profit split are not met, but instead favor one of the parties, the "Nash Bargaining Solution assigns a higher share" of the benefit to the party in the stronger position—*i.e.*, Nielsen. Ex. 1, Keeley Op. Rep. ¶71. Given that factors (1) and (3) favor Nielsen, Dr. Keeley concludes that the Nash Bargaining Solution would assign no less than "a 50/50 split of the net present value of TVision's expected incremental profits" to Nielsen. *Id.* ¶72. Because the Nash Bargaining Solution holds that this 50/50 split is the lower bound of a fair distribution of profits and the facts here favor Nielsen receiving a larger share of the profits, the selection of that split is well-supported by Dr. Keeley's analysis and indeed beneficial to TVision.

TVision also improperly seeks to exclude Dr. Keeley's Nash Bargaining analysis based on disputed facts. For example, TVision argues that "Dr. Keeley cites no evidence to support his assumption that TVision 'would be out of business' without a license to the '889 patent, and there is none." But this ignores the substantial evidence showing just that. TVision's CEO, Yan Liu, testified that ██████████████████████████████████████ Ex. 5, Liu Dep, 183:20-184:2; Ex. 1, Keeley Op. Rep. ¶¶32, 38, 49, 100, 102, 107. Dr. Keeley also properly relies on the opinion of Dr. Moulin that no alternative ACR systems were available to TVision, notwithstanding TVision's claims to the contrary. *See* Ex. 1, Keeley Op. Rep. ¶¶16, 49, 57, 103; Ex. 2, Keeley Reply ¶¶4, 18-21, 23.[5] Dr. Keeley explains that, based on his discussions with Dr.

---

[5] Importantly, TVision confuses existing ACR systems with available ACR systems. For example, the fact that "Nielsen, itself, performs ACR without practicing the claimed invention" (D.I. 191 at 10) does not prove that an alternative was available to TVision. To the contrary, Nielsen would not have allowed TVision to use its system.

Moulin, he understands that "the record does not show that there were acceptable non-infringing alternatives to the patented ACR technology in suit available to TVision." Ex. 1, Keeley Op. Rep. ¶16; *see also id.* ¶¶49, 57, 103; Ex. 2, Keeley Reply ¶¶4, 18-21, 23. Dr. Keeley provides additional detail as to why TVision would have no business without the infringing technology— specifically, because of the critical "importance of ACR technology to [TVision's] business." Ex. 1, Keeley Op. Rep. ¶49. And, as Dr. Keeley notes, TVision's own documents contain admissions that, without such technology, TVision would have "no measurement business." *Id.* (quoting TVSN_NLSN_00042850–853 at 850).

TVision identifies a litany of other issues that it contends Dr. Keeley "does not take into account in his Nash Bargaining analysis," including that TVision considers the parties to have slightly different businesses (in the same space) and that ███████████████████████ ███████████████████ D.I. 191 at 10, 11. But TVision does not explain how any of these issues are material to Dr. Keeley's analysis[6] or do not simply present fact disputes. Put differently, TVision does not show that Dr. Keeley failed to identify or analyze facts sufficient to support his Nash Bargaining analysis, even if TVision disputes certain facts or believes that other facts are relevant as well.

For these reasons, the Court should deny TVision's motion to exclude Dr. Keeley's opinions relating to Nash Bargaining.

---

[6] For example, TVision never explains how historical licenses for ██████ metadata relate to Dr. Keeley's Nash Bargaining analysis. Nor can it, given that licensing "metadata" such as program names and times does not involve using an ACR system—and differs from licensing a patent, in any event.

**IV.    Dr. Keeley Both Apportioned Damages And Utilized Doctrines That Do Not Require Apportionment**

TVision improperly seeks to preclude Dr. Keeley's reasonable royalty analysis on the grounds that he supposedly failed to apportion the value of the patent-in-suit. D.I. 191 at 12-15. TVision contends that Dr. Keeley's alleged failure in this regard caused him to inappropriately subject all (and not just a portion) of TVision's projected profits to a 50/50 split between the parties. TVision's arguments lack merit for at least three reasons:

***First***, Dr. Keeley did, in fact, apportion the value of the '889 Patent. Because the evidence shows that TVision would not have been able to offer ***any*** product that its customers would be willing to buy without a license to the '889 Patent, Dr. Keeley establishes that a 100% apportionment is appropriate. That is, because TVision would have zero sales absent its use of the '889 Patent, ***all*** of TVision's expected profit should be credited to the '889 Patent and the parties would have agreed to split ***all*** of TVision's projected profits.

***Second***, Dr. Keeley uses an additional approach to show that all of TVision's expected profits are in play—namely, a *Georgia-Pacific* analysis. The Federal Circuit has held that a reasonable royalty analysis under the *Georgia Pacific* factors constitutes an apportionment analysis in and of itself.

***And third***, in conjunction with *Georgia-Pacific* Factor No. 6, Dr. Keeley shows through yet another approach—the convoyed sales doctrine—that all of TVision's projected profits (and not just some portion) should be subject to a split between the parties. The convoyed sales approach does not require a separate apportionment analysis.

**A.    Dr. Keeley Properly Apportioned in His Damages Analysis**

Contrary to TVision's assertion, Dr. Keeley properly apportioned in his analysis. He opined that "absent practicing the patent-in-suit TVision would have made no sales because it

did not have available an acceptable, non-infringing alternative. ***Thus, all of TVision's expected profit should be credited to the invention***." Ex. 2, Keeley Reply ¶44. In other words, Dr. Keeley opined that a 100% apportionment to the claimed invention is appropriate and that, accordingly, the profits subject to a split between the parties are **all** of TVision's projected profits.

Dr. Keeley's opinion is based on ████████████████████████████████████ ████████████████████████████████████ Ex. 5, Liu Dep, 184:1-2 █████████████ ████████████████████████████; Ex. 2, Keeley Op. Rep. ¶¶32, 38, 49, 100, 102, 107. In other words, TVision's customers buy its products because of the underlying ACR data. Ex. 5, Liu Dep, 62:1-8, 62:19-63:1; Ex. 1, Keeley Op. Rep. ¶¶49, 100, 104; Ex. 2, Keeley Reply ¶¶10, 39. Moreover, Dr. Keeley relies on Dr. Moulin's opinion that there were no acceptable non-infringing alternatives available at the time of the hypothetical negotiation. Ex. 1, Keeley Op. Rep. ¶¶16, 49, 57, 103; Ex. 2, Keeley Reply ¶¶4, 18-21, 23. TVision could not provide ACR data without a license to the '889 Patent, and thus, TVision would have no product that customers would be willing to buy. Ex. 1, Keeley Op. Rep. ¶¶32, 38, 49, 100, 102, 107; Ex. 2, Keeley Reply ¶¶10, 39.

Other features of TVision's system (*i.e.,* those not covered by the '889 patent) do not affect Dr. Keeley's analysis because they would offer no value if TVision could not create sellable products – which requires using the infringing ACR technology. For example, while TVision touts its attention metrics, it could not produce or sell that product if it did not use the patented ACR technology. *See* Ex. 1, Keeley Op. Rep. ¶49. Thus, Dr. Keeley's 100% apportionment is appropriate. *See AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338-40 (Fed. Cir. 2015) ("the district court did not clearly err in concluding that the [patented] subcoating is so important to the viability of the commercial omeprazole product that it was

11

substantially responsible for the value of the product"); *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, C.A. No. 15-152-RGA, 2018 WL 4691047, at *7 (D. Del. Sep. 28, 2018) ("The Federal Circuit does not limit apportionment to specific methodologies, because flexibility is required to determine fact-dependent damages.").

TVision cannot prevail on a *Daubert* motion simply because it disagrees with Dr. Keeley's view of the facts. Dr. Keeley's well-supported view is that there were no alternatives available to TVision at the time of the hypothetical negotiation and that TVision could not offer any sellable product without a license to the '889 patent. This leads to his conclusion that 100% apportionment is appropriate. In contrast, TVision's (unsupported) view is that such alternatives were available and that the only value of the '889 patent is the decrease in computational complexity it provides. Such a factual dispute should be decided by the jury and not resolved through a *Daubert* motion.

### B.     Dr. Keeley Also Apportioned Through His Consideration of The *Georgia Pacific* Factors

Dr. Keeley also apportioned damages to the incremental value of the invention—*i.e.,* he showed that ***all*** of TVision's projected profits should be subject to a split between the parties— through his analysis of the *Georgia Pacific* factors. In *Shire Viropharma Incorporated v. CSL Behring LLC*, C.A. No. 17-414-MSG, 2021 WL 1227097 (D. Del. Mar. 31, 2021), this District held that an expert's application of the *Georgia Pacific* factors can satisfy any apportionment requirement:

> Several of the *Georgia-Pacific* factors address apportionment, including (a) the utility and advantages of the patent property over the old modes or devices, if any, that had been working out similar results (factor no. 9); (b) the nature of the patented invention, the character of the commercial embodiment of it as owned and produced by the licensor, and the benefits to those who have used the invention (factor no. 10); and (c) the portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the

manufacturing process, business risks, or significant features or improvements added by the infringer (factor no. 13).

*Id.* at *27 (quoting *Microchip Tech. Inc. v. Aptiv Servs. US LLC*, C.A. No. 17-1194, 2020 WL 5203600, at *5 (D. Del. Sept. 1, 2020)); *see also Bd. of Regents UT Sys. v. Boston Sci. Corp.*, 645 F. Supp. 3d 324, 330 (D. Del. 2022) ("An expert may apportion revenue attributable to patented and unpatented features of an accused product through a proper analysis of the *Georgia-Pacific* factors.") (quotation omitted).

The Federal Circuit has also held that "apportionment can be done … through a thorough and reliable analysis [of the *Georgia Pacific* factors] to apportion the royalty rate." *Exmark Mfg. Co. v. Briggs & Stratton Power Prods.*, 879 F.3d 1332, 1348 (Fed. Cir. 2018). In fact, "the standard *Georgia-Pacific* reasonable royalty analysis takes account of the importance of the inventive contribution in determining the royalty rate that would have emerged from the hypothetical negotiation." *Exmark Mfg.*, 879 F.3d at 1349 (quotation omitted).

Dr. Keeley evaluated each of the *Georgia Pacific* factors and used them to calculate his proposed royalty. Relevant here, with regard to Factor No. 9,[7] Dr. Keeley explained:

> I understand … that the record does not show that there were acceptable non-infringing alternatives available to TVision. I have accounted for this in my royalty calculation by determining that the benefit to TVision of obtaining a license to the patent-in-suit is TVision's net present value of its expected incremental profits until the '889 Patent expires. ███████████████
> ███████████████
> ███████████ to practice the patent-in-suit, making a 50/50 split of the expected incremental profits favorable to TVision.

Ex. 1, Keeley Op. Rep. ¶103. Similarly, for Factor No. 10,[8] Dr. Keeley explained:

---

[7] Factor No. 9 is "The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results."

[8] Factor No. 10 is "The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention."

13

[T]he patented invention would allow TVision to use ACR technology from ███████ which is crucial to TVision's business as ACR is a necessary and integral part of its product and service offerings. ████████████

████████████████████████████████████████

This is a key factor in Nash Bargaining over the amount of a reasonable royalty. However, as discussed above, since Nielsen would lose profits as a result of granting a license to TVision, Nielsen would demand a royalty as high as possible to compensate for its loss, assuming that Nielsen was forced to grant a license and accept a royalty that TVision would and could pay.

Ex. 1, Keeley Op. Rep. ¶104. And, for Factor No. 13,[9] Dr. Keeley opined:

All of TVision profits from the time of first infringement to patent expiration result from practicing the '889 Patent because ████████████████

████████████████████████████████████████

Ex. 1, Keeley Op. Rep. ¶107. These excerpts clearly demonstrate that Dr. Keeley

addressed apportionment in his consideration of the *Georgia Pacific* factors.

## C.    Dr. Keeley Properly Considered Convoyed Sales

Finally, Dr. Keeley independently showed that all of TVision's expected profits should

be subject to a 50/50 split between the parties through his application of the convoyed sales

doctrine. This doctrine allows damages from both "patented and non-patented products if they

are functionally inseparable." *Daedalus Blue, LLC v. Microstrategy Inc.*, No. 2:20-CV-551, 2023

WL 5598456, at *5 (E.D. Va. Aug. 29, 2023). *See also Union Carbide Chem. & Plastics Tech.*

*Corp. v. Shell Oil Co.*, 425 F.3d 1366, 1378 (Fed. Cir. 2005) ("In this technology, increased

[infringing] EO production directly increases MEG production. With this linkage, this court

---

[9] Factor No. 13 is "The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer."

14

perceives no error in permitting the jury to factor evidence of bundling and convoyed sales into a determination of the scope of the royalty base."), *overruled on other grounds*, *Cardiac Pacemakers, Inc. v. St. Jude Med., Inc.*, 576 F.3d 1348, 1365 (Fed. Cir. 2009).

TVision products incorporate both data resulting from the infringing ACR process (*e.g.*, the identity of a television program) and other data (*e.g.*, attention metrics). Ex. 1, Keeley Op. ¶¶32, 35; Ex. 2, Keeley Reply ¶¶39, 42. The infringing process uses ███████ software to generate and to match signatures to identify programming. *See* Ex. 1, Keeley Op. ¶¶32, 34-35, 49; Ex. 2, Keeley Reply ¶¶39, 42; Ex. 6, Johnson Rep. ¶¶75-77. TVision monetizes this infringing process by combining the program identification data resulting from this infringing process with other data (not created using the patented process) to create the products that it sells. *See* Ex. 1, Keeley Op. ¶¶35, 49; Ex. 6, Johnson Rep. ¶¶75-79, 81-82. TVision's products are an integrated combination of data resulting from the infringing process (*i.e.*, program identification data) with other data (*e.g.*, attention metrics) sold as a "functionally inseparable" whole. *See Daedalus Blue*, 2023 WL 5598456, at *5; Ex. 1, Keeley Op. ¶¶35, 49-50, 100, 102; Ex. 2, Keeley Reply ¶¶39, 42; Ex. 5, Liu Dep. at 184:1-2; Ex. 6, Johnson Rep. ¶¶75-79, 81-82. Thus, all TVision's profits are associated with TVision's infringement and arise from the convoyed sales of data resulting from its use of the infringing technology to identify the media being consumed combined with other data in a single product. *See* Ex. 1, Keeley Op. ¶¶35, 49-50, 100, 102; Ex. 2, Keeley Reply ¶¶39, 42; Ex. 5, Liu Dep. at 184:1-2; Ex. 6, Johnson Rep. ¶¶75-79, 81-82.

Courts have uniformly held that an expert can consider convoyed sales of non-infringing products that result from the infringement. *See, e.g.*, *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568-69 (Fed. Cir. 1984); *Interactive Pictures v. Infinite Pictures*, 274

F.3d 1371, 1385 (Fed. Cir. 2001) ("The 'extent of ... derivative or convoyed sales' is one of the often-cited *Georgia-Pacific* factors relevant to a determination of a reasonable royalty rate."). In *Trans-World*, for example, the defendant used the patented invention—a point-of-purchase display rack—to promote the sale of non-patented eyeglasses. 750 F.2d 1552, 1568 (Fed. Cir. 1984). The court held that the "extent of the profits from [the eyeglass] sales could be relevant in determining the amount of a reasonable royalty." *Id.* The court further explained: "If … sales were increased because of the infringing displays, that fact could affect the amount of royalties a potential licensee would be willing to pay." *Id.*

Here, Dr. Keeley properly showed that TVision's anticipated profits at the time of the hypothetical negotiation resulted from sales of products incorporating the data generated from the infringing technology combined with other data. In particular, through his analysis of *Georgia Pacific* Factor No. 6, Dr. Keeley explained:

> [The infringing] ACR technology makes it possible to measure what audiences are watching and listening to regarding content as well as advertisements. ██ ████████████████████████████ ████████████████████████████████ This factor has been incorporated into the calculation of TVision's incremental benefits from practicing the patent-in-suit. This also factors into Nash Bargaining because the surplus to be split (putting aside Nielsen's lost profits) would be the present value of TVision's expected incremental profits (at the time of the hypothetical negotiation) from its business, which would not exist if it did not practice the patent-in-suit.

Ex. 1, Keeley Op. Rep. ¶100; *see also* Ex. 2, Keeley Reply Rep. ¶39 ("As explained in my Initial Report, nearly all of TVision's business requires determining what panelists are watching. Ms. Johnson seems to be unaware of this fact and states she is not aware of any convoyed sales. This

---

[10] Dr. Keeley explained that nearly all of TVision's product use the infringing technology. Ex. 1, Keeley Op. ¶49.

factor is one of the key factors in assessing the value of a license to the '889 Patent to TVision.").

Analyzing convoyed sales does not require—and is an alternative to—apportionment. *Daedalus Blue*, 2023 WL 5598456, at *5 ("[T]he convoyed sales analysis does not require a showing that the accused features of the patented product drives demand for the unpatented product sold alongside."). Accepting Dr. Keeley's analysis, the jury could reasonably conclude that TVision's data sales "would not have occurred without the infringing features, rendering ***all*** the value of the [] sales attributable to [Nielsen's] patent rights." *Roche Diagnostics v. Meso Scale Diagnostics*, 503 F. Supp. 3d 156, 176 (D. Del. 2020) (emphasis added). Dr. Keeley "did nothing more or less than take into account the impact of anticipated collateral sales of an admittedly noninfringing product line on the respective bargaining positions of the parties engaged in the theorized licensing negotiations." *Deere & Co. v. Int'l Harvester Co.*, 710 F.2d 1551, 1559 (Fed. Cir. 1983) (citations omitted). Thus, Dr. Keeley's analysis meets the requirements to demonstrate damages from convoyed sales.

## V. Dr. Keeley Properly Considered Nielsen's Willingness to License in The Hypothetical Negotiation

TVision seeks to exclude Dr. Keeley's testimony simply because he observed that, absent a hypothetical negotiation, Nielsen would not have wanted to license the '889 patent to TVision. D.I. 191 at 15. TVision argues that Dr. Keeley's observation renders his entire opinion regarding the hypothetical negotiation inadmissible because, according to TVision, "a proper [reasonable] royalty analysis requires than an expert assume a willing licensor and a willing licensee." D.I. 191 at 15. TVision's argument is completely meritless because it ignores that Dr. Keeley expressly assumes that Nielsen was willing to grant a license to TVision, notwithstanding Nielsen's preference not to do so.

17

Dr. Keeley's observation that Nielsen would not have wanted to license the '889 patent to TVision is made in the context of *Georgia Pacific* Factor No. 4, which instructs Dr. Keeley to consider "[t]he licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special circumstances designed to preserve that monopoly." In his analysis of that factor, Dr. Keeley opines:

> This illustrates the very different bargaining situations of Nielsen and TVision. As mentioned above, Nielsen did not want to grant a license to a competitor or a firm that helped others compete with Nielsen because doing so would cause Nielsen to lose profits exceeding any royalty it could hope to receive. In contrast, TVision needed a license to stay in business. According to bargaining theory, given these facts, if Nielsen were forced to (hypothetically) grant a license to TVision to which TVision would agree, Nielsen would agree to more than half of TVision's expected incremental profits from practicing the patent-in-suit (the highest possible royalty to which TVision would agree but a royalty that would still leave Nielsen the least worse off compared to not granting a license because it was required under the hypothetical negotiation to grant such a license).

Ex. 1, Keeley Op. Rep. ¶92.

Taking these observations out of context, TVision ignores Dr. Keeley's unequivocal statement that "for the purposes of reasonable royalty damages and the hypothetical negotiation construct, *I must assume that Nielsen would have been a willing licensor and granted a license to the patent-in-suit to TVision at a royalty TVision would accept*." Ex. 1, Keeley Op. Rep. ¶18 (emphasis added); *see also* ¶60 (reiterating that he "understand[s] patent law requires the assumption that the patent owner would hypothetically license the infringer for the purposes of determining damages. … I discuss the likely result of a negotiation under this framework."); *Panduit,* 575 F.2d at 1159 ("[T]he 'reasonable royalty' device conjures a 'willing' licensor and licensee, who like Ghosts of Christmas Past, are dimly seen as 'negotiating' a 'license.' *There is, of course, no actual willingness on either side*, and no license to do anything ....") (emphasis added).

18

It is clear that Dr. Keeley adopted the hypothetical negotiation's predicate of willing parties. In arguing otherwise, TVision relies on selective (and misleading) citations to Dr. Keeley's report and ignores Dr. Keeley's assumption, for purposes of his analysis, that Nielsen would have willingly licensed the '889 Patent and his explanation of why Nielsen's real world motivations would lead to a higher royalty in that negotiation.

**VI.    TVision's ██████████████████ is Not "Unsubstantiated" or "Unreliable"**

TVision seeks to preclude Dr. Keeley from offering any testimony that considers a financial forecast TVision generated in ████████ on the ground that the forecast is supposedly "unsubstantiated" and "unreliable." D.I. 191 at 16; Ex. 8, TVSN_NLSN_00269608 ("the April 2018 forecast"). TVision lacks any legally cognizable basis for this claim. The April 2018 forecast reflects TVision's own good faith expectation at the time of the May 2018 hypothetical negotiation as to its future financial performance.

TVision provided the ████████████████████████████



████████████████████████ For example, in May 2018, TVision CEO Yan Liu sent the ████████████████████████ stating, "███████████ ████████████" and "████████████████████████." Ex. 7, TVSN_NLSN_00269606; Ex. 9, Johnson Dep. 37:2-7, 40:1-41:4. If TVision and Mr. Liu believed that the April 2018 forecast was "unsubstantiated" and "unreliable," they would have been required to disclose that belief to this potential investor. *See, e.g.*, 17 CFR §240.10b-5 ("It shall be unlawful for any person …, by the use of the any means or instrumentality of interstate commerce … [t]o make any untrue statement of material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading … in connection with the purchase or sale of any security"); Delaware Code § 73-605(a)(2); *see also Eisenberg v. Gagnon,* 766 F.2d 770, 776 (3d Cir. 1985)

("there is an obligation to disclose data indicating that the opinion or forecast may be doubtful."). Yet neither TVision nor Mr. Liu warned this investor that the forecast was "unsubstantiated" and "unreliable." Thus, evidence strongly supports that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ was a ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.

The ▮▮▮▮▮▮▮▮▮▮ reliability is also substantiated by TVision's former Chief Revenue Officer, Daniel Schiffman, who was responsible for producing sales forecasts. Mr. Schiffman testified that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮" to April 2018. Ex. 10, Schiffman Dep. 21:4-6.

And despite TVision's present contention that its forecasts were "historically unreliable," there is no evidence that TVision would have known that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮. The fact that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ "is irrelevant" to TVision's "state of mind at the time of the hypothetical negotiation." *Interactive Pictures* 274 F.3d at 1384. As the Federal Circuit has held, hypothetical negotiations "'necessarily involve[] an element of approximation and uncertainty.'" *Interactive Pictures*, 274 F.3d at 1385 (quoting *Unisplay, S.A. v. Am. Elec. Sign Co.,* 69 F.3d 512, 517 (Fed. Cir. 1995)).

TVision further contends that Dr. Keeley "ignores TVision's actual balance sheet for the period immediately preceding the hypothetical negotiation;" that the royalty Dr. Keeley calculates "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮;" and that ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ D.I. 191 at 16. Those statements have nothing to do with whether Dr. Keeley's opinions are reliable. They simply identify facts about TVision's financials before the April 2018 forecast that TVision would like the jury to consider. The jury should also consider, as Dr. Keeley opines, that a future-looking

20

forecast more accurately reflects what the parties would consider in a future-looking negotiation than TVision's older financials. And the jury should also consider the fact that TVision itself created the ███████████████ and used that forecast in its business, including to ████ ████████

Certainly, Dr. Keeley's reliance on a ████████████████████████████████████ ████████—and that TVision's own officers believed it would achieve—is not grounds to exclude Dr. Keeley's testimony. *See Interactive Pictures*, 274 F.3d at 1384-85. At most, TVision's motion identifies facts that it *now* disputes, having found itself in litigation over its anticipated profits, notwithstanding that TVision touted this forecast as reasonable and reliable at the time of the hypothetical negotiation. The Court should deny TVision's motion.

## VII.   Conclusion

TVision's motion relies on the wrong law and on disputed facts. For the reasons described above, the Court should deny its motion.

21

OF COUNSEL:

Steven Yovits
Douglas Lewis
Constantine Koutsoubas
Jason P. Greenhut
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
Tel:  (312) 857-7070

Clifford Katz
Jolie Schenerman
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  (212) 808-7800

Dated:  April 9, 2024
11438078 / 14944.00004
Public Version Dated: April 16, 2024

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

By:  */s/ David E. Moore*
     David E. Moore (#3983)
     Bindu A. Palapura (#5370)
     Andrew L. Brown (#6766)
     Hercules Plaza, 6th Floor
     1313 N. Market Street
     Wilmington, DE  19801
     Tel:  (302) 984-6000
     dmoore@potteranderson.com
     bpalapura@potteranderson.com
     abrown@potteranderson.com

*Attorneys for Plaintiff The Nielsen Company (US), LLC*

22