IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

THE NIELSEN COMPANY (US), LLC,    )
                                  )
            Plaintiff,            )      **Redacted – Public Version**
                                  )
      v.                          )   C.A. No. 22-057-CJB
                                  )
                                  )   ████████████████████████
TVISION INSIGHTS, INC.,           )   ████████████████████████
                                  )   ████████████████████████
            Defendant.            )

## TVISION INSIGHTS, INC.'S ANSWERING BRIEF IN OPPOSITION TO THE NEILSEN COMPANY (US), LLC'S DAUBERT AND SUMMARY JUDGMENT MOTIONS

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
P.O. Box B113
150 Fayetteville St, Suite 2800
Raleigh, NC 27601-2960
(984) 960-2860

Michael F. Heafey
RIMÔN LAW P.C.
800 Oak Grove Avenue, Suite 250
Menlo Park, CA 94025
(650) 461-4433

Dated: April 9, 2024

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

## TABLE OF CONTENTS

I.     INTRODUCTION ...................................................................................................1

II.    Nature and Stage of the Proceedings ...................................................................1

    A.    Nielsen Has Changed Its Position By Dropping Its Damages Claim For Lost Profits ...................................................................................................................1

    B.    Relevant Factual Background ..........................................................................1

        1.    Nielsen's Business ...................................................................................1

        2.    The '889 Patent-in-Suit ...........................................................................2

        3.    TVision's Business ..................................................................................2

        4.    Events Leading Up To This Lawsuit ......................................................3

III.   Summary of Argument ........................................................................................4

IV.    Nielsen's Daubert Motions Should be denied ....................................................6

    A.    Ms. Johnson's Opinion Regarding Nielsen's Lost Profits Should not be Excluded ..6

    B.    Ms. Johnson Fully Supports Her Opinion that the TVision's April 2018 Forecast is Speculative and Unsubstantiated ..........................................................12

    C.    Ms. Johnson's Opinion About A Device-Based Running Royalty Is Fully Supported ...................................................................................................................20

    D.    Ms. Johnson Properly Relied on the Gracenote Agreement ...................................24

    E.    Federal Circuit and Supreme Court Case Law Permits Ms. Johnson To Provide Opinions Based In Part On Post-Hypothetical Negotiation Information ................28

    F.    TVision's Experts Are Entitled To Offer Opinions Relating to Alternatives to the Alleged Infringing System ........................................................................31

        1.    TVision does not Bear a Burden To Establish That An Alternative Is Non-Infringing ...................................................................................................31

        2.    There is Ample Basis for Ms. Johnson's Opinion Regarding an Internally Developed ACRCloud Alternative ........................................................33

        3.    There is no basis to Preclude Opinions about Third-Party Alternatives ..............35

        4.    Ms. Johnson Does Not Opine That a Reasonable Royalty Is Limited to The Cost of An Alternative ................................................................................38

    G.    There Is No Basis For Excluding Dr. Anderson's Opinion Regarding Haitsma US ...................................................................................................................39

i

V.      This Court should deny Nielsen's Motion for partial summary judgment ..................42

VI.     Conclusion ...........................................................................................................45

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ActiveVideo Networks, Inc. v. Verizon Comm'n, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012)...................................................................................26

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014), overruled on other grounds by *Williamson
v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc) ....................................38

*Aqua Shield v. Inter Pool Cover Team*,
774 F.3d 766 (Fed. Cir. 2014)...................................................................................10

*Asetek Danmark A/S v. CMI USA Inc.*,
852 F.3d 1352 (Fed. Cir. 2017)...................................................................................10

*AstraZeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015)..............................................................................10, 33

*Brumfield, Tr. for Ascent Tr. v. IBG LLC*,
___ F.4th___, No. 2022-1630, 2024 WL 1292151 (Fed. Cir. Mar. 27,
2024) ........................................................................................................................10

*Cave Consulting Group, Inc. v. Truven Health Analytics Inc.*,
2017 WL 4772348 (N.D. Cal. Oct. 23, 2017)...............................................................26

*Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*,
809 F.3d 1295 (Fed. Cir. 2015)..............................................................................7, 11

*DataQuill Ltd. v. High Tech Computer Corp.*,
2012 Wl 1284381 (S.D. Cal. April 16, 2012)...............................................................28

*Davis v. Pinterest, Inc.*,
601 F.Supp.3d 514 (N.D. Cal. 2022) ..........................................................................14

*Ecolab USA v. Diversey, Inc.*,
2015 WL 2345264 (D. Minn., May 14, 2015)...............................................................15

*EMC Corp. v. Pure Storage, Inc.*,
C.A. No. 13-1985, 2016 WL 775742 (D. Del. Feb. 25, 2016) ..................................41, 42

*Ericsson, Inc. v. D–Link Sys., Inc.*,
773 F.3d 1201 (Fed.Cir.2014)..........................................................................11, 21, 26

*Fate Therapeutics, Inc. et al v. Shoreline Biosciences, Inc.*,
No. 22-cv-000676-H-MSB (S.D. Cal. Jul. 14, 2023) ....................................................19

*Finjan, Inc. v. Blue Coat Systems, Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018)........................................................................................11

*Garretson v. Clark*,
    111 U.S. 120, 4 S.Ct. 291, 28 L.Ed. 371 (1884)...............................................................11

*Gaylord v. U.S.*,
    777 F.3d 1363 (Fed. Cir. 2015)........................................................................................21

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
    318 F. Supp. 1116 (S.D.N.Y. 1970).............................................................................*passim*

*Goldby v. Hologic, Inc.*,
    817 F. Supp. 204 (D. Mass. 1993) ...................................................................................14

*Harris Corp. v. Ericsson Inc.*,
    417 F.3d 1241 (Fed. Cir. 2005)........................................................................................29

*Honeywell Intern., Inc. v. Hamilton Sunstrand Corp.*,
    378 F. Supp.2d 459 (D. Del. 2005)..............................................................................15, 29

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001).....................................................................................15, 29

*Intuitive Surgical, Inc. v. Aurius Health, Inc.*,
    549 F. Supp. 3d 362 (D. Del. 2021).............................................................................41, 42

*LifeScan Scotland, Ltd. v. Shasta Tech., LLC*,
    734 F.3d 1361 (Fed. Cir. 2013)........................................................................................25

*Lucent Tech., Inc. v. Gateway, Inc.*,
    580 F.3d 1301 (Fed. Cir. 2009)...........................................................................21, 22, 26, 29

*Mars, Inc. v. Coin Acceptors, Inc.*,
    527 F.3d 1359 ..................................................................................................................38

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
    851 F.3d 1275 (Fed. Cir. 2017).....................................................................................4, 8

*Novartis Corp. v. Ben Venue Labs.*,
    271 F.3d 1043 (Fed. Cir. 2001)........................................................................................33

*Omega Patents, LLC v. CalAmp Corp.*,
    13 F.4th 1361 (Fed. Cir. 2021) ........................................................................................11

*Optima Tobacco Corp. v. Flue-Cured Tobacco Growers, Inc.*,
    2019 WL 4858848 (E.D.N.C., Sept. 30, 2019)................................................................15

*Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*,
    904 F.3d 965 (Fed. Cir. 2018)..........................................................................................11

iv

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
    553 U.S. 617 (2008) ................................................................................................25

*ResQNet.com, Inc. v. Lansa*,
    594 F.3d 860 (Fed. Cir. 2010) ...........................................................................25, 26

*Rite-Hite Corp. v. Kelley Co., Inc.*,
    56 F.3d 1358 (Fed. Cir. 1995) (en banc) ...............................................................10

*Robertson Transformer Co. v. General Electric Co.*,
    2016 WL 4417019 (N.D.Ill. Aug. 19, 2016) .........................................................34

*RSB Spine, LLC v. DePuy Synthes Sales, Inc.*,
    2022 WL 17084156 (D. Del. Nov. 18, 2022) ....................................................31, 32

*SRI Int'l Inc. v. Internet Sec. Sys., Inc.*,
    2011 WL 5166436 (D. Del. Oct. 31, 2011) ...........................................................33

*StoneEagle Services, Inc. v. Pay-Plus Solutions, Inc.*,
    2015 WL 3824170 (M.D. Fla. June 19, 2015) .......................................................28

*VirnetX, Inc. v. Cisco Sys., Inc.*,
    767 F.3d 1308 (Fed.Cir.2014) ................................................................................7

*VLSI Tech. LLC v. Intel Corp.*,
    87 F.4th 1332 (Fed. Cir. 2023) ..............................................................................10

*WhereverTV, Inc. v. Comcast Cable Commc'ns, LLC*,
    2022 WL 2751752 (M.D. Fla. Jul. 14, 2022) ..............................................32, 33, 34

*Wirtgen America, Inc. v. Caterpillar, Inc.*,
    ___ F. Supp. 3d ___, 2024 WL 456739 (D. Del. Feb. 5, 2024) ...........................7, 8

*Wirtgen America, Inc. v. Caterpillar, Inc.*
    2024 WL 431234 (D. Del. Feb. 9, 2024) ................................................................8

**Statutes**

35 U.S.C. § 102(a) .............................................................................................................44

35 U.S.C. § 102(e) .............................................................................................................44

35 U.S.C. § 284 ...................................................................................................................7

**Other Authorities**

8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcus., Federal
    Practice and Procedure §2285 (3d. ed. 2010) ......................................................14

Fed. R. Evid. 602 ...............................................................................................................14

Fed. R. Evid. 702 ...............................................................................................................16

## I.  INTRODUCTION

For the reasons set forth in detail below, this Court should deny Nielsen's Daubert motion and summary judgment motion.

## II.  NATURE AND STAGE OF THE PROCEEDINGS

### A.  Nielsen Has Changed Its Position By Dropping Its Damages Claim For Lost Profits

Nielsen asserted in its August 23, 2023 initial disclosures (Ex. 1 at 6), and in its supplemental responses to TVision's interrogatories (Ex. 2 at 7) that it sought damages based on its lost profits.  Dr. Keeley admitted in his report, however, that he could not quantify Nielsen's aggregate lost profits. Ex. 3 at 25 ¶ 55. It was unclear from Dr. Keeley's report whether Nielsen sought to prove lost profits at trial.  Nielsen now asserts, for the first time, that it seeks only damages based on a reasonable royalty and that it does not seek lost profits damages.  D.I. 191,  Nielsen Br. at 4.

As is discussed below, without attempting to attribute Nielsen's so-called lost profits to the alleged infringement of the '889 patent, Dr. Keeley repeatedly opines to Nielsen's "lost profits" within his analysis of a reasonable royalty (Ex. 3 at ¶ 14, 17, 19-21, 24, 25, 51-55, 57-63, 71-72, 83-84, 87, 92, 98, 100, 104, and 106.  As is discussed below, TVision's expert, Joanne Johnson, justifiably opines that Dr. Keeley's analysis is flawed because he fails to apportion in contravention of the well-accepted principles discussed below.

### B.  Relevant Factual Background

#### 1.  Nielsen's Business

Nielsen sells audience ratings data that can be used to set prices for advertising on TV and audio. Ex. 3 at 8, ¶ 22.  Nielsen gathers data from households in which it tracks household members' viewing habits and listening habits. *Id.* at 9, 10 ¶ 29. It then uses the data it gathers to generate "ratings," which it sells to customers.  *Id.* at 9-10, ¶ 28-30. Nielsen calls its ratings "currency" because they are used to set prices for advertisements.  *Id.* at 8, ¶ 27.

### 2. The '889 Patent-in-Suit

The patent-in-suit is U.S. Patent No. 7,783,889 ("the '889 patent"), which expires on March 5, 2026. Ex. 5. The '889 patent claims a "method for generating signatures," (Ex. 5, claims 1, 8), but admits that "identifying media information . . . using signature matching techniques is well-known" and has been used in prior art systems for monitoring media-watching in households. Ex. 5, 1:20-43 ███████████████████████████████

███████████████████████ Ex. 3., at 15, ¶ 39. ███████████████████

████████████████████████████████████████████████

██████. Ex. 2 at 7.

TVision's technical expert, Dr. Anderson, opines that "the only advantage of the '889 *intraframe* processing is reduced computational complexity," (Ex. 14 at 38 ¶ 97), which is both irrelevant and negligible. *Id.* at 38-39, ¶ 99. Further, the method for generating signatures claimed in the '889 patent is "only a very small part of an overall ACR system." *Id.* at 39-40, ¶ 100.

### 3. TVision's Business

TVision installs devices in households to track whether household members are paying attention to media. "TVision's systems are targeted toward capturing attention measurement, while Nielsen mainly operates in the viewership space." Ex. 4 at 36, ¶ 118. "TVision's unique attention measurement differs from Nielsen viewership data;" "TVision sells stand-alone calibration panel data while Nielsen does not, and . . . unlike Nielsen, TVision does not sell viewership data." *Id.* at 38, ¶ 121.

TVision's Total View product is its "unified product to show the attention performance across linear and CTV. . . . Total View is complementary to solutions that networks & apps may

2

already rely on. . . . Total View is not a currency[1] product. However, as new alternative currencies are developed by [TVision's customers] like iSpot and VideoAmp, Total View can serve as a complementary solution that layers on qualitative data focused on the value ads and programs deliver." *Id.* at 40, ¶ 123.

### 4.  Events Leading Up To This Lawsuit



██████████████████████████████████████████ Ex. 4 at 11, ¶ 27. After Nielsen acquired Gracenote in 2017, TVision learned that █████████████████████ ██████████████████████. *Id.* at ¶ 28. At that time, there were several ACR systems with roughly equivalent accuracy: ██████████████████████████████ (Ex. 6 (Webster Dep.) at 41:19-42:8), ██████████████ (Ex. 7 (Liu Dep.) at 75:8-15), ████████ ████████████. Ex. 4 at 53, ¶ 157, n. 309.  TVision witnesses will testify at trial that █████ ████████████████████████████████████████████████████ ██████ in the period leading up to the hypothetical negotiation when it was looking for an ACR provider to replace Gracenote.  *See* Ex. 4 at 53, ¶ 158.

In January 2017, after hearing about Nielsen's acquisition of Gracenote, TVision's CEO Mr. Liu reached out to ████████████████████████████████████████ ██████████████████████████████████. Ex. 4 at 53, ¶ 158. ███████ ████████████████████████████s. *Id.* ███████████████████ ████████████████████████████████████████████████ ████████████████████████████████. *Id.* at 53, ¶ 158.  According to a company presentation, ██████████████████████████████████████ ██████████████████████████████████████████████. Ex. 8 (TVSN_NLSN00662112-139) at 115, 121. In an October 2017 email, Dan Schiffman from

---

[1] As discussed above, the term "currency" is used by Nielsen to mean "audience ratings that can be reliably used to set prices (sometimes called 'currency') for advertising on TV and audio. Ex. 3 at 8, ¶ 27.

3



TVision inquired whether ███████████████████████████████████████. Ex. 16 (TVSN_NLSN_00725382-386) at 382-383. In January 2018, TVision further requested pricing quotes from ███████████████████████████████. Ex. 9 (TVSN_NLSN_00660739-772) at 746, 748, 753. Email communications from this period indicates that ██████████████████████████████. *Id.* (TVSN_NLSN_00660739-772) at 748, 756-757.

TVision ultimately decided to use ███████████████████. Ex. 4 at 12, ¶ 31. It is this ███████████ software that Nielsen accuses in this lawsuit of infringing the '889 patent.

## III.  SUMMARY OF ARGUMENT

1. There is no merit to Nielsen's motion to exclude TVision's damages expert's opinions on lost profits simply because she referred to the *Panduit* factors.  As is discussed in section VI.A., TVision's damages expert, Joanne Johnson, provided an opinion in her expert report regarding Nielsen's lost profits, which cited *Panduit* as but "[o]ne non-exclusive standard for establishing but-for causation." Ex. 4 at 86 ¶ 244.  Ms. Johnson opined in her report that Dr. Keeley's entire reasonable royalty analysis is flawed because he fails to apportion damages relating to TVision's infringement of the '889 patent, as opposed to other factors.  Federal Circuit precedent recognizes that a "proper analysis of *Panduit* factors may account for apportionment." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1288 (Fed. Cir. 2017).

2. As set forth in section IV.B., there is no merit to Nielsen's motion to preclude Ms. Johnson's opinion that the ████████████████████████████ is too "speculative and unsubstantiated" to be the basis for quantifying a reasonable royalty in the manner utilized by Nielsen's damages expert.  On the contrary, Ms. Johnson's opinion relies on evidence of record, which demonstrates that ██████████████████████████████

4

████████████████████████████████████████████████████████████████

████████████████████████ *E.g.*, Ex. 4, at 43 ¶ 131 ("█████████████████

████████████████████████████████████████

3. Section IV.C. establishes that there is no merit to Nielsen's motion to exclude Ms. Johnson's opinion that the parties would have negotiated a device-based running royalty, rather than a one-time up-front payment, as Dr. Keeley opines. Ms. Johnson's opinion explicitly recognizes that certain royalty rate indicators support a lump-sum royalty structure while others support a running royalty structure and as such provides opinion under both royalty structures. Regarding the indicators that support a running royalty structure, Ms. Johnson's opinion is supported by both Federal Circuit authority and the record, which includes ACR licenses in which parties, including TVision, have paid on a periodic on-going basis, based on use.

4. In section IV.D., TVision demonstrates that Ms. Johnson properly considers on the ████████ license to TVision as a comparable license for purposes of a reasonable royalty analysis by conducting a through technical and economic comparability analysis. First, it was a license to a complete ACR system. Second, it provided TVision with an implied license to ████████ ACR patents. Third, even though it was expired, it was a data point that would have been considered by the parties. Fourth, Ms. Johnson's use of the ████████ agreement complies with well-settled Federal Circuit precedent that permits reliance on licenses that cover a similar type of technology, albeit not licenses under the patent-in-suit.

5. As explained in section IV.E., well-settled Federal Circuit precedent permits Ms. Johnson to provide opinions based on post-hypothetical negotiation information, and is consistent with Nielsen's own damages expert who also relies on information after the hypothetical negotiation..

6. Section IV.F. provides several reasons why this Court should not exclude Ms. Johnson's and Dr. Anderson's opinions regarding alternative ACR software that TVision could

5

have adopted prior to the hypothetical negotiation. First, based on evidence of record, TVision's experts point to alternative ACR systems TVision actually considered prior to licensing ▮▮▮▮▮▮▮ system. Second, Dr. Anderson explains why it would have been simple for either ▮▮▮▮▮▮ or TVision to design around the '889 patent. Third, both Ms. Johnson and Dr. Anderson base their testimony about TVision's ability to design its own ACR system at the time of the hypothetical negotiation on the assessment by TVision's CTO on the ability of TVision's engineers and on his experience in leading design projects for over 70 software systems.

7. Section IV. G explains why there is no basis for excluding Dr. Anderson's opinion re the Haitsma US reference. Dr. Anderson does not apply a new a claim construction, as Nielsen incorrectly argues—he only rebuts Nielsen's expert. If anything, it is Nielsen's expert who attempts to construe the claims. Further, Dr. Anderson's opinion is supported by the evidence and case law.

8. Section V explains that genuine issues of material fact preclude Nielsen's motion for summary judgment.

## IV.  NIELSEN'S DAUBERT MOTIONS SHOULD BE DENIED

### A.  Ms. Johnson's Opinion Regarding Nielsen's Lost Profits Should not be Excluded

Nielsen focuses on Mr. Johnson's citation of *Panduit* in an attempt to preclude her opinions in paragraphs 13 (bullet point 1), 241-242, 243 (bullet point 1), 244-48, 252, 260, 281 and exhibits 18.1-18.3. After having stated twice, unequivocally, that it was seeking lost profits, Nielsen now does an about face and says that "Nielsen is not seeking lost profits," and as a consequence, argues that the *Panduit* factors are irrelevant to a reasonable royalty analysis. Nielsen Br. at 4. However, in contrast to Nielsen's current position, Dr. Keeley repeatedly opines to Nielsen's "lost profits" within his analysis of a reasonable royalty (Ex. 3 at ¶ 14, 17, 19-21, 24, 25, 51-55, 57-63, 71-72, 83-84, 87, 92, 98, 100, 104, and 106);  and indeed proceeds

6

to calculate various illustrative "lost profits" figures of ▮▮▮▮▮▮▮▮▮ (Ex. 3 at ¶ 17, 58); ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ (*id.* at ¶ 17, 25, 53); ▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮. *Id.* at, ¶ 52. His opinion on lost profits is the foundation for his opinion on reasonable royalty: "absent infringement, TVision likely would not have continued in business without a license to the patent-in-suit" (Ex. 3 at 26 ¶ 57), but if Nielsen licensed TVision it "would have lost ▮▮▮▮▮▮▮▮ *Id.* ¶58. Thus, Dr. Keeley posits, "Nielsen would only agree to license the patent-in-suit to TVision if the royalty it received exceeded the profits it would lose by licensing the '889 patent. *Id.* at 27 ¶ 59. All of Dr. Keeley's testimony assumes, incorrectly, that Nielsen's entire loss would be due to TVision's licensed ability to practice the invention of the '889 patent, utterly failing to apportion the alleged advantages gained over practicing the invention, as opposed to using any one of the pre-existing ACR systems TVision could have licensed.

"Under § 284, damages awarded for patent infringement 'must reflect the value attributable to the infringing features of the product, and no more.'" *Commonwealth Sci. & Indus. Rsch. Organisation v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015), quoting *Ericsson, Inc. v. D–Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed.Cir.2014). "This principle—apportionment—is 'the governing rule' 'where multi-component products are involved.'" *Id.* Consequently, to be admissible, all expert damages opinions must separate the value of the allegedly infringing features from the value of all other features. *VirnetX, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1329 (Fed.Cir.2014).

In *Wirtgen America, Inc. v. Caterpillar, Inc.*, ___ F. Supp. 3d ___, 2024 WL 456739 at *4 (D. Del. Feb. 5, 2024), this District excluded an expert report on reasonable royalty damages that considered "the profits on sales [Plaintiff] might lose as a result of granting a license" for failure to apportion the Plaintiff's lost profits. In doing so, it cited *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1288 (Fed. Cir. 2017) for the proposition that a "proper analysis

7

of *Panduit* factors may account for apportionment." *Id.* Thus, the Court excluded the expert's report on a Daubert motion,[2] because "a failure to apportion goes to admissibility." *Id*. at *5.

Applying these principles, Ms. Johnson critiques Dr. Keeley's opinion because his reasonable royalty analysis, which includes several calculations of his assessment of Nielsen's "lost profits", fails to apportion damages to reflect the value attributable to the small portion of TVision's overall product that allegedly infringes the '889 patent. While Ms. Johnson acknowledges that the *Panduit* factors are "[o]ne non-exclusive standard for establishing but-for causation," nowhere in her report does she opine that this is the only way to prove causation (Ex. 4 at ¶ 244).  Indeed while Ms. Johnson notes that Dr. Keeley does not perform a lost profits analysis under the *Panduit* Factors, she also notes that neither does he establish that there is a reasonable probability that but-for TVision's alleged infringement of the '889 Patent, Nielsen would have generated greater sales and profits (*Id.* at ¶ 245), nor does he establish that it is the functionality of the '889 patent to TVision's products that allows iSpot/VideoAmp to compete with Nielsen. *Id.* at ¶ 246. Thus, Dr. Keeley's entire reasonable royalty analysis is flawed for failure to apportion, just like the expert report in *Wirtgen.*

Nielsen paints with too broad a brush when it argues that Ms. Johnson's opinions relating to Dr. Keeley's lost profits analysis should be excluded simply because she cited the *Panduit* case as a standard.  But if Nielsen has actually withdrawn its claim for lost profits damages, including withdrawal of all of Dr. Keeley's opinions regarding Nielsen's lost profits, then TVision would agree to withdraw the last two sentences of paragraph 244 of Ms. Johnson's report, which are the only sentences that fully discuss the *Panduit* factors, along with the first clause of the first full sentence of paragraph 245, and the second sentence of paragraph 252. For clarity, those parts of Ms. Johnson's report that TVision proposes to withdraw (pending

---

[2] In a later opinion, the court permitted the plaintiff to serve a supplemental expert which "fixed [the] damages report to take care of the apportionment issue." *Wirtgen America, Inc. v. Caterpillar, Inc.* 2024 WL 431234 at *6  (D. Del. Feb. 9, 2024).

Nielsen's withdrawal of Dr. Keeley's lost profits opinions) are highlighted in blue on Ex. 4. The other paragraphs that Nielsen seeks to strike either do not cite to or depend on *Panduit*, or relate to other aspects of the reasonable royalty analysis.

For example, bullet point 1 of paragraph 13 of Ms. Johnson's report (which Nielsen seeks to exclude) is a summary that does not cite *Panduit*, and is supported by Ms. Johnson's opinion in paragraph 172 (opining that "the '889 Patent is not required to have a functioning ACR system as the '889 Patent claims only incremental improvements in generating fingerprints and alternative ACR systems that do not practice the '889 Patent have been successful in the market"); paragraphs 251, 253-269 (opining that Dr. Keeley fails to consider the "next-best alternative(s)" and setting forth evidence of these next-best alternatives); paragraph 118 (opining that "the evidence does not support that Nielsen has "lost sales" due to TVision's use of the '889 Patent"); paragraphs 213-221 (setting forth evidence that TVision's products are complex and include multiple components unrelated to the '889 patent); paragraph 246 (opining "It is not enough to say TVision sells to iSpot/VideoAmp, iSpot and VideoAmp are competitive with Nielsen, and therefore TVision caused lost sales. Dr. Keeley provides a few examples of competition between Nielsen and iSpot/VideoAmp, but never connects […] the functionality that the '889 Patent specifically contributes to TVision's Accused Products to those examples.")

Similarly, there is no basis for precluding Ms. Johnson from testifying, "Dr. Keeley['s] reasonable royalty analysis is infected with the flawed conclusion that Nielsen lost profits due to TVision's alleged infringement of the '889 Patent." Ex. 4, ¶ 241 ██████████████████ ████████████████████████ (Ex. 3 ¶ 39); and Ms. Johnson's report reflects, as the '889 patent admits and the evidence will show, that there were plenty of alternative ACR systems that TVision could have used instead of the accused ACRCloud system at the time of the hypothetical negotiation. *See* section II.B.4., above.

9

*Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362 (Fed. Cir. 2017), cited by Nielsen at page 4, does not support Nielsen's attempt to bar Ms. Johnson's testimony. In *Asktek* the Court stated, "a patent owner participating in a hypothetical negotiation would consider the profits on sales it might lose *as the result of granting a license.*" *Id.* (emphasis added).[3] *Asktek* does not stand for the proposition that a patent owner's lost profits, entirely untethered to the alleged infringement, may be factored in a reasonable royalty analysis. "The reasonable royalty theory of damages . . . seeks to compensate the patentee not for lost sales caused by the infringement, but for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing." *Brumfield, Tr. for Ascent Tr. v. IBG LLC*, ___ F.4th ___, No. 2022-1630, 2024 WL 1292151, at *16 (Fed. Cir. Mar. 27, 2024), citing, *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1334 (Fed. Cir. 2015). The foundational principle for a calculation of a reasonable royalty is that "the royalty due for patent infringement should be the value of what was taken—the value of the use of the patented technology." *AstraZeneca*, 782 F.3d at 1344 (internal quotation marks omitted); *see VLSI Tech. LLC v. Intel Corp.*, 87 F.4th 1332, 1345 (Fed. Cir. 2023); *Aqua Shield v. Inter Pool Cover Team*, 774 F.3d 766, 770 (Fed. Cir. 2014). One aspect of that principle is that "[t]he royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement, as patent damages are limited to those 'adequate to compensate for the infringement.'" *AstraZeneca*, 782 F.3d at 1343 (quoting 35 U.S.C. § 284). Further, any reasonable royalty must seek to measure the value of the patented technology—it must be "apportion[ed]" to that value—by separating out and excluding other value in economic products or practices. *See*

---

[3] For this proposition, the Court cited *Rite-Hite Corp. v. Kelley Co., Inc.*, 56 F.3d 1358, 1554 (Fed. Cir. 1995) (en banc). However, in *Rite-Hite*, the patent-in-suit covered the entire infringing vehicle restraint that the defendants had sold, "the court considered that the [patent-in-suit] was a 'pioneer' patent with manifest commercial success." *Id.* In sharp contrast, in this case, ███████████████████████ █ ████████████████████████████.

*Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018); *see also Garretson v. Clark*, 111 U.S. 120, 121, 4 S.Ct. 291, 28 L.Ed. 371 (1884); *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1376 (Fed. Cir. 2021); *Power Integrations, Inc. v. Fairchild Semiconductor International, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018); *Commonwealth Scientific & Industrial Research Organisation v. Cisco Systems, Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015); *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).

Under these authorities, Ms. Johnson should not be precluded from testifying based on challenged paragraphs 241-248. Ms. Johnson opines:

- In Paragraph 241, that Dr. Keeley's reasonable royalty analysis is "infected with the flawed conclusion that Nielsen lost profits due to TVision's alleged infringement of the '889 patent";

- In paragraph 242, that Dr. Keeley "inappropriately assumes that all TVision's company-wide forecasted sales and profits from operations are attributable to the '889 Patent without any regard for the use of the allegedly infringing technology or the presence of numerous nonpatented elements present in TVision's systems and products."

- In paragraph 243 (bullet 1) that "Dr. Keeley fails to substantiate that Nielsen has lost profits as a result of TVision's alleged infringement of the '889 Patent;"

- In paragraph 245, that Dr. Keeley assumes without evidence that iSpot and VideoAmp would not have been able to compete with Nielsen absent TVision's accused product, which is false, as the evidence will show that iSpot and VideoAmp compete with Nielsen in many respects apart from using TVision's technology;

- In paragraph 246, that Dr. Keeley fails to connect TVision's accused product to iSpot or VideoAmp's offerings.

11

- In paragraph 247, that Dr. Keeley admits that he cannot calculate lost profits but skews the damages horizon by setting forth potential lost profits of ███████ per year;

- In paragraph 248, that "TVision's alleged infringement did not cause Nielsen to lose sales and profits;

- In paragraph 260, that "Dr. Keeley has failed to establish that iSpot and VideoAmp would not have been able to compete against Nielsen using available and acceptable, non-infringing alternatives to TVision's products"; and,

- In paragraph 281, that "Dr. Keeley assumes lost profits without support, incorrectly assumes that TVision has no next-best alternatives, significantly overstates the benefits of the '889 patent, and fails to apportion."

None of the foregoing opinions rely on any of the *Panduit* factors. All are relevant to a reasonable royalty analysis under the authorities discussed above.

**B. Ms. Johnson Fully Supports Her Opinion that the ██████████ ████████ is Speculative and Unsubstantiated**

Nielsen attempts to preclude Ms. Johnson's opinion that the ███████████ that ████████████████████ is too "speculative and unsubstantiated" to be the basis for quantifying a reasonable royalty.[4] Nielsen thus moves to preclude Ms. Johnson's opinion as expressed in Ex. 4 at ¶¶ 13 (bullet 2), 106, 135-139, 232, 242, 243 (bullet 7), 285-94, 302, and 304-06, 309, Figures 10, 22, and Exhibits 11.0-11.2, and 15.0-15.4. There is no merit to Nielsen's request.

Nielsen contends that the ████████████████████████████████████ Br. at 5 (emphasis in original). At page 6 of its brief, Nielsen indirectly refers to ████████ ████████████████████████████████████. Nielsen cites

---

[4] TVision will file a motion to exclude the ████████████ on the ground that it is hearsay, not subject to any exception.

no evidence that the ███████████████████████████████████.[5]  In the email, ████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████ Ex. 11 (Johnson Dep. Ex. 2).  This email

demonstrates that TVision understood, █████████████████████████████████████

██████████████████████████████████████████████.  Nowhere in Dr.

Keeley's report does he discuss this extremely important underlying assumption in th████

████████  Dr. Keeley's failure to reflect this assumption in his analysis undercuts his use

of this forecast as his royalty base (Ex. 4, at 34 ¶ 106, at 99 ¶ 276) and, itself, provides ample

evidence that the ████████████ was not reliable or substantiated.

Nielsen's citation of Dan Schiffman's deposition distorts Mr. Schiffman's testimony.

Mr. Schiffman, who departed TVision in 2019, testified that the April 2018 forecast was

prepared by Peter Carroll, who "████████████████████████████████████████

████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████

██" Ex. 12, Schiffman Tr. 24:22-25:6.  Mr. Shiffman did not have personal knowledge of this

document and testified multiple times that he was guessing.  *See generally id*. at 19:19-20 ██

████████████████████); 20:8-16 ("████████████████████████████████████

████████████████████████████████████████████"); 21:10-17 ("████

████████████████ 23:11-20 ██████████████████████████████████

████████████████████████████ 28:2-4 (████████████████████████████

████████████████████████  When asked directly about the ████████████████

Mr. Schiffman testified, █████████████████████████████████████████████

████████████████████████████████████████████" *Id*. at 20:12-16.  Mr.

Schiffman did not testify that the forecast "Reflects what TVision *likely 'would [have] achieved*

─────────────

in those months subsequent,'" as Nielsen argues at page 6. Rather, Mr. Schiffman testified to his "assumption" that "this is *likely a forecast* for what would be achieved in those months subsequent." *Id*. at 21:4-5. Thus, Mr. Schiffman's testimony is not "unrebutted evidence of the reliability of the April 2018 forecast," as Nielsen argues. It is not evidence at all because Mr. Schiffman's testimony demonstrates that he lacked the requisite personal knowledge to testify about the April 2018 forecast. F.R.E. 602.

Nielsen is wrong when it argues on page 7 that Ms. Johnson's opinion that the April 2018 report is speculative and unsubstantiated (Ex. 4 at 85-86, ¶ 242) is "unsupported and the fact that TVision did not achieve its forecasted results is irrelevant." Nielsen is wrong on both counts.[6]

First, courts have observed that forecasts for startups, especially, are inherently unreliable. *Cf., Goldby v. Hologic, Inc.*, 817 F. Supp. 204, 211 (D. Mass. 1993) (describing forecasts as "inherently difficult and unreliable . . .and . . . not likely to be 'material' to investors," noting that the SEC provides a safe harbor rule that projections filed with the Commission do not violate federal securities law unless made without a "reasonable basis" or not made in "good faith"); *Optima Tobacco Corp. v. Flue-Cured Tobacco Growers, Inc.*, 2019 WL 4858848 at *10 (E.D.N.C., Sept. 30, 2019) (rejecting expert opinion based on lost profit

---

[6] Nielsen's argument at page 7, to the effect that TVision's Rule 30(b)(6) witness, Mr. Neumann, should have been able to explain how the April 2018 forecast was used, if at all, is unavailing. First, the topics were so broad that it would have been impossible to prepare a witness to anticipate every conceivable question. *See* Ex. 10 at 9-10, topics 40-43. Nielsen did not complain in the deposition that Mr. Neumann was unprepared. Had it done so, Mr. Neumann could have taken a break and then provided the information. Nielsen points to no letter to counsel in which it raised the issue, and it did not move to compel. Thus, Nielsen should not be heard now to complain that Mr. Neumann was allegedly unprepared. "[C]ourts often decline to extend the discovery deadline, and refuse to exclude evidence when they believe that the moving party has unduly delayed in bringing up the alleged deficiency in a discovery response." 8B Charles Alan Wright, Arthur R. Miller & Richard L. Marcus., Federal Practice and Procedure §2285 (3d. ed. 2010); *cf., Davis v. Pinterest, Inc.*, 601 F.Supp.3d 514, 525 (N.D. Cal. 2022) (noting failure to move to compel).

14

estimates "based on unreliable and speculative forecasts" as "too speculative to be determined with reasonable certainty").

Nielsen cites *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001), for the blanket proposition that all forecasts should be admissible for purposes of a reasonable royalty calculation. That case does not so hold. Indeed, *Interactive* cites an earlier Federal Circuit decision affirming a damages award in derogation of the testimony of the patentee's expert, "which was based on estimates of the infringer's anticipated profits that 'bore no relation to actual profits.'" *Interactive,* 274 F.3d at 1385. That is exactly the case here. The evidence shows that the April 2018 forecast was provided to only one investor.  Ex. 11.

█████████████████████████████████████████████████████████████████████████████ .

████████████████████████████████████████████████████████████████████████████

████████████████████████ .  Moreover, *Interactive* also states "an actual infringer's profit margin can be relevant to the determination of a royalty rate in a hypothetical negotiation." *Id.* at 1385. This District has interpreted *Interactive* to permit the use of post-negotiation information to inform the hypothetical negotiation.  *See Honeywell Intern., Inc. v. Hamilton Sunstrand Corp.*, 378 F. Supp.2d 459, 466-67 (D. Del. 2005).  So has the District of Minnesota, *Ecolab USA v. Diversey, Inc.*, 2015 WL 2345264 at * 14 (D. Minn., May 14, 2015) (stating that *Interactive* does not preclude consideration of post-hypothetical negotiation information or require that a particular amount of weight be placed on pre- or post-hypothetical negotiation information).

Moreover, *Interactive* does not govern a case, such as this one, in which the forecast at issue was wildly unreliable.  Nielsen and its expert ignore that at the time of the hypothetical negotiation, ███████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

██████████████

For the foregoing reasons, there is no basis for excluding paragraphs 13 (bullet 2), 106, 135-139, 232, 242, 243 (bullet 7), 285-94, 302, and 304-306, 309 of Ms. Johnson's report. Nielsen Br. at 8. Nielsen's entire argument for excluding those paragraphs is that Ms. Johnson should be precluded from opining that the April 2018 forecast is unreliable and unsubstantiated.

As is demonstrated below, Ms. Johnson's opinions in the challenged paragraphs are admissible because they are based on sufficient facts or data and are the product of reliable principles and methods, which Ms. Johnson has reliably applied.  F.R.E. 702. Nielsen's objections thus go to weight, not admissibility.

There is no basis for excluding paragraph 13 (bullet 2) (which notes Nielsen's failure to consider alternatives) or paragraph 106 (which notes Dr. Keeley's royalty base is improperly based on the entire market value of all of TVision's products and that Dr. Keeley's opinion of a one-time upfront royalty structure based on the benefit of being able to earn forecasted revenues and profits through March 2026 is not appropriate given the facts and circumstances of this case). There is no basis for excluding paragraphs 135-139, which cite to evidence of record. Ms. Johnson cites evidence that TVision was a small start-up in the period leading up to the May 2018 hypothetical negotiation. Ex. 4 at ¶ 130.  As of 2017, TVision had earned only ██████████ in revenue and was operating ████████████████ In 2018, TVision generated ████████████████████████████████████████████. *Id.* Further, at the time of the hypothetical negotiation, ████████████████████████ ██████. *Id.* at ¶ 131.  That funding depended in part on how many devices TVision had installed in households. *Id.* TVision ████████████████████████████████ ████, which increased TVision's credibility in the market and with investors. *Id.* Ms. Johnson relies on a 2017 TVision presentation in which TVision outlined its fundraising plan, suggesting that ████████████████████████████████████████████████████ ████████████████████████████████████████████████████

16

 *Id.* at ¶

135.  Further, TVision's forecasts were based on key assumptions that TVision did not meet.

*Id.* at ¶ 136. Ms. Johnson observed that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮,"

reciting specific ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *Id.* at ¶ 137. Paragraph 138 ▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮.  *Id.* at ¶ 138. In challenged

paragraph 139, Ms. Johnson recites that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮.  There is no reason to exclude any of these paragraphs,

which are all based on facts of record, cited in Ms. Johnson's report.

There is no basis for excluding paragraph 232, which does not mention the April 2018

forecast.    Although challenged Paragraph 242 references the forecast, the focus on the

paragraph is Dr. Keely's inappropriate **use** of the forecast (opining Dr. Keeley improperly

invokes the entire market value rule and fails to apportion for the many features and benefits

provided by elements outside of the claimed invention). Bullet 7 of Paragraph 243 criticizes

Dr. Keeley for his **inappropriate reliance** on "a speculative and unsubstantiated forecast to

quantify the reasonable royalty" which as just discussed also includes Ms. Johnson opinions

regarding Dr. Keeley's inappropriate application of this forecast as the basis for this opinion.

Furthermore, as the evidence cited by Ms. Johnson demonstrates, none of TVision's forecasts

in the time frame of the hypothetical negotiation had panned out, and TVision knew it. *Id.* at

¶¶ 130-139

Paragraphs 285-289 opine that Dr. Keeley fails to provide support for an upfront lump

sum royalty structure based on future revenue.  Ms. Johnson takes issue with Dr. Keeley's flight

of fancy where he speculates that TVision would have agreed in the hypothetical negotiation

17

to " ████████████████████████ that is based on forecasted revenues of TVision's entire business through March 5, 2026—the patent expiration date. *Id.* at ¶ 285. Recall that this was at a time when ████████████████████████ ████████████████████████. Dr. Keeley doesn't explain how TVision would have ██████████████. In that regard, Ms. Johnson points out that in 2018, TVision's balance sheet ████████████████████████ rendering Dr. Keeley's opinion that ████████████████████████████████████ ██████████████ Ex. 4 at 43 ¶ 130.

Ms. Johnson recites that TVision was a startup, and correctly opines that "Dr. Keeley fails to consider the practical realities of TVision's financial position at the time of the hypothetical negotiation" (*Id.* at ¶ 286), that he fails to recognize the significant impact that such a payment would have had on TVision's business (*Id.* at ¶ 287), that he fails to take into account how payments are made in the industry (*Id.* at ¶ 288), and that he provides no justification to structure the royalty as a lump sum when his opinion assumes that TVision's benefit from licensing the '889 patent is to continue to stay in business over time, which, contrary to Dr. Keeley's opinion, is more supportive of a running royalty structure. *Id* at ¶ 289.

The portion of Ms. Johnson's report opining that the April 2018 forecast is unsubstantiated, is based on evidence that is cited in paragraphs 290-291. Ms. Johnson reasonably opines that "TVision's forecasts in the 2018 time period were optimistic as TVision was still in the early stage of its startup business and did not have a historical track record available as a basis to build its forecast," that "the forecasts that TVision developed during this period were based on certain key assumptions that had uncertain probabilities of succeeding," and that "Dr. Keeley does not consider the probability that TVision would achieve the underlying assumptions, nor the probability it would achieve its forecasts . . . ██████████ ██████████████ *Id.* at ¶ 290. In paragraph 291, Ms. Johnson

demonstrates that in applying Dr. Keeley's methodology and assumptions, if Dr. Keeley had relied on TVision's *actual revenue and profits,* ███████████████████████████ ███████████████████████████, highlighting the unreliable nature of Dr. Keeley's approach.  *Id.* at ¶ 291.

Ms. Johnson's opinions expressed in paragraphs 292-94, 302, and 304-306 are part of a section of her report that disputes the reliability of Dr. Keeley's quantification of a reasonable royalty.  In paragraphs 292-294, Ms. Johnson opines that Dr. Keeley "assumes without sufficient support" that the parties would agree to a one-time lump-sum royalty, extends the April 2018 forecast (which TVision had made for the years 2018-2022) to 2026, without any basis, and that Dr. Keeley applies a discount rate based on an estimate of the weighted average cost of capital for purportedly similar firms.  *Id.* at ¶¶ 292-293. In paragraph 294, Ms. Johnson states that in addition to previously discussed errors, Dr. Keeley's quantification "suffers from another error that that renders his analysis flawed, speculative, and unreliable." *Id.* at ¶ 294. Then in paragraphs 295-301, which Nielsen does not move to strike, Ms. Johnson explains that Dr. Keeley's use of the discount rate is flawed because, *inter alia*, it "fails to properly account for the probability of success of early stage companies" and that he "overlooks the assumptive nature of discount rates," which "can vary widely for early-stage companies," citing a KPMG report that discount rates can range from 40% to 60% for companies in the first stage of financing, much greater than the discount rate Dr. Keeley applied. *Id.* at ¶¶ 295-300. Moreover, in *Fate Therapeutics, Inc. et al v. Shoreline Biosciences, Inc.*, No. 22-cv-000676-H-MSB (S.D. Cal. Jul. 14, 2023), Dr. Keeley admitted that the probability of success must be taken into account when using a discount rate. *See* Ex. 13, Shoreline Biosciences, Inc.'s Notice of Motion and Motion to Exclude the Expert Report of Dr. Michael C. Keeley Pursuant to Daubert, Case No. 3:22-cv-00676-H-MSB, January 14, 2023, at p. 12). (*See also* Ex. 4 at ¶ 301; Ex. 3 at ¶ 77).

19

In paragraph 301, Ms. Johnson opines that Dr. Keeley has "not provided any evidence to suggest" that the category he chose "appropriately reflects the underlying risks of TVision's early-stage business. Ex. 4 at ¶ 301. Then, in ¶ 302, which Nielsen challenges, Ms. Johnson opines that the "above flaws in Dr. Keeley's analysis are further exacerbated when considering the longer time frame of his damages period." The import of this paragraph is not a criticism of Dr. Keeley's use of the April 2018 forecast, but a criticism of the methodology Dr. Keeley uses to incorporate that forecast into his reasonable royalty analysis. Thus, even if Dr. Keeley were permitted to use the entirely speculative and flawed April 2018 projection in his testimony, Ms. Johnson's is entitled to express her opinion as to why Dr. Keeley's analysis is flawed. Nielsen points to no reason why Ms. Johnson should be precluded from expressing her opinion regarding Dr. Keeley's methodology.

Nielsen's argument to preclude Ms. Johnson's opinion in paragraph 309, which disagrees with Dr. Keeley's use of the Nash Bargaining Solution and his failure to apportion (opining that Dr. Keeley "improperly include[s] TVision's entire company-wide forecasted operating revenue and profit as a basis for his reasonable royalty opinion without any consideration for the incremental value the '889 Patent provides to the accused products over other technologies" and "applies the Nash Bargaining Solution as a 50% rule of thumb") Nielsen points to no reason why Ms. Johnson should be precluded from expressing her opinion regarding Dr. Keeley's methodology.

### C. Ms. Johnson's Opinion About A Device-Based Running Royalty Is Fully Supported

In a short argument bridging pages 8-9, Nielsen seeks to exclude any of Ms. Johnson's opinions in paragraphs 11, 103-06, 156, 163-67, 181-208, 232 (bullets 8 and 11), 235, 239, 270, 285, 288-89 of her report, and also Figures 1, 7, 16 and Exhibits 3.0-3.1, 5.0, 5.2-5.3, 7.0, 9.0, and 18.0-18.3. Nielsen's conclusory argument is no basis for precluding Ms. Johnson's opinion.

20

Ms. Johnson explains the basis for her opinion in detail in the challenged paragraphs. She explains in paragraph 103 that "[i]n support of a running royalty structure, as discussed in *Georgia-Pacific* Factors and 9, 10 and 12, license proposals and agreements for ACR technology include an ongoing royalty payment that is based on the extent of use of the licensed technology." Ex. 4 at 33, ¶ 103. She further explains that considering the number of panel devices TVision employs on a monthly basis is a reasonable metric, and that the monthly data for TVision panel devices in use is available. *Id.* at ¶¶ 104-105. In paragraph 106, she critiques Dr. Keeley's opinion as being inappropriately based on "the entire market value of all TVision's products" in spite of the fact that "there is no evidence to support that the '889 patent is the sole driving factor of customers' demand" for TVision's product. *Id.* at 34, ¶ 106.

Federal Circuit case law provides ample support for Ms. Johnson's opinion. "[L]icenses may be presented to the jury to help the jury decide an appropriate royalty award." *Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014), citing *Monsanto Co. v. McFarling*, 488 F.3d 973, 978 (Fed.Cir.2007) ("An established royalty is usually the best measure of a 'reasonable' royalty for a given use of an invention"). The Federal Circuit has also sanctioned per-unit royalties of the type that Ms. Johnson opines would be appropriate here. *E.g., Gaylord v. U.S.*, 777 F.3d 1363, 1369 (Fed. Cir. 2015) ("A per-unit royalty is a logical way to tie the amount paid for the asset to the marketplace success it helps produce, which fits the objective of measuring market value"); *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325-26 (Fed. Cir. 2009) (holding that the question of whether the parties would have agreed to a lump-sum payment or running royalty based on ongoing usage is subsumed within *Georgia Pacific* factor 2—"the rates paid by the licensee for the use of other patents comparable to the patent in suit").

*Georgia Pacific* factor 10—the nature of the patented invention—also supports a per-device running royalty. So does factor 13—the portion of the realizable profit that should be

21

credited to the invention as distinguished from non-patentable elements. In *Lucent*, the Court noted that the "infringing feature contained in Microsoft Outlook is but a tiny feature of one part of a much larger software program" and concluding that those factors did not support a lump-sum damages award in that case. 580 F.3d at 1332-33. The Court in *Lucent* also held that factor 11—the extent to which the infringer has made use of the invention—mitigated against a lump-sum royalty, explaining that factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation. *Id.* at 1333, citing *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933).

So too, here, the patented method of generating a signature is a tiny part of the overall ACR system, which in turn, is a small part of TVision's product offering, and is in no way the reason why anyone purchases TVision's attention data. This is all spelled out in Ms. Johnson's report.

In this case, the basis for Nielsen's infringement claim is the ▮▮▮▮▮▮ software that is installed and runs in each of TVision's panel devices, which are located in consumer's homes and from which TVision obtains attention data that it processes and sells to customers. Ex. 4 at ¶ 72, citing to Nielsen's Moulin report ¶¶ 25, 74. Ms. Johnson points out that TVision's contract fees (which had periodic payments specifically based on use, including explicit consideration of the number of panel devices. Ex. 4 at 55 ¶¶34-39) for the first year of its ▮▮▮▮▮▮ agreement were equivalent to about ▮▮▮▮ per device per month, and have decreased over time. Ex. 4 at 55 ¶ 163. This challenged paragraph demonstrates, contrary to Nielsen's conclusory argument on pages 8-9 of its brief, that there is a market-place basis for basing a royalty on the number of panel devices employed by TVision in the form of TVision's current agreement with ACRCloud.

Under *Georgia-Pacific* Factors 9 and 10, Ms. Johnson opines to TVision's agreements with ACRCloud between 2018 and 2023 that indicate a running royalty license fee structure

based on the number of devices utilizing ███████ service per year. Ex. 4 at Ex. 9.0, ¶163. *See also,* ¶ 31-42. Similarly, in paragraph 163, Ms. Johnson opines to a January 2017 license proposal by ████ another ACR provider, that also indicated a per-device, per-month license fee based on usage. *Id.* at Exs. 5.3, 5.4, ¶ 164. In *Georgia-Pacific* Factor 12, Ms. Johnson explains in detail the considerations of the Gracenote Agreement and its comparability to the hypothetical license *Id* at ¶ 188-190, 194-195, 200. Ms. Johnson points out that "i███████

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████ (*Id.* at ¶1 89, 182) and that

████████████████████████████████████████

████████████████████████████ " (*Id.* at ¶ 190). As discussed in Section IV.D below, Ms. Johnson's analysis of the ███████ Agreement is based on the evidence of the record, and there is no basis to suggest that any opinions relying on the Gracenote Agreement should be excluded.

Nielsen ignores that the quantitative indicators in the record, such as the ████████ ████████████████████ and the █████ proposal, put forth monthly or annual payment amounts that are fundamentally based on the licensee's usage conditions. *Id.* at ¶¶ 31-42, 188-189, Exs. 5.3-5.4. These agreements provide the basis for Ms. Johnson's per-device running royalties, and therefore Nielsen has no basis to exclude these opinions that rely on proper analysis of evidence in the record.

Similarly, Nielsen takes issue with Ms. Johnson's calculation of "the cost to use a supposed alternative to the patented technology from ACRCloud", claiming that Ms. Johnson's calculations "yield a lump sum, not a per device per month cost." Ms. Johnson does not dispute that the ███████ incremental expense should be a lump sum, as it reflects the engineering cost to modify its code in house, unrelated to any cost structures relating to usage. She does not

opine to a running royalty structure for this particular calculation, and only provides a per device per unit month metric to "illustrate the sense of proportional magnitude" (*id.* at ¶156), to rebut Dr. Keeley's opinion that would translate to a royalty ▮▮▮▮ per device per month. *Id.* at 96-97, ¶ 270, Fig. 21.  Nielsen ignores that Ms. Johnson acknowledges that some of the evidence supports a lump-sum royalty structure ("TVision's best next-best alternative is to have ▮▮▮▮▮▮▮ modify its fingerprinting code to avoid practicing the '889 Patent which would result in a one-time upfront cost") while some of the evidence supports a running royalty structure ("license proposals and agreements for ACR technology include an ongoing royalty payment that is based on the extent of use of the licensed technology") which leads her to present certain indicators in a lump sum format and others in a running royalty format *Id* at ¶103. As such, there is no basis for excluding paragraph 156.

These historical license agreements and proposals are factual evidence from the record where the fee structures are based on the licensee's usage conditions, including consideration of the number of devices.  In paragraphs 31-42, Ms. Johnson outlines the terms of the ▮▮▮▮▮▮ agreements from 2018 through 2023, all of which include annual fees that are based on the licensee's usage conditions**.** Paragraph 164 similarly points to factual evidence from the record indicating a usage-based fee structure through monthly fees per device.

Thus, there is no basis for excluding paragraphs 103-106, 163-167, 232 (at bullet 11), 239, 285, 288-289, Figure 7, and Exhibits 5.3, 7.0, 9.0, and 18.0-18.3, as the analyses therein stem directly from license agreements and evidence in the record that are inherently based on TVision's extent of use.

### D.  Ms. Johnson Properly Relied on the ▮▮▮▮▮ Agreement

It is undisputed that, prior to the date of the hypothetical negotiation, TVision had a license agreement to use ▮▮▮▮▮▮ Entourage product as TVision's ACR software system.  It

is also undisputed that after Nielsen acquired Gracenote, Nielsen informed TVision that it would not renew the Entourage agreement.

Nielsen incorrectly argues that the ███████ agreement "did not license any patents." On the contrary, an agreement permitting a party to use a product exhausts any patents in that products, and thus constitutes an implied license. *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 629 (2008) (rights to patented method claims exhausted by the sale of an item that substantially embodied the patented method). *See also, LifeScan Scotland, Ltd. v. Shasta Tech., LLC*, 734 F.3d 1361, 1377 (Fed. Cir. 2013) (patent owner had exhausted its rights under a patent claim covering a method of detecting blood glucose by giving away or selling below cost the blood glucose meter that it manufactured).

There is no merit to Nielsen's argument that it is "improper to use a non-patent agreement without linking it to the claimed technology." *ResQNet.com, Inc. v. Lansa*, 594 F.3d 860, 870 (Fed. Cir. 2010), cited by Nielsen at page 10 of its brief, does not support Nielsen's argument. In *ResQNet.com*, the plaintiff's damages expert relied on a combination of bundled licenses and licenses to the patent-in-suit to arrive at a higher royalty rate than the license to the patent-in-suit. The bundled licenses included marketing and other services. The Court held under the facts in that case that it was inappropriate for the plaintiff's damages expert to use the bundled licenses to inflate the royalty rate. In sharp contrast, in this case, the Gracenote agreement and other ACR software agreements license the use of an entire ACR software system. The patent-in-suit covers a tiny part of an ACR system—creating a "signature" or "fingerprint." Thus, the agreements licensing ACR systems place a governor on the amount a willing licensee would reasonably pay for the right to use a tiny part of an ACR system.

Under similar circumstances, the Federal Circuit has upheld the use of licenses that did not involve the patent-in-suit, stating that the defendant's objections to the conclusions of plaintiff's expert "go to the weight to be afforded the testimony and not its admissibility" that

25

would be "best addressed by cross examination and not by exclusion." *ActiveVideo Networks, Inc. v. Verizon Comm'n, Inc.*, 694 F.3d 1312, 1334 (Fed. Cir. 2012); *see also, Cave Consulting Group, Inc. v. Truven Health Analytics Inc.*, 2017 WL 4772348 at *3 (N.D. Cal. Oct. 23, 2017) (explaining that *ResQNet.com* did not preclude the use of commercial licenses). Further, Nielsen's narrow approach is precluded by other Federal Circuit authority, recognizing that "any reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'" *Lucent*, 580 F.3d at 1325 (quoting *Unisplay, S.A. v. American Electronic Sign Co., Inc.*, 69 F.3d 512, 517 (Fed. Cir. 1995)). "[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility." *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) (citing *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1326 (Fed. Cir. 2014), overruled on other grounds by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc)).

Nielsen's argument at page 12 to the effect that a license for an entire ACR system (as from Gracenote) would be less valuable than a license for a tiny part of that system makes no sense. None of the cases cited by Nielsen at pages 12-14 support Nielsen's argument.

There is no basis for excluding paragraphs 109, 111, or 181, which simply establish the premise of Georgia-Pacific Factor 1, 2, and 12, respectively.

Nielsen attempts to preclude Ms. Johnson's opinion relying on the ▮▮▮▮ Agreement on the basis that "the ▮▮▮▮ Agreement was not a patent license." Perfect comparability between a license agreement and the hypothetical negotiation rarely exists, and Nielsen's focus on the ▮▮▮▮ Agreement not being a patent license is misguided. In fact, Nielsen attempts to sweep any discussion of the ▮▮▮▮ Agreement under the rug, even though this license agreement is evidence that has been produced in the record, and evidence shows that TVision had historically used ▮▮▮▮ software for its ACR system. Ex. 4 at ¶

26-27. Nielsen and its damages expert, Dr. Keeley, do not dispute that TVision historically used ▮▮▮▮ as its ACR provider. Ex. 3 at ¶ 88.

There is no basis to exclude paragraphs 182-195, which simply lay out the terms of the ▮▮▮▮ Agreement and the subsequent Amendment. In paragraphs 26-27, Ms. Johnson lays out the record evidence of TVision's historical relationship with ▮▮▮▮ and its use of ▮▮▮▮ as its ACR provider prior to Nielsen's acquisition of ▮▮▮▮ Furthermore, as discussed below, Ms. Johnson's analysis of the ▮▮▮▮ Agreement in paragraphs 201 to 205 account for the differences in licensing rights between the ▮▮▮▮ Agreement and the hypothetical license.

Nielsen also claims that Ms. Johnson did not sufficiently compare the ▮▮▮▮ Agreement to the bare patent license from the hypothetical negotiation. Ms. Johnson's comparability analysis, which spans four pages of her report, specifically walks through the adjustments that need to be considered for the ▮▮▮▮ Agreement in order to account for the fact that the hypothetical license is a bare patent license. Indeed, paragraphs 196 to 208 explicitly opine to the economic and technical comparability of the ▮▮▮▮ Agreements and the hypothetical license, including "comparability of the parties, the timing and terms of the agreements, the licensed technology and products." (*see also* Johnson Dep. Tr. 180:21-181:13).

The fact that the ▮▮▮▮ Agreement was not available to TVision in May 2018 is irrelevant to the analysis of the ▮▮▮▮ Agreement itself as a datapoint in this case. Paragraph 288 cites to TVision's historical payment structure under the ▮▮▮▮ Agreement, which is "based on the actual number of users, channels, and/or queries" and is based on evidence in the record. Nielsen claims that "[t]he pricing of an unavailable deal does not inform the hypothetical negotiation because the benefits of that deal were not available to TVision at that time at that price." Nielsen points to no authority for the proposition that the Market Approach would be limited to "deals" only be available to the parties of the hypothetical

negotiation.  Indeed, all that is required is that the technology licensed in those agreements must be comparable to the technology covered by the patent-in-suit.  *See StoneEagle Services, Inc. v. Pay-Plus Solutions, Inc.*, 2015 WL 3824170 at *11 (M.D. Fla. June 19, 2015) (denying Daubert motion where where expert provided Market Approach and stating "Defendants' recourse, if they disagree . . . is through their own expert witness and cross-examination"). *Georgia-Pacific* Factor 12 calls for consideration of "customary [rates] in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions." *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).  The purpose of this factor is to consider "whether there is a customary royalty rate for analogous inventions in this industry." *DataQuill Ltd. v. High Tech Computer Corp.*, 2012 Wl 1284381 at *6 (S.D. Cal. April 16, 2012), quoting *Boston Sci. Corp. v. Johnson & Johnson*, 2009 WL 975424 at *6 (N.D.Cal., Apr. 9, 2009). This is to consider actual market transactions that are comparable to the parameters of the hypothetical license. Similar to when purchasing a home, a buyer will consider the price of other homes that have sold in the area and are no longer available for purchase to inform the price the buyer is willing to pay for homes that are available on that market. More importantly, Nielsen's position that opinions relying on the ███████ Agreement should be excluded when TVision historically used ███████ as its ACR provider, is unreasonable and unsubstantiated.

Given the above, Nielsen has no basis to exclude paragraphs 27, 232 (bullet 11), 235-236, Figures 1 and 16, and Exhibits 3.0, 7.0 of Ms. Johnson's report, which summarize the opinions that stem from the analysis performed.

### E.   Federal Circuit and Supreme Court Case Law Permits Ms. Johnson To Provide Opinions Based In Part On Post-Hypothetical Negotiation Information

As noted above, factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation. *Lucent,* 580 F.3d at 1333, citing *Sinclair*

*Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933). Although a reasonable royalty analysis requires "consideration of a hypothetical negotiation on the date of first infringement," the analysis does not "automatically exclud[e] evidence of subsequent events." *Harris Corp. v. Ericsson Inc.*, 417 F.3d 1241, 1257 (Fed. Cir. 2005) ("the purpose of looking at future events is 'to bring out and expose to light the elements of value that were there from the beginning,'" quoting *Sinclair*, 289 U.S. at 698). Thus, Nielsen's argument at pages 14-16 is simply wrong as a matter of law.

Nielsen's reliance on *Honeywell Int'l Inc. v. Hamilton Sunstrand Corp.*, 378 F. Supp.2d 459, 465 (D. Del. 2005), cited at page 16 of its brief, is misplaced for a number of reasons, not the least of which is that Judge Sleet approved the use of post-hypothetical negotiation sales projections, holding that they were not precluded by the statute or by the *Interactive* decision. Judge Sleet's decision does not hold that post-negotiation information can be used *only* for the purpose of "discouraging infringement" as Nielsen argues. Further, *Lucent* makes abundantly clear that "neither precedent nor economic logic requires us to ignore information about how often a patent invention has been used by infringers . . . since the frequency of expected use and predicted value are related.* * * [T]he hypothetical analysis 'permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." *Lucent,* 580 F.3d at 1333.

Nielsen takes issue with paragraphs 130-134, 136-142, which pertain to Ms. Johnson's analysis of *Georgia-Pacific* Factor #8. *Georgia-Pacific* Factor #8 analyzes "the established profitability of the product made under the patent; its commercial success; and its current popularity." Paragraphs 130-134, 136-142 rely on produced documents and publicly available sources to summarize TVision's financial standing during the relevant period. Nielsen also argues to preclude Exhibits 11.0-11.2, 12.0-12.2 under the premise that it contains information after the hypothetical negotiation date. This illustrates the egregiousness of Nielsen's position.

29

For example, Exhibit 11.0 depicts various TVision forecasted income statements for the 2018 calendar year. Among these forecasts is the April 2018 forecast that Dr. Keeley relies on and Nielsen argues is "a substantiated, accurate, and reliable indication of TVision's expectations[.]" Nielsen Br. at 6. Exhibits 11.1 and 11.2 lay out TVision's forecast 2018 **as of** March 2018 and 2017, respectively. These exhibits cite to financial forecasts created by TVision prior to the hypothetical negotiation. Moreover, the fact that Nielsen is trying to exclude Figure 9 of the Johnson Report (citing Exhibit 12.0), which is nothing more than a summary of TVision's consolidated financial income statements, demonstrates the over-generalization of Nielsen's classification of "information that existed only after the hypothetical negotiation" (Nielsen Br. at 14). These sections of Ms. Johnson's should not be excluded solely because they cite to financial information after the hypothetical negotiation. In fact, Nielsen's own expert looks at post-hypothetical data throughout his report. In his own analysis of *Georgia-Pacific* Factor #8, Dr. Keeley refers to TVision's gross profits from January 1, 2019 through June 30, 2023 Ex. 3 at ¶ 102. Elsewhere, Dr. Keeley discusses TVision's agreements with iSpot and VideoAmp, which were not entered into until 2020, two years after the hypothetical negotiation, in order to support his position regarding the "competitive" relationship between TVision and Nielsen ("…at the present time, TVision competes primarily indirectly and to a certain extent directly with Nielsen…TVision competes indirectly by selling its panel data to big data firms, such as VideoAmp and iSpot." *Id*. at ¶ 93, 47. *See also* Ex. 4 at ¶124. *See also* Ex. 3, ¶¶ 52-54, 81, 94-96, where Dr. Keeley relies on post-hypothetical negotiation information.

Nielsen also takes issue with paragraphs 174-180, which encompass Ms. Johnson's entire analysis of *Georgia-Pacific* Factor #11. This factor speaks to "the extent to which the infringer has made use of the invention; and any evidence probative of the value of that use" all of which inherently occur after the hypothetical negotiation.

30

Nielsen attempts to exclude <u>all</u> of Ms. Johnson's discussion of evidence in the record that occurred after the hypothetical negotiation. In paragraph 221, Ms. Johnson references a February 2022 pitch deck to discuss TVision's products and multi-faceted process of non-patented elements outside of ACR technology. Nielsen's attempt to preclude Ms. Johnson's discussion of this document is hypocritical when Dr. Keeley cites the very same document <u>five times</u> in his report Ex. 3 at ¶¶ 31, 43, 46, 49, 79. Nielsen's attempt to exclude paragraphs 222-223, 225-226 solely on the basis that the documents and evidence cited within are after the hypothetical negotiation is entirely unreasonable, while its own expert cites to documents and information post-dating the hypothetical report throughout his report. Nielsen cannot have it both ways.

Thus, there is no basis for excluding Ms. Johnson's opinions in paragraphs 13 (bullet 7), 130-34, 136-42, 174-80, 221-23, 225-26, 229, 242, 243 (bullets 7-8), 286, 288, 290-92, 294, 306, Figures 9-10, 22, and Exhibits 10.0-10.1, 11.0-11.2, 12.0-12.2, 15.0-15.4, and 18.0-18.3.

### F. TVision's Experts Are Entitled To Offer Opinions Relating to Alternatives to the Alleged Infringing System

#### 1. TVision does not Bear a Burden To Establish That An Alternative Is Non-Infringing

Nielsen's brief incorrectly presumes that TVision bears the burden of proving that an alternative ACR system would not infringe Nielsen's patents or anyone else's patents. On the contrary, this District has recognized that a defendant has no such burden in a case such as this in which the plaintiff seeks only a reasonable royalty. *RSB Spine, LLC v. DePuy Synthes Sales, Inc.*, 2022 WL 17084156 at *3 (D. Del. Nov. 18, 2022) (rejecting argument that Defendants were required "to meet a particular burden of proof when asserting that a product is a non-infringing alternative"). In *RSB Spine,* Judge Andrews stated that the plaintiff "cites no case law that indicates any burden of proof when considering alternative products for a reasonable royalty analysis." Judge Andrews thus concluded that the issue would be the subject of cross-

31

examination. Thus, Nielsen's arguments to the effect that it is TVision's burden to establish that alternative ACR systems would be non-infringing fail as a matter of law. *See* Nielsen Br. at 17-20 23, 28-29.

███████████████████████████████████████████

███████████████████████████████████████████

Nielsen's position is absurd, given that the '889 patent, itself, admits that ACR systems using signature matching techniques "is well known." Ex. 5, 1:20-23.

Equally absurd is Nielsen's characterization of "hypothesized alternative systems that TVision allegedly could have used instead of ██████████ infringing software." Nielsen Br. at 16. However, as Dr. Anderson has opined, it would have been "simple to implement" a modification of the ████████ system to avoid infringement of the '889 patent had it been necessary to do so. Ex. 14 at 41-42 ¶ 101. In fact, the reason ████████ has not redesigned its ACR software is that it does not infringe, as TVision will prove at trial. Further, TVision could also license other third-party software, as discussed above.

Finally, the evidence will show, as reflected in Ms. Johnson's report, that just prior to the hypothetical negotiation, when TVision decided to use ████████ ACR software, TVision could have chosen other ACR providers. This evidence will be supplied at trial by testimony from TVision employees, who will testify as to which ACR software they actually considered, and the reason (price) why they chose ████████

The cases cited by Nielsen at page 17 do not support its argument. In *WhereverTV, Inc. v. Comcast Cable Commc'ns, LLC*, 2022 WL 2751752 at *7 (M.D. Fla. Jul. 14, 2022), the court stated that the "availability and acceptability" of the proposed alternatives "must also be substantiated with record evidence." Here, the record evidence is the investigation that TVision's employees undertook after they learned that the ██████ license would not be renewed, in which they identified acceptable alternative ACR systems to the one they actually

32

chose.  See evidence cited in Ex. 4 at ¶ 157-160, 162. In *WhereverTV*, the defendant identified "two hypothetical non-infringing alternatives," which the court permitted the jury to hear, based on expert testimony. *Id.* The court excluded only "other alternative models, which [the expert] alludes to only vaguely." *Id.* In sharp contrast, the systems available to TVision at the time of the hypothetical negotiation are identified in Ms. Johnson's and Dr. Anderson's reports, and will be the subject of testimony of fact witnesses at trial.  Ex. 4 at ¶157-160, 162-164, Ex. 3. at ¶105-110.  None of this testimony is "wholly speculative," as was the case in *SRI Int'l Inc. v. Internet Sec. Sys., Inc.*, 2011 WL 5166436 at \*2 (D. Del. Oct. 31, 2011).  *Astrazenica AB v. Apotex Corp.*m 782 F.3d 1324, 1340-41 (Fed. Cir. 2015), was a drug case in which the court held that an alternative was not available to the defendant because there was evidence that it was covered by a patent. There is no evidence in this case that the alternatives considered by TVision are covered by patents.  Cases excluding testimony about products that did not exist in the marketplace at the time of the hypothetical negotiation are inapposite because the evidence will show that TVision considered alternative, existing ACR systems before licensing ACRCloud's system.[7]  Thus, there is no basis for precluding Ms. Johnson's cost model.

### 2.  There is Ample Basis for Ms. Johnson's Opinion Regarding an Internally Developed ████████ Alternative

At pages 18-19, Nielsen argues that TVision must "establish that [the non-infringing alternative was more than 'theoretically possible,' and in fact 'available' to be marketed," citing *Visteon Global Techo. V. Garmin Intern.*, 903 F. Supp.2d 521, 528 (E.D. Mich. 2012). First, in *WhereverTV,* 2022 WL 2751752 at \*7, the court permitted expert testimony about hypothetical non-infringing design alternatives based on testimony that the defendant could have developed and used the hypothetical alternatives.  Here, the patented method and system are arguably distinguishable over the prior art only because the claims require comparing "spectral powers"

---

[7] *Novartis Corp. v. Ben Venue Labs.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001) cited by Nielsen on page 17 of its brief, is inapposite because the decision concerned a non-infringement issue.

(i.e., peaks in a graph) within a single "frame" to determine a "descriptor." Ex. 14, at 41-42 ¶ 101. Dr. Anderson opines that ██████ which designed its entire ACR software system in the first place, ████████████████████████████████████████████████████████ ████████████████████████████ Indeed, this software change would be "simple" (*see id.*), and ████████ would have done it already, but for the fact, which will be proven at trial, that the ██████████████████████████████████████████████████████████████.

At page 23 of its brief, Nielsen again argues that a proposed alternative is not available if it infringes a third party patent. However, it is not TVision's burden to prove a negative. In *Robertson Transformer Co. v. General Electric Co.*, 2016 WL 4417019 (N.D.Ill. Aug. 19, 2016), the court denied plaintiff's motion to exclude testimony by defendant's expert on this basis. Here, there is no evidence that any alternatives would infringe.

At page 26 of its brief, Nielsen argues that Ms. Johnson relies on TVision's Chief Technology Officer's [Mr. Sidhu] *ipse dixit* "that TVision has the technical capabilities to develop this functionality in-house." During deposition, Nielsen explored this very topic with Ms. Johnson, with Ms. Johnson testifying to Mr. Sidhu personal experience in the industry (Johnson Dep Tr. 64:3-65:14), the technical know-how demonstrated by TVision's personnel in developing its innovative eyes on screen technology which was not generally known in the industry (Johnson Dep Tr. 213:11-15), Dr. Anderson's independent assessment of Mr. Sidhu's technical capabilities (Johnson Dep Tr. 215:1-215:13), all served to confirm that Mr. Sidhu's assessment of his team's technical capabilities were accurate (Johnson Dep Tr. 77:7-17, 78:15-79:1, 215:14-216:8.)

At pages 27-28 of its brief, Nielsen argues that Dr. Anderson and Ms. Johnson do not even attempt to assert that TVision could have developed an alternative that would have been available at the time of the May 2018 hypothetical negotiation. However, this misstates Ms.

34

Johnson's opinion, as she explicitly testified the analysis was focused on the period leading up to the hypothetical negotiation:



*See* Johnson Dep Tr. 77:22-14, *see also* 79:8-80:7).  See also, Ex. 14 at 43, ¶ 103.

### 3.  There is no basis to Preclude Opinions about Third-Party Alternatives

Regarding third-party solutions ( ███████████████████ Nielsen claims that "TVision's experts fail to identify any evidence to support a claim that these third-party ACR systems would have been available, acceptable alternatives to the patented systems."  Nielsen Br. at 31.  Nielsen is turning a blind eye to the evidence cited in Ms. Johnson's report of these alternatives that TVision had historically considered before choosing ACRCloud for reasons that were completely unrelated to their availability or acceptability.

Ms. Johnson explains in her report that at the time TVision was looking for an ACR provider to replace ████ it had considered at least ███████████ ████ as potential replacements.  Ex. 4 at 53 ¶ 158.  The evidence cited by Ms. Johnson demonstrates these alternatives were, not just available options in the marketplace, but even more compelling, options that TVision was aware of when looking to select a new ACR provider.  In January 2017, at the request of TVision, ████████████ ███████████" Ex. 4 at ¶ 158.  In January 2017, █████████ ██████████████████████████████████ ████████████████████t. *Id*. In October 2017, in response to TVision's inquiry.



35



" *Id*. In January 2018, ███████

███████ *Id*. There is no speculation involved here; these communications indicating the availability of third-party ACR alternatives are all in the record, and Nielsen has provided no evidence that these alternatives were not available.

Nielsen further argues the lack of acceptability of ███████, but fails to acknowledge that TVision chose ███████ over these options for reasons unrelated to acceptability. Regarding ████ Nielsen claims that "███████.
" Nielsen Br. at 32. Ms. Johnson directly addresses this misinterpretation of the document, where she states that "███████" Ex. 4 at ¶ 159. Similarly Dr. Anderson addresses the misinterpretation of this document in Ex 14 at 44-45, ¶107-108 and therefore Nielsen has no basis to exclude these paragraphs. Evidence in the record indicates that pricing was a large consideration to TVision when evaluating ACR providers, such as ███████. Ex. 4 at 53 ¶ 158, at 55-56 ¶¶ 162, 164-165.

Ms. Johnson and Dr. Anderson refer to additional alternatives in their respective reports (███████ as potential options that TVision considered (and actively requested VidVita to make introductions) (Ex 3 at ¶¶ 150, 157, 160 and Ex 14 at 46 ¶110. ) to demonstrate the absurdity of the idea that TVision did not have a next-best alternative "**even to this day**" as argued by its own expert (Ex 3 at ¶ 49) . While the record cited by Ms. Johnson and Dr. Anderson does address the availability of certain ACR alternatives that TVision

considered in the period leading up to the hypothetical negotiation, given that Dr. Keeley opines that TVision did not have alternatives available "even to this day" (Ex 3 at ¶ 49), it is proper for Ms. Johnson and Dr. Anderson to consider alternatives that have entered the market through present day. Furthermore, Ms. Johnson has provided extensive analysis and evidence of ████ ██████████████████████████ as next-best alternatives in her report. Nielsen has no basis to exclude ¶¶ 13 (bullet 2), 149-50, 157, 160, and 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-70, 281, Figures 1, 11-12, 16, 21, and Exhibits 3.0, 5.0, 18.0, and 18.2, all of which contain analyses unrelated to these additional alternatives. For the reasons discussed above, Nielsen has no basis to exclude Anderson ¶ 107-110 which include cites to factual evidence of alternatives considered by TVision and/or available in the marketplace.

Nielsen asks too much when it suggests that this Court "preclude Ms. Johnson from offering any opinions about the "Answer" product, Nielsen moves to strike paragraphs 13 (bullet 2), 232 (bullet 8), 235-236, 239, and 243 (bullet 2). Nielsen Br. at 38. Within those paragraphs, Ms. Johnson opines of value indicators from her comprehensive analysis of next-best alternatives. The company Answer is not mentioned anywhere in these paragraphs. For Beatgrid and Dat-Track, Nielsen purports to exclude the same paragraphs using the same flawed reasoning. Nielsen Br. at 38-39. The companies Beatgrid and Dat-Track are not mentioned anywhere in these paragraphs. Likewise, Ms. Johnson's opinions expressed in paragraphs 251-255, 269-270, 302, and 281 are part of a section of her report that disputes the reliability of Dr. Keeley's consideration of alternatives. The companies Answer, Beatgrid, and Dat-Track are not mentioned anywhere in these paragraphs. There is no merit to Nielsen's attempt to preclude these paragraphs of Ms. Johnson's report.

Nielsen seemingly focuses on Ms. Johnson's cite to TVision's testimony that "the ACR Provider Market is 'Fairly Commoditized' with 'Very Similar Capabilities'" while ignoring the slew of evidence discussed above that each point out specific companies that TVision

considered in its process of finding a new ACR provider. Moreover, Ms. Johnson does not cite to just "a TVision's employee's conclusory statement." Both Tristan Webster and Yan Liu testified to the availability of ACR providers that would have been next-best alternatives. Ex. 4 at ¶ 150, 157. Nielsen has no basis to exclude paragraphs 150, 157, 169-70, 177, 223, 253, of Ms. Johnson's report or paragraphs 105-110 of Dr. Anderson's report, both of which cite to testimony and facts of the record detailing exactly what Nielsen argues is absent from their reports.

### 4. Ms. Johnson Does Not Opine That a Reasonable Royalty Is Limited to The Cost of An Alternative

Nielsen wrongly claims that Ms. Johnson "limits the proposed royalty from her 'cost' approach to the alleged cost of implementing proposed alternatives to the patented technology." Nielsen Br. at 42. But nowhere in her report does Ms. Johnson opine that the cost of an alternative is "a cap" to a reasonable royalty.

Nielsen cites to *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373, stating it is "wrong as a matter of law to claim that reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, non-infringing alternative." Nielsen Br. at 43. However, *Mars* simply holds that reasonable royalty damages *can*, as a matter of law, be higher than the cost of a design-around. It does not hold that a party cannot argue that a reasonable royalty should be based on the cost of a design-around. In fact, the Federal Circuit has held that one acceptable way of estimating a reasonable royalty is "estimate the value of the benefit provided by the infringed features by a comparing the accused product to non-infringing alternatives." *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1315 (Fed. Cir. 2014), *overruled on other grounds by Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015).

Furthermore, Nielsen misstates Ms. Johnson's selection of her royalty rate in that Ms. Johnson irrefutably did not select a royalty based on the cheapest cost to implement a proposed alternative. As summarized in Figure 1 of Ms. Johnson report, Ms. Johnson considered the cost

38

of three alternatives, with the cheapest resulting in no incremental expense to TVision resulting in royalty rate indicator of ███  Ex. 4 at Fig 1, ¶ 162-163.  Clearly, Ms. Johnson's lump sum opinion of ███████ is not capped at the cost of implementing the cheapest available, acceptable alternative.

Nielsen grossly oversimplifies Ms. Johnson's opinion, as her opinion addresses fifteen different considerations that would frame a hypothetical negotiation under *Georgia Pacific* and considers quantitative indicators resulting from the Market Approach, Cost Approach, and Income Approach.  Ms. Johnson provides her rationale as to why certain indicators should be weighed more or less heavily given how closely the indicator reflects the inventive aspect of the asserted patent (*Id.* at ¶ 236) and notes that all of these indicator reflect the maximum benefit attributable to the '889 patent in that these values "still need[] to be split in some fashion between the licensor and the licensee to provide the licensor reasonable compensation for the use of its intellectual property, and the licensee reasonable compensation for assuming the business risks associated with developing, manufacturing, promoting, and selling the product that embodies the particular technology." *Id.* at ¶ 237.

As outlined above, Nielsen has no basis to exclude paragraphs 156, 235-236, 238-239, Figure 11, and Exhibits 4.0, 5.0-5.4, 6.0-6.3, based on its flawed argument that Ms. Johnson is capping her reasonable royalty based on the Cost approach.

Nielsen also has no basis to exclude paragraphs 11-12, 103, 148-149, 172-173, 232 (bullet 8), Figures 1, 12, 16, 21, and Exhibits 3.0, 3.1, and 18.0 of Ms. Johnson's report, which summarize the opinions that stem from the analysis performed.

### G.  There Is No Basis For Excluding Dr. Anderson's Opinion Regarding Haitsma US

The Court should deny Nielsen's motion to preclude Dr. Anderson from testifying that certain aspects of Haitsma US disclose the asserted claims of the '889 patent.  Dr. Anderson's opening report properly compares Haitsma US to the asserted claims.  Anderson Op. Rep.

39

Exhibit 1 (Ex. 2 to D.I. 189) at 5-9. In response, it was Nielsen's expert who, in an effort to avoid invalidity, made a new claim construction argument that "[t]he 'spectral power' of the '889 Patent is the power of a single Fourier coefficient that results from performing an FFT on a particular frame." Moulin Rebuttal Rep. (Ex. 7 to D.I. 189) at ¶ 233. Nielsen now seeks to turn the tables and strike Dr. Anderson's *response* to Nielsen's own new claim construction.

Nielsen first seeks to exclude "opinions in Anderson Op. Rep. Exhibit 1 (limitation 1.b (referencing ¶¶ 29-30 of Haitsma US) and any cross-references to that paragraph for any other claims)." D.I. 188 at 45, 46. Nielsen's argument for this request is based on its claim that Dr. Anderson improperly renders opinions about the construction of the claim term "spectral transform operation" by referencing the "wavelet transforms" and/or comparing prior art to embodiments in the '889 patent. *See id*. at 43-46. However, the Exhibit 1 to Dr. Anderson's Opening Report does not even mention "wavelet transforms" or any specific "embodiment" of the '889 patent. *See* Anderson Op. Rep. Exhibit 1 (Ex. 2 to D.I. 189) at 5-9. Instead, Dr. Anderson correctly compares Haitsma US prior art reference (right column) to the '889 patent claims (left column). *Id.* Thus, Nielsen's request should be denied.

Nielsen next seeks to exclude "Anderson Reply Rep. ¶¶ 6-11 and 14," alleging that Dr. Anderson improperly renders opinions about the construction of the claim term "spectral transform operation" by referencing "wavelet transforms." *See* D.I. 188 at 43-45. Nielsen's arguments again miss the mark.

The Court has construed the "identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples" to mean "[g]enerate first and second frequency components by performing a spectral transform operation on the first frame of media samples." Dr. Moulin opines that, under the Court's construction, the "spectral transform operation" must be limited to a fast Fourier transform

40

(FFT), and thus only the FFT in Haitsma US can meet this limitation. *See* Moulin Rebuttal Rep. (Ex. 7 to D.I. 189) at ¶¶ 182 ("spectral transform operation—the 'Fourier transform circuit 13'"), 184 ("Using the terminology of the '889 Patent, the Haitsma US application identifies frequency components and spectral powers for a particular frame of media samples using Fourier transform."). In response to Dr. Moulin's narrow application of the Court's construction to Haitsma US, Dr. Anderson replied and confirmed his opinion that a person of ordinary skill in the art (POSITA) understood the "spectral transform operation" of the claims not to be limited to just an FFT, and that Haitsma US discloses a "spectral transform operation." *See* Anderson Reply Rep. (Ex. 4 to D.I. 189) at ¶¶ 6-11. Thus, Dr. Anderson was not offering a claim construction opinion as Nielsen alleged, but merely responding to Nielsen expert's effort to distinguish Haitsma US by importing a limitation from the '889 patent specification (use of an FFT) into the claims. In other words, it is Nielsen's own expert who offers a new "claim construction opinion" to exclude Haitsma, and Dr. Anderson merely rebuts it. *See* Moulin Rebuttal Rep. (Ex. 7 to D.I. 189) at ¶ 233 ("The 'spectral power' of the '889 Patent is the power of a single Fourier coefficient that results from performing an FFT on a particular frame.").

Nielsen mainly relies on *Intuitive Surgical, Inc. v. Aurius Health, Inc.*, 549 F. Supp. 3d 362 (D. Del. 2021) and *EMC Corp. v. Pure Storage, Inc.*, C.A. No. 13-1985, 2016 WL 775742 (D. Del. Feb. 25, 2016) as case law support, but both are inapt. In *EMC*, in the context of defendant expert's non-infringement opinion, the Court's concern was that an expert's reference to the patent specification and embodiments would "amount to claim construction and suggest that literal infringement can be established by a comparison between accused products and specification embodiments." *EMC Corp.*, 2016 WL 775742 at *4. Similarly, the *Intuitive* case involves a defendant expert's non-infringement opinion, applying a narrow definition of a term that is not construed by the Court. Here, it would be nonsensical to permit

41

Nielsen's expert to offer a new, narrow construction of a claim element in an attempt to avoid invalidation by Haitsma US, while barring TVision's expert from offering an opinion on why Haitsma US invalidates under the Court's existing claim constructions.

Nielsen asks the Court to exclude "Anderson Reply Rep. ¶¶ 6-11 and 14," alleging that Dr. Anderson improperly "compare[s] the Haitsma US prior art reference to the specification's embodiments rather than to the claims." *See* D.I. 188 at 45-46.  As an initial matter, Nielsen only cites to paragraph 14 of the Anderson Reply Report as alleged evidence, but requests exclusion of paragraphs 6-11 of Anderson Reply Report, none of which are specifically tied to Nielsen's allegation.  Further, paragraph 14 of the Anderson Reply Report includes opinions beyond just the reference to the embodiment of the '889 patent, which is not tied to the purported improper comparison.  Furthermore, in paragraph 14, Dr. Anderson merely cites an embodiment of the '889 patent with logarithmically spaced bands—like those of Haitsma US— to explain that such bands meet the claims of the '889 patent.  Dr. Anderson used the embodiment to show that Mr. Haitsma had wrongly applied a narrow construction of the claims of the '889 patent, which is contradicted by the specification.  Dr. Anderson did not reference the embodiment of the '889 patent for affirmative invalidity purpose as Nielsen claims. As such, none of the cases cited by Nielsen are applicable.  *See* D.I. 188 at 46.

## V.  THIS COURT SHOULD DENY NIELSEN'S MOTION FOR PARTIAL SUMMARY JUDGMENT

The Court should deny Nielsen's partial summary judgment motion because there are genuine disputes of fact regarding the priority date of the '889 patent and whether the Cheung reference is entitled to the priority date of its provisional application.

First, Nielsen's partial summary judgment is contingent on its purported fact that the "'889 patent is entitled to a priority date of February 26, 2004, the filing data [sic] of the provisional patent application to which it claims priority, Provisional Application No. 60/603,024." D.I.184 at 2.  Nielsen lists the following three supporting citations as evidence:

Ex. 1, '889 patent, Face; Ex. 7, Moulin Rebuttal Rep. ¶¶ 75-77, 789-93; Ex. 34, Nielsen Resp. Interrogatory No. 7 (9-1-2023). *See id.*

Based on *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, which Nielsen itself cites, a "patent is only entitled to claim the benefit of the filing date of its provisional application if the disclosure of the provisional application provides support for the claims in the reference patent in compliance with § 112, ¶ 1." 800 F.3d 1375, 1381 (Fed. Cir. 2015). To prove a reference is entitled to its provisional filing date, a party must "compare *the claims* of the . . . patent to the disclosure in the [] provisional application." *Id.* (emphasis in original). None of the evidence Nielsen lists shows that Nielsen has met its burden of persuasion and compared the claims of the '889 patent to the provisional patent application to which it claims priority, Provisional Application No. 60/603,024. Exhibit 1 is just the face of the '889 patent. Exhibit 7 merely conclusively states that "the '889 Patent is entitled to the August 18, 2004 priority date of the '024 Provisional Application" without any substantive comparison. Dr. Moulin relies on an assumption that "the claims of the '889 Patent have sufficient written description" to conclude that the provisional application supports the later date, but Nielsen does not cite any portion of his report where he compares each element of the claims to the either the specification of the '889 patent or to the provisional application. Ex. 7 at ¶ 75-77. Instead, Nielsen cites only a short section where Dr. Moulin attempts to *rebut* Dr. Anderson's written description analysis as to just *one* claim element. *See id.* at ¶ 789-793. Exhibit 34 likewise only attempts to rebut specific TVision contentions, mentioning just *two claim limitations* and providing purported support for those two limitations in the *'889 patent specification*. Thus, there is a genuine dispute as to material fact of whether the '889 patent is entitled to a priority date of February 26, 2004. If the '889 patent is not entitled to the priority date of February 26, 2004, the Cheung reference would be prior art under not only 35 U.S.C. § 102(e) but also 35 U.S.C. § 102(a).

43

Second, even assuming that the '889 patent is entitled to the priority date of February 26, 2004, there is still genuine dispute as to material fact of whether the Cheung reference is not entitled to the priority date of its provisional application filed on February 26, 2004.

As an initial matter, Nielsen's motion is premised on its assertion that the Cheung reference is not entitled to the priority date of its provisional application, but Nielsen omits this critical fact from its concise statement of facts entirely. D.I. 184 at 1. Nielsen's motion should be denied on that ground alone.

Moreover, if the type of evidence Nielsen provided is sufficient to show that the '889 patent is entitled to the August 18, 2004 priority date of the '024 Provisional Application, then the corresponding evidence regarding the Cheung reference shows that it is entitled to the February 26, 2004 priority date of its provisional application. For example, a cursory review shows that the specification of the Cheung provisional application is substantially identical to the specification of the issued Cheung patent. *Compare* Ex. 28 to D.I.189 (Cheung) *with* Ex. __ (Cheung provisional). The only differences relate to the references to the earlier applications made by the later applications (*i.e.*, Cheung at 1:6-9) and extrapolation of certain tables to separate figures (*i.e.*, Cheung at Figs. 9-13). Because the claims of the Cheung reference are supported by the Cheung reference specification by the virtue of the USPTO's allowance of the Cheung patent, and the Cheung provisional specification is substantially identical to the Cheung reference specification, the claims of the Cheung reference are supported by the Cheung provisional application.

Lastly, it is TVision's burden of proof that Cheung reference is prior art, but the time for TVision to present evidence for such proof is at trial, including via direct or cross examination. TVision has already met its initial burden of production by arguing that Cheung reference invalidates the asserted claims of the '889 patent. *See* Ex. 2 to D.I.189 (Anderson Op. Rep.) at ¶¶ 86-99. Nielsen's experts never challenged the Cheung reference's status as

44

prior art.  Instead, Nielsen is attempting to use this partial summary judgment to prevent TVision from presenting evidence at trial to show that Cheung reference invalidates the asserted claims of the '889 patent.  The situation here is different from the cases cited by Nielsen, all of which involve situations where the parties have had a chance to present all invalidity evidence, and none of which involve premature summary judgment motions.

## VI. CONCLUSION

For the reasons set forth above, Nielsen's motions should be denied.

Respectfully submitted,

*/s/ Andrew E. Russell*
John W. Shaw (No. 3362)

OF COUNSEL:                          Andrew E. Russell (No. 5382)
Jason Xu                             Nathan R. Hoeschen (No. 6232)
RIMÔN LAW P.C.                       SHAW KELLER LLP
1990 K. Street, NW, Suite 420        I.M. Pei Building
Washington, DC 20006                 1105 North Market Street, 12th Floor
(202) 470-2141                       Wilmington, DE 19801
                                     (302) 298-0700
Eric C. Cohen                        jshaw@shawkeller.com
RIMÔN LAW P.C.                       arussell@shawkeller.com
P.O. Box B113                        nhoeschen@shawkeller.com
150 Fayetteville St, Suite 2800      *Attorneys for Defendants*
Raleigh, NC 27601-2960
(984) 960-2860

Michael F. Heafey
RIMÔN LAW P.C.
800 Oak Grove Avenue, Suite 250
Menlo Park, CA 94025
(650) 461-4433

Dated: April 9, 2024

## CERTIFICATE OF SERVICE

I hereby certify that on April 9, 2024, this document was served on the persons listed

below in the manner indicated:

**BY EMAIL:**

David E. Moore
Bindu A. Palapura
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

Clifford Katz
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800
ckatz@kelleydrye.com

Steven Yovits
Constantine Koutsoubas
Jason P. Greenhut
Douglas Lewis
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
(312) 857-7070
syovits@kelleydrye.com
ckoutsoubas@kelleydrye.com
jgreenhut@kelleydrye.com
dlewis@kelleydrye.com

Matthew Chakmakian
KELLEY DRYE & WARREN LLP
One Jefferson Road 2nd Floor
Parsippany, NJ 07054
(973) 503-5900
mchakmakian@kelleydrye.com

Joshua B. Long
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd. Suite 900
Houston, TX 77027
(713) 355-5054
jlong@kelleydrye.com

*/s/ Andrew E. Russell*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

46

# Exhibit 1

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE NIELSEN COMPANY (US), LLC,    ) | |
| ) | |
| Plaintiff,    ) | |
| ) | C.A. No. 22-57-CJB |
| v.    ) | |
| ) | **JURY TRIAL DEMANDED** |
| TVISION INSIGHTS, INC.,    ) | |
| ) | |
| Defendant.    ) | |

**PLAINTIFF THE NIELSEN COMPANY (US), LLC'S AMENDED**
**INITIAL DISCLOSURES PURSUANT TO FED. R. CIV. P. 26(a)(1)**

Pursuant to Fed. R. Civ. P. 26(a)(1), Plaintiff The Nielsen Company (US), LLC

("Nielsen"), by and through its undersigned attorneys, makes the following amended disclosures

pursuant to Federal Rule of Civil Procedure 26(a)(1) to TVision Insights, Inc. ("TVision").

These disclosures are based on the information reasonably available to Nielsen as of this date

and do not purport to identify every witness or document possibly relevant to this case.  Nielsen

reserves the right to supplement or amend these disclosures pursuant to Fed. R. Civ. P. 26(e)

upon receipt of subsequently filed pleadings or further investigation and discovery in this case.

Nielsen reserves all applicable privileges.

**Rule 26(a)(1)(A)(i): Individuals Likely to Have Discoverable Information**

> The name and, if known, the address and telephone
> number of each individual likely to have
> discoverable information – along with the subjects of
> that information – that the disclosing party may use
> to support its claims or defenses, unless the use
> would be solely for impeachment;

Nielsen provides this response without waiver or prejudice to: (a) its right, at any later

time, to raise any objections as to the competency, relevancy, materiality, privilege or

admissibility as evidence, for any purpose, of any testimony of, or information provided by, any

**Rule 26(a)(1)(A)(iii): Computation of Damages**

> A computation of each category of damages claimed by the disclosing party – who must make available for inspection and copying as under Rule 34 the documents or other evidentiary material, unless privileged or protected from disclosure, on which each computation is based, including materials bearing on the nature and extent of injuries suffered;

Discovery will be necessary to determine the appropriate type and amount of damages, and expert testimony will be provided on damages according to the timing set in the scheduling order. Nielsen expects to rely on sales records, billing records, invoices, offers for sale, past licenses, and other documents to calculate damages.

In cases in which a defendant is liable for patent infringement, courts award damages adequate to compensate for the infringement, but in no event less than a reasonable royalty. Reasonable royalties may be determined through examination of the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.,* 318 F. Supp. 1116 (S.D.N.Y. 1970). Chief among these factors is the royalty to which a willing licensor and willing licensee would have agreed at the time when infringement began (the so-called "hypothetical negotiation"). Other important factors include established royalty rates for the technology, if any, and rates or amounts paid in conjunction with comparable licenses in the past. A reasonable royalty analysis in the present case would likely involve the application of a reasonable royalty rate to TVision's infringing revenues. The reasonable royalty rate might be discerned from applicable and comparable licenses, should any exist.

Nielsen will also seek lost profits damages. The lost profits analysis is generally conducted in accordance with the factors set forth in *Panduit Corp. v. Stahlin Bros. Fibre Works, Inc.,* 575 F.2d 1152 (6th Cir. 1978). In the present case, lost profits damages may be calculated by examining the number of units of the infringing products and methods TVision has sold,

6

OF COUNSEL:

Steven Yovits
Constantine Koutsoubas
Melvin Gaddy
Jason P. Greenhut
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
Tel:  (312) 857-7070

Clifford Katz
Jolie Schenerman
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  (212) 808-7800

Dated:  August 23, 2023
10982070 / 14944-00004

POTTER ANDERSON & CORROON LLP

By:  */s/ Andrew L. Brown*
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Andrew L. Brown (#6766)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE  19801
    Tel:  (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com
    abrown@potteranderson.com

*Attorneys for Plaintiff The Nielsen Company (US), LLC*

8

# Exhibit 2

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) C.A. No. 22-57-CJB |
| v. | ) |
| | ) **JURY TRIAL DEMANDED** |
| TVISION INSIGHTS, INC., | ) |
| | ) ▮▮▮▮▮▮▮▮ |
| Defendant. | ) |

## PLAINTIFF THE NIELSEN COMPANY (US), LLC'S SECOND SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT'S FIRST SET OF INTERROGATORIES

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiff The Nielsen Company (US), LLC ("Plaintiff" or "Nielsen") hereby provides its Second Supplemental Responses and Objections to defendant TVision Insights, Inc.'s ("Defendant" or "TVision") First Set of Interrogatories as follows:

### GENERAL OBJECTIONS

1.      These responses and objections are made without in any way waiving or intending to waive: (a) any objections as to the competency, relevancy, materiality, privilege, or admissibility as evidence, for any purpose, of any documents, information or things produced in response to the Interrogatories; (b) the right to object on any ground to the use of the documents, information or things produced in response to the Interrogatories at any hearing, trial, or other proceeding; (c) the right to object on any ground at any time to a demand for further responses to the Interrogatories; or (d) the right at any time to revise, correct, add to, supplement, or clarify any of the responses or objections contained herein.

2.      Unless specifically noted herein, each of these General Objections applies to each Definition, Instruction, and Interrogatory.

Subject to and without waiving its general and specific objections, Nielsen states that discovery will be necessary to determine the appropriate type and amount of damages, and expert testimony will be provided on damages in accordance with the timing set in the Joint Scheduling Order.  Nielsen expects to rely on sales records, billing records, invoices, offers for sale, past licenses, financial metrics, and other documents to calculate damages.  In cases in which a defendant is liable for patent infringement, courts award damages adequate to compensate for the infringement, but in no event less than a reasonable royalty.  Reasonable royalties may be determined through examination of the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).  Chief among these factors is the royalty to which a willing licensor and willing licensee would have agreed at the time when infringement began (the so-called "hypothetical negotiation").  Other important factors include established royalty rates for the technology, if any, and rates or amounts paid in conjunction with comparable licenses in the past.  A reasonable royalty analysis in the present case would likely involve the application of a reasonable royalty rate to TVision's infringing revenues.  The reasonable royalty rate might be discerned from applicable and comparable licenses, should any exist.  Nielsen currently seeks to recover reasonable royalty and convoyed sales damages in both cases.

Nielsen seeks reasonable royalty damages for TVision's infringement of the '189 Patent.  Nielsen also intends to seek lost profits damages for infringement of the '889 Patent.  Nielsen practices the '889 Patent.  In the present case, lost profits damages may be calculated by examining the number of units of the infringing products and methods TVision has sold and the sales and licensing of data resulting from those products, determining (if necessary) which of those sales or licenses would have been made by Nielsen but for the infringement, and applying Nielsen's profit margin.  Nielsen may also need to factor price erosion into its analysis.  A price erosion analysis

7

**RESPONSE TO INTERROGATORY NO. 4:**

Nielsen objects to this Interrogatory to the extent that it seeks information that is protected by the attorney-client privilege and the work-product doctrine.

Subject to and without waiving its general and specific objections, Nielsen states that it has no information responsive to this Interrogatory that is not covered by the attorney-client privilege or the work-product doctrine.

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:  */s/ Andrew L. Brown*

Steven Yovits
Constantine Koutsoubas
Melvin Gaddy
Jason P. Greenhut
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
Tel:  (312) 857-7070

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Andrew L. Brown (#6766)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
abrown@potteranderson.com

Clifford Katz
Jolie Schenerman
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  (212) 808-7800

*Attorneys for Plaintiff The Nielsen Company (US), LLC*

Dated:  September 21, 2023
11068146 / 14944.00004

# Exhibit 3
# Redacted in its entirety

# Exhibit 4
# Redacted in its entirety

# Exhibit 5

US007783889B2

(12) **United States Patent**
Srinivasan

(10) **Patent No.:** **US 7,783,889 B2**
(45) **Date of Patent:** **Aug. 24, 2010**

(54) **METHODS AND APPARATUS FOR GENERATING SIGNATURES**

(75) Inventor: **Venugopal Srinivasan**, Palm Harbor, FL (US)

(73) Assignee: **The Nielsen Company (US), LLC**, Schaumburg, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 199 days.

(21) Appl. No.: **11/676,452**

(22) Filed: **Feb. 19, 2007**

(65) **Prior Publication Data**

US 2007/0274537 A1     Nov. 29, 2007

**Related U.S. Application Data**

(63) Continuation of application No. PCT/US2005/029623, filed on Aug. 18, 2005.

(60) Provisional application No. 60/603,024, filed on Aug. 18, 2004.

(51) **Int. Cl.**
    *H04L 9/00*          (2006.01)
(52) **U.S. Cl.** ......................... **713/179**; 713/176; 725/19; 725/20; 380/202; 380/239; 381/94.3
(58) **Field of Classification Search** ................. 713/160, 713/176, 179; 380/202, 206, 207, 239, 253, 380/229; 382/100, 232, 240, 191; 381/94.3; 375/134; 704/268, 273; 725/19, 20
    See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,230,990 A     10/1980  Lert, Jr. et al.
(Continued)

FOREIGN PATENT DOCUMENTS

AU          718227          11/1997
(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office, "PCT International Search Report," issued by the International Searching Authority of the United States Patent and Trademark Office on Feb. 6, 2008, in connection with a counterpart international application No. PCT/US2005/029623 (3 pages).

(Continued)

*Primary Examiner*—Nasser Moazzami
*Assistant Examiner*—Shanto M Abedin
(74) *Attorney, Agent, or Firm*—Hanley, Flight and Zimmerman, LLC

(57)          **ABSTRACT**

Methods, apparatus, and articles of manufacture for media monitoring are disclosed. In particular, the example methods, apparatus, and articles of manufacture generate digital spectral signatures for use in identifying media information. Initially, a frame of media samples is obtained. A first frequency component having a first spectral power and a second frequency component having a second spectral power are identified by performing a spectral transform operation on the frame of media samples. A descriptor of the first frame of media samples is determined based on a comparison of the first spectral power and the second spectral power. A first signature is then generated based on the descriptor.

**17 Claims, 12 Drawing Sheets**



US 7,783,889 B2

## 1

## METHODS AND APPARATUS FOR GENERATING SIGNATURES

### RELATED APPLICATIONS

This patent is a continuation of International Patent Application Ser. No. PCT/US2005/029623, filed Aug. 18, 2005, which claims priority to U.S. Provisional Application 60/603, 024, filed on Aug. 18, 2004, both of which are hereby incorporated herein by reference in their entireties.

### FIELD OF THE DISCLOSURE

The present disclosure relates generally to media monitoring and, more particularly, to methods and apparatus for generating signatures for use in identifying media information.

### BACKGROUND

Identifying media information and more specifically audio streams (e.g., audio information) using signature-matching techniques is well known. Known signature-matching techniques are often used in television and radio audience metering applications and are implemented using several known methods for generating and matching signatures. For example, in television audience metering applications, signatures are generated at monitoring sites (e.g., monitored households) and reference sites. Monitoring sites typically include locations such as, for example, households where the media consumption of audience members is monitored. For example, at a monitoring site, monitored signatures may be generated based on audio streams associated with a selected channel, radio station, etc. The monitored signatures may then be sent to a central data collection facility for analysis. At a reference site, signatures, typically referred to as reference signatures, are generated based on known programs that are provided within a broadcast region. The reference signatures may be stored at the reference site and/or a central data collection facility and compared with monitored signatures generated at monitoring sites. A monitored signature may be found to match with a reference signature and the known program corresponding to the matching reference signature may be identified as the program that was presented at the monitoring site.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A and 1B illustrate example audio stream identification systems for generating digital spectral signatures and identifying audio streams.

FIG. 2 is a time-domain representation of an example monitored audio stream and a plurality of audio sample frames acquired from the monitored audio stream.

FIG. 3 is a time-domain representation of an example reference audio stream and a plurality of audio sample frames acquired from the example reference audio stream.

FIG. 4 is a flow diagram of an example method for generating digital spectral signatures based on spectral decompositions.

FIG. 5 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 4.

FIG. 6 is a flow diagram of another example method for generating digital spectral signatures based on spectral decompositions.

FIG. 7 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 6.

## 2

FIG. 8 is a flow diagram of an example method for comparing the digital spectral signatures generated using the example methods of FIGS. 4-7.

FIG. 9 is a block diagram of an example signature generation system for generating digital spectral signatures based on audio streams.

FIG. 10 is a block diagram of another example signature generation system for generating digital spectral signatures based on audio streams.

FIG. 11 is a block diagram of an example signature comparison system for comparing digital spectral signatures.

FIG. 12 is a block diagram of an example processor system that may be used to implement the methods and apparatus described herein.

### DETAILED DESCRIPTION

Although the following discloses example systems including, among other components, software executed on hardware, it should be noted that such systems are merely illustrative and should not be considered as limiting. For example, it is contemplated that any or all of these hardware and software components could be embodied exclusively in hardware, exclusively in software, or in any combination of hardware and software. Accordingly, while the following describes example systems, persons of ordinary skill in the art will readily appreciate that the examples provided are not the only way to implement such systems.

The methods and apparatus described herein generally relate to generating digital spectral signatures, which may be used to identify media information. In particular, the disclosed methods and apparatus are described with respect to generating digital spectral signatures based on audio streams (e.g., audio information). However, the methods and apparatus described herein may also be used to generate digital spectral signatures based on any other type of media information such as, for example, video information, web pages, still images, computer data, etc. Further, the media information may be associated with broadcast information (e.g., television information, radio information, etc.), information reproduced from any storage medium (e.g., compact discs (CD), digital versatile discs (DVD), etc.), or any other information that is associated with an audio stream, a video stream, or any other media information for which the digital spectral signatures are generated. In one particular example, the audio streams are identified based on digital spectral signatures that include monitored digital signatures generated at a monitoring site (e.g., a monitored household) and reference digital signatures generated and/or stored at a reference site and/or a central data collection facility.

As described in detail below, the methods and apparatus described herein identify media information including audio streams based on digital spectral signatures. The digital spectral signatures may be formed using digital descriptors that are generated based on the spectral components of an audio stream and that may be analyzed using frequency transforms and/or wavelet transforms.

Unlike known methods in the prior art that use interframe operations (e.g., operations based on sample data within different data sample frames) to generate digital spectral signatures, the methods and apparatus described herein may be implemented using intraframe operations (e.g., operations based on sample data within a single frame). Intraframe operations may include, for example, comparison operations, determining percentage differences between values, etc. that are performed on two or more values (e.g., spectral power values) that are uniquely associated with or derived from a single frame. For example, using the methods and apparatus described herein, a digital spectral signature may be generated by obtaining a frame of media samples, determining

US 7,783,889 B2

25                                                    26

with an unidentified audio stream (e.g., the example monitored audio stream 202 of FIG. 2). For example, the media identification look-up table interface 1112 may be communicatively coupled to a media identification look-up table or a database that is used to cross-reference media identification information (e.g., movie title, show title, song title, artist name, episode number, etc.) based on reference signatures. In this manner, the media identifier 1110 may retrieve media identification information from the media identification database based on the matching reference signatures.

FIG. 12 is a block diagram of an example processor system 1210 that may be used to implement the apparatus and methods described herein. As shown in FIG. 12, the processor system 1210 includes a processor 1212 that is coupled to an interconnection bus or network 1214. The processor 1212 includes a register set or register space 1216, which is depicted in FIG. 12 as being entirely on-chip, but which could alternatively be located entirely or partially off-chip and directly coupled to the processor 1212 via dedicated electrical connections and/or via the interconnection network or bus 1214. The processor 1212 may be any suitable processor, processing unit or microprocessor. Although not shown in FIG. 12, the system 1210 may be a multi-processor system and, thus, may include one or more additional processors that are identical or similar to the processor 1212 and that are communicatively coupled to the interconnection bus or network 1214.

The processor 1212 of FIG. 12 is coupled to a chipset 1218, which includes a memory controller 1220 and an input/output (I/O) controller 1222. As is well known, a chipset typically provides I/O and memory management functions as well as a plurality of general purpose and/or special purpose registers, timers, etc. that are accessible or used by one or more processors coupled to the chipset. The memory controller 1220 performs functions that enable the processor 1212 (or processors if there are multiple processors) to access a system memory 1224 and a mass storage memory 1225.

The system memory 1224 may include any desired type of volatile and/or non-volatile memory such as, for example, static random access memory (SRAM), dynamic random access memory (DRAM), flash memory, read-only memory (ROM), etc. The mass storage memory 1225 may include any desired type of mass storage device including hard disk drives, optical drives, tape storage devices, etc.

The I/O controller 1222 performs functions that enable the processor 1212 to communicate with peripheral input/output (I/O) devices 1226 and 1228 via an I/O bus 1230. The I/O devices 1226 and 1228 may be any desired type of I/O device such as, for example, a keyboard, a video display or monitor, a mouse, etc. While the memory controller 1220 and the I/O controller 1222 are depicted in FIG. 12 as separate functional blocks within the chipset 1218, the functions performed by these blocks may be integrated within a single semiconductor circuit or may be implemented using two or more separate integrated circuits.

The methods described herein may be implemented using instructions stored on a computer readable medium that are executed by the processor 1212. The computer readable medium may include any desired combination of solid state, magnetic and/or optical media implemented using any desired combination of mass storage devices (e.g., disk drive), removable storage devices (e.g., floppy disks, memory cards or sticks, etc.) and/or integrated memory devices (e.g., random access memory, flash memory, etc.).

Although certain methods, apparatus, and articles of manufacture have been described herein, the scope of coverage of this patent is not limited thereto. To the contrary, this patent covers all methods, apparatus, and articles of manufacture fairly falling within the scope of the appended claims either literally or under the doctrine of equivalents.

What is claimed is:

1. A method for generating signatures implemented using an apparatus comprising a processor, the method comprising:
   obtaining a first frame of media samples;
   identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;
   determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;
   generating a first signature based on the first descriptor;
   identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples;
   identifying a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;
   determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and
   generating a second signature based on the second descriptor.

2. A method as defined in claim 1, further comprising identifying media information based on the first signature.

3. A method as defined in claim 2, wherein a Hamming distance is used to identify the media information based on the first signature.

4. A method as defined in claim 2, wherein the media information is associated with at least one of audio information or video information.

5. A method as defined in claim 1, wherein the first descriptor is associated with only the first frame of media samples.

6. A method as defined in claim 1, wherein the second descriptor is of the second frame of media samples.

7. A method as defined in claim 1, wherein the spectral transform operation is a sliding Fast Fourier Transform.

8. An apparatus for generating signatures, comprising:
   a processor system including a memory; and
   instructions stored in the memory that enable the processor system to:
      obtain a first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;
      identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;
      identify a third spectral power and a fourth spectral power; determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;
      determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

US 7,783,889 B2

27                                                28

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

9. An apparatus as defined in claim 8, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature.

10. An apparatus as defined in claim 9, wherein a Hamming distance is used to identify the media information based on the first signature.

11. An apparatus as defined in claim 8, wherein the first descriptor is associated with only the first frame of media samples.

12. An apparatus as defined in claim 8, wherein the instructions stored in the memory enable the processor system to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

13. An apparatus as defined in claim 8, wherein the third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

14. A tangible machine accessible medium having instructions stored thereon that, when executed, cause a machine to:

obtain a first frame first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

identify a third spectral power and a fourth spectral power;

determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

15. A tangible machine accessible medium as defined in claim 14, wherein the first descriptor is associated with only the first frame of media samples.

16. A tangible machine accessible medium as defined in claim 14 having instructions stored thereon that, when executed, cause the machine to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

17. A tangible machine accessible medium as defined in claim 14, wherein third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

*    *    *    *    *

# Exhibit 6
# Redacted in its entirety

# Exhibit 7
# Redacted in its entirety

# Exhibit 8
# Redacted in its entirety

# Exhibit 9
# Redacted in its entirety

# Exhibit 10

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 21-1592-CJB |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 22-57-CJB |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

## PLAINTIFF THE NIELSEN COMPANY (US), LLC'S
## NOTICE UNDER RULE 30(B)(6) TO TVISION

Pursuant to Rule 30(b)(6) of the Federal Rules of Civil Procedure, Plaintiff, The Nielsen

Company (US), LLC ("Nielsen"), through its undersigned counsel, will take the oral deposition of

Defendant TVision Insights, Inc. ("TVision") concerning the Matters for Examination set forth in

Schedule A.

Pursuant to Federal Rules of Civil Procedure 30(b)(6) TVision must designate one or more

officers, directors, managing agents, or other persons who consent to testify on its behalf as to the

identified matters. The persons designated must testify about information known or reasonably

available to TVision. The deposition will take place on June 21, 2023, commencing at 9:00 am ET,

at the law offices of Potter Anderson & Corroon LLP located at 1313 North Market Street, 6th

Floor, in Wilmington, Delaware 19801, or at some other mutually agreeable time and place.

**Ex. 10**

The deposition will be recorded via stenographic, audio, and/or videotaped means for the purpose of discovery and/or used as evidence and/or any other purposes permitted by the Federal Rules of Civil Procedure and the Local Rules of this Court, including use at trial.

|  |  |
|---|---|
| OF COUNSEL: | POTTER ANDERSON & CORROON LLP |
|  | By:  /s/ David E. Moore |
| Steven Yovits | David E. Moore (#3983) |
| Constantine Koutsoubas | Bindu A. Palapura (#5370) |
| Melvin Gaddy | Andrew L. Brown (#6766) |
| KELLEY DRYE & WARREN LLP | Hercules Plaza, 6th Floor |
| 333 West Wacker Drive | 1313 N. Market Street |
| Chicago, IL 60606 | Wilmington, DE  19801 |
| Tel:  (312) 857-7070 | Tel:  (302) 984-6000 |
|  | dmoore@potteranderson.com |
|  | bpalapura@potteranderson.com |
| Clifford Katz | abrown@potteranderson.com |
| Jolie Schenerman |  |
| KELLEY DRYE & WARREN LLP |  |
| 3 World Trade Center | *Attorneys for Plaintiff The Nielsen Company* |
| 175 Greenwich Street | *(US), LLC* |
| New York, NY 10007 |  |
| Tel:  (212) 808-7800 |  |

Dated:  May 18, 2023
10817560 / 14944.00004

2

**Ex. 10**

32.     Any alleged motivation to combine any Prior Art that TVision contends renders any claim of the Patents-in-Suit invalid for obviousness.

33.     The level of ordinary skill in the art that TVision contends is applicable to each of the Patents-in-Suit.

34.     All facts that support or refute TVision's contention that objective indicia of non-obviousness do not support a finding of non-obviousness, including but not limited to, facts underlying simultaneous invention, long-felt but unmet need, commercial success, copying, failure of others, skepticism, and industry praise.

35.     The factual bases for any contention by TVision that any Asserted Claim of the Patents-in-Suit is unenforceable.

36.     Any TVision Patent that TVision contends covers the TVision Product.

37.     Any license or agreement offered, considered, negotiated, or agreed to by TVision regarding any product or technology concerning the technology of the Nielsen Patents-in-Suit, TVision Audience Measurement Products and Methods, TVision Audience Counting, TVision ACR, or any products and methods that perform audience measurement.

38.     Communications with third parties concerning products and methods that perform audience measurement.

39.     Sales, offers of sale, licensing and/or provision to any third party of data from the TVision Audience Measurement Products and Methods or data or other information products or services associated with the TVision Audience Measurement Products and Methods.

40.     The monthly, quarterly, and annual sales, in dollars and units, of the TVision Audience Measurement Products and Methods and of data or other information products or

9

Ex. 10

services associated with the TVision Audience Measurement Products and Methods from January 1, 2015 to the present, and any projected and/or anticipated profits.

41.   Any revenue, royalty, payment or other consideration of any kind for all licenses, sales agreements and/or other contracts for data generated by and/or associated with TVision Audience Measurement Products or Methods, including, by way of non-limiting example, relating to TVision's SaaS platform end product.

42.   Any fees or royalties owed to, paid by, or paid to TVision in connection with any TVision Audience Measurement Products or Methods or with data or other information products or services associated with the TVision Audience Measurement Products and Methods, including intellectual property licenses.

43.   TVision's methodology for calculating revenue and gross and net profits before taxes (including the ability to identify labor, material, variances, selling and administrative costs, and the components that make up those costs) for the TVision Audience Measurement Products and Methods, data or other information products or services associated with TVision Audience Measurement Products and Methods, or any products, methods, or system that use or incorporate TVision Audience Counting and/or TVision ACR.

44.   Business plans, strategic plans, long-range plans, budgets, forecasts, projections, financial plans, and management reports concerning the TVision Audience Measurement Products and Methods or data or other information services associated with the TVision Audience Measurement Products and Methods.

45.   Sales, marketing, and/or promotional materials sent by or on behalf of TVision, or presented by TVision, to potential or actual customers concerning the sale or license of any

10

**Ex. 10**

# Exhibit 11
# Redacted in its entirety

# Exhibit 12
# Redacted in its entirety

# Exhibit 13

MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
Morrison & Foerster LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

Attorneys for Defendant and Counterclaimant
SHORELINE BIOSCIENCES, INC.

*Appearances of Counsel Continued on Next Page*

# UNITED STATES DISTRICT COURT

# SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FATE THERAPEUTICS, INC. and WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,<br><br>Plaintiffs,<br><br>v.<br><br>SHORELINE BIOSCIENCES, INC.,<br><br>Defendant.<br><br>─────────────<br><br>SHORELINE BIOSCIENCES, INC.,<br><br>Counterclaimant,<br><br>v.<br><br>FATE THERAPEUTICS, INC. and WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH,<br><br>Counterdefendants. | Case No. 3:22-cv-00676-H-MSB<br><br>**SHORELINE BIOSCIENCES, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE DAMAGES OPINIONS OF MICHAEL C. KEELEY**<br><br>Hearing Date: August 29, 2023<br>Time: 1:30 p.m.<br>Ctrm: 12A<br>Hon. Marilyn L. Huff<br><br>**JURY TRIAL DEMANDED** |

ERIC M. ACKER (CA SBN 135805)
EAcker@mofo.com
BRIAN M. KRAMER (CA SBN 212107)
BMKramer@mofo.com
DREW A. HILLIER (CA SBN 337112)
DHillier@mofo.com
WESLEY W. CHEN (CA SBN 329446)
WChen@mofo.com
SARAH J. VANDERVALK (CA SBN 332651)
SVandervalk@mofo.com
MORRISON & FOERSTER LLP
12531 High Bluff Drive
San Diego, California 92130-2040
Telephone: (858) 720-5100
Facsimile: (858) 720-5125

Attorneys for Defendant and Counterclaimant
SHORELINE BIOSCIENCES, INC.

# **TABLE OF CONTENTS**

**Page**

I. INTRODUCTION .............................................................................................. 1

II. LEGAL STANDARD ........................................................................................ 2

III. FACTUAL BACKGROUND ............................................................................ 3

    A. The Asserted Patents ............................................................................... 3

    B. The Parties and Potential Future Products .............................................. 3

    C. Dr. Keeley's Opinions ............................................................................ 4

        1. Summary of Dr. Keeley's Methods 1 & 2 ................................... 4

        2. Dr. Keeley's Failure to Apportion .............................................. 5

        3. Dr. Keeley's Post-Expiration Royalty Base Using
           Speculative Sales Forecasts ........................................................ 5

        4. Dr. Keeley's One-Sided Book of Wisdom ................................. 6

        5. Dr. Keeley's Failure to Consider Economic and
           Technological Comparability of Patent Licenses ....................... 6

        6. Dr. Keeley's Reliance on Investors and Valuations ................... 6

        7. Dr. Keeley's Assumptions for Nash Bargaining ........................ 7

IV. ARGUMENT ..................................................................................................... 7

    A. Dr. Keeley Improperly Fails to Apportion .............................................. 7

    B. The Court Should Exclude Dr. Keeley's "Illegal Head Start" and
        Post-Expiration Sales Opinions .............................................................. 8

        1. Dr. Keeley's Reliance on Post-Expiration Sales Is Not a
           Cognizable or Reliable Theory .................................................... 8

        2. The Sales Projections on Which Dr. Keeley Bases His
           Opinion Make His Opinions Unreliable ..................................... 10

    C. Dr. Keeley Impermissibly Relies on the Book of Wisdom ................... 12

    D. Dr. Keeley Failed to Adequately Consider Whether Licenses
        Are Technologically or Economically Comparable ........................... 13

    E. Dr. Keeley's Damages Opinion Relies on Investments, Which
        the Court Held Are Irrelevant to Royalties .......................................... 14

    F. Dr. Keeley's Arbitrary 50-50 Split Lacks Justification ...................... 15

V. CONCLUSION ................................................................................................. 15

makes such an upfront payment impracticable. Only a very small percentage of drug candidates reach the market, and doing so can take decades, yet Dr. Keeley assumes a 100% success rate for ██████████████████████████ in a fraction of that time. (*See id.* ¶ 105 & n. 246; Ex. C, Xanthopoulos Tr. 143:22–144:12; Ex. F, Wolchko Tr. 21:12–22:5, 22:20–23:8, 97:12–98:6.) Fate itself has been in existence for 16 years and it has no idea when, or if, it will ever gain FDA approval for a product. (Ex. F, Wolchko Tr. 14:2-9, 21:12–22:5.) A royalty opinion that does not account for this risk and relies on speculative estimates is not reliable or tied to the facts of the case.

Dr. Keeley claims that his royalty rate considers risks and uncertainties because he uses a "conservative" discount rate that has built-in risk. (Ex. H, Keeley Tr. 162:15-21.) Yet although he admitted that probability of success must be taken into account (*id.* at 37:25–39:6), he failed to provide any basis that he appropriately considered the underlying risks of the forecasts (*id.* at 39:7–40:10, 162:15–163:4; Ex. G, Keeley R. ¶ 120). By using fundamentally flawed projections as the basis for his royalty analysis, the end calculation will be fundamentally flawed, regardless of any conservative adjustments. *See Uniloc USA, Inc.*, 632 F.3d at 1317. Both the data and application of his head start damages theory result in a head start royalty rate that is entirely divorced from sound economic principles and the facts.

### C. Dr. Keeley Impermissibly Relies on the Book of Wisdom

Dr. Keeley's application of the "Book of Wisdom" to increase the reasonable royalty under the hypothetical negotiation is not reliable. The Book of Wisdom cannot be used to consider evidence that might increase the reasonable royalty while ignoring evidence that decreases the rate. (*See* Ex. H, Keeley Tr. 46:1-8.)

The Book of Wisdom is used for "looking forward in time from the date of the first hypothetical negotiation to account for all information that would have been relevant to the parties in coming to and arriving at a deal." *Comcast IP Holdings I v. Sprint Commc'ns Co.*, 850 F.3d 1302, 1314 (Fed. Cir. 2017) (cleaned up). Dr. Keeley

selectively relies on speculative sales projections, ███████████████ ███████████████████████████████████████████ A damages expert, however, cannot reliably opine about a reasonable royalty if the expert picks and chooses the evidence on which to rely. *See ePlus, Inc. v. Lawson Software, Inc.*, 700 F.3d 509, 522-23 (Fed. Cir. 2012) (excluding expert who ignored agreements that "produced smaller rates").

The Book of Wisdom allows *actual* sales data and facts—not speculation—from after the date of hypothetical negotiation to inform the reasonable royalty regarding future projections. *See Sinclair Refin. Co. v. Jenkins Petroleum Process, Co.*, 289 U.S. 689, 698-99 (1933); *Lucent*, 580 F.3d at 1334 ("sales projections based on past sales . . . and other sources"). Thus, in *Aqua Shield v. Inter Pool Cover Team*, the court explained that "actual profits" can be admissible as evidence of future profits using the Book of Wisdom. 774 F.3d 766, 772 (Fed. Cir. 2014). Here, there have been no actual sales by Shoreline (or Fate). Dr. Keeley relies on speculation that is not grounded in actual sales, and ignores that those forecasts are inaccurate. Such an application of the Book of Wisdom cannot be allowed.

**D. Dr. Keeley Failed to Adequately Consider Whether Licenses Are Technologically or Economically Comparable**

Dr. Keeley uses Fate's agreements with ███████ and ████ to calculate a royalty rate but fails to analyze comparability. "When relying on licenses to prove a reasonable royalty, alleging a loose or vague comparability between different technologies or licenses does not suffice." *LaserDynamics*, 694 F.3d at 79. Instead, it requires "account[ing] for the technological and economic differences between those licenses and the [patents]." *ResQNet.com*, 594 F.3d at 873.

Dr. Keeley does not analyze the technological comparability of any of the agreements he considers. (Ex. G, Keeley R. ¶ 112.) He is not qualified to do so. Nor did he receive sufficient and reliable input from Plaintiffs' technical experts. It is insufficient to merely conclude ██████████████████████████████████

13

[REDACTED] (Ex. H, Keeley Tr. 65:14-16); *see M2M Sols. LLC v. Enfora, Inc.*, 167 F. Supp. 3d 665, 675-77 (D. Del. 2016) ("nebulous statements of comparability" are insufficient).

Dr. Keeley also does not sufficiently analyze economic comparability. He admits the [REDACTED] agreement was *not* economically comparable. (Ex. H, Keeley Tr. 65:25–66:8.) He simply asserts that the [REDACTED] (Ex. G, Keeley R. ¶ 114.) This does not show comparability.

Dr. Keeley selectively ignores agreements. The agreements he considers to be [REDACTED] (*Id.* ¶ 112.) Yet he asserts that the widely adopted bare patent license [REDACTED] the Asserted Patents. (*Id.* ¶ 139; Ex. H, Keeley Tr. 104:3-18; Ex. J, SHORELINEBIO_0011296-331 at -306.) Dr. Keeley is not qualified to give a technical opinion, nor is his assertion a reason to exclude the lower rate. Dr. Keeley's selective analysis renders his opinion unreliable. *ePlus, Inc.*, 700 F.3d at 522-23.

**E.     Dr. Keeley's Damages Opinion Relies on Investments, Which the Court Held Are Irrelevant to Royalties**

The Court previously rejected Plaintiffs' attempt to derive damages from Shoreline's financing and outside investments. (ECF No. 255 at 37.) Yet Dr. Keeley's opinion relies on Shoreline's alleged investors, market capitalization, and valuation in assessing damages. (*See, e.g.*, Ex. G, Keeley R. ¶¶ 16, 55-56, 100-101, 106.) Shoreline's investments and valuations cannot support Dr. Keeley's reasonable royalty

14

opinions.  (ECF No. 209 at 2-3.)  Courts routinely exclude valuation or market capitalization from being considered as part of a reasonable royalty analysis. (*Id.* (collecting cases).)  Information regarding Shoreline's investments, valuation, or market capitalization is not relevant to the reasonable royalty.  (*Id.*)  The Court should exclude Dr. Keeley's opinions that rely on this information.

### F.    Dr. Keeley's Arbitrary 50-50 Split Lacks Justification

Dr. Keeley assumes that Fate and Shoreline's hypothetical negotiation would begin at a 50-50 split using Nash Bargaining without an adequate basis (Ex. G, Keeley R. ¶ 37), which is impermissible "without sufficiently establishing that the premises of the theorem actually apply to the facts of the case at hand." *VirnetX*, 767 F.3d at 1325, 1333-34 (rejecting 50-50 split assumption); *see also Good Tech. Corp. v. Mobileiron, Inc.*, No. 5:12-cv-05826-PSG, 2015 WL 4090431, at *1-6 (N.D. Cal. July 5, 2015); *Bayer HealthCare LLC v. Baxalta Inc.*, No. 16-cv-1122-RGA, 2019 WL 330149, at *6-8 (D. Del. Jan. 25, 2019).  This opinion should be excluded.

### V.    CONCLUSION

Dr. Keeley's improper damages opinions should be excluded.

Dated: July 14, 2023

MORRISON & FOERSTER LLP

By: _____
Eric M. Acker
EAcker@mofo.com

Attorney for Defendant and Counterclaimant Shoreline Biosciences, Inc.

# Exhibit 14
# Redacted in its entirety

# Exhibit 15

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | PATENT NUMBER | GROUP ART UNIT | FILE WRAPPER LOCATION |
|---|---|---|---|
| 60/547,931 | | | |

# Correspondence Address / Fee Address Change

**The following fields have been set to Customer Number 59830 on 02/13/2006**

- Correspondence Address
- Maintenance Fee Address

**The address of record for Customer Number 59830 is:**
TED SABETY
ONE PENN PLAZA
36TH FL.
NEW YORK,NY 10119

**Ex. 15**

PTO/SB/16 (01-04)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET

This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

| Express Mail Label No. | ER 366567585 US |
|---|---|

### INVENTOR(S)

| Given Name (first and middle [if any]) | Family Name or Surname | Residence (City and either State or Foreign Country) |
|---|---|---|
| Kwan | Cheung | Bryn Mawr, Pennsylvania |

*Additional inventors are being named on the _____ separately numbered sheets attached hereto*

### TITLE OF THE INVENTION (500 characters max)

METHOD AND APPARATUS FOR AUTOMATIC DETECTION AND IDENTIFICATION OF A BROADCAST AUDIO OR VIDEO PROGRAMMING SIGNAL

*Direct all correspondence to:*   **CORRESPONDENCE ADDRESS**

☐ Customer Number: _____

**OR**

| ☑ Firm or Individual Name | Sabety +associates |
|---|---|
| Address | One Penn Plaza, 36th Fl |
| Address | |

| City | New York | State | NY | Zip | 10119 |
|---|---|---|---|---|---|
| Country | USA | Telephone | 212 481 8686 | Fax | |

### ENCLOSED APPLICATION PARTS *(check all that apply)*

☑ Specification *Number of Pages* __70__        ☐ CD(s), Number _____

☑ Drawing(s) *Number of Sheets* __7__        ☐ Other (specify) _____

☐ Application Data Sheet. See 37 CFR 1.76

### METHOD OF PAYMENT OF FILING FEES FOR THIS PROVISIONAL APPLICATION FOR PATENT

☑ Applicant claims small entity status. See 37 CFR 1.27.

☑ A check or money order is enclosed to cover the filing fees.

☐ The Director is herby authorized to charge filing fees or credit any overpayment to Deposit Account Number: _____

☐ Payment by credit card. Form PTO-2038 is attached.

FILING FEE
Amount ($)

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

☑ No.

☐ Yes, the name of the U.S. Government agency and the Government contract number are: _____

[Page 1 of 2]

*Respectfully submitted,*

SIGNATURE _____        Date __12/26/04__

TYPED or PRINTED NAME __Theodore Sabety__        REGISTRATION NO. __53,540__
*(if appropriate)*
Docket Number: __mediaguide-1__

TELEPHONE __212 481 8686__

**USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT**

This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 8 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Mail Stop Provisional Application, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Ex. 15**

PTO/SB/17 (10-03)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# FEE TRANSMITTAL
## for FY 2004
*Effective 10/01/2003. Patent fees are subject to annual revision.*

☑ Applicant claims small entity status. See 37 CFR 1.27

| TOTAL AMOUNT OF PAYMENT | ($) 80.00 |
|---|---|

**Complete if Known**

| | |
|---|---|
| Application Number | |
| Filing Date | |
| First Named Inventor | Cheung, Kwan |
| Examiner Name | |
| Art Unit | |
| Attorney Docket No. | Mediaguide-1 |

## METHOD OF PAYMENT *(check all that apply)*

☑ Check  ☐ Credit card  ☐ Money Order  ☐ Other  ☐ None

☐ Deposit Account:

Deposit Account Number

Deposit Account Name

**The Director is authorized to:** *(check all that apply)*

☐ Charge fee(s) indicated below      ☐ Credit any overpayments

☐ Charge any additional fee(s) or any underpayment of fee(s)

☐ Charge fee(s) indicated below, **except for the filing fee**
to the above-identified deposit account.

## FEE CALCULATION

### 1. BASIC FILING FEE

| Large Entity Fee Code | Large Entity Fee ($) | Small Entity Fee Code | Small Entity Fee ($) | Fee Description | Fee Paid |
|---|---|---|---|---|---|
| 1001 | 770 | 2001 | 385 | Utility filing fee | |
| 1002 | 340 | 2002 | 170 | Design filing fee | |
| 1003 | 530 | 2003 | 265 | Plant filing fee | |
| 1004 | 770 | 2004 | 385 | Reissue filing fee | |
| 1005 | 160 | 2005 | 80 | Provisional filing fee | 80 |

**SUBTOTAL (1)** ($) 80

### 2. EXTRA CLAIM FEES FOR UTILITY AND REISSUE

| | Extra Claims | Fee from below | Fee Paid |
|---|---|---|---|
| Total Claims | -20** = | X | = |
| Independent Claims | - 3** = | X | = |
| Multiple Dependent | | | = |

| Large Entity Fee Code | Large Entity Fee ($) | Small Entity Fee Code | Small Entity Fee ($) | Fee Description |
|---|---|---|---|---|
| 1202 | 18 | 2202 | 9 | Claims in excess of 20 |
| 1201 | 86 | 2201 | 43 | Independent claims in excess of 3 |
| 1203 | 290 | 2203 | 145 | Multiple dependent claim, if not paid |
| 1204 | 86 | 2204 | 43 | ** Reissue independent claims over original patent |
| 1205 | 18 | 2205 | 9 | ** Reissue claims in excess of 20 and over original patent |

**SUBTOTAL (2)** ($)

*\*\*or number previously paid, if greater; For Reissues, see above*

## FEE CALCULATION (continued)

### 3. ADDITIONAL FEES

| Large Entity Fee Code | Large Entity Fee ($) | Small Entity Fee Code | Small Entity Fee ($) | Fee Description | Fee Paid |
|---|---|---|---|---|---|
| 1051 | 130 | 2051 | 65 | Surcharge - late filing fee or oath | |
| 1052 | 50 | 2052 | 25 | Surcharge - late provisional filing fee or cover sheet | |
| 1053 | 130 | 1053 | 130 | Non-English specification | |
| 1812 | 2,520 | 1812 | 2,520 | For filing a request for *ex parte* reexamination | |
| 1804 | 920* | 1804 | 920* | Requesting publication of SIR prior to Examiner action | |
| 1805 | 1,840* | 1805 | 1,840* | Requesting publication of SIR after Examiner action | |
| 1251 | 110 | 2251 | 55 | Extension for reply within first month | |
| 1252 | 420 | 2252 | 210 | Extension for reply within second month | |
| 1253 | 950 | 2253 | 475 | Extension for reply within third month | |
| 1254 | 1,480 | 2254 | 740 | Extension for reply within fourth month | |
| 1255 | 2,010 | 2255 | 1,005 | Extension for reply within fifth month | |
| 1401 | 330 | 2401 | 165 | Notice of Appeal | |
| 1402 | 330 | 2402 | 165 | Filing a brief in support of an appeal | |
| 1403 | 290 | 2403 | 145 | Request for oral hearing | |
| 1451 | 1,510 | 1451 | 1,510 | Petition to institute a public use proceeding | |
| 1452 | 110 | 2452 | 55 | Petition to revive - unavoidable | |
| 1453 | 1,330 | 2453 | 665 | Petition to revive - unintentional | |
| 1501 | 1,330 | 2501 | 665 | Utility issue fee (or reissue) | |
| 1502 | 480 | 2502 | 240 | Design issue fee | |
| 1503 | 640 | 2503 | 320 | Plant issue fee | |
| 1460 | 130 | 1460 | 130 | Petitions to the Commissioner | |
| 1807 | 50 | 1807 | 50 | Processing fee under 37 CFR 1.17(q) | |
| 1806 | 180 | 1806 | 180 | Submission of Information Disclosure Stmt | |
| 8021 | 40 | 8021 | 40 | Recording each patent assignment per property (times number of properties) | |
| 1809 | 770 | 2809 | 385 | Filing a submission after final rejection (37 CFR 1.129(a)) | |
| 1810 | 770 | 2810 | 385 | For each additional invention to be examined (37 CFR 1.129(b)) | |
| 1801 | 770 | 2801 | 385 | Request for Continued Examination (RCE) | |
| 1802 | 900 | 1802 | 900 | Request for expedited examination of a design application | |

Other fee (specify) _____

*\*Reduced by Basic Filing Fee Paid*

**SUBTOTAL (3)** ($)

## SUBMITTED BY

*(Complete if applicable)*

| Name (Print/Type) | Theodore M. Sabety | Registration No. (Attorney/Agent) | 53,540 | Telephone | 212 481 8686 |
|---|---|---|---|---|---|
| Signature | | | | Date | 2/26/04 |

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

This collection of information is required by 37 CFR 1.17 and 1.27. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Ex. 15**

Attorney Docket No. Mediaguide-1

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

## SPECIFICATION

INVENTION:    METHOD AND APPARATUS FOR AUTOMATIC DETECTION AND IDENTIFICATION OF A BROADCAST AUDIO OR VIDEO PROGRAMMING SIGNAL.

INVENTOR:    Kwan Cheung

Citizenship:    United Kingdom, United States Permanent Resident

Post Office Address/

Residence:    275 South Bryn Mawr Ave Apt. D2

Bryn Mawr, PA 19010

ASSIGNEE:    Mediaguide, Inc.

1000 Chesterbrook Blvd. Suite 150

Berwyn, PA  19312

ATTORNEYS:    Sabety+associates

One Penn Plaza, 36th Fl.

New York, NY 10119

Express Mail Label No.  $\underline{\text{ER 366567585}}$

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-1-

## BACKGROUND AND SUMMARY OF THE INVENTION

This invention relates to the automatic detection and identification of broadcast programming, for example music or speech that is broadcast over radio, television or the Internet, or television signals, whether broadcast as analog, digital or digital over the Internet. By "Broadcast" it is meant any readily available source of content, whether now known or hereafter devised, including, for example, streaming, peer to peer delivery of of downloads or streaming or detection of network traffic comprising such content delivery activity. The system initially registers a known program by digitally sampling the program and separating the digital sample stream into a large set of short segments in time. These segments are then processed to extract particular feature sets that are characteristic of the segment. The invention processes each set of features to produce a numerical code that represents the feature set for a particular segment of the known program. These codes and the registration data identifying the program populate a database as part of the system. Once registration of one or more programs is complete, the system can then detect and identify the presence of the registered programming in a broadcast signal by extracting a feature set from the input signal, producing a numerical code for each time segment input into the system and then comparing the sequence of detected numerical codes against the numerical codes stored in the database. Various testing criteria are applied during the comparison process in order to reduce the rate of false positives, false negatives and increase correct detections of the registered programming. The invention also encompasses certain improvements and optimizations in the comparison process so that it executes in a relatively short period of time.

Mediaguide I v 12   Feb 26 '04

**Ex. 15**

-2-

## BRIEF DESCRIPTION OF THE DRAWINGS

Figure 1:     The components of the media broadcast monitoring system.

Figure 2:     An illustration of the data flow of the detection algorithm from a series of frames of an audio program to detection of the program's identity.

Figure 3:     The flowchart of the Pattern Generation Module.

Figure 4:     Example of how original frequency band boundaries lead to pattern mismatches between the original frame signatures and the signatures of the same audio program played at a faster speed.

Figure 5:     Example of how changing the frequency band boundaries yields an improved match between frame signatures of the original audio program and the same audio program played back at fast and slow speeds.

Figure 6:     The new frequency band boundary setting leads to robustness of the audio detection algorithm even with +/-2% speed variations in the audio program.

Figure 7:      The schematic of the DBS operation flow.

Figure 8:      The flowchart of the SRR Algorithm.

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS

Background.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-3-

The present invention relates to the automatic recognition of widely disseminated programming, such as radio, television or digitally delivered content over the Internet.

Owners of copyrights in broadcast programming, including advertisers, need to measure when and where their programming has been broadcast in order to correctly compute performance royalties, confirm compliance with territorial restrictions or verify that certain advertising has been aired as scheduled. The traditional method for monitoring the radio or television has involved using humans to listen or watch and then record that which they hear or see, or alternatively, rely on the broadcast records of radio and television stations. This is a labor intensive process that has limited efficiency or accuracy. It is an object of the invention to use advanced computing systems to fully automate this process. In this manner, audio or video content is registered into the system, and then, in the case of audio detection, radio, the soundtrack from television or other sources of widely distributed audio content are input into the system. In the case of video, the video signal is input into the system from whatever its source. By means of the invention, the detection and identification of registered programming content takes place automatically.

Prior Art:

A number of methods have been developed to automate the detection of broadcast programming. These techniques generally fall into one of two categories: cue detection or pattern recognition. The cue detection method is exemplified by U.S. Pat. Nos. 4,225,967 to Miwa et. al.; 3,845,391 to Crosby and 4,547,804 to Greenberg. These techniques rely on embedded cues inserted into the program prior to

Mediaguide 1  v  12    Feb 26 '04

**Ex. 15**

-4-

distribution. These approaches have not been favored in the field. In audio, the placement of cue signals in the program have limited the acceptance of this approach because it requires the cooperation of the program owners and/or broadcasters--thus making it impractical.

The pattern recognition method generally relies on the spectral characteristics of the content itself to produce a unique identifying code or signature. Thus, the technique of identifying content consists of two steps: the first being extracting a signature from a known piece of content for insertion into a database, and the second being extracting a signature from a detected piece of content and searching for a signature match in the database in order to identify the detected content. In this way, the preferred approach relies on characteristics of the broadcast content itself to create a signature unique to that content. For example, US Patent No. 4,739,398 to Thomas, et.al. discloses a system that takes a known television program and creates for each video frame, a signature code out of both the audio and the video signal within that frame. More recently, similar detection systems have been proposed for Internet distributed content, for example application PCT WO 01/62004 A2, filed by Ikeyoze et. al.

For audio by itself, U.S. Pat. No. 3,919,471 to Moon discloses an audio identification system where only audio signals are used, but it is of limited utility because it attempts to correlate an audio program represented by a limited time slice against the incoming broadcast signal. The disclosed method of matching in Moon is highly compute intensive because it relies on direct signal correlation. Further, this approach is unfavorable because it has been found to be limited in accuracy, especially if the program is time compressed or altered in other ways prior to detection. It is also prone to false positive identifications and is computationally uneconomic if the size of the

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-5-

time slice is expanded to improve its correct identifications.  Lert, et. al. describes in U.S. Pat. No. 4,230,990 a way to mitigate the computational workload of the correlation method by combining it with the coding method of the first category: either an artificial code or some other naturally occurring marker is detected in the program indicating the beginning of a section of the program, and then a feature signature is measured at a pre-determined amount of time later. This method has limited utility in audio-only applications, where either an audible code has to be inserted into the audio to create the cue, thus degrading it or requiring cooperation of the content source, or reliance on natural markers indicating the start of a new audio program which is highly unreliable. In U.S. Pat. No. 4,677,466 Lert, et. al. further describes an improvement on the invention that waits until a "stability condition" has occurred in the signal before measuring and calculating a signature, but the reliability of the method is limited by the size of the sample time slice.  U.S. Pat. No. 4, 739,398 to Thomas et. al. addresses the data processing load problem by randomly choosing portions of a signal to sample as input to the invention's signature generating process.

U.S. Pat. Nos. 5,436,653 to Ellis, et. al. and 5,612,729 to Ellis, et. al., disclose a more complex way of calculating a unique signature, where  the audio signature corresponding to a given video frame is derived by comparing the change in energy in each of a predetermined number of frequency bands between the given video frame and the same measurement made in a prior video frame.  However, the matching technique relies on a combination of the audio and video signatures or the use of a natural marker, in this case, the start or ending of a program.  Thus, this method suffers the same problem as Lert with regard to audio-only programming.

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-6-

In addition, U.S. Pat. No. 5,918,223 to Blum, et. al., discloses the use of audible features within audio programming to create a single signature value for each audio program, particularly the group of amplitude, pitch (i.e. fundamental), bandwidth, bass (i.e. rhythm analysis), brightness (i.e. shape of the frequency response of the program), and Mel-frequency cepstral coefficients. The aggregation of these detailed features across long periods in the audio produce highly variable results, and do not possess sufficient robustness in real-world broadcast situations. U.S. Pat. No. 5,210,820 and 4, 843, 562, both to Kenyon, discloses a digital circuit that uses the envelope (e.g loudness) features in the audio signal in order to create a signature. The approach is designed to address the time compression problem by application of time warping techniques. Reliance on loudness has other robustness problems that also make it difficult to use in real-world environments. U.S. Pat. Application No. 20030086341 filed by Wells, Maxwell, et. al., discloses a system where an audio signature is created using pre-determined numbers of digital samples counted from pre-determined locations from the start point of the music. This approach is much less reliable for broadcast or cases where the audio is detected in analog form, or in cases where the playback of the programming has changed speed, frequency equalization from the original track has been applied, or the audio dubbed into the programming segment.

The present invention describes a system and method whereby identification of known audio or video programming can be done without any reliance on a tandem video signal (in the audio case) or normative markers in the signal indicating a known time in the program and with unique and novel ways to calculate codes representing the characteristics of the audio program without requiring impractical computational capabilities. Benefits of this system and method are accuracy, speed, robustness to

Mediaguide 1  v  12    Feb 26 '04

**Ex. 15**

-7-

playback speed variation and the ability to perform the identification process in real time, without reliance on any embedded cue or watermark. In addition, the present invention takes advantage of the availability of low cost, high performance computing platforms in order to implement a high speed database searching methodology.

Detailed Description.

A. Overview

The broadcast monitoring and detection system embodying the invention works in two phases: registration and detection. During the registration phase, known programming content is registered with the system by sending the program, as digital data, into the system. A series of signatures, in the case here, a pattern vector and more generally in the art a "fingerprint" or "signature", are stored as a sequence of data records in a database, with the identity of the program content cross-referenced to them as a group. During the second phase, unidentified programming is input into the system. Such programming can include radio, television, internet broadcasts or any other source of audio or video programming, whether terrestrial broadcast, satellite, internet, cable television or any other medium of delivery, whether now known or devised in the future. While such programming is being monitored, the pattern vectors of the programming (or any other signature generating technique) are continually calculated. The calculated pattern vectors are then used to search for a match in the database. When a match is found and confirmed, the system uses the cross-referenced identity in the database to provide the identity of the content that is currently being played. In the preferred embodiment, the system is software running on a computer, however, it is envisioned that special purpose hardware components

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-8-

may replace parts or all of each module in order to increase performance and capacity of the system.

In the preferred embodiment, a computer containing a central processing unit is connected to a sound card or interface device into which audio programming is presented. During the registration phase, the CPU fetches the audio or video data from the sound card, calculates the pattern vector data, and then, along with timing data and the identity of the program, these results are stored in a database, as further described below. Alternatively, the data may be loaded directly from authentic material, such as compact discs, mp3 files or any other source of digital data embodying the signal. For non-audio applications, the source of material can be DVD disks, masters provided by movie studios, tapes or any other medium of expression on which the program is fixed or stored. Of course, for some material which may not have a readily available source, then the audio or other program signal is used in the following manner. If the system periodically detects an unknown program but with the substantially the same set of signatures each time, it assigns an aribitrary identifier for the program material and enters the data into the database as if the program had been introduced during the registration phase. Once the program identity is determined in the future, then the database can be updated to include the appropriate information as with authentic information while at the same time providing the owner of the programming the use data detected even when the identity of the program was not yet known. The database, which is typically a data file stored on a hard drive connected to the central processing unit of the computer by means of any kind of computer bus or data transmission interface, including SCSI.

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-9-

During the detection phase, the CPU fetches the program data from the sound card or video card, or loads it from a data file that may be stored on the computer hard drive or external media reader. The CPU calculates the pattern vector data, and then, along with the timing data, submits database queries to the database stored on the hard drive. The database may be the same hard drive as in the computer, or an external hard drive accessed over a digital computer network. When matching data is found, the CPU continues to process the data to confirm the identification of the programming, as described further below. The CPU can then communicate over any of a wide variety of computer networking systems well known in the art to deliver the identification result to a remote location to be displayed on a screen using a graphical user interface, or to be logged in another data file stored on the hard drive. The program that executes the method may be stored on any kind of computer readable media, for example, a hard drive, CD-ROM, EEPROM or floppy and loaded into computer memory at run-time. In the case of video, the signal can be acquired using an analog to digital video converter card, or the digital video data can be directly detected from digital video sources, for example, the Internet or digital television broadcast.

The system consists of four components. Figure 1 shows the interconnection of the four modules: (1) a signal processing stage at the front end, (2) a pattern generation module in the middle, (3) followed by a database search engine module, and (4) a program recognition module at the end. During the registration phase, the results of the pattern generation module, which creates signatures for known audio or video content, are stored in the database and the search and pattern recognition modules are not used.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-10-

The function of each module is described in further detail below:

1.     Sound Acquisition (SA) Module

The SA module, (1), receives audio data from a sound detection circuit and makes it available to the remaining modules. Practitioners of ordinary skill will recognize that there are a variety of products that receive analog audio or video and convert those signals into digital data. These devices can be any source of digital audio data, including an interface card in a personal computer that converts analog audio into digital audio data accessible by the computer's CPU, a stand alone device that outputs digital audio data in a standard format or a digital radio receiver with audio output. Alternatively, pre-detected signal in digital form can be accessed from storage devices connected to the system over typical data networks. The SA module regularly reads the data from the digital interface device or data storage and stores the data into a data buffer or memory to be accessed by the Pattern Generation module. Practitioners of ordinary skill will recognize that the typical digital audio system will provide a digital word at regular intervals, called the sampling rate. The sequence of digital words representing the audio signal are the digital audio samples. The invention organizes the samples into a series of time frames, which consist of a predetermined number of samples. The time frames are stored in sequence. Alternatively, data structures, stored in the computer memory (which includes the hard drive if the operating system supports paging and swapping), may be used where the time frames are not physically stored in sequence, but logically may be referenced or indexed in the sequence that they were detected by means of memory addressing.

Mediaguide 1  v  12    Feb 26 '04

**Ex. 15**

-11-

In the preferred embodiment, the audio signal is conditioned in a manner known in the art, including low-pass filtering. In the preferred embodiment, the signal is sampled at a rate of 8000Hz within the SA Module. In the preferred embodiment, 16,384 samples constitute a single frame. At this rate, the signal must be lowpass filtered for anti-aliasing purpose before being sampled. Higher sampling rates may be used, however, with the appropriate adjustments in the downstream calculations, as explained below.

In the case of video programming, the sound acquisition module essentially acts in an analogous manner: the video signal is acquired as a digital video signal, and converted to the frequency domain using well known methods on a video frame by frame basis. The invention will be explained in detail as applied to audio through a description of the preferred embodiment. However, the system and processes described are applicable to video as well as audio, where a signature or pattern vector has been periodically derived from the video signal. Reference is made to "A Technical Introduction to Digital Video", Charles A. Poynton, John Wiley & Sons, New York, © 1996.

2.      Pattern Vector Generation (PG) Module

The PG module operating during the detection phase, (2), fetches the stored digital audio or video samples that were detected and stored by the SA Module. Once a frame of the samples is received, the PG module will compute the pattern vector of the frame and, when in detection phase, send the

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-12-

pattern vector to the Database Search Module in the form of a database query. During the registration phase, the PG module calculates the pattern vector in order that it be stored in the database, in correlation with the other relevant information about the known audio or video program.  The calculation of the pattern vector is described further below.

Inter-Frame Distance.

For each incremental audio sample, a new frame can be started. That is, each audio sample may be the constituent of N overlapping frames when N is the number of samples in a frame.  The distance between these overlapping frames is the inter-frame distance. The shorter inter-frame distance for pattern generation mitigates the problem of program start-time uncertainty.   Shorter inter-frame distances produce better results when the start time is unknown.  In the preferred embodiment, the value of 4,000, around ¼  of a frame, is used during the audio program registration phase. Other distances may be used either to increase accuracy or reduce compute time and storage overhead.  Thus, in the preferred embodiment, the first frame in the database of known audio programs corresponds to audio samples 1 to 16,384, the second corresponds to samples 4001 to 20,384, and so on.   During the detection phase, the inter-frame distance is set to be equal to one frame length. Thus, the first frame of the detected audio program contains samples 1 to 16,384, the second frame contains samples 16,385 to 32,768, and so on.

Even though the uses a preferred embodiment setting of sampling rate of 8000Hz, frame-size of 16384 samples, inter-frame distance of 4000, a  different sampling rate may be used with varying results.  For example, for a sampling rate of 16000Hz (double the preferred setting), results in a frame number size of 32768 (double in size

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-13-

but the same in time duration), inter-frame distance of 8000 (inter-frame distance is the same at 0.5 sec) and generates almost identical pattern vectors as when using the preferred settings. The only further change is to determine which Fourier Transform (FFT) coefficients would be included in each sub band used to calculate the pattern vectors. For example, with the preferred settings, (ignoring the speed compensation scheme explained below), band 1 comprises the 66th to 92nd FFT coefficients. Then with the alternate example above, the FFT coefficients will be the 32nd to 94th. The calculation of the pattern vectors, which is presented assuming the sampling rate of 8000 Hz, is adjusted accordingly.

In the case of video, the pattern vectors are derived from the two-dimensional FFT transform of each frame of video. The video frames can be considered analogous to the samples in audio. Thus the vertical and horizontal FFT coefficients can be collected across the video frames to build pattern vectors for each time frame, the time frames constituting a group of video frames. Practitioners of ordinary skill will recognize that the approaches may be combined, in that features of the audio soundtrack of the television program can be combined with features of the video signal of the same program to produce the pattern vectors.

3.      Database Search (DBS) Module

Upon the reception of a query generated by the PG module, this module, (3), will search the database containing the sequence of pattern vectors of known programming. If a match is found, then the module returns a set of registration numbers otherwise referred to herein as program-id's and frame-id's, referred to also as frame numbers, corresponding to the identities of a set of audio or video programs and the time frame

Mediaguide 1  v  12    Feb 26 '04

**Ex. 15**

-14-

numbers within these programs where the match occurred. If the search of the database fails to find a match, the DBS Module will issue a NO-MATCHED flag. It is contemplated that aspects of the invention for the DBS Module are applicable to any kind of data set containing signal signatures, even signatures derived using techniques distinct from those used in the Pattern Vector Genreation module.

4.    Program Detection and Identification (SDI) Module

This module, (4), constantly monitors the matching results from the DBS on the most recent contiguous of N time frames, as further described below. In the preferred embodiment, N is set to five, although a larger or smaller number may be used with varying results. Two schemes are used to determine if any audio or video program has been positively detected. The first is a majority voting scheme which determines if, within each thread of matching pattern vectors among N, the number of frames that possess a valid sequence pass a designated majority of the block of frames. The second is a frame sequencing scheme which follows each of the potential thread and counts how many frames within that thread constitute a valid sequence. If there exists a thread(s) where a majority of the contiguous frames satisfy the frame sequencing requirement, then the program (whether audio or video) is deemed detected in that thread. Either or both schemes are used to suppress false positive detections and to increase the correct detections. In the preferred embodiment, both schemes are used. Given a program (or more than one) that is detected, the SDI module will initiate two modes: 1. Identification mode : in this mode, the module logs all the reference information of the detected program, including title, songwriter, artist, record label, publishing company or any other information input during the registration phase of the system, along with the time when the program is detected, and the time into the

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-15-

program that the detection was made.  This information will be registered on the detection log.  2. Tracking mode : In this mode, the module tracks each detected program by monitoring if the queried result of every new frame of the broadcast is obeying the sequencing requirement, described below. The algorithm is locked in this mode until the queried results cannot be matched with the sequencing requirement. Upon the exiting from the tracking mode, a number of detection attributes, including the entire duration of the tracking, and the tracking score, will be logged.

The pattern vector generated by the PG Module is sent to the DBS Module in order to conduct a search of the database for a match. The output is either a NO-MATCHED flag, which indicates that the DBS fails to locate a frame within the database that passes the search criteria; or the program-id's and frame-id's of the library patterns that pass the search criteria.

The SDI Module collects the output from the DBS Module to detect if a new audio program is present. If so, the detected song is identified.  Figure 1 is an illustration of the flow of the algorithm from a frame of audio to its result after detection.    With regard to the application of the invention to video, the operation is analogous, once the pattern vectors have been generated.  It is contemplated that aspects of the invention for the SDI Module are applicable to any kind of data set containing signal signatures, even signatures derived using techniques distinct from those used in the Pattern Vector Genreation module.

Pattern Vector Generation.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-16-

The PG module reads in a frame of signal, preferably consisting of 16,384 samples, with sampling rate preferably set at 8,000 samples per second. Thus, the frame length is approximately two seconds in time. More or less samples or frame widths in time may be used with varying results. Given $\mathbf{x} = [x_1 \quad x_2 \quad \cdots \quad x_{16384}]$, the vector containing a frame of signal, where each $x_i$ is the value of the nth audio sample, an N element pattern vector is calculated with the following steps. In the preferred embodiment, N is equal to 31. Practitioners of ordinary skill will recognize that the value of N is arbitrary, and can be increased or decreased with varying results. For example, decreasing N reduces the compute time and memory requirements, but may reduce accuracy. Increasing N may do the opposite. Also, the method presented will assume that a 31 element pattern vector is being used in the calculation in order to simplify the presentation of the invention. Practitioners of ordinary skill will recognize that the same methodology will work when N is increased or decreased, depending on whether the goal is increased accuracy or reduced computer complexity.

1. The Fourier transform of $\mathbf{x}$ is calculated with the number of points equal to the number of samples in the frame, in order to get the spectrum vector

$$X = [X_1 \quad X_2 \quad \cdots \quad X_{16384}] \ .$$

The spectral resolution of the transform is = $\dfrac{8000 samples / \sec}{16,384 samples} = 0.488 Hz$

Segregate the FFT spectral values into frequency bands of a specified width, where in the preferred embodiment, the width is 64 Hz. The invention will be further

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-17-

explained in terms of the preferred embodiment in order to simplify the presentation, but without limitation to the extent of the invention claimed.

Band #1 is from 0 to 64Hz,  Band #1 encompasses FFT coefficients $X_1$ to $X_{131}$

Band #2 is from 64 to 128Hz, Band #2 encompasses $X_{132}$ to $X_{262}$, and so on.

2.    Compute the centroid (or center-of-gravity COG) of each band:

$$p_k = \frac{\sum_{m=1}^{131} m \times X_{131k+m}}{\sum_{m=1}^{131} X_{131k+m}}$$

In the preferred embodiment, only Band 2 to 32 is used because Band 1 is the lowest band including zero Hz,  which is normally not useful in FM radio transmission; and Band 32 covers the band up to 1,800Hz, which is typically sufficient bandwidth to encode a fingerprint of the audio. Of course, higher bands or lower bands can be used if required. The inclusion of higher or lower bands to account for signal characteristics can be determined empirically. The first step, where the FFT coefficients are collected in order to calculate the centroid in step 2 is different in the case of video. In the video case, the FFT coefficients have to be selected from locations either in the complex plane or on the 2-dimensional spatial frequency plane as described on page 23 of Poynton, incorporated herein by reference. These locations are analogous to the frequency bands on the audio case. In a manner analogous to using predetermine frequency bands

Mediaguide 1  v  12    Feb  26  '04

**Ex. 15**

-18-

in audio, predetermined regions on the vertical/horizontal plane in the frequency domain can be defined and the FFT coefficient values in each regions used to calculate an element corresponding to that region. Once this selection is made, the centroid can be calculated in an equivalent manner. It is advantageous to ignore the frequency region encompassing the frame rate, sync rate, subcarrier, or line rate. The end result is essentially equivalent to the case of audio: that each time frame of video will have a pattern vector associated with it that is stored in a database.

After Step 3, a 31-element vector is obtained: $\mathbf{c} = [p_2 \quad p_3 \quad \cdots \quad p_{32}] = [c_1 \quad c_2 \quad \cdots \quad c_{31}]$. In the preferred embodiment, a further step converts $\mathbf{c}$ to an unsigned integer. The unsigned format is used because all the elements in $\mathbf{c}$ are positive in the interval of (1, 131). A further calculation on $\mathbf{c}$ normalizes each element to a value between 0 and 1 by exercising the division by 131, the number of FFT components within each band:

$$0 \le c_i = \frac{c_i}{131} \le 1$$

In the preferred embodiment, each element is then converted to the unsigned 16-bit integer format for convenient storage and further processing. In order to decrease the compute time downstream, each FFT coefficient or $c_i$ is tested relative to a minimum threshold value. The downstream processes are set to ignore these elements, for example, by not including these elements in downstream sets that are collected for further calculation. Figure 3 shows a flowchart of this module. In the preferred embodiment, both the FFT in step 1 and the centroid (COG) computation in step 3 are typically calculated using double precision floating point instructions.

Mediaguide 1  v 12    Feb 26 '04

**Ex. 15**

-19-

Speed Compensation Scheme

Practitioners of ordinary skill in the art will recognize that for a variety of reasons, broadcast programming is often sped up from the speed of the original programming. Therefore, it is critical that any automatic audio program detection system be robust when the detected audio program may differ from the speed of the audio provided during the registration phase. In order to alleviate this problem, a modification to the pattern vector generating formula is used:

(a)     The modification is to have a different number of FFT components (i.e. bandwidth) of each band in step 2.

(b)     In the preferred embodiment, the modification to the pattern vector generation formula is only applied to the incoming broadcast audio signal during the detection phase, not to the pattern generation process applied during the registration phase of the audio program. Practitioners of ordinary skill will recognize that the use of the alternative frequency bands described above for the detection phase can alternately be performed during the registration phase with substantially the same result.

The specific detail of this modification is described below:

The formulation is based on the scaling property of the Fourier Transform.

A time speed up version of a song is a time-scaled version of the original:

$$x(t) \xrightarrow{\text{speedup}} x(at) \quad ; \quad a > 1$$ where a is the rate of speedup and x(t) is the detected sample at time t. Note that for a > 1, the time axis is "compressed". If the song is sped up by 2%, we have $a = 1.02$.

Ex. 15

-20-

With the scaling property, the factor a can be used to adjust the values of the Fourier Transform:

$$x(t) \xleftarrow{\text{Fourier Transform}} X(f)$$
$$x(at) \xleftarrow{\text{Fourier Tranform}} X(f/a)$$

Thus, the spectrum of a fast playback, or speedup version of a song is stretched. With a 2% speedup rate, the Fourier Transform frequency component at 100Hz without any song speedup, is shifted to 102Hz after speedup. This implies that, if there exists a 2% speedup rate in the detected song, the bandwidth in step 2 should be adjusted accordingly to $1.02 \times 64\text{Hz} = 65.28\text{Hz}$, and hence the number of FFT components within each band should be adjusted to the roundoff of $131 \times 1.02$, which is equal to 134. There are two formulae to calculate the amount of FFT components in each band, both based on the original number of FFT components, which is equal to 131.

Formula

(1) Given the speedup rate r.

Start at Band #1, which encompasses FFT coefficients $X_1$ to $X_{z(1)}$, where $z(1) =$ roundoff of $131 \times (1+r)$.

(2) Compute iteratively each $z(k) =$ roundoff of $[z(k - 1) + 131 \times (1+r)]$ for $k = 2$ to 32. Band #m consists of FFT coefficients of $X_{z(m-1)+1}$ to $X_{z(m)}$.

(3) Compute the centroids (COG) from Band #2 to #32 with the new band partitions calculated above. Exercise the normalization by dividing each centroid (COG) by the number of FFT components in the corresponding band.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-21-

The difference with and without the compensation is shown in Figures 4 and 5. Figure 4 shows Original band setting leads to pattern mismatches between the original and its speedup variant.   Figure 5 shows that the modified band setting yields very good pattern matching behavior given that the speedup rate is known.

Robust Pattern Vector Generation Formula

The pattern vector generation formula described above can be further refined in order to provide robust matching.  This refinement may also be used instead of the prior formulation.  Besides causing the frequency axis to stretch, another effect of speedup is the shift of the boundaries in frequency of every band. The refinement is to compensate the shift of the boundaries of a band by extending the width of the band, such that the amount of the shift due to playback speed is within a small percentage compared with the band width. Thus, there is no modification of the algorithm – that is, calculating centroids as pattern vectors – except that the band locations are changed. The modified band boundaries are used during the registration process to create the stored pattern vectors.  Practitioners of ordinary skill will recognize that several alternative methods may be used to calculate frequency band widths that exhibit the same property, that is, extending the band width such that the frequency shift due to playback speed variation is comparatively small, where the percentage frequency shift due to playback speed changes is a small percentage of each frequency band width. Further, it is contemplated that this technique will work for any method of calculating a signature in the signal that is based on segregating the FFT coefficients into frequency bands. One method to calculate modified band boundaries that exhibit this effect is described below as the preferred embodiment.

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-22-

Algorithm to compute new band boundary locations:

Let the starting and ending indexes of band number k in the frequency domain be $s_{k,1}$ and $s_{k,2}$ respectively, that is the index of the FFT coefficients. For example, index $s_{1,1}$ is equal to 1 and corresponds to the first FFT coefficient for 0 Hz. A shift-to-bandwidth ratio is assumed, which is the expected maximum speedup in percent divided by the percentage of bandwidth that the shift should not exceed. In the preferred embodiment, that value is assumed to be 5%, but other values may be used in order to increase accuracy or reduce compute complexity.

1. Start from band k=1, whose starting location $s_{1,1} = 1$. Assuming a 2% speedup, the location is shifted by 0.02 to 1.02, which after roundoff is still equal to 1. Roundoff is necessary because the result indices must be integers. . Assuming the shift-to-bandwidth ratio to be equal to 0.4 (which is 2% shift divided by 5% bandwidth, the amount that shift should represent) of the bandwidth of Band #1, then the ending location $s_{1,2} = (1 + .02/.05) \times s_{1,1} = 1.4$, or 1 after round-off.

2. Now proceed to compute the two locations for Band #2. The starting location $s_{2,1} = 2$. Given 2% shift and 5% shift-to-bandwidth ratio, we obtain $s_{2,2} = 3$.

3. Continue the iteration until all the FFT components are exhausted. In the preferred embodiment, the result (both lower order bands, , $s_{k,1} < 64$, corresponding to 31.25 Hz, and higher order bands, $s_{k,1} > 5500$, corresponding to 2,686 Hz, are not used.

4. When k equals 9, then $s_{9,2} = 66$, and when k= 10, $s_{10,1} = 67$ and so on.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-23-

In order to avoid overflow because the bandwidth of each band along k increases exponentially with k, the preferred embodiment has set arbitrarily $s_{10,1} = 66$, so that as k iterates to k = 22, $s_{22,2} = 5298$.  Below is a tabulation of the result :

| K | $s_{k,1}$ | $s_{k,2}$ |
|---|---|---|
| 10 | 66 | 92 |
| 11 | 93 | 129 |
| 12 | 130 | 182 |
| 13 | 183 | 255 |
| 14 | 256 | 357 |
| 15 | 358 | 501 |
| 16 | 502 | 702 |
| 17 | 703 | 984 |
| 18 | 985 | 1378 |
| 19 | 1379 | 1930 |
| 20 | 1931 | 2702 |
| 21 | 2703 | 3784 |
| 22 | 3785 | 5298 |

5.    The number of entries at this point is only 13, but a total of 31 entries are preferred, where each entry corresponds to a particular element in the pattern vector.

The second batch of bands are obtained by taking the middle of each of the bands obtained in step 3. An additional 12 bands are obtained:

| 80 | 111 |
|---|---|

**Ex. 15**

-24-

| | |
|------|------|
| 112 | 156 |
| 157 | 219 |
| 220 | 306 |
| 307 | 429 |
| 430 | 602 |
| 603 | 843 |
| 844 | 1181 |
| 1182 | 1654 |
| 1655 | 2316 |
| 2317 | 3243 |
| 3244 | 4541 |

6. At this point there are 25 bands. The remaining six bands are obtained by combining bands from the two tables. In particular, entries 1 and 2 are merged, entries 3 and 4 are merged, and entries 5 and 6 are merged in both tables to creates six more entries:

| | |
|------|------|
| 66 | 129 |
| 130 | 255 |
| 256 | 501 |
| 80 | 156 |
| 157 | 306 |
| 307 | 602 |

**Ex. 15**

-25-

Combining the above, the starting and the ending locations of the 31 bands are presented in Table 1.

Table 1. Starting and Ending Locations of the 31 bands in the generation of robust patterns.

| Starting Location | Ending Location |
|---|---|
| 66 | 92 |
| 93 | 129 |
| 130 | 182 |
| 183 | 255 |
| 256 | 357 |
| 358 | 501 |
| 502 | 702 |
| 703 | 984 |
| 985 | 1378 |
| 1379 | 1930 |
| 1931 | 2702 |
| 2703 | 3784 |
| 3785 | 5298 |
| 66 | 129 |
| 130 | 255 |
| 256 | 501 |
| 80 | 111 |

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-26-

| | |
|------|------|
| 112 | 156 |
| 157 | 219 |
| 220 | 306 |
| 307 | 429 |
| 430 | 602 |
| 603 | 843 |
| 844 | 1181 |
| 1182 | 1654 |
| 1655 | 2316 |
| 2317 | 3243 |
| 3244 | 4541 |
| 80 | 156 |
| 157 | 306 |
| 307 | 602 |

A test result on a frame of signal is shown in Figure 6 to demonstrate the robustness for speed changes of +/- 2% .

## 5    Combination of Speedup Compensation and Robust Formula

The two methods described above for adjusting frequency band boundaries can be combined if speedup compensation is also incorporated. The relationship between speedup and the expansion of the frequency spectrum is exploited to combine the two approaches.   The k-th subband, starting and the ending location $= [s_{k,1}, s_{k,2}]$, has a

Mediaguide 1  v  12    Feb 26 '04

**Ex. 15**

-27-

robustness to speed change of +/- 2%. Each value is then multiplied by $(1 + r)$, where r is the amount of speedup to $[s_{k,1}, s_{k,2}]$, followed by the roundoff method described above. This results in new indices $[\hat{s}_{k,1}, \hat{s}_{k,2}]$ whose robustness to speed change is shifted to $r$ +/- 2%. Essentially, the new table is the prior Table 1, where the values are multiplied by $(1 + 2\%)$ and then the same roundoff method applied. Table 1 is now used during the registration phase to create pattern vectors from the known audio program that populates the database library. Table 2 is used during the detection phase to create the pattern vector from the detected incoming broadcast that is used in the DBS module to find matching data records in the database as described further below. Thus, both methods are combined.

By way of example, setting $r = 0.02$ (2%), and processing every band in Table 1, a new set of subbands is calculated which is robust to speed change of 0 to 4%. Table 2 is obtained with 2% speedup compensation

Table 2 The new 31 pairs of starting and ending locations after 2% speedup compensation added to that tabulated in Table 1. This result is from processing the detected song from the broadcast.

| Starting Location | Ending Location |
|---|---|
| 67 | 94 |
| 95 | 132 |
| 133 | 186 |
| 187 | 260 |

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-28-

| | |
|---|---|
| 261 | 364 |
| 365 | 511 |
| 512 | 716 |
| 717 | 1004 |
| 1005 | 1406 |
| 1407 | 1969 |
| 1970 | 2756 |
| 2757 | 3860 |
| 3861 | 5404 |
| 67 | 132 |
| 133 | 260 |
| 261 | 511 |
| 82 | 113 |
| 114 | 159 |
| 160 | 223 |
| 224 | 312 |
| 313 | 438 |
| 439 | 614 |
| 615 | 860 |
| 861 | 1205 |
| 1206 | 1687 |
| 1688 | 2362 |
| 2363 | 3308 |

Mediaguide 1  v 12    Feb 26 '04

**Ex. 15**

-29-

| | |
|------|------|
| 3309 | 4632 |
| 82 | 159 |
| 160 | 312 |
| 313 | 614 |

The compensation effectively positions the method to have the robustness from 0 to 4% speedup variations.  Practitioners of ordinary skill will recognize that the same approach can be used to mitigate the effects of variation in the speed where the variation ranges above and below zero, that is, slowing down or speeding up the playback.

Database Search (DBS) Module

The Database Search Module takes the pattern vector of each frame from the PG Module and assembles a database query in order to match that pattern vector with database records that have the same pattern vector.  A soft matching scheme is employed to determine matches between database queries and pattern vectors stored in the database. In contrast, a hard matching scheme allows at most one matching entry for each query. The soft matching scheme allows more than one matching entries per query, where a match is where a pattern vector is close enough, in the sense of meeting an error threshold,  to the query vector. The number of the matching entries can either be (i). limited to some maximum amount, or (ii)  limited by the maximum permissible error between the query and the database entires.  Either approach may be used.  The soft matching scheme relies on the fact that the program patterns are being oversampled in the registration phase. For example, in the preferred

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-30-

embodiment the interframe distance used for registration is only ¼ of that used in the detection. Thus it is expected that if the m-th frame of a particular program is the best matching frame to the query, then its adjacent frames, such as (m-1)th frame and (m+1)th frame, will also be good matches. The combined effort of soft matching and sequencing schemes enhance the robustness of the detection system to varying signal condition inherent in the broadcasting environment.

When matches are found, the corresponding program-id numbers and frame numbers in the data record is returned. The flowchart in Figure 7 illustrates the flow in DBS Module. Practitioners of ordinary skill in the art will recognize that a search across a variable to find the location of variables that match within a given tolerance in a very large database is potentially time consuming, if done in a brute force manner. In order to address the compute time problem, a two part search is employed. In Part 1, a range search scheme select those entries within a close vicinity to the query. In Part 2 a refined search over potential candidates from Part 1 is used to select the set of candidates which are the closest neighbors to the query.

The steps are described in detail below:

1. Assemble the query from the pattern vector generated by the PG Module during the detection phase.

2. Execute a nearest neighbor search algorithm, which consists of two parts. Part 1 exercises an approximate search methodology. In particular, a range search (RS) scheme is employed to determine which entries in the database falls within a close vicinity to the query. Part 2 exercises a fine search methodology.

Mediaguide I v 12   Feb 26 '04

**Ex. 15**

-31-

Results from Part 1 are sorted according to their distances to the query. The search algorithm can either (i) return the best M results (in terms of having shortest distances to the query), or (ii) return all the results with distance less than some prescribed threshold. Either approach may be used. As further described below, the nearest neighbor algorithm can be replaced with other algorithms that provide better compute time performance when executing the search.

3.    If there is a match, output the program-id number and the corresponding frame number. If there are multiple matches, output all program-id's and corresponding frame numbers.

If there is no match, output the NOMATCH flag.

Range search requires pattern vectors that match within a tolerance, not necessarily a perfect match in each case. From the geometrical point of view, range search identifies which set of the entries encompassed within a polygon where the dimensions are determined by the tolerance parameters. In the preferred embodiment, the polygon is a 31 dimensional hyper-cube. .

Range Search (RS) Formulation

In the preferred embodiment, the    pattern vector is is a 1 x 31 vector: $c = [c_1 \quad c_2 \quad \cdots \quad c_{31}]$, where c is the pattern vector detected where a match is sought. The number of bands, as described above, may be more or less than 31, with varying results, trading off increased accuracy for compute complexity. The search

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-32-

algorithms will be described using a 31 element vector, but practitioners of ordinary skill will recognize that these methods will apply with any size pattern vector. The pattern library is a M x 31 matrix, where M is the total number of pattern vectors stored in the database and 31 represents the number of elements in the pattern vector. M is a potentially huge number, as demonstrated below. Assume that the entire database is represented by the matrix $A$:

$$A = \begin{bmatrix} z_1 \\ z_2 \\ \vdots \\ z_M \end{bmatrix} = \begin{bmatrix} z_{1,1} & z_{1,2} & \cdots & z_{1,31} \\ z_{2,1} & z_{2,2} & \cdots & z_{2,31} \\ \vdots & \vdots & \ddots & \vdots \\ z_{M,1} & z_{M,2} & \cdots & z_{M,31} \end{bmatrix}$$

Those pattern vectors stored in the library are referred to as the library pattern vector. In the preferred embodiment, each vector $z$ is a pattern vector of 31 elements calculated during the registration phase with known audio content for which detection is sought during the detection phase. During the detection phase, the identification exercise is to locate a set of library pattern vectors, {z_opt}, which are being enclosed within the hypercube determined by the tolerance parameter.

The search criteris can be represented as the identification of any $z^*$ such that

$$z^* = \min_{m=1 \text{ to } M} \|z_m - c\|$$

In the preferred embodiment, L1 norm is used, where $\|x\| = |x_1| + |x_2| + \cdots + |x_{31}|$ is the L1 norm of x. Thus

$$\|z_m - c\| = \underbrace{|z_{m,1} - c_1|}_{e_{m,1}} + \underbrace{|z_{m,2} - c_2|}_{e_{m,2}} + \cdots + \underbrace{|z_{m,31} - c_{31}|}_{e_{m,31}}$$

Here, $e_{m,n}$ is referred to as the nth point error between the $c$ and $z_m$.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-33-

The search for $\mathbf{z}^*$ over the entire library with the RS algorithm is based on the satisfaction of point error criteria. That is, each point error must be less than some tolerance and, in the preferred embodiment, the L1 norm less than a certain amount. Practitioners of ordinary skill will recognize that the tolerance for each element and the L1 norm may be the same or different, which changes the efficiency of searching. The determination of the tolerance is based on some statistical measure of empirically measured errors. Further, it is recognized that other measures of error, besides a first-order L1 norm may be used. The search problem now becomes a range search problem, which is described elsewhere in the art. Reference is made to P.K. Agarwal, Range Search, in J.E. Goodman and J. O'Rourke, editors, *HANDBOOK OF DISCRETE AND COMPUTATIONAL GEOMETRY*, page 575-598, Boca Raton, NY, 1997, CRC Press. C++ codes are also available from : Steve Skiena, *The Algorithm Design Manual*, published by Telos Pr, 1997, ISBN: 0387948600

Following are the steps in the method to determine $\mathbf{z}^*$:

1) Set L equal to the index set containing all the indices of library pattern vectors:

$$L = \{1,2,3,\cdots,M\}$$

2) Start with n = 1.

3) Compute $e_{m,n}$ between the nth element of c to the nth element of each $z_{m,n}$ where m ranges from 1 to M.

4) Update L to include only those indices of pattern vectors whose nth point error is smaller than the specified tolerance $T_n$ :

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-34-

$$L = \begin{cases} 1 \leq m \leq M, \\ where \\ e_{m,k} < T_k, 1 \leq k \leq n \end{cases}$$

$T_n$ can be set arbitrarily.  In the preferred embodiment $T_n$ is set to be 10% of the value of $c_n$.

5)    If L is now an empty set AND $n \leq 31$,

Exit and issue the NO-MATCH FLAG.

Else: Set n = n + 1.

If n > 31 , Go to step 6.

Else:    Go to step 3.

6)    Compute the error between all pattern vectors addressed in L to $c$ :

$$e_m = \|z_m - c\| \quad ; \quad m \in L$$

The best solution is determined by examining all of the $e_m$, and that will result with $z^*$.  Alternatively, for soft matching purposes, either of the two criteria can be used. Criteria 1: select only those $z_m$ with error less than some prescribed threshold $e_{max}$.

Criteria 2: select the best M candidates from $L$, where the M candidates are the least size of error to the Mth size of error.

Once the index m with the best L1 match is determined, the index is used to recover the data record corresponding to the pattern vector $z_m$.   The database module then outputs the program-id and the corresponding frame number as the output.

Note that at the start of the nth iteration, the index set L contains the indices of library pattern vectors whose point error from m = 1 to n-1 passes the tolerance test.   At the start of the nth iteration, the index set L is:

Mediaguide 1  v 12   Feb 26 '04

**Ex. 15**

-35-

$$L = \begin{cases} 1 \le m \le M, \\ where \\ e_{m,k} < T_k, k = 1 \text{ to } n-1 \end{cases}$$

The flowchart of the RS algorithm is shown in Figure 8.

It is anticipated that the library size for application of the invention to audio programming, M, for 30,000 songs is in the order tens of millions. The following shows the calculation:

| | | |
|---|---|---|
| Number of songs | = | 30,000 |
| Typical Song Length | = | 204 seconds (3 min 24 sec) |
| Sampling Rate | = | 8,000 samples per second |
| Frame Size | = | 16,384 samples |
| Inter-Frame Distance | = | 4,000 samples |

The number of frames per song is the song length times the number of samples per second minus the frame size, all divided by the inter-frame distance. In the preferred embodiment, there are about = 404 frames

With 30,000 songs, M = 12,117,120.

With this figure, the first iteration requires around 12 million subtractions and branch statement executions to update the index set L. The next iteration will probably be less, but still in the order of millions. Also, memory must be allocated to hold the intermediate values of all of the subtraction results required for the tolerance test.

Fast Range Search Algorithm

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-36-

There is an improvement to the method that minimizes the amount of subtractions that must be performed in order to find $z^*$. And more importantly, the execution time does not scale up as fast as the size of the database, which is especially important for database of this size. This performance enhancement is achieved at the cost of using a larger amount of memory. However, practitioners of ordinary skill will recognize that because computer memory costs have historically been reduced continuously, this is now a reasonable trade-off. The modification to the RS algorithm is to use indexing rather than computing exact error values. This modification is further explained below.

The improved search methodology for recovering the best match between a detected pattern vector and pattern vectors held in the database is referred to here as the Fast Range Search Algorithm. As before, A is the library matrix consisting of M rows of pattern vectors:

$$A = \begin{bmatrix} z_1 \\ z_2 \\ \vdots \\ z_M \end{bmatrix} = \begin{bmatrix} z_{1,1} & z_{1,2} & \cdots & z_{1,31} \\ z_{2,1} & z_{2,2} & \cdots & z_{2,31} \\ \vdots & \vdots & \ddots & \vdots \\ z_{M,1} & z_{M,2} & \cdots & z_{M,31} \end{bmatrix}$$

Each row is a particular pattern vector. There are in total M pattern vectors, and in the preferred embodiment, each has 31 elements.

<u>Steps</u>

1. Segregate each individual column of A:

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-37-

$$\begin{bmatrix} z_{1,1} & z_{1,2} & \cdots & z_{1,31} \\ z_{2,1} & z_{2,2} & \cdots & z_{2,31} \\ \vdots & \vdots & \ddots & \vdots \\ z_{M,1} & z_{M,2} & \cdots & z_{M,31} \end{bmatrix} \xrightarrow{\text{Segregate the columns}} \begin{bmatrix} z_{1,1} \\ z_{2,1} \\ \vdots \\ z_{M,1} \end{bmatrix}, \begin{bmatrix} z_{1,2} \\ z_{2,2} \\ \vdots \\ z_{M,2} \end{bmatrix}, \cdots, \begin{bmatrix} z_{1,31} \\ z_{2,31} \\ \vdots \\ z_{M,31} \end{bmatrix}$$

2. Each of the elements in the columns are sorted in an ascending order

$$\begin{bmatrix} z_{1,k} \\ z_{2,k} \\ \vdots \\ z_{M,k} \end{bmatrix} \xrightarrow{\text{Sort in Ascending order}} \begin{bmatrix} \hat{z}_{1,k} \\ \hat{z}_{2,k} \\ \vdots \\ \hat{z}_{M,k} \end{bmatrix} \quad ; \quad \hat{z}_{1,k} \le \hat{z}_{2,k} \le \cdots \le \hat{z}_{M,k} ; k = 1 \text{ to } 31$$

3. As a result of the sort, each element $z_{m,k}$ is mapped to $\hat{z}_{\hat{m},k}$. Two cross indexing tables are constructed: Table $R_k$ is a mapping of $m \to \hat{m}$ and table $T_k$ maps $\hat{m} \to m$, for every k = 1 to 31.

The practitioner of ordinary skill will recognize that the sorting and table creation may occur after the registration phase but prior to the search for any matches during the detection phase. By having pre-sorted the pattern vectors during the registration phase, the system reduces the search time during the detection phase. During the detection phase, the method begins with a search through the sorted vectors, as described below.

Index Search

**Ex. 15**

-38-

Given the query vector $c = [c_1 \quad c_2 \quad \cdots \quad c_{31}]$ and the tolerance vector $T = [T_1 \quad T_2 \quad \cdots \quad T_{31}]$, a binary search method may be used to extract the indices of those elements that fall within the tolerance. Other search methods may be used as well, but the binary search, which performs in log(M) time, is preferred.

Steps:

1. Set k = 1.

2. Exercise binary search to locate in the sorted column k: $\hat{z}_{\hat{m},k}, \hat{m} = 1$ to M, the element $\hat{z}_{\hat{m}_L^k,k}$ closest and more-than-or–equal-to $c_k - T_k$. Then exercise binary search again to locate the element $\hat{z}_{\hat{m}_U^k,k}$ closest and less-than-or-equal-to $c_k + T_k$. Thus, all the elements in the set $\{\hat{z}_{\hat{m},k}, \hat{m}_L^k \leq \hat{m} \leq \hat{m}_U^k\}$ satisfy the tolerance requirement. In this manner, the binary search is used twice in every kth column to locate $\hat{m}_L^k$ and $\hat{m}_U^k$.

Further, let $\wp_k$ be the index set containing the indices of all $\hat{z}_{\hat{m},k}$ that satisfy the tolerance requirement:

$$\wp_k = \{\hat{m}_L^k \leq \hat{m} \leq \hat{m}_U^k\}$$

3. k = k +1. if k>31, go to next step.

Alternatively, the process can calculate which columns have the least number of bands that pass the test, and to start with that number of bands in next step. By advancing up the sorted k values where the corresponding number of bands goes from smallest to largest, the result can converge faster than simple increment iteration over

**Ex. 15**

-39-

k.

4.

Repeat steps 2 and 3 until k = 32 in order to obtain every pair of bounds: $\left\{\hat{m}_L^k, \hat{m}_U^k\right\} k = 1$ to $31$ , and thus determine the 31 $\wp_k$'s.

Each $P_k$ is obtained independently. For every k, all the indices enclosed within the pair $\left\{\hat{m}_L^k, \hat{m}_U^k\right\} k = 1$ to $31$ can be converted back to the original indices using $T_k$ . Then, an intersection operation is run on the 31 sets of indices.

An alternate way is to intersect the first two set of indices, the result is then intersected with the 3rd set of indices, and so on, until the last set of indices have been intersected. This is the approached outlined below:

5. Reset k = 1.

6. Retrieve all indices in $\wp_k$ and store into the array $R$.

7. Use Table $T_k$ to convert all indices in $R$ to the original indices :

$$\hat{m} \xrightarrow{\ T_k\ } m$$

Store all the indices $m$ into a set $S$ .

Use Table $R_{k+1}$ to convert m to $\hat{m}$ : (thus the indices represented in column 1 are translated into their representation in column 2). Then to the results are tested to see if they are within the bound of $\left\{\hat{m}_L^{k+1}, \hat{m}_U^{k+1}\right\}$.

$$m \xrightarrow{\ R_{k+1}\ } \hat{m}$$

Apply the tolerance test and generate

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-40-

$$R = \left\{ \hat{m}, \hat{m}_L^{k+1} \le \hat{m} \le \hat{m}_U^{k+1} \right\}$$

In this manner, each successive $\wp_k$ would be the prior $\wp_k$ minus those indices that failed the tolerance test for the kth element. Thus, when k = 30 in step 6, the $\wp_{30}$ are the indices that meet all 31 tolerance tests.

8. k = k + 1.

9. Go to Step 6 and loop until k = 31.

10.    Here, the set $S$ are all the original indices after the 31 intersection loops. If $S$ is empty, issue the NO-MATCH flag. Otherwise, for hard matching, we proceed to locate the sole winner which may be the closest candidate, for example. For soft matching, we proceed to obtain all the qualifying entries.

Further speed enhancements to the fast RS algorithm

Starting from step 4, instead of starting from k = 1, then k = 2, then k = 3, ... , to the end, the total number of candidates in each column can be measured. The total number of candidates in each column is equal to the total number of candidates in each $\wp_k$. The order of k's can then be altered so that the first k tested is where $\wp_k$ has the fewest candidates, and so on until all k's are tested. Then the order of intersection starts with columns with the least number of candidates. .The end result is the same as intersecting the same set of 31 indices with k incrementing sequentially, but by ascending the reordered k's, the number of intersecting operations, is reduced and thus speeds up the search.

Search Booster:

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-41-

Practitioners of ordinary skill will recognize that the current search methodologies generally are searching on a frequency band by frequency band basis. Empirical studies using the preferred embodiment indicate that the initial iteration of the search results in 60% to 90% of the entries in the database passing the filter for that frequency band. Assuming a database of 6,000 song titles with 300 entries per song, the total number of entries to be searched is 1,800,000. With a 60% return, the system has to deal with more than a million entries after the first intersection. The number of iterations necessary to converge on the single search result can be reduced if the size of the initial intersection is smaller. It is another object of the invention, referred to here as the booster, to pre-process the search in such a way as to reduce the number of search results in the beginning iteration of the process.

The booster uses a different indexing scheme such that more than one frequency band can be lumped together. By means of the booster, a single search loop in the booster is equivalent to multiple loops in the range search method, and hence the search speed improved. A ranking scheme is used to determine the order of the search so as to minimize the number of searches for intersecting indices. To establish this ranking, the maximum, mean and standard-deviation of the return percentile in each of the bands is computed during the normal range search process. These empirical results are used to choose which bands will be lumped together using the booster process.

The booster indexing scheme is an extension of a binary-to-decimal conversion, where a vector of binary-value elements is converted to a decimal integer. The extension is straightforward. In particular, if the base of a vector $\vec{x}$, of size N, is M, where M is an integer, the conversion formula is as follows:

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-42-

$$\vec{x} = [x_1 \; x_2 \cdots x_N] \; ; \; 0 \leq x_k \leq M - 1$$

$$d_{\vec{x}} = \sum_{n=1}^{M} x_n \, M^{n-1}$$

Eqn(1)

Note that the conversion by Equation 1 is reversible, that is the equation may be used to convert $d_{\vec{x}}$ to $\vec{x}$. Thus, the conversion possesses the one-to-one relationship so that every unique integer $d_{\vec{x}}$ is calculated from a unique $\vec{x}$. In the preferred embodiment, the database that houses the pattern vectors, each of the pattern element is stored as a 16-bit unsigned integer. This implies that each pattern vector can be considered as a code vector, with M = 65536 and N = 31, and a unique $d_{\vec{x}}$ can be calculated for each pattern vector. As a result of this conversion the multi-dimensional space of the pattern vectors are mapped to a one-dimensional space. The search for pattern vectors that are within the required distance from the query vector $\vec{y} = [y_1, y_2, ..., y_n]$, referred to elsewhere as the tolerance requirement and here as the gap requirement, is to locate all entries $\vec{x} = [x_1, x_2, ..., x_n]$ in the database such that the gap requirement $|x_k - y_k| \leq Q; k = 1...31$ is satisfied. In the preferred embodiment, where the coding is 16 bits, the tolerance $T_k$ is 10% of the range of the 16 bits so that Q = 10% x 64K = 6554. In practice, the value 6,000 is used.

The booster maps the gap requirement in each band (referred to elsewhere as the tolerance requirement) to the corresponding gap requirement in $d_{\vec{x}}$. Although the

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-43-

search can then iteratively single out all entries that satisfies all the gap requirements, the major difficulty of this approach is that the multiple gap requirements result in multiple disjoint segments on $d_{\bar{x}}$ . In particular, 31 iterations are required for the identification of the qualifying entries in $d_{\bar{x}}$ where $\bar{x}$ is converted to $d_{\bar{x}}$ , and the first loop is for band 1, the 31 st loop is for band 31. Practitioners of ordinary skill will recognize that by changing the number of bands in the pattern vector, the number of iterations would change, but the substance of the approach would be the same.

To circumvent the technical difficulty, two compromises is made: First, only a subset of frequency bands are selected to be included in the booster, i.e., only those indices in the subset are coded using Equation 1. Second, a smaller base is used. The first compromise reduces the number of iterative loops, or specifically, the number of disjoint segments, so searching over every segment is practical in terms of CPU speed. The second compromise cuts down the memory requirement, and, more importantly, it allows for hard coding the search result of the booster (with just a marginal amount of RAM) to make the search within the booster very fast.

The process for the preferred embodiment is described in detail below:

1. Set the base N = 31.

2. Choose 3 out of the 31 bands. More or fewer bands could be chosen. However if a large number of bands are chosen relative to the number M, then the booster method becomes slower and its usefulness more limited. If too few, its not accurate enough and does not speed up either, so an optimal number is empirically determined. In the

**Ex. 15**

-44-

preferred embodiment, where N = 31, 3 out of the 31 are chosen. 3. This combination results in:

(a) that the dynamic range of the new index is from 0 to 32767. Thus each new index can be coded in 2 bytes.

(b) Hard-coding of the search results: Create 32768 bins: bin 0 to bin 32767. Bin m holds the indices of all library pattern vectors whose 3-band elements result in the value m after the conversion.

4. Search Methodology:

(a)     Given a query vector     $\bar{y} = [y_1, y_2, ..., y_n]$

(b)     Single out the elements in the three specified bands.

(c)     Convert the query vector using those three bands to a number using Equation 1.

(d)     Collect all the indices of the library vectors that fulfill the gap requirement in the three specified bands by looking for the closest match of values m between the converted query and the converted library pattern vectors.

(e)     Pass the indices in (d) to the output and resume the band-by-band search described above on those sets of indices.

Practitioners of ordinary skill will recognize that the conversion of the library pattern vectors using Equation 1 may be made prior to operation, so that the run-time computation load is reduced.

D.     Song Detection and Identification (SDI) Module.

The SDI module takes the results of the DBS module and then provide final confirmation of the  audio or video program identity.  The SDI module contains two

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-45-

routines:

1.  Detection -- Filtering on regularity of the detected song number:

Irregular matches, where the DBS module returns different program-id numbers on a consecutive set of frames, is a good indication that no program is being positively detected. In contrast, consistent returns, where the DBS module returns consistently the same song number on a consecutive set of frames, indicates that a program is successfully detected.

A simple algorithm based on the "majority vote rule" is used to suppress irregularity returns while detecting consistent returns. Assume that the DBS module outputs a particular program-id and frame-id for the ith frame of the detected program or song. Due to irregular returns, the result program-id will not initially be considered as a valid program identification in that frame. Instead, the system considers results on adjacent frames (that is, non-overlapping frames) of i, i+1, i+2, ... , i+2K, where in the preferred embodiment, K is set to between 2 and 4. If there is no majority winner in these (2K + 1) frames, the system will issue song number = 0 to indicate null detection in the ith frame. If there is a winner, i.e. that at least (K + 1) frames that are contiguous to frame i produced the same program-id number, the system will issue for the ith frame the detected song number as such majority winning program-id number. Practitioners of ordinary skill will recognize that a majority vote calculation can be made in a number of ways, for example, it may be advantageous in certain applications to apply a stronger test, where the majority threshold is a value greather than K+1 and less than or equal to 2K+1, where a threshold of 2K+1 would constitute a unanimous vote. This reduces false positives at potentially the cost of more undetected results. For the purposes here, majority vote shall be defined to include these alternative thresholds. For computation speed, the preferred embodiment determines

Mediaguide 1  v 12   Feb 26 '04

**Ex. 15**

-46-

the majority vote using a median filter. A median on an array of $2K+1$ numbers,

$$Z = \begin{bmatrix} z_1 & z_2 & \cdots & z_{2K+1} \end{bmatrix}, K = 1, 2, \ldots,$$ is the K-th entry after Z is sorted. For example,

if $Z = [\ 1,\ 99,\ 100]$, the median of Z is 99. The formula for such computation is stated below:

Assume that the DBS module returns program-id #[n] for the nth frame. To calculate the median for frame i:

Let $\quad x = median\left(\begin{bmatrix} \#[i] & \#[i+1] & \cdots & \#[i+2K] \end{bmatrix}\right)$

Then let $y = 1 - median\left\{\begin{bmatrix} sgn(|\#[i]-x|) & sgn(|\#[i+1]-x|) & \cdots & sgn(|\#[i+2K]-x|) \end{bmatrix}\right\}$

where

$$sgn(x) = \begin{cases} 1 & x > 0 \\ 0 & x = 0 \\ -1 & x < 0 \end{cases}$$

Then, the detected result is a multiplication of x times y. . The major feature of this formula is that it can be implemented in one pass rather than an implementation requiring loops and a counter.

2.  Identification of programming.

Given that an audio or video program is detected using majority rule, as explained above, the next step is to impose an additional verification test to determine if there is frame synchronization of the song being detected. In particular, the frame synchronization test checks that the frame-id number output by the DBS module for

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-47-

each p-th frame  is a monotonically increasing function over time, that is, as p increases. If it is not, or if the frame indices are random, the detection is declared void.  The following are the step-by-step method of the entire SDI. In cases where a portion of the program has been repeated, for example, in a song chorus that may be edited into the program each time, pattern vectors otherwise substantially identical but with varying time frames will be found by the DBS module. In these cases, the system carries these results along by storing them in a buffer and subjects them to the sequencing test explained below. As the sequencing test proceeds, some of these interim results will have time frame indexes that are deemed invalid under the sequencing test and will then be ignored.  Once a single interim thread survives, then the start and stop times of the detection are updated.

SDI Algorithm and steps

Let $s^p$ be a structure that holds the most recent $2K + 1$ program_id's after the $p$-th broadcast frame  has been detected:

$$\mathbf{s}^p = \left\{ \begin{bmatrix} S_{p,1} \\ S_{p,2} \\ \vdots \\ S_{p,P_1} \end{bmatrix}_{\text{1st bin}} \begin{bmatrix} S_{p+1,1} \\ S_{p+1,2} \\ \vdots \\ S_{+1,P_2} \end{bmatrix}_{\text{2nd bin}} \cdots \begin{bmatrix} S_{p+2K,1} \\ S_{p+2K,2} \\ \vdots \\ S_{p+2K,P_{2K+1}} \end{bmatrix}_{\text{(2K+1)th bin}} \right\}$$

Mediaguide I v 12   Feb 26 '04

**Ex. 15**

-48-

Here, $s_{m,n}$ = the $n$-th program_id being detected in the $m$-th broadcast frame by the DBS module . Note that the $P_m$ is the size of the bin. In general, $P_m$ is different for different $m$'s.

Correspondingly, $f^p$ is another structure holding the the corresponding frame numbers or frame indices:

$$f^p = \left\{ \underbrace{\begin{bmatrix} f_{p,1} \\ f_{p,2} \\ \vdots \\ f_{p,P_1} \end{bmatrix}}_{\text{1st bin}} \underbrace{\begin{bmatrix} f_{p+1,1} \\ f_{p+1,2} \\ \vdots \\ f_{p+1,P_2} \end{bmatrix}}_{\text{2nd bin}} \cdots \underbrace{\begin{bmatrix} f_{p+2K,1} \\ f_{p+2K,2} \\ \vdots \\ f_{p+2K,P_{2K+1}} \end{bmatrix}}_{\text{(2K+1)th bin}} \right\}$$

where $f_{m,n}$ = the corresponding frame index of $s_{m,n}$.

Also, $SI$ = program_id of the last song or program that was successfully detected, such that the voting test and sequential test was successfully met. A register is created to hold this result until a new and different song or program is detected.

Steps:

1.    Compute the majority vote of $s^p$

Taking every program in the first bin of $s^p$ as the reference. Scan the rest of the 2K bins to determine if any program in the first bin pass the majority vote requirement.

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-49-

$$w^p = \begin{cases} \{s_{p,m}, m \in D_p\} & ; \\ 0 & ; \end{cases}$$

$D_p$ = Indices of entries in the first bin of $s^p$ that pass the majority vote requirement

$= 0$ if all the program in the first bin fail the majority vote requirement

2.      If $w^p = 0$,

$p = p + 1$. Go to Step 1.

Elseif $w^p$ is a singleton (meaning a set of one element) and not equal to zero

Set $SI = w^p$. Go to Step 3.

Elseif $w^p$ has more than one candidates

Set $SI = w^p$ (case with multiple program matches). Go to Step 3.

Steps 3 to 7 are performed per $s_{p,m}$ in $w^p$.

3.      For every $s_{p,m}$ in $D_p$, form a matrix A from the corresponding frame in $f^p$:

$$A = \begin{bmatrix} 1 & f_1 \\ 2 & f_2 \\ \vdots & \vdots \\ 2K+1 & f_{2K+1} \end{bmatrix}$$

where $f_t$ is the a frame of $s_{p,m}$ in the $t$-th bin of $f^p$.

If there is no frame in the $t$-th bin that belongs to $s_{p,m}$, $f_t = 0$.

4.      Perform the compacting of A, discarding the $q$-th rows in A where $f_q = 0$:

$$A = \begin{bmatrix} 1 & f_1 \\ 2 & f_2 \\ \vdots & \vdots \\ 2K+1 & f_{2k+1} \end{bmatrix} \xrightarrow{\text{discard the qth row if } f_q = 0} B = \begin{bmatrix} k_1 & f_{l_1} \\ k_2 & f_{l_2} \\ \vdots & \vdots \\ k_N & f_{l_N} \end{bmatrix}$$

5.      Cleanup A by removing rows, with the following steps:

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-50-

A. Start with $n = 1$.

B. Compute

$d_1 = f_{l_{n+1}} - f_{l_n}$ and $d_2 = k_{n+1} - k_n$. After performing step 5 by removing all the entries with mismatched program-id's, this step identifies only those entries that follow the sequencing correctly.

C. Here, the quantity $d_1$ is the offset of frames between the two detected frames in **B**. This quantity can also be translated to an actual time offset as well: by multiplying the value by the interframe distance in samples and dividing by the samples per second. The quantity $d_2$ is the frame offset between the two broadcast frames. Now d is the ratio of the two offsets, representing the advance rate of the detected sequence. In particular, in the preferred embodiment, the system expects an ideal rate of 4 as the value for d. However, an elastic constraint on d is applied: If $[d_1 \in (4[d_2 - 1] + 2, 4[d_2 - 1] + 6)]$, the two frames are in the right sequencing order. Thus, with $d_2 = 1$, an offset of 2 to 6 frames is expected between two adjacent broadcasting frames with the same program-id. If $d_2 = 2$, the offset is from 2+4 to 6+4 frames. Thus the range is the same except for an additional offset of 4 frames in the range. The values of 2 and 6 are a range centering around the ideal value 4. A range instead of a single value allows the offset to be a bit elastic rather than rigid. To be less elastic, one can choose the range to be from 3 to 5. In the same way, the range can be from 1 to 7 to be very elastic. Go to Step D.

Otherwise,

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-51-

n = n + 1, in order to sequence through all the entries in **B**

If n < N,

Go to Step C.

Otherwise,

Go to Step D.

D. The matrix **C** is returned. Every row in **C** consists of the entries that satisfy the sequencing requirement.

Compact B by deleting rows that fail to match the sequencing requirement. Further, note that by taking the first entry of **B** as the reference, if the second entry fails the sequencing requirement, the process can jump to the third entry to see if it satisfies the sequencing requirement with the first entry. If the second entry is satisfied with the requirement, then the second entry becomes the reference for third entry.

$$\mathbf{B} = \begin{bmatrix} k_1 & f_{l_1} \\ k_2 & f_{l_2} \\ \vdots & \vdots \\ k_N & f_{l_N} \end{bmatrix} \xrightarrow[\text{sequencing requirement}]{\text{delete rows that fail the}} \mathbf{C} = \begin{bmatrix} j_1 & f_{j_1} \\ j_2 & f_{j_2} \\ \vdots & \vdots \\ j_P & f_{j_P} \end{bmatrix}$$

Majority vote requirement is enforced again here.

If the number of entries in **C** fails the majority vote requirement,

the entry $s_{p,m}$ is not qualified for further test, return to Step 3 for the next entry in $D_p$.

Otherwise,

continue onto Step 6.

**Ex. 15**

-52-

The majority vote test is applied again because even if the majority vote passes in Step 5, the majority vote test may fail after cleaning up the result with the sequencing rule requirement. If the revised majority vote passes, then a new program or song has been positively detected, otherwise, there is no detection.

6.    Let s = Number of entries (i.e. rows) in **C**.

If s < K,

Go to Step 9.

Else proceed to perform regression analysis:

A. Let $\mathbf{C_1} = \begin{bmatrix} C_{11} & C_{21} & \cdots & C_{s1} \end{bmatrix}^T$ and $\mathbf{C_2} = \begin{bmatrix} C_{12} & C_{22} & \cdots & C_{s2} \end{bmatrix}^T$ be the first and the second columns of C respectively, where the superscript $T$ denotes matrix transposition. Construct the following matrices for regression analysis. Regression analysis is used to calculate a linearity measure of the sequencing of frame-id numbers.:

$$D = \begin{bmatrix} \sum_{n=1}^{s} C_{n1}^2 & \sum_{n=1}^{s} C_{n1} \\ \sum_{n=1}^{s} C_{n1} & s \end{bmatrix} \quad E = \begin{bmatrix} \sum_{n=1}^{s} C_{n1} C_{n2} \\ \sum_{n=1}^{s} C_{n2} \end{bmatrix}$$

B. Compute both the slope and the intercept

$$\begin{bmatrix} \text{slope} \\ \text{y-intercept} \end{bmatrix} = \mathbf{DE}$$

C. Also compute the correlation coefficient r of C .

7.    If [r > 0.9 AND slope ≥ 2 AND slope ≤6],

the thread pertaining to the entry $s_{p,m}$ has passed all the test and is a valid entry to the tracking mode. Store the entry $s_{p,m}$ and the

**Ex. 15**

-53-

corresponding thread into a register called Final_List.

Else,

the entry $s_{p,m}$ is discarded.

Continue the test for the next entry in $D_p$.

8.  Enter the Tracking Mode. Each thread in the Final_list will be tracked either collectively or separately.

9.  Start the tracking mode:

    A.  Create a small database used for the tracking:

        i.   In the collective tracking mode, the small database contains all the pattern vectors of all the qualifying entries in the Final_list.

        ii.  In the separate tracking mode, dedicated database containing just the pattern vectors for each particular entry Final_list is created for that entry.

    B.  If tracking mode = collective tracking,

        i.   $p = p + 1$.

        ii.  Run detection on the $(p+1)$th frame of broadcast.

        iii. Update the sequence of each thread. Monitor the merit of each thread by observing if the thread is satisfied with the sequencing requirement.

        iv.  Continue the tracking by returning to step i. if there exists at least one thread satisfying the sequencing requirement. Otherwise, exit the tracking.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

-54-

If tracking mode = separate tracking, use dedicated database for each thread for the tracking. Steps are identical to that of collective tracking.

The sequencing requirement here is the same as what is being used in Step 5c. That is, we expect the id of the detected frame for the new broadcast frame is in a monotonic increasing manner, and the increasing amount between successive frame of broadcast is between 2 to 6 in the preferred embodiment.

If for any thread being tracked, that the new broadcast failed the sequencing requirement relative to the previous frame, a tolerance policy is implemented. That is, each track can have at most $Q$ times of failure, where $Q = 0, 1, 2, \ldots$. If $Q = 0$, there is no tolerance on failing the sequencing requirement.

C. After the tracking mode is terminated. Exam the merit of each thread. The thread that has the highest score is the winner of all in the Final_list.

    i. The score can be calculated based on the error between each frame in the thread to the corresponding frame of the broadcast; or based on the duration of the thread. Or both. In our preferred embodiment, the duration is taken as the tracking score of each of thread. The one that endures the longest within the period of tracking is the winner thread.

D. If multiple programs in being posted *SI* in Step 2. correct the posting by the program_id of the winning thread.

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

-55-

10.    Wait for the new *p*-th frame from the broadcast, Go back to Step 1.

Practioners of ordinary skill will recognize that the values used in Step 6 for testing the linearity of the sequential frame-id's may be changed either to make the test easier or make the test harder to meet. This controls whether the results increase false positives or suppress false positives while raising or lowering the number of correct identifications as compared to no detections.

Although the present invention has been described and illustrated in detail, it is to be clearly understood that the same is by way of illustration and example only, and is not to be taken by way of limitation.  It is appreciated that various features of the invention which are, for clarity, described in the context of separate embodiments may also be provided in combination in a single embodiment. Conversely, various features of the invention which are, for brevity, described in the context of a single embodiment may also be provided separately or in any suitable combination.  It is appreciated that the particular embodiment described in the Appendices is intended only to provide an extremely detailed disclosure of the present invention and is not intended to be limiting.  It is appreciated that any of the software components of the present invention may, if desired, be implemented in ROM (read-only memory) form or stored on any kind of computer readable media, including CD-ROM, magnetic media, or transmitted as digital data files stored in a computer's memory. The software components may, generally, be implemented in hardware, if desired, using conventional techniques.

Mediaguide 1  v  12    Feb 26 '04

**Ex. 15**

-56-

The spirit and scope of the present invention are to be limited only by the terms of the appended claims.

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

WHAT IS CLAIMED:

For the pattern vector method:

1.    A method of generating a signature comprised of a set of at least one member each member being a real number, for at least one time frame of an audiosignal comprised of a set of predetermined frequency bands, such audio signal being identified by an identification index and such time frame being identified by a time frame index, comprising:

Transforming the at least one time frame of signal into the frequency domain, such that there is a finite number of frequency magnitude values stored in a computer memory;

Calculating a single value for each frequency band that is a linear combination of the frequency magnitude values that reside within the frequency band produced by said transformation;

Storing said single value in a computer memory with a reference to the time frame index and the identification index.

For the specific centroid calculation of the PV:

2.    The method according to Claim 1 where each coefficient in the linear combination is substantially equal to the ordinal index of the frequency magnitude within the frequency band divided by a predetermined constant.

3.    The method according to Claim 1 where the number of predetermined frequency bands is 31.

4.    The method according to Claim 1 where the frequency bands occupy a range above 0 Hz and equal to or below 8000Hz

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

5.    The method according to Claim 2 where the predetermined constant is substantially equal to the sum of frequency magnitude values.

For the speed variation robustness:

6.    A method of determining whether a detected signal is substantially the same as at least one known signal out of a plurality of known signals, each signal of a plurality of time frame duration, comprising:

Calculating at least one signature for each time frame of both the detected signal and the known signal, such signature calculation using frequency magnitude coefficients grouped into predeteremined frequency bands,    where the width of at least one of the predetermined frequency bands is substantially larger than the frequency shift in the signal resulting from a predetermined amount of variation in the signal playback speed.

7.    The method according to Claim 6 where the upper boundary of each frequency band is substantially equal to the value of the lower boundary times the sum of one plus a pre-determined value.

8.    The method according to Claim 7 where the predetermined value is substantially between the values of -2 and +2.

9.    The method according to Claim 7 where the predetermined value  is approximately equal to a predetermined percentage increase in playback speed divided by a predetermined percentage maximum amount of bandwidth of the frequency band.

For the searching inventions:

10.    A method of determining whether a detected signal of a plurality of time frame duration is substantially the same as at least one known signal out of a

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

plurality of known signals, each of a plurality of time frame duration and having an identification index, comprising:

Calculating a first signature for each of the time frames of at least one the known signals,

Storing in a computer database each first signature with a reference to the corresponding known signal identification index and a reference to the location in time of the time frame from substantially the beginning of said known program;

Calculating a second signature for each of a predetermined number of sequential time frames during the detected signal;

Searching the database to determine which first and second signatures meet a predetermined matching criteria.

For majority voting:

11.    The method of Claim 10 where the matching criteria comprises:

Calculating for at least one of the predetermined number of sequential time frames an error value between the second signature corresponding to each sequential time frame and the each first signature in the database;

For each error value that is less than or equal to a predetermined threshold value, determining the identification index and time frame index of the first signature used to calculate such error value;

Determining whether a majority of the determined identification indexes for the group of sequential time frames are the same.

Mediaguide I  v 12    Feb 26 '04

**Ex. 15**

12.    The method of Claim 11 where the first and second signatures are each a set of a predetermined number of elements, each element being a real number and the error value is one of the group: (i) the approximate vector distance from the first signature to the second signature; (ii) the approximate L-1 norm between the first signature and the second signature; (iii) the approximate maximum difference between any element in the first signature and its corresponding element in the second signature; (iv) the approximate minimum difference between any element in the first signature and its corresponding element in the second signature; (v) the approximate average difference between all of the elements in the first signature and their corresponding elements in the second signature.

13.    The method of Claim 10 or 11 where the majority test, for the predetermined number of time frames, is met when the number of second signatures that meet the error threshold is greater than a predetermined number between and including K+1 and  2K+1, where K is evaluated such that 2K+1 is equal to the predetermined number of time frames.

For sequential rule

14.    The method of Claim 11 where the matching criteria comprises:

Determining whether the time frame indices corresponding to the second signature increase substantially monotonically.


15.    The method of Claim 11 where the matching criteria comprises:

Determining whether the time frame indices corresponding to the second signature are substantially linearly correlated with the time frame indices corresponding to the first signature.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

16.    The method of Claim 11 where the matching criteria comprises:

Calculating a regression analysis between the time frame indices corresponding to the second signature relative to the time frame indices corresponding to the first signature.

Both:

17.    The method of Claim 12 further comprising the method of Claim 14.


Multi-thread:

18.    The    method    of    claim    16    further    comprising:

storing in a separate portion of computer memory, the references to the locations of all first signatures that meet the majority test among the set of predetermined time frames;

For each meeting first signatures,  starting a thread so that each is assumed a unique and valid outcome;

Continuing to process the signal independently using each of the threads; and

Terminating any thread when the time frame index corresponding to the latest time frame in the thread does not meet the monotonicity test in the determining step.


For the Fast range search:

19.    A method of searching a database comprised of at least one first signature representing an signal, using a query comprised of a second signature where each signature is a set of a number of elements, each element a real number, comprising:

Mediaguide 1 v 12   Feb 26 '04

**Ex. 15**

Storing in computer memory a first data array out of all of the first signatures, whereby each row in the first array is the set of elements from the first signature;

For at least one column in the first data array, sorting within the computer memory, the elements of the column in either ascending or descending order;

Storing in computer memory an additional data array where at least one element in the second data array corresponds to an element in the first data array, and the value of the at least one element in the second data array cross-indexes where the corresponding element in the first data array originated prior to the sorting step.

20. The method of Claim 1 further comprising the method of Claim 19.

For the booster:

21.    A method of searching a database comprised of at least one first signature representing a signal, using a query comprised of a second signature where each signature is a set of predetermined number of elements, each element a real number, comprising:

Using a predetermined mapping to map each first signature to a first integer on the number line;

Storing in a computer memory the first integer with a reference to the identification index and the time frame index of the each first signature;

Using the predetermined mapping to map the second signature to a second integer;

Using the second integer as an index to search through the computer memory to find memory locations storing the value of a first integer that meets a predetermined matching criteria relative to the second integer;

Returning the identification index and time frame index corresponding to the locations where the first integers that meet the matching criteria are found.

Mediaguide 1  v 12    Feb 26 '04

**Ex. 15**

The whole thing:

22.    A method of determining whether a detected signal of a plurality of time frame duration is substantially the same as at least one known signal out of a plurality of known signals, each of a plurality of  time frame duration and having an identification index and time frame index for each time frame, comprising:

Calculating a first signature for at least one of the time frames of each of the known signals,

Storing in a computer database each first signature with a reference to the corresponding identification index and a reference to the time frame index;

Calculating a second signature for at least one of a predetermined number of sequential time frames during the detected audio signal;

Searching the database to determine which of the first signatures meet a predetermined matching criteria with any of the second signatures, thereby returning the identification index and time frame index corresponding to each matching first signature;

Selecting the identification index returned by at least a majority of the searches;

Determining whether the returned time frame indices, referenced by the matching first signatures that correspond to the selected identification index,  increase substantially monotonically in relation to the time frame indices of the at least one predetermined number of sequential time frames.

Mediaguide 1 v 12    Feb 26 '04

**Ex. 15**

Harvester:

23.    The method of Claim 1 where the known signal is comprised of programming of unknown identity, comprising:

Creating an arbitrary identification index;

Assigning the identification index to those first signatures derived from the programming of unknown identity;

Storing the arbitrary identification index and time frame index in computer memory so as to be referenced by the first signature;

Replacing each instance of the arbitrary identification index in the database with a correct identification index when the unknown programming is identified.

24.    The method of Claim 23 further comprising replacing the arbitrary identification index in the database with another identification index that references valid identification data identifying the programming of unknown identity.

25.    A machine comprising a central processing unit, a digital data transceiver device and a data storage device comprised of any machine readable media, where the machine readable media contains a computer program that when executed by the machine, performs the methods of Claims 1 - 24.

26.    A machine readable media of any type, which contains data that is a computer program that when executed by a computer, performs the methods of Claims 1 - 24.

Mediaguide 1  v 12    Feb 26 '04

**Ex. 15**

## Flow-Chart

The interconnection of the four modules constitutes the radio broadcast monitoring system. Below is the flow-chart:



**Figure 1** The block configuration of the radio broadcast monitoring system.

1

**Ex. 15**



**Figure 2** An illustration of the flow of the algorithm from a frame of audio to its result after detection.

**Ex. 15**

The flowchart of this module is a simple flowchart, as follows:



**Figure 3** The flowchart of the PG Module.

3

**Ex. 15**



**Figure 4** Original band setting leads to pattern mismatches between the original and its speedup variant.



**Figure 5** Modified band setting yields very good pattern matching given the speedup rate is known.

4

**Ex. 15**



**Figure 6 The new band setting leads to good robustness of +/-2% speedup variations.**

5

**Ex. 15**

**Detail of the DBS Operation**

The flowchart illustrates the flow in DBS Module is given below:



**Figure 7** The schematic of the DBS operation flow.

6

**Ex. 15**



**Figure 8** The flowchart of the RS Algorithm.

7

**Ex. 15**

PATENT APPLICATION SERIAL NO. _____

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

03/03/2004 WABDELR1 00000106 60547931

01 FC:2005                    80.00 OP

PTO-1556
  (5/87)

'U.S. Government Printing Office: 2001 — 481-697/59173

**Ex. 15**

# Exhibit 16

**From:** Yan Liu <yan@tvisioninsights.com>
**Sent: Fri,** 02 Feb 2018 18:34:33 -0500
**To:** "Sara Radkiewicz" <sara@tvisioninsights.com>
**Subject:** Re: Re: TVision-W Quotes for **April** Launch
**Attachments:**
- attached_file_1.pdf *(223 kb)*

Signed and attached

Yan Liu | CEO/Co-founder | 929.900.5298

Get your copy of our Quarterly Attention Report

On Fri, Feb 2, 2018 at 6:21 PM, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

> Can you please sign?
>
> Thanks-
>
> Sara
>
> ---------- Forwarded message ----------
> From: **Amy Bolivar** <amy@vidvita.com>
> Date: Fri, Feb 2, 2018 at 5:37 PM
> Subject: Re: Re: TVision-VV Quotes for April Launch
> To: Sara Radkiewicz <sara@tvisioninsights.com>
> Cc: Stephen Brown <steve@vidvita.com>
>
> Hi Sara,
>
> Steve will send another check-in email to the ACRCloud team to start getting things set up and we'll let you know if there is any issue.
>
> The new order is attached.
>
> Have a great weekend!
>
> Amy

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00660739

**Ex.16**

Right now based on our dev schedule, we would be able to provide TVision with a test environment by March 1. I know the timing of this integration is tight with TVision's plans.

The reason for the pricing delay is the back-end is in the process of being built and where that can be a negative when you are considering a new ACR solution, I wanted to provide you with this possibility because Steve and I are dedicating our time and effort into being able to directly support and customize an ACR platform for clients. We think this is the best avenue for VidVita's growth and for us to continue to provide robust solutions for our clients in regards to the age old question "what's playing?" whether it's a song, ad, tv program or jingle.

I want to be transparent with you on our time frame as we build things because at the end of the day we want your transition away from Gracenote to be successful and since first speaking to Yan, the goal has always been for TVision to continue having access to TV reference data for your measurement and also hopefully have more control over the environment. We are 100% committed to working with TVision regardless of the ACR provider and even with doing our own ACR using Source's original algorithm, our company will continue to maintain a neutral position by supporting companies such as ACRCloud, Mufin, MRL etc. I don't want our work with this ACR to make TVision feel that we are changing our relationship with other providers. It is simply a way for us to be able to have 360 views into the process as well as use our experience in the ACR community to create a platform from scratch that would be customizable and address issues we have heard from clients the past 5 years since launching our company.

Best Regards,

Amy

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00660748

**Ex.16**

fingerprints so you have all fingerprint length options stored? Or do they have one long continuous stream and compare our fingerprint against that?

We are looking to make a decision on vendors soon - can we get a call lined up for early next week?

Best-

Sara

On Wed, Jan 17, 2018 at 3: 10 PM, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

Hi Amy-

I think a call with Source would be great. Our current quote from ACR Cloud requires a 1 year commitment. We have some flexibility on the April 1 date, but we are really suffering in quality from our current vendor, so in a hurry to move to a more accurate solution.

I am interested in duration of fingerprints, if there is any lag between fingerprints, and SLA.

We are definitely interested in a schedule correction option in the future- we are also investigating what we can do on our side for this in the future. The issue is really with how we do commercial determination - we get a

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00660753

**Ex.16**



We are actively developing the Source environment, but it is going to be a tight time frame to have it 100% QA'ed and available for your April 1 launch. Hank the CEO of Source is very interested in us expanding his technology and once this is built, we will have complete control over the entire environment which will be excellent for enhancing the tools for measurement and also customizing things for TVision. We hope to have our environment up for testing end of February for you to run in tandem with ACRCloud. Because of the tight time frame, if you are not locked into a 12 month term with ACRCloud, it would allow you freedom to test Source, have us customize the environment based on anomalies and things you experience with your current provider and transition you after April 1 if necessary.

Hank did mention he would match or beat ACRCloud's quote. I think it's more of a question of TVision's interest in pursuing this option. We will continue to be completely transparent in our timing for presentation of the environment. We are excited because from working with our clients and directly being involved in large cross-panel measurement projects, we understand the pain points of the technology and how to build up specific software tools to provide streamlined

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY        TVSN_NLSN_00660756

**Ex.16**



results.

We can also have a call with Source to answer any questions or go over any time tables.

Best Regards,

Amy

On Tue, 16 Jan 2018 21:33:36 -0500, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

A few more questions:

- Is there a way to track program change time? Maybe there is something you can hear or notice in the stream? So sometimes a program starts right on the hour and sometimes one minute off. It's important for us to know exactly when the program actually starts.
- How do we guarantee that the content fingerprints are there before we make our requests? We are concerned that some of our requests will

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY                TVSN_NLSN_00660757

**Ex.16**

get to the server before the live fingerprints.

- What is your SLA?

Thanks!

Sara

On Tue, Jan 16, 2018 at 3:44 PM, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

> Hi Amy-
>
> Do you know when can expect a quote from Source Digital?
>
> Best-
>
> Sara
>
> On Tue, Jan 9, 2018 at 2:19 PM, Sara Radkiewicz <sara@tvisioninsights.com> wrote:
>
>> Hi Amy-
>>
>> Can you ask Source Digital to provide us a quote?
>>
>> We currently have a quote from ACR Cloud storing the content you are encoding (8000 hours

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY        TVSN_NLSN_00660758

**Ex.16**