IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| TVISION INSIGHTS, INC., | ) |
| | ) |
| Defendant. | ) |

**Redacted - Public Version**

C.A. No. 22-057-CJB

## TVISION INSIGHTS, INC.'S REPLY BRIEF IN SUPPORT OF ITS DAUBERT MOTION REGRDING MICHAEL KEELEY

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
P.O. Box B113
150 Fayetteville St, Suite 2800
Raleigh, NC 27601-2960
(984) 960-2860

Michael F. Heafey
RIMÔN LAW P.C.
800 Oak Grove Avenue, Suite 250
Menlo Park, CA 94025
(650) 461-4433

Dated: April 26, 2024

John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

## **TABLE OF CONTENTS**

I.　　Introduction ................................................................................................... 1

II.　　Dr. Keeley Fails To Prove Lost Profits ......................................................... 2

　　A.　Dr. Keeley's Opinion should be excluded because his assumption that "TVision had no available alternatives" is contradicted by admissions in the patent and is contradicted by the factual record ................................................................................................... 3

　　B.　Dr. Keeley's opinion is inadmissible because it conflates the asserted claims of the '889 patent with ACR systems .................................................................................. 3

III.　　Dr. Keeley's Testimony Regarding The Nash Bargaining Solution Should be stricken 4

IV.　　Dr. Keeley's Opinion Should be precluded because he failed to apportion damages .... 5

　　A.　Dr. Keeley Failed To Apportion ................................................................... 5

　　　　1.　Irrefutable Evidence Establishes That Non-Infringing ACR Software Was Available To TVision ................................................................................................ 5

　　　　2.　Dr. Moulin's Opinions Are Not Reliable ............................................... 7

　　　　　　a.　The '889 Patent Admits That Prior Art Non-Infringing ACR Systems Were Available ...................................................................................................... 7

　　　　　　b.　███ ACR Software Was An Available Alternative .......................... 8

　　　　　　c.　███ ACR Software Was An Available Alternative .......................... 9

　　B.　Dr. Keeley Fails To Apportion .................................................................... 10

　　　　1.　The Cases Cited by Nielsen are Inapposite ........................................... 11

　　　　2.　The Doctrine of Unclean Hands Prevents Nielsen From Arguing That ███ ACR System Was Not Available ..................................................................... 12

　　　　3.　Dr. Keeley's Application of the *Georgia Pacific* Factors Does Not Satisfy The Apportionment Requirement ............................................................................ 12

　　C.　Nielsen's Convoyed Sales Argument is Unsupportable ................................ 13

V.　　Dr. Keeley's Opinion Assumes Nielsen Would not be Willing to Negotiate ............... 13

VI.　　TVision's April 2018 Forcast is ███████ and ███████ ............................. 13

VII.　　Conclusion ................................................................................................ 15

| Table of Exhibits | |
|---|---|
| 1 | Keeley Opening Expert Report |
| 2 | U.S. Pat. No. 7,783,889 |
| 3 | Keeley Reply Report |
| 4 | Moulin Opening Report |
| 5 | Moulin Reply Report |
| 6 | Anderson Rebuttal Report |
| 7 | Webster Deposition |
| 8 | Liu Deposition |
| 9 | Bolivar Deposition |
| 10 | Schiffman Deposition |
| 11 | TVSN_NLSN_00611700-707 |
| 12 | TVSN_NLSN_00650281-298 |
| 13 | TVision TVSN_NLSN_00645277-95 |
| 14 | Johnson Rebuttal Report |
| 15 | TVN_SLN _00269606 |
| 16 | TVSN_NLSN00662112-139 |
| 17 | Liu Dep. Ex. 34 |

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*Apple Inc. v. Wi-Lan Inc.*,
    25 F.4th 960 (Fed. Cir. 2022) ................................................................... 4, 7, 8

*AstraZeneca AB v. Apotex Corp.*,
    782 F.3d 1324 (Fed. Cir. 2015) ....................................................................... 11

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
    509 U.S. 209 (1993) ............................................................................................ 7

*Finjan, Inc. v. Blue Coat Systems, Inc.*,
    879 F.3d 1299 (Fed. Cir. 2018) ....................................................................... 10

*Garretson v. Clark*,
    111 U.S. 120 (1884) .......................................................................................... 10

*Gilead Sciences, Inc. v. Merck & Co., Inc.*,
    888 F.3d 1231 (Fec. Cir. 2018) ....................................................................... 12

*Goldby v. Hologic, Inc.*,
    817 F. Supp. 204 (D. Mass. 1993) ................................................................. 14

*Grain Processing Corp. v. American Maize-Products Co.*,
    185 F.3d 1341 (Fed. Cir. 1999) ................................................................. 11, 12

*Greenwell v. Boatwright*,
    184 F.3d 492 (6th Cir. 1999) ............................................................................ 7

*Guzman v. State Farm Lloyds*,
    456 F. Supp.3d 846 (S.D. Tex. 2020) ............................................................... 7

*Hathaway v. Bazany*,
    507 F.3d 312 (5th Cir. 2007) ............................................................................ 7

*Honeywell Intern., Inc. v. Hamilton Sunstrand Corp.*,
    378 F. Supp.2d 459 (D. Del. 2005) ................................................................. 15

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
    274 F.3d 1371 (Fed. Cir. 2001) ....................................................................... 15

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*,
    895 F.2d 1403 (Fed. Cir. 1990)............................................................................................... 15

*Medpointe Healthcare Inc. v. Hi-Tech Pharmacal Co., Inc.*,
    115 Fed Appx. 76 80 (Fed. Cir. 2004) ................................................................................... 3

*Optima Tobacco Corp. v. Flue-Cured Tobacco Growers, Inc.*,
    2019 WL 4858848 (E.D.N.C., Sept. 30, 2019)................................................................... 15

*Qualcomm Inc. v. Apple, Inc.*,
    24 F 4th 1367 (Fed. Cir. 2022) ........................................................................................ 3, 4

*Seymour v. McCormick*,
    57 U.S. (26 How.) 480 (1853) ............................................................................................ 10

*Sound View Innovations, LLC v. Hulu, LLC*,
    33 F.4th 1327 (Fed. Cir. 2022) ..................................................................................... 8, 9, 10

*Summit 6, LLC v. Samsung Electronics Co.*,
    802 F.3d 1283 (Fed. Cir. 2015)............................................................................................ 4

**Statutes**

35 U.S.C. §284............................................................................................................................... 2

**Other Authorities**

Fed. R. Evid. 602 ......................................................................................................................... 14

Fed. R. Evid. 702 ............................................................................................................. 1, 7, 8, 10

## I.  INTRODUCTION

Dr. Keeley's entire report is based on the premise that TVision would have been out of business without a license to the '889 patent,[1] a premise that is inadmissible (a) because it ignores an admission in the '889 patent that non-infringing ACR systems were available and is otherwise is contradicted by indisputable facts of record (sections II.A.1. and IV.A., *infra*), and (b) because it conflates the '889 patent and ACR software (section II.B.2). In turn, Dr. Keeley's opinion is based on Dr. Moulin's opinion that there were no acceptable non-infringing alternatives at the time of the hypothetical negotiation.  Ex. 1 at ¶¶ 16, 19, 49, 57, and ¶ 103.

Based on the evidence discussed below in section IV.A., Dr. Moulin's testimony should be excluded under Fed. R. Evid. 702(b) and (c).  First, the '889 patent itself admits that there were prior art non-infringing ACR systems.  Ex. 2 at 1:20-29.  Second, Amy Bolivar, co-founder of TVision's vendor, VidVita, who is familiar with ACRCloud, Mufin and MRL ACR software, recommended that TVision could substitute any of them for Gracenote ACR software. *See* section IV.A.1.  So, too, Dr. Keeley's "lost profits" analysis should be precluded because it fails to attribute any profits Nielsen may have lost to the infringement of the '889 patent. *See* section II.  For the same reason, there is no merit to Dr. Keeley's Nash Bargaining Solution analysis. *See,* section III. And, Nielsen is simply wrong when it argues that Dr. Keeley apportioned damages as part of his *Georgia Pacific* analysis. Factors 1, 4-11 and 13 of Dr. Keeley's *Georgia Pacific* analysis are each based on the unwarranted assumption that there were no non-infringing alternatives at the time of the hypothetical

---

[1] Ex. 1 at ¶ 57 ("I understand from Dr. Moulin that the record does not show that there were acceptable non-infringing alternatives available to TVision at the time of the hypothetical negotiation. Consequently, absent infringement, TVision likely would not have continued in business without a license to the patent-in-suit"); at ¶ 65 (same in support of opinion re Nash Bargaining Solution); at 32 ¶ 73 (same in support of reasonable royalty opinion); at ¶ 87 (same in support of *Georgia Pacific* factor 1); at ¶ 92 (same in support of factor 4); at ¶ 98 (same in support of factor 5); at ¶¶ 100-104, 107 (same in support of factors 6-11, 13).

negotiation, which is contrary to unrefuted evidence of record. *See* section IV.A.1, below. Dr.

Keeley's assumption that Nielsen would not have been willing to negotiate is also premised

on the incorrect assumption that TVision would have been out of business absent a license

under the '889 patent. *See* section V. Finally, Dr. Keeley's opinion should be excluded

because he relies on an unsubstantiated forecast, to the exclusion of TVision's actual financial

results. *See* section VI.

## II.    DR. KEELEY FAILS TO PROVE LOST PROFITS

Nielsen now makes it clear that it is " ████████████████ " (Nielsen Br. at 3),[2] but

attempts to justify Dr. Keeley's " ████████ " analysis under the rubric that it is in support of

his reasonable royalty analysis. *Id.* at 3-5. If Nielsen were to prevail on its infringement

claim, it would be entitled only to "damages adequate to compensate for *the infringement*,"

which requires apportionment. 35 U.S.C. §284.  But Dr. Keeley's lost profits opinion assumes

that ████████████████████████████████████ were *entirely* due to

TVision's alleged infringement of the '889 patent.  The sole examples of ████████████

██████████████████████████████ . Ex. 1 at ¶¶ 52-54.[3]

Further, Dr. Keeley's reasonable royalty analysis incorrectly *assumes* "TVision had *no*

available alternatives." D.I. 199, Nielsen's Br. at 5 (emphasis in brief).[4]   Dr. Keeley's report

is devoid of any analysis of other factors that ████████████████████████████

████████████ , such as the fact that TVision offers attention data that Nielsen does not

---

[2] This is contrary to the position that Nielsen took in its amended initial disclosures and
supplemental answers to TVision's interrogatories. *See* D.I. 204-1 at 6 and 204-2 at 7.
[3] Dr. Keeley's "lost profits" analysis relies on Nielsen's Global Head of Product and Strategy,
Ms. Poppie, for the proposition that ████████████████████████████████████

████████████████████████ " Ex. 1. ¶ 51 (emphasis added).
[4] *See also,* Ex. 1 ¶¶ 57, 58 ("the record does not show . . . non-infringing alternatives
available to TVision); *id.* at ¶¶ 103-104 (stating that Dr. Keeley has accounted for lack of
non-infringing alternatives, stating "TVision  . . . needed to practice the patent-in-suit to stay
in business).

offer. Dr. Keeley's lost profits opinion should be excluded, not simply because he fails to apply the *Panduit* factors, but because he fails to provide any analysis linking ███████ ██ to the infringement of the patent.

### A.   Dr. Keeley's Opinion should be excluded because his assumption that "TVision had no available alternatives" is contradicted by admissions in the patent and is contradicted by the factual record

Nielsen's argument that "TVision had *no* non-infringing alternatives" (Br. at 5) fails as a matter of law because the '889 patent *admits* that ACR systems were "well known" at the time of the invention. Ex. 2 at 1:20-28.  An admission in a patent is binding on the inventors and the patentee.  *E.g. Qualcomm Inc. v. Apple, Inc.*, 24 F 4th 1367, 1375 (Fed. Cir. 2022) ("it is appropriate to rely on admissions in a patent's specification when assessing whether that patent's claims would have been obvious" and "[a]dmissions in the specification regarding the prior art are binding on the patentee for purposes of a later inquiry into obviousness"); *see also, Medpointe Healthcare Inc. v. Hi-Tech Pharmacal Co., Inc.*, 115 Fed Appx. 76 80 (Fed. Cir. 2004) (finding that district court abused its discretion when it failed to give weight to admission in patent).  Here, the patent admits that prior art non-infringing ACR systems were available, and unrefuted evidence proves that several alternative ACR systems were available to TVision prior to the date of the hypothetical negotiation. § IV.A.

### B.   Dr. Keeley's opinion is inadmissible because it conflates the asserted claims of the '889 patent with ACR systems

Dr. Keeley's opinion is also inadmissible because it conflates the asserted claims of the '889 patent with ACR systems.[5]  The Federal Circuit rejected a similar damages theory

---

[5] According to Nielsen, the asserted claims cover a process or apparatus for generating "frame descriptors upon which signatures are based, an ACR system compares a pair of frequency components from the same frame . . .[which] is known as *intra*frame or "single frame" processing."  D.I. 201 at 3.  Nielsen also admits that "prior art systems for generating signatures rely heavily in *inter*frame, *i.e.*, multiple frame, processing—in which data from multiple audio frames is compared to generate a signature." *Id.* Thus the claims of the '889 patent cannot cover entire ACR systems, only a specific method of generating signatures.

for the same reason in *Apple Inc. v. Wi-Lan Inc.*, 25 F.4th 960 (Fed. Cir. 2022). The patents at issue in *Apple* were directed to allocating bandwidth in wireless communication systems, and the accused products were Apple iPhones that operated under on 4G LTE networks. *Id.* at 964-65. Wi-Lan contended that its patents "enabled Voice over Long-Term Evolution (VoLTE), which provides voice call service over a 4G LTE network." *Id.* at 965. The Federal Circuit affirmed the trial court's decision, granting Apple's motion for a new trial on damages, because Wi-Lan's damages expert's testimony "conflated the patented technology with VoLTE generally." *Id.* at 966, 975-76. Nielsen's argument that "TVision had ***no*** non-infringing alternatives" should be excluded because arguing that TVision couldn't use another ACR system amounts to conflating the claims of the '889 patent with ACR systems.

### III.    DR. KEELEY'S TESTIMONY REGARDING THE NASH BARGAINING SOLUTION SHOULD BE STRICKEN

Dr. Keeley's Nash Bargaining Solution ("NBS") (Br. at 5-9) should be stricken because it, too, conflates the '889 patent with ACR software: "assume that if Nielsen and TVision cannot reach a licensing agreement, then TVision earns zero profits." Br. at 7, citing Ex. 1 ¶ 69. This assumption could be true only if the '889 patent covered all ACR software, not just one of multiple methods of making signatures. Dr. Keeley's NBS opinion should also be excluded because the '889 patent admits that prior art systems existed and because, as is set forth in section IV below, non-infringing alternatives were available to TVision.

Nielsen's cases are distinguishable on their facts. In *Summit 6, LLC v. Samsung Electronics Co.*, 802 F.3d 1283 (Fed. Cir. 2015), the Court noted that the damages expert had conducted an extensive analysis to isolate the value of the infringing camera that was part of the accused Samsung phone and concluded that the profit margin per device was $0.56. *Id.* at 1296-97. The Court approved the expert's conclusion under those circumstances that the parties would have agreed to split the profit margin equally. *Id.* at 1297. That is far different

than this case, in which Nielsen's expert speculates that TVision would have agreed to pay

Nielsen ███████████████████████████████  ████████████████████████████████

### IV.    DR. KEELEY'S OPINION SHOULD BE PRECLUDED BECAUSE HE FAILED TO APPORTION DAMAGES

#### A.    Dr. Keeley Failed To Apportion

At pages 10-11 of its brief, Nielsen incorrectly argues a ██████ apportionment is

appropriate because Dr. Keeley "opined that 'absent practicing the patent-in-suit TVision

would have made no sales because it did not have available an acceptable, non-infringing

alternative. ███████████████████████████████████████████  *Id.* at

10-11 (emphasis in brief removed). There is no basis in fact for this argument.

#### 1.    Irrefutable Evidence Establishes That Non-Infringing ACR Software Was Available To TVision

It is undisputed that TVision initially used ACR software licensed to it by ███████

but after ██████ was acquired by ████████████████████████████████████

██████████████. Keeley Rept. at ¶ 33.  Mr. Liu, TVision's CEO testified that

TVision was ████████████████████████████████████████████

██████████." Ex. 8, Liu Tr. 75:8-76:14.  As of May 2018, and during the licensing period,

the ACR provider market was "fairly commoditized" and companies like Dat-Track provided

very similar capabilities to ACRCloud. Ex. 7, Webster Tr.., 41:19-42:8; 128:1-130:19.

VidVita, which is in the business of delivering fingerprints to customers, ████████

███████████████████████████. Ex. 17at TVSN_NLSN_0673870. Amy Bolivar

is the co-founder and CEO of VidVita. Ex. 9, 11:10-13.  In her deposition, Ms. Bolivar

explained that ███████████████████████████████████████████

████████████████████████████. Ex. 9 at 39:8-16.  VidVita provides ████████

████████████████████████████████████████████." Ex. 9, at

15:3-10. The data feeds are "████████████████████████" or ████████████

████████████s." *Id.*, at 15:18-16:13.  Ms. Bolivar has ████████████████

█████████████████████████████████████████████████" and she was a Linux

systems administrator. *Id.*, at 48:17-49:10.

     On January 11, 2017, ████████████████████████████████████████████

████████████████████ Ex. 11, TVSN_NLSN_00611700-707 at 702-03. Ms. Bolivar

advised Mr. Liu, "███████████████████████████████████████████████████████

██████████████████." *Id.* at 703.  She also advised Mr. Liu, ██████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

█████████████████████████████" *Id.* at 702.  On January 13, 2017, Ms.

Bolivar informed Mr. Liu,



*Id.* at 701.  Ms. Bolivar testified that she understands ACR and fingerprints because █

█████████████████████████████████████████████████████████████████████████."

Ex. 9, Tr. 20:7-21:12. On January 24, 2018, during the period of time that TVision was

transitioning from ██████████ ACR software to ██████████ ACR software, Sara

Radkiewicz of TVision advised Ms. Bolivar that TVision was ████████████████████

████████████P" and wanted "██████████████████████████," and that ██████████

████████████████████." Ex. 12, TVSN_NLSN_00650281-298 at 282-83.  In

response, Ms. Bolivar had suggested ██████ as a potential provider (*id.* at -286 – -292), but

informed TVision, "██████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████ *Id.* at -284.  Thus, contemporaneous evidence shows that as of May 2018,

VidVita could have processed fingerprints generated by TVision using ACR software

supplied by ████████████████████████, and did not differentiate between those

ACR systems when it provided recommendations to TVision. Ex. 11; Ex. 12.  TVision had

also reached out to ██████ D.I. 191 at 4, citing D.I. 191-8 (Ex. 8), 191-13 (Ex. 13).

### 2.    Dr. Moulin's Opinions Are Not Reliable

Dr. Keeley bases his opinion that there were no non-infringing alternatives on Dr.

Moulin's report.   Ex. 1 ¶¶ 16, 19, 49, ¶ 57, and 103.  But, as is demonstrated below, this

Court should exclude Dr. Moulin's opinion with respect to the MRL and Mufin ACR software

alternatives to ACRCloud as unreliable.

An expert's opinion cannot substitute for facts.  *Hathaway v. Bazany,* 507 F.3d 312,

318 (5th Cir. 2007).  "[W]hen indisputable record facts contradict or otherwise render the

opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown &

Williamson Tobacco Corp*., 509 U.S. 209, 242 (1993).  Thus, "[e]xpert testimony . . . is

inadmissible when the facts upon which the expert bases his testimony contradict the

evidence." *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999), citing *United States v.

Chaney*, 577 F.2d 433, 435 (7th Cir. 1978); *see also, e.g., Guzman v. State Farm Lloyds,* 456

F. Supp.3d 846, 854-455 (S.D. Tex. 2020)(excluding expert's testimony that did not "account

for actual, unrebutted facts of the case as unreliable under Rule 702(b)).

### a.    The '889 Patent Admits That Prior Art Non-Infringing ACR Systems Were Available

Dr. Moulin's opinion that there were no non-infringing alternatives to a license under

the '889 patent flies in the face of the admission in the '889 patent that "audio streams . . .

using signature-matching techniques is well known."  Ex. 2 at 1:20-28. It is also excludable

under *Apple Inc. v. Wi-Lan Inc.*, 25 F.4[th] at 966, 975-76 because it conflates the claims of the

'889 patent, which cover only a method of making fingerprints, with entire ACR systems.

**b.** ███████ **Software Was An Available Alternative**

Dr. Moulin's opinion regarding the availability of ███████ software should be excluded because (1) his report does not establish that he has any knowledge of ███████ software (Ex. 4 ¶¶370-375) , and (2) his report fails to account for the fact that Amy Bolivar, the co-founder of TVision's vendor, VidVita, recommended that TVision use ███████

████. *See id; See also,* Ex. 11 at TVSN_NLSN_00611701.  Unlike Dr. Moulin, Ms. Bolivar is familiar with ███████ system because she worked for ████ prior to forming VidVita, and she recommended ████████████████ Ex. 11 at TVSN_NLSN_00611701.  Under these circumstances, Dr. Moulin's opinion should be excluded under Fed. R. Evid 702(b) because it is not "based on sufficient facts or data."

There is no merit to Dr. Moulin's reliance on a March 2, 2017, TVision presentation that refers to a study of ████ software.  Ex. 4, Moulin Rept. ¶¶ 370-372, citing Ex. 13 attached hereto.  The presentation does not report the methodology used to conduct the study. *See* Ex. 13.  For that reason, alone, the presentation fails to qualify as a report of a test that an expert would ordinarily rely upon.  Fed. R. Evid. 702(c).  Second, Dr. Moulin fails to recognize that the tests were conducted on mobile phones using ████ ACR software, and that the failure rate Dr. Moulin refers to was entirely due to the fact that the study was done on mobile phones, not the devices TVision installs in households, which do not have the same issues picking up audio as mobile phones.  Ex. 6, Anderson Rebuttal Rept. at 44-45 ¶ 107. Dr. Moulin's reply report does not address this issue.  Ex. 5 ¶¶ 129-130.

Under very similar circumstances, the Federal Circuit approved the exclusion of an expert's first damages opinion, which was based on a study, where the expert failed to consider the differences between the conditions under which the study was conducted versus the conditions under which the accused product would actually have been used. *Sound View Innovations, LLC v. Hulu, LLC*, 33 F.4[th] 1327, 1337-38 (Fed. Cir. 2022).  The Court also

approved the exclusion of an amended damages opinion, which as here, relied on a press release describing a viewer experience report. *Id.* at 1338. The expert had adopted the press release's explanation of the result, but the district court found "a key reliability problem" in the fact that the expert "did not himself see the report underlying the . . . press release." *Id.* The Federal Circuit noted that the report was properly excluded because "the press release does not include a sufficient, in-depth discussion of the study so that it can be assessed, and then compared to the accused technology." *Id.* The same is true here. Dr. Moulin's reliance on the March 2, 2017, study is an insufficient basis to admit his opinion, and it should be excluded.

Nor is there any basis for Dr. Moulin's speculative opinion that the different mechanism used by ███ as compared with █████ would be a reason TVision would not use ███ product. Ex. 4, at 99-100, ¶¶ 373-74. TVision actually preferred ███ mechanism over █████ because it simplified the aggregation of results, but TVision decided to use █████ because of costs and the speed of transition. Ex. 6, at 45 ¶ 108.

### c.      ███ ACR Software Was An Available Alternative

Dr. Moulin's opening report did not even refer to ███ ACR software. Paragraphs 131-133 of Dr. Moulin's reply report (Ex. 5) should be excluded because he fails to demonstrate that he has any knowledge of ███ ACR software and because he fails to explain why it would not have been suitable for TVision. In this regard, Dr. Moulin ignores the fact that Ms. Bolivar informed Mr. Liu that VidVita had ███████████████ ██████" and that "██████████████████████████████ ██████." *Compare* Ex. 5 ¶¶131-133 with Ex. 11 at TVSN_NLSN_00611702. Dr. Moulin also ignores the fact that TVision received a project proposal in January 2017 from ███ that included terms regarding the cost components for the setup, pilot, and production phases of the system rollout. Ex. 14 at ¶¶ 157, 158. According to a company presentation, ███

specializes in audio fingerprint technology for ACR and touted companies, such as Kantar, Ipsos, and Starz, as being among its customers and partners. Ex. 16 (TVSN_NLSN00662112-139) at 115, 121.

Dr. Moulin's sole opinion regarding █████ is in his reply report, which states that Dr. Anderson "identifies no evidence that would show that Mufin's technology would work in TVision's environment." *See* Ex. 5, ¶¶131-133.  This opinion ignores Ms. Bolivar's recommendation of █████ ACR software, which was based on testing, and it ignores █████ 2017 proposal.  Thus, Dr. Moulin's opinion regarding the availability of █████ ACR software should be excluded because it does not rely on sufficient facts or data.  Fed. R. Evid. 702(b).

### B.    Dr. Keeley Fails To Apportion

Dr. Keeley's opinion fails under Supreme Court precedent for failure to apportion. "[O]ne who invents some improvement . . . could not claim that the profits of the whole [invention] should be the measure of damages for the use of his improvement. . . ." *Seymour v. McCormick,* 57 U.S. (26 How.) 480, 489-90 (1853).  Further, "[w]hen a patent is ... not for an entire[ ] ... machine or contrivance, the patentee must ... give evidence tending to separate or apportion the defendant's profits ... between the patented feature and the unpatented features." *Garretson v. Clark*, 111 U.S. 120, 121 (1884).  The Federal Circuit has rigorously applied these principles.  *Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299, 1309-11 (Fed. Cir. 2018) (reversing damages award for failure to apportion); *Sound View*, 33 F.4th at 1338 (expert failed to apportion).

As set forth in section IV.A., above, the evidence does not support Nielsen's argument that "████████████████████████████████████████████████ ████████████████████████████████ Nielsen Br. at 10.  There were non-infringing alternatives available to TVision. *See* section IV.A.

### 1.    The Cases Cited by Nielsen are Inapposite

The cases Nielsen cites do not support its argument.  Nielsen cites *AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338-40 (Fed. Cir. 2015), for the proposition that the patented sub-coating of a drug formulation "was substantially responsible for the value of the product." Nielsen Br. at 11-12.  That, however, is not true in this case.  The '889 patent claims only a method of creating a signature, which is different from prior art methods. However, Dr. Keeley cites no evidence that the patented feature drives demand for TVision's products, as opposed to the attention data that TVision advertises.

The facts in *AstraZeneca* demonstrate why it is inapposite here.  The inventors in *AstraZeneca* had to solve the problem of producing an omeprazole formulation with an enteric coating, which was necessary to protect the active ingredient from degrading in the gastric environment of the stomach, but which itself was subject to degradation by the acidic components of the enteric coating. 782 F.3d at 1328-29.  The inventors solved this problem by adding a subcoating that protected the omeprazole from the enteric coating.  *Id.* at 1329. Under those circumstances, the Court found that the formulation patents in suit covered "the infringing product as a whole, not a single component of a multi-component product." *Id.* at 1338.[6]

Where, as here, "an infringer can easily design around a patent and replace its infringing goods with non-infringing goods, the hypothetical royalty rate for the product is typically low.  *Id.* at 1334, citing *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1347 (Fed. Cir. 1999).  In *Grain Processing,* in the context of a lost profits analysis, the Federal Circuit reiterated that "an available technology not on the market during

---

[6] *AstraZeneca* listed the patents-in-suit for its branded Prilosec product in FDA's Orange Book, which meant that a competitor could not market a generic version of Prilosec during the life of those patents unless the competitor proved that the patents were either invalid or not infringed.  *Id.* at 1342, citing 35 U.S.C. §271(e)(4)(A).

the infringement can constitute a noninfringing alternative." *Id.* at 1351, citing *Slimfold Mfg. Co. v. Kinkead Indus., Inc.*, 932 F.2d 1453, 1458-59 (Fed. Cir. 1991). In this case, the '889 patent admits that non-infringing alternatives were available. Ex. 2, 1:20-29.

### 2.  The Doctrine of Unclean Hands Prevents Nielsen From Arguing That ███████ ACR System Was Not Available

Under the doctrine of unclean hands, Nielsen's refusal to renew TVision's ███████ license, bars Nielsen's argument that ███████ ACR software was not available to TVision. Nielsen's refusal put TVision in a position where it had to make a quick change to another ACR licensor. Ex. 1 at 12-13 ¶ 33. This created time pressure for TVision (Ex. 8, Liu Tr. 75:8-76:14) and "███████████████████████████." Ex. 10, Schiffman Tr. 81:19-84:8. "A determination of unclean hands may be reached when 'misconduct' of a party seeking relief 'has immediate and necessary relation to the equity that he seeks in respect of the matter in litigation,' *i.e.*, 'for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court.'" *Gilead Sciences, Inc. v. Merck & Co., Inc.*, 888 F.3d 1231, 1239-40 (Fec. Cir. 2018) (finding unclean hands based on breaching commitments to a third party), quoting *Keystone Driller Co. v. General Excavator Co.*, 290 U.S. 240, 245 (1933). Nielsen's refusal to renew, coupled with Nielsen's continued ███████ licenses to others (Ex. 14 ¶ 116), establishes unclean hands. Thus, under *Grain Processing*, Gracenote ACR software must be deemed a non-infringing alternative. 185 F.3d at 1351.

### 3.  Dr. Keeley's Application of the *Georgia Pacific* Factors Does Not Satisfy The Apportionment Requirement

Dr. Keeley's analysis of the *Georgia Pacific* factors does not satisfy the apportion requirement. Thus, the cases Nielsen cites at pages 12-13 of its brief are inapposite. Indeed, Nielsen's entire apportionment argument rests on Dr. Keeley's incorrect conclusion that ███████ ████████████████████████████████████████████████o

████n." Nielsen Br. at 13, 14.  That this conclusion is incorrect is demonstrated in section IV.A., above, which demonstrates that TVision's vendor VidVita recommended three different ACR systems to TVision—████████ ██████ and ████—without differentiating between the three of them.  Nielsen's experts do not contend that the ACR systems provided by ████ or ████ infringe the '889 patent.

### C.    Nielsen's Convoyed Sales Argument is Unsupportable

Nielsen's convoyed sales argument is based entirely on Dr. Keeley's opinion that "without the infringing patented ACR technology, TVision would not be able to sell most of its products and services." Nielsen Br. at 16, citing Ex. 1at ¶ 100; Ex. 3, at ¶ 39.  This opinion should be entirely excluded because it is contrary to the indisputable facts discussed in section IV.A., above.

### V.    DR. KEELEY'S OPINION ASSUMES NIELSEN WOULD NOT BE WILLING TO NEGOTIATE

Nielsen's argument relies on Dr. Keeley's opinion that "Nielsen did not want to grant a license to a competitor or a firm that helped others compete with Nielsen because doing so would cause Nielsen to lose profits . . . . In contrast, TVision needed a license to stay in business." Nielsen Br. at 18, citing Ex. 1, at ¶ 92.  This paragraph of Dr. Keeley's report should be excluded because there is no basis for his opinion that "TVision needed a license to stay in business," for the reasons discussed in section IV.A., above.

### VI.    TVISION'S APRIL 2018 FORCAST IS ████████████████ AND ████████████

Like many of his opinions, Dr. Keeley ignores the fact that TVision's CEO, Mr. Liu, qualified TVision's April 2018 forecast when he informed the single investor to whom the forecast was sent that the forecast assumed that TVision would be able to ████████ ████████" Ex. 15, TVN_SLN _00269606.  Dr. Keeley's failure to reflect this assumption is a significant omission that renders his analysis and his use of this forecast as his royalty base unreliable. *See* Ex. 4 at ¶¶ 74-84, which does not mention TVision's need for funding (Ex. 15)

to achieve the goals set out in the April 2018 forecast. Dr. Keeley's analysis is fraught with unsupportable assumptions, e.g., "███████████████████████████████████████ ██████ (Ex. 4 at ¶ 81). He states ████████████████████████████████████," (Ex. 4 at ¶ 82) but fails to recognize based on ████████████████████████████████ ████████████ t. His conclusion that TVision would have agreed to pay ██████████ (Ex. 4 at ¶¶ 83-84), given TVision's precarious financial position is entirely unrealistic, even in the hypothetical world in which Dr. Keeley appears to inhabit. He ignores the fact that ████████ ███████████████████████ Ex. 14 at ¶¶ 130-139.

Nielsen's reliance on the testimony of Daniel Schiffman, TVision's former CRO, is misplaced because Mr. Schiffman testified that he did not have personal knowledge of this report.[7] When asked directly about the April 2018 forecast, Mr. Schiffman testified, ██████ ██████████████████████████████████████████████████████ ████████████████████████." Ex. 10, 20:12-16. Mr. Schiffman did not testify that the forecast ████████████████████████████████████████████ ██████████,'" as Nielsen argues at page 6. Rather, Mr. Schiffman testified to his "assumption" that "this is *likely a forecast* for what would be achieved in those months subsequent." *Id.*, 21:4-5. Thus, Mr. Schiffman's testimony is not "unrebutted evidence of the reliability of the April 2018 forecast," as Nielsen argues. It is not evidence at all because Mr. Schiffman's testimony demonstrates that he lacked the requisite personal knowledge to testify about the April 2018 forecast. Fed. R. Evid. 602.[8]



---

[7] *See generally* Ex. 10 at 19:19-20 ███████████████████ ); 20:8-16 ████████ ██████████████████ "); 21:10-17 ███████████████████████████ ████████████████████████████████████████ ").

[8] Courts have observed that forecasts for startups, especially, are inherently unreliable. *Cf., Goldby v. Hologic, Inc.*, 817 F. Supp. 204, 211 (D. Mass. 1993) (describing forecasts as "inherently difficult and unreliable . . .and . . . not likely to be 'material' to investors," noting

Nielsen misplaces reliance on *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001). More apposite is *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 895 F.2d 1403, 1407 (Fed. Cir. 1990), where the Court rejected damages testimony "which was based on estimates of the infringer's anticipated profits that 'bore no relation to actual profits.'" That is exactly the case here.  The April 2018 forecast was provided to only one investor (█████████████████████ Ex. 11.  Moreover, *Interactive* also states "an actual infringer's profit margin can be relevant to the determination of a royalty rate in a hypothetical negotiation." 274 F.3d at 1385. Further, this District has interpreted *Interactive* to permit the use of post-negotiation information to inform the hypothetical negotiation.  *See Honeywell Intern., Inc. v. Hamilton Sunstrand Corp.*, 378 F. Supp.2d 459, 466-67 (D. Del. 2005).  Moreover, *Interactive* does not govern a case, such as this one, in which the forecast at issue was wildly unreliable.  Nielsen and its expert ignore that at the time of the hypothetical negotiation,██████████████████████████ ████████████████████████████████████████████████████████████████ ███████████████████████████████

## VII.   CONCLUSION

For the reasons set forth above, Dr. Keeley's opinions should be excluded.

---

that the SEC provides a safe harbor rule that projections filed with the Commission do not violate federal securities law unless made without a "reasonable basis" or not made in "good faith"); *Optima Tobacco Corp. v. Flue-Cured Tobacco Growers, Inc.*, 2019 WL 4858848 at *10 (E.D.N.C., Sept. 30, 2019) (rejecting expert opinion based on lost profit estimates "based on unreliable and speculative forecasts" as "too speculative to be determined with reasonable certainty").

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
P.O. Box B113
150 Fayetteville St, Suite 2800
Raleigh, NC 27601-2960
(984) 960-2860

Michael F. Heafey
RIMÔN LAW P.C.
800 Oak Grove Avenue, Suite 250
Menlo Park, CA 94025
(650) 461-4433

Dated: April 26, 2024

/s/ Nathan R. Hoeschen
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

I hereby certify that on April 26, 2024, this document was served on the persons listed

below in the manner indicated:

**BY EMAIL:**

David E. Moore
Bindu A. Palapura
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

Clifford Katz
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800
ckatz@kelleydrye.com

Steven Yovits
Constantine Koutsoubas
Jason P. Greenhut
Douglas Lewis
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
(312) 857-7070
syovits@kelleydrye.com
ckoutsoubas@kelleydrye.com
jgreenhut@kelleydrye.com
dlewis@kelleydrye.com

Matthew Chakmakian
KELLEY DRYE & WARREN LLP
One Jefferson Road 2nd Floor
Parsippany, NJ 07054
(973) 503-5900
mchakmakian@kelleydrye.com

Joshua B. Long
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd. Suite 900
Houston, TX 77027
(713) 355-5054
jlong@kelleydrye.com

*/s/ Nathan R. Hoeschen*
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

# Exhibit 1
# Redacted in its Entirety

# Exhibit 2



US007783889B2

(12) **United States Patent**

Srinivasan

(10) **Patent No.:** **US 7,783,889 B2**

(45) **Date of Patent:** **Aug. 24, 2010**

(54) **METHODS AND APPARATUS FOR GENERATING SIGNATURES**

(75) Inventor: **Venugopal Srinivasan**, Palm Harbor, FL (US)

(73) Assignee: **The Nielsen Company (US), LLC**, Schaumburg, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 199 days.

(21) Appl. No.: **11/676,452**

(22) Filed: **Feb. 19, 2007**

(65) **Prior Publication Data**

US 2007/0274537 A1    Nov. 29, 2007

**Related U.S. Application Data**

(63) Continuation of application No. PCT/US2005/029623, filed on Aug. 18, 2005.

(60) Provisional application No. 60/603,024, filed on Aug. 18, 2004.

(51) **Int. Cl.**
*H04L 9/00* (2006.01)

(52) **U.S. Cl.** .......................... **713/179**; 713/176; 725/19; 725/20; 380/202; 380/239; 381/94.3

(58) **Field of Classification Search** ................. 713/160, 713/176, 179; 380/202, 206, 207, 239, 253, 380/229; 382/100, 232, 240, 191; 381/94.3; 375/134; 704/268, 273; 725/19, 20
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,230,990 A    10/1980  Lert, Jr. et al.
(Continued)

FOREIGN PATENT DOCUMENTS

AU          718227      11/1997
(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office, "PCT International Search Report," issued by the International Searching Authority of the United States Patent and Trademark Office on Feb. 6, 2008, in connection with a counterpart international application No. PCT/US2005/029623 (3 pages).
(Continued)

*Primary Examiner*—Nasser Moazzami
*Assistant Examiner*—Shanto M Abedin
(74) *Attorney, Agent, or Firm*—Hanley, Flight and Zimmerman, LLC

(57) **ABSTRACT**

Methods, apparatus, and articles of manufacture for media monitoring are disclosed. In particular, the example methods, apparatus, and articles of manufacture generate digital spectral signatures for use in identifying media information. Initially, a frame of media samples is obtained. A first frequency component having a first spectral power and a second frequency component having a second spectral power are identified by performing a spectral transform operation on the frame of media samples. A descriptor of the first frame of media samples is determined based on a comparison of the first spectral power and the second spectral power. A first signature is then generated based on the descriptor.

**17 Claims, 12 Drawing Sheets**



**Ex. 2**

US 7,783,889 B2

**1**

## METHODS AND APPARATUS FOR GENERATING SIGNATURES

### RELATED APPLICATIONS

This patent is a continuation of International Patent Application Ser. No. PCT/US2005/029623, filed Aug. 18, 2005, which claims priority to U.S. Provisional Application 60/603,024, filed on Aug. 18, 2004, both of which are hereby incorporated herein by reference in their entireties.

### FIELD OF THE DISCLOSURE

The present disclosure relates generally to media monitoring and, more particularly, to methods and apparatus for generating signatures for use in identifying media information.

### BACKGROUND

Identifying media information and more specifically audio streams (e.g., audio information) using signature-matching techniques is well known. Known signature-matching techniques are often used in television and radio audience metering applications and are implemented using several known methods for generating and matching signatures. For example, in television audience metering applications, signatures are generated at monitoring sites (e.g., monitored households) and reference sites. Monitoring sites typically include locations such as, for example, households where the media consumption of audience members is monitored. For example, at a monitoring site, monitored signatures may be generated based on audio streams associated with a selected channel, radio station, etc. The monitored signatures may then be sent to a central data collection facility for analysis. At a reference site, signatures, typically referred to as reference signatures, are generated based on known programs that are provided within a broadcast region. The reference signatures may be stored at the reference site and/or a central data collection facility and compared with monitored signatures generated at monitoring sites. A monitored signature may be found to match with a reference signature and the known program corresponding to the matching reference signature may be identified as the program that was presented at the monitoring site.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1**A and **1**B illustrate example audio stream identification systems for generating digital spectral signatures and identifying audio streams.

FIG. **2** is a time-domain representation of an example monitored audio stream and a plurality of audio sample frames acquired from the monitored audio stream.

FIG. **3** is a time-domain representation of an example reference audio stream and a plurality of audio sample frames acquired from the example reference audio stream.

FIG. **4** is a flow diagram of an example method for generating digital spectral signatures based on spectral decompositions.

FIG. **5** is a flow diagram of an example method for generating descriptors associated with the example method of FIG. **4**.

FIG. **6** is a flow diagram of another example method for generating digital spectral signatures based on spectral decompositions.

FIG. **7** is a flow diagram of an example method for generating descriptors associated with the example method of FIG. **6**.

**2**

FIG. **8** is a flow diagram of an example method for comparing the digital spectral signatures generated using the example methods of FIGS. **4**-**7**.

FIG. **9** is a block diagram of an example signature generation system for generating digital spectral signatures based on audio streams.

FIG. **10** is a block diagram of another example signature generation system for generating digital spectral signatures based on audio streams.

FIG. **11** is a block diagram of an example signature comparison system for comparing digital spectral signatures.

FIG. **12** is a block diagram of an example processor system that may be used to implement the methods and apparatus described herein.

### DETAILED DESCRIPTION

Although the following discloses example systems including, among other components, software executed on hardware, it should be noted that such systems are merely illustrative and should not be considered as limiting. For example, it is contemplated that any or all of these hardware and software components could be embodied exclusively in hardware, exclusively in software, or in any combination of hardware and software. Accordingly, while the following describes example systems, persons of ordinary skill in the art will readily appreciate that the examples provided are not the only way to implement such systems.

The methods and apparatus described herein generally relate to generating digital spectral signatures, which may be used to identify media information. In particular, the disclosed methods and apparatus are described with respect to generating digital spectral signatures based on audio streams (e.g., audio information). However, the methods and apparatus described herein may also be used to generate digital spectral signatures based on any other type of media information such as, for example, video information, web pages, still images, computer data, etc. Further, the media information may be associated with broadcast information (e.g., television information, radio information, etc.), information reproduced from any storage medium (e.g., compact discs (CD), digital versatile discs (DVD), etc.), or any other information that is associated with an audio stream, a video stream, or any other media information for which the digital spectral signatures are generated. In one particular example, the audio streams are identified based on digital spectral signatures that include monitored digital signatures generated at a monitoring site (e.g., a monitored household) and reference digital signatures generated and/or stored at a reference site and/or a central data collection facility.

As described in detail below, the methods and apparatus described herein identify media information including audio streams based on digital spectral signatures. The digital spectral signatures may be formed using digital descriptors that are generated based on the spectral components of an audio stream and that may be analyzed using frequency transforms and/or wavelet transforms.

Unlike known methods in the prior art that use interframe operations (e.g., operations based on sample data within different data sample frames) to generate digital spectral signatures, the methods and apparatus described herein may be implemented using intraframe operations (e.g., operations based on sample data within a single frame). Intraframe operations may include, for example, comparison operations, determining percentage differences between values, etc. that are performed on two or more values (e.g., spectral power values) that are uniquely associated with or derived from a single frame. For example, using the methods and apparatus described herein, a digital spectral signature may be generated by obtaining a frame of media samples, determining

**Ex. 2**

**25**

with an unidentified audio stream (e.g., the example monitored audio stream **202** of FIG. **2**). For example, the media identification look-up table interface **1112** may be communicatively coupled to a media identification look-up table or a database that is used to cross-reference media identification information (e.g., movie title, show title, song title, artist name, episode number, etc.) based on reference signatures. In this manner, the media identifier **1110** may retrieve media identification information from the media identification database based on the matching reference signatures.

FIG. **12** is a block diagram of an example processor system **1210** that may be used to implement the apparatus and methods described herein. As shown in FIG. **12**, the processor system **1210** includes a processor **1212** that is coupled to an interconnection bus or network **1214**. The processor **1212** includes a register set or register space **1216**, which is depicted in FIG. **12** as being entirely on-chip, but which could alternatively be located entirely or partially off-chip and directly coupled to the processor **1212** via dedicated electrical connections and/or via the interconnection network or bus **1214**. The processor **1212** may be any suitable processor, processing unit or microprocessor. Although not shown in FIG. **12**, the system **1210** may be a multi-processor system and, thus, may include one or more additional processors that are identical or similar to the processor **1212** and that are communicatively coupled to the interconnection bus or network **1214**.

The processor **1212** of FIG. **12** is coupled to a chipset **1218**, which includes a memory controller **1220** and an input/output (I/O) controller **1222**. As is well known, a chipset typically provides I/O and memory management functions as well as a plurality of general purpose and/or special purpose registers, timers, etc. that are accessible or used by one or more processors coupled to the chipset. The memory controller **1220** performs functions that enable the processor **1212** (or processors if there are multiple processors) to access a system memory **1224** and a mass storage memory **1225**.

The system memory **1224** may include any desired type of volatile and/or non-volatile memory such as, for example, static random access memory (SRAM), dynamic random access memory (DRAM), flash memory, read-only memory (ROM), etc. The mass storage memory **1225** may include any desired type of mass storage device including hard disk drives, optical drives, tape storage devices, etc.

The I/O controller **1222** performs functions that enable the processor **1212** to communicate with peripheral input/output (I/O) devices **1226** and **1228** via an I/O bus **1230**. The I/O devices **1226** and **1228** may be any desired type of I/O device such as, for example, a keyboard, a video display or monitor, a mouse, etc. While the memory controller **1220** and the I/O controller **1222** are depicted in FIG. **12** as separate functional blocks within the chipset **1218**, the functions performed by these blocks may be integrated within a single semiconductor circuit or may be implemented using two or more separate integrated circuits.

The methods described herein may be implemented using instructions stored on a computer readable medium that are executed by the processor **1212**. The computer readable medium may include any desired combination of solid state, magnetic and/or optical media implemented using any desired combination of mass storage devices (e.g., disk drive), removable storage devices (e.g., floppy disks, memory cards or sticks, etc.) and/or integrated memory devices (e.g., random access memory, flash memory, etc.).

Although certain methods, apparatus, and articles of manufacture have been described herein, the scope of coverage of this patent is not limited thereto. To the contrary, this patent

**26**

covers all methods, apparatus, and articles of manufacture fairly falling within the scope of the appended claims either literally or under the doctrine of equivalents.

What is claimed is:

**1**. A method for generating signatures implemented using an apparatus comprising a processor, the method comprising:

obtaining a first frame of media samples;

identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

generating a first signature based on the first descriptor;

identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples;

identifying a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;

determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and

generating a second signature based on the second descriptor.

**2**. A method as defined in claim **1**, further comprising identifying media information based on the first signature.

**3**. A method as defined in claim **2**, wherein a Hamming distance is used to identify the media information based on the first signature.

**4**. A method as defined in claim **2**, wherein the media information is associated with at least one of audio information or video information.

**5**. A method as defined in claim **1**, wherein the first descriptor is associated with only the first frame of media samples.

**6**. A method as defined in claim **1**, wherein the second descriptor is of the second frame of media samples.

**7**. A method as defined in claim **1**, wherein the spectral transform operation is a sliding Fast Fourier Transform.

**8**. An apparatus for generating signatures, comprising:

a processor system including a memory; and

instructions stored in the memory that enable the processor system to:

obtain a first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

identify a third spectral power and a fourth spectral power; determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

**Ex. 2**

US 7,783,889 B2

27

generate a first signature based on the first descriptor and
a second signature based on the second descriptor.

**9**. An apparatus as defined in claim **8**, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature.

**10**. An apparatus as defined in claim **9**, wherein a Hamming distance is used to identify the media information based on the first signature.

**11**. An apparatus as defined in claim **8**, wherein the first descriptor is associated with only the first frame of media samples.

**12**. An apparatus as defined in claim **8**, wherein the instructions stored in the memory enable the processor system to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

**13**. An apparatus as defined in claim **8**, wherein the third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

**14**. A tangible machine accessible medium having instructions stored thereon that, when executed, cause a machine to:

obtain a first frame first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

28

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

identify a third spectral power and a fourth spectral power;

determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

**15**. A tangible machine accessible medium as defined in claim **14**, wherein the first descriptor is associated with only the first frame of media samples.

**16**. A tangible machine accessible medium as defined in claim **14** having instructions stored thereon that, when executed, cause the machine to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

**17**. A tangible machine accessible medium as defined in claim **14**, wherein third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

\*   \*   \*   \*   \*

**Ex. 2**

# Exhibit 3
# Redacted in its Entirety

Exhibit 4

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

THE NIELSEN COMPANY (US), LLC,

          *Plaintiff,*

   v.

TVISION INSIGHTS, INC.,

          *Defendant.*

C.A. No. 1:22-cv-0057-CJB
Magistrate Judge Christopher J. Burke

**JURY TRIAL DEMANDED**

## <u>OPENING EXPERT REPORT OF PIERRE MOULIN</u>

**Ex. 4**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

## I.      INTRODUCTION

1.      I, Pierre Moulin, submit this expert report on behalf of Plaintiff The Nielsen Company (US), LLC ("Nielsen"). I have been retained by Nielsen to provide expert opinions regarding U.S. Patent No. 7,783,889 ("the '889 patent"). In this report, I provide opinions concerning infringement of claims 1, 2, 4–6, 8, 9, and 11–17 of the '889 patent by Defendant TVision Insights, Inc. ("TVision").

2.      I am not an employee of Nielsen or any affiliate or subsidiary of Nielsen. Nor do I have a financial interest in Nielsen or the outcome of this case. I am being compensated for my work at ███████. My compensation is not dependent on the outcome of this case or on the content of my opinions.

3.      The bases for my opinions are discussed in detail below. If called to testify as an expert witness in this matter, I anticipate that my testimony may concern the matters addressed below. Additionally, I anticipate that I may comment on materials relating to these topics that may later become available, and I reserve the right to supplement or amend this report upon receipt of any new information made available to me, including documents yet to be produced or depositions yet to be taken. I also reserve the right to offer additional testimony in response to any matters raised by TVision or their experts, and/or in light of any relevant orders from the Court.

4.      In connection with my testimony, I may present visual aids and demonstrative exhibits that illustrate the analysis discussed in this report.

5.      Unless otherwise noted, the statements made in this Report are based on my personal knowledge and experience, and if called to testify about this Report, I could and would do so competently and truthfully.

**Ex. 4**

currency use cases, it would be a bummer to get this wrong." TVSN_NLSN_00399618–619 at TVSN_NLSN_00399618. Accordingly, the only Dat-Track solution TVision could afford was unacceptable.

368.    In addition, there is no evidence of Dat-Track's availability in the relevant timeframe. Dat-Track is a fairly new company. I have no evidence that Dat-Track existed in 2018 when TVision switched from Gracenote to the infringing ACRCloud solution. The Internet Archive shows that Dat-Track's website, www.dat-track.com, was first crawled on November 30, 2021. Exhibit 3. ICANN registry data at https://lookup.icann.org/en/lookup shows this domain was created on April 28, 2019. Exhibit 4. I have seen no evidence that Dat-Track was an available alternative when TVision started to infringe the '889 patent in 2018.

369.    Accordingly, I have seen no evidence that Dat-Track could provide an acceptable ACR alternative for TVision in April/May 2018 or later. Nor would the Dat-Track solution have been available to TVision in April/May 2018.

**B.  MRLMOBILE RESEARCH LABS (MRL)**

370.    MRL was also mentioned as a possible alternative ACR solution for TVision, but the MRL product would not have been an acceptable alternative. I have reviewed documents showing the results of TVision's 2017 test of MRL's solution before TVision decided to instead begin using ACRCloud. TVSN_NLSN_00645277–295. TVision's documents show that TVision extensively tested MRL's ACR solution for 8 weeks in Japan and that MRL's solution had 75% false negative and 77% false positives as compared to "TVI Data," which I understand to be TVision's then-current ACR provider, Gracenote. TVSN_NLSN_00645277–295 at TVSN_NLSN_00645280. Correcting for times when the microphone was muted or taken, MRL's solution still resulted in a false negative result of 45%, which in my opinion is

**Ex. 4**

unacceptable for a production system. TVSN_NLSN_00645277–295 at TVSN_NLSN_00645281.

371.    This testing shows that MRL's ACR solution did not perform nearly as well as TVision's then-current ACR solution, which was provided by Gracenote. *See, supra*, ¶ 370. TVision later showed that ACRCloud's product was much better than Gracenote's. Liu, Ex. 27, "TVision: All Hands Meeting," at 24-26 (May 31, 2018) (TVSN_NLSN_00732275) ("May 31, 2018 All Hands Meeting"); *see also* Liu Tr., 202:14-205:20 (discussing slides 24-26 to May 31, 2018 All Hands Meeting). Accordingly, one can conclude that MRL's product did not perform nearly as well as ACRCloud's.

372.    For all these reasons, it is my opinion that MRL was not an acceptable alternative to ACR Cloud in April/May 2018, when TVision switched from Gracenote to ACR Cloud's solution.

373.    Regarding acceptability in the period after April/May 2018, my understanding is that TVision did not test MRL's solution again. As explained previously, without testing an ACR solution, one can only speculate whether that solution would have been acceptable (or would even work at all) in a given environment.

374.    Finally, with regard to acceptability as of April/May 2018 or later, MRL's solution appears to work in a fundamentally different way from ACRCloud's solution, such that it is not an acceptable alternative. In particular, in MRL's product, once data is collected on the device, the data is sent to MRL's server for matching. Unlike the ACRCloud solution, MRL's product provides no feedback to the device itself. *See* TVSN_NLSN_00610721–726 at TVSN_NLSN_00610723. In addition, MRL appears to integrate through software development kits (SDKs) with Android and iOS clients, while TVision uses Windows and Linux-based

**Ex. 4**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

software on its panelist meters. TVSN_NLSN_00610742–751 at TVSN_NLSN_00610750. Switching to MRL would require TVision to change the basic software and hardware architecture of its meters. Such a fundamental change is not feasible and confirms that MRL's ACR solution is not an acceptable alternative to ACR Cloud's ACR solution.

375.    Accordingly, MRL could not provide an available, acceptable alternative for TVision at any time.

### C.  AXWAVE

376.    I also researched Axwave, which Mr. Liu's transcript incorrectly identifies as Adwave. *See* Liu Tr., 75:8-15. Axwave was acquired in 2019 by Samba TV. *See* https://en.wikipedia.org/wiki/Axwave (Exhibit 5); https://www.adexchanger.com/digital-tv/samba-tv-acquires-acr-startup-axwave-to-slurp-up-more-acr-data/ (Exhibit 6).

377.    Axwave could not provide an acceptable alternative solution. TVision appears to have investigated Axwave in 2016. But TVision had found by June 2016 that "Axwave's SDK has lots of issue[s] …." TVSN_NLSN_00533729–732 at TVSN_NLSN_00533731. In fact, by October 2017, TVision even refused to meet with Axwave, with Dan Schiffman explaining to Axwave that "I have been advised that we are moving forwards with another solution for the time being. l don't [sic] think it is best use of our time to meet at the moment." TVSN_NLSN_00725382–386 at TVSN_NLSN_00725382.

378.    Moreover, Axwave did not have an available product. In 2021, TVision appears to have exchanged some email with Axwave's purchaser, Samba TV, about ACR, but Samba TV indicated it had no product. Specifically, on October 26, 2021, Samba TV indicated "we are in middle of relaunching [an ACR product] now." TVSN_NLSN_00184226–228 at TVSN_NLSN_00184226. On the same day, Samba TV admitted that they "need to do some

**Ex. 4**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

I, PIERRE MOULIN, hereby declare under penalty of perjury under the laws of the United

States of America, that the foregoing Report is true and correct.

Date: ___October 25, 2023_____                    *Pierre Moulin*
                                                    _____
                                                                    Pierre Moulin

**Ex. 4**

Exhibit 5

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE NIELSEN COMPANY (US), LLC, <br><br> *Plaintiff*, <br><br> v. <br><br> TVISION INSIGHTS, INC., <br><br> *Defendant*. | C.A. No. 1:22-cv-0057-CJB <br> Magistrate Judge Christopher J. Burke <br><br> **JURY TRIAL DEMANDED** |

**<u>REPLY EXPERT REPORT OF PIERRE MOULIN
RESPONDING TO REPORT OF DR. DAVID ANDERSON
REGARDING INFRINGEMENT OF U.S. PATENT NO. 7,783,889</u>**

**Ex. 5**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

## I.      INTRODUCTION

1.      I, Pierre Moulin, submit this reply expert report on behalf of Plaintiff The Nielsen Company (US), LLC ("Nielsen") in response to the Rebuttal Expert Report of Dr. David Anderson Regarding U.S. Patent No. 7,783,889 ("Anderson Rebuttal Report" or "Anderson Rebuttal Rep."). I have been retained by Nielsen to provide expert opinions regarding U.S. Patent No. 7,783,889 ("the '889 Patent"). In this report, I provide opinions concerning infringement of claims 1, 2, 4–6, 8, 9, and 11–17 of the '889 Patent by Defendant TVision Insights, Inc. ("TVision").

2.      I am not an employee of Nielsen or any affiliate or subsidiary of Nielsen. Nor do I have a financial interest in Nielsen or the outcome of this case. I am being compensated for my work at ██████. My compensation is not dependent on the outcome of this case or on the content of my opinions.

3.      The bases for my opinions are discussed in detail below. If called to testify as an expert witness in this matter, I anticipate that my testimony may concern the matters addressed below. Additionally, I anticipate that I may comment on materials relating to these topics that may later become available, and I reserve the right to supplement or amend this report upon receipt of any new information made available to me, including documents yet to be produced or depositions yet to be taken. I also reserve the right to offer additional testimony in response to any matters raised by TVision or their experts, and/or in light of any relevant orders from the Court.

4.      In connection with my testimony, I may present visual aids and demonstrative exhibits that illustrate the analysis discussed in this report.

1

**Ex. 5**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

products that never appear. Dr. Anderson also does not show that TVision tested Axwave's product to see if it would work in its environment. Axwave is therefore not an available alternative to ACRCloud for TVision's business.

### b. Mobile Research Labs (MRL)

129.    With regard to Mobile Research Labs (MRL), Dr. Anderson does not show that a different version of MRL's product would perform better than the product TVision tested (unsuccessfully) and which I discussed in my opening report. *See* Anderson Rebuttal Rep., ¶ 107. In addition, as its full name suggests, MRL has a mobile product, so Dr. Anderson identifies no evidence showing that there is a non-mobile product for TVision to use.

130.    Nonetheless, Dr. Anderson says that: "In my interview with Mr. Liu, he explained that TVision had investigated MRL's offering and that MRL had an SDK that was compatible with the TVision devices." Anderson Rebuttal Rep., ¶ 108. Dr. Anderson appears not to have confirmed Mr. Liu's statement because he cites no evidence that MRL has a SDK compatible with TVision's devices. The record evidence does not support Mr. Liu's statement. For example, the MRL presentation at TVSN_NLSN_00610742 does not mention a non-mobile SDK. To the contrary, it says: "The Asound is available as a fully functioning app, or as a software development kit (SDK) for both Android & iOS," with no mention of TVision's Windows or Linux environments. Furthermore, MRL's webpage identifies only mobile solutions. See https://www.mobileresearchlabs.com/. Dr. Anderson also does not show that TVision tested MRL's product to see if it would work in its environment. MRL is therefore not an available alternative to ACRCloud for TVision's business.

**Ex. 5**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

### c. Mufin

131.     Dr. Anderson mentions Mufin, although he identifies no evidence that would show that Mufin's technology would work in TVision's environment. As explained previously, one cannot know if an ACR solution would work without analyzing and testing it.

132.     He also states that: "Mufin sent a proposal to TVision in early 2017." Anderson Rebuttal Rep., ¶ 109. Dr. Anderson cites no evidence to support that statement. The presentation he cites at TVSN_NLSN_00662112–39 is not a proposal.

133.     Dr. Anderson also does not show that TVision tested Mufin's product to see if it would work in its environment. Mufin is therefore not an available alternative to ACRCloud for TVision's business.

### d. Source Digital

134.     Dr. Anderson also asserts that: "In early 2018, TVision also reached out for pricing quotes from Source Digital, another ACR provider." Anderson Rebuttal Rep., ¶ 109 (citing TVSN_NLSN_00660739–72 at 746–62). Dr. Anderson offers no evidence Source Digital would work or that TVision actually got a proposal from Source Digital. The document he cites does not show that proposal was received or its terms or if Source Digital's product would work in TVision's environment. *See* TVSN_NLSN_00660739–72 at 746–62.

135.     Dr. Anderson also does not show that TVision tested Source Digital's product to see if it would work in its environment. Source Digital is therefore not an available alternative to ACRCloud for TVision's business.

### e. Other Providers

136.     Dr. Anderson also asserts that he is "also aware of other companies such as Audible Magic, Soundhound, Civolution, and Dat-Track operating in the ACR space." Anderson

**Ex. 5**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

146.    In addition, for the reasons set forth above, my opinion is that TVision did not have any acceptable, available alternatives to the ACRCloud solution in April/May 2018. Nor would it have had (or does it now have) such alternatives after that time.

*        *        *

I, PIERRE MOULIN, hereby declare under penalty of perjury under the laws of the United States of America, that the foregoing Report is true and correct.

Date: _December 15_, 2023

*Pierre Moulin*
_____
Pierre Moulin

**Ex. 5**

# Exhibits 6 - 17
# Redacted in their Entirety