IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 22-57-CJB |
| | ) |
| TVISION INSIGHTS, INC., | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM ORDER

Presently pending in this patent infringement case is Plaintiff The Nielsen Company (U.S.), LLC's ("Nielsen" or "Plaintiff") "Emergency Motion to Amend the Scheduling Order[,]" in which Nielsen requests that the Court reopen expert discovery so that the parties can serve new technical expert reports (the "motion to amend").[1] (D.I. 250) Defendant TVision Insights, Inc. ("TVision" or "Defendant") opposes the motion to amend. For the reasons set out below, the Court ORDERS that Nielsen's motion to amend be GRANTED, in the manner set out below.

**I.    BACKGROUND**

When Nielsen filed its motion to amend on June 21, 2024, fact discovery and expert discovery had been long closed in this case; summary judgment and *Daubert* motions had been fully briefed, a hearing on those motions had been scheduled for July 2, 2024, and trial was set to begin on October 7, 2024. (*See* D.I. 100; D.I. 128; D.I. 213) In other words, the Court and the parties had put significant work into the case, and trial was imminent. But with its motion to

---

[1]    Nielsen's motion to amend also requested that the Court order expedited briefing and continue the hearing on the parties' *Daubert* and summary judgment motions, along with the trial date. (D.I. 250 at 1, 10) The Court thereafter granted the parties' stipulation regarding briefing on the motion to amend, cancelled the hearing and vacated the trial date (along with other pre-trial deadlines). (D.I. 252; D.I. 267)

amend, Nielsen asserted that it had recently discovered a significant error that its technical experts had made when analyzing the pseudocode of Defendant's accused system (the "error" or the "pseudocode issue"). (D.I. 250 at 1-2) Nielsen explained that this error "goes to the heart of [its] allegations of infringement" and thus necessitated the submission of new technical reports from its now newly-hired replacement technical experts. (*Id.*)

It is undisputed that the asserted claims of the patent-in-suit, United States Patent No. 7,783,889 (the "'889 patent"), require that frequency components be processed within a single frame (the "single frame limitation"). ('889 patent, cols. 26:12-14, 62-64, 28:6-8;[2] D.I. 250 at 3; D.I. 256 at 3) Nielsen originally retained Dr. Vinayak Tanksale of Quandary Peak ("QP") as an expert; Dr. Tanksale was asked to, *inter alia*, decompile the publicly available object code of the accused system to generate pseudocode, and then to provide opinions relating to that pseudocode. (D.I. 250, ex. 2 at ¶¶ 20, 21, 26, 28-29, 31, 34)[3] Dr. Tanksale's subsequent analysis led him to opine in his opening expert report that a particular portion of the pseudocode demonstrated that the single frame limitation was met by the accused system. (*Id.* at ¶¶ 85(b), 87)[4] More specifically, Dr. Tanksale opined that the "local_max" function calls the

---

[2] The relevant claim limitations recite "determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power" or, similarly, for the method claim, "determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power[.]" ('889 patent, cols. 26:12-14, 26:61-63, 28:6-8)

[3] Third party ACRCloud supplies the allegedly infringing software to TVision. (*See* D.I. 250 at 3) Although Nielsen had attempted to obtain the source code for the accused system earlier in the case, ACRCloud, who was represented by TVision's counsel in another related matter, denied Nielsen's request for such access. (*See* D.I. 177) The parties then agreed that the source code would not be used in this case for any purpose. (*Id.*) The lack of availability of this source code is what prompted Nielsen to request that Dr. Tanksale decompile the publicly available object code of TVision's system in order to help Nielsen attempt to show that infringement had occurred. (D.I. 250 at 3)

"getRowMax" function for the frame of samples, and the getRowMax function then compares all spectral powers within that frame to determine the frequency component with the highest spectral power. (*Id.*) Nielsen's infringement expert, Dr. Pierre Moulin, then explained in his own report that: (1) he was relying on Dr. Tanksale's decompilation of the pseudocode; (2) he agreed with Dr. Tanksale's analysis of the pseudocode; and (3) additionally, he conducted his own independent analysis of the code and determined that it was consistent with Dr. Tanksale's analysis. (*Id.*, ex. 3 at ¶¶ 75-76, 104) Dr. Moulin, like Dr. Tanksale, opined that the same portion of the pseudocode as identified by Dr. Tanksale satisfied the single frame limitation. (*Id.* at ¶¶ 124-31)

However, Nielsen states that on May 31, 2024, it learned that the particular portion of the pseudocode that Dr. Tanksale and Dr. Moulin point to as satisfying the single frame limitation does *not* actually show single frame processing—and that Dr. Tanksale had made a "significant error" in concluding otherwise. (D.I. 250 at 1, 4-5; D.I. 251 at ¶¶ 3-6) On that date, in connection with preparing for trial, Nielsen's counsel Douglas Lewis had a videoconference with Issac Pflaum, a staff member of QP who supports Dr. Tanksale's work; during the videoconference, Mr. Pflaum informed Mr. Lewis that there was a potential error in Dr. Tanksale's analysis of the pseudocode. (D.I. 251 at ¶ 4) The same day, Nielsen engaged new experts from Harbor Labs to investigate whether Dr. Tanksale's analysis of the pseudocode in fact contained an error. (*Id.* at ¶ 5)

---

<sup>4</sup> Earlier in the case, in September 2022 and September 2023, respectively, Nielsen served initial infringement contentions and final infringement contentions based on its review of the pseudocode; in those contentions, Nielsen had pointed to the same lines of pseudocode as meeting the single frame limitation that Dr. Tanksale was now referring to in his expert report. (D.I. 256 at 3-4 (citing *id.*, ex. 2 at 5 & Appendix A at 7; *id.*, ex. 3 at 9-10 & Appendix A at 17-19))

Nielsen's new experts began their investigation immediately. And on June 17, 2024, they confirmed their view that Dr. Tanksale's analysis was erroneous (and that Dr. Moulin's report contains the same error). (*Id.* at ¶¶ 5-6; D.I. 250 at 5)[5] Nielsen asserts that its new experts have also determined that "a different portion of the pseudocode, not analyzed in either expert's report, strongly indicates that TVision infringes the asserted claims in Nielsen's patent." (D.I. 250 at 5; *see also* D.I. 260 at ¶ 11)

## II.     STANDARD OF REVIEW

Federal Rule of Civil Procedure 16(b)(4) provides that "[a] schedule may be modified only for good cause and with the judge's consent." Fed. R. Civ. P. 16(b)(4). In determining whether the party seeking leave to modify a court's scheduling order has demonstrated good cause, courts first consider the diligence of that party. *See, e.g.*, *Brit. Telecommc'ns PLC v. IAC/InterActiveCorp*, Civil Action No. 18-366-WCB, 2020 WL 3047989, at *2 (D. Del. June 8, 2020); *GlaxoSmithKline LLC v. Glenmark Pharms. Inc., USA*, Civil Action No. 14-877-LPS-CJB, 2016 WL 7319670, at *1 (D. Del. Dec 15, 2016). "When examining a party's diligence and whether 'good cause' exists . . . courts typically ascertain whether the movant possessed, or through the exercise of reasonable diligence should have possessed, the knowledge necessary to file the motion to amend before the deadline expired." *Grasso v. Consol. Rail Corp.*, Civil Action No. 12-398 (KM), 2013 WL 3167761, at *5 (D.N.J. June 20, 2013); *see also, e.g.*, *State Farm Mut. Auto. Ins. Co. v. Amazon.com, Inc.*, Civil Action No. 22-1447-CJB, 2024 WL 4145022, at *2 (D. Del. Sept. 11, 2024) ("In order for Defendants to demonstrate diligence,

---

[5] Nielsen's counsel requested that Dr. Tanksale sign a declaration acknowledging the errors in his analysis of the pseudocode, but Dr. Tanksale would not do so. (D.I. 251 at ¶ 7) Herein, when the Court refers to errors that Dr. Tanksale (and Dr. Moulin) committed, it is referring only to Plaintiff's assertions of error, which are undisputed on this record.

Defendants would need to show that they could not have known that they needed to earlier assert the additional references."). If the party has not been diligent, the inquiry ends (as good cause has not been demonstrated). *See, e.g.*, *Allergan, Inc. v. Revance Therapeutics, Inc.*, Civil Action No. 21-1411-RGA, 2024 WL 2254771, at *3-4 (D. Del. May 17, 2024). "If the moving party can establish diligence, other considerations pertinent to the good cause inquiry come into play, including the importance of the new information, the difficulty of locating the new information, any gamesmanship that is evident from the untimely disclosure, and the potential prejudice to the opposing party that would result from permitting the belated amendment." *Brit. Telecommc'ns PLC*, 2020 WL 3047989, at *2 (collecting cases).

### III. DISCUSSION

The Court will first explain why it believes that, in the end, the diligence inquiry has been satisfied here. It will then turn to other considerations relevant to the good cause inquiry.

#### A. Diligence

Nielsen asserts that it has satisfied the diligence inquiry. In its opening brief, Nielsen argued that this was so because Dr. Tanksale's error regarding the relevant portion of the pseudocode was not apparent on its face, nor would it have been apparent at all to a non-expert; accordingly, there was no reason for Nielsen or its counsel to have earlier determined that there was any problem with Dr. Tanksale's analysis that needed correcting. (D.I. 250 at 6) Nielsen explained that its two technical experts had extensive experience with understanding the complicated subject matter at issue here, and argues that it was justified in relying on these experts' analysis and conclusions regarding the pseudocode issue. (*Id.*)[6] Nielsen also argues

---

[6] Nielsen also pointed out that its own employees could not have uncovered the mistake at issue sooner than it did, because Nielsen itself did not have access to the expert reports at issue. (D.I. 250 at 6 n.3, 7) That is because the reports are both designated Outside

that it acted diligently to address the error once it became aware of it—as it immediately retained new experts to investigate the error and disclosed the error to Defendant as soon as it was confirmed. (*Id.* at 7) In light of these circumstances, which were beyond its control, Nielsen asserts that good cause exists to amend the scheduling order to allow the filing of new expert reports beyond the time originally called for by that order. (*Id.*); *see also, e.g.*, *Williams v. Wetzel*, Civil No. 1:17-CV-79, 2019 WL 1206061, at *5 (M.D. Pa. Mar. 14, 2019) ("In the context of requests to extend deadlines, courts have defined good cause to include circumstances beyond the control of a party.") (internal quotation marks and citations omitted).

In response, TVision argues that Nielsen cannot show the required diligence, for two primary reasons.

First, TVision asserts that in its opening brief, Nielsen failed to provide "an explanation of the *exact nature* of the error"; as a result, TVision contends that it was "impossible for Nielsen to carry its burden of showing that it was diligent in *finding* the error." (D.I. 256 at 14 (certain emphasis in original, certain emphasis added); *see also id.* at 13 ("Nowhere in its motion, however, does Nielsen identify the error.")) With no detail provided about what the error was, TVision assumes that, notwithstanding that error, Nielsen could have and should have pursued its new infringement theory years ago (either in place of its prior incorrect infringement theory, or in conjunction with it)—especially since Nielsen acknowledges that its new theory is based on the same publicly available pseudocode as was Nielsen's now-discarded, old infringement theory. (*Id.* at 1, 2, 7-9 ("Nielsen does not allege that anything about the error (which it also fails to identify in detail) prevented Nielsen, its attorneys, or its experts from finding and asserting its 'strong' new theory that was located in a *different* portion of the *same* pseudocode.") (emphasis

---

Attorneys' Eyes Only, in light of the subject matter on which they rely. (*Id.*)

in original); *id.* at 16 ("The fact that Nielsen chose to rely on a single theory of infringement that turned out to be erroneous cannot justify a second bite at the apple."))  TVision argues that since Nielsen "thought it had a 'strong' infringement position before, and it stopped looking for additional ways to allege infringement using the pseudocode it had[,]" the diligence requirement cannot be met.  (*Id.* at 11)

Second, TVision argues that the unidentified error should have been caught by Nielsen long ago, which further undercuts any claim of diligence.  (*Id.* at 2, 14-16)  On that front, TVision points out that in April 2023 and September 2023, in response to Nielsen's infringement contentions, TVision served responses to interrogatories ("TVision's Rog Responses"); therein, TVision informed Nielsen that "[t]he code Nielsen replies upon . . . indicates that the purported descriptors relate to multiple frames[.]"  (*Id.*, ex. 6 at 6A at 19-20; *see also id.* at 6B at 20 ("What Nielsen alleged appears to involve multiple adjacent points from multiple different frames[.]") (*cited in* D.I. 256 at 15))  Then on November 21, 2023, Defendant served the rebuttal report of its technical expert Dr. David Anderson, who opined in some detail that Dr. Tanksale's and Dr. Moulin's conclusion that the pseudocode shows that frequency components are processed within a single frame is wrong.  (*Id.*, ex. 8 at ¶¶ 57, 63 ("[T]he accused TVision products determine a peak point of a local window by comparing the spectral powers of frequency points from *17 different frames*.") (emphasis added))  Having repeatedly informed Nielsen that the pseudocode that it relied upon did not process frequency components within a single frame—"the very 'error' that Nielsen says it just discovered"—TVision asserts that Nielsen should have, but clearly failed to, engage in timely pressure-testing of its experts' opinions to the contrary.  (D.I. 256 at 14-16)

Before the Court moves on to explain why it concludes that Nielsen was diligent here, it pauses to acknowledge the real force of certain of TVision's arguments.  Most particularly,

7

TVision is exactly correct that in Nielsen's opening brief—despite the fact that therein, Nielsen was disclosing that its experts had committed an error so significant that it would do serious violence to the then-current case schedule—Nielsen inexplicably *failed to disclose what exactly the error was* that had caused all these problems.  The Court cannot stress enough how potentially damaging this new failure was for Nielsen.  After all, here Nielsen was admitting that two of its technical experts—experts who had purportedly each performed independent analysis of the pseudocode at issue—had nevertheless both made a very significant mistake.  And yet in that same brief—and despite having the burden to explain why it could not have diligently uncovered this error earlier—Nielsen time and again refused to *say anything about the nature of that error.*  How could the Court know whether the error could have been spotted sooner, if Nielsen refused to say what the error *was* in the first place (that is, *why and how* Dr. Tanksale had wrongly concluded that the code module cited in his report relates to a single frame)?  Additionally, in that opening brief, Nielsen failed to provide the Court with any detail about the other portion of the pseudocode that purportedly indicates that the accused system infringes the single frame limitation—and the facts explaining why Nielsen couldn't have earlier identified *that* portion of the pseudocode instead.  In other words, in its opening brief, after explaining that its experts had committed a grievous error, Nielsen then made another big mistake.

       With all of that said, in its reply brief, Nielsen finally provided the additional critical missing details.  That explanation was supported by the declaration of Dr. Paul Martin, who is part of the expert team that Nielsen retained at Harbor Labs.  In his declaration, Dr. Martin attempts to beat back TVision's assertion that Nielsen was not diligent in advancing its new infringement theory.  (D.I. 257 at 3; D.I. 260)

       For example, as to the nature of Dr. Tanksale's error, Dr. Martin explains that Dr.

Tanksale incorrectly analyzed certain parameter values that determine the number of frames that the decompiled code processes. (D.I. 260 at ¶¶ 4, 6) More specifically, Dr. Martin states that:

- The relevant code "operates according to the values of parameters stored at (and retrieved from) various memory locations" which can be referred to using an "offset number." (*Id.* at ¶ 6) The parameter values determine the number of frames that the code processes. (*Id.* at ¶¶ 4, 7)

- Dr. Tanksale erred in his understanding of the parameter values stored at the memory locations referred to by offset numbers 97 and 98. (*Id.* at ¶ 6) While he concluded that both values are 0 for these locations, the actual, correct values are 32 and 8, respectively. (*Id.*);

- If the value stored at memory location 98 were 0 as Dr. Tanksale believed, then the local_max function that calls the getRowMax function would have processed frequency components within a single frame at a time (i.e., the code loop would have run one time). (*Id.* at ¶ 8);

- Instead, however, in the "local_max" function that Dr. Tanksale analyzed, the value stored in location 98 is 8, which causes the code in the getRowMax function to process 17 frames at one time (i.e., the value 8 causes the particular code to run 17 times and to thus compare spectral powers from multiple frames). (*Id.* at ¶ 7)

And as for TVision's assertion that Nielsen was not diligent because it should have and could have asserted its new infringement theory based on the pseudocode long ago (either instead of its original theory or in addition to it), Dr. Martin explains why this is not so. He notes that Dr. Tanksale's misunderstanding of the parameter values infected his analysis of the next part of the code. (*Id.* at ¶¶ 5, 9) That is, in light of Dr. Tanksale's view that memory offsets 97 and 98 had values of 0, Dr. Tanksale wrongly thought that the next portion of code—the "isListMax loops code"—only passed an array of spectral powers without comparing such powers, thus failing to satisfy the single frame limitation. (*Id.* at ¶¶ 5, 10) However, Dr. Martin opines that when the isListMax loops code is analyzed according to the correct parameter values

(32 and 8 for memory offsets 97 and 98, respectively), it satisfies the single frame limitation. (*Id.* at ¶¶ 5, 11)

In the Court's view, Dr. Martin sufficiently explains not only what Dr. Tanksale's error was, but also why Nielsen could not have identified its new infringement theory earlier. That is, Dr. Martin sets out the nature of Dr. Tanksale's error, and explains why the error made it impossible for Dr. Tanksale (and thus for Nielsen) to have earlier identified the new theory at all. Thus, the record suggests that Nielsen didn't fail to identify the newly-identified portion of pseudocode *because it had stopped looking for additional theories of infringement* once Dr. Tanksale identified the getRowMax function as infringing. Instead, Dr. Tanksale's incorrect understanding of the code led him to think that the newly-identified portion of code *did not infringe in the first place*.

With regard to TVision's assertion that the unidentified error should have been caught by Nielsen's counsel long ago, Nielsen also provides more details in its reply brief (supported by two attorney declarations) about its "pressure testing" of Dr. Tanksale's opinion. (D.I. 257 at 6-7; D.I. 258; D.I. 259) Nielsen points out that in TVision's Rog Responses, TVision did not explain *the basis* for its contention that Nielsen's position regarding the single frame limitation was incorrect. (D.I. 257 at 6; D.I. 258 at ¶¶ 5-6)[7] And so, according to Nielsen, it wasn't until Dr. Anderson's rebuttal report was served in November 2023 that Nielsen was actually put on notice of TVision's specific position as to why the getRowMax portion of pseudocode (i.e., the portion that Dr. Tanksale relies upon) processes 17 frames at one time. (D.I. 257 at 6; D.I. 258 at ¶¶ 8-10; *see also* D.I. 256, ex. 8 at ¶¶ 57, 61-63) At that point, Nielsen's counsel: (1)

---

[7] Nielsen further notes that in earlier responses to the same interrogatory, TVision did not state that Nielsen's contentions regarding single-frame processing were wrong. (D.I. 257 at 6; D.I. 258 at ¶¶ 3-4 & exs. B-C)

"immediately engaged" with Dr. Tanksale to analyze these rebuttal opinions; (2) had "extended discussions over multiple calls" with Dr. Tanksale and his team; and (3) "repeatedly asked" Dr. Tanksale about Dr. Anderson's theory—with Dr. Tanksale in turn providing repeated and persuasive assurances that it was Dr. Anderson who was wrong, not him. (D.I. 258 at ¶¶ 8, 10-11) And Nielsen's counsel did not simply rely on Dr. Tanksale's assurances alone. On December 8, 2023, counsel requested that someone at QR other than Dr. Tanksale check his work; a few days later, members of "Dr. Tanksale's team" assured counsel that they had independently confirmed that Dr. Tanksale's opinions were correct. (*Id.* at ¶ 12) On December 15, 2023, Dr. Tanksale served his rebuttal report in which he doubled down on his opinion that the getRowMax function portion of the pseudocode satisfied the single frame limitation. (D.I. 256, ex. 9 at ¶¶ 32-33, 67-69)

But Nielsen's counsel continued to press Dr. Tanksale on this point. In January 2024, counsel received from TVision a copy of the assembly code and pseudocode that Dr. Anderson generated; the code was sent to Dr. Tanksale the next day. (D.I. 258 at ¶ 14) Dr. Tanksale subsequently reported that nothing therein contradicted his opinions. (*Id.*) In May 2024, in connection with trial preparation, Nielsen's counsel continued to ask Dr. Tanksale and his team the same questions that they had previously asked regarding his pseudocode analysis. (D.I. 251 at ¶ 4; D.I. 259 at ¶ 3) This questioning led Mr. Pflaum to suggest that a "memory inspection test" be run on ACRCloud's object code, in order to test whether Mr. Tanksale was correct. (D.I. 259 at ¶ 3) Prior to that suggestion, no one at QP had indicated that a test existed that might confirm the accuracy of Dr. Tanksale's opinions. (*Id.* at ¶ 4; D.I. 258 at ¶ 15)

In the Court's view, the above facts show that Nielsen's counsel made continued efforts to demonstrate diligence in attempting to confirm the accuracy of Dr. Tanksale's opinions. As

11

an initial matter, there can be no question that Mr. Tanksale was opining as to a highly complex and technical subject matter. No one (including TVision) is suggesting that the nature of Dr. Tanksale's analysis was such that any lay attorney should have been expected to spot the error in question right away.[8] Now, of course, Nielsen's counsel would still be expected to ask good questions along the way to vet that analysis. But the above-referenced declarations indicate that they did so, for many months before May 2024. Under the circumstances, Nielsen has sufficiently demonstrated that it learned of the key facts necessitating the filing of its motion to amend too late to meet the Scheduling Order deadlines—and that it should not have reasonably been expected to have understood those facts before the deadlines passed. And Nielsen has otherwise shown that it diligently addressed that error once it came to light. *See Grasso*, 2013 WL 3167761, at *6 (permitting the plaintiff to amend the complaint to add a new claim, where "plaintiff has exercised a baseline, reasonable level of diligence in pursuing discovery and developing his case" but "despite plaintiff's diligence, he could not reasonably have filed the amended complaint by [the deadline] because the requisite knowledge . . . was not reasonably available to plaintiff until [after the deadline]"); *see also Cornell Univ. v. Illumina, Inc.*, C. A. No. 10-433-LPS-MPT, 2016 WL 3046258, at *5 (D. Del. May 27, 2016) (finding the good cause standard met, where the moving party sought to plead a new legal theory that was based on "a new set of facts obtained and confirmed during discovery which took place after the Scheduling Order's deadline for amending pleadings[,]" and the party "worked diligently to obtain and confirm facts" supporting its new allegations).

---

[8] Indeed, as Nielsen points out, the fact that its infringement expert Dr. Moulin also reached the same conclusion regarding the relevant portion of the pseudocode further supports a conclusion that Nielsen could not have earlier identified the new infringement theory. (D.I. 257 at 8 n.6)

Again though, the Court acknowledges that reaching a decision on this diligence issue was more difficult and time-consuming than it needed to be. In significant part, that is because Nielsen raised a lot of additional key facts as to its diligence for the first time in its reply brief—and in various declarations submitted therewith.

Indeed, TVision has filed a motion to strike on that score (the "motion to strike"). (D.I. 261) With its motion to strike, TVision asserts that these new facts (i.e., those relating to Dr. Tanksale's error, how the error prevented Nielsen from earlier discovering its new infringement theory, and about Nielsen's efforts to pressure-test Dr. Tanksale's opinions) should be stricken because their submission violates D. Del. Local Rule 7.1.3(c)(2). (D.I. 262 at 1-3) That Rule requires that "[t]he party filing the opening brief shall not reserve material for the reply brief which should have been included in a full and fair opening brief." D. Del. LR 7.1.3(c)(2); *see also* (D.I. 266 at 1 ("The new arguments and declarations Nielsen submitted with its reply brief . . . should have been included in [its] opening brief because they explain for the first time the mistake that Nielsen's first set of experts allegedly made" and because "Nielsen relied on the same mistake in its opening brief but did not explain what it was.")).

The Court certainly understands why TVision filed the motion to strike. Nielsen *did* do just what the Local Rule prohibits. Under normal circumstances, the Court would be inclined to grant the motion to strike, in light of the violation of the Local Rule. But again, the circumstances here are very unusual. And in the Court's view, they do not warrant grant of that motion. The Court so concludes for two primary reasons.

First, were the motion to strike to be granted and the motion to amend to be denied, the result would be about as drastic as it gets. Nielsen has explained that in that circumstance, it would not have any viable patent infringement case to put forward and that, one way or another,

13

the instant matter would not go forward on the merits. (D.I. 250 at 1-2, 8-9 ("[T]he error in the existing expert reports is so significant that Nielsen is unable to prosecute its claims on the current record.")); *cf. LoganTree LP v. Garmin Int'l, Inc.*, 339 F.R.D. 171, 188 (D. Kan. 2021) (granting plaintiff's motion to modify the scheduling order to permit it to serve an infringement expert's report belatedly, even though plaintiff failed to demonstrate good cause, where, as a "practical matter" doing otherwise "would effectively be dispositive of the case because [plaintiff] could not meet its burden to prove infringement"). Courts certainly "favor the resolution of disputes on their merits." *Withrow v. Spears*, 967 F. Supp. 2d 982, 1007 (D. Del. 2013) (internal quotation marks and citation omitted); *see also Pro. Cleaning & Innovative Bldg. Servs., Inc. v. Kennedy Funding, Inc.*, 245 F. App'x 161, 165 (3d Cir. 2007) (explaining that one of the "basic objectives of the federal rules" is "the determination of cases on their merits"). And going TVision's way here would be an extreme example of doing the opposite.

Second, although TVision asserts that Nielsen "sandbag[ed]" it with these late-introduced facts, such that it never had a proper opportunity to respond, (D.I. 262 at 2-3), the Court finds that this argument is overstated. The Court notes that TVision did not request oral argument on either the motion to amend or the motion to strike (i.e., at which it could have orally provided any required "sur-reply" position). Moreover, Nielsen offered to stipulate to allowing TVision to file a sur-reply brief, but TVision declined that offer. (*See* D.I. 265 at 1, 5)

In order for the Court to be able to fully consider Nielsen's position in support of its diligence—given the drastic outcome that could occur here were it to do otherwise—the Court exercises its discretion and ORDERS that the motion to strike be DENIED. *See Fifth Mkt., Inc. v. CME Grp., Inc.*, Civil Action No. 08-520-GMS, 2013 WL 3063461, at *1 n.2 (D. Del. June 19, 2013) (agreeing that plaintiff's reply brief improperly included material that should have

been in its opening brief, in violation of Local Rule 7.1.3(c)(2), but exercising its discretion in not striking that brief and instead considering defendant's alternative suggestion of filing a sur-reply brief). And relatedly then, for the reasons set out above, it determines that Nielsen has satisfied the diligence factor.

### B. Other Considerations

With Nielsen having demonstrated diligence, the Court moves on to consider three other pertinent factors. Each also militate in favor of granting the motion to amend.

The first is the importance of the new information. As the Court has already noted, it does not get more important than this. The new expert testimony at issue is clearly critical to Nielsen's case, as without it, Nielsen no longer has a case. This surely counsels in favor of granting the motion to amend. *See State Farm Mut. Auto. Ins. Co. v. Amazon.com, Inc.*, Civil Action No. 22-1447-CJB, D.I. 363 (D. Del. Jan. 17, 2025) (finding that this factor weighed in favor of granting leave to amend invalidity expert reports, where "the information at issue is very important to [d]efendants, who would be left without any Section 102/103 defenses at all as to these three patents-in-suit, were the motion not granted"); *Fraunhofer-Gesellschaft Zur Förderung Der Angewandten Forschung e.V. v. Sirius XM Radio Inc.*, Civil Action No. 17-184-JFB-SRF, 2022 WL 608143, at *3 (D. Del. Jan. 27, 2022) (finding that this factor weighed in favor of permitting leave to amend, where the challenged prior art references at issue were important to the movant's invalidity case); *cf. Kroy IP Holdings, LLC v. AutoZone, Inc.*, CASE NO. 2:13-cv-888-WCB, 2014 WL 7463099, at *5 (E.D. Tex. Dec. 30, 2014) (granting leave to amend supplemental invalidity contentions, where the good cause standard applied and where, *inter alia*, the "proposed amendment relates to an important piece of evidence bearing directly on the merits of the case") .

15

The second is about whether the record reflects that Nielsen engaged in gamesmanship regarding the filing of the motion to amend. Here there is no indication of gamesmanship; indeed, the record suggests the opposite. What has happened here must be significantly embarrassing to Nielsen. Its own experts' alleged erroneous analysis—in conjunction with the awkward way that Nielsen briefed this dispute—has combined to throw this case completely off course. And that, in turn, has waylaid Nielsen's progress in getting its claims before a factfinder. Thus, there is no way that Nielsen *intentionally* put itself, TVision or the Court in the pickle we now find ourselves in. So this factor additionally weighs in favor of granting the motion to amend. *See Bigband Networks, Inc. v. Imagine Commc'ns, Inc.*, Civil Action No. 07-351-JJF, 2010 WL 2898286, at *2-3 (D. Del. July 20, 2010) (granting motion for leave to amend an answer filed after the deadline for filing amended pleadings had expired where, *inter alia*, this Court found no bad faith on the part of the movant).

The third relates to the potential prejudice to TVision. There is some, for sure. Thanks to Nielsen's mistakes, TVision too has been delayed in obtaining final resolution of this case. And there have been—and there may well be in the future—some additional costs that TVision will face due to these circumstances, which it would not have born but for the error at issue.

But in the Court's view, that prejudice is not insurmountable. It can be remedied. *Cf. Brit. Telecommc'ns*, 2020 WL 3047989, at *4 (explaining that grant of the motion to amend would result in some prejudice to the non-movant—in the form of additional work and straining an already stressed schedule—but that "the degree of potential prejudice is not so great as to make prejudice a dispositive factor in deciding the motion"). TVision characterizes Nielsen's new theory as "essentially re-starting the case as to infringement[.]" (D.I. 256 at 18) But the relief here does not seem as drastic as that, since the error relates to evidence of infringement of

16

one claim limitation (as to which Nielsen now intends to point to other evidence relating to the next portion of the pseudocode at issue). And Nielsen notes that: (1) the parties did not depose any technical expert witnesses; (2) they did not depose any fact witnesses about pseudocode; and (3) TVision itself had moved to serve supplemental expert reports to address source code shortly before Nielsen's error was discovered. (D.I. 250 at 8; D.I. 257 at 9-10; *see also* D.I. 150) Nielsen has also agreed that it will no longer oppose TVision's motion for leave to allow the parties' experts to consider relevant source code in their reports (and therefore consents to vacatur of the Court's order denying TVision's motion in that regard). (D.I. 250 at 8-9)[9] Nielsen has further provided that it will reimburse TVision for the fees that it paid to its rebuttal expert, Dr. Anderson, in generating his rebuttal to Dr. Tanksale's and Dr. Moulin's expert reports regarding infringement. (*Id.* at 9)[10] The Court will also order that Nielsen reimburse TVision for its reasonable fees and costs in responding to the motion to amend and in briefing the motion to strike. Lastly, to the extent that there are disputes about the timeframe relating to a new case schedule, the Court will give some leeway to TVision in assessing those disputes (since the current schedule was upended by no fault of its own).

## IV. CONCLUSION

For all of the foregoing reasons, the motion to amend is hereby GRANTED. Nielsen is ORDERED to reimburse TVision for: (1) its reasonable fees that it paid to its rebuttal expert, Dr. Anderson, in generating his rebuttal to Dr. Tanksale's and Dr. Moulin's expert reports regarding infringement; and (2) its reasonable fees and costs in responding to the motion to amend and in briefing the motion to strike. And by no later than fourteen (14) days from the date

---

[9] That Order, (D.I. 177), is therefore VACATED.

[10] TVision's arguments regarding its alleged financial hardship, (D.I. 256 at 19), are unpersuasive, (D.I. 257 at 10).

17

of this Memorandum Order, the parties shall meet and confer and submit a proposed revised Scheduling Order. To the extent there are any disputes in the proposed revised Scheduling Order, the parties may also submit a letter, not to exceed two pages, that sets out the parties' positions regarding any such disputes.

Because this Memorandum Order may contain confidential information, it has been released under seal, pending review by the parties to allow them to submit a single, jointly proposed, redacted version (if necessary) of the Memorandum Order. (*See* D.I. 264 at 2) Any such redacted version shall be submitted no later than **April 17, 2025** for review by the Court. It should be accompanied by a motion for redaction that shows that the presumption of public access to judicial records has been rebutted with respect to the proposed redacted material, by including a factually-detailed explanation as to how that material is the "kind of information that courts will protect and that disclosure will work a clearly defined and serious injury to the party seeking closure." *In re Avandia Mktg., Sales Pracs. & Prods. Liab. Litig.*, 924 F.3d 662, 672 (3d Cir. 2019) (internal quotation marks and citation omitted). The Court will subsequently issue a publicly-available version of its Memorandum Order.

Dated: April 10, 2025

                                                       Christopher J. Burke
                                                       UNITED STATES MAGISTRATE JUDGE