IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | **Redacted – Public Version** |
| | ) | |
| v. | ) | C.A. No. 22-057-CJB |
| | ) | |
| TVISION INSIGHTS, INC., | ) | ████████████████ |
| | ) | |
| Defendant. | ) | |

**OPENING BRIEF IN SUPPORT OF TVISION INSIGHTS, INC.'S SUMMARY
JUDGMENT AND DAUBERT MOTIONS PURSUANT TO D.I. 295**

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
4030 Wake Forest Road, Suite 300
Raleigh, NC 27609
(984) 960-2860

Benjamin D. Brown
Richard A. Koffman
Daniel McCuaig
COHEN MILSTEIN SELLERS
  & TOLL PLLC
1100 New York Ave NW, Suite 800
Washington, DC  20005
(202) 408-4600

Steig D. Olson
Sami H. Rashid
QUINN EMANUEL URQUHART
  & SULLIVAN LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000

Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

Patrick D. Curran
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
11 Huntington Avenue, Suite 5200
Boston, MA 02199
(617) 712-7100

Adam B. Wolfson
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Dated: November 19, 2025

**TABLES OF CONTENTS**

I.   NATURE AND STAGE OF THE PRCEEDINGS ............................................................1

II.  SUMMARY OF ARGUMENT ...................................................................................2

  A.  The Patent-in-Suit Claims a Patent-Ineligible Algorithm ...............................2

  B.  This Court Should Hold Nielsen to Its Previous Claim Construction Position That The Claims Require Intraframe Processing ...................................3

  C.  The Patent-In-Suit Claims a "Single Frame" Process ....................................4

  D.  TVision Does Not Infringe Because, *inter alia*, Its Accused Process Uses Inter-Frame Operations ...................................................................................4

  E.  The Expert Report of Dr. Keeley Should Be Excluded Under *Daubert* .......................5

  F.  Dr. Keeley and Dr. Kyriakakis's Opinions on Non-Infringing Alternatives Are Inadmissible Under *Daubert* .......................................................................5

  G.  Dr. Martin's Opinions, and Dr. Kyriakakis's Opinions Relying on Those Opinions, Are Inadmissible Under *Daubert* ...................................................6

III. THE ASSERTED CLAIMS ARE INELIGIBLE UNDER SECTION 101 ...................6

  A.  Claim 1 is representative ...................................................................................6

  B.  *Alice* Step 1 – Claim 1 Recites A Patent-Ineligible Algorithm And Nothing More .......7

    1. Under *Phillips*, it is proper to rely on the specification ...............................10

    2. The claims are directed solely to an abstract idea of using a spectral transformation to generate a descriptor and signature from a simple comparison operation .......................10

    3. Claims directed to Algorithms are patent ineligible .....................................12

  C.  *Alice* Step 2: The Claims Recite No Inventive Concept ...............................16

  D.  The Asserted Dependent Claims Also Fail Step 2 of *Alice* ..........................18

IV.  Claim Construction of the Limitation "determin[ing] a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power" ...............................................................................................19

  A.  Nielsen Has Waived or Forfeited Any Argument That The Claims Encompass Interframe Processing ...................................................................................20

    1. In Opposition to TVision's § 101 Motion, Nielsen Argued That The Claims Must Be Construed To Require That The Descriptor Be Determined Solely From A Single Frame .......................20

    2. Nielsen's New Expert Reports Adopted A New Claim Construction ..........................21

i

3. Nielsen Should Be Precluded From Raising New Claim Construction Issues At This Stage Of The Proceeding ......................................................................22

B. In the Alternative, Nielsen's Original Construction Was The Proper Construction ..233

1. The '889 Patent Specification Disavows Any Process that Determines a Descriptor using Inter Frame Operations.......................................................25

2. The word "comprising" in Claim 1 does not support Nielsen's argument .................26

3. The doctrine of claim differentiation does not support Nielsen's new argument ........26

4. TVision's proposed interpretation is supported by intrinsic record ............................28

V.     NIELSEN CANNOT PROVE INFRINGEMENT .........................................................29

VI.    DAUBERT MOTION REGARDING DR. KEELEY ....................................................30

A. The Standard for *Daubert* Motions...............................................................30

B. Legal Principles Relating to Damages .......................................................31

C. Undisputed Facts.....................................................................................32

D. Testimony by Nielsen and Dr. Keeley's Opinion Regarding Profits Lost By Nielsen After The Date Of The Hypothetical Negotiation Should be Excluded For Lack Of Relevance .............................................................................................32

E. Dr. Keeley's Testimony Should Be Excluded Because It Is Inherently Incredible......34

F. Dr. Keeley's Testimony About The Nash Bargaining Solution Should Be Excluded Because It is Unreliable As A Matter Of Law.............................................35

G. Dr. Keeley should be precluded from testifying about a reasonable royalty because his report fails to apportion the value of the patent-in-suit from the value of ACR software.....................................................................................37

H. Dr. Keeley should be precluded from testifying about a reasonable royalty because his report assumes that Nielsen would be unwilling to license the patented invention ............................................................................................40

VII. DAUBERT MOTION TO EXCLUDE DR. KEELEY AND DR. KYRIAKAKIS FROM PROVIDING OPINIONS RELATING TO THE AVAILABILITY OF ALTERNATIVE ACR SOFTWARE AT THE TIME OF THE HYPOTHETICAL NEGOTIATION BETWEEN THE PARTIES ...........................................................................41

A. Legal Standard ........................................................................................41

B. The '889 Patent Admits That Prior Art Non-Infringing ACR Systems Were Available ..............................................................................................42

C. Irrefutable Evidence Establishes That Non-Infringing ACR Software Was Available To TVision...............................................................................42

D.   This Court Should Preclude Unreliable Testimony of Drs. Keeley and Dr. Kyriakakis Regarding MRL ACR Software ...................................................................................44

E.   This Court Should Preclude Unreliable Testimony of Dr. Keeley and Dr. Kyriakakis Regarding Mufin ACR Software ...............................................................................45

F.   This Court Should Preclude Unreliable Testimony of Dr. Keeley and Dr. Kyriakakis Regarding Other ACR Software Available in 2018 ....................................................46

1. Dat-Track ...........................................................................................................46

2. Axwave ..............................................................................................................47

3. Source Digital ....................................................................................................47

VIII. DAUBERT MOTION TO EXCLUDE MARTIN AND KYRIAKAKIS TESTMONY BASED ON DR. MARTIN'S COMPUTER PROGRAM AND SIMULATION ..........47

IX.   CONCLUSION.............................................................................................................48

## <u>TABLE OF AUTHORITIES</u>

**Cases**                                                                                                          **Page(s)**

*Alice Corp. Pty. Ltd. v. CLS Bank Intern.*,
   573 U.S. 208 (2014)....................................................................................................12

*Apple Inc. v. Wi-Lan Inc.*,
   25 F.4th 960 (Fed. Cir. 2022)..................................................................................42

*B. Braun Melsungen AG v. Terumo Med. Corp.*,
   749 F. Supp. 2d 210 (D. Del. 2010).........................................................................30

*Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*,
   687 F.3d 1266 (Fed. Cir. 2012)...........................................................................6, 19

*Bayer Healthcare LLC v. Baxalta Inc.*,
   2019 WL 330149 (D. Del., Jan. 25, 2019)...............................................................37

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
   2018 WL 4691047 (D. Del., Sept. 28, 2018)...........................................................34

*Bridge & Post, Inc. v. Verizon Communs., Inc.*,
   778 F. App'x 882 (Fed. Cir. 2019)..........................................................................14

*BroadSoft, Inc. v. CallWave Commc'ns, LLC*,
   282 F. Supp. 3d 771 (D. Del. 2017),
   *aff'd*, 739 Fed. Appx. 985 (Fed. Cir. 2018) ............................................................7

*Brooke Grp. Ltd. v. Brown & Williamson Tobacco Corp.*,
   509 U.S. 209 (1993)................................................................................................41

*BSG Tech LLC v. Buyseasons, Inc.*,
   899 F.3d 1281 (Fed. Cir. 2018)...............................................................................19

*California Institute of Technology. v. Broadcom Ltd.*,
   25 F.4th 976 (Fed. Cir. 2022)..................................................................................15

*California Institute of Technology. v. Broadcom Ltd.*,
   No. 16-3714-GW, 2019 WL 11828211 (C.D. Cal. Jan. 18, 2019)...........................16

*Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*,
   482 F.3d 1347 (Fed. Cir. 2007)...............................................................................22

*Commonwealth Sci. & Indus. Research Organisation v. Cisco Sys., Inc.*,
   809 F.3d 1295 (Fed. Cir. 2015)...............................................................................31

*Customedia Techs., LLC. v. Dish Network Corp.*,
   951 F.3d 1359 (Fed. Cir, 2020)...............................................................................15

*Daubert v. Merrell Dow Pharms., Inc.*,
   509 U.S. 579 (1993)..........................................................................................30, 31

*Digital-Vending Servs. v. The Univ. of Phoenix,*
  672 F.3d 1270 (Fed. Cir. 2012) ....................................................................6

*Digitech Image Techs., LLC v. EFI, Inc.,*
  758 F.3d 1344 (Fed. Cir. 2014) ..................................................................13

*Dippin' Dots, Inc. v. Mosey,*
  476 F.3d 1337 (Fed. Cir. 2007) ..................................................................26

*Dow Chem. Co. v. Mee Indus., Inc.*
  341 F.3d 1370 (Fed. Cir. 2003). .................................................................31

*Eagle View Technologies, Inc. v. Roofr, Inc.,*
  651 F.Supp.3d 729 (D. Del. 2023) ..............................................................13

*Edwards Lifesciences LLC v. Cook Inc.,*
  582 F.3d 1322 (Fed. Cir. 2009) ..................................................................27

*Elbit Sys. Land and C4I Ltd. v. Hughes Network Sys., LLC,*
  927 F.3d 1292 (Fed. Cir. 2019) ..................................................................38

*Elcock v. Kmart Corp.,*
  233 F.3d 734 (3d Cir. 2000) .......................................................................30

*Elec. Power Grp., LLC v. Alstom S.A.,*
  830 F.3d 1350 (Fed. Cir. 2016) ..................................................................13

*Enfish, LLC v. Microsoft Corp.,*
  822 F.3d 1327 (Fed. Cir. 2016) ..................................................................14

*Eon Corp. v. IP Holdings v. Silver Spring Networks,*
  815 F.3d 1314 (Fed. Cir. 2016) ..................................................................28

*Epistar Corp. v. Int'l Trade Comm'n,*
  566 F.3d 1321 (Fed. Cir. 2009) ..................................................................25

*Ericsson, Inc. v. D-Link Sys., Inc.,*
  773 F.3d 1201 (Fed. Cir. 2014) ..................................................................38

*Fast 101 PTY Ltd. v. Citigroup Inc.,*
  424 F. Supp. 3d 385 (D. Del. 2020),
  aff'd 834 Fed. Appx. 591 (Fed Cir. 2020),
  *cert denied*, 141 S. Ct. 2725 (2021) .............................................................7

*Fenner Investments, Ltd. v. Cellco Partnership,*
  778 F.3d 1320 (Fed Cir. 2015) ...................................................................27

*Ferring B.V. v. Watson Labs., Inc.-Florida,*
  764 F.3d 1401 (Fed. Cir. 2014). .................................................................30

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
  879 F.3d 1299 (Fed. Cir. 2018) ........................................................................15

*Garretson v. Clark*,
  111 U.S. 120 (1884) ........................................................................................38

*Georgia-Pacific Corp. v. U.S. Plywood Corp.*,
  318 F.Supp. 1116 (S.D.N.Y. 1970) ..................................................................40

*GlaxoSmithKline LLC v. Glenmark Pharms. Inc., USA*,
  C.A. No. 14-877-LPS-CJB, 2016 U.S. Dist. LEXIS 173408 (D. Del. Dec. 15, 2016),
  *adopted by* 2017 U.S. Dist. 237198 (D. Del. Mar. 17, 2017) ............................23

*Good Tech. Corp. v. Mobileiron, Inc.*,
  2015 WL 4090431 (N.D. Cal. July 5, 2015) ......................................................37

*Gottschalk v. Benson*,
  409 U.S. 63 (1972) ...........................................................................................12

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999) ........................................................................33

*Greenwell v. Boatwright*,
  184 F.3d 492 (6ᵗʰ Cir. 1999) ...........................................................................41

*Guzman v. State Farm Lloyds*,
  456 F. Supp.3d 846 (S.D. Tex. 2020)( .............................................................41

*Hathaway v. Bazany*,
  507 F.3d 312 (5ᵗʰ Cir. 2007) ...........................................................................41

*In re Bd. of Trs. of the Leland Stanford Junior Univ.*,
  991 F.3d 1245 (Fed. Cir. 2021) ........................................................................13

*Intellectual Ventures I LLC v. Erie Indem. Co.*,
  711 F. App'x 1012 (Fed. Cir. 2017) .............................................................14, 15

*IOENGINE, LLC v. PayPal Holdings, Inc.*,
  607 F. Supp.3d 464 (D. Del. 2022) .............................................................39, 40

*KOM Software Inc. v. NetApp, Inc.*,
  C.A. No. 18-160-WCB, 2023 WL 6460025 (D. Del. Oct. 4, 2023) ......................18

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) .......................................................................33, 40

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ...................................................................31, 40

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299 (Fed. Cir. 2016) ........................................................................15

*Mentor Graphics Corp. v. EVE-USA, Inc.*,
    851 F.3d 1275 (Fed. Cir. 2017) ........................................................................ 38

*Microsoft Corp. v. Multi-Tech Sys.*,
    357 F.3d 1340 (Fed. Cir. 2004) ........................................................................ 28

*Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*,
    811 F.3d 1314 (Fed. Cir. 2016) ........................................................................ 18

*Numatics, Inc. v. Balluff, Inc.*,
    66 F. Supp.3d 934 (E.D. Mich. 2014*)* .............................................................. 37

*Odetics, Inc. v. Storage Tech. Corp.*,
    185 F.3d 1259 (Fed. Cir. 1999) ........................................................................ 33

*Openwave Sys. v. Apple Inc.*,
    808 F.3d 509 (Fed. Cir. 2015) .......................................................................... 25

*Oracle Am., Inc. v. Google Inc.*,
    798 F. Supp. 2d 1111 (N.D. Cal. 2011) ............................................................ 37

*Pall Corp. v. Micron Separations, Inc.*,
    66 F.3d 1211 (Fed. Cir. 1995) .......................................................................... 31

*Parallel Networks LLC v. Abercrombie & Fitch, Co.*,
    704 F.3d 958 (Fed. Cir. 2013) .......................................................................... 28

*Parker v. Flook,*
    437 U.S. 584 (1978) .......................................................................................... 12

*Parus Holdings, Inc. v. Amazon.com, Inc.*,
    C.A. No. 23-190, D.I. 93 (D. Del Mar. 18, 2024) ............................................ 22

*Performance Aftermarket Parts Group, Ltc. V. TI Group Automotive Systems, Inc.*,
    2008 WL 169826 (S.D. Tex. Jan. 16, 2008) ..................................................... 48

*Pernix Lr. Pain DAC v. Alvogen Malta Operations Ltd.*,
    316 F. Supp. 816 (D. Del. 2018) ....................................................................... 21

*PersonalWeb Technologies LLC v. Google LLC*,
    8 F.4th 1310 (Fed. Cir. 2021) ........................................................................... 13

*Phillips v. AWH Corp.*,
    415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc) .............................................. 10

*Poly-America, L.P. v. API Industries, Inc.*,
    839 F.3d 1131 (Fed. Cir. 2016) ........................................................................ 27

*Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*,
    904 F.3d 965 (Fed. Cir. 2018) .......................................................................... 38

*Recentive Analytics, Inc. v. Fox Corp.*,
   134 F.4th 1205 (Fed. Cir. 2025) ........................................................................ 14

RecogniCorp, LLC v. Nintendo Co.,
   855 F.3d 1322 (Fed. Cir. 2017) ......................................................................... 13

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
   653 F.3d 1296 (Fed. Cir. 2011) ......................................................................... 25

*Rite-Hite Corp. v. Kelley Co., Inc.*.
   56 F.3d 1538 (Fed. Cir. 1995) ........................................................................... 34

*Roche Diagnostics Operations, Inc. v. Abbott Diabetes Care, Inc.*,
   C.A. No. 07-753-RGA, 2014 U.S. Dist. LEXIS 168613 (D. Del. Dec. 5, 2014) ............... 22

*S.I.SV.EL. Societa Italiana per lo Sviluppo Dell'Elettronica S.p.A. v. Rhapsopy Int'l Inc.*,
   No. 18-69 (MN), 2019 WL 2491898 (D. Del. June 14, 2019) ........................................... 17

*SAP Am., Inc. v. InvestPic, LLC*,
   898 F.3d 1161 (Fed. Cir. 2018) ................................................................... 13, 18

*Schneider ex rel. Estate of Schneider v. Fried*,
   320 F.3d 396 (3d Cir. 2003) ......................................................................... 30, 31

*Scimed Life Systems v. Advanced Cardiovascular*,
   242 F.3d 1337 (Fed. Cir. 2001) ......................................................................... 28

*Siemens Mobility Inc. v. Westinghouse Air Brake Tech. Corp.*,
   2019 WL 9698520 (D. Del., Jan. 2, 2019) ....................................................... 33, 34

*SightSound Techs., LLC v. Apple Inc.*,
   809 F.3d 1307 (Fed. Cir. 2015) ......................................................................... 25

*Sound View Innovations, LLC v. Hulu, LLC*,
   33 F.4th 1327(Fed. Cir. 2022) ........................................................................... 45

*SynKloud Techs., LLC v. HP Inc.*,
   490 F. Supp. 3d 806 (D. Del. 2020) .................................................................. 15

*Synopsis, Inc. v. Mentor Graphics Corp.*,
   839 F.3d 1138 (Fed. Cir. 2016) ......................................................................... 18

*Toro Co. v. White Consol. Indus., Inc.*,
   199 F.3d 1295 (Fed. Cir. 1999) ................................................................... 27, 28

*Trading Techs. Int'l, Inc. v. IBG LLC*,
   921 F.3d 1084 (Fed. Cir. 2019) ......................................................................... 18

*Trs. of Columbia Univ. v. Symantec Corp.*,
   811 F.3d 1359 (Fed. Cir. 2016) ......................................................................... 25

*Ultramercial, Inc. v. Hulu, LLC,*
   772 F.3d 709 (Fed. Cir. 2014) .......................................................................... 11

*United States v. Chaney,*
   577 F.2d 433 (7th Cir. 1978) ............................................................................ 41

*Virnetx, Inc. v. Cisco Sys., Inc.,*
   767 F.3d 1308 (Fed. Cir. 2014) ........................................................................ 37

*Wis. Alumni Research Found. v. Apple Inc.,*
   905 F.3d 1341 (Fed. Cir. 2018) ........................................................................ 28

**Statutes**

35 U.S.C. § 101 .............................................................................................. passim

35 U.S.C. § 284 ...................................................................................................... 31

**Rules**

Fed. R. Civ. P. 16(b)(4) ......................................................................................... 22

Fed. R. Evid. 702 ........................................................................................... passim

## I.    NATURE AND STAGE OF THE PROCEEDINGS

From the time this case was filed in November 2022, Nielsen asserted a single interpretation of the asserted claims of U.S. Pat. No. 7,783,889 ("the '889 patent"): that they called for intraframe processing, not interframe processing. That position is consistent with the language of the claims and with the specification, which describes the invention as addressing issues with prior-art methods that used interframe processing. Nielsen relied on that position to oppose summary judgment under § 101.

In May 2024, however, Nielsen, allegedly discovered that its first set of experts had misinterpreted "getRowMax," the function it had accused of infringement in the TVision products.  Nielsen's original experts contended that getRowMax determined a descriptor from a single frame (D.I. 250 at 3-4), but as TVision's expert had explained, getRowMax determines a descriptor using data from a window that covers 17 frames, (D.I. 256 at 4-5). Nielsen retained a new set of experts and moved for leave to re-set the schedule (D.I. 250), which this Court granted, (D.I. 272).  At no point in that briefing did Nielsen disclose that its new infringement theory, supported by new experts, would require resolution of a new claim construction issue.

On July 29, 2025, after the parties' experts had exchanged infringement and non-infringement reports, counsel for Nielsen raised a new claim construction issue. Ex. 2 at 1-2. As is explained below, the construction proposed in Nielsen's email, and the construction Nielsen apparently proposes now, is a 180-degree reversal from Nielsen's previous claim construction position before it hired its new set of experts.

TVision renews its motion for summary judgment that the asserted claims are ineligible under § 101, particularly in light of Nielsen's reversal on the claim construction it relied upon to oppose ineligibility.  TVision also moves for summary judgment of non-infringement. TVision submits that Nielsen has waived or forfeited its new claim construction

1

by delaying over 2 ½ years from the date set in the scheduling order for raising claim construction issues, and that there is no dispute that TVision's products do not infringe under the parties' original claim construction.

Finally, TVision moves to exclude certain testimony of Nielsen's experts Drs. Keeley, Martin, and Kyriakakis under *Daubert*.

## II. SUMMARY OF ARGUMENT

### A. The Patent-in-Suit Claims a Patent-Ineligible Algorithm

1.      Nielsen accuses TVision of infringing a patent that covers nothing but mathematical operations on media samples.  The first step of the claimed method is to "obtain[] a first frame of media samples." Ex. 1, 26:5-7. The second step is to identify a first and second spectral power generated by a "spectral transform operation," such as a "Fast Fourier Transform," on the first frame of media samples.  *Id.* at 26:8-11. A Fast Fourier Transform, or "FFT," is a mathematical algorithm which, the specification admits "is well known in the art and, thus, not discussed in detail." *Id.* at 14:17-19. The third step recites that a "descriptor" be determined by comparing two values: "the first spectral power" and "the second spectral power" of the first frame. *Id.* at 26:12-14. The fourth step recites, "generating a first signature based on the first descriptor."  *Id.* at 26:15. Finally, the fifth through eighth steps repeat the above steps on a second frame of media samples. *Id.* at 26:15-32.

2.      Nielsen's prior opposition to summary judgement on this point *admitted* that Nielsen's claims "recite . . . a ***general algorithm*.**" D.I. 201 at 19 (emphasis in original). It nonetheless opposed a finding of ineligibility by arguing that the claims represent "an improvement in computer technology." *Id.* at 10-11. To make that argument, Nielsen relied on a construction of the claims under which "all claims recite intraframe processing." *Id.* at 8. In Nielsen's own words, "the asserted claims of the '889 Patent do not cover . . .  systems . . . that use interframe (*i.e.*, multiple frame) processing." *Id.* at 18.

3. Following the Court's grant of Nielsen's request to re-do its infringement analysis, and to support its new infringement theory, Nielsen has reversed its position. It now argues that the remaining claims are *not* limited to intraframe processing.

4. There is no merit to Nielsen's position that the asserted claims represent an improvement in computer technology. Nielsen has dropped one of the three arguments it previously made, and-well settled case law precludes Nielsen's reliance on its remaining "technology improvements" argument. Thus, Nielsen's asserted claims are patent ineligible.

### B. This Court Should Hold Nielsen to Its Previous Claim Construction Position That The Claims Require Intraframe Processing

5. The Scheduling Order entered by the Court on May 18, 2022 (D.I. 24) provided deadlines for identifying claim construction issues, which resulted in a joint claim construction brief being filed with the Court on April 14, 2023.  D.I. 24 ¶¶ 13-14; *see* D.I. 75 (joint claim construction brief).

6. Before July 29, 2025, Nielsen had taken the position that the claims require a "single-frame, two-component-comparison approach," that "all claims recite intraframe processing," and that "all the claims recite determining a descriptor of an individual, single frame." D.I. 201 at 9-11. The Court recognized this prior state of affairs when it stated, in granting Nielsen's motion to amend the scheduling order to assert its infringement position against a new section of code, that "[i]t is undisputed that the asserted claims of the patent-in-suit . . . require that frequency components be processed within a single frame (the 'single frame limitation')." D.I. 272 at 2.

7. On July 7, 2025, Nielsen served reports of its new experts on the issue of infringement. *See* D.I. 316. On July 28, 2025, TVision served the rebuttal report of its expert, Dr. Anderson, pointing out TVision did not infringe because (as Nielsen admitted) TVision's process for determining a descriptor compares values over a window of 17 frames, not a single frame.  *See* D.I. 321; Ex. 6, ¶¶ 61, 70. Two days later, Nielsen accused *TVision* of

3

"implicitly" offering a new construction. Ex. 2 at 1. But Dr. Anderson had merely applied the previously-agreed construction, as referenced by the Court. *See* D.I. 272 at 2; Ex. 6, ¶¶ 61, 70. Nielsen's new construction directly contradicts the parties' prior construction.

8.    Nielsen has waived or forfeited its right to offer its new claim construction by relying on the opposite construction for the duration of the case, up until the Court granted its motion to amend the scheduling order. Nielsen cannot show good cause for offering the opposite claim construction at this late stage of the case.

### C.  The Patent-In-Suit Claims a "Single Frame" Process

9.    In the alternative, to the extent the Court permits Nielsen to reverse its prior position at this stage and advance its new claim construction, that construction should be rejected as inconsistent with the specification and the claims. The patent specification characterizes the invention as an "intraframe" or single-frame process and distinguishes prior art inter-frame or multi-frame processes. Ex. 1, 2:56-61 (known methods in prior art use interframe operations to generate digital spectral signatures). The only description of the invention is of an intraframe operation. Ex. 1, 11:16-23 ("each of the reference descriptors is generated using one or more [comparison] . . . operations . . . based on two or more spectral components that are both associated with the same audio sample frame . . . performed using data exclusive to a single audio frame and [] not dependent on sample data collected over other audio frames"). Nowhere does the specification describe any inter-frame operation of the invention. Consistent with the specification, the first four steps of claim 1 determine a descriptor using operations entirely within a single frame. Ex. 1, 26:5-15.

### D.  TVision Does Not Infringe Because, *inter alia*, Its Accused Process Uses Inter-Frame Operations

10.    TVision does not infringe because Nielsen's experts admit that TVision's process for determining a descriptor compares values across a window of 17 frames, not a single frame, as is required by the parties' undisputed prior claim construction. *See, e.g.*, Ex.

3, Kyriakakis July 7, 2025 Rep. at 36 ¶ 127. Nielsen cannot reasonably dispute that TVision does not infringe under Nielsen's prior construction. Further, it is undisputed that the accused software will *always* determine a descriptor by an *inter*-frame process spanning 17 frames, not by an intraframe process involving a single frame. *See* Ex. 3 at 60 ¶ 198. Nielsen now contends that after that 17-frame comparison, the descriptor may be determined from a single frame, essentially because the two maximum values within the 17-frame window may reside in a single frame. *See, e.g.*, *id.* at 38 ¶ 132. Even if true, that cannot mean that TVision infringes, since it ignores the 17-frame comparison made by TVision's products.

### E.  The Expert Report of Dr. Keeley Should Be Excluded Under *Daubert*

11.     Dr. Keeley's damages opinions suffer from a myriad of *Daubert* issues, including that he improperly: (1) relies on information from *after* the date of the hypothetical negotiation in his reasonable royalty analysis; (2) relies on a single projection of TVision's future profits and ignoring TVision's actual financial condition at the time of the hypothetical negotiation; (3) basis his reasonable royalty on the Nash Bargaining Solution, a technique which the Federal Circuit has rejected; (4) fails to apportion the value of the patent-in-suit; and (5) assumes an unwilling licensee.

### F.  Dr. Keeley and Dr. Kyriakakis's Opinions on Non-Infringing Alternatives Are Inadmissible Under *Daubert*

12.     Drs. Keeley and Kyriakakis are unqualified to offer opinions regarding non-infringing alternatives, and their conclusions are unreliable. Neither expert claims to have independent factual knowledge of prior art ACR systems that TVision considered prior to deciding to use the accused system. The experts further improperly applied the non-infringing alternative analysis, failed to account for existing non-infringing alternatives, and offered unreliable testimony regarding the availability of those systems.

### G. Dr. Martin's Opinions, and Dr. Kyriakakis's Opinions Relying on Those Opinions, Are Inadmissible Under *Daubert*

13.    Dr. Marin's testimony is based on a program that he built, not the program at issue. Those opinions are based on insufficient facts and data, are the product of unreliable principles and methods, and do not reflect a reliable application of those principles and methods to the facts of the case.

## III.    THE ASSERTED CLAIMS ARE INELIGIBLE UNDER SECTION 101

The claims of the '889 patent are directed to a patent-ineligible mathematical algorithm that, contrary to Nielsen's prior arguments, does not represent a "real-world solution[] to improve computer technology." D.I. 201 at 10. For the purposes of this § 101 motion only, TVision adopts Nielsen's new claim construction, that the claims encompass either intraframe or interframe operations.

### A. Claim 1 is representative

It should be undisputed that claim 1 is representative. Nielsen previously agreed that claim 1 is representative as long as it requires intraframe processing. D.I. 201 at 8 ("Nielsen agrees that claim 1 is representative ***provided*** that there is no dispute that all claims recite intraframe processing") (emphasis in original). In response, TVision "agree[d] that all asserted claims require intraframe processing." D.I. 214 at 2.

Each of the independent claims, including claims 1, 8, and 14, recite only minor variations on the same mathematical algorithm. *See* Ex. 1 at 26:47-27:2, 27:29-28:13. Claims 8 and 14 merely claim apparatus and machine-accessible-medium variations on the method of claim 1. *See Bancorp Servs. L.L.C. v. Sun Life Assur. Co.*, 687 F.3d 1266, 1277 (Fed. Cir. 2012) (affirming use of method claim as representative of apparatus claim); *Digital-Vending Servs. v. The Univ. of Phoenix*, 672 F.3d 1270, 1275 n.1 (Fed. Cir. 2012) (treating claims to computer-readable medium as method claims).   Likewise, the asserted dependent claims are either subsumed by claim 1, merely recite additional portions of the mathematical algorithm for

6

creating signatures, or are further step(s)/information relating to those signatures.  *See* claims 2, 9-10 (identifying media data based on the signature); claim 4 (media information attributes relating to audio or video data); claims 6, 11, 15 (descriptor relationship to the frame data); claims 12, 16 (mathematical relationship between the second and first frame data, similar to step 5 of claim 1); claims 13, 17 (mathematical relationship between the second frame data and related spectral powers, similar to step 6 of claim 1).

The Court can therefore rely on its analysis of asserted claim 1 for purposes of determining that the asserted claims are not patent eligible.  *See, e.g., Fast 101 PTY Ltd. v. Citigroup Inc*., 424 F. Supp. 3d 385, 387-88 (D. Del. 2020), aff'd 834 Fed. Appx. 591 (Fed Cir. 2020), *cert denied*, 141 S. Ct. 2725 (2021) (finding claim 1 representative "[b]ecause all of the independent claims of the remaining patents recite the same concept . . . and the dependent claims offer only minor, non-technical variations"); *BroadSoft, Inc. v. CallWave Commc'ns, LLC*, 282 F. Supp. 3d 771, 779 (D. Del. 2017), *aff'd*, 739 Fed. Appx. 985 (Fed. Cir. 2018) (finding claim 1 representative of the asserted claims for purposes of Section 101 analysis).

## B.  *Alice* Step 1 – Claim 1 Recites A Patent-Ineligible Algorithm And Nothing More

During the original § 101 briefing, Nielsen affirmatively argued that "the claims recite particular technological methods in the form of a ***general algorithm***." D.I. 201 at 19 (emphasis in original). The parties' dispute lies in whether the algorithm recited by the claims represents a patent-ineligible mathematical algorithm or, as Nielsen asserts, represents a specific and allegedly patent-eligible "improvement in computer technology." *Id.* at 10-11.

Representative claim 1 reads as follows:

> 1. A method for generating signatures implemented using an apparatus comprising a processor, the method comprising:
> **[a]** obtaining a first frame of media samples;
> **[b]** identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

[c] determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;
[d] generating a first signature based on the first descriptor,
[e] identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples;
[f] identifying a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;
[g] determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and
[h] generating a second signature based on the second descriptor.

*See* Ex. 1 at 26:5-32 (designations of steps [a]-[h] added).

Each of the first four steps [a]-[d] in claim 1 are generalized descriptions of mathematical operations that collectively form a pure mathematical algorithm, which is performed on data from single frames of media samples. These first four steps recite performing a mathematical operation on a "first frame":

| Claim Limitation | Specification Description |
|---|---|
| [a] obtaining a first frame of media samples; | The patent describes the "obtaining" step to be performed by mathematically sampling the audio stream during various time intervals. *Id.* at 8:22-28 ("**The audio sample frames 204, 206, 208, and 210 are generated by sampling the example monitored audio stream 202 during four time intervals at a sampling frequency fs.** For example, a sampling frequency fs of 6000 Hz will generate 6000 samples of audio data for each of the audio sample frames 204, 206, 208, and 210 (assuming the sample frames are collected over one second intervals)."). [1] |

---

[1] All emphasis is added unless otherwise noted.

8

| Claim Limitation | Specification Description |
|---|---|
| [b] identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples; | The patent describes the "identifying" step to be performed by Fourier Transform, a known mathematical equation. *Id.* at 3:5-12 ("Frequency components of an audio signal are typically generated by transforming the audio signal data (e.g., an audio stream) from the time domain to the frequency domain using, for example, a **Fast Fourier Transform**. The Fast Fourier Transform can be used to analyze the frequency components in an audio stream and identify the spectral power of each frequency component. The spectral powers may then be used to generate digital spectral signatures.") |
| [c] determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; | The patent describes the "determining" step to be performed by a mathematical comparison that results into a mathematical representation of "descriptor." *Id.* at 7:62-67 ("N-bit monitored signature S(t) is formed using one or more **M-bit descriptors B.(to), B(to-1), B(t+2), B(t+3)**. For example, a 32-bit monitored signature S(t) includes **four 8-bit descriptors B(t), B(to-1), B(t+2), B(t+3)** …"); 16:49-55 ("A descriptor bit is determined based on the frequency components $f_{00}$ and $f_{10}$ by **comparing the first spectral power $P_{00}$ with the second spectral power $P_{10}$** (block 506). **If the first spectral power is greater than the second spectral power (i.e., $P_{00} > P_{10}$), the descriptor bit is set equal to one. If, instead, the first spectral power is less than or equal to the second spectral power (i.e., $P_{00} <= P_{10}$), the descriptor bit is set equal to zero.**") |
| [d] generating a first signature based on the first descriptor, | The patent describes the "generating" step to be performed by mathematically concatenating descriptors together. *Id.* at 8:16-22 ("A monitored signature may be generated by sampling the example monitored audio stream 202 to generate the audio sample frames 204, 206, 208, and 210, generating the descriptors B(t), B(t+1), B(t+2), B(t+3) based on spectral decompositions of the audio sample frames 204, 206, 208, and 210, and **concatenating the descriptors**."); 9:27-29 ("**One or more of the descriptors B(t) may then be concatenated to form an N-bit reference signature S(t).**"); 10:22-30 ("To further illustrate the generation of reference signatures that are time shifted and overlapped, **each reference signature is formed by four reference descriptors**" $B_{Rx}\left(t_0 + \frac{k}{T_s}\right)$, $B_{Rx}\left(t_0 + \frac{k}{T_s} + 1\right)$, $B_{Rx}\left(t_0 \frac{k}{T_s} + 2\right)$, $B_{Rx}\left(t_0 + \frac{k}{T_s} + 3\right)$. |

The second four steps essentially repeat the first four steps on a second frame of media samples. Ex. 1, 26:16-32.

### 1. Under *Phillips*, it is proper to rely on the specification

In the original § 101 briefing, Nielsen criticized TVision for relying on the specification in the above chart. D.I. 201 at 19 n.6. There is no merit to Nielsen's criticism: "claims 'must be read in view of the specification, of which they are a part.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc).  Read in light of the specification, the claim elements are nothing more than generalized descriptions of mathematical operations. Indeed, the claim limitations are a layer of abstraction beyond even the more specific mathematical operations described in the specification.

### 2. The claims are directed solely to an abstract idea of using a spectral transformation to generate a descriptor and signature from a simple comparison operation

In prior briefing on this issue, Nielsen argued, "TVision's [proposed] algorithm is so broad that it covers systems that the asserted claims of the '889 Patent do not cover. For example, TVision's four-step algorithm covers systems . . . that use interframe (i.e., multiple frame) processing . . . ." D.I. 201 at 18. Nielsen has now reversed its position as to whether the claims encompass interframe processing, resolving that objection. Moreover, the claims as a whole are abstract: each step is merely an abstract generalization of an underlying mathematical operation.

Step one obtains a "first frame of media samples." Ex. 1, 26:7. Step 2 recites a mathematical operation of obtaining two spectral powers from a spectral transform operation. *Id.* at 8-11.  The only example provided in the patent is a purely mathematical operation called a Fast Fourier Transform ("FFT").  Ex. 1, 13:37-45.  The '889 patent admits that this mathematical technique was well-known in the art at the time of the invention. *Id.* at 13:36-67 ("[a]s will be appreciated by one having ordinary skill in the art"); 14:17-19 ("[t]he method of performing a FFT is well known in the art and, thus, is not discussed in detail herein"), and

indeed, it has been known since 1965.[2]  Step three recites "determining a first descriptor" step, which the specification describes as a mathematical "greater-than" operation—a simple comparison between two spectral powers to determine which is larger. 1,16:49-55. The claim, however, takes that mathematical operation to a higher level of abstraction: it claims any and all methods of "determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power." *Id.* at 26:12-14.  The same is true of the process of generating a first signature. The specification describes this as a simple concatenation operation. *Id.* at 8:16-21, 9:27-29, 10:22-30. The claim then abstracts the process further: "generating a first signature based on the first descriptor," however that may be achieved. *Id.* at 26:15. Nielsen has not identified any step in the representative claim that is not simply a more-abstract description of a mathematical operation described in the specification.

To summarize the abstract idea, the eight steps of representative claim 1 express an abstract mathematical algorithm of (1) performing an spectral transform operation on a first frame of media sample data, (2) comparing spectral powers of the two frequency components obtained from the transformation operation to determine a descriptor; (3) calculating a signature based on the descriptor; and (4) repeating the operation on a second frame, which is obtained by using data from the first frame and data from a second frame. These steps are abstract. *See, e.g., Ultramercial, Inc. v. Hulu, LLC*, 772 F.3d 709, 714-15 (Fed. Cir. 2014) ("An examination of the claim limitations of the [] patent shows that claim 1 includes eleven steps for displaying an advertisement in exchange for access to copyrighted media. . . . [t]his ordered

---

[2] *See* Ex. 10, James W. Cooley and John W. Tukey, *An Algorithm for the Machine Calculation of Complex Fourier Series*, (Apri., 1965),
https://web.stanford.edu/class/cme324/classics/cooley-tukey.pdf; *see also* Ex. 11, Peter Hess, *How IBM Research first demonstrated the revolutionary Cooley-Tukey FFT* (June 6, 2025), https://research.ibm.com/blog/how-ibm-research-first-demonstrated-the-revolutionary-cooley-tukey-fft ("It's the algorithm that made internet videos possible").

combination of steps recites an abstraction—an idea, having no particular or concrete or tangible form.").

### 3. Claims directed to Algorithms are patent ineligible

The Supreme Court has long held that claims directed to algorithms are patent-ineligible. *Gottschalk v. Benson,* 409 U.S. 63, 72-73 (1972); *Parker v. Flook,* 437 U.S. 584, 594-96 (1978). In *Benson,* the Court held that an algorithm for converting binary-coded decimal numerals into pure binary numerals was not eligible for a patent under § 101 because it is a law of nature. 409 U.S. at 71-73. In *Flook*, the Court was confronted with a method for calculating and updating an alarm limit for monitored temperature, pressure and flow rates in a catalytic conversion process. 437 U.S. at 585-86. The Court held that the algorithm was patent ineligible even though it controlled alarm limits for a chemical process: "[I]f a claim is directed essentially to a method of calculating, using a mathematical formula, even if the solution is for a specific purpose, the claimed method is nonstatutory."*Id.* at 595 (citations omitted).

In *Alice Corp. Pty. Ltd. v. CLS Bank Int'l.*, the Court reiterated that § 101 "contains an important implicit exception: [l]aws of nature, natural phenomena and abstract ideas." 573 U.S. 208, 216 (2014) (citations omitted). The Court adopted a two-part test:

> First, we determine whether the claims at issue are directed to one of those patent-ineligible concepts. . . . If so, we then ask, "[w]hat else is there in the claims before us?" To answer that question, we consider the elements of each claim both individually and "as an ordered combination" to determine whether the additional elements "transform the nature of the claim" into a patent-eligible application.

*Id.* at 217.

Claim 1 of the '889 patent mathematically calculates and determines the frequency component and descriptor information to generate signature information. Ex. 1 at 26:5-32. In *Benson*, the claim covered an algorithm that mathematically converted binary coded decimal to binary numerals. 409 U.S. at 71-73. *Flook* involved an algorithm to determine alarm limits

for a chemical process. 437 U.S. at 585-86.  Thus, the claim in this case is quite similar to claims that the Supreme Court held ineligible.

Further, because claim 1 of the '889 patent mathematically calculates and determines the frequency component and descriptor information to generate signature information, claim 1 is an abstract idea under well-settled precedents that "a process that employs mathematical algorithms to manipulate existing information to generate additional information is not patent eligible." *Digitech Image Techs., LLC v. EFI, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014); *see also SAP Am., Inc. v. InvestPic, LLC,* 898 F.3d 1161, 1167 (Fed. Cir. 2018) ("[S]electing certain information, analyzing it using mathematical techniques, and reporting or displaying the results of the analysis" is abstract.); *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1327 (Fed. Cir. 2017) ("[a] process that started with data, added an algorithm, and ended with a new form of data was directed to an abstract idea."); *Elec. Power Grp., LLC v. Alstom S.A.,* 830 F.3d 1350, 1354 (Fed. Cir. 2016) (The Federal Circuit has "treated analyzing information . . . by mathematical algorithms, without more, as essentially mental processes within the abstract-idea category."); *PersonalWeb Technologies LLC v. Google LLC*, 8 F.4th 1310, 1316 (Fed. Cir. 2021) ("Generating such identifiers via a known algorithm is no less abstract."); *In re Bd. of Trs. of the Leland Stanford Junior Univ.*, 991 F.3d 1245, 1252 (Fed. Cir. 2021) ("That a specific or different combination of mathematical steps yields more accurate . . . predictions than previously achievable under the prior art is not enough to transform the abstract idea in claim 1 into a patent eligible application); *Eagle View Technologies, Inc. v. Roofr, Inc.*, 651 F.Supp.3d 729,  739 (D. Del. 2023) ("claim 1 of the '538 patent boils down to a series of steps: '(a) collecting tangible information—*i.e.*, a geographic location and corresponding image; (b) analyzing that information using basic mathematical algorithms (*e.g.*, to determine a footprint, predominant pitch, and an estimated roofing area); and (c)

13

displaying the results of the analysis ("the estimated roofing area") and collected information ("at least one image showing the roof")' . . . This is abstract.").

Recently, the Federal Circuit held patent ineligible "claims that do no more than apply established methods of machine learning to a new data environment." *Recentive Analytics, Inc. v. Fox Corp.*, 134 F.4th 1205, 1211 (Fed. Cir. 2025). There is no difference in the "use of generic machine learning technology in carrying out the claimed methods for generating event schedules and network maps" held ineligible in *Recentive* (*id.* at 1212) and the claims here, which apply well known mathematical FFT operations to identify "descriptors" of audio.

There is no merit to Nielsen's reliance on *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-38 (Fed. Cir. 2016). D.I. 201 at 10, 19.  There, the Court held that a "self-referential" database was patent-eligible because it was "a specific type of data structure designed to improve the way a computer stores and retrieves data in memory."  822 F.3d at 1339. The Court noted that the specification disparaged conventional data structures, in contrast to the claimed self-referential data structure. *Id. Enfish* distinguished other cases, similar to this one, where the claims "recited use of an abstract mathematical formula on any general-purpose computer . . . or recited a purely conventional computer implementation of a mathematical formula." 822 F.3d at 1338.

Unlike the representative claim in *Enfish*, which included a means-plus-function limitation and corresponding structure, the '889 patent claims are stated at a high level of abstraction—even as compared to the mathematical formulas set forth in the specification— and they can be executed on any general-purpose computer. *See Bridge & Post, Inc. v. Verizon Commc'ns., Inc.*, 778 F. App'x 882, 889 (Fed. Cir. 2019) (distinguishing "goals . . . in the abstract realm" from the kind of specific improvement claimed in *Enfish*). Nor do Nielsen's claims of improved speed or accuracy impact that result. *Intell. Ventures I LLC v.*

14

*Erie Indem. Co.*, 711 F. App'x 1012, 1017 (Fed. Cir. 2017) ("[W]e have held that speed and accuracy increases stemming from the ordinary capabilities of a general-purpose computer 'do[] not materially alter the patent eligibility of the claimed subject matter.'").

*McRO, Inc. v. Bandai Namco Games Am. Inc.* does not help Nielsen either. 837 F.3d 1299, 1312-14 (Fed. Cir. 2016); D.I. 201 at 12-13. In *McRO,* the court held patent-eligible claims directed to the automatic use of particular rules to set morph weights and transitions between phonemes used for 3-D animation devices. 837 F.3d at 1313. Here, in contrast, Nielsen cannot identify a single improved computing device in representative claim 1. The relevant inquiry is whether the claims recite a "specific technological improvement," *i.e.*, whether they enable computers to do something that they could not do before. *See, e.g.*, *Customedia Techs., LLC. v. Dish Network Corp.*, 951 F.3d 1359, 1365 (Fed. Cir, 2020) (claims "directed to a patent-eligible improvement to computer functionality . . . must be directed to an improvement to the functionality of the computer or network platform itself."); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305-06 (Fed. Cir. 2018) (finding claims that recite more than a mere result and instead "recite specific steps—generating a security profile that identifies suspicious code and linking it to a downloadable—that accomplish the desired result" to be non-abstract); *SynKloud Techs., LLC v. HP Inc.*, 490 F. Supp. 3d 806, 819 (D. Del. 2020) (claims directed to unpatentable abstract idea where none of alleged computer improvements "'enables a computer . . . to do things it could not do before'"). Representative claim 1 and the remaining asserted claims do not recite a single improved computer, frame, frequency component, media sample, descriptor, signature, or computing technology. Instead, they recite only an abstract mathematical formula.

In the prior briefing, Nielsen further analogized the claim to the claim at issue in *California Institute of Technology v. Broadcom Ltd.*, 25 F.4th 976 (Fed. Cir. 2022). D.I. 201 at 13-15. But there, the Federal Circuit held that "[c]laim 13 … is directed to an efficient,

15

improved method of encoding data that relies in part on irregular repetition." 25 F.4th at 988. That opinion noted the parties "cursory" briefing on this issue and resolved it in just two paragraphs. *Id.* But the lower court ruling makes clear that this "irregular repetition" is related to codes which "aim to both minimize errors and maintain a transmission rate close to the theoretical limit of the amount of data that a channel can carry" as recited in the patent-at-issue there. *See Cal. Inst. of Tech. v. Broadcom Ltd.*, C.A. No. 16-3714-GW, 2019 U.S. Dist. LEXIS 237106, at *11 (C.D. Cal. Jan. 18, 2019). Thus, it was the specific reference to the technological efficiency results in the patent specification that allowed the patent at issue there to pass muster under *Alice* step 1. *Id.* at *11-14. Here, in contrast, what Nielsen alleges to be the improvement results over prior art systems are not found in the specification or the claims.

## C. *Alice* Step 2: The Claims Recite No Inventive Concept

The asserted claims also fail the second step of the *Alice* test because they contain no "inventive concept," i.e., an element or combination of elements sufficient to transform the claimed abstract idea into patent-eligible subject matter.  573 U.S. at 221. Once it is established that the claims are directed to "laws of nature, natural phenomena [or] abstract ideas," *Alice* requires that the Court "ask '[w]hat else is there in the claims before us?'" *Alice*, 573 U.S. at 217.  "We have described step two of this analysis as a search for an 'inventive concept'—*i.e.*, an element or combination of elements that is 'sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the [ineligible concept] itself.'" *Id.* at 217-218.  A claim reciting merely "well-understood, routine [and] conventional activities previously known to the industry" cannot provide an inventive concept.  *Id.* at 225 (cleaned up).

As the Court in *Alice* observed, "*Mayo*[3] itself is instructive." *Id.* at 221.  In *Mayo,* the claim covered "a method for measuring metabolites in the bloodstream in order to calibrate the

---

[3] *Mayo Collaborative Services v. Prometheus Laboratories, Inc.*, 566 U.S. 66 (2012).

appropriate dosage of thiopurine drugs in the treatment of autoimmune diseases." *Id.* But "methods for determining metabolite levels were already 'well known in the art' and the process at issue amounted to 'nothing significantly more than an instruction to doctors to apply the applicable laws [of nature] when treating their patients.'" *Id.* at 221-22. The Court held this ineligible. *Id.* at 227.

Here, the first four steps of claims recite the use of a well-known spectral transforms, e.g. an FFT, along with simple arithmetic steps to create a descriptor and then a signature. Ex. 1, 26:5-15. The second four steps essentially repeat the first four steps on a second frame. *Id.* at 26:16-32.   The patent admits that FFTs are well known.  *See, e.g.*, *Id.* at 13:46-48 ("[a]s will be appreciated by one having ordinary skill in the art"); 14:17-19 ("FFT is well known in the art").

These steps are carried out using a generic and conventional processor.  *See* Ex. 1 at 21:24-30 ("The example methods described above in connection with FIGS. 4-8 may be implemented by hardware, software, and/or any combination thereof … The example methods may also be implemented by software executed on a processor system such as, for example, the processor system 1210 of FIG. 12."); 25:11-22 ("FIG. 12 is a block diagram of an example processor system 1210 that may be used to implement the apparatus and methods described herein. As shown in FIG. 12, the processor system 1210 includes a processor 1212 … The processor 1212 may be any suitable processor, processing unit or microprocessor."). *E.g., S.I.SV.EL. Societa Italiana per lo Sviluppo Dell'Elettronica S.p.A. v. Rhapsopy Int'l Inc*., C.A. No. 18-69-MN-CJB, 2019 U.S. Dist. LEXIS 100917, at \*17-18 (D. Del. June 14, 2019) (claims "do not require use of anything more than off-the-shelf computer technology . . . as a tool to implement what is really an assertedly better way of analyzing data using mathematical techniques").

Finally, the purported novelty of the combination or sequence of steps in the asserted claims does not make them patent eligible under § 101. *See Flook*, 437 U.S. at 591-92 ("[T]he novelty of the mathematical algorithm is not a determining factor at all" and "is treated as though it were a familiar part of the prior art."); *Synopsis, Inc. v. Mentor Graphics Corp.*, 839 F.3d 1138, 1151 (Fed. Cir. 2016) ("a claim for a *new* abstract idea is still an abstract idea") (emphasis in original).

Nielsen's arguments in prior briefing regarding technological improvements should be rejected because they were based solely on conclusory statements by Dr. Moulin, its prior expert, and were not tied to claim limitations. D.I. 201 at 10-11.  *See Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*, 811 F.3d 1314, 1325-26 (Fed. Cir. 2016) (holding that expert declaration did not raise issue of fact under § 101 where expert analysis provided nonmaterial opinions not tied to specific limitations of the claims); *KOM Software Inc. v. NetApp, Inc.*, 697 F. Supp. 3d 203, 218 (D. Del. Oct. 4, 2023) (noting that under *Alice* step two, "what is required is for the patentee to point to the alleged improvement, consisting of an inventive concept that is embodied in the claims and described and enabled by the specification"); *Bot M8 LLC*, 465 F. Supp. 3d at 1024, aff'd, 4 F.4th 1342, 1351 (Fed. Cir. 2021) (rejecting expert declarations that failed to prove inventive concept); *Trading Techs. Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1093 (Fed. Cir. 2019) ("The abstract idea itself cannot supply the inventive concept, 'no matter how groundbreaking the advance.'"); *SAP*, 898 F.3d at 1166 ("the claims add no inventive concept to the mathematics to which they are directed").

### D.  The Asserted Dependent Claims Also Fail Step 2 of *Alice*

Because there can be no dispute that claim 1 is representative, as discussed above, that should end the inquiry.  In the alternative, the dependent claims do nothing more than recite patent-ineligible algorithms, which, themselves cannot satisfy *Alice* step 2. *See SAP*, 898 F.3d at 1166-67; *Accenture Global Servs. V. Guidewire Software, Inc.,* 728 F.3d 1336, 1338-39

18

(claims reciting "insurance transaction database" and "task library database" held to be patent ineligible subject matter); *Bancorp Servs. L.L.C. v. Sun Life Assur. Co. of Canada*, 687 F.3d 1266, 1280-81 (Fed. Cir. 2012) ("digital storage" claims held to be patent-ineligible); *See BSG Tech LLC v. Buyseasons, Inc.*, 899 F.3d 1281, 1287 n.1 (Fed. Cir. 2018) (additional limitations in dependent claims adding elements directed to types of information processed did not change abstract idea).

Under these authorities, Claims 2 and 9 are patent ineligible because they do nothing more than extend the mathematical algorithm in claim 1 by using the created signature to identify media information, and the specification descries this step to be a simple look-up algorithm. *See* Ex. 1 at 3:39-46. Claim 4 simply describes the types of data (audio or video) that the media information may be associated with, which does not supply an inventive concept. *Id.* at 26:38-40. Claims 6, and 11 slightly expand the "determining" step in Claim 1 to further describe the mathematical relationship between the "descriptor" and the "frame" data, which does not supply an inventive concept. *Id.* at 26:43-44, 27:9-11. Claims 12 and 16 describe a mathematical relationship between the second frame data and the first frame data through a mathematical "move" equation, clearly nothing more than an algorithm. *Id.* at 27:12-21, 28:17-27, 10:8-16. Similarly, Clams 13 and 17 identify the third and fourth frequency components by performing a spectral transform, itself an algorithm. *Id.* at 3:5-12, 27:22-28, 28:28-34.

IV.    **CLAIM CONSTRUCTION OF THE LIMITATION "DETERMIN[ING] A FIRST DESCRIPTOR OF THE FIRST FRAME OF MEDIA SAMPLES BASED ON A COMPARISON OF THE FIRST SPECTRAL POWER AND THE SECOND SPECTRAL POWER"**

Throughout the pendency of this case, up until the Court granted Nielsen's motion to amend the Scheduling Order, the parties have agreed that the claims encompass intraframe processing, not interframe processing. Indeed, Nielsen specifically opposed TVision's § 101 motion on the grounds that "that the asserted claims of the '889 Patent do not cover . . . systems . . . that use interframe (i.e., multiple frame) processing." D.I. 201 at 18. And this

Court previously recognized the parties' agreement by noting that it was "***undisputed*** that the asserted claims of the patent-in-suit . . . require that frequency components be processed within a single frame (the 'single frame limitation')." D.I. 272 at 2. Nielsen's position on this issue changed when it realized that, as TVision has argued all along, its devices use *interframe* operations. This Court should preclude Nielsen from raising a new claim construction issue at this late date. Alternatively, this Court should reject Nielsen's new position, which is contrary to the language of the claims and the specification.

### A. Nielsen Has Waived or Forfeited Any Argument That The Claims Encompass Interframe Processing

#### 1. In Opposition to TVision's § 101 Motion, Nielsen Argued That The Claims Must Be Construed To Require That The Descriptor Be Determined Solely From A Single Frame

On March 12, 2024, TVision filed a motion for summary judgment that the asserted claims of the '889 patent are invalid under § 101. D.I. 185 (motion); D.I. 186 (memo in support) at 5-12.  When TVision contended that claim 1 of the '889 patent is representative of all of the asserted claims for purposes of the section 101 analysis (D.I. 186 at 3-5), Nielsen responded that it "agrees that claim 1 is representative ***provided*** that there is no dispute that all claims recite intraframe processing. * * * And there should not be any such dispute, as all the claims recite determining a descriptor of an individual, single frame." D.I. 201 at 8 (citation omitted; emphasis in original).  Moreover, Nielsen specifically pushed back on TVision's description of the abstract idea because it would encompass interframe processing:

> TVision's four-step algorithm is so broad that it covers ***systems that the asserted claims of the '889 Patent do not cover.*** For example, TVision's four-step algorithm covers ***systems . . . that use interframe (i.e., multiple frame) processing*** . . . .

D.I. 201 at 18. The Court later recognized the parties' alignment on this issue:

> It is ***undisputed*** that the asserted claims of the patent-in-suit, United States Patent No. 7,783,889 (the "'889 patent"), require that ***frequency components be processed within a single frame (the "single frame limitation")***. ('889 patent, cols. 26:12-14, 62-64, 28:6-8;[] D.I. 250 at 3; D.I. 256 at 3)

D.I. 272 at 2 (emphasis added); *see id.* at n.2.

Among other things, Nielsen heavily relied on the computational advantages of "single frame" or "intraframe" processing over the prior art to support its argument that "claims that are directed to improvements in computer technology (and not merely directed to an idea that computers only as a tool) are patent-eligible:

> the claims recite ***processing a single frame of audio samples*** and the use of as few as two frequency components in generating a signature. * * * As Nielsen's technical expert Dr. Pierre Moulin explains, this ***single-frame***, two-component-comparison approach is an improvement in computer technology that reduces required computational resources, allows faster computation of signatures, and allows easier hardware and software implementation. [D.I. 203 ¶¶ 5-9, 28]. These benefits are particularly helpful in large-scale audience measurement systems, which have sizable reference libraries and underpowered devices placed in panelist households.

D.I. 201 at 10-11. Notwithstanding the fact that Dr. Moulin has been replaced by Dr. Kyriakakis, Dr. Moulin's prior reports are admissible against Nielsen under Fed. R. Evid. 801(d)(2)(B) because Nielsen made statements in its brief demonstrating that it believed Dr. Moulin's statements to be true. *See Pernix Ireland. Pain DAC v. Alvogen Malta Operations Ltd.*, 316 F. Supp.3d 816, 823-26 (D. Del. 2018). Thus, Dr. Moulin's opinion at that time was based on Nielsen's position that the claims covered intraframe operations.

### 2. Nielsen's New Expert Reports Adopted A New Claim Construction

In its new expert reports, Nielsen's experts accuse TVision of infringement even though they recognize that TVision's accused process compares frequency values across multiple frames *See* Ex. 3 at 36 ¶ 127. Nielsen's expert identified "isListMax" as the function that does this comparison. *See id.* at 38 ¶ 131.  In response to Dr. Anderson, who pointed out that isListMax "is not an intraframe operation because it is dependent on data over other frames, not exclusive to a single frame" (Ex. 6, ¶ 73), Dr. Kyriakakis and Nielsen *agreed*. Ex. 7, ¶¶ 27, 32. Nielsen took the explicit position for the first time in this case that "there is no

language in the claims that says that intraframe comparison is the only kind that is allowed." *Id.* at ¶ 27. Dr. Kyriakakis opines, in essence, that because the preamble of the claim recites "comprising," the claims are open ended and encompass either intraframe *or* interframe processing. *Id.* at ¶¶ 27-35. This is a 180-degree reversal of Nielsen's prior position on the interpretation of the claims, which Nielsen previously insisted—and TVision agreed—require only intraframe processing.

### 3. Nielsen Should Be Precluded From Raising New Claim Construction Issues At This Stage Of The Proceeding

By asserting throughout the case that the claims are directed to intraframe processing, Nielsen has waived a contrary argument that the claims encompass either intraframe or interframe processing. *See Cent. Admixture Pharmacy Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1356 (Fed. Cir. 2007) (affirming finding that a party "waived any argument with respect to [a] term by failing to raise it during the claim construction phase."); *Roche Diagnostics Operations, Inc. v. Abbott Diabetes Care, Inc.*, C.A. No. 07-753-RGA, 2014 U.S. Dist. LEXIS 168613, at *10 (D. Del. Dec. 5, 2014) ("'Rolling claim construction' is not justified by a party's considered claim construction choices that it later regrets.").

Even if the Court does not find that Nielsen's new claim construction is waived, it should be precluded because Nielsen's attempt to raise a new claim construction issue 2 ½ years after the deadline for identification of new claim terms violates the scheduling order. *Parus Holdings, Inc. v. Amazon.com, Inc.*, C.A. No. 23-190, D.I. 93 (D. Del Mar. 18, 2024) (striking the defendant's new claim construction position that it introduced three weeks after the plaintiff filed its opening claim construction brief for *de facto* altering the scheduling order's deadlines without good cause). Nielsen has not sought leave to ask this Court to consider a new claim construction.  To do so, Nielsen must satisfy the good cause standard of Fed. R. Civ. P. 16(b)(4), which provides, "[a] schedule may be modified only for good cause and with the judge's consent."  This Court has explained, "whether Rule 16(b)'s good cause

requirement is met depends on the diligence of the party seeking modification, rather than on prejudice to the non-moving party." *GlaxoSmithKline LLC v. Glenmark Pharms. Inc., USA*, C.A. No. 14-877-LPS-CJB, 2016 U.S. Dist. LEXIS 173408, at *3-4 (D. Del. Dec. 15, 2016), *rep. & recommendation adopted by* 2017 U.S. Dist. 237198 (D. Del. Mar. 17, 2017) (denying motion for leave to amend for lack of diligence).

Nielsen has not been diligent. To the extent Nielsen knew of its new claim construction position at the time it filed its motion to amend the schedule, it said nothing. After that, Nielsen served supplemental infringement contentions on June 2, 2025, which alleged that TVision's system "create[s] a new data structure . . . that contains, for every frame, the maximum value for every frequency bin *across 17 (+/- 8) frames*." Ex. 4 at 21-22. Yet it still said nothing. On July 7, 2025, Dr. Kyriakakis provided an opening expert report to the same effect as Nielsen's infringement contentions, but again said nothing. Ex. 3. It was not until July 29, 2025, that Nielsen's counsel sent an email to TVision's counsel, arguing that *Dr. Anderson's* July 28, 2025 non-infringement report raised a new claim construction issue. Ex. 2. Nielsen was wrong about that; it was Nielsen who changed position on claim construction but failed to mention that it had done so. *Compare* D.I. 201 at 9-11 *with* Ex. 7, ¶¶ 27-35. Dr. Anderson's opinion that getRowMax determined a descriptor by comparing values across a window covering 17 frames has never changed. *Compare* Ex. 5, Anderson November 21, 2023 Rep. at ¶¶ 57, 63 with Ex. 6, Anderson July 28, 2025 Rep. at ¶ 75.

### B. In the Alternative, Nielsen's Original Construction Was The Proper Construction

If this Court permits Nielsen to reverse its prior proposed claim construction at this stage, TVision submits that Nielsen's original construction should be upheld and that Nielsen's new construction is contrary to the intrinsic record.

The "determining a first descriptor step" is the third step in the claimed process. In step 1, a "*first frame* of media samples" is obtained. In step 2, a first and second frequency

power are identified "by performing a spectral transform operation *on the first frame*.  In step 3, "a *first descriptor of the first frame*" is determined "based on a comparison of the first spectral power and the second spectral power," both of which come from the first frame, as is made clear in step 2. Thus, the claim as a whole requires that the first descriptor be obtained from operations entirely within the first frame.

The specification supports this conclusion. The '889 patent admits that "[i]dentifying . . . audio streams . . . using signature-matching techniques is well known." Ex. 1, 1:21-23.  It states, unequivocally, "[u]nlike known methods in the prior art that use interframe operations (e.g., operations based on sample data within different data sample frames) to generate digital spectral signatures, the methods and apparatus described herein may be implemented using intraframe operations (e.g., operations based on sample data within a single frame)." *Id.* 2:56-61.  To that end, the '889 patent discloses,

> [U]sing the methods and apparatus described herein, a digital spectral signature may be generated by obtaining a frame of media samples, determining spectral power values by performing a spectral transform. . . on the frame of media samples, and performing an *intraframe operation* (e.g. a comparison) based on two or more spectral power values that are uniquely associated with the frame of media samples.

*Id.* 2:65-3:5 (emphasis added).  All of the examples of the allegedly inventive method in the '889 patent describe only intraframe operations.  *See* Ex. 1, 8:1-4 ("each of the descriptors is generated using one or more intraframe operations (e.g., comparison operations) based on two or more spectral components that are uniquely associated with a single audio sample frame"); 11:20-23 ("[t]hese operations are referred to as intraframe operations because they are performed using data *exclusive to a single audio frame* and *are not dependent on sample data collected over other audio frames*.").

Claims are construed in light of the specification as the terms would be understood by a person of ordinary skill in the art.  *See Phillips*, 415 F.3d at 1312-13. In this regard, "the person of ordinary skill in the art is deemed to *read the claim term not only in the context of*

24

*the particular claim in which the disputed term appears, but in the context of the entire patent.*" *Id.* at 1313.

As claimed, all of the steps [a]-[d] are performed on data from the first frame; none from outside the first frame.

### 1. The '889 Patent Specification Disavows Any Process that Determines a Descriptor using Inter Frame Operations

The Federal Circuit has noted instances where "the specification may reveal an intentional disclaimer, or disavowal, of claim scope." *Phillips*, 415 F.3d at 1316. In those situations, it is again the inventor's disavowal that is dispositive of the claim construction. *See id.* "To disavow claim scope, the specification must contain 'expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope.'" *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1306 (Fed. Cir. 2011) (quoting *Epistar Corp. v. Int'l Trade Comm'n,* 566 F.3d 1321, 1335 (Fed. Cir. 2009)). While disavowal must be clear and unequivocal, it need not be explicit. *Trs. of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363-64 (Fed. Cir. 2016). Especially applicable to this case, an inventor may disavow claims lacking a particular feature when the specification distinguishes or disparages prior art based on the absence of that feature, (*see Openwave Sys. v. Apple Inc*., 808 F.3d 509, 512-14 (Fed. Cir. 2015) (court found disavowal where the specification disparaged prior art)), or when the specification "defines terms by implication," *SightSound Techs., LLC v. Apple Inc*., 809 F.3d 1307, 1317 (Fed. Cir. 2015) (quoting *Phillips*, 415 F.3d at 1321). Here, the '889 patent specification contrasts the claimed invention, which uses only intraframe operations, with the prior art that used interframe operations. Ex. 1 at 2:55-60. The specification stresses that the "intraframe operations . . . are performed using data exclusive to a single audio frame and are not dependent on sample data collected over other audio frames. *Id.* at 11:16-23. Nielsen itself cited these portions of the patent specification when it attempted to avoid § 101 patent ineligibility, that "the invention recited in the asserted claims solves several problems

25

in the prior art . . . the prior art approach of interframe processing is computationally complex and requires excessive processing power and memory." D.I. 201 at 3. Nielsen focused on the benefits described in the specification of the intraframe processing claimed in the '889 patent. D.I. 201 at 3-4; *see also* Nielsen's Statement of Additional Facts ("SAF") (D.I. 203 ¶¶ 2, 5-8, 10, 28).

### 2. The word "comprising" in Claim 1 does not support Nielsen's argument

Nielsen's expert, Dr. Kyriakakis, contended in his reply expert report, "There is no language in the claims that says that intraframe comparison is the only kind that allowed." Ex. 7, ¶ 27. If this is Nielsen's claim construction position, it is 180 degrees opposite the position that Nielsen took when it argued that the alleged invention of the '889 patent is a "technological improvement" over the prior art. *See* D.I. 201 at 10-11. Dr. Kyriakakis also states, "it is my understanding that claims that start with the term 'comprising,' as claims 1 and 8 and their dependent claims to, are open ended" and that Claim 14 "has similar open-ended language." Ex. 7, ¶ 28.

Dr. Kyriakakis' "understanding" is contrary to well-settled Federal Circuit authority. A "comprising" transition, moreover, "is not a weasel word with which to abrogate claim limitations" and "does not reach into each of the . . . steps to render every word and phrase therein open-ended." *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007). Thus, the word "comprising" does not trump the claim language that limits processing of steps 1-4 to data from within a single frame.

### 3. The doctrine of claim differentiation does not support Nielsen's new argument

Dr. Kyriakakis argues that "non-asserted claims 5, 11, and 15 recite that 'the first descriptor is associated with only the first frame of media samples.' This element would limit the first descriptor to comparisons within only the first frame. Claims 1, 8, and 14, however,

are not so limited." Ex. 7 at 8, ¶ 32.  Dr. Kyriakakis misinterprets Claim 5 (as well as Claims 8 and 14), which reads as follows:

> 5.  A method as defined in claim 1, wherein the first descriptor is associated with only the first frame of media samples.

Claim 5 cannot form the basis of a claim differentiation argument.  Claim 5 states that the "first descriptor" is "associated with only the first frame of media samples."  But, under Claim 1, the first descriptor is, by definition, created solely from a comparison of two spectral powers within the first frame.  In this case, Claim 5 is nothing more than redundant of Claim 1. *See Edwards Lifesciences LLC v. Cook Inc.*, 582 F.3d 1322, 1330 (Fed. Cir. 2009) ("[S]imply noting the difference in the use of claim language does not end the matter. Different terms or phrases in separate claims may be construed to cover the same subject matter where the written description and prosecution history indicate that such a reading of the terms or phrases is proper"); *see also, Fenner Investments, Ltd. v. Cellco Partnership*, 778 F.3d 1320, 1327 (Fed Cir. 2015) (rejecting argument that claim construction rendered dependent claim redundant because "claim differentiation does not serve to broaden claims beyond their meaning in light of the specification").

Moreover, Federal Circuit precedent supports the conclusion that the inventor's disavowal and the plain language of the specification and claims overrides the doctrine of claim differentiation. *See Poly-America, L.P. v. API Industries, Inc.,* 839 F.3d 1131, 1137 (Fed. Cir. 2016) ("Poly–America also argues that because other independent and dependent claims explicitly provide for reduced upper opening width, claim differentiation principles preclude importing that limitation into claim 10, which does not contain such an explicit limitation. But claim differentiation does not serve to broaden claims beyond their meaning in light of the patent as a whole, and it cannot override clear statements of claim scope found in the specification and prosecution history. *See Toro Co. v. White Consol. Indus., Inc*., 199 F.3d 1295, 1302 (Fed. Cir. 1999)").  As the Court stated in *Toro*, "[t]his is not a case of limiting the

claims to a 'preferred embodiment' . . . . [T]he invention is described throughout the specification as it is claimed." *Toro,* 199 F.3d at 1301-02. "[T]he doctrine of claim differentiation does not serve to broaden claims beyond their meaning in light of the specification." *Id.* at 1302*; see Eon Corp. v. IP Holdings v. Silver Spring Networks,* 815 F.3d 1314, 1320 (Fed. Cir. 2016) ("the 'ordinary meaning' of a claim term is its meaning to the ordinary artisan after reading the entire patent. . . . 'The claims are directed to the invention that is described in the specification; they do not have meaning removed from the context from which they arose'" (citation omitted)).

Nielsen previously argued that the "single frame limitation" is a critical feature of the claimed invention that distinguishes it from the prior art and saves it from being patent-ineligible under § 101. *See* section IV.A.1, above. Thus, any construction that reads out this feature would improperly expand the claim scope. *See Parallel Networks LLC v. Abercrombie & Fitch*, *Co.*, 704 F.3d 958, 970 (Fed. Cir. 2013) ("[Patentee] cannot now claim that a limitation that featured so critically in the patent was not, in fact, a part of the invention."); *Microsoft Corp. v. Multi-Tech Sys.*, 357 F.3d 1340, 1351-52 (Fed. Cir. 2004) (construing claim to require limitation that was "central to the functioning of the claimed invention[]").

### 4. TVision's proposed interpretation is supported by intrinsic record

The "single frame limitation" that Nielsen previously advocated is consistent with the only way in which the claimed invention is described in the specification. *See Wis. Alumni Research Found. v. Apple Inc.*, 905 F.3d 1341, 1351 (Fed. Cir. 2018) ("[w]here, as here, 'a patent "repeatedly and consistently" characterizes a claim term in a particular way, it is proper to construe the claim term in accordance with that characterization.'"); *Scimed Life Systems v. Advanced Cardiovascular*, 242 F.3d 1337, 1342 (Fed. Cir. 2001) (citing *Toro Co. v. White Consolidated Industries, Inc.,* 199 F.3d 1295 (Fed. Cir. 1999)) (requiring the disputed claim term "including" to be construed as "permanently attached" because the specification and the

figures only showed elements of the claim being permanently attached "and did not illustrate or describe any other structure").

### V.  NIELSEN CANNOT PROVE INFRINGEMENT

Nielsen cannot prove that TVision infringes any of the asserted Claims 1, 2, 4, 6, 8, 9, 12-14, 16, 17 of the '889 patent.  Each of those claims requires the step of determining a "first descriptor" "based on a comparison of the first spectral power and the second spectral power" within the "first frame." Nielsen's expert admits that the software TVision uses determines a "first descriptor" based on a comparison of spectral values from 17 frames. Ex. 3 at 60 ¶ 198. The plain language of the claims, which Nielsen previously construed as requiring "intraframe" operations, precludes Nielsen's infringement theory.

Although there are multiple reasons why TVision does not infringe, for purposes of this motion, TVision relies on Dr. Kyriakakis' admission that TVision's process determines a descriptor based on a process that reviews data from 17 frames, not a single frame. Ex. 3 at 60 ¶ 198 ("local_max then processes the data in tmpZ to create a new data structure pointed to by maxInfo that contains, for every bin in every frame, the maximum value for every frequency bin across 17 (+/– 8) frames ('getRowMax processing')").  Dr. Anderson agrees. Ex. 6, at 23-24 ¶ 70 ("the local_max function calls the getRowMax function . . . to determine the maximum value of a row of 17 frames that is within the window. . . . Such determination is done by comparing the spectrum values of a frame within the window to the spectrum value of the neighboring left and right 8 . . . frames").

TVision's process of using data from 17 frames to obtain the alleged descriptor does not meet the Claim 1 limitation, "[c] determining a first descriptor *of the first frame* of media samples based on a comparison of the first spectral power and the second spectral power." The claim itself requires that the first descriptor be a descriptor "of the first frame." But Nielsen's own expert alleges that TVision's first descriptor is the result of comparing values

29

over 17 frames, not one. Dr. Kyriakakis admits that "some of the functionality of the local_max function does compare across frames." Ex. 7 at 10 ¶ 36.

Because TVision does not infringe any of the independent claims, it cannot infringe any of the asserted dependent claims. *See Ferring B.V. v. Watson Labs., Inc.*, 764 F.3d 1401, 1411 (Fed. Cir. 2014).

## VI. DAUBERT MOTION REGARDING DR. KEELEY

Dr. Keeley's opinions regarding an unquantified amount of lost profits that allegedly occurred after 2018 should be excluded under *Daubert*, because those allegations cannot be relevant to demonstrate Nielsen's beliefs at the time of the 2018 hypothetical negotiation.

### A. The Standard for *Daubert* Motions

Rule 702 of the Federal Rules of Evidence governs the admissibility of qualified expert testimony, providing that an expert witness may testify if:

> (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702.=

Rule 702's requirements were examined in detail in *Daubert v. Merrell Dow Pharms., Inc.*, 579 (1993), and have been said to embody "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability, and fit." *Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir. 2000); *see also, B. Braun Melsungen AG v. Terumo Med. Corp.*, 749 F. Supp. 2d 210, 222 (D. Del. 2010).

As to this motion, at issue is the reliability and "fit" of the proposed expert testimony. With regard to the requirement of reliability, Rule 702 mandates that the relevant expert testimony "must be supported by appropriate validation—i.e., 'good grounds,' based on what is known." *Daubert*, 509 U.S. at 590; see also *Schneider ex rel. Estate of Schneider v. Fried*, 320 F.3d 396, 404 (3d Cir. 2003). Such testimony should amount to "more than subjective

belief or unsupported speculation[,]" and a court's focus in examining this factor must be on "principles and methodology" rather than on the expert's conclusions. *Daubert*, 509 U.S. at 590, 595. As to the "fit" requirement, it "goes primarily to relevance" as the testimony must "assist the trier of fact to understand the evidence or to determine a fact in issue" and have "a valid . . . connection to the pertinent inquiry as a precondition to admissibility." *Daubert*, 509 U.S. at 591-92 (internal quotation marks and citations omitted); *see also, Schneider*, 320 F.3d at 404.

### B. Legal Principles Relating to Damages

Upon a finding of infringement of a valid patent, a patentee is entitled to damages "adequate to compensate for the infringement, but in no event less than a reasonable royalty for the use made of the invention by the infringer[.]" 35 U.S.C. § 284. The purpose of compensatory damages in patent cases is "not to punish the infringer, but to make the patentee whole." *Pall Corp. v. Micron Separations, Inc*., 66 F.3d 1211, 1223 (Fed. Cir. 1995). To that end, under 35 U.S.C. § 284 ("Section 284"), damages awarded for patent infringement "must reflect the value attributable to the infringing features of the product, and no more." *Commonwealth Sci. & Indus. Rsch. Org. v. Cisco Sys., Inc.*, 809 F.3d 1295, 1301 (Fed. Cir. 2015) (internal quotation marks and citation omitted).

The burden of proving damages falls on the patentee. *Dow Chem. Co. v. Mee Indus., Inc.* 341 F.3d 1370, 1381 (Fed. Cir. 2003).

Generally, there are two alternative types of compensatory damages that may be recovered in a patent case: (1) the patentee's lost profits; or (2) the "reasonable royalty [the patentee] would have received through arms-length bargaining." *Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301, 1324 (Fed. Cir. 2009).

### C. Undisputed Facts

1. ████████████████████████████████ Ex. 12, Johnson November 21, 2023 Rebuttal Rep. at 11, ¶ 27.

2. ████████████████████████████████████ ████████████████████████ *Id.* ¶ 28.

3. In 2018, TVision decided to use ACRCloud ACR software. *Id.* at 12, ¶ 31.

4. Nielsen alleges that TVision's use of ACRCloud's ACR software infringes the '889 patent. Compl., ¶¶ 36-37.

5. ████████████████████████████████████ ████ Ex. 9 at 17, ¶ 41 ("██████████████████████████████").

### D. Testimony by Nielsen and Dr. Keeley's Opinion Regarding Profits Lost By Nielsen After The Date Of The Hypothetical Negotiation Should be Excluded For Lack Of Relevance

In this case, Nielsen seeks damages in the form of a reasonable royalty. Ex. 9 at 5, ¶ 15. Nielsen has stated that it does not seek lost profits. *Id.* Dr. Keeley states that he has "not quantified the magnitude of Nielsen's lost profits," but opines that Nielsen's lost profits "would likely be very large." *Id.*

Dr. Keeley assesses a reasonable royalty using "the construct of a hypothetical license negotiation between a willing licensor and willing licensee as outlined in the *Georgia Pacific* case." *Id.* at 4, ¶ 16. According to Dr. Keeley, the hypothetical negotiation would have taken place "prior to TVision's first infringement on or about May 1, 2018" (*id.*), when "TVision completely switched its ACR technology from ██████ to ACRCloud," (*id.* atn.12), ████ ████████████████████████████████████████. Ex. 14, 35:13-19.

Because Nielsen is not seeking lost profits, but only a reasonable royalty, and because the reasonable royalty is based on a hypothetical negotiation that takes place in 2018, Dr. Keeley's testimony regarding lost profits that allegedly occurred after 2018 should be

excluded.  Whatever might have occurred ***after* the 2018 hypothetical negotiation**, it could not be relevant to demonstrate Nielsen's belief ***at the time of the hypothetical negotiation in 2018*** that it would lose profits in the future. *Cf., LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 78 (Fed. Cir. 2012) (excluding settlement agreement entered into three years after the hypothetical negotiation); *Odetics, Inc. v. Storage Tech. Corp.*, 185 F.3d 1259, 1276-77 (Fed. Cir. 1999) (excluding license agreements entered into after date of infringement).

Dr. Keeley's testimony should also be excluded because of his "failure to account for the alternative actions [the defendant] would foreseeably have undertaken had it not infringed." *Siemens Mobility Inc. v. Westinghouse Air Brake Tech. Corp.*, C.A. No. 16-284-LPS, 2019 U.S. Dist. LEXIS 213, at *4 (D. Del., Jan. 2, 2019) (precluding damages expert from testifying about lost profits); *see also, Grain Processing Corp. v. Am. Maize-Prods. Co.*, 185 F.3d 1341, 1350-51 (Fed. Cir. 1999) ("[A] fair and accurate reconstruction of the 'but for' market also must take into account, where relevant, alternative actions the infringer foreseeably would have undertaken had he not infringed.").  As Judge Stark observed, "it is 'hardly likely' that a company . . . would 'surrender its complete market share when faced with a patent, if it can compete in some other lawful manner." *Siemens*, 2019 U.S. Dist. LEXIS 213 at *4 (citing *Grain*).  It is not a reasonable assumption that TVision would "leave the market altogether." *Id.* at *5.

Dr. Keeley provides  Ex. 9 at 7 ¶ 25 (              ), at 22-27, ¶¶ 52-56 (                    ).  That testimony should be excluded because the lost profits that are the subject of Dr. Keeley's testimony did not occur before the hypothetical negotiation and would have not been known to Nielsen during the 2018 hypothetical negotiation. It should also be excluded because Dr. Keeley fails to apply the

*Panduit* factors to establish that those losses were due to TVision's alleged infringement. *See Siemens,* U.S. Dist. LEXIS 213 at *4. Dr. Keeley admits that "I have not been able to quantify Nielsen's aggregate lost profits." Ex. 9 at 28, ¶ 57. In short, Dr. Keeley does not perform a proper lost profits analysis. Among other things, Dr. Keeley fails to establish that there was any demand for the patented product. *See Rite-Hite Corp. v. Kelley Co*., *Inc.*, 56 F.3d 1538, 1545-46 (Fed. Cir. 1995) (*en banc*) (approving application of *Panduit* four-factor test to establish "but for" causation to obtain lost profits). Indeed, Dr. Keeley acknowledges

████████████████████████████████████████████████████████

Ex. 9 at 17, ¶ 41.

Further, Dr. Keeley's analysis ignores the undisputed fact that TVision considered several other alternative ACR systems before deciding on ACRCloud. *See* Ex. 20; Ex. 21. There is no evidence that any of those systems practices the '889 patent. Thus, Dr. Keeley fails to establish, or even address, "but-for causation" to prove lost profits. *See Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, C.A. No. 15-152-RGA, 2018 U.S. Dist. LEXIS 167104, at *19 (D. Del., Sept. 28, 2018) (excluding damages expert's testimony on lost profits for failure to adequately address "but for" causation.)

### E.  Dr. Keeley's Testimony Should Be Excluded Because It Is Inherently Incredible

Dr. Keeley opines, "based on the framework of Nash Bargaining . . . the parties would negotiate to a reasonable royalty of 50% of the net present value of TVision's expected incremental profits from practicing the patent-in-suit at the time of the hypothetical negotiation." Ex. 9 at 6, ¶ 20. "This 50% royalty arises as a solution to Nash Bargaining when the parties are in similar bargaining positions." *Id.* at 7, ¶ 22. As of the date of the hypothetical negotiation, ███████████████████ Ex. 12 at 44, ¶¶ 132, 133:



Ex. 12 at 44, ¶ 132. TVision's total revenues in 2018 were ▮▮▮▮▮▮, while it operated at a ▮▮▮▮▮▮▮▮▮▮. *See* Fig. 9, above.

Notwithstanding TVision's large net losses at the time of the hypothetical negotiation, Dr. Keeley relies on a single projection TVision prepared for an investor, ignores TVision's actual financial condition, and concludes that in a hypothetical negotiation in 2018, when TVision had virtually no cash on hand, "a reasonable royalty would be ▮▮▮▮▮▮ based on the average linear growth scenario" and that TVision would have been willing to pay all ▮▮▮▮▮▮ up front. Ex. 9 at 7, 55 ¶ 24, 112.

### F.  Dr. Keeley's Testimony About The Nash Bargaining Solution Should Be Excluded Because It is Unreliable As A Matter Of Law

Dr. Keeley bases his entire royalty opinion on the Nash Bargaining Solution.

> The hypothetical licensing negotiation in this case fits the Nash Bargaining framework (under the constraints of the hypothetical negotiation construct): a licensing agreement between the parties provides an opportunity for mutual benefit. If Nielsen and TVision come to an agreement, TVision earns an incremental profit from licensing the patented technology, and Nielsen earns a royalty from TVision. *Without a license to the '889 Patent, TVision would be out of business* and would not earn incremental profits from the patented technology, and Nielsen would not earn royalties from TVision.

Ex. 9 at 31, ¶ 67 (emphasis supplied).

> The Nash Bargaining Solution would be: TVision pays Nielsen half of the discounted present value of its expected profits and retains the remaining half of expected profits. The value of each share at the

> time of the negotiation would be equal (i.e., 50/50). Once again, remember that in the example above, I have assumed counterfactually (and beneficially to TVision) that Nielsen does not lose any profits as a result of granting a hypothetical license and that Nielsen and TVision are in identical bargaining positions to arrive at this solution.

Ex. 9 at 33, ¶ 71.

First, Dr. Keeley cites no evidence to support his assumption that TVision "would be out of business" without a license to the '889 patent, and there is none.  Ex. 9 at 31, ¶ 67.  The '889 patent admits that its method is not the only way to perform ACR, and ██████████ ████████████████████████████████████████████ Ex. 1, 1:21-26, 2:55-60; Ex. 9 at 17, ¶ 41. Second, Dr. Keeley's use of the Nash Bargaining Solution is equivalent to an abstract 50% rule of thumb.  Dr. Keeley prefaces his Nash Bargaining Solution by stating that he will first "[simplify] the negotiation and then discuss the likely consequences of doing so."  Ex. 9 at 33, ¶ 71.  By placing Nielsen and TVision into a "simplified" world, Dr. Keeley wholly disregards any relevant facts that the parties would have considered at the hypothetical negotiation.

Dr. Keeley does not take into account in his Nash Bargaining analysis that TVision provides different data than Nielsen. TVision offers a product that measures "eyes on TV," rather than people in the room. Ex. 24 (Green Dep at 77:12-78:7; 79:3-21; 91:7-92:6; 99:11-18; 101:4-102:11).  TVision's product is unique in this regard.  Ex. 13, passim; Ex. 14,Liu Dep., at 86:7-89:17. TVision's product "Total View can serve as a complementary solution that layers on qualitative data focused on the value ads and programs deliver." Ex. 13 at 8. In this regard, Mr. Liu, TVision's CEO, had spoken with ██████████████████████ ████████████████████████████████████████████ ████████ Ex. 14 at 92:11-93:10; s*ee also*, Ex. 15 (Schiffman Dep.) at 32:8-34:4.

In addition, Dr. Keeley failed to take into account evidence that ███████

█████████████████████████████████████████████████████

████████████████. *See* Ex. 16.

Dr. Keeley's application of the Nash Bargaining Solution in this case is equivalent to an abstract 50% rule of thumb, which has been rejected by the Federal Circuit and by this Court. *Virnetx, Inc. v. Cisco Sys., Inc.*, 767 F.3d 1308, 1332-33 (Fed. Cir. 2014) (rejecting use of Nash Bargaining as an improper "rule of thumb"); *Bayer Healthcare LLC v. Baxalta Inc.*, C.A. No. 16-1122-RGA, 2019 U.S. Dist. LEXIS 11952, at *18, 228 (D. Del., Jan. 25, 2019) (excluding expert testimony that "a reasonable royalty rate is 'the mid-point of the bargaining range'"); *see also Numatics, Inc. v. Balluff, Inc.,* 66 F. Supp. 3d 934, 961 (E.D. Mich. 2014); *Good Tech. Corp. v. Mobileiron, Inc*., C.A. 12-5826-PSG, 2015 U.S. Dist. LEXIS 87347, at *21 (N.D. Cal. July 5, 2015) (excluding expert testimony that "fails to tie the 50/50 split to the specifics of the case or to explain why such a split would be reasonable—other than to invoke a boilerplate assertion about the relative bargaining powers of the parties"); *Oracle Am., Inc. v. Google Inc.,* 798 F. Supp. 2d 1111, 1119 (N.D. Cal. 2011) (excluding expert testimony that purported to apply the Nash Bargaining Solution but "glossed over the axioms underlying the Nash solution without citing *any* evidence to show that those assumptions were warranted in the present case") (emphasis in original).

In short, Dr. Keeley should be precluded from testifying about a reasonable royalty because his entire report relies on the Nash Bargaining and uses a 50% rule of thumb that is untethered to the facts in this case.

### G. Dr. Keeley should be precluded from testifying about a reasonable royalty because his report fails to apportion the value of the patent-in-suit from the value of ACR software.

The Federal Circuit has explained that "apportionment is an important component of damages law generally, and . . . it is necessary in both reasonable royalty and lost profits

analysis." *Mentor Graphics Corp. v. EVE-USA, Inc.*, 851 F.3d 1275, 1287 (Fed. Cir. 2017); *see also Ericsson, Inc. v. D-Link Sys., Inc.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014) ("Indeed, apportionment is required even for non-royalty forms of damages[.]").

More specifically, with regard to reasonable royalty damages, "[a] patentee is only entitled to a reasonable royalty attributable to the infringing features" and therefore "[t]he patentee 'must in every case give evidence tending to separate or apportion the defendant's profits and the patentee's damages between the patented feature and the unpatented features.'" *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, 904 F.3d 965, 977 (Fed. Cir. 2018) (quoting *Garretson v. Clark*, 111 U.S. 120, 121 (1884)); *see also Elbit Sys. Land and C4I Ltd. v. Hughes Network Sys.*, LLC, 927 F.3d 1292, 1301 (Fed. Cir. 2019) ("[T]he apportionment requirement [dictates] that a royalty should reflect the value of patented technology."); *Ericsson*, 773 F.3d at 1226 ("As a substantive matter, it is the 'value of what was taken' that measures a 'reasonable royalty' under [Section] 284") (internal citation omitted).

Throughout his report, Dr. Keeley conflates the benefits attributable to the '889 patent's method of generating signatures, as compared to other methods, with the benefits of using ACR technology generally. *E.g.*, "Without the infringing ACR technology from ACRCloud, TVision would have no revenue . . . ." (Ex. 9 at 22, ¶52); "ACR technology is critical to TVision's products, and absent the infringing ACR technology, TVision would have had no revenues or profits." Ex. 9, ¶ 75. Thus, Dr. Keeley mistakenly assumes that the '889 patent is equivalent to ACR technology generally, leading him to conclude that absent ACR technology, TVision would have no revenues or profits. *Id.* But Dr. Keeley does not address whether the benefits of the "specific way" that the '889 patent contributes to ACR is a critical component of TVision's business. As noted above, the '889 patent admits that generating signatures or fingerprints was known in the prior art. Ex. 1, 1:21-26, 2:55-60. Moreover,

38

███████████████████████████████████████

██████████████ Ex. 9, ¶ 41.

Dr. Keeley's hypothetical negotiation framework is supposed to be based on the "incremental benefit the patent provides to the infringer compared to the next-best available non-infringing alternative" at the time of the hypothetical negotiation.  Ex. 9, ⁋ 59; *see IOENGINE, LLC v. PayPal Holdings, Inc.*, 607 F. Supp.3d 464, 503 (D. Del. 2022) (excluding expert testimony because expert did not apportion).

Neither Dr. Keeley nor Nielsen's technical expert, Dr. Kyriakakis, address the benefits of the '889 patent in the period leading up to the hypothetical negotiation in May 2018.  The '889 patent claims creating a "descriptor" by the mathematical operation (algorithm) of comparing different spectral values within a single "frame." Ex. 1, Claim 1. The descriptor is then used to create a "signature." *Id.* TVision's technical expert, Dr. Anderson, opined that "the only advantage of the '889 *intraframe* processing is reduced computational complexity." Ex. 6, ¶ 120 (emphasis in original). However, this "purported computational advantage of only processing a small number of frequency components is irrelevant" because "a significant part of the computation requirements of creating signatures is the frequency transform" which "must be performed on every frame whether or not the descriptors are intra-frame operations or inter-frame operations." *Id.* at  ¶ 122.  The computational advantage of the claimed invention is "negligible." *Id.* Further, "[i]f there were computational advantages to the '889 system . . ., advances in computer technology have dwarfed any possible algorithmic advantages." *Id.* In this regard, Nielsen offers no evidence that the functioning of the TVision devices would be impeded in any way by a slower or more computationally intensive ACR algorithm that operates using the prior art methods.

Nowhere does Dr. Keeley consider the relative value of the patented invention, which is only a small part of ACR software, in the context of the value of ACR software. Further,

there is no evidence that the patented invention drives the demand for TVision's products. Under these circumstances, Dr. Keeley should be prohibited from testifying about a reasonable royalty for failure to apportion the value of the patented invention from the other components of TVision's products.   *See IOENGINE, LLC*, 607 F. Supp.3d at 503 (excluding expert testimony because expert did not apportion).[4]

### H.  Dr. Keeley should be precluded from testifying about a reasonable royalty because his report assumes that ███████████████████ ████████████████

The hypothetical negotiation or "willing licensor-willing licensee" approach "attempts to ascertain the royalty upon which the parties would have agreed had they successfully negotiated an agreement just before infringement began." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1327 (Fed. Cir. 2009), citing *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, 1120 (S.D.N.Y. 1970).

Dr. Keeley's report gives lip service to the *Georgia Pacific* requirement that the hypothetical negotiation must be between a willing licensor and a willing licensee, but states several times that ██████████████████████████████████. Ex. 9, ¶ 18 (███████████████████████████████████████████████ ████████████████"); *Id.* at ¶ 61 ("████████████████████ ███████████████████████████████████████

---

[4] A narrow exception to the general rule requiring apportionment is the entire market value rule. *LaserDynamics, Inc. v. Quanta Comput., Inc.*, 694 F.3d 51, 66-67 (Fed. Cir. 2012). The entire market value rule "permits recovery of damages based on the value of a patentee's entire apparatus containing several features when the patent related feature is the basis for customer demand." *Zimmer Surgical, Inc. v. Stryker Corp.*, 365 F. Supp. 3d 466, 491 (D. Del. 2019) (applying entire market value rule to lost profits damages analysis); *see also*, *LaserDynamics*, 694 F.3d at 67 ("In effect, the entire market value rule acts as a check to ensure that [reasonable] royalty damages being sought under [Section] 284 are in fact 'reasonable' in light of the technology at issue."). In order to satisfy the entire market value rule, a patentee must "present evidence showing that the [patented feature] drove demand for the [entire apparatus][;] [i]t is not enough to merely show that the [patented feature] is viewed as valuable, important, or even essential to the use of the [entire apparatus]." *Id*. at 68. Dr. Keeley does not justify his failure to apportion based on the entire market value rule.

███████████████ ").  His testimony regarding reasonable royalty should be excluded

because a proper analysis under this approach requires that an expert assume a willing

licensor and a willing licensee. *Lucent*, 580 F.3d at 1327.

## VII. DAUBERT MOTION TO EXCLUDE DR. KEELEY AND DR. KYRIAKAKIS FROM PROVIDING OPINIONS RELATING TO THE AVAILABILITY OF ALTERNATIVE ACR SOFTWARE AT THE TIME OF THE HYPOTHETICAL NEGOTIATION BETWEEN THE PARTIES

Both Dr. Kyriakakis and Dr. Keeley purport to provide opinions that there was no

alternative ACR software available to TVision at the time of the 2018 hypothetical

negotiation. *See* Ex. 9, ¶ 19; Ex. 3, ¶¶ 468-488. Neither Dr. Kyriakakis nor Dr. Keeley are

qualified to provide any such opinion. As is demonstrated below, this Court should exclude

the opinions of both Dr. Kyriakakis and Dr. Keeley with respect to the availability of MRL,

Mufin, and other ACR software alternatives to ACRCloud.  Neither expert has provided any

evidence in his expert report that he had any knowledge of any prior art ACR system that

TVision had considered prior to deciding to use ACRCloud's ACR software. Thus, any

testimony would be unreliable.

### A.  Legal Standard

An expert's opinion cannot substitute for facts.  *Hathaway v. Bazany,* 507 F.3d 312,

318 (5th Cir. 2007).  "[W]hen indisputable record facts contradict or otherwise render the

opinion unreasonable, it cannot support a jury's verdict." *Brooke Grp. Ltd. v. Brown &*

*Williamson Tobacco Corp*., 509 U.S. 209, 242 (1993).  Thus, "[e]xpert testimony . . . is

inadmissible when the facts upon which the expert bases his testimony contradict the

evidence." *Greenwell v. Boatwright*, 184 F.3d 492, 497 (6th Cir. 1999) (citing *United States v.*

*Chaney*, 577 F.2d 433, 435 (7th Cir. 1978)); *see also, e.g., Guzman v. State Farm Lloyds,* 456

F. Supp.3d 846, 855 (S.D. Tex. 2020) (excluding expert's testimony that did not "account for

actual, unrebutted facts of the case" as unreliable under Rule 702(b)).

**B. The '889 Patent Admits That Prior Art Non-Infringing ACR Systems Were Available**

Dr. Kyriakakis's opinion that there were no non-infringing alternatives to a license under the '889 patent (Ex. 3, ¶¶ 468-488) flies in the face of the admission in the '889 patent that "audio streams . . . using signature-matching techniques is well known." Ex. 1 at 1:20-28. It is also excludable under *Apple Inc. v. Wi-Lan Inc.*, 25 F.4th 960, 966, 975-76 (Fed. Cir. 2022), because it conflates the claims of the '889 patent, which cover only a method of making fingerprints, with entire ACR systems.

**C. Irrefutable Evidence Establishes That Non-Infringing ACR Software Was Available To TVision**

It is undisputed that 

Ex. 9, ¶ 35. Mr. Liu, TVision's CEO testified that TVision was "under . . . time pressure. We could not run the full process to pick the best ACR provider." Ex. 14 at 75:8-76:14. As of May 2018, and during the licensing period, the ACR provider market was "fairly commoditized" and companies like Dat-Track provided very similar capabilities to ACRCloud. Ex. 17, Webster Tr., 41:19-42:8; 128:1-130:19.

VidVita, which is in the business of delivering fingerprints to customers, has been one of TVision's vendors since March 13, 2017. Ex. 18 (VidVita Dep. Ex. 1). Amy Bolivar is the co-founder and CEO of VidVita. Ex. 19, Bolivar Dep. Tr., at 11:10-13. In her deposition, Ms. Bolivar explained that VidVita uses its own proprietary software to ingest audio streams and create fingerprints using ACR software for TVision. *Id.* at 39:8-16. VidVita provides "data feeds to TVision utilizing a third-party ACR for them to create their reference network." *Id.* at 15:3-10. The data feeds are "linear or cable or streaming channels" or "on demand or over-the-top content feeds." *Id.* at 15:18-16:13. Ms. Bolivar has "been in the ACR industry

for 20 years, so [she has] a lot of firsthand knowledge of the technical aspects" and she was a Linux systems administrator. *Id.* at 48:17-49:6.

On January 11, 2017, Mr. Liu reached out to Ms. Bolivar to request recommendations for a new ACR provider. Ex. 20, TVSN_NLSN_00611700-707 at 702-03. Ms. Bolivar advised Mr. Liu, "ACRCloud is a partner and we can definitely provide channel feeds for use with their ACR platform." *Id.* at 703. She also advised Mr. Liu, "The muffin team is great too. We have tested their ACR with our network as well. . . . ACRCloud and muffin are the two top companies for licensing the technology, creating your own reference libraries and having that direct control over the environment." *Id.* at 702. On January 13, 2017, Ms. Bolivar informed Mr. Liu,

> Another ACR company similar to these two would be Mobile Research Labs (MRL). It's the Israeli based company Steve and I worked for before jumping off to form VidVita. They are the company that did the original Google project for the London Olympics. . . . They have been positioning their ACR technology to be licensed/more DIY and their algorithm is audio based and works well on mobile. They are also compatible with our network and have processed our USA channels.

*Id.* at 701. Ms. Bolivar testified that she understands ACR and fingerprints because "I worked for a previous company that also utilized an audio ACR prior to forming VidVita." Ex. 19 at 20:7-21:12. On January 24, 2018, during the period of time that TVision was transitioning from Gracenote's ACR software to ACRCloud's ACR software, Sara Radkiewicz of TVision advised Ms. Bolivar that TVision was "committed to moving to a new provider ASAP" and wanted "to proceed as quickly as possible," and that "[t]iming . . . depends on the ACR provider." Ex. 21, TVSN_NLSN_00650281-298 at 282-83. In response, Ms. Bolivar had suggested Source as a potential provider (*id.* at 286 to 292), but informed TVision, "We are 100% committed to working with TVision regardless of the ACR provider and even with doing our own ACR using Source's original algorithm, our company will continue to maintain a neutral position by supporting companies such as ACRCloud,

Mufin, MRL, etc." *Id.* at 284.  Thus, contemporaneous evidence shows that as of May 2018, VidVita could have processed fingerprints generated by TVision using ACR software supplied by ACRCloud, Mufin, MRL, or Source, and did not differentiate between those ACR systems when it provided recommendations to TVision. Ex. 20; Ex. 21.  TVision had also reached out to Axwave. D.I. 191 at 4, citing D.I. 191-D.I. 13.

### D. This Court Should Preclude Unreliable Testimony of Drs. Keeley and Dr. Kyriakakis Regarding MRL ACR Software

Dr. Kyriakakis's opinion regarding the availability of MRL's ACR software should be excluded because (1) his report does not establish that he has any knowledge of MRL's ACR software (Ex. 3, ¶¶ 475-80) , and (2) his report fails to account for the fact that Amy Bolivar, the co-founder of TVision's vendor, VidVita, recommended that TVision use MRL's ACR software.  *See id; See also,* Ex. 20 at TVSN_NLSN_00611701.  Unlike Dr. Kyriakakis, Ms. Bolivar is familiar with MRL's ACR system because she worked for MRL prior to forming VidVita, and she recommended MRL's ACR software to TVision.  Ex. 20 at TVSN_NLSN_00611701.  Under these circumstances, Dr. Kyriakakis's opinion should be excluded under Fed. R. Evid 702(b) because it is not "based on sufficient facts or data."

There is no merit to Dr. Kyriakakis's reliance on a March 2, 2017, TVision presentation that refers to a study of MRL software.  Ex. 33, ¶¶ 475-77, citing Ex. 22 attached hereto.  The presentation does not report the methodology used to conduct the study. *See* Ex. 22. For that reason, alone, the presentation fails to qualify as a report of a test that an expert would ordinarily rely upon.  *See* Fed. R. Evid. 702(c).  Second, Dr. Kyriakakis fails to recognize that the tests were conducted on mobile phones using MRL ACR software, and that the failure rate Dr. Kyriakakis refers to was entirely due to the fact that the study was done on mobile phones, not the devices TVision installs in households, which do not have the same issues picking up audio as mobile phones.  Ex. 5, ¶ 130.  Dr. Kyriakakis's reply report does not address this issue.  Ex. 7, ¶¶ 128-129.

Under very similar circumstances, the Federal Circuit approved the exclusion of an expert's first damages opinion, which was based on a study where the expert failed to consider the differences between the conditions under which the study was conducted versus the conditions under which the accused product would actually have been used. *Sound View Innovations, LLC v. Hulu, LLC*, 33 F.4th 1327, 1337-38 (Fed. Cir. 2022). The Court also approved the exclusion of an amended damages opinion, which as here, relied on a press release describing a viewer experience report. *Id.* at 1338. The expert had adopted the press release's explanation of the result, but the district court found "a key reliability problem" in the fact that the expert "did not himself see the report underlying the . . . press release." *Id.* The Federal Circuit noted that the report was properly excluded because "the press release does not include a sufficient, in-depth discussion of the study so that it can be assessed, and then compared to the accused technology." *Id.* (cleaned up). The same is true here. Dr. Kyriakakis's reliance on the March 2, 2017, study is an insufficient basis to admit his opinion, and it should be excluded.

Nor is there any basis for Dr. Kyriakakis's speculative opinion that the different mechanism used by MRL as compared with ACRCloud would be a reason TVision would not use MRL's product. Ex. 3, ¶¶ 479-80. TVision actually preferred MRL's mechanism over ACRCloud's because it simplified the aggregation of results, but TVision decided to use ACRCloud because of costs and the speed of transition. Ex. 6, ¶ 131.

### E. This Court Should Preclude Unreliable Testimony of Dr. Keeley and Dr. Kyriakakis Regarding Mufin ACR Software

Dr. Kyriakakis's opening report did not even refer to Mufin's ACR software. Paragraphs 178 to 180 of Dr. Kyriakakis's reply report (Ex. 7) should be excluded because he fails to demonstrate that he has any knowledge of Mufin's ACR software and because he fails to explain why it would not have been suitable for TVision. In this regard, Dr. Kyriakakis ignores the fact that Ms. Bolivar informed Mr. Liu that VidVita had "tested [Mufin's] ACR

with our network" and that "ACRCloud and muffin are the two top companies for licensing the technology." *Compare* Ex. 7 ¶¶ 178-180 with Ex. 20 at TVSN_NLSN_00611702. Dr. Kyriakakis also ignores the fact that TVision received a project proposal in January 2017 from Mufin that included terms regarding the cost components for the setup, pilot, and production phases of the system rollout. Ex. 12 at 53, ¶ 158.  According to a company presentation, Mufin specializes in audio fingerprint technology for ACR and touted companies, such as Kantar, Ipsos, and Starz, as being among its customers and partners. Ex. 23, TVSN_NLSN_00662112-139 at 115, 121.

Dr. Kyriakakis's sole opinion regarding Mufin is in his reply report, which states that Dr. Anderson "identifies no evidence that would show that Mufin's technology would work in TVision's environment."  *See* Ex. 7, ¶¶ 178.  This opinion ignores Ms. Bolivar's recommendation of Mufin's ACR software, which was based on testing, and it ignores Mufin's 2017 proposal.  Thus, Dr. Kyriakakis's opinion regarding the availability of Mufin ACR software should be excluded because it does not rely on sufficient facts or data.  *See* Fed. R. Evid. 702(b).

### F. This Court Should Preclude Unreliable Testimony of Dr. Keeley and Dr. Kyriakakis Regarding Other ACR Software Available in 2018

The expert reports of Dr. Keeley and Dr. Kyriakakis fail to evidence actual knowledge of any of the ACR software that was potentially available to TVision as of the time of the hypothetical negotiation in 2018.

### 1. Dat-Track

This Court should exclude the bare opinion by Dr. Kyriakakis that "Dat-Track would have been too expensive unless TVision reduced its then-current matching frequency." Ex. 3 at 136 ¶ 472; *see also*, Ex. 7 ¶¶ 183, 188.  This is mere argument based on documents produced by TVision, not testimony based on the expert's analysis of facts. Dr. Kyriakakis's statement, "I have no evidence that Dat-Track existed in 2018" shows that Dr. Kyriakakis

does not know whether Dat-Track existed or not.  Ex. 3 at 136 ¶ 473. His testimony about Dat-Track should be excluded because there is no evidence that Dr. Kyriakakis has sufficient knowledge to testify on this issue.

### 2.  Axwave

Dr. Kyriakakis criticizes Dr. Anderson based on his interpretation of publicly available articles and taking issue with Dr. Anderson's testimony that Axwave was relaunching its product. Ex. 7 at 67-68 ¶¶ 172-75.  Dr. Kyriakakis does not indicate any familiarity with Axwave at all. He does not have sufficient knowledge to testify on this issue.

### 3.  Source Digital

Dr. Kyriakakis makes no mention of the fact that Source Digital was recommended to TVision by VidVita.  Ex. 7 at 70 ¶¶ 181-82. His proposed testimony regarding Source Digital's ACR software is not based on any knowledge of the Source Digital ACR system. It is nothing more than a proxy for attorney argument.  Dr. Kyriakakis's testimony should be excluded.

## VIII.   DAUBERT MOTION TO EXCLUDE MARTIN AND KYRIAKAKIS TESTMONY BASED ON DR. MARTIN'S COMPUTER PROGRAM AND SIMULATION

All of Dr. Martin's testimony based on the program that he built, and all of Dr. Kyriakakis' opinions based on data from Dr. Martin's program should be excluded under Fed. R. Evid. 702(b)-(d).  Thus, paragraphs 106-144 of Dr. Martin's report, Ex. 8, should be excluded because Dr. Martin's opinion testimony as to whether TVision's product infringes is based entirely on Dr. Martin running a computer program that is not the program at issue, and the testimony of Drs. Martin and Kyriakakis are based on Dr. Martin's use of that program. Ex.  8 at Section VIII; Ex. 3 at ¶¶ 131, 136-44, 206-11, 252-57, 317-22, 357-62, 371-77, 386-98. Nielsen has failed to establish that Dr. Martin's and Dr. Kyriakakis' testimony is "based on sufficient facts or data,"  "is the product of reliable principles and methods," or   reflects a

"reliable application of the principles and methods to the facts of the case." Fed. R. Evid. 702 (b)-(d).

In this regard, Dr. Martin states that he "built a computer program . . . to determine whether the fingerprint generation process performs intraframe processing." Ex. 8 at 45 ¶ 130. He does not explain why it was necessary to build a computer program to prove infringement. Any evidence based on Dr. Martin's simulations should be excluded. *See*, *e.g.*, *Performance Aftermarket Parts Grp., LTD. V. TI Group Auto. Sys., Inc.*, C.A. No. H-05-4251, 2008 U.S. Dist. LEXIS 3255, at *10 (S.D. Tex. Jan. 16, 2008) (excluding computer simulation). Here, there is no evidence that the software Dr. Martin created was adequately validated or that the simulation was accurate, other than Dr. Martin's *ipse dixit* statements.

## IX. CONCLUSION

For the reasons set forth above, TVision respectfully requests that the Court grant its motions for summary judgment that the asserted claims are patent-ineligible, for summary judgment that TVision does not infringe, and to preclude Nielsen's experts from offering the opinions subject to TVision's Daubert motions.

Respectfully submitted,

/s/ Andrew E. Russell
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
4030 Wake Forest Road, Suite 300
Raleigh, NC 27609
(984) 960-2860

Benjamin D. Brown
Richard A. Koffman
Daniel McCuaig
COHEN MILSTEIN SELLERS
 & TOLL PLLC
1100 New York Ave NW, Suite 800
Washington, DC  20005
(202) 408-4600

Steig D. Olson
Sami H. Rashid
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000

Patrick D. Curran
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
11 Huntington Avenue, Suite 5200
Boston, MA 02199
(617) 712-7100

Adam B. Wolfson
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Dated: November 19, 2025

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 19, 2025, this document was served on the persons

listed below in the manner indicated:

**<u>BY EMAIL:</u>**

David E. Moore
Bindu A. Palapura
Malisa C. Dang
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
mdang@potteranderson.com

Clifford Katz
Nithya Damodharan
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800
ckatz@kelleydrye.com
ndamodharan@kelleydrye.com

Steven Yovits
Constantine Koutsoubas
Jason P. Greenhut
Douglas Lewis
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
(312) 857-7070
syovits@kelleydrye.com
ckoutsoubas@kelleydrye.com
jgreenhut@kelleydrye.com
dlewis@kelleydrye.com

Matthew Chakmakian
KELLEY DRYE & WARREN LLP
One Jefferson Road 2nd Floor
Parsippany, NJ 07054
(973) 503-5900
mchakmakian@kelleydrye.com

_/s/ Andrew E. Russell_____
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
nhoeschen@shawkeller.com
*Attorneys for Defendant*

US007783889B2

(12) **United States Patent**
Srinivasan

(10) **Patent No.:**     **US 7,783,889 B2**
(45) **Date of Patent:**         **Aug. 24, 2010**

(54) **METHODS AND APPARATUS FOR GENERATING SIGNATURES**

(75) Inventor: **Venugopal Srinivasan**, Palm Harbor, FL (US)

(73) Assignee: **The Nielsen Company (US), LLC**, Schaumburg, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 199 days.

(21) Appl. No.: **11/676,452**

(22) Filed: **Feb. 19, 2007**

(65) **Prior Publication Data**

US 2007/0274537 A1     Nov. 29, 2007

**Related U.S. Application Data**

(63) Continuation of application No. PCT/US2005/029623, filed on Aug. 18, 2005.

(60) Provisional application No. 60/603,024, filed on Aug. 18, 2004.

(51) **Int. Cl.**
***H04L 9/00***        (2006.01)

(52) **U.S. Cl.** ........................ **713/179**; 713/176; 725/19; 725/20; 380/202; 380/239; 381/94.3

(58) **Field of Classification Search** ................ 713/160, 713/176, 179; 380/202, 206, 207, 239, 253, 380/229; 382/100, 232, 240, 191; 381/94.3; 375/134; 704/268, 273; 725/19, 20
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,230,990 A    10/1980  Lert, Jr. et al.

(Continued)

FOREIGN PATENT DOCUMENTS

AU           718227       11/1997

(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office, "PCT International Search Report," issued by the International Searching Authority of the United States Patent and Trademark Office on Feb. 6, 2008, in connection with a counterpart international application No. PCT/US2005/029623 (3 pages).

(Continued)

*Primary Examiner*—Nasser Moazzami
*Assistant Examiner*—Shanto M Abedin
(74) *Attorney, Agent, or Firm*—Hanley, Flight and Zimmerman, LLC

(57) **ABSTRACT**

Methods, apparatus, and articles of manufacture for media monitoring are disclosed. In particular, the example methods, apparatus, and articles of manufacture generate digital spectral signatures for use in identifying media information. Initially, a frame of media samples is obtained. A first frequency component having a first spectral power and a second frequency component having a second spectral power are identified by performing a spectral transform operation on the frame of media samples. A descriptor of the first frame of media samples is determined based on a comparison of the first spectral power and the second spectral power. A first signature is then generated based on the descriptor.

**17 Claims, 12 Drawing Sheets**



**Ex. 1**

US 7,783,889 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,450,531 A | | 5/1984 | Kenyon et al. |
| 4,677,466 A | * | 6/1987 | Lert et al. .................... 725/22 |
| 4,697,209 A | * | 9/1987 | Kiewit et al. ................. 725/19 |
| 4,739,398 A | | 4/1988 | Thomas et al. |
| 4,843,562 A | | 6/1989 | Kenyon et al. |
| 4,931,871 A | | 6/1990 | Kramer |
| 4,945,412 A | | 7/1990 | Kramer |
| 4,947,436 A | | 8/1990 | Greaves et al. |
| 5,019,899 A | | 5/1991 | Boles et al. |
| 5,436,653 A | | 7/1995 | Ellis et al. |
| 5,437,050 A | | 7/1995 | Lamb et al. |
| 5,450,490 A | * | 9/1995 | Jensen et al. ................ 380/253 |
| 5,481,294 A | | 1/1996 | Thomas et al. |
| 5,485,518 A | | 1/1996 | Hunter et al. |
| 5,504,518 A | | 4/1996 | Ellis et al. |
| 5,572,246 A | | 11/1996 | Ellis et al. |
| 5,581,658 A | | 12/1996 | O'Hagan et al. |
| 5,612,729 A | | 3/1997 | Ellis et al. |
| 5,621,454 A | | 4/1997 | Ellis et al. |
| 5,809,160 A | | 9/1998 | Powell et al. |
| 5,822,436 A | | 10/1998 | Rhoads |
| 5,826,164 A | | 10/1998 | Weinblatt |
| 5,875,122 A | | 2/1999 | Acharya |
| 5,909,518 A | | 6/1999 | Chui |
| 5,918,223 A | | 6/1999 | Blum et al. |
| 6,061,793 A | * | 5/2000 | Tewfik et al. ............... 713/176 |
| 6,072,888 A | | 6/2000 | Powell et al. |
| 6,122,392 A | | 9/2000 | Rhoads |
| 6,175,627 B1 | | 1/2001 | Petrovic et al. |
| 6,226,387 B1 | * | 5/2001 | Tewfik et al. ............... 382/100 |
| 6,230,176 B1 | | 5/2001 | Mizutani |
| 6,240,062 B1 | | 5/2001 | Kozaki et al. |
| 6,253,182 B1 | * | 6/2001 | Acero ......................... 704/268 |
| 6,266,430 B1 | | 7/2001 | Rhoads |
| 6,272,176 B1 | * | 8/2001 | Srinivasan ................. 375/240 |
| 6,330,335 B1 | | 12/2001 | Rhoads |
| 6,366,937 B1 | | 4/2002 | Shridhar et al. |
| 6,385,330 B1 | | 5/2002 | Powell et al. |
| 6,404,898 B1 | | 6/2002 | Rhoads |
| 6,421,445 B1 | | 7/2002 | Jensen et al. |
| 6,459,803 B1 | | 10/2002 | Powell et al. |
| 6,466,670 B1 | | 10/2002 | Tsuria et al. |
| 6,469,749 B1 | | 10/2002 | Dimitrova et al. |
| 6,496,591 B1 | | 12/2002 | Rhoads |
| 6,504,870 B2 | * | 1/2003 | Srinivasan ................. 375/240 |
| 6,513,161 B2 | * | 1/2003 | Wheeler et al. ............. 725/14 |
| 6,542,620 B1 | | 4/2003 | Rhoads |
| 6,560,349 B1 | | 5/2003 | Rhoads |
| 6,560,350 B2 | | 5/2003 | Rhoads |
| 6,567,780 B2 | | 5/2003 | Rhoads |
| 6,574,594 B2 | | 6/2003 | Pitman et al. |
| 6,597,405 B1 | | 7/2003 | Iggulden |
| 6,604,072 B2 | | 8/2003 | Pitman et al. |
| 6,614,915 B2 | | 9/2003 | Powell et al. |
| 6,633,651 B1 | | 10/2003 | Hirzalla et al. |
| 6,647,129 B2 | | 11/2003 | Rhoads |
| 6,647,130 B2 | | 11/2003 | Rhoads |
| 6,675,383 B1 | | 1/2004 | Wheeler et al. |
| 6,678,392 B2 | | 1/2004 | Powell et al. |
| 6,714,683 B1 | | 3/2004 | Tian et al. |
| 6,757,407 B2 | * | 6/2004 | Bruckstein et al. .......... 382/100 |
| 6,799,274 B1 | * | 9/2004 | Hamlin ...................... 713/176 |

| | | | |
|---|---|---|---|
| 6,839,673 B1 | * | 1/2005 | Choi et al. .................. 704/273 |
| 6,959,386 B2 | | 10/2005 | Rhoads |
| 6,968,337 B2 | | 11/2005 | Wold |
| 6,971,010 B1 | * | 11/2005 | Abdel-Mottaleb .......... 713/176 |
| 7,006,555 B1 | * | 2/2006 | Srinivasan ................. 375/133 |
| 7,073,065 B2 | * | 7/2006 | Stone ......................... 713/176 |
| 7,120,562 B1 | * | 10/2006 | Wilson ....................... 702/189 |
| 7,221,902 B2 | * | 5/2007 | Kopra et al. ............ 455/3.05 |
| 7,269,338 B2 | * | 9/2007 | Janevski ..................... 386/96 |
| 7,284,128 B2 | * | 10/2007 | Sako ......................... 713/176 |
| 7,512,801 B1 | | 3/2009 | Akiyama et al. |
| 7,562,012 B1 | | 7/2009 | Wold et al. |
| 2001/0005823 A1 | | 6/2001 | Fischer et al. |
| 2001/0029580 A1 | | 10/2001 | Moskowitz |
| 2002/0178410 A1 | | 11/2002 | Haitsma et al. |
| 2002/0186768 A1 | | 12/2002 | Dimitrova et al. |
| 2003/0005430 A1 | | 1/2003 | Kolessar |
| 2003/0036910 A1 | * | 2/2003 | Van Der Veen et al. ..... 704/500 |
| 2003/0086341 A1 | | 5/2003 | Wells et al. |
| 2003/0131350 A1 | | 7/2003 | Peiffer et al. |
| 2003/0156827 A1 | * | 8/2003 | Janevski ..................... 386/96 |
| 2003/0223584 A1 | * | 12/2003 | Bradley et al. ............. 380/22 |
| 2004/0122679 A1 | | 6/2004 | Neuhauser et al. |
| 2004/0210922 A1 | | 10/2004 | Peiffer et al. |
| 2005/0257064 A1 | * | 11/2005 | Boutant et al. ............. 713/180 |
| 2006/0107057 A1 | * | 5/2006 | Lewis et al. ................. 713/176 |
| 2006/0184961 A1 | | 8/2006 | Lee et al. |
| 2006/0195861 A1 | * | 8/2006 | Lee .............................. 725/19 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 747044 | 9/2000 |
| EP | 0887958 | 12/1998 |
| EP | 0987855  A2 | 3/2000 |
| JP | 3173291 | 7/1991 |
| WO | WO0079709 | 12/2000 |
| WO | WO02065782 | 8/2002 |
| WO | 2005/006768 | 1/2005 |

### OTHER PUBLICATIONS

Graps, Amara, "An Introduction to Wavelets," Institute of Electrical and Electronics Engineers, Inc., Summer 1995, Los Alamitos, USA (18 pages).

Haitsma et al., "Robust Audio Hashing for Content Identification," Philips Research, Eindhoven, NL, http://cite.seer.ist.psu.edu/haitsma01robust.html, 2001 (8 pages).

Conner, Margery, "Advantages of the Sliding-Mode DFT," www.edn.com, Jan. 9, 2002 (1 page).

International Preliminary Examining Authority, "PCT International Preliminary Examination Report," issued by the United States Patent and Trademark Office on May 6, 2008, in connection with a counterpart international applicaton No. PCT/US2005/029623 (9 pages).

Mexican Institute of Industrial Property issued on Jul. 16, 2009, The result of Substantive Examination (including English Translation) in Mexican patent application No. MX/a/2007/002071, 3 pages with 3 pages English Translation.

Jeffrey D. Taft, PhD., "DSP Design Performance—Breaking barriers in Digital Signal Processing...with new design tools," 2001, [retrieved from http://www.nauticom.net/www.jdtaft/DFT_increm.htm, accessed on Jan. 19, 2004], 1 page.

Schneider et al., "A Robust Content Based Digital Signature for Image Authentication," Columbia University, 1996, 4 pages.

* cited by examiner

**Ex. 1**



FIG. 1A

**Ex. 1**



FIG. 1B

Ex. 1



FIG. 2



FIG. 3

Ex. 1



FIG. 4

Ex. 1



FIG. 5

Ex. 1



FIG. 6

Ex. 1



FIG. 7

Ex. 1



FIG. 8



FIG. 9

Ex. 1



FIG. 10



FIG. 11

Ex. 1



FIG. 12

Ex. 1

US 7,783,889 B2

**1**

## METHODS AND APPARATUS FOR GENERATING SIGNATURES

### RELATED APPLICATIONS

This patent is a continuation of International Patent Application Ser. No. PCT/US2005/029623, filed Aug. 18, 2005, which claims priority to U.S. Provisional Application 60/603, 024, filed on Aug. 18, 2004, both of which are hereby incorporated herein by reference in their entireties.

### FIELD OF THE DISCLOSURE

The present disclosure relates generally to media monitoring and, more particularly, to methods and apparatus for generating signatures for use in identifying media information.

### BACKGROUND

Identifying media information and more specifically audio streams (e.g., audio information) using signature-matching techniques is well known. Known signature-matching techniques are often used in television and radio audience metering applications and are implemented using several known methods for generating and matching signatures. For example, in television audience metering applications, signatures are generated at monitoring sites (e.g., monitored households) and reference sites. Monitoring sites typically include locations such as, for example, households where the media consumption of audience members is monitored. For example, at a monitoring site, monitored signatures may be generated based on audio streams associated with a selected channel, radio station, etc. The monitored signatures may then be sent to a central data collection facility for analysis. At a reference site, signatures, typically referred to as reference signatures, are generated based on known programs that are provided within a broadcast region. The reference signatures may be stored at the reference site and/or a central data collection facility and compared with monitored signatures generated at monitoring sites. A monitored signature may be found to match with a reference signature and the known program corresponding to the matching reference signature may be identified as the program that was presented at the monitoring site.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1**A and **1**B illustrate example audio stream identification systems for generating digital spectral signatures and identifying audio streams.

FIG. **2** is a time-domain representation of an example monitored audio stream and a plurality of audio sample frames acquired from the monitored audio stream.

FIG. **3** is a time-domain representation of an example reference audio stream and a plurality of audio sample frames acquired from the example reference audio stream.

FIG. **4** is a flow diagram of an example method for generating digital spectral signatures based on spectral decompositions.

FIG. **5** is a flow diagram of an example method for generating descriptors associated with the example method of FIG. **4**.

FIG. **6** is a flow diagram of another example method for generating digital spectral signatures based on spectral decompositions.

FIG. **7** is a flow diagram of an example method for generating descriptors associated with the example method of FIG. **6**.

**2**

FIG. **8** is a flow diagram of an example method for comparing the digital spectral signatures generated using the example methods of FIGS. **4-7**.

FIG. **9** is a block diagram of an example signature generation system for generating digital spectral signatures based on audio streams.

FIG. **10** is a block diagram of another example signature generation system for generating digital spectral signatures based on audio streams.

FIG. **11** is a block diagram of an example signature comparison system for comparing digital spectral signatures.

FIG. **12** is a block diagram of an example processor system that may be used to implement the methods and apparatus described herein.

### DETAILED DESCRIPTION

Although the following discloses example systems including, among other components, software executed on hardware, it should be noted that such systems are merely illustrative and should not be considered as limiting. For example, it is contemplated that any or all of these hardware and software components could be embodied exclusively in hardware, exclusively in software, or in any combination of hardware and software. Accordingly, while the following describes example systems, persons of ordinary skill in the art will readily appreciate that the examples provided are not the only way to implement such systems.

The methods and apparatus described herein generally relate to generating digital spectral signatures, which may be used to identify media information. In particular, the disclosed methods and apparatus are described with respect to generating digital spectral signatures based on audio streams (e.g., audio information). However, the methods and apparatus described herein may also be used to generate digital spectral signatures based on any other type of media information such as, for example, video information, web pages, still images, computer data, etc. Further, the media information may be associated with broadcast information (e.g., television information, radio information, etc.), information reproduced from any storage medium (e.g., compact discs (CD), digital versatile discs (DVD), etc.), or any other information that is associated with an audio stream, a video stream, or any other media information for which the digital spectral signatures are generated. In one particular example, the audio streams are identified based on digital spectral signatures that include monitored digital signatures generated at a monitoring site (e.g., a monitored household) and reference digital signatures generated and/or stored at a reference site and/or a central data collection facility.

As described in detail below, the methods and apparatus described herein identify media information including audio streams based on digital spectral signatures. The digital spectral signatures may be formed using digital descriptors that are generated based on the spectral components of an audio stream and that may be analyzed using frequency transforms and/or wavelet transforms.

Unlike known methods in the prior art that use interframe operations (e.g., operations based on sample data within different data sample frames) to generate digital spectral signatures, the methods and apparatus described herein may be implemented using intraframe operations (e.g., operations based on sample data within a single frame). Intraframe operations may include, for example, comparison operations, determining percentage differences between values, etc. that are performed on two or more values (e.g., spectral power values) that are uniquely associated with or derived from a single frame. For example, using the methods and apparatus described herein, a digital spectral signature may be generated by obtaining a frame of media samples, determining

Ex. 1

US 7,783,889 B2

3

spectral power values by performing a spectral transform (e.g., a FFT, a wavelet transform, etc.) on the frame of media samples, and performing an intraframe operation (e.g., a comparison) based on two or more spectral power values that are uniquely associated with the frame of media samples.

Frequency components of an audio signal are typically generated by transforming the audio signal data (e.g., an audio stream) from the time domain to the frequency domain using, for example, a Fourier Transform. The Fourier Transform can be used to analyze the frequency components in an audio stream and identify the spectral power of each frequency component. The spectral powers may then be used to generate digital spectral signatures.

Digital spectral signatures may also be generated based on wavelet transforms which transform audio data from the time domain to the wavelet domain. In general, wavelet transforms may be used to decompose blocks or frames of data (e.g., time domain audio samples) into multiple sub-bands, thereby allowing data sets to be analyzed at various scales and/or resolutions. By separating data into multiple sub-bands, a wavelet transform may be used to analyze each time interval of data at a desired scale or resolution.

Monitored signatures may be generated at a monitoring site based on audio streams associated with media information (e.g., a monitored audio stream) that is consumed by an audience. For example, a monitored signature may be generated based on the audio track of a television program presented at a monitoring site. The monitored signature may then be communicated to a central data collection facility for comparison to one or more reference signatures.

Reference signatures are generated at a reference site and/or a central data collection facility based on audio streams associated with known media information. The known media information may include media that is broadcast within a region, media that is reproduced within a household, media that is received via the internet, etc. Each reference signature is stored in a memory with media identification information such as, for example, a song title, a movie title, etc. When a monitored signature is received at the central data collection facility, the monitored signature is compared with one or more reference signatures until a match is found. This match information may then be used to identify the media information (e.g., monitored audio stream) from which the monitored signature was generated. For example, a look-up table or a database may be referenced to retrieve a media title, a program identity, an episode number, etc. that corresponds to the media information from which the monitored signature was generated.

As described below in connection with FIGS. 2 and 3, more reference signatures are generated at a reference site and/or a central data collection facility for a given audio stream than monitored signatures generated for a given audio stream at a monitoring site. In particular, the reference signatures generated for an audio stream (i.e., a reference audio stream) overlap in time. More specifically, the starting reference time or timestamp of each reference signature is shifted by a relatively small amount of time from the starting reference time or timestamp of a previous reference signature. In this manner, a monitored signature generated at a monitoring site and having a substantially arbitrary reference time may be aligned and/or matched with at least one of the reference signatures generated for a reference audio stream. As a result of the relatively fewer number of monitored signatures generated at the monitoring site, monitored signatures may be generated by processor systems and/or hardware devices having relatively less computing power and/or memory than processor systems and/or hardware devices used to generate reference signatures.

FIGS. 1A and 1B illustrate example audio stream identification systems 100 and 150 for generating digital spectral

4

signatures and identifying audio streams. The example audio stream identification systems 100 and 150 may be implemented as a television broadcast information identification system and a radio broadcast information identification system, respectively. The example audio stream identification system 100 includes a monitoring site 102 (e.g., a monitored household), a reference site 104, and a central data collection facility 106.

Monitoring television broadcast information involves generating monitored signatures at the monitoring site 102 based on the audio data of television broadcast information and communicating the monitored signatures to the central data collection facility 106 via a network 108. Reference signatures may be generated at the reference site 104 and may also be communicated to the central data collection facility 106 via the network 108. The audio content represented by a monitored signature that is generated at the monitoring site 102 may be identified at the central data collection facility 106 by comparing the monitored signature to one or more reference signatures until a match is found. Alternatively, monitored signatures may be communicated from the monitoring site 102 to the reference site 104 and compared one or more reference signatures at the reference site 104. In another example, the reference signatures may be communicated to the monitoring site 102 and compared with the monitored signatures at the monitoring site 102.

The monitoring site 102 may be, for example, a household for which the media consumption of an audience is monitored. In general, the monitoring site 102 may include a plurality of media delivery devices 110, a plurality of media presentation devices 112, and a signature generator 114 that is used to generate monitored signatures associated with media presented at the monitoring site 102.

The plurality of media delivery devices 110 may include, for example, set top box tuners (e.g., cable tuners, satellite tuners, etc.), DVD players, CD players, radios, etc. Some or all of the media delivery devices 110 such as, for example, set top box tuners may be communicatively coupled to one or more broadcast information reception devices 116, which may include a cable, a satellite dish, an antenna, and/or any other suitable device for receiving broadcast information. The media delivery devices 110 may be configured to reproduce media information (e.g., audio information, video information, web pages, still images, etc.) based on, for example, broadcast information and/or stored information. Broadcast information may be obtained from the broadcast information reception devices 116 and stored information may be obtained from any information storage medium (e.g., a DVD, a CD, a tape, etc.). The media delivery devices 110 are communicatively coupled to the media presentation devices 112 and configurable to communicate media information to the media presentation devices 112 for presentation. The media presentation devices 112 may include televisions having a display device and/or a set of speakers by which audience members consume, for example, broadcast television information, music, movies, etc.

The signature generator 114 may be used to generate monitored digital signatures based on audio information as described in greater detail below. In particular, at the monitoring site 102, the signature generator 114 may be configured to generate monitored signatures based on monitored audio streams that are reproduced by the media delivery devices 110 and/or presented by the media presentation devices 112. The signature generator 114 may be communicatively coupled to the media delivery devices 110 and/or the media presentation devices 112 via an audio monitoring interface 118. In this manner, the signature generator 114 may obtain audio streams associated with media information that is reproduced by the media delivery devices 110 and/or presented by the media presentation devices 112. Additionally or alternatively,

**Ex. 1**

US 7,783,889 B2

5

the signature generator **114** may be communicatively coupled to microphones (not shown) that are placed in proximity to the media presentation devices **112** to detect audio streams. The signature generator **114** may also be communicatively coupled to the central data collection facility **106** via the network **108**.

The network **108** may be used to communicate signatures (e.g., digital spectral signatures), control information, and/or configuration information between the monitoring site **102**, the reference site **104**, and the central data collection facility **106**. Any wired or wireless communication system such as, for example, a broadband cable network, a DSL network, a cellular telephone network, a satellite network, and/or any other communication network may be used to implement the network **108**.

As shown in FIG. **1A**, the reference site **104** may include a plurality of broadcast information tuners **120**, a reference signature generator **122**, a transmitter **124**, a database or memory **126**, and broadcast information reception devices **128**. The reference signature generator **122** and the transmitter **124** may be communicatively coupled to the memory **126** to store reference signatures therein and/or to retrieve stored reference signatures therefrom.

The broadcast information tuners **120** may be communicatively coupled to the broadcast information reception devices **128**, which may include a cable, an antenna, a satellite dish, and/or any other suitable device for receiving broadcast information. Each of the broadcast information tuners **120** may be configured to tune to a particular broadcast channel. In general, the number of tuners at the reference site **104** is equal to the number of channels available in a particular broadcast region. In this manner, reference signatures may be generated for all of the media information transmitted over all of the channels in a broadcast region. The audio portion of the tuned media information may be communicated from the broadcast information tuners **120** to the reference signature generator **122**.

The reference signature generator **122** may be configured to obtain the audio portion of all of the media information that is available in a particular broadcast region. The reference signature generator **122** may then generate a plurality of reference signatures (as described in greater detail below) based on the audio information and store the reference signatures in the memory **126**. Although one reference signature generator is shown in FIG. **1**, a plurality of reference signature generators may be used in the reference site **104**. For example, each of the plurality of signature generators may be communicatively coupled to a respective one of the broadcast information tuners **120**.

The transmitter **124** may be communicatively coupled to the memory **126** and configured to retrieve signatures therefrom and communicate the reference signatures to the central data collection facility **106** via the network **108**.

The central data collection facility **106** may be configured to compare monitored signatures received from the monitoring site **102** to reference signatures received from the reference site **104**. In addition, the central data collection facility **106** may be configured to identify monitored audio streams by matching monitored signatures to reference signatures and using the matching information to retrieve television program identification information (e.g., program title, broadcast time, broadcast channel, etc.) from a database. The central data collection facility **106** includes a receiver **130**, a signature analyzer **132**, and a memory **134**, all of which are communicatively coupled as shown.

The receiver **130** may be configured to receive monitored signatures and reference signatures via the network **108**. The receiver **130** is communicatively coupled to the memory **134** and configured to store the monitored signatures and the reference signatures therein.

6

The signature analyzer **132** may be used to compare reference signatures to monitored signatures. The signature analyzer **132** is communicatively coupled to the memory **134** and configured to retrieve the monitored signatures and the reference signatures from the same. The signature analyzer **132** may be configured to retrieve reference signatures and monitored signatures from the memory **134** and compare the monitored signatures to the reference signatures until a match is found. The memory **134** may be implemented using any machine accessible information storage medium such as, for example, one or more hard drives, one or more optical storage devices, etc.

Although the signature analyzer **132** is located at the central data collection facility **106** in FIG. **1A**, the signature analyzer **132** may instead be located at the reference site **104**. In such a configuration, the monitored signatures may be communicated from the monitoring site **102** to the reference site **104** via the network **108**. Alternatively, the memory **134** may be located at the monitoring site **102** and reference signatures may be added periodically to the memory **134** via the network **108** by transmitter **124**. Additionally, although the signature analyzer **132** is shown as a separate device from the signature generators **114** and **122**, the signature analyzer **132** may be integral with the reference signature generator **122** and/or the signature generator **114**. Still further, although FIG. **1** depicts a single monitoring site (i.e., the monitoring site **102**) and a single reference site (i.e., the reference site **104**), multiple such sites may be coupled via the network **108** to the central data collection facility **106**.

The audio stream identification system **150** of FIG. **1B** may be configured to monitor and identify audio streams associated with radio broadcast information. In general, the audio stream identification system **150** is used to monitor the content that is broadcast by a plurality of radio stations in a particular broadcast region. Unlike the audio stream identification system **100** used to monitor television content consumed by an audience, the audio stream identification system **150** may be used to monitor music, songs, etc. that are broadcast within a broadcast region and the number of times that they are broadcast. This type of media tracking may be used to determine royalty payments, proper use of copyrights, etc. associated with each audio composition. The audio stream identification system **150** includes a monitoring site **152**, a central data collection facility **154**, and the network **108**.

The monitoring site **152** is configured to receive all radio broadcast information that is available in a particular broadcast region and generate monitored signatures based on the radio broadcast information. The monitoring site **152** includes the plurality of broadcast information tuners **120**, the transmitter **124**, the memory **126**, and the broadcast information reception devices **128**, all of which are described above in connection with FIG. **1A**. In addition, the monitoring site **152** includes a signature generator **156**. When used in the audio stream identification system **150**, the broadcast information reception devices **128** are configured to receive radio broadcast information and the broadcast information tuners **120** are configured to tune to the radio broadcast stations. The number of broadcast information tuners **120** at the monitoring site **152** may be equal to the number of radio broadcasting stations in a particular broadcast region.

The signature generator **156** is configured to receive the tuned to audio information from each of the broadcast information tuners **120** and generate monitored signatures for the same. Although one signature generator is shown (i.e., the signature generator **156**), the monitoring site **152** may include multiple signature generators, each of which may be communicatively coupled to one of the broadcast information tuners **120**. The signature generator **156** may store the monitored signatures in the memory **126**. The transmitter **124** may

US 7,783,889 B2

7

retrieve the monitored signatures from the memory **126** and communicate them to the central data collection facility **154** via the network **108**.

The central data collection facility **154** is configured to receive monitored signatures from the monitoring site **152**, generate reference signatures based on reference audio streams, and compare the monitored signatures to the reference signatures. The central data collection facility **154** includes the receiver **130**, the signature analyzer **132**, and the memory **134**, all of which are described in greater detail above in connection with FIG. **1A**. In addition, the central data collection facility **154** includes a reference signature generator **158**.

The reference signature generator **158** is configured to generate reference signatures based on reference audio streams. The reference audio streams may be stored on any type of machine accessible medium such as, for example, a CD, a DVD, a digital audio tape (DAT), etc. In general, artists and/or record producing companies send their audio works (i.e., music, songs, etc.) to the central data collection facility **154** to be added to a reference library. The reference signature generator **158** may read the audio data from the machine accessible medium and generate a plurality of reference signatures based on each audio work (e.g., the reference audio stream **302** of FIG. **3**). The reference signature generator **158** may then store the reference signatures in the memory **134** for subsequent retrieval by the signature analyzer **132**. Identification information (e.g., song title, artist name, track number, etc.) associated with each reference audio stream may be stored in a database and may be indexed based on the reference signatures. In this manner, the central data collection facility **154** includes a database of reference signatures and identification information corresponding to all known and available song titles.

The receiver **130** is configured to receive monitored signatures from the network **108** and store the monitored signatures in the memory **134**. The monitored signatures and the reference signatures are retrieved from the memory **134** by the signature analyzer **132** for use in identifying the monitored audio streams broadcast within a broadcast region. The signature analyzer **132** may identify the monitored audio streams by first matching a monitored signature to a reference signature. The match information and/or the matching reference signature is then used to retrieve identification information (e.g., a song title, a song track, an artist, etc.) from a database stored in the memory **134**.

Although one monitoring site (e.g., the monitoring site **152**) is shown in FIG. **1B**, multiple monitoring sites may be communicatively coupled to the network **108** and configured to generate monitored signatures. In particular, each monitoring site may be located in a respective broadcast region and configured to monitor the content of the broadcast stations within a respective broadcast region.

FIG. **2** is a time-domain representation **200** of an example monitored audio stream **202** and a plurality of audio sample frames **204**, **206**, **208**, and **210** acquired from the monitored audio stream **202**. A monitored digital spectral signature is generated at a monitoring site (e.g., the monitoring site **102** of FIG. **1A** or the monitoring site **152** of FIG. **1B**) based on audio samples acquired from the example monitored audio stream **202**. The time-domain representation **200** illustrates the time relationship between the example monitored audio stream **202** and the audio sample frames **204**, **206**, **208**, and **210**, which are used to generate monitored reference signatures.

In one example, an N-bit monitored signature $S_x(t)$ is formed using one or more M-bit descriptors $B_x(t_0)$, $B_x(t_0+1)$, $B_x(t_0+2)$, $B_x(t_0+3)$. For example, a 32-bit monitored signature $S_x(t)$ includes four 8-bit descriptors $B_x(t_0)$, $B_x(t_0+1)$, $B_x(t_0+2)$, $B_x(t_0+3)$, each of which is generated based on a corresponding one of the audio sample frames **204**, **206**, **208**, and

8

**210**. More specifically, each of the descriptors is generated using one or more intraframe operations (e.g., comparison operations) based on two or more spectral components that are uniquely associated with a single audio sample frame.

The four descriptors may be generated based on spectral decompositions (e.g., frequency decompositions or wavelet decompositions) of the audio sample frames **204**, **206**, **208**, and **210** as described in detail below in connection with FIGS. **4-7**. The spectral decompositions are used to extract features that are uniquely characteristic of the example monitored audio stream **202**. In this manner, a reference signature and a monitored signature that are generated based on the same audio stream using the same signature generation method (e.g., the same spectral decomposition-based method) will include similar features, and, thus can be used to reliably identify the monitored audio stream **202** using a matching algorithm. A monitored signature may be generated by sampling the example monitored audio stream **202** to generate the audio sample frames **204**, **206**, **208**, and **210**, generating the descriptors $B_x(t_0)$, $B_0(t_0+1)$, $B_x(t_0+2)$, $B_x(t_0+3)$ based on spectral decompositions of the audio sample frames **204**, **206**, **208**, and **210**, and concatenating the descriptors.

The audio sample frames **204**, **206**, **208**, and **210** are generated by sampling the example monitored audio stream **202** during four time intervals at a sampling frequency $f_s$. For example, a sampling frequency $f_s$ of 6000 Hz will generate 6000 samples of audio data for each of the audio sample frames **204**, **206**, **208**, and **210** (assuming the sample frames are collected over one second intervals). However, any other suitable sampling frequency $f_s$ may instead be selected. As shown in FIG. **2**, the duration of each of the audio sample frames **204**, **206**, **208**, and **210** is one second (e.g., 0 to $t_0$, $t_0$ to $t_0+1$, $t_0+1$ to $t_0+2$, and $t_0+2$ to $t_0+3$). However, the duration may instead be set to any other length of time. The times within the monitored audio stream **202** during which monitored signatures are generated are substantially similar or identical to the times within a reference audio stream during which corresponding reference signatures are generated. By acquiring audio sample frames for monitored signatures and reference signatures at substantially the same times, the features extracted from a monitored audio stream (e.g., the example monitored audio stream **202**) and a corresponding reference audio stream (e.g., the example reference audio stream **302** of FIG. **3**) are substantially similar or identical. Although the audio sample frames **204**, **206**, **208**, and **210** are shown in FIG. **2** as occurring consecutively in time, the audio sample frames **204**, **206**, **208**, and **210** may occur at any time and in any sequence within the example monitored audio stream **202**.

To ensure that the monitored signature is compared with a reference signature that is generated at substantially the same time within respective audio streams, the monitored signatures may be generated relative to a reference time that is used during the signature comparison process to align a monitored signature with a reference signature. More specifically, during the generation of a monitored signature, the example monitored audio stream **202** is sampled starting at a time indicated by a reference time to, which may be selected relative to a time stamp embedded within the example monitored audio stream **202**, a system startup time, a daily recurring time (e.g., midnight), and/or any other reference time that may be indicative of the time at which a signature is generated. A signature matching system (e.g., the signature analyzer **132** of FIGS. **1A** and **1B**) uses the reference time $t_0$ to retrieve one or more reference signatures that correspond to substantially the same time within reference audio streams as indicated by the reference time $t_0$.

Additionally, one or more monitored signatures may be generated using the example monitored audio stream **202** so that multiple signatures are matched to identify the example

**Ex. 1**

US 7,783,889 B2

9

monitored audio stream **202**. For example, it is possible that one or more monitored signatures generated using the example monitored audio stream **202** are substantially similar or identical to one or more reference signatures of a reference audio stream (e.g., the example reference audio stream **302** of FIG. **3**) that does not correspond to the example monitored audio stream **202**. In this case, to decrease the possibility of erroneously identifying the wrong reference audio stream, more than one monitored signature is generated for the monitored audio stream **202**. More specifically, the signatures may be generated at multiple times throughout the example monitored audio stream **202**. In addition, a comparison algorithm may be configured to match two or more monitored signatures with corresponding reference signatures to accurately identify the example monitored audio stream **202**.

FIG. **3** is a time-domain representation **300** of an example reference audio stream **302** and a plurality of audio sample frames **304**, **306**, **308**, and **310** that may be acquired from the example reference audio stream **302**. The time-domain representation **300** shows two one second time intervals (e.g., 0 to $t_0$ and $t_0$ to $t_0+1$) and the plurality of audio sample frames **304**, **306**, **308**, and **310** that are collected during the time intervals and that are subsequently used to generate a plurality of reference signatures that are staggered in time (i.e., time shifted relative to one another). The example reference audio stream **302** is sampled at a sampling frequency $f_s$ to collect the audio sample frames **304**, **306**, **308**, and **310**, which are used to generate M-bit descriptors $B_{Rn}(t)$. One or more of the descriptors $B_{Rn}(t)$ may then be concatenated to form an N-bit reference signature $S_{Rn}(t)$. Typically, the number of descriptors in a reference signature is equal to the number of descriptors in a monitored signature. Additionally, each of the M-bit descriptors $B_{Rn}(t)$ includes the same number of bits as a corresponding M-bit descriptor $B_x(t)$ associated with the example monitored audio stream **202** (FIG. **2**) and, thus, each N-bit reference signature $S_{Rn}(t)$ includes the same number of bits as a corresponding N-bit monitored signature $S_x(t)$.

Multiple reference signatures are generated for the example reference audio stream **302** in a manner that causes the reference signatures to be time-shifted relative to each other and to overlap in time with one another. More specifically, the start time at which a first audio sample frame (e.g., the audio sample frame **304**) of a first reference signature is collected is offset, or shifted, by an amount of time

$$\frac{1}{T_s}$$

from the start time at which a first audio sample frame (e.g., the audio sample frame **308**) of a second reference signature is collected. The value $T_s$ is associated with a number of equal segments ("sample segments") into which each time interval (e.g., $t_0$ to $t_0+1$) is divided. For example, if the number of sample segments $T_s$ in a time interval of one second is set equal to thirty, the collection of a new data set will begin every

$$\frac{1}{30} \cdot th$$

of a second. In addition, if the sampling frequency $f_s$ is set equal to 6000 Hz, each sample segment will include 200 samples.

Each audio sample frame is used to generate a single signature. More specifically, an audio sample frame is collected using a predetermined number of sample segments (e.g., the

10

sample segments **312a-312e**), which are concatenated to form the audio sample frame (e.g., the audio sample frame **304**). To achieve overlap among consecutively generated signatures, each signature is formed using an audio sample frame that partially overlaps with an audio sample frame used to form the previously generated signature. More specifically, two audio sample frames that overlap include a common set of sample segments. For example, the audio sample frames **304** and **308** include a common set of sample segments comprising the sample segments **312b-312e**. The audio sample frame **308** may be formed by extracting a common plurality of media samples or the common set of sample segments **312b-312e** from the audio sample frame **304** and appending a recently acquired sample segment (e.g., the sample segment **312f**) to the common set of sample segments **312b-312e**. In addition, two audio sample frames that overlap also contain sample segments that are exclusive to one or the other of the audio sample frames (i.e., audio sample frames that overlap also contain sample segments that occur in one or the other of the audio sample frames but do not occur in both frames).

To further illustrate the generation of reference signatures that are time shifted and overlapped, each reference signature is formed by four reference descriptors

$$B_{Ro}\left(t_0 + \frac{k}{T_s}\right),\ B_{Ro}\left(t_0 + \frac{k}{T_s} + 1\right),\ B_{Ro}\left(t_0 \frac{k}{T_s} + 2\right),\ B_{Ro}\left(t_0 + \frac{k}{T_s} + 3\right).$$

The four reference descriptors are separated by one-second time intervals and are shifted by

$$\frac{k}{T_s}$$

seconds with respect to the reference time $T_0$, where $0 \leqq k < T_s$. For example, the audio sample frames **304** and **306** (generated at

$$t_0 + \frac{0}{T_s} \text{ and } t_0 + \frac{0}{T_s} + 1\right),$$

respectively, in combination with two other audio sample frames generated at

$$t_0 + \frac{0}{T_s} + 2 \text{ and } t_0 + \frac{0}{T_s} + 3$$

(not shown), are used to generate four descriptors that form a first reference signature. Additionally, the audio sample frames **308** and **310** (generated at

$$\left(t_0 + \frac{1}{T_s}\right) \text{and} \left(t_0 + \frac{1}{T_s} + 1\right),$$

respectively, are used with two other audio sample frames generated at

**Ex. 1**

US 7,783,889 B2

11

12

$$\left(t_0 + \frac{1}{T_s} + 2\right) \text{and} \left(t_0 + \frac{1}{T_s} + 3\right)$$

(not shown) to generate four descriptors that form a second reference signature that is time shifted relative to the first reference signature by

$$\frac{1}{T_s}$$

seconds. As described below in connection with FIG. 5, each of the reference descriptors is generated using one or more operations (e.g., comparison operations) based on two or more spectral components that are both associated with the same audio sample frame. These operations are referred to as intraframe operations because they are performed using data exclusive to a single audio frame and are not dependent on sample data collected over other audio frames.

During an example sample acquisition process, the sample segments $312a$-$312e$ are collected and are used to form the first audio sample frame 304, which is subsequently used to determine a descriptor. This descriptor is then used to form part of a first reference signature. Then, a new sample segment $312f$ is collected and a second audio sample frame 308 is formed using sample segments $312b$-$312f$. The second audio sample frame 308 is then used to determine a reference descriptor which is used to form part of a second reference signature. Thus, the first and second audio sample frames 304 and 308 include a common set of sample segments $312b$-$312e$ and each of the first and second audio sample frames additionally include a sample segment not included in the other (i.e., the first audio sample frame 304 includes sample segment $312a$ and the second audio sample frame 308 includes sample segment $312f$). In this manner, the first and second reference signatures are generated using data collected at points in the audio stream that are staggered or shifted in time by

$$\frac{1}{T_s}$$

seconds and are generated using data that overlaps. In addition, the amount by which the first and second signatures are shifted can be adjusted by changing the value of $T_S$ thereby permitting the resolution of the signatures to vary as desired. Specifically, if a set of signatures that represents an audio stream with a greater resolution is desired, $T_S$ can be increased accordingly. Likewise, if less resolution is desired, $T_S$ can be decreased. As will be appreciated by one having ordinary skill in the art, the value of $T_S$ may affect the quantity of signatures that can be generated for a given audio stream. For example, if the number of sample segments used to form a signature remains constant, a larger value of $T_S$ will result in forming more audio sample frames than a smaller value of $T_S$. Therefore, the amount of memory available to store the signature data may be a factor in determining the desired value of $T_S$.

As described above, in order to identify the title of a song or the title of a program associated with a particular audio stream, a set of monitored signatures generated for a monitored audio stream are compared to a database of reference signatures associated with a plurality of reference audio streams. In one example system, a signature generator (e.g., the signature generator 114 of FIG. 1A) may be configured to monitor the audio emitted by a specific television (e.g., one of the presentation devices 112 of FIG. 1A) located in the home of a specific panelist. Signatures are generated for the audio emitted by the television in the manner described above. In addition, the time at which the audio corresponding to each signature was emitted is recorded and stored as a reference time $t_0$ with the corresponding monitored signature in a memory device. A timing device (e.g., the timing device 903 of FIGS. 9 and 10) located at the monitoring site may be used to trigger the collection of the audio data for the subsequent generation of monitored signatures and to provide the corresponding data collection times (e.g., reference times $t_0$, timestamps, etc.) to the memory for storage with the corresponding signature. To enable the subsequent identification of the emitted audio, a reference site (e.g., the reference site 104 of FIG. 1A) located within the same broadcast region as a monitoring site (e.g., the monitoring site 102 of FIG. 1A) is configured to generate reference signatures corresponding to the audio broadcast on all television broadcast channels at all times of the day. A timing device (e.g., the timing device 903 of FIGS. 9 and 10) located at the reference site may be used to trigger the collection of the audio data at a set of equally spaced intervals corresponding to the time period

$$\frac{1}{T_s}$$

for the subsequent generation of the reference signatures and to provide a corresponding set of data collection times to a reference memory (e.g., the memory 126 of FIG. 1A) for storage. Thus, each reference signature is stored in a memory device located at the reference site along with timestamp data indicating the time at which the underlying audio data was collected. In one example, the timing devices (e.g., the timing device 903 of FIG. 9) located at the monitoring site and the reference site are synchronized such that the timestamps can be used to align the reference signatures with the monitored signatures to facilitate the signature matching process. Likewise, because a plurality of monitoring sites are likely to be located in the same broadcast region as a single reference site, in the same example, each of the timing devices 903 located in each such monitoring site may be synchronized with the timing device 903 located in the single reference site. However, due to the staggered arrangement of the reference signatures described above in connection with FIG. 3, the timing devices 903 at the monitoring site and the reference site do not have to be synchronized.

To compensate for offsets between the timing devices located at the monitoring sites and the reference site, the value of $T_s$ may be adjusted. The value of $T_s$ is generally selected to incrementally time shift a reference signature from a previous reference signature so that a monitored signature generated at an arbitrary reference time is highly likely to align with one of the staggered or time-shifted reference signatures. More specifically, increasing the value of $T_s$ causes the number of sample segments (e.g., the sample segments $312a$-$312f$) to increase and the offset or time shift from one reference signature to the next reference signature to decrease. This, in turn, increases the likelihood that the times at which reference signatures are generated for a given audio stream correspond to substantially similar or identical reference times at which monitored signatures are generated for the same audio stream. Signatures generated at the same times for the same program are expected to be identical or at least similar enough

US 7,783,889 B2

13

to cause a match to be detected. Thus, increasing the value of $T_z$ increases the likelihood of a match between a set of reference signatures and a set of monitored signatures corresponding to the same audio program. Additionally, assuming the timing devices located at the reference site and the monitoring site are synchronized with sufficient precision, a monitored signature generated for data collected at a time T need only be compared to each reference signature associated with the same timestamp T instead of all reference signatures generated during the same twenty-four hour period. This reduction in comparisons reduces the processing time required to find a match. Similarly, assuming there is a known error, E, between the timing devices located at a monitoring site and a reference site, each monitored signature generated at the monitoring site at a time T need only be compared to all reference signatures generated from data collected within a window of the time spanning from T−E to T+E.

In another example system (e.g., the example audio identification system 150 of FIG. 1B), a set of monitored signatures are generated for a monitored audio stream and then compared to a database of reference signatures associated with a set of reference audio streams that, ideally, represent the universe of currently available audio streams. For example, as described above, in connection with FIG. 1B, reference signatures corresponding to reference audio streams may be stored in a database that is stored in, for example, the memory 134. For each reference signature that is matched to a monitored signature, the matching information and/or the reference signature may be used to retrieve identification information (e.g., song title, song track, artist, etc.) from the database. The identification information is then used to identify the monitored audio stream. In one example, reference times $t_0$ or timestamps associated with each monitored signature may be used to identify the time (of day) at which the monitored audio streams were broadcast.

FIG. 4 is a flow diagram of an example method for generating digital spectral signatures based on spectral decompositions. In particular, the example method of FIG. 4 may be used to generate digital spectral signatures (e.g., reference signatures and/or monitored signatures) based on frequency decomposition methods using a sliding Fast Fourier transform (FFT). As is known by one having ordinary skill in the art, an FFT may be used to convert a time domain signal (e.g., the example audio streams 202 and 302 of FIGS. 2 and 3) into a frequency domain representation of the same signal which may then be used to analyze the frequency components of the converted signal.

As will be appreciated by one having ordinary skill in the art, a sliding FFT provides advantages over a conventional non-sliding FFT for generating the digital spectral signatures. Unlike a conventional non-sliding FFT, a sliding FFT can be used to incrementally compute an FFT. For example, one example approach to processing the audio streams 202 and 302 involves generating FFT data for each audio sample frame independent of any data associated with previous audio sample frames. In contrast, a sliding FFT involves generating FFT data for an audio sample frame by updating the FFT data generated in connection with a previous audio sample frame. Updating the previous frame's FFT data is less computationally expensive than generating FFT data anew for each frame causing the sliding FFT technique to be more efficient than the non-sliding conventional FFT approach. Additionally, the number of samples forming each audio sample frame (e.g., the audio sample frames 204, 206, 208, and 210 of FIG. 2 or 304, 306, 308, and 310 of FIG. 3) need not be a power of two, as is required of the non-sliding FFT approach. Thus, when using a sliding FFT, the digital spectral signatures can be generated using audio sample frames of any arbitrary size (i.e., any number of samples) that are acquired using any sampling frequency $f_s$.

14

Now turning in detail to the example method of FIG. 4, initially the example method involves obtaining an audio stream (block 402) (e.g., the example monitored audio stream 202 of FIG. 2 or the example reference audio stream 302 of FIG. 3). A reference time to described above in connection with FIGS. 2 and 3 is determined (block 404) to indicate the time within an audio stream at which a signature is generated. An initial audio sample set is then obtained (block 406). The audio samples may be obtained by sampling an analog audio stream at a sampling frequency $f_s$ and performing an analog-to-digital conversion. Alternatively, the audio samples may be obtained by extracting or acquiring samples from a digital audio stream at a sampling frequency $f_s$. The initial audio sample set may be a complete audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or 304, 306, 308, and 310 of FIG. 3) or a portion thereof. An initial FFT operation is performed on the initial audio sample set to establish an initial frequency spectrum (block 408). The method of performing a FFT is well known in the art and, thus, is not discussed in detail herein.

After the initial frequency spectrum is determined (block 408), a next set of audio samples is obtained (block 410). The sliding FFT may then be used to update the initial frequency spectrum (generated at block 408) based on two most recently collected samples $v_{N_s-2}$ and $v_{N_s-1}$ according to Equation 1 below.

$$
\begin{aligned}
a_1[J] \times \exp(\varphi_1[J]) = \quad & \text{Equation 1} \\
a_0[J] \times \exp(\varphi_0[J]) \times \exp\!\left(-\frac{i2\pi J(2)}{N_S}\right) + \\
\left(v_{N_{S}-2} \times \exp\!\left(\frac{i2\pi J(N_S-2)}{N_S}\right)\right) + \\
\left(v_{N_{S}-1} \times \exp\!\left(\frac{i2\pi J(N_S-1)}{6000}\right)\right) - \\
\left(v_0 \times \exp\!\left(-\frac{i2\pi J(2)}{N_S}\right)\right) - \left(v_1 \times \exp\!\left(-\frac{i2\pi J}{N_S}\right)\right)
\end{aligned}
$$

Equation 1 may be used to update the frequency spectrum of an audio sample frame having a sample quantity $N_s$. The spectral amplitude $a_0[J]$ and phase value $\phi_0[J]$ form the existing frequency spectrum $a_0[J] \times \exp(\phi_0[J])$, which includes the frequencies indexed by the frequency index J. When the two most recently collected audio samples $v_{N_s-2}$ and $v_{N_s-1}$ are obtained, the existing frequency spectrum $a_0[J] \times \exp(\phi_0[J])$ may be updated to determine a new frequency spectrum $a_1[J] \times \exp(\phi_1[J])$. The two most recently collected audio samples $v_{N_s-2}$ and $v_{N_s-1}$ are inserted into the audio sample frame to replace the two earliest collected samples $v_0$ and $v_1$.

As shown in Equation 1, the updated frequency spectrum $a_1[J] \times \exp(\phi_1[J])$ is determined using one or more multiplication operations, addition operations, and subtraction operations based on complex exponents, the two earliest collected samples $v_0$ and $v_1$, and the two most recently collected samples $v_{N_s-2}$ and $v_{N_s-1}$. Initially, the existing frequency spectrum $a_0[J] \times \exp(\phi_0[J])$ is multiplied by a first complex exponential value

$$\exp\!\left(-\frac{i2\pi J(2)}{N_S}\right).$$

The product of the multiplication is added to a product determined by multiplying the first most recently collected audio sample $v_{N_s-2}$ by a second complex exponential value

**Ex. 1**

US 7,783,889 B2

15

$$\exp\left(\frac{i2\pi J(N_S - 2)}{N_S}\right).$$

The result is then added to a product determined by multiplying the second most recently collected audio sample $v_{N_s-1}$ by a third complex exponential value

$$\exp\left(\frac{i2\pi J(N_S - 1)}{N_S}\right).$$

The first earliest collected audio sample $v_0$ is then multiplied by the first complex exponential value

$$\exp\left(-\frac{i2\pi J(2)}{N_S}\right)$$

and subtracted from the previous addition result. The second earliest collected audio sample $v_1$ is then multiplied by a fourth complex exponential value

$$\exp\left(-\frac{i2\pi J}{N_S}\right)$$

and subtracted from the previous subtraction result.

It is well known in the art that instabilities such as, for example, oscillation or data overflow can be substantially minimized when implementing a sliding FFT by multiplying most recently collected audio samples (e.g., the most recently collected audio samples $v_{N_s-2}$ and $v_{N_s-1}$) by a first stability factor $sf_1$ and earliest collected audio samples (e.g., the earliest collected audio samples $v_0$ and $v_1$) by a second stability factor $sf_2$. The first stability factor $sf_1$ may be set equal to a value as close as possible to one. In the case of an audio sample frame having 6000 samples, the first stability factor $sf_1$ may be set equal to 0.99995. The second stability factor $sf_2$ may be set equal to $(sf_1)^{p-1}$, where the value p is equal to the number of sample shifts required to process an audio sample frame using the sliding FFT. For example, a two-sample shift is required to update an audio sample frame based on the two most recently collected audio samples $v_{N_s-2}$ and $v_{N_s-1}$. In the case of an audio sample frame having 6000 samples, the value p may be set equal to 3000.

After the sliding FFT is determined or calculated at block 412, it is determined if a complete audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or one of the audio sample frames 304, 306, 308, and 310 of FIG. 3) has been obtained (block 414). At the monitoring sites 102 (FIG. 1A) and 152 (FIG. 1B), a complete audio sample frame is obtained when a plurality of most recently collected $N_S$ samples is obtained. For example, if an audio sample frame includes 6000 samples, a complete audio sample frame is obtained after 6000 new samples are obtained. At the reference site 104 (FIG. 1A) or the central data collection facility 154 (FIG. 1B), a complete audio sample frame is obtained when a most recently collected audio sample segment (e.g., one of the sample segments 312a-312f of FIG. 3) is obtained and a current audio sample frame is formed as described in greater detail above in connection with FIG. 3. If it is determined at block 414 that a complete audio sample frame has not been obtained, control is passed back to block 410. However, if it is

16

determined at block 414 that a complete audio sample frame has been obtained, a descriptor is generated (block 416). An example method for generating descriptors based on frequency components is described in greater detail below in connection with FIG. 5.

It is then determined if a complete descriptor set has been obtained (block 418). A descriptor set includes a predetermined number of descriptors that are used to form a signature. For example, if a 32-bit signature is formed by 8-bit descriptors, then a descriptor set includes four descriptors. If it is determined at block 418 that a complete descriptor set has not been obtained, control is passed back to block 410. However, if it is determined at block 418 that a complete descriptor set has been obtained, a digital spectral signature is generated by concatenating the descriptors of the descriptor set (block 420). After the digital spectral signature is generated (block 420), it is determined if another signature is to be generated (block 422). If another signature is to be generated, control is passed back to block 404.

FIG. 5 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 4. In particular, the example method of FIG. 5 may be used to implement block 416 of FIG. 4. An M-bit descriptor is generated by selecting M pairs of frequency components $f_{lb}$ that are uniquely associated with an audio sample frame and determining each bit of the descriptor based on intraframe comparisons of the spectral powers $P_{lb}$ of the frequency components $f_{lb}$. The frequency components $f_{lb}$ and the spectral powers $P_{lb}$ are indexed by a frequency component index l and a bit index b, where $0 \leq l < f$ index$_{max}$ and $0 \leq b < M$.

The example method initially selects a first pair of frequency components $f_{00}$ and $f_{10}$ (block 502). Although consecutive frequency components are selected (i.e., $f_{0b}$ and $f_{1b}$, $f_{2b}$ and $f_{3b}$, etc.) in the example method, the frequency components may be selected from any location in the frequency spectrum of an audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or one of the audio sample frames 304, 306, 308, and 310 of FIG. 3). However, the frequency component indexes l used to select pairs of frequency components for generating a monitored signature are the same frequency component indexes l used to select pairs of frequency components for generating a corresponding reference signature.

After the first pair of frequency components $f_{00}$ and $f_{10}$ is selected, the spectral powers $P_{00}$ and $P_{10}$ corresponding to the selected frequency components are determined (block 504). One of ordinary skill in the art will readily appreciate that the spectral power for each frequency component can be obtained based on the results of the sliding FFT performed at block 412 of FIG. 4.

A descriptor bit is determined based on the frequency components $f_{00}$ and $f_{10}$ by comparing the first spectral power $P_{00}$ with the second spectral power $P_{10}$ (block 506). If the first spectral power is greater than the second spectral power (i.e., $P_{00} > P_{10}$), the descriptor bit is set equal to one. If, instead, the first spectral power is less than or equal to the second spectral power (i.e., $P_{00} \leq P_{10}$), the descriptor bit is set equal to zero.

It is then determined if another descriptor bit is to be determined (block 508). If another descriptor bit is to be determined, another pair of frequency components is selected (e.g., $f_{21}$ and $f_{31}$) (block 510) and control is passed back to block 504. If, instead, another descriptor bit is not to be determined, the example method of FIG. 5 may be stopped.

FIG. 6 is a flow diagram of another example method for generating digital spectral signatures based on spectral decompositions. In particular, the example method of FIG. 6 may be used to generate digital spectral signatures (e.g., reference signatures and monitored signatures) based on wavelet decompositions of audio sample frames (e.g., the audio sample frames 204, 206, 208, and 210 of FIG. 2 or 304,

**Ex. 1**

US 7,783,889 B2

**17**

**306**, **308**, and **310** of FIG. **3**) using wavelet transforms. As described above, wavelet transforms may be employed to analyze data using different scales and/or resolutions by separating blocks or frames of data (e.g., the audio sample frames **204**, **206**, **208**, **210**, **304**, **306**, **308**, and **310**) into multiple sub-bands.

Initially, the example method obtains an audio stream (block **602**) (e.g., the example monitored audio stream **202** of FIG. **2** or the example reference audio stream **302** of FIG. **3**). A reference time to described above in connection with FIGS. **2** and **3** is determined (block **604**) to indicate the time within an audio stream at which a signature is generated. An audio sample frame is then obtained (block **606**). The audio sample frame may be obtained by sampling an analog audio stream at a sampling frequency $f_s$ and performing an analog-to-digital conversion. Alternatively, the audio sample frame may be obtained by extracting or acquiring samples from a digital audio stream at a sampling frequency $f_s$. Based on the Nyquist Theorem, aliasing is avoided by sampling the audio samples at frequencies ranging from zero to

$$\frac{f_s}{2}.$$

A descriptor is then determined (block **608**) based on wavelet decomposition performed using a wavelet transform. An example method for generating descriptors based on one or more wavelet decompositions is described in greater detail below in connection with FIG. **7**.

After the descriptor is generated, it is determined if a complete descriptor set has been obtained (block **610**). If a complete descriptor set has not been obtained, a next audio sample frame is obtained (block **612**) and control is passed back to block **608**. However, if a complete descriptor set has been obtained, a digital spectral signature is generated (block **614**) by concatenating the descriptors of the descriptor set. After the digital spectral signature is generated, it is determined if another signature is to be generated (block **616**). If another signature is to be generated, control is passed back to block **604**. Otherwise, the example method is stopped.

FIG. **7** is a flow diagram of an example method for generating descriptors associated with the example method of FIG. **6**. In particular, the example method of FIG. **7** may be used to implement block **608** of FIG. **6**. An M-bit descriptor is generated by performing an M-level wavelet decomposition on an audio sample frame (e.g., one of the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or one of the audio sample frames **304**, **306**, **308**, and **310** of FIG. **3**). For each level wavelet decomposition, the energy of the audio signal for each sub-band is determined and descriptors are generated based on comparisons of the sub-band energies. For each descriptor, the M-level wavelet decomposition is implemented as an intraframe operation that is performed on spectral energies that are uniquely associated with an audio sample frame. Additionally, the M-level wavelet decomposition may be implemented using any wavelet transform. For purposes of clarity, the example method of FIG. **7** is described in terms of the well-known Daubechies wavelet transform.

Initially, the example method performs a first-level wavelet decomposition (block **702**) by applying the Daubechies wavelet transform to an audio sample frame. The first application of the Daubechies wavelet transform results in a low-frequency sub-band block of filtered values $L_0$ and a high-frequency sub-band block of filtered values $H_0$, each of which includes

**18**

$$\frac{N_s}{2}$$

filtered values.

Turning in greater detail to the Daubechies wavelet transform implementation, the Daubechies coefficients $c_0$, $c_1$, $c_2$, and $c_3$ are used to generate an $N_s \times N_s$ transformation matrix in which the coefficients are arranged as shown below.

$$
\begin{bmatrix}
c_0 & c_1 & c_2 & c_3 & & & & & \\
c_3 & -c_2 & c_1 & -c_0 & & & & & \\
& & c_0 & c_1 & c_2 & c_3 & & & \\
& & c_3 & -c_2 & c_1 & -c_0 & & & \\
& & & & & & & & \\
& & & & & c_0 & c_1 & c_2 & c_3 \\
& & & & & c_3 & -c_2 & c_1 & -c_0 \\
c_2 & c_3 & & & & & & c_0 & c_1
\end{bmatrix}
$$

The coefficients are ordered in the transformation matrix, as shown above, using two dominant patterns. The odd rows include the first pattern, which is an ordering of the coefficients that functions as a smoothing filter (e.g., similar to a moving filter). The even rows include the second pattern, which is an ordering of the coefficients that functions to bring out the details of data (e.g., the audio sample frame). The transformation matrix is first applied to the entire audio sample frame (e.g., all of the $N_s$ samples) to generate filtered values that include low-frequency sub-band filtered values alternated with high-frequency sub-band filtered values. The values are de-interleaved to generate the two sub-band blocks $L_0$ and $H_0$, each of which includes

$$\frac{N_s}{2}$$

samples. The low-frequency sub-band block $L_0$ includes filtered values that are associated with sub-band frequencies ranging from zero to

$$\frac{f_s}{4}.$$

The high-frequency sub-band block $H_0$ includes filtered values that are associated with sub-band frequencies ranging from

$$\frac{f_s}{4} \text{ to } \frac{f_s}{2}.$$

An

$$\frac{N_s}{2} \times \frac{N_s}{2}$$

transformation matrix of the Daubechies coefficients is then applied to the low-frequency sub-band block $L_0$ to generate

**Ex. 1**

19 20

two additional sub-band blocks $L_1$ and $H_1$. For each transformation, the number of filtered values in each sub-band block is halved. Additionally, for each transformation, a descriptor is generated based on a high-frequency sub-band block (e.g., $H_0, H_1, H_2$, etc.). Further details related to the implementation of wavelet transforms are well known in the art and are not described herein.

After the first-level wavelet transform is applied, the high-frequency sub-band block $H_0$ is parsed by separating the filtered values into a first half and a second half (block 704). Next, at a block 706, a first energy value $E_0$ is determined by squaring and summing the filtered values of the first half of the high-frequency sub-band block $H_0$ and a second energy value $E_1$ is also determined (block 706) by squaring and summing the filtered values of the second half of the high-frequency sub-band block $H_0$.

A descriptor bit is determined by comparing the first energy value $E_0$ with the second energy value $E_1$ (block 708). For example, if the first energy value $E_0$ is greater than the second energy value $E_1$ (i.e., $E_0 > E_1$), the first descriptor bit is set equal to one. If the first energy value $E_0$ is less than or equal to the second energy value $E_1$ (i.e., $E_0 \leq E_1$), the first descriptor bit is set equal to zero. It is then determined if another descriptor bit is to be determined (block 710). If another descriptor bit is to be determined, a next-level wavelet decomposition is performed (block 712). For example, as described above, if a second-level wavelet decomposition is performed, an

$$\frac{N_S}{2} \times \frac{N_S}{2}$$

transformation matrix is applied to the filtered values of the low-frequency sub-band block $L_0$ to determine filtered sub-band blocks $L_1$ and $H_1$. If it is determined at block 710 that another descriptor bit is not to be determined, the example method of FIG. 7 may be stopped.

FIG. 8 is a flow diagram of an example method for comparing the digital spectral signatures (e.g., monitored signatures and reference signatures) generated using the example methods of FIGS. 4-7. In particular, the example method may be used to compare a monitored signature with a reference signature, both of which are generated based on a sliding FFT or a wavelet transform. In general, the example method of FIG. 8 may be used to match a monitored signature with a reference signature by comparing the monitored signature with a plurality of reference signatures. Identification information (e.g., channel, program title, episode number, etc.) associated with a matching reference signature may then be retrieved from, for example, a database and used to generate media ratings information. The comparisons may be performed by comparing any number of bits from a monitored signature with the same number of bits from a reference signature such as, for example, a bit-by-bit comparison, a byte-by-byte comparison, a word-by-word comparison, etc. Due to the large number of reference signatures available for comparison, a Hamming distance may be used for the comparisons to eliminate mismatches rapidly, thereby significantly decreasing the time required to compare a monitored signature with the reference signatures.

As is known to one of ordinary skill in the art, a Hamming distance between two values may be identified by determining how many bits, numbers, characters, etc. need to be changed to make the two values equal. For example, a first binary value of 0110 and a second binary value of 0101 have a Hamming distance of two because bit location zero and bit location one need to be changed to make the first binary value equal to the second binary value.

Now turning in detail to the example method of FIG. 8, the example method involves first obtaining a monitored signature (block 802). A reference time to for the monitored signature is then obtained (block 804). A first reference signature corresponding to a time within a reference audio stream indicated by the reference time to is obtained from, for example, the memory 134 of FIGS. 1A and 1B (block 806). The first descriptor of the monitored signature and the first descriptor of the reference signature are then obtained (block 808).

The first descriptor of the monitored signature is compared to the first descriptor of the reference signature to determine if the descriptors match (block 810). If a match is detected, it is determined if all of the descriptors of the monitored signature and the reference signature have been compared (block 812). If it is determined at block 812 that all of the descriptors have not been compared, the next descriptors are obtained from the monitored signature and the reference signature (block 816) and control is passed back to block 810. If it is determined at block 812 that all of the descriptors have been compared, the monitored audio stream is identified based on the matching reference signature (block 814). Alternatively, the example method may be implemented so that multiple monitored signatures of a single audio stream need to be matched to multiple signatures of a reference audio stream prior to identifying the monitored audio stream.

If it is determined at block 810 that the descriptors do not match, then it is determined if all of the reference signatures has been compared (block 818). If all of the reference signatures have not been compared, the next reference signature is obtained (block 820) and control is passed to block 808. However, if it is determined at block 818 that all of the reference signatures have been compared, the media, channel, radio station, etc. associated with the monitored audio stream may be unidentifiable and the example method is stopped. A flag may be set to indicate that the monitored audio stream is unidentifiable.

Although the example method of FIG. 8 is described as comparing one reference signature at a time, the example method can be adapted to compare multiple reference signatures with one monitored signature in parallel (i.e., at the same time). For example, the operation of block 806 may be configured to obtain a plurality of reference signatures at one time, each of which corresponds to a different reference audio stream. The operation of block 808 may be configured to obtain the first descriptor of each of the plurality of reference signatures retrieved at block 806. The descriptors of each of the reference signatures may be compared with the each descriptor of the monitored signature until a match is found or until the plurality of reference signatures obtained at block 806 is eliminated, after which time another plurality of reference signatures may be obtained at block 820.

One of ordinary skill in the art can readily appreciate that applying the Hamming distance to the comparison process may significantly reduce the time required to match all of the available reference signatures. For example, after the first descriptor of each of a plurality of reference signatures are compared to the first descriptor of a monitored signature, the first descriptor of each of the reference signatures is associated with a Hamming distance. Only reference signatures having first descriptors associated with a Hamming distance less than a predetermined Hamming distance threshold are further compared with the monitored signature based on the next descriptor of each of the reference signatures and the monitored signature. Reference signatures having descriptors

Ex. 1

US 7,783,889 B2

21

associated with a Hamming distance greater than a predetermined threshold are discarded. The number of reference signatures to be compared based on the next descriptors is reduced from the number of reference signatures compared to the monitored signature based on the first descriptor. In this manner, with each iteration of the comparison process, the number of reference signatures that remain to be compared in subsequent iterations of the signature comparison process quickly diminishes until it is determined that all of the descriptors of a single reference signature are associated with a Hamming distance below the predetermined Hamming distance threshold.

In instances where all of the descriptors of more than one reference signature are associated with a Hamming distance below the predetermined Hamming distance threshold, more than one monitored signature may need to be matched with respective reference signatures of the possible matching reference audio streams. It will be relatively unlikely that all of the monitored signatures generated based on the monitored audio stream will match all of the reference signatures of more than one reference audio stream, and, thus erroneously matching more than one reference audio stream to the monitored audio stream can be prevented.

The example methods described above in connection with FIGS. 4-8 may be implemented by hardware, software, and/ or any combination thereof. More specifically, the example methods may be executed in hardware defined by the block diagrams of FIGS. 9-11. The example methods may also be implemented by software executed on a processor system such as, for example, the processor system 1210 of FIG. 12.

FIG. 9 is a block diagram of an example signature generation system 900 for generating digital spectral signatures. In particular, the example signature generation system 900 may be used to generate monitored signatures and/or reference signatures based on a sliding FFT as described above in connection with the example methods of FIGS. 4 and 5. For example, the example signature generation system 900 may be used to implement the signature generators 114 and 122 of FIG. 1A or the signature generators 156 and 158 of FIG. 1B. Additionally, the example signature generation system 900 may be used to implement the example methods of FIGS. 4 and 5.

As shown in FIG. 9, the example signature generation system 900 includes a sample generator 902, a timing device 903, a reference time generator 904, a sliding FFT module 906, a frequency identifier 908, a spectral power value identifier 910, a comparator 912, a descriptor generator 914, a concatenator 916, and a data communication interface 918, all of which may be communicatively coupled as shown. The example signature generation system 900 may be configured to obtain an example audio stream 920, acquire a plurality of audio samples from the example audio stream 920, and generate digital spectral signatures based on the audio samples.

The sample generator 902 may be configured to obtain the example audio stream 920, which may be any analog or digital audio stream. If the example audio stream 920 is an analog audio stream, the sample generator 902 may be implemented using an analog-to-digital converter. If the example audio stream 920 is a digital audio stream, the sample generator 902 may be implemented using a digital signal processor. Additionally, the sample generator 902 may be configured to acquire and/or extract audio samples at any desired sampling frequency $f_s$ and notify the reference time generator 904 when an audio sample acquisition process begins. The sample generator 902 communicates samples to the sliding FFT module 906. The sample generator 902 may also be configured to notify the frequency identifier 908 when an

22

audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or 304, 306, 308, and 310 of FIG. 3) or a sample segment (e.g., one of the sample segments 312a-f of FIG. 3) has been generated.

The timing device 903 may be configured to generate time data and/or timestamp information and may be implemented by a clock, a timer, a counter, and/or any other suitable device. The timing device 903 may be communicatively coupled to the reference time generator 904 and may be configured to communicate time data and/or timestamps to the reference time generator 904. The timing device 903 may also be communicatively coupled to the sample generator 902 and may assert a start signal or interrupt to instruct the sample generator 902 to begin collecting or acquiring audio sample data. In one example, the timing device 903 may be implemented by a real-time clock having a 24-hour period that tracks time at a resolution of milliseconds. In this case, the timing device 903 may be configured to reset to zero at midnight and track time in milliseconds with respect to midnight.

The reference time generator 904 may initialize a reference time to when a notification is received from the sample generator 902. As described above in connection with FIGS. 2 and 3, the reference time $t_0$ may be used to indicate the time within an audio stream at which a signature is generated. In particular, the reference time generator 904 may be configured to read time data and/or a timestamp value from the timing device 903 when notified of the beginning of a sample acquisition process by the sample generator 902. The reference time generator 904 may then store the timestamp value as the reference time to.

The sliding FFT module 906 may be configured to perform a sliding FFT using the audio samples obtained from the sample generator 902. As described above in connection with FIG. 4, a sliding FFT may update frequency spectrum data each time two samples (e.g., the two most recently acquired samples $v_{N_x-2}$ and $v_{N_x-1}$) are obtained from the sample generator 902.

The frequency identifier 908 may be configured to identify one or more frequency pairs from frequency spectrum data in response to a notification from the sample generator 902 that a new audio sample frame or a new sample segment has been generated. For example, if the example signature generation system 900 is configured to generate monitored signatures, the frequency identifier 908 identifies frequency pairs from the frequency spectrum data in response to a new audio sample frame notification. Alternatively, if the example signature generation system 900 is configured to generate reference signatures, an audio sample frame of data is formed with each new sample segment as described above in connection with FIG. 3. Therefore, the frequency identifier 908 identifies frequency pairs from the frequency spectrum data in response to a new sample segment notification. The frequency identifier 908 may then be configured to communicate indexes identifying the frequency components of the frequency pairs to the spectral power value identifier 910.

The spectral power value identifier 910 may be configured to obtain the indexes associated with the frequency components of the frequency pairs from the frequency identifier 908. The spectral power value identifier 910 may then determine or identify the spectral power of each frequency component of the frequency pairs by retrieving the spectral power value for each frequency component from the frequency spectrum data generated by the sliding FFT module 906. The spectral power values may then be communicated to the comparator 912.

As described above in connection with FIG. 5, the comparator 912 and the descriptor generator 914 may work coop-

**Ex. 1**

US 7,783,889 B2

23

24

eratively to generate M-bit descriptors. The comparator **912** may obtain the spectral power values and compare the spectral power values for each frequency pair. The descriptor generator **914** may be configured to obtain comparison results from the comparator **912** and generate the descriptor bits of an M-bit descriptor based on the comparison results.

The concatenator **916** may obtain descriptor values from the descriptor generator **914**. When a complete set of descriptors is obtained, the concatenator **916** may concatenate the descriptors **916** to form a digital spectral signature. The data communication interface **918** may obtain the digital spectral signatures from the concatenator **916** and the reference time to corresponding to the digital spectral signature and communicate the same to a memory and/or a reference site. For example, if the example signature generation system **900** is configured to generate monitored signatures at the monitoring site **102** (FIG. 1A), the monitored signatures may be communicated to the central data collection facility (FIG. 1A) via the network **108** (FIG. 1A). Alternatively, if the example signature generation system **900** is configured to generate reference signatures, the reference signatures may be communicated to the central data collection facility **154** (FIG. 1B) and/or stored in the memory **134** (FIG. 1B).

FIG. **10** is a block diagram of another example signature generation system **1000** for generating digital signatures based on audio streams. In particular, the example signature generation system **1000** may be used to generate monitored signatures and/or reference signatures based on wavelet transforms as described above in connection with the example methods of FIGS. **6** and **7**. For example, the example signature generation system **1000** may be used to implement the signature generators **114** and **122** of FIG. 1A and generate monitored signatures. Additionally or alternatively, the example signature generation system **1000** may be used to implement the signature generators **156** and **158** of FIG. 1B. In addition, the example signature generation system **1000** may be used to implement the example methods of FIGS. **6** and **7**.

The example signature generation system **1000** includes the sample generator **902**, the timing device **903**, the reference time generator **904**, the comparator **912**, the descriptor generator **914**, the concatenator **916**, and the data communication interface **918** of the example signature generation system **900** described above in connection with FIG. **9**. Additionally, the example signature generation system **1000** includes a wavelet transform module **1002**, a sub-band block identifier **1004**, and an energy value generator **1006**, all of which may be communicatively coupled as shown.

The wavelet transform module **1002** may be configured to apply wavelet transforms to audio samples obtained from the sample generator **902**. For example, the wavelet transform module **1002** may obtain an audio sample frame (e.g., one of the audio sample frames **204**, **206**, **208**, and **210** of FIG. 2 or **304**, **306**, **308**, and **310** of FIG. 3) from the sample generator **902** and perform an M-level wavelet decomposition on the audio samples to generate filtered data values using, for example, the Daubechies wavelet transform as described in connection with FIGS. **6** and **7**. The filtered data values may then be communicated to the sub-band block identifier **1004**.

The sub-band block identifier **1004** may be configured to obtain the filtered data values from the wavelet transform module **1002** and generate a low-frequency sub-band block $L_x$ and a high-frequency sub-band block $H_x$. As described in greater detail above in connection with FIG. **7**, the sub-band blocks $L_x$ and $H_x$ may be identified by de-interleaving the filtered data values. The low-frequency sub-band block may then be communicated to the wavelet transform module **1002**

to perform another wavelet decomposition and the high-frequency sub-band filtered block may be communicated to the energy value generator **1006**.

The energy value generator **1006** may be configured to generate energy values $E_x$ based on the high-frequency sub-band block. The energy value generator **1006** may be configured to parse or separate the high-frequency sub-band block into a first half of filtered data values and a second half of filtered data values as described in greater detail above in connection with FIG. **7**. The energy value generator **1006** may then generate a first energy value $E_0$ by squaring and summing the first half of filtered data values. A second energy value $E_1$ may be generated by squaring and summing the second half of filtered data values.

The comparator **912** and the descriptor generator **914** may be configured to generate descriptors based on energy values. For example, the comparator **912** may obtain energy values from the energy value generator **1006** and compare a first energy to a second energy value. The descriptor generator **914** may obtain comparison results from the comparator **912** and generate the bits of an M-bit descriptor based on the comparison results.

The concatenator **916** may obtain descriptors from the descriptor generator **914** and generate digital spectral signatures by concatenating a plurality of descriptors as described above in connection with FIG. **9**. The data communication interface **918** may then store or transmit signatures obtained from the concatenator **916** with corresponding reference times obtained from the reference time generator **904**.

FIG. **11** is a block diagram of an example signature comparison system **1100** for comparing digital spectral signatures. In particular, the example signature comparison system **1100** may be used to compare monitored signatures with reference signatures. For example, the example signature comparison system **1100** may be used to implement the signature analyzer **132** of FIG. 1 to compare monitored signatures with reference signatures. Additionally, the example signature comparison system **1100** may be used to implement the example method of FIG. **8**.

The example signature comparison system **1100** includes a monitored signature receiver **1102**, a reference signature receiver **1104**, a comparator **1106**, a Hamming distance filter **1108**, a media identifier **1110**, and a media identification look-up table interface **1112**, all of which may be communicatively coupled as shown.

The monitored signature receiver **1102** may be configured to obtain monitored signatures via the network **106** (FIG. 1) and communicate the monitored signatures to the comparator **1106**. The reference signature receiver **1104** may be configured to obtain reference signatures from the memory **134** (FIGS. 1A and 1B) and communicate the reference signatures to the comparator **1106**.

The comparator **1106** and the Hamming distance filter **1108** may be configured to compare reference signatures to monitored signatures using Hamming distances. In particular, the comparator **1106** may be configured to compare descriptors of monitored signatures with descriptors from a plurality of reference signatures and to generate Hamming distance values for each comparison. The Hamming distance filter **1108** may then obtain the Hamming distance values from the comparator **1106** and filter out non-matching reference signatures based on the Hamming distance values as described above in connection with FIG. **8**.

After a matching reference signature is found, the media identifier **1110** may obtain the matching reference signature and in cooperation with the media identification look-up table interface **1112** may identify the media information associated

Ex. 1

US 7,783,889 B2

25

with an unidentified audio stream (e.g., the example monitored audio stream 202 of FIG. 2). For example, the media identification look-up table interface 1112 may be communicatively coupled to a media identification look-up table or a database that is used to cross-reference media identification information (e.g., movie title, show title, song title, artist name, episode number, etc.) based on reference signatures. In this manner, the media identifier 1110 may retrieve media identification information from the media identification database based on the matching reference signatures.

FIG. 12 is a block diagram of an example processor system 1210 that may be used to implement the apparatus and methods described herein. As shown in FIG. 12, the processor system 1210 includes a processor 1212 that is coupled to an interconnection bus or network 1214. The processor 1212 includes a register set or register space 1216, which is depicted in FIG. 12 as being entirely on-chip, but which could alternatively be located entirely or partially off-chip and directly coupled to the processor 1212 via dedicated electrical connections and/or via the interconnection network or bus 1214. The processor 1212 may be any suitable processor, processing unit or microprocessor. Although not shown in FIG. 12, the system 1210 may be a multi-processor system and, thus, may include one or more additional processors that are identical or similar to the processor 1212 and that are communicatively coupled to the interconnection bus or network 1214.

The processor 1212 of FIG. 12 is coupled to a chipset 1218, which includes a memory controller 1220 and an input/output (I/O) controller 1222. As is well known, a chipset typically provides I/O and memory management functions as well as a plurality of general purpose and/or special purpose registers, timers, etc. that are accessible or used by one or more processors coupled to the chipset. The memory controller 1220 performs functions that enable the processor 1212 (or processors if there are multiple processors) to access a system memory 1224 and a mass storage memory 1225.

The system memory 1224 may include any desired type of volatile and/or non-volatile memory such as, for example, static random access memory (SRAM), dynamic random access memory (DRAM), flash memory, read-only memory (ROM), etc. The mass storage memory 1225 may include any desired type of mass storage device including hard disk drives, optical drives, tape storage devices, etc.

The I/O controller 1222 performs functions that enable the processor 1212 to communicate with peripheral input/output (I/O) devices 1226 and 1228 via an I/O bus 1230. The I/O devices 1226 and 1228 may be any desired type of I/O device such as, for example, a keyboard, a video display or monitor, a mouse, etc. While the memory controller 1220 and the I/O controller 1222 are depicted in FIG. 12 as separate functional blocks within the chipset 1218, the functions performed by these blocks may be integrated within a single semiconductor circuit or may be implemented using two or more separate integrated circuits.

The methods described herein may be implemented using instructions stored on a computer readable medium that are executed by the processor 1212. The computer readable medium may include any desired combination of solid state, magnetic and/or optical media implemented using any desired combination of mass storage devices (e.g., disk drive), removable storage devices (e.g., floppy disks, memory cards or sticks, etc.) and/or integrated memory devices (e.g., random access memory, flash memory, etc.).

Although certain methods, apparatus, and articles of manufacture have been described herein, the scope of coverage of this patent is not limited thereto. To the contrary, this patent

26

covers all methods, apparatus, and articles of manufacture fairly falling within the scope of the appended claims either literally or under the doctrine of equivalents.

What is claimed is:

1. A method for generating signatures implemented using an apparatus comprising a processor, the method comprising:

obtaining a first frame of media samples;

identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

generating a first signature based on the first descriptor;

identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples;

identifying a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;

determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and

generating a second signature based on the second descriptor.

2. A method as defined in claim 1, further comprising identifying media information based on the first signature.

3. A method as defined in claim 2, wherein a Hamming distance is used to identify the media information based on the first signature.

4. A method as defined in claim 2, wherein the media information is associated with at least one of audio information or video information.

5. A method as defined in claim 1, wherein the first descriptor is associated with only the first frame of media samples.

6. A method as defined in claim 1, wherein the second descriptor is of the second frame of media samples.

7. A method as defined in claim 1, wherein the spectral transform operation is a sliding Fast Fourier Transform.

8. An apparatus for generating signatures, comprising:

a processor system including a memory; and

instructions stored in the memory that enable the processor system to:

obtain a first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

identify a third spectral power and a fourth spectral power; determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

**Ex. 1**

US 7,783,889 B2

27

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

**9**. An apparatus as defined in claim **8**, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature.

**10**. An apparatus as defined in claim **9**, wherein a Hamming distance is used to identify the media information based on the first signature.

**11**. An apparatus as defined in claim **8**, wherein the first descriptor is associated with only the first frame of media samples.

**12**. An apparatus as defined in claim **8**, wherein the instructions stored in the memory enable the processor system to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

**13**. An apparatus as defined in claim **8**, wherein the third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

**14**. A tangible machine accessible medium having instructions stored thereon that, when executed, cause a machine to:

obtain a first frame first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

28

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

identify a third spectral power and a fourth spectral power;

determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

**15**. A tangible machine accessible medium as defined in claim **14**, wherein the first descriptor is associated with only the first frame of media samples.

**16**. A tangible machine accessible medium as defined in claim **14** having instructions stored thereon that, when executed, cause the machine to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

**17**. A tangible machine accessible medium as defined in claim **14**, wherein third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

\*   \*   \*   \*   \*

**Ex. 1**

**Subject:** RE: Nielsen v. TVision (22-cv-57) - Claim Construction
**Date:** Wednesday, July 30, 2025 at 5:51:54 PM Eastern Daylight Time
**From:** Greenhut, Jason P.
**To:** Jason Xu, Eric Cohen, Andrew Russell, Nate Hoeschen
**CC:** Yovits, Steven, Lewis, Douglas, Wood, Andrew, Palapura, Bindu A., David E. Moore, Andrew M. Moshos

Jason,

Dr. Anderson's report implicitly construes the limitations "determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power" (as well as the claim limitation "determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power") as requiring the descriptor to be determined by comparing two frequency components from a single frame without taking data from other frames into account. Nielsen construes the limitations as requiring the descriptor to be determined by comparing two frequency components from a single frame, regardless of whether data from other frames is taken into account.

For example, Dr. Anderson opines that "Because the claim limitation requires that the descriptor of a frame is calculated based on a comparison of two frequency components from the same frame (i.e., determined through intraframe calculation), even assuming the peak point being calculated can be considered to be of the 'frame,' the interframe calculation used by the local_max function (calling the getRowMax function) does not practice the above-referenced claim element." ¶70. Similarly, he opines that "Because the '889 patent specification, as understood by a POSITA, describes the intraframe operation to be 'using data exclusive to a single audio frame and are not dependent on sample data collected over other audio frames,' the isListMax function is not an intraframe operation because it is dependent on data over other frames, not exclusive to a single frame." ¶73.

We do not believe the determining claim terms should be construed the way that Dr. Anderson construes them. The parties accordingly have a claim construction dispute.

Best regards,
Jason

**JASON GREENHUT**

**Kelley Drye & Warren LLP**
Tel: (312) 857-7096

---

**From:** Jason Xu
**Sent:** Wednesday, July 30, 2025 3:31 PM
**To:** Greenhut, Jason P. ; Eric Cohen ; Andrew Russell ; Nate Hoeschen
**Cc:** Yovits, Steven ; Lewis, Douglas ; Wood, Andrew ; Palapura, Bindu A. ; David E. Moore ; Andrew M. Moshos
**Subject:** RE: Nielsen v. TVision (22-cv-57) - Claim Construction

> **CAUTION:** This message originated outside of Kelley Drye and was sent by: jason.xu@rimonlaw.com

---

Counsel,
We don't quite understand the email below. Paragraph 73 of Dr. Anderson's rebuttal non-

infringement report just compares the accused products to the claim element showing why there is no infringement, and there do not appear to be any claim construction arguments.

If you still believe claim construction is needed, can you elaborate on the specific claim term and proposed construction so that we can consider your proposal?

Best,
Jason

---

**From:** Greenhut, Jason P. <JGreenhut@KelleyDrye.com>
**Sent:** Tuesday, July 29, 2025 6:23 PM
**To:** Jason Xu <jason.xu@rimonlaw.com>; Eric Cohen <eric.cohen@rimonlaw.com>; Andrew Russell <arussell@shawkeller.com>; Nate Hoeschen <nhoeschen@shawkeller.com>
**Cc:** Yovits, Steven <SYovits@KelleyDrye.com>; Lewis, Douglas <DLewis@KelleyDrye.com>; Wood, Andrew <AWood@KelleyDrye.com>; Palapura, Bindu A. <bpalapura@potteranderson.com>; David E. Moore <dmoore@potteranderson.com>; Andrew M. Moshos <amoshos@potteranderson.com>
**Subject:** Nielsen v. TVision (22-cv-57) - Claim Construction

Counsel,

In Dr. Anderson's Supplemental Non-Infringement Report dated July 28, 2025, Dr. Anderson makes numerous new assertions purporting to limit the scope of the claim limitation "determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power" (as well as the claim limitation "determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power"). *See, e.g.*:

> "Because the '889 patent specification, as understood by a POSITA, describes the intraframe operation to be "using data exclusive to a single audio frame and are not dependent on sample data collected over other audio frames," the isListMax function is not an intraframe operation because it is dependent on data over other frames." *See* Anderson Supp. NI Report at ¶ 73.

Please let us know if TVision agrees to filing a joint letter requesting that the Court construe this claim term at the same time as it construes "frequency component." If you do not agree, please let us know when you are available to meet and confer.

Best regards,
Jason

**JASON GREENHUT**
Special Counsel

**Kelley Drye & Warren LLP**
333 West Wacker Drive, 26th Floor
Chicago, IL 60606
Tel: (312) 857-7096

jgreenhut@kelleydrye.com

This message is subject to Kelley Drye & Warren LLP's email communication policy.
KDW-Disclaimer

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

THE NIELSEN COMPANY (US), LLC,

        *Plaintiff*,

   v.

TVISION INSIGHTS, INC.,

        *Defendant*.

C.A. No. 1:22-cv-0057-CJB
Magistrate Judge Christopher J. Burke

**JURY TRIAL DEMANDED**

## <u>OPENING EXPERT REPORT OF CHRIS KYRIAKAKIS</u>

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

# TABLE OF CONTENTS

I.   INTRODUCTION ........................................................................................... 1

II.  PERSONAL BACKGROUND AND EXPERT QUALIFICATIONS............................ 2

III. DOCUMENTS REVIEWED ........................................................................... 6

IV.  SUMMARY OF OPINIONS ........................................................................... 6

V.   PERSON OF SKILL IN THE ART ................................................................ 7

VI.  AUDIO SIGNATURES................................................................................... 7

     A.   Background Information ....................................................................... 7

     B.   Frequency-Domain Transforms ........................................................... 9

     C.   Signature Generation for Content Matching........................................ 15

VII. U.S. PATENT NO. 7,783,889 ................................................................... 17

     A.   Background of the '889 patent............................................................. 17

     B.   Asserted Claims and their Meaning ..................................................... 19

VIII. TVISION'S USE OF PROCESSORS AND ACRCLOUD.................................... 21

     A.   Reference Fingerprints Background .................................................... 21

     A.   Device Fingerprints Background ......................................................... 23

     B.   Source Code for the ACRCloud FP Algorithm .................................. 29

     C.   Analysis of the ACRCloud FP Algorithm ......................................... 30

          1.   Obtaining Overlapping/Consecutive Frames of Media Samples............ 32

          2.   Frequency Components ........................................................... 35

          3.   Generating a Signature................................................................ 39

     D.   SIMULATION OF ACRCLOUD ALGORITHM............................................. 40

IX.  INFRINGEMENT OF THE ASSERTED CLAIMS ...................................... 44

     A.   LEGAL STANDARD.................................................................................. 44

     B.   Infringement analysis.......................................................................... 45

          1.   Claim 1................................................................................... 45

          2.   Claim 2—"A method as defined in claim 1, further comprising identifying media information based on the first signature." .................. 81

          3.   Claim 4—"A method as defined in claim 2, wherein the media information is associated with at least one of audio information or video information."................................................................................ 89

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

4.    Claim 6—"A method as defined in claim 1, wherein the second descriptor is of the second frame of media samples." ............................. 90

5.    Claim 8 ............................................................................................ 90

6.    Claim 9—"An apparatus as defined in claim 8, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature." ...................... 120

7.    Claim 12—"An apparatus as defined in claim 8, wherein the instructions stored in the memory enable the processor system to: obtain a first plurality of media samples; and identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples." ..................................................................................... 121

8.    Claim 13—"An apparatus as defined in claim 8, wherein the third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples." ............................................................................ 123

9.    Claim 14 .......................................................................................... 124

10.   Claim 16—"A tangible machine accessible medium as defined in claim 14 having instructions stored thereon that, when executed, cause the machine to: obtain a first plurality of media samples; and identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples." .......................................................... 132

11.   Claim 17—"A tangible machine accessible medium as defined in claim 14, wherein third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples." .......................................................... 134

X.    Alleged Alternatives ........................................................................ 135

      A.    "Answer" ................................................................................ 135

      B.    Dat-Track .............................................................................. 136

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

C. Mobile Research Labs (MRL) ........................................................................... 137

D. Axwave .......................................................................................................... 139

E. Summary ....................................................................................................... 140

XI. CONCLUSION ................................................................................................. 141

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

and has 1888 samples in common with the first frame and 160 new samples that are consecutively located in the audio stream.

2.    **Frequency Components**

120.    The ACRCloud **create_fp_by_buffer** function performs a spectral transformation on each "frame of media samples" discussed above. For each frame, the spectral transform identifies frequency components and stores them in an array data object that is indexed by frequency bin and time frame. Each element in the array represents a spectral power associated for each identified frequency component at a point in time, as set forth in detail below.

121.    Specifically, ACRCloud's FP Algorithm performs a spectral transform operation on each frame of media samples collected. ██████████████████████████████████████

████████████████. *See* ACRCloud NLSN_SC_00000013; *see also* ¶¶ 114–117, *supra*

███████████████████████████████████████████████████

122.    ███████████████████████████████████████████████

██████████████████. ACRCloud_NLSN_SC_00000013. ████████████████████████████

████████████████████████████████████████████. *Id.*

123.    ████████████████████████████████████████████

███████████, a FFT is a form of DFT that transforms the original time-domain signal into the frequency domain. *See* Section VI.B

124.    ████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

███████████████████████████████████████████

██████████████████████████████████████████.

35

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

125. ██████████████████████████████████████.

ACRCloud_NLSN_SC_00000013. The **local_max** function is defined at

ACRCloud_NLSN_SC_00000014.

126. ████████████████████████████████████████████

███████████████████████████████████.

ACRCloud_NLSN_SC_00000015. The **getRowMax** function is defined at

ACRCloud_NLSN_SC_00000020.

████  ████████████████████████████████████████

████████████████████████████████.

ACRCloud_NLSN_SC_00000020. ██████████████████████

███████████████████████████████████████████

ACRCloud_NLSN_SC_00000015 ███████████████████████

████████████████████████████████████

████████████████████████████████;"); *see also id.* (███████████████

█████████████████████████████████████████

██████████████████████████████ ACRCloud_NLSN_SC_00000018.

128.     Next, for each frame,████████████████████████████

████████████████████████████████████████████

██████████████████. *See* ACRCloud_NLSN_SC_00000015;

ACRCloud_NLSN_SC_00000021 ████████████████████████ Put simply,

for each frame, this processing finds the maximum value(s) in that frame, ignoring any values for

the frame when other bins +/– 8 bins away have higher values.

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

129.    This processing requires comparing the values of at least two frequency components from the same frame, *i.e.*, intra-frame processing. Specifically, ███████

████████████████████████████████████████████████████

█████████████████████████████████████████

██████████████████████. ACRCloud_NLSN_SC_00000015.

130.    ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

█████████████████████. *See* lines ACRCloud_NLSN_SC_00000021.

131.    ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

██████████████████████████████████in.

ACRCloud_NLSN_SC_00000015. As described previously. █████████████████

████████████████████████████████████████

████████████████████████

████████████████

██████████████████

█████

█

▌

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

where ███████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████. *See* ACRCloud_NLSN_SC_00000015 (calling function isListMax with maxInfo

as first parameter).████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████

███████████████████ *See* ACRCloud_NLSN_SC_00000021 (isListMax). This is

discussed in detail with regard to Dr. Martin's simulation in Section VIII.D,

132. ████████████████████████████████████

█████████████████████████████████████. *See*

ACRCloud_NLSN_SC_00000021 ███████████████████████████ *See*

ACRCloud_NLSN_SC_00000015 ███████████████████████████

This results in local_max storing as a descriptor the bin, frame, and value for the current frame

and bin ("s->spec_z_[f_x][t_y]") in the buffer pointed to by s->local_max_:

███████████████████████

███████████████████████████████

███████████████████████████████

███████████████████████████████

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

==*Id.* As explained in the paragraphs above, the descriptors for each frame are determined via a comparison of the first and second values from a given frame.==

133.    isListMax also returns the next bin in a frame on which to continue the processing. Using that bin, local_max repeats the processing of maxInfo described above. *See* ¶¶128-132. This repeats until the processing reaches the last bin in the frame. At that point, ACRCloud's FP Algorithm repeats the steps set forth above for the each of the subsequent frames in the six-second sample. In other words, for each frame, the **local_max** function goes through the above processing to determine the maximum value in bins +/– 32 bins from the present one.

3.    **Generating a Signature**

134.    ACRCloud's FP Algorithm generates signatures based on descriptors (discussed above). The create_fp_by_buffer function calls the ████████████. ACRCloud_NLSN_SC_00000008. Because ████████████████████████ ████████████████████████████████████████████ ████████████████████████████. ACRCloud_NLSN_SC_00000013. ████ ██████████████████████████████ ██████████████████████████). ████████████████████████ ██████████████████████████ *See Id.* ████████████████████████ ██████████████████████ The signature is based on the first descriptor in that it is the combination of the first frame's descriptor(s) in the form of one or more spectral powers and their frame and bin numbers. get_fp does this for all frames in a sample that have descriptors. *Id.*

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

135.    The ██████████████████████████████████████

██████████████████. ACRCloud NLSN_SC_00000013-14 █████████████

████████████████████████████████████████████████████

████████"). The create_fp_by_buffer function uses the fp and fp_len values from get_fp to build

the Python data structure returned to TVision's calling function. ACRCloud

NLSN_SC_00000008 ████████████████████████████████ ACRCloud

NLSN_SC_00000009 ███████████

### D.    SIMULATION OF ACRCLOUD ALGORITHM

136.    As explained in the Martin Report, Dr. Martin created a simulation of the

processing done by ACRCloud's source code. Martin Rep., Section VIII. Dr. Martin's simulation

implements the algorithm in the ACRCloud source code. Dr. Martin ran his simulation using

audio data harvested from television content for 9,978 samples of 6 seconds each. This

corresponds to TVision's meter monitoring panelist viewing for approximately 99,928 seconds

or 1,665 minutes. His results show that in every 6-second audio clip except for one[1] (*i.e.*,

basically 100% of the 6-second audio clips), the simulation-generated descriptors resulted from

intraframe comparisons. *See* Martin Rep., ¶¶ 142-44. That one 6-second audio clip was digital

silence and had no descriptors at all. In my opinion, the audio data from television that Dr.

Martin tested is representative of television content including the television content that

TVision's devices monitor.

137.    Dr. Martin's simulation tested the audio tracks from 71 video files representing

various television programs and commercials. *See* Martin Rep., ¶ 142. Those 71 video files

---

[1] As Dr. Martin explains, one tested video started with 14 seconds of silence and accordingly generated no descriptors. All other 6-second clips from that video and all others tested had descriptors for consecutive and overlapping where those descriptors were found using intraframe comparisons.

40

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

represented 1,665 minutes of television. His simulation processed those files in the same way ACRCloud's SDK does: in 6-second clips taken from 10 seconds of audio. In total, Dr. Martin's simulation tested 9,978 6-second audio clips.

138.     This test showed that for every video file and for nearly all 6-second clips created from those video files (excepting the silent one discussed above), ACRCloud's SDK creates signatures based on descriptors that (1) were determined by performing intraframe comparisons of spectral powers, and (2) located in consecutive frames and in overlapping frames (as required by subsequent limitations of this claim, which I explain in more detail below). See Martin Rep., ¶¶142-144.

139.     Dr. Martin's output data from the simulation refers to maxima and maxes found in the audio portion of the video files tested. The maxima and maxes that Dr. Martin refers to correspond to the descriptors in the claims, as explained below.

140.     Because the simulation processed and analyzed typical television audio, it is my opinion that when used in panelists' household, TVision's devices would similarly determine descriptors by performing intraframe comparisons in overlapping frames and in consecutive frames. In addition, the signatures have to be the same for both reference signatures and monitoring signatures, so VidVita's processing to create reference signatures would also perform intraframe comparisons in overlapping frames and in consecutive frames.

141.     In my opinion, Dr. Martin's simulation demonstrates that ACRCloud's SDK performs intraframe comparison(s) when determining descriptors and does so to determine descriptors in consecutive and overlapping frames.

142.     This is not surprising, for the reasons that follow. TV audio content such as speech, music, or sound effects typically has sustained frequencies or harmonics that last for a

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

certain time interval. This causes consistent peaks in specific frequency bins across consecutive frames. As a result, the spectrogram structure is not random. For example, speech has formants (a characteristic component of the quality of a speech sound usually any of several resonance bands that determine the phonetic quality of a vowel) that appear as horizontal lines at certain frequencies. Horizontal lines, in spectrograms where the vertical axis is frequency and the horizontal axis is time, occur when a certain frequency is sustained over a period of time, which appears as a horizontal line.  Music and sound effects produce repeating patterns of tones. Because of these effects, it is common to observe multiple strong frequency components in consecutive frames in television audio, which typically contains speech, music, and sound effects.

143.    The below figures show example spectrograms of an organ with sustained notes at different frequencies and a piano that has shorter sustained frequencies. These types of patterns are typical in audio content where one would not expect the spectrogram to randomly change from frame to frame.



Ex. 3

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



144.    For example, the following figure shows a spectrogram for a 6-second snippet from the McDonalds commercial Dr. Martin used for the simulation. It is common to see frequencies that linger over multiple frames (*i.e.*, they don't change randomly). This affects the local maximum found by ACRCloud's SDK and used as signatures as such maxima will often appear in consecutive or nearby (e.g., overlapping) frames.



**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

s->pcm_ to a set of values in the frequency domain pointed to by pFFDataR, pFFTDataI, and pFFTEnergy.

193.    TVision proposes to construe "frequency component as "Plain meaning, i.e., a single frequency or single band of frequencies." The above description shows that ACRCloud's code creates a frequency component (the value returned by kkfft for a single bin in the buffers pointed to by pFFDataR, pFFTDataI, and pFFTEnergy) that represents the frequency domain coefficient of a single frequency or group of frequencies.

194.    The above describes "identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power" in that the FFT results in and thereby identifies 1025 frequency bins representing 1025 frequencies in the original audio signal. These bins have spectral powers derived from the FFT output and the subsequent processing of those results. In addition, the above describes "performing a spectral transform operation on the first frame of media samples" by performing an FFT on the audio media samples.

195.    In view of the above, it is therefore my opinion that TVision satisfies this element of Claim 1—"identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples"— both when creating Device Fingerprints and when creating Reference Fingerprints (via VidVita).

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

      c)      **"determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power"**

196.    TVision uses ACRCloud's FP Algorithm to create both the Device Fingerprints and Reference Fingerprints (via VidVita). *See, supra*, ¶¶ 151–173. By doing so, TVision performs this claimed step.

197.    As detailed below, ACRCloud's FP Algorithm determines a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power. *See, supra*, ¶¶ 120–133 (Section VIII.C.2 Frequency Components) (incorporated by reference).

198.    



ACRCloud_NLSN_SC_00000013; ACRCloud_NLSN_SC_00000014

).

ACRCloud_NLSN_SC_00000015

ACRCloud_NLSN_SC_00000020

). s->opt_.deltaT_ has the value of 8 when it is set in create_afp_session from extr_op.

199.    The create_fp_by_buffer function sets parameters using

};" ACRCloud_NLSN_SC_00000008. The

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

205.    Although some of the values compared within isListMax may be from other frames, during the processing of a 6-second audio sample (as explained below), the processing of 65-bin windows will directly compare values from the same frame. Moreover, TVision provides ACRCloud's algorithm 6-second audio clips every 10 seconds, so over an hour TVision will have sent 360 6-second clips. TVision uses this ACRCloud FP Algorithm whenever its panelists watch television, which would likely exceed one hour for each panelist, further ensuring that an intraframe comparison occurs. Accordingly, over a panelist's typical television watching session, TVision's use of the ACRCloud FP Algorithm will directly compare two values from the same frame.

206.    As explained in the Martin Report, Dr. Martin created a simulation of the processing done by ACRCloud's source code. Martin Rep., Section VIII. Dr. Martin's simulation implements the algorithm in the ACRCloud source code. Dr. Martin ran his simulation using audio data harvested from television content for 9,978 samples of 6 seconds each. This corresponds to TVision's meter monitoring panelist viewing for approximately 99,928 seconds or 1,665 minutes. His results show that in every 6-second audio clip except *for one* (i.e., basically 100% of the 6-second audio clips), the simulation-generated descriptors *resulted* from intraframe comparisons. See Martin Rep., ¶¶ 142-44. That one 6-second audio clip was digital silence and had no descriptors at all. In my opinion, the audio data from television that Dr. Martin tested is representative of television content including the television content that TVision's devices monitor.

207.    Dr. Martin's simulation tested the audio tracks from 71 video files representing various television programs and commercials. *See* Martin Rep., ¶ 142. Those 71 video files represented 1,665 minutes of television. His simulation processed those files in the same way

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

ACRCloud's SDK does: in 6-second clips taken from 10 seconds of audio. In total, Dr. Martin's simulation tested 9,978 6-second audio clips.

208.    This test showed that for every video file and for nearly all 6-second clips created from those video files (excepting the silent one discussed above), ACRCloud's SDK creates signatures based on descriptors that (1) were determined by performing intraframe comparisons of spectral powers, and (2) located in consecutive frames and in overlapping frames (as required by subsequent limitations of this claim, which I explain in more detail below). See Martin Rep., ¶¶142-144.

209.    Dr. Martin's output data from the simulation refers to maxima and maxes found in the audio portion of the video files tested. The maxima and maxes that Dr. Martin refers to correspond to the descriptors in the claims, as explained below.

210.    Because the simulation processed and analyzed typical television audio, it is my opinion that when used in panelists' household, TVision's devices would similarly determine descriptors by performing intraframe comparisons in overlapping frames and in consecutive frames. In addition, the signatures have to be the same for both reference signatures and monitoring signatures, so VidVita's processing to create reference signatures would also perform intraframe comparisons in overlapping frames and in consecutive frames.

211.    In my opinion, Dr. Martin's simulation demonstrates that ACRCloud's SDK performs intraframe comparison(s) when determining descriptors and does so to determine descriptors in consecutive and overlapping frames.

212.    When isListMax finds that the value at the current frame and bin ███. *See*

ACRCloud_NLSN_SC_00000021 ████████████████

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

249.    The local_max function stores this second descriptor into a buffer

████████████ ) along with its bin number and frame number.

ACRCloud_NLSN_SC_00000015.

250.    As set forth above in Section IX.B.1.c) (element 1.c) with regard to the "first

spectral power" and the "second spectral power," for purposes of this claim element, the

comparison of the "third spectral power" and "fourth spectral power" results in a maximum

spectral power that is the result of the **local_max** and **isListMax** functions discussed above but

applied to the "second frame of media samples." This comparison results in the second

descriptor (comprised of its frame number, bin number, and value). *See also* Section IX.B.1.d)

(element 1.d). Moreover, as set forth in Section IX.B.1.h) (element 1.h), this "second descriptor"

will become part of the "second signature." *See* Section IX.B.1.h) (element 1.h).

251.    The first frame and the second frame both have descriptors (generated as a result

of intraframe comparison) and overlap (*i.e.*, contain common and not common samples) in the

processing of a typical 6-second audio sample. *See* Section VIII.D.

252.    As explained in the Martin Report, Dr. Martin created a simulation of the

processing done by ACRCloud's source code. Martin Rep., Section VIII. Dr. Martin's simulation

implements the algorithm in the ACRCloud source code. Dr. Martin ran his simulation using

audio data harvested from television content for 9,978 samples of 6 seconds each. This

corresponds to TVision's meter monitoring panelist viewing for approximately 99,928 seconds

or 1,665 minutes. His results show that in every 6-second audio clip except *for one* (i.e.,

basically 100% of the 6-second audio clips), the simulation-generated descriptors *resulted* from

intraframe comparisons. See Martin Rep., ¶¶ 142-44. That one 6-second audio clip was digital

silence and had no descriptors at all. In my opinion, the audio data from television that Dr.

Ex. 3

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Martin tested is representative of television content including the television content that TVision's devices monitor.

253.    Dr. Martin's simulation tested the audio tracks from 71 video files representing various television programs and commercials. *See* Martin Rep., ¶ 142. Those 71 video files represented 1,665 minutes of television. His simulation processed those files in the same way ACRCloud's SDK does: in 6-second clips taken from 10 seconds of audio. In total, Dr. Martin's simulation tested 9,978 6-second audio clips.

254.    This test showed that for every video file and for nearly all 6-second clips created from those video files (excepting the silent one discussed above), ACRCloud's SDK creates signatures based on descriptors that (1) were determined by performing intraframe comparisons of spectral powers, and (2) located in consecutive frames and in overlapping frames (as required by subsequent limitations of this claim, which I explain in more detail below). See Martin Rep., ¶¶142-144.

255.    Dr. Martin's output data from the simulation refers to maxima and maxes found in the audio portion of the video files tested. The maxima and maxes that Dr. Martin refers to correspond to the descriptors in the claims, as explained below.

256.    Because the simulation processed and analyzed typical television audio, it is my opinion that when used in panelists' household, TVision's devices would similarly determine descriptors by performing intraframe comparisons in overlapping frames and in consecutive frames. In addition, the signatures have to be the same for both reference signatures and monitoring signatures, so VidVita's processing to create reference signatures would also perform intraframe comparisons in overlapping frames and in consecutive frames.

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

257.    In my opinion, Dr. Martin's simulation demonstrates that ACRCloud's SDK performs intraframe comparison(s) when determining descriptors and does so to determine descriptors in consecutive and overlapping frames.

258.    In view of the above, it is therefore my opinion that TVision meets this element of Claim 1—"determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power"—both when creating Device Fingerprints and when creating Reference Fingerprints (via VidVita). It meets this element both literally and under the Doctrine of Equivalents, as shown above in Section IX.B.1.c) (element 1.c), but for the third and fourth spectral powers associated with the second frame of media samples.

### h)    "generating a second signature based on the second descriptor"

259.    TVision uses ACRCloud's FP Algorithm to create both the Device Fingerprints and Reference Fingerprints (via VidVita). *See, supra*, ¶¶ 151–173.

260.    As detailed below, ACRCloud's FP Algorithm generates a second signature based on the second descriptor. According to the ACRCloud Code, the second signature is generated from the second descriptor in the same manner as the first signature was generated in Section IX.B.1.d) (element 1.d.), which is incorporated by reference. The ACRCloud code calls get_fp as described in Section IX.B.1.d) to process the descriptors for all the frames in the sample into signatures. *See* ACRCloud_NLSN_SC_00000013-14.

261.    The second signature is based on the second descriptor in that it contains the combination of the second frame's descriptor(s) in the form of one or more spectral powers and their frame and bin numbers. The get_fp function processes descriptors into signatures for all frames in a sample that have descriptors.

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

317.    As explained in the Martin Report, Dr. Martin created a simulation of the processing done by ACRCloud's source code. Martin Rep., Section VIII. Dr. Martin's simulation implements the algorithm in the ACRCloud source code. Dr. Martin ran his simulation using audio data harvested from television content for 9,978 samples of 6 seconds each. This corresponds to TVision's meter monitoring panelist viewing for approximately 99,928 seconds or 1,665 minutes. His results show that in every 6-second audio clip except *for one* (i.e., basically 100% of the 6-second audio clips), the simulation-generated descriptors *resulted* from intraframe comparisons. See Martin Rep., ¶¶ 142-44. That one 6-second audio clip was digital silence and had no descriptors at all. In my opinion, the audio data from television that Dr. Martin tested is representative of television content including the television content that TVision's devices monitor.

318.    Dr. Martin's simulation tested the audio tracks from 71 video files representing various television programs and commercials. *See* Martin Rep., ¶ 142. Those 71 video files represented 1,665 minutes of television. His simulation processed those files in the same way ACRCloud's SDK does: in 6-second clips taken from 10 seconds of audio. In total, Dr. Martin's simulation tested 9,978 6-second audio clips.

319.    This test showed that for every video file and for nearly all 6-second clips created from those video files (excepting the silent one discussed above), ACRCloud's SDK creates signatures based on descriptors that (1) were determined by performing intraframe comparisons of spectral powers, and (2) located in consecutive frames and in overlapping frames (as required by subsequent limitations of this claim, which I explain in more detail below). See Martin Rep., ¶¶142-144.

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

320.    Dr. Martin's output data from the simulation refers to maxima and maxes found in the audio portion of the video files tested. The maxima and maxes that Dr. Martin refers to correspond to the descriptors in the claims, as explained below.

321.    Because the simulation processed and analyzed typical television audio, it is my opinion that when used in panelists' household, TVision's devices would similarly determine descriptors by performing intraframe comparisons in overlapping frames and in consecutive frames. In addition, the signatures have to be the same for both reference signatures and monitoring signatures, so VidVita's processing to create reference signatures would also perform intraframe comparisons in overlapping frames and in consecutive frames.

322.    In my opinion, Dr. Martin's simulation demonstrates that ACRCloud's SDK performs intraframe comparison(s) when determining descriptors and does so to determine descriptors in consecutive and overlapping frames.

323.    In view of the above, it is therefore my opinion that TVision meets this claim element—"obtain a first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples"—both when creating Device Fingerprints and when creating Reference Fingerprints (via VidVita).

> ### c)    "identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples"

324.    TVision uses ACRCloud's FP Algorithm to create both the Device Fingerprints and Reference Fingerprints (via VidVita). *See, supra*, ¶¶ 151–173.

325.    As detailed below, ACRCloud's FP Algorithm "identif[ies] a first frequency component having a first spectral power and a second frequency component having a second

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

found to contain the maximum value (which must be true to find a descriptor), ███████████

████████████████████████████████████████████████████

████████████████    *See* ACRCloud_NLSN_SC_00000021 (isListMax). I discuss this in detail below and in the simulation section. *See* Section VIII.D.

356.    Although some of the values compared within isListMax may be from other frames, during the processing of a 6-second audio sample (as explained below), the processing of 65-bin windows will directly compare values from the same frame. Moreover, TVision provides ACRCloud's algorithm 6-second audio clips every 10 seconds, so over an hour TVision will have sent 360 6-second clips. TVision uses this ACRCloud FP Algorithm whenever its panelists watch television, which would likely exceed one hour for each panelist, further ensuring that an intraframe comparison occurs. Accordingly, over a panelist's typical television watching session, TVision's use of the ACRCloud FP Algorithm will directly compare two values from the same frame.

357.    As explained in the Martin Report, Dr. Martin created a simulation of the processing done by ACRCloud's source code. Martin Rep., Section VIII. Dr. Martin's simulation implements the algorithm in the ACRCloud source code. Dr. Martin ran his simulation using audio data harvested from television content for 9,978 samples of 6 seconds each. This corresponds to TVision's meter monitoring panelist viewing for approximately 99,928 seconds or 1,665 minutes. His results show that in every 6-second audio clip except *for one* (i.e., basically 100% of the 6-second audio clips), the simulation-generated descriptors *resulted* from intraframe comparisons. See Martin Rep., ¶¶ 142-44. That one 6-second audio clip was digital silence and had no descriptors at all. In my opinion, the audio data from television that Dr.

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Martin tested is representative of television content including the television content that TVision's devices monitor.

358. Dr. Martin's simulation tested the audio tracks from 71 video files representing various television programs and commercials. *See* Martin Rep., ¶ 142. Those 71 video files represented 1,665 minutes of television. His simulation processed those files in the same way ACRCloud's SDK does: in 6-second clips taken from 10 seconds of audio. In total, Dr. Martin's simulation tested 9,978 6-second audio clips.

359. This test showed that for every video file and for nearly all 6-second clips created from those video files (excepting the silent one discussed above), ACRCloud's SDK creates signatures based on descriptors that (1) were determined by performing intraframe comparisons of spectral powers, and (2) located in consecutive frames and in overlapping frames (as required by subsequent limitations of this claim, which I explain in more detail below). See Martin Rep., ¶¶142-144.

360. Dr. Martin's output data from the simulation refers to maxima and maxes found in the audio portion of the video files tested. The maxima and maxes that Dr. Martin refers to correspond to the descriptors in the claims, as explained below.

361. Because the simulation processed and analyzed typical television audio, it is my opinion that when used in panelists' household, TVision's devices would similarly determine descriptors by performing intraframe comparisons in overlapping frames and in consecutive frames. In addition, the signatures have to be the same for both reference signatures and monitoring signatures, so VidVita's processing to create reference signatures would also perform intraframe comparisons in overlapping frames and in consecutive frames.

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

362.    In my opinion, Dr. Martin's simulation demonstrates that ACRCloud's SDK
performs intraframe comparison(s) when determining descriptors and does so to determine
descriptors in consecutive and overlapping frames.

363.    ██████████████████████████████████████████

██████████████████████████████████████. See

ACRCloud_NLSN_SC_00000021 ██████████████████████

ACRCloud_NLSN_SC_00000015 ████████████████████████ {").

This results in █████████████████████████████████████

████████████████████████████████████



368.    Id. As explained in the paragraphs above, the descriptors for each frame are
determined via a comparison of the first and second values from a given frame. Since each
local_max entry comprising a descriptor is a maximum point identified by a bin, frame, and
value, each such descriptor is necessarily "of the" frame associated with that point (i.e., it is a
descriptor of the frame identified by the "t_y" in the statement "s->local_max_[s-
>local_max_num_].t_y = t_y;").

369.    isListMax also returns the next bin in a frame on which to continue the
processing. Using that bin, local_max repeats the processing of maxInfo described above. This
repeats until the processing reaches the last bin in the frame. At that point, ACRCloud's FP
Algorithm repeats the steps set forth above for the each of the subsequent frames in the six-

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Both the claimed determining step and the comparison in ACRCloud's code perform substantially the same function in substantially the same way to obtain substantially the same result. The function performed is to determine the descriptor based on a comparison of frequency domain values. The ACRCloud code performs substantially the same function—it compares two frequency domain values to determine which one is greater. The way the claim performs this function is to compare two frequency domain values and to determine a descriptor based on this comparison. The ACRCloud code acts in substantially the same way by creating a descriptor based on a comparison of which frequency domain value is greater. The result is also substantially the same. In both cases, the descriptor is generated based on the result of the comparison of two frequency domain values. Accordingly, TVision satisfies this element under the doctrine of equivalents.

371.    As claimed, the first frame and second frame must be consecutive (*see* element 8.b) and must each have a descriptor. This claim element requires determining a descriptor for the same first frame recited in element 8.b that is recited as consecutive with the second frame which element 8.f requires also have a descriptor. For first and second frames that are "consecutively located in an audio stream," an intraframe comparison will occur in determining both the first descriptor and the second descriptor in consecutive frames while processing typical panelist television content. Dr. Martin's simulation shows that while processing audio in typical television content, TVision's device will perform intraframe comparisons to create descriptors in consecutive frames. *See* Section VIII.D (incorporated by reference).

372.    As explained in the Martin Report, Dr. Martin created a simulation of the processing done by ACRCloud's source code. Martin Rep., Section VIII. Dr. Martin's simulation implements the algorithm in the ACRCloud source code. Dr. Martin ran his simulation using audio data harvested from television content for 9,978 samples of 6 seconds each. This corresponds to TVision's meter monitoring panelist viewing for approximately 99,928 seconds or 1,665 minutes. His results show that in every 6-second audio clip except *for one* (i.e., basically 100% of the 6-second audio clips), the simulation-generated descriptors *resulted* from intraframe comparisons. See Martin Rep., ¶¶ 142-44. That one 6-second audio clip was digital

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

silence and had no descriptors at all. In my opinion, the audio data from television that Dr. Martin tested is representative of television content including the television content that TVision's devices monitor.

373.    Dr. Martin's simulation tested the audio tracks from 71 video files representing various television programs and commercials. *See* Martin Rep., ¶ 142. Those 71 video files represented 1,665 minutes of television. His simulation processed those files in the same way ACRCloud's SDK does: in 6-second clips taken from 10 seconds of audio. In total, Dr. Martin's simulation tested 9,978 6-second audio clips.

374.    This test showed that for every video file and for nearly all 6-second clips created from those video files (excepting the silent one discussed above), ACRCloud's SDK creates signatures based on descriptors that (1) were determined by performing intraframe comparisons of spectral powers, and (2) located in consecutive frames and in overlapping frames (as required by subsequent limitations of this claim, which I explain in more detail below). See Martin Rep., ¶¶142-144.

375.    Dr. Martin's output data from the simulation refers to maxima and maxes found in the audio portion of the video files tested. The maxima and maxes that Dr. Martin refers to correspond to the descriptors in the claims, as explained below.

376.    Because the simulation processed and analyzed typical television audio, it is my opinion that when used in panelists' household, TVision's devices would similarly determine descriptors by performing intraframe comparisons in overlapping frames and in consecutive frames. In addition, the signatures have to be the same for both reference signatures and monitoring signatures, so VidVita's processing to create reference signatures would also perform intraframe comparisons in overlapping frames and in consecutive frames.

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

377.     In my opinion, Dr. Martin's simulation demonstrates that ACRCloud's SDK performs intraframe comparison(s) when determining descriptors and does so to determine descriptors in consecutive and overlapping frames.

378.     In view of the above, it is therefore my opinion that TVision meets this claim element—"determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power"—both when creating Device Fingerprints and when creating Reference Fingerprints (via VidVita). TVision meets this claim element both literally and under the Doctrine of Equivalents.

> **f)**     **"determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power"**

379.     TVision uses ACRCloud's FP Algorithm to create both the Device Fingerprints and Reference Fingerprints (via VidVita). *See, supra*, ¶¶ 151–173.

380.     As detailed below, ACRCloud's FP Algorithm "determine[s] a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power"—both when creating Device Fingerprints and when creating Reference Fingerprints (via VidVita). *See, supra*, ¶¶ 120–133 (Section VIII.C.2 Frequency Components) (incorporated by reference).

381.     This element (8.f) is substantively identical to claim element 1.g—"determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power"—discussed above. That discussion is incorporated herein by reference (Section IX.B.1.g)). *See, supra*, ¶¶ 246–258 (incorporated by reference).

382.     In addition to finding the first descriptor for the first frame of media samples discussed above in Section IX.B.1.c) (element 1.c) in local_max

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

(ACRCloud_NLSN_SC_00000014-15), function local_max determines the second descriptor by using the isListMax function to compare the third and fourth spectral powers from the second frame of media samples in the same way discussed above for the first and second spectral powers. See ACRCloud_NLSN_SC_00000015.

383.    The local_max function stores this second descriptor into a buffer (s->local_max_) along with its bin number and frame number. ACRCloud_NLSN_SC_00000015.

384.    As set forth above in Section IX.B.1.c) (element 1.c) with regard to the "first spectral power" and the "second spectral power," for purposes of this claim element, the comparison of the "third spectral power" and "fourth spectral power" results in a maximum spectral power that is the result of the **local_max** and **isListMax** functions discussed above but applied to the "second frame of media samples." This comparison results in the second descriptor (comprised of its frame number, bin number, and value). *See also* Section IX.B.1.d) (element 1.d). Moreover, as set forth in Section IX.B.1.h) (element 1.h), this "second descriptor" will become part of the "second signature." *See* Section IX.B.1.h) (element 1.h).

385.    The first frame and the second frame both have descriptors (generated as a result of intraframe comparison) and overlap (*i.e.*, contain common and not common samples) in the processing of a typical 6-second audio sample. *See* Section VIII.D.

386.    As explained in the Martin Report, Dr. Martin created a simulation of the processing done by ACRCloud's source code. Martin Rep., Section VIII. Dr. Martin's simulation implements the algorithm in the ACRCloud source code. Dr. Martin ran his simulation using audio data harvested from television content for 9,978 samples of 6 seconds each. This corresponds to TVision's meter monitoring panelist viewing for approximately 99,928 seconds

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

or 1,665 minutes. His results show that in every 6-second audio clip except *for one* (i.e., basically 100% of the 6-second audio clips), the simulation-generated descriptors *resulted* from intraframe comparisons. See Martin Rep., ¶¶ 142-44. That one 6-second audio clip was digital silence and had no descriptors at all. In my opinion, the audio data from television that Dr. Martin tested is representative of television content including the television content that TVision's devices monitor.

387.    Dr. Martin's simulation tested the audio tracks from 71 video files representing various television programs and commercials. *See* Martin Rep., ¶ 142. Those 71 video files represented 1,665 minutes of television. His simulation processed those files in the same way ACRCloud's SDK does: in 6-second clips taken from 10 seconds of audio. In total, Dr. Martin's simulation tested 9,978 6-second audio clips.

388.    This test showed that for every video file and for nearly all 6-second clips created from those video files (excepting the silent one discussed above), ACRCloud's SDK creates signatures based on descriptors that (1) were determined by performing intraframe comparisons of spectral powers, and (2) located in consecutive frames and in overlapping frames (as required by subsequent limitations of this claim, which I explain in more detail below). See Martin Rep., ¶¶142-144.

389.    Dr. Martin's output data from the simulation refers to maxima and maxes found in the audio portion of the video files tested. The maxima and maxes that Dr. Martin refers to correspond to the descriptors in the claims, as explained below.

390.    Because the simulation processed and analyzed typical television audio, it is my opinion that when used in panelists' household, TVision's devices would similarly determine descriptors by performing intraframe comparisons in overlapping frames and in consecutive

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

frames. In addition, the signatures have to be the same for both reference signatures and monitoring signatures, so VidVita's processing to create reference signatures would also perform intraframe comparisons in overlapping frames and in consecutive frames.

391.    In my opinion, Dr. Martin's simulation demonstrates that ACRCloud's SDK performs intraframe comparison(s) when determining descriptors and does so to determine descriptors in consecutive and overlapping frames.

392.    As claimed, the first frame and second frame must be consecutive (*see* element 8.b) and must each have a descriptor. This claim element requires determining a descriptor for the same second frame recited in element 8.b that is recited as consecutive with the first frame, which element 8.e requires also have a descriptor. For first and second frames that are "consecutively located in an audio stream," an intraframe comparison will occur in determining both the first descriptor and the second descriptor in consecutive frames while processing typical panelist television content. Dr. Martin's simulation shows that while processing audio in typical television content, TVision's device will perform intraframe comparisons to create descriptors in consecutive frames. *See* Section VIII.D (incorporated by reference).

393.    As explained in the Martin Report, Dr. Martin created a simulation of the processing done by ACRCloud's source code. Martin Rep., Section VIII. Dr. Martin's simulation implements the algorithm in the ACRCloud source code. Dr. Martin ran his simulation using audio data harvested from television content for 9,978 samples of 6 seconds each. This corresponds to TVision's meter monitoring panelist viewing for approximately 99,928 seconds or 1,665 minutes. His results show that in every 6-second audio clip *except for* one (i.e., basically 100% of the 6-second audio clips), the simulation-generated descriptors resulted from intraframe comparisons. See Martin Rep., ¶¶ 142-44. That one 6-second audio clip was digital silence and

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

had no descriptors at all. In my opinion, the audio data from television that Dr. Martin tested is representative of television content including the television content that TVision's devices monitor.

394.    Dr. Martin's simulation tested the audio tracks from 71 video files representing various television programs and commercials. *See* Martin Rep., ¶ 142. Those 71 video files represented 1,665 minutes of television. His simulation processed those files in the same way ACRCloud's SDK does: in 6-second clips taken from 10 seconds of audio. In total, Dr. Martin's simulation tested 9,978 6-second audio clips.

395.    This test showed that for every video file and for nearly all 6-second clips created from those video files (excepting the silent one discussed above), ACRCloud's SDK creates signatures based on descriptors that (1) were determined by performing intraframe comparisons of spectral powers, and (2) located in consecutive frames and in overlapping frames (as required by subsequent limitations of this claim, which I explain in more detail below). See Martin Rep., ¶¶142-144.

396.    Dr. Martin's output data from the simulation refers to maxima and maxes found in the audio portion of the video files tested. The maxima and maxes that Dr. Martin refers to correspond to the descriptors in the claims, as explained below.

397.    Because the simulation processed and analyzed typical television audio, it is my opinion that when used in panelists' household, TVision's devices would similarly determine descriptors by performing intraframe comparisons in overlapping frames and in consecutive frames. In addition, the signatures have to be the same for both reference signatures and monitoring signatures, so VidVita's processing to create reference signatures would also perform intraframe comparisons in overlapping frames and in consecutive frames.

117

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

398.    In my opinion, Dr. Martin's simulation demonstrates that ACRCloud's SDK performs intraframe comparison(s) when determining descriptors and does so to determine descriptors in consecutive and overlapping frames.

399.    In view of the above, it is therefore my opinion that TVision meets this claim element—"determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power"—both when creating Device Fingerprints and when creating Reference Fingerprints (via VidVita). TVision meets this claim element both literally and under the Doctrine of Equivalents.

### g)    "generate a first signature based on the first descriptor and a second signature based on the second descriptor"

400.    TVision uses ACRCloud's FP Algorithm to create both the Device Fingerprints and Reference Fingerprints (via VidVita). *See, supra*, ¶¶ 151–173.

401.    As detailed below, ACRCloud's FP Algorithm "generate[s] a first signature based on the first descriptor and a second signature based on the second descriptor"—both when creating Device Fingerprints and when creating Reference Fingerprints (via VidVita).

402.    This claim element (8.g) is substantively identical to the combination of elements 1.d ( "generating a first signature based on the first descriptor") and 1.h ("generating a second signature based on the second descriptor"), discussed above. Those discussions are incorporated herein by reference (Sections IX.B.1.h) and IX.B.1.d)). *See, supra*, ¶¶ 134-135 (Section VIII.C.3 Generating a Signature) (incorporated by reference), 217–221 (incorporated by reference), and 259–264 (incorporated by reference).

403.    The create_fp_by_buffer function calls the get_fp function. ACRCloud_NLSN_SC_00000008. Because s->opt_.is_local_ is true, get_fp processes the descriptors for each frame identified in local_max to create signatures for each frame. get_fp

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

discussion is incorporated by reference (Section IX.B.1.f)). *See, supra*, ¶¶ 234–242 (incorporated by reference).

467.    In view of the above, it is therefore my opinion that TVision infringes (both literally and under the Doctrine of Equivalents) Claim 17—"A tangible machine accessible medium as defined in claim 14, wherein third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples."

## X.    ALLEGED ALTERNATIVES

468.    I have reviewed information about the companies mentioned by Mr. Webster and Mr. Liu in their depositions as possible available, acceptable, non-infringing alternatives for ACR in its system. These companies are Answer, Mobile Research Lab ("MRL"), Dat-Track, and AxWave. I discuss each of these below.

### A.  "ANSWER"

469.    Mr. Liu identified a company called "Answer." *See* Liu Tr., 75:8-15. I was not able to find any information about such a company in either public sources or in TVision's document production.

470.    I understand, however, that there is a company in the ACR space called "Enswers." Nielsen has owned Enswers since before May 2018 (and thus its products were unavailable to TVision). Nielsen Holdings plc 2020 10-K, Ex. 21.1 https://www.sec.gov/Archives/edgar/data/1492633/000156459021008814/nlsnnv-ex211_738.htm (Enswers as subsidiary of Nielsen subsidiary Gracenote Korea Ltd.); Exhibit 6, "Gracenote company profile,"

**Ex. 3**

https://tracxn.com/d/companies/gracenote/__HBuP7bXwfa2McbO9UgN8Kx9AKv8ezJul2CF1m
kyRYRw (showing Nielsen acquired Gracenote in 2017 and Gracenote acquired Enswers in
2015).

## B. DAT-TRACK

471.    With regard to Dat-Track, there is no evidence that it could provide an acceptable
alternative to ACRCloud. Although Mr. Webster testified that TVision tested Dat-Track
(Webster Tr. at 42:15-17), I understand that there is no evidence in the record supporting that
testimony. ACR solutions are not off-the-shelf solutions. Rather, ACR solutions need to be
customized for the environment in which they are being used, and that environment must be
customized for a given ACR solution. I have seen no evidence that TVision did any testing, or
even looked into the details, of using an ACR solution from Dat-Track. Without testing an ACR
solution, one can only speculate whether that solution would have been acceptable (or would
even work at all) in a given environment.

472.    Also with respect to acceptability, according to Yan Liu, TVision's CEO, Dat-
Track would have been too expensive unless TVision reduced its then-current matching
frequency. TVSN_NLSN_00399618–619 at TVSN_NLSN_00399619. Reducing the matching
frequency, in turn, would degrade the quality of TVision's ACR recognition, thereby reducing
the quality of TVision's data. Not surprisingly, a TVision consultant advised Mr. Liu against
reducing the matching frequency: "It's a core attribute of your data and given the upswing in
currency use cases, it would be a bummer to get this wrong." TVSN_NLSN_00399618–619 at
TVSN_NLSN_00399618. Accordingly, the only Dat-Track solution TVision could afford was
unacceptable.

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

473.    In addition, there is no evidence of Dat-Track's availability in the relevant timeframe. Dat-Track is a fairly new company. I have no evidence that Dat-Track existed in 2018 when TVision switched from Gracenote to the infringing ACRCloud solution. The Internet Archive shows that Dat-Track's website, www.dat-track.com, was first crawled on November 30, 2021. (Exhibit 8.) ICANN registry data at https://lookup.icann.org/en/lookup shows this domain was created on April 28, 2019. (Exhibit 7.) I have seen no evidence that Dat-Track was an available alternative when TVision started to infringe the '889 patent in 2018.

474.    Accordingly, I have seen no evidence that Dat-Track could provide an acceptable ACR alternative for TVision in April/May 2018 or later. Nor would the Dat-Track solution have been available to TVision in April/May 2018.

### C.  MOBILE RESEARCH LABS (MRL)

475.    MRL was also mentioned as a possible alternative ACR solution for TVision, but the MRL product would not have been an acceptable alternative. I have reviewed documents showing the results of TVision's 2017 test of MRL's solution before TVision decided to instead begin using ACRCloud. TVSN_NLSN_00645277–295. TVision's documents show that TVision extensively tested MRL's ACR solution for 8 weeks in Japan and that MRL's solution had 75% false negative and 77% false positives as compared to "TVI Data," which I understand to be TVision's then-current ACR provider, Gracenote. TVSN_NLSN_00645277–295 at TVSN_NLSN_00645280. Correcting for times when the microphone was muted or taken, MRL's solution still resulted in a false negative result of 45%, which in my opinion is unacceptable for a production system. TVSN_NLSN_00645277–295 at TVSN_NLSN_00645281.

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

476.    This testing shows that MRL's ACR solution did not perform nearly as well as TVision's then-current ACR solution, which was provided by Gracenote. *See*, *supra*, ¶ 475. TVision later showed that ACRCloud's product was much better than Gracenote's. Liu, Ex. 27, "TVision: All Hands Meeting," at 24-26 (May 31, 2018) (TVSN_NLSN_00732275) ("May 31, 2018 All Hands Meeting"); *see also* Liu Tr., 202:14-205:20 (discussing slides 24-26 to May 31, 2018 All Hands Meeting). Accordingly, one can conclude that MRL's product did not perform nearly as well as ACRCloud's.

477.    For all these reasons, it is my opinion that MRL was not an acceptable alternative to ACRCloud in April/May 2018, when TVision switched from Gracenote to ACRCloud's solution.

478.    Regarding acceptability in the period after April/May 2018, my understanding is that TVision did not test MRL's solution again. As explained previously, without testing an ACR solution, one can only speculate whether that solution would have been acceptable (or would even work at all) in a given environment.

479.    Finally, with regard to acceptability as of April/May 2018 or later, MRL's solution appears to work in a fundamentally different way from ACRCloud's solution, such that it is not an acceptable alternative. In particular, in MRL's product, once data is collected on the device, the data is sent to MRL's server for matching. Unlike the ACRCloud solution, MRL's product provides no feedback to the device itself. *See* TVSN_NLSN_00610721–726 at TVSN_NLSN_00610723. In addition, MRL appears to integrate through software development kits (SDKs) with Android and iOS clients, while TVision uses Windows and Linux-based software on its panelist meters. TVSN_NLSN_00610742–751 at TVSN_NLSN_00610750. Switching to MRL would require TVision to change the basic software and hardware

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

architecture of its meters. Such a fundamental change is not feasible and confirms that MRL's ACR solution is not an acceptable alternative to ACRCloud's ACR solution.

480.    Accordingly, MRL could not provide an available, acceptable alternative for TVision at any time.

### D.  AXWAVE

481.    I also researched Axwave, which Mr. Liu's transcript incorrectly identifies as Adwave. *See* Liu Tr., 75:8-15. Axwave was acquired in 2019 by Samba TV. *See* Exhibit 9, https://en.wikipedia.org/wiki/Axwave; Exhibit 10, https://www.adexchanger.com/digital-tv/samba-tv-acquires-acr-startup-axwave-to-slurp-up-more-acr-data/.

482.    Axwave could not provide an acceptable alternative solution. TVision appears to have investigated Axwave in 2016. But TVision had found by June 2016 that "Axwave's SDK has lots of issue[s] …." TVSN_NLSN_00533729–732 at TVSN_NLSN_00533731. In fact, by October 2017, TVision even refused to meet with Axwave, with Dan Schiffman explaining to Axwave that "I have been advised that we are moving forwards with another solution for the time being. l don't [sic] think it is best use of our time to meet at the moment." TVSN_NLSN_00725382–386 at TVSN_NLSN_00725382.

483.    Moreover, Axwave did not have an available product. In 2021, TVision appears to have exchanged some email with Axwave's purchaser, Samba TV, about ACR, but Samba TV indicated it had no product. Specifically, on October 26, 2021, Samba TV indicated "we are in middle of relaunching [an ACR product] now." TVSN_NLSN_00184226–228 at TVSN_NLSN_00184226. On the same day, Samba TV admitted that they "need to do some production work on the audio SDK, and I think Chris Jantz Sell can give you a sense of timing for when we can send you software + documentation (probably early 2022)."

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00182490. These statements further confirm that Samba TV did not have a production product at that time. In response to Mr. Liu's request in TVSN_NLSN_00182490, Mr. Webster followed up with Samba TV on November 5, 2021 regarding the "planned ACR offering." TVSN_NLSN_00336541. Samba TV's representative scheduled a call with Mr. Webster on November 16, 2021, (TVSN_NLSN_00841712–13), but the record contains no further communications between TVision and Samba TV about ACR.

484.    I am not aware of any indication in the record that Samba TV ever developed a commercial ACR product. Moreover, Samba TV's webpage gives no indication that they could offer TVision an audio ACR solution that would work with its meters. Samba TV appears to use video ACR as part of its end-to-end data products and does not offer an audio ACR solution that would be integratable into TVision's meters. *See* Exhibit 11, https://www.samba.tv/business; Exhibit 12, https://www.samba.tv/business/data. Video ACR would not work with TVision's meters, which use a microphone to capture audio.

485.    For all of the above reasons, it is my opinion that Axwave (and Samba TV) did not have an available, acceptable alternative to ACRCloud's product, either in April/May 2018 or thereafter.

**E.  SUMMARY**

486.    As shown above, there were and are no available, acceptable alternative ACR solutions for TVision to use instead of ACRCloud. In addition, even if such a solution had become available after April/May 2018, switching from ACRCloud to a different ACR solution would have been prohibitively expensive (in terms of time, effort, and money). In particular, it would require regenerating all reference fingerprints (assuming continued availability of the reference content, which is not a given) because different ACR providers use different

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

algorithms to generate fingerprints. For fingerprints to match, fingerprints generated from media content being watched by a panelist must be generated using the same algorithm that generated the reference fingerprint to which the fingerprint is being matched. As of 2020, TVision had about 15,000 hours of OTT content, 1,000 hours of YouTube content and 500 hours of specific advertisements fingerprinted for which it would have to regenerate fingerprints if it switched ACR providers. TVSN_NLSN_00610739–41 at TVSN_NLSN_00610740. It likely has more content fingerprinted now.

487.    Changing ACR providers would also require changing the software running on TVision's panelist meters. This meter software calls specific APIs associated with ACRCloud's ACR solution. Using another company's ACR solution would require using APIs associated with that company. In many cases, switching providers requires more than just changing which APIs are called.

488.    In summary, TVision did not have any acceptable, available alternatives to the ACRCloud solution in April/May 2018. Nor would it have had (or does it now have) such alternatives after that time.

## XI.    CONCLUSION

489.    For the reasons set forth above, my opinion is that TVision has infringed claims 1, 2, 4, 6, 8, 9, and 12–14, 16-17 of the '889 patent.

490.    In addition, for the reasons set forth above, my opinion is that TVision did not have any acceptable, available alternatives to the ACRCloud solution in April/May 2018. Nor would it have had (or does it now have) such alternatives after that time.

**Ex. 3**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

I, CHRIS KYRIAKAKIS, hereby declare under penalty of perjury under the laws of the United

States of America, that the foregoing Report is true and correct.

Date: _7/6/2025_____                                    _____

                                                                              Chris Kyriakakis

**Ex. 3**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | C.A. No. 22-57-CJB |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | **HIGHLY CONFIDENTIAL –** |
| TVISION INSIGHTS, INC., | ) | **OUTSIDE ATTORNEYS' EYES ONLY** |
| | ) | |
| Defendant. | ) | |

**THE NIELSEN COMPANY (US), LLC'S
SUPPLEMENTAL FINAL INFRINGEMENT CONTENTIONS**

Plaintiff The Nielsen Company (US), LLC ("Nielsen"), by and through its counsel,

serves Defendant TVision Insights, Inc. ("TVision") with the following Supplemental Final

Infringement Contentions pursuant to D.I. 295 (Scheduling Order entered on May 15, 2025).

This replaces the final infringement contentions served on September 18, 2023, and the initial

claim chart served on September 8, 2022 (Appendix A) for U.S. Patent No. 7,783,889 ("the '889

patent") pursuant to Paragraph 7(d) of the Court's Scheduling Order (D.I. 24) and Paragraph 4(c)

of the Default Standard for Discovery, Including Discovery of Electronically Stored Information

("Default Standard").

## I.    Preliminary Statement

These Supplemental Final Infringement Contentions for the '889 patent are based on

information reasonably available to Nielsen at this time. These Supplemental Final Infringement

Contentions also expressly incorporate by reference Nielsen's future expert reports on the issue

of infringement. The Court has not construed all identified claim terms. For example, the Court

has not yet construed "frequency component." D.I. 140, Oral Order of Nov. 9, 2023. To the

extent that the construction of that term is disputed, Nielsen reserves the right to ask the Court to

construe it. In addition, pursuant to the Court's Scheduling Order (D.I. 24, as amended by D.I.

**Ex. 4**

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By:  /s/ David E. Moore

Steven Yovits
Douglas Lewis
Constantine Koutsoubas
Jason P. Greenhut
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
Tel:  (312) 857-7070

David E. Moore (#3983)
Bindu A. Palapura (#5370)
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
Tel:  (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

Clifford Katz
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  (212) 808-7800

*Attorneys for Plaintiff The Nielsen Company (US), LLC*

Joshua Long
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd Suite 900
Houston, TX 77027
Tel: (713) 355-5000

Dated: June 2, 2025
12267438 / 14944.00004

11

**Ex. 4**

## <u>CERTIFICATE OF SERVICE</u>

I, David E. Moore, hereby certify that on June 2, 2025, true and correct copies of the

within document were served on the following counsel of record at the addresses and in the

manner indicated:

### <u>VIA ELECTRONIC MAIL</u>

John W. Shaw
Andrew E. Russell
Nathan R. Hoeschen
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
SKTVision@shawkeller.com

Jason Xu
RIMON LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
jason.xu@rimonlaw.com

Michael F. Heafey
RIMON LAW P.C.
800 Oak Grove Avenue, Suite 250
Menlo Park, CA 94025
michael.heafey@rimonlaw.com

Eric C. Cohen
RIMON LAW
4030 Wake Forest Road
Suite 300
Raleigh, NC 27609
Tel: (302) 960-2860
eric.cohen@rimonlaw.com

*/s/ David E. Moore*
David E. Moore

10164932 / 14944.00004

**Ex. 4**

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY**

| Index | Claim Element | Device Fingerprints (Panelist Devices) and Reference Fingerprints |
|---|---|---|
| | | results of the subsequent processing of those results. In addition, the above describes "performing a spectral transform operation on the first frame of media samples" by performing an FFT on the audio media samples.<br><br>The Court construed this term: "to mean 'generate first and second frequency components by performing a spectral transform operation on the first frame of media samples.'" ECF No 141. The above describes generating first and second frequency components by generating 1024 frequency bins (which includes the first and second frequency components) by performing an FFT (*i.e.*, a "spectral transform operation") on the first frame of media samples (*i.e.*, 2048 samples).<br><br>The Court has not yet construed "frequency component." See ECF 140. Nielsen proposes to construe "frequency component" as: "Plain and Ordinary Meaning: of a signal generated by transforming the signal data from the time domain to the frequency domain." The above description shows how the kkfft function returns a frequency component in the frequency domain that is generated by transforming a time domain signal in a memory pointed to by s->pcm_ to a set of values in the frequency domain pointed to by pFFDataR, pFFTDataI, and pFFTEnergy.<br><br>TVision proposes to construe "frequency component as "Plain meaning, i.e., a single frequency or single band of frequencies." The above description shows that ACRCloud's code creates a frequency component (the value returned by kkfft for a single bin in the buffers pointed to by pFFDataR, pFFTDataI, and pFFTEnergy) that represents the frequency domain coefficient of a single frequency or group of frequencies. |
| 1.c. | determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; | TVision uses ACRCloud's FP Algorithm to create both the Device Fingerprints and Reference Fingerprints. The following analysis applies equally to both.<br><br>████████████████████████<br><br>ACRCloud_NLSN_SC_00000013; ACRCloud_NLSN_SC_00000014 |

**Ex. 4**

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY**

| Index | Claim Element | Device Fingerprints (Panelist Devices) and Reference Fingerprints |
|-------|---------------|--------------------------------------------------------------------|
|       |               | ██████). ██████████████████████████████ ACRCloud_NLSN_SC_00000015 ███████████ *see also id.* (████████████████████w). ████████████ <br><br> The create_fp_by_buffer function sets parameters using "██████████████████████};" ACRCloud_NLSN_SC_00000008. <br><br> The create_afp_session function copies these parameters into th ██████████████████████████);" ACRCloud_NLSN_SC_00000018. The AfpExtraSession structure type defines "opt_" to be of type ExtrOption. ExtrOption is defined as: <br><br> ████████ <br> █████████████████ <br> ███████████████ <br> ████████ <br> ████████████ <br> ████████████ <br> ████████ |

**Ex. 4**

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY**

| Index | Claim Element | Device Fingerprints (Panelist Devices) and Reference Fingerprints |
|-------|---------------|-------------------------------------------------------------------|
|       |               | ACRCloud_NLSN_SC_00000106. The AfpExtrSession data type is defined by the following structure: <br><br> typedef struct <br><br> ■ ████████ <br><br> ████ <br><br> █████ <br><br> ██████ <br><br> ████ <br><br> ████ <br><br> ACRCloud_NLSN_SC_00000106. |

**Ex. 4**

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY**

| Index | Claim Element | Device Fingerprints (Panelist Devices) and Reference Fingerprints |
|-------|---------------|-------------------------------------------------------------------|
|       |               | The create_afp_session function copying extr_op to s->opt_ results in the fields in the latter having the following values that correspond to the values stored in the former: <br><br> ████████████████████ <br><br> ███████████. *See* ACRCloud_NLSN_SC_00000015; ACRCloud_NLSN_SC_00000021 ████████████████ Put simply, for each value in maxInfo for a given frame, this processing finds the maximum values in each frame, ignoring any values for the frame when other bins +/- 8 bins away have higher values. <br><br> This processing requires comparing the values of at least two frequency components from the same frame, *i.e.*, intra-frame processing. Specifically, local_max loops over every frame ███████████████ ). ACRCloud_NLSN_SC_00000015. <br><br> When the value in maxInfo for the current frame and bin is from the currently being-analyzed frame ███████████████ |

**Ex. 4**

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY**

| Index | Claim Element | Device Fingerprints (Panelist Devices) and Reference Fingerprints |
|-------|---------------|-------------------------------------------------------------------|
|       |               | ███████████████████████████████████████████ *See* ACRCloud_NLSN_SC_00000021.<br><br>For each set of bins +/- 32 from the current bin, the code compares each value for a frame in the maxInfo buffer to every other value for that frame in the maxInfo buffer to determine the "maximum." The comparison occurs ████████████████ ███████████████████████████ ACRCloud_NLSN_SC_00000015. As described previously, ████████████████ This loop makes this comparison of values expressly for each bin +/-32 from the current bin:<br><br>████████████████████████████<br>████████████████<br>██████████<br>██ █<br>█<br><br>where ████████████████████████████ ███████████████ *See* ACRCloud_NLSN_SC_00000015 ████████████). The isListMax code compares these two values to determine if the value in the maxInfo buffer currently being analyzed is greater than the maximum thus far as stored in "max." For any frame where the current bin contains the maximum value (which is the only time a descriptor is found), it will compare the value of the current bin with other values from the same frame, while processing typical audio data. See ACRCloud_NLSN_SC_00000021 (isListMax).<br><br>Although some of the values compared within isListMax may be from other frames, |

**Ex. 4**

**HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY**

| Index | Claim Element | Device Fingerprints (Panelist Devices) and Reference Fingerprints |
|-------|---------------|-------------------------------------------------------------------|
|  |  | during the processing of a 6-second audio sample, the processing of 65-bin windows will directly compare values from the same frame. Moreover, TVision provides ACRCloud's algorithm 6-second audio clips every 10 seconds, so over an hour TVision will have sent 360 6-second clips. TVision uses this ACRCloud FP Algorithm whenever its panelists watch television, which would likely exceed one hour for each panelist (even per night), further ensuring that an intraframe comparison occurs. Accordingly, over a panelist's typical television watching session, TVision's use of the ACRCloud FP Algorithm will directly compare two values from the same frame.<br><br>█████████████████████████████████████████████ *See* ████████<br>ACRCloud_NLSN_SC_00000021 ████████<br>*See* ACRCloud_NLSN_SC_00000015 ███████████<br>████████) {"). This results in local_max storing as a descriptor the bin, frame, and value for the current frame and bin (████████████████") in the buffer pointed to by s->local_max_:<br><br>██████████████████████████████<br>██████████████████████████████<br>██████████████████████████████<br><br>*Id.* As explained in the paragraphs above, the descriptors for each frame are determined via a comparison of the first and second values from a given frame.<br><br>To the extent determining a descriptor in this manner is not considered to be "a comparison of the first spectral power and the second spectral power," this limitation is met by the doctrine of equivalents. The claimed spectral powers are representations of the frame's time domain audio samples in the frequency domain. The values that the ACRCloud code compares are also frequency domain representations of the time domain audio signal like the spectral power in the claim. Comparing these values is insubstantially |

**Ex. 4**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

| Index | Claim Element | Device Fingerprints (Panelist Devices) and Reference Fingerprints |
|---|---|---|
|  |  | different from comparing the powers. The values the ACRCloud code compares are the filtered square root of the power. The square root of the power is the magnitude of that frequency bin. There is no advantage or disadvantage to comparing a signal directly or its square root/magnitude, especially given that all the values being compared are similarly treated. The claim element requires a "comparison" and the results of a comparison of two signals representing magnitude or representing power (the magnitude squared) will result in the same result, in that the same signal will be greater in both cases. Moreover, both power and magnitude are well-known characteristics (and mathematical alternatives) of a frequency domain signal resulting from the output of an FFT and are interchangeable in this context. Further, using a filter is a common action in signal processing and does not make the processing in the code substantially different from comparing power directly. Comparing such values that are easily (and reversibly) mathematically determined from each other is insubstantially different. And both the claim and the ACRCloud code use a comparison, thereby garnering the advantages of a sign-based approach based on comparisons.<br><br>Both the claimed determining step and the comparison in ACRCloud's code perform substantially the same function in substantially the same way to obtain substantially the same result. The function performed is to determine the descriptor based on a comparison of frequency domain values. The ACRCloud code performs substantially the same function—it compares two frequency domain values to determine which one is greater. The way the claim performs this function is to compare two frequency domain values and to determine a descriptor based on this comparison. The ACRCloud code acts in substantially the same way by creating a descriptor based on a comparison of which frequency domain value is greater. The result is also substantially the same. In both cases, the descriptor is generated based on the result of the comparison of two frequency domain values. Accordingly, TVision satisfies this element under the doctrine of equivalents. |
| 1.d. | generating a first signature based on the first descriptor; | TVision uses ACRCloud's FP Algorithm to create both the Device Fingerprints and Reference Fingerprints. The following analysis applies equally to both.<br><br>As an initial matter, gen_fp does not call nice_max because s->opt_.is_local_ is set to 1 |

**Ex. 4**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

THE NIELSEN COMPANY (US), LLC,    )
    )
    Plaintiff,    )   C.A. No. 22-057-CJB
    )
    v.    )   **HIGHLY CONFIDENTIAL -**
    )   **OUTSIDE COUNSEL ONLY**
TVISION INSIGHTS, INC.,    )
    )
    Defendant.    )
    )
    )
    )

---

**REBUTTAL EXPERT REPORT OF DR. DAVID ANDERSON**
**REGARDING U.S. PATENT NO. 7,783,889**

**HIGHLY CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

**Ex. 5**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION ................................................................................................1

II.     QUALIFICATIONS AND BACKGROUND ....................................................2

III.    METHODOLOGY USED .................................................................................5

        1.      Infringement ...........................................................................................6

IV.     LEVEL OF ORDINARY SKILL .....................................................................7

V.      THE PATENT-IN-SUIT AND RELATED TECHNOLOGY ........................7

        1.      Overview .................................................................................................7

        2.      The Asserted Claims ...............................................................................9

        3.      Spectral Transform Operations .............................................................11

VI.     CLAIM CONSTRUCTION ............................................................................16

VII.    SUMMARY OF OPINIONS ...........................................................................16

VIII.   NON-INFRINGEMENT ANALYSIS .............................................................16

        1.      Summary of the Accused Product Features ...........................................16

        2.      Independent Claim 1 .............................................................................23

                a.      "Reference Fingerprints" ...........................................................23

                b.      "determining a first descriptor of the first frame of media samples
                        based on a comparison of the first spectral power and the second
                        spectral power" ...........................................................................24

                c.      "generating a first signature based on the first descriptor" .......27

                d.      "identifying a second frame of media samples by extracting a
                        common plurality of media samples from the first frame of media
                        samples and appending another plurality of media samples to the
                        common plurality of media samples" .........................................28

                e.      "determining a second descriptor based on a comparison of the
                        third spectral power and the fourth spectral power" ...................29

                f.      "generating a second signature based on the second descriptor" ..............29

**HIGHLY CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

**Ex. 5**

3.    Claim 1 Dependent Claims .................................................................30

4.    Independent Claim 8 ..........................................................................31

5.    Claim 8 Dependent Claims .................................................................31

6.    Independent Claim 14 ........................................................................33

7.    Claim 14 Dependent Claims ...............................................................33

IX.    **OTHER ANALYSIS** ..................................................................................**34**

1.    Alleged Innovations of the '889 Patent .............................................34

2.    Non-infringing Alternatives ...............................................................41

3.    Comparability of Gracenote License ..................................................46

X.    **MISCELLANEOUS** ...................................................................................**48**

**CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

**Ex. 5**

51.     In his report, Dr. Tanksale identifies the **create_fp** function as the entry-point function for implementing the ACRCloud FP Algorithm.  "As set forth above, the TVision "Muninn" code executes the **create_fingerprint_by_filebuffer** function of the ACRCloud Python SDK (acrcloud_extr_tool.so). This binary was decompiled to extract the ultimate function responsible for the creation of fingerprints that was common across all of the various 'create_fingerprint' functions discussed above in the ACRCloud Python SDK—**create_fp**. The function **create_fp** shall be referred to as the 'ACRCloud FP Algorithm' in this report." (Tanksale Report, ¶51).     However, later in his report, Dr. Tanksale states, that **create_fingerprint_by_filebuffer** is an alias for a different function, **create_fp_by_buffer**. While both functions perform the task of creating fingerprints of the audio, the ambiguity of the decompilation process shows **create_fp_by_buffer** calling the function **create_afp_session** with the wrong number of inputs.     I followed Dr. Tanksale's procedure for decompiling **create_fp_by_buffer** with a more recent version of the IDA Pro decompiler and the call to **create_afp_session** was similarly found in **create_fp**.   Accordingly, the analysis below is relevant to both functions identified by Dr. Tanksale as implementing the ACRCloud FP Algorithm and it assumes that the call to **create_afp_session** in **create_fp_by_buffer** is performed as shown in Dr. Tanksale's code for **create_fp**.  If Dr. Moulin or Nielson argues that that is inappropriate, then their analysis has the flaw that their trace through the code does not properly identify relevant function parameters being passed.

52.     To create a fingerprint, the ACRCloud FP Algorithm uses a Fast Fourier Transform (FFT) to convert frames of audio from the time domain to the frequency domain.  The procedure followed in the code follows these steps.   The **create_fp** and/or the **create_fp_by_buffer** functions call the **gen_fp** function at Moulin Ex. 1, ln32 and ln. 1143

respectively using the **afp_session** as the input. [4]    The **afp_session** is created by the **create_afp_session** function.[5]  Moulin Ex. 1, ln 30 and ln 1141.  The following analysis follows the **create_fp** code only, for simplicity, but the same functionality is exhibited in **create_fp_by_buffer**.  The calling of the **create_afp_session** function takes v13 as a parameter, which is defined as the following: "LODWORD(v13) = 839393280."  Moulin Ex. 1, ln 25. LODWORD value 839393280 converted to the binary format is 00110010 00001000 00100000 00000000, which corresponds to the decimal value "50, 8, 32, 0."   Data in the Intel x86 family of CPUs is generally stored using little-endian format,[6] in which the "little end" (least significant value in the sequence) is stored first; therefore, v13(839393280) using little-endian here is stored as "0, 32, 8, 50."[7]

53.    In the **create_afp_session** function, v13 value "0, 32, 8, 50" is used as input parameter a8.  Moulin Ex. 1, ln. 57.  The **create_afp_session** function then allocates a 112 byte memory as v9.    Moulin Ex. 1, ln. 72 (0x70 converted to decimal is 112).     The **create_afp_session** function then sets "*((_QWORD *)v9 + 12 ) = a8" at Moulin Ex. 1, ln. 77,

---

[4] The **gen_fp** function is defined at Moulin Ex. 1, lns at 129–39.

[5] The **create_afp_session** function is defined at Moulin Ex. 1, lns 57-95.

[6] https://en.wikipedia.org/wiki/Endianness#:~:text=Conversely%2C%20little%2Dendianness%20is%20the,is%20used%20throughout%20the%20file ("Big-endianness is the dominant ordering in networking protocols, such as in the Internet protocol suite, where it is referred to as network order, transmitting the most significant byte first. Conversely, little-endianness is the dominant ordering for processor architectures (x86, most ARM implementations, base RISC-V implementations) and their associated memory").

[7] Moulin Ex. 1 is decompiled from https://github.com/acrcloud/acrcloud_sdk_python/blob/master/docker_alpine/x86-64/python2.7/acrcloud/acrcloud_extr_tool.so., which is based on x86 computer structure.  *See* Tanksale Report at ¶23.

**CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

**Ex. 5**

FFT process, and the results are stored.   The following illustrates an array of spectrum values as created.



56.    The **gen_fp** function then calls the **local_max** function, which takes the **afp_session** received (a1).  Moulin Ex. 1, ln. 133.[10] The **local_max** function uses a local window to move one frame by one frame on the previously generated spectrogram array.

57.    The **local_max** function calls the **getRowMax** function to determine the maximum value of a row of all the frames that are within the window.[11]  As explained above, the **afp_session** contains the "0, **32, 8**, 50" value. Moulin Ex. 1, ln. 368 (row size 8 is retrieved from the **afp_session** structure and assign to v15); ln. 382 (v15 corresponds to the value of the 98th byte of the **afp_session**, which is 8, is used as input parameter when being called from the **local_max** function).   Such determination is done by comparing the spectrum values of each

---

[10] The **local_max** function is defined at Moulin Ex. 1, lns. 273–504.

[11] The **getRowMax** function is defined at Moulin Ex. 1, ln. 537.

**CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

**Ex. 5**

==frame to the spectrum value of the neighboring left and right 8 (row size) frames within the window (a total of 17 frames).== Moulin Ex. 1, ln. 382; lns. 537 (row size 8 is an input parameter a5); 565–70 (calling the **fmaxf** function to determine the maximum among the frames). Note, Dr. Moulin's assertion in ⁋ 125 about the operation of **getRowMax** that "all spectral powers related to all frequency components in the evaluated frame are compared to each other in order to determine the frequency component with the highest spectral power" is incorrect. The **getRowMax** function compares spectral values for a single frequency bin across multiple frames. Once all the frames and all the frequencies have gone through the **getRowMax** function, the **local_max** function then calls the **isListMax** function to determine whether the points with the maximum spectrum value in a row (results from the **getRowMax** function) also have the largest spectrum value compared with neighboring lower and higher 32 (list size) frequencies in the same frame within the local window (a total of 65 frequencies).[12] Moulin Ex. 1, ln. 393 (v21 corresponds to the value of the 97th byte of the **afp_session**, which is 32); ln. 413 (v21=32 is used as input parameter when being called from the **local_max** function). Each of the determined largest spectrum value (peak value) of the local window is stored along with the corresponding position (i, j). Moulin Ex. 1, lns. 446–54. As a result, the largest spectrum value (peak value) of the **local window** is determined. An illustration is shown below.

---

[12] The **isListMax** function is defined at Moulin Ex. 1, ln. 613.

to VidVita.  *See* Moulin Report at ⁋154 ("TVision … provides VidVita with an ID (e.g. tivo_source_id) that corresponds to the ID of the programming guide metadata.").

60.    As a result, I disagree with Dr. Moulin's opinion regarding Reference Fingerprints (Moulin Report at §IX.1).  It is my opinion that the TVision does not infringe due to VidVita's creating of reference fingerprints.

**b. "determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power"**

61.    It is my opinion that this claim element requires a descriptor of a particular frame to be determined by comparing the spectral powers of two frequency components from that same frame.  I understand that Nielsen agrees.  *See* D.I. 75 (Joint Claim Construction Motion) at p. 5 ("The frame "***descriptor***" mentioned above is generated by comparing the spectral powers of two frequency components within a particular frame. (*Id.*, 11:24-28, 16:19-54.)") (emphasis in original).

62.    Dr. Moulin also took the same position in his opinion when he stated "[t]his descriptor uses information corresponding only to the frequency components in the first frame. In other words, the descriptor is associated only with the first frame."  Moulin Report at ⁋174. Dr. Moulin's opinion is that the peak point determined by the **local_max** function is the claimed "descriptor" of the first frame.  Moulin Report at ⁋⁋174-175. I disagree.

63.    First, the ACRCloud FP Algorithm used by the accused TVision products employs a local window to move one frame by one frame on the generated array of spectrum values.  *See supra*. at §VIII.1.  The peak point is determined based on the points within the local window.  *Id*.  When determining whether a particular point is a peak point, the **local_max** function calls the **getRowMax** function to determine the maximum value of a row of 17 frames that is within the window.  *Id*. (Moulin Ex. 1, ln. 368).  Such determination is done by comparing

**Ex. 5**

patent specifications, file histories, deposition testimony, or diagrams or other graphical presentations describing the technology of the patent-in-suit, or the prior art.

116. To the extent that Nielsen or any of its proposed experts offer any new or different opinions or provide any additional information or evidence in connection with this case, I reserve the right to supplement, amend, or modify the opinions set forth in this report.

117. If I am called upon to testify about this report by deposition or at a hearing before the Court, I may cite other documents or information similar to that specifically identified in this report. I may also use graphics, animations, pictures, demonstrations, and/or other audio/visual aids to explain my analysis and opinions.

**CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

**Ex. 5**

Dated:  November 21, 2023

_____
David Anderson, Ph.D.

CONFIDENTIAL, OUTSIDE COUNSEL ONLY

**Ex. 5**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on November 21, 2023, this document was served on the persons

listed below in the manner indicated:

**BY EMAIL:**

David E. Moore
Bindu A. Palapura
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

Clifford Katz
Malavika Rao
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800
ckatz@kelleydrye.com
mrao@kelleydrye.com

Steven Yovits
Constantine Koutsoubas
Mel W. Gaddy
Jason P. Greenhut
Douglas Lewis
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
(312) 857-7070
syovits@kelleydrye.com
ckoutsoubas@kelleydrye.com
mgaddy@kelleydrye.com
jgreenhut@kelleydrye.com
dlewis@kelleydrye.com

Matthew Chakmakian
KELLEY DRYE & WARREN LLP
One Jefferson Road 2nd Floor
Parsippany, NJ 07054
(973) 503-5900
mchakmakian@kelleydrye.com

Joshua B. Long
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd. Suite 900
Houston, TX 77027
(713) 355-5054
jlong@kelleydrye.com

**Ex. 5**

/s/ Andrew E. Russell
John W. Shaw (No. 3362)
Andrew E. Russell (No. 5382)
Nathan R. Hoeschen (No. 6232)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
jshaw@shawkeller.com
arussell@shawkeller.com
nhoeschen@shawkeller.com

Dated: November 21, 2023                      *Attorneys for Defendant*

2

**Ex. 5**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 22-057-CJB |
| | ) | |
| v. | ) | **HIGHLY CONFIDENTIAL** |
| | ) | **OUTSIDECOUNSEL ONLY** |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

 

## SUPPLEMENTAL REBUTTAL EXPERT REPORT OF
## DR. DAVID ANDERSON REGARDING U.S. PATENT NO. 7,783,889

**HIGHLY CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

## <u>TABLE OF CONTENTS</u>

I.      INTRODUCTION...........................................................................................1

II.     QUALIFICATIONS AND BACKGROUND ...........................................2

III.    METHODOLOGY USED.........................................................................5

    1.  Infringement...........................................................................................6

    2.  The Reverse Doctrine of Equivalents .....................................................6

IV.     LEVEL OF ORDINARY SKILL ...........................................................7

V.      THE PATENT-IN-SUIT AND RELATED TECHNOLOGY .................7

    1.  Overview.................................................................................................7

    2.  The Asserted Claims ..............................................................................9

    3.  Spectral Transform Operations and Fast Fourier Transform ("FFT")
        Operations ............................................................................................12

VI.     CLAIM CONSTRUCTION ....................................................................16

VII.    SUMMARY OF OPINIONS....................................................................17

VIII.   NON-INFRINGEMENT ANALYSIS .....................................................17

    1.  Summary of the Accused Product Features .........................................17

    2.  Independent Claim 1 ............................................................................21

        a)  "Reference Fingerprints" ..........................................................21

        b)  "determining a first descriptor of the first frame of media samples
            based on a comparison of the first spectral power and the second
            spectral power" ..........................................................................22

        c)  "generating a first signature based on the first descriptor".......32

        d)  "identifying a second frame of media samples by extracting a
            common plurality of media samples from the first frame of media
            samples and appending another plurality of media samples to the
            common plurality of media samples" ........................................35

        e)  "determining a second descriptor based on a comparison of the
            third spectral power and the fourth spectral power"..................37

**HIGHLY CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

        f)      "generating a second signature based on the second descriptor" ...............37

3.     Claim 1 Dependent Claims ......................................................................38

4.     Independent Claim 8 ...............................................................................39

5.     Claim 8 Dependent Claims ......................................................................39

6.     Independent Claim 14 .............................................................................40

7.     Claim 14 Dependent Claims ....................................................................41

IX.    **OTHER ANALYSIS** ........................................................................................**42**

1.     Alleged Innovations of the '889 Patent ...................................................42

2.     Non-infringing Alternatives.....................................................................49

3.     Comparability of Gracenote License ......................................................53

X.     **MISCELLANEOUS** ......................................................................................**55**

(ACRCloud_NLSN_SC_00000014), which takes the **AfpExtrSession *s as input.** (ACRCloud_NLSN_SC_00000013). The **local_max** function uses a local window to move across the previously-generated spectrogram array.

61. ███ ████ ████ ███ ██ █████ █████ (ACRCloud_NLSN_SC_00000015-20) ██████████████████████████████ █████████████. As explained above, ██████████████████████



(ACRCloud_NLSN_SC_00000015-20).    In other words, the **getRowMax** function evaluates spectral values for a single frequency bin across multiple frames.

62.    Once all the frames and all the frequencies have gone through the **getRowMax** function, the results are stored in a new array called "maxInfo." The values of this new array no longer match the values of the FFT results. ███████████████████ ██████ (ACRCloud_NLSN_SC_00000021) ██████████████████ ██████████████████████████████████████ ██████████████████████████████████████ (ACRCloud_NLSN_SC_00000015). Each of the determined largest spectrum value (peak value) of the local window is stored along with the corresponding position (i, j) into the local_max value. (ACRCloud_NLSN_SC_00000015).  Ultimately, the largest spectrum value (peak value) of the **local window** is determined.  An illustration is shown below.

**CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

processing within a single frame is known as '*intra*frame' or 'single frame' processing. In contrast, prior art systems for generating signatures rely heavily on *inter*frame, *i.e.*, multiple frame, processing—in which data from multiple audio frames is compared to generate a signature.") (emphasis in original), 8 ("Nielsen agrees that claim 1 is representative *provided* that there is no dispute that all claims recite intraframe processing. *See* D.I. 186 at 3-5. And there should not be any such dispute, as all the claims recite determining a descriptor of an individual, single frame. *See, e.g.*, Claim 1 ("determining a first descriptor *of the first frame*") (emphasis in original). In other words, the "descriptor" is determined through intraframe operation, *i.e.*, an operation that is performed using data exclusive to a single audio frame and are not dependent on sample data collected over other audio frames. *See* '889 patent at 11:16-23, 2:55-3:5, 8:1-4; *see also supra* ¶29.

68. It is my opinion that the "descriptor" identified by Dr. Kyriakakis and Dr. Martin (*i.e.*, peak point determined by the **local_max** function of data from a frame) is not a "descriptor of the first frame" determined based on "a comparison of the first spectral power and the second power," both of which are from the same "first frame" (*i.e.*, an intraframe operation).

69. First, Dr. Kyriakakis identifies the results of local_max function call as the "descriptor" claim element because that result is used to create the "signature" element he identifies. *See* Kyriakakis Report, ¶¶132 ("

(emphasis added).

70. The ACRCloud FP Algorithm used by the accused TVision products employs a

local window to move one frame by one frame on the generated array of spectrum values. *See supra.* at §VIII.1. The peak point is determined based on the points within the local window. *Id.* When determining whether a particular point is a peak point, the **local_max** function calls the **getRowMax** function to determine the maximum value of a row of 17 frames that is within the window. *Id.* Such determination is done by comparing the spectrum values of a frame within the window to the spectrum value of the neighboring left and right 8 frames. *Id.* As illustrated below, assuming the frame at consideration is frame#8, the comparison would always include the preceding eight frames [0-7] and the succeeding eight frames [9-16].



As a result, ████████████

███████████████████████████████████

████████████████████████        *See* ACRCloud_NLSN_SC_00000015; ACRCloud_NLSN_SC_00000020. Dr. Kyriakakis and Dr. Martin agree. Kyriakakis Report at ¶¶126 ("████████████████████████████████████

████████████████████████ 127 ("██████████████████████

**CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

████████████████████████████████████████████

████████████████ ).”); Martin Report at ¶71.  Because the claim limitation requires that the descriptor of a frame is calculated based on a comparison of two frequency components from the same frame (*i.e.*, determined through intraframe calculation), even assuming the peak point being calculated can be considered to be of the "frame," the <u>interframe</u> calculation used by the **local_max** function (calling the **getRowMax** function) does not practice the above-referenced claim element as confirmed by the '889 Patent specification at 2:56-65 ("**<u>Unlike known methods in the prior art that use interframe operations (e.g., operations based on sample data within different data sample frames)</u>** to generate digital spectral signatures, the methods and apparatus described herein may be implemented using intraframe operations (e.g., operations based on sample data within a single frame).  Intraframe operations may include, for example, comparison operations, determining percentage differences between values, etc. that are performed on two or more values (e.g., spectral power values) that are uniquely associated with or derived from a single frame.") (Emphasis added).

71.    Second, Dr. Kyriakakis opines that the **isListMax** function satisfies this claim element because the **isListMax** function processes 65-bin windows from the same frame.  I disagree.

72.    As an initial matter, the results of the **isListMax** function call are not the "descriptor" Dr. Kyriakakis identifies.  Dr. Kyriakakis has clearly identified the result of the **local_max** function as the "descriptor" because the result of the **local_max** function (descriptor) is being used to create the signature identified by Dr. Kyriakakis.  *See* Kyriakakis Report at ¶¶132, 134.  Indeed, the results of **isListMax** function call are only part of the **local_max** function call, and further operations are performed before reaching the results of the **local_max** function call.

For example, ███████████████████████████████████████

███████████████████████████████████████████████

██████ ████ ████ ████ ████ ███ ████ ██████ ███ ████ ████████ ██████ ████.

(ACRCloud_NLSC_SC_00000014-15)

73.    Further, the **isListMax** function call is *not* an intraframe operation, and does not result in a descriptor "of the first frame" determined based on "a comparison of the first spectral power and the second power" from the same first frame.  In fact, it does not even operate on the actual frame data but instead starts from data representing an amalgamation of multiple frames. When the **local_max** function invokes the **isListMax** function call, the input to the **isListMax** function call is the "results of the getRowMax proceeding, pointed to by an index into maxInfo." *See* Kyriakakis Report at ¶130; ACRCloud_NLSN_SC_00000015; ACRCloud_NLSN_SC_00000021.    Indeed, as Dr. Kyriakakis admitted ███████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

████████)." Kyriakakis Report at ¶203 (emphasis added); ACRCloud_NLSN_SC_00000015. In other words, ██████████████████████████████████████████

███████████████████████████████████████████████

██████████ █████████ █████ ██████ ███ ███ ███ ███ ███ ██████████ *Id.* (ACRCloud_NLSN_SC_00000021).  Because the '889 patent specification, as understood by a POSITA, describes the intraframe operation to be "using data exclusive to a single audio frame and are not dependent on sample data collected over other audio frames," the **isListMax** function is not an intraframe operation because it is dependent on data over other frames, not exclusive to

a single frame.

74.    To further illustrate why the **isListMax** function is not an intraframe operation based on its relationship with the **getRowMax** function, I am attaching Appendix A.  Given the limited sample data, Appendix A uses deltaT=8 (frames) and deltaF=5 (frequency bins).

75.    Table 1 in Appendix A shows the results of an initial array after the FFT operation. The horizontal axis indicates frames, and the vertical axis indicates frequencies.  The code calls the **getRowMax** function on the data in Table 1. Table 2 in Appendix A shows the results of a new array called maxInfo[4] returned by the **getRowMax** function, which evaluates the spectral powers of frequency points from 17 different frames (deltaT=8). The columns in maxInfo, as shown in Table 2, no longer include the data from any individual frame as returned by the FFT.  Instead, each column represents data from derived from multiple frames.  Table 3 in Appendix A shows the results of the array when the **local_max** function determines when to call the **isListMax** function.  In particular, the **local_max** function calls the **isListMax** function when the value in the max_Info array after the **getRowMax** function call (Table 2) is the same as the value in the initial array (Table 1), highlighted in red in the third table.  Table 4 in Appendix A shows the results after the calling of the **isListMax** function, which only checks those red highlighted values in Table 3 to keep the greatest spectral power of the frequency points (highlighted in green) of the column(s) that have the red highlighted values.

76.    As I opined above, because the **isListMax** function call is based on the results of the **getRowMax** function call, which evaluates spectral power points across multiple (17) frames, the **isListMax** function is not an intraframe proceeding.  If the **isListMax** function were intraframe

---

[4] Note, for the tmpZ and maxInfo arrays, I have used re-centered indices for this example.  In the actual code, the data is copied into a larger array and padded with zeros for convenience in comparing samples around the borders in the sample indices are offset accordingly.

locations, requiring more processing power to cull the results, and too much entropy usually leads to fragility and non-reproducibility of fingerprint tokens in the presence of noise and distortion." (Wang 2003, p2). In other words, fingerprint-based ACR performs better if the fingerprints capture information from a signal in a way that is not likely to be randomly matched with other signals. Since a particular note or chord may appear in multiple unrelated pieces of music, it is not unlikely that the same or similar spectral peaks will appear in the descriptors or fingerprints of multiple different signals if only a single frame of data is used. However, it is much less likely that different songs would exhibit the same temporal patterns, making *interframe* descriptors less likely to randomly match other signals. This is the property of fingerprints having higher entropy. In order to address the problem of generating sufficiently robust fingerprints, Wang describes a method of creating peaks based on the relative positions of peaks in time-frequency zones, incorporating the temporal characteristics of a waveform as well as the frequency characteristics. (Wang 2003, sections 2.1-2.2)

120.    Therefore, the only advantage of the '889 *intraframe* processing method is reduced computational complexity of the signature generation. And this advantage is part of a trade-off (as identified by Wang) between complexity of the signature and matching performance of the overall system.

121.    Dr. Kyriakakis continues to expound on the advantages of the '889 over the prior art: "There are several technical advantages to using the claimed approach. In particular, the claimed approach is more computationally efficient than the [2004] prior art (i.e., the signatures are faster to compute and easier to implement in hardware and/or software). In addition, only a small number of frequency components need to be processed. This allows for a reduction (as compared to the prior art) in computational resources needed for signature generation. This is

acceptable available ACR solutions for TVision to use instead of ACRCloud. (Kyriakakis report, ¶ 381.) I disagree.

128.    As an initial matter, Dr. Kyriakakis only opines on three alternatives to ACRCloud, but TVision knew of other ACR providers in the period leading up to May 2018. According to Mr. Webster, the ACR provider market is "fairly commoditized" and with companies providing "very similar capabilities."[12] As Mr. Liu testified, there are several ACR systems with roughly equivalent accuracy to ACRCloud, and ACRCloud was selected due to the time pressure to find a new provider after Gracenote informed TVision they were not going to renew its contract.[13]

129.    Axwave was founded in 2012 and had a state-of-the-art ACR system. I understand that, for example, in October 2017, Dan Schiffman asked Axwave whether it had a solution for TVision's "primary issue [that] we are looking to solve for today is commercial detection and associated metadata," to which an Axwave personnel responded it did have such solutions.[14] Dr. Kyriakakis's opinion (¶ 378) implied that Axwave had no product but that is incorrect—rather, Axwave's purchaser explained that it was *re*launching an ACR product in 2021. Furthermore, in 2015, Axwave made available a "free and easy-to-integrate software development kit (SDK) which allows app developers to efficiently recognize live TV, TV ads, DVR, OnDemand Video (including Netflix), music and other audio files." They also demonstrated the ability to do large-scale monitoring of household viewership patterns.[15]

130.    Dr. Kyriakakis opines that the accuracy of the Mobile Research Labs ACR was

---

[12] Deposition of Tristan Webster, September 13, 2023, p. 42, 129.

[13] Deposition of Yan Liu, August 29, 2023, pp. 75-76.

[14] TVSN_NLSN_00725382-386 at 382-383.

[15] https://www.businesswire.com/news/home/20150412005036/en/Axwave's-Unique-Viewership-Numbers-Show-30-TV#.VTXuj_CLMdV.

**CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

insufficient for practical use by TVision. (¶ 370).  Part of this opinion was supported by an analysis of a report on MRL's ACR accuracy as tested by TVision.  However, I understand from my interview with Mr. Liu that MRL's failure rate, as cited by Dr. Kyriakakis, was in reference to testing MRL's capability when using mobile phones to pick up audio rather than a dedicated device that is placed next to the panelist's TV (which is the configuration used by TVision).[16]  In other words, the validation study cited by Dr. Kyriakakis was to determine if utilizing a mobile phone could adequately deploy ACR technology, not whether MRL's ACR technology would work in the configuration used by TVision.  It is well understood in the art that mobile device audio pickup is generally much more variable in its quality, signal-to-noise ratio, and distortion than a fixed, dedicated device—especially for far-field sounds such as sounds produced by speakers at some distance from the device.  Mr. Liu also cited problems with accuracy in that study specifically related to signal dropouts, devices being placed in pockets, and generally poor audio pickup.  Thus, the lower accuracy rates reported by Dr. Kyriakakis would be expected to be much higher in TVision's use case, especially if tuning of the algorithm (e.g., adapting matching thresholds, etc.) was performed.

131.    Dr. Kyriakakis also states, that since the MRL SDK operated differently than the ACRCloud solution (e.g., it used Android clients and did not send results back to the user device), switching to MRL would not be feasible.  In my interview with Mr. Liu, he explained that TVision had investigated MRL's offering and that MRL had an SDK that was compatible with the TVision devices.  Furthermore, the difference response mechanism used by MRL (accumulating recognition data on the server instead of returning it to the monitoring devices) was preferred by TVision since it simplified the aggregation of results.  Mr. Liu explained that the only reasons that

---

[16] Interview with Yan Liu.

TVision did not use MRL instead of ACRCloud were costs (MRL was slightly more expensive) and speed of transition.  In my opinion, there were/are no significant barriers to adopting an MRL ACR solution for TVision.  Accordingly, I disagree with Dr. Kyriakakis's statement that the MRL would not have been an acceptable alternative.

132.    I understand that TVision had contacted several ACR providers, *in addition to those addressed by Dr. Kyriakakis's report*, in the period prior to TVision's adoption of ACRCloud. Per my conversation with Mr. Liu, in late 2016 to early 2017, VidVita informed Mr. Liu that both ACRCloud and Mufin[17] were great ACR providers with whom VidVita partnered. Mufin sent a proposal to TVision in early 2017.  VidVita also said that Mobile Research Labs (MRL) was a similar company providing ACR technology and with whom VidVita had worked previously.  In early 2018, TVision also reached out for pricing quotes from Source Digital, another ACR provider.[18]

133.    I am also aware of other companies such as Audible Magic, Soundhound, Civolution, and Dat-Track operating in the ACR space.  Furthermore, innovation has not ceased in the ACR space.  Additional players have been cropping up in recent years and those in the space are continually improving their algorithms, software, and overall offerings.

### 3.  Comparability of Gracenote License

134.    The Gracenote patent portfolio identified from http://www.gracenote.com/us-patents/ on May 29, 2016 shows 39 patents.[19]  These patents cover a variety of technology areas including **reducing fingerprint database storage requirements and improving search speed**,

---

[17] Mufin specializes in audio fingerprint technology for ACR and had already had notable customers partners including Kantar, Ipsos, and Starz. TVSN_NLSN_00662112-139 at 115, 121.
[18] TVSN_NLSN_00660739-772 at 746-762.
[19] https://web.archive.org/web/20160529145241/http://www.gracenote.com:80/us-patents/.

CONFIDENTIAL, OUTSIDE COUNSEL ONLY

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  August 1, 2025

_____
David Anderson, Ph.D.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on Augusts 1, 2025, this document was served on the persons listed below in the manner indicated:

**<u>BY EMAIL:</u>**

David E. Moore
Bindu A. Palapura
Andrew M. Moshos
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
amoshos@potteranderson.com

Steven Yovits
Jason P. Greenhut
Douglas Lewis
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
(312) 857-7070
syovits@kelleydrye.com
jgreenhut@kelleydrye.com
dlewis@kelleydrye.com

/s/ Andrew E. Russell
Andrew E. Russell (No. 5382)
Lindsey M. Gellar (No. 7202)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
lgellar@shawkeller.com
*Attorneys for Defendant*

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| THE NIELSEN COMPANY (US), LLC,<br><br>　　　　　　*Plaintiff*,<br><br>　　v.<br><br>TVISION INSIGHTS, INC.,<br><br>　　　　　　*Defendant*. | C.A. No. 1:22-cv-0057-CJB<br>Magistrate Judge Christopher J. Burke<br><br>**JURY TRIAL DEMANDED** |

**REPLY EXPERT REPORT OF CHRIS KYRIAKAKIS**
**RESPONDING TO REPORT OF DR. DAVID ANDERSON**
**REGARDING INFRINGEMENT OF U.S. PATENT NO. 7,783,889**

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

# TABLE OF CONTENTS

I.      Introduction .................................................................................................................. 1

II.     Personal Background And Expert Qualifications ....................................................... 2

III.    Documents Reviewed .................................................................................................. 2

IV.     Summary Of Opinions ................................................................................................ 2

V.      Scope Of Report And Opinions Herein ...................................................................... 2

VI.     Response To Dr. Anderson's Opinions On Certain Claim Elements ........................ 3

    A.   Reference Fingerprints ........................................................................................ 3

    B.   Extracting/Appending (Claim 1 Only) ............................................................... 4

    C.   Intraframe Comparisons ...................................................................................... 6

        1.   The Claims Do Not Require Only Intraframe Comparisons ..................... 7

        2.   The Frequency Domain Magnitude Resulting From A Spectral Transform Operation Is A Spectral Power ........................................... 13

        3.   "Weighted Spectral Magnitude" is a "Spectral Power" ......................... 31

    D.   Descriptors And Signatures .............................................................................. 41

    E.   Reverse Doctrine Of Equivalents ..................................................................... 44

    F.   Dependent Claims ............................................................................................. 47

        1.   Claims 2 and 9 ........................................................................................ 47

        2.   Claim 6 .................................................................................................... 49

        3.   Claims 12, 13, 16, and 17 ....................................................................... 50

VII.    Response To Dr. Anderson's "Alleged Innovations Of The '889 Patent" Section .............................................................................................................. 50

VIII.   Alleged Non-Infringing Alternatives ....................................................................... 57

    A.   Dr. Anderson's General Statements about alternatives .................................... 57

    B.   TVision internally developed system ................................................................ 60

    C.   Third Party Systems .......................................................................................... 65

        1.   Axwave .................................................................................................... 67

        2.   Mobile Research Labs (MRL) ................................................................ 68

        3.   Mufin ....................................................................................................... 69

        4.   Source Digital .......................................................................................... 70

        5.   Other Providers Mentioned in Passing ................................................... 70

IX.     GraceNote .................................................................................................................. 72

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

X.    Conclusion ........................................................................................................................ 73

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

"determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power"

25.     Nothing in Dr. Anderson's report changes my opinion about these claim elements. TVision's use of the ACRCloud SDK still satisfies these claim elements. Dr. Anderson is wrong for the reasons I discuss below.

### 1.     The Claims Do Not Require Only Intraframe Comparisons

26.     Dr. Anderson incorrectly assumes that the claims require performing intraframe comparisons only and that a system that performs any interframe comparisons would not infringe. That is not correct. Dr. Anderson's assumption is inconsistent with the claim language.

27.     First, the claim language says only that an intraframe comparison occurs, *e.g.*, "determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power." The claim identifies "the first spectral power and the second spectral power" as from the same frame ("identify a first frequency component having a first spectral power and a second frequency component having a second spectral power"). There is no language in the claims that says that intraframe comparison is the only kind that is allowed.

28.     Second, it is my understanding that claims that start with the term "comprising," as claims 1 and 8 and their dependent claims do, are open ended. Claim 14 has similar open-ended language: "A tangible machine accessible medium having instructions stored thereon that, when executed, cause a machine to." In other words, proving infringement depends on proving that the defendant has met the claim elements recited in the claims. It does not matter what else the defendant is doing.

29.     Third, Dr. Anderson cites the specification in his opinion as limiting the claims to only intraframe comparisons. Anderson Reb. ¶29, ¶70 citing 2:56-65:

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Unlike known methods in the prior art that use interframe operations (e.g., operations based on sample data within different data sample frames) to generate digital spectral signatures, the methods and apparatus described herein may be implemented using intraframe operations (e.g., operations based on sample data within a single frame). Intraframe operations may include, for example, comparison operations, determining percentage differences between values, etc. that are performed on two or more values (e.g., spectral power values) that are uniquely associated with or derived from a single frame.

30.     This excerpt from the specification does not limit the invention or the claims to intraframe comparisons. The specification is describing an exemplary embodiment. My understanding is that Dr. Anderson would have to identify specific scenarios that would allow the preferred embodiment in the specification to limit the claims. He has identified no such scenarios.

31.     My understanding is also that claims are not limited to the preferred embodiment in most cases. Dr. Anderson does not identify any exceptions that would justify limiting the claims to the preferred embodiment in this case.

32.     In addition, non-asserted claims 5, 11, and 15 recite that "the first descriptor is associated with only the first frame of media samples." This element would limit the first descriptor to comparisons within only the first frame. Claims 1, 8, and 14, however, are not so limited. My understanding is that the doctrine of claim differentiation carries an especially strong presumption that an independent claim does not require a limitation that is the only meaningful difference between that claim and its dependent claim; otherwise, the dependent claim would be superfluous. Dr. Anderson identifies no reason to overcome this presumption.

33.     As I showed in my opening report, ACRCloud's SDK will perform intraframe comparisons—i.e., "determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power" and "determine a second descriptor of the second frame of media samples based on a comparison of the third spectral

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

power and the fourth spectral power"—when it processes audio data from television. *See e.g.,* Kyriakakis Op., ¶317. Indeed, Dr. Martin's simulation ran the audio for nearly 100,000 seconds of television through ACRCloud's SDK and determined that it performed intraframe comparisons on all 6-second clips (other than the one that was completely silent) and generally did so many times. *See* Martin Op., ¶¶ 142-43; Kyriakakis Op., ¶¶317-19. Processing television audio is the use case for TVision's meters and accordingly something that TVision does using ACRCloud's SDK.

34.     Dr. Anderson opines that "Because the claim limitation requires that the descriptor of a frame is calculated based on a comparison of two frequency components from the same frame (i.e., determined through intraframe calculation), even assuming the peak point being calculated can be considered to be of the 'frame,' the interframe calculation used by the local_max function (calling the getRowMax function) does not practice the above-referenced claim element." Anderson Reb., ¶70. He also opines that "Because the '889 patent specification, as understood by a POSITA, describes the intraframe operation to be 'using data exclusive to a single audio frame and are not dependent on sample data collected over other audio frames,' the isListMax function is not an intraframe operation because it is dependent on data over other frames, not exclusive to a single frame." Anderson Reb., ¶73.

35.     As explained above, Dr. Anderson's statements unduly limit the claims to using data exclusive to a single audio frame and not dependent on sample data collected over other audio frames. This is not a proper construction of the claims. The claims require only determining a descriptor using a comparison of two (or more) spectral powers from the same frame. As explained in my opening report, ACRCloud's SDK unquestionably does that.

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Kyriakakis Op., ¶¶196-216; 346-378. The fact that data from other frames is also processed is irrelevant.

36.     Dr. Anderson also opines that the local_max function (calling the getRowMax function) performs "interframe calculation" (Anderson Reb., ¶70). While some of the functionality in the local_max function does compare across frames, it is also true that local_max (in the isListMax function) compares spectral powers within one frame. The simulation discussed in my opening report proves this. See Kyriakakis Op., ¶¶205-11; 356-62, 371-77. The claims only require intraframe comparisons; it does not matter if interframe comparisons also occur.

37.     Dr. Anderson opines that "after the results of isListMax function call, the local_max array value will be further updated based on opt_.filter_energy_min value, which means that the final values in the local_max array are not the same as the results of the isListMax function call. (ACRCloud_NLSC_SC_00000014-15)." Anderson Reb., ¶72. Dr. Andersons's point is irrelevant. For any descriptor produced by ACRCloud's SDK, the energy (e_z) will be greater than "opt_.filter_energy_min_." If not, the results of isListMax are ignored. The simulation shows that energy levels commonly exceed the minimum because it shows that the ACRCloud SDK produces one or more descriptors for many frames and that producing those descriptors used an intraframe comparison. The claim requires only an intraframe comparison that leads to a descriptor. The simulation shows that such a comparison happens often and leads to descriptor(s).

38.     Dr. Anderson opines that "the isListMax function call is not an intraframe operation, and does not result in a descriptor 'of the first frame' determined based on 'a comparison of the first spectral power and the second power' from the same first frame. In fact,

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

environment poses challenges for content recognition that the invention helps resolve. It was known at the time of the invention that noise presented a challenge to content recognition, and solutions like the combination of features in the '889 patent and its claims provided an inventive solution to the problem of noise in content recognition.

128.    First, the '889 patent solves this prior art problem relating to noise or signal interference, which could render signatures inaccurate and hamper content recognition. The invention recited in the asserted claims solves this problem by creating signatures that are more robust and thus far more likely to result in accurate matching. The descriptors upon which signatures in the '889 patent are based are obtained by comparing pairs of frequency components (*i.e.*, comparing one frequency component to another frequency component). This approach (sometimes called a "sign-based" approach) creates signatures that are resistant to noise (*i.e.*, they are "robust"). By using a comparison to determine the descriptors, descriptors are based on the relative values of two frequency components rather than their actual values. While noise may change the values of these frequency components, it is less likely to change which one is greater or smaller. Using relative values makes the claimed content recognition more robust because noise is less likely to change which frequency component's spectral power determines the descriptor and thus cause the monitored signature to differ meaningfully from the reference signature for the monitored content.

129.    In addition, the claimed invention reduces the deleterious effects of noise by finding descriptors and signatures in overlapping and consecutive frames. Noise that appears in one frame may not appear in the other and thus using such frames reduces the likelihood that the noise will adversely affect content recognition.

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

particular solutions and provides no analysis that such "additional players" or such "fairly commoditized" providers would be able to provide acceptable, non-infringing, and available alternatives. It is therefore impossible based on Dr. Anderson's statement for me to analyze and respond to his opinion.

171.    The specific third-party providers that Dr. Anderson lists would not be acceptable, non-infringing, and available alternatives to ACRCloud for TVision for the reasons described below.

### 1.    Axwave

172.    Dr. Anderson never shows that Axwave's technology would work in TVision's ecosystem. For example, Dr. Anderson cites a 2015 article (Ex. 14, https://www.businesswire.com/news/home/20150412005036/en/Axwave's-Unique-Viewership-Numbers-Show-30-TV#.VTXuj_CLMdV) about Axwave (Anderson Reb., ¶129 n.15), even though that article explains that Axwave's technology works only with OTT content and therefore would not work on the breadth of TV content that TVision needs (*e.g.*, including linear television and ads). Moreover, this 2015 article is not proof of what would have been available in May 2018 or thereafter.

173.    Furthermore, Axwave appears to operate only in the mobile space with an app-based product. The article that Dr. Anderson cites describes "Axwave, [as] the leading mobile app content recognition experts." Ex. 14, https://www.businesswire.com/news/home/20150412005036/en/Axwave's-Unique-Viewership-Numbers-Show-30-TV#.VTXuj_CLMdV. So although this article says that Axwave "delivers a free and easy-to-integrate software development kit (SDK) which allows app developers to efficiently recognize live TV, TV ads, DVR, OnDemand Video (including Netflix), music and

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

other audio files," that SDK appears to be mobile-only, and Dr. Anderson identifies no evidence showing any other availability.

174.    Elsewhere in his report, Dr. Anderson asserts that mobile technology is not comparable to the technology that TVision needs in its meters. *See* Anderson Reb., ¶130 ("It is well understood in the art that mobile device audio pickup is generally much more variable in its quality, signal-to-noise ratio, and distortion than a fixed, dedicated device—especially for far-field sounds such as sounds produced by speakers at some distance from the device."). Axwave's mobile technology would not be appropriate for TVision's meters.

175.    Dr. Anderson also asserts that Axwave/Samba indicated that they told TVision they were "relaunching" their product and concludes that I was "incorrect" that the Axwave/Samba product was not available. Anderson Reb., ¶129. Dr. Anderson is incorrect. A vendor saying that they are "relaunching" a product does not mean that a product is currently available. The product may never have been commercially available or could have been available many years before in an outdated or otherwise not appropriate form (such as a mobile-only form, as appears to the case here). Indeed, such a statement provides no assurance that a product will ever be available, with "vaporware" being a common industry term to describe products that never appear. Dr. Anderson also does not show that TVision tested Axwave's product to see if it would work in its environment. Axwave is therefore not an available alternative to ACRCloud for TVision's business. Indeed, if Axwave was an acceptable, available alternative to ACRCloud, TVision would have been able to provide more information about its products and how they would work in its ecosystem.

### 2.    Mobile Research Labs (MRL)

176.    With regard to Mobile Research Labs (MRL), Dr. Anderson does not show that a different version of MRL's product would perform better than the product TVision tested

Ex. 7

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

(unsuccessfully) and which I discussed in my opening report. *See* Anderson Reb., ¶130-31. In addition, as its full name suggests, MRL has a mobile product, so Dr. Anderson identifies no evidence showing that there is a non-mobile product for TVision to use.

177.    Nonetheless, Dr. Anderson says that: "In my interview with Mr. Liu, he explained that TVision had investigated MRL's offering and that MRL had an SDK that was compatible with the TVision devices." Anderson Reb., ¶131. Dr. Anderson appears not to have confirmed Mr. Liu's statement because he cites no evidence that MRL has an SDK compatible with TVision's devices. The record evidence does not support Mr. Liu's statement. For example, the MRL presentation at TVSN_NLSN_00610742 does not mention a non-mobile SDK. To the contrary, it says: "The Asound is available as a fully functioning app, or as a software development kit (SDK) for both Android & iOS," with no mention of TVision's Windows or Linux environments. Furthermore, MRL's webpage identifies only mobile solutions. *See* Ex. 15, https://www.mobileresearchlabs.com/. Dr. Anderson also does not show that TVision tested MRL's product to see if it would work in its environment. MRL is therefore not an available alternative to ACRCloud for TVision's business. Indeed, if MRL was an acceptable, available alternative to ACRCloud, TVision would have been able to provide more information about its products and how they would work in its ecosystem.

### 3.    Mufin

178.    Dr. Anderson mentions Mufin, although he identifies no evidence that would show that Mufin's technology would work in TVision's environment. *See* Anderson Reb., ¶132. As explained previously, one cannot know if an ACR solution would work without analyzing and testing it.

69

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

179.    He also states that: "Mufin sent a proposal to TVision in early 2017." Anderson Reb., ¶132. Dr. Anderson cites no evidence to support that statement. The presentation he cites at TVSN_NLSN_00662112–39 is not a proposal.

180.    Dr. Anderson also does not show that TVision tested Mufin's product to see if it would work in its environment. Mufin is therefore not an acceptable, available alternative to ACRCloud for TVision's business. Indeed, if Mufin was an acceptable, available alternative to ACRCloud, TVision would have been able to provide more information about its products and how they would work in its ecosystem.

### 4.    Source Digital

181.    Dr. Anderson also asserts that: "In early 2018, TVision also reached out for pricing quotes from Source Digital, another ACR provider." Anderson Reb., ¶132 (citing TVSN_NLSN_00660739–72 at 746–62). Dr. Anderson offers no evidence Source Digital would work or that TVision actually got a proposal from Source Digital. The document he cites does not show that proposal was received or its terms or if Source Digital's product would work in TVision's environment. *See* TVSN_NLSN_00660739–72 at 746–62.

182.    Dr. Anderson also does not show that TVision tested Source Digital's product to see if it would work in its environment. Source Digital is therefore not an available, acceptable alternative to ACRCloud for TVision's business. Indeed, if Source Digital was an acceptable, available alternative to ACRCloud, TVision would have been able to provide more information about its products and how they would work in its ecosystem.

### 5.    Other Providers Mentioned in Passing

183.    Dr. Anderson also asserts that he is "also aware of other companies such as Audible Magic, Soundhound, Civolution, and Dat-Track operating in the ACR space." Anderson

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Reb., ¶133. Dr. Anderson provides no explanation or proof that these companies could provide an ACR solution that would work for TVision. He just lists them.

184.    I looked at these companies, and it is clear that they could not provide an ACR solution for TVision. Indeed, if any of these companies was an acceptable, available alternative to ACRCloud, TVision would have been able to provide more information about its products and how they would work in its ecosystem.

185.    Audible Magic appears to have a product that works for music only. *See* Ex. 16, https://www.audiblemagic.com/. I have seen no evidence that Audible Magic has a product for television or that its product would work with television. Moreover, what might work for music might not be appropriate for recognizing television. Television audio is very different from music. An ACR algorithm designed for music has learned music features based on a music database. Since TV audio signals include a much greater variety of sounds (such as human speech, car sounds, etc.) whose acoustic features are generally quite different from music, an ACR algorithm designed for music does not necessarily perform well for TV audio. Dr. Anderson also does not show that TVision tested Audible Magic's product to see if it would work in TVision's environment. Audible Magic is therefore not an available, acceptable alternative to ACRCloud for TVision's business.

186.    Like Audible Magic, Soundhound does not appear to offer technology for television recognition. *See* Nelson Dep., 226:27–227:2. SoundHound appears to provide voice recognition such as for restaurant reservations and music recognition. *See* Ex. 17, https://www.soundhound.com. As with Audible Magic, what might work for music might not work for recognizing television. Dr. Anderson also does not show that TVision tested

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

SoundHound's product to see if it would work in its environment. Soundhound is therefore not an available, acceptable alternative to ACRCloud for TVision's business.

187.    With regard to Civolution, Dr. Anderson cites no evidence identifying any Civolution product or that such a product might work in TVision's environment. It also appears that Civolution left the ACR market before the hypothetical negotiation date in May 2018. *See* Ex. 8, https://www.civolution.com/. Dr. Anderson also does not show that TVision tested any Civolution product to see if it would work in its environment. Civolution is therefore not an available, acceptable alternative to ACRCloud for TVision's business.

188.    With regard to Dat-track, I explained in my opening report why Dat-track was not an available alternative. *See* Kyriakakis Op., ¶¶ 471-74. Dr. Anderson did not dispute the evidence I cited or the conclusions I drew from it.

189.    It is my opinion that the record evidence does not show that TVision had or has any acceptable, non-infringing alternative to ACRCloud's ACR solution.

## IX.    GRACENOTE

190.    Dr. Anderson also opines about the "Comparability of Gracenote License." Anderson Reb., ¶¶134-35. Dr. Anderson does not show that the Gracenote patents are technologically or economically comparable to the patent-in-suit. Rather, Dr. Anderson just lists broad "technology areas" relating to those patents, most of which have nothing to do with ACR or the subject matter of the asserted claims. These patents are not technologically comparable to the '889 Patent.

191.    Even for those patents for which Dr. Anderson lists ACR-related technology areas, he does not explain why they are technologically or economically comparable to the patent-in-suit. For example, ACR can be done in many ways that do not involve the same techniques as claimed in the '889 Patent, including for example video ACR.

Ex. 7

## X.    CONCLUSION

192.    For the reasons set forth above, my opinion is that TVision has infringed claims 1, 2, 4, 6, 8, 9, and 12–14, 16-17 of the '889 patent.

193.    In addition, for the reasons set forth above, my opinion is that TVision did not have any acceptable, available alternatives to the ACRCloud solution in April/May 2018. Nor would it have had (or does it now have) such alternatives after that time.

194.    As set forth above, it is also my opinion that Dr. Anderson did not show that the Gracenote patents are technologically or economically comparable to the patent-in-suit.


I, CHRIS KYRIAKAKIS, hereby declare under penalty of perjury under the laws of the United States of America, that the foregoing Report is true and correct.

Date: 08/17/2025

_____
Chris Kyriakakis

Ex. 7

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE NIELSEN COMPANY (US), LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>TVISION INSIGHTS, INC.,<br><br>*Defendant*. | C.A. No. 1:22-cv-0057-CJB<br>Magistrate Judge Christopher J. Burke<br><br>**JURY TRIAL DEMANDED** |

## OPENING EXPERT REPORT OF PAUL MARTIN

**Ex. 8**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

## TABLE OF CONTENTS

I.     INTRODUCTION ................................................................................................ 1

II.    QUALIFICATIONS ........................................................................................... 2

III.   SCOPE OF WORK ............................................................................................ 9

IV.    MATERIALS RELIED UPON .......................................................................... 9

V.     BACKGROUND .............................................................................................. 10

VI.    TVISION'S USE OF THE ACRCLOUD SDK ............................................... 10

VII.   DESCRIPTION OF ACRCLOUD CODE FUNCTIONALITY ...................... 14

       A.    ACRCloud Python SDK ....................................................................... 18

       B.    Analysis of ACRCloud's Fingerprinting Algorithm........................... 18

             1.    Obtaining Frames of Media Samples........................................ 19

             2.    Frequency Domain Processing ................................................. 22

             3.    Generating a Signature............................................................. 28

       A.    IDENTIFYING CONTENT ................................................................. 30

VIII.  SIMULATION AND RESULTS....................................................................... 37

       A.    Simulation Development and Testing................................................... 37

             1.    Algorithm and Implementation................................................. 37

             2.    The Simulation.......................................................................... 38

             3.    Testing Methodology ................................................................ 40

             4.    My Opinion Regarding the Simulation and Testing ................. 43

       B.    Simulation Processing.......................................................................... 43

       C.    Simulation Results ............................................................................... 49

**Ex. 8**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

(lns. 202–224) (TVSN_NLSN_SC_00000349). As part of doing so, the

**content_prediction_frame** function calls the **disambiguate_content_fingerprints** function at

ln. 222. ar.py (ln. 222) (TVSN_NLSN_SC_00000349).

104.    The function **disambiguate_content_fingerprints** takes the raw linear data frame to

disambiguate multiple choices of content fingerprints for the same device observation timestamp.

ar.py (lns. 161–199) (TVSN_NLSN_SC_00000348).

> The chosen observation fingerprint obeys the following rules: - If there is a
> previous fingerprint for a previous timestamp on the same content ID, choose the
> least candidate fingerprint which is >= the previous one. –Otherwise choose the
> latest fingerprint which is <= the observation timestamp. Otherwise choose the
> earliest fingerprint.

ar.py at lns. 163–169 at TVSN_NLSN_SC00000348. *See id.* lns. 175–199

(TVSN_NLSN_SC_00000349). *See also* ar.py (TVSN_NLSN_SC_00000347–52), lns. 202–224

(content_prediction_frame); lns. 227–67 (line-ar_fringe_map); lns. 270–299

(interpolate_fingerprints); lns. 301–71 (linear_predict_content); lns. 444–474 (pre-dict_frame).

## VIII.    SIMULATION AND RESULTS

105.    My team and I have developed a simulation of TVision's use of ACRCloud's SDK. I

have used this simulation to determine whether and how often intraframe comparisons occur in

finding local maxima in overlapping and consecutive frames.

### A.    Simulation Development and Testing

#### 1.    Algorithm and Implementation

106.    In software development, an algorithm defines *what* needs to be done, and its

implementation determines *how* those steps are executed in a specific programming language,

framework, or system.  Algorithms can be analyzed, their properties can be studied, and their

**Ex. 8**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

theoretical effectiveness can be measured.  To be used in a software product, however, an algorithm must be implemented by software developers.  Software development best practices need to ensure that implementations are correct in manifesting the algorithm.

## 2.    The Simulation

107.    In the current case, my team and I used resources from ACRCloud and TVision.  These resources enabled us to understand the algorithms practiced by ACRCloud's audio processing and fingerprint generation process, and algorithms practiced by TVision when calling ACRCloud services for audio recognition.  These resources include, and are not limited to:

- <u>Documentation</u> (from ACRCloud and TVision) provides insights into ACRCloud and TVision algorithms' purpose, parameters, and expected behavior.

- <u>Source code</u> (from ACRCloud and TVision) allows us to investigate data storage and manipulation within the algorithm.

- <u>Libraries</u> (from ACRCloud) provides reusable, tested implementations that help us see ACRCloud's algorithm in action and observe the expected output.

108.    In order to perform further analysis on how TVision utilizes ACRCloud's audio processing and fingerprint generation process, I, and my team under my instruction, implemented a simulation that implements the following parts that we learned from ACRCloud and TVision's code:

- <u>Part One</u>: Implementing <u>the algorithm utilized by TVision</u> when calling ACRCloud's acrcloud_extr_tool.so library for audio decoding and spectrogram generation.

  o  The algorithm includes specific settings as indicated in TVision documentation and source code.  Such settings include but are not limited to:

    ▪  Utilizing PCM audio data of 8000Hz and 16 bits per second;

    ▪  Analyzing 6-second audio samples, with 4-second intervals between these samples;

    ▪  Utilizing the version of acrcloud_extr_tool.so identified in D.I. 314 at ¶ 2: (<u>https://github.com/acrcloud/acrcloud_sdk_python/commit/64e39bbefa0e5 4c631e8c301d9423d4bbf331cd3</u>).

**Ex. 8**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

- Part Two: Implementing the algorithm utilized by ACRCloud for calculating "local max(es)" from a spectrogram generated from decoded PCM audio (created using ACRCloud's SDK), as a part of the ACRCloud's fingerprint generation process.

109.    From my review of the source code and documentation, I understand that the above algorithms would capture the complete workflow of how PCM audio is decoded and processed, and how local max(ex) are generated in TVision's products, by TVision using ACRCloud services for fingerprint generation.  The simulation intends to correctly implement the same algorithms practiced by ACRCloud's audio processing and fingerprint generation process and the same algorithms practiced by TVision when calling ACRCloud services for audio recognition.

110.    In addition to implementing the above algorithms from ACRCloud and TVision, the simulation also implements the following functionality in Part Two to identify intraframe comparisons occurring in finding local maxima in overlapping and consecutive frames:

- Addition to the Part Two: Implementing functionalities that record and analyze the frame from which each "local max" is generated, determine whether each local max is generated via intraframe comparison, and perform a numerical summary of local max(es) generated from intraframe comparisons.

  - These supplementary functionalities record and process intermediary data (frame numbers) within ACRCloud's and TVision's algorithms.  These supplementary functionalities are added without changing the ACRCloud and TVision algorithms discussed above by analyzing the output of those algorithms, plus the additional data generated by my team and me.

111.    As I discussed above, the simulation intends to correctly implement the same algorithms practiced by ACRCloud's audio processing and fingerprint generation process and the same algorithms practiced by TVision when calling ACRCloud services for audio recognition. Therefore, I understand that, for the same audio file, the simulation should produce the same local maxima as those generated when TVision calls ACRCloud services.  Therefore, the

**Ex. 8**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

simulation contains the following additional functionality to verify the simulation-generated local maxima:

- <u>Part Three</u>: Implementing <u>the algorithm utilized by TVision</u> when calling ACRCloud's acrcloud_extr_tool.so library (TVSN_NLSN_00000312-15, https://github.com/acrcloud/acrcloud_sdk_python/commit/64e39bbefa0e54c631e8c301d9423d4bbf331cd3) for obtaining the fingerprint of an audio.
  - o This functionality is executed for every audio samples being processed by our simulation.  For every audio sample, the fingerprints obtained in Part Three are compared with the local maxima generated in Part One and Part Two.

112.    The source code of the simulation also contains control routines that invokes these individual components.

113.    The simulation was implemented by me and my team under my instructions.  It utilizes programming languages Python 2.7.13 and Python 3.8.16. The source code files for the simulation were provided with this report using a file sharing service and are incorporated by reference herein.

### 3.    Testing Methodology

114.    An implementation of an algorithm must be tested to make sure it complies with the algorithm it is implementing.  Professional organizations in the field of computer science, such as the Institute of Electrical and Electronics Engineers (IEEE), publish extensively on these topics.  I hereby refer to the widely referenced IEEE Software Engineering Body of Knowledge (SWEBOK)[1] on software development and testing.  As it describes, "software testing is a pervasive and holistic activity involving all the steps of any process development life cycle."[2]

---

[1] Ex. 6, https://www.computer.org/education/bodies-of-knowledge/software-engineering/v4. (SWEBOK).

[2] SWEBOK at 5-2.

**Ex. 8**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

115.    Considering the nature of the simulation (not packaged, released, or deployed as a software application), my team and I follow the instructions within IEEE SWEBOK regarding Construction Testing: "Construction involves two forms of testing, which are often performed by the software engineer who wrote the code: unit testing and integration testing."[3]

116.    Unit testing is the process of testing individual components or functions of a program in isolation to ensure they work as intended.  My team and I performed adequate unit testing throughout the implementation of the simulation.  These unit tests were implemented with the Python "unittest" framework.[4]

117.    For each function within the simulation, we designed multiple unit test cases to cover typical usage scenarios as well as edge cases of the specific functions, and we validated individual components in isolation to quickly identify and resolve issues.  This practice is applied to both the implementation of ACRCloud and TVision algorithms and to supplementary functionalities that I discussed above.  All logic-bearing functions in the simulation are covered by comprehensive unit tests that exercise every documented execution path.

118.    Integration testing is a level of software testing where individual units or components of a program are combined and tested as a group.  My team and I performed adequate integration testing throughout the implementation of the simulation.  The methods of integration testing are described below.

119.    First, my team and I not only performed testing, but also implemented validation checks within the simulation to ensure that the data being passed between simulation components are

---

[3] SWEBOK at 4-7.

[4] *See, e.g.,* Ex. 7, https://docs.python.org/3.8/library/unittest.html; Ex. 8, https://docs.python.org/2.7/library/unittest.html.

**Ex. 8**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

accurate, consistent, and correctly formatted.  As I discussed above, the simulation consists of three parts:

- <u>Spectrogram data between Part One and Part Two</u>: In addition to testing the accuracy and formatting of data using unit tests, Part Two (local max implementations) contains validation checks that verifies the size and format of the spectrogram generated by Part One.

- <u>Local max data generated by Part Two</u>: In addition to testing the accuracy and formatting of functionalities using unit tests, Part Two contains validation checks that verify the accuracy and formatting of local max data, when processing simulation-generated local maxima.

- <u>Local max data between Part Two and Part Three</u>: for each audio sample processed in the simulation, the same audio sample is also independently processed through ACRCloud's acrcloud_extr_tool.so library (https://github.com/acrcloud/acrcloud_sdk_python/commit/64e39bbefa0e54c631e8c301d9423d4bbf331cd3) for fingerprint generation.  In addition to the software testing methodologies that I applied above, ACRCloud library-generated fingerprints are compared with local max(es) generated from the simulation to ensure accuracy of the simulation.

120.    The comparison between ACRCloud library-generated and local maxima generated from the simulation is executed every time the simulation runs, and is repeatedly performed for every 6-second sample in every audio that is analyzed by the simulation.  I consider this comparison to be a key validation step that ensures that the simulation correctly implements the algorithms practiced by ACRCloud's audio processing and fingerprint generation process and algorithms practiced by TVision when calling ACRCloud services for audio recognition.

121.    The above integration testing steps are also essential for verifying the accuracy of control routines, which invoke tested components within Part One, Part Two, and Part Three to execute each step of the simulation.

122.    I understand that the above proactive testing approach helps maintain a high standard of code quality throughout the development of the simulation.  The above practice also aligns with

**Ex. 8**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

what I teach in my courses at Johns Hopkins University when describing how to reduce, find, and mitigate security vulnerabilities in software programming.

### 4.    My Opinion Regarding the Simulation and Testing

**123.**    As I discussed above, the simulation correctly implements the same algorithms practiced by ACRCloud's audio processing and fingerprint generation process and the same algorithms practiced by TVision when calling ACRCloud services for audio recognition, with supplementary functionalities that record and compare intermediary data (frame numbers and intraframe comparisons) generated in ACRCloud and TVision's algorithms that do not change ACRCloud's and TVision's algorithms themselves.

124.    In addition, it is my opinion that my team and I have performed adequate and sufficient testing for the simulation according to software engineering standards like IEEE SWEBOK. Each logic-bearing function within the simulation had its own unit testing, and any interaction between simulation components have its own integration testing and validation checks.

125.    A key step of unit testing and integration testing ensures that the simulation results are further validated with fingerprints directly generated through ACRCloud's acrcloud_extr_tool.so library, utilized by TVision products.  My team and I ran a large number of audio files taken from television programming through the simulation (totaling 27 hours, 45 minutes and 28 seconds).  All simulation generated local maxima match corresponding fingerprints generated directly through ACRCloud's library, thereby proving its accuracy.

### B.    Simulation Processing

126.    The simulation has two parts. The first calls ACRCloud's SDK to process audio data in the same manner that TVision uses it. I used the SDK packaged in acrcloud_extr_tool.so (available at

**Ex. 8**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

https://github.com/acrcloud/acrcloud_sdk_python/raw/64e39bbefa0e54c631e8c301d9423d4bbf3

31cd3/linux/x86-64/python2.7/acrcloud/acrcloud_extr_tool.so). This is the same version of the

SDK file that TVision puts on its meters. *See* ¶41.

127.    My team and I downloaded publicly available television content from archive.org and

commercials from iSpot.com. The television programs and commercials I used in the simulation

(and their source) are listed in Exhibit 9. I extracted the audio from these television video files

into PCM format at 8000 Hz, 16 bit. This is the same format that TVision uses for the audio files

it processes using ACRCloud's SDK.

128.    Like TVision's code, I called the ACRCloud SDK using

acrcloud_extr_tool.create_fingerprint_by_filebuffer with the audio extracted as discussed above.

I had the simulation send the ACRCloud SDK television audio in 6-second clips 10 seconds

apart in the same way that TVision does. Starting 1 second into each clip, I had the ACRCloud

SDK create fingerprints for 6-second clips and did this every 10 seconds for the entirety of the

television program or commercial.  According to advice from Dr. Chris Kyriakakis, I had the

simulation start at 1 second into each audio clip to avoid potential encoder delay artifacts that

could interfere with accurate fingerprint creation.  I understand that this practice does not change

the fact that the simulation is sending 6-second clips, that are 10 seconds apart, to the ACRCloud

SDK television audio, in the same way that TVision does.

129.    The simulation received back from the ACRCloud SDK the results from the

create_fingerprint_by_filebuffer/create_fp_by_buffer function in the form of fingerprint values,

frame numbers, and bin numbers. I used these fingerprints to confirm that the second part of the

simulation accurately implemented the ACRCloud algorithm to create fingerprints from the same

audio clips. In all cases, the fingerprints generated by the second part of the simulation

**Ex. 8**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

(discussed below) matched the fingerprints generated by a direct call to the

create_fingerprint_by_filebuffer/create_fp_by_buffer function in ACRCloud's SDK.

130.    For the second part of the simulation, I built a computer program

(run_simulation_long_audio.py and modules called therein) to determine whether the fingerprint

generation processing performs intraframe processing. These modules report the identify of local

maxima found and the frames in which they are found. This allows the simulation to determine

and report when local maxima are found using intraframe comparison(s) and when such local

maxima are located in consecutive and in overlapping frames.

131.    The simulation code in run_simulation_long_audio.py accepts an audio file and sends it

to acrcloud_extr_tool_interface.py for processing. That module calls into ACRCloud's SDK to

execute the acrcloud_extr_tool.decode_audio_by_file function. The decode_audio_by_file

function in ACRCloud's code accepts an audio file and after some preliminary processing calls

decode_audio. This preliminary processing is the same as that done in create_fp_by_buffer

before it calls decode_audio. ACRCloud_NLSN_SC_00000008 & 09. The only difference is that

the decode_audio_by_file function adds a WAV header onto the decoded file.  I remove that

header manually to make sure the result is the same as if I had used create_fp_by_buffer. The

decode_audio function is used by create_fp_by_buffer, and in my program,

decode_audio_by_file returns the same PCM formatted content that is returned to

create_fp_by_buffer when TVision calls the decode_audio function in ACRCloud's SDK.

132.    After setting various variables in the same way as in ACRCloud's code, my simulation

program calls the spectrogram function in the ACRCloud SDK. This is the same functionality as

in create_fp_ by_buffer, which calls gen_fp, which calls spectrogram. As explained above,

spectrogram returns the values from the FFT performed on the frames in the sample as pointed to

**Ex. 8**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

by the spec_z_ field. The simulation's call to spectrogram receives the same information, which it stores in a local array, called spec_z_ptrs. Once it stores this data, this module ends, returning control to run_simulation_long_audio.py.

133.    Through this point, the simulation has called the same ACRCloud functions that TVision uses in order to create the data structures in Python that are used later in the processing. In other words, up to this point, the simulation has used the same code that TVision causes to be executed when it calls the create_fingerprint_by_filebuffer/create_fp_by_buffer function.

134.    For the local_max function, however, the simulation recreates ACRCloud's functionality in the local_max function to allow it to analyze how ACRCloud's code processes audio data. In the ACRCloud code, after calling spectrogram, the gen_fp function calls local_max. The local_max function then calls getRowMax and isListMax, which the simulation code reproduces, and calls as well to perform the same functionality described above in the ACRCloud code.

135.    The simulation reproduces the processing in ACRCloud's code so that it can record when isListMax compares two values from the same frame, *i.e.*, intraframe processing. The simulation reports when it finds a maximum (*i.e.*, when isListMax returns true), including the frame number, value, and bin number, and whether the process of comparing values in isListMax involved intraframe comparison (*i.e.*, true or false).

136.    The run_simulation_long_audio.py program calls local_max_w_frames_output.py to perform the local_max processing. The local_max_w_frames_output.py module implements and calls a function called local_max that performs the same processing that ACRCloud's local_max performs with the addition of recording when, while performing the isListMax function, an intraframe comparison between the values in two frequency bins (values produced from the results of the FFT as described above, ¶¶63-81) from the same frame occurs. The simulation's

**Ex. 8**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

local_max also stores the same data in the same form as ACRCloud's local_max function. The simulation's local_max function stores the bin number, frame, number, and an intraframe comparison flag for each maxima (local max) it finds. local_max_w_frames_output.py then ends and control returns to run_simulation_long_audio.py.

137.    run_simulation_long_audio.py then calls acrcloud_sdk_call.py to generate the fingerprints using ACRCloud's create_fingerprint_by_filebuffer (alias for create_fp_by_buffer) function with no modification. acrcloud_sdk_call.py directly calls the function acrcloud_extr_tool.create_fingerprint_by_filebuffer, which is implemented within acrcloud_extr_tool.so, to generate the fingerprints of the same audio sample. acrcloud_sdk_call.py then stores the result and ends, restoring execution to run_simulation_long_audio.py.

138.    To ensure that the second part of the simulation is working correctly, the simulation confirms that the simulation's local_max code returns the same fingerprints (value, bin number, and frame number) as the call to the create_fp_by_buffer function in the ACRCloud SDK for the same audio. If not, the simulation generates an error message and stops. The run_simulation_long_audio.py module does this by comparing the results from calling ACRCloud's create_fingerprint_by_filebuffer function and from the simulation's results from local_max using its verify_local_max_results function. In doing so, we ensure that the results of the simulation have been validated against the results from the ACRCloud SDK, ensuring that the simulation executed properly. In running the simulation on the audio files described above, we did not observe any such errors, thus showing that the simulation executed properly and consistently with ACRCloud's SDK.

47

**Ex. 8**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

139.    Once it ensures that the simulation's local_max produced the same result as the ACRCloud SDK code, the simulation analyzes the output of the previously run modules to compile data about intraframe comparisons in overlapping and in consecutive frames. run_simulation_long_audio.py calls the process_local_max_output.py module. This module analyzes the files produced by acrcloud_sdk_call.py to identify consecutive and overlapping frames with maxima found using intraframe comparison(s). It reports for a 6-second audio clip (1) the frames with maxima produced using intraframe comparison(s) consecutive with frames also using maxima produced using intraframe comparison(s); and (2) frames with maxima produced using intraframe comparison(s) overlapping with frames also using maxima produced using intraframe comparison(s). The process_local_max_output.py module also outputs the number of local maxima in the 6-second audio clip and the total number of consecutive and overlapping frames with local maxima found using intraframe comparisons. The process_local_max_output.py module then ends, sending execution back to run_simulation_long_audio.py.

140.    run_simulation_long_audio.py then calculates and reports overall results for the entire audio clip. run_simulation_long_audio.py reports for a given audio file, the number of 6-second samples in that file, the number and percentage of 6-second samples with maxima found using intraframe comparison(s) in consecutive frames and in overlapping frames.

141.    In my opinion, the simulation accurately determines local maxima and fingerprints for audio files. I confirmed this opinion by validating the results of the simulation against the results of calling ACRCloud's SDK directly. If the two results do not match, the simulation will report that and stop. In addition, it is my opinion that the simulation's version of local_max accurately measures whether intraframe comparison(s) occurred during the determination of local maxima.

48

**Ex. 8**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

### C.    Simulation Results

142.    I used the simulation to analyze 71 audio files of television content, both programs and commercials, obtained from publicly available sources and from recording directly from TV programs using a mobile phone. These files and their lengths are listed in Exhibit 9, and the extracted audio files were provided with this report using a file sharing service. As described above, I extracted the audio from these files into PCM format, at 8000 Hz (samples per second), 16 bits per sample. These television files total approximately 99,928 seconds or 1,665 minutes of audio data. Exhibit 9.

143.    I analyzed the audio extracted from these television files using the simulation. The resulting files were provided with this report using a file sharing service. I reviewed the files containing the results of the simulation's analysis of these audio files, which I incorporated by reference herein. Every 6-second audio clip analyzed except for one[5] (*i.e.*, basically 100% of the 6-second audio clips) contained at least one set of local maxima resulting from using intraframe comparison(s) in overlapping and in consecutive frames. Exhibit 9. That one 6-second audio clip was digital silence and had no descriptors at all. To analyze the 71 files mentioned above, the simulation processed 9,978 6-second clips. *Id.* In other words, basically 100% of the 6-second audio clips analyzed performed intraframe comparisons to produce maxima in overlapping and in consecutive frames.

144.    In my opinion, the simulation demonstrates that in processing the audio from ordinary television content the ACRCloud algorithm as implemented by the create_fp_by_buffer function in ACRCloud's SDK performs intraframe comparisons while generating local maxima that are

---

[5] One tested video started with 14 seconds of silence and thus the first 6-second clip generated no maxima of any sort. All the other 6-second clips from that video had maxima in consecutive and overlapping frames where those maxima were found using intraframe comparisons.

**Ex. 8**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

located in both overlapping and in consecutive frames. It is my opinion that when TVision's meters utilize the ACRCloud SDK to create fingerprints as panelists watch television in their homes and when VidVita uses the ACRCloud SDK to create reference fingerprints, that the ACRCloud SDK performs intraframe comparisons to produce local maxima and does so in consecutive and overlapping frames.

*      *      *

I, Paul Martin, hereby declare under penalty of perjury under the laws of the United States of America, that the foregoing Report is true and correct.

Date: _____2025-07-07_____                    _____

                                                          Paul D. Martin, Ph.D.

4925-8502-9459v.2

**Ex. 8**

*The Nielsen Company (US), LLC*

*v.*

*TVision Insights, Inc.*

U.S. District Court for the District of Delaware
Case No. 22-057-LPS

**Expert Report on Damages**

**Michael C. Keeley, Ph.D.
Senior Advisor, Cornerstone Research**

**July 7, 2025**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 9**

# TABLE OF CONTENTS

I.      QUALIFICATIONS ............................................................................................. 1

II.     ASSIGNMENT ................................................................................................... 2

III.    MATERIALS CONSIDERED AND REPORT OUTLINE ............................. 4

        A.      Materials Considered .............................................................................. 4

        B.      Report Outline ........................................................................................ 4

IV.     SUMMARY OF OPINIONS ............................................................................. 5

V.      CASE BACKGROUND .................................................................................. 10

        A.      Parties .................................................................................................... 10

                1.      Nielsen ........................................................................................ 10

                2.      TVision ...................................................................................... 12

        B.      Patent-in-Suit ........................................................................................ 16

        C.      Audience Measurement Market and Competitive Landscape .............. 17

                1.      Ratings Measurement as a Currency ........................................... 17

                2.      Importance of TV Panel Data to Calibrate Big Data ................. 18

                3.      Nielsen Competitors in the Audience Measurement Market ..... 19

VI.     THE PATENTED TECHNOLOGY IS VALUABLE TO TVISION ............. 21

VII.    LOST PROFITS ............................................................................................... 23

VIII.   *GEORGIA-PACIFIC* PROVIDES AN ANALYTICAL FRAMEWORK FOR THE
        HYPOTHETICAL NEGOTIATION USED TO DETERMINE A REASONABLE
        ROYALTY ........................................................................................................ 28

        A.      Analytical Framework .......................................................................... 29

                1.      Hypothetical Negotiation Between Nielsen and TVision ......... 29

                2.      Nash Bargaining ......................................................................... 30

        B.      Calculation of a Reasonable Royalty Based on the Incremental Benefit to TVision
                and Cost to Nielsen ............................................................................... 35

IX.     ANALYSIS OF THE *GEORGIA-PACIFIC* FACTORS ................................. 44

X.      SIGNATURE .................................................................................................... 55

**Ex. 9**

## IV.    SUMMARY OF OPINIONS

15.    As discussed below, I compute damages resulting from TVision's infringement of the '889 Patent based on a reasonable royalty analysis.  Although Nielsen has likely lost profits and will lose profits in the future before the patent-in-suit expires, I have not quantified the magnitude of Nielsen's lost profits.  However, given the magnitude of Nielsen's revenues, Nielsen's lost profits from TVision competing and selling data to firms that compete with Nielsen would likely be very large.

16.    To assess a reasonable royalty, I use the construct of a hypothetical license negotiation between a willing licensor and willing licensee as outlined in the *Georgia-Pacific* case to determine a reasonable royalty.[11]  The consideration of a hypothetical license negotiation is common when evaluating reasonable royalties in patent damages cases.  Applying the framework set forth in *Georgia-Pacific*, I model the hypothetical license negotiation between Nielsen and TVision prior to TVision's first infringement on or about May 1, 2018.[12]

17.    The magnitude of the royalty would depend on the incremental benefits (compared to the next-best available, acceptable non-infringing alternative) that would accrue to TVision as a result of practicing the patent-in-suit at the time of the negotiation of the hypothetical license.  I understand based on discussions with Nielsen's technical expert, Dr. Kyriakakis, and a review of his opening report, that the record based on depositions of TVision personnel does not show that there were acceptable non-infringing alternatives to the patented ACR technology in suit available to TVision at the time of the hypothetical negotiation (or even later).[13]  Therefore, if TVision had not infringed the patent-in-suit, it would not have had a viable business absent a license to the patent-in-suit.  As a result, the future incremental benefit expected at the time of the hypothetical negotiation would be the present discounted value of the profits TVision expected to make until the patent-in-suit expires.

---

[11] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, (S.D.N.Y. 1970), modified and affirmed, 443 F. 2d 295 (2d Cir. 1971).

[12] Effective May 1, 2018, TVision completely switched its ACR technology from Gracenote to ACRCloud. *See* Liu Exhibit 30 ("TVision FAQ: ACR Update" [TVSN_NLSN_00311852–854 at 852]).

[13] Conversation with Dr. Kyriakakis; Kyriakakis Report, Section X.  The companies discussed by TVision personnel in their depositions as possible available, acceptable, non-infringing alternatives for ACR in TVision's system include Answer (or Enswers), Mobile Research Lab ("MRL"), Dat-Track, and AxWave.  If additional non-infringing alternatives are identified in TVision's expert reports, I will address these alternatives in my reply report.

18. 

19.    Nevertheless, for the purposes of reasonable royalty damages and the hypothetical negotiation construct, I must assume that Nielsen would have been a willing licensor and granted a license to the patent-in-suit to TVision at a royalty TVision would accept.

20.    As explained below, based on the framework of Nash Bargaining, and assuming counterfactually (but beneficially to TVision) that Nielsen and TVision were in similar bargaining positions (and ignoring Nielsen's lost profits), the parties would negotiate to a reasonable royalty of 50% of the net present value of TVision's expected incremental profits from practicing the patent-in-suit at the time of the hypothetical negotiation.

21.    However, Nielsen and TVision were not in similar bargaining positions.  For one thing, as mentioned above, the profits Nielsen would lose diminish and likely would eliminate the benefit to Nielsen of granting a license to TVision.  That is, the profits Nielsen would lose by granting TVision a license would likely exceed TVision's net present value of expected profits from practicing the patent-in-suit.  Thus, Nielsen would not willingly grant a license to TVision and would not care if TVision refused to accept a royalty less than Nielsen's lost profits.  In addition, Nielsen was a large, established firm and any royalty it would likely receive would not be significant to its financial situation.  In contrast, TVision was a startup, and without a license

---

[14] Nielsen U.S. Revenue, 2012 - 2022 [NLSN_TVISION0252274].  Nielsen's U.S. revenues were ██████████ in 2022 and ██████████ in 2018.

[15] See discussion in Section VII.

would not be in business.  This stronger bargaining position would also enable Nielsen to negotiate a royalty greater than 50% of TVision's expected incremental profits.

22.    Notwithstanding these facts, as part of the hypothetical negotiation construct, a very favorable royalty for TVision would be 50% of TVision's net present value of expected profits until patent expiration from practicing the patent-in-suit.  This 50% royalty arises as a solution to Nash Bargaining when the parties are in similar bargaining positions.  But, as explained above, Nielsen is in a much stronger bargaining position than TVision, and Nielsen would lose profits by granting a license to TVision.  Thus, if forced to grant a license at a royalty TVision would agree to pay, Nielsen would demand a royalty higher than 50% of the net present value of TVision's expected incremental profits from practicing the patent-in-suit.

23.    The net present value of TVision's expected incremental benefit at the time of the hypothetical negotiation is ██████████████████████████████████████



██████████████████████████████████████████████████████ [16]  Of these three scenarios, I believe the middle average linear growth scenario is the most reasonable to use to calculate a reasonable royalty.

24.    Applying the very favorable (to TVision) 50% royalty explained above, a reasonable royalty would be ██████████ based on the average linear growth scenario. [17]  In my opinion, this provides TVision a favorable reasonable royalty under the hypothetical negotiation construct.

25.    According to ████████████████████████████████ Although ████████ ████████████████████████████ ████████████████████████████████████████████████ Moreover, ████████████████████████████████████ ████████████ [18]  For example, according to a VideoAmp press release, as of June 2023 Nielsen appeared likely to lose some of the business of Byron Allen's Allen Media Group ("AMG") (and possibly the business of advertisers that advertise on AMG's broadcasts) to VideoAmp. [19]  Based

---

[16] Exhibit 1.  *See also* Exhibits 1A, 1B and 1C.

[17] Exhibit 1.

[18] Conversation with ████████████████████████████████

[19] Lukovitz, Karlene, "Allen Media Group Makes VideoAmp Primary Currency Replacing Nielsen," *MediaPost*, June 20, 2023, https://www.mediapost.com/publications/article/386514/allen-media-group-makes-videoamp-primary-currency.html.

on my discussions with ████████ as well as TVision's own documents and the testimony of its Chief Executive Officer ("CEO") and co-founder, Mr. Yan Liu, ████████████████████ ████████████████████████████████████.[20]  Based on an opinion of the U.S. District Court of the Northern District of Illinois – Eastern Division, Nielsen had a contract with AMG extending until September 30, 2024.[21]  In June 2023, AMG announced VideoAmp as the "currency" it would use to negotiate advertising prices (instead of Nielsen) and unveiled a 10-year deal with VideoAmp.[22] ████████████████████ ████████████████████████, in October 2024 Nielsen and AMG entered into a multi-year agreement for audience measurement.[23] ████████████████████

26.    In addition, ████████████████████



---

[20] *See e.g.,* ████████████████████

[21] *See e.g.,* Memorandum Opinion and Order, July 10, 2020, *CF Entertainment, Inc. v. The Nielsen Company (US), LLC,* Case No. 20-CV-2393 ("AMG v. Nielsen July 2020 Order"); Memorandum Opinion and Order, August 17, 2023, *CF Entertainment, Inc. v. The Nielsen Company (US), LLC,* Case No. 20-CV-2393 ("AMG v. Nielsen August 2023 Order").

[22] In April 2023, AMG announced that it would use VideoAmp as the currency for The Weather Channel. *See* "Allen Media Group to Leverage VideoAmp as New Currency for 2023-24 Upfront Season," *VideoAmp*, April 26, 2023, https://videoamp.com/press/allen-media-to-leverage-videoamp-as-new-currency/; Lukovitz, Karlene, "Allen Media Group Makes VideoAmp Primary Currency, Replacing Nielsen," *Media Post*, June 20, 2023, https://www.mediapost.com/publications/article/386514/allen-media-group-makes-videoamp-primary-currency.html; "Byron Allen's Allen Media Group Announces VideoAmp as Primary Currency with Ten-Year Agreement," *VideoAmp*, June 20, 2023 [NLSN_TVISION0252503–511].

[23] Conversation with ████████████████ "Allen Media Group Inks Cable, Digital Nielsen Deal," *RBR TVBR,* October 4, 2024, https://rbr.com/allen-media-group-inks-cable-digital-nielsen-deal/.

content being watched.[54]  Both stages of the process rely on technology provided by ACR

vendors (that are discussed below).[55]  According to TVision, ACR is a critical component of its

business.  For example, TVision's CEO, Mr. Liu, testified that "if we have no ACR data,

certainly we do not have a product."[56]



35.      TVision used and now uses ACR technology it obtains from other firms.
[57]
[58])

Gracenote was acquired by Nielsen in February 2017.[59]  In early 2018,
[60]

36.      With Gracenote's ACR technology no longer an option, TVision entered into an

agreement with ACRCloud in March 2018, under which ACRCloud provided TVision with ACR

technology for the identification of content.[61]  TVision and ACRCloud entered into similar

---

piece of content. … Q. Does the panelist device or meter create fingerprints? A. I believe that the creation of the fingerprint happens on the device, yes.").

[54] Liu Deposition, pp. 39–40 ("So we have a device. Device captures acoustic audio from the panel home. Then we match that audio – we first convert that audio into fingerprint. Then we match that fingerprint against our database to determine what's on the screen… Q. And when you match the fingerprint against your database, is that done via an API from ACRCloud? A. Yes."); Webster Deposition, p. 102 ("When there is a match, what is the fingerprint matched to? A. Available reference content at ACRCloud.").

[55] Liu Deposition pp. 39–40 ("Q. And when you convert the audio into a fingerprint, is that done using APIs provided by ACRCloud? A. Yes. … Q. And when you match the fingerprint against your database, is that done via an API from ACRCloud? A. Yes."); Webster Deposition, p. 102 ("When there is a match, what is the fingerprint matched to? A. Available reference content at ACRCloud.").

[56] Liu Deposition, p. 184.

[57]       Gracenote was founded in 1993 and developed into a metadata and data services company for the entertainment industry.  Gracenote launched Gracenote Entourage, its ACR platform, in January 2012.  *See* "Gracenote," *CB Insights,* https://www.cbinsights.com/company/gracenote, accessed September 18, 2023; "Gracenote Launches Interactive TV Platform," *Sony,* January 10, 2012, https://www.sony.com/content/sony/en/en_us/SCA/company-news/press-releases/gracenote-launches-interactive-tv-platform.html.

[58] *See e.g.,*

[59] "Nielsen Completes Acquisition of Gracenote," *Nielsen,* February 1, 2017, https://www.nielsen.com/news-center/2017/nielsen-completes-acquisition-of-gracenote/.

[60] Webster Deposition, pp. 109–110 ("Q. Do you have any recollection of what was going on around April 23, 2018, with regard to TVision's ACR solution, particularly with respect to Gracenote and ACRCloud? A. Yeah.
.

[61]

41. 

### C.    Audience Measurement Market and Competitive Landscape

42.    In this section, I discuss ratings measurement as a currency, the importance of TV panel data to calibrate big data as well as Nielsen's competitors in the audience measurement market, including those utilizing TVision's panel data.

### 1.    Ratings Measurement as a Currency

43.    The value of an advertisement ("ad") on a television program, for example, depends on the number of people (and their demographics) who watch an ad in that spot.[76]  Therefore, viewership measurement is an important consideration for advertisers looking to purchase ad time from content providers to display their ads and content providers selling time associated with its programs where those ads can be shown.[77]  When a measurement metric becomes the basis for assigning a price to an ad, that measurement metric is called a "currency."[78]  Industry standard currencies are based on audience viewership metrics (i.e., ratings) that measure the viewership on particular programs at particular times among particular demographic groups.[79]  For almost its entire history, Nielsen's panel data was used to determine ratings and was the currency used to price ads by both buyers and sellers.[80]  Recently, "census" data (i.e., data on the

---

[75] Plaintiff The Nielsen Company (US), LLC's Supplemental Responses and Objections to Defendant's First Set of Interrogatories, September 11, 2023, No. 2. ("Other than the work that Venugopal Srinivasan did that is described in response to Interrogatory No. 1 (which was never put into a product or commercialized), Nielsen has and has had no products or systems that practice the '889 patent.").

[76] "National TV Measurement," *Nielsen,* https://www.nielsen.com/solutions/audience-measurement/national-tv/, accessed October 11, 2023.

[77] "National TV Measurement," *Nielsen,* https://www.nielsen.com/solutions/audience-measurement/national-tv/, accessed October 11, 2023.

[78] Boyle, Alyssa, "AdExplainer: TV Measurement vs. TV Currency," *AdExchanger,* April 26, 2023, https://www.adexchanger.com/adexplainer/adexplainer-tv-measurement-vs-tv-currency/.

[79] Boyle, Alyssa, "AdExplainer: TV Measurement vs. TV Currency," AdExchanger, April 26, 2023, https://www.adexchanger.com/adexplainer/adexplainer-tv-measurement-vs-tv-currency/; Liu Deposition, pp. 110–111 ("'Currency' means the industry standard viewership data, which is accepted by both sell-and buy-side in the industry.").

[80] Boyle, Alyssa, "AdExplainer: TV Measurement vs. TV Currency," *AdExchanger,* April 26, 2023, https://www.adexchanger.com/adexplainer/adexplainer-tv-measurement-vs-tv-currency/.

testimony of TVision witnesses.[101]  For example, Mr. Liu, testified that of the three products that TVision sells, most of the data feed products, all of the dashboard SaaS products, and most of its custom projects utilize ACR data.[102]  Most importantly, TVision sells data on who is watching particular programs and their demographics to VideoAmp, iSpot and other big data firms to enable these firms to compete directly with Nielsen, and ACRCloud's ACR services are necessary to develop these data.  TVision's attention measurement products rely on ACR to such an extent that "ACRCloud is a Tier 1 business critical supplier and without their service [TVision has] no measurement business."[103]  "If [the ACR is] inaccurate, it means [TVision's] product is inaccurate."[104]  The financial impact caused by a loss of ACR data would affect nearly all products and TVision's business as a whole.[105]

52.    Without the infringing ACR technology from ACRCloud, TVision would have no revenue and would not have been able to attract investors since the time of the hypothetical negotiation.  ████████████████████████████████████

████████████████████████████████████ ██

████████████████████████████            This sales growth has attracted continued investment in the

---

[101] *See e.g.,* Liu Exhibit 30 ("TVision FAQ: ACR Update" [TVSN_NLSN_00311852–854 at 852]); Liu Exhibit 13 ("TVision Insights Internal" [TVSN_NLSN_00008034–041 at 039]); Liu Exhibit 14 ("TVision Next Generation Audience Measurement," February 2022 [TVSN_NLSN_00172207–244 at 218]); Schiffman Exhibit 2 ("TVision Next-Generation TV Measurement" [TVSN_NLSN_00626486–558 at 501]); TVision Email from T. Webster to S. Neumann, "Re:… Tvision & ACRCloud contract renewal," April 1, 2022 [TVSN_NLSN_00042850–853 at 850].

[102] Liu Deposition, p. 62 ("All SaaS product use ACRCloud data. Most of the data feed product, most of the custom study product does use ACR data.").

[103] TVision Email from T. Webster to S. Neumann, "Re:… Tvision & ACRCloud contract renewal," April 1, 2022 [TVSN_NLSN_00042850–853 at 850].

[104] Liu Deposition, pp. 199–200 ("Q. Okay. How important is ACR accuracy to TVision? A. It is important. Q. I mean, what would happen – strike that. Why is it important? A. Because as we discussed, most of our product use ACR data, and if it's inaccurate, it means our product is inaccurate. Q. And that would be -- your customers, I imagine, would not like that? A. Correct.").

[105] Liu Deposition, pp. 183–184 ("Q. What would be the financial impact that could be caused by a loss of ACR data? … [A.] If we have no ACR data, certainly we do not have a product. But as I mentioned, people take average. So losing two days of data should not impact our data accuracy. …Q. But if you had a longer outage, it would affect nearly all of your products that you sell? A. Yes, that's correct. Q. And, therefore, your business as a whole; correct? A. Yes.").

[106] Exhibit 3.  Gross profit is calculated as revenues less cost of goods sold.  *See also* TVision FY2023 Financial Statements [TVSN_NLSN_00951672].

[107] TVision Presentation:  TVision Business Update, June 29, 2021 [TVSN_NLSN_00063827–848]; "TVision Insights," *TVision*, https://www.tvisioninsights.com/, accessed October 6, 2023.

company, further fueling its growth and success.  Having raised over ███████ in total funding as of November 2, 2020, TVision's round of funding on November 15, 2022 landed renowned institutional investors such as Susquehanna International Group as well as a strategic investor in iSpot, raising an additional ████████.[108]  In June 2024 NTT DOCOMO Ventures invested an undisclosed amount in TVision, and Flow Capital provided TVision with a ████████ follow-on loan in December 2024.[109]

## VII.    LOST PROFITS

53.    According to █████████████████████████████████



Based on my discussions with ████████, as well as TVision's own documents and the testimony of its CEO, Mr. Liu, ████████████████████████████

---

[108] "TVision Financials," *Crunchbase,* https://www.crunchbase.com/organization/tvision-insights/company_financials, accessed September 19, 2023; "Build Query: Investors," *Crunchbase,* https://www.crunchbase.com/search/principal.investors/field/funding_round.has_funding_round.forward/num_investors/tvision-insights-series-unknown--fed4fe56, accessed September 27, 2023; Ha, Anthony, "TVision raises $16M to measure viewer attention on connected TVs," *TechCrunch,* November 2, 2020, https://techcrunch.com/2020/11/02/tvision-funding/; "TVision Raises $16 Million to Continue to Deliver the Data that is Innovating TV and CTV Measurement," *TVision*, November 2, 2020, https://www.tvisioninsights.com/resources/tvision-raises-to-continue-to-deliver-the-data-that-is-innovating-tv-and-ctv-measurement; "Build Query: Investors," *Crunchbase,* https://www.crunchbase.com/search/principal.investors/field/funding_round.has_funding_round.forward/num_investors/tvision-insights-series-unknown--a31a243e, accessed September 27, 2023; "iSpot Leads $16 Million Investment in TVision Insights to Expand Cross-Platform TV Currency Capabilities, Evolve Streaming Transparency," *iSpot*, November 15, 2022, https://www.ispot.tv/hub/ispot-leads-16-million-investment-in-tvision-insights-to-expand-cross-platform-tv-currency-capabilities-evolve-streaming-transparency/; "ISpot Leads $16M VC Round In Panel Provider TVision To Measure Co-Viewing," November 15, 2022, *AdExchanger*, https://www.adexchanger.com/digital-tv/ispot-leads-16m-vc-round-in-panel-provider-tvision-to-measure-co-viewing/.
[109] "NTT DOCOMO Ventures Invests in TVision Insights, Inc. …," *NTT DOCOMO Press Release,* June 28, 2025, https://www.nttdocomo-v.com/en/news/f8tj1l7s1f/; "Flow Capital Announces a US$1.5M Follow-On Loan in TVision," *Flow Capital Press Release,* December 16, 2024, https://www.globenewswire.com/news-release/2024/12/16/2997934/0/en/Flow-Capital-Announces-a-US-1-5M-Follow-On-Loan-in-TVision.html.

█████████████████████████████████████ [110]   Below I provide illustrative examples of the likely losses that Nielsen will face due to such competition.

54.      In June 2023, AMG announced that it was making VideoAmp (instead of Nielsen) "its primary and preferred currency across all of its properties" under a 10-year agreement that was effective immediately.[111]  AMG properties include a number of streaming and online outlets and broadcast stations, as well as cable networks including The Weather Channel.[112]  Based on an opinion of the U.S. District Court of the Northern District of Illinois – Eastern Division, Nielsen had a contract with the AMG extending until September 30, 2024.[113]  For The Weather Channel alone, AMG paid Nielsen $475,000 per month, and I understand will continue to pay that amount through September 2024.[114]  Notwithstanding AMG's deal with VideoAmp, I understand that ███

████████████████████████████████████████████████████████████

██████████████████████████████████████████████████████

████████████████████████████████████████████████ [115] ████████

---

[110] *See e.g.,* TVision Next-Generation Audience Measurement, February 2022 [TVSN_NLSN_00172344–358 at 352]; Liu Exhibit 11 ("TVision August 2021 Email to Investors" [TVSN_NLSN_00951039]); Liu Deposition, pp. 55–56 ("Q. And do you know what iSpot uses your calibration panel data to do? A. To create unified viewership data product. Q. So to combine census data with the panel device data? A. That's correct.  Q. Do you know if iSpot uses that data to compete with Nielsen? … [A.] I think so. … Q. And what does VideoAmp use the calibration panel data from TVision for? A. A similar use case. Q. And does VideoAmp use that data to compete with Nielsen? … [A.] I think so."); Lukovitz, Karlene, "Allen Media Group Makes VideoAmp Primary Currency Replacing Nielsen," *MediaPost,* June 20, 2023, https://www.mediapost.com/publications/article/386514/allen-media-group-makes-videoamp-primary-currency.html.

[111] Lukovitz, Karlene, "Allen Media Group Makes VideoAmp Primary Currency, Replacing Nielsen," *MediaPost,* June 20, 2023, https://www.mediapost.com/publications/article/386514/allen-media-group-makes-videoamp-primary-currency.html; "Byron Allen's Allen Media Group Announces VideoAmp as Primary Currency with Ten-Year Agreement," *VideoAmp,* June 20, 2023 [NLSN_TVISION0252503–511]. AMG became the first publisher to make VideoAmp its primary currency and in April 2023 AMG announced VideoAmp as its primary currency for The Weather Channel.

[112] Some of AMG's holdings include cable television networks (i.e., The Weather Channel, Comedy.TV, Cars.TV, ES.TV, JusticeCentral.TV, MyDestination.TV, Pets.TV, Recipe.TV, Local Now, The Weather Channel en Español, TheGRIO), as well as various broadcast TV stations.  *See e.g.,* Lukovitz, Karlene, "Allen Media Group Makes VideoAmp Primary Currency, Replacing Nielsen," *MediaPost,* June 20, 2023, https://www.mediapost.com/publications/article/386514/allen-media-group-makes-videoamp-primary-currency.html; "Investor Relations – Allen Media Group," *AllenMedia.TV,* https://allenmedia.tv/ir/, accessed September 12, 2023; "Company – ES Networks," *ES Networks,* https://esnetworks.tv/company/, accessed September 12, 2023; "Founder – Allen Media Group – Byron Allen," *AllenMedia.TV,* https://allenmedia.tv/founder/, accessed September 12, 2023.

[113] *See e.g.,* AMG v. Nielsen July 2020 Order; AMG v. Nielsen August 2023 Order.

[114] AMG v. Nielsen July 2020 Order, pp.5–6, 8, 19; AMG v. Nielsen August 2023 Order, pp. 6–7, 17.

[115] "Allen Media Group Inks Cable, Digital Nielsen Deal," *RBR TVBR,* October 4, 2024, https://rbr.com/allen-media-group-inks-cable-digital-nielsen-deal/.

---

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED]

[REDACTED] Thus, TVision's infringement caused Nielsen to lose profits.

55.    In February 2023, NBCU "announced that measurement vendors iSpot and VideoAmp are now certified as currencies for advanced audiences" which "means iSpot is serving as a cross-platform currency that can deliver both age and gender…, while VideoAmp is serving as an additional currency that can serve advanced audience ad buyers."[116]  NBCU stated that it would "still be using traditional measurement firm Nielsen for this year's upfront, transacting on the vendor's C3 and C7 metrics (aka measurement of the average viewership of commercials within TV shows, live and delayed three and seven days after their original air date), until Nielsen One goes live" at which time NBCU "will assess Nielsen's certification readiness."[117] NBCU further noted that "iSpot and VideoAmp will be NBCU's cross-platform certified currency partners that the company is ready to act and transact on with clients in the Upfront."[118] The May 1, 2023 Amendment to Nielsen's Amended and Restated Master Services Agreement with NBCU and Comcast [REDACTED] [REDACTED]

[REDACTED]



---

[116] Fletcher, Bevin, "NBCU certifies iSpot, VideoAmp currency for advanced audiences, intros content quality index," *StreamTVInsider,* February 8, 2023, https://www.streamtvinsider.com/advertising/nbcu-certifies-ispot-videoamp-currency-advanced-audiences-intros-content-quality-index.  In 2022, NBCU "announced that it will activate iSpot.tv's cross-platform audiences as currency for national ad buys at this year's Upfront.  *See* Kelly, Chris, "NBCUniversal elevates iSpot to ad currency in blow to Nielsen," *MarketingDive,* March 23, 2023, https://www.marketingdive.com/news/nbcuniversal-elevates-ispot-to-ad-currency-as-measurement-battle-heats-up/620827/.

[117] Fletcher, Bevin, "NBCU certifies iSpot, VideoAmp currency for advanced audiences, intros content quality index," *StreamTVInsider,* February 8, 2023, https://www.streamtvinsider.com/advertising/nbcu-certifies-ispot-videoamp-currency-advanced-audiences-intros-content-quality-index.

[118] Fletcher, Bevin, "NBCU certifies iSpot, VideoAmp currency for advanced audiences, intros content quality index," *StreamTVInsider,* February 8, 2023, https://www.streamtvinsider.com/advertising/nbcu-certifies-ispot-videoamp-currency-advanced-audiences-intros-content-quality-index.

[119] [REDACTED]

[REDACTED]

[REDACTED] [121]

[REDACTED] [122]

Moreover, if Nielsen were to lose the entire contract to VideoAmp or iSpot, Nielsen would lose [REDACTED] per year. In addition, in March 2024 VideoAmp announced it had become "NBCU's currency of choice for this year's upfront,"[123] with NBCU stating in April 2025 that it was "partnerships agnostic" regarding measurement and currency prior to the 2025 upfront.[124] I understand that VideoAmp and iSpot are only available as options for alternative currencies to Nielsen, especially for national measurement,[125] due to their use of the TVision panel data, which as discussed above is made possible through its infringement of the '889 Patent.

56. [REDACTED] For example, in August 2023, Paramount and Omnicom Media Group announced a pilot program for "the first fully standardized new currency

---

[120] [REDACTED]

[121] [REDACTED]

[122] [REDACTED] *See* Nielsen/NBCU May 2023 Amendment [NLSN_TVISION0252664–779 at 679, 704, 771].

[123] "NBCU's New Approach to Measurement — Everything To Know From Its One24 Tech Conference," *VideoAmp Press Release,* March 20, 2024, https://videoamp.com/press/nbcus-new-approach-to-measurement-everything-to-know-from-its-one24-tech-conference/.

[124] Bradley, Bill, "NBCU Expects 'Monumental' Year in TV Upfront Despite Tariff Talk," *AdWeek,* April 28, 2025.

[125] Conversation with [REDACTED]

**Ex. 9**

and audience-based workflow using Mediaocean's ad infrastructure … [that] leverages VideoAmp data as an advanced currency."[126]  In October 2023, Paramount announced that it was adding iSpot as a new currency provider across Paramount's media and streaming platforms, noting that "Paramount expects to be able to measure and transact across iSpot data in the first quarter of 2024."[127]  After Paramount and Nielsen's contract expired in September/October 2024, the parties were at an impasse negotiating a new contract.[128]  During this time, Paramount turned to VideoAmp, including entering into a new agreement with VideoAmp in January 2025.[129]  While Paramount eventually entered into a multi-year agreement with Nielsen in February 2025,

█████████████████████████████████████████████████████ [130]

█████████████████████████████████████████████████████

████████████████

---

[126] Bradley, Bill, "Paramount and OMG Usher in Next Step in New Currency Workflow," *AdWeek,* August 17, 2023, https://www.adweek.com/convergent-tv/paramount-and-omg-usher-in-next-step-in-new-currency-workflow/.

[127] Cahillane, Mollie, "Paramount Adds iSpot as New Currency Partner," *AdWeek,* October 10, 2023, https://www.adweek.com/convergent-tv/paramount-adds-ispot-currency-partner/#.  "The collaboration allows the companies to measure and transact national TV advertising campaigns with iSpot's currency across Paramount's media and streaming platforms."

[128] *See e.g.,* Adgate, Brad, "The Paramount-Nielsen Contract Impasse Is In Its Second Month," *Forbes,* November 6, 2024, https://www.forbes.com/sites/bradadgate/2024/11/06/the-paramount-nielsen-contract-impasse-is-in-its-second-month/; Brown, Mark, "What Paramount and Nielsen's Contract Dispute Means for the Future of Alternative Media Currencies," *Rain for Growth Agency,* December 3, 2024, https://www.rainforgrowth.com/insights-updates/what-paramount-and-nielsens-contract-dispute-means-for-the-future-of-alternative-media-currencies/

[129] "VideoAmp Renews Measurement and Currency Partnership with Paramount Global," *BusinessWire,* January 7, 2025, https://www.businesswire.com/news/home/20250107427039/en/VideoAmp-Renews-Measurement-and-Currency-Partnership-with-Paramount-Global; Boyle, Alyssa, "Nielsen's Long-Awaited Measurement Offering Is Ready For The Upfronts," *AdExchanger,* January 31, 2025, https://www.adexchanger.com/ctv-roundup/nielsens-long-awaited-measurement-offering-is-ready-for-the-upfronts/ ("When Paramount's contract with Nielsen lapsed in the fall, the broadcaster placed its bet on VideoAmp and became the only major TV programmer that isn't relying on Nielsen in some way.").

[130] "Paramount and Nielsen sign multi-year measurement and analytics deal across Paramount's leading broadcast, cable and streaming platforms," *Nielsen Press Release,* February 3, 2025, https://www.nielsen.com/news-center/2025/paramount-and-nielsen-sign-multi-year-measurement-and-analytics-deal-across-paramounts-leading-broadcast-cable-and-streaming-platforms/ ("The partnership includes measurement for all Paramount platforms: national and local broadcast, all cable networks, and streaming on Paramount+ and Pluto TV.  Paramount has licensed new Nielsen services as part of the agreement, including Advanced Audiences, Big Data + Panel, Ad-Supported Streaming Platform Ratings, Nielsen ONE Ads for Connected Television, and National out-of-home expansion to inform advertising, programming and licensing strategies.").  *See also* Steinberg, Brian, "Paramount, Nielsen Strike New Measurement Deal, Ending Months-Long Feud," *Variety,* February 3, 2025, https://variety.com/2025/tv/news/paramount-nielsen-renew-measurement-deal-ending-feud-1236295343/; Conversation with Christine Pierce (Nielsen Chief Data Officer).

57.    Therefore, while I have not been able to quantify Nielsen's aggregate lost profits these illustrative examples demonstrate that Nielsen will suffer losses due to TVision's infringement, because without the acquired TVision panel data, neither VideoAmp nor iSpot would have been able to provide sufficiently accurate audience measurement data that would be acceptable to advertisers or broadcasters.

## VIII.    *GEORGIA-PACIFIC* PROVIDES AN ANALYTICAL FRAMEWORK FOR THE HYPOTHETICAL NEGOTIATION USED TO DETERMINE A REASONABLE ROYALTY

58.    I assess the royalty that TVision would have agreed to pay, and Nielsen would have agreed to accept, as a result of a hypothetical negotiation for a license to practice the patent-in-suit starting at the time of the first infringement, which I understand is on or about May 1, 2018.[131]  With this hypothetical license, TVision could use ACRCloud's ACR services without infringing the '889 Patent.  I use the framework outlined in the *Georgia-Pacific* case to determine a reasonable royalty (i.e., a royalty that would result from a hypothetical negotiation between the parties for a license for the patent-in-suit).[132]  The framework of a hypothetical negotiation between a licensor (the patent owner) and a licensee (the infringer) is regularly considered when determining a reasonable royalty for purposes of assessing damages in a patent infringement matter.  The hypothetical negotiation in this framework assumes a willing licensor and a willing licensee and is deemed to occur just prior to the date of first infringement, although subsequent information, often referred to as the "Book of Wisdom," may also be considered, in appropriate circumstances, to ensure that a patentee is not undercompensated.[133]  In addition, the parties to the hypothetical negotiation assume that the patent is valid and would be infringed.

---

[131] Effective May 1, 2018, TVision completely switched its ACR technology from Gracenote to just ACRCloud.  TVision entered into an agreement with ACRCloud in March 2018 for ACRCloud to provide TVision with ACR services, and TVision rolled out ACRCloud prior to May 2018, noting that the "two solutions will be running in parallel starting April 24th."  *See* Liu Exhibit 30 ("TVision FAQ: ACR Update" [TVSN_NLSN_00311852–854 at 852]); ACRCloud/TVision March 2018 Agreement [TVSN_NLSN_00641220–231].

[132] *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, (S.D.N.Y. 1970), modified and affirmed, 443 F. 2d 295 (2d Cir. 1971).

[133] *See e.g.*, *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116, (S.D.N.Y. 1970), modified and affirmed, 443 F. 2d 295 (2d Cir. 1971); *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289

## A.    Analytical Framework

### 1.    Hypothetical Negotiation Between Nielsen and TVision

59.    Economic principles indicate that the value of a patent to the infringer (i.e., TVision) is the incremental benefit the patent provides to the infringer compared to the next-best available non-infringing alternative.  The value to the patent holder of granting a license is the royalty it would receive less any incremental costs (e.g., lost profits) associated with increased competition from the licensee or its customers.  Assuming the value to the patent holder and the value to the licensee are both positive, economic theory tells us that a hypothetical negotiation would have resulted in a royalty between the incremental profits of the infringer and the lost profits of the patent holder.[134]  In this case, as mentioned above, I understand from Dr. Kyriakakis that the companies discussed by TVision personnel in their depositions as possible available, acceptable, non-infringing alternatives for ACR in TVision's system, actually would not be acceptable non-infringing alternatives available to TVision at the time of the hypothetical negotiation.[135]  Consequently, absent infringement, TVision likely would not have continued in business without a license to the patent-in-suit.

60.    On the other hand, licensing the patent-in-suit to a competitor would have diminished Nielsen's profits.  Because TVision's products either compete with, or are inputs to products that compete with Nielsen, and because Nielsen was and is much larger than TVision, Nielsen's losses would have been much larger than TVision's profits.  For example, as mentioned above, if Nielsen only cut prices or was unable to raise prices by ███ due to competition from TVision and the firms to which TVision sells data, Nielsen would have lost ████████████ per year (i.e., ███████████████) for a period from the time of first infringement until patent expiration.

---

U.S. 689 (1933) ("To correct uncertain prophecies in such circumstances [where the value of the patent might originally be considered "nominal" at the time of infringement due to "scanty or imperfect" information] is not to charge the offender with elements of value non-existent at the time of his offense.  It is to bring out and expose to light the elements of value that were there from the beginning.").  *See also Spectralytics, Inc. v. Cordis Corp.*, 650 F. Supp. 2d 900 (D. Minn. 2009) ("[In *Sinclair Refining*] Justice Cardozo advocates looking to future events to avoid undercompensating patentees, not to limit their compensation as [the infringer] advocates here.").

[134] Keeley, Michael C., "Infringement:  Valuing IP for Damages," *les Nouvelles*, 34(4) 1999, pp. 172–175.

[135] Conversation with Dr. Kyriakakis; Kyriakakis Report, Section X.  These companies included Answer (or Enswers), MRL, Dat-Track, AxWave.

Moreover, if, as mentioned above, Nielsen only lost one major broadcast entity like NBCU as a customer, it would lose about ▮▮▮▮▮▮▮ per year.[136]

61.     Nielsen would only agree to license the patent-in-suit to TVision if the royalty it received exceeded the profits it would lose by licensing the '889 Patent.  TVision would only benefit from licensing the patent-in-suit if the royalty it paid was less than the incremental profits it would receive from practicing the '889 Patent.  Because Nielsen's lost profits would have exceeded TVision's incremental profits, Nielsen would have not been willing to grant a license to TVision. TVision would not and could not have paid Nielsen a royalty sufficient to compensate Nielsen for its lost profits due to competition from TVision and the firms to which TVision sells its data.

62.     However, I understand patent law requires the assumption that the patent owner would hypothetically license the infringer for the purposes of determining damages.  In the next section I discuss the likely result of a negotiation under this framework.

### 2.     Nash Bargaining

63.     If Nielsen would not have lost any profits, economic theory tells us that Nielsen would benefit from any non-zero royalty from licensing the patent-in-suit.

64.     Nash Bargaining Theory, developed by Dr. John Nash who was awarded the Nobel Prize in Economics,[137] provides a way to determine how the parties would split TVision's incremental profits to determine a royalty for licensing the patent-in-suit.  Putting aside Nielsen's lost profits from licensing the '889 Patent to TVision, Nielsen and TVision would negotiate about how to split the "surplus" arising from TVision's practicing the patent-in-suit (i.e., TVision's expected incremental profits).  According to Nash Bargaining Theory, each party to a bilateral negotiation assesses its own threat point (i.e., the point at which it would walk away from the negotiation) and estimates its counter party's threat point.[138]  Each party would also consider what it would lose if negotiations break down and neither party receives anything.

---

[136] See discussion in Section VII. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

[137] "The Prize in Economics 1994 – Press Release," *NobelPrize.org,* October 11, 1994, https://www.nobelprize.org/prizes/economic-sciences/1994/press-release/.

[138] Nash, John, "Two-Person Cooperative Games," *Econometrica: Journal of the Econometric Society,* 21(1), January 1953, pp. 128–140 at 130 ("A common device in negotiation is the threat. […] It

65.     Nielsen and TVision's incentives are different:  TVision's incentive is to negotiate a lower licensing fee, while Nielsen benefits from a higher license fee (relative to a lower fee) putting aside the profits Nielsen would lose by licensing the patent-in-suit.  Economic theory provides a framework to evaluate such a negotiation if both parties are in an identical negotiating position.

66.     In a seminal pair of papers, Dr. Nash develops such a framework to evaluate negotiations between two parties.[139]  In these papers, Dr. Nash considers a situation, applicable to this matter, where two parties "have the opportunity to collaborate for mutual benefit."[140]

67.     The hypothetical licensing negotiation in this case fits the Nash Bargaining framework (under the constraints of the hypothetical negotiation construct):  a licensing agreement between the parties provides an opportunity for mutual benefit.  If Nielsen and TVision come to an agreement, TVision earns an incremental profit from licensing the patented technology, and Nielsen earns a royalty from TVision.  Without a license to the '889 Patent, TVision would be out of business and would not earn incremental profits from the patented technology, and Nielsen would not earn royalties from TVision.

68.     In his papers, Dr. Nash seeks a "solution" to this bargaining problem.  The solution determines benefits each party should expect from the negotiation.[141]  Dr. Nash restricts the set of possible solutions to those that satisfy "general properties that 'any reasonable solution'

---

turns out that the solution of the game not only gives what should be the utility of the situation to each player, but also tells the players what threats they should use in negotiating.").

[139] Nash, John F., "The Bargaining Problem," *Econometrica: Journal of the Econometric Society,* 18(2), April 1950, pp. 155–162; Nash, John, "Two-Person Cooperative Games," *Econometrica: Journal of the Econometric Society,* 21(1), January 1953, pp. 128–140.

[140] Dr. Nash's work on bargaining is a precursor to and an application of game theory and the Nash Equilibrium Theory, for which Dr. Nash was awarded the Nobel Prize in economics.  Nash Bargaining continues to be one of the preeminent frameworks used to understand negotiations and bargaining as evidenced by its inclusion in numerous textbooks and applications to economic literature. *See e.g.,* Mas-Colell, Andreu, Michael D. Whinston, and Jerry R. Green, *Microeconomic Theory*, New York, NY: Oxford University Press (1995), Chapter 8, pp. 235–266; Thomson, William, "Cooperative Models of Bargaining*," Handbook of Game Theory,* Volume 2, Elsevier Science B.V. (1994), Chapter 35, pp. 1237–1283; Roth, Alvin E., "The Nash Solution and the Utility of Bargaining," *Econometrica:  Journal of the Econometric Society,* 46(3), May 1978, pp. 587–594; Roth, Alvin E., and Uriel G. Rothblum, "Risk Aversion and Nash's Solution for Bargaining Games with Risky Outcomes," *Econometrica: Journal of the Econometric Society,* 50(3) 1982, pp. 639–647; Binmore, Ken, Ariel Rubinstein, and Asher Wolinsky, "The Nash Bargaining Solution in Economic Modelling," *The RAND Journal of Economics,* 17(2), Summer 1986, pp. 176–188; Harsanyi, John C. and Reinhard Selten, "A Generalized Nash Solution for Two-Person Bargaining Games with Incomplete Information," *Management Sciences,* 18(5), January 1972, pp. P80–P106.

[141] Nash, John F., "The Bargaining Problem," *Econometrica: Journal of the Econometric Society,* 18(2), April 1950, pp. 155–162 at 155.

additional benefit each party receives from the agreement in excess of what they would have received had they not reached an agreement.[144]

70.    To illustrate this solution, consider the following simple example.  Suppose two people, Alice and Brian, are deciding how to split $100.  If they cannot reach an agreement, neither receives anything (i.e., each receive $0).  Therefore, Alice and Brian's surplus is simply the amount they receive from the negotiation.  If they are to split the entire $100, Brian will receive $100 minus whatever Alice receives.  The Nash Bargaining Solution, assuming symmetry in the negotiation, results in an outcome where Alice receives $50 and Brian receives the remaining $50.

71.    To apply the Nash Bargaining Solution to a hypothetical negotiation between Nielsen and TVision, where they are determining an upfront royalty to Nielsen for a license to the '889 Patent, I begin by simplifying the negotiation and then discuss the likely consequences of doing so.  First, assume that Nielsen and TVision are identical (in terms of how they value profits and their negotiating ability and negotiating position).  Second, assume that if Nielsen and TVision cannot reach a licensing agreement, then TVision earns zero profits.  Also assume that Nielsen would not lose any business by licensing the patented technology.  Given these assumptions, the negotiation is simply Nielsen and TVision trying to split TVision's expected future profits where Nielsen loses the revenue from the royalty and TVision loses the incremental profits it would make if they do not reach an agreement.  Note that TVision's profits from practicing the patent-in-suit accrue over time, so the negotiation would be to split the discounted present value of TVision's expected profits.  The Nash Bargaining Solution would be:  TVision pays Nielsen half of the discounted present value of its expected profits and retains the remaining half of expected profits.  The value of each share at the time of the negotiation would be equal (i.e., 50/50).  Once again, remember that in the example above, I have assumed counterfactually (and beneficially to TVision) that Nielsen does not lose any profits as a result of

---

[144] In mathematical terms, the solution to the bargaining problem is: $\arg\max_{x}(u_1(x) - s_1^0)(u_2(x) - s_2^0)$, where $u_i(x)$ is player $i$'s utility from an agreement $x$ and $s_i^0$ is the outcome obtained for player $i$ if there is no agreement.  *See* Binmore, Ken, Ariel Rubinstein, and Asher Wolinsky, "The Nash Bargaining Solution in Economic Modelling," *The RAND Journal of Economics,* 17(2), Summer 1986, pp. 176–188 at 182; Nash, John F., "The Bargaining Problem," *Econometrica: Journal of the Econometric Society,* 18(2), April 1950, pp. 155–162 at 139.

==highlight==granting a hypothetical license and that Nielsen and TVision are in identical bargaining positions to arrive at this solution.==highlight==

72.    However, Nielsen and TVision are not identical and are not in identical bargaining positions.  Nielsen is a large, well-established firm, and TVision is a startup.[145]  A small hypothetical royalty would not have a significant effect on Nielsen's financial position.  In contrast, TVision's very existence would depend on taking a hypothetical license.  When two parties are bargaining over the distribution of a surplus, the Nash Bargaining Solution assigns a larger share to the bargainer who has little to lose if the negotiation fails, which, in this case, is Nielsen.[146]

73.    The outcomes for Nielsen and TVision should they be unable to reach an agreement are much different when accounting for the profits Nielsen would lose by granting TVision a license.  As I describe above, TVision competes with Nielsen both directly and indirectly through its customers.  Licensing the '889 Patent would come at the expense of some of Nielsen's profits.  As mentioned above, Nielsen would actually prefer not to license the patent-in-suit to TVision because Nielsen would lose more in profits than TVision would gain from practicing the '889 Patent.  If Nielsen and TVision do not come to an agreement, TVision has no other way of obtaining the patented technology (or otherwise performing the ACR required to have a business) and would not be in business.  In economic terms, Nielsen has a much higher "threat point" than TVision.  The Nash Bargaining Solution assigns a higher share to the party with a higher threat point.[147]  Nielsen's stronger bargaining position in the hypothetical negotiation, would lead to a higher share for Nielsen as compared to TVision according to Nash Bargaining.

74.    In summary, assuming, beneficially to TVision, that Nielsen and TVision have identical bargaining positions and that Nielsen would not be losing profits greater than the royalty in the

---

[145] *See e.g.,* Nielsen 2021 10-K, p. 3; "Celebrating 95 Years of Innovation," *Nielsen,* https://sites.nielsen.com/timelines/our-history/, accessed September 22, 2023; Deposition of Daniel Schiffman, September 8, 2023 ("Schiffman Deposition"), pp. 33, 50 ("because we are a tiny startup"; "we were an ambitious startup").

[146] Roth, Alvin E., and Uriel G. Rothblum, "Risk Aversion and Nash's Solution for Bargaining Games with Risky Outcomes," *Econometrica: Journal of the Econometric Society,* 50(3) 1982, pp. 639–647; Roth, Alvin E., "A Note on Risk Aversion in a Perfect Equilibrium Model of Bargaining," *Econometrica: Journal of the Econometric Society,* 53, 1985, pp. 207–211.

[147] Nash, John, "Two-Person Cooperative Games," *Econometrica: Journal of the Econometric Society,* 21(1), January 1953, pp. 128–140.  *See also* Sidak, J. Gregory, "Bargaining Power and Patent Damages," *Stanford Technology Law Review,* 19(1), Fall 2015, pp. 1–31 at 21.

event of a hypothetical license, the parties would negotiate to a 50/50 split of the net present value of TVision's expected incremental profits.  Accordingly, because Nielsen would lose profits from granting a license and because it was in a stronger bargaining position than TVision, a 50/50 split of the net present value of TVision's expected incremental profits from practicing the '889 Patent is a very favorable reasonable royalty for TVision.  If account were taken of Nielsen's stronger bargaining position and Nielsen's lost profits from granting the license, then the royalty would be higher.

### B. Calculation of a Reasonable Royalty Based on the Incremental Benefit to TVision and Cost to Nielsen

75.    To calculate a reasonable royalty based on TVision's incremental profits, I calculate TVision's expected profits from May 2018 through patent expiration on March 5, 2026.  As discussed above, ACR technology is critical to TVision's products, and absent the infringing ACR technology, TVision would have had no revenues or profits.  Therefore, TVision's expected revenues and expenses are precisely those forecasted revenues and expenses from the date of the hypothetical negotiation until the patent-in-suit expires.

76.    TVision produced a forecast created around April 2018 (the time of the hypothetical negotiation) of its expected net income through 2022.[148]  This 2018 forecast shows that TVision expected to make profits for the first time in 2020 and would continue to make profits thereafter. Like many startup firms, TVision expected to initially incur losses and then make profits later. The 2018 forecast also indicated TVision expected rapid growth of revenue and profits. Although, more recent data show that TVision did not make profits in 2020 through 2022,[149] what is important for purposes of a reasonable royalty is what the parties' expectations were at the time of the hypothetical negotiation in 2018.

77.    To calculate a reasonable royalty based on TVision's expected profits from the date of the hypothetical negotiation through patent expiration, I start by using TVision's projected income statement from April 2018 through year-end 2022.[150]  Given that ███████████

---

[148] Exhibit 2A summarizes this TVision forecast (as adjusted). *See also* TVision Forecast 2018–2022 [TVSN_NLSN_00269608].

[149] Exhibit 3. *See also* TVision FY2023 Financial Statements [TVSN_NLSN_00951672].

[150] Exhibit 2A.

112.    I have considered a hypothetical negotiation between Nielsen and TVision as discussed above.  For the reasons discussed above, in my opinion the most reasonable and reliable estimate of a reasonable royalty favoring TVision would be $█████████[194]

## X.    SIGNATURE

113.    This report represents my conclusions at this time.  However, as mentioned above, I may supplement this report as new information is made available to me and as allowed by the Court. I also plan to continue my analysis of data and documents and review depositions.  In addition, I plan to write a reply report.  Further, I plan to use demonstrative exhibits at trial that have not yet been developed.

Michael C. Keeley, Ph.D.

---

[194] Exhibit 1.  *See also* Section VIII.B.

# An Algorithm for the Machine Calculation of Complex Fourier Series

## By James W. Cooley and John W. Tukey

An efficient method for the calculation of the interactions of a $2^m$ factorial experiment was introduced by Yates and is widely known by his name. The generalization to $3^m$ was given by Box et al. [1]. Good [2] generalized these methods and gave elegant algorithms for which one class of applications is the calculation of Fourier series. In their full generality, Good's methods are applicable to certain problems in which one must multiply an $N$-vector by an $N \times N$ matrix which can be factored into $m$ sparse matrices, where $m$ is proportional to $\log N$. This results in a procedure requiring a number of operations proportional to $N \log N$ rather than $N^2$. These methods are applied here to the calculation of complex Fourier series. They are useful in situations where the number of data points is, or can be chosen to be, a highly composite number. The algorithm is here derived and presented in a rather different form. Attention is given to the choice of $N$. It is also shown how special advantage can be obtained in the use of a binary computer with $N = 2^m$ and how the entire calculation can be performed within the array of $N$ data storage locations used for the given Fourier coefficients.

Consider the problem of calculating the complex Fourier series

$$(1) \qquad X(j) = \sum_{k=0}^{N-1} A(k) \cdot W^{jk}, \qquad j = 0, 1, \cdots, N-1,$$

where the given Fourier coefficients $A(k)$ are complex and $W$ is the principal $N$th root of unity,

$$(2) \qquad W = e^{2\pi i/N}.$$

A straightforward calculation using (1) would require $N^2$ operations where "operation" means, as it will throughout this note, a complex multiplication followed by a complex addition.

The algorithm described here iterates on the array of given complex Fourier amplitudes and yields the result in less than $2N \log_2 N$ operations without requiring more data storage than is required for the given array $A$. To derive the algorithm, suppose $N$ is a composite, i.e., $N = r_1 \cdot r_2$. Then let the indices in (1) be expressed

$$(3) \quad \begin{aligned} j &= j_1 r_1 + j_0, & j_0 &= 0, 1, \cdots, r_1 - 1, & j_1 &= 0, 1, \cdots, r_2 - 1, \\ k &= k_1 r_2 + k_0, & k_0 &= 0, 1, \cdots, r_2 - 1, & k_1 &= 0, 1, \cdots, r_1 - 1. \end{aligned}$$

Then, one can write

$$(4) \qquad X(j_1, j_0) = \sum_{k_0} \sum_{k_1} A(k_1, k_0) \cdot W^{jk_1 r_2} W^{jk_0}.$$

Received August 17, 1964. Research in part at Princeton University under the sponsorship of the Army Research Office (Durham). The authors wish to thank Richard Garwin for his essential role in communication and encouragement.

**Ex. 10**

298                    JAMES W. COOLEY AND JOHN W. TUKEY

Since

(5) $$W^{jk_1r_2} = W^{j_0k_1r_2},$$

the inner sum, over $k_1$, depends only on $j_0$ and $k_0$ and can be defined as a new array,

(6) $$A_1(j_0, k_0) = \sum_{k_1} A(k_1, k_0) \cdot W^{j_0k_1r_2}.$$

The result can then be written

(7) $$X(j_1, j_0) = \sum_{k_0} A_1(j_0, k_0) \cdot W^{(j_1r_1+j_0)k_0}.$$

There are $N$ elements in the array $A_1$, each requiring $r_1$ operations, giving a total of $Nr_1$ operations to obtain $A_1$. Similarly, it takes $Nr_2$ operations to calculate $X$ from $A_1$. Therefore, this two-step algorithm, given by (6) and (7), requires a total of

(8) $$T = N(r_1 + r_2)$$

operations.

It is easy to see how successive applications of the above procedure, starting with its application to (6), give an $m$-step algorithm requiring

(9) $$T = N(r_1 + r_2 + \cdots + r_m)$$

operations, where

(10) $$N = r_1 \cdot r_2 \cdots r_m.$$

If $r_j = s_j t_j$ with $s_j, t_j > 1$, then $s_j + t_j < r_j$ unless $s_j = t_j = 2$, when $s_j + t_j = r_j$. In general, then, using as many factors as possible provides a minimum to (9), but factors of 2 can be combined in pairs without loss. If we are able to choose $N$ to be highly composite, we may make very real gains. If all $r_j$ are equal to $r$, then, from (10) we have

(11) $$m = \log_r N$$

and the total number of operations is

(12) $$T(r) = rN \log_r N.$$

If $N = r^m s^n t^p \cdots$, then we find that

(13)
$$\frac{T}{N} = m \cdot r + n \cdot s + p \cdot t + \cdots,$$

$$\log_2 N = m \cdot \log_2 r + n \cdot \log_2 s + p \cdot \log_2 t + \cdots,$$

so that

$$\frac{T}{N \log_2 N}$$

is a weighted mean of the quantities

$$\frac{r}{\log_2 r}, \quad \frac{s}{\log_2 s}, \quad \frac{t}{\log_2 t}, \cdots,$$

**Ex. 10**

whose values run as follows

| $r$ | $\dfrac{r}{\log_2 r}$ |
|---|---|
| 2 | 2.00 |
| 3 | 1.88 |
| 4 | 2.00 |
| 5 | 2.15 |
| 6 | 2.31 |
| 7 | 2.49 |
| 8 | 2.67 |
| 9 | 2.82 |
| 10 | 3.01. |

The use of $r_j = 3$ is formally most efficient, but the gain is only about 6% over the use of 2 or 4, which have other advantages. If necessary, the use of $r_j$ up to 10 can increase the number of computations by no more than 50%. Accordingly, we can find "highly composite" values of $N$ within a few percent of any given large number.

Whenever possible, the use of $N = r^m$ with $r = 2$ or 4 offers important advantages for computers with binary arithmetic, both in addressing and in multiplication economy.

The algorithm with $r = 2$ is derived by expressing the indices in the form

$$(14) \qquad \begin{aligned} j &= j_{m-1} \cdot 2^{m-1} + \cdots + j_1 \cdot 2 + j_0, \\ k &= k_{m-1} \cdot 2^{m-1} + \cdots + k_1 \cdot 2 + k_0, \end{aligned}$$

where $j_v$ and $k_v$ are equal to 0 or 1 and are the contents of the respective bit positions in the binary representation of $j$ and $k$. All arrays will now be written as functions of the bits of their indices. With this convention (1) is written

$$(15) \quad X(j_{m-1}, \cdots, j_0) = \sum_{k_0} \sum_{k_1} \cdots \sum_{k_{m-1}} A(k_{m-1}, \cdots, k_0) \cdot W^{jk_{m-1} \cdot 2^{m-1} + \cdots + jk_0},$$

where the sums are over $k_v = 0, 1$. Since

$$(16) \qquad W^{jk_{m-1} \cdot 2^{m-1}} = W^{j_0 k_{m-1} \cdot 2^{m-1}},$$

the innermost sum of (15), over $k_{m-1}$, depends only on $j_0, k_{m-2}, \cdots, k_0$ and can be written

$$(17) \quad A_1(j_0, k_{m-2}, \cdots, k_0) = \sum_{k_{m-1}} A(k_{m-1}, \cdots, k_0) \cdot W^{j_0 k_{m-1} \cdot 2^{m-1}}.$$

Proceeding to the next innermost sum, over $k_{m-2}$, and so on, and using

$$(18) \qquad W^{j \cdot k_{m-l} \cdot 2^{m-l}} = W^{(j_{l-1} \cdot 2^{l-1} + \cdots + j_0) k_{m-l} \cdot 2^{m-l}},$$

one obtains successive arrays,

$$(19) \quad \begin{aligned} &A_l(j_0, \cdots, j_{l-1}, k_{m-l-1}, \cdots, k_0) \\ &\quad = \sum_{k_{m-l}} A_{l-1}(j_0, \cdots, j_{l-2}, k_{m-l}, \cdots, k_0) \cdot W^{(j_{l-1} \cdot 2^{l-1} + \cdots + j_0) \cdot k_{m-l} \cdot 2^{m-l}} \end{aligned}$$

for $l = 1, 2, \cdots, m$.

**Ex. 10**

Writing out the sum this appears as

$$(20) \quad \begin{aligned} A_l(j_0, \cdots, j_{l-1}, k_{m-l-1}, \cdots, k_0) \\ = A_{l-1}(j_0, \cdots, j_{l-2}, 0, k_{m-l-1}, \cdots, k_0) \\ + (-1)^{j_{l-1}} i^{j_{l-2}} A_{l-1}(j_0, \cdots, j_{l-2}, 1, k_{m-l-1}, \cdots, k_0) \\ \cdot W^{(j_{l-2} \cdot 2^{l-2} + \cdots + j_0) \cdot 2^{m-l}}, \quad j_{l-1} = 0, 1. \end{aligned}$$

According to the indexing convention, this is stored in a location whose index is

$$(21) \quad j_0 \cdot 2^{m-1} + \cdots + j_{l-1} \cdot 2^{m-l} + k_{m-l-1} \cdot 2^{m-l-1} + \cdots + k_0.$$

It can be seen in (20) that only the two storage locations with indices having 0 and 1 in the $2^{m-l}$ bit position are involved in the computation. Parallel computation is permitted since the operation described by (20) can be carried out with all values of $j_0, \cdots, j_{l-2}$, and $k_0, \cdots, k_{m-l-1}$ simultaneously. In some applications[*] it is convenient to use (20) to express $A_l$ in terms of $A_{l-2}$, giving what is equivalent to an algorithm with $r = 4$.

The last array calculated gives the desired Fourier sums,

$$(22) \quad X(j_{m-1}, \cdots, j_0) = A_m(j_0, \cdots, j_{m-1})$$

in such an order that the index of an $X$ must have its binary bits put in reverse order to yield its index in the array $A_m$.

In some applications, where Fourier sums are to be evaluated twice, the above procedure could be programmed so that no bit-inversion is necessary. For example, consider the solution of the difference equation,

$$(23) \quad aX(j + 1) + bX(j) + cX(j - 1) = F(j).$$

The present method could be first applied to calculate the Fourier amplitudes of $F(j)$ from the formula

$$(24) \quad B(k) = \frac{1}{N} \sum_j F(j) W^{-jk}.$$

The Fourier amplitudes of the solution are, then,

$$(25) \quad A(k) = \frac{B(k)}{aW^k + b + cW^{-k}}.$$

The $B(k)$ and $A(k)$ arrays are in bit-inverted order, but with an obvious modification of (20), $A(k)$ can be used to yield the solution with correct indexing.

A computer program for the IBM 7094 has been written which calculates three-dimensional Fourier sums by the above method. The computing time taken for computing three-dimensional $2^a \times 2^b \times 2^c$ arrays of data points was as follows:

---

* A multiple-processing circuit using this algorithm was designed by R. E. Miller and S. Winograd of the IBM Watson Research Center. In this case $r = 4$ was found to be most practical.

Ex. 10

MACHINE CALCULATION OF COMPLEX FOURIER SERIES          301

| a | b | c | No. Pts. | Time (minutes) |
|---|---|---|---|---|
| 4 | 4 | 3 | $2^{11}$ | .02 |
| 11 | 0 | 0 | $2^{11}$ | .02 |
| 4 | 4 | 4 | $2^{12}$ | .04 |
| 12 | 0 | 0 | $2^{12}$ | .07 |
| 5 | 4 | 4 | $2^{13}$ | .10 |
| 5 | 5 | 3 | $2^{13}$ | .12 |
| 13 | 0 | 0 | $2^{13}$ | .13 |

IBM Watson Research Center
Yorktown Heights, New York

Bell Telephone Laboratories,
Murray Hill, New Jersey

Princeton University
Princeton, New Jersey

1. G. E. P. Box, L. R. Connor, W. R. Cousins, O. L. Davies (Ed.), F. R. Hirnsworth & G. P. Silitto, *The Design and Analysis of Industrial Experiments*, Oliver & Boyd, Edinburgh, 1954.
2. I. J. Good, "The interaction algorithm and practical Fourier series," *J. Roy. Statist. Soc. Ser. B.*, v. 20, 1958, p. 361–372; Addendum, v. 22, 1960, p. 372–375. MR **21** ⚡1674; MR **23** ⚡A4231.

**Ex. 10**

Home
↳ Blog

---

Date

<mark>06 Jun 2025</mark>

---

Authors

Peter Hess

---

Topics

Mathematic...

---

Share

 
 

📰 News          🕐 4 minute read

# How IBM Research first demonstrated the revolutionary Cooley-Tukey FFT

It's the algorithm that made internet videos possible. The Cooley-Tukey Fast Fourier Transform was first demonstrated at IBM

**Ex. 11**

Research in 1964.



If you're reading this, you're interacting with the Cooley-Tukey Fast Fourier Transform (FFT) algorithm right now. You probably interact with it online dozens of times every day. Originally deployed to detect underground nuclear testing, it's become crucial to the routine file compression that makes internet image sharing possible. The Cooley-Tukey FFT also enables diverse signal processing tasks for atmospheric research, radio astronomy, and more.

The algorithm was first

**Ex. 11**

demonstrated in 1964 at IBM's Thomas J. Watson Research Center in Yorktown Heights, New York. It could be used to calculate Fourier transforms at least two orders of magnitude faster than had been previously shown. To commemorate that first demonstration, the Institute of Electrical and Electronics Engineers (IEEE) is presenting IBM Research with a Milestone Award, a program of the IEEE History Committee. The event will be marked with a plaque outside the office where mathematician James Cooley used to work at IBM Research headquarters.

## Cooley and Tukey

John Tukey was a statistician who taught and worked at Princeton and at Bell Labs. He is credited with coining the computer term 'bit' and introducing the box plot, among many other computational and mathematical contributions

**Ex. 11**

Case 1:22-cv-00057-CJB    Document 368    Filed 11/26/25    Page 232 of 352 PageID #: 8827

that bear his name, like Tukey's range test.

James Cooley was born and raised in the Woodside neighborhood of Queens, New York. He went to Manhattan College on the G.I. Bill, earned his Ph.D. at Columbia University, and worked at IBM research for three decades.

Together, the two mathematicians devised the Cooley-Tukey FFT, an algorithm used to quickly discern the varied frequencies in waveforms, like a prism or a rain cloud separating out the different visible wavelengths of light. "The FFT is a mathematical version of this effect, one that can be executed on a computer," said Harold Stone, former IBM Research staff member.



The Discrete Fourier Transform (shown here) is an equation that takes a

**Ex. 11**



signal in its time domain as input and breaks it down into a sum of sine and cosine waves of varying frequencies, revealing the many characteristics of the signal. The Fast Fourier Transform casts the time-to-frequency transformation as a binary problem of even and odd indices, bringing the algorithm into a log of 2s rather than base 10 and creating tables in-memory, thereby significantly reducing the steps and time required to solve the problem

**Ex. 11**

11/19/25, 12:10 PM

(shown in top image).

Cooley, who enlisted in the U.S. Army fresh out of high school, went on to work as a programmer at the Institute for Advanced Study in Princeton, New Jersey, from 1953 to 1956, where he was part of John von Neumann's group that built Princeton's first electronic computer, the IAS machine. During that time, he met his wife Ingrid, an au pair from Sweden.

In 1961, Cooley took a job at IBM Research, where he worked until his retirement in 1991. He passed away in 2016.

Lars Cooley recalled his father as a smiling, friendly man who could keep up his end of a conversation with anyone. He was handy, too, and a quick study. After chatting with the stonemasons who worked on the Thomas J. Watson Research Center, IBM Research's

**Ex. 11**

Case 1:22-cv-00057-CJB   Document 368   Filed 11/26/25   Page 235 of 352 PageID #: 8830

new permanent home, Cooley enlisted Lars to mix up their own mortar and build a retaining wall for the home swimming pool. "Growing up I saw a person who wasn't just committed to the FFT — he had a lot of different loves of life," Lars said.

At the same time, he was "modest to a fault," according to Lars. "People had no idea he was this brilliant mathematician." Neighbors and family friends often knew his father worked with computers, but even those who knew about the Cooley-Tukey FFT sometimes didn't make the connection. "They didn't know he was *the* James Cooley," said Lars. "People who knew his work would tell me what a great mathematician he was, but to me, he was just Dad."

## The third man

The algorithm is named for two

**Ex. 11**

people, but a third was responsible for linking them: Dick Garwin. In 1963 Garwin, who was head of the IBM Watson Scientific Laboratory at Columbia University at the time, met John Tukey at a meeting of President John F. Kennedy's Science Advisory Committee in Washington, D.C. They were there for a classified discussion about how to detect rival nations' underground nuclear tests — and glean data on their nuclear weapons programs.

Enter the Fourier equations, a 19th-century series which expand or approximate periodic functions — including light or sound waves — as a sum of trigonometric functions. These equations made it possible to take the amplitude of a wave at various timepoints and calculate its frequency. This method can be applied to detect earthquakes (or underground explosions) by differentiating primary waves and secondary waves from surface waves on a seismograph recording. Each type

**Ex. 11**

of wave travels through the Earth at a different velocity, which shows up as different frequencies on a seismograph. Given these measurements, the Fourier transform, a generalization of the series, can solve for the amplitude of the earthquake at its source.

The Fourier series enables you to calculate the frequency of a wave from its amplitude at various timepoints.

Back in 1963, though, this wasn't enough to solve the problem at hand. "The Fourier transform was far too slow to calculate in practice," said Stone. "It couldn't keep up with the seismic data." What they needed was a fast Fourier transform, an FFT.

**Ex. 11**

Garwin inquired with IBM Research to find someone who could write numerical analysis code for high-speed scientific computers. Word came back that Cooley was the man he was looking for, so Garwin introduced him to Tukey. Cooley and Tukey met at Princeton, and Cooley returned to the Watson Research Center. Not long after, he had written a Fortran program for the FFT. They published their paper on the FFT in 1965 in the journal *Mathematics of Computation*. In 2024, Garwin told IEEE Spectrum that this introduction between the two was the achievement he was most proud of.

"Maybe it would have happened eventually, but he made it happen," said Stone.

Six decades later, Cooley, Tukey, and Garwin are all no longer with us, but the Cooley-Tukey FFT lives on. It is used in the chemical and materials simulations that impact drug and material design, and the

**Ex. 11**

computer-aided design (CAD) used to design cars, airplanes, and buildings. All modern image reconstructions for magnetic resonance imaging (MRI) and computed tomography (CT) scans are based on the FFT or its variants, as well as the compression and decompression of photos and videos to share on the internet, and it's still widely used in seismology. The JPEG and MPEG standards are based on FFT algorithms. Videos and images comprise the bulk of internet traffic, and their transmission depends on the FFT algorithm, defined at a time when the earliest version of the internet wasn't even yet an idea.

| 🗐 News | 🚀 Release | 🗐 News | 🗐 News |
|---|---|---|---|
| Expanding | Building the | How IBM | IBM |

**Ex. 11**



In the United States District Court for the District of Delaware

THE NIELSEN COMPANY (US), LLC

v.

TVISION INSIGHTS, INC.

CASE NO. 1:22-CV-00057-CJB

---

REBUTTAL EXPERT REPORT OF JOANNE JOHNSON

November 21, 2023

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 12**



### 4.2 TVision Insights

22. TVision is an audience measurement company based in New York that provides information on TV and cable television viewed engagement.[33] TVision's technology "gathers second-by-second data from a nationally representative panel of households," which provides brands, media networks, and streaming applications insight into ad attention and viewability.[34] According to its current website, TVision's panel includes approximately 13,000 people in the U.S.[35]

23. On its website, TVision's Sensor technology is described as using "sophisticated facial recognition to detect who is in the room and matches data with ACR technology to understand what is on the TV."[36] Other technology includes a Digital Meter that "uses network traffic analysis to detect if a digital device is connected/if any streaming apps are in use" as well as a Measurement Engine that "remotely manages and supports thousands of in-home devices…and identifies the source of content at any given second."[37]

24. TVision licenses and offers to license data that it collects and analyzes from its panel.[38] TVision has licensed its data to iSpot, VideoAmp, and Xandr.[39] On its website, TVision also states that "measurement leaders like iSpot, VideoAmp, and Oracle all trust TVision data."[40] In addition to measurement providers, TVision client types also include brands, agencies, networks, and streaming services.[41] I discuss TVision's products and solutions further in Section 7.1.

25. A summary of TVision's financials for 2016 through March 2023 is shown below.

---

[33] "About," *TVision Insights*, https://www.tvisioninsights.com/about.
[34] "About," *TVision Insights*, https://www.tvisioninsights.com/about.
[35] "Our Panel," *TVision Insights*, https://www.tvisioninsights.com/our-panel.
[36] "Our Technology," *TVision Insights*, https://www.tvisioninsights.com/our-technology.
[37] "Our Technology," *TVision Insights*, https://www.tvisioninsights.com/our-technology.
[38] Alison Weissbrot, "4 Challenges the Industry Will Face As It Breaks Away from Nielsen," *Campaignlive*, September 1, 2021, https://www.campaignlive.com/article/4-challenges-industry-will-face-breaks-away-nielsen/1726140?DCMP=EMC-CONTheCampaignFix&bulletin=the-campaign-fix.
[39] "AdAge - TVision is the Go-to Choice for Several Nielsen Rivals," *TVision Insights*, https://www.tvisioninsights.com/resources/adage-mrc-panel-data. *See also* Deposition of Yan Liu, August 29, 2023, pp. 97-99.
[40] "About," *TVision Insights*, https://www.tvisioninsights.com/about. *See also* TVSN_NLSN_00044646.
[41] "TVision," *TVision Insights*, https://www.tvisioninsights.com/.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 12**





**4.3    Gracenote**

26.    Gracenote, now a Nielsen company, is software technology company that provides media and entertainment metadata. Gracenote's products and services range from media management, enrichment, and discovery products to content identification technologies.[43] While Gracenote began in 1998 as a system for identifying CDs that users placed in their computers, I understand that by 2016, Gracenote had "become a leading supplier of consumers' viewing habits regarding online media content."[44] At this this time, Gracenote owned several patents related to its technology.[45] I understand that Gracenote licensed others, including TVision, to use its Entourage software for devices that measured audience behavior in the presence of a consumer's streaming device, such as a television.[46]

27.    TVision licensed Gracenote's Entourage software for "ACR related manipulation and performance" from 2015 to 2018.[47] I discuss Gracenote's license agreement with TVision in further detail in Section 12.12.

28.    On February 1, 2017, Nielsen announced that it had completed its acquisition of Gracenote.[48] [blacked out] [9] As the terms of the license agreement between Gracenote and TVision stipulated that parties must provide written notice

---

[42] Exhibit 12.0.

[43] TVSN_NLSN_00859096-214 at 107.

[44] Civil Action No 22-1345, Dkt 68, Amended Answer to Complaint for Patent Infringement and Counterclaim of TVision Insights, Inc. for Violation of Antitrust Laws, Tortious Interference and Unjust Enrichment, October 13, 2023, pp. 65-66.

[45] "US Patents," *Wayback Machine*, May 29, 2016, https://web.archive.org/web/20160529145241/http://www.gracenote.com/us-patents/. *See also* Section 12.12.

[46] Civil Action No 22-1345, Dkt 68, Amended Answer to Complaint for Patent Infringement and Counterclaim of TVision Insights, Inc. for Violation of Antitrust Laws, Tortious Interference and Unjust Enrichment, October 13, 2023, pp. 65-66.

[47] TVSN_NLSN_00637233-258; TVision Insights, Inc.'s First Supplemental Objections and Responses to the Nielsen Company (US), LLC's Third Set of Interrogatories, August 23, 2023, p. 11.

[48] "Nielsen Completes Acquisition of Gracenote," The Nielsen Company (US), LLC., February 2017, https://www.nielsen.com/news-center/2017/nielsen-completes-acquisition-of-gracenote/.

[49] Civil Action No 22-1345, Dkt 68, Amended Answer to Complaint for Patent Infringement and Counterclaim of TVision Insights, Inc. for Violation of Antitrust Laws, Tortious Interference and Unjust Enrichment, October 13, 2023, pp. 65-66.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 12**



of termination 90 days before the renewal term, Gracenote could not cancel its contract for the period May 2017 through April 2018.[50]   In May 2018, TVision switched to the ACRCloud solution.[51]

## 4.4    ACRCloud

29.    ACRCloud is an audio recognition service provider for music recognition, broadcast monitoring, live channel detection, second screen synchronization, copyright compliance, data duplication, audience measurement, humming recognition, and offline recognition.[52]   ACRCloud services a wide range of industries, including music streaming services, performance rights organizations, record labels, digital music distributors, TV and radio stations, advertising agencies, automotive manufacturers, and more.[53]

30.    ACRCloud describes its Audience Measurement solution as providing "resourceful ways to monitor audience viewership for TV and video content" that "recognizes the radio or TV content broadcast from the user's TV set-top box or second-screen devices automatically by identifying the live feed and pre-recorded content."[54]

### 4.4.1    ACRCloud Agreements with TVision

31.    After contracting with ACRCloud in March 2018, TVision began using ACRCloud services in May 2018 after ███████████████████████████████████████[55]   Under TVision's license agreement with ACRCloud, ████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████[57]

32.    In addition to the licensed use of ACRCloud's content identification technology and services, ACRCloud also provided to TVision the following additional services:

- ▪  Maintenance and Monitoring Services: includes bug fix maintenance, troubleshooting, SDK upgrade, interface updates, documentation updates, and more.

- ▪  Technical Services: includes technical support through phone, e-mail, and other online communication methods.

---

[50] TVSN_NLSN_00637233-258.
[51] TVSN_NLSN_00311852–854 at 852, Deposition of Yan Liu, August 29, 2023, p. 35.
[52] "ACRCloud," *ACRCloud,* https://www.acrcloud.com/.
[53] "ACRCloud," *ACRCloud,* https://www.acrcloud.com/.
[54] "Audience Measurement," *ACRCloud,* https://www.acrcloud.com/audience-measurement%e2%80%8b/.
[55] Deposition of Inderbir Sidhu, August 31, 2023, p. 117; TVSN_NLSN_00311852-854 at 852; TVSN_NLSN_00641220-231 at 230.
[56] TVSN_NLSN_00000929-940 at 930.  *See also* TVSN_NLSN_00621607-618 at 608.
[57] TVSN_NLSN_00000929-940 at 930.  *See also* TVSN_NLSN_00621607-618 at 608.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 12**



ads based on industry standard viewership measurement data.[100]  I understand that data on the number of TVs tuned to a particular program (also referred to as "census" data) has been used to measure viewership.[101]  Smart TV manufacturers, along with cable providers, satellite providers, and streaming providers, can gather this viewing data directly from smart TVs, that is, a TV that has an internet connection.[102]  The prevalence of smart TVs has increased, with a 2023 study finding that almost 77% of TV households report owning a smart TV, up from 66% three years ago.  The same study found that 61% of all U.S. TV sets were smart TVs, up from 45% in 2020.[103]  As such, census data can report information about what programs are tuned into on over 30 million smart TVs in the U.S.[104]

54.  Additional information can be overlaid with census data to provide further insight as to the number of people, along with reporting their demographic, that are watching a specific program. I understand that one way to do so is with people panel datasets.[105]  However, I understand that there are a variety of measurement solutions in the industry, and not all use people panel data. For example, a NBCUniversal Measurement Framework presentation noted that several of Nielsen's competitors, such as Comscore, 605, SambaTV, and TVSquared do not utilize panel datasets but continue to compete in the marketplace.[106]  Nielsen has historically been considered the primary TV currency in the U.S. as it provides "the primary source of the information that contains cost per impression and viewer count."[107]  However, I understand that TV currency has lagged behind with shifting consumer behavior and expanded technology.[108]  In more recent history, customers are desiring a "multi-currency" environment.  For example, a February 2023 Nielsen presentation noted that both buyers and sellers had an "increased appetite" for multi-currency and that networks have turned to Comscore, VideoAmp, iSpot, and Experian as a secondary currency.[109]  Sellers may desire a multi-currency environment for improved cross-media measurement, while buyers advocate for multi-currency "to better serve their brands, via improved metrics and more commercial leverage."[110]  Customers can choose to adopt multiple, interoperable measurement systems to understand the fullest picture available.[111]

---

[100] Alyssa Boyle, "AdExplainer: TV Measurement vs. TV Currency," *adexchanger*, April 26, 2023, https://www.adexchanger.com/adexplainer/adexplainer-tv-measurement-vs-tv-currency/; Deposition of Yan Liu, August 29, 2023, pp. 110-111.

[101] TVSN_NLSN_00862311-326 at 316-317; Keeley Report, ¶ 41.

[102] TVSN_NLSN_00862311-326 at 316-317; Keeley Report, ¶ 41.

[103] George Winslow, "Smart TVs Pass the 200 Million Milestone," *tvtech*, April 10, 2023, https://www.tvtechnology.com/news/smart-tvs-pass-the-200-million-milestone.

[104] TVSN_NLSN_00862311-326 at 316-317; Keeley Report, ¶ 41; "US Smart TV Market Size & Share Analysis – Growth Trends & Forecasts (2023 – 2028)" *Mordor Intelligence*, https://www.mordorintelligence.com/industry-reports/united-states-smart-tv-market.

[105] Deposition of Yan Liu, August 29, 2023, pp. 55-56.

[106] NLSN_TVISION0254007-122 at 026.  The metadata associated with this document indicates a date of 2/2/2022.

[107] Deposition of Daniel Schiffman, September 8, 2023, p. 34; *see also,* Alyssa Boyle, "AdExplainer: TV Measurement vs. TV Currency," *adexchanger*, April 26, 2023, https://www.adexchanger.com/adexplainer/adexplainer-tv-measurement-vs-tv-currency/.

[108] NLSN_TVISION0254007-122 at 009.

[109] NLSN_TVISION0251751-827 at 803, 811, 813.

[110] NLSN_TVISION0251751-827 at 806, 818.

[111] *See, for example,* NLSN_TVISION0254007-122 at 009.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 12**



technology from 2004 to 2018 have dwarfed any possible algorithmic advantages that could have been attributed to the '889 Patent in 2004.[129]

70.  Additionally, Dr. Anderson notes that the "alleged contribution of the '889 Patent (computational efficiency due to intraframe signature generation methods involving only a small number of frequency components) is only a very small part of an overall ACR system."[130] Furthermore, while the '889 Patent is a specific method of "[c]reat[ing] descriptors/signatures/hashes based on the spectral content of the frames," the specific method is not critical and may be substituted by other methods known in the art.[131]

## 7.    RELEVANT PRODUCTS AND SYSTEMS

71.  I understand it is Plaintiff's contention that TVision practices claims 1, 2, 4-6, 8, 9, and 11-17 of the '889 Patent through "its creation of audio signatures using the fingerprinting algorithm of TV's vendor, ACRCloud."[132] Plaintiff has also acknowledged that none of Nielsen's products or systems practice the '889 Patent.[133] As such, in this section, I discuss TVision's Accused System as well as systems utilized by Nielsen that identify content without utilizing the '889 Patent.

### 7.1    TVision's Accused Product

72.  Nielsen alleges that TVision infringes the asserted claims through "its creation of audio signatures using the fingerprinting algorithm of TV's vendor, ACRCloud."[134] Furthermore, Dr. Moulin notes that TVision "creates infringing audio signatures at individual devices that are in the homes of its panelists using ACRCloud's FP Algorithm."[135]

73.  I understand that TVision's technology and systems are intended to address the measurement gap in "viewability." In an internal strategy document from the 2016-2017 time frame, TVision outlines its objectives:[136]

> *In the case of TV, advertisers do not know if the audio is on, if someone is in view of the TV or more relevantly if their eyes are on the TV on a second-by-second basis just like the internet. Unlike the interactive nature of the internet, where it might be reasonable to assume the device is being looked at while it is active, TV is passive and often left on while people do other things.*
>
> *While the people meter provides information on a person's TV activity, it requires active compliance of panellsts [sic] to work. A panellst [sic] must push a button every time they start watching TV and another push of the button to say they are done. The consequent data reports opportunity to see instead*

---

[129] Discussion with Dr. Anderson; Anderson Non-Infringement Report, ¶ 99.
[130] Discussion with Dr. Anderson; Anderson Non-Infringement Report, ¶ 100.
[131] Discussion with Dr. Anderson; Anderson Non-Infringement Report, ¶ 100.
[132] Moulin Report, ¶¶ 25, 74.
[133] Plaintiff The Nielsen Company (US), LLC's Second Supplemental Responses and Objections to Defendant's First Set of Interrogatories, September 21, 2023, p. 8.
[134] Moulin Report, ¶¶ 25, 74.
[135] Moulin Report, ¶ 83.
[136] Deposition of Yan Liu, August 29, 2023, p. 103; TVSN_NLSN_00008034-041 at 036-037.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 12**



*of actual exposures, as people are not completely sedentary when the TV is on. People get up and do things all the time. Some people even use the TV as background entertainment, moving around even more. The people meter is blind to what people are doing when the TV is on.*

*TVision solves this measurement gap by directly measuring what people are doing while the TV is on. Unlike the people meter, TVision uses passive technology of cameras and microphones to track when the TV is on and audible, when a specific person is in front of the TV, and when their eyes are on the TV.*

74. TVision's systems and end products are powered by proprietary hardware, software, advanced data models, as well as in-home computer vision technology, IOT, AI-powered data processing, and more.[137]   An overview of the TVision system and its broader ecosystem is shown in the diagram below.

**Figure 6: Diagram of TVision's Accused System and Other Components, 2021**[138]



75. To detect presence and attention, TVision uses a device placed in the panelist's home. These devices are positioned next to or on top of a TV, where it will collect a 6-second sample of audio signal roughly every 10 seconds.[139]

---

[137] "Our Technology," *TVision Insights*, https://www.tvisioninsights.com/our-technology.
[138] TVSN_NLSN_00695873-878 at 874. Mr. Sidhu testified that with the exception of two inaccuracies – (1) the "GoodData" dashboard, which is no longer used, and (2) the arrow going from "ACRCloud" to "Devices, which should be double-sided) – the diagram accurately represents TVision's systems architecture. Deposition of Inderbir Sidhu, August 31, 2023, pp. 68-69.
[139] Deposition of Inderbir Sidhu, August 31, 2023, pp. 16-17. *See also* "TVision Methodology Overview," *TVision Insights,* https://www.tvisioninsights.com/resources/tvision-methodology-overview.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 12**



**12.8    Factor 8: The established profitability of the product made under the patent; its commercial success; and its current popularity.**

129. Factor 8, in part, represents a quantitative valuation metric associated with the sales and profitability of the products made under the Patent-in-Suit.  Accordingly, in connection with this factor, I have considered the profitability of the TVision based on financial information produced by TVision.

130. In the period leading up to the hypothetical negotiation, TVision was a small start-up tech company [235] that had earned ███████ in revenue in 2017, ████ million in gross profit, and was operating at a net loss of ██████ in 2017.[236]  According to its balance sheet, in 2017 TVision had ████████ in assets of which ████████ was cash, and an equity balance of ████ million.[237]  In 2018, TVision generated less than ████ million in revenue, approximately ████████ in gross profit, and an operating loss of approximately ████ million.[238]  According to its balance sheet, in 2018 TVision had ████ million in assets of which ████ million was cash, and an equity balance of ██████.[239]

131. At the time of the hypothetical negotiation, TVision had yet to complete its early-stage funding.  In 2016, TVision had raised $6.8 million in funding from two investors.[240]  After the hypothetical negotiation, on July 17, 2018, TVision announced that it had raised ████ million from its existing investors, which Mr. Liu stated would "support the expansion of our opt-in, privacy-safe, in-home panel, and the growth of our team in order to meet the incredible demand for our TV attention data."[241]  Per my interview with Mr. Liu, I understand that without an adequately sized panel—which TVision eventually set to be approximately 5,000—customers were not interested in TVision's data.  Until TVision could raise enough investment funds to increase its panel size, TVision was stuck in a holding pattern.[242]  As such, its early investments were critical to building out its panel, as without a large enough panel, TVision's targeted customers were not interested in its products.  TVision first reached 5,000 panel devices in March 2019.[243]  Once TVision met this threshold, the company reached a tipping point, with increased credibility of its data which led to increasing the firm's recurring revenue.[244]

---

[235] TVSN_NLSN_00134504-507 at 504 (In an internal 2017 company email, Yan Liu writes, "I hope everyone agrees that we are building a successful tech company which will last at least for 3-5 years. […] 80% of the time, engineering team should build software in the right way.  However, since we are start-up, sometimes we do need to take care of 20% of firefighting.").
[236] TVSN_NLSN_00951672.
[237] TVSN_NLSN_00951672.
[238] TVSN_NLSN_00951672.
[239] TVSN_NLSN_00951672.
[240] "Measurement Company TVision Raises $11.5M in New Funding," *TVision Insights,* July 17, 2018, https://www.tvisioninsights.com/resources/has-raised-11-5-million-in-new-funding.
[241] "Measurement Company TVision Raises $11.5M in New Funding," *TVision Insights,* July 17, 2018, https://www.tvisioninsights.com/resources/has-raised-11-5-million-in-new-funding; "Series A – TVision," *Crunchbase,* https://www.crunchbase.com/funding_round/tvision-insights-series-a--9a2c6f19.
[242] Interviews with Yan Liu.
[243] Exhibit 8.1.
[244] Interviews with Yan Liu; *See also* Exhibit 12.1.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 12**



132. The figure below summarizes the sales and profits earned by TVision company-wide from 2016 through March 2023, the most current date for which financial data was produced.

**Figure 9: TVision Company-Wide Sales and Profitability 2016 – March 2023[245]**



133. As illustrated above, from the period 2016 to March 2023, TVision has had operating losses of $███████.

134. I understand from Mr. Webster's testimony that TVision's AAP product likely generates the most revenue for TVision and that Connected TV ("CTV") measurement is a growing revenue segment for TVision.[246] Mr. Webster further testified to TVision's financial performance of the AAP and Total View product:

> *Q. Does TVision consider its AAP product to be a success?*
>
> *A. I think it does okay, but I don't think it's a slam dunk.*
>
> *Q. Does TVision consider its Total View product to be a success?*
>
> *A. No.*
>
> *Q. Is TVision profitable?*
>
> *A. I don't know. I don't think so.[247]*

135. In a 2017 presentation entitled "Next-Generation TV Measurement," TVision outlined its fundraising plan for the upcoming period.[248] TVision estimated that its expected runway was July 2019, noting that based on its current cash position and expenses.[249] In addition, TVision's recurring revenue was heavily dependent on the size of its panels.[250] This further suggests that TVision's success and profitability was in flux in the months leading up to the hypothetical negotiation as its panel size was around 1,200 to 1,300 devices.[251]

---

[245] Exhibit 12.0.
[246] Deposition of Tristan Webster, September 13, 2023, pp. 23, 261. *See also* Exhibit 10.1.
[247] Deposition of Tristan Webster, September 13, 2023, pp. 95-96.
[248] TVSN_NLSN_00651606 at slides 35-42.
[249] TVSN_NLSN_00651606 at slide 37.
[250] TVSN_NLSN_00651606 at slide 38; *see also* TVSN_NLSN_00172207-244 at 232-233.
[251] Exhibit 8.1.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 12**



136. The forecasts that TVision developed during this period were based on certain key assumptions. For example, in its 2017 presentation deck for potential investors, TVision planned to raise ███ and had key assumptions of reaching ████████ in revenue in 2018, ████████ in revenue in 2019, building out 5,000 panel households in 2018, and 10,000 panel households in 2019.[252] However, the key assumptions clearly had varying probabilities of succeeding. For example, by the end of 2018, TVision had ████ households that dropped down to ████ households by the end of 2019 (████████ household than the key assumption underlying its 2017 forecast), before further decreasing to ██████ by the end of 2020.[253]

137. TVision has historically overestimated its forecasts. For example, in 2017, TVision projected that for the first quarter of 2018, it would generate approximately ██████ in total revenue.[254] However, in comparing to actual financials, TVision earned ████ in Q1 2018 – only half of its expected projections.[255] Similarly, TVision's projections for fiscal year 2018 changed significantly between forecasts that were compiled in 2017, March 2018 and August 2018.

**Figure 10: TVision Revenue Projections Compared to Actuals for FY 2018[256]**



138. From 2017 to March 2018, TVision's revenue forecast for the 2018 fiscal year decreased by ███ ████.[257] Furthermore, TVision's projections from March 2018 for this time frame was more than twice the amount that it actually generated ($████████████████).[258] Between March 2018 and August 2018, TVision's once again overestimated its projections. A draft of an August 2018 board meeting presentation noted that "YTD June 2018 revenue missed forecast due to fundraising efforts and audit product not getting as strong traction as expected."[259] TVision also pointed to "product marketing and key misses" and "meeting volume well below expectations" for Q2 2018.[260]

---

[252] TVSN_NLSN_00651606 at slide 36.
[253] Exhibit 8.1.
[254] TVSN_NLSN_00651606 at slide 36.
[255] Exhibit 11.1; *see also* TVSN_NLSN_00651606 at slide 36; TVSN_NLSN_00269608.
[256] Exhibit 11.0.
[257] ████████████
[258] I note that Dr. Keeley relies on this forecast from March 2018 for his royalty opinion.
[259] TVSN_NLSN_00267638-673 at 643.
[260] TVSN_NLSN_00267638-673 at 646.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 12**



139. TVision's longer-term projections had even wider discrepancies over time. For example, in March 2018, TVision projected that by 2022, its annual net income would reach $ ████████ [261] However, by January 2020, TVision's projections for 2022 was only $ ███████ in net income.[262] In contrast, in 2022, TVision operated at a net loss ████████ [263] This large discrepancy in projections demonstrates the assumptive nature of forecasts for TVision as a start-up company. Furthermore, according to Shlomo Neumann, these forecasts were created before his tenure at TVision and as such, I have seen no evidence to substantiate any of these projections. As of June 2023, TVision is still operating at a loss.[264]

140. With regard to commercial success in the industry, TVision has received industry praise for its innovation on "eyes on screen" technology, which I understand is incremental technology contributed by TVision that is beyond the inventions of the '889 Patent.[265] For example, a November 2018 article discussing TVision's partnership with one of India's leading sports broadcasters noted that "TVision has the reputation of being the only company to measure actual eyes on screen attention, providing advertisers, agencies, and television networks with the second-by-second data required to understand the effectiveness of television advertising and programming."[266] In 2018, TVision was also named in the Advertising Research Foundation's Innovators A-List for its "privacy-safe motion capture technology to passively "watch people watch TV" in their natural viewing environment (i.e., the living room sofa)."[267] These industry recognitions demonstrate that TVision's eyes on screen technology is a recognized differentiating feature for TVision.

141. ████████████████████████████████████████████████████ As discussed, the '889 Patent was issued on August 24, 2010 and was originally assigned to Nielsen Media Research, Inc.[268] In its interrogatory responses, Nielsen stated that ████████████████████████████████████████████████████████████████████████████████████ [269] Yet, Nielsen's annual financial reports show that ████████████████████████████ [1] This indicates that ████████████████████████████████████████████████████████████████████████████████████

[261] TVSN-NLSN_00269608.
[262] TVSN_NLSN_00498302.
[263] TVSN_NLSN_00695901. *See also* Exhibit 12.0.
[264] TVSN_NLSN_00951672.
[265] Anderson Non-Infringement Report, ¶¶ 97, 99-100; *Georgia-Pacific* Factor 13.
[266] "Star-TV-TVision Partnership for more precise broadcast audience data," *InsideSport*, https://www.insidesport.in/star-tv-tvision-partnership-for-more-precise-broadcast-audience-data/.
[267] "Invest in Innovation A-List Startups 2018," *the Advertising Research Foundation*, https://thearf.org/access-knowledge-2/a-list-startups/list-of-a-list-companies/.
[268] U.S. Patent No. 7,783,889, p. 1; "11/676,452 | 20004/97-US: METHODS AND APPARATUS FOR GENERATING SIGNATURES," *USPTO Patent Center*, https://patentcenter.uspto.gov/applications/11676452/assignments?application=.
[269] Plaintiff The Nielsen Company (US), LLC's Second Supplemental Responses and Objections to Defendant's First Set of Interrogatories, September 21, 2023, p. 6.
[270] Nielsen's Global Media segment provides viewership and listening data and analytics primarily to media publishers and marketers and their ad agencies for TV, radio, and digital viewing and listening platforms. *See* Section 4.1.
[271] Exhibit 14.0.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 12**



TVision has historically run two reference databases in parallel, performing matches against both. The old database will naturally become obsolete as new reference material is only added to the new reference database.[300] For CTV content, the reference database would need to be re-processed as the content stays live for a longer period than broadcast linear TV. Mr. Sidhu estimates that to rebuild the entire present-day reference database, which would be larger than the reference database back in 2018, would take approximately two weeks.[301]

155. However, I understand that in the period leading up to the hypothetical negotiation, TVision was already in a situation that required it to "recreate" its entire reference database as it was forced to find another ACR provider that had its own fingerprinting algorithm, after ███████ ███████████████████████████████████.[302] That is, TVision already had to transition its reference database in the period leading up to the hypothetical negotiation. As such, there would be no incremental cost to TVision to have a reference database processed using a non-infringing ACRCloud algorithm rather than an infringing algorithm.

156. Therefore, the total incremental costs associated with ACRCloud modifying its code to avoid infringing the '889 Patent would be the engineering time of less than a week up to, at most, three months. Applying an annual salary of $175,000,[303] this results in a total incremental expense of approximately $3,500 to $45,000.[304] This is the incremental expense to ACRCloud to modify its code, which it may, or may not, have passed on to TVision. Assuming this incremental cost was passed on to TVision, this indicates that the maximum benefit attributable to the '889 Patent is, at most, ███████ To illustrate the sense of proportional magnitude, expressing this incremental cost on a per device per month basis for the running royalty compensation period contemplated in this report is ███[305] Note this per unit amount will decrease as the compensation period is updated to include additional device-months.

157. **Alternative ACR Providers:** Next, I considered alternative ACR suppliers that TVision could have turned to assuming that ACRCloud was not an option available to TVision in the period leading up to the hypothetical negotiation. I understand that ACRCloud is not the only provider of ACR technology as there are several providers of ACR in the marketplace. Mr. Webster testified that the ACR provider market is "fairly commoditized" and with companies providing "very similar capabilities."[306] Consistently, Mr. Liu testified that ACRCloud was selected due to the time pressure to find a new provider after █████████████████████████████████████ █████████████████ and that there are several ACR systems with roughly equivalent accuracy to ACRCloud.[307] During his deposition, Mr. Webster identified Media Research Labs ("MRL")

[300] Interviews with Inderbir Sidhu.
[301] Interviews with Inderbir Sidhu.
[302] Interviews with Yan Liu and Inderbir Sidhu.
[303] Interviews with Inderbir Sidhu. *See also* "Software Developer Overview," *U.S. News,* https://money.usnews.com/careers/best-jobs/software-developer; "Software Developers, Quality Assurance Analysts, and Testers," *U.S. Bureau of Labor Statistics,* https://www.bls.gov/ooh/computer-and-information-technology/software-developers.htm.
[304] Exhibit 4.0.
[305] Exhibit 4.0. Calculated as $45,000 / 232,126 panel device-months = $0.19.
[306] Deposition of Tristan Webster, September 13, 2023, p. 42, 129.
[307] Deposition of Yan Liu, August 29, 2023, pp. 75-76.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 12**



and Dat-Track as other providers of ACR services.[308]   Mr. Liu also identified Axwave and Answer as ACR service providers during his deposition and Mufin and Source Digital in my interview with Mr. Liu.[309]

158.   In fact, TVision historically contacted, at least,  MRL, Axwave, Mufin, and Source Digital in the period leading up to the hypothetical negotiation when it was looking for an ACR provider to replace Gracenote.  Per my interview with Mr. Liu, I understand that in January 2017, ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, Mr. Liu proactively reached out to VidVita asking for ACR platform recommendations.  In addition to MRL, Ms. Bolivar from VidVita recommended ACRCloud and Mufin as top ACR solutions and scheduled introduction meetings with both Mufin and ACRCloud and TVision.[310]  TVision also received a project proposal in January 2017 from Mufin that included terms regarding the cost components for the setup, pilot, and production phases of the system rollout.[311]   According to a company presentation, Mufin specializes in audio fingerprint technology for ACR and touted companies, such as Kantar, Ipsos, and Starz, as being among its customers and partners.[312]  In an October 2017 email, Dan Schiffman from TVision inquired whether Axwave had a solution for TVision's "primary issue [that] we are looking to solve for today is commercial detection and associated metadata," to which an Axwave replied in the affirmative that it did have such solutions.[313]  In January 2018, TVision was requesting pricing quotes from Source Digital, another ACR provider, while in the process of negotiating with ACRCloud.[314]   Indeed, the email communication from this period indicates that VidVita had already been working with Source Digital for ACR functionality.[315]

159.   I understand that Dr. Moulin raises the argument that as TVision had concerns with working with MRL and Axwave in the period leading up to the hypothetical negotiation, these companies would not be alternatives.  For example, Dr. Moulin referenced MRL's failure rate in testing done on behalf of TVision in 2017 as well as Axwave's "subpar" methodology.[316]  However, I understand from my interview with Mr. Liu that MRL's failure rate is not relevant to the configuration used by TVision, which utilizes a dedicated device that is placed next to the panelist's TV, as the testing evaluated MRL's capability when using mobile phones to pick up audio.[317]  Additionally, Dr. Anderson notes that Axwave "had a state-of-the-art ACR system."[318]  Furthermore, it is illogical to assume that TVision wouldn't turn to a secondary option – even if imperfect – if the alternative consequence would be to close its business if it could not contract with ACRCloud.

---

[308] Deposition of Tristan Webster, September 13, 2023, p. 42.
[309] Deposition of Yan Liu, August 29,2023, p. 75.  It appears the Mr. Liu's transcript incorrectly identified Axwave as Adwave. Interviews with Yan Liu.
[310] Interviews with Yan Liu.
[311] Interviews with Yan Liu.
[312] TVSN_NLSN_00662112-139 at 115, 121.
[313] TVSN_NLSN_00725382-386 at 382-383.
[314] TVSN_NLSN_00660739-772 at 746-762.
[315] TVSN_NLSN_00660739-772 at 748, 756-757.
[316] Moulin Report, ¶¶ 370-371, 377; TVSN_NLSN_00645277; TVSN_NLSN_00645295; TVSN_NLSN_00533729-732.
[317] Interviews with Yan Liu. Anderson Non-Infringement Report, ¶ 107.
[318] Anderson Non-Infringement Report, ¶ 106.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 12**



160. TVision also could have turned to an alternative ACR provider during the damages period. In his report, Dr. Keeley, citing Dr. Moulin, claims that "the record does not show that there were acceptable, non-infringing alternatives to the '889 Patent for ACR available to TVision at the time of the hypothetical negotiation or **even to this day**."[319] This is simply not supported by the evidence. The evidence indicates that there were several ACR providers available to TVision during the damages period outside of MRL, Axwave, and Dat-Track, such as the already discussed Mufin and Source Digital. Even if in 2018 TVision's alternative options were imperfect, more options would have been available to TVision throughout the damages period, and evidence suggests that TVision would have pursued these options.[320] In 2021, TVision reached out to SambaTV/Axwave for a potential partnership and to learn more about Samba's ACR offering.[321] I also understand that in 2022, TVision actively sought information regarding backup ACR options.[322] According to Mr. Liu, TVision received ACR solution recommendations from Vidvita, which included Dat-Track, Beatgrid, and Source Digital. In response to these recommendations, TVision also requested VidVita to make introductions to each of the three companies, suggesting that TVision was more than willing to find alternatives when necessary, rather than shutter its doors. It would be reasonable for TVision to take the same steps at the time of the hypothetical negotiation, as well as throughout the course of the damages period.

161. I understand that for TVision, switching ACR systems comes with "very high" costs and is a "significant undertaking."[323] Based on my interview with Mr. Liu and Mr. Sidhu, I understand these costs are on the scale of approximately ███████[324] Generally, TVision's history indicates that it prefers to stay with its current ACR provider. Mr. Liu testified that ████████████████████████████████.[325] For example, Mr. Sidhu testified that "the effort required to test out" alternative ACR functionality "does not yield much value when we compare that to just staying with ACRCloud," its current provider.[326] However, in the period leading up to the hypothetical negotiation, TVision had already been forced into switching its ACR system as ██████████████████████████████████████████████.[327] Based on my interview with Mr. Liu and Mr. Sidhu, I understand that the relative cost to switch to one ACR system versus another ACR system in the period leading up to May 2018 would be generally comparable as the various providers have a similar structure with an SDK that would require similar testing and similar work regarding the back end infrastructure/processing.[328] Therefore, in the period leading up to the hypothetical negotiation,

---

[319] Keeley Report, ¶ 49. Emphasis added.
[320] In a July 2019 "Quarterly Sales Leadership" presentation, Nielsen/Gracenote identified Vizio/Inscape, Samba TV, and Samsung as competitors in the ACR space. TVSN_NLSN_00947094-115 at 101-102.
[321] TVSN_NLSN_00336541; TVSN_NLSN_00184226-228.
[322] Interviews with Yan Liu.
[323] Deposition of Yan Liu, August 29, 2023, pp. 76, 116; *see also* Deposition of Tristan Webster, September 13, 2023, p. 45.
[324] Interviews with Yan Liu and Inderbir Sidhu; Exhibit 6.3.
[325] Deposition of Yan Liu, August 29, 2023, p. 198.
[326] Deposition of Inderbir Sidhu, August 31, 2023, p. 138.
[327] ████████████████████████████ (Keeley Report, ¶ 75). TVision had begun switching from Gracenote to ACRCloud at least as early as the beginning of 2018. Deposition of Yan Liu, August 29, 2023, p. 236.
[328] Interviews with Yan Liu and Inderbir Sidhu.

**Ex. 12**



312.  I note that on appeal, the parties did not dispute the District Court's decision to grant Baxalta's Daubert motion against Dr. Addanki regarding his improper 50/50 split based on the Nash Bargaining Solution.[562]

313.  I am also aware of a Daubert motion against Dr. Keeley in *Fate Therapeutics, Inc. et al v. Shoreline Biosciences, Inc.* where Shoreline argued that Dr. Keeley assumed the parties would begin at a "50/50 split using Nash Bargaining without an adequate basis […] which is impermissible 'without sufficiently establishing that the premises of the theorem actually apply to the facts of the case at hand'" (citing *VirnetX, Inc. v. Cisco Sys., Inc*).[563]  While the court denied this motion as moot in light of granting Shoreline's motion for summary judgement of non-infringement[564], this indicates that Dr. Keeley has applied the same methodology indiscriminately, regardless of the specifics of the case.

## 15.  PREJUDGMENT INTEREST

314.  From an economic analysis standpoint, a time-value-of-money award would be necessary to compensate Plaintiff for the loss of use of funds during the damages period.  However, I understand that an award of prejudgment interest is a legal matter and that the Court has substantial discretion in determining the interest rate and compounding method to be awarded. I have not prepared any prejudgment interest calculations as of this date, but am prepared to do so if requested by the Court.

## 16.  SIGNATURE

315.  I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,


_Joanne Johnson_                                    _____November 21, 2023_____

Joanne Johnson                                                    Date

---

[562] *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 972, 983-85 (Fed. Cir. 2021).

[563] Shoreline Biosciences, Inc.'s Memorandum of Points and Authorities in Support of Motion to Exclude Damages Opinions of Michael C. Keeley, *Fate Therapeutics, Inc. et al v. Shoreline Biosciences, Inc.*, No. 22-cv-000676-H-MSB (S.D. Cal. Jul. 14, 2023).

[564] Order Granting Defendant's Motion for Summary Judgement; and Denying Plaintiffs' Motion for Partial Summary Judgement as Moot, *Fate Therapeutics, Inc. et al v. Shoreline Biosciences, Inc.*, No. 22-cv-000676-H-MSB (S.D. Cal. Aug. 30, 2023).

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 12**



# TVision Total View Competitive Battlecards

April 2023

Ex. 13

# Four Primary Competitors

   

Total View can be an *additive solution*
for ad sales research use cases

Total View can be *complementary or a replacement*
for program research use cases

# Our Top 10 Points of Differentiation

1.  Our unified panel for apples-to-apples measurement of both linear & CTV (programs & ads)

2.  The depth of TVision's CTV data - we measure hundreds of apps and thousands of shows

3.  We provide true eyes-on-screen attention data

4.  Our person-level measurement enables accurate demos and co-viewing metrics for CTV

5.  We help networks / apps discover new brands and categories that will perform above avg.

6.  Total View provides competitive intel at the brand & program level across apps & networks

7.  We provide detailed data to inform ad break and pod composition strategies

8.  We report on audience viewing habits so you can better understand who is watching your programs

9.  Total View provides powerful brand insights

10. Total View is complementary to solutions that networks & apps may already rely on

T)VISION

Ex. 13[3]

# Our Top 10 Points of Differentiation

1. **Our unified panel for apples-to-apples measurement of both linear & CTV (programs & ads)**
   *TVision measures everything that comes across the glass in our panelists' homes. This gives us a unique ability to measure both linear and CTV and make equal comparisons of any TV platform. As consumer behavior shifts and audiences spend more time with CTV content, both networks and apps need to have nuanced understanding of where, when and how viewers are engaging with both content and ads.*

1. **The depth of TVision's CTV data - we measure hundreds of apps and thousands of shows.**
   *TVision's CTV data is unparalleled. We measure person-level viewer behavior across all devices, hundreds of apps, and thousands of shows - including SVODs, AVODs, hybrid apps, FAST apps, dMVPDs, and MVPDs. This enables Total View to report on not only the largest players, but also mid to smaller sized apps, as well as emerging apps that are quickly gaining share.*

T))VISION

**Ex. 13**[4]

# Our Top 10 Points of Differentiation

**3 . We provide true eyes-on-screen attention data**

*With cutting-edge computer vision technology, TVision is the market leader for measuring person-level TV viewer engagement. Don't settle for proxies of eyes-on-screen attention. As Attention gains more momentum in the industry, it can be a critical metric to help you identify, differentiate, and price premium content and ad opportunities that deliver highly-engaged audiences.*

**4. Our person-level measurement enables accurate demos and co-viewing metrics for CTV**

*Co-Viewing rates provide insight into the real reach of CTV applications and programming. They serve as a multiple that can help both marketers and platforms better value CTV ad inventory. Apps with high co-viewing rates offer greater reach per impression as well as more engaged viewers. At TVision, we see that overall CTV co-viewing rates are much higher than the average that the industry typically assumes. This means media buyers and sellers may be undervaluing inventory that offers greater reach per impression.*

T》VISION

**Ex. 13**[5]

# Our Top 10 Points of Differentiation

**5 . We help networks / apps discover new brands and categories that will perform above avg.**

*Total View provides detailed insight into the performance of brands and advertiser categories on any app or network. Our clients use this capability for prospecting - to identify brands and categories that will perform better on their app or network than they do on their competitors. We provide independent justification for advertisers to increase their spend on your media.*

**6. Total View provides competitive intel at the brand & program level across apps & networks**

*Total View customers have unrestricted access to data from any app/network that we measure providing unparalleled competitive intelligence capabilities. We provide detailed engagement metrics for brands as well as insight into how programs, content types, and platforms are driving audience engagement across the entire TV landscape. This allows customers to make smarter ad and programming choices based on where they sit in the market.*

T》VISION

# Our Top 10 Points of Differentiation

**7 . We provide detailed data to inform ad break and pod composition strategies**

*Viewer engagement with ads depends on many factors, including the structure, timing and placement of ad pods. For instance, we see the duration of the ad pod, and when the ad plays within the pod, and even the lengths of the ads themselves all impact how audiences engage. Total View helps media sellers identify how ad environments can garner the highest engagement with performance metrics by pod position, ad length and more.*

**8. We report on audience viewing habits so you can better understand who is watching your programs**

*Viewer engagement can vary depending on who is watching. Total View not only provides program-specific audience engagement metrics broken out by age group and gender, but also digs deeper by providing metrics based on how much TV viewers watch (heavy, medium and light TV viewers). You'll be able to identify how programming draws in new viewers, and what appeals to your most loyal watchers.*

T》VISION

Ex. 13[7]

# Our Top 10 Points of Differentiation

**9. Total View provides powerful brand insights**

*TVision Total View provides powerful brand insights for your post-campaign reporting. You'll be able to demonstrate viewer engagement with their ads, and benchmark clients' performance to paint a positive picture of their investment.*

**10. Total View is complementary to solutions that networks & apps may already rely on**

*Total View is not a currency product. However, as new alternative currencies are developed by companies like iSpot and Videoamp, Total View can serve as a complementary solution that layers on qualitative data focused on the value ads and programs deliver.*

T》VISION

**Ex. 13**[8]

# iSpot - Network Solutions

## Prove and Optimize the Value of Linear and Streaming Inventory

Go from the GRPs of yesterday to the outcome-based, cross-platform measurement of today. Offer TV advertisers real-time conversion metrics, and enable weekly or daily campaign optimizations.



## A Holistic and Granular View of Campaign Performance

Since iSpot measures every ad aired on TV and streaming in real time, network partners get an immediate view of advertising activity across the entire TV landscape.

## Best-in-Class Data for Outcome-Based Buying

Every day, brands across every major category use iSpot to measure conversions resulting from TV ad investments. Harness this data to set up successful outcome-based campaigns for your brand clients.



### Identify the Right Placements to Drive Outcomes

Get better data-driven insights to place ads in the right genres, programs, dayparts and streaming inventory that will drive conversions.

### Make In-Flight Optimizations

Don't wait for lagging reports to make impactful decisions. Use real-time attention and conversion analytics to optimize clients' campaigns towards KPIs.

### Measure and Benchmark Performance

With comprehensive TV ad data, you can prove your inventory is working to drive outcomes and outperforming benchmarks.

Learn more about Attribution


### Drill Into Media Performance

Measure outcomes across all your owned TV and streaming properties — down to specific genres, programs and dayparts — and compare to industry-specific benchmarks.


### Real-Time and Historical Data

With iSpot, the infrastructure is already in place for you to access data collected every second of every day over a 9-year span.


### Easy Set Up

Our Media Partnerships team is dedicated to ensuring a smooth and hassle-free experience for our network clients. The set up is like the press of a button as soon as the partnership goes live.

T》VISION



## PRODUCT & FEATURES

**iSpot Platform**

- Cross-platform measurement
- Insight into the performance of genres, programs, dayparts, and streaming inventory
- In-Flight optimization data
- Benchmarking
- Campaign Performance

**Note: iSpot has access to TVision data for personification and co-viewing for both linear & CTV platforms. They do not have our Attention Data**

## CLIENT BASE

- 155 network, 300+ streaming platforms and DSPs

## GTM POSITIONING

- Offer your TV and streaming advertisers outcome-based media buying, data-driven targeting, and real-time optimizations to ensure ROAS.
- Identify the right genres, programs, dayparts and streaming inventory that will drive conversions

| WHERE WE COMPETE | | TVISION | ISPOT |
|---|---|---|---|
| **Ad Sales Research** | Prove the value of linear and streaming inventory | ✓ | ✓ |
| | Measure media performance at the property, genre, program, and daypart levels. Compare these to industry benchmarks | ✓ | ✓ |
| | Brand-level reporting - **Note, iSpot is more focused on ad-level insights** | ✓ | ✓ |
| | Co-viewing multiples--**Note that for iSpot, co-viewing is powered by TVision data** | ✓ | ✓ |
| | Incremental reach at the app/network-level | ✓ | ✓ |
| | **Advertising effectiveness as measured by attention.** Note that only TVision has eyes-on-screen attention data. | ✓ | ✗ |
| | **Discovery capabilities: data to find new brand partners to work with** | ✓ | ✗ |
| | **Unrestricted access to competitive intelligence data for all apps/networks. Includes data on how individual properties, programs, and brands do on other apps/networks** | ✓ | ✗ |
| | **Detailed data to inform ad break and pod composition strategy** | ✓ | ✗ |
| **Program Content Research** | Ad and program measurement at the program genre and program-level | ✓ | ✓ |
| | **Program performance across CTV and linear for all user app/networks** | ✓ | ✗ |
| | **Unrestricted access to competitive intelligence program data for all apps/networks. This includes data around how individual programs are resonating with audiences across the entire TV ecosystem** | ✓ | ✗ |
| | **Detailed audience behavior data including performance by age, gender, viewer type** | ✓ | ✗ |
| | **For content that appears across both CTV and linear, we can answer "how does the perform vary between delivery mechanisms?"** | ✓ | ✗ |

## HOW TO WIN

**AD SALES USE CASES**

- Reiterate that TVision is complementary to iSpot
- Focus on the benefits of eyes-on-screen attention
- Focus on brand-level competitive intelligence and discovery capabilities for ad sales use cases
- Emphasize the value of pod-level insights in creating effective monetization strategies

**PROGRAM ANALYSIS USE CASES**

- We have a clear advantage here. You likely will not run into iSpot when pitching to programming & content teams.

Ex. 13

# Videoamp - Network Solutions



## Outcome Measurement

- Quantify the effectiveness of your cross-plat[form] portfolio in driving business outcomes for ad[vertisers].

- Receive prescriptive conversion insights to in[form] sales and campaign optimization strategies.

- Demonstrate the value of your inventory by a[ttributing] conversions to advertising campaigns.

## Audience Measurement

- Bring traditional TV and streaming data together to assess content and ad performance across high-value audiences.

- Identify cross-platform optimization opportunities to maximize audience reach at the optimal frequency for advertisers.

- Optimize your programming strategy by evaluating content consumption and viewership trends across the TV landscape.

| CAPABILITY | CAPABILITY | CAPABILITY |
|---|---|---|
| Audience Design | Activation Segments | TV Data Feeds |
| CAPABILITY | CAPABILITY | |
| Audience Measurement | Outcome Measurement | |

## For Publishers

Maximize inventory value and accurately measure impressions with a currency-grade dataset.

T»VISION

Ex. 13



## PRODUCT & FEATURES

Videoamp Platform

- Audience Creation, Activation, Integration, and Measurement
- Incremental reach
- In-flight optimization
- Outcome measurement
- TV data feeds
- Attribution through third-party data
- Content and viewership trends

## CLIENT BASE

- Current Clients: NBCU, Paramount, Universal Studios

## GTM POSITIONING

- Our currency-grade measurement dataset helps publishers assess and optimize content performance across platforms to increase inventory yield.

| WHERE WE COMPETE | | TVISION | VIDEOAMP |
|---|---|---|---|
| **Ad Sales Research** | Prove the value of linear and streaming inventory | ✓ | ✓ |
| | Incremental reach at the app/network-level | ✓ | ✓ |
| | Measure content and viewership trends across the TV landscape | ✓ | ✓ |
| | Personification Data for CTV driven by true, passive, person-level measurement | ✓ | ✗ |
| | Co-viewing rates for CTV | ✓ | ✗ |
| | Advertising effectiveness as measured by attention. Note that only TVision has eyes-on-screen attention data. | ✓ | ✗ |
| | Discovery capabilities: data to find new brand partners to work with | ✓ | ✗ |
| | Focus on competitive intelligence data on how brands do on other apps/networks/programs | ✓ | ✗ |
| | Detailed data to inform ad break and pod composition strategy | ✓ | ✗ |
| **Program Content Research** | Ad and program measurement at the program genre and program-level | ✓ | ✓ |
| | Detailed audience behavior data for programming | ✓ | ✓ |
| | Personification Data for CTV driven by true, passive, person-level measurement | ✓ | ✗ |
| | Program performance across CTV and linear for all user app/networks | ✓ | ✗ |
| | Focus on competitive intelligence program-level data for all apps/networks | ✓ | ✗ |
| | For content that appears across both CTV and linear, we can answer "how does the perform vary between delivery mechanisms?" | ✓ | ✗ |

## HOW TO WIN

**AD SALES USE CASES**

- Reiterate that TVision is complementary to Videoamp
- Focus on passive, person-level measurement for CTV
- Focus on the benefits of eyes-on-screen attention
- TVision provides true co-viewing metrics
- Focus on brand-level competitive intelligence and discovery capabilities for ad sales use cases

**PROGRAM ANALYSIS  USE CASES**

- We have a clear advantage here. You likely will not run into Videoamp when pitching to programming & content teams.

Ex. 13

# Nielsen - Digital Ad Ratings

**Media sellers**

Prove your ability to reach digital audiences using industry-standard audience data.

**Answer critical questions like:**

• How can I prove that my platform delivers to my client's target audiences?
• Which audiences deliver the greatest incremental reach?
• How can I compare my platform to industry averages?

**Features**

## The industry standard for digital advertising measurement

**Industry trusted**



Prove your advertising performance with accurate data trusted by 21 of the top 25 global advertisers.

**People-based verification**



Reach unique audiences with unbiased, representative ad measurement verified by people-based panels.

**Comprehensive coverage**



Analyze and optimize your media strategy with comprehensive coverage across computers, mobile and CTV.

**Holistic measurement**



Better understand reach, manage frequency, and deliver ads to target audiences with more impressions.

T)VISION

**Ex. 133**

# Nielsen - Digital Content Ratings





Ex. 134



## PRODUCT & FEATURES

**Nielsen Digital Ad Ratings (DAR)**

- People-based verification/ de-duplicated reach and frequency metrics
- Cross-platform measurement: computers, mobile, CTV
- Incremental reach metrics
- Industry benchmarks

**Nielsen Digital Content Ratings**

- Comprehensive content consumption measurement across every major digital platform
- Incremental reach
- Reports average audience, reach, frequency, GRP, and time spent

## CLIENT BASE

- Current Clients: CBS, NBCU, News Corp, Disney

## GTM POSITIONING

- Prove your ability to reach digital audiences using industry-standard audience data.
- Determine who's watching your programs to properly price ad inventory and make critical programming decisions.

| WHERE WE COMPETE | | TVISION | NIELSEN |
|---|---|---|---|
| **Ad Sales Research (DAR)** | Prove the value of linear and streaming inventory | ✓ | ✓ |
| | Understand who is watching your inventory by key demographic splits | ✓ | ✓ |
| | Industry benchmarks | ✓ | ✓ |
| | Incremental reach at the app/network-level | ✓ | ✓ |
| | Both are based on panel measurement. Note: Nielsen uses a separate, much smaller panel for their streaming vs. linear measurement | ✓ | ✓ |
| | Underlying data is driven by true, passive person-level measurement | ✓ | ✗ |
| | Easy brand-level reporting for existing brand partners & discovery capabilities to find new brand partners to work with (Does not seem like an area of focus) | ✓ | ✗ |
| | Focus on competitive intelligence data on how brands do on other app, networks, and programs (Does not seem like an area of focus) | ✓ | ✗ |
| | Detailed data to inform ad break and pod composition strategy (Does not seem like an area of focus) | ✓ | ✗ |
| | True attention and CTV co-viewing metrics | ✓ | ✗ |
| **Program Content Research (DCR)** | Program-level measurement | ✓ | ✓ |
| | Detailed audience profiling based on various demographic cuts | ✓ | ✓ |
| | Industry benchmarking | ✓ | ✓ |
| | Focus on competitive intelligence program-level data across apps/networks | ✓ | ✓ |
| | Underlying data is driven by true, passive person-level measurement | ✓ | ✗ |
| | Program performance across CTV and linear for all user app/networks. (Nielsen has both CTV & linear data, but it seems delivered across two separate products, and is derived from two separate panels.) | ✓ | ✗ |
| | Detailed audience behavior data including performance by type of viewer (light, medium, heavy TV watchers, etc.) | ✓ | ✗ |
| | For content that appears across both CTV and linear, we can answer "how does the perform vary between delivery mechanisms?" | ✓ | ✗ |
| | True attention and co-viewing metrics | ✓ | ✗ |
| | Broad CTV coverage across hundreds of apps. Note: Nielsen limited to Amazon, AppleTV+, Disney+, HBO Max, Hulu, Paramount+, Peacock & Netflix for CTV | Ex. 13 ✓ | ✗ |

**WHERE WE COMPETE**

# Nielsen - Nielsen ONE





(continued)

## PRODUCT & FEATURES

**Nielsen ONE Ads**

- Unified view of linear, CTV, desktop, and mobile
- Deduplicated, cross-media measurement
- People-based panels and device recognition for data validation
- Granular insight into impressions, reach and frequency across platforms with accuracy
- Unmatched audience coverage and visibility

## CLIENT BASE

- Launched alpha in January 2023

## GTM POSITIONING

- Understand the true value of your inventory, measure campaign impact with confidence and discover new, comprehensive ways to reach audiences and drive revenue.

| | WHERE WE COMPETE | TVISION | NIELSEN |
|---|---|---|---|
| **Ad Sales Research** | Prove the value of linear and streaming inventory | ✓ | ✓ |
| | Understand who is watching your inventory by key demographic splits | ✓ | ✓ |
| | Industry benchmarks | ✓ | ✓ |
| | Underlying data is driven by true, passive person-level measurement | ✓ | ✗ |
| | Easy brand-level reporting for existing brand partners & discovery capabilities to find new brand partners to work with <br> Note We think this is the case, but this could be something provided in the platform | ✓ | ✗ |
| | Unrestricted access to competitive intelligence data for all apps/networks.  This includes data around how individual properties, programs, and brands do on other apps/networks | ✓ | ✗ |
| | Detailed data to inform ad break and pod composition strategy | ✓ | ✗ |
| | True attention and co-viewing metrics | ✓ | ✗ |
| **Program Content Research** | Nielsen ONE Content is still in alpha and there doesn't seem to be much info on it. <br><br> At this time, customers who want content research data would have to use the Digital Content Ratings Product (previous slide) | | |

**Ex. 13**

(continued)

## HOW TO WIN

### AD SALES USE CASES

- Reiterate the benefits of TVision's panel:
  - True person-level measurement
  - We measure the quality of engagement - who's in the room & if they're attentive
  - TVision compares linear & CTV in same panel
- Focus on the benefits of eyes-on-screen attention
- TVision provides true co-viewing metrics for CTV
- Focus on brand-level competitive intelligence and discovery capabilities for ad sales use cases
- Emphasize the value of pod-level insights in creating effective monetization strategies

### PROGRAM ANALYSIS  USE CASES

- Same panel use cases as Ad Sales (person-level measurement, quality vs. quantity, single-source panel)
- Emphasize TVision's broader CTV coverage - we measure hundreds of apps and thousands of programs
- Focus on our insights for audience viewer types (heavy / medium / light TV viewers)
- TVision provides true co-viewing metrics for CTV
- Focus on data about how program performance varies by distribution method, i.e. CTV vs. linear

**Ex. 13**

# Comscore - Video Metrix Multi-Platform

Get a complete, unduplicated view of how digital audiences consume video across devices

**Comscore Video Metrix® Multi-Platform delivers a total view of consumer digital video consumption across desktops, smartphones, tablets and CTV devices.**

- **Understand the total reach of your content** and scale of your digital audience across platforms.

- **Benchmark video performance against competitors** and identify where to find new audiences.

- **Measure engagement by device** and by demographic to help sales teams package ad deals and video inventory across different platforms.

- **Measure and get credit** for audiences and viewership on distributed platforms, including YouTube and its Partner Program.

- **Inform video content curation** and programming based on accurate measurement, trends, and performance.

### Holistic View Across Devices

Gain a complete view of audiences' video consumption with comprehensive coverage of the desktop, mobile, and CTV ecosystem.



### Unduplicated, Person-Centric Data

Get unduplicated, person-level insights through a combination of data from Comscore panels, the Comscore Census Network and third-party partners.

### Co-Viewing Insights

Account for multiple people viewing content and ads on the same screen at the same time with the use of Comscore's proprietary co-viewing methodology.





# Comscore - TV National (linear)

**Comscore TV National provides television buyers and sellers with precise, massive-scale measurement of national television programming and advertising.**

With the largest and most representative TV viewing measurement footprint covering 1-in-3 homes across 75 million TV screens in over 35M households— including STBs from every major cable, satellite, and vMVPD provider—Comscore offers a level of granularity and stability absent from traditional television measurement services.

**LEARN MORE**

## Scale & Stability of Data

Access massive second-by-second viewership data collected passively across every major MVPD and vMVPD households, 24/7/365 through return path device data.





## Comscore Advanced Audiences™

Go beyond age/gender to find and reach high- value audiences based on the programming they watch, the lifestyles they lead, the way they vote, the cars they drive and the products they buy.

## Trusted Methodology

Rely on the same trusted currency that hundreds of



- **Prove the value of your audience** to buyers and sell more advertising by identifying high-value audience targets.

- **Help advertisers effectively and efficiently meet their goals** with reliable and stable TV measurement data.

- **Make smarter programming and promotional decisions** by knowing precisely what and when your audience is watching.

T»VISION

Ex. 130

# Comscore - CTV Intelligence

**Comscore CTV Intelligence™ provides clients with critical insights into consumer over-the-top (OTT) streaming activity on TV-connected devices.**

### Cross-Platform View

Pair Comscore Video Metrix® Multi-Platform data with OTT Intelligence insights for a better understanding of OTT consumption.





### Subscription and Ad-Supported OTT

Understand reach and time spent for subscription and ad-supported services (SVOD/AVOD) like Netflix, Amazon, YouTube, Hulu, Disney+, HBO Go and others.

### Competitive Insights

Track and analyze OTT adoption, growth, device penetration, audience cross-over, and user loyalty.



- **Analyze the competitive landscape** by tracking adoption and growth of competing services.
- **Gain a more granular understanding of audience segments** with third-party validated metrics and demographics.
- **Create strategies to reach untapped audiences** by identifying demographic segments that under-index.

- **Monitor growth of OTT services** with greater insight into consumer streaming service usage.
- **Better understand TV Everywhere viewing behavior** by quantifying the usage of top TV Everywhere and virtual MVPD (vMVPD) services on OTT devices.
- **Maximize reach** by identifying and evaluating potential OTT service partners.



Ex. 13¹



## PRODUCT & FEATURES

**CTV Intelligence, Video Metrix Multi-Platform, TV National**

- Panel-based measurement
- Insight into CTV behavior, by app type & cord-cutter status
- Household & unduplicated person-level data
- Measures reach & engagement
- Co-viewing insights
- Time spent metrics
- Competitive insight
- Device-level measurements

## CLIENT BASE

- 5 of the world's 5 largest movie studios, 23 of the top 25 Local Station Groups

## GTM POSITIONING

- Comscore Video Metrix® Multi-Platform delivers a total view of consumer digital video consumption across desktops, smartphones, tablets and CTV devices.
- Comscore CTV Intelligence™ provides clients with critical insights into consumer over-the-top (OTT) streaming activity on TV-connected devices.

| WHERE WE COMPETE | | TVISION | COMSCORE |
|---|---|---|---|
| **Ad Sales Research** | Prove the value of linear and streaming inventory | ✓ | ✓ |
| | Understand who is watching your inventory by key demographic splits | ✓ | ✓ |
| | Person-level, panel-based insights | ✓ | ✓ |
| | Industry benchmarks | ✓ | ✓ |
| | **True attention metrics--Underlying data is driven by true, passive person-level measurement** | ✓ | ✗ |
| | **Easy brand-level reporting for existing brand partners & discovery capabilities to find new brand partners to work with.** **(Does not seem like an area of focus)** | ✓ | ✗ |
| | **Unrestricted access to competitive intelligence data for all apps/networks. Includes data on how individual properties, programs, and brands do on other apps/networks** | ✓ | ✗ |
| | **Detailed data to inform ad break and pod composition strategy** | ✓ | ✗ |
| | **Breadth of measured apps is larger.** **(Note Comscore only talks about the major apps and makes no mention of how many apps they measure in total)** | ✓ | ✗ |
| **Program Content Research**<br><br>Note: seem to need to subscribe to multiple platforms to get broad program content research data | Program-level and app-level measurement | ✓ | ✓ |
| | Detailed audience profiling based on various demographic cuts including age & gender | ✓ | ✓ |
| | Ability to find new audiences | ✓ | ✓ |
| | Industry benchmarking | ✓ | ✓ |
| | **Program performance across CTV and linear for all user app/networks.** **(Note that Comscore has both CTV and linear data, but it seems like Comscore's list of measured apps are smaller than ours)** | ✓ | ✗ |
| | **Unrestricted access to competitive intelligence program data for all apps/networks, including how individual programs resonate with audiences across the TV ecosystem** | ✓ | ✗ |
| | **Detailed audience behavior data including performance by type of viewer (light, medium, heavy TV watchers, etc.)** | ✓ | ✗ |
| | **True attention metrics--Underlying data is driven by true, passive person-level measurement** | ✓ | ✗ |
| | **Breadth of measured apps is larger.** **(Note Comscore only talks about the major apps and makes no mention of how many apps they measure in total)** | ✓ | ✗ |

Ex. 13

 (continued)

## HOW TO WIN

### AD SALES USE CASES

- Reiterate that only TVision provides true eyes-on-screen attention metrics
- Focus on brand-level competitive intelligence and discovery capabilities for ad sales use cases
- Emphasize the value of pod-level insights in creating effective monetization strategies
- Focus on breadth of TVision's CTV data, which includes hundreds of apps,, including CTV walled gardens

### PROGRAM ANALYSIS USE CASES

- Reiterate that only TVision provides true eyes-on-screen attention metrics
- Emphasize TVision's broader CTV coverage
- Focus on our detailed audience behavior data
- Emphasize that TVision's program-level competitive intelligence data provides insight into what viewers are watching across the entire TV landscape
- Focus on breadth of TVision's CTV data, which includes hundreds of apps, including CTV walled gardens

**Ex. 13**

# EDO - Ad Engage

## The Ad EnGage Platform

With real-time behavioral engagement metrics, EDO matches any TV airing to the most powerful signals of human intent. By measuring the moment when consideration moves to intent — it's proven that brands can make movements in market share. Whether linear or streaming, EDO's mix of media analytics and decision science helps your brand Know What Works.

### Plan & Buy Smarter

**Audience insights**
Inform target audiences using demographics, TV viewing behaviors and behavioral responses.

**Optimal ad frequency**
Nail your ad's frequency to make the most of your budget across linear and streaming TV.

**Creative insights**
Discover which ads are generating the most consumer engagement to guide creative strategy and in-market rotation decisions.

**Creative insights**
Measure the performance of network sponsorships, including in-program brand placements and custom creative elements to inform future programming partnerships.

**Data-driven linear**
Assess Data-Driven Linear audience targeting campaigns and compare performance against historical benchmarks or tandem traditional TV campaigns.

**Real accountability**
Hold partners accountable while campaigns are in-flight to ensure buys are delivered as promised.



## Engagement Drives Outcomes

EDO's Ad EnGage platform is powered by predictive outcomes data - with a proven link to market share. By matching the moments when consumers engage with syndicated data of every airing — you have real-time TV intelligence.



## First-ever syndicated multi-touch attribution (MTA) modeling

Until now, MTA has been a slow and limited one-client-at-a-time solution. EDO has created the industry's first MTA solution built on a pooled data set across advertisers. Our MTA dramatically improves actionability, so MTA can better inform all your marketing activities. Go beyond first- or last-touch attribution with EDO's advanced, data-driven modeling capabilities.

## Competitive Data, At Your Fingertips

Want to know your competitors better than they do? With syndicated data of every TV airing - and its performance - you'll have real-time access to any brand ad in your category, going back 6+ years. No setup, no custom studies, just all the competitive intel you need backed up by a world class team of data scientists to help you create signal from the noise.





**Ex. 13**



## PRODUCT & FEATURES

**AdEnGage**: Competitive intelligence, search engagement, AVOD ad insights

- Outcome measurement throughout customer journey
- Multi-touch attribution modeling
- Competitive intelligence data
- Audience insights
- Next-day performance data for tentpole events

## CLIENT BASE

- NBCU, Disney, 21st Century Fox, Warner Bros, Paramount, Prime Video, Univision, Universal Studios

## GTM POSITIONING

- Gain an immediate, comprehensive view of all TV airings (linear AND streaming) — and the real-time engagement behavior
- Take immediate action on your linear and streaming TV ad campaigns. Inform in-flight optimizations, plan for the future, and know what works.

### WHERE WE COMPETE

| | | TVISION | EDO |
|---|---|---|---|
| **Ad Sales Research** | Prove the value of linear and streaming inventory | ✓ | ✓ |
| | Incremental reach at the app/network-level | ✓ | ✓ |
| | Measure content and viewership trends across the TV landscape | ✓ | ✓ |
| | Competitive intelligence data and industry benchmarks for apps/networks for any brand or category | ✓ | ✓ |
| | In-flight optimization **Note, this is available through TVision's CTV Activation--not Total View** | ✓ | ✓ |
| | Outcome-based measurement<br>**Note: TVision provides insight into higher-funnel metrics like attention & viewer presence, which align 1:1 with key brand lift metrics, according to our recent study with Upwave.** | ✓ | ✓ |
| | **Co-viewing rates** | ✓ | ✗ |
| | **Advertising effectiveness as measured by attention.** | ✓ | ✗ |
| | **Discovery capabilities: data to find new brand partners to work with** | ✓ | ✗ |
| | **Detailed data to inform ad break and pod composition strategy** | ✓ | ✗ |
| **Program Content Research** | Ad and program measurement at the program genre and program-level | ✓ | ✓ |
| | **Program performance across CTV and linear for all user app/networks** | ✓ | ✗ |
| | **Unrestricted access to competitive intelligence program data for all apps/networks, including how individual programs resonate with audiences across the TV ecosystem** | ✓ | ✗ |
| | **Detailed audience behavior data including performance by age, gender, viewer type** | ✓ | ✗ |
| | **For content that appears across both CTV and linear, we can answer "how does the perform vary between delivery mechanisms?"** | ✓ | ✗ |

### HOW TO WIN

**AD SALES USE CASES**

- Focus on the benefits of eyes-on-screen attention
- TVision provides true co-viewing multiples
- Total View can be used in conjunction with our CTV Activation product by sell-side to help their clients perform in-flight optimizations.
- Emphasize 1:1 relationship between attention and brand lift metrics (Upwave study)

**PROGRAM ANALYSIS USE CASES**

- We have a clear advantage here. You likely will not run into EDO when pitching to programming & content teams.

Ex. 13

# Oracle - Moat

## Oracle Moat—Solutions for publishers and platforms

Maximize your programmatic and direct inventory for the most revenue with metrics that drive home the value of your audiences and digital properties. Build stronger client relationships and attract new business by reinforcing your network's value through trusted, independent ad measurement.

### Why publishers and platforms choose Oracle Moat as their measurement partner

**Purpose-built for today's media professionals**

Leverage an industry-leading measurement suite backed by an expert account management team to help you verify campaigns and tell data-driven stories about the unique value of your inventory.

**Fully transparent and customizable**

Have access to the necessary tools to thrive in the modern digital advertising marketplace.

**Commitment to transparency**

Establish creditability and bolster trust with advertisers and clients through independent measurement.

**Comprehensive cross-channel measurement**

Measure across CTV, linear TV, mobile, desktop, and in-game advertising. Oracle Moat is dedicated to measuring all forms of media, and we will continue to identify new and emerging media trends in media measurement transparency.

**Award-winning technologies**

Protect your bottom line, safeguard your reputation, and generate insights that inform actions with Oracle Moat's award-winning technologies. Founded on the principles of accuracy, ease of use, and personalization, Moat is the winner in three categories in Adweek's 2021 Reader's Choice: Best of Tech Partner Awards.

**Advanced metrics**

Measure ad performance beyond verification with detailed attention analytics that reveal the true efficacy of campaigns.

1. Ensure that your inventory meets (or even exceeds) the buyer's criteria.

2. Verify campaign delivery with a trusted and recognized partner.

3. Go beyond standard verification. Provide measures of ad effectiveness to differentiate the story of the value that your platform delivers.

4. Measure consumer attention across channels, devices, and platforms.

5. View reach and frequency across TV and digital to ensure you're reaching the right audiences with the right frequency.

6. Employ a range of optimization techniques to drive higher revenue and increase viewability on your platform.

7. Validate new media channels as effective and valuable for media buyers.

8. Unify reporting by drawing from a single source of truth for campaign data across the buy and sell side.

# ORACLE

## PRODUCT & FEATURES

**Moat**

- Cross-platform measurement with attention
- Share value of audiences/ rich audience profiling
- Measure outcomes

Note: uses TVIsion attention data

## CLIENT BASE

- Teads, Bloomberg Media Group

## GTM POSITIONING

- Maximize your programmatic & direct inventory with metrics that show the value of your audiences and digital properties.
- Strengthen client relationships and attract new business by reinforcing your network's value with trusted, independent ad measurement.

| | WHERE WE COMPETE | TVISION | Oracle |
|---|---|---|---|
| Ad Sales Research | Prove the value of linear and streaming inventory | ✓ | ✓ |
| | Incremental reach at the app/network-level | ✓ | ✓ |
| | Measure content and viewership trends across the TV landscape | ✓ | ✓ |
| | Advertising effectiveness as measured by attention.<br>**Note: Oracle uses TVision Attention Data** | ✓ | ✓ |
| | Outcome-based measurement<br>**Note: TVision provides insight into higher-funnel metrics like attention & viewer presence, which align 1:1 with key brand lift metrics, according to our recent study with Upwave.** | ✓ | ✓ |
| | **Co-viewing rates** | ✓ | ✗ |
| | **Discovery capabilities: data to find new brand partners to work with** | ✓ | ✗ |
| | **Detailed data to inform ad break and pod composition strategy** | ✓ | ✗ |
| Program Content Research | Ad and program measurement at the program genre and program-level | ✓ | ✓ |
| | **Program performance across CTV and linear for all user app/networks** | ✓ | ✗ |
| | **Unrestricted access to competitive intelligence program data for all apps/networks, including how individual programs resonate with audiences across the TV ecosystem** | ✓ | ✗ |
| | **Detailed audience behavior data including performance by age, gender, viewer type** | ✓ | ✗ |
| | **For content that appears across both CTV and linear, we can answer "how does the perform vary between delivery mechanisms?"** | ✓ | ✗ |

## HOW TO WIN

**AD SALES USE CASES**

- Focus on the benefits of eyes-on-screen attention
- TVision provides true co-viewing multiples

- Emphasize 1:1 relationship between attention and brand lift metrics (Upwave study)

**PROGRAM ANALYSIS  USE CASES**

- We have a clear advantage here. You likely will not run into Oracle when pitching to programming & content teams.

**Ex. 13**

8/29/2023              The Nielsen Company (US), LLC v. TVision Insights, Inc.         Yan Liu 30(b)(6)
                                   Outside Counsel Attorneys' Eyes Only

**Page 1**

```
          IN THE UNITED STATES DISTRICT COURT

            FOR THE DISTRICT OF DELAWARE

--------------------------------X

THE NIELSEN COMPANY (US), LLC,    :

                  Plaintiff,      : Case No.:

        v.                        : 22-57-CJB

TVISION INSIGHTS, INC.,           :

                  Defendant.      :

--------------------------------X


     *** OUTSIDE COUNSEL ATTORNEYS' EYES ONLY ***

     Deposition of TVision Insights, Inc., by and

    through its designated representative, YAN LIU

              Washington, D.C.

            Tuesday, August 29, 2023

                  8:39 a.m.




Reported by: Matthew Goldstein, RMR, CRR

--------------------------------

          DIGITAL EVIDENCE GROUP

       1730 M Street, NW, Suite 812

          Washington, D.C. 20036

              (202) 232-0646
```

**Page 2**

```
 1      Deposition of YAN LIU, held at:

 2

 3

 4        Kelley Drye & Warren LLP

 5        3050 K Street, NW

 6        Washington, D.C. 20007

 7        202.342.8400

 8

 9

10

11

12      Pursuant to Notice, before Matthew Goldstein,

13 RMR, CRR, Notary Public in and for the District of

14 Columbia.

15

16

17

18

19

20

21

22
```

**Page 3**

```
 1        A P P E A R A N C E S

 2    ON BEHALF OF THE PLAINTIFF, THE NIELSEN

 3    COMPANY (US), LLC,:

 4    DOUGLAS LEWIS, ESQUIRE

 5    STEVEN YOVITS, ESQUIRE

 6    KELLEY DRYE & WARREN, LLP

 7    333 West Wacker Drive

 8    26th Floor

 9    Chicago, Illinois 60606

10    312.857.7073

11

12    ON BEHALF OF THE DEFENDANT, TVISION INSIGHTS,

13    INC.:

14    JASON XU, ESQUIRE

15    RIMON PC

16    1990 K Street, NW

17    Suite 420

18    Washington, D.C. 20006

19    202.971.9494

20

21    ALSO PRESENT:

22    DANIEL HOLMSTOCK - VIDEOGRAPHER
```

**Page 4**

```
 1        C O N T E N T S
 2 EXAMINATION OF YAN LIU              PAGE
 3 By MR. LEWIS                   12
 4
 5        E X H I B I T S
 6        (Attached)
 7 LIU        DEPOSITION EXHIBIT      PAGE
 8 Exhibit 1   Notice of Deposition of Yan Liu   17
 9 Exhibit 2   Plaintiff The Nielsen Company     13
10        (US), LLC's Notice Under Rules
11        30(b)(6) To TVision
12 Exhibit 3   Plaintiff The Nielsen Company     14
13        (US), LLC's First Supplemental
14        Notice Under Rules 30(b)(6) to
15        TVision
16 Exhibit 4   TVSN_NLSN_00787356 through        19
          TVSN_NLSN_00787365, TVision -
17        Financial Model Overview May
          2020 Slide Deck
18 Exhibit 5   TVSN_NLSN_00776803 through        45
19        TVSN_NLSN_00776806, September
          25, 2020, E-mail Correspondence
20 Exhibit 6   TVSN_NLSN_00904299 through        49
21        TVSN_NLSN_00904303, April 2,
22        2020, E-mail Correspondence
```

1 (Pages 1 to 4)

8/29/2023          The Nielsen Company (US), LLC v. TVision Insights, Inc.          Yan Liu 30(b)(6)
Outside Counsel Attorneys' Eyes Only

Page 33

1  performance of each channel at each daypart.
2      Q.   What do you mean by "channel" here?
3      A.   "Channel" means within NBC.  There are
4  many cable network.
5      Q.   Okay.  So traditionally channel.  Not
6  like a --
7      A.   Correct.
8      Q.   Not like a brand channel, but like a TV
9  channel?
10     A.   TV channel or it can be the CTV
11 platforms, such as Roku channel, Samsung TV Plus,
12 et cetera.
13     Q.   Okay.  I just wanted to make sure that
14 you weren't using it in some nonstandard way.
15         Okay.  And then does the Brand Platform
16 indicate to its users either the ad or TV shows
17 that the panelists were watching?
18     A.   No.
19     Q.   Does it just look at the channel itself,
20 like if somebody was watching ABC at a certain
21 time or something -- strike that.
22         What does the Brand Platform actually

Page 34

1  show your customers?
2      A.   It's the attention of those content, so
3  whether Roku channel has higher attention than
4  YouTube.  That's the information.  We do not show
5  the viewership of YouTube or Roku itself.
6      Q.   And it's the attention of the panelists
7  watching the channel.  Is that what you're saying?
8      A.   Uh-huh.
9      Q.   I'm sorry?
10     A.   Yes.
11     Q.   Does the Brand Platform product show
12 what TV show or ad was running on that channel
13 when the panelist was watching it?
14         MR. XU:  Objection; form.
15         THE WITNESS:  Can you repeat the
16 question?
17 BY MR. LEWIS:
18     Q.   Sure.
19         Does your Brand Platform show customers
20 what TV show or ad was running on the channel when
21 the panelist was watching that channel?
22         MR. XU:  Same objection.

Page 35

1          THE WITNESS:  I don't think so.
2  BY MR. LEWIS:
3      Q.   Does the Brand Platform in whole or in
4  part -- sorry, strike that.
5          Does the Brand Platform directly or
6  indirectly use data from a ACRCloud?
7      A.   Yes.
8      Q.   And how does it do that?
9      A.   In order to show performance in terms of
10 attention, first we have to understand what's on
11 the screen.  And we use ACR technology in that
12 context.
13     Q.   And your ACR technology vendor is
14 ACRCloud?
15     A.   It's ACRCloud since 2017, 2018, when we
16 switched from Gracenote.
17     Q.   Right.  If I said it was in April to May
18 of 2018; is that correct?
19     A.   That's correct.
20     Q.   And then when we talked about what
21 TVision sells, your third was -- first you said
22 data feed, second you said dashboard, and the

Page 36

1  third was a purpose project.
2          Do you recall that?
3      A.   Yes.
4      Q.   And what -- and then you said it was a
5  PowerPoint?
6      A.   That's correct.
7      Q.   Are those projects more custom than the
8  other revenue sources?
9      A.   That's correct.
10     Q.   Do all or some of the project revenue
11 that TVision gets rely either directly or
12 indirectly on data received from ACRCloud?
13     A.   Most of them, yes.
14     Q.   Who are some clients that you've
15 contracted with on for these sorts products?
16         MR. XU:  Objection; form.
17         THE WITNESS:  Mainly TV networks.
18 BY MR. LEWIS:
19     Q.   Which ones?
20     A.   We have clients such as Disney, NBC,
21 AMC, Fox, major TV networks.
22     Q.   Those are major TV networks.

9 (Pages 33 to 36)

Page 53

1    Q.  And so you provide an estimate in this
2    document for the total value of ACR-based
3    measurement data.
4        Do you see that?
5    A.  Yes.
6    Q.  What do you mean by ACR-based
7    measurement data in this e-mail?
8    A.  That means census viewership data
9    offered by mainly smart TV manufacturers, such as
10   Vizio, LG, Samsung, et cetera.
11   Q.  And why is such data ACR-based?
12       MR. XU:  Objection; form.
13       THE WITNESS:  The smart TV manufacturers
14   use ACR to capture what's on the screen on their
15   smart TV, but that's not our product.
16   BY MR. LEWIS:
17   Q.  Okay.  But the total market would
18   include your product, as well; right?
19   A.  No.
20   Q.  So the market for ACR-based measurement
21   data would not include TVision's product?
22   A.  No, we do not sell the viewership data.

Page 54

1    Q.  Okay.  So this is referring to
2    viewership data that's being sold in the
3    marketplace?
4    A.  That's correct.
5    Q.  And that would be analogous to the data
6    that TVision gets from ACRCloud; right?
7    A.  No.
8    Q.  So what in your system would be
9    analogous to this ACR-based measurement data you
10   referred to in Exhibit 7?
11   A.  The connection here is our calibration
12   panel data need to be used alongside of -- can be
13   used alongside of the ACR-based measurement data,
14   i.e., census viewership data.  That is the
15   connection.
16   Q.  Okay.  And your calibration panel data
17   comes in part at least from the data returned from
18   ACRCloud on the panelist devices; right?
19   A.  If it's a sessionized data, yes.
20   Q.  And is the calibration panel data a
21   valuable resource for TVision to sell folks using
22   census-based data?

Page 55

1        MR. XU:  Objection; form.
2        THE WITNESS:  Our two main clients on
3    calibration panel data is VideoAmp and iSpot.
4    Other than that, it has close to zero revenue
5    impact to our company.
6    BY MR. LEWIS:



16   Q.  And do you know what iSpot uses your
17   calibration panel data to do?
18   A.  To create unified viewership data
19   product.
20   Q.  So to combine census data with the panel
21   device data?
22   A.  That's correct.

Page 56

1    Q.  Do you know if iSpot uses that data to
2    compete with Nielsen?
3        MR. XU:  Objection; form.
4        THE WITNESS:  I think so.
5    BY MR. LEWIS:
6    Q.  And what does VideoAmp use the
7    calibration panel data from TVision for?
8    A.  A similar use case.
9    Q.  And does VideoAmp use that data to
10   compete with Nielsen?
11       MR. XU:  Objection; form.
12       THE WITNESS:  I think so.
13   BY MR. LEWIS:
14   Q.  Can you tell me how the calibration
15   panel data is used by iSpot and VideoAmp?
16       MR. XU:  Objection; form.
17       THE WITNESS:  So the calibration panel
18   data can be overlaid on top of the ACR-based
19   measurement data.  So it adds in person-level
20   information on top of the household-based
21   information, which is collected from the smart TV
22   or set-top box.

14  (Pages 53 to 56)

Ex. 14

Page 73

1  over 90 percent figure you're referring to?
2      A.  It means the -- we have the ground
3  truth, which is the truth of the channel
4  recognition, and the data from ACRCloud is
5  90 percent accurate against the ground truth.
6      Q.  So what is ground truth?
7      A.  Ground truth means we usually take a
8  separate video and ask a human to recognize what's
9  on the screen.
10     Q.  Okay.  And then you compare the results
11  from ACRCloud to what the human says is on the
12  screen?
13     A.  That's right.
14     Q.  And you found that ACRCloud returns a
15  correct channel and therefore program over
16  90 percent of the time; is that right?
17     A.  Yes.  This is for linear TV, I believe.
18     Q.  Okay.  And what is linear TV?
19     A.  It's traditional TV using either
20  broadcasting network or cable network.
21     Q.  Okay.  Would linear TV include like DVR
22  playback?

Page 74

1      A.  Yes.
2      Q.  Anything else under linear TV?
3      A.  You can use antenna, as well, OTA.
4      Q.  Okay.  Anything else?
5      A.  That's it.
6      Q.  And linear TV stands in contrast to CTV;
7  is that correct?
8      A.  That's correct.
9      Q.  And this document uses the acronym OTT.
10     Do you see that?
11     A.  Yes.
12     Q.  What is OTT?
13     A.  That's the same as CTV.
14     Q.  Okay.  Does ACRCloud have a different
15  accuracy percentage for CTV?
16     A.  For CTV ads, yes.
17     Q.  And is that because of the limited
18  database that you described earlier?
19     A.  Yes.
20     Q.  So ACRCloud returns a correct channel
21  less often with CTV because TVision provides a
22  less robust database for them to use in matching;

Page 75

1  is that right?
2      A.  Yeah, for both ads and --
3          MR. XU:  Objection; form.
4          THE WITNESS:  For both ads and content.
5  BY MR. LEWIS:
6      Q.  On CTV?
7      A.  Correct.
8      Q.  Are there other ACR providers other than
9  ACRCloud?
10     A.  Yes.
11     Q.  And who are they?
12     A.  There are many, but we -- as far as I
13  know, there's a company like AdWare.  There's a
14  company called Answer.  There's a company called
15  Mobile Research Lab.  There are many others.
16     Q.  And TVision has chosen to use ACRCloud;
17  right?
18     A.  That's correct.
19     Q.  Do these other ACR providers have a
20  lower accuracy than ACRCloud?
21         MR. XU:  Objection; form.
22         THE WITNESS:  We did not test all the

Page 76

1  solutions, but I do not believe ACRCloud stands
2  out in terms of accuracy.
3  BY MR. LEWIS:
4      Q.  You think their accuracy is roughly
5  equivalent to the other ACR vendors?
6      A.  Yes.
7      Q.  Why did you pick ACRCloud then?
8      A.  We -- at that point, ███████████████
███████████████████████████████████████████
███████████  We were under the
11  time pressure.  We could not run the full process
12  to pick the best ACR provider.
13     Q.  And that was in 2018; right?
14     A.  That's correct.
15     Q.  If -- and you've had time since then to
16  switch if you thought it was necessary to do so;
17  right?
18         MR. XU:  Objection; form.
19         THE WITNESS:  Switching costs is very
20  high for ACRCloud -- for typical ACR system.
21  BY MR. LEWIS:
22     Q.  Has TVision looked at other ACR

19 (Pages 73 to 76)

Ex. 14

8/29/2023          The Nielsen Company (US), LLC v. TVision Insights, Inc.          Yan Liu 30(b)(6)
Outside Counsel Attorneys' Eyes Only

Page 85

1   That's 60 and 61.  So let's talk about that
2   offline and finish that one.
3   BY MR. LEWIS:
4       Q.  Let's switch gears then.
5           Mr. Liu, who are TVision's competitors?
6       A.  On the attention measurement side, we do
7   not have the direct competitor.  However, we do
8   share the similar space with some other attention
9   measurement companies, such as Lumen Research,
10  Adelaide, and Amplified Intelligence.
11      Q.  Is Adelaide spelled like the city in
12  Australia?
13      A.  Yes, in Australia.
14      Q.  Okay.  And what was the last one?
15      A.  Amplified Intelligence.
16      Q.  Okay.  And --
17      A.  Then --
18      Q.  Okay.  Sorry.
19      A.  -- for the calibration panel data, we do
20  not have the direct competition either, but
21  there's a company called HyphaMetrics trying to
22  develop something similar to our product.

Page 86

1       Q.  Okay.  And does your attention data
2   compete with other companies in the marketplace
3   that report viewership?
4       A.  No.
5       Q.  You don't believe that it does?
6       A.  No.
7       Q.  So how would you characterize the market
8   that TVision competes in?
9       A.  Our attention measurement is very
10  unique.  So it's not that competitive.  Same for
11  the calibration panel data, because HyphaMetrics
12  does not have the real product.  So we do not face
13  much competition.
14      Q.  Is that also because other parties with
15  panels don't sell their calibration panel data?
16      A.  That's correct.
17      Q.  Nielsen being one of those companies?
18      A.  Do not sell stand-alone calibration
19  panel data, yes.
20      Q.  Is Nielsen a competitor of TVision's?
21      A.  No.
22      Q.  Has TVision been consistent in treating

Page 87

1   Nielsen as not a competitor?
2       A.  We do not -- we never ask our sales team
3   to compete with Nielsen in any capacity.
4       Q.  So there's no documents that show
5   Nielsen as a competitor?
6       A.  We play in the same industry, but we do
7   not directly compete with Nielsen.
8       Q.  Tell me what you mean by "play in the
9   same industry."
10      A.  It's in the same measurement industry,
11  so as many maybe thousands of companies.
12      Q.  So if Nielsen does handle calibration,
13  why isn't TVision a competitor of Nielsen's?
14          MR. XU:  Objection; form.
15          THE WITNESS:  Because Nielsen does not
16  provide calibration panel data as a stand-alone
17  product, and Nielsen's main product is viewership
18  data product, which we do not sell or even develop
19  that product.
20  BY MR. LEWIS:
21      Q.  "That product" meaning the panel
22  calibration data?

Page 88

1       A.  No, "that product" means the currency or
2   the viewership -- audience viewership data.
3       Q.  Okay.  Now, when you refer to "attention
4   data," that includes audience viewership data;
5   right?
6       A.  No.
7       Q.  There's no audience viewership data?
8       A.  No.
9       Q.  Doesn't your attention data involve
10  viewership data and then the attention data
11  overlaid on top of that?
12      A.  Correct.  But we do not sell the
13  viewership data.  When clients see the data, it's
14  about attention index, attention metrics of that
15  show, not about the viewership.
16      Q.  But the viewership data underlies the
17  attention data, which you do sell; is that right?
18          MR. XU:  Objection; form.
19          THE WITNESS:  Correct.
20  BY MR. LEWIS:
21      Q.  Before this --
22      A.  Let me correct that answer.  Viewership

22 (Pages 85 to 88)

Page 89

1 data in our industry means the number of people
2 that get exposed to that ad. And we do not sell
3 that data. ACR data is a component of our
4 attention metrics, but our attention metrics or
5 attention product do not -- doesn't really involve
6 the viewership data.
7     Q. So the ACR data, is that the same as
8 viewership data?
9     A. No. ACR data is more like a technology,
10 a foundation of many measurement product. And the
11 one measurement product is viewership data.
12 Another measurement product is attention
13 measurement.
14     Q. And does attention measurement require
15 calculating viewership data from ACR data?
16     A. It does require ACR data, but does not
17 require viewership data.
18     Q. I see.
19         Before this case was filed, were you
20 aware that Nielsen had patents?
21     A. No.
22     Q. Did TVision do any due diligence to see

Page 90

1 if it might be infringing any of the Nielsen's
2 patents?
3     A. No.
4     Q. So TVision had no concern that it might
5 be using Nielsen's technology?
6     A. For ACR, we license technology from
7 ACRCloud.
8     Q. Let me reask that question.
9         Did TVision have any concern that it
10 might be using Nielsen's technology?
11     A. No.
12     Q. Did TVision ask ACRCloud whether it was
13 using Nielsen's technology?
14     A. No.
15     Q. Did TVision ask ACRCloud to any due
16 diligence regarding its ACR technology?
17     A. No.
18         MR. XU: Objection; form.
19 BY MR. LEWIS:
20     Q. Do you agree that companies should avoid
21 infringing other companies' patents?
22     A. Yes.

Page 91

1     Q. Do you understand that Nielsen's patents
2 allow it to prevent others from using the
3 technology claimed in the patent?
4     A. Yeah.
5         MR. XU: Objection; form.
6 BY MR. LEWIS:
7     Q. How closely does TVision follow what
8 Nielsen is doing?
9     A. As a company, they're the biggest in our
10 space. So I do follow the news, but we -- from
11 the competitive point of view, we focus more on
12 our -- the other companies in our space, such as
13 Lumen, Adelaide. They're much more important to
14 us compared to Nielsen.
15     Q. Does TVision, including yourself, talk
16 to Nielsen employees at like industry events or
17 things like that?
18     A. Not really.
19     Q. Has TVision ever hired any ex-Nielsen
20 employees?
21     A. Yes, Mark Green.
22     Q. Mark Green.

Page 92

1         Anyone else?
2     A. We hired a seller who worked at NCS,
3 Nielsen Catalina Solution, which is a joint
4 venture between Catalina and Nielsen. His name is
5 Rob. I forgot his last name, but --
6     Q. Do you know the letter it starts with
7 or...
8     A. We terminated him in a few months. So I
9 couldn't recall his last name.
10     Q. Okay. Out of sight, out of mind.
11         Do you know a gentleman named Karthik
12 Rao?
13     A. Yes.
14     Q. Who is Karthik Rao?
15     A. He's currently CEO of Nielsen Audience
16 Measurement.
17     Q. Have you ever spoken to Mr. Rao?
18     A. Yes.
19     Q. On the phone, on video, in person?
20     A. Our first engagement was before this
21 lawsuit, maybe around 2017, introduced by Linda
22 who was Nielsen president.

23 (Pages 89 to 92)

8/29/2023         The Nielsen Company (US), LLC v. TVision Insights, Inc.        Yan Liu 30(b)(6)
Outside Counsel Attorneys' Eyes Only

Page 93

1   Q.  Linda -- what's Linda's last name?
2   A.  Karazo [sic].
3   Q.  Okay.  I won't ask you to spell that.
4       And so how many times have you talked to
5   Mr. Rao, either video, phone, or in person?
6   A.  Four or five times in total.
7   Q.  And what did you and Mr. Rao talk about?
8   A.

11  Q.  You said "initially."  How about after
12  that?
13  A.

17  Q.

19  Q.  Did you talk about anything else other
20  than

22  Q.  Have you ever talked to Mr. Rao about

Page 94

1   any other subjects other than what you've
2   mentioned in the last two minutes?
3   A.  Before this lawsuit, we bumped into each
4   other at conferences, we may discuss some general
5   industry topic, trends in our industry, but that's
6   a typical conversation we have.
7   Q.  Did you ever discuss Nielsen's
8   viewership data and how it did or didn't compete
9   with TVision's data?
10  A.  No.
11  Q.  Do you know somebody named Amilcar
12  Perez, A-M-I-L-C-A-R, and then Perez, P-E-R-E-Z?
13  A.  No.
14  Q.  If I told you that was a Nielsen
15  employee, would you have any recollection?
16  A.  No.
17  Q.  Does TVision try to take business away
18  from Nielsen?
19      MR. XU:  Objection; form.
20      THE WITNESS:  No.
21  BY MR. LEWIS:
22  Q.  Has TVision taken business away from

Page 95

1   Nielsen?
2   A.  No.
3   Q.  Is TV Squared a customer of TVision?
4   A.  No.
5   Q.  So TVision doesn't sell data to TV
6   Squared?
7   A.  No.
8   Q.  Does TVision enable other companies to
9   take business away from Nielsen through the use of
10  TVision's data?
11      MR. XU:  Objection; form.
12      THE WITNESS:  The main two clients are
13  VideoAmp and iSpot.
14  BY MR. LEWIS:
15  Q.  And with respect to VideoAmp and
16  iSpot, does TVision enable them to take business
17  away from Nielsen through the use of TVision's
18  data?
19      MR. XU:  Objection; form.
20      THE WITNESS:  They do compete with
21  Nielsen, but I do not know to what extent they're
22  taking shares from Nielsen.

Page 96

1   BY MR. LEWIS:
2   Q.  Does VideoAmp compete in the same market
3   segment as Nielsen?
4   A.  Yes.
5   Q.  Does --
6   A.  But I don't think that's their main
7   business, but a portion of VideoAmp business does
8   compete with Nielsen.
9   Q.  And does iSpot compete in the same
10  market segment as Nielsen?
11  A.  Yes.
12      (Liu Deposition Exhibit 11 was marked
13  for identification and attached to the
14  transcript.)
15      (Liu Deposition Exhibit 12 was marked
16  for identification and attached to the
17  transcript.)
18  BY MR. LEWIS:
19  Q.  So the court reporter, Mr. Liu, has
20  handed you what's been marked as Liu Exhibit 11,
21  951039, and also what's been marked as Exhibit 12,
22  951040.  I believe the two are related, which is

24  (Pages 93 to 96)

Page 117

1 for identification and attached to the
2 transcript.)
3 BY MR. LEWIS:
4      Q.  Mr. Liu, the court reporter has handed
5 you Exhibit 15.  It's Bates stamped
6 TVSN_NLSN_00694041.  To explain the handwritten
7 Bates number, this was produced as a native
8 document, and then we just, I think at the last
9 moment, put the Bates number on it by hand so that
10 we would be able to identify it.  But for the
11 record Exhibit 15 has the Bates number I just
12 read.
13      Do you recognize Exhibit 15?
14      A.  Yes.
15      Q.  What is it, Mr. Liu?
16      A.  This is an internal material to educate
17 our seller about our new product, Total View.
18      Q.  Okay.  And you testified about
19 Total View earlier, but can you add -- I'm sorry,
20 can you indicate again what Total View is?
21      A.  Total View is our unified product to
22 show the attention performance across linear and

Page 118

1 CTV.
2      Q.  If you'd take a look at page 2 of
3 Exhibit 15.
4      A.  Yes.
5      Q.  At the top it says, "Four primary
6 competitors"; right?
7      A.  Yes.
8      Q.  And there are four companies listed
9 underneath there.  Could you read those to me?
10      A.  iSpot, VideoAmp, Nielsen, and
11 Comscore.
12      Q.  So under the phrase "Four primary
13 competitors" Exhibit 15, this introduction to
14 TVision's Total View product, lists Nielsen;
15 right?
16      A.  Yes.
17      Q.  Okay.  And this Exhibit 15 is dated on
18 the front April of 2023; right?
19      A.  Yes.
20      Q.  Is that about the date when this was
21 created?
22      A.  Yes.

Page 119

1      Q.  And it says Niels- -- the title is
2 "TVision Total View competitive battle cards";
3 right?
4      A.  Yes.
5      Q.  What does a "competitive battle card"
6 mean?
7      A.  This document is to educate our seller
8 regarding other product may compete with
9 Total View so they can better handle the questions
10 from the potential clients.
11      Q.  So this document goes to who at TVision?
12      A.  Our commercial team.
13      Q.  Is that the sales team?
14      A.  Sales and customer success.
15      Q.  What does customer success do?
16      A.  They serve our existing customers.
17      Q.  So when you provide -- strike that.
18      Is Exhibit 15 at TVision an internal
19 document?
20      A.  Yes.
21      Q.  These documents are meant to be
22 accurate; right?

Page 120

1      A.  It's developed by our product marketing
2 team.  We try our best to be accurate, but
3 sometimes there can be a mistake.
4      Q.  Okay.  Is Exhibit 15 accurate, as far as
5 you know?
6      MR. XU:  Objection; form.
7      THE WITNESS:  I'm taking a look at the
8 later page about Nielsen, from page 13.
9 BY MR. LEWIS:
10      Q.  Yeah.
11      A.  Nielsen Digital Ad Rating, Nielsen
12 Digital Content Rating, and Nielsen One, we do not
13 compete with any of these products.
14      Q.  So my question pending -- so strike that
15 answer.
16      My question pending, is Exhibit 15
17 accurate, as far you know?
18      MR. XU:  Objection; form.  He is
19 answering.
20      THE WITNESS:  I don't think this is very
21 accurate.
22

30  (Pages 117 to 120)

Ex. 14

9/8/2023          The Nielsen Company (US), LLC v. TVision Insights, Inc.      Daniel Schiffman
Highly Confidential - Outside Attorneys' Eyes Only

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE
- - - - - - - - - - - - - - - -x
THE NIELSEN COMPANY (US), LLC,  :
          Plaintiff,            :
     v.                         :  Civil Action No.
TVISION INSIGHTS, INC.,         :  21-1592-CJB
          Defendant.            :
- - - - - - - - - - - - - - - -x
THE NIELSEN COMPANY (US), LLC,  :
          Plaintiff,            :
     v.                         :  Civil Action No.
TVISION INSIGHTS, INC.,         :  22-57-CJB
          Defendant.            :
- - - - - - - - - - - - - - - -x

HIGHLY CONFIDENTIAL
OUTSIDE ATTORNEYS' EYES ONLY
DEPOSITION OF DANIEL SCHIFFMAN
APPEARING REMOTELY

September 8, 2023
9:09 a.m.

Reported by: Lori J. Goodin, RPR, CLR, CRR,
RSA, California CSR #13959

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

Page 2

```
 1          REMOTE APPEARANCES:
 2
 3   FOR NIELSEN COMPANY:
 4       KELLEY DRYE & WARREN, LLP
 5       DOUGLAS LEWIS, ESQUIRE
 6       101 Park Avenue
 7       New York, New York  10178
 8       212-808-7800
 9       dlewis@kelleydrye.com
10
11   FOR TVISION INSIGHTS, INC.:
12       RIMON, LLP
13       JASON XU, ESQUIRE
14       1990 K Street, Northwest
15       Suite 420
16       Washington, D.C.  20006
17       jason.xu@rimonlaw.com
18
19
20   Also Present:
21       Henry Marte, video/document tech
22
```

Page 3

```
 1              INDEX TO EXAMINATION
 2
 3 WITNESS:  DANIEL SCHIFFMAN
 4
 5 EXAMINATION BY                          PAGE
 6 MR. LEWIS                                 6
 7
 8              INDEX TO EXHIBITS
 9 SCHIFFMAN
10 EXHIBIT      DESCRIPTION             PAGE
11 Exhibit 1    Subpoena to Mr. Schiffman   16
12 Exhibit 2    Slide Deck, Next Generation
13              TV Measurement,
14              TVSN_NLSN_00626486          37
15 Exhibit 3    Slide Deck, TVision Insights,
16              TVSN_NLSN_00287211          61
17 Exhibit 4    e-mail thread, 1/20/17,
18              TVSN_NLSN_00134504          74
19 Exhibit 5    e-mail thread, 8/6/18,
20              TVSN_NLSN_00638049          88
21 Exhibit 6    Excel spreadsheet,
22              TVSN_NLSN_00311596         106
```

Page 4

```
 1       INDEX TO EXHIBITS, CON'T
 2 SCHIFFMAN
 3 EXHIBIT    DESCRIPTION           PAGE
 4 Exhibit 7  Scenario Testing document,
 5       TVSN_NLSN_00232541       115
 6 Exhibit 8  Methodology Guide, 2019,
 7       TVSN_NLSN_00634644       117
 8
 9       PRIOR MARKED EXHIBITS
10          FIRST REFERRAL
11 EXHIBIT                 PAGE
12 Neumann Exhibit 16        18
13 Liu Exhibit 13           29
14 Liu Exhibit 27           93
15 Liu Exhibit 30           97
16
17
18
19
20
21
22
```

1 (Pages 1 to 4)

Page 5

```
 1    FRIDAY, SEPTEMBER 8, 2023, 9:09 a.m.
 2         PROCEEDINGS
 3         THE VIDEOGRAPHER:  We are now on the
 4    record.  My name is Henry Marte, videographer
 5    with Digital Evidence Group.
 6         Today's date is September 8, 2023.
 7    And the time is 9:09 a.m.
 8         This deposition is being held in the
 9    matter of the Nielsen Company U.S. LLC,
10    versus TVision Insights, Inc.
11         The deponent today is Mr. Daniel
12    Schiffman.
13         All parties to this deposition are
14    appearing remotely and have agreed to the
15    witness being sworn in remotely.
16         Counsel please identify themselves
17    for the record.  Afterwards the court
18    reporter, Lori Goodin, will administer the
19    oath to the witness.
20         MR. LEWIS:  Douglas Lewis.  I am
21    with Kelley, Drye & Warren, out of Chicago,
22    and I am representing the plaintiff, Nielsen
```

Page 6

```
 1    Company U.S. LLC.
 2         MR. XU:  This is Jason Xu from
 3    Rimon.  I am representing the witness here.
 4         MR. LEWIS:  Mr. Xu, are you also
 5    representing TVision?
 6         MR. XU:  Sure.  Yes, I am also
 7    representing defendant TVision in this
 8    lawsuit.
 9         DANIEL SCHIFFMAN,
10    a witness called for examination, having been
11    first duly sworn, testified as follows:
12         EXAMINATION
13    BY MR. LEWIS:
14    Q.    Thank you.  Good morning,
15    Mr. Schiffman.
16    A.    Good morning.
17    Q.    As I introduced myself off the
18    record -- can you hear me?  This says it just
19    changed my microphone.
20    A.    I think your video went off.  You
21    have a USB and I think maybe the USB came out or
22    something.
```

Page 7

```
 1         THE VIDEOGRAPHER:  Mr. Lewis, do you
 2    want to go off the record?
 3         MR. LEWIS:  I'm going to go off the
 4    record.
 5         THE VIDEOGRAPHER:  Give me one
 6    second.  The time is 9:11 a.m. We are going
 7    off the record.
 8         (Recess taken -- 9:11 a.m.)
 9         (After recess -- 9:12 a.m.)
10         THE VIDEOGRAPHER:  The time is
11    9:12 a.m.  We are back on the record.
12    BY MR. LEWIS:
13    Q.    Sorry about that, Mr. Schiffman,
14    slight technical problem.
15         Anyway, I was introducing myself.
16    My name is Douglas Lewis.  We met off the record.
17         If you could just state your name
18    for the record.
19    A.    Daniel Schiffman.
20    Q.    And could you also state your
21    business address?
22    A.    746 Mamaroneck Avenue, 1224,
```

Page 8

```
 1    Mamaroneck, New York, 10543.
 2    Q.    Thank you.  My understanding is that
 3    you used to work for a company called TVision
 4    Insights; is that correct?
 5    A.    Correct.
 6    Q.    And when did you work for TVision
 7    Insights?
 8    A.    I started the company out in, while
 9    I was finishing up business school in 2015.
10         And I believe -- my last day
11    technically, you know, at the business, I don't
12    fully remember.  I think it was 2019.
13         You guys might have that.  I didn't
14    look up my employment contract with the company,
15    but I think it was the end of 2019 -- or the
16    beginning of 2019.
17    Q.    It was the end of 2019, you just
18    said; is that right?
19    A.    I think it was the beginning of 2019
20    actually.
21    Q.    Oh, the beginning?
22    A.    Because I started with Cybereason in
```

2  (Pages 5 to 8)

Ex. 15

9/8/2023            The Nielsen Company (US), LLC v. TVision Insights, Inc.    Daniel Schiffman
Highly Confidential - Outside Attorneys' Eyes Only

Page 29

1  let's put up TVSN_NLSN_00008034.
2        This has previously been marked as
3  Liu Exhibit 13.
4            (Whereupon, previously marked
5            Liu Exhibit 13, first referral.)
6        THE WITNESS:  Can you zoom?
7  BY MR. LEWIS:
8        Q.   You can zoom definitely.  Otherwise,
9  Mr. Schiffman, if it would help you use the box
10 to that link the hot seater sent you, feel free
11 to download the PDF.
12            THE VIDEOGRAPHER:  Give me a second.
13 For whatever reason that screen froze.
14            THE WITNESS:  Okay, great.
15 BY MR. LEWIS:
16       Q.   All right.  Mr. Schiffman, we have
17 put in front of you what was marked previously as
18 Liu Exhibit 13.
19            Do you recognize this document?
20       A.   No, actually.
21       Q.   So, you never had any role in
22 creating it or you never saw it while you were at

Page 30

1  TVision to your current recollection?
2        A.   I can't -- I do not recall this
3  document.  I mean, I will be honest, I'm not
4  even -- that is not a trick.  Like I really don't
5  -- I'm surprised that you have a document that I
6  don't remember.  I do not recall seeing this
7  document ever.
8        Q.   Okay.  So, parts of it though might
9  be familiar, so let me just take you to a couple
10 of places and see if you remember that particular
11 thing, if it is not in this document.
12            MR. LEWIS:  So, Henry, if you could
13 open up -- not open up.  Go to the page where the
14 Bates Number ends in 8038 at the top.  It is the
15 fifth page.  And then if you could zoom in to the
16 chart there at the top.
17 BY MR. LEWIS:
18       Q.   All right.  Mr. Schiffman, you have
19 been shown Page 8038 from Liu Exhibit 13.
20            Do you see that table there?
21       A.   Yeah, uh-huh.
22       Q.   Does that table look familiar to you

Page 31

1  at all?
2        A.   I mean the table -- this document,
3  honestly, is not, I'm not familiar -- I have -- I
4  am not really familiar with this document, to be
5  frank with you.
6            The table that you are producing and
7  that is being produced in front of me, I can
8  read, I'm reading it for the first time.
9        Q.   Okay, fair enough.
10       A.   So, I could interpret it for you
11 but this is the first time I've seen it.
12       Q.   Okay, that is the question, right?
13 Have you seen it before.  The answer is no.
14       A.   No.
15       Q.   So, I would like you to interpret it
16 for me consistent with your experience at
17 TVision, of course.
18            It says in the first row, after the
19 header row, it lists Nielsen under Companies.  Do
20 you see that?
21       A.   Yeah, where it says People Panel for
22 TV.

Page 32

1        Q.   Right.  And then the companies,
2  Nielsen is one of the two included, right?
3        A.   Yeah, yeah.
4        Q.   And then on the right, under
5  Relationship it says Competitors or Licensees.
6  Do you see that?
7        A.   Yeah.
8        Q.   Now, when you were at TVision, did
9  you consider Nielsen to be a competitor?
10       A.   No.  No.  And in fact, I am quoted
11 literally saying that I am -- well, this is an
12 issue, right.
13            So, we, we would say and I would say
14 to customers -- and we thought that Nielsen was a
15 complement.
16            So, I would say to customers --
17 because they would say to us like are we going to
18 replace our system with, you know, Nielsen with
19 what you guys have.
20            And we would say no, no, no, no.
21 Nielsen is the currency.  They are the
22 transaction, pricing mechanism that you used.

8  (Pages 29 to 32)

Ex. 15

9/8/2023          The Nielsen Company (US), LLC v. TVision Insights, Inc.    Daniel Schiffman
                  Highly Confidential - Outside Attorneys' Eyes Only

Page 33

1          We think that we are an incredible
2   complement to that Nielsen data.
3          Why are we such a good complement?
4          Because we can -- you can use the
5   Nielsen data to transact.  You can use the
6   TVision data to find better places to transact to
7   make more yield, let's say, off of your inventory
8   or for an advertiser to make better decisions.
9          So your decisions will be priced on
10  Nielsen, but you can use our data to help inform
11  that strategy and make better ones.
12         It was always tension because some
13  people saw us that way, but we were always in
14  market as to be a complement.
15         And frankly, because we are a tiny
16  startup.  So, like, we don't want to be saw as a
17  substitution for the incumbent product that is
18  ubiquitous in the industry.
19         We would say, no, no, no. Just keep
20  with what you are doing.  We just think you are
21  going to make better decision with our data.  And
22  if you do make those better decisions, you keep

Page 34

1   buying from us, right.
2          And that was how we were growing our
3   client base; that they needed more, not that they
4   needed something to replace what they had.
5          Q.   So you used the word currency.  What
6   does that mean in --
7          A.   I don't like that word.  Yeah, it
8   was used often.  I don't like that word, but
9   in -- from my understanding of it, I can, I can
10  tell you.
11         And that is that when advertisers
12  and agencies and networks sell inventory, that
13  they need some mechanism to price it, based on
14  the number of people it will be viewed by, and
15  the price per impression.
16         And Nielsen, in the United States,
17  from my understanding, is the primary source of
18  the information that gives you the cost per
19  impression and the number of people who would
20  view it.
21         Q.   Is it, is it valuable to be a
22  currency?

Page 35

1          A.   I would think so because Nielsen is
2   a valuable company.
3          Q.   Did TVision, while you were there,
4   seek to become a currency?
5          A.   Our, I can't tell you the company's
6   whole, like -- it is kind of, a company is not a
7   person.  And a person has an idea or a strategy.
8          So, it is hard for me to say what
9   the company's strategy was in the specific way
10  you asked it.
11         What I could answer for you is kind
12  of the executive leadership's perspective on
13  currency and how we fit into the future state.
14         But we -- and, yeah, so like our
15  belief was that the future there would be
16  multiple kind of quote -- currency, the single
17  currency idea wouldn't exist in the future.
18         And that there would be multiple
19  data sets that advertisers, agencies and networks
20  could use to transact.
21         And our hope was in that future
22  state that TVision's data would be able to power

Page 36

1   all of the currencies that were available,
2   because we had this unique data set that could be
3   valuable, just like I said as a complement to all
4   of these other, to the currency, right.
5          We could be the kind of necessary
6   ingredients in the future for all of them.  That
7   was the, that was the goal.
8          We actually -- in my view and some
9   of the other executive's view and many in the
10  company, that was the case, that there would be
11  multiple currencies.  That we would build a
12  business and a product that could fuel all of
13  those to be successful.
14         And that that was the most strategic
15  way to build a successful business here.
16         That if we did go straight to --
17  like if we tried to be one of the seven, that
18  let's say we would lose, and then there would be
19  six.
20         But if we have the strategy to
21  actually be something that all the seven need,
22  right, we could be immensely valuable.  So that

9 (Pages 33 to 36)

Ex. 15

 Menu

# AdAge

**Don't Miss**   AI marketing tracker   Creator, influencer news   Papa Johns hires Carat   2024 Creativity Awards juries   Business of Brands

 Measurement @

# NIELSEN PULLS ITS GRACENOTE DATA FROM RIVAL VIDEOAMP, OTHERS MULL ALTERNATIVES

Vizio's Inscape, which provides viewing data across the industry, also prepares to shift from Gracenote toward TiVo product

     

By Jack Neff. Published on September 26, 2023.

TVision-JJ00000803

**Ex. 16**

11/8/23, 3:11 PM                          Nielsen pulls Gracenote data from rival VideoAmp as others mull alternatives I Ad Age



Vizio's Inscape provides smart T V viewership data to Nielsen, as well as rivals such as VideoAmp.  Credit: Vizio

Nielsen, which dominates U.S. TV and digital audience measurement, has pulled its Gracenote metadata, long part of the backbone for processing and classifying vast amounts of commercial and program data, from rival VideoAmp. This has led other industry players to consider their alternatives in the wake of the move.

Nielsen's seeming move to yank Gracenote metadata away from rivals has been the subject of industry buzz for months and is seen by some as a way for Nielsen to disrupt and raise costs for competitors.

Vizio's Inscape, a provider of smart TV viewing data across the industry, is also preparing to drop Gracenote metadata for at least some customers, according to a client letter obtained by Ad Age.

**Ad Age Media Summit**
**Hear from industry leaders during October event in NYC**

Register here

TVision-JJ00000804

**Ex. 16**

That comes amid contract discussions nearing conclusion between Vizio and Nielsen on a new Gracenote contract, according to people familiar with the matter. Vizio's Inscape provides smart TV viewership data to Nielsen, as well as rivals such as VideoAmp.

Regardless of the outcome of those talks, Inscape's move from Gracenote to TiVo as its core metadata system will go forward, according to a person familiar with the matter. An Inscape client letter on Sept. 15 set a deadline of Oct. 15 for the switch to TiVo's metadata, but a new deal between Vizio and Nielsen could give customers more time to make that transition.

## Industry buzz

So far, Nielsen's move to pare back Gracenote data from rivals is limited. The why behind the decision is being debated and raises concerns over antitrust issues. If Nielsen's goal is to disrupt competitors, it doesn't seem to be working, at least for VideoAmp, according to one executive.

Types of metadata where reporting details could be affected include IDs of content, titles, station call signs and networks that surround commercial airings, plus the IDs, titles, station call signs and networks assigned to programs themselves that run on TV, according to Inscape's letter to clients.

According to one person familiar with the matter, Inscape has said it will handle what can be extensive work to translate Gracenote and TiVo data for customers that have their own direct Gracenote contracts. That would no longer include VideoAmp.

A Vizio spokesman declined to comment. A Nielsen spokesman declined to comment on most aspects of the Gracenote contract moves.

### Recent news from Ad Age

The CW names media AOR as it seeks live sports audience

**Parker Herren**

Jack in the Box hired Hollywood horror writers to make a creepy short for Halloween

**Erika Wheless**

TVision-JJ00000805

**Ex. 16**

**ISpot gets MRC accreditation for its ad catalog, in possible step toward broader audit**

9'ackNeff

"We're encouraged about Gracenote's current and future prospects," Nielsen said in a statement. "Understanding the evolving use cases for our data and the various innovations we enable in the market, we regularly review the ways we work with customers to establish mutually beneficial relationships. Gracenote is open to working with all companies from across the media and advertising ecosystem to help them create engaging content experiences and extract the most value from content assets."

Comscore, another Nielsen rival, doesn't use Gracenote metadata, according to a spokesman. ISpot.tv, another competitor, has been expecting a non-renewal notice of its own from Nielsen over Gracenote and is in talks to possibly shift to another metadata source and its Gracenote contract extends into next year, according to people familiar with the matter. An iSpot.tv spokesman declined to comment.

**Minimum of notification**

VideoAmp is glad to have made the switch, despite initial concerns, according to one executive.

"We got the bare minimum of notification," said Josh Hudgins, VP of product development at VideoAmp. "I think there was a concern. The market seemed to think that this was going to be disruptive. It turned out it was a minor inconvenience. I wouldn't grade it any higher than that."

VideoAmp built an integration to TiVo's metadata after evaluating alternatives, he said.

"We found it was a very reasonable replacement," Hudgins said. "There was not really any loss of data or functionality."

Gracenote has been "threaded through a lot of the plumbing" in the industry, Hudgins said. "This allowed us to take a step back and think about how do we make this more generic and over time layer in diverse sources of scheduling and metadata and not tie your system inextricably to a single data provider. So we're really happy with how that turned out."

TVision-JJ00000806

**Ex. 16**

9/13/2023          The Nielsen Company (US), LLC v. TVision Insights, Inc.          Tristan Webster
Highly Confidential - Attorneys' Eyes Only - Under the Protective Order

---

**Page 1**

```
              UNITED STATES DISTRICT COURT
               FOR THE DISTRICT OF DELAWARE
- - - - - - - - - - - - - - - -x
THE NIELSEN COMPANY (US), LLC,  :
          Plaintiff,            :
     v.                         :  Civil Action No.
TVISION INSIGHTS, INC.,         :  21-1592-CJB
          Defendant.            :
- - - - - - - - - - - - - - - -x
THE NIELSEN COMPANY (US), LLC,  :
          Plaintiff,            :
     v.                         :  Civil Action No.
TVISION INSIGHTS, INC.,         :  22-57-CJB
          Defendant.            :
- - - - - - - - - - - - - - - -x
     HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
             UNDER THE PROTECTIVE ORDER

    30(b)(6) EXAMINATION OF TVISION INSIGHTS, INC.
      30(b)(1) EXAMINATION OF TRISTAN WEBSTER

          WEDNESDAY, SEPTEMBER 13, 2023
                   9:04 a.m.
CERTIFIED STENOGRAPHER:
JESSIE WAACK, RDR, CRR, CCRR, NYRCR, NYACR,
CCR-NJ (No. 30XI008238700) CSR-TX (No. 11958)
CCR-WA (No. 21007264), CSR-CA (No. 14420),
REALTIME SYSTEMS ADMINISTRATOR
_____

              DIGITAL EVIDENCE GROUP
            1730 M Street, NW, Suite 812
               Washington, D.C. 20036
                  (202) 232-0646
```

---

**Page 3**

```
 1           A P P E A R A N C E S

 2

 3  ON BEHALF OF THE PLAINTIFF:

 4      KELLEY DRYE & WARREN LLP

 5      BY:  DOUGLAS LEWIS, ESQ.

 6      333 West Wacker, Suite 2600

 7      Chicago, Illinois  60606

 8      PHONE:  312-857-7073

 9      EMAIL:  Dlewis@kelleydrye.com

10

11  ON BEHALF OF THE DEFENDANT:

12      SHAW KELLER LLP

13      BY:  ANDREW E. RUSSELL, ESQ.

14      1105 North Market Street, 12th Floor

15      Wilmington, Delaware  19801

16      PHONE:  302-298-0704

17      EMAIL:  Arussell@shawkeller.com

18

19        A L S O   P R E S E N T

20  ALEISHA CATTS, videographer

21

22
```

---

**Page 2**

```
 1          30(b)(6) EXAMINATION of TVISION
 2  INSIGHTS, INC. and 30(b)(1) EXAMINATION of
 3  TRISTAN WEBSTER, taken before
 4  JESSICA R. WAACK, appearing remotely,
 5  Registered Professional Reporter, Registered
 6  Merit Reporter, Certified Realtime Reporter,
 7  Registered Diplomate Reporter, California
 8  Certified Realtime Reporter, New Jersey
 9  Certified Court Reporter (License No.
10  30XI008238700); Texas Certified Shorthand
11  Reporter (License No. 11958); Washington
12  State Certified Court Reporter (License No.
13  21007264); California Certified Shorthand
14  Reporter (License No. 14420); New York
15  Association Certified Reporter, New York
16  Realtime Court Reporter and Notary Public of
17  Washington, D.C. and the States of New York,
18  Pennsylvania, Delaware, Maryland and
19  Virginia, at Potter Anderson & Corroon LLP,
20  1313 North Market Street, Wilmington,
21  Delaware, on Wednesday, September 13, 2023,
    commencing at 9:04 a.m. and concluding at
22  3:39 p.m.
```

---

**Page 4**

```
 1      INDEX TO EXAMINATION
 2      EXAMINATION          PAGE
 3  BY MR. LEWIS               9
 4  BY MR. RUSSELL           277
 5
 6      INDEX TO EXHIBITS
 7  MARKED      DESCRIPTION      PAGE
 8  Exhibit 1  Notice of deposition    10
 9  Exhibit 2  30(b)(6) notice to TVision   11
10  Exhibit 3  TV Insights internal
11      documentation;
12      TVSN_NOSN_00008280          60
13  Exhibit 4  "Next-Generation TV
14      Measurement";
15      TVSN_NLSN_00651606          68
16  Exhibit 5  Email chain ending on June 3,
17      2021; TVSN_NOSN_00950687     74
18  Exhibit 6  "TVision Total View
19      Competitive Battlecards;
20      TVSN_NOSN_00694041          90
21  Exhibit 7  Email dated April 23, 2018;
22      TVSN_NOSN_00638049          107
```

---

                              1 (Pages 1 to 4)

                                                                    **Ex. 17**

Page 9

1    Will counsel please introduce
2  themselves for the record.
3    MR. LEWIS:  My name is Douglas
4  Lewis from Kelley Drye & Warren in
5  Chicago, and I represent the plaintiff
6  Nielsen Company U.S. LLC.
7    MR. RUSSELL:  I'm Andrew Russell
8  from Shaw Keller.  I representatives
9  Insights Inc.
10    THE VIDEOGRAPHER:  Could the
11  court reporter please swear in the
12  witness.
13       *****
14    TRISTAN WEBSTER, sworn
15  on oath and/or affirmed, called as a
16  witness herein, was examined and testified
17    as follows:
18       *****
19    EXAMINATION
20  BY MR. LEWIS:
21    Q.  All right.  My turn.
22    Good morning, Mr. Webster.

Page 10

1    A.  Good morning.
2    Q.  Could you just state your name
3  for the record.
4    A.  Tristan Webster.
5    Q.  And could you also put on the
6  record your business address.
7    A.  So I work from home.
8    Q.  Oh, either your home address or
9  do you have, I guess, a company's address?
10    A.  I'll just do home address is
11  easier, if that's okay.  So it's 216 Walnut
12  Avenue in Wayne, Pennsylvania, 19087.
13    Q.  Okay.  I am going to hand you
14  what's been marked as Webster Exhibit 1.
15    (Whereupon, Exhibit 1 is marked
16    for identification.)
17  BY MR. LEWIS:
18    Q.  And that's the deposition notice
19  under which, subject to changes in date,
20  you are appearing today, correct?
21    A.  Yes.
22    Q.  All right.  And now I'm going to

Page 11

1  hand you what's been marked as Webster
2  Exhibit 2.
3    (Whereupon, Exhibit 2 is marked
4    for identification.)
5  BY MR. LEWIS:
6    Q.  For the record, that's the
7  30(b)(6) notice to TVision.  Now, it is my
8  understanding that you have been designated
9  as the corporate witness for certain topics
10  in that deposition notice.
11    Is that something you understand
12  as well?
13    A.  Yes.
14    Q.  Okay.  I just want to make sure
15  that I understand that you're here for the
16  same topics that you understand and your
17  lawyer understands.
18    A.  Yep.
19    Q.  So if you could go to page 6 of
20  Webster Exhibit 2.  It is my understanding
21  that you are designated on Topic 7; is that
22  right?

Page 12

1    A.  Yes.
2    Q.  You are designated on Topic 9; is
3  that right?
4    A.  Yes.
5    Q.  You are designated on Topic 10;
6  is that right?
7    A.  Yes.
8    Q.  Is it right you're designated on
9  Topic 11?
10    A.  Yes.
11    Q.  You're designated on Topic 12?
12    A.  Yes.
13    Q.  And then if we could go to page 9
14  of Webster Exhibit 2.
15    It is my understanding that you
16  are designated on Topic 38; is that right?
17    A.  Yes.
18    Q.  If you could turn to page 11 of
19  Webster Exhibit 2.
20    Is it correct that you are
21  designated on Topics 48 and 49?
22    A.  Yes.

9/13/2023          The Nielsen Company (US), LLC v. TVision Insights, Inc.          Tristan Webster
Highly Confidential - Attorneys' Eyes Only - Under the Protective Order

Page 41

1   that TVision currently sells?
2       MR. RUSSELL:  Object to form.
3       THE WITNESS:  Not necessarily.
4   BY MR. LEWIS:
5       Q.  Have you done that analysis?
6       A.  No.
7       Q.  Have you done any analysis about
8   whether a general product that is less
9   aware of channel or content would be less
10  valuable than TVision's current probability
11  table data?
12      MR. RUSSELL:  Object to form.
13      THE WITNESS:  No.  No.
14  BY MR. LEWIS:
15      Q.  Sorry.  You talked at the same
16  time.  I wanted to make sure the court
17  reporter was able to get that.
18      A.  Sure.
19      Q.  You mentioned other ACR providers
20  as another way of avoiding ACRCloud.
21          Are you aware of other ACR
22  providers in the marketplace?

Page 42

1       A.  Yes.
2       Q.  And who would those be?
3       A.  So it's fairly commoditized, so
4   there are quite a few.  I can name a couple
5   off the top of my head.  So the MRL, also
6   known as Media Research Labs.  And
7   Dat-Track and Gracenote would be the three
8   that sort of top of mind.
9       Q.  You said Dat-Track, is that
10  D-a --
11      A.  That is D-a-t, and then track.
12      Q.  T-r-a-c-k?
13      A.  T-r-a-c-k.
14      Q.  Thank you.
15          And has TVision ever used
16  Dat-Track for ACR?
17      A.  We've tested the technology.
18      Q.  And why didn't TVision adopt that
19  technology?
20      A.  Because we were happy with our
21  current vendor.
22      Q.  Did Dat-Track test it accurately

Page 43

1   -- strike that.
2          When you tested Dat-Track, did it
3   identify content and ads as accurately as
4   ACRCloud?
5       A.  I don't recall the specifics, but
6   comparable.
7       Q.  Do you -- does TVision use
8   Dat-Track right now for ACR?
9       A.  No.
10      Q.  When did TVision test Dat-Track
11  for its -- in its ACR product?
12      MR. RUSSELL:  Object to form.
13      THE WITNESS:  Do you mind taking
14  that one -- sorry.
15  BY MR. LEWIS:
16      Q.  Sure.  When did TVision test
17  Dat-Track's ACR product?
18      A.  I believe it was last year, 2022.
19  May have bled into early 2023, but not
20  recently.
21      Q.  Where were the tests done on
22  Dat-Track?  In the field?

Page 44

1       MR. RUSSELL:  Object to form.
2       THE WITNESS:  No.
3   BY MR. LEWIS:
4       Q.  Were the test of Dat-Track done
5   only in TVision's labs?
6       A.  I believe so.
7       Q.  Has TVision ever used MRL for
8   ACR?
9       A.  No.
10      Q.  Has TVision ever tested MRL for
11  ACR?
12      A.  I don't think we got to testing.
13      Q.  And why did TVision not get any
14  farther than I guess just talking to MRL?
15      MR. RUSSELL:  Object to form.
16  BY MR. LEWIS:
17      Q.  Strike that.
18          How far did TVision get with MRL
19  with regard to ACR?
20      A.  I believe they sent us a
21  proposal, and I don't think we got any
22  further than that.

11  (Pages 41 to 44)

Page 125

1    A.  No.
2    Q.  Okay.  So the very first
3  paragraph after the title reads, "On
4  4/1/2019, we renewed our contract with
5  ACRCloud for another 12 months because we
6  have not been able to locate a viable
7  alternative that was priced appropriately."
8        Do you see that sentence?
9    A.  I do.
10    Q.  Do you have any knowledge
11  regarding the ACRCloud contract renewal on
12  or about 4/1/2019?
13    A.  I can't recall if I was
14  responsible for renewal then or if it was
15  the next one.  I think I started in 2020,
16  so I would not have been directly involved
17  in this renewal.
18    Q.  Okay.  Do you have any knowledge
19  about whether or not TVision was able to
20  locate a viable alternative on or about
21  4/1/2019?
22    A.  This -- only what's written in

Page 126

1  front of me.  You know, I'd be making
2  presumptions, but this implies not one that
3  was priced appropriately.
4    Q.  Okay.  Do you have any
5  independent knowledge of any attempts, you
6  know, on or about 4/1/2019 to find a viable
7  alternative to ACRCloud?
8    A.  Only, you know, in subsequent
9  years in doing my diligence at renewal
10  times.  I was introduced to MRL --
11    Q.  Uh-huh.
12    A.  -- as someone that we had spoken
13  to before.  I don't know the timing or the
14  specific context on when that discussion
15  happened.  But I know we'd at least had
16  conversations.
17    Q.  Okay.  But you think that was
18  later, those conversation were later?
19    A.  I don't know.  I mean, they could
20  have been in this context.  This implies
21  that there was some search that was
22  undertaken; so...

Page 127

1    Q.  But the result of that search was
2  to sign a contract renewal with ACRCloud,
3  correct?
4    A.  Yes.  We have not changed away
5  from ACRCloud.
6    Q.  You mentioned something about
7  diligence with regard to the renewal of
8  your ACRCloud contract.
9        Do you recall that?
10    A.  Yes.
11    Q.  What was the diligence you
12  performed with regard to ACRCloud contract
13  renewal?
14        MR. RUSSELL:  Object to form.
15        THE WITNESS:  Anytime you are
16  renewing a contract and you need to
17  understand how that vendor is
18  performing, what alternatives exist,
19  look for leverage around pricing.  Just
20  doing -- being a responsible steward of
21  the company's finances and services.
22  BY MR. LEWIS:

Page 128

1    Q.  Was the ACRCloud contract renewed
2  yearly?
3    A.  Yes.
4    Q.  And did you perform some
5  diligence every year before the contract
6  renewal with ACRCloud?
7    A.  Some level, yeah.
8    Q.  And you never replaced ACRCloud,
9  though, correct?
10    A.  Correct.
11    Q.  What form did that diligence
12  take?
13    A.  So reviewing their performance
14  over the prior 12 months.  Scanning the
15  landscape for alternative providers.
16  Sometimes we would get some pricing
17  information, but not every time.  Yeah,
18  those would be the primary activities.
19    Q.  With regard to the pricing
20  information, you mean pricing information
21  from other companies?
22    A.  Sometimes, yes.

32  (Pages 125 to 128)

9/13/2023          The Nielsen Company (US), LLC v. TVision Insights, Inc.          Tristan Webster
Highly Confidential - Attorneys' Eyes Only - Under the Protective Order

Page 129

1    Q.   And what other companies did you
2  receive pricing information from?
3    A.   We -- over the years, we've had
4  quotes from MRL and Dat-Track.  They're
5  probably the key vendors where we would
6  have gotten to that level of discussion.
7    Q.   You don't recall any other
8  vendors where you got price information?
9    A.   I don't remember if we got there
10  with iSPot.  At one point we did speak to
11  iSPot, but I don't think we got pricing.
12    Q.   When did you speak to iSPot about
13  ACR?
14    A.   It would have been in the last
15  two years.  But, you know, so I would say
16  2021, 2022, somewhere around there.  That's
17  a bit of a guess.
18    Q.   But you didn't replace ACRCloud
19  with iSPot, right?
20    A.   No.
21    Q.   And you didn't replace ACRCloud
22  with Dat-Track, right?

Page 130

1    A.   No.
2    Q.   And you didn't replace ACRCloud
3  with MRL, right?
4    A.   No.
5    Q.   That's not right?
6    A.   No, we did not replace ACRCloud
7  with any of those vendors.
8    Q.   Why not?
9    A.   So ACR services are fairly
10  commoditized.  They provide very similar
11  capabilities.  And some of those -- well,
12  both of those vendors are more expensive,
13  and there are switching costs to changing
14  vendors that, you know, introduce
15  operational complexity.  So if the status
16  quo is working, I see no reason to change.
17    Q.   Has TVision ever analyzed the
18  accuracy of an alternative to ACRCloud?
19    A.   We've done -- definitely done lab
20  testing and Dat-Track solution.
21    Q.   Uh-huh.
22    A.   Prior to that, I don't know who

Page 131

1  else was assessed in the, you know,
2  original decision to move to ACRCloud.  I
3  presume it was probably other testing, but
4  I don't know.
5    Q.   What kind of lab testing was done
6  with Dat-Track?
7    A.   I think we were primarily looking
8  at ad detection, so direct detection of
9  ads.  And looking at the rate at which ads
10  were correctly identified.
11    Q.   Did you see reports or something
12  that'll happen related to that?
13    A.   I would have seen some results.
14  I don't recall the specific findings.  Only
15  that they were not materially different.
16    Q.   Different than what?
17    A.   Our current performance.
18    Q.   With ACRCloud?
19    A.   Correct.
20    Q.   And do you recall how you
21  received those results?
22    A.   They could have been conveyed in

Page 132

1  a meeting.  I don't recall.
2    Q.   Would the meeting have had a
3  PowerPoint?  Did you get an email?
4    MR. RUSSELL:  Object to form.
5    THE WITNESS:  I don't recall.
6  BY MR. LEWIS:
7    Q.   Who in the lab worked on the
8  Dat-Track testing?
9    A.   It would have been our backend
10  engineering team.
11    Q.   Is that Mr. Jeris's department?
12    A.   Yeah, he's one of -- he leads the
13  -- he's our chief architect and is heavily
14  involved with that team.
15    Q.   J-e-r-i-s?
16    A.   J-e-r-i-s, yes.
17    Q.   Mr. Webster, I've handed you
18  what's been marked as Webster Exhibit 9.
19    (Whereupon, Exhibit 9 is marked
20      for identification.)
21  BY MR. LEWIS:
22    Q.   TVSN_NOSN_00554281.

33 (Pages 129 to 132)

Ex. 17

# EXHIBIT 18

**REDACTED IN ITS ENTIRETY**

# EXHIBIT 19

**REDACTED IN ITS ENTIRETY**

| | |
|---|---|
| **From:** | Amy Ingram <amy@x.ai> |
| **To:** | Inderbir <inderbir@tvisioninsights.com> |
| **Sent:** | 1/13/2017 11:30:45 AM |
| **Subject:** | Re: VidVita Tech Overview+ Lineup |

Hi Inderbir,

Amy has confirmed Tuesday, Jan 17 at 11:00 AM EST. Does this work?

Amy

Amy Ingram ı Personal Assistant to Yan Liu
Artificial intelligence that schedules meetings. Learn more at x.ai.

2:30 PM EST


On Fri, January 13th, 2017 at 11:32 am (EST), Amy Ingram <amy@x.ai> wrote:
Hi Inderbir,

Happy to get something on Yan's calendar.

Does **Tuesday, Jan 17 at 11:00 AM EST** work? Alternatively, Yan is available Tuesday, Jan 17 at 6:00 PM EST or Wednesday, Jan 18 at 5:30 PM.

I'll include the dial-in on the invite.

Amy

Amy Ingram ı Personal Assistant to Yan Liu
x.ai - an artificially intelligent assistant that schedules meetings

11:32 AM EST


On Fri, January 13th, 2017 at 10:55 am (EST), Yan Liu <yan@tvisioninsights.com> wrote:

Hi Amy,


Sounds good. We know them since we work together with MRL on a google project.

I will ping them again.


I schedule a meeting with Mufin and ACRcloud.


HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY       TVSN_NLSN_00611700

**Ex. 20**

Can we also have a quick catch up soon?

I'd like to better understand how to put together everything.

I will invite Inderbir who is our CTO.

CC'ed Amy to help us to find a time.

Best,

Yan

Yan Liu

CEO/Co-founder

www.tvisioninsights.com | +1 929 900 5298

+86 138 1813 4291 | +81 050 5866 7243

On Fri, Jan 13, 2017 at 10:50 AM, Amy Bolivar <amy@vidvita.com> wrote:

Hi Yan,

Sounds good.  Another ACR company similar to these two would be Mobile Research Labs (MRL).  It's the Israeli based company Steve and I worked for before jumping off to form VidVita.  They are the company that did the original Google project for the London Olympics.  Our former manager still works for their USA operations and the CEO, Omri is really nice to work with.  They have been positioning their ACR technology to be licensed/more DIY and their algorithm is audio based and works well on mobile.  They are also compatible with our network and have processed our USA channels.

I can put together an intro if you want to explore this company as well.

Have a great weekend!

Amy

On Thu, 12 Jan 2017 16:16:40 -0500, Yan Liu <yan@tvisioninsights.com> wrote:

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY     TVSN_NLSN_00611701

**Ex. 20**

Thanks Amy. Let me discuss with Mufin and ACRcloud first.

If you know any other ACR companies please let us know.

Best,

Yan


Yan Liu

CEO/Co-founder

www.tvisioninsights.com I +1 929 900 5298

+86 138 1813 4291 I +81 050 5866 7243


On Thu, Jan 12, 2017 at 6:48 AM, Amy Bolivar <amy@vidvita.com> wrote:

Hi Yan,


The mufin team is great too.  We have tested their ACR with our network as well.  Are there any other companies you tested prior to choosing Gracenote?  I can think about some other recommendations for you. ACRCloud and mufin are the two top companies for licensing the technology directly, creating your own reference libraries and having that direct control over the environment.


I was going to set up a call with FYI this month as well to learn more about their pricing and if we could provide clients with schedule data directly.  They are another EPG provider and part of Ericsson.  They would be an alternative for schedule data for companies that aren't licensing Tivo and Nielsen or are looking for another option: http://www.fyitelevision.com/


Best Regards,


Amy


On Wed, 11 Jan 2017 13:40:18 -0500, Yan Liu <yan@tvisioninsights.com> wrote:


Perfect.


HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00611702

**Ex. 20**

I'm speaking with Peng in a week or so.

Do you have any other ACR platform you recommend?

I'm going to speak with Lars at mufin as well.


Best,

Yan


Yan Liu

CEO/Co-founder

www.tvisioninsights.com | +1 929 900 5298

+86 138 1813 4291 | +81 050 5866 7243


On Wed, Jan 11, 2017 at 1:39 PM, Amy Bolivar <amy@vidvita.com> wrote:

Hi Yan,


I hope you had a great new year and CES trip!  ACRCloud is a partner and we can definitely provide channel feeds for use with their ACR platform.  They are really nice.  I f you need an intro, let me know.  Peng Dong would be the primary contact there.


Best Regards,


Amy


On Wed, 11 Jan 2017 13:27:04 -0500, Yan Liu <yan@tvisioninsights.com> wrote:


Hi Amy,


Do you think you can provide video stream to ACRCloud?

https://www.acrcloud.com/docs/acrcloud-services/audio-recognition-for-mobile-apps/tv-channel-detection/


HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00611703

**Ex. 20**

Best,

Yan


Yan Liu

CEO/Co-founder

www.tvisioninsights.com I +1 929 900 5298

+86 138 1813 4291 I +81 050 5866 7243


On Wed, Dec 21, 2016 at 6:14 PM, Yan Liu <yan@tvisioninsights.com> wrote:

Thanks Amy.

We are evaluating the impact on us.


Happy holidays! If you are going to CES, we can catch up there.


Yan

Sent from Oneplus 3


On Dec 22, 2016 2:05 AM, "Amy Bolivar" <amy@vidvita.com> wrote:

Hi Yan,


I saw the news this week with the Gracenote/Nielsen acquisition and thought of Tvision.


It's been the year of larger media mergers. Reach out in the new year if you and your team start exploring different ACR platforms and we will be happy to assist.


Have a wonderful holiday week and best wishes for 201 7 :)


Thanks!

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00611 704

**Ex. 20**

Amy

On Wed, 09 Nov 2016 09:06:30 -0500, Yan Liu <yan@tvisioninsights.com> wrote:

Thanks Amy! Let me share it with tech team

Yan Liu

CEO/Co-founder

www.tvisioninsights.com I +1  929 900 5298

+86  138  1813 4291   I +81  050 5866 7243

On Wed, Nov 9, 2016 at 8:23 AM, Amy Bolivar <amy@vidvita.com> wrote:
Hi Yan,

Thanks for the call yesterday.  As we mentioned, VidVita is a TV/Radio/OTT network infrastructure company that gives companies the freedom to use their own proprietary or licensed ACR, cognitive, speech or other software to analyze media.

Companies utilize our virtual machine environments and/or dedicated hardware in each city for access to both OTA and Cable TV networks.

I have attached our lineup as of 10/1.  We are in the process of bringing Detroit, Phoenix and a second NYC site live this week.

I also attached our Tech Overview which provides a background on our company, our services and our really great pricing model.

It sounds like you are shopping for a better alternative solution and we would be happy to assist if you are testing other ACR platforms.  We have a lot of experience with all of the players out there and regardless of whether you end up on our network, please feel free to reach out with any questions for TV and OTT monitoring.

We would welcome another call with your CTO and team.  We wish you all the best with your growth!

Best Regards,

Amy

--
Amy Bolivar

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00611705

**Ex. 20**

Co-Founder
VidVita
484-945-2595
amy@vidvita.com
skype:abolivaratwork
http://vidvita.com
@vidvitadotcom

Don't Build a Network, Join One.

--

Amy Bolivar
Co-Founder
VidVita
484-945-2595
amy@vidvita.com
skype:abolivaratwork
http://vidvita.com
@vidvitadotcom

Don't Build a Network, Join One.

--

Amy Bolivar
Co-Founder
VidVita
484-945-2595
amy@vidvita.com
skype:abolivaratwork
http://vidvita.com
@vidvitadotcom

Don't Build a Network, Join One.

--

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY           TVSN_NLSN_00611 706

**Ex. 20**

Amy Bolivar
Co-Founder
VidVita
484-945-2595
amy@vidvita.com
skype:abolivaratwork
http://vidvita.com
@vidvitadotcom

Don't Build a Network, Join One.

--

Amy Bolivar
Co-Founder
VidVita
484-945-2595
amy@vidvita.com
skype:abolivaratwork
http://vidvita.com
@vidvitadotcom

Don't Build a Network, Join One.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00611707

**Ex. 20**

**From:** Yan Liu <yan@tvisioninsights.com>
**Sent:** Thu, 25 Jan 2018 14:30:25 -0500
**To:** "Sara Radkiewicz" <sara@tvisioninsights.com>
**Subject:** Re: TVision-W Quotes for April Launch

let's connect in person

Yan Liu | CEO/Co-founder | 929.900.5298

Get your copy of our Quarterly Attention Report

On Thu, Jan 25, 2018 at 2:28 PM, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

> Yes
>
> On Thu, Jan 25, 2018 at 2:25 PM, Yan Liu <yan@tvisioninsights.com> wrote:
>
>> is acr cloud their partner or not?
>>
>> Yan Liu | CEO/Co-founder | 929.900.5298
>>
>> Get your copy of our Quarterly Attention Report
>>
>> On Thu, Jan 25, 2018 at 1:10 PM, Sara Radkiewicz <sara@tvisioninsights.com> wrote:
>>
>>> How do you want me to proceed on negotiations here?
>>>
>>> ---------- Forwarded message----------
>>> From: **Amy Bolivar** <amy@vidvita.com>
>>> Date: Thu, Jan 25, 2018 at 12:23 PM
>>> Subject: Re: TVision-VV Quotes for April Launch
>>> To: Sara Radkiewicz <sara@tvisioninsights.com>
>>> Cc: Stephen Brown <steve@vidvita.com>
>>>
>>>
>>> Hi Sara,
>>>
>>>
>>> The discounted rate for ACR partners is $35 per channel per month and then an initial one-time $15 per channel for setup. You can use those figures for determining any variation of channel count and DMA. (Pay TV, Premium, PPV and all local network affiliates). We do not charge additional fees for

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00650281

**Ex. 21**

any amount of time shift and the OTT side is based on dedicated resources to generate the fingerprints versus the size of the library from our end.

Our non-partner clients pay a higher fee per channel monthly and setup and then also pay typically anywhere from $580-800 per month per DMA because of the dedicated virtual machines/bare metal co-location fees.

I will honor the discount % for setup that we provided in the last quote (for 190 channels) regardless of how many you end up starting with.

Let me know if you need any further info in the meantime.

Best Regards,

Amy

On Thu, 25 Jan 2018 11:18:29 -0500, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

Amy - Is it possible to get Vidvita's updated quote for just the encoding based on our new requirements - which is dropping to 125 national channels and 30 days of history instead of 35.

Thanks-

Sara

On Wed, Jan 24, 2018 at 4:01 PM, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

Also - we are engineering in such a way that in the future, if necessary or desired, we can swap ACR vendors without rewriting the whole system.

On Wed, Jan 24, 2018 at 3:55 PM, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

HI Amy-

Thank you for this information. We are still committed to moving to a new provider ASAP for many reasons - but are not canceling our Gracenote contract now as it is too risky for us - this

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00650282

**Ex. 21**

will give us a little more breathing room on dates - however as you can imagine, we would like to proceed as quickly as possible still.  Timing for us depends on the ACR provider - if we move forward with ACR Cloud, we would want our test environment up ASAP.  If we move forward with Source - as soon as possible - which sounds like March 1.

We are still in negotiations with ACR Cloud as well - so good to know you are still committed to working w/ them.  We would also like a new quote from VidVita for the reduced number of channels and reduced history (not sure if length of history impacts your costs).

We do not currently have an ad library, just the 125 National channels, 5 channels per DMA and OTT.  We are absolutely interested in an ad library in the future - but not in V1, so we do not need pricing on that right now.

Hope this helps!

Sara

On Wed, Jan 24, 2018 at 2:39 PM, Amy Bolivar <amy@vidvita.com> wrote:

Hi Sara,

Thanks for this update.  I am cc'ing Steve to send his answers to your original Q/A request list in regards to the Source ACR because I think that will help address the 6 second/10 second question.

We are currently estimating the cost to process the original specs and Hank and I are actively working on that.  I'll set up an internal call prior to Friday to prioritize that so we can finalize the cost analysis.  One question we did have when going over processing models is the size of your ad library.  That would be good to know; the size it is today plus the percentage of growth per year.  Do you utilize campaign end dates in order to remove older ads or promote ads that only run 1x a year but are recycled?  An example would be the Britney Spears perfume ad that runs every Christmas season.

Right now based on our dev schedule, we would be able to provide TVision with a test environment by March 1.  I know the timing of this integration is tight with TVision's plans.

The reason for the pricing delay is the back-end is in the process of being built and where that can be a negative when you are considering a new ACR solution, I wanted to provide you with this possibility because Steve and I are dedicating our time and effort into being able to directly support and customize an ACR platform for clients.  We think this is the best avenue for VidVita's growth and for us to continue to provide robust solutions for our clients in regards to

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00650283

**Ex. 21**

the age old question "what's playing?" whether it's a song, ad, tv program or jingle.

I want to be transparent with you on our time frame as we build things because at the end of the day we want your transition away from Gracenote to be successful and since first speaking to Yan, the goal has always been for TVision to continue having access to TV reference data for your measurement and also hopefully have more control over the environment. We are 100% committed to working with TVision regardless of the ACR provider and even with doing our own ACR using Source's original algorithm, our company will continue to maintain a neutral position by supporting companies such as ACRCloud, Mufin, MRL etc. I don't want our work with this ACR to make TVision feel that we are changing our relationship with other providers. It is simply a way for us to be able to have 360 views into the process as well as use our experience in the ACR community to create a platform from scratch that would be customizable and address issues we have heard from clients the past 5 years since launching our company.

Best Regards,

Amy

On Wed, 24 Jan 2018 13:33:36 -0500, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

HI Amy-

Here are some updated specs for both you and Source Digital:

- Reduce fingerprint to 6 seconds, but keep interval at 10 seconds
- Reduce number of national channels to 125 (keep 5 channels per DMA) - can we understand the difference in price between 100 and 125 national channels?
- Reduce historical database to 30 days of history

Do you know when we will be able to understand timeframes and get a quote from Source Digital? We are hoping to make a decision this week - understanding that Source Digital can't start the work this week - but we need to make a decision.

Were you waiting on anything further from me?

Best-

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00650284

**Ex. 21**

Sara

On Fri, Jan 19, 2018 at 1:29 PM, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

Your uber conference is fine, thanks!

On Fri, Jan 19, 2018 at 1:28 PM, Amy Bolivar <amy@vidvita.com> wrote:

Hi Sara,

Thanks for the Monday slot.  We can use our uber conference or if you prefer us to call in if it's easier for Inderbir, we can do that too.

Thanks!

Amy

On Fri,  19 Jan 2018  ll :09:27 -0500, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

HIAmy "

We can do  1:00-1:30 on Monday.  Will you send how you would like to connect?

Thanks-
Sara

On Thu, Jan  18, 2018 at 6:32 PM, Amy Bolivar <amy@vidvita.com> wrote:

Hi Sara,

Can we move the call a day ahead to Monday?  Steve reminded me he is out of the

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00650285

**Ex. 21**

office Tuesday.  I checked with Hank and he can do the following times on Monday:

10-1 1am or a time between 1-3:30

Thanks!

Amy

On Jan 18, 2018, at 5:35 PM, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

Great  -can we do 12PM on Tuesday?  I'll have Inderbir w/ me again.

Thanks!
Sara

On Thu, Jan 18, 2018 at 5:22 PM, Amy Bolivar <amy@vidvita.com> wrote:

Hi Sara,

Do you have availability on Tuesday?  We have any time between 8am - 10am or  12pm-2pm right now.

We will review the points below to prepare.

Thanks!

Amy

On Thu, 18 Jan 2018  15:57:01  -0500, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00650286

**Ex. 21**

HI Amy-

For our call with Source Digital - here are some things that we are interested in:

- Regardless of the fingerprint length, we need the match position accurate down to one second - can they do this?  For example, if we have 10 devices taking fingerprints at 10 successive seconds, will those return a stream position starting at seconds of 0-9 respectively?
- If number of fingerprint requests is a driving factor of cost, can we do something like created a shorter fingerprint, but only send the request every so many seconds?  For example, can we create 6 second fingerprints and send them every 10 seconds.  Shorter fingerprints will allow us better accuracy when the viewer intervenes - (ie. changes the channel or pauses, etc)
- Finally, our technology team wanted a little more information on how the matching works (which would help answer the above questions as well).  How long is the interval that is matched concretely - do they look for coherence of a subinterval of what we send to a subinterval of what is stored?  Or does it have to be a complete match for the entire length of the fingerprint?  Do they store overlapping fingerprints so you have all fingerprint length options stored?  Or do they have one long continuous stream and compare our fingerprint against that?

We are looking to make a decision on vendors soon - can we get a call lined up for early next week?

Best-

Sara

On Wed, Jan 17, 2018 at 3:10 PM, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

Hi Amy-

I think a call with Source would be great.  Our current quote from ACR Cloud requires a 1 year commitment.  We have some flexibility on the April 1 date, but we are really suffering in quality from our current vendor, so in a hurry to move to a more accurate solution.

I am interested in duration of fingerprints, if there is any lag between fingerprints, and SLA.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00650287

**Ex. 21**

We are definitely interested in a schedule correction option in the future- we are also investigating what we can do on our side for this in the future.  The issue is really with how we do commercial determination - we get a commercial log that indicates when the commercials aired - when they started and stopped, and if the clock time of when VidVita has a program start is off by even 10 seconds from the clock time from when our ad vendor says an ad aired, then we really screw up attention to commercials.  Just wanted to give you the context of why it's so important to us.

Thanks-

Sara

On Wed, Jan 17, 2018 at 8:28 AM, Amy Bolivar <amy@vidvita.com> wrote:

> Hi Sara,
>
> Thanks for these questions.  We had another dev call Monday to go over the design and architecture for the back-end of Source Digital for our VidVita integration.
>
> We are designing the environment to be able to support very large datasets similar to the project we did for Google with the Olympics. We will be able to detect silence and can also factor in for device movement for mobile measurement to help aide passive listening.
>
> For your questions below, our network is slightly ahead of when the viewer sees the TV stream in their home depending on the source we are providing.  Generally, when we create the logic around a match, a window of time is determined so if you are at the top of the hour for live matching, you would match against a fifteen minute window of reference channels for real-time matching.  This would account for any offset in the stream due to satellite vs. over-the-air for cord cutters or cable vs. satellite etc.
>
> For exact program start time determination, this is a problem for most if not all measurement companies because any breaking news, local cut-ins or sporting event that goes over in length can skew the results.  We have had discussions about developing schedule correction software that would allow us to analyze the video and

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00650288

**Ex. 21**

audio to determine an anomaly in the stream in comparison to the schedule data (EPG) but it is not on our current software schedule as the Source environment has taken precedence. I think this is something we could assist with in the future as we develop more tools to help the Source platform determine the best match.

For quotes and timing, is your April 1 launch a hard date in order to convert from Gracenote? What is the term you are negotiating with ACRCloud?

We are actively developing the Source environment, but it is going to be a tight time frame to have it 100% QA'ed and available for your April 1 launch. Hank the CEO of Source is very interested in us expanding his technology and once this is built, we will have complete control over the entire environment which will be excellent for enhancing the tools for measurement and also customizing things for TVision. We hope to have our environment up for testing end of February for you to run in tandem with ACRCloud. Because of the tight time frame, if you are not locked into a 12 month term with ACRCloud, it would allow you freedom to test Source, have us customize the environment based on anomalies and things you experience with your current provider and transition you after April 1 if necessary.

Hank did mention he would match or beat ACRCloud's quote. I think it's more of a question of TVision's interest in pursuing this option. We will continue to be completely transparent in our timing for presentation of the environment. We are excited because from working with our clients and directly being involved in large cross-panel measurement projects, we understand the pain points of the technology and how to build up specific software tools to provide streamlined results.

We can also have a call with Source to answer any questions or go over any time tables.

Best Regards,

Amy

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00650289

**Ex. 21**

On Tue, 16 Jan 2018 21:33:36 -0500, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

A few more questions:

- Is there a way to track program change time?  Maybe there is something you can hear or notice in the stream?  So sometimes a program starts right on the hour and sometimes one minute off.  It's important for us to know exactly when the program actually starts.
- How do we guarantee that the content fingerprints are there before we make our requests?  We are concerned that some of our requests will get to the server before the live fingerprints.
- What is your SLA?

Thanks!

Sara

On Tue, Jan 16, 2018 at 3:44 PM, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

Hi Amy-

Do you know when can expect a quote from Source Digital?

Best-

Sara

On Tue, Jan 9, 2018 at 2:19 PM, Sara Radkiewicz <sara@tvisioninsights.com> wrote:

Hi Amy-

Can you ask Source Digital to provide us a quote?

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY        TVSN_NLSN_00650290

**Ex. 21**

We currently have a quote from ACR Cloud storing the content you are encoding (8000 hours of OTT is included), 35 day archive of linear television.

We are ramping our panel - at the time of roll out (April 1), we will have 1500 Devices, in Q3 that will grow to 3000 and at end of Q4 will be 5000.

We require a Windows and armhf/Linux SDK - (our old machines are Windows and our new ones are Linux).

During peak times (primetime US) we typically see about 38% of our panel watching television (this is important if Source Digital is able to detect silence and not send requests for silence).  Our peak day time was the Superbowl - where we had roughly 51 % of our panel concurrently watching.

Let me know if you need anything else to get us a quote.  We are excited to get started on this project.

Thanks-

Sara

On Thu, Jan 4, 2018 at 12:17 PM, Amy Bolivar <amy@vidvita.com> wrote:

Hi Sara,

Here is info on your requested channel plan.

For the immediate "50 Live channels w/ 7 days of playback 300 hours of OTT content", I included a quote for your review.  Any setup fees you pay for the pilot will be deducted from the production feeds when converted and that is also marked in the main quote.

I attached another quote to show the Q1/Q2 that would

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00650291

**Ex. 21**

include 150 linear channels, 8 DMAs (5 channels per DMA) and 3 OTT providers @450 content hours per provider.

The pricing model is pretty simple for integrated ACR technologies and we charge a flat rate of $35 per channel regardless of DMA rank, premium or PPV status of a channel.

For the additional growth for Q3 and Q4:

Q3 - growth to 11 DMAs would be an additional $525 per month

Q4 - growth to 18 DMAs would be an additional $1225 per month

I'm also including our vitaLib documentation for your review. I have 3 dedicated encoders listed, but if you want to add the 4th, we can just adjust the work order at the time you are ready to move forward with production.

For our call yesterday with Source Digital, the new ACR tech we are working with, their CEO mentioned that he is very open to pricing. Peng had shared some pricing with me initially, but if you are comfortable sharing the ACRCloud quote or you have a price you would like to meet for the ACR portion that lines up with your current provider, we can use that as a guideline for positioning the service for you. The same is true for the ad creative library. My client just wanted to know a budget to meet or beat in order to determine a price that would work. I think there's a lot of opportunity for TVision to set their budget price and let these companies meet it. :)

We can work with you to test the Source ACR as soon as it is ready if that is of interest to compare against the ACRCloud results and logic.

Best Regards,

Amy


--
Amy Bolivar
Co-Founder/CEO
VidVita
484-945-2595
amy@vidvita.com
skype:abolivaratwork
http://vidvita.com
@vidvitadotcom

Don't Build a Network, Join One.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY    TVSN_NLSN_00650292

**Ex. 21**



**Ex. 22**

**1**

CONFIDENTIAL

# Summary of Project

| Period | 2016.12.12 – 2017.2.5 (8 weeks) |

Period

2016.12.12 – 2017.2.5
(8 weeks)

Panel installed

234 panels for 190 households, Kanto area
(Including in/out in the midst)

Target CMs

41 CMs, added by 4 rounds

MRL detected          TVI detected(Viewable)

4,733                    4,330

©2015-2017 TVision Insights. All Rights Reserved.

T>VISION
INSIGHTS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00645278

**Ex. 22**

## Factsheet

CONFIDENTIAL

**Who the panels are...**



**The unique users and detection by detection frequency**



©2015-2017 TVision Insights. All Rights Reserved.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00645279

**Ex. 22**

# Summary of data validation

CONFIDENTIAL

3



- False negative = 75%, False positive = 77%

©2015-2017 TVision Insights. All Rights Reserved.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00645280

TVISION INSIGHTS

**Ex. 22**

## Deep dive for False Negative

**CONFIDENTIAL**

4



TVI Data

Viewable

| | | Detected | 1,086 | 25% | 55% |

- The biggest issue is mute/mic taken time of MRL, which counts 55% of all TVI viewable data, explains the most of un-matched situation

- If we set the unmuted time as 100%, the percentage of false negative is 45%

MRL Data — Non-detected: Unmuted 881 20% 45%

Muted/Mic Taken 2,363 55%

4,330

©2015-2017 TVision Insights. All Rights Reserved.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

T)VISION
INSIGHTS

TVSN_NLSN_00645281

**Ex. 22**

**5**

CONFIDENTIAL

# Summary of muted/mic taken time

### Average time share of each Spotter status



- Muted/Mic taken time insists 40% of total time (9.6h/day)

- Assuming awaken time as 17h/day (7h for sleep) and all muted/mic taken happening at that time, the muted/mic taken time is 56%, close to the percentage of Muted/mic taken caused false negative

- The trend are stable during the project

©2015-2017 TVision Insights. All Rights Reserved.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00645282

T>VISION
INSIGHTS

**Ex. 22**

## Segment trend for False Negative

6

CONFIDENTIAL



- Matching ratio are similar, but the mix between unmatching-unmuted and muted/mic taken time are kind of different

- Limited to unmuted situation, matching ratio of male is better than female (but probably the reason of outlier described later)

©2015-2017 TVision Insights. All Rights Reserved.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY



TVSN_NLSN_00645283

**Ex. 22**

# Segment trend for False Negative

CONFIDENTIAL



- Muted/mic taken share are similar

- Matching ratio for above 34 are a lit bit higher than that of under 34

©2015-2017 TVision Insights. All Rights Reserved.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00645284

**Ex. 22**

# Segment trend for False Negative

CONFIDENTIAL



- the overall trend does not change a lot by removing outlier, though 8 outliers shows significant matching ratio

©2015-2017 TVision Insights. All Rights Reserved.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00645285



**Ex. 22**

## CM trend for False Negative (Unmuted)



CONFIDENTIAL



True positive ratio by each CM (100=unmuted detection, 0 are removed)

| CM | Ratio |
|---|---|
| UQ Communications-UQ mobile-SNS Daddy | 87 |
| Coca Cola-Irohasu NASHI | 82 |
| NTT Docomo-dpoint | 79 |
| Lion-Bufferin | 78 |
| UQ Communications-UQ mobile | 76 |
| KDDI-au STAR | 73 |
| Johnson and Johnson-Handaid | 65 |
| House-Vermont Curry | 64 |
| KDDI-au Student | 60 |
| Nissan-Leaf | 58 |
| Suntory-lemon | 57 |
| HAAGENDAZS-HAAGENDAZS | 55 |
| Recruit-Carcensor | 54 |
| McDonald-Mac Coffee | 53 |
| Coca Cola-Fanta | 53 |
| Suntory-Ginmugi | 53 |
| Suzuki-Solio Hybrid | 52 |
| Daihatsu-Tanto | 51 |
| Asahi-Manzoku Bar | 50 |
| LIXIL-Lixil | 49 |
| Amazon-Amazon Prime | 49 |
| Recruit-Townwork | 48 |
| MyNavi-MyNavi | 44 |
| Y!mobile-Y!mobile-PPAP | 42 |
| Recruit-Suumo | 29 |
| Suzuki-Swift | 25 |
| Cygames-GrandBlue Fantagy | 22 |

55

- Industry:
  - Except Y! Mobile's PPAP, most of mobiles' CMs among the top ratio group

  - FMCG and auto do not show a strong trend

- Only three almost-BGM ads and two of them are the bottom two (another is amazon)

T∨ISION
INSIGHTS

©2015-2017 TVision Insights. All Rights Reserved.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00645286

**Ex. 22**

## Deep dive for False Positive – definition

CONFIDENTIAL

10



MRL detected, and TVI data shows…

| Match | Un-match |
|---|---|

| | Spotter matches the living TV contents at that home, but the person is not viewable | YouTube turns on | the CM in on-air in the TV, but living TV turns-off and Spotter captured audio without YouTube | Other un-match cases at home, possible to be other devices | by location match, captured location and home location are beyond 100m- |

Viewable | Audience Leaving | YouTube | Second TVs | Un-match at home | Out of home

©2015-2017 TVision Insights. All Rights Reserved.

T⟩VISION
INSIGHTS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00645287

**Ex. 22**

# Deep dive for False Positive

11
CONFIDENTIAL

|  | | TVI Data | | | | | |
|---|---|---|---|---|---|---|---|
| | | Viewable | Audience Leaving | YouTube | Second TVs | Un-match at home | Out of home |
| MRL Data | Detected | 1,086 (23%) | 688 (15%) | 398 (8%) | 699 (15%) | 1,028 (22%) | 844 (18%) | 4,733 |

- Other than viewable, each situation has 10-20% volume of total detection

©2015-2017 TVision Insights. All Rights Reserved.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

T VISION
INSIGHTS

TVSN_NLSN_00645288

**Ex. 22**

## Segment trend for False Positive

12

CONFIDENTIAL



- Young people are less matched, with more data at YouTube and out of home

©2015-2017 TVision Insights. All Rights Reserved.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00645289



**Ex. 22**



## Segment trend for False Positive



- In between male and female panels, the biggest difference is audience leaving and YouTube ratio

©2015-2017 TVision Insights. All Rights Reserved.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00645290

**Ex. 22**

## CMs trend for False Positive

**14**

**CONFIDENTIAL**

 >= 25%

| | Viewable | Audience leaving | Youtube | Second TVs | Un-match at home | Out of home | |
|---|---|---|---|---|---|---|---|
| All | 23% | 15% | 8% | 15% | 22% | 18% | 100% |
| Lion-Bufferin | 50% | 15% | 8% | 7% | 5% | 15% | 100% |
| LIXIL-Lixil | 48% | 28% | 1% | 11% | 5% | 8% | 100% |
| McDonald-Mac Coffee | 46% | 21% | 2% | 16% | 10% | 5% | 100% |
| Suntory-Ginmugi | 41% | 19% | 7% | 20% | 6% | 5% | 100% |
| Nissan-Leaf | 36% | 14% | 3% | 16% | 21% | 9% | 100% |
| Recruit-Carcensor | 36% | 15% | 4% | 24% | 8% | 12% | 100% |
| Amazon-Amazon Prime | 35% | 29% | 4% | 15% | 7% | 9% | 100% |
| House-Vermont Curry | 35% | 23% | 6% | 13% | 15% | 8% | 100% |
| Suntory-lemon | 33% | 22% | 7% | 21% | 17% | 4% | 100% |
| HAAGENDAZS-HAAGENDAZS | 33% | 22% | 6% | 18% | 9% | 12% | 100% |
| MyNavi-MyNavi | 32% | 28% | 10% | 23% | 6% | 1% | 100% |
| NTT Docomo-dpoint | 31% | 19% | 6% | 9% | 10% | 24% | 100% |
| Recruit-Townwork | 31% | 23% | 9% | 23% | 5% | 9% | 100% |
| Daihatsu-Tanto | 28% | 13% | 7% | 13% | 22% | 16% | 100% |
| Johnson and Johnson-Handaid | 23% | 17% | 8% | 10% | 23% | 19% | 100% |
| Coca Cola - Fanta | 23% | 15% | 8% | 15% | 22% | 18% | 100% |
| Coca Cola-Irohasu NASHI | 23% | 18% | 6% | 12% | 11% | 30% | 100% |
| Asahi-Manzoku Bar | 21% | 7% | 0% | 7% | 43% | 21% | 100% |
| Suzuki-Solio Hybrid | 20% | 6% | 8% | 16% | 30% | 20% | 100% |
| KDDI-au Student | 18% | 13% | 5% | 18% | 40% | 5% | 100% |
| Recruit-Suumo | 18% | 20% | 12% | 27% | 12% | 12% | 100% |
| KDDI-au STAR | 17% | 13% | 5% | 13% | 16% | 37% | 100% |
| Ymobile-Ymobile-PPAP | 12% | 11% | 5% | 14% | 31% | 29% | 100% |
| Cygames-GrandBlue Fantagy | 8% | 15% | 4% | 20% | 44% | 9% | 100% |
| UQ Communications-UQ mobile | 8% | 5% | 5% | 12% | 52% | 19% | 100% |
| UQ Communications-UQ mobile-SNS Daddy | 4% | 4% | 4% | 13% | 61% | 14% | 100% |
| Suzuki-Swift | 4% | 0% | 22% | 26% | 44% | 4% | 100% |

- The result are assumed heavily depending media mix of each campaign

- At the highest one, matching ratio are 50%

- Mobiles' CM records un-match at home a lot, and a few records high out of home ratio

©2015-2017 TVision Insights. All Rights Reserved.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00645291

T/VISION INSIGHTS

**Ex. 22**

## Summary

15

CONFIDENTIAL

- **The biggest issue for low true positive is mute/mic taken time of MRL spotter, which counts 55% of all TVI viewable data, explains a large part of un-matched situation**

- Media mix for panels captured and shows a balanced contents reach in un-muted situation

- A few outlier exists, they do not change the overall trend of detection ratio the but weights some trend between segments

©2015-2017 TVision Insights. All Rights Reserved.

T\VISION
INSIGHTS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00645292

**Ex. 22**

## DISCLAIMER

16

CONFIDENTIAL

**Proprietary Rights Notice**

The contents of this document are protected under US, Japan and international copyright law and may not be reproduced, distributed, or displayed, in whole or in part, in any form, without the express written permission of TVISION INSIGHTS Co., Ltd.

The data reported herein was generated using TVision Insights' proprietary technology, including pending US patents 62/185,970 and 62/275,699.

© 2017 TVision Insights Co., Ltd.
All Rights Reserved

**Disclaimer**

The data in this document is provided "as is." TVision Insights does not make any warranty as to its accuracy, completeness, or currency. TVision Insights is not responsible for the consequences of any decisions made in reliance on the data. The data may be updated at any time with no notice.

©2015-2017 TVision Insights. All Rights Reserved.

TVISION
INSIGHTS

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00645293

**Ex. 22**

## CM List (1/2)



**17**

**CONFIDENTIAL**

| cmid | cmidtest | Company | CM/Product | Duration | URL | Added date |
|---|---|---|---|---|---|---|
| 1268152 | 1 | Mitsui Estate | Lalaport XMAS illumination | 15 | https://www.youtube.com/watch?v=IrfGcHEyvjg | 2016/12/5 |
| 1268380 | 2 | Square Enix | Final Fantasy XV | 15 | https://www.youtube.com/watch?v=mqg3jdyOVLw | 2016/12/5 |
| 1268382 | 3 | Coca Cola | Irohasu NASHI | 15 | https://www.youtube.com/watch?v=UNR0IP6zNFg | 2016/12/5 |
| 1268756 | 4 | Daihatsu | Tanto | 15 | https://www.youtube.com/watch?v=XCKYp7YiwDo | 2016/12/5 |
| 1268831 | 5 | Suzuki | Solio Hybrid | 15 | https://www.youtube.com/watch?v=1lwk0CNzmKo | 2016/12/5 |
| 1268835 | 6 | UQ Communications | UQ mobile | 15 | https://www.youtube.com/watch?v=FUFRDZYx0LY | 2016/12/5 |
| 1268866 | 7 | NTT Docomo | dpoint | 15 | https://www.youtube.com/watch?v=bGwXD2H6QN8 | 2016/12/5 |
| 1268457 | 8 | Coca Cola | Georgia | 15 | https://www.youtube.com/watch?v=Br8fIG8jddU&list=PL63E4D99ED936F30D&index=2 | 2016/12/27 |
| 1269210 | 9 | KDDI | au STAR | 15 | https://youtu.be/_xs2FCNPgug | 2016/12/27 |
| 1272507 | 10 | Y!mobile | Y!mobile-PPAP | 15 | https://youtu.be/ktnDCcbA1vU | 2016/12/27 |
| 1268835 | 11 | UQ Communications | UQ mobile-SNS Daddy | 15 | https://youtu.be/_QFvzJDix6A | 2016/12/27 |
| 1265976 | 13 | Softbank | Softbank Card | 15 | https://youtu.be/p450yiY8q1o | 2016/12/27 |
| 1260466 | 14 | KDDI | au WALLET | 15 | https://youtu.be/rAcbzlhmkPM | 2016/12/27 |
| 1264685 | 15 | Johnson and Johnson | Handaid | 15 | https://www.youtube.com/watch?v=hw_BAqJzL-0 | 2016/12/27 |
| 1269990 | 16 | Cygames | GrandBlue Fantasy | 15 | https://youtu.be/t25n2WzvUDc | 2017/1/6 |
| 1273918 | 17 | Google | Google Play | 15 | https://youtu.be/C4K1NF931QM | 2017/1/6 |
| 1263611 | 18 | HAAGENDAZS | HAAGENDAZS | 15 | https://www.youtube.com/watch?v=dhM0rjhWvIA | 2017/1/6 |
| 1231180 | 19 | Nestle | Nescafe | 15 | https://youtu.be/DxwKiAI0eSU | 2017/1/6 |
| 1269892 | 20 | Meiji | Meiji Yogult | 15 | https://youtu.be/RkGGjqsk9U0 | 2017/1/6 |
| 1202908 | 21 | Lion | Bufferin | 15 | https://www.youtube.com/watch?v=29PRBS5KUEw | 2017/1/6 |
| 1271690 | 22 | Amazon | Amazon Prime | 15 | https://youtu.be/u-8nSc_Iyxg | 2017/1/6 |
| 1268810 | 23 | House | Ukon no Chikara | 15 | https://youtu.be/qhOlwcvNXPU | 2017/1/6 |

©2015-2017 TVision Insights. All Rights Reserved.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

T⟩VISION
INSIGHTS

TVSN_NLSN_00645294

**Ex. 22**

18

CONFIDENTIAL

# CM List (2/2)

| cmid | cmidtest | Company | CM/Product | Duration | URL | Added date |
|---|---|---|---|---|---|---|
| 1236312 | 24 | Asahi | Manzoku Bar | 15 | https://www.youtube.com/watch?v=p7vxNMXjmU4 | 2017/1/25 |
| 1278647 | 25 | Coca Cola | Fanta | 15 | https://youtu.be/w6H4COyXO8U | 2017/1/25 |
| 1276316 | 26 | House | Vermont Curry | 15 | https://youtu.be/ZSoHGnFJx9k | 2017/1/25 |
| 1277270 | 27 | Japan Roto | BIG | 15 | https://youtu.be/4uExSat0-L4 | 2017/1/25 |
| 1279294 | 28 | KDDI | au Student | 15 | https://youtu.be/buGiN3QAEU4 | 2017/1/25 |
| 1277677 | 29 | LIXIL | Lixil | 15 | https://youtu.be/8GMYLIM3mdI | 2017/1/25 |
| 1277594 | 30 | McDonald | McDonald election | 15 | https://youtu.be/KxLcC-4oGag | 2017/1/25 |
| 1280109 | 31 | McDonald | Mac Coffee | 15 | https://youtu.be/-FHR33vXdTk | 2017/1/25 |
| 1280114 | 32 | MyNavi | MyNavi | 15 | https://youtu.be/RYsAH9N8wHI | 2017/1/25 |
| 1268811 | 33 | Nissan | Leaf | 15 | https://youtu.be/keEx9CHaXY0 | 2017/1/25 |
| 1279540 | 34 | Otsuka | Oronamin C | 15 | https://youtu.be/ufWXgxS6lwk | 2017/1/25 |
| 1277698 | 35 | Rakuten | Rakuten Card | 15 | https://youtu.be/IcAPD9U1YN4 | 2017/1/25 |
| 1223404 | 36 | Recruit | Suumo | 15 | https://youtu.be/6fi6IhwAbuM | 2017/1/25 |
| 1279580 | 37 | Recruit | Carcensor | 15 | https://youtu.be/gFna3Cjw4W4 | 2017/1/25 |
| 1279640 | 38 | Recruit | Townwork | 15 | https://youtu.be/PSg2oXJ77lE | 2017/1/25 |
| 1264567 | 39 | Ryuakukusan | Ryuakusan | 15 | https://youtu.be/YBlnu2F-Ku0 | 2017/1/25 |
| 1277213 | 40 | Suntory | lemon | 15 | https://youtu.be/PEVO_qiX84A | 2017/1/25 |
| 1279766 | 41 | Suntory | Ginmugi | 15 | https://youtu.be/067hvgRalHY | 2017/1/25 |
| 1279068 | 42 | Suzuki | Swift | 15 | https://youtu.be/4zKONlg4OqQ | 2017/1/25 |

©2015-2017 TVision Insights. All Rights Reserved.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00645295

Ex. 22



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00662112

**Ex. 23**

 **company overview**

- **Founded in 2007**
  - Wholly owned, but independently operating subsidiary of the Bellevue Investments GmbH&Co.KGaA
  - Twelve employees; Headquartered in Berlin, Germany with 7 employees at the development department in Dresden

- **Best in-class digital signal processing technology based on sound analysis** which automates the process of recognizing, discovering, navigating and managing content
  - Specializes in audio fingerprint technology for ACR (automatic content recognition) and audio based music recommender systems
  - Vast selection of industry leading products; white label software solution for the B2B sector for integration in cutting edge consumer and professional products and business services
  - Wide variety of business scenarios: broadcast advertisement monitoring, TV audience metering, second screen synchronization and production music recommendation and discovery
  - Worldwide patented portfolio of audio fingerprinting and music recommendation technologies

- **Significant investment in technology and R&D** over the last couple of years
  - Continuous R&D assures mufin's technology remains cutting edge

- **Strategically positioned** in a large and **global market that is poised for rapid growth**

- **World-class, experienced management and technical team**
  - Excellent team of digital signal processing and software development experts

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00662115

**Ex. 23**



**business cases & product overview**

## Customers & Partners

These are just a few selected B2B customers and partners we work with:



*Market Size (USD Million) in 2016

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

TVSN_NLSN_00662121

**Ex. 23**

8/3/2023                The Nielsen Company, LLC v. TVision Insights, Inc.                Mark Green
Confidential - Attorneys' Eyes Only

---

## Page 1

```
        IN THE UNITED STATES DISTRICT COURT
          FOR THE DISTRICT OF DELAWARE

_____
THE NIELSEN COMPANY (US), LLC, )
                               )
          Plaintiff,           )
                               )
vs.                            )   No. 21-1592-CJB
                               )
TVISION INSIGHTS, INC.,        )
                               )
          Defendant.           )
_____)
THE NIELSEN COMPANY (US), LLC, )
                               )
          Plaintiff,           )
                               )
vs.                            )   No. 22-57-CJB
                               )
TVISION INSIGHTS, INC.,        )
                               )
          Defendant.           )
_____)
      CONFIDENTIAL - ATTORNEYS' EYES ONLY

     Video-recorded deposition of MARK GREEN, at
333 West Wacker Drive, Chicago, Illinois, before
Donna M. Kazaitis, IL-CSR, RPR, CRR, at 9:04 a.m.
on Thursday, August 3, 2023.

_____
              DIGITAL EVIDENCE GROUP
              1730 M Street, NW, Suite 812
                 Washington, D.C. 20036
                   (202) 232-0646
```

## Page 2

```
 1 APPEARANCES:
 2 ON BEHALF OF THE PLAINTIFF:
 3     KELLEY DRYE & WARREN LLP
 4     BY:  JASON P. GREENHUT, ESQ.
 5          STEVEN YOVITS, ESQ.
 6          333 West Wacker Drive
 7          Chicago, Illinois 60606
 8          312.857.7070
 9          jgreenhut@kelleydrye.com
10          syovits@kelleydrye.com
11
12 ON BEHALF OF THE DEFENDANT:
13     RIMON LAW
14     BY:  JASON XU, ESQ.
15          1990 K Street, NW
16          Suite 420
17          Washington, DC 10006
18          202.470.2141
19          jason.xu@rimonlaw.com
20
21 ALSO PRESENT:
22     Amanda Yonushatis  (Legal Videographer)
```

## Page 3

```
 1                  INDEX
 2                                          PAGE
 3 MARK GREEN
 4    Examination by Mr. Greenhut              5
 5
 6                 EXHIBITS
 7 GREEN                                      PAGE
 8 Exhibit 1  TVision Research, Technical Guide,  83
 9            TVSN NLSN 00637876 - 887
10 Exhibit 2  Next-Generation TV Measurement      98
11            slide deck
12 Exhibit 3  6/29/17 email string,             119
13            TVSN NLSN 00131480 - 485
14 Exhibit 4  5/23/18 email string,             152
15            TVSN NLSN 00269798
16 Exhibit 5  ACR Drizzle Groundtruth Analysis, 154
17            May 2018, TVSN NLSN 00269799 - 803
18 Exhibit 6  U.S. Patent 7,783,889            206
19 Exhibit 7  U.S. Patent 9,020,189            206
20
21
22
```

## Page 4

```
 1       THE VIDEOGRAPHER:  This is file number
 2 1 of the videotaped deposition of Mark Green taken
 3 by the plaintiff in the matter of The Nielsen
 4 Company LLC vs. TVision Insights, Incorporated, in
 5 the United States District Court for the District
 6 of Delaware, Case Number 21-1592-CJB.
 7       This deposition is being held at
 8 333 West Wacker Drive in Chicago, Illinois, on
 9 August 3, 2023.  Time on the screen is 9:04 a.m.
10       My name is Amanda Yonushatis.  I'm
11 the legal videographer for Digital Evidence Group.
12 The court reporter is Donna Kazaitis in
13 association with Digital Evidence Group.
14       Will counsel please introduce
15 themselves for the record.
16       MR. GREENHUT:  Jason Greenhut
17 appearing on behalf of the plaintiff The Nielsen
18 Company.  With me today is Steve Yovits, both of
19 Kelly Drye.
20       MR. XU:  Jason Xu from Rimon on behalf
21 of defendant TVision and the witness Mark Green.
22 (Witness sworn.)
```

1 (Pages 1 to 4)

Page 5

1          MARK GREEN,
2 having been first duly sworn, was examined and
3 testified as follows:
4          EXAMINATION
5 BY MR. GREENHUT:
6      Q.  Mr. Green, good morning.
7      A.  Good morning.
8      Q.  My name's Jason Greenhut.  I represent
9 the plaintiff in this matter, The Nielsen Company.
10          I'm just going to go ahead and go
11 over some preliminary questions and ground rules.
12 Do you understand that the testimony you're giving
13 today is under oath?
14      A.  Uh-huh.
15      Q.  And that you have an obligation to
16 answer all questions truthfully?
17      A.  Yep.
18      Q.  Is there any reason today that you
19 can't give complete and accurate testimony?
20      A.  Not that I'm aware of.
21      Q.  Are you under the influence of any
22 drugs, alcohol, or medications that might affect

Page 6

1 your ability to understand the questions or
2 respond truthfully at this deposition?
3      A.  No.
4      Q.  The court reporter is creating a
5 verbatim transcript of everything we say, so
6 it's important that you speak up, answer all
7 questions orally.  The court reporter can't record
8 a nod or a shake of the head.  Do you understand?
9      A.  Understood.
10          THE WITNESS:  And just as a comment,
11 if there's any question as to my response please
12 just ask for it again.
13 BY MR. GREENHUT:
14      Q.  It's also important that you let me
15 finish my questions before you answer even if you
16 think you know what the question is.  I'll do my
17 best not to interrupt your answer.  Again, this is
18 to help the court reporter since she can't record
19 two people speaking at once.  Is that fair?
20      A.  Clear.
21      Q.  If I ask a question and you don't
22 understand it for any reason, please just let me

Page 7

1 know and I'll do my best to rephrase it.  Okay?
2      A.  Sounds good.
3      Q.  If you don't ask for clarification,
4 I'll assume that you understood the question.  Is
5 that fair?
6      A.  It's fair to say that my understanding
7 and your understanding may not be the same.  So I
8 can say that I understood it from my
9 understanding, but I can't say that I understood
10 it the way you meant it.
11      Q.  If you need to take a break at any
12 time, please let me know.  The only thing that I
13 ask is that you answer whatever question was
14 pending before we take the break.  Is that okay?
15      A.  Yep.
16      Q.  Do you have any questions for me
17 before we get started?
18      A.  No.
19      Q.  So I'm going to go over a few
20 preliminary questions.  Have you ever sat for a
21 deposition before?
22      A.  No.

Page 8

1      Q.  Did you do anything to prepare for
2 this deposition?
3      A.  Prepare?  You guys, the law firm
4 representing Nielsen, asked for me to do a search
5 on my materials in terms of, quote, written
6 materials, but everything for me is digital, so
7 it's all digital.  And I did that search.  So that
8 would be, quote, in preparation.  I didn't really
9 read through everything in detail because I just
10 took anything that was closely resembling TVision
11 and sent it on.
12          So that would be the extent of my
13 preparation, other than a conversation with Jason
14 as to explaining essentially what the deposition
15 was going to be about.
16      Q.  You said that you did a search for
17 documents; right?
18      A.  Correct.  So digital, correct.  I
19 don't have physical documents.
20      Q.  I'll rephrase.  You did a search for
21 digital documents; correct?
22      A.  That's correct.

Ex. 24

8/3/2023                 The Nielsen Company, LLC v. TVision Insights, Inc.                 Mark Green
                                    Confidential - Attorneys' Eyes Only

Page 77

1  connectivity of the communicating the equipment to
2  your central computers.  In other words, you'd
3  have to set it up so that you have an ability to
4  either hop on the wifi or do a cellular call.  I
5  think we were doing cellular calls.  I can't
6  remember but I think it was cellular calls.
7  Mobile I think is what we call it these days.  So
8  that was kind of the technology.
9          I think with Nielsen I think they
10 had something similar.  I don't remember.
11 BY MR. GREENHUT:
12     Q.  When you were at TVision, did you see
13 TVision as a competitor of Nielsen?
14         MR. XU:  Objection, form.
15         THE WITNESS:  So you could answer the
16 question two ways. ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆.
19 ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
   ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆

Page 78

1  ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆
   ▆▆▆▆▆▆▆▆▆.
3          So I would say the answer is No
4  because TVision was not aimed at being a currency
5  in the marketplace.  They were aimed at being a
6  supplemental measurement system in the
7  marketplace.  So that's the way I saw it.
8  BY MR. GREENHUT:
9      Q.  Can you explain what you mean when you
10 say a "currency in the marketplace"?
11     A.  Yes.  So with most linear television,
12 there is this thing called advertising and the
13 advertising gets sold relative to the audience
14 that the exposures are associated with.
15         So when the negotiation takes place
16 around selling these advertisements, the buyers of
17 the airtime of which the advertisements are
18 broadcasted on want to have some sort of guarantee
19 of exposure, because you're buying something in
20 the future.  So the question then becomes what
21 measurement service do you use for that guaranteed
22 purpose.  And that measurement service

Page 79

1  colloquially in the United States is referred to
2  as a currency.
3      Q.  How was TVision's strategy different
4  than being used as a currency?
5      A.  So initially TVision was more focused
6  on the commercials themselves and interested in
7  talking about what part of the commercial is
8  engaging, what part of the commercial is not
9  engaging, which commercials work, which
10 commercials work less.
11         So that's not about what Nielsen is
12 about, which is this generic notion of who was in
13 the room when the commercial was on.  And that who
14 was in the room when the commercial was on is what
15 the currency negotiation is about.
16         So if you think about TVision as
17 supplemental to that, it's like I'm interested in
18 understanding what parts of my messages are
19 working, what part of the messages are not
20 working.  It's a totally different framework than
21 the business of currency.
22     Q.  Was TVision --

Page 80

1      A.  Sorry to interrupt.  I know you don't
2  like the interruptions but just to help you out a
3  little bit.  The same argument could be made on
4  program content as well; it's just they were
5  focused on the commercials.
6      Q.  Was TVision's device meant to be used
7  as part of a system for attention currency?
8      A.  So I'm not aware of attention being a
9  currency in the marketplace today, let alone back
10 then.  So I don't know how I could answer that
11 question because you're using a term of art that
12 really doesn't exist.
13     Q.  As the chief strategy officer at
14 TVision, did you have a vision for attention being
15 a currency in the marketplace?
16     A.  My vision was, and this is what I
17 advised TVision on, was that TVision's
18 measurements would be a supplemental scheme on top
19 of a foundation scheme.  So the foundation scheme
20 could be the Nielsen, quote, currency, it could be
21 comScore, it could be other measurement schemes in
22 the marketplace.

                              20  (Pages 77 to 80)

Page 89

1  survey, I can't remember the name of it, put out
2  by the U.S. Census.
3         So you get these measurement
4  frames, and then what you do is you say okay, I
5  don't have exactly this group of people in my
6  panel, okay, let me weight up this group of
7  people. But there's more than one factor. So
8  it's not just age, it's not just gender --
9  "gender" in the old speak -- it's not just
10 household income.
11        So you got to take into
12 consideration all the factors, and the way you do
13 that is through this framework called RIM
14 weighting, which has other names as well within
15 the community. So that's what this is talking
16 about.
17     Q.  Just because you said that I guess
18 this has other names, what are other names for RIM
19 weighting?
20     A.  I'm trying to remember. It has the
21 word "factor" in it. I'd have to look it up. RIM
22 weighting is the way I always think about it.

Page 90

1     Q.  What's described in this document
2  appears to show TVision using panels to do
3  audience measurement. Would you say that that's
4  fair?
5         MR. XU: Objection, form.
6         THE WITNESS: I would say that you
7  could probably interpret it that way.
8  BY MR. GREENHUT:
9     Q.  Would you agree with that
10 interpretation?
11     A.  Well, what TVision was measuring was
12 some specific measurements, okay, related to
13 television viewing.
14     Q.  How does that differ from what Nielsen
15 would have been measuring in their panels?
16     A.  So, like I said, Nielsen had a
17 different panel framework. So being a stratified
18 random sample, it had the footing to be considered
19 a currency in the market while TVision did not
20 being a quota sample and also sample size,
21 et cetera.
22        If you just look at the economics

Page 91

1  of how much it cost to stand up a stratified
2  random sample versus the sample at TVision, you'll
3  see immediately what I'm talking about. It just
4  costs a lot more money. Why would somebody do
5  that if it didn't have value, right? So there's
6  that.
7         Then there's also what Nielsen was
8  measuring was presence of people in the room. So
9  the who in the room. Nielsen has marketing
10 documents with bravado as well saying these are
11 the people watching TV. But that's not what
12 they're measuring. So, again, differences between
13 what marketing materials show and what is actually
14 happening.
15        TVision was not doing that.
16 TVision had a camera and was identifying
17 individuals within range of the camera, okay, so
18 different measurement than, quote, in the room
19 pushing a button. And then TVision was also
20 measuring what their eyes were on the television.
21        So the eyes on the television was
22 kind of the big sale point. There was not a lot

Page 92

1  of value proposition or resonance with just in the
2  room, they were getting their money off of the
3  eyes on TV, which is not generally the way people
4  think about media measurement. Media measurement
5  is a spectrum of measurements, as I was talking
6  about earlier.
7     Q.  Can you help me understand how the
8  eyes on TV metric is different than the people in
9  the room metric?
10     A.  Sure. So can I use you as an example?
11     Q.  Please.
12     A.  So I presume you watched some TV over
13 the last month, okay. Supposition. You don't
14 have to answer that. So your behavior around
15 watching TV probably entails sitting down and
16 watching something, getting up, going out, getting
17 a drink, coming back, sitting down, watching it --
18 I'm talking linear now, not where you can pause
19 it, okay, and/or going to the bathroom or
20 whatever.
21        So all of that spectrum can be
22 within the frame of in the room. Though Nielsen

23 (Pages 89 to 92)

8/3/2023                The Nielsen Company, LLC v. TVision Insights, Inc.                Mark Green
Confidential - Attorneys' Eyes Only

Page 97

1  addition to polling, okay.  And the reason you do
2  focus groups in addition to polling is to get a
3  deeper understanding of specific profiles of
4  people, but it's not necessarily representative of
5  anything from a statistical point of view; you do
6  the polling for that.
7          Now, you can make a lot of
8  arguments around how good polling is these days
9  and you can make the same arguments around the
10 stratified random sample's cooperation rate, blah,
11 blah, blah, but Nielsen's methodology there is the
12 gold standard in the industry -- or at least it
13 was, I think they're struggling with their Nielsen
14 One sample.  But prior to the Nielsen One sample,
15 it was definitely the gold standard in the
16 industry.  Certainly for linear.
17         The issue that Nielsen always had
18 in competing was sample size, to measure these
19 niche programs and also to measure these niche
20 audiences.  But there's no way TVision was
21 competing with that at all because Nielsen's
22 samples were way bigger than TVision's samples.

Page 98

1  If Nielsen is struggling with 50,000 homes,
2  there's no way TVision would ever compete with
3  that.  Does that make sense?
4      Q.  Just one second.  I'm going to ask the
5  court reporter to mark Green 2.
6          (Deposition Exhibit 2 was marked
7          for identification.)
8  BY MR. GREENHUT:
9      Q.  Green Exhibit 2 is a presentation
10 titled "Next Generation TV Measurement" which
11 lists Yan Liu and Dan Schiffman as the presenters.
12 Please take a second to review.  (Document
13 tendered to the witness.)
14     A.  Here's this MRC thing, Steps 4 and 5.
15 That's what they were referring to.  Yeah, okay.
16     Q.  Can you take a look at Slide 12,
17 please.
18     A.  These are not labeled.  Oh, here they
19 are, tiny little numbers I see.  One second, yeah.
20     Q.  What is Slide 12 showing?
21     A.  I would say that Slide 12 is showing
22 the different measurement schemes that are in the

Page 99

1  marketplace for at minimum linear TV, but I think
2  it goes beyond that.
3      Q.  In the center column of Slide 12, do
4  you see where it says "Individual level TV data
5  (Panel)"?
6      A.  Yeah.
7      Q.  Which companies are listed there?
8      A.  So I can tell you what logos are
9  listed there.  There's Nielsen and TVision
10 Insights.
11     Q.  Does that suggest that TVision was
12 attempting to market itself as a replacement for
13 Nielsen's panels?
14         MR. XU:  Objection, form.
15         THE WITNESS:  Not in my opinion.
16 BY MR. GREENHUT:
17     Q.  Why not?
18     A.  Because they measure different things.
19 It doesn't indicate -- you know, if you take a
20 look at household TV data, right -- it's
21 interesting they have Rentrak here because it's
22 really comScore.

Page 100

1          But if you look at this and you
2  think about comScore and say Samsung or comScore
3  and Rentrak, I'll just talk about what's on the
4  slide, Rentrak and Comcast, Rentrak and Samsung,
5  there is some of it overlap, some of it not
6  overlap, from the census point of view.  So if I
7  was a buyer of this data, I would not think of
8  them as mutually exclusive.  I might be interested
9  in both datasets and try to merge the datasets
10 depending on the type of deal I got.  And that's
11 the household level TV.
12         What's missing on that is Nielsen
13 measures that as well.  So that's not here.  It's
14 interesting Rentrak here and comScore under the
15 digital level device -- I guess that's before
16 comScore bought Rentrak.  I don't know the date on
17 this presentation.
18         So it doesn't necessarily mean that
19 they're mutually exclusive or that they're --
20 they're certainly frenemies, that's for sure.
21     Q.  If you take a look at the next slide
22 that's titled "TVision is able to measure

25 (Pages 97 to 100)

Ex. 24

8/3/2023     The Nielsen Company, LLC v. TVision Insights, Inc.     Mark Green
Confidential - Attorneys' Eyes Only

Page 101

1 individual TV viewership more accurately than any
2 other companies."  Do you see that slide?
3     A.  Yes, I do.
4     Q.  Is this slide comparing the people
5 meter to TVision's product?
6     A.  It appears to be the case.
7     Q.  Doesn't that suggest that TVision is
8 marketing itself as a replacement to the people
9 meter?
10     MR. XU:  Objection, form.
11     THE WITNESS:  You'd need to stand in
12 the room and listen to how the slide is explained.
13 You can interpret many different things from this
14 slide.
15     I was at TVision.  I'm telling you
16 the way I framed it.  That's the way I was
17 coaching it.  If you were to ask me
18 independent of me being at TVision, you know, me
19 being today where I'm not at TVision right now,
20 they're not paying me, I would say TVision is not
21 a replacement for Nielsen.  It never could be by
22 itself, without a major investment and major

Page 102

1 reorientation around the sample.
2     Could TVision work in tandem with
3 Nielsen, absolutely.  Could TVision work in tandem
4 with Comcast, absolutely.  Could TVision work in
5 tandem with iSpot, absolutely.  As a matter of
6 fact, I think iSpot subscribes to TVision.
7     So does TVision have a different
8 methodology than Nielsen, absolutely.  Does
9 TVision have strengths that Nielsen does not,
10 absolutely.  Does Nielsen have strengths that
11 TVision does not, absolutely.
12     MR. GREENHUT:  We've been going for a
13 little over an hour.  Lunch is supposed to be here
14 in about 20 minutes.  Would you like to take a
15 break now or would you like to keep going?
16     THE WITNESS:  No, we can wait.  I'm
17 fine.
18     MR. GREENHUT:  Is that okay with you,
19 Jason?
20     MR. XU:  Yes, sure.
21     THE REPORTER:  It's okay with me too.
22     THE WITNESS:  I prefer to just roll.

Page 103

1 BY MR. GREENHUT:
2     Q.  Can the attention metric be provided
3 without using a panel?
4     A.  Can the attention -- so yes, in a
5 certain context.  And that is you can license the
6 attention metric to another company to stand it up
7 with a panel to do the measurements.
8     Q.  So to rephrase the question:  Is it
9 possible to use the attention metric without a
10 panel -- strike that.
11     It sounded like from your answer
12 the only way to use the attention metric without
13 having a panel is to license it to a company that
14 does use a panel; right?
15     A.  As far as I can tell, yeah.  That's
16 what I said, but as far as I can tell that's the
17 only way I can think about it.
18     Q.  As far as you know, it is necessary to
19 use a panel in some way to use the attention
20 metric?
21     A.  Correct.  Now, just to be clear, a
22 panel doesn't necessarily mean that it's

Page 104

1 competitive with other panels, you know.  Six
2 people, the six of us are a panel for the duration
3 of this time that we're doing the interview,
4 interrogation, however you want to frame it.  So
5 we would need to go back to "panel" definition in
6 terms of context.
7     But the point being is that if
8 you're not measuring anything, there's no metric.
9 There is a methodology, so you could argue that
10 that's the metric, you know, this is all
11 semantics.  So from the point of view of there is
12 a methodology, for sure.  And from the point of
13 view of licensing the methodology, you have the
14 ability to generate data with that methodology.
15 But if you're not measuring anything, then there's
16 no data.
17     Q.  How did TVision obtain its panels?
18     A.  So I'm going to do this from memory.
19 I noted my comments about human memory earlier, so
20 just for clarity.  They outsourced to a company to
21 get quota panels within specific cities in the
22 United States.

26 (Pages 101 to 104)