IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | **Redacted - Public Version** |
| Plaintiff, | ) | |
| | ) | C.A. No. 22-057-CJB |
| v. | ) | |
| | ) | ████████████████ |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

**BRIEF OF TVISION INSIGHTS, INC. IN RESPONSE TO THE NIELSEN COMPANY (US), LLC'S BRIEF IN SUPPORT OF ITS DAUBERT AND SUMMARY JUDGMENT MOTIONS**

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
4030 Wake Forest Road, Suite 300
Raleigh, NC 27609
(984) 960-2860

Steig D. Olson
Sami H. Rashid
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000

Patrick D. Curran
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
11 Huntington Avenue, Suite 5200
Boston, MA 02199
(617) 712-7100

Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Defendant Tvision Insights, Inc.*

Adam B. Wolfson
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Benjamin D. Brown
Richard A. Koffman
Daniel McCuaig
COHEN MILSTEIN SELLERS
 & TOLL PLLC
1100 New York Ave NW, Suite 800
Washington, DC  20005
(202) 408-4600

Dated: January 5, 2026

## TABLE OF CONTENTS

I.    INTRODUCTION ...................................................................................................1

II.   Summary of Argument..........................................................................................1

III.  Nielsen's Daubert Motions Should be Denied......................................................4

   A.    Background...................................................................................................4

   B.    Ms. Johnson's Opinion Regarding ▮▮▮▮▮▮▮ Should Not be Excluded Merely Because One Paragraph Cites the *Panduit* Factors ......................................8

   C.    Ms. Johnson's Opinion that the TVision's April 2018 Forecast is Speculative and Unsubstantiated is Fully Supported ....................................................12

   D.    Ms. Johnson's Opinion About a Device-Based Running Royalty is Fully Supported ...................................................................................................19

   E.    Ms. Johnson Properly Relied on the ▮▮▮▮ Agreement ...................................23

   F.    Federal Circuit and Supreme Court Case Law Permits Ms. Johnson to Provide Opinions Based in Part on Post-Hypothetical Negotiation Information.................27

   G.    TVision's Experts are Entitled to Offer Opinions Relating to Alternatives to the Alleged Infringing System .......................................................................29

      1.    Background ..........................................................................................29

      2.    TVision does not Bear a Burden to Establish that an Alternative is Non-Infringing ...........................................................................................30

      3.    This Court Should Not Exclude TVision's Experts' Opinions Relating to the ACRCloud Alternative...............................................................................33

      4.    TVision's Experts' Opinions About a Potential TVision-Internal Alternative Should Not be Excluded ....................................................................36

         a)    Facts ............................................................................................36

         b)    Dr. Anderson and Ms. Johnson Properly Rely on Mr. Sidhu's Estimate .............37

         c)    Mr. Sidhu had Expertise to Provide a Budget to TVision..................................38

         d)    A TVision-Engineered ACR System was "Available" under Federal Circuit Case Law 39

         e)    TVision Does Not Bear the Burden of Proving Acceptable, Non-Infringing Alternatives .................................................................................39

      5.    There is No Basis to Preclude Opinions about Third-Party Alternatives ............42

i

6.      There is No Basis for Precluding Ms. Johnson from Opining that a Reasonable Royalty Should be Limited to the Cost of an Alternative ....................................46

IV.    This Court Should Deny Nielsen's Motion for Partial Summary Judgment ...............48

   A.     Reverse Doctrine of Equivalents (RDOE)...................................................48

   B.     The *Cheung* Reference.........................................................................48

V.     Conclusion .........................................................................................50

**TABLE OF AUTHORITIES**

Cases

*ActiveVideo Networks, Inc. v. Verizon Comm'n, Inc.*,
694 F.3d 1312 (Fed. Cir. 2012) ...................................................................................24

*Apple Inc. v. Motorola, Inc.*,
757 F.3d 1286 (Fed. Cir. 2014) ..............................................................................24, 47

*Aqua Shield v. Inter Pool Cover* Team,
774 F.3d 766 (Fed. Cir. 2014) ....................................................................................32

*Asetek Danmark A/S v. CMI USA Inc.*,
852 F.3d 1352 (Fed. Cir. 2017) ..............................................................................11, 34

*Asetek Danmark A/S v. Coolit Sys. Inc.*,
2022 U.S. Dist. LEXIS 246284 at *91, 2022 WL 21306657 (N.D. Cal. Sept. 11, 2022) ...34

*Astrazeneca AB v. Apotex Corp.*,
782 F.3d 1324 (Fed. Cir. 2015) .............................................................................9, 32, 40

*Brumfield v. IBG LLC*,
97 F. 4th 854 (Fed. Cir. 2024) ...................................................................................6, 9

*Carnegie Mellon University v. Marvell Technology Group, Ltd.*,
807 F.3d 1283 (Fed. Cir. 2015) ..................................................................................32

*Cave Consulting Group, Inc. v. Truven Health Analytics Inc.*,
2017 WL 4772348 (N.D. Cal. Oct. 23, 2017)...............................................................24

*Correct Transmission, LLC v. Nokia of Am. Corp.*,
2024 U.S. Dist. LEXIS 53470, 2024 WL 1289821 (E.D. Tex. Mar. 26, 2024) ...................32

*Droplets, Inc. v. YAHOO! Inc.*,
2021 U.S. Dist. LEXIS 259658, 2021 WL 9038509  (N.D. Cal. Apr. 27, 2021).................31

*Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*,
800 F.3d 1375 (Fed. Cir. 2015) ..............................................................................49, 50

*Ecolab USA v. Diversey, Inc.*,
2015 WL 2345264 (D. Minn., May 14, 2015) ...............................................................15

*Ericsson, Inc. v. D-Link Systems, Inc.*,
773 F.3d 1201 (Fed. Cir. 2014) ..................................................................................24

*Finjan, Inc. v. Blue Coat Systems, Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) ....................................................................................9

*Garretson v. Clark*,
111 U.S. 120 (1884) ....................................................................................................9

*Gaylord v. U.S.*,
   777 F.3d 1363 (Fed. Cir. 2015) ...................................................................................19

*Goldby v. Hologic, Inc.*,
   817 F. Supp. 204 (D. Mass. 1993) ...............................................................................13

*Grain Processing Corp. v. American Maize-Products Co.*,
   185 F.3d 1341 (Fed. Cir. 1999) ...........................................................................7, 34, 39

*Harris Corp. v. Ericsson, Inc.*,
   417 F.3d 1241 (Fed. Cir. 2005) ...................................................................................27

*Honeywell Intern., Inc. v. Hamilton Sunstrand Corp.*,
   378 F. Supp.2d 459 (D. Del. 2005) ..........................................................................15, 27

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
   274 F.3d 1371 (Fed. Cir. 2001) ............................................................................14, 15, 27

*LaserDynamics, Inc. v. Quanta Comput., Inc.*,
   694 F.3d 51 (Fed. Cir. 2012) .......................................................................................25

*LifeScan Scotland, Ltd. v. Shasta Tech., LLC*,
   734 F.3d 1361 (Fed. Cir. 2013) ...................................................................................23

*Lighting Def. Grp. LLC v. Shanghai Sansi Elec. Eng'g Co.*,
   2024 U.S. Dist. LEXIS 215893, 2024 WL 4905222 (D. Ariz. Nov. 27, 2024) ...................31

*Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*,
   895 F.2d 1403 (Fed. Cir. 1990) ...................................................................................14

*Lucent Tech., Inc. v. Gateway, Inc.*,
   580 F.3d 1301 (Fed. Cir. 2009) ..........................................................................19, 20, 24, 27

*Mars, Inc. v. Coin Acceptors, Inc.*,
   527 F.3d 1359 (Fed. Cir. 2008) ...................................................................................46

*McGoveran v. Amazon Web Servs., Inc.*,
   2024 U.S. Dist. LEXIS 197034, 2024 WL 4626253 (D. Del. Oct. 30, 2024) ...................38

*Mentor Graphics Corp. v. Eve-USA, Inc.*,
   851 F.3d 1275 (Fed. Cir. 2017) ..........................................................................10, 11, 30, 35

*Monsanto Co. v. McFarling*,
   488 F.3d 973 (Fed.Cir.2007) ......................................................................................25

*Novartis Corp. v. Ben Venue Labs.*,
   271 F.3d 1043 (Fed. Cir. 2001) ...................................................................................41

*Novosteel SA v. United States,*
   284 F.3d 1261 (Fed. Cir. 2002) ...................................................................................20

*Omega Patents, LLC v. CalAmp Corp.*,
  13 F.4th 1361 (Fed. Cir. 2021)..............................................................................9

*Optima Tobacco Corp. v. Flue-Cured Tobacco Growers, Inc.*,
  2019 WL 4858848 (E.D.N.C., Sept. 30, 2019)..................................................14

*Paltalk Holdings, Inc. v. Cisco Sys., Inc.*,
  2025 U.S. Dist. LEXIS 175986, 2025 WL 2581690 (W.D. Tex. Aug. 27, 2025)...............32

*Pavo Sols. LLC v. Kingston Tech. Co., Inc.*,
  2019 WL 8138163 (C.D. Cal. 2019)...................................................................33

*Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*,
  875 F.3d 1369 (Fed. Cir. 2017).............................................................30, 34, 35

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
  553 U.S. 617 (2008)............................................................................................23

*ResQNet.com, Inc. v. Lansa*,
  594 F.3d 860 (Fed. Cir. 2010)............................................................................23

*Riles v. Shell Exploration & Prod. Co.*,
  298 F.3d 1302 (Fed. Cir. 2002)..........................................................................31

*Robertson Transformer Co. v. General Electric Co.*,
  2016 WL 4417019 (N.D.Ill. Aug. 19, 2016).......................................................40

*RSB Spine, LLC v. DePuy Synthes Sales, Inc.*,
  2022 WL 17084156 (D. Del. Nov. 18, 2022) ...............................................31, 39

*Salazar v. HTC Corp.*,
  2018 U.S. Dist. LEXIS 234544, 2018 WL 2033709  (E.D. Tex. March 28, 2018).............31

*Sherwin Williams Co. v. PPG Indus.*,
  2020 U.S. Dist. LEXIS 46631, 2020 WL 1283465  (W.D. Pa. March 18, 2020)................35

*Shure Inc. v. ClearOne, Inc.*
  2021 U.S. Dist. LEXIS 196017, 2021 WL 4748744 (D. Del. Oct. 8, 2021) ......................33

*Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*,
  637 F.3d 1269 (Fed. Cir. 2011) ............................................................................8

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.*,
  289 U.S. 689 (1933)......................................................................................20, 27

*Slimfold Mfg. Co. v. Kinkead Indus., Inc.*,
  932 F.2d 1453 (Fed. Cir. 1991)............................................................................8

*Smart Skins, LLC v. Microsoft Corp.*,
  2016 U.S. Dist. LEXIS 106030, 2016 WL 4148091 (W.D. Wash. July 1, 2016)...............32

*SPEX Techs. v. Apricorn, Inc.*,
   2020 WL 1289546 (C.D. Cal. 2020) ............................................................... 33

*SRI Int'l Inc. v. Internet Sec. Sys., Inc.*,
   2011 WL 5166436 (D. Del. Oct. 31, 2011) ...................................................... 40

*Steuben Foods, Inc. v. Shibuya Hoppman Corp.*,
   127 F.4th 348 (Fed. Cir. 2025) ........................................................................ 48

*Stoller Enters., Inc. v. Fine Agrochemicals,*
   705 F. Supp. 3d 774 (S.D. Tex. 2023) ............................................................. 33

*Teen-Ed, Inc. v. Kimball Int'l, Inc.*,
   620 F.2d 399 (3d Cir. 1980) ............................................................................ 38

*Unisplay, S.A. v. American Electronic Sign Co., Inc.*,
   69 F.3d 512 (Fed. Cir. 1995) ........................................................................... 24

*United States v. Sponaugle,*
   2024 U.S. App. LEXIS 23077, 2024 WL 4144069 (3d Cir. 2024) ................... 38

*Visteon Global Techo. V. Garmin Intern.*,
   903 F. Supp.2d 521(E.D. Mich. 2012) ............................................................. 41

*VLSI Technology LLC. V. Intel Corp.*,
    87 F.4th 1332 (Fed. Cir. 2023) ................................................................... 9, 32

*WhereverTV, Inc. v. Comcast Cable Commc'ns, LLC*,
   2022 WL 2751752 (M.D. Fla. Jul. 14, 2022) ................................................... 40

*Williamson v. Citrix Online, LLC*,
   792 F.3d 1339 (Fed. Cir. 2015) ................................................................... 24, 47

*Wirtgen America, Inc. v. Caterpillar, Inc.*,
   715  F. Supp. 3d 587 (D. Del. 2024) ........................................................... 11, 12

*Zygo Corp v. Wyko Corp.*,
   79 F.3d 1563 (Fed. Cir. 1996) ......................................................................... 31

Statutes

35 U.S.C. § 102(e) .............................................................................................. 3, 25

35 U.S.C. § 284 ...................................................................................................... 9

Rules

F.R. Evid. 602 ....................................................................................................... 13

**TABLE OF EXHIBITS**

| Ex. No. | Description |
|---|---|
| 1 | U.S. Patent No. 7,783,889 |
| 2 | Deposition of Daniel Nelsen Excerpt (Sep. 8, 2023) |
| 3 | Yan Liu Deposition Excerpt (Aug. 29, 2023) |
| 4 | TVSN_NLSN_00008034-41 |
| 5 | Expert Report of Michael C. Keeley, Ph.D. (Jul. 7, 2025) |
| 6 | Plaintiff The Nielsen Company (US), LLC's Second Supplemental Responses and Objections to Defendant's First Set of Interrogatories (Sep. 21, 2023) |
| 7 | Opening Expert Report of Pierre Moulin Excerpt (Oct. 10, 2023) |
| 8 | Rebuttal Expert Report of Joanne Johnson (Nov. 21, 2023) |
| 9 | Amy Bolivar Deposition Excerpt (Sep. 15, 2023) |
| 10 | Bolivar Dep. Ex. 1 |
| 11 | TVSN _NLSN_00611700-07 |
| 12 | TVSN_NLSN_00650281-92 |
| 13 | Joanne Johnson Deposition Excerpt (Jan. 24, 2024) |
| 14 | Supplemental Rebuttal Expert Report of Joanne Johnson (Jul. 28, 2025) |
| 15 | Johnson Dep. Ex. 2 (TVSN_NLSN_00269606) |
| 16 | Schiffman Deposition Excerpt (Sep. 8, 2023) |
| 17 | Anderson Opening Supp. Invalidity Report (Jul. 7, 2025) |
| 18 | Anderson Supp. Rebuttal Report Excerpt (Aug. 1, 2025) |
| 19 | Inderbir Sidhu Deposition Excerpt (Aug. 31, 2023) |
| 20 | Inderbir Sidhu Deposition Excerpt (Sep. 9, 2025) |
| 21 | Shoreline Biosciences, Inc.'s Notice of Motion and Motion to Exclude the Expert Report of Dr. Michael C. Keeley Pursuant to Daubert, Case No. 3:22-cv-00676-H-MSB (N.D. Cal.) (Jan. 14, 2023) |
| 22 | Cheung Provisional Patent Application |
| 23 | Reply Expert Report of Michael C. Keeley, Ph. D. Excerpt (Aug. 18, 2025) |
| 24 | David Anderson Deposition Excerpt (Aug. 29, 2025) |

## I.   INTRODUCTION

For the reasons set forth in detail below, this Court should deny Nielsen's *Daubert* and summary judgment motions.

## II.   SUMMARY OF ARGUMENT

1.     There is no merit to Nielsen's motion to exclude portions of the report of TVision's damages expert, Joanne Johnson, merely because she cites the *Panduit* factors in paragraph 244 of her report. D.I. 350 at 3-4. As is explained in section III.B., below, the opinion of Nielsen's damages expert, Dr. Keeley, opines that Nielsen is entitled to a lump-sum reasonable royalty.  His opinion, however, is laced with references to Nielsen's lost revenues, without regard to whether those lost revenues are attributable to TVision's alleged infringement. Both Nielsen and Dr. Keeley ignore Federal Circuit authority equating the first two *Panduit* factors with the requirement of apportionment; and, Dr. Keeley entirely ignores apportionment in his opinion. Moreover, most of the sections of Ms. Johnson's report that Nielsen seeks to exclude do not even mention the *Panduit* factors.  Instead, those paragraphs are part of Ms. Johnson's well-reasoned opinion critiquing Dr. Keeley's failure to apportion or to even relate Nielsen's lost revenues to a reasonable royalty analysis.

2.     Nielsen cannot support its motion to exclude Ms. Johnson's opinion that the "May 2018 forecast"[1] was "speculative and unsubstantiated." D.I. 350 at 4-7. Ms. Johnson supports her opinion with evidence: the forecast was based on an (unrealized) assumption that certain events would occur, which Nielsen ignores. *See* section III.C., below.

3.     There is no merit Nielsen's motion to exclude Ms. Johnson's opinion regarding a running, device-based reasonable royalty. D.I. 350 at 7-8. Nielsen's motion is contrary to well-settled case law, and unsupported by the evidence. *See* section III. D, below.

---

[1] Nielsen's brief describes this as the "May 2018 forecast," even though the forecast itself is dated as April 2018. TVision will use the same nomenclature in this brief to avoid confusion.

4. As demonstrated in section III.E., below, case law and the evidence preclude Nielsen's attempt to exclude Ms. Johnson's opinions relating to TVision's ███████ agreement. D.I. 350 at 8-12. Licenses of similar products, however, are relevant under the *Georgia Pacific* factors in calculating a reasonable royalty. Ms. Johnson appropriately applies those principles to TVision's prior license with ███████. *See* section III.E., below

5. Blind to the opinions of its own damages expert, who relies on events taking place after the hypothetical negotiation in support of his reasonable royalty calculation, Nielsen incorrectly moves to exclude Ms. Johnson's opinions that assess post-hypothetical negotiation events. D.I. 350 at 12-14. Nielsen's argument is precluded by Federal Circuit case law. Ms. Johnson's opinion, that the May 2018 financial projection on which Dr. Keeley relies was based on assumptions that did not come to fruition, is highly relevant and there is no basis for precluding it. *See*, section III.F., below.

6. As discussed in section III.G, below, there is no basis for Nielsen's motion to exclude the opinions of TVision's experts regarding proposed alternatives to the accused ACRCloud ACR system. D.I. 350 at 14-45. Case law in this District precludes Nielsen's attempt to place the burden of proving that an alternative would not infringe on TVision. Section III.G.2. Dr. Anderson, TVision's technical expert, has studied the ACRCloud source code, and is qualified to testify regarding the steps could have taken ACRCloud to change its software to avoid infringement, if it had believed that it infringed. Because the claim of the '889 patent covers only intraframe processing,

7. Section III.G.3 establishes that Dr. Anderson is competent to testify that ACRCloud could have compare spectral powers over multiple frames instead of a single frame, as the '889 patent concedes was done in the prior art. Nor is there any merit to Nielsen's attempt to exclude Dr. Anderson's opinions relating to the potential of TVision creating its own ACR software. TVision's Chief Technology Officer testified that he has, in his career, done

hundreds of estimates for software development and that he applied the same methodology to estimate the amount of time and money it would cost TVision to create its own ACR software. Nielsen is wrong when it associates the estimate in TVision's experts' reports with Project Macro. The estimate Mr. Sidhu provided to the experts was not part of ███████████ Nor is it expert opinion. In 2023, Mr. Sidhu created an estimate prior to TVision undertaking ██████ ██████. If he gave that estimate to the experts in response to their request for what it would have cost TVision to create its own ACR system at the time of the hypothetical negotiation, there is no reason to exclude it. *See*, section III.G.3.

8.      There is no reason exclude the opinions of TVision's experts regarding the availability of commercial ACR systems that TVision actually considered around the time TVision chose ACRCloud's ACR system. Nielsen ignores that the '889 patent recognizes that ACR systems for identifying content by generating fingerprints were old and that the is no evidence anyone has ever used the system covered by the '889 patent—not even Nielsen. The evidence shows that after Nielsen refused to renew TVision's license to use ███████████ ██████, the CEO of ██████ recommended several ACR alternatives to TVision, including ███████████████████████████████████. The evidence further demonstrates that TVision chose ACRCloud because it was the least expensive. *See* section III.G.4-5, below. Nielsen mischaracterizes Ms. Johnson's opinion when it argues that she caps a reasonable royalty to the cost of an alternative. Section III.G.6.

9.      Nielsen's motions for summary judgment should be denied. The Federal Circuit has recognized the reverse doctrine of equivalents. *See* section IV.A. This, alone, is sufficient to deny Nielsen's first motion. Nielsen's motion to exclude the *Cheung* reference likewise fails because *Cheung* is prior art under 35 U.S.C. § 102(e). *See* Section IV.B.

3

## III. NIELSEN'S DAUBERT MOTIONS SHOULD BE DENIED

### A. Background

Audio automatic content recognition ("ACR") systems collect reference media (e.g. media broadcast by TV or radio stations) and monitored media (media tuned in by consumers at monitored sites).  From these media, ACR systems create so-called "signatures" or "fingerprints."  Typical audio stream identification systems are depicted in Figs. 1A and 1B of the '889 patent.  Ex. 1.



FIG. 1A

As is shown above, the signature or fingerprint generator is a small part of the overall system. ███████████████████████████  Ex. 2, ███ Dep. 143:17-144-15.

████████████████████████████████████████████████████

████████████████████ *Id.* 75:12-19; 77:1-78:4; 79:11-14. ████████████████

██ *Id.* 82:22-25.  T███████████████████████████████████████

███████████████████████████████████████████████████████

████████████ *Id.* 83:10-20; 84:5-85:22. ████████████████████████

████████████████████████████████████████████████████ *Id.*

197:18-198:24. ███████████████████████████████████████████

███████████████████████████████████ In contrast, TVision uses passive

technology of cameras and microphones to track when the TV is on and audible, when a specific

person is in front of the TV, and when their eyes are on the TV. [2] Thus, unlike Nielsen, TVision

directly measures what people are doing while the TV is on, using the cameras and

microphones in its meter.

Nielsen's damages expert, Dr. Keeley computes "███████████████████

████████████████████████████████████████" Ex. 5,[3] Keeley Rpt.

¶ 15.  Dr. Keeley, states, "███████████████████████████████████

████████████████████████████████████████████████████

██████" *Id.* Although Dr. Keeley does not quantify Nielsen's alleged lost profits,[4] his

reasonable royalty analysis is heavily based on ██████████████████████[5]

---

[2] Ex. 3, Deposition of Yan Liu, August 29, 2023, 103:20-104:7; Ex. 4 TVSN_NLSN_00008034-041 at 036-037.

[3] July 7, 2025 Expert Report of Michel C. Keeley, Ph.D. ("Keeley Rpt.").

[4] This is not surprising, given ███████████████████████████ ██████ Ex. 6 at 8; Ex. 5. Keeley Rept. ¶ 15.

[5] For example, Dr. Keeley explains that ████████████████████████ ██████████" Ex. 5 ¶ 25.  He further opines that █████████████ ████████████████████████████████████████████████████ ████████████████████████████████████████████████ *Id.* ¶ 53.

TVision has moved to exclude Dr. Keeley's opinions regarding lost profits because Dr. Keeley fails to tie █████████ to his reasonable royalty analysis, fails to apportion the ███████████, and speculates that "███████████████████████████████ ████████████████████████." *Id.*¶ 59; ¶ 67 ("████████████████████████ ████████████"). *See* D.I. 355 at 37-47.

There is a significant difference between a lost profits and a reasonable royalty analysis. *Brumfield v. IBG LLC*, 97 F. 4th 854, 876 (Fed. Cir. 2024). "An award of lost profits generally depends on showing the existence and magnitude of profits lost to the patentee on sales the patentee did not make, or made at lower prices, as a result, under proper causation standards, of the infringement." *Id.* "The reasonable royalty theory of damages, however, seeks to compensate the patentee not for lost sales caused by the infringement, but for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing." *Id.* "The royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement, as patent damages are limited to those 'adequate to compensate for the infringement." *Id.*

The '889 patent recognizes that Automatic Content Recognition ("ACR") software "using signature-matching techniques" was "well known" prior to the alleged invention of the '889 patent. Ex. 1, 1:21-26. Nielsen's prior expert, Dr. Moulin, admitted that prior to the alleged invention, "people of skill in the art generated digital spectral signatures of audio or video content using operations based on complex spatiotemporal signatures," which "rely heavily on interframe processing. . . which is more computationally complex relative to the intraframe methods (i.e., processing of data from within an individual frame) disclosed in the '889 patent."[6] Dr. Moulin also admitted that the '889 patent sought to address problems using

---

[6] Ex. 7, Opening Expert Report of Pierre Moulin, dated Oct. 10, 2023, ¶¶ 66-68, citing '889 patent, 2:55-3:5.

passive audio signature technology used by Nielsen in 2004.[7] There is no evidence that anyone has ever used the invention of the '889 patent, not even Nielsen.[8]

Prior to the alleged acts of infringement, TVision licensed ACR software from ███████. Ex. 5 ¶ 35. In January 2017, TVision learned that █████████████████ ███████, and thus began inquiring about alternative ACR providers. Ex. 8 ¶ 88. TVision consulted with █████████████████████████████████████████ ██████████████████████████ Ex. 9, Bolivar Dep. Tr., at 11:10-13; 12:13-14:2; Ex. 10. ██████ processes reference fingerprints for TVision. Ex. 9 at 15:18-16:13; 19:11-21:12. Ms. ██████ has "been in the ACR industry for 20 years." *Id.* at 48:17-49:6. Ms. Bolivar advised Mr. Liu of several potential ACR providers, including ███████████████████. Ex. 11 at -702-03; Ex. 12 at -284. ██████ could have processed fingerprints generated by TVision using ACR software provided by any of those vendors.

In a reasonable royalty calculation, the jury must be instructed that "without the infringing product, a rational would-be infringer is likely to offer an acceptable noninfringing alternative, if available, to compete with the patent owner rather than leave the market altogether. * * * Moreover, ***only by comparing the patented invention to its next-best available alternative(s) - regardless of whether the alternative(s) were actually produced and sold during the infringement*** - can the court discern the market value of the patent owner's exclusive right, and therefore his expected profit or reward, had the infringer's activities not prevented him from taking full economic advantage of this right." *Grain Processing Corp. v. American Maize-Products Co.*, 185 F.3d 1341, 1351 (Fed. Cir. 1999) (emphasis added). Thus, it is well settled that even "an available technology not on the market during the infringement can constitute a noninfringing alternative." *Id.* at 1351 (*citing Slimfold Mfg. Co. v. Kinkead*

---

[7] *Id.*

[8] Ex. 5 ¶ 41; Ex. 8, Opening Expert Report of Joanne Johnson, November 21, 2023 ¶ 83 (citing Ex. 6 ¶ 8).

*Indus., Inc.*, 932 F.2d 1453 (Fed. Cir. 1991)); *see also Siemens Med. Sols. USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1288-89 (Fed. Cir. 2011).

### B. Ms. Johnson's Opinion Regarding Nielsen's ▮▮▮▮▮ Should not be Excluded Merely Because One Paragraph Cites the *Panduit* Factors

There is no merit to Nielsen's motion to exclude Johnson Rpt. (Ex. 8) paragraphs 13 (bullet point 1), 241-42, 243 (bullet point 1), 244-48, 252, 260, 281, and Johnson Dep. 155:21-156:10 (Ex. 13). Nielsen's argument for exclusion, based on Ms. Johnson's citation to the *Panduit* factors in paragraph 244 of her report, is contrary to Federal Circuit precedent and mischaracterizes the import of Ms. Johnson's opinions.

Ms. Johnson raised the *Panduit* factors because Dr. Keeley's report is replete with references to and calculations of Nielsen's "▮▮▮▮▮," which he conflates with lost revenues, not as a passing consideration, but as the *foundation* of his reasonable royalty opinion:

- Dr. Keeley repeatedly opines to ▮▮▮▮▮▮▮▮▮ within his analysis of a reasonable royalty (Ex. 5 at ¶¶ 14, 17, 19-21, 24, 25, 51-55, 57-63, 71-72, 83-84, 87, 92, 98, 100, 104, and 106);

- He calculates specific "▮▮▮▮▮▮▮: ▮▮▮▮▮▮▮▮ (Ex. 5 at ¶ 17, 58); ▮▮▮▮ ▮▮▮▮▮▮▮▮ (*id.* at ¶ 17, 25, 53), and ▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮ *Id.* at, ¶ 52.

- His lost profits theory forms the basis for his reasonable royalty opinion: "▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮" (Ex. 5 at 26 ¶ 57), but if Nielsen licensed TVision it "▮▮▮▮▮▮ t ▮▮▮▮ ▮▮▮" *Id.* ¶ 58.

- He concludes "▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮" *Id.* at 27 ¶ 59.

Dr. Keeley's report entirely ignores "demand for the patented product" and "absence of acceptable non-infringing alternatives," which are essential elements of an apportionment

analysis, which is required by Federal Circuit case law. They also happen to be the first two *Panduit* factors, which Ms. Johnson properly discusses in ¶ 244 of her report.[9]

It is well settled that the "royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement, as patent damages are limited to those 'adequate to compensate for the infringement.'" *Astrazeneca AB v. Apotex Corp.,* 782 F.3d 1324, 1343 (Fed. Cir. 2015). The royalty "must be 'apportion[ed] to [the value of the patented technology] by separating out and excluding other value in economic products or practices." *Brumfield v. IBG LLC*, 97 F.4th 854, 877 (Fed. Cir. 2024), quoting, *VLSI Technology LLC. V. Intel Corp.*, 87 F.4th 1332, 1345 (Fed. Cir. 2023). "The reasonable royalty theory of damages . . . seeks to compensate the patentee not for lost sales caused by the infringement, but for its lost opportunity to obtain a reasonable royalty that the infringer would have been willing to pay if it had been barred from infringing." *Brumfield,* 97 F.4th at 876; *Astrazeneca,* 782 F.3d at 1344 ("the royalty due for patent infringement should be the value of what was taken—the value of the use of the patented technology"). "The royalty base for reasonable royalty damages cannot include activities that do not constitute patent infringement, as patent damages are limited to those 'adequate to compensate for the infringement.'" *AstraZeneca*, 782 F.3d at 1343 (quoting 35 U.S.C. § 284). Further, any reasonable royalty must seek to measure the value of the patented technology—it must be "apportion[ed]" to that value—by separating out and excluding other value in economic products or practices. *See Finjan, Inc. v. Blue Coat Systems, Inc.*, 879 F.3d 1299, 1309 (Fed. Cir. 2018); *see also Garretson v. Clark*, 111 U.S. 120, 121 (1884); *Omega Patents, LLC v. CalAmp Corp.*, 13 F.4th 1361, 1376 (Fed. Cir. 2021).

Contrary to Nielsen's argument, Ms. Johnson's recitation of the *Panduit* factors is relevant because Dr. Keeley fails to apportion. *See* D.I. 355 at 37-40. "[A]pportionment is . . .

---

[9] Ex. 8, *supplemented by* Ex. 14, July 28, 2025 Supplemental Rebuttal Expert Report of Joanne Johnson. All references herein to the Johnson Report refer to Ex. 8, unless expressly otherwise noted.

necessary in both reasonable royalty and lost profits analysis," and may be properly incorporated into such analysis through the *Panduit* factors. *Mentor Graphics Corp. v. Eve-USA, Inc.*, 851 F.3d 1275, 1287-88 (Fed. Cir. 2017).[10]  Dr. Keeley's report entirely ignores "demand for the patented product," and "absence of acceptable non-infringing alternatives" (the first two *Panduit* factors). Ex. 8 ¶ 244.  There is *no evidence* in this case that there has ever been *any demand* for the patented product; a method of producing fingerprints based on the comparison of spectral powers from a single frame. ██████████████████████████ ████████████████████████████████████ Further, TVision does not market "fingerprints." Instead, TVision markets attention data, which is derived from TVision's meters that use cameras and microphones to determine who is in the TV room and whether they are paying attention to the TV. Ex. 8 ¶ 121. Moreover, Ms. Johnson characterizes *Panduit* as providing a "non-exclusive standard." Ex. 8 ¶ 244.  And, she correctly opines that Dr. Keeley has not established that the infringement had any relationship with ██████████████ ██████ *Id.* ¶¶ 242, 245, 251, 253-69. In that regard, Ms. Johson's critiques do not depend on *Panduit*, but rather on Dr. Keeley's failure to apportion, which is a critical failure of his opinion, based the Federal Circuit authorities cited above.

The record shows that there were many non-infringing ways to generate fingerprints, beginning with the admission in the '889 patent. Nielsen has admitted ██████████████ ████████████████████████████████████████████████████████ ██████████████████████████████████. Ex. 5, ¶¶ 35, 41, citing n. 75.

---

[10] In *Mentor Graphics*, the patented product was a software emulator with the patented features. The inventors of the patented product formed one of the defendants, which was acquired by another defendant. The Court found that the market for emulators consisted of the plaintiff's product and the defendant's product. *Id.* at 1286.  In contrast, in this case, the "patented product" is the tiny, incremental improvement in fingerprint creation of ACR software that ██████████████████████.

Nielsen misinterprets *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362 (Fed. Cir. 2017). In *Asetek*, the plaintiff's damages expert relied in part on the plaintiff's per-unit profit margin under its license agreement on the patented product with another company to calculate a reasonable royalty. 852 F.3d at 1362. ███████████████████████████
███████████████████ And in *Asetek*, the damages expert "adjusted her hypothetical-negotiation model to account for numerous considerations other than [plaintiff's] per unit profits, including 'the nature and scope of the license' at issue." *Id.* at 1363. Thus, *Asetek* does not support Nielsen's argument.

Under these authorities, there is no merit to Nielsen's motion to exclude those paragraphs of Ms. Johnson's opinion that are allegedly based on her citation of the *Panduit* factors. Ms. Johnson's opinions in paragraphs 245-248, 260, and 281[11] should not be stricken because they do not recite or depend on *Panduit* at all; but rather address aspects of the reasonable royalty analysis that are relevant under Federal Circuit law.

In *Wirtgen America, Inc. v. Caterpillar, Inc.*, 715 F. Supp. 3d 587, 592 (D. Del. 2024), this District excluded an expert report on damages for failure to apportion. In doing so, it cited *Mentor Graphics,* 851 F.3d at 1288, for the proposition that a "proper analysis of *Panduit* factors may account for apportionment." *Id.* In *Wirtgen,* the Court noted that the expert's calculation of lost profits was "problematic because that figure fails to isolate the value of the allegedly infringing features from the value of all other features." *Id.* The Court excluded the

---

[11] Ex. 8, challenging Dr. Keeley's assumption it was the infringement of the '889 patent, alone, that enabled TVision to compete with iSpot and VideoAmp would not have been able to compete with Nielsen (¶¶ 245, 260); challenging Dr. Keeley's failure to connect TVision's product to iSpot or VideoAmp's offerings (¶246); and, challenging Dr. Keeley's recitation of ████████████████████████████ along with his admission that he cannot calculate lost profits (¶¶ 247, 281).

expert's report on a *Daubert* motion, because "a failure to apportion goes to admissibility, not weight." *Id*. at 593.[12]

### C.   Ms. Johnson's Opinion that the TVision's April 2018 Forecast is Speculative and Unsubstantiated Is Fully Supported

Nielsen moves to preclude Ms. Johnson's opinion[13] that the document Nielsen refers to as the "May 2018 financial forecast" that TVision sent to a single investor is too "speculative and unsubstantiated" to be the basis for quantifying a reasonable royalty. Nielsen argues that Ms. Johnson's opinion "contradicts all the facts in the record." Simply put, it is Nielsen's argument—not Ms. Johnson's opinion—that "contradicts all the facts in the record."

Nielsen's is wrong when it states that the May 2018 financial forecast was  D.I. 350 at 4.  In fact, the May 2018 forecast is a

There is no evidence that this potential investor actually invested in TVision. Moreover, Dr. Keeley ignores the unambiguous condition precedent set forth in Mr. Liu's email:

." Ex. 15 (Johnson Dep. Ex. 2).

With respect to the forecast itself, Ms. Johnson explains, "Dr. Keeley does not note the creator of the forecast, the purpose of the forecast, or the extent to which TVision relied upon the forecast in the normal course of business. He also provides no details regarding the extent to which the forecasted revenues and profits were derived from use of the technology of the '889 Patent." Johnson Rept. ¶ 290.  She further opines, based on interviews with TVision's CEO, Mr. Liu, "

---

[12] Although the court permitted the plaintiff to serve a supplemental expert which "fixed [the] damages report to take care of the apportionment issue," that issue cannot be fixed in this case. *See Wirtgen,* 2024 WL 531234 at *3 (D. Del. Feb. 9, 2024) (revised expert report used methodology in expert's original report but apportioned value of patented invention).

[13] Johnson Rep. ¶¶13 (bullet 2), 106, 135-139, 232, 242, 243 (bullet 7), 285-94, 302, and 304-06, 309, Figures 10, 22, and Exhibits 11.0-11.2, and 15.0-15.4.



."

*Id.* Ms. Johnson also refers to TVision's ███████████████████████." *Id.*

Nielsen distorts the testimony of Daniel Schiffman, who departed TVision in 2019, and who lacks personal knowledge to substantiate the forecast under F.R. Evid. 602. Mr. Schiffman testified unequivocally that he did not have personal knowledge of the forecast. *See generally* Ex. 16 at 19:19-20 ("I recognize it a little bit); 20:8-16 ("I was not the person who created this, so I can tell you what I think and what I would guess, but it is not – I can't assert it with accuracy"); 21:10-17 ("I'm just guessing, right."); 23:11-20 ("Do you know for whom this document would be created? * * * I don't know how to answer that question."); 28:2-4 ("I can't give you specifics on this document history.  I really don't know.").

Nielsen's make-weight argument at pages 5-6 of its brief about not "misleading investors" is entirely irrelevant to the issue of whether the May 2018 forecast was reliable in the absence of fulfilling the conditions precedent stated by Mr. Liu in his May 2018 email (Ex. 15). Nielsen's attempt to ask the jury to ignore TVision's actual revenues in the years covered by the forecast is belied by the opinion of its own expert who refers to ████████████ ███████████ to support his reasonable royalty analysis. *See, e.g.* Keeley July 7, 2025 Report ¶¶ 25-27 (referring to ██████████).  Nielsen can't have it both ways.

Courts have observed that forecasts for startups, especially, are inherently unreliable. *Cf., Goldby v. Hologic, Inc.*, 817 F. Supp. 204, 211 (D. Mass. 1993) (describing forecasts as "inherently difficult and unreliable . . .and . . . not likely to be 'material' to investors," noting that the SEC provides a safe harbor rule that projections filed with the Commission do not violate federal securities law unless made without a "reasonable basis" or not made in "good

faith"); *Optima Tobacco Corp. v. Flue-Cured Tobacco Growers, Inc.*, 2019 WL 4858848 at *10 (E.D.N.C., Sept. 30, 2019) (rejecting expert opinion based on lost profit estimates "based on unreliable and speculative forecasts" as "too speculative to be determined with reasonable certainty"). Here, a significant reason why TVision did not achieve its forecast is that the conditions precedent detailed in Mr. Liu's email did not occur. *See generally*, Johnson Rept. Nielsen's anticompetitive filing of serial patent infringement lawsuits against TVision, its suppliers, and its customers, including this one, for the untoward purpose of litigating TVision out of business, plus the misuse by Nielsen of its monopoly power to prevent TVision's customers and potential customers from using TVision's data. *See* counterclaim filed in *The Nielsen Company (US) LLC v. TVision Insights, Inc.*, 25-cv-575 (D. Del), D.I. 20.

Nielsen cites *Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384 (Fed. Cir. 2001), for the blanket proposition that all forecasts should be admissible for purposes of a reasonable royalty calculation. *Interactive* is distinguishable on its facts. In this case, the forecast at issue was subject to conditions precedent, which Dr. Keeley does not acknowledge and which did not occur. There was no evidence that the forecast in *Interactive* was subject to a condition precedent that had not occurred. *Lindemann Maschinenfabrik GmbH v. Am. Hoist & Derrick Co.*, 895 F.2d 1403, 1407 (Fed. Cir. 1990) is more applicable to the facts of this case. The Court in *Interactive* recognized that Lindemann "supports the proposition that an actual infringer's profit margin can be relevant to the determination of a royalty rate in a hypothetical negotiation." *Interactive,* 274 F.3d at 1385. Federal Circuit authority thus supports the proposition that an expert's opinion must consider all of the evidence, and not just cherry-pick parts of it that support his opinion.

In this case, the evidence shows that the ████████████████████████████ ██████ Ex. 15. There is no evidence that the investor actually invested in TVision.

This District has interpreted *Interactive* to permit the use of post-negotiation information to inform the hypothetical negotiation. *See Honeywell Intern., Inc. v. Hamilton Sunstrand Corp.*, 378 F. Supp.2d 459, 466-67 (D. Del. 2005). So has the District of Minnesota, *Ecolab USA v. Diversey, Inc.*, 2015 WL 2345264 at * 14 (D. Minn., May 14, 2015) (stating that *Interactive* does not preclude consideration of post-hypothetical negotiation information or require that a particular amount of weight be placed on pre- or post-hypothetical negotiation information). Moreover, *Interactive* does not govern a case, such as this one, in which the forecast at issue is obviously dependent on future events, which did not occur, and also the absence of a monopolist's anticompetitive behavior, which did indeed occur. Nielsen and its expert ignore that at the time of the hypothetical negotiation, TVision had ███████████ ████████████████████████████████████████████ . ████████ ██████████████████████████████ .

There is no basis for excluding paragraph 13 (bullet 2) or paragraph 106 of Ms. Johnson's report, neither of which even mention the May 2018 financial forecast. There is no basis for excluding paragraphs 135-139, which cite to evidence that TVision was a small start-up in the period leading up to the May 2018 hypothetical negotiation. Ex. 8, ¶ 130. As of 2017, TVision had earned ████████████████ and was operating at ████████████ . *Id.* In 2018, TVision ████████████████████████ and an ████████████ ████████ . *Id.* Further, at the time of the hypothetical negotiation, TVision had not completed its early-stage funding. *Id.*, ¶ 131. That funding depended in part on how many devices TVision had installed in households. *Id.* TVision did not reach its goal of ███████████████ ████████ , which increased TVision's credibility in the market and with investors. *Id.*

Ms. Johnson cites a 2017 TVision presentation in which TVision outlined its fundraising plan, suggesting that "TVision's success and profitability was in flux in the months leading up to the hypothetical negotiation as its panel size [the number of households with

installed TVision devices] was around ███████████," far less that its goal of █████ installed devices. *Id.* ¶ 135. Further, TVision's forecasts were based on key assumptions that TVision did not meet. *Id.* ¶ 136. Ms. Johnson observed that "TVision has historically overestimated its forecasts," reciting specific evidence of 2017 projected revenues of over ████████ versus actual revenue of slightly under ████████. *Id.* ¶ 137. Paragraph 138 contains even more examples of TVision overestimating its projections in the 2018 timeframe. *Id.* 138. In challenged paragraph 139, Ms. Johnson recites that "TVision's longer-term projections had even wider discrepancies over time," comparing a March 2018 projection of ████████ in net income by 2022, which projection was reduced to ████████ in a 2020 projection, as compared with an actual ████████ in 2022. There is no reason to exclude any of these paragraphs, which are all based on facts of record.

Nor is there any basis for excluding paragraphs 232 and 242, which do not mention the May 2018 financial forecast. Bullet 7 of Paragraph 243 criticizes Dr. Keeley for relying on "a speculative and unsubstantiated forecast," but as the evidence cited by Ms. Johnson demonstrates, none of TVision's forecasts in the time frame of the hypothetical negotiation had panned out, and Dr. Keeley knew it when he wrote his report. Ex. 8, ¶¶ 130-139. Paragraphs 285-289 opine that Dr. Keeley fails to provide support for an upfront lump sum royalty structure based on future revenue. Ms. Johnson takes issue with Dr. Keeley's unsupported speculation that TVision would have agreed to "an upfront one-time lump sum of ████████" that is based on forecasted revenues through March 5, 2026—the patent expiration date. Ex. 8, ¶ 285. This was at a time when TVision's operating loss for the year 2018 was ████████ and TVision's total revenues were ████████ *Id.* ¶ 286.

There is no evidence that, at the time of the hypothetical negotiation, TVision was capable of making the ████ million lump sum payment that Dr. Keeley opines to be a "reasonable" royalty. Ex. 5 ¶ 112. In fact, given TVision's financial condition, the royalty

16

opined to by Dr. Keeley is an ***unreasonable royalty***. Dr. Keeley does not explain how TVision would have been able to make a ▮▮▮▮▮▮ dollar payment to anyone. Thus, Ms. Johnson correctly opines, (i) that "Dr. Keeley fails to consider the practical realities of TVision's financial position at the time of the hypothetical negotiation" (Ex. 8, ¶ 286), (ii) that he fails to recognize the significant impact that such a payment would have had on TVision's business (¶ 287), (iii) that he fails to take into account how payments are made in the industry (¶ 288), and (iv) that he provides no justification to structure the royalty as a lump sum when his opinion assumes that TVision's benefit is to continue to stay in business over time. ¶ 289.

In paragraphs 290-291. Ms. Johnson reasonably opines that "TVision's forecasts in the 2018 time period were optimistic as TVision was still in the early stage of its startup business and did not have a historical track record available as a basis to build its forecast" and that "Dr. Keeley does not consider the probability that TVision would achieve the underlying assumptions, nor the probability it would achieve its forecasts . . . given that TVision had a history of overestimating its forecasts." *Id.* ¶ 290. In paragraph 291, Ms. Johnson demonstrates that if Dr. Keeley had relied on TVision's *actual revenue and profits,* TVision's net present value would range from ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ highlighting the unreliable nature of Dr. Keeley's approach. *Id.* ¶ 291.

Ms. Johnson's opinions expressed in paragraphs 292-94, 302, and 304-306 are part of a section of her report that disputes the reliability of Dr. Keeley's quantification of a reasonable royalty. In paragraphs 292-294, Ms. Johnson opines that Dr. Keeley "assumes without sufficient support" that the parties would agree to a one-time lump-sum royalty, extends the May 2018 financial forecast (which TVision had made for the years 2018-2022) to 2026, without any basis, and that Dr. Keeley applies a discount rate based on an estimate of the weighted average cost of capital for purportedly similar firms. Ex. 8, ¶¶ 292-293. In paragraph 294, Ms. Johnson states that in addition to previously discussed errors, Dr. Keeley's

quantification "suffers from another error that that renders his analysis flawed, speculative, and unreliable." *Id.* ¶ 294.  Then in paragraphs 295-301, which Nielsen does not move to strike, Ms. Johnson explains that Dr. Keeley's use of the discount rate is flawed because, *inter alia*, it "fails to properly account for the probability of success of early stage companies" and that he "overlooks the assumptive nature of discount rates," which "can vary widely for early-stage companies," citing a KPMG report that discount rates can range from 40% to 60% for companies in the first stage of financing, much greater than the discount rate Dr. Keeley applied. *Id.* ¶¶ 295-300. Moreover, in *Fate Therapeutics, Inc. et al v. Shoreline Biosciences, Inc.*, No. 3:22-cv-00676-H-MSB (S.D. Cal. Jul. 14, 2023) at, Dr. Keeley admitted that the probability of success must be taken into account when using a discount rate. *See* Ex. 21., Shoreline Biosciences, Inc.'s Notice of Motion and Motion to Exclude the Expert Report of Dr. Michael C. Keeley Pursuant to Daubert, Case No. 3:22-cv-00676-H-MSB, January 14, 2023, D.I. 291-1 at p. 12). (*See also* Ex. 8, Johnson Rep. ¶ 301; Ex. 23, Keeley Reply Rep. ¶ 77).

In paragraph 301, Ms. Johnson opines that Dr. Keeley has "not provided any evidence to suggest" that the category he chose "appropriately reflects the underlying risks of TVision's early-stage business. Ex. 8, ¶ 301. Then, in ¶ 302, which Nielsen challenges, Ms. Johnson opines that the "above flaws in Dr. Keeley's analysis are further exacerbated when considering the longer time frame of his damages period."  The import of this paragraph is not a criticism of Dr. Keeley's use of the April 2018 forecast, but a criticism of the methodology Dr. Keeley uses to incorporate that forecast into his reasonable royalty analysis.  Thus, even if Dr. Keeley were permitted to use the entirely speculative and flawed April 2018 projection in his testimony, Ms. Johnson should be entitled to express her opinion as to why Dr. Keeley's analysis is flawed.

Nielsen's argument to preclude Ms. Johnson's opinion in paragraph 309, which disagrees with Dr. Keeley's use of the Nash Bargaining Solution, is not based at all on the April 2018 projection, and Nielsen provides no reason to exclude this opinion.

### D. Ms. Johnson's Opinion About A Device-Based Running Royalty Is Fully Supported

In a short argument bridging pages 7-8, Nielsen seeks to exclude any of Ms. Johnson's opinions regarding a device-based running royalty in Ex. 8, paragraphs 11, 103-06, 156, 163-67, 181-208, 232 (bullets 8 and 11), 235, 239, 270, 285, 288-89 of her report, and also Figures 1, 7, 16 and Exhibits 3.0-3.1, 5.0, 5.2-5.3, 7.0, 9.0, and 18.0-18.3.  Nielsen's conclusory argument is no basis for precluding Ms. Johnson's running royalty opinion.

Ms. Johnson explains her opinion regarding a running royalty under *Georgia-Pacific* Factors and 9, 10 and 12.  *See* Ex. 8, ¶¶ 103-106 (summary). She further explains that considering the number of panel devices TVision employs on a monthly basis is a reasonable metric, and that the monthly data for TVision panel devices in use is available. *Id.* ¶¶ 104-105. In paragraph 106, she critiques Dr. Keeley's opinion as being inappropriately based on "the entire market value of all TVision's products" in spite of the fact that "there is no evidence to support that the '889 patent is the sole driving factor of customers' demand" for TVision's product. *Id.* ¶ 106. In short, Ms. Johnson did not simply announce a running royalty preference – she grounded it in the nature of the technology, the available usage data, and a pointed rebuttal of Nielsen's own damages theory.

The Federal Circuit has upheld per-unit royalties of the type that Ms. Johnson opines would be appropriate here. *E.g., Gaylord v. U.S.*, 777 F.3d 1363, 1369 (Fed. Cir. 2015) ("A per-unit royalty is a logical way to tie the amount paid for the asset to the marketplace success it helps produce, which fits the objective of measuring market value"); *Lucent Tech., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325-26 (Fed. Cir. 2009) (holding that the question of whether the parties would have agreed to a lump-sum payment or running royalty based on ongoing

usage is subsumed within *Georgia Pacific* factor 2—"the rates paid by the licensee for the use of other patents comparable to the patent in suit"). Further, a per-unit running royalty avoids the speculation inherent in Dr. Keeley's reliance on a single projection sent to a single potential investor based on conditions precedent that did not, in fact occur. *See Lucent*, 580 F.3d at 1327 ("it is well established that speculation does not constitute 'substantial evidence'"), quoting *Novosteel SA v. United States,* 284 F.3d 1261, 1276 (Fed. Cir. 2002)(Dyk, J., dissenting).

*Georgia Pacific* factor 10—the nature of the patented invention—also supports a per-device running royalty. So does factor 13—the portion of the realizable profit that should be credited to the invention as distinguished from non-patentable elements. In *Lucent*, the Court noted that the "infringing feature contained in Microsoft Outlook is but a tiny feature of one part of a much larger software program" and concluded that those factors did not support a lump-sum damages award in that case. 580 F.3d at 1332-33. The Court in *Lucent* also held that factor 11—the extent to which the infringer has made use of the invention—mitigated against a lump-sum royalty, explaining that factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation. *Id.* at 1333, citing *Sinclair Refining Co. v. Jenkins Petroleum Process Co.*, 289 U.S. 689, 698 (1933). Under *Lucent*, a running royalty is appropriate here because the patented method of generating a signature is a tiny part of the overall ACR system, which in turn, is a small part of TVision's product offering, and is in no way the reason why anyone purchases TVision's attention data. *Lucent,* 580 F.3d at 1333 (finding that "the infringing use of Outlook's date-picker feature is a minor aspect of a much larger software program and that the portion of the profit that can be credited to the infringing use . . . is exceedingly small. . .[providing] little support for the jury's lump sum damages award"). This is all spelled out in Ms. Johnson's report.

The marketplace evidence further confirms that a device-based running royalty reflects how the parties would behave. In this case, the basis for Nielsen's infringement claim is the

█████ software that is installed and runs in each of TVision's panel devices, which are located in consumer's homes and from which TVision obtains attention data that it processes and sells to customers. Ex. 8 ¶¶ 71, 76. Ms. Johnson points out that TVision's contract fees for the first year of its ████████ agreement were about ████████████████ and have decreased over time. Ex. 8 ¶ 163. She also opines that other ACR providers had similar pricing arrangements. *Id.* ¶ 162 ("alternative ACR providers' pricing would be comparable to ████████/████████ pricing"). Ms. Johnson thus demonstrates, contrary to Nielsen's conclusory argument on pages 8-9 of its brief, that there is a market-place basis for basing a royalty on the number of panel devices employed by TVision in the form of TVision's current agreement with ████████

Under *Georgia-Pacific* Factors 9 and 10, Ms. Johnson opines to TVision's agreements with ████████ between 2018 and 2023 that indicate a running royalty license fee structure based on the number of devices utilizing ACRCloud's service per year (Ex. 8, Johnson Rep. Ex. 9.0, ¶ 163. *See also,* ¶¶ 31-42). Similarly, in paragraph 163, Ms. Johnson opines to a January 2017 license proposal by ████ another ACR provider, that also indicated a per-device, per-month license fee based on usage (Ex. 8, Johnson Rep. Exs. 5.3, 5.4, ¶ 164). As part of her *Georgia-Pacific* Factor 12 analysis, Ms. Johnson explains in detail the considerations of the ████████ Agreement and its comparability to the hypothetical license (Ex. 8, Johnson Rep. ¶ 188-190, 194-195, 200). Ms. Johnson points out that "i█████████████ ███████████████████████████████████████████████████████████████████ █████████████████████████████████ *See* TVSN_NLSN_00637233-258 at 233] █████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████" (Ex. 8, ¶ 189) and that "████████████████████████████████████████████████████████ █████████████████████████████████████████████████████████████████████"

(¶ 190). As discussed in Section III.E below, Ms. Johnson's analysis of the ███████ Agreement is based on the evidence of the record, and there is no basis to suggest that any opinions relying on the ███████ Agreement should be excluded.

Nielsen ignores that while the quantitative indicators in the record, such as the ███████ Agreement, ███████ Agreements, and the ████ proposal, put forth payment structures in the form of a lump sum, the financial considerations are fundamentally based on the licensee's usage conditions (Ex. 8, ¶¶ 31-42, 188-189, Exs. 5.3-5.4). These agreements provide the basis for Ms. Johnson's per-device running royalties, and therefore Nielsen has no basis to exclude these opinions, which rely on proper analysis of evidence in the record.

Similarly, Nielsen takes issue with Ms. Johnson's calculation of "the cost to use a supposed alternative to the patented technology from ███████ claiming that Ms. Johnson's calculations "yield a lump sum, not a per device per month cost." Ms. Johnson does not dispute that the ███████████ should be a lump sum, as it reflects the engineering cost to modify its code in house, unrelated to any cost structures relating to usage. She does not opine to a running royalty structure for this particular calculation and only provides a per device per unit month metric to "illustrate the sense of proportional magnitude." (Ex. 8, ¶ 156). Nielsen ignores that Ms. Johnson acknowledges that some of the evidence supports a lump-sum royalty structure ("TVision's best next-best alternative is to have ███████ modify its fingerprinting code to avoid practicing the '889 Patent which would result in a one-time upfront cost") while some of the evidence supports a running royalty structure ("license proposals and agreements for ACR technology include an ongoing royalty payment that is based on the extent of use of the licensed technology") which leads her to present certain indicators in a lump sum format and others in a running royalty format (*id.* ¶ 103). As such, there is no basis for excluding paragraph 156.

These historical license agreements and proposals are factual evidence from the record where the fee structures are based on the licensee's usage conditions.  In paragraphs 31-42, Ms. Johnson outlines the terms of the ███████ agreements from 2018 through 2023, all of which include annual fees that are based on the licensee's usage conditions.  Paragraph 164 similarly points to factual evidence from the record indicating a usage-based fee structure through monthly fees per device.

Thus, there is no basis for excluding paragraphs 103-106, 163-167, 232 (at bullet 11), 239, 285, 288-289, Figure 7, and Exhibits 5.3, 7.0, 9.0, and 18.0-18.3, as the analyses therein stem directly from license agreements and evidence in the record.

### E.  Ms. Johnson Properly Relied on the ███████ Agreement

It is undisputed that, prior to the date of the hypothetical negotiation, TVision had a license agreement to use ███████ ███████ product as TVision's ACR software system. Ex. 5 ¶ 35. It is also undisputed that ████████████████████████████████████ ██████████████████████████████████. *Id.*

Nielsen incorrectly argues that the ███████ agreement "██████████████████████" On the contrary, when a patent owner licenses another party to use a product covered by a patent, it exhausts any patents in that product, and thus grants an implied license to those patents. *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 629 (2008). *See also, LifeScan Scotland, Ltd. v. Shasta Tech., LLC*, 734 F.3d 1361, 1377 (Fed. Cir. 2013) (patent owner had exhausted its rights under a patent claim covering a method of detecting blood glucose by giving away or selling below cost the blood glucose meter that it manufactured).

There is no merit to Nielsen's argument that it is "improper to use a non-patent agreement without linking it to the claimed technology." *ResQNet.com, Inc. v. Lansa*, 594 F.3d 860, 870 (Fed. Cir. 2010), cited by Nielsen at page 10 of its brief, does not support Nielsen's argument. In *ResQNet.com*, the plaintiff's damages expert relied on a combination of bundled

licenses and licenses to the patent-in-suit to arrive at a higher royalty rate than the license to the patent-in-suit.  The bundled licenses included marketing and other services. The Court held under the facts in that case that it was inappropriate for the plaintiff's damages expert to use the bundled licenses to inflate the royalty rate.  In sharp contrast, in this case, the ███████ agreement and other ACR software agreements license the use of an entire ACR system.  The patent-in-suit covers a tiny part of an ACR system—creating a "signature" or "fingerprint." Thus, the agreements licensing ACR systems place a governor on the amount a willing licensee would reasonably pay for the right to use a tiny part of an ACR system.   Under similar circumstances, the Federal Circuit has upheld the use of licenses that did not involve the patent-in-suit, stating that the defendant's objections to the conclusions of plaintiff's expert "go to the weight to be afforded the testimony and not its admissibility" that would be "best addressed by cross examination and not by exclusion." *ActiveVideo Networks, Inc. v. Verizon Comm'n, Inc.*, 694 F.3d 1312, 1334 (Fed. Cir. 2012); *see also, Cave Consulting Group, Inc. v. Truven Health Analytics Inc.*, 2017 WL 4772348 at *3 (N.D. Cal. Oct. 23, 2017) (explaining that *ResQNet.com* did not preclude the use of commercial licenses).   Further, Nielsen's narrow approach is precluded by other Federal Circuit authority, recognizing that "any reasonable royalty analysis 'necessarily involves an element of approximation and uncertainty.'" *Lucent*, 580 F.3d at 1325 (quoting *Unisplay, S.A. v. American Electronic Sign Co., Inc.*, 69 F.3d 512, 517 (Fed. Cir. 1995)). "[T]he fact that a license is not perfectly analogous generally goes to the weight of the evidence, not its admissibility." *Ericsson, Inc. v. D-Link Systems, Inc.*, 773 F.3d 1201, 1227 (Fed. Cir. 2014) (citing *Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1326 (Fed. Cir. 2014), overruled on other grounds by *Williamson v. Citrix Online, LLC*, 792 F.3d 1339 (Fed. Cir. 2015) (en banc)).  "[L]icenses may be presented to the jury to help the jury decide an appropriate royalty award." *Ericsson,* 773 F.3d at 1227, citing *Monsanto Co. v. McFarling*, 488 F.3d 973,

24

978 (Fed.Cir.2007) ("An established royalty is usually the best measure of a 'reasonable' royalty for a given use of an invention").

The cases cited at pages 10-12 of Nielsen's brief[14] do not support its argument to the effect that a license for an entire ACR system (as from ▮▮▮▮▮▮▮▮ would be less valuable than a license for a tiny part of that system. There is no basis for excluding paragraphs 109, 111, or 181, of Ms. Johnson's report, which simply establish the premise of Georgia-Pacific Factor 1, 2, and 12, respectively. In fact, Nielsen attempts to sweep any discussion of the ▮▮▮▮▮▮ Agreement under the rug, even though TVision had historically used ▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮. (Ex. 5 ¶ 35; Ex. 8, ¶ 26-27). There is no basis to exclude paragraphs 182-195 of Ms. Johnson's report, which simply lay out the terms of the ▮▮▮▮▮▮ Agreement and the subsequent Amendment. Paragraphs 26-27 of Ms. Johnson's report provide factual background on TVision's historical relationship with ▮▮▮▮▮▮ and its use of ▮▮▮▮▮▮ as its ACR provider prior to ▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮ Furthermore, as discussed below, Ms. Johnson's analysis of the ▮▮▮▮▮▮ Agreement in paragraphs 201 to 205 accounts for the differences in licensing rights between the ▮▮▮▮▮▮ Agreement and the hypothetical license.

Nielsen incorrectly contends that Ms. Johnson did not sufficiently compare the ▮▮▮▮▮▮ Agreement to the bare patent license from the hypothetical negotiation. Not so. Ms. Johnson's comparability analysis, which spans four pages of her report, specifically walks through the adjustments that need to be considered for the ▮▮▮▮▮▮ Agreement in order to account for the fact that the hypothetical license is a bare patent license. Indeed, paragraphs 196 to 208 explicitly opine to the economic and technical comparability of the ▮▮▮▮▮▮ Agreements and the hypothetical license, including "comparability of the parties, the timing

---

[14] The *ResQNet.com* quote in *LaserDynamics, Inc. v. Quanta Comput., Inc.,* 694 F.3d 51, 79 (Fed. Cir. 2012) is taken out of context. *LaserDynamics* affirmed the use of the implied licenses. *Id.* at 73.

and terms of the agreements, the licensed technology and products." (*see also* Ex. 13, Johnson Dep. Tr. 180:21-181:13).

The fact that the ▇▇▇▇ Agreement was not available to TVision in May 2018 is irrelevant to the analysis of the ▇▇▇▇ Agreement itself as a datapoint in this case. Paragraph 288 cites to TVision's historical payment structure under the ▇▇▇▇ Agreement, which is "▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇" and is based on evidence in the record. Nielsen claims that "[t]he pricing of an unavailable deal does not inform the hypothetical negotiation because the benefits of that deal were not available to TVision at that time at that price." Nielsen provides no basis for this argument. The Market Approach is not limited to "deals" that would only be available to the parties of the hypothetical negotiation; rather, the purpose of the Market Approach (as considered under *Georgia-Pacific* Factor12 calls for consideration of "customary [rates] in the particular business or in comparable businesses to allow for the use of the invention or analogous inventions") is to consider actual market transactions that are comparable to the parameters of the hypothetical negotiation, make necessary adjustments that are relevant to the case facts, and assess quantitative and/or qualitative impact on the hypothetical negotiation. Similar to when purchasing a home, a buyer will consider the price of other homes that have sold in the area and are no longer available for purchase to inform the price the buyer is willing to pay for homes that are available on that market. More importantly, Nielsen's position that opinions relying on the ▇▇▇▇ Agreement should be excluded when TVision historically used ▇▇▇▇ as its ACR provider, is unreasonable and unsubstantiated.

Given the above, Nielsen has no basis to exclude paragraphs 27, 232 (bullet 11), 235-236, Figures 1 and 16, and Exhibits 3.0, 7.0 of Ms. Johnson's report, which summarize the opinions that stem from the analysis performed.

### F. Federal Circuit and Supreme Court Case Law Permits Ms. Johnson To Provide Opinions Based In Part On Post-Hypothetical Negotiation Information

It is well settled that factual developments occurring after the date of the hypothetical negotiation can inform the damages calculation. *Lucent,* 580 F.3d at 1333, citing *Sinclair*, 289 U.S. at 698. Although a reasonable royalty analysis requires "consideration of a hypothetical negotiation on the date of first infringement," the analysis does not "automatically exclud[e] evidence of subsequent events." *Harris Corp. v. Ericsson, Inc*., 417 F.3d 1241, 1257 (Fed. Cir. 2005) ("the purpose of looking at future events is 'to bring out and expose to light the elements of value that were there from the beginning,'" quoting *Sinclair*, 289 U.S. at 698). Thus, Nielsen's argument at pages 14-16 is simply wrong as a matter of law.

Nielsen's reliance on *Honeywell*, 378 F. Supp.2d at 465, cited at page 13 of its brief, is misplaced for a number of reasons, not the least of which is that Judge Sleet approved the use of post-hypothetical negotiation sales projections, holding they were not precluded by the statute or by the *Interactive* decision. Judge Sleet did not hold that post-negotiation information can be used *only* for "discouraging infringement" as Nielsen argues. Further, *Lucent* makes abundantly clear that "neither precedent nor economic logic requires us to ignore information about how often a patent invention has been used by infringers . . . since the frequency of expected use and predicted value are related.* * * [T]he hypothetical analysis 'permits and often requires a court to look to events and facts that occurred thereafter and that could not have been known to or predicted by the hypothesized negotiators." *Lucent,* 580 F.3d at 1333.

None of Nielsen's specific objections have any merit. Nielsen first takes issue with Ms. Johnson's analysis of *Georgia-Pacific* Factor #8, which addresses "the established profitability of the product made under the patent; its commercial success; and its current popularity." Challenged paragraphs 130-134, 136-142 of Ms. Johnson's report rely on produced documents and publicly available sources to summarize TVision's financial standing during the relevant

27

period.  Nielsen also argues to preclude Exhibits 11.0-11.2, 12.0-12.2 under the premise that it contains information after the hypothetical negotiation date.  This illustrates the egregiousness of Nielsen's position.  For example, Exhibit 11.0 depicts various TVision forecasted income statements for the 2018 calendar year.  Among these forecasts is the May 2018 forecast that Dr. Keeley relies on and Nielsen argues is "a substantiated, accurate, and reliable indication of TVision's expectations[.]" Nielsen Br. at 6.  Exhibits 11.1 and 11.2 to Ms. Johnson's report (Ex. 8) lay out TVision's forecast 2018 **as of** March 2018 and 2017, respectively—forecasts created by TVision prior to the hypothetical negotiation.  Yet Nielsen labels all of those as "information that existed only after the hypothetical negotiation." Br. at 14. Nielsen also seeks to exclude Figure 9 of the Johnson Report (citing Exhibit 12.0), which is nothing more than a summary of TVision's consolidated financial income statements, demonstrates the over-generalization of Nielsen's classification of "information that existed only after the hypothetical negotiation." D.I. 350 at 14.  These sections of Ms. Johnson's should not be excluded solely because they cite to financial information after the hypothetical negotiation.  In fact, Nielsen's own expert looks at post-hypothetical data throughout his report.  In his own analysis of *Georgia-Pacific* Factor #8, Dr. Keeley refers to TVision's gross profits from January 1, 2019 through June 30, 2023.  (Ex. 5, Keeley Rep. ¶ 102).  Elsewhere, Dr. Keeley discusses TVision's agreements with iSpot and VideoAmp, which were not entered into until 2020, two years after the hypothetical negotiation, in order to support his position regarding the "competitive" relationship between TVision and Nielsen ("…at the present time, TVision competes primarily indirectly and to a certain extent directly with Nielsen…TVision competes indirectly by selling its panel data to big data firms, such as VideoAmp and iSpot." Ex. 5, Keeley Rep. ¶¶ 48-49, 93; *see also*, Ex. 8, Johnson Rep. ¶ 124. Moreover, *see* Ex. 5, ¶¶ 53-56, 83, 95-97, where Dr. Keeley relies on post-hypothetical negotiation information.

Nielsen also takes issue with paragraphs 174-180 of Ex. 8, which encompass Ms. Johnson's entire analysis of *Georgia-Pacific* Factor #11.  This factor speaks to "the extent to which the infringer has made use of the invention; and any evidence probative of the value of that use" all of which inherently occur after the hypothetical negotiation.

Nielsen's broad attempt to purge all post-negotiation evidence from Ms. Johnson's report is untenable, especially given Nielsen's own reliance on post-negotiation evidence of lost profits.  In paragraph 221, Ms. Johnson references a February 2022 pitch deck to discuss TVision's products and multi-faceted process of non-patented elements outside of ACR technology. Nielsen's attempt to preclude Ms. Johnson's discussion of this document is hypocritical when Dr. Keeley cites the very same document <u>five times</u> in his report (Keeley Rep. ¶¶ 33 (n.44); 45 (n.830; 48 (n.90); 51, (n.101); 81 (n.161).  Nielsen's attempt to exclude paragraphs 222-223, 225-226 solely on the basis that the documents and evidence cited within are after the hypothetical negotiation is entirely unreasonable, while its own expert cites to documents and information post-dating the hypothetical report throughout his report.  Nielsen cannot have its cake and eat it too.

Thus, there is no basis for excluding Ms. Johnson's opinions in paragraphs 13 (bullet 7), 130-34, 136-42, 174-80, 221-23, 225-26, 229, 242, 243 (bullets 7-8), 286, 288, 290-92, 294, 306, Figures 9-10, 22, and Exhibits 10.0-10.1, 11.0-11.2, 12.0-12.2, 15.0-15.4, and 18.0-18.3.

### G. TVision's Experts Are Entitled To Offer Opinions Relating to Alternatives to the Alleged Infringing System

#### 1. Background

TVision used an ACR system that it licensed from ███████ until ███████ ████████████████████████████████████████████████████████████ ███████████████. Nielsen does not contend that the ███████ system infringed the '889 patent.  TVision turned to ███████████████████, for advice. ███████ is the company that provides TVision with reference signatures, based on media feeds that ███████



acquires from several sources. Ex. 9, Bolivar Dep. 15:3-10; 15:18-16:13. ▮▮▮ uses a proprietary software tool to ingest audio streams, which are then fed to ▮▮▮ fingerprint tool. *Id.* 39:8-16. Ms. ▮▮▮ has been in the ACR industry for 20 years. *Id.* 48:11-20.

In November 2016, Ms. ▮▮▮ advised TVision's CEO, Yan Liu, that ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 11 at TVSN_NLSN_00611705. After being informed that TVision was talking to ▮▮▮ and scheduled to talk to ▮▮▮ in January 2017, Ms. ▮▮▮ informed Mr. Liu that "▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ." *Id.* at -702. Ms. ▮▮▮ also recommended ▮▮▮ a company she had worked for before founding VidVita, which, she informed Mr. Liu was "compatible with our network." *Id.* at 701. In January 2018, Ms. ▮▮▮ also recommended ▮▮▮ as a ▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮ Ex. 12, TVSN_NLSN_00650292 at -291, -292. Ms. ▮▮▮ informed Mr. Liu ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮ " *Id.* at -284.

### 2. TVision Does Not Bear A Burden To Establish That An Alternative Is Non-Infringing

Nielsen argues that a "purported alternative must be available, acceptable, and non-infringing," assuming incorrectly that the burden is on TVision to prove that it is non-infringing. D.I. 350 at 14-15. On the contrary, the Federal Circuit does not place the burden is on the defendant to prove that an alternative is non-infringing. The burden of proving damages is on the patent owner. If Nielsen were attempting to prove lost profits, Federal Circuit case law would squarely place the burden on Nielsen to prove "an absence of acceptable, non-infringing alternatives." *Mentor Graphics,* 851 F.3d at 1285; *Presidio Components, Inc. v. Am. Tech. Ceramics Corp.*, 875 F.3d 1369, 1380 (Fed. Cir. 2017). Nielsen points to no Federal

Circuit case imposing a burden on the accused infringer to demonstrate "acceptable, non-infringing alternatives." Moreover, "[t]he correct inquiry under *Panduit* is whether a non-infringing alternative would be acceptable compared to the patent owner's product, not whether it is a substitute for the infringing product." *Presidio*, 875 F.3d at 1381. In this case, however, Nielsen is not attempting to prove lost profits, as it has admitted that it does not practice the '889 patent. Thus, Nielsen has the burden of proving a reasonable royalty.

Nielsen ignores this Court's decision in *RSB Spine, LLC v. DePuy Synthes Sales, Inc.*, 2022 WL 17084156 at *3 (D. Del. Nov. 18, 2022).[15] In *RSB,* Judge Andrews held that a defendant has no burden to establish that an alternative is non-infringing in a case such as this in which the plaintiff seeks only a reasonable royalty. Judge Andrews rejected the same argument that Nielsen makes here, finding "no case law that indicates any burden of proof when considering alternative products for a reasonable royalty analysis." Judge Andrews thus concluded that the issue would be the subject of cross-examination.

The Federal Circuit has specifically recognized that a reasonable royalty calculation may involve consideration of an acceptable non-infringing alternative. *See, e.g., Zygo Corp v. Wyko Corp.*, 79 F.3d 1563, 1571-72 (Fed. Cir. 1996) (explaining that in a hypothetical negotiation, the accused infringer "would have been in a stronger position to negotiate for a royalty rate knowing it had a competitive noninfringing device 'in the wings'"); *Riles v. Shell Exploration & Prod. Co.*, 298 F.3d 1302, 1312 (Fed. Cir. 2002) (finding relevant that "in the hypothetical negotiation that characterizes the reasonable royalty calculation, [the accused infringer] may have had non-infringing alternatives to installing with [the patented method]").

---

[15] Other districts have followed *RSB*. *Salazar v. HTC Corp.*, 2018 U.S. Dist. LEXIS 234544, 2018 WL 2033709 at *3 (E.D. Tex. March 28, 2018) (courts consider "next best alternative"); *Droplets, Inc. v. YAHOO! Inc.*, 2021 U.S. Dist. LEXIS 259658, 2021 WL 9038509, at *10 (N.D. Cal. Apr. 27, 2021) (concluding that neither party bears the burden because parties may rely on a variety of factors); *See also, Lighting Def. Grp. LLC v. Shanghai Sansi Elec. Eng'g Co.*, 2024 U.S. Dist. LEXIS 215893 *87-88, 2024 WL 4905222 (D. Ariz. Nov. 27, 2024).

As the Federal Circuit recently put it, "the core economic question is what the infringer" in the hypothetical negotiation "would have anticipated the profit-making potential of use of the patented technology to be, compared to using non-infringing alternatives." *VLSI*, 87 F.4th at 1346, citing *Aqua Shield v. Inter Pool Cover* Team, 774 F.3d 766, 770 (Fed. Cir. 2014); *see also, Carnegie Mellon University v. Marvell Technology Group, Ltd.*, 807 F.3d 1283, 1304 (Fed. Cir. 2015) ("A key inquiry in the analysis is what it would have been worth to the defendant, as it saw things at the time, to obtain the authority to use the patented technology, considering the benefits it would expect to receive from using the technology and the alternatives it might have pursued.").

*Astrazeneca AB v. Apotex Corp.*, 782 F.3d 1324 (Fed. Cir. 2015), cited by Nielsen on page 14, is distinguishable because the Court there found that the accused infringer "would have faced substantial technical and practical obstacles to marketing a non-infringing generic formulation, which included consideration of "FDA regulatory delay as one factor affecting the hypothetical negotiations," finding that the defendant's "proposed changes to its existing infringing formulation either had been rejected [by FDA] for technical reasons or were unlikely to result in a non-infringing product." *Id.* at 1335. Nothing in *Astrazeneca* places the burden on the defendant to establish that an alternative is non-infringing.

Nielsen misplaces reliance on cases from other districts. See Nielsen brief at 16. Those cases are not binding, and Nielsen has failed to explain why this Court should follow those opinions as opposed to Judge Andrew's opinion[16] and relevant Federal Circuit precedent. First,

---

[16] *Correct Transmission, LLC v. Nokia of Am. Corp.*, 2024 U.S. Dist. LEXIS 53470, 2024 WL 1289821, at *4 (E.D. Tex. Mar. 26, 2024); *Paltalk Holdings, Inc. v. Cisco Sys., Inc.*, 2025 U.S. Dist. LEXIS 175986, 2025 WL 2581690, at *10 (W.D. Tex. Aug. 27, 2025) (ruling on post-trial motions denied a new trial after "both sides presented competing testimony regarding the availability of non-infringing alternatives," establishing that this is a jury issue); *Smart Skins, LLC v. Microsoft Corp.*, No. C15-544, 2016 U.S. Dist. LEXIS 106030, 2016 WL 4148091, at * 2 (W.D. Wash. July 1, 2016) (reciting that Defendant failed to disclose "any expert testimony relating to non-infringing alternatives in its opening expert report); *Pavo Sols. LLC v. Kingston*

Nielsen has failed to prove that anyone has ever commercially used the invention of the '889 patent in an ACR system. And Nielsen, itself, never used it. Ex. 6 at 8. Second, the '889 patent itself admits that there were non-infringing alternatives in the market. Ex. 1, 1:21-26; 2:55-3:5. Third, the ███████ ██████████████████████████████████████████ ███████ ██████████████████████████████████████████ Ex. 5, ¶ 35. Fourth, Nielsen has shown that it is not bashful about filing patent infringement lawsuits: it has sued TVision five times, sued TVision's customer VideoAmp twice and TVision's supplier once. Yet, Nielsen has never sued the providers of the alternative ACR systems that Ms. ██████ recommended to TVision that VidVita was able to use. This Court's opinion in *Shure Inc. v. ClearOne, Inc.* 2021 U.S. Dist. LEXIS 196017, 2021 WL 4748744 (D. Del. Oct. 8, 2021) is inapposite because an expert's testimony was precluded for lack of foundation.

### 3. This Court Should Not Exclude TVision's Experts' Opinions Relating to the ██████████ Alternative

Dr. David Anderson, TVision's technical expert, is a professor in the school of Electrical and Computer Engineering at Georgia Tech, who holds a Ph.D. in Electrical and Computer engineering.[17] Dr. Anderson has reviewed prior art ACR systems.[18] After describing the basics of signal analysis using overlapping frames with forms of Fourier transforms (*id.* ¶¶ 17-47), Dr. Anderson states,

> 48. Haitsma, Kenyon, Jackson, Cheng, and Wang as described below also use the same basic approach of dividing the signal into overlapping frames, computing a spectral transformation of each frame, identifying salient features or characteristics of the spectra (signatures), converting these features into descriptors or hashes, and using these to match the received audio to samples in a database. The main differences between their methods are in the details of how the signatures are generated. ***An important observation is that the steps are largely interchangeable—meaning that the basic structure and***

*Tech. Co., Inc.*, No. 14-cv-01352, 2019 WL 8138163, at *21 (C.D. Cal. 2019) (similar); *SPEX Techs. v. Apricorn, Inc.*, No. 16-cv-07349, 2020 WL 1289546, at *2 (C.D. Cal. 2020) (similar); *Stoller Enters., Inc. v. Fine Agrochemicals,* 705 F. Supp. 3d 774, 798 (S.D. Tex. 2023)

[17] Ex. 17, July 7, 2025 Anderson Opening Supp. Invalidity Rept. ¶¶ 1-2.

[18] *See id, passim.*

> ***operation of a content-recognition system remain the same if another
> signature- and/or hash-generation method is substituted.***

*Id.* ¶ 48 (emphasis added).  Neither Nielsen nor its experts dispute this analysis.

No authorities cited by Nielsen undermine Dr. Anderson's opinion that ▮▮▮▮▮ could have redesigned its software to avoid infringement.  Ex. 18 ¶¶ 124-125. The district court decision in *Asetek Danmark*,[19] cited by Nielsen at page 17 of its brief, is inapposite. A few paragraphs before the quotation upon which Nielsen relies, *Asetek Danmark* cites *Presidio,* 875 F.3d at 1380, for the proposition that the burden is on the patentee to "prove the absence of acceptable, non-infringing alternatives" (citing the *Panduit* factors). There is no "presumption that an ▮▮▮▮▮ alternative was not available," as Nielsen contends at page 17. Indeed, Nielsen's argument flies in the face of *Grain Processing,* which requires "comparing the patented invention to its next-best available alternative(s) - regardless of whether the alternative(s) were actually produced and sold during the infringement." 185 F.3d at 1351.

Dr. Anderson has reviewed the ▮▮▮▮▮ source code at issue in this case. He has concluded that the ▮▮▮▮▮ software does not infringe because it utilizes ***inter-frame processing of the prior art, not the intraframe processing claimed in the '889 patent.*** But even if that were not true, it would be trivial for ▮▮▮▮▮ to revise its software to ensure that it does the inter frame processing of the prior art. Indeed, Dr. Anderson was specific regarding the non-infringing alternative:

> Modifying the ▮▮▮▮▮ system to use different descriptors (such as descriptors that are not based on the alleged comparison of a first spectral power and a second spectral power) would be simple to implement. For example, creating signatures based on the frequencies of peaks (as described in the prior art) or linear prediction coefficients (LPCs) would be viable alternatives. Since new signatures could be implemented within the same overall framework as previous signatures, implementing a new signature method could take as little time as a few hours to a few days by employing standard signal processing code libraries. Testing on a few tens of thousands of music

---

[19] *Asetek Danmark A/S v. Coolit Sys. Inc.*, 2022 U.S. Dist. LEXIS 246284 at *91, 2022 WL 21306657 at *30 (N.D. Cal. Sept. 11, 2022).

> files would require on the order of a few hours of computation time. Once a different method for creating signatures is chosen, computing new signatures for an entire static reference dataset would likely take only a few days of time on a single server.[11]
>
> [11] ▮▮▮▮▮▮ uses 2048-point FFTs with a frame offset of 80 and an 8kHz sampling rate, resulting in 100 FFTs per second. I benchmarked computing 2048-point FFTs on random data on my personal computer and found that an Intel i7-7900x processor can perform a 2048-point FFT in about 3.4usec. Since the FFT is the greatest single contributor to computational cost in most signatures, a conservative estimate for time to compute a new descriptor for each frame is 5usec-10usec. Based on this assumption, changing the signatures on a database of 100,000 hours of programming would take (100,000 hr * 100 frames/sec * 10e-6 sec/frame = 100 hours) of processing time—less than a week of computation on a single server. Using just a few servers could reduce this time to a single day.

Ex. 18, Anderson July 28, 2025 Rebuttal Report ¶ 124 (including n. 11).

*Sherwin Williams Co. v. PPG Indus.*, 2020 U.S. Dist. LEXIS 46631, 2020 WL 1283465 at *9 (W.D. Pa. March 18, 2020) is distinguishable on its facts. There, the Court cited *Mentor Graphics* for the proposition that the burden is on the patent owner to make "a prima facie showing under *Panduit*" that no non-infringing alternatives exist. 2020 U.S. Dist. LEXIS at *20. "[W]hether acceptable non-infringing alternatives exist . . . presents a question of fact." *Id* at *21. *Sherwin Williams* involved the question of whether the patentee had lost profits in the market for BPA-NI coatings. There, the court found that the patentee met its burden under *Presidio* to demonstrate the absence of a non-infringing alternative under circumstances where alternative products "must undergo a complicated and time-consuming qualification process." *Id.* at *24-*25. In sharp contrast, there are no time consuming qualification processes involved here, only coding. Nielsen is simply wrong when it argues on page 18 that Dr. Anderson does not describe how an alternative system would operate, as shown by the paragraph quoted above.

Nielsen's arguments at pages 18-20 are simply misplaced because they incorrectly assume that it was TVision's burden to prove non-infringing alternatives. As demonstrated

above, it was Nielsen's burden, and Nielsen has not and cannot meet it, if for no other reason than the '889 patent admits that non-infringing alternatives existed.

Equally meritless is Nielsen's argument at page 20-21 that TVision hasn't demonstrated that an ███████ redesign would not infringe third-party patents. Nielsen's bare argument to the effect that TVision's proposed solution might be covered by the Wang patent is unsupported by any evidence. Nielsen does not present a claim chart demonstrating how, if at all, Dr. Anderson's solution would infringe the Wang patent. Nielsen's citation of patents owned by Mufin, and Source Digital is laughable because Mufin and Source Digital were two entities that TVision actually considered as sources of ACR software, and there is no evidence that either one of those entities would have refused to license TVision.

Equally absurd is Nielsen's characterization of "hypothesized alternative systems that TVision allegedly could have used instead of ███████ infringing software." Nielsen Br. at 16. However, as Dr. Anderson has opined, it would have been trivial for ██████ to re-design its software to avoid infringement of the '889 patent had it been necessary to do so. Ex. 18 ¶ 124. In fact, the reason ██████ has not redesigned its ACR software is that it does not infringe, as TVision will prove at trial.

### 4. TVision's Experts' Opinions About A Potential TVision-Internal Alternative Should Not Be Excluded

#### a)      Facts

Nielsen recognizes that Mr. Sidhu is TVision's Chief Technology Officer. Nielsen Br. at 23. Mr. Sidhu had done between 100 and 500 estimates for software development projects during his career. Sidhu Dep. 9/9/2025 at 242:6-20. Compared with other projects Mr. Sidhu has managed, ACR software is not complex. *Id.* 242:21-243:10. There is no merit to Nielsen's motion to exclude TVision's experts opinions that rely on estimates of the cost and development time for TVision to create its own ACR system, which is based on Dr. Anderson's discussion with Mr. Sidhu. *See* Ex. 18 ¶ 126 (reflecting steps to be taken and engineering time required).

Mr. Sidhu testified that sometime in 2023, ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████ Ex. 19, Sidhu Dep. 125:14-126:22, 127:19-128:3. ███████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████████. Ex. 20, Sidhu Dep. 196:8-19; 196:20-197:4. The estimate was based on Mr. Sidhu's experience in software development prior to the date that TVision began working on Project Macro. *Id.* 197:9-198:1. Mr. Sidhu testified that reading literature regarding the fingerprint algorithm is "typically the process one would follow" to develop software. *Id.* 205:17-206:14. ***Mr. Sidhu definitively testified that the estimate he gave to Dr. Anderson was not based on his experience with Project Macro***. *Id.* 211:13-212:3. Thus, there is no reason to exclude the expert reports that rely on their conversations with Mr. Sidhu.

### b) Dr. Anderson and Ms. Johnson Properly Rely on Mr. Sidhu's Estimate

Contrary to Nielsen's argument, Rule 701 does not preclude experts Anderson and Johnson from considering Mr. Sidhu's estimate as part of their expert reports. The fact is that Mr. Sidhu had made an estimate in the ordinary course of business in 2023 for the cost of TVision creating its own ACR software. There is no reason to believe Mr. Sidhu's estimate of the development time of creating an ACR system in 2018 would have been any different than the development time in 2023, based on his vast experience in estimating software development projects. Thus, Mr. Sidhu's testimony should not be excluded. Mr. Sidhu has done hundreds of estimates for software development projects. Ex. 20, 242:6-20. Mr. Sidhu has managed projects where his team had zero experience in the subject matter before commencing work. *Id.* 242:21-243:10. The creation of ACR software is less complex than other projects Mr. Sidhu has supervised. *Id.* This testimony about Mr. Sidhu's past experience refutes Nielsen's bare argument that Mr. Sidhu is not qualified to provide an estimate because he is not an expert in

ACR software. D.I. 350 at 23-25.  And because he is not employed by TVision to provide expert testimony, he was not required to serve an expert report under Fed. R. Civ. P. 26(A)(2)(b).

Dr. Anderson has provided an expert report concluding that Mr. Sidhu's estimate is a good proxy for the costs of TVision creating its own ACR software at the time of the hypothetical negotiation. Ex. 18, ¶ 126. Nielsen does not dispute Dr. Anderson's qualifications as an expert. Thus, Nielsen's entire argument Mr. Sidhu's estimate is misplaced. *See United States v. Sponaugle*, 2024 U.S. App. LEXIS 23077, 2024 WL 4144069 (3d Cir. 2024), permitting testimony by accountants who had worked for corporation because it was "based on his personal knowledge, as well as 'particularized knowledge that [he] ha[d] by virtue of his . . . position' Fed. R. Evid. 701 Advisory Committee's Note (2000)." *See also*, *Teen-Ed, Inc. v. Kimball Int'l, Inc*., 620 F.2d 399, 402-03 (3d Cir. 1980) (permitting accountant for company to testify how lost profits could be calculated based on the company's books); *McGoveran v. Amazon Web Servs., Inc.*, 2024 U.S. Dist. LEXIS 197034 at *8, 2024 WL 4626253 (D. Del. Oct. 30, 2024) (Bibas, J. sitting by designation) (permitting testimony of senior Amazon engineers about how technical features of Amazon's system work).

c) **Mr. Sidhu Had Expertise to Provide a Budget to TVision**

Nielsen's argument that Mr. Sidhu did not have sufficient expertise regarding TVision's ability to create its own ACR system is based on a false premise: that Mr. Sidhu did not have ACR experience. *See* Br. at 25-26.  Yet, Nielsen has not established that prior "ACR technology experience" is necessary to create an ACR system.  The portion of Dr. Anderson's testimony on which Nielsen relies proves the opposite: "It turns out that ACR systems, as far as signal processing systems go, aren't all that complex. And so its not like it's a highly specialized, no one else can understand what's happening type of problem." Ex. 24, Anderson Dep.181:13-182:16.  Dr. Anderson's testimony stands for the proposition that he would preferably consult

38

with a person with signal processing expertise, but that it is not necessary to do so. At most, this is a jury question subject to cross examination.

### d)    A TVision-Engineered ACR System was "Available" under Federal Circuit Case Law

At page 27 of its brief, Nielsen misapplies the term *ipse dixit* to Mr. Sidhu's assessment that TVision had the capabilities to develop its own ACR system in-house.  Mr. Sidhu made that assessment based on his extensive experience in software development after reviewing literature.  *See* section III.F.4.a., above.[20] A TVision-created ACR system would constitute an available technology: "an available technology not on market during the infringement can constitute a non-infringing alternative." *Grain Processing*, 185 F.3d at 1351.

### e)    TVision Does Not Bear The Burden of Proving Acceptable, Non-Infringing Alternatives

Nielsen, who has the burden of proof, implies throughout its argument that TVision bears the burden of proving that an internally-developed system would be "an acceptable" non-infringing alternative. Nielsen is wrong that TVision has the burden of proving that the system would not infringe. *RSB,* 2022 WL 17084156 at *3. In that regard, Nielsen's argument is especially unsupportable in this case because of the narrow scope of the invention. "It is undisputed that the asserted claims of the . . . ['889 patent] require that frequency components be processed within a single frame." D.I. 272 at 2. The ACRCloud software at issue doesn't do that to begin with: it processes spectral powers from within a window that encompasses 17 frames.  Ex. 18, ¶¶ 67-84. At the time Mr. Sidhu provided his estimate, Nielsen had taken the position (it turns out, mistakenly) that the ▮▮▮▮▮▮▮ function of ACRCloud's software

---

[20] Ms. Johnson noted Mr. Sidhu's personal experience in the industry (Ex. 13, Johnson Dep Tr. 64:3-65:14), the technical know-how demonstrated by TVision's personnel in developing its innovative eyes on screen technology which was not generally known in the industry (Ex. 13, 213:11-15). She also noted Dr. Anderson's independent assessment of Mr. Sidhu's technical capabilities (Ex. 13 215:1-215:13), and that given that TVision has in fact developed ACR functionality internally, it served to confirm that Mr. Sidhu's assessment of his team's technical capabilities was accurate. *Id*. 77:7-17, 78:15-79:1, 215:14-216:8.

processed spectral powers only from within a single frame. *See* D.I. 272 at 2-3. Thus, the only parameter that TVision had to solve to avoid infringement was to create fingerprints that compared spectral powers from more than one frame: a simple workaround.

Nielsen's argument incorrectly infers that to be acceptable, the substitute ACR system would need to perform as well as the infringing ACRCloud system" or would be "good enough to substitute for the infringing technology." Br. at 31. In this case, there is no evidence at all that there was a demand for the alleged infringing product—ACR software comparing intraframe spectral powers. Nor is there any evidence that the data TVision sells, which tracks whether the viewer is paying attention to a particular program or advertisement, is in any way dependent on the alleged invention. Thus, Nielsen's argument regarding "acceptability" fails because the alleged invention is entirely unrelated to the product TVision is selling.

At pages 29-30 of its brief, Nielsen again argues that a proposed alternative is not available if it infringes a third party patent. However, it is not TVision's burden to prove a negative. In *Robertson Transformer Co. v. General Electric Co.*, 2016 WL 4417019 (N.D.Ill. Aug. 19, 2016), the court denied plaintiff's motion to exclude testimony by defendant's expert on this basis. Here, there is no evidence that any alternatives would infringe. Further, the cases cited by Nielsen at page 31 do not support its argument. In *WhereverTV, Inc. v. Comcast Cable Commc'ns, LLC*, 2022 WL 2751752 at *7 (M.D. Fla. Jul. 14, 2022), the court stated that the "availability and acceptability" of the proposed alternatives "must also be substantiated with record evidence."[21] Here, the record evidence is the investigation that TVision's employees

---

[21] In *WhereverTV*, the court excluded only "other alternative models, which [the expert] alludes to only vaguely." *Id.* In sharp contrast, the systems available to TVision at the time of the hypothetical negotiation are identified in Ms. Johnson's and Dr. Anderson's reports, and will be the subject of testimony of fact witnesses at trial. (Ex. 8, Johnson Rep. ¶¶ 157-160, 162-164); Ex. 18, Anderson Rept. ¶¶ 128-133. Neither of those opinions are "wholly speculative," as was the case in *SRI Int'l Inc. v. Internet Sec. Sys., Inc.*, 2011 WL 5166436 at *2 (D. Del. Oct. 31, 2011). *Astrazeneca*, 782 F.3d at 1340-41, was a drug case in which the court held that an alternative was not available to the defendant because there was evidence

undertook after they learned that the ███████████ would not be renewed, in which they identified a number of different acceptable alternative ACR systems to the one they actually chose, which were recommended to them by the CEO of ██████ *See* section III.G.1., above. Cases excluding testimony about products that did not exist in the marketplace at the time of the hypothetical negotiation are inapposite because the evidence will show that TVision considered alternative, existing ACR systems before licensing █████████ system.[22]  Thus, there is no basis for precluding Ms. Johnson's cost model.

Nielsen's argument that TVision could not have developed an alternative in May 2018 is entirely misplaced.  Br. at 32.  Nielsen appears to argue that Mr. Sidhu provided his estimate of the time and expense to develop an in-house ACR system some time before March 2023. Nothing in the record indicates that anything would have prevented TVision from doing this in 2018.  At most, Nielsen's argument may present a jury question, and neither Dr. Anderson's nor Ms. Johnson's opinion should be excluded.

At pages 32-33 of its brief, Nielsen argues that Dr. Anderson and Ms. Johnson do not even attempt to assert that TVision could have developed an alternative that would have been available at the time of the May 2018 hypothetical negotiation.  However, this Ms. Johnson explicitly testified that the analysis was focused on the period leading up to the hypothetical negotiation ("Mr. Sidhu's assignment in my interview was focused on what TVision's timing would have been back in the period leading up to the  hypothetical negotiation" see Ex 13, 67:17-68:12, "the question as posed to Mr. Sidhu was not the time and cost to develop the ACR functionality currently, I was asking Mr. Sidhu to imagine himself in the period leading up to May 2018 if TVision did not have access to not just the '889 Patent but very broadly to ACRCloud technology,

---

that it was covered by a patent. Evidence as to whether Project Macro would be covered by a patent is, by agreement, not properly the subject of this lawsuit.  In contrast to *Visteon Global Techo. V. Garmin Intern.*, 903 F. Supp.2d 521, 528 (E.D. Mich. 2012), the scope of the claims of the '889 patent are extremely narrow.

[22] *Novartis Corp. v. Ben Venue Labs.*, 271 F.3d 1043, 1051 (Fed. Cir. 2001) cited by Nielsen on page 17 of its brief, is inapposite because the decision concerned a non-infringement issue.

that there were no other ACR providers into the market, what would be his cost estimate in that situation where there are absolutely no other alternatives and this was the only method of gaining ACR functionality, what would be the time associated with getting a system up and running, which is very different than his historical experience, his actual experience." See Ex. 13, 77:22-14; 79:8-80:7).

### 5. There is no basis to Preclude Opinions about Third-Party Alternatives

There is no merit to Nielsen's motion to exclude the opinions of TVision's experts regarding third party alternatives. Nielsen ignores evidence cited in Ms. Johnson's report of the alternatives that TVision had historically considered before choosing ACRCloud. Nielsen also ignores evidence of record, including the deposition testimony of the CEO of VidVita, who suggested several alternatives to TVision, based on her 20-years of experience in that market. *See* section III.G.1, above.

Thus, in November 2016, Ms. Bolivar advised TVision's CEO, Yan Liu, that VidVita "gives companies the freedom to use their own proprietary or licensed ACR."  Ex. 11 at TVSN_NLSN_00611705.  After being informed that TVision was talking to ACRCloud and scheduled to talk to Mufin, in January 2017, Ms. Bolivar informed Mr. Liu that "The [Mufin] team is great, too. We have tested their ACR with our network . . . . I can think of other recommendations . . . ." *Id.* at -702.  Ms. Bolivar also recommended MRL, a company she had worked for before founding VidVita, which, she informed Mr. Liu was "compatible with our network." *Id.* at 701. In January 2018, Ms. Bolivar also recommended Source Digital as a "new ACR tech we [VidVita] are working with." Ex. 12, TVSN_NLSN_00650292 at -291, -292. Ms. Bolivar informed Mr. Liu "We are 100% committed to working with TVision regardless of the ACR provider and even doing our own ACR using Source's original algorithm, our company will continue to maintain a neutral position by supporting companies such as ACRCloud, Mufin, MRL, etc." *Id.*at -284.

Indeed, contemporaneous evidence demonstrates that multiple third-party ACR solutions were both available in the marketplace and actively considered by TVision when it sought to replace ██████████████. Ms. Johnson's report cites concrete examples, including the fact that in January 2017, VidVita had recommended ACRCloud and Mufin as "top ACR solutions." Ex. 8, ¶ 158. In January 2017, TVision also received a cost proposal from Mufin that included terms regarding the cost components for setup, pilot, and production phases of the system rollout. *Id.* ¶ 158. In October 2017, in response to TVision's inquiry. Axwave confirmed that it had solutions for TVision's "primary issue [that] we are looking to solve for today is commercial detection and associated metadata." *Id.* In January 2018, TVision requested pricing quotes from Source Digital, a company that VidVita had already been working with for ACR functionality. *Id.* There is no speculation involved here; these communications indicating the availability of third-party ACR alternatives are all in the record, and Nielsen has provided no evidence that these alternatives were not available.

In the face of this evidence, Nielsen relies on testimony of its expert, Dr. Kyriakakis. But TVision has moved to preclude Dr. Kyriakakis from testifying about the alternatives because his expert reports fail to establish that he has any familiarity with any of them. Both Nielsen's arguments, and its experts' opinions fail because they entirely ignore the marketplace for ACR software in 2017 and 2018. Instead, Nielsen employs snippets from deposition testimony and quotations out of context. The bottom line is that there is no merit to any of Nielsen's arguments in pages 33-45 of its brief regarding third party ACR software that was available in the marketplace and that had been recommended to TVision by VidVita.

Nielsen also questions the *acceptability* of these alternatives, but the record again undermines Nielsen's position. For example, Nielsen grossly misinterprets a document when it argues that "TVision tested an MRL ACR product in 2017 before deciding to use the infringing ACRCloud technology and rejected MRL's solution because of its erroneous output." Nielsen

Br. at 34. Ms. Johnson directly addresses this misinterpretation of the document, where she states that "MRL's failure rate is not relevant to the configuration used by TVision, which utilizes a dedicated device that is placed next to the panelist's TV, as the testing evaluated MRL's capability when using mobile phones to pick up audio." Ex. 8, ¶ 159. Evidence in the record indicates that pricing was a large consideration to TVision when evaluating ACR providers, such as Mufin and Source Digital. Ex. 8, ¶¶ 158, 162, 164-165. Nielsen's contention that MRL was not available because it had been used only for mobile operating systems (Br. at 34-35) is not a reason to exclude Ms. Johnson's and Dr. Anderson's opinion, but, at most, is an issue for cross-examination and jury consideration. Nielsen's attempt to exclude testimony about Axwave (Br. at 35-37) fails for the same reason.

Nielsen's argument regarding Mufin is contradicted by the fact that VidVita recommended Mufin. Ex. 11 at -702. The cost/technical issues Nielsen attempts to raise at pages 37-38 are, at most, for cross examination and the jury. The same is true of Nielsen's argument regarding Source Digital, another ACR provider recommended by VidVita in 2018. In sum, Nielsen's attempt to portray the third-party alternatives as unacceptable is not supported by the record. There is certainly no justification for excluding Ms. Johnson's discussion of these alternatives, all of which are grounded in factual evidence of options TVision actually considered.

Ms. Johnson refers to additional alternatives in her report (Answer, Beatgrid, Dat-Track) as potential options that TVision considered (and actively requested VidVita to make introductions) to demonstrate the absurdity of the idea that TVision would not consider a next-best alternative when necessary. Ex. 8, ¶¶ 150, 157, 160. In citing those alternatives, Ms. Johnson responded directly to Dr. Keeley, who opined that TVision had no viable alternative "even to this day." Ex. 5 ¶ 49. Ms. Johnson points out that in addition to the alternatives available at the time of the hypothetical negotiation (*i.e.*, ████████████████████

44

██████ newer entrants like ████████████████████████ since become available, illustrating the fallacy of Nielsen's "no alternative" theory.  Ex. 8, ¶ 160.  Furthermore, Ms. Johnson has provided extensive analysis and evidence of ████ ████████ ██████ and ██████ ██████ as next-best alternatives in her report.  Nielsen has no basis to exclude ¶¶ 13 (bullet 2), 149-50, 157, 160, and 232 (bullet 8), 235-36, 239, 243 (bullet 2), 251-55, 269-70, 281, Figures 1, 11-12, 16, 21, and Exhibits 3.0, 5.0, 18.0, and 18.2, all of which contain analyses unrelated to these additional alternatives.

Nielsen asks too much when it suggests that this Court "preclude Ms. Johnson from offering any opinions about the "██████ product, Nielsen moves to strike paragraphs 13 (bullet 2), 232 (bullet 8), 235-236, 239, and 243 (bullet 2).  Nielsen Br. at 38.  The company ██████ is not mentioned anywhere in those paragraphs.  Rather, Ms. Johnson opines of value indicators from her comprehensive analysis of next-best alternatives.  The company ██████ is not mentioned anywhere in these paragraphs.  For Beatgrid and Dat-Track, Nielsen purports to exclude the same paragraphs using the same flawed reasoning.  Nielsen Br. at 38-39.  The companies ██████ and ██-████ are not mentioned anywhere in these paragraphs. Likewise, Ms. Johnson's opinions expressed in paragraphs 251-255, 269-270, 302, and 281 are part of a section of her report that disputes the reliability of Dr. Keeley's consideration of alternatives.  The companies ████████████████████ are not mentioned anywhere in these paragraphs.  There is no merit to Nielsen's attempt to preclude these paragraphs of Ms. Johnson's report.

Nielsen seemingly focuses on Ms. Johnson's cite to TVision's testimony that "the ACR Provider Market is "Fairly Commoditized" with "Very Similar Capabilities" while ignoring the slew of evidence discussed above that each point out specific companies that TVision considered in its process of finding a new ACR provider.  Moreover, Ms. Johnson does not cite to just "a TVision's employee's conclusory statement."  Both Tristan Webster and Yan Liu

testified to the availability of ACR providers that would have been next-best alternatives (Johnson Rep. ¶¶ 150, 157). Nielsen has no basis to exclude paragraphs 150, 157, 169-70, 177, 223, 253, which cite to testimony and facts of the record detailing exactly what Nielsen argues is absent from Ms. Johnson's report.

There is no merit to Nielsen's attempt contradict the testimony of TVision's witnesses that "the ACR provider market is 'fairly commoditized' and with companies providing 'very similar capabilities.'" Br. at 43. Evidence supports that statement. First, ████ recommended several ACR providers to TVision, stating that it could work with any of them. Second, the '889 patent, itself, admits that in 2004, ACR technology was well known. Ex. 1, 1:21-26. Those to pieces of evidence, alone, are sufficient for TVision's experts to reach the conclusion that ACR software was commoditized in 2018.

### 6. There Is No Basis For Precluding Ms. Johnson From Opining That A Reasonable Royalty Should Be Limited To The Cost Of An Alternative

Nielsen brazenly claims that Ms. Johnson "limits the proposed royalty from her 'cost' approach to the alleged cost of implementing proposed alternatives to the patented technology." Nielsen Br. at 42. Nowhere in her report does Ms. Johnson opine that the cost of an alternative is "a cap" to a reasonable royalty.

Nielsen cites to *Mars, Inc. v. Coin Acceptors, Inc.*, 527 F.3d 1359, 1373 (Fed. Cir. 2008), stating it is "wrong as a matter of law to claim that reasonable royalty damages are capped at the cost of implementing the cheapest available, acceptable, noninfringing alternative." Nielsen Br. at 45. However, *Mars* simply holds that reasonable royalty damages *can*, as a matter of law, be higher than the cost of a design-around. 527 F.3d 1373. It does not hold that a party cannot argue that a reasonable royalty should be based on the cost of a design-around. In fact, the Federal Circuit has held that one acceptable way of estimating a reasonable royalty is "estimate the value of the benefit provided by the infringed features by a comparing the accused

product to non-infringing alternatives." *Apple Inc. v. Motorola, Inc.*, 757 F.3d at 1315, *overruled on other grounds by Williamson*, 792 F.3d 1339 (Fed. Cir. 2015).

Furthermore, Nielsen mischaracterizes Ms. Johnson's selection of her royalty rate, in that Ms. Johnson did not select a royalty based on the cheapest cost to implement a proposed alternative. As summarized in Figure 1 of her report, Ms. Johnson considered the cost of three alternatives, with the cheapest resulting in no incremental expense to TVision resulting in royalty rate indicator of $0 (Ex. 8, Fig 1, ¶¶ 162-163). Clearly, Ms. Johnson's lump sum opinion of $45,000 is not capped at the cost of implementing the cheapest available, acceptable alternative.

Nielsen grossly oversimplifies Ms. Johnson's opinion. Her report reflects a comprehensive damages analysis, not a simplistic cost-only approach. Her opinion addresses fifteen different considerations that would frame a hypothetical negotiation under *Georgia Pacific* and considers quantitative indicators resulting from the Market Approach, Cost Approach, and Income Approach. Ms. Johnson provides her rationale as to why certain indicators should be weighed more or less heavily given how closely the indicator reflects the inventive aspect of the asserted patent (Ex. 8, ¶ 236) and notes that all of these indicator reflect the maximum benefit attributable to the '889 patent in that these values "still need[] to be split in some fashion between the licensor and the licensee to provide the licensor reasonable compensation for the use of its intellectual property, and the licensee reasonable compensation for assuming the business risks associated with developing, manufacturing, promoting, and selling the product that embodies the particular technology." Ex. 8, ¶ 237.

As outlined above, Nielsen has no basis to exclude paragraphs 156, 235-236, 238-239, Figure 11, and Exhibits 4.0, 5.0-5.4, 6.0-6.3, based on its flawed argument that Ms. Johnson is capping her reasonable royalty based on the Cost approach.

47

Nielsen also has no basis to exclude paragraphs 11-12, 103, 148-149, 172-173, 232 (bullet 8), Figures 1, 12, 16, 21, and Exhibits 3.0, 3.1, and 18.0 of Ms. Johnson's report, which summarize the opinions that stem from the analysis performed.

## IV. THIS COURT SHOULD DENY NIELSEN'S MOTION FOR PARTIAL SUMMARY JUDGMENT

### A. Reverse Doctrine of Equivalents (RDOE)

The Court should deny Nielsen's partial summary judgment motion regarding TVision's RDOE defense. As Nielsen admitted, the Federal Circuit never decided that the RDOE did not survive the 1952 Patent Act. *See Steuben Foods, Inc. v. Shibuya Hoppman Corp.*, 127 F.4th 348, 356-58 (Fed. Cir. 2025). Instead, the Federal Circuit in *Steuben Foods* analyzed the evidence under the RDOE. *See id.* at 358 ("Here, viewing the evidence in the light most favorable to Steuben, the nonmovant, a reasonable jury could have found the principles of operation of the accused product and claim 26 of the '591 patent were not 'so far changed,' as to support a theory of noninfringement under RDOE.").

### B. The *Cheung* Reference

The Court should deny Nielsen's partial summary judgment motion regarding *Cheung* because there are genuine disputes of fact regarding the priority date of the '889 patent and whether *Cheung* is entitled to the priority date of its provisional application.

First, while it was not listed in Nielsen's concise statement of facts, Nielsen's motion is contingent on its allegation that the "'889 patent is entitled to priority as of its provisional filing date of August 18, 2004." D.I. 350 at 47. Nielsen lists the following supporting citations as evidence: Ex. 1,'889 patent, Face; Ex. 42, Written Opinion of the International Search Authority for PCT/US05/29623.

Based on *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, which Nielsen itself cites, a "patent is only entitled to claim the benefit of the filing date of its provisional application if the disclosure of the provisional application provides support for the claims in the reference

patent in compliance with § 112, ¶ 1." 800 F.3d 1375, 1381 (Fed. Cir. 2015). To prove a reference is entitled to its provisional filing date, a party must "compare *the claims* of the . . . patent to the disclosure in the [] provisional application." *Id.* (emphasis in original). None of the evidence Nielsen lists shows that Nielsen has met its burden of persuasion and compared the '889 patent to the provisional patent application to which it claims priority, Provisional Application No. 60/603,024. Exhibit 1 is just the face of the '889 patent. Exhibit 42, as Nielsen admitted itself, relates to the parent PCT application of the '889 patent, not the '889 patent itself. D.I. 350 at 47-48. Thus, there is a genuine dispute as to material fact of whether the '889 patent is entitled to a priority date of February 26, 2004. If the '889 patent is not entitled to the priority date of February 26, 2004, *Cheung* would be prior art under not only 35 U.S.C. § 102(e) but also 35 U.S.C. § 102(a).

Second, even assuming that the '889 patent is entitled to the priority date of February 26, 2004, there is still a genuine dispute as to material fact of whether *Cheung* is entitled to the priority date of its provisional application filed on February 26, 2004 under 35 U.S.C. § 102(e). As an initial matter, Nielsen's motion is premised on its assertion that *Cheung* is not entitled to the priority date of its provisional application, but Nielsen's concise statement does not state this assertion explicitly. D.I. 349 at 1. Nielsen's motion should be denied on that ground alone.

Moreover, if the evidence Nielsen provided is sufficient to show that the '889 patent is entitled to the August 18, 2004 priority date of the '024 Provisional Application, then the corresponding evidence regarding *Cheung* shows that it is entitled to the February 26, 2004 priority date of its provisional application. For example, a cursory review shows that the specification of the *Cheung* provisional application is substantially identical to the specification of the *Cheung* reference specification. *Compare* Ex. 29 to D.I.351 (*Cheung*) *with* Ex. 22 (*Cheung* provisional). The only differences relate to the references to the earlier applications made by the later applications (*i.e.*, *Cheung* at 1:6-9) and extrapolation of certain tables to

49

separate figures (*i.e.*, *Cheung* at Figs. 9-13). Because the claims of *Cheung* are supported by the *Cheung* reference specification by the virtue of the USPTO's allowance of the *Cheung* patent, and the *Cheung* provisional specification is substantially identical to the *Cheung* reference specification, the claims of the *Cheung* reference are supported by the *Cheung* provisional application. *Dynamic Drinkware,* 800 F.3d at 1378, citing 35 U.S.C. § 119(3)(1)(2006.

Lastly, it is TVision's burden of proof *Cheung* is prior art, but the time for TVision to present evidence for such proof is at trial, including via direct or cross examination. TVision has already met its initial burden of production by arguing *Cheung* invalidates the asserted claims of the '889 patent. *See* Ex. 2 to D.I. 351 (Anderson Supp. Op. Rep. at ¶¶ 102-07). TVision's expert, Dr. Anderson, specifically stated that "If Nielsen contests whether any of the references I have relied upon are indeed prior art, I reserve the right to supplement my report in rebuttal." *Id.* at ¶ 61. Nielsen's experts never challenged *Cheung*'s status as prior art. Instead, Nielsen is attempting to use this partial summary judgment to prevent TVision from presenting evidence at trial to show that *Cheung* invalidates the asserted claims of the '889 patent. The situation here is different from the cases cited by Nielsen, all of which involve situations where the parties have had a chance to represent all invalidity evidence, and none of which involve premature summary judgment motions.

### V. CONCLUSION

For the reasons set forth above, Nielsen's motions should be denied.

|  |  |
|---|---|
|  | /s/ Emily S. DiBenedetto |
|  | Andrew E. Russell (No. 5382) |
| OF COUNSEL: | Emily S. DiBenedetto (No. 6779) |
| Jason Xu | SHAW KELLER LLP |
| RIMÔN LAW P.C. | I.M. Pei Building |
| 1990 K. Street, NW, Suite 420 | 1105 North Market Street, 12th Floor |
| Washington, DC 20006 | Wilmington, DE 19801 |
| (202) 470-2141 | (302) 298-0700 |
|  | arussell@shawkeller.com |
| Eric C. Cohen | edibenedetto@shawkeller.com |
| RIMÔN LAW P.C. | *Attorneys for Defendant TVision Insights, Inc.* |
| 4030 Wake Forest Road, Suite 300 |  |
| Raleigh, NC 27609 |  |
| (984) 960-2860 |  |

Steig D. Olson
Sami H. Rashid
QUINN EMANUEL URQUHART
  & SULLIVAN LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000

Patrick D. Curran
QUINN EMANUEL URQUHART
  & SULLIVAN LLP
11 Huntington Avenue, Suite 5200
Boston, MA 02199
(617) 712-7100

Adam B. Wolfson
QUINN EMANUEL URQUHART
  & SULLIVAN LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Benjamin D. Brown
Richard A. Koffman
Daniel McCuaig
COHEN MILSTEIN SELLERS
  & TOLL PLLC
1100 New York Ave NW, Suite 800
Washington, DC  20005
(202) 408-4600

Dated: January 5, 2026

51

## CERTIFICATE OF SERVICE

I hereby certify that on January 5, 2026, this document was served on the persons

listed below in the manner indicated:

**BY EMAIL:**

David E. Moore
Bindu A. Palapura
Malisa C. Dang
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
mdang@potteranderson.com

Clifford Katz
Nithya Damodharan
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800
ckatz@kelleydrye.com
ndamodharan@kelleydrye.com

Steven Yovits
Constantine Koutsoubas
Jason P. Greenhut
Douglas Lewis
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
(312) 857-7070
syovits@kelleydrye.com
ckoutsoubas@kelleydrye.com
jgreenhut@kelleydrye.com
dlewis@kelleydrye.com

Matthew Chakmakian
KELLEY DRYE & WARREN LLP
One Jefferson Road 2nd Floor
Parsippany, NJ 07054
(973) 503-5900
mchakmakian@kelleydrye.com

*/s/ Emily S. DiBenedetto*
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Defendant TVision Insights, Inc.*

52

# EXHIBIT 1

US007783889B2

(12) **United States Patent**

Srinivasan

(10) **Patent No.:**     **US 7,783,889 B2**

(45) **Date of Patent:**     **Aug. 24, 2010**

(54) **METHODS AND APPARATUS FOR GENERATING SIGNATURES**

(75) Inventor: **Venugopal Srinivasan**, Palm Harbor, FL (US)

(73) Assignee: **The Nielsen Company (US), LLC**, Schaumburg, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 199 days.

(21) Appl. No.: **11/676,452**

(22) Filed: **Feb. 19, 2007**

(65) **Prior Publication Data**

US 2007/0274537 A1     Nov. 29, 2007

**Related U.S. Application Data**

(63) Continuation of application No. PCT/US2005/029623, filed on Aug. 18, 2005.

(60) Provisional application No. 60/603,024, filed on Aug. 18, 2004.

(51) **Int. Cl.**
**H04L 9/00**          (2006.01)

(52) **U.S. Cl.** .......................... **713/179**; 713/176; 725/19; 725/20; 380/202; 380/239; 381/94.3

(58) **Field of Classification Search** ................. 713/160, 713/176, 179;  380/202, 206, 207, 239, 253, 380/229;  382/100, 232, 240, 191;  381/94.3; 375/134;  704/268, 273;  725/19, 20
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,230,990  A      10/1980   Lert, Jr. et al.

(Continued)

FOREIGN PATENT DOCUMENTS

AU          718227        11/1997

(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office, "PCT International Search Report," issued by the International Searching Authority of the United States Patent and Trademark Office on Feb. 6, 2008, in connection with a counterpart international application No. PCT/US2005/029623 (3 pages).

(Continued)

*Primary Examiner*—Nasser Moazzami
*Assistant Examiner*—Shanto M Abedin
(74) *Attorney, Agent, or Firm*—Hanley, Flight and Zimmerman, LLC

(57)          **ABSTRACT**

Methods, apparatus, and articles of manufacture for media monitoring are disclosed. In particular, the example methods, apparatus, and articles of manufacture generate digital spectral signatures for use in identifying media information. Initially, a frame of media samples is obtained. A first frequency component having a first spectral power and a second frequency component having a second spectral power are identified by performing a spectral transform operation on the frame of media samples. A descriptor of the first frame of media samples is determined based on a comparison of the first spectral power and the second spectral power. A first signature is then generated based on the descriptor.

**17 Claims, 12 Drawing Sheets**



**Ex. 1**

**US 7,783,889 B2**

Page 2

## U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,450,531 | A | 5/1984 | Kenyon et al. |
| 4,677,466 | A * | 6/1987 | Lert et al. ..................... 725/22 |
| 4,697,209 | A * | 9/1987 | Kiewit et al. ................. 725/19 |
| 4,739,398 | A | 4/1988 | Thomas et al. |
| 4,843,562 | A | 6/1989 | Kenyon et al. |
| 4,931,871 | A | 6/1990 | Kramer |
| 4,945,412 | A | 7/1990 | Kramer |
| 4,947,436 | A | 8/1990 | Greaves et al. |
| 5,019,899 | A | 5/1991 | Boles et al. |
| 5,436,653 | A | 7/1995 | Ellis et al. |
| 5,437,050 | A | 7/1995 | Lamb et al. |
| 5,450,490 | A * | 9/1995 | Jensen et al. ................ 380/253 |
| 5,481,294 | A | 1/1996 | Thomas et al. |
| 5,485,518 | A | 1/1996 | Hunter et al. |
| 5,504,518 | A | 4/1996 | Ellis et al. |
| 5,572,246 | A | 11/1996 | Ellis et al. |
| 5,581,658 | A | 12/1996 | O'Hagan et al. |
| 5,612,729 | A | 3/1997 | Ellis et al. |
| 5,621,454 | A | 4/1997 | Ellis et al. |
| 5,809,160 | A | 9/1998 | Powell et al. |
| 5,822,436 | A | 10/1998 | Rhoads |
| 5,826,164 | A | 10/1998 | Weinblatt |
| 5,875,122 | A | 2/1999 | Acharya |
| 5,909,518 | A | 6/1999 | Chui |
| 5,918,223 | A | 6/1999 | Blum et al. |
| 6,061,793 | A * | 5/2000 | Tewfik et al. ............... 713/176 |
| 6,072,888 | A | 6/2000 | Powell et al. |
| 6,122,392 | A | 9/2000 | Rhoads |
| 6,175,627 | B1 | 1/2001 | Petrovic et al. |
| 6,226,387 | B1 * | 5/2001 | Tewfik et al. ............... 382/100 |
| 6,230,176 | B1 | 5/2001 | Mizutani |
| 6,240,062 | B1 | 5/2001 | Kozaki et al. |
| 6,253,182 | B1 * | 6/2001 | Acero ........................ 704/268 |
| 6,266,430 | B1 | 7/2001 | Rhoads |
| 6,272,176 | B1 * | 8/2001 | Srinivasan .................. 375/240 |
| 6,330,335 | B1 | 12/2001 | Rhoads |
| 6,366,937 | B1 | 4/2002 | Shridhar et al. |
| 6,385,330 | B1 | 5/2002 | Powell et al. |
| 6,404,898 | B1 | 6/2002 | Rhoads |
| 6,421,445 | B1 | 7/2002 | Jensen et al. |
| 6,459,803 | B1 | 10/2002 | Powell et al. |
| 6,466,670 | B1 | 10/2002 | Tsuria et al. |
| 6,469,749 | B1 | 10/2002 | Dimitrova et al. |
| 6,496,591 | B1 | 12/2002 | Rhoads |
| 6,504,870 | B2 * | 1/2003 | Srinivasan .................. 375/240 |
| 6,513,161 | B2 * | 1/2003 | Wheeler et al. ............... 725/14 |
| 6,542,620 | B1 | 4/2003 | Rhoads |
| 6,560,349 | B1 | 5/2003 | Rhoads |
| 6,560,350 | B2 | 5/2003 | Rhoads |
| 6,567,780 | B2 | 5/2003 | Rhoads |
| 6,574,594 | B2 | 6/2003 | Pitman et al. |
| 6,597,405 | B1 | 7/2003 | Iggulden |
| 6,604,072 | B2 | 8/2003 | Pitman et al. |
| 6,614,915 | B2 | 9/2003 | Powell et al. |
| 6,633,651 | B1 | 10/2003 | Hirzalla et al. |
| 6,647,129 | B2 | 11/2003 | Rhoads |
| 6,647,130 | B2 | 11/2003 | Rhoads |
| 6,675,383 | B1 | 1/2004 | Wheeler et al. |
| 6,678,392 | B2 | 1/2004 | Powell et al. |
| 6,714,683 | B1 | 3/2004 | Tian et al. |
| 6,757,407 | B2 * | 6/2004 | Bruckstein et al. .......... 382/100 |
| 6,799,274 | B1 * | 9/2004 | Hamlin ....................... 713/176 |
| 6,839,673 | B1 * | 1/2005 | Choi et al. .................. 704/273 |
| 6,959,386 | B2 | 10/2005 | Rhoads |
| 6,968,337 | B2 | 11/2005 | Wold |
| 6,971,010 | B1 * | 11/2005 | Abdel-Mottaleb .......... 713/176 |
| 7,006,555 | B1 * | 2/2006 | Srinivasan ................. 375/133 |
| 7,073,065 | B2 * | 7/2006 | Stone ......................... 713/176 |
| 7,120,562 | B1 * | 10/2006 | Wilson ....................... 702/189 |
| 7,221,902 | B2 * | 5/2007 | Kopra et al. ............... 455/3.05 |
| 7,269,338 | B2 * | 9/2007 | Janevski ...................... 386/96 |
| 7,284,128 | B2 * | 10/2007 | Sako ......................... 713/176 |
| 7,512,801 | B1 | 3/2009 | Akiyama et al. |
| 7,562,012 | B1 | 7/2009 | Wold et al. |
| 2001/0005823 | A1 | 6/2001 | Fischer et al. |
| 2001/0029580 | A1 | 10/2001 | Moskowitz |
| 2002/0178410 | A1 | 11/2002 | Haitsma et al. |
| 2002/0186768 | A1 | 12/2002 | Dimitrova et al. |
| 2003/0005430 | A1 | 1/2003 | Kolessar |
| 2003/0036910 | A1* | 2/2003 | Van Der Veen et al. ..... 704/500 |
| 2003/0086341 | A1 | 5/2003 | Wells et al. |
| 2003/0131350 | A1 | 7/2003 | Peiffer et al. |
| 2003/0156827 | A1* | 8/2003 | Janevski ...................... 386/96 |
| 2003/0223584 | A1* | 12/2003 | Bradley et al. .............. 380/229 |
| 2004/0122679 | A1 | 6/2004 | Neuhauser et al. |
| 2004/0210922 | A1 | 10/2004 | Peiffer et al. |
| 2005/0257064 | A1* | 11/2005 | Boutant et al. .............. 713/180 |
| 2006/0107057 | A1* | 5/2006 | Lewis et al. ................. 713/176 |
| 2006/0184961 | A1 | 8/2006 | Lee et al. |
| 2006/0195861 | A1* | 8/2006 | Lee ............................. 725/19 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 747044 | 9/2000 |
| EP | 0887958 | 12/1998 |
| EP | 0987855 A2 | 3/2000 |
| JP | 3173291 | 7/1991 |
| WO | WO0079709 | 12/2000 |
| WO | WO02065782 | 8/2002 |
| WO | 2005/006768 | 1/2005 |

### OTHER PUBLICATIONS

Graps, Amara, "An Introduction to Wavelets," Institute of Electrical and Electronics Engineers, Inc., Summer 1995, Los Alamitos, USA (18 pages).

Haitsma et al., "Robust Audio Hashing for Content Identification," Philips Research, Eindhoven, NL, http://cite.seer.ist.psu.edu/haitsma01robust.html, 2001 (8 pages).

Conner, Margery, "Advantages of the Sliding-Mode DFT," www.edn.com, Jan. 9, 2002 (1 page).

International Preliminary Examining Authority, "PCT International Preliminary Examination Report," issued by the United States Patent and Trademark Office on May 6, 2008, in connection with a counterpart international applicaton No. PCT/US2005/029623 (9 pages).

Mexican Institute of Industrial Property issued on Jul. 16, 2009, The result of Substantive Examination (including English Translation) in Mexican patent application No. MX/a/2007/002071, 3 pages with 3 pages English Translation.

Jeffrey D. Taft, PhD., "DSP Design Performance—Breaking barriers in Digital Signal Processing...with new design tools," 2001, [retrieved from http://www.nauticom.net/www.jdtaft/DFT_increm.htm, accessed on Jan. 19, 2004], 1 page.

Schneider et al., "A Robust Content Based Digital Signature for Image Authentication," Columbia University, 1996, 4 pages.

* cited by examiner

**Ex. 1**



FIG. 1A

Ex. 1



FIG. 1B

Ex. 1



FIG. 2



FIG. 3

Ex. 1



FIG. 4

**Ex. 1**

**U.S. Patent**          Aug. 24, 2010          Sheet 5 of 12          US 7,783,889 B2



FIG. 5

**Ex. 1**



FIG. 6

Ex. 1



FIG. 7

**Ex. 1**

U.S. Patent    Aug. 24, 2010    Sheet 8 of 12    US 7,783,889 B2



FIG. 8

**Ex. 1**



FIG. 9

**Ex. 1**



FIG. 10

**Ex. 1**



FIG. 11

**Ex. 1**



FIG. 12

**Ex. 1**

US 7,783,889 B2

**1**

## METHODS AND APPARATUS FOR GENERATING SIGNATURES

### RELATED APPLICATIONS

This patent is a continuation of International Patent Application Ser. No. PCT/US2005/029623, filed Aug. 18, 2005, which claims priority to U.S. Provisional Application 60/603,024, filed on Aug. 18, 2004, both of which are hereby incorporated herein by reference in their entireties.

### FIELD OF THE DISCLOSURE

The present disclosure relates generally to media monitoring and, more particularly, to methods and apparatus for generating signatures for use in identifying media information.

### BACKGROUND

Identifying media information and more specifically audio streams (e.g., audio information) using signature-matching techniques is well known. Known signature-matching techniques are often used in television and radio audience metering applications and are implemented using several known methods for generating and matching signatures. For example, in television audience metering applications, signatures are generated at monitoring sites (e.g., monitored households) and reference sites. Monitoring sites typically include locations such as, for example, households where the media consumption of audience members is monitored. For example, at a monitoring site, monitored signatures may be generated based on audio streams associated with a selected channel, radio station, etc. The monitored signatures may then be sent to a central data collection facility for analysis. At a reference site, signatures, typically referred to as reference signatures, are generated based on known programs that are provided within a broadcast region. The reference signatures may be stored at the reference site and/or a central data collection facility and compared with monitored signatures generated at monitoring sites. A monitored signature may be found to match with a reference signature and the known program corresponding to the matching reference signature may be identified as the program that was presented at the monitoring site.

### BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. **1**A and **1**B illustrate example audio stream identification systems for generating digital spectral signatures and identifying audio streams.

FIG. **2** is a time-domain representation of an example monitored audio stream and a plurality of audio sample frames acquired from the monitored audio stream.

FIG. **3** is a time-domain representation of an example reference audio stream and a plurality of audio sample frames acquired from the example reference audio stream.

FIG. **4** is a flow diagram of an example method for generating digital spectral signatures based on spectral decompositions.

FIG. **5** is a flow diagram of an example method for generating descriptors associated with the example method of FIG. **4**.

FIG. **6** is a flow diagram of another example method for generating digital spectral signatures based on spectral decompositions.

FIG. **7** is a flow diagram of an example method for generating descriptors associated with the example method of FIG. **6**.

**2**

FIG. **8** is a flow diagram of an example method for comparing the digital spectral signatures generated using the example methods of FIGS. **4-7**.

FIG. **9** is a block diagram of an example signature generation system for generating digital spectral signatures based on audio streams.

FIG. **10** is a block diagram of another example signature generation system for generating digital spectral signatures based on audio streams.

FIG. **11** is a block diagram of an example signature comparison system for comparing digital spectral signatures.

FIG. **12** is a block diagram of an example processor system that may be used to implement the methods and apparatus described herein.

### DETAILED DESCRIPTION

Although the following discloses example systems including, among other components, software executed on hardware, it should be noted that such systems are merely illustrative and should not be considered as limiting. For example, it is contemplated that any or all of these hardware and software components could be embodied exclusively in hardware, exclusively in software, or in any combination of hardware and software. Accordingly, while the following describes example systems, persons of ordinary skill in the art will readily appreciate that the examples provided are not the only way to implement such systems.

The methods and apparatus described herein generally relate to generating digital spectral signatures, which may be used to identify media information. In particular, the disclosed methods and apparatus are described with respect to generating digital spectral signatures based on audio streams (e.g., audio information). However, the methods and apparatus described herein may also be used to generate digital spectral signatures based on any other type of media information such as, for example, video information, web pages, still images, computer data, etc. Further, the media information may be associated with broadcast information (e.g., television information, radio information, etc.), information reproduced from any storage medium (e.g., compact discs (CD), digital versatile discs (DVD), etc.), or any other information that is associated with an audio stream, a video stream, or any other media information for which the digital spectral signatures are generated. In one particular example, the audio streams are identified based on digital spectral signatures that include monitored digital signatures generated at a monitoring site (e.g., a monitored household) and reference digital signatures generated and/or stored at a reference site and/or a central data collection facility.

As described in detail below, the methods and apparatus described herein identify media information including audio streams based on digital spectral signatures. The digital spectral signatures may be formed using digital descriptors that are generated based on the spectral components of an audio stream and that may be analyzed using frequency transforms and/or wavelet transforms.

Unlike known methods in the prior art that use interframe operations (e.g., operations based on sample data within different data sample frames) to generate digital spectral signatures, the methods and apparatus described herein may be implemented using intraframe operations (e.g., operations based on sample data within a single frame). Intraframe operations may include, for example, comparison operations, determining percentage differences between values, etc. that are performed on two or more values (e.g., spectral power values) that are uniquely associated with or derived from a single frame. For example, using the methods and apparatus described herein, a digital spectral signature may be generated by obtaining a frame of media samples, determining

**Ex. 1**

US 7,783,889 B2

3

spectral power values by performing a spectral transform (e.g., a FFT, a wavelet transform, etc.) on the frame of media samples, and performing an intraframe operation (e.g., a comparison) based on two or more spectral power values that are uniquely associated with the frame of media samples.

Frequency components of an audio signal are typically generated by transforming the audio signal data (e.g., an audio stream) from the time domain to the frequency domain using, for example, a Fourier Transform. The Fourier Transform can be used to analyze the frequency components in an audio stream and identify the spectral power of each frequency component. The spectral powers may then be used to generate digital spectral signatures.

Digital spectral signatures may also be generated based on wavelet transforms which transform audio data from the time domain to the wavelet domain. In general, wavelet transforms may be used to decompose blocks or frames of data (e.g., time domain audio samples) into multiple sub-bands, thereby allowing data sets to be analyzed at various scales and/or resolutions. By separating data into multiple sub-bands, a wavelet transform may be used to analyze each time interval of data at a desired scale or resolution.

Monitored signatures may be generated at a monitoring site based on audio streams associated with media information (e.g., a monitored audio stream) that is consumed by an audience. For example, a monitored signature may be generated based on the audio track of a television program presented at a monitoring site. The monitored signature may then be communicated to a central data collection facility for comparison to one or more reference signatures.

Reference signatures are generated at a reference site and/or a central data collection facility based on audio streams associated with known media information. The known media information may include media that is broadcast within a region, media that is reproduced within a household, media that is received via the internet, etc. Each reference signature is stored in a memory with media identification information such as, for example, a song title, a movie title, etc. When a monitored signature is received at the central data collection facility, the monitored signature is compared with one or more reference signatures until a match is found. This match information may then be used to identify the media information (e.g., monitored audio stream) from which the monitored signature was generated. For example, a look-up table or a database may be referenced to retrieve a media title, a program identity, an episode number, etc. that corresponds to the media information from which the monitored signature was generated.

As described below in connection with FIGS. 2 and 3, more reference signatures are generated at a reference site and/or a central data collection facility for a given audio stream than monitored signatures generated for a given audio stream at a monitoring site. In particular, the reference signatures generated for an audio stream (i.e., a reference audio stream) overlap in time. More specifically, the starting reference time or timestamp of each reference signature is shifted by a relatively small amount of time from the starting reference time or timestamp of a previous reference signature. In this manner, a monitored signature generated at a monitoring site and having a substantially arbitrary reference time may be aligned and/or matched with at least one of the reference signatures generated for a reference audio stream. As a result of the relatively fewer number of monitored signatures generated at the monitoring site, monitored signatures may be generated by processor systems and/or hardware devices having relatively less computing power and/or memory than processor systems and/or hardware devices used to generate reference signatures.

FIGS. 1A and 1B illustrate example audio stream identification systems 100 and 150 for generating digital spectral

4

signatures and identifying audio streams. The example audio stream identification systems 100 and 150 may be implemented as a television broadcast information identification system and a radio broadcast information identification system, respectively. The example audio stream identification system 100 includes a monitoring site 102 (e.g., a monitored household), a reference site 104, and a central data collection facility 106.

Monitoring television broadcast information involves generating monitored signatures at the monitoring site 102 based on the audio data of television broadcast information and communicating the monitored signatures to the central data collection facility 106 via a network 108. Reference signatures may be generated at the reference site 104 and may also be communicated to the central data collection facility 106 via the network 108. The audio content represented by a monitored signature that is generated at the monitoring site 102 may be identified at the central data collection facility 106 by comparing the monitored signature to one or more reference signatures until a match is found. Alternatively, monitored signatures may be communicated from the monitoring site 102 to the reference site 104 and compared one or more reference signatures at the reference site 104. In another example, the reference signatures may be communicated to the monitoring site 102 and compared with the monitored signatures at the monitoring site 102.

The monitoring site 102 may be, for example, a household for which the media consumption of an audience is monitored. In general, the monitoring site 102 may include a plurality of media delivery devices 110, a plurality of media presentation devices 112, and a signature generator 114 that is used to generate monitored signatures associated with media presented at the monitoring site 102.

The plurality of media delivery devices 110 may include, for example, set top box tuners (e.g., cable tuners, satellite tuners, etc.), DVD players, CD players, radios, etc. Some or all of the media delivery devices 110 such as, for example, set top box tuners may be communicatively coupled to one or more broadcast information reception devices 116, which may include a cable, a satellite dish, an antenna, and/or any other suitable device for receiving broadcast information. The media delivery devices 110 may be configured to reproduce media information (e.g., audio information, video information, web pages, still images, etc.) based on, for example, broadcast information and/or stored information. Broadcast information may be obtained from the broadcast information reception devices 116 and stored information may be obtained from any information storage medium (e.g., a DVD, a CD, a tape, etc.). The media delivery devices 110 are communicatively coupled to the media presentation devices 112 and configurable to communicate media information to the media presentation devices 112 for presentation. The media presentation devices 112 may include televisions having a display device and/or a set of speakers by which audience members consume, for example, broadcast television information, music, movies, etc.

The signature generator 114 may be used to generate monitored digital signatures based on audio information as described in greater detail below. In particular, at the monitoring site 102, the signature generator 114 may be configured to generate monitored signatures based on monitored audio streams that are reproduced by the media delivery devices 110 and/or presented by the media presentation devices 112. The signature generator 114 may be communicatively coupled to the media delivery devices 110 and/or the media presentation devices 112 via an audio monitoring interface 118. In this manner, the signature generator 114 may obtain audio streams associated with media information that is reproduced by the media delivery devices 110 and/or presented by the media presentation devices 112. Additionally or alternatively,

**Ex. 1**

US 7,783,889 B2

the signature generator **114** may be communicatively coupled to microphones (not shown) that are placed in proximity to the media presentation devices **112** to detect audio streams. The signature generator **114** may also be communicatively coupled to the central data collection facility **106** via the network **108**.

The network **108** may be used to communicate signatures (e.g., digital spectral signatures), control information, and/or configuration information between the monitoring site **102**, the reference site **104**, and the central data collection facility **106**. Any wired or wireless communication system such as, for example, a broadband cable network, a DSL network, a cellular telephone network, a satellite network, and/or any other communication network may be used to implement the network **108**.

As shown in FIG. **1A**, the reference site **104** may include a plurality of broadcast information tuners **120**, a reference signature generator **122**, a transmitter **124**, a database or memory **126**, and broadcast information reception devices **128**. The reference signature generator **122** and the transmitter **124** may be communicatively coupled to the memory **126** to store reference signatures therein and/or to retrieve stored reference signatures therefrom.

The broadcast information tuners **120** may be communicatively coupled to the broadcast information reception devices **128**, which may include a cable, an antenna, a satellite dish, and/or any other suitable device for receiving broadcast information. Each of the broadcast information tuners **120** may be configured to tune to a particular broadcast channel. In general, the number of tuners at the reference site **104** is equal to the number of channels available in a particular broadcast region. In this manner, reference signatures may be generated for all of the media information transmitted over all of the channels in a broadcast region. The audio portion of the tuned media information may be communicated from the broadcast information tuners **120** to the reference signature generator **122**.

The reference signature generator **122** may be configured to obtain the audio portion of all of the media information that is available in a particular broadcast region. The reference signature generator **122** may then generate a plurality of reference signatures (as described in greater detail below) based on the audio information and store the reference signatures in the memory **126**. Although one reference signature generator is shown in FIG. **1**, a plurality of reference signature generators may be used in the reference site **104**. For example, each of the plurality of signature generators may be communicatively coupled to a respective one of the broadcast information tuners **120**.

The transmitter **124** may be communicatively coupled to the memory **126** and configured to retrieve signatures therefrom and communicate the reference signatures to the central data collection facility **106** via the network **108**.

The central data collection facility **106** may be configured to compare monitored signatures received from the monitoring site **102** to reference signatures received from the reference site **104**. In addition, the central data collection facility **106** may be configured to identify monitored audio streams by matching monitored signatures to reference signatures and using the matching information to retrieve television program identification information (e.g., program title, broadcast time, broadcast channel, etc.) from a database. The central data collection facility **106** includes a receiver **130**, a signature analyzer **132**, and a memory **134**, all of which are communicatively coupled as shown.

The receiver **130** may be configured to receive monitored signatures and reference signatures via the network **108**. The receiver **130** is communicatively coupled to the memory **134** and configured to store the monitored signatures and the reference signatures therein.

The signature analyzer **132** may be used to compare reference signatures to monitored signatures. The signature analyzer **132** is communicatively coupled to the memory **134** and configured to retrieve the monitored signatures and the reference signatures from the same. The signature analyzer **132** may be configured to retrieve reference signatures and monitored signatures from the memory **134** and compare the monitored signatures to the reference signatures until a match is found. The memory **134** may be implemented using any machine accessible information storage medium such as, for example, one or more hard drives, one or more optical storage devices, etc.

Although the signature analyzer **132** is located at the central data collection facility **106** in FIG. **1A**, the signature analyzer **132** may instead be located at the reference site **104**. In such a configuration, the monitored signatures may be communicated from the monitoring site **102** to the reference site **104** via the network **108**. Alternatively, the memory **134** may be located at the monitoring site **102** and reference signatures may be added periodically to the memory **134** via the network **108** by transmitter **124**. Additionally, although the signature analyzer **132** is shown as a separate device from the signature generators **114** and **122**, the signature analyzer **132** may be integral with the reference signature generator **122** and/or the signature generator **114**. Still further, although FIG. **1** depicts a single monitoring site (i.e., the monitoring site **102**) and a single reference site (i.e., the reference site **104**), multiple such sites may be coupled via the network **108** to the central data collection facility **106**.

The audio stream identification system **150** of FIG. **1B** may be configured to monitor and identify audio streams associated with radio broadcast information. In general, the audio stream identification system **150** is used to monitor the content that is broadcast by a plurality of radio stations in a particular broadcast region. Unlike the audio stream identification system **100** used to monitor television content consumed by an audience, the audio stream identification system **150** may be used to monitor music, songs, etc. that are broadcast within a broadcast region and the number of times that they are broadcast. This type of media tracking may be used to determine royalty payments, proper use of copyrights, etc. associated with each audio composition. The audio stream identification system **150** includes a monitoring site **152**, a central data collection facility **154**, and the network **108**.

The monitoring site **152** is configured to receive all radio broadcast information that is available in a particular broadcast region and generate monitored signatures based on the radio broadcast information. The monitoring site **152** includes the plurality of broadcast information tuners **120**, the transmitter **124**, the memory **126**, and the broadcast information reception devices **128**, all of which are described above in connection with FIG. **1A**. In addition, the monitoring site **152** includes a signature generator **156**. When used in the audio stream identification system **150**, the broadcast information reception devices **128** are configured to receive radio broadcast information and the broadcast information tuners **120** are configured to tune to the radio broadcast stations. The number of broadcast information tuners **120** at the monitoring site **152** may be equal to the number of radio broadcasting stations in a particular broadcast region.

The signature generator **156** is configured to receive the tuned to audio information from each of the broadcast information tuners **120** and generate monitored signatures for the same. Although one signature generator is shown (i.e., the signature generator **156**), the monitoring site **152** may include multiple signature generators, each of which may be communicatively coupled to one of the broadcast information tuners **120**. The signature generator **156** may store the monitored signatures in the memory **126**. The transmitter **124** may

**Ex. 1**

US 7,783,889 B2

7

retrieve the monitored signatures from the memory **126** and communicate them to the central data collection facility **154** via the network **108**.

The central data collection facility **154** is configured to receive monitored signatures from the monitoring site **152**, generate reference signatures based on reference audio streams, and compare the monitored signatures to the reference signatures. The central data collection facility **154** includes the receiver **130**, the signature analyzer **132**, and the memory **134**, all of which are described in greater detail above in connection with FIG. **1A**. In addition, the central data collection facility **154** includes a reference signature generator **158**.

The reference signature generator **158** is configured to generate reference signatures based on reference audio streams. The reference audio streams may be stored on any type of machine accessible medium such as, for example, a CD, a DVD, a digital audio tape (DAT), etc. In general, artists and/or record producing companies send their audio works (i.e., music, songs, etc.) to the central data collection facility **154** to be added to a reference library. The reference signature generator **158** may read the audio data from the machine accessible medium and generate a plurality of reference signatures based on each audio work (e.g., the reference audio stream **302** of FIG. **3**). The reference signature generator **158** may then store the reference signatures in the memory **134** for subsequent retrieval by the signature analyzer **132**. Identification information (e.g., song title, artist name, track number, etc.) associated with each reference audio stream may be stored in a database and may be indexed based on the reference signatures. In this manner, the central data collection facility **154** includes a database of reference signatures and identification information corresponding to all known and available song titles.

The receiver **130** is configured to receive monitored signatures from the network **108** and store the monitored signatures in the memory **134**. The monitored signatures and the reference signatures are retrieved from the memory **134** by the signature analyzer **132** for use in identifying the monitored audio streams broadcast within a broadcast region. The signature analyzer **132** may identify the monitored audio streams by first matching a monitored signature to a reference signature. The match information and/or the matching reference signature is then used to retrieve identification information (e.g., a song title, a song track, an artist, etc.) from a database stored in the memory **134**.

Although one monitoring site (e.g., the monitoring site **152**) is shown in FIG. **1B**, multiple monitoring sites may be communicatively coupled to the network **108** and configured to generate monitored signatures. In particular, each monitoring site may be located in a respective broadcast region and configured to monitor the content of the broadcast stations within a respective broadcast region.

FIG. **2** is a time-domain representation **200** of an example monitored audio stream **202** and a plurality of audio sample frames **204**, **206**, **208**, and **210** acquired from the monitored audio stream **202**. A monitored digital spectral signature is generated at a monitoring site (e.g., the monitoring site **102** of FIG. **1A** or the monitoring site **152** of FIG. **1B**) based on audio samples acquired from the example monitored audio stream **202**. The time-domain representation **200** illustrates the time relationship between the example monitored audio stream **202** and the audio sample frames **204**, **206**, **208**, and **210**, which are used to generate monitored signatures.

In one example, an N-bit monitored signature $S_x(t)$ is formed using one or more M-bit descriptors $B_x(t_0)$, $B_x(t_0+1)$, $B_x(t_0+2)$, $B_x(t_0+3)$. For example, a 32-bit monitored signature $S_x(t)$ includes four 8-bit descriptors $B_x(t_0)$, $B_x(t_0+1)$, $B_x(t_0+2)$, $B_x(t_0+3)$, each of which is generated based on a corresponding one of the audio sample frames **204**, **206**, **208**, and

8

**210**. More specifically, each of the descriptors is generated using one or more intraframe operations (e.g., comparison operations) based on two or more spectral components that are uniquely associated with a single audio sample frame.

The four descriptors may be generated based on spectral decompositions (e.g., frequency decompositions or wavelet decompositions) of the audio sample frames **204**, **206**, **208**, and **210** as described in detail below in connection with FIGS. **4-7**. The spectral decompositions are used to extract features that are uniquely characteristic of the example monitored audio stream **202**. In this manner, a reference signature and a monitored signature that are generated based on the same audio stream using the same signature generation method (e.g., the same spectral decomposition-based method) will include similar features, and, thus can be used to reliably identify the monitored audio stream **202** using a matching algorithm. A monitored signature may be generated by sampling the example monitored audio stream **202** to generate the audio sample frames **204**, **206**, **208**, and **210**, generating the descriptors $B_x(t_0)$, $B_0(t_0+1)$, $B_x(t_0+2)$, $B_x(t_0+3)$ based on spectral decompositions of the audio sample frames **204**, **206**, **208**, and **210**, and concatenating the descriptors.

The audio sample frames **204**, **206**, **208**, and **210** are generated by sampling the example monitored audio stream **202** during four time intervals at a sampling frequency $f_s$. For example, a sampling frequency $f_s$ of 6000 Hz will generate 6000 samples of audio data for each of the audio sample frames **204**, **206**, **208**, and **210** (assuming the sample frames are collected over one second intervals). However, any other suitable sampling frequency $f_s$ may instead be selected. As shown in FIG. **2**, the duration of each of the audio sample frames **204**, **206**, **208**, and **210** is one second (e.g., 0 to $t_0$, $t_0$ to $t_0+1$, $t_0+1$ to $t_0+2$, and $t_0+2$ to $t_0+3$). However, the duration may instead be set to any other length of time. The times within the monitored audio stream **202** during which monitored signatures are generated are substantially similar or identical to the times within a reference audio stream during which corresponding reference signatures are generated. By acquiring audio sample frames for monitored signatures and reference signatures at substantially the same times, the features extracted from a monitored audio stream (e.g., the example monitored audio stream **202**) and a corresponding reference audio stream (e.g., the example reference audio stream **302** of FIG. **3**) are substantially similar or identical. Although the audio sample frames **204**, **206**, **208**, and **210** are shown in FIG. **2** as occurring consecutively in time, the audio sample frames **204**, **206**, **208**, and **210** may occur at any time and in any sequence within the example monitored audio stream **202**.

To ensure that the monitored signature is compared with a reference signature that is generated at substantially the same time within respective audio streams, the monitored signatures may be generated relative to a reference time that is used during the signature comparison process to align a monitored signature with a reference signature. More specifically, during the generation of a monitored signature, the example monitored audio stream **202** is sampled starting at a time indicated by a reference time to, which may be selected relative to a time stamp embedded within the example audio stream **202**, a system startup time, a daily recurring time (e.g., midnight), and/or any other reference time that may be indicative of the time at which a signature is generated. A signature matching system (e.g., the signature analyzer **132** of FIGS. **1A** and **1B**) uses the reference time $t_0$ to retrieve one or more reference signatures that correspond to substantially the same time within reference audio streams as indicated by the reference time $t_0$.

Additionally, one or more monitored signatures may be generated using the example monitored audio stream **202** so that multiple signatures are matched to identify the example

**Ex. 1**

US 7,783,889 B2

monitored audio stream **202**. For example, it is possible that one or more monitored signatures generated using the example monitored audio stream **202** are substantially similar or identical to one or more reference signatures of a reference audio stream (e.g., the example reference audio stream **302** of FIG. **3**) that does not correspond to the example monitored audio stream **202**. In this case, to decrease the possibility of erroneously identifying the wrong reference audio stream, more than one monitored signature is generated for the monitored audio stream **202**. More specifically, the signatures may be generated at multiple times throughout the example monitored audio stream **202**. In addition, a comparison algorithm may be configured to match two or more monitored signatures with corresponding reference signatures to accurately identify the example monitored audio stream **202**.

FIG. **3** is a time-domain representation **300** of an example reference audio stream **302** and a plurality of audio sample frames **304**, **306**, **308**, and **310** that may be acquired from the example reference audio stream **302**. The time-domain representation **300** shows two one second time intervals (e.g., 0 to $t_0$ and $t_0$ to $t_0+1$) and the plurality of audio sample frames **304**, **306**, **308**, and **310** that are collected during the time intervals and that are subsequently used to generate a plurality of reference signatures that are staggered in time (i.e., time shifted relative to one another). The example reference audio stream **302** is sampled at a sampling frequency $f_s$ to collect the audio sample frames **304**, **306**, **308**, and **310**, which are used to generate M-bit descriptors $B_{Rn}(t)$. One or more of the descriptors $B_{Rn}(t)$ may then be concatenated to form an N-bit reference signature $S_{Rn}(t)$. Typically, the number of descriptors in a reference signature is equal to the number of descriptors in a monitored signature. Additionally, each of the M-bit descriptors $B_{Rn}(t)$ includes the same number of bits as a corresponding M-bit descriptor $B_x(t)$ associated with the example monitored audio stream **202** (FIG. **2**) and, thus, each N-bit reference signature $S_{Rn}(t)$ includes the same number of bits as a corresponding N-bit monitored signature $S_x(t)$.

Multiple reference signatures are generated for the example reference audio stream **302** in a manner that causes the reference signatures to be time-shifted relative to each other and to overlap in time with one another. More specifically, the start time at which a first audio sample frame (e.g., the audio sample frame **304**) of a first reference signature is collected is offset, or shifted, by an amount of time

$$\frac{1}{T_s}$$

from the start time at which a first audio sample frame (e.g., the audio sample frame **308**) of a second reference signature is collected. The value $T_S$ is associated with a number of equal segments ("sample segments") into which each time interval (e.g., $t_0$ to $t_0+1$) is divided. For example, if the number of sample segments $T_S$ in a time interval of one second is set equal to thirty, the collection of a new data set will begin every

$$\frac{1}{30}\text{-}th$$

of a second. In addition, if the sampling frequency $f_s$ is set equal to 6000 Hz, each sample segment will include 200 samples.

Each audio sample frame is used to generate a single signature. More specifically, an audio sample frame is collected using a predetermined number of sample segments (e.g., the

sample segments **312a-312e**), which are concatenated to form the audio sample frame (e.g., the audio sample frame **304**). To achieve overlap among consecutively generated signatures, each signature is formed using an audio sample frame that partially overlaps with an audio sample frame used to form the previously generated signature. More specifically, two audio sample frames that overlap include a common set of sample segments. For example, the audio sample frames **304** and **308** include a common set of sample segments comprising the sample segments **312b-312e**. The audio sample frame **308** may be formed by extracting a common plurality of media samples or the common set of sample segments **312b-312e** from the audio sample frame **304** and appending a recently acquired sample segment (e.g., the sample segment **312f**) to the common set of sample segments **312b-312e**. In addition, two audio sample frames that overlap also contain sample segments that are exclusive to one or the other of the audio sample frames (i.e., audio sample frames that overlap also contain sample segments that occur in one or the other of the audio sample frames but do not occur in both frames).

To further illustrate the generation of reference signatures that are time shifted and overlapped, each reference signature is formed by four reference descriptors

$$B_{Rn}\left(t_0+\frac{k}{T_s}\right),\ B_{Rn}\left(t_0+\frac{k}{T_s}+1\right),\ B_{Rn}\left(t_0\frac{k}{T_s}+2\right),\ B_{Rn}\left(t_0+\frac{k}{T_s}+3\right).$$

The four reference descriptors are separated by one-second time intervals and are shifted by

$$\frac{k}{T_s}$$

seconds with respect to the reference time $T_0$, where $0\leqq k<T_S$. For example, the audio sample frames **304** and **306** (generated at

$$t_0+\frac{0}{T_s}\text{ and }t_0+\frac{0}{T_s}+1\Big),$$

respectively, in combination with two other audio sample frames generated at

$$t_0+\frac{0}{T_s}+2\text{ and }t_0+\frac{0}{T_s}+3$$

(not shown), are used to generate four descriptors that form a first reference signature. Additionally, the audio sample frames **308** and **310** (generated at

$$\left(t_0+\frac{1}{T_s}\right)\text{and}\left(t_0+\frac{1}{T_s}+1\right)\!\Big),$$

respectively, are used with two other audio sample frames generated at

**Ex. 1**

US 7,783,889 B2

11

$$\left(t_0 + \frac{1}{T_s} + 2\right) \text{and} \left(t_0 + \frac{1}{T_s} + 3\right)$$

(not shown) to generate four descriptors that form a second reference signature that is time shifted relative to the first reference signature by

$$\frac{1}{T_s}$$

seconds. As described below in connection with FIG. 5, each of the reference descriptors is generated using one or more operations (e.g., comparison operations) based on two or more spectral components that are both associated with the same audio sample frame. These operations are referred to as intraframe operations because they are performed using data exclusive to a single audio frame and are not dependent on sample data collected over other audio frames.

During an example sample acquisition process, the sample segments $312a$-$312e$ are collected and are used to form the first audio sample frame 304, which is subsequently used to determine a descriptor. This descriptor is then used to form part of a first reference signature. Then, a new sample segment $312f$ is collected and a second audio sample frame 308 is formed using sample segments $312b$-$312f$. The second audio sample frame 308 is then used to determine a reference descriptor which is used to form part of a second reference signature. Thus, the first and second audio sample frames 304 and 308 include a common set of sample segments $312b$-$312e$ and each of the first and second audio sample frames additionally include a sample segment not included in the other (i.e., the first audio sample frame 304 includes sample segment $312a$ and the second audio sample frame 308 includes sample segment $312f$). In this manner, the first and second reference signatures are generated using data collected at points in the audio stream that are staggered or shifted in time by

$$\frac{1}{T_s}$$

seconds and are generated using data that overlaps. In addition, the amount by which the first and second signatures are shifted can be adjusted by changing the value of $T_S$ thereby permitting the resolution of the signatures to vary as desired. Specifically, if a set of signatures that represents an audio stream with a greater resolution is desired, $T_S$ can be increased accordingly. Likewise, if less resolution is desired, $T_S$ can be decreased. As will be appreciated by one having ordinary skill in the art, the value of $T_S$ may affect the quantity of signatures that can be generated for a given audio stream. For example, if the number of sample segments used to form a signature remains constant, a larger value of $T_S$ will result in forming more audio sample frames than a smaller value of $T_S$. Therefore, the amount of memory available to store the signature data may be a factor in determining the desired value of $T_S$.

As described above, in order to identify the title of a song or the title of a program associated with a particular audio stream, a set of monitored signatures generated for a monitored audio stream are compared to a database of reference

12

signatures associated with a plurality of reference audio streams. In one example system, a signature generator (e.g., the signature generator 114 of FIG. 1A) may be configured to monitor the audio emitted by a specific television (e.g., one of the presentation devices 112 of FIG. 1A) located in the home of a specific panelist. Signatures are generated for the audio emitted by the television in the manner described above. In addition, the time at which the audio corresponding to each signature was emitted is recorded and stored as a reference time $t_0$ with the corresponding monitored signature in a memory device. A timing device (e.g., the timing device 903 of FIGS. 9 and 10) located at the monitoring site may be used to trigger the collection of the audio data for the subsequent generation of monitored signatures and to provide the corresponding data collection times (e.g., reference times $t_0$, timestamps, etc.) to the memory for storage with the corresponding signature. To enable the subsequent identification of the emitted audio, a reference site (e.g., the reference site 104 of FIG. 1A) located within the same broadcast region as a monitoring site (e.g., the monitoring site 102 of FIG. 1A) is configured to generate reference signatures corresponding to the audio broadcast on all television broadcast channels at all times of the day. A timing device (e.g., the timing device 903 of FIGS. 9 and 10) located at the reference site may be used to trigger the collection of the audio data at a set of equally spaced intervals corresponding to the time period

$$\frac{1}{T_s}$$

for the subsequent generation of the reference signatures and to provide a corresponding set of data collection times to a reference memory (e.g., the memory 126 of FIG. 1A) for storage. Thus, each reference signature is stored in a memory device located at the reference site along with timestamp data indicating the time at which the underlying audio data was collected. In one example, the timing devices (e.g., the timing device 903 of FIG. 9) located at the monitoring site and the reference site are synchronized such that the timestamps can be used to align the reference signatures with the monitored signatures to facilitate the signature matching process. Likewise, because a plurality of monitoring sites are likely to be located in the same broadcast region as a single reference site, in the same example, each of the timing devices 903 located in each such monitoring site may be synchronized with the timing device 903 located in the single reference site. However, due to the staggered arrangement of the reference signatures described above in connection with FIG. 3, the timing devices 903 at the monitoring site and the reference site do not have to be synchronized.

To compensate for offsets between the timing devices located at the monitoring sites and the reference site, the value of $T_s$ may be adjusted. The value of $T_s$ is generally selected to incrementally time shift a reference signature from a previous reference signature so that a monitored signature generated at an arbitrary reference time is highly likely to align with one of the staggered or time-shifted reference signatures. More specifically, increasing the value of $T_s$ causes the number of sample segments (e.g., the sample segments $312a$-$312f$) to increase and the offset or time shift from one reference signature to the next reference signature to decrease. This, in turn, increases the likelihood that the times at which reference signatures are generated for a given audio stream correspond to substantially similar or identical reference times at which monitored signatures are generated for the same audio stream. Signatures generated at the same times for the same program are expected to be identical or at least similar enough

Ex. 1

US 7,783,889 B2

13

to cause a match to be detected. Thus, increasing the value of $T_s$ increases the likelihood of a match between a set of reference signatures and a set of monitored signatures corresponding to the same audio program. Additionally, assuming the timing devices located at the reference site and the monitoring site are synchronized with sufficient precision, a monitored signature generated for data collected at a time T need only be compared to each reference signature associated with the same timestamp T instead of all reference signatures generated during the same twenty-four hour period. This reduction in comparisons reduces the processing time required to find a match. Similarly, assuming there is a known error, E, between the timing devices located at a monitoring site and a reference site, each monitored signature generated at the monitoring site at a time T need only be compared to all reference signatures generated from data collected within a window of the time spanning from T−E to T+E.

In another example system (e.g., the example audio identification system **150** of FIG. **1**B), a set of monitored signatures are generated for a monitored audio stream and then compared to a database of reference signatures associated with a set of reference audio streams that, ideally, represent the universe of currently available audio streams. For example, as described above, in connection with FIG. **1**B, reference signatures corresponding to reference audio streams may be stored in a database that is stored in, for example, the memory **134**. For each reference signature that is matched to a monitored signature, the matching information and/or the reference signature may be used to retrieve identification information (e.g., song title, song track, artist, etc.) from the database. The identification information is then used to identify the monitored audio stream. In one example, reference times $t_0$ or timestamps associated with each monitored signature may be used to identify the time (of day) at which the monitored audio streams were broadcast.

FIG. **4** is a flow diagram of an example method for generating digital spectral signatures based on spectral decompositions. In particular, the example method of FIG. **4** may be used to generate digital spectral signatures (e.g., reference signatures and/or monitored signatures) based on frequency decomposition methods using a sliding Fast Fourier transform (FFT). As is known by one having ordinary skill in the art, an FFT may be used to convert a time domain signal (e.g., the example audio streams **202** and **302** of FIGS. **2** and **3**) into a frequency domain representation of the same signal which may then be used to analyze the frequency components of the converted signal.

As will be appreciated by one having ordinary skill in the art, a sliding FFT provides advantages over a conventional non-sliding FFT for generating the digital spectral signatures. Unlike a conventional non-sliding FFT, a sliding FFT can be used to incrementally compute an FFT. For example, one example approach to processing the audio streams **202** and **302** involves generating FFT data for each audio sample frame independent of any data associated with previous audio sample frames. In contrast, a sliding FFT involves generating FFT data for an audio sample frame by updating the FFT data generated in connection with a previous audio sample frame. Updating the previous frame's FFT data is less computationally expensive than generating FFT data anew for each frame causing the sliding FFT technique to be more efficient than the non-sliding conventional FFT approach. Additionally, the number of samples forming each audio sample frame (e.g., the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or **304**, **306**, **308**, and **310** of FIG. **3**) need not be a power of two, as is required of the non-sliding FFT approach. Thus, when using a sliding FFT, the digital spectral signatures can be generated using audio sample frames of any arbitrary size (i.e., any number of samples) that are acquired using any sampling frequency $f_s$.

14

Now turning in detail to the example method of FIG. **4**, initially the example method involves obtaining an audio stream (block **402**) (e.g., the example monitored audio stream **202** of FIG. **2** or the example reference audio stream **302** of FIG. **3**). A reference time to described above in connection with FIGS. **2** and **3** is determined (block **404**) to indicate the time within an audio stream at which a signature is generated. An initial audio sample set is then obtained (block **406**). The audio samples may be obtained by sampling an analog audio stream at a sampling frequency $f_s$ and performing an analog-to-digital conversion. Alternatively, the audio samples may be obtained by extracting or acquiring samples from a digital audio stream at a sampling frequency $f_s$. The initial audio sample set may be a complete audio sample frame (e.g., one of the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or **304**, **306**, **308**, and **310** of FIG. **3**) or a portion thereof. An initial FFT operation is performed on the initial audio sample set to establish an initial frequency spectrum (block **408**). The method of performing a FFT is well known in the art and, thus, is not discussed in detail herein.

After the initial frequency spectrum is determined (block **408**), a next set of audio samples is obtained (block **410**). The sliding FFT may then be used to update the initial frequency spectrum (generated at block **408**) based on two most recently collected samples $v_{N_s-2}$ and $v_{N_s-1}$ according to Equation 1 below.

$$a_1[J] \times \exp(\varphi_1[J]) = \qquad\qquad \text{Equation 1}$$
$$a_0[J] \times \exp(\varphi_0[J]) \times \exp\left(-\frac{i2\pi J(2)}{N_S}\right) +$$
$$\left(v_{N_{S-2}} \times \exp\left(\frac{i2\pi J(N_S - 2)}{N_S}\right)\right) +$$
$$\left(v_{N_{S-1}} \times \exp\left(\frac{i2\pi J(N_S - 1)}{6000}\right)\right) -$$
$$\left(v_0 \times \exp\left(-\frac{i2\pi J(2)}{N_S}\right)\right) - \left(v_1 \times \exp\left(-\frac{i2\pi J}{N_S}\right)\right)$$

Equation 1 may be used to update the frequency spectrum of an audio sample frame having a sample quantity $N_S$. The spectral amplitude $a_0[J]$ and phase value $\phi_0[J]$ form the existing frequency spectrum $a_0[J] \times \exp(\phi_0[J])$, which includes the frequencies indexed by the frequency index J. When the two most recently collected audio samples $v_{N_s-2}$ and $v_{N_s-1}$ are obtained, the existing frequency spectrum $a_0[J] \times \exp(\phi_0[J])$ may be updated to determine a new frequency spectrum $a_1[J] \times \exp(\phi_1[J])$. The two most recently collected audio samples $v_{N_s-2}$ and $v_{N_s-1}$ are inserted into the audio sample frame to replace the two earliest collected samples $v_0$ and $v_1$.

As shown in Equation 1, the updated frequency spectrum $a_1[J] \times \exp(\phi_1[J])$ is determined using one or more multiplication operations, addition operations, and subtraction operations based on complex exponents, the two earliest collected samples $v_0$ and $v_1$, and the two most recently collected samples $v_{N_s-2}$ and $v_{N_s-1}$. Initially, the existing frequency spectrum $a_0[J] \times \exp(\phi_0[J])$ is multiplied by a first complex exponential value

$$\exp\left(-\frac{i2\pi J(2)}{N_S}\right).$$

The product of the multiplication is added to a product determined by multiplying the first most recently collected audio sample $v_{N_s-2}$ by a second complex exponential value

**Ex. 1**

US 7,783,889 B2

15                                                                16

$$\exp\left(\frac{i2\pi J(N_S - 2)}{N_S}\right).$$

The result is then added to a product determined by multiplying the second most recently collected audio sample $v_{N_s-1}$ by a third complex exponential value

$$\exp\left(\frac{i2\pi J(N_S - 1)}{N_S}\right).$$

The first earliest collected audio sample $v_0$ is then multiplied by the first complex exponential value

$$\exp\left(-\frac{i2\pi J(2)}{N_S}\right)$$

and subtracted from the previous addition result. The second earliest collected audio sample $v_1$ is then multiplied by a fourth complex exponential value

$$\exp\left(-\frac{i2\pi J}{N_S}\right)$$

and subtracted from the previous subtraction result.

It is well known in the art that instabilities such as, for example, oscillation or data overflow can be substantially minimized when implementing a sliding FFT by multiplying most recently collected audio samples (e.g., the most recently collected audio samples $v_{Ns-2}$ and $v_{N_s-1}$) by a first stability factor $sf_1$ and earliest collected audio samples (e.g., the earliest collected audio samples $v_0$ and $v_1$) by a second stability factor $sf_2$. The first stability factor $sf_1$ may be set equal to a value as close as possible to one. In the case of an audio sample frame having 6000 samples, the first stability factor $sf_1$ may be set equal to 0.99995. The second stability factor $sf_2$ may be set equal to $(sf_1)^{p-1}$, where the value p is equal to the number of sample shifts required to process an audio sample frame using the sliding FFT. For example, a two-sample shift is required to update an audio sample frame based on the two most recently collected audio samples $v_{N_s-2}$ and $v_{N_s-1}$. In the case of the audio sample frame having 6000 samples, the value p may be set equal to 3000.

After the sliding FFT is determined or calculated at block **412**, it is determined if a complete audio sample frame (e.g., one of the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or one of the audio sample frames **304**, **306**, **308**, and **310** of FIG. **3**) has been obtained (block **414**). At the monitoring sites **102** (FIG. **1A**) and **152** (FIG. **1B**), a complete audio sample frame is obtained when a plurality of most recently collected $N_S$ samples is obtained. For example, if an audio sample frame includes 6000 samples, a complete audio sample frame is obtained after 6000 new samples are obtained. At the reference site **104** (FIG. **1A**) or the central data collection facility **154** (FIG. **1B**), a complete audio sample frame is obtained when a most recently collected sample segment (e.g., one of the sample segments **312a-312f** of FIG. **3**) is obtained and a current audio sample frame is formed as described in greater detail above in connection with FIG. **3**. If it is determined at block **414** that a complete audio sample frame has not been obtained, control is passed back to block **410**. However, if it is

determined at block **414** that a complete audio sample frame has been obtained, a descriptor is generated (block **416**). An example method for generating descriptors based on frequency components is described in greater detail below in connection with FIG. **5**.

It is then determined if a complete descriptor set has been obtained (block **418**). A descriptor set includes a predetermined number of descriptors that are used to form a signature. For example, if a 32-bit signature is formed by 8-bit descriptors, then a descriptor set includes four descriptors. If it is determined at block **418** that a complete descriptor set has not been obtained, control is passed back to block **410**. However, if it is determined at block **418**, that a complete descriptor set has been obtained, a digital spectral signature is generated by concatenating the descriptors of the descriptor set (block **420**). After the digital spectral signature is generated (block **420**), it is determined if another signature is to be generated (block **422**). If another signature is to be generated, control is passed back to block **404**.

FIG. **5** is a flow diagram of an example method for generating descriptors associated with the example method of FIG. **4**. In particular, the example method of FIG. **5** may be used to implement block **416** of FIG. **4**. An M-bit descriptor is generated by selecting M pairs of frequency components $f_{lb}$ that are uniquely associated with an audio sample frame and determining each bit of the descriptor based on intraframe comparisons of the spectral powers $P_{lb}$ of the frequency components $f_{lb}$. The frequency components $f_{lb}$ and the spectral powers $P_{lb}$ are indexed by a frequency component index l and a bit index b, where $0 \leq l < f\ \text{index}_{max}$ and $0 \leq b < M$.

The example method initially selects a first pair of frequency components $f_{00}$ and $f_{10}$ (block **502**). Although consecutive frequency components are selected (i.e., $f_{0b}$ and $f_{1b}$, $f_{2b}$ and $f_{3b}$, etc.) in the example method, the frequency components may be selected from any location in the frequency spectrum of an audio sample frame (e.g., one of the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or one of the audio sample frames **304**, **306**, **308**, and **310** of FIG. **3**). However, the frequency component indexes l used to select pairs of frequency components for generating a monitored signature are the same frequency component indexes l used to select pairs of frequency components for generating a corresponding reference signature.

After the first pair of frequency components $f_{00}$ and $f_{10}$ is selected, the spectral powers $P_{00}$ and $P_{10}$ corresponding to the selected frequency components are determined (block **504**). One of ordinary skill in the art will readily appreciate that the spectral power for each frequency component can be obtained based on the results of the sliding FFT performed at block **412** of FIG. **4**.

A descriptor bit is determined based on the frequency components $f_{00}$ and $f_{10}$ by comparing the first spectral power $P_{00}$ with the second spectral power $P_{10}$ (block **506**). If the first spectral power is greater than the second spectral power (i.e., $P_{00} > P_{10}$), the descriptor bit is set equal to one. If, instead, the first spectral power is less than or equal to the second spectral power (i.e., $P_{00} \leq P_{10}$), the descriptor bit is set equal to zero.

It is then determined if another descriptor bit is to be determined (block **508**). If another descriptor bit is to be determined, another pair of frequency components is selected (e.g., $f_{21}$ and $f_{31}$) (block **510**) and control is passed back to block **504**. If, instead, another descriptor bit is not to be determined, the example method of FIG. **5** may be stopped.

FIG. **6** is a flow diagram of another example method for generating digital spectral signatures based on spectral decompositions. In particular, the example method of FIG. **6** may be used to generate digital spectral signatures (e.g., reference signatures and monitored signatures) based on wavelet decompositions of audio sample frames (e.g., the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or **304**,

**Ex. 1**

US 7,783,889 B2

17

306, 308, and 310 of FIG. 3) using wavelet transforms. As described above, wavelet transforms may be employed to analyze data using different scales and/or resolutions by separating blocks or frames of data (e.g., the audio sample frames 204, 206, 208, 210, 304, 306, 308, and 310) into multiple sub-bands.

Initially, the example method obtains an audio stream (block 602) (e.g., the example monitored audio stream 202 of FIG. 2 or the example reference audio stream 302 of FIG. 3). A reference time to described above in connection with FIGS. 2 and 3 is determined (block 604) to indicate the time within an audio stream at which a signature is generated. An audio sample frame is then obtained (block 606). The audio sample frame may be obtained by sampling an analog audio stream at a sampling frequency $f_s$ and performing an analog-to-digital conversion. Alternatively, the audio sample frame may be obtained by extracting or acquiring samples from a digital audio stream at a sampling frequency $f_s$. Based on the Nyquist Theorem, aliasing is avoided by sampling the audio samples at frequencies ranging from zero to

$$\frac{f_s}{2}.$$

A descriptor is then determined (block 608) based on wavelet decomposition performed using a wavelet transform. An example method for generating descriptors based on one or more wavelet decompositions is described in greater detail below in connection with FIG. 7.

After the descriptor is generated, it is determined if a complete descriptor set has been obtained (block 610). If a complete descriptor set has not been obtained, a next audio sample frame is obtained (block 612) and control is passed back to block 608. However, if a complete descriptor set has been obtained, a digital spectral signature is generated (block 614) by concatenating the descriptors of the descriptor set. After the digital spectral signature is generated, it is determined if another signature is to be generated (block 616). If another signature is to be generated, control is passed back to block 604. Otherwise, the example method is stopped.

FIG. 7 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 6. In particular, the example method of FIG. 7 may be used to implement block 608 of FIG. 6. An M-bit descriptor is generated by performing an M-level wavelet decomposition on an audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or one of the audio sample frames 304, 306, 308, and 310 of FIG. 3). For each level wavelet decomposition, the energy of the audio signal for each sub-band is determined and descriptors are generated based on comparisons of the sub-band energies. For each descriptor, the M-level wavelet decomposition is implemented as an intraframe operation that is performed on spectral energies that are uniquely associated with an audio sample frame. Additionally, the M-level wavelet decomposition may be implemented using any wavelet transform. For purposes of clarity, the example method of FIG. 7 is described in terms of the well-known Daubechies wavelet transform.

Initially, the example method performs a first-level wavelet decomposition (block 702) by applying the Daubechies wavelet transform to an audio sample frame. The first application of the Daubechies wavelet transform results in a low-frequency sub-band block of filtered values $L_0$ and a high-frequency sub-band block of filtered values $H_0$, each of which includes

18

$$\frac{N_S}{2}$$

filtered values.

Turning in greater detail to the Daubechies wavelet transform implementation, the Daubechies coefficients $c_0$, $c_1$, $c_2$, and $c_3$ are used to generate an $N_S \times N_S$ transformation matrix in which the coefficients are arranged as shown below.

$$\begin{bmatrix} c_0 & c_1 & c_2 & c_3 & & & & \\ c_3 & -c_2 & c_1 & -c_0 & & & & \\ & & c_0 & c_1 & c_2 & c_3 & & \\ & & c_3 & -c_2 & c_1 & -c_0 & & \\ & & & & & & & \\ & & & & c_0 & c_1 & c_2 & c_3 \\ & & & & c_3 & -c_2 & c_1 & -c_0 \\ c_2 & c_3 & & & & & c_0 & c_1 \end{bmatrix}$$

The coefficients are ordered in the transformation matrix, as shown above, using two dominant patterns. The odd rows include the first pattern, which is an ordering of the coefficients that functions as a smoothing filter (e.g., similar to a moving filter). The even rows include the second pattern, which is an ordering of the coefficients that functions to bring out the details of data (e.g., the audio sample frame). The transformation matrix is first applied to the entire audio sample frame (e.g., all of the $N_S$ samples) to generate filtered values that include low-frequency sub-band filtered values alternated with high-frequency sub-band filtered values. The values are de-interleaved to generate the two sub-band blocks $L_0$ and $H_0$, each of which includes

$$\frac{N_S}{2}$$

samples. The low-frequency sub-band block $L_0$ includes filtered values that are associated with sub-band frequencies ranging from zero to

$$\frac{f_s}{4}.$$

The high-frequency sub-band block $H_0$ includes filtered values that are associated with sub-band frequencies ranging from

$$\frac{f_s}{4} \text{ to } \frac{f_s}{2}.$$

An

$$\frac{N_S}{2} \times \frac{N_S}{2}$$

transformation matrix of the Daubechies coefficients is then applied to the low-frequency sub-band block $L_0$ to generate

**Ex. 1**

US 7,783,889 B2

19

two additional sub-band blocks $L_1$ and $H_1$. For each transformation, the number of filtered values in each sub-band block is halved. Additionally, for each transformation, a descriptor is generated based on a high-frequency sub-band block (e.g., $H_0, H_1, H_2$, etc.). Further details related to the implementation of wavelet transforms are well known in the art and are not described herein.

After the first-level wavelet transform is applied, the high-frequency sub-band block $H_0$ is parsed by separating the filtered values into a first half and a second half (block **704**). Next, at a block **706**, a first energy value $E_0$ is determined by squaring and summing the filtered values of the first half of the high-frequency sub-band block $H_0$ and a second energy value $E_1$ is also determined (block **706**) by squaring and summing the filtered values of the second half of the high-frequency sub-band block $H_0$.

A descriptor bit is determined by comparing the first energy value $E_0$ with the second energy value $E_1$ (block **708**). For example, if the first energy value $E_0$ is greater than the second energy value $E_1$ (i.e., $E_0 > E_1$), the first descriptor bit is set equal to one. If the first energy value $E_0$ is less than or equal to the second energy value $E_1$ (i.e., $E_0 \leqq E_1$), the first descriptor bit is set equal to zero. It is then determined if another descriptor bit is to be determined (block **710**). If another descriptor bit is to be determined, a next-level wavelet decomposition is performed (block **712**). For example, as described above, if a second-level wavelet decomposition is performed, an

$$\frac{N_S}{2} \times \frac{N_S}{2}$$

transformation matrix is applied to the filtered values of the low-frequency sub-band block $L_0$ to determine filtered sub-band blocks $L_1$ and $H_1$. If it is determined at block **710** that another descriptor bit is not to be determined, the example method of FIG. **7** may be stopped.

FIG. **8** is a flow diagram of an example method for comparing the digital spectral signatures (e.g., monitored signatures and reference signatures) generated using the example methods of FIGS. **4-7**. In particular, the example method may be used to compare a monitored signature with a reference signature, both of which are generated based on a sliding FFT or a wavelet transform. In general, the example method of FIG. **8** may be used to match a monitored signature with a reference signature by comparing the monitored signature with a plurality of reference signatures. Identification information (e.g., channel, program title, episode number, etc.) associated with a matching reference signature may then be retrieved from, for example, a database and used to generate media ratings information. The comparisons may be performed by comparing any number of bits from a monitored signature with the same number of bits from a reference signature such as, for example, a bit-by-bit comparison, a byte-by-byte comparison, a word-by-word comparison, etc. Due to the large number of reference signatures available for comparison, a Hamming distance may be used for the comparisons to eliminate mismatches rapidly, thereby significantly decreasing the time required to compare a monitored signature with the reference signatures.

As is known to one of ordinary skill in the art, a Hamming distance between two values may be identified by determining how many bits, numbers, characters, etc. need to be changed to make the two values equal. For example, a first binary value of 0110 and a second binary value of 0101 have

20

a Hamming distance of two because bit location zero and bit location one need to be changed to make the first binary value equal to the second binary value.

Now turning in detail to the example method of FIG. **8**, the example method involves first obtaining a monitored signature (block **802**). A reference time to for the monitored signature is then obtained (block **804**). A first reference signature corresponding to a time within a reference audio stream indicated by the reference time to is obtained from, for example, the memory **134** of FIGS. **1**A and **1**B (block **806**). The first descriptor of the monitored signature and the first descriptor of the reference signature are then obtained (block **808**).

The first descriptor of the monitored signature is compared to the first descriptor of the reference signature to determine if the descriptors match (block **810**). If a match is detected, it is determined if all of the descriptors of the monitored signature and the reference signature have been compared (block **812**). If it is determined at block **812** that all of the descriptors have not been compared, the next descriptors are obtained from the monitored signature and the reference signature (block **816**) and control is passed back to block **810**. If it is determined at block **812** that all of the descriptors have been compared, the monitored audio stream is identified based on the matching reference signature (block **814**). Alternatively, the example method may be implemented so that multiple monitored signatures of a single audio stream need to be matched to multiple signatures of a reference audio stream prior to identifying the monitored audio stream.

If it is determined at block **810** that the descriptors do not match, then it is determined if all of the reference signatures has been compared (block **818**). If all of the reference signatures have not been compared, the next reference signature is obtained (block **820**) and control is passed to block **808**. However, if it is determined at block **818** that all of the reference signatures have been compared, the media, channel, radio station, etc. associated with the monitored audio stream may be unidentifiable and the example method is stopped. A flag may be set to indicate that the monitored audio stream is unidentifiable.

Although, the example method of FIG. **8** is described as comparing one reference signature at a time, the example method can be adapted to compare multiple reference signatures with one monitored signature in parallel (i.e., at the same time). For example, the operation of block **806** may be configured to obtain a plurality of reference signatures at one time, each of which corresponds to a different reference audio stream. The operation of block **808** may be configured to obtain the first descriptor of each of the plurality of reference signatures retrieved at block **806**. The descriptors of each of the reference signatures may be compared with the each descriptor of the monitored signature until a match is found or until the plurality of reference signatures obtained at block **806** is eliminated, after which time another plurality of reference signatures may be obtained at block **820**.

One of ordinary skill in the art can readily appreciate that applying the Hamming distance to the comparison process may significantly reduce the time required to match all of the available reference signatures. For example, after the first descriptor of each of a plurality of reference signatures are compared to the first descriptor of a monitored signature, the first descriptor of each of the reference signatures is associated with a Hamming distance. Only reference signatures having first descriptors associated with a Hamming distance less than a predetermined Hamming distance threshold are further compared with the monitored signature based on the next descriptor of each of the reference signatures and the monitored signature. Reference signatures having descriptors

**Ex. 1**

US 7,783,889 B2

21

associated with a Hamming distance greater than a predetermined threshold are discarded. The number of reference signatures to be compared based on the next descriptors is reduced from the number of reference signatures compared to the monitored signature based on the first descriptor. In this manner, with each iteration of the comparison process, the number of reference signatures that remain to be compared in subsequent iterations of the signature comparison process quickly diminishes until it is determined that all of the descriptors of a single reference signature are associated with a Hamming distance below the predetermined Hamming distance threshold.

In instances where all of the descriptors of more than one reference signature are associated with a Hamming distance below the predetermined Hamming distance threshold, more than one monitored signature may need to be matched with respective reference signatures of the possible matching reference audio streams. It will be relatively unlikely that all of the monitored signatures generated based on the monitored audio stream will match all of the reference signatures of more than one reference audio stream, and, thus erroneously matching more than one reference audio stream to the monitored audio stream can be prevented.

The example methods described above in connection with FIGS. 4-8 may be implemented by hardware, software, and/or any combination thereof. More specifically, the example methods may be executed in hardware defined by the block diagrams of FIGS. 9-11. The example methods may also be implemented by software executed on a processor system such as, for example, the processor system 1210 of FIG. 12.

FIG. 9 is a block diagram of an example signature generation system 900 for generating digital spectral signatures. In particular, the example signature generation system 900 may be used to generate monitored signatures and/or reference signatures based on a sliding FFT as described above in connection with the example methods of FIGS. 4 and 5. For example, the example signature generation system 900 may be used to implement the signature generators 114 and 122 of FIG. 1A or the signature generators 156 and 158 of FIG. 1B. Additionally, the example signature generation system 900 may be used to implement the example methods of FIGS. 4 and 5.

As shown in FIG. 9, the example signature generation system 900 includes a sample generator 902, a timing device 903, a reference time generator 904, a sliding FFT module 906, a frequency identifier 908, a spectral power value identifier 910, a comparator 912, a descriptor generator 914, a concatenator 916, and a data communication interface 918, all of which may be communicatively coupled as shown. The example signature generation system 900 may be configured to obtain an example audio stream 920, acquire a plurality of audio samples from the example audio stream 920, and generate digital spectral signatures based on the audio samples.

The sample generator 902 may be configured to obtain the example audio stream 920, which may be any analog or digital audio stream. If the example audio stream 920 is an analog audio stream, the sample generator 902 may be implemented using an analog-to-digital converter. If the example audio stream 920 is a digital audio stream, the sample generator 902 may be implemented using a digital signal processor. Additionally, the sample generator 902 may be configured to acquire and/or extract audio samples at any desired sampling frequency $f_s$ and notify the reference time generator 904 when an audio sample acquisition process begins. The sample generator 902 communicates samples to the sliding FFT module 906. The sample generator 902 may also be configured to notify the frequency identifier 908 when an

22

audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or 304, 306, 308, and 310 of FIG. 3) or a sample segment (e.g., one of the sample segments 312a-f of FIG. 3) has been generated.

The timing device 903 may be configured to generate time data and/or timestamp information and may be implemented by a clock, a timer, a counter, and/or any other suitable device. The timing device 903 may be communicatively coupled to the reference time generator 904 and may be configured to communicate time data and/or timestamps to the reference time generator 904. The timing device 903 may also be communicatively coupled to the sample generator 902 and may assert a start signal or interrupt to instruct the sample generator 902 to begin collecting or acquiring audio sample data. In one example, the timing device 903 may be implemented by a real-time clock having a 24-hour period that tracks time at a resolution of milliseconds. In this case, the timing device 903 may be configured to reset to zero at midnight and track time in milliseconds with respect to midnight.

The reference time generator 904 may initialize a reference time to when a notification is received from the sample generator 902. As described above in connection with FIGS. 2 and 3, the reference time $t_0$ may be used to indicate the time within an audio stream at which a signature is generated. In particular, the reference time generator 904 may be configured to read time data and/or a timestamp value from the timing device 903 when notified of the beginning of a sample acquisition process by the sample generator 902. The reference time generator 904 may then store the timestamp value as the reference time to.

The sliding FFT module 906 may be configured to perform a sliding FFT using the audio samples obtained from the sample generator 902. As described above in connection with FIG. 4, a sliding FFT may update frequency spectrum data each time two samples (e.g., the two most recently acquired samples $v_{N_s-2}$ and $v_{N_s-1}$) are obtained from the sample generator 902.

The frequency identifier 908 may be configured to identify one or more frequency pairs from frequency spectrum data in response to a notification from the sample generator 902 that a new audio sample frame or a new sample segment has been generated. For example, if the example signature generation system 900 is configured to generate monitored signatures, the frequency identifier 908 identifies frequency pairs from the frequency spectrum data in response to a new audio sample frame notification. Alternatively, if the example signature generation system 900 is configured to generate reference signatures, an audio sample frame of data is formed with each new sample segment as described above in connection with FIG. 3. Therefore, the frequency identifier 908 identifies frequency pairs from the frequency spectrum data in response to a new sample segment notification. The frequency identifier 908 may then be configured to communicate indexes identifying the frequency components of the frequency pairs to the spectral power value identifier 910.

The spectral power value identifier 910 may be configured to obtain the indexes associated with the frequency components of the frequency pairs from the frequency identifier 908. The spectral power value identifier 910 may then determine or identify the spectral power of each frequency component of the frequency pairs by retrieving the spectral power value for each frequency component from the frequency spectrum data generated by the sliding FFT module 906. The spectral power values may then be communicated to the comparator 912.

As described above in connection with FIG. 5, the comparator 912 and the descriptor generator 914 may work coop-

**Ex. 1**

US 7,783,889 B2

23

eratively to generate M-bit descriptors. The comparator 912 may obtain the spectral power values and compare the spectral power values for each frequency pair. The descriptor generator 914 may be configured to obtain comparison results from the comparator 912 and generate the descriptor bits of an M-bit descriptor based on the comparison results.

The concatenator 916 may obtain descriptor values from the descriptor generator 914. When a complete set of descriptors is obtained, the concatenator 916 may concatenate the descriptors 916 to form a digital spectral signature. The data communication interface 918 may obtain the digital spectral signatures from the concatenator 916 and the reference time to corresponding to the digital spectral signature and communicate the same to a memory and/or a reference site. For example, if the example signature generation system 900 is configured to generate monitored signatures at the monitoring site 102 (FIG. 1A), the monitored signatures may be communicated to the central data collection facility (FIG. 1A) via the network 108 (FIG. 1A). Alternatively, if the example signature generation system 900 is configured to generate reference signatures, the reference signatures may be communicated to the central data collection facility 154 (FIG. 1B) and/or stored in the memory 134 (FIG. 1B).

FIG. 10 is a block diagram of another example signature generation system 1000 for generating digital signatures based on audio streams. In particular, the example signature generation system 1000 may be used to generate monitored signatures and/or reference signatures based on wavelet transforms as described above in connection with the example methods of FIGS. 6 and 7. For example, the example signature generation system 1000 may be used to implement the signature generators 114 and 122 of FIG. 1A and generate monitored signatures. Additionally or alternatively, the example signature generation system 1000 may be used to implement the signature generators 156 and 158 of FIG. 1B. In addition, the example signature generation system 1000 may be used to implement the example methods of FIGS. 6 and 7.

The example signature generation system 1000 includes the sample generator 902, the timing device 903, the reference time generator 904, the comparator 912, the descriptor generator 914, the concatenator 916, and the data communication interface 918 of the example signature generation system 900 described above in connection with FIG. 9. Additionally, the example signature generation system 1000 includes a wavelet transform module 1002, a sub-band block identifier 1004, and an energy value generator 1006, all of which may be communicatively coupled as shown.

The wavelet transform module 1002 may be configured to apply wavelet transforms to audio samples obtained from the sample generator 902. For example, the wavelet transform module 1002 may obtain an audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or 304, 306, 308, and 310 of FIG. 3) from the sample generator 902 and perform an M-level wavelet decomposition on the audio samples to generate filtered data values using, for example, the Daubechies wavelet transform as described in connection with FIGS. 6 and 7. The filtered data values may then be communicated to the sub-band block identifier 1004.

The sub-band block identifier 1004 may be configured to obtain the filtered data values from the wavelet transform module 1002 and generate a low-frequency sub-band block $L_x$ and a high-frequency sub-band block $H_x$. As described in greater detail above in connection with FIG. 7, the sub-band blocks $L_x$ and $H_x$ may be identified by de-interleaving the filtered data values. The low-frequency sub-band block may then be communicated to the wavelet transform module 1002

24

to perform another wavelet decomposition and the high-frequency sub-band filtered block may be communicated to the energy value generator 1006.

The energy value generator 1006 may be configured to generate energy values $E_x$ based on the high-frequency sub-band block. The energy value generator 1006 may be configured to parse or separate the high-frequency sub-band block into a first half of filtered data values and a second half of filtered data values as described in greater detail above in connection with FIG. 7. The energy value generator 1006 may then generate a first energy value $E_0$ by squaring and summing the first half of filtered data values. A second energy value $E_1$ may be generated by squaring and summing the second half of filtered data values.

The comparator 912 and the descriptor generator 914 may be configured to generate descriptors based on energy values. For example, the comparator 912 may obtain energy values from the energy value generator 1006 and compare a first energy to a second energy value. The descriptor generator 914 may obtain comparison results from the comparator 912 and generate the bits of an M-bit descriptor based on the comparison results.

The concatenator 916 may obtain descriptors from the descriptor generator 914 and generate digital spectral signatures by concatenating a plurality of descriptors as described above in connection with FIG. 9. The data communication interface 918 may then store or transmit signatures obtained from the concatenator 916 with corresponding reference times obtained from the reference time generator 904.

FIG. 11 is a block diagram of an example signature comparison system 1100 for comparing digital spectral signatures. In particular, the example signature comparison system 1100 may be used to compare monitored signatures with reference signatures. For example, the example signature comparison system 1100 may be used to implement the signature analyzer 132 of FIG. 1 to compare monitored signatures with reference signatures. Additionally, the example signature comparison system 1100 may be used to implement the example method of FIG. 8.

The example signature comparison system 1100 includes a monitored signature receiver 1102, a reference signature receiver 1104, a comparator 1106, a Hamming distance filter 1108, a media identifier 1110, and a media identification look-up table interface 1112, all of which may be communicatively coupled as shown.

The monitored signature receiver 1102 may be configured to obtain monitored signatures via the network 106 (FIG. 1) and communicate the monitored signatures to the comparator 1106. The reference signature receiver 1104 may be configured to obtain reference signatures from the memory 134 (FIGS. 1A and 1B) and communicate the reference signatures to the comparator 1106.

The comparator 1106 and the Hamming distance filter 1108 may be configured to compare reference signatures to monitored signatures using Hamming distances. In particular, the comparator 1106 may be configured to compare descriptors of monitored signatures with descriptors from a plurality of reference signatures and to generate Hamming distance values for each comparison. The Hamming distance filter 1108 may then obtain the Hamming distance values from the comparator 1106 and filter out non-matching reference signatures based on the Hamming distance values as described above in connection with FIG. 8.

After a matching reference signature is found, the media identifier 1110 may obtain the matching reference signature and in cooperation with the media identification look-up table interface 1112 may identify the media information associated

**Ex. 1**

US 7,783,889 B2

25

with an unidentified audio stream (e.g., the example monitored audio stream 202 of FIG. 2). For example, the media identification look-up table interface 1112 may be communicatively coupled to a media identification look-up table or a database that is used to cross-reference media identification information (e.g., movie title, show title, song title, artist name, episode number, etc.) based on reference signatures. In this manner, the media identifier 1110 may retrieve media identification information from the media identification database based on the matching reference signatures.

FIG. 12 is a block diagram of an example processor system 1210 that may be used to implement the apparatus and methods described herein. As shown in FIG. 12, the processor system 1210 includes a processor 1212 that is coupled to an interconnection bus or network 1214. The processor 1212 includes a register set or register space 1216, which is depicted in FIG. 12 as being entirely on-chip, but which could alternatively be located entirely or partially off-chip and directly coupled to the processor 1212 via dedicated electrical connections and/or via the interconnection network or bus 1214. The processor 1212 may be any suitable processor, processing unit or microprocessor. Although not shown in FIG. 12, the system 1210 may be a multi-processor system and, thus, may include one or more additional processors that are identical or similar to the processor 1212 and that are communicatively coupled to the interconnection bus or network 1214.

The processor 1212 of FIG. 12 is coupled to a chipset 1218, which includes a memory controller 1220 and an input/output (I/O) controller 1222. As is well known, a chipset typically provides I/O and memory management functions as well as a plurality of general purpose and/or special purpose registers, timers, etc. that are accessible or used by one or more processors coupled to the chipset. The memory controller 1220 performs functions that enable the processor 1212 (or processors if there are multiple processors) to access a system memory 1224 and a mass storage memory 1225.

The system memory 1224 may include any desired type of volatile and/or non-volatile memory such as, for example, static random access memory (SRAM), dynamic random access memory (DRAM), flash memory, read-only memory (ROM), etc. The mass storage memory 1225 may include any desired type of mass storage device including hard disk drives, optical drives, tape storage devices, etc.

The I/O controller 1222 performs functions that enable the processor 1212 to communicate with peripheral input/output (I/O) devices 1226 and 1228 via an I/O bus 1230. The I/O devices 1226 and 1228 may be any desired type of I/O device such as, for example, a keyboard, a video display or monitor, a mouse, etc. While the memory controller 1220 and the I/O controller 1222 are depicted in FIG. 12 as separate functional blocks within the chipset 1218, the functions performed by these blocks may be integrated within a single semiconductor circuit or may be implemented using two or more separate integrated circuits.

The methods described herein may be implemented using instructions stored on a computer readable medium that are executed by the processor 1212. The computer readable medium may include any desired combination of solid state, magnetic and/or optical media implemented using any desired combination of mass storage devices (e.g., disk drive), removable storage devices (e.g., floppy disks, memory cards or sticks, etc.) and/or integrated memory devices (e.g., random access memory, flash memory, etc.).

Although certain methods, apparatus, and articles of manufacture have been described herein, the scope of coverage of this patent is not limited thereto. To the contrary, this patent

26

covers all methods, apparatus, and articles of manufacture fairly falling within the scope of the appended claims either literally or under the doctrine of equivalents.

What is claimed is:

1. A method for generating signatures implemented using an apparatus comprising a processor, the method comprising:

obtaining a first frame of media samples;

identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

generating a first signature based on the first descriptor;

identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples;

identifying a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;

determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and

generating a second signature based on the second descriptor.

2. A method as defined in claim 1, further comprising identifying media information based on the first signature.

3. A method as defined in claim 2, wherein a Hamming distance is used to identify the media information based on the first signature.

4. A method as defined in claim 2, wherein the media information is associated with at least one of audio information or video information.

5. A method as defined in claim 1, wherein the first descriptor is associated with only the first frame of media samples.

6. A method as defined in claim 1, wherein the second descriptor is of the second frame of media samples.

7. A method as defined in claim 1, wherein the spectral transform operation is a sliding Fast Fourier Transform.

8. An apparatus for generating signatures, comprising:

a processor system including a memory; and

instructions stored in the memory that enable the processor system to:

obtain a first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

identify a third spectral power and a fourth spectral power; determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

**Ex. 1**

US 7,783,889 B2

27

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

9. An apparatus as defined in claim **8**, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature.

10. An apparatus as defined in claim **9**, wherein a Hamming distance is used to identify the media information based on the first signature.

11. An apparatus as defined in claim **8**, wherein the first descriptor is associated with only the first frame of media samples.

12. An apparatus as defined in claim **8**, wherein the instructions stored in the memory enable the processor system to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

13. An apparatus as defined in claim **8**, wherein the third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

14. A tangible machine accessible medium having instructions stored thereon that, when executed, cause a machine to:

obtain a first frame first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

28

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

identify a third spectral power and a fourth spectral power;

determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

15. A tangible machine accessible medium as defined in claim **14**, wherein the first descriptor is associated with only the first frame of media samples.

16. A tangible machine accessible medium as defined in claim **14** having instructions stored thereon that, when executed, cause the machine to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

17. A tangible machine accessible medium as defined in claim **14**, wherein third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

*   *   *   *   *

**Ex. 1**

# EXHIBIT 2



## Planet Depos®
### We Make It *Happen*™

# HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

# Transcript of ███████████, Designated Representative

**Date:** September 8, 2023
**Case:** The Nielsen Company (US), LLC, -v- Tvision Insights, Inc.

**Planet Depos**
**Phone:** 888.433.3767
**Email:** transcripts@planetdepos.com
**www.planetdepos.com**

WORLDWIDE COURT REPORTING & LITIGATION TECHNOLOGY

**Ex. 2**

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY
Transcript of Daniel Nelsen, Designated Representative
Conducted on September 8, 2023

1 (1 to 4)

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

THE NIELSEN COMPANY (US), LLC,

Plaintiff,

v.                    C.A. No. 21-1592-CJB

TVISION INSIGHTS, INC.,

Defendant.
_____
THE NIELSEN COMPANY (US), LLC,

Plaintiff,

v.                    C.A. No. 22-57-CJB

TVISION INSIGHTS, INC.,

Defendant.
_____

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

V I D E O   D E P O S I T I O N

o f

THE NIELSEN COMPANY (US), LLC, by and through its

DESIGNATED REPRESENTATIVE, ███████████

taken on behalf of Defendant

DATE:        September 8, 2023

TIME:        8:55 a.m. to 5:09 p.m. EST

PLACE:       - REMOTE -

BEFORE:      Dawn A. Hillier, RMR, CRR
             Stenographic Reporter
             Notary Public - State of
             Florida, at Large

JOB NO:      505593

**Page 2**

APPEARANCES:  ALL PARTIES ATTENDING REMOTELY

ON BEHALF OF PLAINTIFF:

    ANDREW E. RUSSELL, ESQUIRE
    LINDSEY GELLAR, ESQUIRE
    SHAW KELLER LLP
    I.M. Pei Building
    1105 North Market Street, 12th Floor
    Wilmington, DE 19801
    (302) 298-0700
    arussell@shawkeller.com

ON BEHALF OF DEFENDANT:

    STEVEN YOVITS, ESQUIRE
    KELLEY DRYE & WARREN LLP
    333 West Wacker Drive
    Chicago, IL 60606
    (312) 857-7070
    syovits@kelleydrye.com

ALSO PRESENT:
    Gabriel Martin, Planet Depos videographer
    Merinda Evans, Planet Depos videographer

**Page 3**

| INDEX | PAGE |
|---|---|
| WITNESS - ███████████ | |
| EXAMINATION BY MR. RUSSELL | 6 |
| EXAMINATION BY MR. YOVITZ | 255 |
| FURTHER EXAMINATION BY MR. RUSSELL | 264 |
| CERTIFICATE OF OATH | 269 |
| REPORTER'S CERTIFICATE | 270 |

EXHIBITS

| | | PAGE |
|---|---|---|
| Exhibit 1 | Ex. 1 - 30(b)(1) Notice | 16 |
| Exhibit 2 | Ex. 3 - 30(b)(6) Notice - Objections - v2.pdf | 17 |
| Exhibit 3 | Ex. 3 - 30(b)(6) Notice - Objections - v2.pdf | 17 |
| Exhibit 4 | Ex. 4 - ███████ _ LinkedIn.pdf | 21 |
| Exhibit 5 | Ex. 5 - NLSN_TVISION0000304 - '889.pdf | 32 |
| Exhibit 6 | Deposition Notes - Final | 75 |
| Exhibit 7 | Ex. 7 - 22-057 Complaint | 179 |
| Exhibit 8 | Ex. 8 22-057 Complaint - Exhibits | 180 |
| Exhibit 9 | Ex. 9 - NLSN_TVISION0087429 | 232 |
| Exhibit 10 | Ex. 10 - TVSN_NLSN_00005259 - Haitsma US | 246 |
| Exhibit 11 | Ex. 11 TVSN_NLSN_00935087 - Wang Article | 247 |
| Exhibit 12 | Ex. 12 TVSN_NLSN_00002957 - Wang WO | 247 |
| Exhibit 13 | Ex. 13 TVSN_NLSN_00005229 - Wang US | 247 |
| Exhibit 14 | Notebook - RETAINED BY WITNESS | 250 |

**Page 4**

REPORTER'S KEY TO PUNCTUATION:

--  At end of question or answer references
    interruption.

...  References a trail-off by the speaker.

     No testimony omitted.

"Uh-huh" "Um-hum" References affirmative sound.

"Huh-uh" "Um-um"  References negative sound.

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Ex. 2

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY
Transcript of Daniel Nelsen, Designated Representative

19 (73 to 76)

Conducted on September 8, 2023



Ex. 2

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Transcript of Daniel Nelsen, Designated Representative
Conducted on September 8, 2023



Ex. 2

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY
Transcript of Daniel Nelsen, Designated Representative

Conducted on September 8, 2023



Ex. 2

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY
Transcript of Daniel Nelsen, Designated Representative
Conducted on September 8, 2023

22 (85 to 88)

Ex. 2

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY

Transcript of Daniel Nelsen, Designated Representative

Conducted on September 8, 2023



Ex. 2

HIGHLY CONFIDENTIAL - OUTSIDE COUNSEL EYES ONLY
Transcript of Daniel Nelsen, Designated Representative
Conducted on September 8, 2023

50 (197 to 200)



**Ex. 2**

# EXHIBIT 3

8/29/2023          The Nielsen Company (US), LLC v. TVision Insights, Inc.          Yan Liu 30(b)(6)
Outside Counsel Attorneys' Eyes Only

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

--------------------------------X

THE NIELSEN COMPANY (US), LLC,    :

                  Plaintiff,      : Case No.:

     v.                           : 22-57-CJB

TVISION INSIGHTS, INC.,           :

                  Defendant.      :

--------------------------------X

*** OUTSIDE COUNSEL ATTORNEYS' EYES ONLY ***

Deposition of TVision Insights, Inc., by and

through its designated representative, YAN LIU

Washington, D.C.

Tuesday, August 29, 2023

8:39 a.m.

Reported by: Matthew Goldstein, RMR, CRR

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

Page 2

Deposition of YAN LIU, held at:

Kelley Drye & Warren LLP

3050 K Street, NW

Washington, D.C. 20007

202.342.8400

Pursuant to Notice, before Matthew Goldstein, RMR, CRR, Notary Public in and for the District of Columbia.

Page 3

A P P E A R A N C E S

ON BEHALF OF THE PLAINTIFF, THE NIELSEN

COMPANY (US), LLC,:

DOUGLAS LEWIS, ESQUIRE

STEVEN YOVITS, ESQUIRE

KELLEY DRYE & WARREN, LLP

333 West Wacker Drive

26th Floor

Chicago, Illinois 60606

312.857.7073

ON BEHALF OF THE DEFENDANT, TVISION INSIGHTS,

INC.:

JASON XU, ESQUIRE

RIMON PC

1990 K Street, NW

Suite 420

Washington, D.C. 20006

202.971.9494

ALSO PRESENT:

DANIEL HOLMSTOCK - VIDEOGRAPHER

Page 4

CONTENTS

EXAMINATION OF YAN LIU                 PAGE
By MR. LEWIS                     12

EXHIBITS
     (Attached)
LIU        DEPOSITION EXHIBIT         PAGE
Exhibit 1    Notice of Deposition of Yan Liu    17
Exhibit 2    Plaintiff The Nielsen Company      13
     (US), LLC's Notice Under Rules
     30(b)(6) To TVision
Exhibit 3    Plaintiff The Nielsen Company      14
     (US), LLC's First Supplemental
     Notice Under Rules 30(b)(6) to
     TVision
Exhibit 4    TVSN_NLSN_00787356 through         19
     TVSN_NLSN_00787365, TVision -
     Financial Model Overview May
     2020 Slide Deck
Exhibit 5    TVSN_NLSN_00776803 through         45
     TVSN_NLSN_00776806, September
     25, 2020, E-mail Correspondence
Exhibit 6    TVSN_NLSN_00904299 through         49
     TVSN_NLSN_00904303, April 2,
     2020, E-mail Correspondence

1 (Pages 1 to 4)



Ex. 3

26 (Pages 101 to 104)

# EXHIBIT 4

Ex. 4



This Document is for INTERNAL USE ONLY and not to be circulated

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEY'S EYES ONLY

Ex. 4

TVSN_NLSN_00008034

Ex. 4



This Document is for INTERNAL USE ONLY and not to be circulated

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEY'S EYES ONLY

Ex. 4

TVSN_NLSN_00008035

Ex. 4



This Document is for INTERNAL USE ONLY and not to be circulated

Ex. 4

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEY'S EYES ONLY

TVSN_NLSN_00008036

Ex. 4



This Document is for INTERNAL USE ONLY and not to be circulated

**Ex. 4**

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEY'S EYES ONLY

TVSN_NLSN_00008037

Ex. 4



This Document is for INTERNAL USE ONLY and not to be circulated

Ex. 4

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEY'S EYES ONLY

TVSN_NLSN_00008038

Ex. 4



This Document is for INTERNAL USE ONLY and not to be circulated

Ex. 4

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEY'S EYES ONLY

TVSN_NLSN_00008039

Ex. 4



This Document is for INTERNAL USE ONLY and not to be circulated

Ex. 4

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEY'S EYES ONLY

TVSN_NLSN_00008040

**Ex. 4**



This Document is for INTERNAL USE ONLY and not to be circulated

**Ex. 4**

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEY'S EYES ONLY

TVSN_NLSN_00008041

# EXHIBIT 5

Ex. 5

*The Nielsen Company (US), LLC*

*v.*

*TVision Insights, Inc.*

U.S. District Court for the District of Delaware
Case No. 22-057-LPS

**Expert Report on Damages**

**Michael C. Keeley, Ph.D.**
**Senior Advisor, Cornerstone Research**

**July 7, 2025**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**TABLE OF CONTENTS**

I.     QUALIFICATIONS ................................................................................ 1

II.    ASSIGNMENT ................................................................................... 2

III.   MATERIALS CONSIDERED AND REPORT OUTLINE ............................... 4

    A.    Materials Considered ............................................................... 4

    B.    Report Outline ......................................................................... 4

IV.    SUMMARY OF OPINIONS ................................................................... 5

V.     CASE BACKGROUND ......................................................................... 10

    A.    Parties ...................................................................................... 10

        1.    Nielsen ............................................................................. 10

        2.    TVision ............................................................................ 12

    B.    Patent-in-Suit .......................................................................... 16

    C.    Audience Measurement Market and Competitive Landscape ............ 17

        1.    Ratings Measurement as a Currency................................. 17

        2.    Importance of TV Panel Data to Calibrate Big Data ............ 18

        3.    Nielsen Competitors in the Audience Measurement Market ... 19

VI.    THE PATENTED TECHNOLOGY IS VALUABLE TO TVISION ..................... 21

VII.   LOST PROFITS .................................................................................. 23

VIII.  *GEORGIA-PACIFIC* PROVIDES AN ANALYTICAL FRAMEWORK FOR THE HYPOTHETICAL NEGOTIATION USED TO DETERMINE A REASONABLE ROYALTY ........................................................................................... 28

    A.    Analytical Framework .............................................................. 29

        1.    Hypothetical Negotiation Between Nielsen and TVision......... 29

        2.    Nash Bargaining............................................................... 30

    B.    Calculation of a Reasonable Royalty Based on the Incremental Benefit to TVision and Cost to Nielsen ......................................................... 35

IX.    ANALYSIS OF THE *GEORGIA-PACIFIC* FACTORS................................. 44

X.     SIGNATURE ..................................................................................... 55

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

## I.      QUALIFICATIONS

1.      My name is Michael C. Keeley.  I am a Senior Advisor of Cornerstone Research, an economic and financial consulting firm with eight offices worldwide.  I joined Cornerstone Research in 1989, and prior to becoming a Senior Advisor, I was a Senior Vice President.  I specialize in economic, financial, and statistical analysis.

2.      Prior to joining Cornerstone Research, I was a Research Officer at the Federal Reserve Bank of San Francisco and prior to that I was a senior economist at Stanford Research Institute.  I have also taught economics at Santa Clara University.

3.      I earned an S.B. degree in mathematics from the Massachusetts Institute of Technology, and the University of Chicago awarded me M.A. and Ph.D. degrees in economics.

4.      For more than 30 years I have consulted and served as an expert witness on a variety of legal disputes, including intellectual property, antitrust, and general business litigation.  I have testified as an expert witness in a number of cases and served as a consultant in others.  In addition to consulting on issues relating to litigation, I have consulted on non-litigation business, economic, and public policy issues, including business consulting on pricing, auction design, patent licensing, and business strategy, and public policy consulting on energy policy, financial regulation, and welfare reform.

5.      I have addressed reasonable royalty rates, lost profits, unjust enrichment, commercial success, and/or the value of technology-sharing agreements in over 25 disputes in the intellectual property area, and I have served as a consultant to intellectual property holders, helping to negotiate licenses.  I have served as an expert in intellectual property cases alleging patent infringement, misappropriation of trade secrets, copyright infringement, trade dress infringement, trademark infringement, tax evasion, and breaches of technology-sharing agreements.  I have been retained by both plaintiffs and defendants.

6.      I am the author of "Estimating Damages in Patent Infringement Cases:  An Economic Perspective,"[1] published by Cornerstone Research, "Infringement:  Valuing IP for Damages,"[2]

---

[1] Keeley, Michael C., "Estimating Damages in Patent Infringement Cases:  An Economic Perspective," *Cornerstone Research*, 1999.

[2] Keeley, Michael C., "Infringement: Valuing IP for Damages," *les Nouvelles* 34, no. 4 (1999), pp. 172–5.

which appeared in *les Nouvelles*, a publication of the Licensing Executives Society, and "Patent Damages—A Brave New World?,"[3] that appeared in *Inside Counsel*. These publications focused on damages issues in intellectual property matters, including lost profits, licensing, royalty, and valuation issues.

7.      In addition to my work in the intellectual property area, I have also served as an expert in cases involving allegations of violations of the antitrust laws, breach of contract, fraud, and other types of litigation.

8.      My research has been published widely in economics and finance journals. Based on citations of my research, I was selected for inclusion in *Who's Who in Economics*. I was also awarded the Garn prize for my research on bank risk-taking, and I have served as a referee (i.e., a reviewer) for many of the major economics and finance journals. Details of my qualifications are provided in my curriculum vitae in Appendix I. A list of cases in which I have provided testimony since 2017 is provided in Appendix II. I am being compensated at my current billing rate of ████ per hour for the work I have done on this case. Cornerstone Research is also being compensated for the work my colleagues have done at their standard billing rates. Cornerstone Research's compensation is not dependent on the outcome of this litigation. I may also receive compensation from Cornerstone Research based on Cornerstone Research's billings in this matter.

## II.    ASSIGNMENT

9.      I have been asked by counsel for the Nielsen Company (US), LLC ("Nielsen" or "Plaintiff") to assess its damages resulting from TVision Insights, Inc.'s ("TVision") alleged patent infringement of U.S. Patent No. 7,783,889 (the "'889 Patent," the "patent-in-suit," or the "asserted patent").[4] That is, I have been asked to assess damages under the assumption that the patent-in-suit is valid, enforceable, and infringed.

---

[3] Keeley, Michael, "Patent Damages—A Brave New World?," *Inside Counsel*, June 8, 2012.

[4] Complaint for Patent Infringement, *The Nielsen Company (US), LLC v. TVision Insights, Inc.,* Case No. 1:22-CV-00057, January 14, 2022 ("Complaint"), ¶ 1.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



[5] Expert Report on Damages, Michael C. Keeley, Ph.D., October 25, 2023; Reply Expert Report on Damages, Michael C. Keeley, Ph.D., December 15, 2023.

[6] Complaint, ¶ 12.

[7] Complaint, ¶ 13.

[8] Complaint, ¶ 12.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 5**

### III.    MATERIALS CONSIDERED AND REPORT OUTLINE

#### A.    Materials Considered

12.    I have reviewed a variety of materials in forming my opinions in this case, including legal pleadings, Court Opinions, responses to interrogatories, depositions, documents produced in discovery, industry studies, and publicly available information.  However, as mentioned above, with the exception of what is described below, for this report I have only considered the materials available at the time I wrote my first damages report.  The new materials I have considered are interviews with ████████████████████████████████[9] and Nielsen's technical expert, Dr. Chris Kyriakakis, Dr. Kyriakakis' opening report,[10] as well as certain news press related to TVision and Nielsen.  In addition, when I have relied upon any information from these discussions, I have noted the individual who provided this information below.  Appendix III contains a list of materials I have considered in forming my opinions.

13.    I may supplement my report and opinions if new information relevant to damages is provided through subsequent fact discovery and as allowed by the Court.  I also expect to assess and respond to any opinions set forth by TVision's damage expert(s), and I plan to use demonstrative exhibits at trial that have not yet been created.  I may also rely on testimony that occurs at trial.

#### B.    Report Outline

14.    My report proceeds as follows:  I first present a summary of opinions, followed by a broad overview of Nielsen and TVision, the patent-in-suit, and the audience measurement market and competitive landscape.  Next I discuss lost profits.  Following the framework outlined in *Georgia-Pacific*, I then present in detail the economic considerations of the hypothetical negotiation and calculation of a reasonable royalty.  I then follow with a review of the *Georgia-Pacific* factors.

---

[9] I had interviewed ████████████████████████████████████, and cited her in my prior reports.  I understand she is no longer with Nielsen and that ███████████ will testify on behalf of Nielsen at trial.

[10] Opening Expert Report of Chris Kyriakakis, July 7, 2025 ("Kyriakakis Report").

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 5**



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



Ex. 5

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Ex. 5



Ex. 5

**Ex. 5**



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



Ex. 5

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Ex. 5



Ex. 5

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Ex. 5



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY





HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY





HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY





HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



## X.    SIGNATURE

113.    This report represents my conclusions at this time.  However, as mentioned above, I may supplement this report as new information is made available to me and as allowed by the Court.  I also plan to continue my analysis of data and documents and review depositions.  In addition, I plan to write a reply report.  Further, I plan to use demonstrative exhibits at trial that have not yet been developed.

_____
Michael C. Keeley, Ph.D.

---

[194] Exhibit 1.  *See also* Section VIII.B.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

# Appendix I

## MICHAEL C. KEELEY, Ph.D.
### Senior Advisor

**Cornerstone Research**
mkeeley@cornerstone.com

**Business**
1302 El Camino Real, Suite 250 • Menlo Park, CA  94025
650.868.8489

## ACADEMIC BACKGROUND

| | | |
|---|---|---|
| 1974 | **University of Chicago** | Chicago, Illinois |
| | *Ph.D., Economics* | |
| 1971 | **University of Chicago** | Chicago, Illinois |
| | *M.A., Economics* | |
| 1969 | **Massachusetts Institute of Technology** | Cambridge, Massachusetts |
| | *S.B., Mathematics* | |

## RANGE OF EXPERIENCE

Expert in economics, econometrics, and finance.  Provided consulting and expert testimony in antitrust, intellectual property, breach of contract, product misrepresentation, transfer pricing, and securities matters.  Testified in over 20 trials.  Provided business consulting on pricing, auction design, and strategy.  Provided public policy analysis on energy, labor, economic development, welfare reform, and banking issues.  Has industry experience in telecommunications, insurance, banking, oil & gas, medical device, health care, pharmaceutical, computer software and hardware, automotive, internet, chemical, financial, agriculture, bio-technology, and real estate industries among others.  Has published in the areas of labor economics, banking, and finance among other areas.

## PROFESSIONAL EXPERIENCE

1989 – Present  **Cornerstone Research**                                             Menlo Park, California

*Senior Advisor*
*Senior Vice President*

Developed the firm's antitrust practice.  Cases involved issues of alleged price fixing, monopolization, predatory pricing, price discrimination, tying, and mergers and acquisitions.

Developed the firm's intellectual property practice.  Addressed issues of damages in patent, copyright, trade secret, and trade dress infringement matters, commercial success in a patent liability matter and the economics of technology sharing agreements.

Testified in several prominent cases, such as *Monsanto v. DuPont*, the Long Beach crude oil price fixing case, the Mercedes-Benz tying cases, *Verizon v. Cox*, *Verdin v. R & B Falcon et al., Aguilar v. Atlantic Richfield et al.*, and the *AMD v. Intel* litigation. Served as the expert in a number of other antitrust and intellectual property matters.

Served as an expert or consultant regarding class certification in a number of cases in the financial, pharmaceutical, medical device, chemical, oil and gas, and high tech industries, as well as in cases involving labor markets.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Advisor**

---

**PROFESSIONAL EXPERIENCE (CONT.)**

Managed a number of prominent cases, including the *High Fructose Corn Syrup Antitrust Litigation,* the *Lotus v. Borland* copyright litigation, and the Wyoming Tight Sands Antitrust Cases, in which affiliated experts served as the testifying experts.  Responsible for defining the scope of research and analysis, managing project teams, coordinating work with attorneys and experts and presenting research findings.

Consulted on issues of auction design and bidding strategy.  Work has included consulting on the PCS spectrum auctions and helping to design and administer an auction in the petrochemical industry.  Also, assisted a firm in the petrochemical industry on contract negotiation strategy.

Provided public policy analysis on energy issues.

Consulted or testified in a variety of other types of cases, including securities fraud, breach of contract, fraudulent conveyance, usury, piercing the corporate veil, transfer pricing and wrongful termination.

Cases have involved a variety of industries, including telecommunications, oil and gas, automotive, chemical, health care, pharmaceutical, software, semi-conductor, banking, insurance and retailing.

1983 – 1989    **Federal Reserve Bank of San Francisco**                San Francisco, California
*Research Officer*

Contributed to the development of the Bank's policy on regulatory, banking and financial issues.

Conducted research and published articles on banking and financial regulation and deregulation.  (See **Journal Articles** and **Weekly Letters**.)

Analyzed the competitive effects of bank mergers and acquisitions in conjunction with the Bank's regulatory activities.

1983 – 1989    **Michael C. Keeley, Consulting**
*Sole Proprietor*

Provided expert testimony and litigation consulting.  Work involved primarily economic and statistical analysis of damage claims.

1975 – 1983    **SRI International**                                Menlo Park, California
*Manager, Antitrust Economics Consulting Group*

Started up and managed SRI's Antitrust Economics Consulting Group, which provided economic research, statistical analysis and expert testimony.

*Project Director and Principal Investigator, The Labor-Market Evaluation of the Employment Opportunity Pilot Projects (EOPP)*

Developed study design and was awarded a multi-million dollar contract to conduct an evaluation of EOPP.  Managed in-house staff and two sub-contracting firms.

*Principal Investigator of a Study of the Labor-Market Performance of Small Business*

Developed study plan and was awarded funding to analyze turnover, new hiring, and flows between large and small business.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Advisor**

---

## PROFESSIONAL EXPERIENCE (CONT.)

**SRI International (cont.)**

*Senior Economist, Regulatory Economics Program*

Conducted series of published studies of market-oriented approaches to regulation funded by the Presidential Task Force on Regulatory Relief.  (See **Government Publications**.)

*Task Leader of Studies of the Seattle and Denver Income Maintenance Experiment*

Developed new approach for evaluating the behavioral effects and costs of alternative welfare programs.  (See **Books and Monographs**, **Journal Articles** and **SRI Publications**.)

1982 – 1983    **University of Santa Clara**                                        Santa Clara, California

*Visiting Associate Professor*

Taught courses in managerial economics and microeconomics in the Graduate School of Business and Department of Economics.

1976 – 1977    **University of Santa Clara**                                        Santa Clara, California

*Lecturer*

Taught courses in managerial economics in the Graduate School of Business.

1973 – 1975    **General Electric, TEMPO, Center for Advanced Studies**

*Economist*

Developed economic-demographic simulation models and conducted research on the relationships between economic and demographic variables.  Research culminated in book on economic development.  (See **Books and Monographs** and **Journal Articles**.)

## AWARDS AND SERVICES

Four-year full fellowship, University of Chicago; selected for inclusion in Who's Who in Economics, Who's Who Legal—Competition, the IAM Patent 1000, Who's Who in the West, Who's Who in Finance and Industry, and the International Biographical Dictionary; reviewer for the National Science Foundation, the Hoover Institution and the Pacific Institute; invited speaker for the Garn Institute, the Cato Institute, the Lowe Institute, Urban Land Institute, the National League of Cities, the Chicago Bank Structure Conference, the Municipal Finance Officers Association, The Law and Society Association, the Bank Administration Institute, the Cravath Patent Institute, the George Washington University Law School Symposium on Intellectual Property; awarded the Garn prize for paper on bank risk-taking.

## REFEREEING ACTIVITY

Referee for:  *American Economic Review*; *The Journal of Political Economy*; *The Journal of Economic Literature*; *The Journal of Law and Economics*; *The Journal of Banking and Finance*; *The Journal of Financial Services Research*; *The Journal of Money, Credit and Banking*; *Demography*; *Economic Inquiry*; *International Economic Review*; *The Quarterly Journal of Economics*; *The Review of Economics and Statistics*; *The Journal of Human Resources*; *Public Finance Quarterly*; *Behavioral and Brain Sciences*; *Economic Development and Cultural Change*; *Land Economics*; *Eastern Economic Review*; and *Federal Reserve Bank of San Francisco's Economic Review*.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Advisor**

## PUBLICATIONS

### Books and Monographs

*Labor Supply and Public Policy:  A Critical Review*, New York, New York:  Academic Press, June 1981, 196 pp.

*Population, Public Policy, and Economic Development*, ed., New York, New York:  Praeger, 1976, 259 pp.

### Journal Articles

"Uniform Gasoline Price Regulation:  Consequences for Consumer Welfare," with K. Elzinga, *International Journal of the Economics of Business*, Volume 10, No. 2, July 2003, pp. 157-168.

"Infringement:  Valuing IP for Damages," *les Nouvelles*, Volume XXXIV No. 4, December 1999, pp. 172-175.

"Deposit Insurance, Risk and Market Power in Banking," *American Economic Review*, Volume 80, 1990, pp. 1183–1200.

"A Reexamination of Mean-Variance Analysis of Bank Capital Regulation," with F. Furlong, *Journal of Banking and Finance*, Volume 14, 1990, pp. 69–84.

"Capital Regulation and Bank Risk-Taking:  A Note," with F. Furlong, *Journal of Banking and Finance*, Volume 13, 1989, pp. 883–891.

"Estimating the Fisher Effect and the Stochastic Money Growth Process," with M. Hutchinson, *Economic Inquiry*, Volume XXVII, April 1989, pp. 219–239.

"The Stock Price Effects of Bank Holding Company Security Issuance," *Economic Review*, Federal Reserve Bank of San Francisco, Winter 1989, pp. 3–19.

"Bank Capital Regulation in the 1980s:  Effective or Ineffective," *Economic Review*, Federal Reserve Bank of San Francisco, Winter 1988, pp. 3–20.

"Bank Capital Regulation and Asset Risk," with F. Furlong, *Economic Review*, Federal Reserve Bank of San Francisco, Spring 1987, pp. 20–40.

"Policy Coordination and Financial Intermediaries:  The 1986 Fall Academic Conference of the Federal Reserve Bank of San Francisco," with C. Walsh, *Economic Review*, Federal Reserve Bank of San Francisco, Winter 1987, pp. 31–46.

"The Effects of Experimental Negative Income Tax Programs on Marital Dissolution:  Evidence from the Seattle and Denver Income Maintenance Experiments," *International Economic Review*, Volume 28, No. 1, February 1987, pp. 241–257.

"Deposit Rate Deregulation and the Demand for Transactions Media," with G. Zimmerman, *Economic Review*, Federal Reserve Bank of San Francisco, Summer 1986, pp. 47–62.

"Bank Regulation and the Public Interest," with F. Furlong, *Economic Review*, Federal Reserve Bank of San Francisco, Spring 1986, pp. 55–71.

"The Regulation of Bank Entry," *Economic Review*, Federal Reserve Bank of San Francisco, Summer 1985, pp. 5–13.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Advisor**

**Journal Articles (cont.)**

"Determining Geographic Markets for Deposit Competition in Banking," with G. Zimmerman, *Economic Review*, Federal Reserve Bank of San Francisco, Summer 1985, pp. 25–45.

"Job Search for the Duration of Unemployment," with P.K. Robins, *Journal of Labor Economics*, July 1985, pp. 337–362.

"Competition for Money Market Deposit Accounts," with G. Zimmerman, *Economic Review*, Federal Reserve Bank of San Francisco, Spring 1985, pp. 5–27.

"Cyclical Unemployment and Employment:  Effects of Labor-Force Entry and Exit," *Economic Review*, Federal Reserve Bank of San Francisco, Summer 1984, pp. 5–25.

"The Economics of Firm Size:  Implications from Labor-Market Studies," *Economic Review*, Federal Reserve Bank of San Francisco, Winter 1984, pp. 5–21.

"A Review of the Evidence on Labor-Supply Response from the Income Maintenance Experiments," *Social Science Forum*, Volume 4, No. 1, 1981–1982, pp. 23–37.

"The Effects of a Negative Income Tax on Migration," *The Journal of Human Resources*, Volume VI, No. 4, Fall 1980, pp. 480–498.

"The Effects of a Negative Income Tax on Fertility," *The Journal of Human Resources*, Volume VI, No. 4, Fall 1980, pp. 675–694.

"Experimental Design, The Conlisk-Watts Assignment Model, and the Proper Estimation of Behavioral Response," with P.K. Robins, *The Journal of Human Resources*, Volume VI, No. 4, Fall 1980, pp. 695–706.

"An Analysis of the Age Pattern of First Marriage," *International Economic Review*, Volume 20, No. 2, June 1979, pp. 421–438.

"Work Incentives and the Negative Income Tax," with P.K. Robins, *Challenge*, Volume 22, No. 1, March/April 1979, pp. 52–56.

"The Estimation of Labor-Supply Models Using Experimental Data," with P.K. Robins, R.G. Spiegelman and R.W. West, *The American Economic Review*, Volume 68, No. 5, December 1978, pp. 873–887.

"The Economics of Family Formation:  An Investigation of the Age of First Marriage," *Economic Inquiry*, April 1977, pp. 238–250.

"A Comment on an Interpretation of the Economic Theory of Fertility," *Journal of Economic Literature*, Volume XIII, No. 2, June 1975, pp. 461–468.

**Chapters in Books**

"Potential Damages Facing Auditors in Securities Fraud Cases," with William H. Beaver and James K. Malernee, in *Accountants' Liability:  The Need for Fairness*, Washington, D.C.:  National Legal Center for the Public Interest, 1994.

"Interest on Business Checking Accounts," in *Readings in Money, the Financial System and Monetary Policy*, N.Y.:  Prentice Hall, 1990.

"Troubled Banks and Thrifts," in *Financial Institutions and Markets in a Changing World*, Business Publications, Fall 1989.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Advisor**

---

**Chapters in Books (cont.)**

"Reforming Deposit Insurance," in *Financial Institutions and Markets in a Changing World*, Business Publications, Fall 1989.

"A Cashless Society?" in *Macroeconomics*, Guildford, Conn.:  Dushkin Publishing Group, Inc., Fall 1989; Also in *Readings in Money, the Financial System and Monetary Policy*, N.Y.:  Prentice Hall, 1990.

"The Thrift Insurance Crisis," with J. Neuberger, in *Financial Institutions and Markets in a Changing World*, Business Publications, Fall 1989.

"International Coordination of Regulation:  Comment," in *Proceedings of a Conference of Governing Banking's Future*, The Cato Institute, 1989.

"Regulating Bank Capital," with F. Furlong, in *Macroeconomics*, Guildford, Conn.:  Dushkin Publishing Group, Inc., Fall 1988.

"Money and the Fisher Effect," with M. Hutchinson, in *Macroeconomics,* Guildford, Conn.:  Dushkin Publishing Group, Inc., Fall 1988.

"Bank Capital Regulation:  Effective or Ineffective?" in *Proceedings of a Conference on Bank Structure and Competition,* Federal Reserve Bank of Chicago, 1988.

"Uniting Investment and Commercial Banking," with R. Pozdena, in *Current Readings on Money, Banking and Financial Markets,* edited by James Wilcox, Boston, Mass.:  Little, Brown & Co., 1988.

"Interest Checking," with G. Zimmerman, in *Current Readings on Money, Banking and Financial Markets,* edited by James Wilcox, Boston, Mass.:  Little, Brown & Co., 1987.

"Regulation of Bank Entry," in *Financial Institutions and Markets in a Changing World, Business Publications,* Spring 1986.

"The Search for Financial Stability," with F. Furlong, in *The Search for Financial Stability:  The Past 50 Years*, Federal Reserve Bank of San Francisco, 1986.

"Competition for Money Market Deposit Accounts," with G. Zimmerman, in *Proceedings of a Conference on Bank Structure and Competition*, Federal Reserve Bank of Chicago, 1985.

"Unemployment vs. Employment," in *Macroeconomics 85/86*, edited by John Pisciotta, Guildford, Conn.:  Dushkin Publishing Group, Inc., 1985.

"The Design of Social Experiments:  A Critique of the Conlisk-Watts Assignment Model," with P. Robins, in *Research in Labor Economics*, Volume 3, edited by Ronald G. Ehrenberg, Greenwich, Conn.:  JAI Press, 1980.

"A Design for Evaluating the Labor-Market Effects of the Employment Opportunity Pilot Projects," with J. Bishop, G. Farkas, E. Stromsdorfer and P. Robins, in *Evaluation Studies Review Annual*, Volume 5, edited by Ernst W. Stromsdorfer and George Farkas, Beverly Hills, Calif.:  Sage Publications, 1980, pp. 759–800.

"The Design of an Income Maintenance Experiment," Chapter I, with R.G. Spiegelman and R.W. West, in *A Guaranteed Annual Income:  Results from an Income Maintenance Experiment*, edited by P. Robins, R.G. Spiegelman, S. Weiner, and J.G. Bell, New York, New York:  Academic Press, 1980, pp. 3–32.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Advisor**

---

### Chapters in Books (cont.)

"Migration," Chapter XI, in *A Guaranteed Annual Income:  Results from an Income Maintenance Experiment*, edited by P. Robins, R.G. Spiegelman, S. Weiner, and J.G. Bell, New York, New York: Academic Press, 1980, pp. 241–262.

"The Demand for Children," Chapter XVI, in *A Guaranteed Annual Income:  Results from an Income Maintenance Experiment*, edited by P. Robins, R.G. Spiegelman, S. Weiner, and J.G. Bell, New York, New York:  Academic Press, 1980, pp. 207–220.

"Migration as Consumption:  The Impact of Alternative Negative Income Tax Programs," in *Research in Population Economics*, Volume 2, edited by Julian Simon and Julie DaVanzo, Greenwich, Conn.:  JAI Press, 1979, pp. 401–432.

"A Neoclassical Analysis of Economic-Demographic Simulation Models," Chapter I, in *Population, Public Policy, and Economic Development*, Praeger, edited by M.C. Keeley, 1976, pp. 25–45.

### Other Publications

"An Economic Evaluation of the California Energy Commission's 2005 Integrated Energy Policy Report and an Alternative Blueprint for California Transportation Fuel Policy," Sacramento, California:  California Chamber of Commerce, May 10, 2006.

### Cornerstone Research Publications

"Estimating Damages in Patent Infringement Cases:  An Economic Perspective," 1999.

"Stock Trading Behavior and Damage Estimation in Securities Cases," with William H. Beaver and James K. Malernee, 1993.

"Bank Charter Values and Risk Taking," 1990.

### Weekly Letters, Federal Reserve Bank of San Francisco

"Reforming Deposit Insurance," April 21, 1989.

"The Thrift Insurance Crisis," with J. Neuberger, March 31, 1989.

"Banks' Cost of Capital," March 17, 1989.

"Bank Charter Values and Risk," February 24, 1989.

"States Take the Lead," with G. Zimmerman, September 9, 1988.

"Corporate Separateness," with B. Bennett, June 3, 1988.

"A Cashless Society?" April 15, 1988.

"Legislation to Expand Bank Powers," (with B. Bennett), March 19, 1988.

"Troubled Banks and Thrifts," January 29, 1988.

"Bank Capital Regulation in the Early 1980s," January 22, 1988.

"Subordinated Debt as Bank Capital," with F. Furlong, October 23, 1987.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Advisor**

---

**Weekly Letters, Federal Reserve Bank of San Francisco (cont.)**

"Money and the Fisher Effect," with M. Hutchinson, August 7, 1987.

"A Deposit Insurance Puzzle," with F. Furlong, July 3, 1987.

"Uniting Investment and Commercial Banking," with R. Pozdena, June 19, 1987.

"Regulating Bank Capital," with F. Furlong, May 22, 1987.

"Interest Checking and M1," with G. Zimmerman, November 21, 1986.

"Interest Checking," with G. Zimmerman, November 14, 1986.

"Monetary Policy in a Deregulated World," August 22, 1986.

"Bank Runs," with F. Furlong, July 25, 1986.

"Are Banks Special?" with F. Furlong, July 18, 1986.

"Interest on Business Checking Accounts?" May 2, 1986.

"The Health of Banks and Thrifts," February 21, 1986.

"Geographic Deposit Competition," with G. Zimmerman, September 1985.

"Bank Entry and Deregulation," August 1985.

"Interest Sensitivity of MMDAs," with G. Zimmerman, June 1985.

"The Big Switch," with G. Zimmerman, June 1985.

"Western Banking Turnaround," with G. Zimmerman, April 1985.

"Unemployment vs. Employment," September 1984.

"Deregulation and Bank Profitability," with G. Zimmerman, July 1984.

"Interest–Rate Deregulation," January 1984.

**Government Publications**

"Monetary Incentives: A Practical Guide to the Use of Fees, Subsidies and Cost Internalization as Regulatory Techniques," with J. Daly, U.S. Government publication, 1981.

"Marketable Rights in Regulatory Programs: A Practical Guide," with D. Downing, U.S. Government publication, 1981.

**SRI Publications**

"Earnings Mobility, Program Participation, and the Labor-Supply Response to a Negative Income Tax Program," with H.S. Wai, Research Memorandum, 1981.

"A Simultaneous Model of the Marital Stability and Labor-Supply Response to a Negative Income Tax Program," Research Memorandum, 1980.

**MICHAEL C. KEELEY, Ph.D.**
**Senior Advisor**

---

**SRI Publications (cont.)**

"Labor-Supply Response to a Permanent Negative Income Tax Program," with H.S. Wai, Research Memorandum, 1980.

"The Effects of a Negative Income Tax Program on Work in the Home:  A Study of Nonmarket Time," with K. Yaeger, Research Memorandum, 1980.

"The Effects of Alternative Negative Income Tax Programs on Marital Dissolution," Research Memorandum, 1980.

 "Taxes, Transfers, and Subsidies and the Demand for Children:  The Impact of Alternative Negative Income Tax Programs," Research Memorandum No. 65, June 1979.

"The Destination Choices and Earnings of Migrants:  The Impact of Negative Income Tax Programs," Research Memorandum No. 64, May 1979.

"Final Report:  Design of the Labor-Market Impacts of the Employment Opportunity Pilot Projects," with John Bishop and George Farkas, co-principal investigators, prepared for the U.S. Department of Labor, December 1979.

"The Design of Social Experiments:  A Critique of the Conlisk-Watts Assignment Model," with P.K. Robins, Research Memorandum No. 57, December 1978.

"The Impact of Income Maintenance on Fertility:  Preliminary Findings from the Seattle and Denver Income Maintenance Experiments," Research Memorandum No. 49, February 1978.

"Impact of Income Maintenance on Geographical Mobility:  Preliminary Analysis and Empirical Results from the Seattle and Denver Income Maintenance Experiments," Research Memorandum No. 47, October 1977.

"An Interim Report on the Work-Effort Effects and Costs of a Negative Income Tax Using Results of the Seattle and Denver Income Maintenance Experiments:  A Summary," with P.K. Robins, R.G. Spiegelman and R.W. West, Research Memorandum No. 41, June 1977.

"The Labor-Supply Effects and Costs of Alternative Negative Income Tax Programs:  Evidence from the Seattle and Denver Income Maintenance Experiments, Part II:  National Predictions Using the Labor Supply Response Function," with P.K. Robins, R.G. Spiegelman and R.W. West, Research Memorandum No. 39, May 1977.

"The Labor-Supply Effects and Costs of Alternative Negative Income Tax Programs:  Evidence from the Seattle and Denver Income Maintenance Experiments, Part I:  The Labor Supply Response Function," with P.K. Robins, R.G. Spiegelman and R.W. West, Research Memorandum No. 38, May 1977.

"The Estimation of Labor-Supply Models Using Experimental Data:  Evidence from the Seattle and Denver Income Maintenance Experiments, Part II:  National Predictions Using the Labor Supply Response Function," with P.K. Robins, R.G. Spiegelman and R.W. West, Research Memorandum No. 29, August 1976.

# Appendix II

# Michael C. Keeley, Ph.D. Prior Testimony Since 2017

I have given expert testimony in written testimony, expert reports or declarations, depositions and/or at trial since 2017 as indicated below.  I have indicated in bold the party by whom I was retained.

*2023:  Robert Riddell, et al. v.* **General Motors LLC** (expert report)
— United States District Court Eastern District of Missouri, Case No.:  1:20-cv-00254-SNLJ
— Crowell & Moring LLP, 1001 Pennsylvania Ave, N.W. Washington, D.C. 20004
— Matter alleging that certain General Motors vehicles suffered from excess oil consumption. Assessment of issues related to class certification

*2023:*  **The Nielsen Company (US), LLC** *v. TVision Insights, Inc.* (expert report)
— United States District Court District of Delaware, Case No.:  22-057-LPS
— Kelley Drye & Warren LLP, 333 West Wacker Drive, 26th Floor, Chicago, IL  60606
— Patent Infringement matter.  Assessment of damages.

*2023:*  **Fate Therapeutics, Inc. and Whitehead Institute for Biomedical Research** *v. Shoreline Biosciences, Inc., and Dan S. Kaufman* (expert report, deposition)
— United States District Court Southern District of California, San Diego Division, Case No. 3:22-CV-00676-H-MSB
— Greenberg Traurig LLP, One Vanderbilt Avenue, New York, NY 10017
— Patent infringement matter.  Assessment of damages.

*2023:  Robert Awalt, et al. v.* **General Motors LLC** (expert report)
— United States District Court District of Massachusetts, Case No.:  1:21-cv-10111
— Crowell & Moring LLP, 1001 Pennsylvania Ave, N.W. Washington, D.C. 20004
— Matter alleging that certain General Motors vehicles suffered from excess oil consumption. Assessment of issues related to class certification

*2023:  Durwin Hampton, et al. v.* **General Motors LLC** (expert report)
— United States District Court Eastern District of Oklahoma, Case No.:  21-CV-250-KEW
— Crowell & Moring LLP, 1001 Pennsylvania Ave, N.W. Washington, D.C. 20004
— Matter alleging that certain General Motors vehicles suffered from excess oil consumption. Assessment of issues related to class certification

*2023:  Dominguez Hurry, et al. v.* **General Motors LLC** (expert report)
— United States District Court Middle District of Alabama, Case No.:  3:21-cv-00673-ECM
— Crowell & Moring LLP, 1001 Pennsylvania Ave, N.W. Washington, D.C. 20004
— Matter alleging that certain General Motors vehicles suffered from excess oil consumption. Assessment of issues related to class certification

*2022:  Roy White, et al. v.* **General Motors LLC** (expert report)

— United States District Court for the District of Colorado, Case No.:  1:21-cv-00410-MEH
— Crowell & Moring LLP, 1001 Pennsylvania Ave, N.W. Washington, D.C. 20004
— Matter alleging that certain General Motors vehicles suffered from excess oil consumption. Assessment of issues related to class certification

*2022:  Seth Hackler, et al. v.* **General Motors LLC** (expert report)

— United States District Court for the Southern District of Georgia, Brunswick Division, Case No.:  2:21-cv-0019-LGW-BWC
— Crowell & Moring LLP, 1001 Pennsylvania Ave, N.W. Washington, D.C. 20004
— Matter alleging that certain General Motors vehicles suffered from excess oil consumption. Assessment of issues related to class certification

*2022:  Dennis Vita and FXR Construction, Inc. v.* **General Motors LLC** (expert report)

— United States District Court for the Eastern District of New York, Civil Action No.:  2:20-cv-1032
— Crowell & Moring LLP, 1001 Pennsylvania Ave, N.W. Washington, D.C. 20004
— Matter alleging that certain General Motors vehicles suffered from excess oil consumption. Assessment of issues related to class certification.

*2022:  In re Methyl Tertiary Butyl Ether Products Liability Litigation (MDL No. 1358); Commonwealth of Pennsylvania v.* **Exxon Mobil Corporation, et al.** (expert report, deposition) (Retained by **Chevron**)

— United States District Court Southern District of New York, Master File No. 1:00-1898 MDL NO. 1358 (SAS)
— King & Spalding LLP, 101 Second Street, Suite 2300, San Francisco, CA 94105
— Matter alleging that Chevron was responsible for releases of MTBE at certain sites in Pennsylvania.  Assessment of whether gasoline refined by Chevron could have contributed to alleged MTBE releases in Pennsylvania.

*2021: Antonio Pantusa v. **Parkland Fuel Corporation**, et al.* (expert report, cross-examination)
— In the Supreme Court of British Columbia, Vancouver Registry, Court File No. VLC-S-S-20562
— Blake, Cassels & Graydon LLP, 595 Burrard Street, P.O. Box 49314, Suite 2600, Three Bentall Centre, Vancouver, BC V7X1L3;
— Borden Ladner Gervais LLP, 200 Burrard Street, Suite 1200, Vancouver, BC V7X 1T2;
— Fasken Martineau DuMoulin LLP, 350 7th Ave. SW, Ste. 3400, Calgary, AB, T2P 3N9;
— Norton Rose Fulbright Canada LLP, 510 West Georgia Street, Suite 1800, Vancouver, BC V6B 0M3;
— Osler, Hoskin & Harcourt LLP, 1055 West Hastings Street, Suite 1700, Vancouver, BC V6E 2E9
— Matter alleging that the defendants fixed the wholesale price of gasoline in British Columbia.  Assessment of issues related to class certification and summary judgment.

*2021: Airko, Inc. and Lisa Mae Jennings v. **General Motors LLC*** (expert report)
— United States District Court for the Northern District of Ohio, Cleveland Division, Case No. 1:20-cv-02638-PAB
— Crowell & Moring LLP, 1001 Pennsylvania Ave, N.W. Washington, D.C. 20004
— Matter alleging that certain General Motors vehicles suffered from excess oil consumption. Assessment of issues related to class certification.

*2019: Monteville Sloan, Jr., et al. v. **General Motors LLC*** (expert report, deposition)
— United States District Court for the Northern District of California, San Francisco Division, Case No. 3:16-cv-07244-EMC
— Crowell & Moring LLP, 1001 Pennsylvania Ave, N.W. Washington, D.C. 20004
— Matter alleging that certain General Motors vehicles suffered from excess oil consumption. Assessment of issues related to class certification.

*2017: In Re:  **Emerson Electric Co.** Wet/Dry Vac Marketing and Sales Litigation* (expert report, deposition)
— United States District Court for the Eastern District of Missouri, MDL No. 2382
— Husch Blackwell, 750 17th Street, N.W., Suite 900, Washington, DC 20006
— Matter alleging that Emerson Electric misled consumers regarding the horsepower of RIDGID wet/dry vacuums.  Assessment of issues related class certification.

*2017: Yogesh Kalra v. **Mercedes-Benz Canada, Inc., et al.*** (expert report, cross examination)
— Ontario Superior Court of Justice, Court File No. CV-16-550271-00CP
— Fasken Martineau DuMoulin LLP, 333 Bay Street, Suite 2400, Toronto, Ontario M5H 2T6
— Matter alleging that Mercedes-Benz BlueTEC diesels do not meet emissions requirements when in actual operation.  Assessment of issues related to class certification.

# Appendix III
## Documents Considered by Michael C. Keeley, Ph.D.

| Document Title, Bates Numbers | Document Date |
|---|---|
| **Pleadings** | |
| Complaint for Patent Infringement | January 14, 2022 |
| Answer to Complaint for Patent Infringement | March 7, 2022 |
| Plaintiff The Nielsen Company (US), LLC's Initial Disclosures Pursuant to Fed. R. Civ. P. 25(a)(1) | June 3, 2022 |
| The Nielsen Company (US), LLC's First Set of Requests for the Production of Documents and Things | August 26, 2022 |
| TVision Insights, Inc.'s Objections and Responses to The Nielsen Company (US), LLC's First Set of Interrogatories | September 26, 2022 |
| Plaintiff The Nielsen Company (US), LLC's Responses and Objections to Defendant's Second Set of Interrogatories | November 3, 2022 |
| Plaintiff Nielsen, Inc's Second Set of Requests for the Production of Documents and Things | November 30, 2022 |
| Plaintiff The Nielsen Company (US), LLC's Responses and Objections to Defendant TVision Insights, Inc.'s Third Set of Interrogatories | December 9, 2022 |
| The Nielsen Company (US), LLC's Third Set of Requests for the Production of Documents and Things | March 7, 2023 |
| TVision Insights, Inc.'s Objections and Responses to The Nielsen Company (US), LLC's Fourth Set of Interrogatories | August 21, 2023 |
| TVision Insights Inc's First Supplemental Objections and Responses to The Nielsen Company (US), LLC's Third Set of Interrogatories | August 23, 2023 |
| The Nielsen Company (US), LLC's Supplemental Responses and Objections to the Defendant TVision Insights, Inc.'s Interrogatory Nos. 7 and 9 | September 1, 2023 |
| TVision Insights, Inc.'s Third Supplemental Objections and Responses to The Nielsen Company (US), LLC's Second Set of Interrogatories | September 8, 2023 |
| Plaintiff The Nielsen Company (US), LLC's Supplemental Responses and Objections to Defendant's First Set of Interrogatories | September 11, 2023 |
| Amended Scheduling Order | May 15, 2025 |
| **Nielsen Depositions** | |
| Deposition of Daniel Nelsen, Designated Representative, with Exhibits 1–13 | September 8, 2023 |
| Deposition of Ken Contrata, with Exhibits 1–19 | September 12, 2023 |
| **TVision Depositions** | |
| Deposition of Mark Green, with Exhibits 1–7 | August 3, 2023 |
| Deposition of Yan Liu, with Exhibits 1–39 | August 29, 2023 |
| Deposition of Shlomo Neumann, with Exhibits 1–16 | August 30, 2023 |
| Deposition of Inderbir Sidhu, with Exhibits 1–19 | August 31, 2023 |
| Deposition of Daniel Schiffman, with Exhibits 1–8 | September 8, 2023 |
| Deposition of Tristan Webster, with Exhibits 1–26 | September 13, 2023 |
| **Nielsen Expert Reports** | |
| Opening Expert Report of Chris Kyriakakis | July 7, 2025 |

**Nielsen Documents**

Nielsen Competition and Industry Documents
*NLSN_TVISION0048142–4; NLSN_TVISION0245499–521; NLSN_TVISION0251665–70; NLSN_TVISION0251674–748; NLSN_TVISION0251751–866; NLSN_TVISION0251888–904; NLSN_TVISION0251909–44; NLSN_TVISION0251984–2006; NLSN_TVISION0252009–17; NLSN_TVISION0252093–104; NLSN_TVISION0252235–63; NLSN_TVISION0252265–71; NLSN_TVISION0252394–6*

Nielsen Financials
*NLSN_TVISION0252272–5; NLSN_TVISION0251593*

Nielsen Forecasts
*NLSN_TVISION0251900*

Nielsen Pricing
*NLSN_TVISION0096685; NLSN_TVISION0244789–90; NLSN_TVISION0244794; NLSN_TVISION0245011; NLSN_TVISION0245014; NLSN_TVISION0245029; NLSN_TVISION0245495–8; NLSN_TVISION0245560–8; NLSN_TVISION0245657*

| Document Title, Bates Numbers | Document Date |
| --- | --- |

*NLSN_TVISION0253774–83*

*NLSN_TVISION0078428–70; NLSN_TVISION0080280–96; NLSN_TVISION0080479;*
*NLSN_TVISION0089982–90; NLSN_TVISION0097616; NLSN_TVISION0097744–59;*
*NLSN_TVISION0227322–97; NLSN_TVISION0246295–491; NLSN_TVISION0252664–976;*
*NLSN_TVISION0253037–93; NLSN_TVISION0253094–218; NLSN_TVISION0253784–4006;*
*NLSN_TVISION0254659–774*

*NLSN_TVISION0245691–727; NLSN_TVISION0254775–821; NLSN_TVISION0255544–80*

*NLSN_TVISION0254193–394*

*NLSN_TVISION0254822–71*

*NLSN_TVISION0078730–5; NLSN_TVISION0081009–12;  NLSN_TVISION0245728–842;*
*NLSN_TVISION0254632–58*

*NLSN_TVISION0246058–294; NLSN_TVISION0254395–631*

*NLSN_TVISION0255011–59*

*NLSN_TVISION0251960–83*

*NLSN_TVISION0253273–765; NLSN_TVISION0255060–543*

*NLSN_TVISION0233860–70*

*NLSN_TVISION02246492–9*

*NLSN_TVISION0245174–82*

*NLSN_TVISION0246500–61; NLSN_TVISION0254877–5010*

*NLSN_TVISION0080157–78; NLSN_TVISION0245945–6057; NLSN_TVISION0246562–617;*
*NLSN_TVISION0254872–6; NLSN_TVISION0255581–641*

*NLSN_TVISION0246618–75; NLSN_TVISION0255650–708*

*NLSN_TVISION0078428–70; NLSN_TVISION0080280–96; NLSN_TVISION0080479;*
*NLSN_TVISION0089982–90; NLSN_TVISION0097616; NLSN_TVISION0097744–59;*
*NLSN_TVISION0227322–97; NLSN_TVISION0254007–122; NLSN_TVISION0254133–71*

s
*NLSN_TVISION0076789–805; NLSN_TVISION0076943–53; NLSN_TVISION0078713;*
*NLSN_TVISION0081009–12; NLSN_TVISION0084308–11*

*NLSN_TVISION0079758–81*

*NLSN_TVISION0081892–954; NLSN_TVISION0081989–98; NLSN_TVISION0245260–95*

July 1, 2009

*NLSN_TVISION0245677–90*

May 1, 2023

*NLSN_TVISION0252977–3036*

| Document Title, Bates Numbers | Document Date |
|---|---|

Nielsen Presentations
*NLSN TVISION0024151–73; NLSN_TVISION0203435–53; NLSN_TVISION0245217–59; NLSN_TVISION0245449–92; NLSN_TVISION0245303–448*

Industry Reports
*NLSN_TVISION0078572–85; NLSN_TVISION0084863–79*

Various Articles and Press Releases
*NLSN_TVISION0252278–96; NLSN_TVISION0252299–315; NLSN_TVISION0252318–52; NLSN_TVISION0252355–96; NLSN_TVISION0252399–511; NLSN_TVISION0252514–42; NLSN_TVISION0252545–56; NLSN_TVISION0252559–66; NLSN_TVISION0252569–84; NLSN_TVISION0252587–658; NLSN_TVISION0253259–72; NLSN_TVISION0253766–73; NLSN_TVISION0254123–32; NLSN_TVISION0254172–90*

**TVision Documents**

TVision Financial Statements
*TVSN_NLSN_00037125; TVSN_NLSN_00042202; TVSN_NLSN_00096498; TVSN_NLSN_00172428; TVSN_NLSN_00200907; TVSN_NLSN_00248062–4; TVSN_NLSN_00280901; TVSN_NLSN_00695901;*

TVision Forecasts and Financial Models
*TVSN_NLSN_00056652–7; TVSN_NLSN_00221517; TVSN_NLSN_00227663; TVSN_NLSN_00252874; TVSN_NLSN_00257538; TVSN_NLSN_00258407; TVSN_NLSN_00269608; TVSN_NLSN_00498302; TVSN_NLSN_00841640*

TVision Revenues and Bookings
*TVSN_NLSN_00000943; TVSN_NLSN_00023146; TVSN_NLSN_00044646; TVSN_NLSN_00047820; TVSN_NLSN_00005204; TVSN_NLSN_00172429; TVSN_NLSN_00258409*

TVision Costs
*TVSN_NLSN_00393734*

TVision Funding
*TVSN_NLSN_00039739–41; TVSN_NLSN_00103034–48; TVSN_NLSN_00202140; TVSN_NLSN_00748686; TVSN_NLSN_00767272; TVSN_NLSN_00772240–2; TVSN_NLSN_00778745; TVSN_NLSN_00778313; TVSN_NLSN_00869899–900*

TVision Pricing
*TVSN_NLSN_00201635; TVSN_NLSN_00694040*

TVision Other Financials
*TVSN_NLSN_00103164; TVSN_NLSN_00158250; TVSN_NLSN_00172429; TVSN_NLSN_00387079–83*

TVision Total View Competitive Battlecards, April 2023
*TVSN_NLSN_00694041*

TVision Email from T. Webster to S. Neumann, "Re:… Tvision & ACRCloud contract renewal," April 1, 2022
*TVSN_NLSN_00042850–3*

ACRCloud Agreements with TVision
*TVSN_NLSN_00000929–940; TVSN_NLSN_00621607–18; TVSN_NLSN_00641220–31; TVSN_NLSN_00692199–211; TVSN_NLSN_00696139–149*

Gracenote Agreements with TVision
*NLSN_TVISION0253219–58*

iSpot Agreements with TVision
*TVSN_NLSN_00941209–14; TVSN_NLSN_00951657–9*

TVision Agreements, Order Forms and Invoices with iSpot
*TVSN_NLSN_00103578; TVSN_NLSN_00021350; TVSN_NLSN_00040837; TVSN_NLSN_00045222; TVSN_NLSN_00045224; TVSN_NLSN_00063767–77; TVSN_NLSN_00103034–48; TVSN_NLSN_00103165–74; TVSN_NLSN_00176851–6; TVSN_NLSN_00706326–9; TVSN_NLSN_00940895–900; TVSN_NLSN_00940901–7*

TVision Agreements and Order Forms with VideoAmp
*TVSN_NLSN_00364679–82; TVSN_NLSN_00940924–6; TVSN_NLSN_00941123–8; TVSN_NLSN_00949055–62; TVSN_NLSN_00950126–30*

TVision Agreements with comScore
*TVSN_NLSN_00428079–100; TVSN_NLSN_00480557–60; TVSN_NLSN_00589551–60; TVSN_NLSN_00590727*

| Document Title, Bates Numbers | Document Date |
|---|---|

TVision Agreements, etc. with Other Customers
*TVSN NLSN 00312628–31; TVSN NLSN 00901998–2028; TVSN NLSN 00940967–74; TVSN NLSN 00941154–6; TVSN NLSN_00940558–60; TVSN_NLSN_00000047–50; TVSN_NLSN_00000141–2; TVSN_NLSN_00000156–61; TVSN_NLSN_00000210–2; TVSN_NLSN_00005436; TVSN_NLSN_00017413–21; TVSN_NLSN_00033215–22; TVSN_NLSN_00034046–53; TVSN_NLSN_00052913–6; TVSN_NLSN_00053202–5; TVSN_NLSN_00053490–522; TVSN_NLSN_00100204–7; TVSN_NLSN_00112885–6; TVSN_NLSN_00118904–8; TVSN_NLSN_00124693–4; TVSN_NLSN_00156797–99; TVSN_NLSN_00167273–8; TVSN_NLSN_00190883–6; TVSN_NLSN_00194129; TVSN_NLSN_00232150–2; TVSN_NLSN_00233884–6; TVSN_NLSN_00243939–42; TVSN_NLSN_00244425–9; TVSN_NLSN_00254931; TVSN_NLSN_00270175–83; TVSN_NLSN_00270183–8; TVSN_NLSN_00306669–73; TVSN_NLSN_00326741–4; TVSN_NLSN_00328622–7; TVSN_NLSN_00328805–10; TVSN_NLSN_00349073–6; TVSN_NLSN_00351684–8; TVSN_NLSN_00360553–8; TVSN_NLSN_00365687; TVSN_NLSN_00382303–8; TVSN_NLSN_00387275; TVSN_NLSN_00388849; TVSN_NLSN_00430175–8; TVSN_NLSN_00492951–2; TVSN_NLSN_00620249–51; TVSN_NLSN_00620254–61; TVSN_NLSN_00627459–85; TVSN_NLSN_00649499–503; TVSN_NLSN_00695914–7; TVSN_NLSN_00869137–46; TVSN_NLSN_00869147–8; TVSN_NLSN_00901996–7; TVSN_NLSN_00906071–4; TVSN_NLSN_00906075–117; TVSN_NLSN_00909757; TVSN_NLSN_00915923–8; TVSN_NLSN_00940215–7; TVSN_NLSN_00940800–3; TVSN_NLSN_00940837–52; TVSN_NLSN_00940854–63; TVSN_NLSN_00940908–19; TVSN_NLSN_00940946–50; TVSN_NLSN_00940954–7; TVSN_NLSN_00940960–2; TVSN_NLSN_00940962–3; TVSN_NLSN_00940980–4; TVSN_NLSN_00940992–1003; TVSN_NLSN_00941016–21; TVSN_NLSN_00941022–6; TVSN_NLSN_00941032–7; TVSN_NLSN_00941038–45; TVSN_NLSN_00941086–95; TVSN_NLSN_00941096–102; TVSN_NLSN_00941113–22; TVSN_NLSN_00941129–32; TVSN_NLSN_00941152–5; TVSN_NLSN_009411592–68*

TVision Product and Competitor Documents
*TVSN_NLSN_00008034–41; TVSN_NLSN_00105316–20; TVSN_NLSN_00107888–99; TVSN_NLSN_00121062–5; TVSN_NLSN_00121763–4; TVSN_NLSN_00124222–34; TVSN_NLSN_00172344–58; TVSN_NLSN_00182152–6; TVSN_NLSN_00217998–8032; TVSN_NLSN_00249832–7*

TVision Board Presentations
*TVSN_NLSN_00007670–713; TVSN_NLSN_00007973–8014; TVSN_NLSN_00098092–122; TVSN_NLSN_00162211–35; TVSN_NLSN_00172430–55; TVSN_NLSN_00227910–43; TVSN_NLSN_00267638–73*

TVision Business Presentations
*TVSN_NLSN_00023742; TVSN_NLSN_00096467–96; TVSN_NLSN_00121190–202; TVSN_NLSN_00221633–43; TVSN_NLSN_00704718–41*

TVision Company Update Presentations
*TVSN_NLSN_00007949–69; TVSN_NLSN_00063827–48; TVSN_NLSN_00124097–123; TVSN_NLSN_00124547–621; TVSN_NLSN_00139299–346; TVSN_NLSN_00186039–49; TVSN_NLSN_00231355–80*

TVision Investor Presentations
*TVSN_NLSN_00124097039739–41; TVSN_NLSN_00205635-54; TVSN_NLSN_00597223-51; TVSN_NLSN_00610585; TVSN_NLSN_00626486-558; TVSN_NLSN_00639891–922; TVSN_NLSN_00640618-49; TVSN_NLSN_00767505*

TVision Reports
*TVSN_NLSN_00105766–76; TVSN_NLSN_00107985–1014; TVSN_NLSN_00124654*

TVision Market Size
*TVSN_NLSN_00044644–5; TVSN_NLSN_00101297–1301; TVSN_NLSN_00158103–4*

**Nielsen SEC Filings**

Nielsen Holdings plc, Form 10-K, for the Fiscal Year Ended December 31, 2018
Nielsen Holdings plc, Form 10-K, for the Fiscal Year Ended December 31, 2019
Nielsen Holdings plc, Form 10-K, for the Fiscal Year Ended December 31, 2020
Nielsen Holdings plc, Form 10-K, for the Fiscal Year Ended December 31, 2021
Nielsen Presentation: 4th Quarter 2021 Earnings, February 28, 2022

| Document Title, Bates Numbers | Document Date |
|---|---|

**Research**

Keeley, Michael C. "Estimating Damages in Patent Infringement Cases: An Economic Perspective," *Cornerstone Research,* 1999

Keeley, Michael C., "Infringement: Valuing IP for Damages," *les Nouvelles* 34, no. 4 (1999), pp. 172–5

Keeley, Michael C., "Patent Damages—A Brave New World," *Inside Counsel,* June 8, 2012

Nash, John F., "The Bargaining Problem," *Econometrica* 18, no. 2 (1950), pp. 155–62, https://www.jstor.org/stable/1907266

Nash, John, "Two-Person Cooperative Games," *Econometrica* 21, no. 1 (1953), pp. 128–40, https://www.jstor.org/stable/1906951

"The Prize in Economics 1994," *The Royal Swedish Academy of Sciences,* October 11, 1994, https://www.nobelprize.org/prizes/economic-sciences/1994/press-release/

Binmore, Ken, *et al.,* "The Nash Bargaining Solution in Economic Modelling," *The RAND Journal of Economics* 17, no. 2 (1986), pp. 178–88, https://www.jstor.org/stable/2555382

Choi, William and Roy Weinstein, "An Analytical Solution to Reasonable Royalty Rate," *IDEA - The Journal of Law and Technology* 41, no. 1 (2001), pp. 49–64, https://heinonline.org/HOL/Page?handle=hein.journals/idea41&id=61&collection=journals

Harsanyi, John C., and Reinhard Selten, "A Generalized Nash Solution for Two-Person Bargaining Games with Incomplete Information," *Management Science* 18, no. 5 (1972), pp. P80–P106, https://www.jstor.org/stable/2661446

Howard, Ronald A., "Decision Analysis: Practice and Promise," *Management Science* 34, no. 6 (1988), pp. 679–95, https://www.jstor.org/stable/2632123

Lance Wyatt, "Keeping up with the Game: The Use of the Nash Bargaining Solution in Patent Infringement Cases," *Santa Clara High Technology Law Journal* 31, no. 3 (2014-2015), pp. 427–460, https://heinonline.org/HOL/Page?handle=hein.journals/sccj31&id=447&collection=journals

Mas-Collell, Andreu and Michael D. Whinston, and Jerry R. Green, *Microeconomic Theory,* (New York, NY: Oxford University Press, 1995), Chapter 8, pp. 235–266

Roth, Alvin E., "A Note on Risk Aversion in a Perfect Equilibrium Model of Bargaining," *Econometrica* 53, no. 1 (1985), pp. 207–11, https://www.jstor.org/stable/1911733

Roth, Alvin E., "The Nash Solution and the Utility of Bargaining," *Econometrica* 46, no. 3 (May 1978), pp. 587–94, https://www.jstor.org/stable/1914234

Roth, Alvin E., and Uriel G. Rothblum, "Risk Aversion and Nash's Solution for Bargaining Games with Risky Outcomes," *Econometrica* 50, no. 3 (1982), pp. 639–47, https://www.jstor.org/stable/1912605

Sidak, Gregory J., "Bargaining Power and Patent Damages," *Stanford Technology Law Review* 19, no. 1 (2015), pp. 1–31, https://heinonline.org/HOL/Page?handle=hein.journals/stantlr19&id=9&collection=journals

Thomson, William, "Cooperative Models of Bargaining," in *The Handbook of Game Theory,* Volume 2, eds. R.J. Aumann and S. Hart (Amsterdam, Netherlands: Elsevier Science B.V., 1994), Chapter 35, pp. 1238–77, available at https://www.sciencedirect.com/science/article/pii/S1574000505800670

Zider, Bob, "How Venture Capital Works," *Harvard Business Review,* November–December 1998, https://hbr.org/1998/11/how-venture-capital-works

"About," *Nielsen,* https://www.nielsen.com/about-us/about/, accessed September 28, 2023

"Ad Intel," *Nielsen,* https://www.nielsen.com/solutions/media-planning/ad-intelligence/?gad=1&gclid=EAIaIQobChMIzfqW0Zz4gAMVkBqtBh30iwOZEAAYASAAEgLIQfD_%E2%80%A6, accessed August 25, 2023

"Better together: Panel + big data sets offers unprecedented insights into consumers," *Nielsen,* October 2021, https://www.nielsen.com/news-center/2021/better-together-panel--big-data-sets-offers-unprecedented-insights-into-consumers/

"Home," *EDO, Inc.,* https://www.edo.com, accessed August 14, 2023

"Audience Is Everything," *Nielsen,* https://global.nielsen.com, accessed June 8, 2022

"Questions – Nielsen Panels & Surveys," *Nielsen,* https://panels.nielsen.com/questions/#your-privacy, accessed October 19, 2023

"Celebrating 95 Years of Innovation," *Nielsen,* https://sites.nielsen.com/timelines/our-history/, accessed September 22, 2023

"Nielsen Solutions," *Nielsen ,* https://www.nielsen.com/solutions/, accessed September 21, 2023

| Document Title, Bates Numbers | Document Date |
|---|---|

"Nielsen's industry-leading U.S. National TV Panel reaches over 42,000 households, comprised of 101,000 directly measured viewers," *Nielsen,* August 10, 2022, https://www.nielsen.com/news-center/2022/nielsens-industry-leading-u-s-national-tv-panel-reaches-over-42000-household/

"Top 10 Nielsen Global Media Alternatives & Competitors," *G2.com, Inc.,* https://www.g2.com/products/nielsen-global-media/competitors/alternatives, accessed July 26, 2023

"National TV Measurement," *Nielsen,* https://www.nielsen.com/solutions/audience-measurement/national-tv/, accessed October 11, 2023

"Nielsen Families," *Nielsen,* https://www.nielsen.com/us/en/about-us/panels/ratings-and-families/, accessed June 9, 2022

"Nielsen Panels," *Nielsen,* https://www.nielsen.com/about-us//nielsen-panels/#data-science-big-data, accessed October 11, 2023

"TV Homes," *Nielsen,* https://www.nielsen.com/us/en/about-us/panels/tv-homes/, accessed June 9, 2022

"TV Ratings," *Nielsen,* https://www.nielsen.com/us/en/solutions/measurement/television/, accessed June 9, 2022

"VOD Content Ratings," *Nielsen,* https://www.nielsen.com/us/en/solutions/capabilities/vod-content-ratings/, accessed June 9, 2022

Hayes, Dade, "Nielsen Combines Streaming Metrics Into Single Tool," *Deadline,* October 7, 2021, https://deadline.com/2021/10/nielsen-combines-streaming-measurement-1234851174/

"Total Media Solutions," *Nielsen,* https://www.nielsen.com/solutions/, accessed September 21, 2023

"Audience Measurement Solutions," *Nielsen,* https://www.nielsen.com/solutions/audience-measurement, accessed June 8, 2022

"Audio Measurement," *Nielsen,* https://www.nielsen.com/solutions/audience-measurement/audio/, accessed July 3, 2023

"Podcast Data Solutions," *Nielsen,* https://www.nielsen.com/solutions/audience-measurement/podcast/, accessed July 3, 2023

"Nielsen ONE," *Nielsen,* https://www.nielsen.com/solutions/audience-measurement/nielsen-one/, accessed July 3, 2023

"Total Ad Ratings," *Nielsen,* https://www.nielsen.com/solutions/audience-measurement/total-ad-ratings/, July 3, 2023

"Total Content Ratings," *Nielsen,* https://www.nielsen.com/solutions/audience-measurement/total-content-ratings/, accessed July 3, 2023

"Digital Ad Ratings," *Nielsen,* https://www.nielsen.com/solutions/audience-measurement/digital-ad-ratings/, accessed July 3, 2023

"Digital Content Ratings," *Nielsen,* https://www.nielsen.com/solutions/audience-measurement/digital-content-ratings/, accessed July 3, 2023

"Streaming Platform Ratings," *Nielsen,* https://www.nielsen.com/solutions/audience-measurement/streaming-platform-signals/, accessed July 3, 2023

"Streaming Signals," *Nielsen,* https://www.nielsen.com/solutions/audience-measurement/streaming-signals/, accessed July 3, 2023

"Streaming Video Ratings," *Nielsen,* https://www.nielsen.com/solutions/audience-measurement/streaming-content-ratings/, accessed July 3, 2023

"Local TV Ratings," *Nielsen,* https://www.nielsen.com/solutions/audience-measurement/local-tv/, accessed July 3, 2023

"National TV Measurement," *Nielsen,* https://www.nielsen.com/audience-measurement/national-tv/, accessed July 3, 2023

"Audio On Demand," *Nielsen,* https://www.nielsen.com/solutions/content-metadata/audio-on-demand/, accessed July 3, 2023

"Global Music Data," *Nielsen,* https://www.nielsen.com/solutions/content-metadata/global-music-data/, accessed July 3, 2023

"Music Recognition," *Nielsen,* https://www.nielsen.com/solutions/content-metadata/music-recognition/, accessed July 3, 2023

"Smart Radio Solutions," *Nielsen,* https://www.nielsen.com/solutions/content-metadata/smart-radio/, accessed July 3, 2023

"Global Sports Services," *Nielsen,* https://www.nielsen.com/solutions/content-metadata/smart-radio/global-sports-services/, accessed July 3, 2023

"Global Sports Data," *Nielsen,* https://www.nielsen.com/solutions/content-metadata/global-sports-data/, accessed July 3, 2023

| Document Title, Bates Numbers | Document Date |
|---|---|

"Global Sports Events," *Nielsen,* https://www.nielsen.com/solutions/content-metadata/global-sports-events/, accessed July 3, 2023

"Advanced Discovery Suite," *Nielsen,* https://www.nielsen.com/solutions/content-metadata/advanced-discovery/, accessed July 3, 2023

"Content Analytics Solutions," *Nielsen,* https://www.nielsen.com/solutions/content-metadata/content-analytics/, accessed July 3, 2023

"Global Video Data," *Nielsen,* https://www.nielsen.com/solutions/content-metadata/global-video-data/, accessed July 3, 2023

"Gracenote View," *Nielsen,* https://www.nielsen.com/solutions/content-metadata/gracenote-view/, accessed July 3, 2023

"ID Distribution System," *Nielsen,* https://www.nielsen.com/solutions/content-metadata/id-distribution-system/, accessed July 3, 2023

"Streaming Video Suite," *Nielsen,* https://www.nielsen.com/solutions/content-metadata/streaming-video-suite/, accessed July 3, 2023

"Studio Solutions Suite," *Nielsen,* https://www.nielsen.com/solutions/content-metadata/studio-solutions/, accessed July 3, 2023

"Studio System," *Nielsen,* https://www.nielsen.com/solutions/content-metadata/studio-system/, accessed July 3, 2023

"Brand Impact," *Nielsen,* https://www.nielsen.com/solutions/marketing-optimization/brand-impact/, accessed July 3, 2023

"Campaign Lift," *Nielsen,* https://www.nielsen.com/solutions/marketing-optimization/campaign-lift/, accessed July 3, 2023

"Marketing Mix Modeling," *Nielsen,* https://www.nielsen.com/solutions/marketing-optimization/marketing-mix-modeling/, accessed July 3, 2023

"Esports," *Nielsen Sports,* https://nielsensports.com/esports-3-2/, accessed July 3, 2023

"Fan Insights," *Nielsen Sports,* https://nielsensports.com/fan-insights/, accessed July 3, 2023

"Media Valuation," *Nielsen Sports,* https://nielsensports.com/media-valuation/, accessed July 3, 2023

"Research & Consulting," *Nielsen Sports,* https://nielsensports.com/research-consulting/, accessed July 3, 2023

"Video Game Tracking," *Nielsen,* https://www.nielsen.com/solutions/marketing-optimization/video-game-tracker/, accessed July 3, 2023

"Audience Segments," *Nielsen,* https://www.nielsen.com/solutions/media-planning/audience-segments/, accessed July 3, 2023

"Marketing Cloud Solutions," *Nielsen,* https://www.nielsen.com/solutions/media-planning/marketing-cloud/, accessed July 3, 2023

"Advertising Effectiveness Measurement Solutions & Services for CPG," *NCSolutions,* https://ncsolutions.com, accessed July 3, 2023

"Scarborough," *Nielsen,* https://www.nielsen.com/solutions/media-planning/scarborough/, accessed July 3, 2023

"Competitive Advertising Intelligence," *Nielsen,* https://www.nielsen.com/solutions/media-planning/ad-intelligence/, accessed July 3, 2023

"Commspoint Influence," *Nielsen,* https://www.nielsen.com/solutions/media-planning/commspoint-influence/, accessed July 3, 2023

"Commspoint Journey," *Nielsen,* https://www.nielsen.com/solutions/media-planning/commspoint-journey/, accessed July 3, 2023

"Compass Planner," *Nielsen,* https://www.nielsen.com/solutions/media-planning/compass-planner/, accessed July 3, 2023

"Media Impact," *Nielsen,* https://www.nielsen.com/solutions/media-planning/media-impact/, accessed July 3, 2023

"Nielsen Completes Acquisition of Gracenote," *Gracenote,* February 1, 2017, https://www.nielsen.com/news-center/2017/nielsen-completes-acquisition-of-gracenote/

Rifilato, Tony, "MRC Strips Nielsen Of Its National, Local TV Accreditation," *AdExchanger,* September 1, 2021, https://www.adexchanger.com/tv-2/mrc-strips-nielsen-of-its-national-local-tv-accreditation/#:~:text=The%20Media%20Rating%20Council%20stripped,underreported%20viewers%20during%20the%20pandemic.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

| Document Title, Bates Numbers | Document Date |
|---|---|

"Nielsen's Gracenote Quantifies Program Bingeability, Tracks Streaming Availability," *Gracenote,* June 1, 2022, https://www.gracenote.com/nielsens-gracenote-quantifies-program-bingeability-tracks-streaming-availability-through-new-content-analytics-datasets/#:~:text=Gracenote%20Program%20Availability%20Archive%20provides,Program%20and%20episode%20titles

"Gracenote," *CB Insights,* https://www.cbinsights.com/company/gracenote, accessed September 18, 2023

"Nielsen announces closing of transaction with Evergreen - and Brookfield-led Consortium," *Nielsen,* October 11, 2022, https://www.nielsen.com/news-center/2022/nielsen-announces-closing-of-transaction-with-evergreen-and-brookfield-led-consortium/

Adgate, Brad, "Under New Ownership And Continued Competition, Nielsen Is Restructuring," *Forbes,* January 5, 2023, https://www.forbes.com/sites/bradadgate/2023/01/05/under-new-ownership-and-continued-competition-nielsen-is-restructuring/?sh=7e5c913917c8

Adgate, Brad, "Nielsen to Begin Measuring Addressable Advertising," *Forbes,* November 10, 2020, https://www.forbes.com/sites/bradadgate/2020/11/10/nielsen-to-begin-measuring-addressable-advertising/?sh=2db77556535f

"Nielsen Receives MRC Accreditation for its National TV Audience Measurement Service," *Nielsen,* April 17, 2023, https://www.nielsen.com/news-center/2023/nielsen-receives-mrc-accreditation-for-its-national-tv-audience-measurement-service/#:~:text=New%20York%20%E2%80%93%20April%2017%2C%202023,be%20accredited%20by%20the%20MRC

Boyle, Alyssa, "Nielsen Wins Back Its Accreditation For National TV Ratings," *AdExchanger,* April 23, 2023, https://www.adexchanger.com/tv-2/breaking-nielsen-wins-back-its-accreditation-for-national-tv-ratings/

Homonoff, Howard, "Keeping Score In Media Measurement 2023 Nielsen And Its Competitors," *Forbes,* June 13, 2023, https://www.forbes.com/sites/howardhomonoff/2023/06/13/keeping-score-in-media-measurement-2023-nielsen-and-its-competitors/?sh=52bda536f877

"Nielsen Annual Marketing Report Era of Alignment," *Nielsen,* April 12, 2022, https://www.nielsen.com/us/en/insights/report/2022/nielsen-annual-marketing-report-era-of-alignment/

"The Nielsen Total Audience Report Advertising Across Today's Media," *Nielsen,* March 25, 2021, https://www.nielsen.com/us/en/insights/report/2021/total-audience-advertising-across-todays-media/

"Nielsen - Overview, News & Competitors," *ZoomInfo.com,* https://www.zoominfo.com/c/the-nielsen-co/196461271, accessed October 5, 2023

"Nielsen Holdings PLC," *Buzzfile.com,* https://www.buzzfile.com/business/Nielsen-Holdings-PLC-646-654-5000, accessed October 5, 2023

"Nielsen Holdings plc - EDGAR Entity Landing Page," *SEC,* https://www.sec.gov/edgar/browse/?CIK=0001492633, accessed October 11, 2023

"About Us," *Gracenote,* https://www.gracenote.com/company/about-us/, accessed June 21, 2022

"Gracenote - Homepage," *Gracenote,* https://www.gracenote.com, accessed June 21, 2022

"Gracenote - Products, Competitors, Financials, Employees, Headquarters Locations," *CBinsights,* https://www.cbinsights.com/company/gracenote, accessed September 18, 2023

"Gracenote Launches Interactive TV Platform," *Sony,* January 10, 2012, https://www.sony.com/content/sony/en/en_us/SCA/company-news/press-releases/gracenote/2012/gracenote-launches-interactive-tv-platform.html

"Nielsen Completes Acquisition of Gracenote," *Nielsen,* February 1, 2017, https://www.nielsen.com/news-center/2017/nielsen-completes-acquisition-of-gracenote/

"About TVision," *TVision Insights,* https://www.tvisioninsights.com/about, accessed June 9, 2022

"TVision Insights," TVision, https://www.tvisioninsights.com/, accessed October 16, 2023

"Passive TV Measurement, TVision Panel" *TVision Insights,* https://www.tvisioninsights.com/our-panel, accessed September 19, 2023

"See How People Really Watch TV," *TVision Insights,* https://www.tvisioninsights.com, accessed June 9, 2022

"Why Viewer Attention Matters for TV," *TVision Insights,* https://www.tvisioninsights.com/why-attention, accessed June 9, 2022

"Ad Scoreboard for Brands & Agencies," *TVision Insights,* https://www.tvisioninsights.com/ad-scoreboard, accessed June 9, 2022

"Calibration Data for TV Measurement," *TVision Insights,* https://www.tvisioninsights.com/calibration-data, June 9, 2022

| Document Title, Bates Numbers | Document Date |
| --- | --- |

"Creative Monitoring for Brands & Agencies," *TVision Insights,* https://www.tvisioninsights.com/creative-monitoring, accessed June 9, 2022

"CTV Analytics for Apps & Networks," *TVision Insights,* https://www.tvisioninsights.com/ctv-analytics, accessed June 9, 2022

"Data Licensing for TV Measurement," *TVision Insights,* https://www.tvisioninsights.com/data-licensing, accessed June 9, 2022

"Digital Activation for Brands & Agencies," *TVision Insights,* https://www.tvisioninsights.com/digital-activation#hs_cos_wrapper_widget_1648493386560, accessed June 9, 2022

"Linear TV Insights for Networks," *TVision Insights,* https://www.tvisioninsights.com/linear-tv-insights, accessed June 9, 2022

"TV Planning & Measurement," *TVision Insights,* https://www.tvisioninsights.com/tv-planning-measurement, accessed June 9, 2022

"Our Technology," *TVision Insights,* https://www.tvisioninsights.com/our-technology, accessed June 9, 2022

Liu, Yan, "The Future of Media Measurement: The Role of Panels in Big Data," *TVision Blog,* June 16, 2021, https://www.tvisioninsights.com/resources/the-role-of-panels-in-big-data

"TVision – About Us," *MyTVPanel.com,* https://www.mytvpanel.com/about, accessed October 19, 2023

"See How People Really Watch TV," *TVision Insights,* accessed October 16, 2023, https://www.tvisioninsights.com

DeWolff, Daniel, "The leader in eyes on screen attention measurement," *TVision Insights,* May 29, 2018, https://www.tvisioninsights.com/resources/mit-profile

Schiff, Allison, "TVision Insights: 'Ratings Only Tell Part Of The Story,'" *Ad Exchanger,* March 16, 2020, https://www.adexchanger.com/tv-and-video/tvision-insights-ratings-only-tell-part-of-the-story/

"AdAge - TVision is the go-to-choice for several Nielsen rivals," *TVision Insights,* August 30, 2021, https://www.tvisioninsights.com/resources/adage-mrc-panel-data

"Realeyes & TVision Partner to Expand Full Suite of Attention Metrics." *TVision Insights,* May 24, 2022, https://www.tvisioninsights.com/resources/press-release-tvision-realeyes

"WARC Guide to CTV Helps Advertisers Navigate the Opportunity," *TVision Insights,* June 2, 2022, https://www.tvisioninsights.com/resources/warc-ctv-report

McGranaghan, Matthew, Jura Liaukonyte, and Kenneth C. Wilbur, "How Viewer Tuning, Presence, and Attention Respond to Ad Content and Predict Brand Search Lift," Marketing Science, February 9, 2022, https://pubsonline.informs.org/doi/10.1287/mksc.2021.1344

"Independent Study Shows TV Viewer Ad Attention Correlates to Search," *TVision Insights,* March 22, 2022, https://www.tvisioninsights.com/resources/attention-correlates-search

"Success Stories & Case Studies," *TVision Insights,* https://www.tvisioninsights.com/success-stories, accessed June 9, 2022

"TVision - Overview, News & Competitors," *ZoomInfo.com,* https://www.zoominfo.com/c/tvision-insights-inc/369419851, accessed October 4, 2023

Lunden, Ingrid, "TVision raises $6.8M to take on Nielsen with thermal eye and emotion tracking tech," *TechCrunch,* October 26, 2016, https://techcrunch.com/2016/10/26/tvision-raises-6-8m-to-take-on-nielsen-with-thermal-eye-and-emotion-tracking-tech/

"Television Measurement Company TVision Insights Raises $11.5M," *FinSMEs,* July 17, 2018, https://www.finsmes.com/2018/07/adtech-company-tvision-insights-raises-11-5m-in-funding.html

"TVision Insights Raises $11.5M to Meet Accelerating Demand for TV Attention Data," *TVision Insights,* July 17, 2018, https://www.tvisioninsights.com/resources/tvision-insights-raises-11-5m#:~:text=BOSTON - (July 17%2C 2018,by Accomplice and Jump Capital.

Lafayette, Jon, "Measurement Company TVision Raises $11.5M in New Funding," *Next TV,* July 17, 2018, https://www.nexttv.com/news/tvision-raises-11-5-million-in-new-funding

Lafayette, Jon, "Measurement Company TVision Raises $11.5M in New Funding," *TVision Insights,* July 17, 2018, https://www.tvisioninsights.com/resources/has-raised-11-5-million-in-new-funding#:~:text=TVision%20Insights%2C%20a%20measurement%20firm,round%20of%20funding%20in%E2

"TVision Raises $16 Million to Continue to Deliver the Data that is Innovating TV and CTV Measurement," *TVision Insights,* November 2, 2020, https://www.tvisioninsights.com/resources/tvision-raises-to-continue-to-deliver-the-data-that-is-innovating-tv-and-ctv-measurement

"iSpot Leads $16 Million Investment in TVision Insights to Expand Cross-Platform TV Currency Capabilities, Evolve Streaming Transparency," *iSpot,* November 15, 2022, https://www.ispot.tv/hub/ispot-leads-16-million-investment-in-tvision-insights-to-expand-cross-platform-tv-currency-capabilities-evolve-streaming-transparency/

| Document Title, Bates Numbers | Document Date |
|---|---|

Ha, Anthony, "TVision raises $16M to measure viewer attention on connected TVs," *TechCrunch,* November 2, 2020, https://techcrunch.com/2020/11/02/tvision-funding/

Agate, Brad, "ISpot An Audience Measurement Provider And Nielsen Competitor Invests In TVision," *Forbes,* November 15, 2022, https://www.forbes.com/sites/bradadgate/2022/11/15/ispot-an-audience-measurement-provider-and-nielsen-competitor-invests-in-tvision/?sh=7ec9d0f40a3b

Boyle, Alyssa, "ISpot Leads $16M VC Round In Panel Provider TVision To Measure Co-Viewing," *AdExchanger,* November 15, 2022, https://www.adexchanger.com/digital-tv/ispot-leads-16m-vc-round-in-panel-provider-tvision-to-measure-co-viewing/

"TVision Financials," *Crunchbase,* https://www.crunchbase.com/organization/tvision-insights/company_financials, accessed September 19, 2023

"TVision Financials," *Crunchbase,* https://www.crunchbase.com/organization/tvision-insights/company_financials, accessed October 17, 2023

"Build Query: Investors," *Crunchbase,* https://www.crunchbase.com/search/principal.investors/field/funding_round.has_funding_round.forward/num_investors/tvision-insights-series-unknown--a31a243e, accessed September 27, 2023

"Build Query: Investors," *Crunchbase,* https://www.crunchbase.com/search/principal.investors/field/funding_round.has_funding_round.forward/num_investors/tvision-insights-series-unknown--a31a243e, accessed September 27, 2023

"TVision Insights - 39 Competitors and Alternatives," *Tracxn,* https://tracxn.com/d/companies/tvision-insights/__asNKkmESqDVnIYeNuoYvwLNm2bq5VgBzsxrEK5qrDR8/competitors, accessed October 10, 2023

"TVision Insights - Company Profile," *Tracxn,* https://tracxn.com/d/companies/tvision-insights/__asNKkmESqDVnIYeNuoYvwLNm2bq5VgBzsxrEK5qrDR8, accessed October 10, 2023

"TVision Insights - Raised $70.3M Funding from 36 investors," *Tracxn,* https://tracxn.com/d/companies/tvision-insights/__asNKkmESqDVnIYeNuoYvwLNm2bq5VgBzsxrEK5qrDR8/funding-and-investors, accessed October 10, 2023

"TVision Insights, All Funding Rounds," *Tracxn,* https://tracxn.com/a/companies/2iaY2gO1afNIEWQJQlSeX4Aj4aM0-eSPJAwEYE_LzWE/tvisioninsights.com#a:funding-and-investors, accessed October 11, 2023

"TVision Insights Inc.," *Buzzfile,* https://www.buzzfile.com/business/Tvision-Insights-Inc.-617-821-0848, accessed October 5, 2023

"TVision Insights Stock Price, Funding, Valuation, Revenue & Financial Statements," *CBInsights,* https://www.cbinsights.com/company/tvision-insights/financials, accessed October 4, 2023

"TVision Company Profile: Valuation, Funding & Investors," *PitchBook,* https://pitchbook.com/profiles/company/125811-37#overview, accessed October 4, 2023

"TVision: Contact Details and Business Profile," *RocketReach,* https://rocketreach.co/tvision-profile_b5a78651f70676a3, accessed October 5, 2023

"TVision - Overview, News & Competitors," *Zoominfo,* https://www.zoominfo.com/c/tvision-insights-inc/369419851, accessed October 4, 2023

"2018 Valuation Handbook - U.S. Industry Cost of Capital," *Duff & Phelps,* March 31, 2018

Capital Industry Benchmarking Reports for SIC Codes: 73, 737, & 7389, *Duff & Phelps,* December 31, 2018

"iSpot tv Inc. Industry Classifications," *S&P Capital IQ,* accessed October 6, 2023

"iSpot.TV, Inc.," *Refinitiv,* accessed September 13, 2023

"Nielsen Holdings plc Industry Classifications," *S&P Capital IQ,* accessed September 19, 2023

"TVision Insights, Inc Industry Classifications," *S&P Capital IQ,* accessed September 15, 2023

"VideoAmp, Inc. Industry Classifications," *S&P Capital IQ,* accessed October 6, 2023

"Automatic Content Recognition Market Size, Share & Analysis 2022 - 2030," *Markets and Markets,* https://www.marketsandmarkets.com/Market-Reports/automatic-content-recognition-market-148131627.html, accessed October 5, 2023

"Media Rating Council – History," *Media Rating Council,* mediaratingcouncil.org/History.htm, accessed June 16, 2022

"Media Rating Council – Home," *Media Rating Council,* mediaratingcouncil.org, accessed June 16, 2022

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

| Document Title, Bates Numbers | Document Date |
|---|---|

"Industry Perspectives on the Transition to a Multi-Currency TV Market," *Deloitte, CIMM, The 4A's, ANA,* 2022, https://www.ana.net/miccontent/show/id/rr-2023-01-ana-transition-to-multi-currency-tv#:~:text=Industry%20Perspectives%20on%20the%20Transition%20to%20a%20Multi%2Dcurrency%20TV%20Market,-January%2012%2C%202023&text=The%20TV%20market%20is,monetization%20approaches%2C%20and%20advertising%20models.

"Oracle Data Cloud TV & Video Glossary," *Oracle,* https://www.oracle.com/a/ocom/docs/oracle-data-cloud-tv-glossary-one-sheet.pdf, accessed June 16, 2022

"Today's Innovations in Measurement" *VAB,* 3Q 2022, https://thevab.com/insight/todays-innovations-measurement-q3-2022

"What is Changing About TV Currency?" *VAB,* May 2023, https://thevab.com/insight/whats-changing-tv-currency#:~:text=C3%20and%20C7%20ratings%20will,23%2D'24%20TV%20season.

"What is Connected TV and OTT," *Oracle,* https://www.oracle.com/cx/advertising/measurement/ctv-vs-ott/, accessed June 16, 2022

"What's the Deal with Viewership Data Collection?" *VAB,* March 2023, https://thevab.com/insight/wtdw-viewership-data-collection

"Who We Are," *World Federation of Advertisers,* https://wfanet.org/about-wfa/who-we-are, accessed June 16 2022

Boyle, Alyssa, "AdExplainer: TV Measurement vs. TV Currency," *AdExchanger,* April 26, 2023, https://www.adexchanger.com/adexplainer/adexplainer-tv-measurement-vs-tv-currency/

"Big Data in Media and Telco: 6 Applications and Use Cases," *Talend,* https://www.talend.com/resources/big-data-media-telco, accessed September 23, 2023

"ACRCloud - Audio Recognition Services For Doers," *ACRCloud*, www.acrcloud.com, accessed September 27, 2023

"ACRCloud - Company Profile & Funding," *Crunchbase,* https://www.crunchbase.com/organization/acrcloud, accessed October 5, 2023

Liao, Rita, "How China's ACRCloud Detects Copyrighted Music in Short Videos," *TechCrunch,* August 12, 2020, https://techcrunch.com/2020/08/12/acrcloud-profile/

"Products," *VidVita,* http://vidvita.com/about/, accessed September 28, 2023

"VidVita - Company Info, Employees & Competitors," *Cience,* https://www.cience.com/company/vidvita/-945522521194491359, accessed September 28, 2023

"VidVita," *LinkedIn,* https://www.linkedin.com/company/vidvita, accessed September 28, 2023

"About iSpot - iSpot.tv, iSpot.tv, https://www.ispot.tv/about, accessed October 18, 2023

"iSpot.tv - 40 Competitors and Alternatives," *Tracxn,* https://tracxn.com/d/companies/ispot.tv/__ON1p7ssbk53zQfgmxni4R0s4M5fqBe5s-DgCTgJWBuk/competitors, accessed August 14, 2023

Adgate, Brad, "Networks And Advertisers Are Looking To Replace Nielsen," *Forbes,* January 20, 2022, https://www.forbes.com/sites/bradadgate/2022/01/20/networks-and-advertisers-are-looking-to-replace-nielsen/?sh=57b77df0381b

Fletcher, Bevin, "NBCU certifies iSpot, VideoAmp Currency for Advanced Audiences, Intros Content Quality Index," *StreamTVInsider,* February 8, 2023, https://www.streamtvinsider.com/advertising/nbcu-certifies-ispot-videoamp-currency-advanced-audiences-intros-content-quality-index#:~:text=NBCUniversal%20on%20Wednesday%20announced%20that,in%20an%20evolving%20measurement%20landscape.

Kelly, Chris, "NBCUniversal Elevates iSpot to Ad Currency in Blow to Nielsen," *Marketing Dive,* March 23, 2022, https://www.marketingdive.com/news/nbcuniversal-elevates-ispot-to-ad-currency-as-measurement-battle-heats-up/620827/

Cahillane, Mollie, "Paramount Adds iSpot as New Currency Partner," *AdWeek,* October 10, 2023, https://www.adweek.com/convergent-tv/paramount-adds-ispot-currency-partner/#.

"About," *VideoAmp,* https://videoamp.com/about/, accessed October 16, 2023

"Our Data" *VideoAmp,* https://videoamp.com/data/, accessed October 16, 2023

"Our Platform," *VideoAmp,* https://videoamp.com/platform/, accessed October 16, 2023

"Our Solutions," *VideoAmp,* https://videoamp.com/solutions/, accessed October 16, 2023

Bradley, Bill, "Paramount and OMG Usher in Next Step in New Currency Workflow," *AdWeek,* August 17, 2023, https://www.adweek.com/convergent-tv/paramount-and-omg-usher-in-next-step-in-new-currency-workflow/

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

| Document Title, Bates Numbers | Document Date |
| --- | --- |

Hercher, James, "VideoAmp's Josh Chasin On The Somehow-Enduring Value Of TV Panel Data," *AdExchanger,* November 16, 2021, https://www.adexchanger.com/digital-tv/videoamps-josh-chasin-on-the-somehow-enduring-value-of-tv-panel-data/

Lafayette, Jon, "B+C: TVision Launches Person-Based Advanced Audience Projections," *VideoAmp,* November 16, 2020, https://videoamp.com/press/tvision-launches-person-based-advanced-audience-projections/

Press Release, "TelevisaUnivision and VideoAmp Announce New Data, Currency and Cross-Platform Partnership to Advance Measurement of U.S. Hispanics, *VideoAmp,* June 21, 2022, https://corporate.televisaunivision.com/press/2022/06/21/televisaunivision-and-videoamp-announce-new-data-currency-and-cross-platform-partnership/#:~:text=CANNES%2C%20FRANCE%20%E2%80%93%20JUNE%2021%2C,power%20its%20robust%20suite%20of

Press Release, "VideoAmp and ViacomCBS Announce TV Measurement Partnership," *Paramount,* September 28, 2021, https://ir.paramount.com/news-releases/news-release-details/videoamp-and-viacomcbs-announce-tv-measurement-partnership

Rizzo, Lillian, "Warner Bros. Discovery Signs Deal with Startup Nielsen Rival VideoAmp," *CNBC,* January 3, 2023, https://www.cnbc.com/2023/01/03/warner-bros-discovery-videoamp-nielsen.html

"Allen Media Group to Leverage VideoAmp as New Currency for 2023-24 Upfront Season," *VideoAmp,* April 26, 2023, https://videoamp.com/press/allen-media-to-leverage-videoamp-as-new-currency/

Lukovitz, Karlene, "Allen Media Group Makes VideoAmp Primary Currency, Replacing Nielsen," *MediaPost,* June 20, 2023, https://www.mediapost.com/publications/article/386514/allen-media-group-makes-videoamp-primary-currency.html

"Business Wire: Byron Allen's Allen Media Group Announces VideoAmp as Primary Currency with Ten-year Agreement," *Allen Media Group,* June 20, 2023, https://allenmedia.tv/business-wire/

"Byron Allen - Founder," *Allen Media Group,* https://allenmedia.tv/founder/, accessed September 12, 2023

"Byron Allen's Allen Media Group Announces VideoAmp as Primary Currency With Ten-year Agreement," *Yahoo Finance,* June 20, 2023, https://finance.yahoo.com/news/byron-allen-allen-media-group-090000679.html

"Company - ES Networks Timeline," *Allen Media Group,* https://esnetworks.tv/company/, accessed September 12, 2023

"Entertainment Studios Networks," *ES Networks,* https://esnetworks.tv, accessed September 12, 2023

"Investor Relations," *Allen Media Group,* https://allenmedia.tv/ir/, accessed September 12, 2023

Memorandum Opinion and Order, July 10, 2020, *CF Entertainment, Inc. v. The Nielsen Company (US) LLC,* Case No. 20-cv-2393

Memorandum Opinion and Order, August 17, 2023, *CF Entertainment, Inc. v. The Nielsen Company (US) LLC,* Case No. 20-cv-2393

**TVision U.S. Patents and Patent Applications**

U.S. Patent No. 11,509,956 B6
U.S. Patent No. 11,540,009 B2
U.S. Patent No. 11,770,574 B2
U.S. Patent Application Publication No: 2018/0007431 A1
U.S. Patent Application Publication No: 2020/0084497 A1
U.S. Patent Application Publication No: 2022/0150581 A1
U.S. Patent Application Publication No: 2022/0159341 A1
U.S. Patent Application Publication No: 2023/0106115 A1
U.S. Patent Application Publication No: 2023/0319348 A1

**Case Law**

*Georgia-Pacific Corp. v. U.S. Plywood Corp.* , 318 F. Supp. 1116 (S.D.N.Y. 1970), modified and affirmed, 443 F. 2d 295 (2d Cir. 1971)

*Bayer Healthcare LLC v. Baxalta, Inc.* 407 F. Supp 3d 462 (D. Del. 2019)

*Robocast, Inc. v. Microsoft Corp.,* 2014 WL 350062, (D. Del. 2014)

*Sinclair Refining Co. v. Jenkins Petroleum Process Co.,* 289 U.S. 689 (1933)

*Spectralytics, Inc. v. Cordis Corp.,* 650 F. Supp. 2d 900 (D. Minn. 2009)

*VirnetX, Inc. v. Cisco Systems, Inc.,* 767 F. 3d 1308 (Fed. Cir. 2014)

| Document Title, Bates Numbers | Document Date |
|---|---|

**Additional Research**

"NTT DOCOMO Ventures Invests in TVision Insights, Inc. …," *NTT DOCOMO Press Release,* June 28, 2025, https://www.nttdocomo-v.com/en/news/f8tj1l7s1f/

"Flow Capital Announces a US$1.5M Follow-On Loan in TVision," *Flow Capital Press Release,* December 16, 2024, https://www.globenewswire.com/news-release/2024/12/16/2997934/0/en/Flow-Capital-Announces-a-US-1-5M-Follow-On-Loan-in-TVision.html

"Flow Capital Announces a US$1.5M Follow-On Loan in TVision," *Globe Newswire,* December 16, 2024, https://www.streetinsider.com/Globe+Newswire/Flow+Capital+Announces+a+US%241.5M+Follow-On+Loan+in+TVision/24111012.html

"Debt Financing - TVision," *Crunchbase,* December 16, 2024, https://www.crunchbase.com/funding_round/tvision-insights-debt-financing--ce9d739e, accessed June 2, 2025

"TVision - Financial Details," *Crunchbase,* https://www.crunchbase.com/organization/tvision-insights/financial_details, accessed June 2, 2025

"TVision Insights - Funding & Investors," *Tracxn,* https://tracxn.com/d/companies/tvision-insights/__asNKkmESqDVnIYeNuoYvwLNm2bq5VgBzsxrEK5qrDR8/funding-and-investors#funding-rounds, accessed June 3, 2025

"TVision Expands to 35 DMAs; Now Covers More DMAs than Any Other Person-Level TV Measurement Provider," *TVision Blog,* October 31, 2024, https://www.tvisioninsights.com/resources/tvision-35-dmas

Steinberg, Brian, "Inside Allen Media Group's Partnership with VideoAmp, One of Nielsen's Many Competitors," *Variety,* December 17, 2023, https://variety.com/2023/tv/news/byron-allen-media-group-

"Allen Media Group Inks Cable, Digital Nielsen Deal," *RBR TVBR,* October 4, 2024, https://rbr.com/allen-media-group-inks-cable-digital-nielsen-deal/

"Allen Media Group Signs a Multi-Year Deal with Nielsen for Audience Measurement & Advanced Audiences Services," *Nielsen Press Release,* October 4, 2024, https://www.nielsen.com/news-center/2024/allen-media-group-signs-a-multi-year-deal-with-nielsen-for-audience-measurement-advanced-audiences-services/

Steinberg, Brian, "Allen Media Strikes New Nielsen Alliance After Touting Rival VideoAmp in 10-Year Deal (Exclusive)," *Variety,* October 4, 2024, https://variety.com/2024/tv/news/nielsen-allen-media-group-tv-ratings-deal-videoamp-1236168208/

"NBCU's New Approach to Measurement — Everything To Know From Its One24 Tech Conference," *VideoAmp Press Release,* March 20, 2024, https://videoamp.com/press/nbcus-new-approach-to-measurement-everything-to-know-from-its-one24-tech-conference/

Boyle, Alyssa, "NBCU's Pre-Upfronts Pitch Highlights Sports, Data And Measurement," *AdExchanger,* March 20, 2024, https://www.adexchanger.com/tv/nbcus-pre-upfronts-pitch-highlights-sports-data-and-measurement/

Bradley, Bill, "NBCU Expects 'Monumental' Year in TV Upfront Despite Tariff Talk," *AdWeek,* April 28, 2025

Steinberg, Brian, "Paramount, Nielsen Without TV Ratings Contract in Dispute Over Costs," *Variety,* September 30, 2024, https://variety.com/2024/tv/news/paramount-cbs-nielsen-tv-ratings-contract-expire-1236161136/

Adgate, Brad, "The Paramount-Nielsen Contract Impasse Is In Its Second Month," *Forbes*, November 6, 2024, https://www.forbes.com/sites/bradadgate/2024/11/06/the-paramount-nielsen-contract-impasse-is-in-its-second-month/

Brown, Mark, "What Paramount and Nielsen's Contract Dispute Means for the Future of Alternative Media Currencies," *Rain for Growth Agency,* December 3, 2024, https://www.rainforgrowth.com/insights-updates/what-paramount-and-nielsens-contract-dispute-means-for-the-future-of-alternative-media-currencies/

"VideoAmp Renews Measurement and Currency Partnership with Paramount Global," *BusinessWire*, January 7, 2025, https://www.businesswire.com/news/home/20250107427039/en/VideoAmp-Renews-Measurement-and-Currency-Partnership-with-Paramount-Global

"Paramount and Nielsen sign multi-year measurement and analytics deal across Paramount's leading broadcast, cable and streaming platforms," *Nielsen Press Release,* February 3, 2025, https://www.nielsen.com/news-center/2025/paramount-and-nielsen-sign-multi-year-measurement-and-analytics-deal-across-paramounts-leading-broadcast-cable-and-streaming-platforms/

Steinberg, Brian, "Paramount, Nielsen Strike New Measurement Deal, Ending Months-Long Feud," *Variety*, February 3, 2025, https://variety.com/2025/tv/news/paramount-nielsen-renew-measurement-deal-ending-feud-1236295343/

| Document Title, Bates Numbers | Document Date |
|---|---|

Boyle, Alyssa, "Nielsen's Long-Awaited Measurement Offering Is Ready For The Upfronts," *AdExchanger,* January, 31, 2025, https://www.adexchanger.com/ctv-roundup/nielsens-long-awaited-measurement-offering-is-ready-for-the-upfronts/

Boyle, Alyssa, "HyphaMetrics Won't Compete With Alt Currencies – It Will Supply Them Data," *AdExchanger,* February 5, 2024, https://www.adexchanger.com/tv/hyphametrics-wont-compete-with-alt-currencies-it-will-supply-them-data/

Fletcher, Bevin, "U.S. JIC certifies Comscore, VideoAmp TV measurement currencies," *StreamTV Insider,* April 4, 2024, https://www.streamtvinsider.com/advertising/us-jic-certifies-comscore-videoamp-tv-measurement-currencies

Fletcher, Bevin, "iSpot secures US JIC certification as national TV currency," *StreamTV Insider,* August 13, 2024, https://www.streamtvinsider.com/advertising/ispot-secures-us-jic-certification-national-tv-currency

Fletcher, Bevin, "VideoAmp marks currency momentum, on track to guarantee $1.5B in media dollars," *StreamTV Insider,* September 17, 2024, https://www.streamtvinsider.com/advertising/videoamp-marks-currency-momentum-track-guarantee-15b-media-dollars

Butts, Tom, "Run3TV, TVision Partner on NextGen TV Measurement," *TV Tech,* October 17, 2024, https://www.tvtechnology.com/news/run3tv-tvision-partner-on-nextgen-tv-measurement

McNally, Victoria, "VideoAmp's Vampfront Event Proves The Measurement Company Is Out For Blood," *AdExchanger,* April 11, 2025, https://www.adexchanger.com/ctv-roundup/videoamps-vampfront-event-proves-the-measurement-company-is-out-for-blood/

Liederman, Emmy, "Advertisers embrace Nielsen alternatives for measurement," *EMarketer,* May 19, 2025, https://www.emarketer.com/content/advertisers-embrace-nielsen-alternatives-measurement

*All other materials cited in report and exhibits.*

# EXHIBIT 6

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | C.A. No. 22-57-CJB |
| v. | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| TVISION INSIGHTS, INC., | ) | |
| | ) | **CONFIDENTIAL** |
| Defendant. | ) | |

**PLAINTIFF THE NIELSEN COMPANY (US), LLC'S SECOND SUPPLEMENTAL
RESPONSES AND OBJECTIONS TO DEFENDANT'S
FIRST SET OF INTERROGATORIES**

Pursuant to Rules 26 and 33 of the Federal Rules of Civil Procedure, plaintiff The Nielsen Company (US), LLC ("Plaintiff" or "Nielsen") hereby provides its Second Supplemental Responses and Objections to defendant TVision Insights, Inc.'s ("Defendant" or "TVision") First Set of Interrogatories as follows:

**GENERAL OBJECTIONS**

1. These responses and objections are made without in any way waiving or intending to waive: (a) any objections as to the competency, relevancy, materiality, privilege, or admissibility as evidence, for any purpose, of any documents, information or things produced in response to the Interrogatories; (b) the right to object on any ground to the use of the documents, information or things produced in response to the Interrogatories at any hearing, trial, or other proceeding; (c) the right to object on any ground at any time to a demand for further responses to the Interrogatories; or (d) the right at any time to revise, correct, add to, supplement, or clarify any of the responses or objections contained herein.

2. Unless specifically noted herein, each of these General Objections applies to each Definition, Instruction, and Interrogatory.

**Ex. 6**

Subject to and without waiving its general and specific objections, Nielsen states that discovery will be necessary to determine the appropriate type and amount of damages, and expert testimony will be provided on damages in accordance with the timing set in the Joint Scheduling Order.  Nielsen expects to rely on sales records, billing records, invoices, offers for sale, past licenses, financial metrics, and other documents to calculate damages.  In cases in which a defendant is liable for patent infringement, courts award damages adequate to compensate for the infringement, but in no event less than a reasonable royalty.  Reasonable royalties may be determined through examination of the factors set forth in *Georgia-Pacific Corp. v. U.S. Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970).  Chief among these factors is the royalty to which a willing licensor and willing licensee would have agreed at the time when infringement began (the so-called "hypothetical negotiation").  Other important factors include established royalty rates for the technology, if any, and rates or amounts paid in conjunction with comparable licenses in the past.  A reasonable royalty analysis in the present case would likely involve the application of a reasonable royalty rate to TVision's infringing revenues.  The reasonable royalty rate might be discerned from applicable and comparable licenses, should any exist.  Nielsen currently seeks to recover reasonable royalty and convoyed sales damages in both cases.

Nielsen seeks reasonable royalty damages for TVision's infringement of the '189 Patent. Nielsen also intends to seek lost profits damages for infringement of the '889 Patent.  ████████ ████████████.  In the present case, lost profits damages may be calculated by examining the number of units of the infringing products and methods TVision has sold and the sales and licensing of data resulting from those products, determining (if necessary) which of those sales or licenses would have been made by Nielsen but for the infringement, and applying Nielsen's profit margin.  Nielsen may also need to factor price erosion into its analysis.  A price erosion analysis

7

**Ex. 6**

entails determining the amount by which the patentee's prices were reduced due to the existence of competition arising from the infringing product.  Nielsen also seeks an injunction.  Where lost profits damages are not available, Nielsen will seek a reasonable royalty.  Nielsen also intends to seek damages on convoyed sales or licensing of data as to the '889 Patent.

Discovery will be necessary to determine the date on which damages began to accrue, which will likely be the date TVision first made, used, sold, or offered for sale the accused instrumentalities.  As noted above, Nielsen identifies any data or other information that is based on or derived from the information retrieved from the aforementioned devices, systems, or methods as one proper basis for damages, whether by way of a convoyed sales theory or otherwise.

In cases in which a defendant is liable for willful infringement, courts award treble damages.

Nielsen's investigation continues, and Nielsen reserves the right to supplement or amend this response.

**SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

Subject to and without waiving the its general and specific objections and incorporating its original response to Interrogatory No. 3, Nielsen states as follows:

**INTERROGATORY NO. 4**: Separately for each asserted claim of each of the Asserted Patents, identify and describe any investigations, evaluations, or opinions relating to the validity, patentability, infringement, and/or enforceability of such claim, and identify all persons with knowledge of such investigations, evaluations or opinions.

8

**Ex. 6**

**RESPONSE TO INTERROGATORY NO. 4:**

Nielsen objects to this Interrogatory to the extent that it seeks information that is protected by the attorney-client privilege and the work-product doctrine.

Subject to and without waiving its general and specific objections, Nielsen states that it has no information responsive to this Interrogatory that is not covered by the attorney-client privilege or the work-product doctrine.

<table>
<tr><td>

OF COUNSEL:

Steven Yovits
Constantine Koutsoubas
Melvin Gaddy
Jason P. Greenhut
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
Tel: (312) 857-7070

Clifford Katz
Jolie Schenerman
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-7800

Dated: September 21, 2023
11068146 / 14944.00004

</td>
<td>

POTTER ANDERSON & CORROON LLP

By: */s/ Andrew L. Brown*
    David E. Moore (#3983)
    Bindu A. Palapura (#5370)
    Andrew L. Brown (#6766)
    Hercules Plaza, 6th Floor
    1313 N. Market Street
    Wilmington, DE 19801
    Tel: (302) 984-6000
    dmoore@potteranderson.com
    bpalapura@potteranderson.com
    abrown@potteranderson.com

*Attorneys for Plaintiff The Nielsen Company (US), LLC*

</td>
</tr>
</table>

9

**Ex. 6**

# EXHIBIT 7

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Ex. 7

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THE NIELSEN COMPANY (US), LLC,<br><br>*Plaintiff*,<br><br>v.<br><br>TVISION INSIGHTS, INC.,<br><br>*Defendant*. | C.A. No. 1:22-cv-0057-CJB<br>Magistrate Judge Christopher J. Burke<br><br>**JURY TRIAL DEMANDED** |

### <u>OPENING EXPERT REPORT OF PIERRE MOULIN</u>

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

## TABLE OF CONTENTS

I.      INTRODUCTION ................................................................................... 1

II.     PERSONAL BACKGROUND AND EXPERT QUALIFICATIONS ............................ 2

III.    DOCUMENTS REVIEWED .................................................................... 6

IV.     SUMMARY OF OPINIONS ..................................................................... 7

V.      PERSON OF SKILL IN THE ART ............................................................. 7

VI.     AUDIO SIGNATURES ........................................................................... 7

    A.     Background Information ............................................................... 7

    B.     Frequency-Domain Transforms ..................................................... 8

    C.     Signature Generation for Content Matching ...................................... 13

VII.    U.S. PATENT NO. 7,783,889 ............................................................... 16

    A.     Background of the '889 patent ....................................................... 16

    B.     Asserted Claims and their Meaning ................................................ 18

VIII.   TVISION'S USE OF PROCESSORS AND ACRCLOUD ................................. 19

    A.     Reference Fingerprints Background ................................................ 20

    B.     Device Fingerprints Background .................................................... 22

    C.     Decompilation of the ACRCloud FP Algorithm ................................. 26

    D.     Analysis of the ACRCloud FP Algorithm ........................................ 27

        1.     Obtaining Overlapping Frames of Media Samples .................... 29

        2.     Frequency Components ................................................... 31

        3.     Generating a Signature .................................................... 34

IX.     INFRINGEMENT OF THE ASSERTED CLAIMS ......................................... 36

        1.     Claim 1 ...................................................................... 37

        2.     Claim 2—"A method as defined in claim 1, further comprising identifying media information based on the first signature." ................. 63

        3.     Claim 4—"A method as defined in claim 2, wherein the media information is associated with at least one of audio information or video information." ................. 70

        4.     Claim 5—"A method as defined in claim 1, wherein the first descriptor is associated with only the first frame of media samples." ................. 71

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

5.      Claim 6—"A method as defined in claim 1, wherein the second descriptor is of the second frame of media samples." ............................ 72

6.      Claim 8 ................................................................................................ 73

7.      Claim 9—"An apparatus as defined in claim 8, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature." ........................ 81

8.      Claim 11—"An apparatus as defined in claim 8, wherein the first descriptor is associated with only the first frame of media samples." ............................................................................................... 82

9.      Claim 12—"An apparatus as defined in claim 8, wherein the instructions stored in the memory enable the processor system to: obtain a first plurality of media samples; and identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples." ............................................................................................... 83

10.     Claim 13—"An apparatus as defined in claim 8, wherein the third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples." ............................................................................................... 84

11.     Claim 14 .............................................................................................. 85

12.     Claim 15—"A tangible machine accessible medium as defined in claim 14, wherein the first descriptor is associated with only the first frame of media samples." ................................................................. 93

13.     Claim 16—"A tangible machine accessible medium as defined in claim 14 having instructions stored thereon that, when executed, cause the machine to: obtain a first plurality of media samples; and identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples." ............................................................. 94

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

14.    Claim 17—"A tangible machine accessible medium as defined in claim 14, wherein third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples." ........................................................... 95

X.    Alleged Alternatives ................................................................................ 97

    A.    Dat-Track ........................................................................................... 97

    B.    MRLMobile Research Labs (MRL).................................................... 98

    C.    Axwave ............................................................................................ 100

    D.    Summary .......................................................................................... 101

XI.    CONCLUSION ........................................................................................ 102

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

## I.      INTRODUCTION

1.      I, Pierre Moulin, submit this expert report on behalf of Plaintiff The Nielsen Company (US), LLC ("Nielsen"). I have been retained by Nielsen to provide expert opinions regarding U.S. Patent No. 7,783,889 ("the '889 patent"). In this report, I provide opinions concerning infringement of claims 1, 2, 4–6, 8, 9, and 11–17 of the '889 patent by Defendant TVision Insights, Inc. ("TVision").

2.      I am not an employee of Nielsen or any affiliate or subsidiary of Nielsen. Nor do I have a financial interest in Nielsen or the outcome of this case. I am being compensated for my work at ██████. My compensation is not dependent on the outcome of this case or on the content of my opinions.

3.      The bases for my opinions are discussed in detail below. If called to testify as an expert witness in this matter, I anticipate that my testimony may concern the matters addressed below. Additionally, I anticipate that I may comment on materials relating to these topics that may later become available, and I reserve the right to supplement or amend this report upon receipt of any new information made available to me, including documents yet to be produced or depositions yet to be taken. I also reserve the right to offer additional testimony in response to any matters raised by TVision or their experts, and/or in light of any relevant orders from the Court.

4.      In connection with my testimony, I may present visual aids and demonstrative exhibits that illustrate the analysis discussed in this report.

5.      Unless otherwise noted, the statements made in this Report are based on my personal knowledge and experience, and if called to testify about this Report, I could and would do so competently and truthfully.

**Ex. 7**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

64. Examples of discriminative signatures extracted from spatiotemporal audio representations are those that for each time segment describe a few key frequencies associated with audio tones.

65. Examples of computationally efficient signatures are those that are not computed from a large number of frames and frequency components.

66. I understand that the priority date of the '889 Patent is August 18, 2004. Prior to the priority date of the '889 Patent, people of skill in the art generated digital spectral signatures of audio or video content using operations based on complex spatiotemporal signatures. This includes signatures generated from LPC coefficients, Mel-frequency cepstral coefficients, spectral flatness measures, and ordered lists of indexes of spectral bands with prominent tones. P. Cano, E. Battle, T. Kalker and J. Haistma, "A Review of Algorithms for Audio Fingerprinting," Proceedings IEEE International Workshop on Multimedia Signal Processing, December 2002; V. Venkatachalam, L. Cazzanti, N. Dhillon, and M. Wells, "Automatic Identification of Sound Recordings," IEEE Signal Processing Magazine, pp. 92-99, March 2004. These methods rely heavily on interframe processing (*i.e.,* processing of data from multiple frames), which is more computationally complex relative to the intraframe methods (*i.e.,* processing of data from within an individual frame) disclosed in the '889 patent. *See* '889 Patent, 2:55-3:5.

67. There are several technical advantages to using the claimed approach. In particular, the claimed approach is more computationally efficient than the prior art *(i.e.,* the signatures are faster to compute and easier to implement in hardware and/or software). In addition, only a small number of frequency components need to be processed. This allows for a reduction (as compared to the prior art) in computational resources needed for signature generation. This is particularly important in solving the prior art technical problem for large-

17

**Ex. 7**

scale systems that a very large number of signatures must be generated and a very large amount of computational resources is needed.

68.     The claimed approach also provides the advantages of robustness and discriminativeness over the prior art as discussed above. Specifically, the claimed approach provides robustness because it is a sign-based approach based on comparisons of power levels, as explained above in Paragraph 63 And the claimed approach provides discriminativeness because signatures are derived from descriptors based on a few key frequencies, as explained above in Paragraph 64.

## B.  ASSERTED CLAIMS AND THEIR MEANING

69.     Nielsen is asserting claims 1, 2, 4–6, 8, 9, and 11–17 of the '889 patent ("the asserted claims") in this case.

70.     I understand from counsel that the Court has not yet issued a claim construction ruling in this case. I understand the proposed constructions for the various terms to be:

| Claim term | Nielsen's Proposed Construction | TVision's Proposed Construction |
|---|---|---|
| "frequency component" | Plain and ordinary meaning:<br><br>To the extent construction is necessary, Nielsen proposes the following construction:<br><br>Component of a signal generated by transforming the signal data from the time domain to the frequency domain. | Plain meaning, i.e., a single frequency or single band of frequencies. |
| "identify[ing] a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation | Plain and ordinary meaning: Generate first and second frequency components by performing a spectral transform operation on the first frame of media samples | This claim term requires selecting at least two frequency components to the exclusion of others; more than just "performing a spectral transform operation on the first frame of media samples" |

18

**Ex. 7**

# EXHIBIT 8



In the United States District Court for the District of Delaware

THE NIELSEN COMPANY (US), LLC

v.

TVISION INSIGHTS, INC.

CASE NO. 1:22-CV-00057-CJB

---

REBUTTAL EXPERT REPORT OF JOANNE JOHNSON

November 21, 2023

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



1.  FIRM BACKGROUND AND QUALIFICATIONS..................................................... 1

2.  ASSIGNMENT ........................................................................................ 2

3.  SUMMARY OF OPINIONS .......................................................................... 4

4.  RELEVANT PARTIES................................................................................ 6

    4.1  THE NIELSEN COMPANY ........................................................... 6
    4.2  TVISION INSIGHTS ................................................................... 10
    4.3  GRACENOTE ........................................................................... 11
    4.4  ACRCLOUD ............................................................................ 12
    4.5  VIDVITA ................................................................................ 15

5.  BACKGROUND AND INDUSTRY OVERVIEW ............................................... 16

    5.1  HISTORY OF AUDIENCE MEASUREMENT....................................... 16
    5.2  CURRENCY IN THE INDUSTRY .................................................... 17

6.  THE PATENT-IN-SUIT ............................................................................ 19

    6.1  OVERVIEW .............................................................................. 19
    6.2  BENEFITS OF THE '889 PATENT .................................................. 20

7.  RELEVANT PRODUCTS AND SYSTEMS ...................................................... 24

    7.1  TVISION'S ACCUSED PRODUCT ................................................. 24
    7.2  ███████ █████ ███████ ███████████ █████ ██████ ██████ ............ 28

8.  TIMELINE OF EVENTS ............................................................................ 30

9.  REASONABLE ROYALTY COMPENSATION .................................................. 31

10. HYPOTHETICAL NEGOTIATION PARAMETERS ........................................... 31

    10.1  HYPOTHETICAL NEGOTIATION DATE ........................................ 31
    10.2  PARTIES TO THE NEGOTIATION ............................................... 32
    10.3  HYPOTHETICAL V. REAL WORLD NEGOTIATIONS.......................... 32
    10.4  NATURE OF RIGHTS BEING LICENSED ....................................... 32

11. COMPENSATION PERIOD AND ROYALTY STRUCTURE ................................. 32

    11.1  COMPENSATION PERIOD ........................................................ 32
    11.2  ROYALTY STRUCTURE ........................................................... 33

12. REASONABLE ROYALTY DETERMINATION – *GEORGIA-PACIFIC* ANALYSIS ............... 34

13. REASONABLE ROYALTY CONCLUSION ...................................................... 82

14. ADDITIONAL CRITIQUE OF THE KEELEY REPORT ...................................... 84

    14.1  DR. KEELEY FAILS TO SUPPORT ███████ ███████ ████ ██████ ....... 86
    14.2  DR. KEELEY FAILS TO PROPERLY ANALYZE NON-INFRINGING ALTERNATIVES........................... 87
    14.3  DR. KEELEY OVERSTATES THE BENEFITS OF THE '889 PATENT ......... 98
    14.4  DR. KEELEY INAPPROPRIATELY INVOKES EMVR AND FAILS TO APPORTION .............................. 99
    14.5  DR. KEELEY'S REASONABLE ROYALTY FRAMEWORK IS FUNDAMENTALLY FLAWED.................... 101
    14.6  DR. KEELEY FAILS TO PROVIDE SUPPORT FOR UPFRONT LUMP SUM ROYALTY STRUCTURE BASED ON FUTURE REVENUE .......................... 101
    14.7  DR. KEELEY RELIES ON AN UNSUBSTANTIATED FORECAST........................ 103
    14.8  DR. KEELEY'S QUANTIFICATION OF THE REASONABLE ROYALTY IS NOT RELIABLE ................... 104
    14.9  DR. KEELEY IMPROPERLY RELIES ON THE 50% NASH BARGAINING RULE OF THUMB ................ 108

15. PREJUDGMENT INTEREST ...................................................................... 110

16. SIGNATURE ........................................................................................ 110

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



## 1.    FIRM BACKGROUND AND QUALIFICATIONS

1.    My name is Joanne Johnson, and I am a Managing Director of Ocean Tomo, LLC ("Ocean Tomo"), a part of J.S. Held.  Ocean Tomo provides Financial Expert, Management Consulting, and Advisory services related to intellectual property (IP) and other intangible assets; corporate accounting investigations; regulatory and reporting obligations; solvency and restructuring; and contractual or competition disputes.  Practice offerings address economic damage calculations and testimony; accounting investigations and financial forensics; technology and intangible asset valuation; strategy and risk management consulting; mergers and acquisitions; debt and equity private placement; and IP brokerage.  With more than 100 offices globally, J.S. Held assists clients – corporations, insurers, law firms, governments, and institutional investors – on complex technical, scientific, and financial matters across all assets and value at risk.

2.    I work in Ocean Tomo's Intellectual Property Disputes Financial Expert Testimony practice.  My efforts at Ocean Tomo are concentrated on quantifying economic damages arising from intellectual property disputes.   I have consulted on various engagements involving the determination of economic damages for patent, trademark, and trade dress infringement as well as trade secret misappropriation and breach of contract matters.  While specific issues vary by engagement, my work has included evaluation and analysis of financial and business data for the quantification of lost profits, reasonable royalties, price erosion, unjust enrichment, and corrective advertising.   Additionally, I have assessed the commercial success of patented products and the economic criteria necessary for preliminary and permanent injunctions.  Outside of a litigation context, I have experience with intellectual property valuation and have provided analytical support to clients engaged in licensing negotiations.

3.    My experience spans several industries including industrial products, recreational boating, travel services, pharmaceuticals, consumer products, internet/ecommerce, consumer electronics, smartphones, entertainment, personal care products and packaging, clothing, software, lighting products, automotive products, medical devices, semiconductors, and carpeting products, among others.

4.    I hold dual Bachelor of Science degrees in Accountancy and Finance from the College of Business at the University of Illinois, Urbana-Champaign, both earned with High Honors.  I am a registered Certified Public Accountant (CPA) in the State of Illinois and a Certified Licensing Professional. The CPA designation is a third-party endorsement of a professional's accounting competency and expertise. The CPA license is provided by the Board of Accountancy for each state with the American Institute of Certified Public Accountants (AICPA) providing resources on obtaining the license. The CLP program is a professional designation that provides a third-party endorsement of a licensing professional's demonstrated experience and qualifications as well as the proficiency, knowledge, and exposure to licensing and commercialization of IP through active involvement of IP law and valuation, among other focus areas. The program was started as an initiative of The Licensing Executive Society, LES, (USA and Canada) and is now managed by a separately incorporated entity, Certified Licensing Professionals, Inc. (CLP, Inc.). I am also a member of AICPA, a professional organization for CPAs in the U.S, which provides its members technical insights and continuing professional education (CPE) to maintain their competency and skill sets as professional service providers.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



5.    Ocean Tomo is presently being compensated for my work in this matter at a rate of $530 per hour.  Other Ocean Tomo consultants are assisting me in this engagement and with rates under $530 per hour. No part of my compensation depends on the outcome of this litigation.

## 2.    ASSIGNMENT

6.    I was retained by Rimon Law ("Counsel"), counsel for defendant, TVision Insights, Inc. ("TVision" or "Defendant"), in connection with this matter.  I was asked to analyze certain accounting, financial, marketing, and other business data in order to identify the compensation that would be appropriate for The Nielsen Company (US), LLC ("Nielsen" or "Plaintiff") to receive in the event that one or more of the asserted claims of U.S. Patent No. 7,783,889 are found to be valid and infringed by the Defendant.  I was also asked to review and assess the Expert Report of Michael C. Keeley, dated October 25, 2023 ("Keeley Report").

7.    In order to accurately assess any damages that may be recoverable if liability is found, I have relied upon the following types of documents and information.  A detailed listing of all the information considered in connection with this litigation is attached as Exhibit 2.

- Legal filings and proceedings related to the case;

- U.S. Patent No. 7,783,889 ("the '889 Patent");

- Documents produced by Nielsen and TVision relating to damages, including but not limited to, financial records, license agreements, marketing and promotional materials, and various written communications;

- Deposition testimony of the following Nielsen representatives:

    - Daniel Nelson, Principal Architect of TV Measurement Back Office at Nielsen[1]

    - Ken Contrata, Associate General Counsel, M&A at Nielsen[2]

- Deposition testimony of the following TVision representatives:

    - Mark Green, Chief Strategy Officer at TVision, former SVP at Nielsen[3]

    - Shlomo Neumann, VP of Finance at TVision[4]

    - Yan Liu, CEO and Co-Founder of TVision[5]

---

[1] Deposition of Daniel Nelson, September 8, 2023, p. 23.
[2] Deposition of Ken Contrata, September 12, 2023, pp. 7, 14-15.
[3] Deposition of Mark Green, August 3, 2023, pp. 47-48, 69.
[4] Deposition of Shlomo Neumann, August 30, 2023, p. 10.
[5] Deposition of Yan Liu, August 29, 2023, p. 13.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

- – Daniel Schiffman, former Chief Revenue Officer of TVision[6]

- – Inderbir Sidhu, Chief Technology Officer at TVision[7]

- – Tristan Webster, SVP of Product & Operations at TVision[8]

- ▪ Deposition testimony of third-party representatives:

  - – Chengcheng Jia, former Computer Vision Engineer at TVision[9]

  - – Amy Bolivar, CEO and Founder of VidVita[10]

- ▪ Information prepared and produced by other experts:

  - – Expert Report of Michael C. Keeley, Ph.D., October 25, 2023

  - – Opening Expert Report of Pierre Moulin, October 25, 2023

  - – Opening Expert Report of Vinayak Tanksale, October 25, 2023

  - – Opening Expert Report of Dr. David Anderson Regarding Invalidity of U.S. Patent No. 7,783,889, October 25, 2023 ("Anderson Invalidity Report")

  - – Rebuttal Expert Report of Dr. David Anderson Regarding U.S. Patent No. 7,783,889, November 21, 2023 ("Anderson Non-Infringement Report")

- ▪ Interviews with the following individuals:

  - – Yan Liu, CEO and Founder of TVision

  - – Inderbir Sidhu, Chief Technology Officer at TVision

  - – Dr. David Anderson, Professor at Georgia Institute of Technology, School of Electrical and Computer Engineering[11]

- ▪ Publicly available information including, but not limited to, company websites, industry and technology research, and relevant product websites.

8. In connection with my work in this matter, I have assumed that the Patent-in-Suit is valid, enforceable and infringed. That assumption is made exclusively for the purpose of calculating potential damages in this matter and in no way represents a conclusion that I have reached or

---

[6] Deposition of Daniel Schiffman, September 8, 2023, p. 10.
[7] Deposition of Inderbir Sidhu, August 31, 2023, p. 164.
[8] Deposition of Tristan Webster, September 13, 2023, pp. 13-14.
[9] Deposition of Chengcheng Jia, May 30, 2023, p. 22; TVSN_NLSN_00140650-651.
[10] Deposition of Amy Bolivar, September 15, 2023, p. 11.
[11] Anderson Invalidity Report, ¶ 1.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



the position of the Defendant or Counsel. References to documents and testimony herein are meant to provide examples of supporting information but are not intended to be a comprehensive or exhaustive list of all known support.  In addition to this report, I may rely on excerpts taken from depositions and/or demonstrative exhibits that illustrate the concepts and conclusions contained in this report. Such excerpts and/or demonstratives have not yet been prepared.

9.  The opinions discussed throughout this report are based on my current understanding of the facts and circumstances surrounding this matter, my review of the produced documentation, testimony, third party information available to date and any underlying assumptions upon which I have relied.  As such, the analyses and opinions described herein are subject to change based upon additional discovery or any other relevant development.  I reserve the right to submit a supplemental report if both necessary and allowed by the Court.

## 3.  SUMMARY OF OPINIONS

10.



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Case 1:22-cv-00057-CJB    Document 389    Filed 01/12/26    Page 298 of 597 PageID #:
11411

Case 1:22-cv-00057-CJB    Document 389    Filed 01/12/26    Page 299 of 597 PageID #:
11412



312. I note that on appeal, the parties did not dispute the District Court's decision to grant Baxalta's Daubert motion against Dr. Addanki regarding his improper 50/50 split based on the Nash Bargaining Solution.[562]

313. I am also aware of a Daubert motion against Dr. Keeley in *Fate Therapeutics, Inc. et al v. Shoreline Biosciences, Inc.* where Shoreline argued that Dr. Keeley assumed the parties would begin at a "50/50 split using Nash Bargaining without an adequate basis [...] which is impermissible 'without sufficiently establishing that the premises of the theorem actually apply to the facts of the case at hand'" (citing *VirnetX, Inc. v. Cisco Sys., Inc*).[563] While the court denied this motion as moot in light of granting Shoreline's motion for summary judgement of non-infringement[564], this indicates that Dr. Keeley has applied the same methodology indiscriminately, regardless of the specifics of the case.

## 15.  PREJUDGMENT INTEREST

314. From an economic analysis standpoint, a time-value-of-money award would be necessary to compensate Plaintiff for the loss of use of funds during the damages period.  However, I understand that an award of prejudgment interest is a legal matter and that the Court has substantial discretion in determining the interest rate and compounding method to be awarded. I have not prepared any prejudgment interest calculations as of this date, but am prepared to do so if requested by the Court.

## 16.  SIGNATURE

315. I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,

Joanne Johnson                                                  November 21, 2023

Joanne Johnson                                                  Date

---

[562] *Bayer Healthcare LLC v. Baxalta Inc.*, 989 F.3d 964, 972, 983-85 (Fed. Cir. 2021).

[563] Shoreline Biosciences, Inc.'s Memorandum of Points and Authorities in Support of Motion to Exclude Damages Opinions of Michael C. Keeley, *Fate Therapeutics, Inc. et al v. Shoreline Biosciences, Inc.*, No. 22-cv-000676-H-MSB (S.D. Cal. Jul. 14, 2023).

[564] Order Granting Defendant's Motion for Summary Judgement; and Denying Plaintiffs' Motion for Partial Summary Judgement as Moot, *Fate Therapeutics, Inc. et al v. Shoreline Biosciences, Inc.*, No. 22-cv-000676-H-MSB (S.D. Cal. Aug. 30, 2023).

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Exhibit 1.0

# JOANNE JOHNSON



MANAGING  DIRECTOR *and* TESTIFYING EXPERT



### KEY EXPERTISE

- Intellectual Property Damages Analysis
- Expert Testimony in Federal Court
- 15 Years IP Experience

### EDUCATION

B.S. Accountancy
University of Illinois
College  of Business

B.S. Finance
University of Illinois
College  of Business

### CREDENTIALS

Certified Public Accountant (CPA)
in the State of Illinois
License No. 239.023218

Certified Licensing
Professional (CLP)
Certification Number 3176

### CONTACT

Joanne Johnson
+1 312 327 8161
joanne.johnson@jsheld.com

Ocean Tomo, LLC
200 West Madison Street
Suite 1020
Chicago, IL 60606

## PROFESSIONAL  SUMMARY

Joanne Johnson is a Managing Director and Testifying Expert of Ocean Tomo, LLC, a part of J.S. Held. Ocean Tomo provides Financial Expert, Management Consulting, and Advisory services related to intellectual property (IP) and other intangible assets; corporate accounting investigations; regulatory and reporting obligations; solvency and restructuring; and contractual or competition disputes. Practice offerings address economic damage calculations and testimony; accounting investigations and financial forensics; technology and intangible asset valuation; strategy and risk management consulting; mergers and acquisitions; debt and equity private placement; and IP brokerage. With more than 100 offices globally, J.S. Held assists clients – corporations, insurers, law firms, governments, and institutional investors – on complex technical, scientific, and financial matters across all assets and value at risk.

Ms. Johnson has fifteen years of professional experience in quantifying economic damages arising from intellectual property disputes and providing general litigation support. Ms. Johnson has provided expert testimony and consulted on various engagements involving the determination of economic damages for patent, trademark, and trade dress infringement as well as trade secret misappropriation and breach of contract matters.  While specific issues vary by engagement, her work has included evaluation and analysis of financial and business data for the quantification of lost profits, reasonable royalties, price erosion, unjust enrichment, and corrective advertising. Additionally, Ms. Johnson has assessed the commercial success of patented products and the economic criteria necessary for preliminary and permanent injunctions. She has supported counsel in all phases of the litigation process from discovery to trial, and her experience spans several industries including industrial products, recreational boating, travel services, pharmaceuticals, consumer products, internet/ecommerce, consumer electronics, smartphones, entertainment, personal care products and packaging, clothing, software, lighting products, automotive products, medical devices, semiconductors, and carpeting products, among others.

Outside of the litigation context, Ms. Johnson has also assisted clients engaged in licensing negotiations. In this role, she has recommended licensing structures and royalty rates, prepared valuations, and researched comparable licenses.

Ms. Johnson holds dual Bachelor of Science degrees in Accountancy and Finance from the College of Business at the University of Illinois, Urbana-Champaign, both earned with High Honors. She is a registered Certified Public Accountant (CPA) in the State of Illinois and a Certified Licensing Professional.

## EXPERIENCE

Managing Director, Financial Expert Practice, Ocean Tomo, LLC (July 2023 – Present)
Senior Director, Financial Expert Practice, Ocean Tomo, LLC (January 2022 – June 2023)
Director, Expert Testimony Practice, Ocean Tomo, LLC (January 2015 – December 2021)
Associate, Expert Testimony Practice, Ocean Tomo, LLC (January 2011 – December 2014)
Analyst, Expert Testimony Practice, Ocean Tomo, LLC (July 2008 – December 2010)

## PUBLICATIONS & PRESENTATIONS

- "*Personal Audio, LLC. v. Apple, Inc.* - Lump Sum Damages Award Applies to Accused Products Not Tried by the Jury," *Licensing Executives Society*, 2011. Co-authored with Michael K. Milani.
- "Valuing Trade Secrets Under the Defend Trade Secrets Act," *2017 AIPLA Trade Secret Law Summit*, March 2-3, 2017. Co-authored with Michael K. Milani.
- "Evaluating Royalty Analysis Admissibility in Patent Cases," *IP Law360,* February 14, 2023. Co-authored with Sherry Zhang and Sarah Zhu.
- "Case Law on the Role of Non-Infringing Alternatives Under a Reasonable Royalty Analysis versus a Lost Profits Analysis," *Ocean Tomo Insights,* March 20, 2023. Co-authored with Sherry Zhang and Sarah Zhu.
- "Calculating Patent Damages: Key Developments and Notable Cases Explored," *The Knowledge Group,* April 13, 2023.

Exhibit 1.0

# JOANNE JOHNSON



MANAGING DIRECTOR *and* TESTIFYING EXPERT

## EXPERT TESTIMONY *and* CONSULTING

**Yellowfin Yachts, Inc. v. Barker Boatworks, LLC and Kevin Barker**
Case No. 8:15-cv-00990-SDM-TGW; Filed 04/25/2015
United States District Court, Middle District of Florida
On Behalf of Defendants
Expert Report, Deposition Testimony
Primary Actions: Trade Dress Infringement, Trade Secret Misappropriation

**V-Cole Enterprises, Inc., d/b/a Super Holiday Tours, v. UR Tours & Events, Inc., Livy I. Roche, and Jeffrey J. Lepera**
Case No. 2015-ca-4730-o; Filed 05/21/2015
Circuit Court of the Ninth Judicial Circuit, Orange County, Florida
On Behalf of Plaintiff
Expert Report
Primary Actions: Trade Secret Misappropriation, Breach of Fiduciary Duty

**Ocean Tomo, LLC v. Jonathan Barney and PatentRatings, LLC**
Case No. 12-cv-08450; Filed 07/10/2015
United States District Court, Northern District of Illinois
On Behalf of Plaintiff
Expert Report, Trial Testimony
Primary Action: Royalty Audit

**Repeat Precision, LLC v. DynaEnergetics Europe GmbH & DynaEnergetics US, Inc.**
Case No. 6:21-CV-00104-ADA; Filed 01/20/2020
United States District Court, Western District of Texas, Waco Division
On Behalf of Defendants
Expert Report, Deposition Testimony, Trial Testimony
Primary Actions: Patent Infringement, Permanent Injunction

**LKQ Corporation and Keystone Automotive Industries, Inc., v. General Motors Company, et al.**
Case No. 1:20-cv-2753; Filed 05/06/2020
United States District Court, Northern District of Illinois
On Behalf of DJ Plaintiff
Consulting
Primary Action: Design Patent Infringement

**LKQ Corporation and Keystone Automotive Industries, Inc., v. General Motors Company, et al.**
Case No. 1:21-cv-05854; Filed 11/02/2021
United States District Court, Northern District of Illinois
On Behalf of DJ Plaintiff
Consulting
Primary Action: Design Patent Infringement

**Shibumi Shade, Inc., v. NB Shades, LLC**
Case No. 3:22-cv-00351-BJD-LLL; Filed 03/25/2022
United States District Court, Middle District of Florida, Jacksonville Division
On Behalf of Plaintiff
Consulting
Primary Action: Trade Dress Infringement

**ATLeisure, LLC v. Lowe's Home Centers, LLC**
Case No. 6:22-cv-686-WWB-GJK; Filed 04/08/2022
United States District Court, Middle District of Florida, Orlando Division
On Behalf of Plaintiff
Consulting
Primary Action: Patent Infringement

Exhibit 1.0

# JOANNE JOHNSON



## MANAGING DIRECTOR *and* TESTIFYING EXPERT

**Ball Metal Beverage Container Corp. v. Crown Packaging Technology, Inc.**
Case 3:12-cv-0033-WHR; Filed 02/01/2012
United States District Court, Southern District of Ohio
On Behalf of DJ Plaintiff
Expert Reports
Primary Actions: Patent Infringement, Commercial Success

**Bridgestone Americas Tire Operations, LLC v. Speedways Rubber Co Limited, et al.**
Case No. 3:12-cv-0033-WHR; Filed 02/25/2022
United States District Court, Northern District of Texas, Fort Worth Division
On Behalf of Plaintiff
Expert Report
Primary Actions: Patent Infringement

**Cutting Edge Vision, LLC, v. TCL Technology Group Corporation, et al.**
Case No. 6:22-cv-285; Filed 03/16/2022
United States District Court, Western District of Texas, Waco Division
On Behalf of Defendants
Consulting
Primary Action: Patent Infringement

**The Nielsen Company (US), LLC, v. TVision Insights, Inc.**
Case No. 1:22-cv-00057; Filed 01/14/2022
United States District Court, District of Delaware
On Behalf of Defendant
Consulting
Primary Action: Patent Infringement

**The Nielsen Company (US), LLC, v. TVision Insights, Inc.**
Case No. 1:22-cv-01345; Filed 10/12/2022
United States District Court, District of Delaware
On Behalf of Defendant
Consulting
Primary Action: Patent Infringement

## ENGAGEMENTS ASSISTING OTHER OCEAN TOMO EXPERTS

**Zenith Electronics LLC v. Vizio, Inc., Westinghouse Digital Electronics LLC, et al.**
Case No. 5:06-cv-246-DF; Filed 10/30/2006
United States District Court, Eastern District of Texas, Texarkana Division
On Behalf of Plaintiff
Primary Action: Patent Infringement

**Crane Co., and Dixie-Narco, Inc. v. SandenVendo America, Inc. and Royal Vendors, Inc.**
Case No. 2:07-cv-00042-CE; Filed 02/06/2007
United States District Court, Eastern District of Texas, Marshall Division On Behalf of Defendants
Primary Action: Patent Infringement

**The Spoilage Cutter Company Incorporated d/b/a Martor USA v. World Kitchen, LLC**
Case No. 08-cv-01263; Filed 03/03/2008
United States District Court, Northern District of Illinois
On Behalf of Defendant
Primary Actions: Patent Infringement, Breach of Contract

**In Re Gabapentin Patent Litigation**
MDL Docket No. 1384 (FSH)
Master Case No. 2:00-cv-02931-FSH; Filed 06/15/2000
United States District Court, District of New Jersey
On Behalf of Defendants Teva Pharmaceutical Industries Ltd., IVAX Corporation and related parties
Primary Action: Patent Infringement

Exhibit 16

# JOANNE JOHNSON



### MANAGING DIRECTOR *and* TESTIFYING EXPERT

***Lighting Ballast Control LLC. v. Universal Lighting Technologies, Inc.***
Case No. 7:09-cv-00029-O; Filed 02/24/2009
United States District Court, Northern District of Texas, Wichita Falls Division
On Behalf of Defendant
Primary Action: Patent Infringement

***Inter-Ego Systems, Inc. d/b/a Pinnacle Speakers v. DBL Distributing LLC***
AAA Case Number: 50 133T00316 06
American Arbitration Association
On Behalf of Plaintiff
Primary Actions: Breach of Contract, Copyright Infringement, Trade Dress

***Pacific Bioscience Laboratories, Inc. v. Nutra Luxe MD, LLC, Nutra Botanical MD, Inc.***
Case No. 2:10-cv-00230-JLR; Filed 02/08/2010
United States District Court, Western District of Washington, Seattle
On Behalf of Defendants
Primary Actions: Patent Infringement, False Advertising, Trade Dress Infringement

***Kruse Technology Partnership v. Daimler AG, Mercedes-Benz USA, LLC, Volkswagen AG, Volkswagen Group of America, Inc., d/b/a Audi of America, Inc., et al.***
Case No. 8:10-cv-01066-JVS –RNB; Filed 07/04/2010
United States District Court, Central District of California
On Behalf of Plaintiff
Primary Actions: Patent Infringement

***Medgraph, Inc. v. Medtronic, Inc.***
Case No. 6:09-cv-06610-DGL-MWP; Filed 12/02/2009
United States District Court, Western District of New York, Rochester Division
On Behalf of Defendant
Primary Action: Patent Infringement

***Fortune Dynamic, Inc. v. Victoria's Secret Stores Brand Management, Inc.***
Case No. 2:07-cv-02962-R-JTL; Filed 05/04/2007
United States District Court, Central District of California
On Behalf of Defendant
Primary Action: Trademark Infringement

***iHance, Inc. v. Eloqua Limited and Eloqua Corporation***
Case No. 2:11-cv-257-MSD-TEM; Filed 05/09/2011
United States District Court, Eastern District of Virginia, Norfolk Division
On Behalf of Defendants
Primary Action: Patent Infringement

***Knowles Electronics, LLC v. Analog Devices, Inc.***
Case No. 1:11-cv-06804; Filed 09/27/2011
United States District Court, Northern District of Illinois, Eastern Division On Behalf of Plaintiff
Primary Action: Patent Infringement

***Rosetta Stone Ltd. v. Google Inc.***
Case No. 1:09-cv-00736-GBL-TCB; Filed 07/10/2009
United States District Court, Eastern District of Virginia, Alexandria Division
On Behalf of Plaintiff
Primary Action: Trademark Infringement, Corrective Advertising

***Smartphone Technologies LLC., v. LG Electronics, Inc., LG Electronics USA, Inc. et al.***
Case No. 6:10-cv-00074-LED-JDL; Filed 03/03/2010
United States District Court, Eastern District of Texas, Tyler Division
On Behalf of Defendants
Primary Action: Patent Infringement

***Bath & Body Works Brand Management, Inc. v. Summit Entertainment, LLC***
Case No. 1:11-cv-01594-GBD; Filed 03/08/2011
United States District Court, Southern District of New York

Exhibit 1.0

# JOANNE JOHNSON



## MANAGING DIRECTOR *and* TESTIFYING EXPERT

On Behalf of Plaintiff
Primary Action: Trademark Infringement

**Altana Pharma AG and Wyeth v. Teva Pharmaceuticals USA, Inc. and Teva Pharmaceuticals Industries Ltd., et. al.**
Case No. 2:04-cv-02355-JLL-CCC; Filed 05/20/2004
United States District Court, District of New Jersey
On Behalf of Defendants
Primary Action: Patent Infringement

**Interface, Inc.; Interface Americas, Inc.; InterfaceFLOR LLC; and FLOR, Inc. v. Tandus Flooring, Inc. and Tandus Flooring US, LLC.**
Case No. 4:13-cv-00046-WSD; Filed 02/26/2013
United States District Court, Northern District of Georgia, Rome Division
On Behalf of Defendants
Primary Action: Patent Infringement, Preliminary Injunction

**Stonefire Grill, Inc., v. FGF Brands, Inc., a Canadian corporation d/b/a Stonefire Authentic Flatbreads**
Case No. 2:11-cv-08292-JGB-PJW; Filed 10/06/2011
United States District Court, Central District of California, Western Division
On Behalf of Defendant
Primary Action: Trademark Infringement

**Motorola Mobility, Inc. v. Apple, Inc. Apple, Inc. v. Motorola Mobility, Inc.**
Case Nos. 10-cv-23580-RNS-TEB; 12-cv-20271-RNS-TEB
Filed 10/06/2010; 01/24/2012
United States District Court, Southern District of Florida
On Behalf of Apple, Inc.
Primary Action: Patent Infringement

**ROY-G-BIV Corporation v. ABB Ltd., ABB Inc., MeadWestvaco Texas, LP, and MeadWestvaco Corp.**
Case No. 6:11-cv-00622-LED; Filed 11/15/2011
United States District Court, Eastern District of Texas, Tyler Division
On Behalf of Defendants
Primary Action: Patent Infringement

**Robertson Transformer Co. d/b/a Robertson Worldwide v. General Electric Company, GE Lighting LLC, H.B. Etlin Company, Ltd. a/k/a Etlin-Daniels, ARN Industries, Inc. d/b/a Halco Lighting Technologies, Hatch Transformers, Inc., Howard Industries Inc., and Keystone Technologies, LLC, and Super X Manufacturing Ltd. (Intervenor).**
Case No. 1:12-cv-080904; Filed 10/10/2012
United States District Court, Northern District of Illinois, Eastern Division
On Behalf of Plaintiff
Primary Action: Patent Infringement

**Power Survey, LLC v. Premier Utility Services, LLC, and L-3 Communications Holdings, Inc. d/b/a/ Narda Safety Test Solutions**
Case No. 2:13-cv-05670-FSH-MAH; Filed 09/23/2013
United States District Court, District of New Jersey On Behalf of Plaintiff
Primary Action: Patent Infringement, Preliminary Injunction

**L-3 Communications Holdings, Inc. and Premier Utility Services, LLC v. Patents of Power Survey, LLC**
U.S. Patent and Trademark Office, Patent Trial and Appeal Board
Case Nos. IPR2014-00274, IPR2014-0085, and IPR00864; Filed 05/30/2014
On Behalf of Patent Owner
Primary Action: Inter Partes Reexamination, Commercial Success

**Koninklijke Philips N.V., v. Hunt Control Systems, Inc., d/b/a Caribe Corporation**
Case No. 2:11-cv-03684-DMC-JBC; Filed 06/27/2011
United States District Court, District of New Jersey
On Behalf of Defendant
Primary Action: Trademark Infringement

Exhibit 1.0

# JOANNE JOHNSON



## MANAGING DIRECTOR *and* TESTIFYING EXPERT

***Garmin International, Inc. v. PhatRat Technology, LLC***
JAMS Arbitration Case No. 1240021597; Filed 01/08/2014
Place of Arbitration: San Diego, California
On Behalf of Defendant
Primary Action: Breach of Contract (Licensing Dispute)


***Quest Integrity USA, LLC v. A. Hak Industrial Services US, LLC***
Case No. 2:14-cv-01971-RAJ; Filed 12/15/2014
United States District Court, Western District of Washington at Seattle
On Behalf of Plaintiff
Primary Action: Preliminary Injunction


***Quest Integrity USA, LLC v. Cokebusters USA Inc.***
Case No. 1:14-cv-01483-SLR; Filed 12/15/2014
United States District Court, District of Delaware
On Behalf of Plaintiff
Primary Action: Preliminary Injunction


***Quest Integrity USA, LLC v. Clean Harbors Industrial Services, Inc.***
Case No. 1:14-cv-01482-SLR; Filed 12/15/2014
United States District Court, District of Delaware
On Behalf of Plaintiff
Primary Action: Preliminary Injunction


***Viva Healthcare Packaging LTD., Viva Healthcare Packaging (HK) LTD., and Viva Healthcare Packaging (USA) Inc. v. CTL Packaging USA, Inc. and Tuboplast Hispania***
Case No. 3:13-cv-00569-MOC-DSC; Filed 05/10/2013
United States District Court, Western District of North Carolina
On Behalf of Defendants
Primary Action: Patent Infringement


***Gilead Sciences, Inc. v. Merck & Co., Inc., Merck Sharp & Dohme Corp., and ISIS Pharmaceuticals, Inc.***
Case No. 5:13-cv-04057-BLF; Filed 08/30/2013
United States District Court, Northern District of California, San Jose Division.
On Behalf of Defendants
Primary Action: Patent Infringement


***Idenix Pharmaceuticals, Inc., Universita Degli Studi Di Cagliari, Centre National De La Recherche Scientifique, and L' Université Montpellier II v. Gilead Sciences, Inc. and Gilead Pharmasset LLC***
Case No. 13-cv-01987-LPS; Filed 12/01/2013
United States District Court, District of Delaware
On Behalf of Plaintiff
Primary Action: Patent Infringement


***Idenix Pharmaceuticals, Inc., and Universita Degli Studi Di Cagliari v. Gilead Sciences, Inc.***
Case No.14-cv-00846-LPS; Filed 12/01/2013
United States District Court, District of Massachusetts On Behalf of Plaintiff
Primary Action: Patent Infringement


***Realtime Data LLC d/b/a IXO, v Riverbed Technology, Inc. and Dell, Inc.***
Case No. 6:15-CV-463-RWS-JDL; Filed 05/08/2015
United States District Court, Eastern District of Texas On Behalf of Defendant Riverbed
Primary Action: Patent Infringement


***Siemens Industry, Inc., v. Westinghouse Air Brake Technologies Corporation (d/b/a Wabtec Corporation) and Wabtec Railway Electronics, Inc.***
Case 1:16-cv-00284-LPS; Filed 04/21/2016
United States District Court, District of Delaware
On Behalf of Plaintiff
Primary Action: Patent Infringement

Exhibit 1.0

# JOANNE JOHNSON



A PART OF JS|HELD

## MANAGING DIRECTOR *and* TESTIFYING EXPERT

**PPS Data, LLC v. Jack Henry & Associates, Inc.**
Case No. 2:18-cv-00007; Filed 01/10/2018
United States District Court, Eastern District of Texas
On Behalf of Defendant
Primary Action: Patent Infringement

**Westinghouse Air Brake Technologies Corporation (d/b/a WABTEC Corporation) v. Siemens Mobility, Inc.**
Case No. 1:17-cv-01687; Filed 09/08/2017
United States District Court, District of Delaware
On Behalf of Defendant
Primary Action: Patent Infringement

**Match Group, LLC v. Bumble Trading Inc. et al.**
Civil Action 6:18-cv-00080; Filed 03/16/2018
United States District Court, Western District of Texas Waco Division
On Behalf of Plaintiff
Primary Action: Patent Infringement

**Razor USA LLC and Shane Chen v. DGL Group, LTD.,**
Civil Action 2:19-cv-12939; Filed 05/24/2019
United States District Court, District of Delaware
On Behalf of Defendant
Primary Action: Patent Infringement

**First Quality Tissue, LLC v. Irving Consumer Products Limited and Irving Consumer Products, Inc.**
Civil Action 1:19-cv-00428; Filed 03/01/2019
United States District Court, District of Delaware
On Behalf of Defendants
Primary Action: Patent Infringement

**Loma Linda University v. Smarter Alloys, Inc.**
Civil Action 1:19-cv-00607; Filed 05/10/2019
United States District Court, Western District of New York
On Behalf of Plaintiff
Primary Action: Breach of Contract

**DynaEnergetics Europe GmbH and DynaEnergetics US, Inc. v. Hunting Titan, Inc.**
Civil Action 4:20-cv-02123; Filed 6/17/2020
United States District Court, Southern District of Texas
On Behalf of Plaintiffs
Primary Action: Patent Infringement

**Hy-Ko Products Company LLC v. The Hillman Group, Inc.**
Civil Action 2:21-cv-00197-JRG; Filed 6/01/2021
United States District Court, Eastern District of Texas Marshall Division
On Behalf of Plaintiff
Primary Actions: Patent Infringement and Lanham Act Claims

**Bluebonnet Internet Media Services, LLC, v. Pandora Media LLC**
Civil Action 3:21-cv-08294; Filed 08/12/2020
United States District Court, Northern District of California
On Behalf of Plaintiff
Primary Action: Patent Infringement

J.S. Held, its affiliates and subsidiaries are not certified public accounting firm(s) and do not provide audit, attest, or any other public accounting services. J.S. Held, its affiliates and subsidiaries are not law firms and do not provide legal advice. Securities offered through our affiliate, Ocean Tomo Investment Group, LLC, member FINRA/SIPC. All rights reserved.

*The Nielsen Company (US), LLC v. TVision Insights, Inc.*
**DOCUMENTS CONSIDERED**
Exhibit 2.0

| Beginning Bates | | Ending Bates | Beginning Bates | | Ending Bates | Beginning Bates | | Ending Bates |
|---|---|---|---|---|---|---|---|---|
| NLSN_TVISION0024151 | – | NLSN_TVISION0024173 | NLSN_TVISION0245677 | – | NLSN_TVISION0245690 | NLSN_TVISION0252977 | – | NLSN_TVISION0253036 |
| NLSN_TVISION0048142 | – | NLSN_TVISION0048144 | NLSN_TVISION0245691 | – | NLSN_TVISION0245727 | NLSN_TVISION0253037 | – | NLSN_TVISION0253093 |
| NLSN_TVISION0076789 | – | NLSN_TVISION0076805 | NLSN_TVISION0245728 | – | NLSN_TVISION0245834 | NLSN_TVISION0253094 | – | NLSN_TVISION0253218 |
| NLSN_TVISION0076943 | – | NLSN_TVISION0076953 | NLSN_TVISION0245728 | – | NLSN_TVISION0245842 | NLSN_TVISION0253219 | – | NLSN_TVISION0253258 |
| NLSN_TVISION0078428 | – | NLSN_TVISION0078470 | NLSN_TVISION0245945 | – | NLSN_TVISION0246057 | NLSN_TVISION0253259 | – | NLSN_TVISION0253272 |
| NLSN_TVISION0078572 | – | NLSN_TVISION0078585 | NLSN_TVISION0246058 | – | NLSN_TVISION0246294 | NLSN_TVISION0253273 | – | NLSN_TVISION0253765 |
| NLSN_TVISION0078713 | – | NLSN_TVISION0078713 | NLSN_TVISION0246295 | – | NLSN_TVISION0246491 | NLSN_TVISION0253766 | – | NLSN_TVISION0253773 |
| NLSN_TVISION0078730 | – | NLSN_TVISION0078735 | NLSN_TVISION0246500 | – | NLSN_TVISION0246561 | NLSN_TVISION0253774 | – | NLSN_TVISION0253783 |
| NLSN_TVISION0079758 | – | NLSN_TVISION0079781 | NLSN_TVISION0246562 | – | NLSN_TVISION0246617 | NLSN_TVISION0253784 | – | NLSN_TVISION0254006 |
| NLSN_TVISION0080157 | – | NLSN_TVISION0080178 | NLSN_TVISION0246618 | – | NLSN_TVISION0246675 | NLSN_TVISION0254007 | – | NLSN_TVISION0254122 |
| NLSN_TVISION0080280 | – | NLSN_TVISION0080296 | NLSN_TVISION025037 | – | NLSN_TVISION025093 | NLSN_TVISION0254123 | – | NLSN_TVISION0254132 |
| NLSN_TVISION0080479 | – | NLSN_TVISION0080479 | NLSN_TVISION0251593 | – | NLSN_TVISION0251593 | NLSN_TVISION0254133 | – | NLSN_TVISION0254171 |
| NLSN_TVISION0081009 | – | NLSN_TVISION0081012 | NLSN_TVISION0251665 | – | NLSN_TVISION0251670 | NLSN_TVISION0254172 | – | NLSN_TVISION0254190 |
| NLSN_TVISION0081892 | – | NLSN_TVISION0081954 | NLSN_TVISION0251674 | – | NLSN_TVISION0251692 | NLSN_TVISION0254193 | – | NLSN_TVISION0254394 |
| NLSN_TVISION0081989 | – | NLSN_TVISION0081998 | NLSN_TVISION0251674 | – | NLSN_TVISION0251692 | NLSN_TVISION0254395 | – | NLSN_TVISION0254631 |
| NLSN_TVISION0084308 | – | NLSN_TVISION0084311 | NLSN_TVISION0251674 | – | NLSN_TVISION0251748 | NLSN_TVISION0254632 | – | NLSN_TVISION0254658 |
| NLSN_TVISION0084863 | – | NLSN_TVISION0084879 | NLSN_TVISION0251751 | – | NLSN_TVISION0251827 | NLSN_TVISION0254659 | – | NLSN_TVISION0254774 |
| NLSN_TVISION0084863 | – | NLSN_TVISION0084879 | NLSN_TVISION0251751 | – | NLSN_TVISION0251866 | NLSN_TVISION0254775 | – | NLSN_TVISION0254821 |
| NLSN_TVISION0089982 | – | NLSN_TVISION0089990 | NLSN_TVISION0251888 | – | NLSN_TVISION0251899 | NLSN_TVISION0254822 | – | NLSN_TVISION0254871 |
| NLSN_TVISION0096684 | – | NLSN_TVISION0096684 | NLSN_TVISION0251888 | – | NLSN_TVISION0251904 | NLSN_TVISION0254872 | – | NLSN_TVISION0254876 |
| NLSN_TVISION0096685 | – | NLSN_TVISION0096685 | NLSN_TVISION0251900 | – | NLSN_TVISION0251900 | NLSN_TVISION0254877 | – | NLSN_TVISION0255010 |
| NLSN_TVISION0097616 | – | NLSN_TVISION0097616 | NLSN_TVISION0251909 | – | NLSN_TVISION0251944 | NLSN_TVISION0255011 | – | NLSN_TVISION0255059 |
| NLSN_TVISION0097744 | – | NLSN_TVISION0097759 | NLSN_TVISION0251960 | – | NLSN_TVISION0251983 | NLSN_TVISION0255060 | – | NLSN_TVISION0255543 |
| NLSN_TVISION0203435 | – | NLSN_TVISION0203453 | NLSN_TVISION0251984 | – | NLSN_TVISION0252006 | NLSN_TVISION0255544 | – | NLSN_TVISION0255580 |
| NLSN_TVISION02246492 | – | NLSN_TVISION02246499 | NLSN_TVISION0252009 | – | NLSN_TVISION0252017 | NLSN_TVISION0255581 | – | NLSN_TVISION0255641 |
| NLSN_TVISION0227322 | – | NLSN_TVISION0227397 | NLSN_TVISION0252093 | – | NLSN_TVISION0252104 | NLSN_TVISION0255650 | – | NLSN_TVISION0255708 |
| NLSN_TVISION0233860 | – | NLSN_TVISION0233870 | NLSN_TVISION0252235 | – | NLSN_TVISION0252263 | NLSN_TVISION0251674 | – | NLSN_TVISION0251692 |
| NLSN_TVISION0244789 | – | NLSN_TVISION0244790 | NLSN_TVISION0252265 | – | NLSN_TVISION0252271 | NLSN_TVISION0254007 | – | NLSN_TVISION0254122 |
| NLSN_TVISION0244794 | – | NLSN_TVISION0244794 | NLSN_TVISION0252272 | – | NLSN_TVISION0252275 | TVSN_NLSN_00312628 | – | TVSN_NLSN_00312631 |
| NLSN_TVISION0245011 | – | NLSN_TVISION0245011 | NLSN_TVISION0252278 | – | NLSN_TVISION0252296 | TVSN_NLSN_00637259 | – | TVSN_NLSN_00637263 |
| NLSN_TVISION0245014 | – | NLSN_TVISION0245014 | NLSN_TVISION0252299 | – | NLSN_TVISION0252315 | TVSN_NLSN_00901998 | – | TVSN_NLSN_00902028 |
| NLSN_TVISION0245029 | – | NLSN_TVISION0245029 | NLSN_TVISION0252318 | – | NLSN_TVISION0252352 | TVSN_NLSN_00940967 | – | TVSN_NLSN_00940974 |
| NLSN_TVISION0245174 | – | NLSN_TVISION0245182 | NLSN_TVISION0252355 | – | NLSN_TVISION0252396 | TVSN_NLSN_00941154 | – | TVSN_NLSN_00941156 |
| NLSN_TVISION0245217 | – | NLSN_TVISION0245259 | NLSN_TVISION0252394 | – | NLSN_TVISION0252396 | TVSN_NLSN_00940558 | – | TVSN NLSN_00940560 |
| NLSN_TVISION0245260 | – | NLSN_TVISION0245295 | NLSN_TVISION0252399 | – | NLSN_TVISION0252511 | TVSN_NLSN_00000047 | – | TVSN_NLSN_00000050 |
| NLSN_TVISION0245303 | – | NLSN_TVISION0245448 | NLSN_TVISION0252514 | – | NLSN_TVISION0252542 | TVSN_NLSN_00000141 | – | TVSN_NLSN_00000142 |
| NLSN_TVISION0245449 | – | NLSN_TVISION0245492 | NLSN_TVISION0252545 | – | NLSN_TVISION0252556 | TVSN_NLSN_00000156 | – | TVSN_NLSN_00000161 |
| NLSN_TVISION0245495 | – | NLSN_TVISION0245498 | NLSN_TVISION0252559 | – | NLSN_TVISION0252566 | TVSN_NLSN_00000210 | – | TVSN_NLSN_00000212 |
| NLSN_TVISION0245499 | – | NLSN_TVISION0245521 | NLSN_TVISION0252569 | – | NLSN_TVISION0252584 | TVSN_NLSN_00000929 | – | TVSN_NLSN_00000940 |
| NLSN_TVISION0245560 | – | NLSN_TVISION0245568 | NLSN_TVISION0252587 | – | NLSN_TVISION0252658 | TVSN_NLSN_00000943 | – | TVSN_NLSN_00000943 |
| NLSN_TVISION0245657 | – | NLSN_TVISION0245657 | NLSN_TVISION0252664 | – | NLSN_TVISION0252976 | TVSN_NLSN_00227910 | – | TVSN_NLSN_00227943 |

CONFIDENTIAL ATTORNEYS' EYES ONLY

*The Nielsen Company (US), LLC v. TVision Insights, Inc.*
**DOCUMENTS CONSIDERED**
Exhibit 2.0

| Beginning Bates | | Ending Bates | Beginning Bates | | Ending Bates | Beginning Bates | | Ending Bates |
|---|---|---|---|---|---|---|---|---|
| TVSN_NLSN_00005204 | – | TVSN_NLSN_00005204 | TVSN_NLSN_00107888 | – | TVSN_NLSN_00107899 | TVSN_NLSN_00231355 | – | TVSN_NLSN_00231380 |
| TVSN_NLSN_00005436 | – | TVSN_NLSN_00005436 | TVSN_NLSN_00107985 | – | TVSN_NLSN_00101014 | TVSN_NLSN_00232150 | – | TVSN_NLSN_00232152 |
| TVSN_NLSN_00007670 | – | TVSN_NLSN_00007713 | TVSN_NLSN_00112885 | – | TVSN_NLSN_00112886 | TVSN_NLSN_00233884 | – | TVSN_NLSN_00233886 |
| TVSN_NLSN_00007949 | – | TVSN_NLSN_00007969 | TVSN_NLSN_00118904 | – | TVSN_NLSN_00118908 | TVSN_NLSN_00243939 | – | TVSN_NLSN_00243942 |
| TVSN_NLSN_00007973 | – | TVSN_NLSN_00008014 | TVSN_NLSN_00121062 | – | TVSN_NLSN_00121065 | TVSN_NLSN_00244425 | – | TVSN_NLSN_00244429 |
| TVSN_NLSN_00008034 | – | TVSN_NLSN_00008034 | TVSN_NLSN_00121190 | – | TVSN_NLSN_00121202 | TVSN_NLSN_00248062 | – | TVSN_NLSN_00248064 |
| TVSN_NLSN_00008034 | – | TVSN_NLSN_00008041 | TVSN_NLSN_00121763 | – | TVSN_NLSN_00121764 | TVSN_NLSN_00249832 | – | TVSN_NLSN_00249837 |
| TVSN_NLSN_00008034 | – | TVSN_NLSN_00008041 | TVSN_NLSN_00122885 | – | TVSN_NLSN_00122892 | TVSN_NLSN_00252874 | – | TVSN_NLSN_00252874 |
| TVSN_NLSN_00017413 | – | TVSN_NLSN_00017421 | TVSN_NLSN_00124097 | – | TVSN_NLSN_00124123 | TVSN_NLSN_00254931 | – | TVSN_NLSN_00254931 |
| TVSN_NLSN_00021350 | – | TVSN_NLSN_00021350 | TVSN_NLSN_00124222 | – | TVSN_NLSN_00124234 | TVSN_NLSN_00257538 | – | TVSN_NLSN_00257538 |
| TVSN_NLSN_00023146 | – | TVSN_NLSN_00023146 | TVSN_NLSN_00124547 | – | TVSN_NLSN_00124621 | TVSN_NLSN_00258407 | – | TVSN_NLSN_00258407 |
| TVSN_NLSN_00023742 | – | TVSN_NLSN_00023742 | TVSN_NLSN_00124654 | – | TVSN_NLSN_00124654 | TVSN_NLSN_00258409 | – | TVSN_NLSN_00258409 |
| TVSN_NLSN_00033215 | – | TVSN_NLSN_00033222 | TVSN_NLSN_00124693 | – | TVSN_NLSN_00124693 | TVSN_NLSN_00267638 | – | TVSN_NLSN_00267673 |
| TVSN_NLSN_00034046 | – | TVSN_NLSN_00034053 | TVSN_NLSN_00134504 | – | TVSN_NLSN_00134507 | TVSN_NLSN_00267638 | – | TVSN_NLSN_00267673 |
| TVSN_NLSN_00037125 | – | TVSN_NLSN_00037125 | TVSN_NLSN_00139299 | – | TVSN_NLSN_00139346 | TVSN_NLSN_00269608 | – | TVSN_NLSN_00269608 |
| TVSN_NLSN_00039739 | – | TVSN_NLSN_00039741 | TVSN_NLSN_00140650 | – | TVSN_NLSN_00140651 | TVSN_NLSN_00269798 | – | TVSN_NLSN_00269798 |
| TVSN_NLSN_00040837 | – | TVSN_NLSN_00040837 | TVSN_NLSN_00156797 | – | TVSN_NLSN_00156799 | TVSN_NLSN_00270175 | – | TVSN_NLSN_00270183 |
| TVSN_NLSN_00042202 | – | TVSN_NLSN_00042202 | TVSN_NLSN_00158103 | – | TVSN_NLSN_00158104 | TVSN_NLSN_00270183 | – | TVSN_NLSN_00270188 |
| TVSN_NLSN_00042850 | – | TVSN_NLSN_00042853 | TVSN_NLSN_00158250 | – | TVSN_NLSN_00158250 | TVSN_NLSN_00280901 | – | TVSN_NLSN_00280901 |
| TVSN_NLSN_00044644 | – | TVSN_NLSN_00044645 | TVSN_NLSN_00162211 | – | TVSN_NLSN_00162235 | TVSN_NLSN_00306669 | – | TVSN_NLSN_00306673 |
| TVSN_NLSN_00044646 | – | TVSN_NLSN_00044646 | TVSN_NLSN_00167273 | – | TVSN_NLSN_00167278 | TVSN_NLSN_00311852 | – | TVSN_NLSN_00311854 |
| TVSN_NLSN_00045222 | – | TVSN_NLSN_00045222 | TVSN_NLSN_00172207 | – | TVSN_NLSN_00172244 | TVSN_NLSN_00326148 | – | TVSN_NLSN_00326148 |
| TVSN_NLSN_00045224 | – | TVSN_NLSN_00045224 | TVSN_NLSN_00172344 | – | TVSN_NLSN_00172358 | TVSN_NLSN_00326741 | – | TVSN_NLSN_00326744 |
| TVSN_NLSN_00047820 | – | TVSN_NLSN_00047820 | TVSN_NLSN_00172428 | – | TVSN_NLSN_00172428 | TVSN_NLSN_00328622 | – | TVSN_NLSN_00328627 |
| TVSN_NLSN_00052913 | – | TVSN_NLSN_00052916 | TVSN_NLSN_00172429 | – | TVSN_NLSN_00172429 | TVSN_NLSN_00328805 | – | TVSN_NLSN_00328810 |
| TVSN_NLSN_00053202 | – | TVSN_NLSN_00053205 | TVSN_NLSN_00172430 | – | TVSN_NLSN_00172455 | TVSN_NLSN_00336541 | – | TVSN_NLSN_00336541 |
| TVSN_NLSN_00053490 | – | TVSN_NLSN_00053522 | TVSN_NLSN_00176851 | – | TVSN_NLSN_00176856 | TVSN_NLSN_00349073 | – | TVSN_NLSN_00349076 |
| TVSN_NLSN_00056652 | – | TVSN_NLSN_00056657 | TVSN_NLSN_00182152 | – | TVSN_NLSN_00182156 | TVSN_NLSN_00351684 | – | TVSN_NLSN_00351688 |
| TVSN_NLSN_00063767 | – | TVSN_NLSN_00063777 | TVSN_NLSN_00182490 | – | TVSN_NLSN_00182490 | TVSN_NLSN_00360553 | – | TVSN_NLSN_00360558 |
| TVSN_NLSN_00063827 | – | TVSN_NLSN_00063848 | TVSN_NLSN_00184226 | – | TVSN_NLSN_00184228 | TVSN_NLSN_00364679 | – | TVSN_NLSN_00364682 |
| TVSN_NLSN_00096467 | – | TVSN_NLSN_00096496 | TVSN_NLSN_00186039 | – | TVSN_NLSN_00186049 | TVSN_NLSN_00365687 | – | TVSN_NLSN_00365687 |
| TVSN_NLSN_00096498 | – | TVSN_NLSN_00096498 | TVSN_NLSN_00190883 | – | TVSN_NLSN_00190886 | TVSN_NLSN_00368793 | – | TVSN_NLSN_00368796 |
| TVSN_NLSN_00098092 | – | TVSN_NLSN_00098122 | TVSN_NLSN_00194129 | – | TVSN_NLSN_00194129 | TVSN_NLSN_00382303 | – | TVSN_NLSN_00382308 |
| TVSN_NLSN_00100204 | – | TVSN_NLSN_00100207 | TVSN_NLSN_00200907 | – | TVSN_NLSN_00200907 | TVSN_NLSN_00387079 | – | TVSN_NLSN_00387083 |
| TVSN_NLSN_00101297 | – | TVSN_NLSN_00101301 | TVSN_NLSN_00201635 | – | TVSN_NLSN_00201635 | TVSN_NLSN_00387275 | – | TVSN_NLSN_00387275 |
| TVSN_NLSN_00103034 | – | TVSN_NLSN_00103048 | TVSN_NLSN_00202140 | – | TVSN_NLSN_00202140 | TVSN_NLSN_00388849 | – | TVSN_NLSN_00388849 |
| TVSN_NLSN_00103164 | – | TVSN_NLSN_00103164 | TVSN_NLSN_00205635 | – | TVSN_NLSN_00205654 | TVSN_NLSN_00393734 | – | TVSN_NLSN_00393734 |
| TVSN_NLSN_00103165 | – | TVSN_NLSN_00103174 | TVSN_NLSN_00217998 | – | TVSN_NLSN_00218032 | TVSN_NLSN_00399618 | – | TVSN_NLSN_00399619 |
| TVSN_NLSN_00103578 | – | TVSN_NLSN_00103578 | TVSN_NLSN_00221517 | – | TVSN_NLSN_00221517 | TVSN_NLSN_00407108 | – | TVSN_NLSN_00407114 |
| TVSN_NLSN_00105316 | – | TVSN_NLSN_00105320 | TVSN_NLSN_00221633 | – | TVSN_NLSN_00221643 | TVSN_NLSN_00428079 | – | TVSN_NLSN_00428100 |
| TVSN_NLSN_00105766 | – | TVSN_NLSN_00105776 | TVSN_NLSN_00227663 | – | TVSN_NLSN_00227663 | TVSN_NLSN_00940895 | – | TVSN_NLSN_00940900 |

CONFIDENTIAL ATTORNEYS' EYES ONLY

*The Nielsen Company (US), LLC v. TVision Insights, Inc.*
**DOCUMENTS CONSIDERED**
Exhibit 2.0

| Beginning Bates | | Ending Bates | Beginning Bates | | Ending Bates | Beginning Bates | | Ending Bates |
|---|---|---|---|---|---|---|---|---|
| TVSN_NLSN_00430175 | – | TVSN_NLSN_00430178 | TVSN_NLSN_00692199 | – | TVSN_NLSN_00692211 | TVSN_NLSN_00940901 | – | TVSN_NLSN_00940907 |
| TVSN_NLSN_00480557 | – | TVSN_NLSN_00480560 | TVSN_NLSN_00694040 | – | TVSN_NLSN_00694040 | TVSN_NLSN_00940908 | – | TVSN_NLSN_00940919 |
| TVSN_NLSN_00492951 | – | TVSN_NLSN_00492952 | TVSN_NLSN_00694041 | – | TVSN_NLSN_00694041 | TVSN_NLSN_00940924 | – | TVSN_NLSN_00940926 |
| TVSN_NLSN_00498302 | – | TVSN_NLSN_00498302 | TVSN_NLSN_00695873 | – | TVSN_NLSN_0069878 | TVSN_NLSN_00940946 | – | TVSN_NLSN_00940950 |
| TVSN_NLSN_00533729 | – | TVSN_NLSN_00533732 | TVSN_NLSN_00695901 | – | TVSN_NLSN_00695901 | TVSN_NLSN_00940954 | – | TVSN_NLSN_00940957 |
| TVSN_NLSN_00589551 | – | TVSN_NLSN_00589560 | TVSN_NLSN_00695914 | – | TVSN_NLSN_00695917 | TVSN_NLSN_00940960 | – | TVSN_NLSN_00940962 |
| TVSN_NLSN_00590727 | – | TVSN_NLSN_00590727 | TVSN_NLSN_00696139 | – | TVSN_NLSN_00696149 | TVSN_NLSN_00940962 | – | TVSN_NLSN_00940963 |
| TVSN_NLSN_00597223 | – | TVSN_NLSN_00597251 | TVSN_NLSN_00704718 | – | TVSN_NLSN_00704741 | TVSN_NLSN_00940980 | – | TVSN_NLSN_00940984 |
| TVSN_NLSN_00610585 | – | TVSN_NLSN_00610585 | TVSN_NLSN_00706326 | – | TVSN_NLSN_00706329 | TVSN_NLSN_00940992 | – | TVSN_NLSN_00941003 |
| TVSN_NLSN_00610721 | – | TVSN_NLSN_00610726 | TVSN_NLSN_00725382 | – | TVSN_NLSN_00725386 | TVSN_NLSN_00941016 | – | TVSN_NLSN_00941021 |
| TVSN_NLSN_00610739 | – | TVSN_NLSN_00610741 | TVSN_NLSN_00732275 | – | TVSN_NLSN_00732308 | TVSN_NLSN_00941022 | – | TVSN_NLSN_00941026 |
| TVSN_NLSN_00610739 | – | TVSN_NLSN_00610741 | TVSN_NLSN_00748686 | – | TVSN_NLSN_00748686 | TVSN_NLSN_00941032 | – | TVSN_NLSN_00941037 |
| TVSN_NLSN_00610742 | – | TVSN_NLSN_00610751 | TVSN_NLSN_00767272 | – | TVSN_NLSN_00767272 | TVSN_NLSN_00941038 | – | TVSN_NLSN_00941045 |
| TVSN_NLSN_00620249 | – | TVSN_NLSN_00620251 | TVSN_NLSN_00767505 | – | TVSN_NLSN_00767505 | TVSN_NLSN_00941086 | – | TVSN_NLSN_00941095 |
| TVSN_NLSN_00620254 | – | TVSN_NLSN_00620261 | TVSN_NLSN_00772240 | – | TVSN_NLSN_00772242 | TVSN_NLSN_00941096 | – | TVSN_NLSN_00941102 |
| TVSN_NLSN_00621607 | – | TVSN_NLSN_00621618 | TVSN_NLSN_00778313 | – | TVSN_NLSN_00778313 | TVSN_NLSN_00941113 | – | TVSN_NLSN_00941122 |
| TVSN_NLSN_00621607 | – | TVSN_NLSN_00621618 | TVSN_NLSN_00778745 | – | TVSN_NLSN_00778745 | TVSN_NLSN_00941123 | – | TVSN_NLSN_00941128 |
| TVSN_NLSN_00624919 | – | TVSN_NLSN_00624926 | TVSN_NLSN_00841640 | – | TVSN_NLSN_00841640 | TVSN_NLSN_00941129 | – | TVSN_NLSN_00941132 |
| TVSN_NLSN_00626486 | – | TVSN_NLSN_00626558 | TVSN_NLSN_00841712 | – | TVSN_NLSN_00841713 | TVSN_NLSN_00941152 | – | TVSN_NLSN_00941155 |
| TVSN_NLSN_00627459 | – | TVSN_NLSN_00627485 | TVSN_NLSN_00859096 | – | TVSN_NLSN_00859214 | TVSN_NLSN_009411592 | – | TVSN_NLSN_009411568 |
| TVSN_NLSN_00637233 | – | TVSN_NLSN_00637258 | TVSN_NLSN_00862311 | – | TVSN_NLSN_00862326 | TVSN_NLSN_00941209 | – | TVSN_NLSN_00941214 |
| TVSN_NLSN_00637233 | – | TVSN_NLSN_0063258 | TVSN_NLSN_00869137 | – | TVSN_NLSN_00869146 | TVSN_NLSN_00946573 | – | TVSN_NLSN_00946586 |
| TVSN_NLSN_00639891 | – | TVSN_NLSN_00639922 | TVSN_NLSN_00869147 | – | TVSN_NLSN_00869148 | TVSN_NLSN_00947094 | – | TVSN_NLSN_00947115 |
| TVSN_NLSN_00640618 | – | TVSN_NLSN_00640649 | TVSN_NLSN_00869899 | – | TVSN_NLSN_00869900 | TVSN_NLSN_00949055 | – | TVSN_NLSN_00949062 |
| TVSN_NLSN_00641220 | – | TVSN_NLSN_00641231 | TVSN_NLSN_00901996 | – | TVSN_NLSN_00901997 | TVSN_NLSN_00950126 | – | TVSN_NLSN_00950130 |
| TVSN_NLSN_00641220 | – | TVSN_NLSN_00641231 | TVSN_NLSN_00906071 | – | TVSN_NLSN_00906074 | TVSN_NLSN_00950126 | – | TVSN_NLSN_00950130 |
| TVSN_NLSN_00645277 | – | TVSN_NLSN_00645277 | TVSN_NLSN_00906075 | – | TVSN_NLSN_00906117 | TVSN_NLSN_00951657 | – | TVSN_NLSN_00951659 |
| TVSN_NLSN_00645277 | – | TVSN_NLSN_00645295 | TVSN_NLSN_00909757 | – | TVSN_NLSN_00909757 | TVSN_NLSN_00951660 | – | TVSN_NLSN_00951660 |
| TVSN_NLSN_00645295 | – | TVSN_NLSN_00645295 | TVSN_NLSN_00915923 | – | TVSN_NLSN_00915928 | TVSN_NLSN_00951672 | – | TVSN_NLSN_00951672 |
| TVSN_NLSN_00649499 | – | TVSN_NLSN_00649503 | TVSN_NLSN_00940215 | – | TVSN_NLSN_00940217 | TVSN_NSLN_00172207 | – | TVSN_NSLN_00172224 |
| TVSN_NLSN_00651606 | – | TVSN_NLSN_00651606 | TVSN_NLSN_00940800 | – | TVSN_NLSN_00940803 | VidVita_00001 | – | VidVita_00013 |
| TVSN_NLSN_00660739 | – | TVSN_NLSN_00660772 | TVSN_NLSN_00940837 | – | TVSN_NLSN_00940852 | | | |
| TVSN_NLSN_00662112 | – | TVSN_NLSN_00662139 | TVSN_NLSN_00940854 | – | TVSN_NLSN_00940863 | | | |

*The Nielsen Company (US), LLC, v. Tvision Insights, Inc.*
**DOCUMENTS CONSIDERED**
Exhibit 2.0

**Legal Filings**

Complaint for Patent Infringement, The Nielsen Company (US), LLC v. TVision Insights, Inc., Case No. DDE-1:22-cv-00057, filed January 14, 2022

Plaintiff The Nielsen Company (US), LLC's Responses and Objections to Defendant's First Set of Interrogatories, October 14, 2022

Plaintiff The Nielsen Company (US), LLC's Responses and Objections to Defendant TVision Insights, Inc.'s Notice Under Rule 30(B)(6), August 3, 2023

TVision Insights, Inc.'s First Supplemental Objections and Responses to the Nielsen Company (US), LLC's Third Set of Interrogatories, August 23, 2023

Plaintiff The Nielsen Company (US), LLC's Second Supplemental Responses and Objections to Defendant's First Set of Interrogatories, September 21, 2023

Civil Action No 22-1345, Dkt 68, Amended Answer to Complaint for Patent Infringement and Counterclaim of TVision Insights, Inc. for Violation of Antitrust Laws, Tortious Interference and Unjust Enrichment, October 13, 2023

**Patents & Patent Applications**

U.S. Patent No. 7,783,889

**Patent Statute and Case Law**

35 U.S.C. §271(a)
35 U.S.C. §284
*Bayer Healthcare LLC v. Baxalta Inc*., 989 F.3d 964 (Fed. Cir. 2021)
*Bayer Healthcare LLC v. Baxalta Inc*., No. 16-cv-1122-RGA (D. Del. Jan. 25, 2019)
*Cyntec Company, Ltd. v. Chilisin Electronics Corp.*, No. 22-1873 (Fed. Cir. Oct. 16, 2023)
*Georgia-Pacific Corp. v. United States Plywood Corp.*, 318 F. Supp. 1116 (S.D.N.Y. 1970)
*Grain Processing Corporation v. American Maize-Products Company*, 185 F.3d 1341 (Fed. Cir. 1999)
*LaserDynamics, v. Quanta Computer, Inc*., 694 F.3d 51 (Fed. Cir. 2012)
*LifeScan Scotland, Ltd. v. Shasta Tech., LLC*, 734 F.3d 1361 (Fed. Cir. 2013)
*Lucent Techs., Inc. v. Gateway, Inc*., 580 F.3d 1301 (Fed. Cir. 2009).
Memorandum Opinion, March 28, 2018, *Joe Andrew Salazar v. HTC Corporation*, Case No. 2:16-CV-01096-JRG-RSP (E.D. Tex. Mar. 28, 2018)
Memorandum Opinion, *NexStep, Inc. v. Comcast Cable Communications, LLC*, No. 19-cv-01031-RGA (D. Del. Sep 16, 2021)
Order Granting Defendant's Motion for Summary Judgement; and Denying Plaintiffs' Motion for Partial Summary Judgement as Moot, *Fate Therapeutics, Inc. et al v. Shoreline Biosciences, Inc*., No. 22-cv-000676-H-MSB (S.D. Cal. Aug. 30, 2023)
Order of January 18, 2013, Brandeis University and *GFA Brands, Inc., vs. Keebler Co.*, Case No. 1:12-cv-01508, (N.D. Ill., Jan. 18, 2013)
Order on Motions in Limine, Motion to Strike and Exclude, and Motions to Seal, *Contour IP Holdings, LLC v. GoPro, Inc*., No. 17-cv-04738-WHO (N.D. Cal. Jan. 8, 2023)
Order re: Disputed Jury Instructions and Jury Verdict Form, November 2, 2022, *Colibri Heart Valve LLC v. Medtronic CoreValve LLC et al*., Case No. 8:20-cv-00847-DOC-JDE
*Panduit Corp. v. Stahlin Bros. Fibre Works, Inc*., 575 F.2d 1152 (6th Cir. 1978)
*Powell v. Home Depot U.S.A., Inc*., 663 F.3d 1221 (Fed. Cir. 2012)
*Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008)
*Rembrandt Wireless Techs., LP v. Samsung Elecs. Co*., 853 F.3d 1370 (Fed. Cir. 2017)
*ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860 (Fed. Cir. 2010)
*Rite-Hite Corp. v. Kelley Co*., 56 F.3d 1538 (Fed. Cir. 1995)
*Schofield v. United States Steel Corp.*, Cause No. 2:04-cv-520-PRC (N.D. Ind. Mar. 31, 2006).
Shoreline Biosciences, Inc.'s Memorandum of Points and Authorities in Support of Motion to Exclude Damages Opinions of Michael C. Keeley, *Fate Therapeutics, Inc. et al v. Shoreline Biosciences, Inc*., No. 22-cv-000676-H-MSB (S.D. Cal. Jul. 14, 2023)
*VirnetX, v. Cisco Sys.*, 767 F.3d 1308 (Fed. Cir. 2014)

*The Nielsen Company (US), LLC, v. Tvision Insights, Inc.*
**DOCUMENTS CONSIDERED**
Exhibit 2.0

### Other Legal Filings

Complaint for Patent Infringement, Case No. 1-21-cv-01591, November 10, 2021
Complaint for Patent Infringement, Case No. 1-21-cv-01592, November 10, 2021
Complaint for Patent Infringement, Case No. 1-22-cv-01344, October 12, 2022
Complaint for Patent Infringement, Case No. 1-22-cv-01345, October 12, 2022
Complaint for Patent Infringement, Case No. 1-23-cv-00136, February 3, 2023
Complaint for Patent Infringement, Case No. 1-23-cv-00532, May 17, 2023

### Deposition Testimony and Exhibits

Amy Bolivar, September 15, 2023
Chengcheng Jia, May 30, 2023
Daniel Nelson, September 8, 2023
Daniel Schiffman, September 8, 2023
Inderbir Sidhu, August 31, 2023
Ken Contrata, September 12, 2023
Mark Green, August 3, 2023
Shlomo Neumann, August 30, 2023
Tristan Webster, September 13, 2023
Yan Liu, August 29, 2023

### Expert Reports

Opening Expert Report of Vinayak Tanksale, October 23, 2023
Opening Expert Report of Dr. David Anderson Regarding Invalidity of U.S. Patent No. 7,783,889, October 25, 2023
Expert Report of Michael C. Keeley, Ph.D., October 25, 2023
Opening Expert Report of Pierre Moulin, October 25, 2023
Rebuttal Expert Report of Dr. David Anderson Regarding U.S. Patent No. 7,783,889, November 21, 2023

### Interviews

Yan Liu, CEO and Founder of TVision
Inderbir Sidhu, Chief Technology Officer at TVision
Dr. David Anderson, Professor at Georgia Institute of Technology, School of Electrical and Computer Engineering

### Publicly Available Sources

"11/676,452 | 20004/97-US: METHODS AND APPARATUS FOR GENERATING SIGNATURES," USPTO Patent Center, https://patentcenter.uspto.gov/applications/11676452/assignments?application=
"11/676,452 | 20004/97-US: METHODS AND APPARATUS FOR GENERATING SIGNATURES," USPTO Patent Center, https://patentcenter.uspto.gov/applications/11676452/patentTermAdjustment?application=
"16 Underestimated Tech-Related Risks Businesses Need To Consider," Forbes, https://www.forbes.com/sites/forbestechcouncil/2021/12/09/16-underestimated-tech-related-risks-businesses-need-to-consider/?sh=7e3bd179daaf
"About Launchopedia," Launchopedia, https://startupetsu.com/about-launchopedia/
"About Nielsen," The Nielsen Company (US), LLC., https://www.nielsen.com/about-us/about/

*The Nielsen Company (US), LLC, v. Tvision Insights, Inc.*
**DOCUMENTS CONSIDERED**
Exhibit 2.0

**Publicly Available Sources, Con't.**
"About," TVision Insights, https://www.tvisioninsights.com/about
"ACRCloud," ACRCloud, https://www.acrcloud.com/
"AdAge - TVision is the Go-to Choice for Several Nielsen Rivals," TVision Insights, https://www.tvisioninsights.com/resources/adage-mrc-panel-data
"Audience Measurement," ACRCloud, https://www.acrcloud.com/audience-measurement%e2%80%8b/
"Comscore, VideoAmp, iSpot Get Early Nod From TV-Network Consortium Aiming to Devise Nielsen Rival", Variety, <https://variety.com/2023/tv/news/comscore-videoamp-ispot-joint-industry-committee-measurment-nielsen-1235728367/>
"comScore", comScore, <https://www.comscore.com/>
"Euro to US Dollar Spot Exchange Rates for 2017," *Exchange Rates UK*, https://www.exchangerates.org.uk/EUR-USD-spot-exchange-rates-history-2017.html.
"Invest in Innovation A-List Startups 2018," the Advertising Research Foundation, https://thearf.org/access-knowledge-2/a-list-startups/list-of-a-list-companies/
"Measurement Company TVision Raises $11.5M in New Funding," TVision Insights, July 17, 2018, https://www.tvisioninsights.com/resources/has-raised-11-5-million-in-new-funding
"NBCUniversal Measurement Framework Look Book V1," NBCUniversal, February 2022, https://together.nbcuni.com/wp-content/uploads/sites/3/2022/02/NBCU-Measurement-Framework-Look-Book-V1-Feb-2022-1.pdf
"Need to know: what is panel data, and why does it matter?" The Nielsen Company (US), LLC., https://www.nielsen.com/insights/2023/what-is-panel-data-and-why-does-it-matter/
"Nielsen Announces Completion of Sale of Global Connect Business to Advent International," The Nielsen Company (US), LLC., March 2021, https://www.nielsen.com/news-center/2021/nielsen-announces-completion-of-sale-of-global-connect-business-to-advent-international/
"Nielsen Completes Acquisition of Gracenote," The Nielsen Company (US), LLC., February 2017, https://www.nielsen.com/news-center/2017/nielsen-completes-acquisition-of-gracenote/
"Nielsen Panels & Surveys," The Nielsen Company (US), LLC., https://panels.nielsen.com/panels-and-surveys/
"Nielsen's industry-leading U.S. National TV Panel reaches over 42,000 households, comprised of 101,000 directly measured viewers," The Nielsen Company (US), LLC., August 10, 2022, https://www.nielsen.com/news-center/2022/nielsens-industry-leading-u-s-national-tv-panel-reaches-over-42000-household/
"Now Playing," VidVita, https://vidvita.com/now-playing/
"Our Panel," TVision Insights, https://www.tvisioninsights.com/our-panel
"Our Technology," TVision Insights, https://www.tvisioninsights.com/our-technology
"Pricing & Subscriptions," Docker, https://www.docker.com/pricing/
"Products," VidVita, https://vidvita.com/about/
"Series A – TVision," Crunchbase, https://www.crunchbase.com/funding_round/tvision-insights-series-a--9a2c6f19
"Software Developer Overview," *U.S. News*, https://money.usnews.com/careers/best-jobs/software-developer
"Software Developers, Quality Assurance Analysts, and Testers," *U.S. Bureau of Labor Statistics*, https://www.bls.gov/ooh/computer-and-information-technology/software-developers.htm
"Start-ups and Early Stage Companies, A Valuation Insight," KPMG Quarterly Brief – 15th Edition of the International Valuation Newsletter, 2021
"Star-TV-TVision Partnership for more precise broadcast audience data," InsideSport, https://www.insidesport.in/star-tv-tvision-partnership-for-more-precise-broadcast-audience-data/
"The Nielsen Company (US), LLC et al v. ACRCloud, Ltd.," Docket Navigator, last accessed 11/14/2023, https://search.docketnavigator.com/patent/case/286544/0
"The Nielsen Company (US), LLC v. HyphaMetrics, Inc.," Docket Navigator, last accessed 11/14/2023, https://search.docketnavigator.com/patent/case/258547/0
"The Nielsen Company (US), LLC v. HyphaMetrics, Inc.," Docket Navigator, last accessed 11/14/2023, https://search.docketnavigator.com/patent/case/299898/0
"The Nielsen Company (US), LLC v. HyphaMetrics, Inc.," Docket Navigator, last accessed 11/14/2023, https://search.docketnavigator.com/patent/case/309580/0
"The Nielsen Company (US), LLC v. TVision Insights, Inc.," Docket Navigator, last accessed 11/14/2023, https://search.docketnavigator.com/patent/case/286545/0
"The Nielsen Company (US), LLC v. TVision Insights, Inc.," Docket Navigator, last accessed 11/14/2023, https://search.docketnavigator.com/patent/case/258548/0
"TV & Movie Data," The Nielsen Company (US), LLC., 2023, https://www.nielsen.com/solutions/content-metadata/tv-and-movie-data/
"TV Measurement: Past, Present, and Future," tvScientific, https://www.tvscientific.com/insight/tv-measurement.
"TVision Methodology Overview," TVision Insights, https://www.tvisioninsights.com/resources/tvision-methodology-overview
"TVision," TVision Insights, https://www.tvisioninsights.com/
"TVision's Total View Offers Linear, CTV Person-Level Measurement," Next TV, April 17, 2023, https://www.nexttv.com/news/tvisions-total-view-offers-linear-ctv-person-level-measurement
"US Patents," Wayback Machine, May 29, 2016, https://web.archive.org/web/20160529145241/http://www.gracenote.com/us-patents/
"US Smart TV Market Size & Share Analysis – Growth Trends & Forecasts (2023 – 2028)" Mordor Intelligence, https://www.mordorintelligence.com/industry-reports/united-states-smart-tv-market

CONFIDENTIAL ATTORNEYS' EYES ONLY

*The Nielsen Company (US), LLC, v. Tvision Insights, Inc.*
**DOCUMENTS CONSIDERED**
Exhibit 2.0

**Publicly Available Sources, Con't.**
"Use containers to Build, Share and Run your applications," Docker, https://www.docker.com/resources/what-container/.

"VidVita," LinkedIn, https://www.linkedin.com/company/vidvita

"What is an API (Application Programming Interface)?" Amazon Web Services, 2023, https://aws.amazon.com/what-is/api/

Adgate, Brad, "Networks And Advertisers Are Looking To Replace Nielsen," Forbes, January 20, 2022, https://www.forbes.com/sites/bradadgate/2022/01/20/networks-and-advertisers-are-looking-to-replace-nielsen/?sh=59d1e6fe381b

Adgate, Brad, "Nielsen Rivals Have Been Upgrading Their Capabilities," Forbes, May 3, 2022, https://www.forbes.com/sites/bradadgate/2022/03/03/nielsen-rivals-have-been-upgrading-their-capabilities/?sh=37d8ae0d1647

Alexa Cleek, "14 Startup Risks Entrepreneurs Should Consider When Launching their Startup," Launchopedia, January 29, 2021, https://startupetsu.com/14-startup-risks-entrepreneurs-should-consider/

Alison Weissbrot, "4 Challenges the Industry Will Face As It Breaks Away from Nielsen," Campaignlive, September 1, 2021, https://www.campaignlive.com/article/4-challenges-industry-will-face-breaks-away-nielsen/1726140?DCMP=EMC-CONTheCampaignFix&bulletin=the-campaign-fix

Alyssa Boyle, "AdExplainer: TV Measurement vs. TV Currency," adexchanger, April 26, 2023, https://www.adexchanger.com/adexplainer/adexplainer-tv-measurement-vs-tv-currency/

Ben Sisario, "Nielsen Acquires Gracenote, Highlighting the Value of Data," The New York Times, December 20, 2016, https://www.nytimes.com/2016/12/20/business/media/nielsen-gracenote-acquisition.html

Boyle, Alyssa, "Nielsen Asserts Its Place In The TV Currency Crowd," ad exchanger, https://www.adexchanger.com/digital-tv/nielsen-asserts-its-place-in-the-tv-currency-crowd/

comScore, Inc. SEC Form 10-K for the fiscal year ended December 31, 2017

Dol, Quinten, "TV ad analytics company iSpot.tv raises $30M, plans to expand team," Built in Seattle, September 26, 2018, https://www.builtinseattle.com/2018/09/26/ispot-raises-30m

George Winslow, "Smart TVs Pass the 200 Million Milestone," tvtech, April 10, 2023, https://www.tvtechnology.com/news/smart-tvs-pass-the-200-million-milestone

J.G. Webster, "Audience Measurement," Elsevier Ltd., 2001, https://www.sciencedirect.com/science/article/abs/pii/B0080430767043138

Joe, Ryan, "Roku Acquires Video Ad Tech From Nielsen – And Nielsen Gets Insights On Roku Users," ad exchanger, March 1, 2021, https://www.adexchanger.com/digital-tv/roku-acquires-advanced-video-ad-tech-from-nielsen-and-nielsen-expands-access-to-roku-audiences/

Kokou Adzo, "Manage Technological Risks As A Startup," Startup Info, February 4, 2021, https://startup.info/manage-technological-risks-as-a-startup/

Neff, Jack, "Nielsen Pulls its Gracenote Data from Rival VideoAmp, Others Mull Alternatives," AdAge, September 26, 2023, https://adage.com/article/measurement/nielsen-pulls-gracenote-data-rival-videoamp-others-mull-alternatives/2518366

Nicole Fallon, "Tech Startup Challenges (and How to Overcome Them)", Business News Daily, October 24, 2023, https://www.businessnewsdaily.com/6265-tech-startup-challenges.html

Nielsen Holdings PLC SEC Form 10-K for the fiscal year ended December 31, 2019

Nielsen Holdings PLC SEC Form 10-K for the fiscal year ended December 31, 2020

Nielsen Holdings PLC SEC Form 10-K for the fiscal year ended December 31, 2021

The Federal Circuit Bar Association Model Patent Jury Instructions, Last Edited: May 2020

## CERTIFICATE OF SERVICE

I hereby certify that on November 21, 2023, this document was served on the persons

listed below in the manner indicated:

**BY EMAIL:**

David E. Moore
Bindu A. Palapura
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com

Clifford Katz
Malavika Rao
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800
ckatz@kelleydrye.com
mrao@kelleydrye.com

Steven Yovits
Constantine Koutsoubas
Mel W. Gaddy
Jason P. Greenhut
Douglas Lewis
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
(312) 857-7070
syovits@kelleydrye.com
ckoutsoubas@kelleydrye.com
mgaddy@kelleydrye.com
jgreenhut@kelleydrye.com
dlewis@kelleydrye.com

Matthew Chakmakian
KELLEY DRYE & WARREN LLP
One Jefferson Road 2nd Floor
Parsippany, NJ 07054
(973) 503-5900
mchakmakian@kelleydrye.com

Joshua B. Long
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd. Suite 900
Houston, TX 77027
(713) 355-5054
jlong@kelleydrye.com

                                        */s/ Andrew E. Russell*
                                        John W. Shaw (No. 3362)
                                        Andrew E. Russell (No. 5382)
                                        Nathan R. Hoeschen (No. 6232)
                                        SHAW KELLER LLP
                                        I.M. Pei Building
                                        1105 North Market Street, 12th Floor
                                        Wilmington, DE 19801
                                        (302) 298-0700
                                        jshaw@shawkeller.com
                                        arussell@shawkeller.com
                                        nhoeschen@shawkeller.com
Dated: November 21, 2023                *Attorneys for Defendant*

2

# EXHIBIT 9

## Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

------------------------------x

THE NIELSEN COMPANY (US), LLC,:

                              :

          Plaintiff,    :      C.A. No.

     vs.                      :

                              :     22-57-CJB

TVISION INSIGHTS, INC.,       :

                              :

          Defendant.    :

------------------------------x

** HIGHLY CONFIDENTIAL **
** OUTSIDE ATTORNEYS' EYES ONLY **
** UNDER THE PROTECTIVE ORDER **
VIRTUAL VIDEOTAPED 30(b)(6) DEPOSITION
OF VIDVITA CORPORATE REPRESENTATIVE
AMY BOLIVAR
Friday, September 15, 2023
10:07 a.m. Eastern Daylight Time

REPORTER:   Dawn A. Jaques, CSR, CLR

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

## Page 2

APPEARANCES:

On behalf of the Plaintiff, The Nielsen Company:

     KELLEY DRYE & WARREN LLP

     By:  Constantine "Dino" Koutsoubas, ESQ.

     333 West Wacker Drive, 26th Floor

     Chicago, Illinois  60606

     (312) 857-2321

     ckoutsoubas@kelleydrye.com

On behalf of the Defendant, TVision Insights:

     RIMON LAW

     By: Jason Xu, ESQ.

     1990 K Street, NW

     Suite 420

     Washington, D.C.  20006

     (202) 470-2141

     jason.xu@rimonlaw.com

## Page 3

APPEARANCES (Continued):

On behalf of VidVita and the witness:

     HOLLAND & KNIGHT

     By:  Mark Francis, ESQ.

     31 West 52nd Street

     12th Floor

     New York, New York  10019

     (212) 513-3572

     mark.francis@hklaw.com

VIDEOGRAPHER AND DIGITAL EXHIBIT TECHNICIAN:

     Daniel Holmstock, Digital Evidence Group

## Page 4

I-N-D-E-X

WITNESS:                    PAGE:

AMY BOLIVAR

     Examination by Mr. Koutsoubas      11

E-X-H-I-B-I-T-S

VIDVITA DEPOSITION EXHIBIT:           PAGE:

████

 ████████

 ███████

 ████████         █

 █████████

 █████████

 █████████

 ██████████

 █

 ████████████

 

 ███████████

 ██████

 ██████              54

1  (Pages 1 to 4)

9/15/2023                The Nielsen Company (US), LLC v. TVision Insights, Inc.        Amy Bolivar 30(b)(6)
Highly Confidential - Attorneys' Eyes Only - Under the Protective Order



Page 5

E-X-H-I-B-I-T-S, CON'T

84

Page 7

E-X-H-I-B-I-T-S, CON'T

97

Page 6

E-X-H-I-B-I-T-S, CON'T

VIDVITA DEPOSITION EXHIBIT:          PAGE:

Page 8

P R O C E E D I N G S

THE VIDEOGRAPHER:  We are now on the record.  This is Video No. 1 in the 30(b)(6) video-recorded deposition of VidVita, today being represented by Amy Bolivar, taken in the matter of The Nielsen Company (US), LLC, v. TVision Insights, Inc.  The case is pending before the United States District Court for the District of Delaware, Case No. 22-57-CJB.

This deposition is being conducted by Zoom Video Remote Conferencing on September 15th, 2023.  The time on the video screen is 10:07 a.m. Eastern Daylight Time.

My name is Daniel Holmstock; I am the legal videographer and digital exhibit technician from Digital Evidence Group.  The court reporter today is Dawn Jaques, also in association with Digital Evidence Group.

All parties have stipulated to the witness being sworn in remotely.

Counsel, will you now please state your appearances and whom you represent,

2 (Pages 5 to 8)

**Ex. 9**



**Ex. 9**

3 (Pages 9 to 12)

**Ex. 9**

Ex. 9

5 (Pages 17 to 20)

6 (Pages 21 to 24)

www.DigitalEvidenceGroup.com    Digital Evidence Group C'rt 2023    202-232-0646

**Ex. 9**

**Ex. 9**

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2023 202-232-0646

**Ex. 9**

**Ex. 9**

# EXHIBIT 10



Nielsen v. Tvision, 1:22-cv-00057 (D.Del.)
HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

VidVita_00001

Ex. 10



**SIGNATURE PAGE FOR VIDVITA/TVISION INSIGHTS SERVICES AGREEMENT**

Nielsen v. Tvision, 1:22-cv-00057 (D.Del.)
HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Ex. 10

Vidvita_00006

**EXHIBIT A – Television Monitoring Services Service Level Agreement ("SLA")**



Nielsen v. Tvision, 1:22-cv-00057 (D.Del.)
HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

VidVita_00007

**Ex. 10**

# EXHIBIT 11



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY        TVSN_NLSN_00611 700

**Ex. 11**



Ex. 11

On Thu, 12 Jan 2017 16:16:40 -0500, Yan Liu <yan@tvisioninsights.com> wrote:

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00611701

**Ex. 11**



Amy

On Wed, 11 Jan 2017 13:40:18 -0500, Yan Liu <u>yan@tvisioninsights.com</u> wrote:

Perfect.

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00611702

**Ex. 11**



**Ex. 11**

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00611 703



Ex. 11

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00611 704



**Ex. 11**

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00611 705

**Ex. 11**







CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          TVSN_NLSN_00611 706

**Ex. 11**

Ex. 11

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY         TVSN_NLSN_00611 707

**Ex. 11**

# EXHIBIT 12

# EXHIBIT 13

## Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

------------------------------X

THE NIELSEN COMPANY (US), LLC, )

      Plaintiff, )

vs. ) No. 21-1592-CJB

TVISION INSIGHTS, INC., )

      Defendant. )

------------------------------)

THE NIELSEN COMPANY (US), LLC, )

      Plaintiff, )

vs. ) No. 22-57-CJB

TVISION INSIGHTS, INC., )

      Defendant. )

------------------------------X

Video-recorded deposition of JOANNE JOHNSON, at 333 West Wacker Drive, Chicago, Illinois, before Donna M. Kazaitis, IL-CSR, at 8:12 a.m. on Wednesday, January 24, 2024.

_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

## Page 2

APPEARANCES:

ON BEHALF OF THE PLAINTIFF:

    KELLEY DRYE & WARREN LLP

    BY:  DOUGLAS LEWIS, ESQ.

        333 West Wacker Drive

        Chicago, Illinois 60606

        312.857.7070

        dlewis@kelleydrye.com

ON BEHALF OF THE DEFENDANT:

    RIMON LAW

    BY:  ERIC C. COHEN, ESQ.

        P.O. Box B113

        150 Fayetteville Street, Suite 2800

        Raleigh, North Carolina 27601-2960

        984.960.2860

        eric.cohen@rimonlaw.com

ALSO PRESENT:

    Joseph Salinas (Legal Videographer)

## Page 3

INDEX

                    PAGE

JOANNE JOHNSON

    Examination by Mr. Lewis            6

EXHIBITS

JOHNSON                                  PAGE

Exhibit 1    Rebuttal expert report of         7
          Joanne Johnson

Exhibit 2    5/26/18 email,                    37
          TVSN_NLSN 00269606

Exhibit 3    2/2/18 email string,             111
          TVSN_NLSN 00660739 - 772

Exhibit 4    Tracxn web page                  170

Exhibit 5    crunchbase web page              173

Exhibit 6    "Start-ups and Early Stage       190
          Companies" article,
          TVision-JJ 00000015 - 25

Exhibit 7    Dr. Keeley's expert report       223
          on damages and Dr. Keeley's
          reply expert report on damages

## Page 4

EXHIBITS CON'T

JOHNSON                                  PAGE

Exhibit 8    Opening expert report of        223
          Dr. David Anderson regarding
          invalidity of U.S. Patent
          Number 7,783,889

Exhibit 9    Reply expert report of          224
          Pierre Moulin responding to
          report of Dr. David Anderson
          regarding infringement of U.S.
          Patent Number 7,783,889.

Exhibit 10    Rebuttal expert report of       224
          Dr. David Anderson regarding
          U.S. Patent Number 7,783,889

1 (Pages 1 to 4)

**Ex. 13**

16 (Pages 61 to 64)

**Ex. 13**

Ex. 13

Ex. 13



Ex. 13

Ex. 13

Ex. 13



Ex. 13

Ex. 13

Ex. 13

# EXHIBIT 14



**OCEAN TOMO®**

A PART OF JS|HELD

In the United States District Court for the District of Delaware

THE NIELSEN COMPANY (US), LLC

v.

TVISION INSIGHTS, INC.

CASE NO. 1:22-CV-00057-CJB

---

**SUPPLEMENTAL REBUTTAL EXPERT REPORT OF JOANNE JOHNSON**

**July 28, 2025**

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 14**



1.    **ASSIGNMENT** .................................................................................................................... 1

2.    **SUMMARY OF CHANGES TO THE JOHNSON REBUTTAL EXPERT REPORT** .................... 2

3.    **SIGNATURE** ..................................................................................................................... 7

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 14**



## 1.    ASSIGNMENT

1. I was retained by Rimon Law ("Counsel"), counsel for defendant, TVision Insights, Inc. ("TVision" or "Defendant"), in connection with this matter. In my Rebuttal Expert Report dated November 21, 2023, I analyzed certain accounting, financial, marketing, and other business data in order to identify the compensation that would be appropriate for The Nielsen Company (US), LLC ("Nielsen" or "Plaintiff") to receive in the event that one or more of the asserted claims of U.S. Patent No. 7,783,889 are found to be valid and infringed by the Defendant.[1] In my Rebuttal Expert Report, I also reviewed and assessed the Expert Report of Michael C. Keeley, dated October 25, 2023 ("Keeley Report").

2. In response to certain opinions expressed by Dr. Chris Kyriakakis, Nielsen's technical expert, in his opening expert report dated July 7, 2025 ("Kyriakakis Report"), I have been asked by counsel to update my Rebuttal Expert Report to the extent I relied on the opinions of Dr. Pierre Moulin, Nielsen's prior technical expert. As part of my analysis, I have also reviewed the Expert Report of Dr. Michael C. Keeley dated July 7, 2025 ("Keeley 2025 Report").[2] To the extent that my Rebuttal Expert Report referenced excerpts in the Keeley Report from 2023 that cited to Dr. Moulin, I have updated those references accordingly. Nothing in the Keeley 2025 Report has caused me to change my opinion.

3. My qualifications and experience are set forth in Exhibit 1 of my Rebuttal Expert Report and is incorporated herein by reference. Since the submission of my Rebuttal Expert Report, I have been Certified in Financial Forensics[3] and have been nationally recognized as a World Leading Patent Professional by the IAM Patent 1000. Ocean Tomo is presently being compensated for my work in this matter at a rate of $600 per hour. Other Ocean Tomo consultants are assisting me with this engagement and with rates under $600 per hour. No part of my compensation depends on the outcome of this litigation.

4. Exhibit 2 of my Rebuttal Expert Report includes a list of materials I have considered in this matter to date and is incorporated herein by reference. In addition, I have relied upon the following new information:

- Information prepared and produced by other experts:

    - Expert Report of Michael C. Keeley, Ph.D., July 7, 2025

    - Opening Expert Report of Chris Kyriakakis, July 7, 2025

    - Opening Expert Report of Paul Martin, July 7, 2025

---

[1] Rebuttal Expert Report of Joanne Johnson, November 21, 2023.

[2] I summarize all the changes in the Keeley 2025 Report in Exhibit 1 of this report.

[3] The American Institute of Certified Public Accountants (AICPA) established the CFF credential program for CPAs who specialize in forensic accounting and have demonstrated considerable expertise in forensic accounting through their knowledge, skills and experience.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 14**



- Opening Supplemental Expert Report of Dr. David Anderson Regarding Invalidity of U.S. Patent No. 7,783,889, July 7, 2025

- Supplemental Rebuttal Expert Report of Dr. David Anderson Regarding U.S. Patent No. 7,783,889, July 28, 2025 ("Anderson Supplemental Non-Infringement Report")

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 14**



<hr />

[4] Moulin Report, ¶¶ 66-68. *See also* Anderson Supplemental Non-Infringement Report, ¶¶ 117-118.
[5] Kyriakakis Report, ¶¶ 67-69.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Ex. 14



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 14**



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 14**



Ex. 14

[6] In my 2023 Rebuttal Expert Report, footnote 498 inadvertently cited to Dr. Moulin's report instead of Dr. Keeley's report. For sake of clarification, I have included this correction here.

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Ex. 14



## 3.    SIGNATURE

6.  I declare under penalty of perjury that the foregoing is true and correct.

Respectfully submitted,


_Joanne Johnson_                               July 28, 2025

Joanne Johnson                                      Date

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

Ex. 14

*The Nielsen Company (US), LLC v. TVision Insights, Inc.*
**SUMMARY OF CHANGES IN KEELEY 2025 REPORT**
Exhibit 1



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 14** Page 1 of 5

*The Nielsen Company (US), LLC v. TVision Insights, Inc.*
**SUMMARY OF CHANGES IN KEELEY 2025 REPORT**
Exhibit 1



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 14** Page 2 of 5

*The Nielsen Company (US), LLC v. TVision Insights, Inc.*
**SUMMARY OF CHANGES IN KEELEY 2025 REPORT**
Exhibit 1



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 14** Page 3 of 5

*The Nielsen Company (US), LLC v. TVision Insights, Inc.*
**SUMMARY OF CHANGES IN KEELEY 2025 REPORT**
Exhibit 1



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 14** Page 4 of 5

*The Nielsen Company (US), LLC v. TVision Insights, Inc.*
**SUMMARY OF CHANGES IN KEELEY 2025 REPORT**
Exhibit 1



HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 14** Page 5 of 5

## CERTIFICATE OF SERVICE

I hereby certify that on July 28, 2025, this document was served on the persons listed below in the manner indicated:

**BY EMAIL:**

David E. Moore
Bindu A. Palapura
Malisa C. Dang
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
mdang@potteranderson.com

Clifford Katz
Nithya Damodharan
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800
ckatz@kelleydrye.com
ndamodharan@kelleydrye.com

Steven Yovits
Constantine Koutsoubas
Jason P. Greenhut
Douglas Lewis
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
(312) 857-7070
syovits@kelleydrye.com
ckoutsoubas@kelleydrye.com
jgreenhut@kelleydrye.com
dlewis@kelleydrye.com

Matthew Chakmakian
KELLEY DRYE & WARREN LLP
One Jefferson Road 2nd Floor
Parsippany, NJ 07054
(973) 503-5900
mchakmakian@kelleydrye.com

Joshua B. Long
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd. Suite 900
Houston, TX 77027
(713) 355-5054
jlong@kelleydrye.com

**Ex. 14**

/s/ Lindsey M. Gellar
Andrew E. Russell (No. 5382)
Lindsey M. Gellar (No. 7202)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
lgellar@shawkeller.com
*Attorneys for Defendant*

2

**Ex. 14**

# EXHIBIT 15



929.900.5298

Get your copy of our Quarterly Attention Report

Ex. 15

HIGHLY CONFIDENTIAL - OUTSIDE ATTORNEY'S EYES ONLY

TVSN_NLSN_00269606

# EXHIBIT 16

Case 1:22-cv-00057-CJB    Document 389    Filed 01/12/26    Page 453 of 597 PageID #: 11566

9/8/2023        The Nielsen Company (US), LLC v. TVision Insights, Inc.    Daniel Schiffman
Highly Confidential - Outside Attorneys' Eyes Only

```
                                          Page 1
              UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF DELAWARE
     - - - - - - - - - - - - - - - -x
     THE NIELSEN COMPANY (US), LLC,   :
               Plaintiff,             :
          v.                          : Civil Action No.
     TVISION INSIGHTS, INC.,          : 21-1592-CJB
           Defendant.                 :
     - - - - - - - - - - - - - - - -x
     THE NIELSEN COMPANY (US), LLC,   :
               Plaintiff,             :
          v.                          : Civil Action No.
     TVISION INSIGHTS, INC.,          : 22-57-CJB
           Defendant.                 :
     - - - - - - - - - - - - - - - -x
                HIGHLY CONFIDENTIAL
              OUTSIDE ATTORNEYS' EYES ONLY
              DEPOSITION OF DANIEL SCHIFFMAN
                APPEARING REMOTELY

                 September 8, 2023
                     9:09 a.m.

     Reported by:  Lori J. Goodin, RPR, CLR, CRR,
                   RSA, California CSR #13959
     _____
                 DIGITAL EVIDENCE GROUP
               1730 M Street, NW, Suite 812
                 Washington, D.C. 20036
                    (202) 232-0646
```

```
                                          Page 2
              REMOTE APPEARANCES:

       FOR NIELSEN COMPANY:
            KELLEY DRYE & WARREN, LLP
            DOUGLAS LEWIS, ESQUIRE
            101 Park Avenue
            New York, New York  10178
            212-808-7800
            dlewis@kelleydrye.com

       FOR TVISION INSIGHTS, INC.:
            RIMON, LLP
            JASON XU, ESQUIRE
            1990 K Street, Northwest
            Suite 420
            Washington, D.C.  20006
            jason.xu@rimonlaw.com


       Also Present:
            Henry Marte, video/document tech
```

```
                                          Page 3
                INDEX TO EXAMINATION

     WITNESS:  DANIEL SCHIFFMAN

     EXAMINATION BY                          PAGE
     MR. LEWIS                                6


                INDEX TO EXHIBITS
     SCHIFFMAN
     EXHIBIT     DESCRIPTION            PAGE
     Exhibit 1   Subpoena to Mr. Schiffman    16
     Exhibit 2   Slide Deck, Next Generation
                 TV Measurement,
                 TVSN_NLSN_00626486        37
     Exhibit 3   Slide Deck, TVision Insights,
                 TVSN_NLSN_00287211        61
     Exhibit 4   e-mail thread, 1/20/17,
                 TVSN_NLSN_00134504        74
     Exhibit 5   e-mail thread, 8/6/18,
                 TVSN_NLSN_00638049        88
     Exhibit 6   Excel spreadsheet,
                 TVSN_NLSN_00311596        106
```

```
                                          Page 4
           INDEX TO EXHIBITS, CON'T
     SCHIFFMAN
     EXHIBIT    DESCRIPTION            PAGE
     Exhibit 7   Scenario Testing document,
                 TVSN_NLSN_00232541        115
     Exhibit 8   Methodology Guide, 2019,
                 TVSN_NLSN_00634644        117

           PRIOR MARKED EXHIBITS
             FIRST REFERRAL
     EXHIBIT                      PAGE
     Neumann Exhibit 16                18
     Liu Exhibit 13               29
     Liu Exhibit 27               93
     Liu Exhibit 30               97
```

Ex. 16

2 (Pages 5 to 8)

www.DigitalEvidenceGroup.com Digital Evidence Group C'rt 2023                202-232-0646

5 (Pages 17 to 20)

**Ex. 16**

9/8/2023        The Nielsen Company (US), LLC v. TVision Insights, Inc.    Daniel Schiffman

**Ex. 16**

6 (Pages 21 to 24)

9/8/2023         The Nielsen Company (US), LLC v. TVision Insights, Inc.     Daniel Schiffman

**Ex. 16**

7 (Pages 25 to 28)

# EXHIBIT 17

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 22-057-CJB |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | **CONFIDENTIAL -** |
| TVISION INSIGHTS, INC., | ) | **OUTSIDE ATTORNEYS'** |
| | ) | **EYES ONLY** |
| Defendant. | ) | |
| | ) | |
| | ) | |

## OPENING SUPPLEMENTAL EXPERT REPORT OF DR. DAVID ANDERSON REGARDING INVALIDITY OF U.S. PATENT NO. 7,783,889

**Ex. 17**

**TABLE OF CONTENTS**

I.    QUALIFICATIONS AND BACKGROUND .......................................................1

II.   SUMMARY OF THE PATENT-IN-SUIT AND RELATED TECHNOLOGY.... 4

      A.    The '889 Patent ......................................................................................4

      B.    Fast Fourier Transform ("FFT") Operations ...................................6

      C.    Signal Analysis using Overlapping Frames ...................................11

      D.    Content Recognition ...........................................................................14

III.  Level of Skill of One of Ordinary Skill in the Art .................................16

IV.   Summary of Opinions ...................................................................................17

V.    CLAIM CONSTRUCTION ...........................................................................17

VI.   LEGAL FRAMEWORK .................................................................................18

      A.    Anticipation ..........................................................................................18

      B.    Obviousness ..........................................................................................19

      C.    Written Description .............................................................................20

      D.    Priority Date .........................................................................................20

VII.  SUMMARY OF ANTICIPATION AND OBVIOUSNESS ...............................21

      A.    Summary of Prior Art .........................................................................21

      B.    Haitsma US ...........................................................................................23

      C.    Wang 2002 .............................................................................................28

      D.    Cheung ...................................................................................................34

      E.    Secondary Indications of Obviousness ...........................................41

VIII. OTHER GROUNDS OF INVALIDITY ..........................................................43

      A.    Lack of Written Description ...............................................................43

      B.    Unpatentable Subject Matter .............................................................45

IX.   MATERIALS CONSIDERED .........................................................................46

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**   **Ex. 17**

i

My name is David Anderson. The following is my report summarizing the subjects, background, facts, and opinions regarding the invalidity of U.S. Patent No. 7,783,889 ("the '889 Patent") about which I expect to testify in this case if called upon to do so.

## I.    QUALIFICATIONS AND BACKGROUND

1.    I am a professor in the School of Electrical and Computer Engineering at the Georgia Institute of Technology ("Georgia Tech") in Atlanta, Georgia. I have been a professor at Georgia Tech since 1999. In 2009 I served as a visiting professor in the Department of Computer Science at Korea University in Seoul, South Korea.

2.    I received my Ph.D. in Electrical and Computer Engineering from Georgia Tech in 1999. I received my B.S. and M.S. in Electrical Engineering from Brigham Young University in 1993 and 1994, respectively.

3.    In my employment prior to Georgia Tech as well as in my subsequent studies and research, I have worked extensively in areas related to the research, design, and implementation of speech and audio processing systems, as well as in signal processing, including work on face recognition, optical flow (analysis of movement in video images), and imaging. I have also taught graduate and undergraduate level courses at Georgia Tech on the implementation of human-centered computing applications. For example, I have taught courses on machine learning for speech, pattern recognition, multimedia processing and systems, software design, real-time signal processing systems, and applications of signal processing (covering topics in audio processing and speech recognition). I have also designed and taught a course on signal processing in the context of human perception. These courses and my research have covered many topics relevant to the subject matter of the patents at issue and the prior art cited therein.

1

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY   Ex. 17

4.     I also have extensive experience with software design for embedded systems and various aspects of real-time signal processing. For example, I supervised the student development of an ultra-low-power hotword detector using a micro-power analog processing front end with a low-power microcontroller for recognition. This system was designed to wake up a more powerful processor upon detection of a hotword. In 2004, I received the Presidential Early Career Award for Scientists and Engineers, presented by then-President George W. Bush, for my work on ultra-low-power signal processing system design.

5.     I have served as principal investigator or co-principal investigator in numerous multi-disciplinary research projects including "Improved Speech Analysis, Coding, and Enhancement using Microradars," "Low–Power Analog Image Processing Using Transform Imagers," "The behavioral simulation results of the optical flow estimation algorithm for CADSP system design," "Blind Source Separation for Audio," "Audio Classification," "Auditory Scene Analysis," "Hearing Aid Audio Processing," "Speaker Driver Sound Enhancement," "I-Vector Based Voice Quality," "Analysis of Voice Exercise Using Signal Processing," and "Smart Homes for Effective and Safe Remote Work During a Pandemic and Beyond."

6.     I have published over 200 book chapters and papers in reviewed journals and conferences. Topics include those such as "A physiologically inspired method for audio classification," "Checkerboard-type filtering for a low-power gradient-based optical flow estimation system," "The wavelet-based multi-resolution motion estimation using temporal aliasing detection," "Improved wavelet-based embedded image coding using a dynamic index reordering vector quantizer," "Compressive sensing on a CMOS separable

2

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY     Ex. 17

transform image sensor," "Improved wavelet-based embedded image coding using a dynamic index reordering vector quantizer," "Modulation features: In pursuit of invariant representations of music with application to unsupervised source identification," "Online tensor robust principal component analysis," "Distributed acquisition and processing systems for speech and audio," "A missing data-based feature fusion strategy for noise-robust automatic speech recognition using noisy sensors," "Learning distances to improve phoneme classification," "Identification of voice quality variation using i-vectors," "Varying time-constants and gain adaptation in feature extraction for speech processing," "Low bit-rate coding of speech in harsh conditions using nonacoustic auxiliary devices," "Multi-sensor spectro-temporal comb filtering for speech enhancement," "Evaluation of a hearing compensation algorithm," "Speech analysis and coding using a multi-resolution sinusoidal transform," "Biologically inspired auditory sensing system interfaces on a chip," "Cascade classifiers for audio classification," and "A multi-channel temporal attention convolutional neural network model for environmental sound classification."

7.      I have also contributed book chapters for treatises such as "Independent Component Analysis for Audio and Biosignal Applications," and written a book on Fixed-Point Signal Processing which is related to the practical implementation of systems for processing sound and other signals.

8.      I am a named inventor on eight patents, including "Speech activity detector for use in noise reduction system, and methods therefor" (U.S. Patent No. 6,351,731), and "Analog audio signal enhancement system using a noise suppression algorithm" (U.S. Patent No. 7,590,250).

9.      I am a Senior Member of the Institute of Electrical and Electronics

3

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**    Ex. 17

Engineers ("IEEE") and have been a Member since 1991. I am also a Member of the IEEE Signal Processing Society and Communications Society. From 1994 to 2016, I was also a member of the Acoustical Society of America. In 2003, I served as the Co-Chair for the NSF Symposium on Next Generation Automatic Speech Recognition.

10.     I have won numerous awards for my work including the Presidential Early Career Award for Scientists and Engineers, being named a US Frontiers of Engineering Fellow by the National Academy of Engineering, and being named a Frontiers of Science Fellow by the National Academy of Science.

11.     I am being compensated by TVision for my time spent in connection with the study and analysis in this matter in the amount of $450 per hour.  None of this compensation is dependent on the contents of my opinions or the outcome of this case.

12.     I may amend or supplement my opinions to address any issues raised by any other proposed experts or resulting from any additional information or documents that become available, including any depositions that have yet to be taken or based on any further orders or rulings by the Court in this case.  I may also testify about matters: (1) raised on direct or cross-examination at trial; (2) necessary to rebut any other matters that the Court allows any party or experts to introduce or rely upon; or (3) otherwise raised at trial by counsel or the Court in relation to matters set forth herein.

## II.     SUMMARY OF THE PATENT-IN-SUIT AND RELATED TECHNOLOGY

### A.     The '889 Patent

13.     The '889 patent claims "methods and apparatus for generating signatures for use in identifying media information." '889 patent, 1:15-17.  Most of the techniques disclosed in the patent were known in the art, including generating signatures based on

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**   Ex. 17

spectral data. *See id.*, 1:21-26, 2:55-60. The '889 patent purports to improve on prior art techniques by forming a signature based on comparisons of spectral powers within a single frame of samples, rather than comparing spectral powers across multiple frames of samples. *Id.*, 2:55-3:5, 8:1-4.

14.     As shown in Figure 3 of the '889 patent, the method disclosed in the patent splits the audio signal into overlapping "frames." *Id.*, 1:53-55, 7:58-61. Each frame is transformed from the "time domain" to the "frequency domain" by performing a spectral transformation such as a "Fast Fourier Transform," or "FFT." *Id.*, 13:37-45, 14:12-20, 14:40-50, 22:31-37. An FFT is a well-known mathematical operation used to determine the energy, or "spectral power," of individual frequency components of a signal. *Id.*, 13:37-45. Performing an FFT results in a frequency spectrum that can be used to obtain the spectral power for each frequency component. *Id.*, 14:41-44, 16:45-48.

15.     The method disclosed in the '889 patent generates a "signature" for a sample by comparing the spectral power of frequency components within the frequency spectrum generated by the FFT. *Id.*, 16:19-60; 22:66-23:6. The software first identifies two or more frequency components within the frequency spectrum for the frame. *Id.*, 16:30-44; 22:38-58. It then compares those components to create a "descriptor" of the frame. *Id.*, 16:49-60, 22:66-23:6. The descriptor may, for example, be a single-bit descriptor consisting of a 1 or a 0, corresponding to a comparison of the relative spectral powers of the components. *Id.*, 16:49-60. In that case, if the spectral power of the first identified frequency component is greater than that of the second component, the resulting descriptor bit is 1; if not, it is 0. *Id.*

16.     This process is repeated, if necessary, identifying and comparing additional

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY      Ex. 17

sets of frequency components to form additional descriptors. *Id.*, 16:55-60, Fig. 5. These descriptors are then joined (or "concatenated") together to form a signature.[1] *Id.*, 16:6-18, 23:7-10. For example, if the descriptors are 1, 0, 1, 1, 1, 0, 1, and 1, then the resulting 8-bit signature would be 10111011. For the method to work, the same frequency components must be identified to form both the reference signature used at the reference site and the monitored signature at the monitoring site. *Id.*, 16:37-41; 8:9-17. Otherwise, the signature generated at the monitoring site would not match the reference signature. *Id.*

### B.  Spectral Transform Operation and Fast Fourier Transform ("FFT") Operations

17.   An FFT is a mathematical operation that converts a signal from the time domain to the frequency domain. FFT operations are well known in the signal processing field, and are not unique to the '889 patent.

18.   To aid in describing the operation of an FFT, I created several example depictions of an audio signal. The first, shown below, depicts the signal as recorded in the time domain:



*Figure 1: Time Domain Audio Signal*

---

[1] The patent describes that once the device generates the first signature, the same process may repeat, generating a second signature. *Id.*, 16:15-18. This second signature is the signature of an overlapping frame (i.e., a frame that shares some samples with the first frame). *Id.*, 10:3-6.

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**    **Ex. 17**

19.    The audio signal shown in Figure 1 consists of a number of samples captured over a period of time.

20.    Performing an FFT of the signal shown in Figure 1 returns the frequency content of a signal, resulting in a frequency spectrum consisting of the magnitude and phase for each FFT frequency bin. Audio signals are real-valued, that is, the samples can be expressed using real numbers instead of complex numbers. For such signals, an FFT having a size parameter, $N$, will return $N$ values; but only $N/2+1$ of those values contains unique information. Therefore, in the discussion below and consistent with standard practice, only the $N/2+1$ unique values will be shown and discussed. The other values correspond to "negative frequencies" and only have significance for complex valued signals.

21.    Figure 2 shows the result of an FFT of the signal shown in Figure 1, showing the magnitude of each FFT bin.



Figure 2: Result of FFT

22.    Each of the red circles in Figure 2 shows the magnitude of a frequency component corresponding to a frequency "bin." Each bin is numbered with an index (0, 1, 2, 3, and so on). In the example shown in Figure 2, the bins are numbered 0 through 64. The spectral power of each frequency component is a function of its magnitude.

23.    The number of bins returned by the FFT depends on the parameters of the FFT operation, not on the content of the signal analyzed. For signals that are longer than

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY    **Ex. 17**

the FFT length, $N$, the signal may be divided into shorter sections and analysis may then be performed on those short sections (often called blocks, frames, or windows). The FFT shown in Figure 2, for example, will always return 65 evenly-spaced bins, regardless of the signal, for the positive frequency portion of the spectrum as shown in Figure 2. The magnitude of each frequency component, on the other hand, will vary depending on the content of the underlying signal. For some signals, some of the frequency components may have no magnitude or spectral power at all (a value of zero).

24.     A signal may include an infinite number of frequencies and may contain components of any frequency of up half of the frequency at which the signal was sampled. However, there are only a finite number of frequency bins with which to represent that variety of frequencies. As a result, each bin represents the contribution of a range or band of frequencies in the original signal.

25.     An FFT can be performed in such a way that it returns any number of bins. As the number of bins increase, the portion of the underlying frequencies each bin represents will decrease. The person or software performing the FFT determines the number of bins.

26.     Figure 3 illustrates which frequencies contribute to a particular FFT output value (in this example, bin 4) and the relative weight or contribution strength of each frequency:



Figure 3: An FFT Component Overlaid with the Range of Frequencies that Contribute to It

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**     Ex. 17

27.   The bin number can be converted to a frequency if the original sampling frequency is known.

28.   For example, if the original signal was sampled at 16 kHz, then the spacing between each bin shown in Figure 3 is 16000/(16*2)=500 Hz, where 16 is the FFT length divided by two.[2]  For this example, the value of FFT bin 4 represents, primarily, the contribution of frequencies between 1500 Hz and 2500 Hz.

29.   Figure 3 further shows an example of spectral leakage effect, where neighboring bins can influence each other.  The spectral leakage is known in the art and is an inherent property of the mathematics of frequency analysis used to perform the FFT. This leakage is shown in the Figure 3 above, and it is why the frequency component shown in Figure 3 corresponds *primarily* with the range of frequencies within its bin.

30.   When persons of skill in the art discuss frequency components, the fact that leakage must be accounted for is implicit and understood.  For example, when a person of skill in the art describes a frequency component that corresponds to a band of frequencies between 0 Hz and 375 Hz, it is understood that that range is what the frequency component is intended to correspond to, and that leakage will normally be present.

31.   The purpose of the FFT is to determine the frequency components and the magnitude and phase of the signal for each corresponding bin of frequencies. The leakage is a side effect of the mathematical operation used, and is known and expected in the art.

32.   Thus, each FFT bin represents the frequency content in the original signal over a range of frequencies.

---

[2] As explained above, for a length 32 FFT, only the bins 0-16 bins would provide unique information for a real signal.

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**   Ex. 17

33.     An FFT is a mathematical operation. It does not choose or select frequency components. Instead, it results in a frequency spectrum showing the contribution of the frequency components of the underlying signal corresponding to predetermined bins.

34.     The FFT is not the only method of transforming a time-domain signal into a frequency-domain signal.  There are many different such transforms and many variations on each.  For example, the DCT (discrete cosine transform) and various wavelet transforms are commonly used in audio and other signals.  Some transforms can use the FFT as an intermediate step, often for the purposes of increasing computational efficiency.

35.     The FFT is one type of spectral transform operation.

36.     In the '889 patent claims, the fast Fourier transform (FFT) only appears as a limitation in dependent claim 7.  I understand that a dependent claim must be narrower in scope than the claim from which it depends.  For that reason alone, the "spectral" limitations of claim 1 should not be interpreted to include only FFT operations or components.

37.     The '889 patent describes multiple embodiments including embodiments in which a wavelet operation is used for the spectral transform.  *See* '889 patent at Fig. 7, Fig. 10, 3:6-21, 16:61-17:6, 23:49-59.  The wavelet operation was termed a spectral transform in the '889 specification.  *See id*. at 2:65-3:5 ("For example, using the methods and apparatus described herein, a digital spectral signature may be generated by obtaining a frame of media samples, determining spectral power values by performing a ***spectral transform*** (***e.g.,*** a FFT, ***a wavelet transform***, etc.) on the frame of media samples, and performing an intraframe operation (e.g., a comparison) based on two or more spectral power values that are uniquely associated with the frame of media samples.") (emphasis

10

added). Furthermore, by including "etc.," the list of spectral transforms was not limited to only FFT's and wavelet transforms.

38.    The '889 patent describes the wavelet as producing multiple sub-bands. *See id.* at 3:13-21. Then the energy in each subband is determined by squaring and summing the wavelet subband values. *See id.* at 19:8-16. The descriptor bit is then based on the comparisons of these energy values. *See id.* at 19:17-39. A POSITA understands that the power and energy of spectral components are almost always treated as equivalent.[3] In the '889 patent, the terms "power" and "energy" seem to be used interchangeably. Indeed, the specification refers to the results of the wavelet operations which are compared to produce descriptors as both "spectral powers" and "energies." *See, e.g.*, '889 patent at 3:1-5, 19:8-28.

39.    Thus, the '889 patent contemplates various methods for generating spectral powers including methods that involve summing and squaring values in a band after an initial transform step. This is consistent with a POSITA's understanding—a spectral transform operation such as an FFT may be used as an intermediate step in computation or computing a different spectral transform.

C.    **Signal Analysis using Overlapping Frames**

40.    When operating on real signals, it is common to do spectral analysis on shorter frames (or segments of a signal) rather than the entire signal. In this way, the spectrum can be analyzed at different points in time—a very important concept for when

---

[3] The power of a spectral component is defined as the squared magnitude of that component (*See*, Richard G. Lyons, Understanding Digital Signal Processing, 2001, page 54). In physics, energy is the sum or integral of power over time. However, a spectral transform performed on an entire frame of samples yields only a single spectral power per frequency. The sum of power over time (energy) is reduced to the sum of that single spectral power component and so the energy and power are the same.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY    Ex. 17

the signal changes as a function of time.  The short-time Fourier transform (STFT) is one method of performing such analysis.  It is defined as $X_m(f) = \sum_{n=-\infty}^{\infty} x(n)g(n - mR)e^{-j2\pi fn}$ where $x(n)$ is the the input signal and $g(n)$ is a window that selects and shapes a short segment of the signal.  R is the amount that the window shifts for each frame.

$$X_m(f) = \sum_{n=-\infty}^{\infty} x(n)\,g(n - mR)\,e^{-j2\pi fn}.$$



41.    Matlab, a widely used software tool for signal processing, has a built-in function for performing the STFT that uses overlapping frames by default:

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY    Ex. 17

**Description**

s = spectrogram(x) returns the Short-Time Fourier Transform (STFT) of the input signal x. Each column of s contains an estimate of the short-term, time-localized frequency content of x. The magnitude squared of s is known as the *spectrogram* time-frequency representation of x [1].

s = spectrogram(x,window) uses window to divide the signal into segments and perform windowing.

s = spectrogram(x,window,noverlap) uses noverlap samples of overlap between adjoining segments.

s = spectrogram(x,window,noverlap,nfft) uses nfft sampling points to calculate the discrete Fourier transform.

The default overlap value is 50% but may be specified to be any number of points. (https://www.mathworks.com/help/signal/ref/spectrogram.html).

42.     Overlapping frames are used in speech coders, speech recognition, frequency analysis, music compression (*e.g.*, mp3), signal enhancement and filtering (*e.g.*, background noise suppression), sound classification, and music recognition.  One of the reasons that overlapping frames are important is that the windowing functions used in frequency analysis tend to emphasize the characteristics of the middle of a frame.  Thus, without overlapping frames, the signal characteristics of either end of a frame would not be adequately represented in the analysis.  By using overlapping frames, the signal characteristics of the endpoints from one frame may be more central, and thus more fully considered, in the transformation of a neighboring overlapping frame.  Another important reason for overlapping frames in recognition, classification, or related tasks is that it is generally not possible to line up the frame boundaries on a new, unknown signal with the frame boundaries of the template signals.  By having a high overlap between frames, the maximum shift in frame boundaries between the template and the signal under analysis can be made arbitrarily small.  This is discussed in some of the prior art references discussed

13

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY     Ex. 17

below (such as Zheng and Haitsma).

43.     In summary, using overlapping frames for analysis of signals was and is a common and recommended practice that predates the '889 patent.  It was well-known in the art.

**D.     Content Recognition**

44.     Pattern recognition as a discipline has been around for many years and the basic concepts are well-developed.  For example, automatic speech recognition (ASR) predates the '889 patent by decades and operates by dividing audio into overlapping frames, performing a spectral transformation on each of the frames, computing features or descriptors from the spectra of each frame, and using these features to find the best match for a phoneme, syllable, word, or phrase.

45.     Music and other recorded audio content recognition and retrieval employs the same basic concepts but differs from ASR in a few particulars.  Since recorded audio content is generally played back at the same rate or nearly the same rate in every case, the temporal structure is largely fixed (as opposed to speech in which people may say the same word or phrase quickly or slowly).  This is important for recognition of the entire signal and will be discussed below.  Beginning around 2000, researchers also began exploring audio features that would be robust to distortion due to noise, compression, or playback systems; as well as exploring ways to efficiently perform pattern matching using these features with large databases.  The result was that the spectral features for recorded audio content often included functions of spectral peaks (which should stand out above noise and be preserved in compression algorithms) as well as other features that represent salient aspects of an audio signal.  The features are then used to develop signatures which are

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**      **Ex. 17**

"summarized" into hashes or descriptors which are compared against those in a reference database. There may be many false matches for any given single descriptor but if there are matches to a particular song or audio content which occur over many frames, then the content is considered to have been identified.

46.     These concepts were common among music and other recorded audio content recognition methods published by multiple researchers including Srinivasan, Wang, Haitsma, Kenyon, Jackson, Cheng, Yang, and others. For example, in 2001, Yang gave the structure of an index-based retrieval system.



Yang[4], Fig. 1

47.     Yang goes on to explain steps that include using a spectral transform (FFT), and identifying salient peaks

---

[4] *Yang*, "MACS: MUSIC AUDIO CHARACTERISTIC SEQUENCE INDEXING FOR SIMILARITY RETRIEVAL," 21-24 October 2001, available at https://citeseerx.ist.psu.edu/viewdoc/download;jsessionid=846EE2080EBF48109ED449F A1FB9DAE7?doi=10.1.1.125.9377&rep=rep1&type=pdf.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Ex. 17

1. Use the Short-Time Fourier Transform (STFT) to convert each signal into a spectrogram: split each signal into 1024-byte-long segments with 50% overlap, window each segment with a Hanning window and perform 2048-byte zero-padded FFT on each windowed segment. Taking absolute values (magnitudes) of the FFT result, we obtain a spectrogram giving localized spectral content as a function of time.

2. Plot the instantaneous power as a function of time. Figure 2 shows such a power plot for a 40-second sound clip of Tchaikovsky's Piano Concerto No. 1.

3. Identify peaks in the power plot, where peak is defined as a local maximum value within a neighborhood of a fixed size. This definition helps remove certain bogus local "peaks" which are immediately followed or preceded by higher values. For example, in Figure 3, $A, B, C$ are true peaks but $D$ is a bogus peak. Intuitively, these peaks roughly correspond to distinctive notes or rhythmic patterns, but with some errors, which will be compensated later.

4. Extract frequency components near each peak. We take 180 samples of frequency components between 200Hz and 2000Hz. Average values over a short time period following the peak are used in order to reduce sensitivity to noise and to avoid the "attack" portions produced by certain instruments

48.     Haitsma, Kenyon, Jackson, Cheng, and Wang as described below also use the same basic approach of dividing the signal into overlapping frames, computing a spectral transformation of each frame, identifying salient features or characteristics of the spectra (signatures), converting these features into descriptors or hashes, and using these to match the received audio to samples in a database. The main differences between their methods are in the details of how the signatures are generated. An important observation is that the steps are largely interchangeable—meaning that the basic structure and operation of a content-recognition system remain the same if another signature- and/or hash-generation method is substituted.

## III.    LEVEL OF SKILL OF ONE OF ORDINARY SKILL IN THE ART

49.     In my opinion, a person of ordinary skill in the art in the field of the '889 Patent would have a working knowledge of basic computer technology and content recognition technology. The person would gain this knowledge through either (i) an

16

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY  **Ex. 17**

# EXHIBIT 18

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 22-057-CJB |
| | ) | |
| v. | ) | **HIGHLY CONFIDENTIAL** |
| | ) | **OUTSIDECOUNSEL ONLY** |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## SUPPLEMENTAL REBUTTAL EXPERT REPORT OF
## DR. DAVID ANDERSON REGARDING U.S. PATENT NO. 7,783,889

**HIGHLY CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

Ex. 18

## TABLE OF CONTENTS

I.    INTRODUCTION..................................................................................1

II.    QUALIFICATIONS AND BACKGROUND ..................................................2

III.    METHODOLOGY USED........................................................................5

    1.    Infringement................................................................................6

    2.    The Reverse Doctrine of Equivalents .........................................6

IV.    LEVEL OF ORDINARY SKILL ................................................................7

V.    THE PATENT-IN-SUIT AND RELATED TECHNOLOGY .......................................7

    1.    Overview......................................................................................7

    2.    The Asserted Claims ..................................................................9

    3.    Spectral Transform Operations and Fast Fourier Transform ("FFT") Operations ................................................................12

VI.    CLAIM CONSTRUCTION ......................................................................16

VII.    SUMMARY OF OPINIONS....................................................................17

VIII.    NON-INFRINGEMENT ANALYSIS .........................................................17

    1.    Summary of the Accused Product Features .............................17

    2.    Independent Claim 1 ................................................................21

        a)    "Reference Fingerprints" ................................................21

        b)    "determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power" ......................................................................22

        c)    "generating a first signature based on the first descriptor" .......................32

        d)    "identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples" ........................................................35

        e)    "determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power"................................37

**HIGHLY CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

Ex. 18

|  | f) | "generating a second signature based on the second descriptor" ...............37 |
|---|---|---|
|  | 3. | Claim 1 Dependent Claims ...............................................................38 |
|  | 4. | Independent Claim 8 ...........................................................................39 |
|  | 5. | Claim 8 Dependent Claims ...............................................................39 |
|  | 6. | Independent Claim 14 .........................................................................40 |
|  | 7. | Claim 14 Dependent Claims .............................................................41 |
| IX. | **OTHER ANALYSIS** | **...................................................................................42** |
|  | 1. | Alleged Innovations of the '889 Patent ...............................................42 |
|  | 2. | Non-infringing Alternatives...............................................................49 |
|  | 3. | Comparability of Gracenote License ...................................................53 |
| X. | **MISCELLANEOUS** | **............................................................................................55** |

Ex. 18

## I.    INTRODUCTION

1.    I understand that The Nielsen Company (US), LLC ("Nielsen") has alleged that TVision Insights, Inc. ("TVision") infringes claims 1, 2, 4, 6, 8, 9, 12-14, 16, 17 ("asserted claims") of U.S. Patent No. 7,783,889 ("the '889 Patent" or "patent-in-suit").

2.    I have been retained by TVision as an expert in this case to provide opinions and conclusions regarding the asserted claims of the patents-in-suit and to evaluate and address the infringement opinions of Dr. Chris Kyriakakis, who has been engaged by Nielsen, as set forth in his report dated July 7, 2025 ("Kyriakakis Report"). Dr. Kyriakakis relies on the report of Dr. Paul Martin dated July 7, 2025 ("Martin Report"). To the extent my opinion applies differently to the Kyriakakis Report and the Martin Report, I will address them separately. Otherwise, my opinions apply to both reports.

3.    This report provides the bases for my conclusion that accused TVision product(s) do not infringe any of the asserted claims. I have reviewed the patent-in-suit, the respective prosecution histories for the patent-in-suit, the accused TVision product(s), and other documents in forming the opinions expressed in this report. The materials I reviewed and/or relied upon are listed below.

4.    If Dr. Kyriakakis, Dr. Martin, or Nielsen is permitted to offer any additional or different opinions regarding infringement in reply or for any other reason, I reserve the right to supplement my report or to otherwise address such opinions and to provide any rebuttal opinions in response. To the extent Dr. Kyriakakis or Dr. Martin is permitted to supplement or amend his reports to provide any such information, I reserve the right to address any such information or opinions and to supplement my report to the extent necessary.

**HIGHLY CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

Ex. 18



Ex. 18

CONFIDENTIAL, OUTSIDE COUNSEL ONLY

Ex. 18

-23-



Ex. 18

CONFIDENTIAL, OUTSIDE COUNSEL ONLY

-24-



Ex. 18

CONFIDENTIAL, OUTSIDE COUNSEL ONLY

-25-



Ex. 18

CONFIDENTIAL, OUTSIDE COUNSEL ONLY

-26-



Ex. 18

CONFIDENTIAL, OUTSIDE COUNSEL ONLY

-27-



CONFIDENTIAL, OUTSIDE COUNSEL ONLY

Ex. 18

-28-



**CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

Ex. 18

-29-



Ex. 18

CONFIDENTIAL, OUTSIDE COUNSEL ONLY



Ex. 18

CONFIDENTIAL, OUTSIDE COUNSEL ONLY



Ex. 18

CONFIDENTIAL, OUTSIDE COUNSEL ONLY

Ex. 18



Ex. 18

CONFIDENTIAL, OUTSIDE COUNSEL ONLY

Ex. 18

-47-



Ex. 18

CONFIDENTIAL, OUTSIDE COUNSEL ONLY
-47-

Ex. 18



CONFIDENTIAL, OUTSIDE COUNSEL ONLY

-49-



Ex. 18

CONFIDENTIAL, OUTSIDE COUNSEL ONLY



Ex. 18

CONFIDENTIAL, OUTSIDE COUNSEL ONLY

Ex. 18



CONFIDENTIAL, OUTSIDE COUNSEL ONLY

Ex. 18



**CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

Ex. 18



Ex. 18

CONFIDENTIAL, OUTSIDE COUNSEL ONLY

Ex. 18

# EXHIBIT 19

## Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

- - - - - - - - - - - - - - - - -x
THE NIELSEN COMPANY (US), LLC,   :
      Plaintiff,                :
   v.                             : Civil Action No.
TVISION INSIGHTS, INC.,          : 21-1592-CJB
     Defendant.                   :
- - - - - - - - - - - - - - - - -x
THE NIELSEN COMPANY (US), LLC,   :
      Plaintiff,                :
   v.                             : Civil Action No.
TVISION INSIGHTS, INC.,          : 22-57-CJB
     Defendant.                   :
- - - - - - - - - - - - - - - - -x

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
Videotaped deposition of Inderbir Sidhu
in his individual capacity and as 30(b)(6) witness
for TVision Insights, Inc.
Boston, Massachusetts
August 31, 2023
9:03 a.m.

Reported By: Alan H. Brock, RDR, CRR

_____

DIGITAL EVIDENCE GROUP
1730 M Street, NW, Suite 812
Washington, D.C. 20036
(202) 232-0646

## Page 2

     A P P E A R A N C E S
ON BEHALF OF PLAINTIFF:
   CONSTANTINE KOUTSOUBAS, ESQ.
   STEVEN YOVITS, ESQ.
   KELLEY DRYE & WARREN LLP
   333 West Wacker Drive
   Chicago, Illinois 60606
   312.857.7070
   ckoutsoubas@kelleydrye.com
   syovits@kelleydrye.com

ON BEHALF OF DEFENDANT:
   MICHAEL F. HEAFEY, ESQ.
   RIMON LAW P.C.
   800 Oak Grove Avenue, Suite 250
   Menlo Park, California 94025
   650.641.4433
   michael.heafey@rimonlaw.com

ALSO PRESENT:
   Adam Cerro, Videographer

## Page 3

C O N T E N T S
EXAMINATION OF INDERBIR SIDHU                PAGE
   By Mr. Koutsoubas                            9

E X H I B I T S
SIDHU DEPOSITION EXHIBITS                    PAGE
Exhibit 1   Notice of Deposition of Inderbir    6
       Sidhu
Exhibit 2   Plaintiff The Nielsen Company       6
       (US), LLC's Notice Under Rule
       30(b)(6) to TVision
Exhibit 3   Plaintiff The Nielsen Company       6
       (US), LLC's First Supplemental
       Notice Under Rule 30(b)(6) to
       TVision
Exhibit 4   U.S. Patent 7,783,889               6
Exhibit 5   TVision Insights, Inc.'s            8
       Responses and Objections to
       Plaintiff The Nielsen Company
       (US), LLC's Notice Under Rule
       30(b)(6) to TVision

## Page 4

E X H I B I T S, CON'T
SIDHU DEPOSITION EXHIBITS                    PAGE
Exhibit 6   Email chain, TVSN_NLSN_00277168 -   15
       00277170
Exhibit 7   TVision Insights, Inc.'s First      39
       Supplemental Objections and
       Responses to The Nielsen Company
       (US), LLC's Third Set of
       Interrogatories
Exhibit 8   Confluence printout,                47
       TVSN_NLSN_00001436 - 00001467
Exhibit 9   System Architecture Overview        64
       Diagrams, Linux Devices (2021),
       TVSN_NLSN_00695873 - 00695878
Exhibit 10  System Architecture Overview        73
       (Spring 2022), TVSN_NLSN_00695899
       - 00695900
Exhibit 11  Diagram attachment to Exhibit 10    73
Exhibit 12  ACRCloud architecture diagram,      80
       TVSN_NLSN_00000331

1 (Pages 1 to 4)

Ex. 19

8/31/2023          The Nielsen Company (US), LLC v. TVision Insights, Inc.          Inderbir Sidhu
                                Highly Confidential - Attorneys' Eyes Only

Ex. 19

32  (Pages 125 to 128)

# EXHIBIT 20

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE


-------------------------------x
THE NIELSEN COMPANY (US), LLC,:
                              :
            Plaintiff,        :        C.A. No.
      vs.                     :
                              :        22-057-CJB
TVISION INSIGHTS, INC.,       :
                              :
            Defendant.        :
-------------------------------x


         **  HIGHLY CONFIDENTIAL  **

      **  OUTSIDE ATTORNEYS' EYES ONLY  **


      VIRTUAL VIDEOTAPED DEPOSITION OF

         INDERBIR SIDHU - VOLUME 2

         Tuesday, September 9, 2025

       3:31 p.m. Eastern Daylight Time


REPORTER:   Dawn A. Jaques, CSR, CLR

      _____

            DIGITAL EVIDENCE GROUP
          1730 M Street, NW, Suite 812
          Washington, D.C.  20036

              (202) 232-0646

**Page 184**

APPEARANCES:

On behalf of the Plaintiff, The Nielsen Company:

    KELLEY DRYE & WARREN LLP

    By:  Douglas Lewis, Esq.

        Elizabeth N. Krasnow, Esq.

    333 West Wacker Drive

    26th Floor

    Chicago, Illinois  60606

    (312) 857-7073   (Mr. Lewis)

    (212) 808-5137   (Ms. Krasnow)

    dlewis@kelleydrye.com

    ekrasnow@kelleydrye.com

On behalf of the Defendant, TVision Insights:

    RIMON LAW

    By:  Eric C. Cohen, Esq.

    4030 Wake Forest Road

    Suite 300

    Raleigh, North Carolina  27609

    (984) 960-2860

    eric.cohen@rimonlaw.com

**Page 186**

I-N-D-E-X

WITNESS:                                    PAGE:

INDERBIR SIDHU

    Examination by Mr. Lewis          188, 243

    Examination by Mr. Cohen              242

E-X-H-I-B-I-T-S

SIDHU DEPOSITION EXHIBIT:                   PAGE:

Exhibit 20  November 21, 2023, Rebuttal

    Expert Report of Joanne

    Johnson                              187

Exhibit 21  August 1, 2025, Supplemental

    Rebuttal Expert Report of

    Dr. David Anderson Regarding

    U.S. Patent No. 7,783,889      187

Exhibit 22  Exhibit 6.2, TVision Upfront

    Cost to Develop Internal

    ACR System                           228

**Page 185**

APPEARANCES (Continued):

VIDEOGRAPHER AND DIGITAL EXHIBIT TECHNICIAN:

    Daniel Holmstock, Digital Evidence Group

**Page 187**

    P R O C E E D I N G S

    (Sidhu Exhibits 20 and 21 were

    marked for identification.)

    THE VIDEOGRAPHER:  The time is

3:31 p.m. on September 9th, 2025.

    This is Video 1, Volume 2, of the

continued video-recorded deposition of

Mr. Inderbir Sidhu.

    Court reporter, please re-administer

the oath, and which, Counsel, you may proceed

after.

    THE REPORTER:  Mr. Sidhu, if you'll

please raise your right hand to be sworn.

    (The witness was administered the oath.)

Whereupon,

    INDERBIR SIDHU,

    was called as a witness, after having

    been first duly sworn by the Notary

    Public, was examined and testified as

    follows:

Ex. 20



Ex. 20

Ex. 20



Ex. 20



Ex. 20

Ex. 20



Ex. 20

Ex. 20

# EXHIBIT 21

MICHAEL A. JACOBS (CA SBN 111664)
MJacobs@mofo.com
Morrison & Foerster LLP
425 Market Street
San Francisco, California 94105-2482
Telephone: (415) 268-7000
Facsimile: (415) 268-7522

Attorneys for Defendant and Counterclaimant
SHORELINE BIOSCIENCES, INC.

*Appearances of Counsel Continued on Next Page*

# UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FATE THERAPEUTICS, INC. and WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, <br><br> Plaintiffs, <br><br> v. <br><br> SHORELINE BIOSCIENCES, INC., <br><br> Defendant. <br><br>―――――――――――<br><br> SHORELINE BIOSCIENCES, INC., <br><br> Counterclaimant, <br><br> v. <br><br> FATE THERAPEUTICS, INC. and WHITEHEAD INSTITUTE FOR BIOMEDICAL RESEARCH, <br><br> Counterdefendants. | Case No. 3:22-cv-00676-H-MSB <br><br> **SHORELINE BIOSCIENCES, INC.'S MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO EXCLUDE DAMAGES OPINIONS OF MICHAEL C. KEELEY** <br><br> Hearing Date: August 29, 2023 <br> Time: 1:30 p.m. <br> Ctrm: 12A <br> Hon. Marilyn L. Huff <br><br> **JURY TRIAL DEMANDED** |

Ex. 21

makes such an upfront payment impracticable. Only a very small percentage of drug candidates reach the market, and doing so can take decades, yet Dr. Keeley assumes a 100% success rate for ███████████████████████ in a fraction of that time. (*See id.* ¶ 105 & n. 246; Ex. C, Xanthopoulos Tr. 143:22–144:12; Ex. F, Wolchko Tr. 21:12–22:5, 22:20–23:8, 97:12–98:6.) Fate itself has been in existence for 16 years and it has no idea when, or if, it will ever gain FDA approval for a product. (Ex. F, Wolchko Tr. 14:2-9, 21:12–22:5.) A royalty opinion that does not account for this risk and relies on speculative estimates is not reliable or tied to the facts of the case.

Dr. Keeley claims that his royalty rate considers risks and uncertainties because he uses a "conservative" discount rate that has built-in risk. (Ex. H, Keeley Tr. 162:15-21.) Yet although he admitted that probability of success must be taken into account (*id.* at 37:25–39:6), he failed to provide any basis that he appropriately considered the underlying risks of the forecasts (*id.* at 39:7–40:10, 162:15–163:4; Ex. G, Keeley R. ¶ 120). By using fundamentally flawed projections as the basis for his royalty analysis, the end calculation will be fundamentally flawed, regardless of any conservative adjustments. *See Uniloc USA, Inc.*, 632 F.3d at 1317. Both the data and application of his head start damages theory result in a head start royalty rate that is entirely divorced from sound economic principles and the facts.

### C.    Dr. Keeley Impermissibly Relies on the Book of Wisdom

Dr. Keeley's application of the "Book of Wisdom" to increase the reasonable royalty under the hypothetical negotiation is not reliable. The Book of Wisdom cannot be used to consider evidence that might increase the reasonable royalty while ignoring evidence that decreases the rate. (*See* Ex. H, Keeley Tr. 46:1-8.)

The Book of Wisdom is used for "looking forward in time from the date of the first hypothetical negotiation to account for all information that would have been relevant to the parties in coming to and arriving at a deal." *Comcast IP Holdings I v. Sprint Commc'ns Co.*, 850 F.3d 1302, 1314 (Fed. Cir. 2017) (cleaned up). Dr. Keeley

# EXHIBIT 22

 **UNITED STATES PATENT AND TRADEMARK OFFICE**

UNITED STATES DEPARTMENT OF COMMERCE
United States Patent and Trademark Office
Address: COMMISSIONER FOR PATENTS
P.O. Box 1450
Alexandria, Virginia 22313-1450
www.uspto.gov

| APPLICATION NUMBER | PATENT NUMBER | GROUP ART UNIT | FILE WRAPPER LOCATION |
|---|---|---|---|
| 60/547,931 | | | |

# Correspondence Address / Fee Address Change

**The following fields have been set to Customer Number 59830 on 02/13/2006**

- Correspondence Address
- Maintenance Fee Address

**The address of record for Customer Number 59830 is:**
TED SABETY
ONE PENN PLAZA
36TH FL.
NEW YORK,NY 10119

**Ex. 22**

PTO/SB/16 (01-04)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

## PROVISIONAL APPLICATION FOR PATENT COVER SHEET

This is a request for filing a PROVISIONAL APPLICATION FOR PATENT under 37 CFR 1.53(c).

Express Mail Label No. **ER 366567585 US**

### INVENTOR(S)

| Given Name (first and middle [if any]) | Family Name or Surname | Residence (City and either State or Foreign Country) |
|---|---|---|
| Kwan | Cheung | Bryn Mawr, Pennsylvania |

*Additional inventors are being named on the* _____ *separately numbered sheets attached hereto*

### TITLE OF THE INVENTION (500 characters max)

METHOD AND APPARATUS FOR AUTOMATIC DETECTION AND IDENTIFICATION OF A BROADCAST AUDIO OR VIDEO PROGRAMMING SIGNAL

*Direct all correspondence to:* **CORRESPONDENCE ADDRESS**

☐ Customer Number:

**OR**

| ☑ Firm or Individual Name | Sabety +associates |
|---|---|
| Address | One Penn Plaza, 36th Fl |
| Address | |
| City | New York | State | NY | Zip | 10119 |
| Country | USA | Telephone | 212 481 8686 | Fax | |

### ENCLOSED APPLICATION PARTS *(check all that apply)*

☑ Specification *Number of Pages* **70**　　　☐ CD(s), Number _____

☑ Drawing(s) *Number of Sheets* **7**　　　☐ Other (specify) _____

☐ Application Data Sheet. See 37 CFR 1.76

### METHOD OF PAYMENT OF FILING FEES FOR THIS PROVISIONAL APPLICATION FOR PATENT

☑ Applicant claims small entity status. See 37 CFR 1.27.

☑ A check or money order is enclosed to cover the filing fees.

☐ The Director is herby authorized to charge filing fees or credit any overpayment to Deposit Account Number: _____

☐ Payment by credit card. Form PTO-2038 is attached.

FILING FEE
Amount ($)

The invention was made by an agency of the United States Government or under a contract with an agency of the United States Government.

☑ No.

☐ Yes, the name of the U.S. Government agency and the Government contract number are: _____

[Page 1 of 2]

*Respectfully submitted,*

SIGNATURE _____

TYPED or PRINTED NAME ___Theodore Sabety___

TELEPHONE ___212 481 8686___

Date ___12/26/04___

REGISTRATION NO. ___53,540___
*(if appropriate)*

Docket Number: ___mediaguide-1___

### USE ONLY FOR FILING A PROVISIONAL APPLICATION FOR PATENT

This collection of information is required by 37 CFR 1.51. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 8 hours to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Mail Stop Provisional Application, Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

Ex. 22

PTO/SB/17 (10-03)
Approved for use through 07/31/2006. OMB 0651-0032
U.S. Patent and Trademark Office; U.S. DEPARTMENT OF COMMERCE
Under the Paperwork Reduction Act of 1995, no persons are required to respond to a collection of information unless it displays a valid OMB control number.

# FEE TRANSMITTAL
## for FY 2004
*Effective 10/01/2003. Patent fees are subject to annual revision.*

☑ Applicant claims small entity status. See 37 CFR 1.27

**TOTAL AMOUNT OF PAYMENT** | ($) 80.00

| **Complete if Known** | |
|---|---|
| Application Number | |
| Filing Date | |
| First Named Inventor | Cheung, Kwan |
| Examiner Name | |
| Art Unit | |
| Attorney Docket No. | Mediaguide-1 |

## METHOD OF PAYMENT *(check all that apply)*

☑ Check   ☐ Credit card   ☐ Money Order   ☐ Other   ☐ None

☐ Deposit Account:

Deposit Account Number: 

Deposit Account Name: 

**The Director is authorized to:** *(check all that apply)*

☐ Charge fee(s) indicated below          ☐ Credit any overpayments

☐ Charge any additional fee(s) or any underpayment of fee(s)

☐ Charge fee(s) indicated below, **except for the filing fee** to the above-identified deposit account.

## FEE CALCULATION

### 1. BASIC FILING FEE

| Large Entity Fee Code | Fee ($) | Small Entity Fee Code | Fee ($) | Fee Description | Fee Paid |
|---|---|---|---|---|---|
| 1001 | 770 | 2001 | 385 | Utility filing fee | |
| 1002 | 340 | 2002 | 170 | Design filing fee | |
| 1003 | 530 | 2003 | 265 | Plant filing fee | |
| 1004 | 770 | 2004 | 385 | Reissue filing fee | |
| 1005 | 160 | 2005 | 80 | Provisional filing fee | 80 |

**SUBTOTAL (1)** | ($) 80

### 2. EXTRA CLAIM FEES FOR UTILITY AND REISSUE

| | Extra Claims | Fee from below | Fee Paid |
|---|---|---|---|
| Total Claims | -20** = | X | = |
| Independent Claims | - 3** = | X | = |
| Multiple Dependent | | | = |

| Large Entity Fee Code | Fee ($) | Small Entity Fee Code | Fee ($) | Fee Description |
|---|---|---|---|---|
| 1202 | 18 | 2202 | 9 | Claims in excess of 20 |
| 1201 | 86 | 2201 | 43 | Independent claims in excess of 3 |
| 1203 | 290 | 2203 | 145 | Multiple dependent claim, if not paid |
| 1204 | 86 | 2204 | 43 | ** Reissue independent claims over original patent |
| 1205 | 18 | 2205 | 9 | ** Reissue claims in excess of 20 and over original patent |

**SUBTOTAL (2)** | ($)

**or number previously paid, if greater; For Reissues, see above

## FEE CALCULATION (continued)

### 3. ADDITIONAL FEES

| Large Entity Fee Code | Fee ($) | Small Entity Fee Code | Fee ($) | Fee Description | Fee Paid |
|---|---|---|---|---|---|
| 1051 | 130 | 2051 | 65 | Surcharge - late filing fee or oath | |
| 1052 | 50 | 2052 | 25 | Surcharge - late provisional filing fee or cover sheet | |
| 1053 | 130 | 1053 | 130 | Non-English specification | |
| 1812 | 2,520 | 1812 | 2,520 | For filing a request for *ex parte* reexamination | |
| 1804 | 920* | 1804 | 920* | Requesting publication of SIR prior to Examiner action | |
| 1805 | 1,840* | 1805 | 1,840* | Requesting publication of SIR after Examiner action | |
| 1251 | 110 | 2251 | 55 | Extension for reply within first month | |
| 1252 | 420 | 2252 | 210 | Extension for reply within second month | |
| 1253 | 950 | 2253 | 475 | Extension for reply within third month | |
| 1254 | 1,480 | 2254 | 740 | Extension for reply within fourth month | |
| 1255 | 2,010 | 2255 | 1,005 | Extension for reply within fifth month | |
| 1401 | 330 | 2401 | 165 | Notice of Appeal | |
| 1402 | 330 | 2402 | 165 | Filing a brief in support of an appeal | |
| 1403 | 290 | 2403 | 145 | Request for oral hearing | |
| 1451 | 1,510 | 1451 | 1,510 | Petition to institute a public use proceeding | |
| 1452 | 110 | 2452 | 55 | Petition to revive - unavoidable | |
| 1453 | 1,330 | 2453 | 665 | Petition to revive - unintentional | |
| 1501 | 1,330 | 2501 | 665 | Utility issue fee (or reissue) | |
| 1502 | 480 | 2502 | 240 | Design issue fee | |
| 1503 | 640 | 2503 | 320 | Plant issue fee | |
| 1460 | 130 | 1460 | 130 | Petitions to the Commissioner | |
| 1807 | 50 | 1807 | 50 | Processing fee under 37 CFR 1.17(q) | |
| 1806 | 180 | 1806 | 180 | Submission of Information Disclosure Stmt | |
| 8021 | 40 | 8021 | 40 | Recording each patent assignment per property (times number of properties) | |
| 1809 | 770 | 2809 | 385 | Filing a submission after final rejection (37 CFR 1.129(a)) | |
| 1810 | 770 | 2810 | 385 | For each additional invention to be examined (37 CFR 1.129(b)) | |
| 1801 | 770 | 2801 | 385 | Request for Continued Examination (RCE) | |
| 1802 | 900 | 1802 | 900 | Request for expedited examination of a design application | |

Other fee (specify) _____

*Reduced by Basic Filing Fee Paid

**SUBTOTAL (3)** | ($)

## SUBMITTED BY

| | | (Complete *if applicable*) | |
|---|---|---|---|
| Name (Print/Type) | Theodore M. Sabety | Registration No. (Attorney/Agent) 53,540 | Telephone 212 481 8686 |
| Signature | | | Date 2/26/04 |

**WARNING: Information on this form may become public. Credit card information should not be included on this form. Provide credit card information and authorization on PTO-2038.**

This collection of information is required by 37 CFR 1.17 and 1.27. The information is required to obtain or retain a benefit by the public which is to file (and by the USPTO to process) an application. Confidentiality is governed by 35 U.S.C. 122 and 37 CFR 1.14. This collection is estimated to take 12 minutes to complete, including gathering, preparing, and submitting the completed application form to the USPTO. Time will vary depending upon the individual case. Any comments on the amount of time you require to complete this form and/or suggestions for reducing this burden, should be sent to the Chief Information Officer, U.S. Patent and Trademark Office, U.S. Department of Commerce, P.O. Box 1450, Alexandria, VA 22313-1450. DO NOT SEND FEES OR COMPLETED FORMS TO THIS ADDRESS. **SEND TO: Commissioner for Patents, P.O. Box 1450, Alexandria, VA 22313-1450.**

*If you need assistance in completing the form, call 1-800-PTO-9199 and select option 2.*

**Ex. 22**

Attorney Docket No. Mediaguide-1

# IN THE UNITED STATES PATENT AND TRADEMARK OFFICE

## SPECIFICATION

INVENTION:    METHOD AND APPARATUS FOR AUTOMATIC DETECTION

AND IDENTIFICATION OF A BROADCAST AUDIO OR VIDEO

PROGRAMMING SIGNAL.

INVENTOR:    Kwan Cheung

Citizenship:    United Kingdom, United States Permanent Resident

Post Office Address/

Residence:    275 South Bryn Mawr Ave Apt. D2

Bryn Mawr, PA 19010

ASSIGNEE:    Mediaguide, Inc.

1000 Chesterbrook Blvd. Suite 150

Berwyn, PA 19312

ATTORNEYS:    Sabety+associates

One Penn Plaza, 36th Fl.

New York, NY 10119

Express Mail Label No. _ER366567585_

Mediaguide 1 v 12    Feb 26 '04

**Ex. 22**

-1-

## BACKGROUND AND SUMMARY OF THE INVENTION

This invention relates to the automatic detection and identification of broadcast programming, for example music or speech that is broadcast over radio, television or the Internet, or television signals, whether broadcast as analog, digital or digital over the Internet.  By "Broadcast" it is meant any readily available source of content, whether now known or hereafter devised,  including, for example, streaming, peer to peer delivery of of downloads or streaming or detection of network traffic comprising such content delivery activity. The system initially registers a known program by digitally sampling the program and separating the digital sample stream into a large set of short segments in time. These segments are then processed to extract particular feature sets that are characteristic of the segment.  The invention processes each set of features to produce a numerical code that represents the feature set for a particular segment of the known program.  These codes and the registration data identifying the program populate a database as part of the system.  Once registration of one or more programs is complete, the system can then detect and identify the presence of the registered programming in a broadcast signal by extracting a feature set from the input signal, producing a numerical code for each time segment input into the system and then comparing the sequence of detected numerical codes against the numerical codes stored in the database.  Various testing criteria are applied during the comparison process in order to reduce the rate of false positives, false negatives and increase correct detections of the registered programming.   The invention also encompasses certain improvements and optimizations in the comparison process so that it executes in a relatively short period of time.

Mediaguide I  v 12    Feb 26 '04

**Ex. 22**

-2-

## BRIEF DESCRIPTION OF THE DRAWINGS

Figure 1:     The components of the media broadcast monitoring system.

Figure 2:     An illustration of the data flow of the detection algorithm from a series of frames of an audio program to detection of the program's identity.

Figure 3:     The flowchart of the Pattern Generation Module.

Figure 4:     Example of how original frequency band boundaries lead to pattern mismatches between the original frame signatures and the signatures of the same audio program played at a faster speed.

Figure 5:     Example of how changing the frequency band boundaries yields an improved match between frame signatures of the original audio program and the same audio program played back at fast and slow speeds.

Figure 6:     The new frequency band boundary setting leads to robustness of the audio detection algorithm even with +/-2% speed variations in the audio program.

Figure 7:     The schematic of the DBS operation flow.

Figure 8:     The flowchart of the SRR Algorithm.


## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENTS


Background.


Mediaguide 1 v 12    Feb 26 '04

**Ex. 22**

-3-

The present invention relates to the automatic recognition of widely disseminated programming, such as radio, television or digitally delivered content over the Internet.

Owners of copyrights in broadcast programming, including advertisers, need to measure when and where their programming has been broadcast in order to correctly compute performance royalties, confirm compliance with territorial restrictions or verify that certain advertising has been aired as scheduled. The traditional method for monitoring the radio or television has involved using humans to listen or watch and then record that which they hear or see, or alternatively, rely on the broadcast records of radio and television stations. This is a labor intensive process that has limited efficiency or accuracy. It is an object of the invention to use advanced computing systems to fully automate this process. In this manner, audio or video content is registered into the system, and then, in the case of audio detection, radio, the soundtrack from television or other sources of widely distributed audio content are input into the system. In the case of video, the video signal is input into the system from whatever its source. By means of the invention, the detection and identification of registered programming content takes place automatically.

Prior Art:

A number of methods have been developed to automate the detection of broadcast programming. These techniques generally fall into one of two categories: cue detection or pattern recognition. The cue detection method is exemplified by U.S. Pat. Nos. 4,225,967 to Miwa et. al.; 3,845,391 to Crosby and 4,547,804 to Greenberg. These techniques rely on embedded cues inserted into the program prior to

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-4-

distribution. These approaches have not been favored in the field. In audio, the placement of cue signals in the program have limited the acceptance of this approach because it requires the cooperation of the program owners and/or broadcasters--thus making it impractical.

The pattern recognition method generally relies on the spectral characteristics of the content itself to produce a unique identifying code or signature. Thus, the technique of identifying content consists of two steps: the first being extracting a signature from a known piece of content for insertion into a database, and the second being extracting a signature from a detected piece of content and searching for a signature match in the database in order to identify the detected content. In this way, the preferred approach relies on characteristics of the broadcast content itself to create a signature unique to that content. For example, US Patent No. 4,739,398 to Thomas, et.al. discloses a system that takes a known television program and creates for each video frame, a signature code out of both the audio and the video signal within that frame. More recently, similar detection systems have been proposed for Internet distributed content, for example application PCT WO 01/62004 A2, filed by Ikeyoze et. al.

For audio by itself, U.S. Pat. No. 3,919,471 to Moon discloses an audio identification system where only audio signals are used, but it is of limited utility because it attempts to correlate an audio program represented by a limited time slice against the incoming broadcast signal. The disclosed method of matching in Moon is highly compute intensive because it relies on direct signal correlation. Further, this approach is unfavorable because it has been found to be limited in accuracy, especially if the program is time compressed or altered in other ways prior to detection. It is also prone to false positive identifications and is computationally uneconomic if the size of the

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-5-

time slice is expanded to improve its correct identifications. Lert, et. al. describes in U.S. Pat. No. 4,230,990 a way to mitigate the computational workload of the correlation method by combining it with the coding method of the first category: either an artificial code or some other naturally occurring marker is detected in the program indicating the beginning of a section of the program, and then a feature signature is measured at a pre-determined amount of time later. This method has limited utility in audio-only applications, where either an audible code has to be inserted into the audio to create the cue, thus degrading it or requiring cooperation of the content source, or reliance on natural markers indicating the start of a new audio program which is highly unreliable. In U.S. Pat. No. 4,677,466 Lert, et. al. further describes an improvement on the invention that waits until a "stability condition" has occurred in the signal before measuring and calculating a signature, but the reliability of the method is limited by the size of the sample time slice. U.S. Pat. No. 4, 739,398 to Thomas et. al. addresses the data processing load problem by randomly choosing portions of a signal to sample as input to the invention's signature generating process.

U.S. Pat. Nos. 5,436,653 to Ellis, et. al. and 5,612,729 to Ellis, et. al., disclose a more complex way of calculating a unique signature, where the audio signature corresponding to a given video frame is derived by comparing the change in energy in each of a predetermined number of frequency bands between the given video frame and the same measurement made in a prior video frame. However, the matching technique relies on a combination of the audio and video signatures or the use of a natural marker, in this case, the start or ending of a program. Thus, this method suffers the same problem as Lert with regard to audio-only programming.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-6-

In addition, U.S. Pat. No. 5,918,223 to Blum, et. al., discloses the use of audible features within audio programming to create a single signature value for each audio program, particularly the group of amplitude, pitch (i.e. fundamental), bandwidth, bass (i.e. rhythm analysis), brightness (i.e. shape of the frequency response of the program), and Mel-frequency cepstral coefficients. The aggregation of these detailed features across long periods in the audio produce highly variable results, and do not possess sufficient robustness in real-world broadcast situations. U.S. Pat. No. 5,210,820 and 4, 843, 562, both to Kenyon, discloses a digital circuit that uses the envelope (e.g loudness) features in the audio signal in order to create a signature. The approach is designed to address the time compression problem by application of time warping techniques. Reliance on loudness has other robustness problems that also make it difficult to use in real-world environments. U.S. Pat. Application No. 20030086341 filed by Wells, Maxwell, et. al., discloses a system where an audio signature is created using pre-determined numbers of digital samples counted from pre-determined locations from the start point of the music. This approach is much less reliable for broadcast or cases where the audio is detected in analog form, or in cases where the playback of the programming has changed speed, frequency equalization from the original track has been applied, or the audio dubbed into the programming segment.

The present invention describes a system and method whereby identification of known audio or video programming can be done without any reliance on a tandem video signal (in the audio case) or normative markers in the signal indicating a known time in the program and with unique and novel ways to calculate codes representing the characteristics of the audio program without requiring impractical computational capabilities. Benefits of this system and method are accuracy, speed, robustness to

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-7-

playback speed variation and the ability to perform the identification process in real time, without reliance on any embedded cue or watermark. In addition, the present invention takes advantage of the availability of low cost, high performance computing platforms in order to implement a high speed database searching methodology.

Detailed Description.

A. Overview

The broadcast monitoring and detection system embodying the invention works in two phases: registration and detection. During the registration phase, known programming content is registered with the system by sending the program, as digital data, into the system. A series of signatures, in the case here, a pattern vector and more generally in the art a "fingerprint" or "signature", are stored as a sequence of data records in a database, with the identity of the program content cross-referenced to them as a group. During the second phase, unidentified programming is input into the system. Such programming can include radio, television, internet broadcasts or any other source of audio or video programming, whether terrestrial broadcast, satellite, internet, cable television or any other medium of delivery, whether now known or devised in the future. While such programming is being monitored, the pattern vectors of the programming (or any other signature generating technique) are continually calculated. The calculated pattern vectors are then used to search for a match in the database. When a match is found and confirmed, the system uses the cross-referenced identity in the database to provide the identity of the content that is currently being played. In the preferred embodiment, the system is software running on a computer, however, it is envisioned that special purpose hardware components

Mediaguide 1 v 12  Feb 26 '04

-8-

may replace parts or all of each module in order to increase performance and capacity of the system.

In the preferred embodiment, a computer containing a central processing unit is connected to a sound card or interface device into which audio programming is presented.  During the registration phase, the CPU fetches the audio or video data from the sound card, calculates the pattern vector data, and then, along with timing data and the identity of the program, these results are stored in a database, as further described below. Alternatively, the data may be loaded directly from authentic material, such as compact discs,  mp3 files or any other source of digital data embodying the signal.  For non-audio applications, the source of material can be DVD disks, masters provided by movie studios, tapes or any other medium of expression on which the program is fixed or stored.  Of course, for some material which may not have a readily available source, then the audio or other program signal is used in the following manner. If the system periodically detects an unknown program but with the substantially the same set of signatures each time, it assigns an aribitrary identifier for the program material and enters the data into the database as if the program had been introduced during the registration phase. Once the program identity is determined in the future, then the database can be updated to include the appropriate information as with authentic information while at the same time providing the owner of the programming the use data detected even when the identity of the program was not yet known.   The database, which is typically a data file stored on a hard drive connected to the central processing unit of the computer by means of any kind of computer bus or data transmission interface, including SCSI.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-9-

During the detection phase, the CPU fetches the program data from the sound card or video card, or loads it from a data file that may be stored on the computer hard drive or external media reader. The CPU calculates the pattern vector data, and then, along with the timing data, submits database queries to the database stored on the hard drive. The database may be the same hard drive as in the computer, or an external hard drive accessed over a digital computer network. When matching data is found, the CPU continues to process the data to confirm the identification of the programming, as described further below. The CPU can then communicate over any of a wide variety of computer networking systems well known in the art to deliver the identification result to a remote location to be displayed on a screen using a graphical user interface, or to be logged in another data file stored on the hard drive. The program that executes the method may be stored on any kind of computer readable media, for example, a hard drive, CD-ROM, EEPROM or floppy and loaded into computer memory at run-time. In the case of video, the signal can be acquired using an analog to digital video converter card, or the digital video data can be directly detected from digital video sources, for example, the Internet or digital television broadcast.

The system consists of four components. Figure 1 shows the interconnection of the four modules: (1) a signal processing stage at the front end, (2) a pattern generation module in the middle, (3) followed by a database search engine module, and (4) a program recognition module at the end. During the registration phase, the results of the pattern generation module, which creates signatures for known audio or video content, are stored in the database and the search and pattern recognition modules are not used.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-10-

The function of each module is described in further detail below:

### 1.    Sound Acquisition (SA) Module

The SA module, (1), receives audio data from a sound detection circuit and makes it available to the remaining modules.  Practitioners of ordinary skill will recognize that there are a variety of products that receive analog audio or video and convert those signals into digital data. These devices can be any source of digital audio data, including an interface card in a personal computer that converts analog audio into digital audio data accessible by the computer's CPU, a stand alone device that outputs digital audio data in a standard format or a digital radio receiver with audio output.  Alternatively, pre-detected signal in digital form can be accessed from storage devices connected to the system over typical data networks. The SA module regularly reads the data from the digital interface device or data storage and stores the data into a data buffer or memory to be accessed by the Pattern Generation module.  Practitioners of ordinary skill will recognize that the typical digital audio system will provide a digital word at regular intervals, called the sampling rate.  The sequence of digital words representing the audio signal are the digital audio samples.  The invention organizes the samples into a series of time frames, which consist of a predetermined number of samples.  The time frames are stored in sequence. Alternatively, data structures, stored in the computer memory (which includes the hard drive if the operating system supports paging and swapping), may be used where the time frames are not physically stored in sequence, but logically may be referenced or indexed in the sequence that they were detected by means of memory addressing.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-11-

In the preferred embodiment, the audio signal is conditioned in a manner known in the art, including low-pass filtering. In the preferred embodiment, the signal is sampled at a rate of 8000Hz within the SA Module. In the preferred embodiment, 16,384 samples constitute a single frame. At this rate, the signal must be lowpass filtered for anti-aliasing purpose before being sampled. Higher sampling rates may be used, however, with the appropriate adjustments in the downstream calculations, as explained below.

In the case of video programming, the sound acquisition module essentially acts in an analogous manner: the video signal is acquired as a digital video signal, and converted to the frequency domain using well known methods on a video frame by frame basis. The invention will be explained in detail as applied to audio through a description of the preferred embodiment. However, the system and processes described are applicable to video as well as audio, where a signature or pattern vector has been periodically derived from the video signal. Reference is made to "A Technical Introduction to Digital Video", Charles A. Poynton, John Wiley & Sons, New York, © 1996.

2.    Pattern Vector Generation (PG) Module

The PG module operating during the detection phase, (2), fetches the stored digital audio or video samples that were detected and stored by the SA Module. Once a frame of the samples is received, the PG module will compute the pattern vector of the frame and, when in detection phase, send the

Mediaguide 1  v  12   Feb 26 '04

**Ex. 22**

-12-

pattern vector to the Database Search Module in the form of a database query. During the registration phase, the PG module calculates the pattern vector in order that it be stored in the database, in correlation with the other relevant information about the known audio or video program. The calculation of the pattern vector is described further below.

Inter-Frame Distance.

For each incremental audio sample, a new frame can be started. That is, each audio sample may be the constituent of N overlapping frames when N is the number of samples in a frame. The distance between these overlapping frames is the inter-frame distance. The shorter inter-frame distance for pattern generation mitigates the problem of program start-time uncertainty. Shorter inter-frame distances produce better results when the start time is unknown. In the preferred embodiment, the value of 4,000, around ¼ of a frame, is used during the audio program registration phase. Other distances may be used either to increase accuracy or reduce compute time and storage overhead. Thus, in the preferred embodiment, the first frame in the database of known audio programs corresponds to audio samples 1 to 16,384, the second corresponds to samples 4001 to 20,384, and so on. During the detection phase, the inter-frame distance is set to be equal to one frame length. Thus, the first frame of the detected audio program contains samples 1 to 16,384, the second frame contains samples 16,385 to 32,768, and so on.

Even though the uses a preferred embodiment setting of sampling rate of 8000Hz, frame-size of 16384 samples, inter-frame distance of 4000, a different sampling rate may be used with varying results. For example, for a sampling rate of 16000Hz (double the preferred setting), results in a frame number size of 32768 (double in size

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-13-

but the same in time duration), inter-frame distance of 8000 (inter-frame distance is the same at 0.5 sec) and generates almost identical pattern vectors as when using the preferred settings. The only further change is to determine which Fourier Transform (FFT) coefficients would be included in each sub band used to calculate the pattern vectors. For example, with the preferred settings, (ignoring the speed compensation scheme explained below), band 1 comprises the 66th to 92nd FFT coefficients. Then with the alternate example above, the FFT coefficients will be the 32nd to 94th. The calculation of the pattern vectors, which is presented assuming the sampling rate of 8000 Hz, is adjusted accordingly.

In the case of video, the pattern vectors are derived from the two-dimensional FFT transform of each frame of video. The video frames can be considered analogous to the samples in audio. Thus the vertical and horizontal FFT coefficients can be collected across the video frames to build pattern vectors for each time frame, the time frames constituting a group of video frames. Practitioners of ordinary skill will recognize that the approaches may be combined, in that features of the audio soundtrack of the television program can be combined with features of the video signal of the same program to produce the pattern vectors.

3.    Database Search (DBS) Module

Upon the reception of a query generated by the PG module, this module, (3), will search the database containing the sequence of pattern vectors of known programming. If a match is found, then the module returns a set of registration numbers otherwise referred to herein as program-id's and frame-id's, referred to also as frame numbers, corresponding to the identities of a set of audio or video programs and the time frame

Mediaguide 1 v 12    Feb 26 '04

**Ex. 22**

-14-

numbers within these programs where the match occurred. If the search of the database fails to find a match, the DBS Module will issue a NO-MATCHED flag. It is contemplated that aspects of the invention for the DBS Module are applicable to any kind of data set containing signal signatures, even signatures derived using techniques distinct from those used in the Pattern Vector Genreation module.

4.    Program Detection and Identification (SDI) Module

This module, (4), constantly monitors the matching results from the DBS on the most recent contiguous of N time frames, as further described below. In the preferred embodiment, N is set to five, although a larger or smaller number may be used with varying results. Two schemes are used to determine if any audio or video program has been positively detected. The first is a majority voting scheme which determines if, within each thread of matching pattern vectors among N, the number of frames that possess a valid sequence pass a designated majority of the block of frames. The second is a frame sequencing scheme which follows each of the potential thread and counts how many frames within that thread constitute a valid sequence. If there exists a thread(s) where a majority of the contiguous frames satisfy the frame sequencing requirement, then the program (whether audio or video) is deemed detected in that thread. Either or both schemes are used to suppress false positive detections and to increase the correct detections. In the preferred embodiment, both schemes are used.

Given a program (or more than one) that is detected, the SDI module will initiate two modes: 1. Identification mode : in this mode, the module logs all the reference information of the detected program, including title, songwriter, artist, record label, publishing company or any other information input during the registration phase of the system, along with the time when the program is detected, and the time into the

Mediaguide 1 v 12    Feb 26 '04

**Ex. 22**

-15-

program that the detection was made. This information will be registered on the detection log. 2. Tracking mode : In this mode, the module tracks each detected program by monitoring if the queried result of every new frame of the broadcast is obeying the sequencing requirement, described below. The algorithm is locked in this mode until the queried results cannot be matched with the sequencing requirement. Upon the exiting from the tracking mode, a number of detection attributes, including the entire duration of the tracking, and the tracking score, will be logged.

The pattern vector generated by the PG Module is sent to the DBS Module in order to conduct a search of the database for a match. The output is either a NO-MATCHED flag, which indicates that the DBS fails to locate a frame within the database that passes the search criteria; or the program-id's and frame-id's of the library patterns that pass the search criteria.

The SDI Module collects the output from the DBS Module to detect if a new audio program is present. If so, the detected song is identified. Figure 1 is an illustration of the flow of the algorithm from a frame of audio to its result after detection.   With regard to the application of the invention to video, the operation is analogous, once the pattern vectors have been generated.   It is contemplated that aspects of the invention for the SDI Module are applicable to any kind of data set containing signal signatures, even signatures derived using techniques distinct from those used in the Pattern Vector Genreation module.

Pattern Vector Generation.

Mediaguide 1  v  12    Feb 26 '04

**Ex. 22**

-16-

The PG module reads in a frame of signal, preferably consisting of 16,384 samples, with sampling rate preferably set at 8,000 samples per second. Thus, the frame length is approximately two seconds in time. More or less samples or frame widths in time may be used with varying results. Given $\mathbf{x} = [x_1 \quad x_2 \quad \cdots \quad x_{16384}]$, the vector containing a frame of signal, where each $x_i$ is the value of the nth audio sample, an N element pattern vector is calculated with the following steps. In the preferred embodiment, N is equal to 31. Practitioners of ordinary skill will recognize that the value of N is arbitrary, and can be increased or decreased with varying results. For example, decreasing N reduces the compute time and memory requirements, but may reduce accuracy. Increasing N may do the opposite. Also, the method presented will assume that a 31 element pattern vector is being used in the calculation in order to simplify the presentation of the invention. Practitioners of ordinary skill will recognize that the same methodology will work when N is increased or decreased, depending on whether the goal is increased accuracy or reduced computer complexity.

1.   The Fourier transform of $\mathbf{x}$ is calculated with the number of points equal to the number of samples in the frame, in order to get the spectrum vector $X = [X_1 \quad X_2 \quad \cdots \quad X_{16384}]$ .

The spectral resolution of the transform is = $\dfrac{8000 samples/\sec}{16,384 samples} = 0.488 Hz$

Segregate the FFT spectral values into frequency bands of a specified width, where in the preferred embodiment, the width is 64 Hz. The invention will be further

Mediaguide 1 v 12    Feb 26 '04

**Ex. 22**

-17-

explained in terms of the preferred embodiment in order to simplify the presentation, but without limitation to the extent of the invention claimed.

Band #1 is from 0 to 64Hz, Band #1 encompasses FFT coefficients $X_1$ to $X_{131}$

Band #2 is from 64 to 128Hz, Band #2 encompasses $X_{132}$ to $X_{262}$, and so on.

2.    Compute the centroid (or center-of-gravity COG) of each band:

$$p_k = \frac{\sum_{m=1}^{131} m \times X_{131k+m}}{\sum_{m=1}^{131} X_{131k+m}}$$

In the preferred embodiment, only Band 2 to 32 is used because Band 1 is the lowest band including zero Hz, which is normally not useful in FM radio transmission; and Band 32 covers the band up to 1,800Hz, which is typically sufficient bandwidth to encode a fingerprint of the audio. Of course, higher bands or lower bands can be used if required. The inclusion of higher or lower bands to account for signal characteristics can be determined empirically. The first step, where the FFT coefficients are collected in order to calculate the centroid in step 2 is different in the case of video. In the video case, the FFT coefficients have to be selected from locations either in the complex plane or on the 2-dimensional spatial frequency plane as described on page 23 of Poynton, incorporated herein by reference. These locations are analogous to the frequency bands on the audio case. In a manner analogous to using predetermine frequency bands

Mediaguide 1  v 12   Feb 26 '04

**Ex. 22**

-18-

in audio, predetermined regions on the vertical/horizontal plane in the frequency domain can be defined and the FFT coefficient values in each regions used to calculate an element corresponding to that region. Once this selection is made, the centroid can be calculated in an equivalent manner. It is advantageous to ignore the  frequency region encompassing the frame rate, sync rate, subcarrier, or line rate. The end result is essentially equivalent to the case of audio: that each time frame of video will have a pattern vector associated with it that is stored in a database.

After Step 3, a 31-element vector is obtained: $\mathbf{c} = [p_2 \quad p_3 \quad \cdots \quad p_{32}] = [c_1 \quad c_2 \quad \cdots \quad c_{31}]$. In the preferred embodiment, a further step converts $\mathbf{c}$ to an unsigned integer. The unsigned format is used because all the elements in $\mathbf{c}$ are positive in the interval of (1, 131). A further calculation on $\mathbf{c}$ normalizes each element to  a value between 0 and 1 by exercising the division by 131, the number of FFT components within each band:

$$0 \le c_i = \frac{c_i}{131} \le 1$$

In the preferred embodiment, each element is then converted to the unsigned 16-bit integer format for convenient storage and further processing.  In order to decrease the compute time downstream, each FFT coefficient or $c_i$ is tested relative to a minimum threshold value. The downstream processes are set to ignore these elements, for example, by not including these elements in downstream sets that are collected for further calculation.  Figure 3 shows a flowchart of this module.  In the preferred embodiment, both the FFT in step 1 and the centroid (COG) computation in step 3 are typically calculated using double precision floating point instructions.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-19-

Speed Compensation Scheme

Practitioners of ordinary skill in the art will recognize that for a variety of reasons, broadcast programming is often sped up from the speed of the original programming. Therefore, it is critical that any automatic audio program detection system be robust when the detected audio program may differ from the speed of the audio provided during the registration phase. In order to alleviate this problem, a modification to the pattern vector generating formula is used:

(a)    The modification is to have a different number of FFT components (i.e. bandwidth) of each band in step 2.

(b)    In the preferred embodiment, the modification to the pattern vector generation formula is only applied to the incoming broadcast audio signal during the detection phase, not to the pattern generation process applied during the registration phase of the audio program. Practitioners of ordinary skill will recognize that the use of the alternative frequency bands described above for the detection phase can alternately be performed during the registration phase with substantially the same result.

The specific detail of this modification is described below:

The formulation is based on the scaling property of the Fourier Transform.

A time speed up version of a song is a time-scaled version of the original:

$$x(t) \xrightarrow{\text{speedup}} x(at) \quad ; \quad a > 1$$ where a is the rate of speedup and x(t) is the detected sample at time t. Note that for $a > 1$, the time axis is "compressed". If the song is sped up by 2%, we have $a = 1.02$.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-20-

With the scaling property, the factor a can be used to adjust the values of the Fourier Transform:

$$x(t) \xleftrightarrow{\text{Fourier Transform}} X(f)$$
$$x(at) \xleftrightarrow{\text{Fourier Tranform}} X(f/a)$$

Thus, the spectrum of a fast playback, or speedup version of a song is stretched. With a 2% speedup rate, the Fourier Transform frequency component at 100Hz without any song speedup, is shifted to 102Hz after speedup. This implies that, if there exists a 2% speedup rate in the detected song, the bandwidth in step 2 should be adjusted accordingly to $1.02 \times 64\text{Hz} = 65.28\text{Hz}$, and hence the number of FFT components within each band should be adjusted to the roundoff of $131 \times 1.02$, which is equal to 134. There are two formulae to calculate the amount of FFT components in each band, both based on the original number of FFT components, which is equal to 131.

Formula

(1) Given the speedup rate r.

Start at Band #1, which encompasses FFT coefficients $X_1$ to $X_{z(1)}$, where $z(1)$ = roundoff of $131 \times (1+r)$.

(2) Compute iteratively each $z(k)$ = roundoff of $[z(k-1) + 131 \times (1+r)]$ for k = 2 to 32. Band #m consists of FFT coefficients of $X_{z(m-1)+1}$ to $X_{z(m)}$.

(3) Compute the centroids (COG) from Band #2 to #32 with the new band partitions calculated above. Exercise the normalization by dividing each centroid (COG) by the number of FFT components in the corresponding band.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-21-

The difference with and without the compensation is shown in Figures 4 and 5. Figure 4 shows Original band setting leads to pattern mismatches between the original and its speedup variant.  Figure 5 shows that the modified band setting yields very good pattern matching behavior given that the speedup rate is known.

Robust Pattern Vector Generation Formula

The pattern vector generation formula described above can be further refined in order to provide robust matching.  This refinement may also be used instead of the prior formulation.  Besides causing the frequency axis to stretch, another effect of speedup is the shift of the boundaries in frequency of every band. The refinement is to compensate the shift of the boundaries of a band by extending the width of the band, such that the amount of the shift due to playback speed is within a small percentage compared with the band width. Thus, there is no modification of the algorithm – that is, calculating centroids as pattern vectors – except that the band locations are changed. The modified band boundaries are used during the registration process to create the stored pattern vectors.  Practitioners of ordinary skill will recognize that several alternative methods may be used to calculate frequency band widths that exhibit the same property, that is, extending the band width such that the frequency shift due to playback speed variation is comparatively small, where the percentage frequency shift due to playback speed changes is a small percentage of each frequency band width. Further, it is contemplated that this technique will work for any method of calculating a signature in the signal that is based on segregating the FFT coefficients into frequency bands. One method to calculate modified band boundaries that exhibit this effect is described below as the preferred embodiment.

Mediaguide 1  v 12    Feb 26 '04

**Ex. 22**

-22-

Algorithm to compute new band boundary locations:

Let the starting and ending indexes of band number k in the frequency domain be $s_{k,1}$ and $s_{k,2}$ respectively, that is the index of the FFT coefficients. For example, index $s_{1,1}$ is equal to 1 and corresponds to the first FFT coefficient for 0 Hz. A shift-to-bandwidth ratio is assumed, which is the expected maximum speedup in percent divided by the percentage of bandwidth that the shift should not exceed. In the preferred embodiment, that value is assumed to be 5%, but other values may be used in order to increase accuracy or reduce compute complexity.

1.    Start from band k=1, whose starting location $s_{1,1} = 1$. Assuming a 2% speedup, the location is shifted by 0.02 to 1.02, which after roundoff is still equal to 1. Roundoff is necessary because the result indices must be integers. . Assuming the shift-to-bandwidth ratio to be equal to 0.4 (which is 2% shift divided by 5% bandwidth, the amount that shift should represent) of the bandwidth of Band #1, then the ending location $s_{1,2} = (1 + .02/.05) \times s_{1,1} = 1.4$, or 1 after round-off.

2.    Now proceed to compute the two locations for Band #2. The starting location $s_{2,1} = 2$. Given 2% shift and 5% shift-to-bandwidth ratio, we obtain $s_{2,2} = 3$.

3.    Continue the iteration until all the FFT components are exhausted. In the preferred embodiment, the result (both lower order bands, , $s_{k,1} < 64$, corresponding to 31.25 Hz, and higher order bands, $s_{k,1} > 5500$, corresponding to 2,686 Hz, are not used.

4.    When k equals 9, then $s_{9,2} = 66$, and when k= 10, $s_{10,1} = 67$ and so on.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-23-

In order to avoid overflow because the bandwidth of each band along k increases exponentially with k, the preferred embodiment has set arbitrarily $s_{10,1} = 66$, so that as k iterates to k = 22, $s_{22,2} = 5298$. Below is a tabulation of the result :

| K | $s_{k,1}$ | $s_{k,2}$ |
|---|---|---|
| 10 | 66 | 92 |
| 11 | 93 | 129 |
| 12 | 130 | 182 |
| 13 | 183 | 255 |
| 14 | 256 | 357 |
| 15 | 358 | 501 |
| 16 | 502 | 702 |
| 17 | 703 | 984 |
| 18 | 985 | 1378 |
| 19 | 1379 | 1930 |
| 20 | 1931 | 2702 |
| 21 | 2703 | 3784 |
| 22 | 3785 | 5298 |

5.    The number of entries at this point is only 13, but a total of 31 entries are preferred, where each entry corresponds to a particular element in the pattern vector.

The second batch of bands are obtained by taking the middle of each of the bands obtained in step 3. An additional 12 bands are obtained:

| 80 | 111 |
|---|---|

Mediaguide 1 v 12    Feb 26 '04

**Ex. 22**

-24-

| | |
|---|---|
| 112 | 156 |
| 157 | 219 |
| 220 | 306 |
| 307 | 429 |
| 430 | 602 |
| 603 | 843 |
| 844 | 1181 |
| 1182 | 1654 |
| 1655 | 2316 |
| 2317 | 3243 |
| 3244 | 4541 |

6.    At this point there are 25 bands. The remaining six bands are obtained by combining bands from the two tables. In particular, entries 1 and 2 are merged, entries 3 and 4 are merged, and entries 5 and 6 are merged in both tables to creates six more entries:

| | |
|---|---|
| 66 | 129 |
| 130 | 255 |
| 256 | 501 |
| 80 | 156 |
| 157 | 306 |
| 307 | 602 |

Mediaguide 1  v 12    Feb 26 '04

**Ex. 22**

-25-

Combining the above, the starting and the ending locations of the 31 bands are presented in Table 1.

Table 1. Starting and Ending Locations of the 31 bands in the generation of robust patterns.

| Starting Location | Ending Location |
|---|---|
| 66 | 92 |
| 93 | 129 |
| 130 | 182 |
| 183 | 255 |
| 256 | 357 |
| 358 | 501 |
| 502 | 702 |
| 703 | 984 |
| 985 | 1378 |
| 1379 | 1930 |
| 1931 | 2702 |
| 2703 | 3784 |
| 3785 | 5298 |
| 66 | 129 |
| 130 | 255 |
| 256 | 501 |
| 80 | 111 |

**Ex. 22**

-26-

| | |
|---|---|
| 112 | 156 |
| 157 | 219 |
| 220 | 306 |
| 307 | 429 |
| 430 | 602 |
| 603 | 843 |
| 844 | 1181 |
| 1182 | 1654 |
| 1655 | 2316 |
| 2317 | 3243 |
| 3244 | 4541 |
| 80 | 156 |
| 157 | 306 |
| 307 | 602 |

A test result on a frame of signal is shown in Figure 6 to demonstrate the robustness for speed changes of +/- 2% .

## 5    Combination of Speedup Compensation and Robust Formula

The two methods described above for adjusting frequency band boundaries can be combined if speedup compensation is also incorporated. The relationship between speedup and the expansion of the frequency spectrum is exploited to combine the two approaches.   The k-th subband, starting and the ending location = $[s_{k,1}, s_{k,2}]$, has a

Mediaguide 1  v 12    Feb 26 '04

**Ex. 22**

-27-

robustness to speed change of +/- 2%. Each value is then multiplied by $(1 + r)$, where r is the amount of speedup to $[s_{k,1}, s_{k,2}]$, followed by the roundoff method described above. This results in new indices $[\hat{s}_{k,1}, \hat{s}_{k,2}]$ whose robustness to speed change is shifted to r +/- 2%. Essentially, the new table is the prior Table 1, where the values are multiplied by $(1 + 2\%)$ and then the same roundoff method applied. Table 1 is now used during the registration phase to create pattern vectors from the known audio program that populates the database library. Table 2 is used during the detection phase to create the pattern vector from the detected incoming broadcast that is used in the DBS module to find matching data records in the database as described further below. Thus, both methods are combined.

By way of example, setting r = 0.02 (2%), and processing every band in Table 1, a new set of subbands is calculated which is robust to speed change of 0 to 4%. Table 2 is obtained with 2% speedup compensation

Table 2 The new 31 pairs of starting and ending locations after 2% speedup compensation added to that tabulated in Table 1. This result is from processing the detected song from the broadcast.

| Starting Location | Ending Location |
|---|---|
| 67 | 94 |
| 95 | 132 |
| 133 | 186 |
| 187 | 260 |

**Ex. 22**

-28-

| | |
|---|---|
| 261 | 364 |
| 365 | 511 |
| 512 | 716 |
| 717 | 1004 |
| 1005 | 1406 |
| 1407 | 1969 |
| 1970 | 2756 |
| 2757 | 3860 |
| 3861 | 5404 |
| 67 | 132 |
| 133 | 260 |
| 261 | 511 |
| 82 | 113 |
| 114 | 159 |
| 160 | 223 |
| 224 | 312 |
| 313 | 438 |
| 439 | 614 |
| 615 | 860 |
| 861 | 1205 |
| 1206 | 1687 |
| 1688 | 2362 |
| 2363 | 3308 |

**Ex. 22**

-29-

| | |
|------|------|
| 3309 | 4632 |
| 82 | 159 |
| 160 | 312 |
| 313 | 614 |

The compensation effectively positions the method to have the robustness from 0 to 4% speedup variations. Practitioners of ordinary skill will recognize that the same approach can be used to mitigate the effects of variation in the speed where the variation ranges above and below zero, that is, slowing down or speeding up the playback.

Database Search (DBS) Module

The Database Search Module takes the pattern vector of each frame from the PG Module and assembles a database query in order to match that pattern vector with database records that have the same pattern vector. A soft matching scheme is employed to determine matches between database queries and pattern vectors stored in the database. In contrast, a hard matching scheme allows at most one matching entry for each query. The soft matching scheme allows more than one matching entries per query, where a match is where a pattern vector is close enough, in the sense of meeting an error threshold, to the query vector. The number of the matching entries can either be (i). limited to some maximum amount, or (ii) limited by the maximum permissible error between the query and the database entires. Either approach may be used. The soft matching scheme relies on the fact that the program patterns are being oversampled in the registration phase. For example, in the preferred

Mediaguide 1  v 12    Feb 26 '04

**Ex. 22**

-30-

embodiment the interframe distance used for registration is only ¼ of that used in the detection. Thus it is expected that if the m-th frame of a particular program is the best matching frame to the query, then its adjacent frames, such as (m-1)th frame and (m+1)th frame, will also be good matches. The combined effort of soft matching and sequencing schemes enhance the robustness of the detection system to varying signal condition inherent in the broadcasting environment.

When matches are found, the corresponding program-id numbers and frame numbers in the data record is returned. The flowchart in Figure 7 illustrates the flow in DBS Module. Practitioners of ordinary skill in the art will recognize that a search across a variable to find the location of variables that match within a given tolerance in a very large database is potentially time consuming, if done in a brute force manner. In order to address the compute time problem, a two part search is employed. In Part 1, a range search scheme select those entries within a close vicinity to the query. In Part 2 a refined search over potential candidates from Part 1 is used to select the set of candidates which are the closest neighbors to the query.

The steps are described in detail below:

1. Assemble the query from the pattern vector generated by the PG Module during the detection phase.

2. Execute a nearest neighbor search algorithm, which consists of two parts. Part 1 exercises an approximate search methodology. In particular, a range search (RS) scheme is employed to determine which entries in the database falls within a close vicinity to the query. Part 2 exercises a fine search methodology.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-31-

Results from Part 1 are sorted according to their distances to the query. The search algorithm can either (i) return the best M results (in terms of having shortest distances to the query), or (ii) return all the results with distance less than some prescribed threshold. Either approach may be used. As further described below, the nearest neighbor algorithm can be replaced with other algorithms that provide better compute time performance when executing the search.

3.    If there is a match, output the program-id number and the corresponding frame number. If there are multiple matches, output all program-id's and corresponding frame numbers.

If there is no match, output the NOMATCH flag.

Range search requires pattern vectors that match within a tolerance, not necessarily a perfect match in each case. From the geometrical point of view, range search identifies which set of the entries encompassed within a polygon where the dimensions are determined by the tolerance parameters. In the preferred embodiment, the polygon is a 31 dimensional hyper-cube. .

Range Search (RS) Formulation

In the preferred embodiment, the    pattern vector is is a 1 x 31 vector: $c = [c_1 \quad c_2 \quad \cdots \quad c_{31}]$, where c is the pattern vector detected where a match is sought. The number of bands, as described above, may be more or less than 31, with varying results, trading off increased accuracy for compute complexity. The search

Mediaguide 1 v 12    Feb 26 '04

**Ex. 22**

-32-

algorithms will be described using a 31 element vector, but practitioners of ordinary skill will recognize that these methods will apply with any size pattern vector. The pattern library is a M x 31 matrix, where M is the total number of pattern vectors stored in the database and 31 represents the number of elements in the pattern vector. M is a potentially huge number, as demonstrated below. Assume that the entire database is represented by the matrix $A$:

$$A = \begin{bmatrix} z_1 \\ z_2 \\ \vdots \\ z_M \end{bmatrix} = \begin{bmatrix} z_{1,1} & z_{1,2} & \cdots & z_{1,31} \\ z_{2,1} & z_{2,2} & \cdots & z_{2,31} \\ \vdots & \vdots & \ddots & \vdots \\ z_{M,1} & z_{M,2} & \cdots & z_{M,31} \end{bmatrix}$$

Those pattern vectors stored in the library are referred to as the library pattern vector. In the preferred embodiment, each vector $z$ is a pattern vector of 31 elements calculated during the registration phase with known audio content for which detection is sought during the detection phase. During the detection phase, the identification exercise is to locate a set of library pattern vectors, {$z\_opt$}, which are being enclosed within the hypercube determined by the tolerance parameter.

The search criteris can be represented as the identification of any $z^*$ such that

$$z^* = \min_{m=1\,to\,M} \|z_m - c\|$$

In the preferred embodiment, L1 norm is used, where $\|x\| = |x_1| + |x_2| + \cdots + |x_{31}|$ is the L1 norm of x. Thus

$$\|z_m - c\| = \underbrace{|z_{m,1} - c_1|}_{e_{m,1}} + \underbrace{|z_{m,2} - c_2|}_{e_{m,2}} + \cdots + \underbrace{|z_{m,31} - c_{31}|}_{e_{m,31}}$$

Here, $e_{m,n}$ is referred to as the nth point error between the $c$ and $z_m$.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-33-

The search for $z^*$ over the entire library with the RS algorithm is based on the satisfaction of point error criteria. That is, each point error must be less than some tolerance and, in the preferred embodiment, the L1 norm less than a certain amount. Practitioners of ordinary skill will recognize that the tolerance for each element and the L1 norm may be the same or different, which changes the efficiency of searching. The determination of the tolerance is based on some statistical measure of empirically measured errors. Further, it is recognized that other measures of error, besides a first-order L1 norm may be used. The search problem now becomes a range search problem, which is described elsewhere in the art. Reference is made to P.K. Agarwal, Range Search, in J.E. Goodman and J. O'Rourke, editors, *HANDBOOK OF DISCRETE AND COMPUTATIONAL GEOMETRY*, page 575-598, Boca Raton, NY, 1997, CRC Press. C++ codes are also available from : <u>Steve Skiena</u>, *The Algorithm Design Manual*, published by Telos Pr, 1997, ISBN: 0387948600

Following are the steps in the method to determine $z^*$:

1) Set L equal to the index set containing all the indices of library pattern vectors:

$$L = \{1,2,3,\cdots,M\}$$

2) Start with n = 1.

3) Compute $e_{m,n}$ between the nth element of c to the nth element of each $z_{m,n}$ where m ranges from 1 to M.

4) Update L to include only those indices of pattern vectors whose nth point error is smaller than the specified tolerance $T_n$ :

Mediaguide 1 v 12    Feb 26 '04

**Ex. 22**

-34-

$$L = \begin{cases} 1 \leq m \leq M, \\ where \\ e_{m,k} < T_k, 1 \leq k \leq n \end{cases}$$

$T_n$ can be set arbitrarily. In the preferred embodiment $T_n$ is set to be 10% of the value of $c_n$.

5) If L is now an empty set AND $n \leq 31$,

Exit and issue the NO-MATCH FLAG.

Else: Set n = n + 1.

If n > 31 , Go to step 6.

Else:   Go to step 3.

6)    Compute the error between all pattern vectors addressed in L to $c$ :

$$e_m = \|z_m - c\| \quad ; \quad m \in L$$

The best solution is determined by examining all of the $e_m$, and that will result with $z^*$. Alternatively, for soft matching purposes, either of the two criteria can be used. Criteria 1: select only those $z_m$ with error less than some prescribed threshold $e_{max}$.

Criteria 2: select the best M candidates from $L$, where the M candidates are the least size of error to the Mth size of error.

Once the index m with the best L1 match is determined, the index is used to recover the data record corresponding to the pattern vector $z_m$.   The database module then outputs the program-id and the corresponding frame number as the output.

Note that at the start of the nth iteration, the index set L contains the indices of library pattern vectors whose point error from m = 1 to n-1 passes the tolerance test.   At the start of the nth iteration, the index set L is:

Mediaguide 1  v 12    Feb 26 '04

**Ex. 22**

-35-

$$L = \begin{cases} 1 \le m \le M, \\ where \\ e_{m,k} < T_k, k = 1 \text{ to } n-1 \end{cases}$$

The flowchart of the RS algorithm is shown in Figure 8.

It is anticipated that the library size for application of the invention to audio programming, M, for 30,000 songs is in the order tens of millions. The following shows the calculation:

| | | |
|---|---|---|
| Number of songs | = | 30,000 |
| Typical Song Length | = | 204 seconds (3 min 24 sec) |
| Sampling Rate | = | 8,000 samples per second |
| Frame Size | = | 16,384 samples |
| Inter-Frame Distance | = | 4,000 samples |

The number of frames per song is the song length times the number of samples per second minus the frame size, all divided by the inter-frame distance. In the preferred embodiment, there are about = 404 frames

With 30,000 songs, M = 12,117,120.

With this figure, the first iteration requires around 12 million subtractions and branch statement executions to update the index set L. The next iteration will probably be less, but still in the order of millions. Also, memory must be allocated to hold the intermediate values of all of the subtraction results required for the tolerance test.

Fast Range Search Algorithm

Mediaguide 1 v 12    Feb 26 '04

**Ex. 22**

-36-

There is an improvement to the method that minimizes the amount of subtractions that must be performed in order to find $z^*$. And more importantly, the execution time does not scale up as fast as the size of the database, which is especially important for database of this size. This performance enhancement is achieved at the cost of using a larger amount of memory. However, practitioners of ordinary skill will recognize that because computer memory costs have historically been reduced continuously, this is now a reasonable trade-off. The modification to the RS algorithm is to use indexing rather than computing exact error values. This modification is further explained below.

The improved search methodology for recovering the best match between a detected pattern vector and pattern vectors held in the database is referred to here as the Fast Range Search Algorithm. As before, A is the library matrix consisting of M rows of pattern vectors:

$$A = \begin{bmatrix} z_1 \\ z_2 \\ \vdots \\ z_M \end{bmatrix} = \begin{bmatrix} z_{1,1} & z_{1,2} & \cdots & z_{1,31} \\ z_{2,1} & z_{2,2} & \cdots & z_{2,31} \\ \vdots & \vdots & \ddots & \vdots \\ z_{M,1} & z_{M,2} & \cdots & z_{M,31} \end{bmatrix}$$

Each row is a particular pattern vector. There are in total M pattern vectors, and in the preferred embodiment, each has 31 elements.

Steps

1. Segregate each individual column of A:

Mediaguide 1 v 12    Feb 26 '04

**Ex. 22**

-37-

$$\begin{bmatrix} z_{1,1} & z_{1,2} & \cdots & z_{1,31} \\ z_{2,1} & z_{2,2} & \cdots & z_{2,31} \\ \vdots & \vdots & \ddots & \vdots \\ z_{M,1} & z_{M,2} & \cdots & z_{M,31} \end{bmatrix} \xrightarrow{\text{Segregate the columns}} \begin{bmatrix} z_{1,1} \\ z_{2,1} \\ \vdots \\ z_{M,1} \end{bmatrix}, \begin{bmatrix} z_{1,2} \\ z_{2,2} \\ \vdots \\ z_{M,2} \end{bmatrix}, \cdots, \begin{bmatrix} z_{1,31} \\ z_{2,31} \\ \vdots \\ z_{M,31} \end{bmatrix}$$

2. Each of the elements in the columns are sorted in an ascending order

$$\begin{bmatrix} z_{1,k} \\ z_{2,k} \\ \vdots \\ z_{M,k} \end{bmatrix} \xrightarrow{\text{Sort in Ascending order}} \begin{bmatrix} \hat{z}_{1,k} \\ \hat{z}_{2,k} \\ \vdots \\ \hat{z}_{M,k} \end{bmatrix} \quad ; \quad \hat{z}_{1,k} \le \hat{z}_{2,k} \le \cdots \le \hat{z}_{M,k}; k = 1 \text{ to } 31$$

3. As a result of the sort, each element $z_{m,k}$ is mapped to $\hat{z}_{\hat{m},k}$. Two cross indexing tables are constructed: Table $R_k$ is a mapping of $m \to \hat{m}$ and table $T_k$ maps $\hat{m} \to m$, for every k = 1 to 31.

The practitioner of ordinary skill will recognize that the sorting and table creation may occur after the registration phase but prior to the search for any matches during the detection phase. By having pre-sorted the pattern vectors during the registration phase, the system reduces the search time during the detection phase. During the detection phase, the method begins with a search through the sorted vectors, as described below.

Index Search

**Ex. 22**

-38-

Given the query vector $c = [c_1 \quad c_2 \quad \cdots \quad c_{31}]$ and the tolerance vector $T = [T_1 \quad T_2 \quad \cdots \quad T_{31}]$, a binary search method may be used to extract the indices of those elements that fall within the tolerance. Other search methods may be used as well, but the binary search, which performs in log(M) time, is preferred.

Steps:

1. Set $k = 1$.

2. Exercise binary search to locate in the sorted column k: $\hat{z}_{\hat{m},k}, \hat{m} = 1$ to M, the element $\hat{z}_{\hat{m}_L^k,k}$ closest and more-than-or–equal-to $c_k - T_k$. Then exercise binary search again to locate the element $\hat{z}_{\hat{m}_U^k,k}$ closest and less-than-or-equal-to $c_k + T_k$. Thus, all the elements in the set $\{\hat{z}_{\hat{m},k}, \hat{m}_L^k \leq \hat{m} \leq \hat{m}_U^k\}$ satisfy the tolerance requirement. In this manner, the binary search is used twice in every kth column to locate $\hat{m}_L^k$ and $\hat{m}_U^k$.

Further, let $\wp_k$ be the index set containing the indices of all $\hat{z}_{\hat{m},k}$ that satisfy the tolerance requirement:

$$\wp_k = \{\hat{m}_L^k \leq \hat{m} \leq \hat{m}_U^k\}$$

3. $k = k + 1$. if k>31, go to next step.

Alternatively, the process can calculate which columns have the least number of bands that pass the test, and to start with that number of bands in next step. By advancing up the sorted k values where the corresponding number of bands goes from smallest to largest, the result can converge faster than simple increment iteration over

Mediaguide 1  v  12    Feb 26 '04

**Ex. 22**

-39-

k.

4.

Repeat steps 2 and 3 until k = 32 in order to obtain every pair of bounds: $\left\{\hat{m}_L^k, \hat{m}_U^k\right\} k = 1 \text{ to } 31$ , and thus determine the 31 $\wp_k$'s.

Each $P_k$ is obtained independently. For every k, all the indices enclosed within the pair $\left\{\hat{m}_L^k, \hat{m}_U^k\right\} k = 1 \text{ to } 31$ can be converted back to the original indices using $T_k$ . Then, an intersection operation is run on the 31 sets of indices.

An alternate way is to intersect the first two set of indices, the result is then intersected with the 3rd set of indices, and so on, until the last set of indices have been intersected. This is the approached outlined below:

5.  Reset k = 1.

6.  Retrieve all indices in $\wp_k$ and store into the array $R$.

7.  Use Table $T_k$ to convert all indices in $R$ to the original indices :

$$\hat{m} \xrightarrow{T_k} m$$

Store all the indices $m$ into a set $S$ .

Use Table $R_{k+1}$ to convert m to $\hat{m}$: (thus the indices represented in column 1 are translated into their representation in column 2). Then to the results are tested to see if they are within the bound of $\left\{\hat{m}_L^{k+1}, \hat{m}_U^{k+1}\right\}$.

$$m \xrightarrow{R_{k+1}} \hat{m}$$

Apply the tolerance test and generate

Mediaguide 1 v 12    Feb 26 '04

**Ex. 22**

-40-

$$R = \left\{ \hat{m}, \hat{m}_L^{k+1} \le \hat{m} \le \hat{m}_U^{k+1} \right\}$$

In this manner, each successive $\wp_k$ would be the prior $\wp_k$ minus those indices that failed the tolerance test for the kth element. Thus, when k = 30 in step 6, the $\wp_{30}$ are the indices that meet all 31 tolerance tests.

8. k = k + 1.

9. Go to Step 6 and loop until k = 31.

10.    Here, the set $S$ are all the original indices after the 31 intersection loops. If $S$ is empty, issue the NO-MATCH flag. Otherwise, for hard matching, we proceed to locate the sole winner which may be the closest candidate, for example. For soft matching, we proceed to obtain all the qualifying entries.


Further speed enhancements to the fast RS algorithm

Starting from step 4, instead of starting from k = 1, then k = 2, then k = 3, ... , to the end, the total number of candidates in each column can be measured. The total number of candidates in each column is equal to the total number of candidates in each $\wp_k$. The order of k's can then be altered so that the first k tested is where $\wp_k$ has the fewest candidates, and so on until all k's are tested. Then the order of intersection starts with columns with the least number of candidates. .The end result is the same as intersecting the same set of 31 indices with k incrementing sequentially, but by ascending the reordered k's, the number of intersecting operations, is reduced and thus speeds up the search.

Search Booster:

Mediaguide 1  v 12    Feb 26 '04

**Ex. 22**

-41-

Practitioners of ordinary skill will recognize that the current search methodologies generally are searching on a frequency band by frequency band basis. Empirical studies using the preferred embodiment indicate that the initial iteration of the search results in 60% to 90% of the entries in the database passing the filter for that frequency band. Assuming a database of 6,000 song titles with 300 entries per song, the total number of entries to be searched is 1,800,000. With a 60% return, the system has to deal with more than a million entries after the first intersection. The number of iterations necessary to converge on the single search result can be reduced if the size of the initial intersection is smaller. It is another object of the invention, referred to here as the booster, to pre-process the search in such a way as to reduce the number of search results in the beginning iteration of the process.

The booster uses a different indexing scheme such that more than one frequency band can be lumped together. By means of the booster, a single search loop in the booster is equivalent to multiple loops in the range search method, and hence the search speed improved. A ranking scheme is used to determine the order of the search so as to minimize the number of searches for intersecting indices. To establish this ranking, the maximum, mean and standard-deviation of the return percentile in each of the bands is computed during the normal range search process. These empirical results are used to choose which bands will be lumped together using the booster process.

The booster indexing scheme is an extension of a binary-to-decimal conversion, where a vector of binary-value elements is converted to a decimal integer. The extension is straightforward. In particular, if the base of a vector $\vec{x}$, of size N, is M, where M is an integer, the conversion formula is as follows:

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-42-

$$\vec{x} = \lfloor x_1 \ x_2 \cdots x_N \rfloor \ ; \ 0 \leqslant x_k \leqslant M - 1$$

$$d_{\vec{x}} = \sum_{n=1}^{M} x_n \, M^{n-1}$$

Eqn(1)

Note that the conversion by Equation 1 is reversible, that is the equation may be used to convert $d_{\vec{x}}$ to $\vec{x}$ . Thus, the conversion possesses the one-to-one relationship so that every unique integer $d_{\vec{x}}$ is calculated from a unique $\vec{x}$ . In the preferred embodiment, the database that houses the pattern vectors, each of the pattern element is stored as a 16-bit unsigned integer. This implies that each pattern vector can be considered as a code vector, with M = 65536 and N = 31, and a unique $d_{\vec{x}}$ can be calculated for each pattern vector. As a result of this conversion the multi-dimensional space of the pattern vectors are mapped to a one-dimensional space. The search for pattern vectors that are within the required distance from the query vector $\vec{y} = [y_1, y_2, ..., y_n]$, referred to elsewhere as the tolerance requirement and here as the gap requirement, is to locate all entries $\vec{x} = [x_1, x_2, ..., x_n]$ in the database such that the gap requirement $|x_k - y_k| \leq Q; k = 1...31$ is satisfied. In the preferred embodiment, where the coding is 16 bits, the tolerance $T_k$ is 10% of the range of the 16 bits so that Q = 10% x 64K = 6554. In practice, the value 6,000 is used.

The booster maps the gap requirement in each band (referred to elsewhere as the tolerance requirement) to the corresponding gap requirement in $d_{\vec{x}}$ . Although the

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-43-

search can then iteratively single out all entries that satisfies all the gap requirements, the major difficulty of this approach is that the multiple gap requirements result in multiple disjoint segments on $d_{\bar{x}}$ . In particular, 31 iterations are required for the identification of the qualifying entries in $d_{\bar{x}}$ where $\bar{x}$ is converted to $d_{\bar{x}}$ , and the first loop is for band 1, the 31 st loop is for band 31. Practitioners of ordinary skill will recognize that by changing the number of bands in the pattern vector, the number of iterations would change, but the substance of the approach would be the same.

To circumvent the technical difficulty, two compromises is made: First, only a subset of frequency bands are selected to be included in the booster, i.e., only those indices in the subset are coded using Equation 1. Second, a smaller base is used. The first compromise reduces the number of iterative loops, or specifically, the number of disjoint segments, so searching over every segment is practical in terms of CPU speed. The second compromise cuts down the memory requirement, and, more importantly, it allows for hard coding the search result of the booster (with just a marginal amount of RAM) to make the search within the booster very fast.

The process for the preferred embodiment is described in detail below:

1. Set the base N = 31.

2. Choose 3 out of the 31 bands. More or fewer bands could be chosen. However if a large number of bands are chosen relative to the number M, then the booster method becomes slower and its usefulness more limited. If too few, its not accurate enough and does not speed up either, so an optimal number is empirically determined. In the

**Ex. 22**

-44-

preferred embodiment, where N = 31, 3 out of the 31 are chosen. 3. This combination results in:

(a) that the dynamic range of the new index is from 0 to 32767. Thus each new index can be coded in 2 bytes.

(b) Hard-coding of the search results: Create 32768 bins: bin 0 to bin 32767. Bin m holds the indices of all library pattern vectors whose 3-band elements result in the value m after the conversion.

4. Search Methodology:

(a)    Given a query vector    $\bar{y} = [y_1, y_2, ..., y_n]$

(b)    Single out the elements in the three specified bands.

(c)    Convert the query vector using those three bands to a number using Equation 1.

(d)    Collect all the indices of the library vectors that fulfill the gap requirement in the three specified bands by looking for the closest match of values m between the converted query and the converted library pattern vectors.

(e)    Pass the indices in (d) to the output and resume the band-by-band search described above on those sets of indices.

Practitioners of ordinary skill will recognize that the conversion of the library pattern vectors using Equation 1 may be made prior to operation, so that the run-time computation load is reduced.

D.    Song Detection and Identification (SDI) Module.


The SDI module takes the results of the DBS module and then provide final confirmation of the  audio or video program identity.  The SDI module contains two

Mediaguide 1 v 12    Feb 26 '04

**Ex. 22**

-45-

routines:

1.  Detection -- Filtering on regularity of the detected song number:

Irregular matches, where the DBS module returns different program-id numbers on a consecutive set of frames, is a good indication that no program is being positively detected. In contrast, consistent returns, where the DBS module returns consistently the same song number on a consecutive set of frames,  indicates that a program is successfully detected.

A simple algorithm based on the "majority vote rule" is used to suppress irregularity returns while detecting consistent returns. Assume that the DBS module  outputs a particular program-id and frame-id  for the ith frame of the detected  program or song. Due to irregular returns, the result program-id will not initially be considered as a valid program identification in that frame. Instead, the system considers results on adjacent frames  (that is, non-overlapping frames) of i, i+1, i+2, … , i+2K, where in the preferred embodiment, K is set to between 2 and  4.  If there is no majority winner in these $(2K + 1)$ frames, the system will issue song number = 0 to indicate null detection in the ith frame. If there is a winner, i.e. that at least $(K + 1)$ frames that are contiguous to frame i produced the same program-id number, the system will issue for the ith frame the detected song number as such majority winning program-id number.  Practitioners of ordinary skill will recognize that a majority vote calculation can be made in a number of ways, for example, it may be advantageous in certain applications to apply a stronger test, where the majority threshold is a value greather than K+1 and less than or equal to 2K+1, where a threshold of 2K+1 would constitute a unanimous vote. This reduces false positives at potentially the cost of more undetected results.  For the purposes here, majority vote shall be defined to include these alternative thresholds.  For computation speed, the preferred embodiment determines

Mediaguide 1  v 12   Feb 26 '04

**Ex. 22**

-46-

the majority vote using a median filter. A median on an array of 2K+1 numbers,

$$Z = \begin{bmatrix} z_1 & z_2 & \cdots & z_{2K+1} \end{bmatrix}, K = 1, 2, \ldots,$$ is the K-th entry after Z is sorted. For example, if Z = [ 1, 99, 100], the median of Z is 99. The formula for such computation is stated below:

Assume that the DBS module returns program-id #[n] for the nth frame. To calculate the median for frame i:

Let $\quad x = median\left( \begin{bmatrix} \#[i] & \#[i+1] & \cdots & \#[i+2K] \end{bmatrix} \right)$

Then let $y = 1 - median\left\{ \begin{bmatrix} \operatorname{sgn}(|\#[i]-x|) & \operatorname{sgn}(|\#[i+1]-x|) & \cdots & \operatorname{sgn}(|\#[i+2K]-x|) \end{bmatrix} \right\}$

where

$$\operatorname{sgn}(x) = \begin{cases} 1 & x > 0 \\ 0 & x = 0 \\ -1 & x < 0 \end{cases}$$

Then, the detected result is a multiplication of x times y. . The major feature of this formula is that it can be implemented in one pass rather than an implementation requiring loops and a counter.

2. Identification of programming.

Given that an audio or video program is detected using majority rule, as explained above, the next step is to impose an additional verification test to determine if there is frame synchronization of the song being detected. In particular, the frame synchronization test checks that the frame-id number output by the DBS module for

Mediaguide 1  v 12    Feb 26 '04

**Ex. 22**

-47-

each p-th frame  is a monotonically increasing function over time, that is, as p

increases. If it is not, or if the frame indices are random, the detection is declared

void.  The following are the step-by-step method of the entire SDI. In cases where a

portion of the program has been repeated, for example, in a song chorus that may be

edited into the program each time, pattern vectors otherwise substantially identical but

with varying time frames will be found by the DBS module. In these cases, the system

carries these results along by storing them in a buffer and subjects them to the

sequencing test explained below. As the sequencing test proceeds, some of these

interim results will have time frame indexes that are deemed invalid under the

sequencing test and will then be ignored.  Once a single interim thread survives, then

the start and stop times of the detection are updated.

### SDI Algorithm and steps

Let $s^p$ be a structure that holds the most recent $2K + 1$ program_id's after the $p$-th

broadcast frame  has been detected:

$$
\mathbf{s}^p = \left\{ \underbrace{\begin{bmatrix} S_{p,1} \\ S_{p,2} \\ \vdots \\ S_{p,P_1} \end{bmatrix}}_{\text{1st bin}} \underbrace{\begin{bmatrix} S_{p+1,1} \\ S_{p+1,2} \\ \vdots \\ S_{+1,P_2} \end{bmatrix}}_{\text{2nd bin}} \cdots \underbrace{\begin{bmatrix} S_{p+2K,1} \\ S_{p+2K,2} \\ \vdots \\ S_{p+2K,P_{2K+1}} \end{bmatrix}}_{(2K+1)\text{th bin}} \right\}
$$

Mediaguide I v 12   Feb 26 '04

**Ex. 22**

-48-

Here, $s_{m,n}$ = the $n$-th program_id being detected in the $m$-th broadcast frame by the DBS module . Note that the $P_m$ is the size of the bin. In general, $P_m$ is different for different $m$'s.

Correspondingly, $f^p$ is another structure holding the the corresponding frame numbers or frame indices:

$$f^p = \left\{ \begin{bmatrix} f_{p,1} \\ f_{p,2} \\ \vdots \\ f_{p,P_1} \end{bmatrix} \underbrace{\quad}_{\text{1st bin}} \begin{bmatrix} f_{p+1,1} \\ f_{p+1,2} \\ \vdots \\ f_{p+1,P_2} \end{bmatrix} \underbrace{\quad}_{\text{2nd bin}} \cdots \begin{bmatrix} f_{p+2K,1} \\ f_{p+2K,2} \\ \vdots \\ f_{p+2K,P_{2K+1}} \end{bmatrix} \underbrace{\quad}_{\text{(2K+1)th bin}} \right\}$$

where $f_{m,n}$ = the corresponding frame index of $s_{m,n}$.

Also, $SI$ = program_id of the last song or program that was successfully detected, such that the voting test and sequential test was successfully met. A register is created to hold this result until a new and different song or program is detected.

Steps:

1.    Compute the majority vote of $s^p$

Taking every program in the first bin of $s^p$ as the reference. Scan the rest of the 2K bins to determine if any program in the first bin pass the majority vote requirement.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-49-

$$w^p = \begin{cases} \{s_{p,m}, m \in D_p\} & ; \quad D_p = \text{Indices of entries in the first bin of } s^p \text{ that pass the majority vote} \\ & \quad \text{requirement} \\ 0 & ; \quad = 0 \text{ if all the program in the first bin fail the majority vote requirement} \end{cases}$$

2.  If $w^p = 0$,

$p = p + 1$. Go to Step 1.

Elseif $w^p$ is a singleton (meaning a set of one element) and not equal to zero

Set $SI = w^p$. Go to Step 3.

Elseif $w^p$ has more than one candidates

Set $SI = w^p$ (case with multiple program matches). Go to Step 3.

Steps 3 to 7 are performed per $s_{p,m}$ in $w^p$.

3.  For every $s_{p,m}$ in $D_p$, form a matrix A from the corresponding frame in $f^p$:

$$A = \begin{bmatrix} 1 & f_1 \\ 2 & f_2 \\ \vdots & \vdots \\ 2K+1 & f_{2K+1} \end{bmatrix}$$

where $f_t$ is the a frame of $s_{p,m}$ in the $t$-th bin of $f^p$.

If there is no frame in the $t$-th bin that belongs to $s_{p,m}$, $f_t = 0$.

4.  Perform the compacting of A, discarding the $q$-th rows in A where $f_q = 0$:

$$A = \begin{bmatrix} 1 & f_1 \\ 2 & f_2 \\ \vdots & \vdots \\ 2K+1 & f_{2k+1} \end{bmatrix} \xrightarrow{\text{discard the q}th\text{ row if } f_q = 0} B = \begin{bmatrix} k_1 & f_{I_1} \\ k_2 & f_{I_2} \\ \vdots & \vdots \\ k_N & f_{I_N} \end{bmatrix}$$

5.  Cleanup A by removing rows, with the following steps:

Mediaguide I  v 12   Feb 26 '04

**Ex. 22**

-50-

A. Start with $n = 1$.

B. Compute

$d_1 = f_{i_{n+1}} - f_{i_n}$ and $d_2 = k_{n+1} - k_n$. After performing step 5 by removing all the entries with mismatched program-id's, this step identifies only those entries that follow the sequencing correctly.

C. Here, the quantity $d_1$ is the offset of frames between the two detected frames in **B**. This quantity can also be translated to an actual time offset as well: by multiplying the value by the interframe distance in samples and dividing by the samples per second. The quantity $d_2$ is the frame offset between the two broadcast frames. Now d is the ratio of the two offsets, representing the advance rate of the detected sequence. In particular, in the preferred embodiment, the system expects an ideal rate of 4 as the value for d. However, an elastic constraint on d is applied: If $[d_1 \in (4[d_2 - 1] + 2, 4[d_2 - 1] + 6)]$, the two frames are in the right sequencing order. Thus, with $d_2 = 1$, an offset of 2 to 6 frames is expected between two adjacent broadcasting frames with the same program-id. If $d_2 = 2$, the offset is from 2+4 to 6+4 frames. Thus the range is the same except for an additional offset of 4 frames in the range. The values of 2 and 6 are a range centering around the ideal value 4. A range instead of a single value allows the offset to be a bit elastic rather than rigid. To be less elastic, one can choose the range to be from 3 to 5. In the same way, the range can be from 1 to 7 to be very elastic. Go to Step D.

Otherwise,

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

-51-

n = n + 1, in order to sequence through all the entries in **B**

If n < N,

Go to Step C.

Otherwise,

Go to Step D.

D. The matrix **C** is returned. Every row in **C** consists of the entries that satisfy the sequencing requirement.

Compact B by deleting rows that fail to match the sequencing requirement. Further, note that by taking the first entry of **B** as the reference, if the second entry fails the sequencing requirement, the process can jump to the third entry to see if it satisfies the sequencing requirement with the first entry. If the second entry is satisfied with the requirement, then the second entry becomes the reference for third entry.

$$
\mathbf{B} = \begin{bmatrix} k_1 & f_{l_1} \\ k_2 & f_{l_2} \\ \vdots & \vdots \\ k_N & f_{l_N} \end{bmatrix} \xrightarrow[\text{sequencing requirement}]{\text{delete rows that fail the}} \mathbf{C} = \begin{bmatrix} j_1 & f_{j_1} \\ j_2 & f_{j_2} \\ \vdots & \vdots \\ j_P & f_{j_P} \end{bmatrix}
$$

Majority vote requirement is enforced again here.

If the number of entries in **C** fails the majority vote requirement,

the entry $s_{p,m}$ is not qualified for further test, return to Step 3 for the next entry in $D_p$.

Otherwise,

continue onto Step 6.

Mediaguide 1  v 12    Feb 26 '04

**Ex. 22**

-52-

The majority vote test is applied again because even if the majority vote passes in Step 5, the majority vote test may fail after cleaning up the result with the sequencing rule requirement.  If the revised majority vote passes, then a new program or song has been positively detected, otherwise, there is no detection.

6.      Let s = Number of entries (i.e. rows) in **C**.

If s < K,

Go to Step 9.

Else proceed to perform regression analysis:

A. Let  $\mathbf{C}_1 = \begin{bmatrix} C_{11} & C_{21} & \cdots & C_{s1} \end{bmatrix}^T$ and  $\mathbf{C}_2 = \begin{bmatrix} C_{12} & C_{22} & \cdots & C_{s2} \end{bmatrix}^T$ be the first and the second columns of C respectively, where the superscript $T$ denotes matrix transposition. Construct the following matrices for regression analysis.  Regression analysis is used to calculate a linearity measure of the sequencing of frame-id numbers.:

$$D = \begin{bmatrix} \sum_{n=1}^{s} C_{n1}^2 & \sum_{n=1}^{s} C_{n1} \\ \sum_{n=1}^{s} C_{n1} & s \end{bmatrix} \quad E = \begin{bmatrix} \sum_{n=1}^{s} C_{n1} C_{n2} \\ \sum_{n=1}^{s} C_{n2} \end{bmatrix}$$

B. Compute both the slope and the intercept

$$\begin{bmatrix} \text{slope} \\ \text{y-intercept} \end{bmatrix} = \mathbf{DE}$$

C. Also compute the correlation coefficient r of C .

7.      If [r > 0.9 AND slope ≥ 2 AND slope ≤6],

the thread pertaining to the entry $s_{p,m}$ has passed all the test and is a valid entry to the tracking mode. Store the entry $s_{p,m}$ and the

Mediaguide I  v 12    Feb 26 '04

**Ex. 22**

-53-

corresponding thread into a register called Final_List.

Else,

the entry $s_{p,m}$ is discarded.

Continue the test for the next entry in $D_p$.

8. Enter the Tracking Mode. Each thread in the Final_list will be tracked either collectively or separately.

9. Start the tracking mode:

A. Create a small database used for the tracking:

   i. In the collective tracking mode, the small database contains all the pattern vectors of all the qualifying entries in the Final_list.

   ii. In the separate tracking mode, dedicated database containing just the pattern vectors for each particular entry Final_list is created for that entry.

B. If tracking mode = collective tracking,

   i. $p = p + 1$.

   ii. Run detection on the $(p+1)$th frame of broadcast.

   iii. Update the sequence of each thread. Monitor the merit of each thread by observing if the thread is satisfied with the sequencing requirement.

   iv. Continue the tracking by returning to step i. if there exists at least one thread satisfying the sequencing requirement. Otherwise, exit the tracking.

**Ex. 22**

-54-

If tracking mode = separate tracking, use dedicated database for each thread for the tracking. Steps are identical to that of collective tracking.

The sequencing requirement here is the same as what is being used in Step 5c. That is, we expect the id of the detected frame for the new broadcast frame is in a monotonic increasing manner, and the increasing amount between successive frame of broadcast is between 2 to 6 in the preferred embodiment.

If for any thread being tracked, that the new broadcast failed the sequencing requirement relative to the previous frame, a tolerance policy is implemented. That is, each track can have at most $Q$ times of failure, where $Q = 0, 1, 2, \ldots$. If $Q = 0$, there is no tolerance on failing the sequencing requirement.

C. After the tracking mode is terminated. Exam the merit of each thread. The thread that has the highest score is the winner of all in the Final_list.

   i. The score can be calculated based on the error between each frame in the thread to the corresponding frame of the broadcast; or based on the duration of the thread. Or both. In our preferred embodiment, the duration is taken as the tracking score of each of thread. The one that endures the longest within the period of tracking is the winner thread.

D. If multiple programs in being posted $SI$ in Step 2. correct the posting by the program_id of the winning thread.

Mediaguide 1 v 12    Feb 26 '04

**Ex. 22**

-55-

10.    Wait for the new *p*-th frame from the broadcast, Go back to Step 1.

Practioners of ordinary skill will recognize that the values used in Step 6 for testing the linearity of the sequential frame-id's may be changed either to make the test easier or make the test harder to meet. This controls whether the results increase false positives or suppress false positives while raising or lowering the number of correct identifications as compared to no detections.

Although the present invention has been described and illustrated in detail, it is to be clearly understood that the same is by way of illustration and example only, and is not to be taken by way of limitation. It is appreciated that various features of the invention which are, for clarity, described in the context of separate embodiments may also be provided in combination in a single embodiment. Conversely, various features of the invention which are, for brevity, described in the context of a single embodiment may also be provided separately or in any suitable combination. It is appreciated that the particular embodiment described in the Appendices is intended only to provide an extremely detailed disclosure of the present invention and is not intended to be limiting. It is appreciated that any of the software components of the present invention may, if desired, be implemented in ROM (read-only memory) form or stored on any kind of computer readable media, including CD-ROM, magnetic media, or transmitted as digital data files stored in a computer's memory. The software components may, generally, be implemented in hardware, if desired, using conventional techniques.

Mediaguide 1  v  12    Feb 26 '04

**Ex. 22**

-56-

The spirit and scope of the present invention are to be limited only by the terms of the appended claims.

**Ex. 22**

WHAT IS CLAIMED:

For the pattern vector method:

1.    A method of generating a signature comprised of a set of at least one member each member being a real number, for at least one time frame of an audiosignal comprised of a set of predetermined frequency bands, such audio signal being identified by an identification index and such time frame being identified by a time frame index, comprising:

Transforming the at least one time frame of signal into the frequency domain, such that there is a finite number of frequency magnitude values stored in a computer memory;

Calculating a single value for each frequency band that is a linear combination of the frequency magnitude values that reside within the frequency band produced by said transformation;

Storing said single value in a computer memory with a reference to the time frame index and the identification index.

For the specific centroid calculation of the PV:

2.    The method according to Claim 1 where each coefficient in the linear combination is substantially equal to the ordinal index of the frequency magnitude within the frequency band divided by a predetermined constant.

3.    The method according to Claim 1 where the number of predetermined frequency bands is 31.

4.    The method according to Claim 1 where the frequency bands occupy a range above 0 Hz and equal to or below 8000Hz

Mediaguide 1 v 12    Feb 26 '04

**Ex. 22**

5.    The method according to Claim 2 where the predetermined constant is substantially equal to the sum of frequency magnitude values.

For the speed variation robustness:

6.    A method of determining whether a detected signal is substantially the same as at least one known signal out of a plurality of known signals, each signal of a plurality of time frame duration, comprising:

Calculating at least one signature for each time frame of both the detected signal and the known signal, such signature calculation using frequency magnitude coefficients grouped into predeteremined frequency bands,     where the width of at least one of the predetermined frequency bands is substantially larger than the frequency shift in the signal resulting from a predetermined amount of variation in the signal playback speed.

7.    The method according to Claim 6 where the upper boundary of each frequency band is substantially equal to the value of the lower boundary times the sum of one plus a pre-determined value.

8.    The method according to Claim 7 where the predetermined value is substantially between the values of -2 and +2.

9.    The method according to Claim 7 where the predetermined value    is approximately equal to a predetermined percentage increase in playback speed divided by a predetermined percentage maximum amount of bandwidth of the frequency band.

For the searching inventions:

10.    A method of determining whether a detected signal of a plurality of time frame duration is substantially the same as at least one known signal out of a

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

plurality of known signals, each of a plurality of time frame duration and having an identification index, comprising:

Calculating a first signature for each of the time frames of at least one the known signals,

Storing in a computer database each first signature with a reference to the corresponding known signal identification index and a reference to the location in time of the time frame from substantially the beginning of said known program;

Calculating a second signature for each of a predetermined number of sequential time frames during the detected signal;

Searching the database to determine which first and second signatures meet a predetermined matching criteria.

For majority voting:

11.    The method of Claim 10 where the matching criteria comprises:

Calculating for at least one of the predetermined number of sequential time frames an error value between the second signature corresponding to each sequential time frame and the each first signature in the database;

For each error value that is less than or equal to a predetermined threshold value, determining the identification index and time frame index of the first signature used to calculate such error value;

Determining whether a majority of the determined identification indexes for the group of sequential time frames are the same.

Mediaguide I v 12    Feb 26 '04

**Ex. 22**

12.    The method of Claim 11 where the first and second signatures are each a set of a predetermined number of elements, each element being a real number and the error value is one of the group: (i) the approximate vector distance from the first signature to the second signature; (ii) the approximate L-1 norm between the first signature and the second signature; (iii) the approximate maximum difference between any element in the first signature and its corresponding element in the second signature; (iv) the approximate  minimum difference between any element in the first signature and its corresponding element in the second signature; (v) the approximate average difference between all of the elements in the first signature and their corresponding elements in the second signature.

13.    The method of Claim 10 or 11 where the majority test, for the predetermined number of time frames, is met when the number of second signatures that meet the error threshold is greater than a predetermined number between and including K+1 and  2K+1, where K is evaluated such that 2K+1 is equal to the predetermined number of time frames.

<u>For sequential rule</u>

14.    The method of Claim 11 where the matching criteria comprises:

Determining whether the time frame indices corresponding to the second signature increase substantially monotonically.


15.    The method of Claim 11 where the matching criteria comprises:

Determining whether the time frame indices corresponding to the second signature are substantially linearly correlated with the time frame indices corresponding to the first signature.

Mediaguide 1  v  12    Feb 26 '04

**Ex. 22**

16.    The method of Claim 11 where the matching criteria comprises:

Calculating a regression analysis between the time frame indices corresponding to the second signature relative to the time frame indices corresponding to the first signature.

<u>Both</u>:

17.    The method of Claim 12 further comprising the method of Claim 14.

<u>Multi-thread</u>:

18.    The method of claim 16 further comprising:

storing in a separate portion of computer memory, the references to the locations of all first signatures that meet the majority test among the set of predetermined time frames;

For each meeting first signatures, starting a thread so that each is assumed a unique and valid outcome;

Continuing to process the signal independently using each of the threads; and

Terminating any thread when the time frame index corresponding to the latest time frame in the thread does not meet the monotonicity test in the determining step.

<u>For the Fast range search:</u>

19.    A method of searching a database comprised of at least one first signature representing an signal, using a query comprised of a second signature where each signature is a set of a number of elements, each element a real number, comprising:

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

Storing in computer memory a first data array out of all of the first signatures, whereby each row in the first array is the set of elements from the first signature;

For at least one column in the first data array, sorting within the computer memory, the elements of the column in either ascending or descending order;

Storing in computer memory an additional data array where at least one element in the second data array corresponds to an element in the first data array, and the value of the at least one element in the second data array cross-indexes where the corresponding element in the first data array originated prior to the sorting step.

20. The method of Claim 1 further comprising the method of Claim 19.


For the booster:

21.     A method of searching a database comprised of at least one first signature representing a signal, using a query comprised of a second signature where each signature is a set of predetermined number of elements, each element a real number, comprising:

Using a predetermined mapping to map each first signature to a first integer on the number line;

Storing in a computer memory the first integer with a reference to the identification index and the time frame index of the each first signature;

Using the predetermined mapping to map the second signature to a second integer;

Using the second integer as an index to search through the computer memory to find memory locations storing the value of a first integer that meets a predetermined matching criteria relative to the second integer;

Returning the identification index and time frame index corresponding to the locations where the first integers that meet the matching criteria are found.

Mediaguide 1 v 12   Feb 26 '04

**Ex. 22**

The whole thing:

22.    A method of determining whether a detected signal of a plurality of time frame duration is substantially the same as at least one known signal out of a plurality of known signals, each of a plurality of  time frame duration and having an identification index and time frame index for each time frame, comprising:

Calculating a first signature for at least one of the time frames of each of the known signals,

Storing in a computer database each first signature with a reference to the corresponding identification index and a reference to the time frame index;

Calculating a second signature for at least one of a predetermined number of sequential time frames during the detected audio signal;

Searching the database to determine which of the first signatures meet a predetermined matching criteria with any of the second signatures, thereby returning the identification index and time frame index corresponding to each matching first signature;

Selecting the identification index returned by at least a majority of the searches;

Determining whether the returned time frame indices, referenced by the matching first signatures that correspond to the selected identification index,  increase substantially monotonically in relation to the time frame indices of the at least one predetermined number of sequential time frames.

Mediaguide I v 12    Feb 26 '04

**Ex. 22**

Harvester:

23.     The method of Claim 1 where the known signal is comprised of programming of unknown identity, comprising:

Creating an arbitrary identification index;

Assigning the identification index to those first signatures derived from the programming of unknown identity;

Storing the arbitrary identification index and time frame index in computer memory so as to be referenced by the first signature;

Replacing each instance of the arbitrary identification index in the database with a correct identification index when the unknown programming is identified.

24.     The method of Claim 23 further comprising replacing the arbitrary identification index in the database with another identification index that references valid identification data identifying the programming of unknown identity.

25.     A machine comprising a central processing unit, a digital data transceiver device and a data storage device comprised of any machine readable media, where the machine readable media contains a computer program that when executed by the machine, performs the methods of Claims 1 - 24.

26.     A machine readable media of any type, which contains data that is a computer program that when executed by a computer, performs the methods of Claims 1 - 24.

Mediaguide 1  v 12    Feb 26 '04

**Ex. 22**

## Flow-Chart

The interconnection of the four modules constitutes the radio broadcast monitoring system. Below is the flow-chart:



**Figure 1** The block configuration of the radio broadcast monitoring system.

1

**Ex. 22**



**Figure 2** An illustration of the flow of the algorithm from a frame of audio to its result after detection.

Ex. 22

The flowchart of this module is a simple flowchart, as follows:



**Figure 3** The flowchart of the PG Module.

3

**Ex. 22**



**Figure 4** Original band setting leads to pattern mismatches between the original and its speedup variant.



**Figure 5** Modified band setting yields very good pattern matching given the speedup rate is known.

4

**Ex. 22**



**Figure 6 The new band setting leads to good robustness of +/-2% speedup variations.**

**Ex. 22**

**Detail of the DBS Operation**

The flowchart illustrates the flow in DBS Module is given below:



**Figure 7** The schematic of the DBS operation flow.

6

**Ex. 22**



**Figure 8** The flowchart of the RS Algorithm.

7

**Ex. 22**

PATENT APPLICATION SERIAL NO. _____

U.S. DEPARTMENT OF COMMERCE
PATENT AND TRADEMARK OFFICE
FEE RECORD SHEET

03/03/2004 WABDELR1 00000106 60547931

01 FC:2005                    80.00 OP

PTO-1556
  (5/87)

'U.S. Government Printing Office: 2001 — 481-697/59173

**Ex. 22**

# EXHIBIT 23

*The Nielsen Company (US), LLC*

*v.*

*TVision Insights, Inc.*

U.S. District Court for the District of Delaware
Case No. 22-057-LPS

## Reply Expert Report on Damages

## Michael C. Keeley, Ph.D.
## Senior Advisor, Cornerstone Research

## August 18, 2025

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 23**

**TABLE OF CONTENTS**

I.     ASSIGNMENT ................................................................................................ 1

II.    SUMMARY OF OPINIONS ......................................................................... 2

III.   MS. JOHNSON'S AFFIRMATIVE APPROACHES TO DAMAGES ARE FLAWED .. 5

       A.    Ms. Johnson's Cost Approach Is Flawed Because There Are No Acceptable Non-Infringing Alternatives Available to TVision ........................................................ 6

       B.    Ms. Johnson's Market Approach Is Flawed Because It Is Based on an Alternative Not Available to TVision ................................................................... 12

       C.    Ms. Johnson's Income Approach Is Flawed ............................................... 13

       D.    Ms. Johnson's Analysis of the *Georgia-Pacific* Factors Is Flawed ..................... 14

IV.    RESPONSE TO MS. JOHNSON'S CRITIQUES OF MY INITIAL REPORT ............. 21

       A.    Use of a Forecast at the Time of the Hypothetical Negotiation ........................... 21

       B.    Nielsen and TVision Are Competitors ...................................................... 22

       C.    I Properly Analyzed Non-Infringing Alternatives ....................................... 25

       D.    I Do Not Overstate the Benefits of the '889 Patent ..................................... 26

       E.    I Do Not Use the Entire Market Value Rule ............................................. 26

       F.    Nielsen Lost Profits and Will Lose Profits Due to TVision's Infringement ......... 27

       G.    I Provide Support for a Lump Sum Royalty Structure Based on Future Revenue 33

       H.    I Used an Appropriate Discount Rate ..................................................... 35

       I.    I Do Not Use a 50% "Rule of Thumb" ..................................................... 37

V.     SIGNATURE .............................................................................................. 38

HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY



HIGHLY CONFIDENTIAL – OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 23**

# EXHIBIT 24

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

---------------------------------X

THE NIELSEN COMPANY (US), LLC,    :

              Plaintiff,      :

                                        C.A. No.:

   v.                           :

                                        22-057-CJB

TVISION INSIGHTS, INC.,           :

              Defendants.      :

---------------------------------X

*** ATTORNEYS' EYES ONLY ***

Deposition of DAVID ANDERSON, PH.D.

Conducted Remotely

Friday, August 29, 2025

9:05 a.m.


Reported by: Matthew Goldstein, RMR, CRR


_____

DIGITAL EVIDENCE GROUP

1730 M Street, NW, Suite 812

Washington, D.C. 20036

(202) 232-0646

**Ex. 24**

8/29/2025        The Nielsen Company (US), LLC v. TVision Insights, Inc.    David Anderson, Ph.D.
Attorneys' Eyes Only



Ex. 24

46 (Pages 178 to 181)

**Ex. 24**

8/29/2025          The Nielsen Company (US), LLC v. TVision Insights, Inc.    David Anderson, Ph.D.
Attorneys' Eyes Only

**Ex. 24**

47 (Pages 182 to 185)

**Ex. 24**