## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | C.A. No. 22-57-CJB |
| Plaintiff, | ) | |
| | ) | **JURY TRIAL DEMANDED** |
| v. | ) | |
| | ) | **PUBLIC VERSION** |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

### THE NIELSEN COMPANY (US), LLC'S BRIEF IN OPPOSITION TO
### TVISION'S DAUBERT AND SUMMARY JUDGMENT MOTIONS (D.I. 352-53, 358-366)

OF COUNSEL:

Steven Yovits
Douglas Lewis
Constantine Koutsoubas
Jason P. Greenhut
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
Tel: (312) 857-7070

Clifford Katz
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel: (212) 808-7800

Dated: January 5, 2026
12632962 / 14944.00004

Public Version Dated: January 12, 2026

David E. Moore (#3983)
Bindu A. Palapura (#5370)
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE 19801
Tel: (302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
*Attorneys for Plaintiff The Nielsen Company
(US), LLC*

## TABLE OF CONTENTS

I.      SUMMARY OF ARGUMENT ......................................................................................... 1

II.     TVISION'S MOTION FOR SUMMARY JUDGMENT OF INELIGIBILITY
        FAILS BECAUSE TVISION FAILS TO SATISFY ITS BURDEN ON *ALICE*
        STEPS ONE AND TWO (RESPONDING TO D.I. 352; D.I. 355 § III; D.I. 365) ........... 3

        A.      Factual Background ................................................................................................ 3

                1.      Automatic Content Recognition ("ACR") and Problems in the
                        Prior Art ..................................................................................................... 3

                2.      The '889 Patent's Real-World Solutions to Prior Art Problems ................ 4

        B.      The Claims Recite Patentable Subject Matter ....................................................... 6

                1.      Nielsen's Defense of the '889 Patent's Patentability Is Not
                        Precluded by Prior Briefing ...................................................................... 6

                2.      TVision Has Not Shown the Claims Are Patent Ineligible Under
                        Step One of the *Alice* Test ........................................................................ 6

                        a.      The Claims Are Directed to Patent-Eligible Improvements
                                in Signal Processing and Computer Technology That Solve
                                Problems in the Prior Art ................................................................ 6

                        b.      The Asserted Claims Recite Specific Solutions, Not Results ......... 7

                        c.      Courts Have Found Similar Claims Patent-Eligible ...................... 8

                        d.      TVision Fails to Meet Its Burden to Show That the Claims
                                Are "Directed to" an Abstract Idea .............................................. 11

                        e.      The Asserted Claims Do Not Recite Mere Mathematical
                                Formulae, Nor Are Algorithms *Per Se* Unpatentable .................. 12

                3.      TVision Fails to Carry Its Burden on *Alice* Step Two ............................ 15

                        a.      TVision Fails to Rebut Nielsen's Evidence of Inventiveness ....... 16

                        b.      TVision Fails to Show No Claim Element Is Inventive .............. 17

III.    TVISION'S CONSTRUCTION OF THE LIMITATION "DETERMIN[ING] A
        FIRST DESCRIPTOR OF THE FIRST FRAME OF MEDIA SAMPLES BASED
        ON A COMPARISON OF THE FIRST SPECTRAL POWER AND THE
        SECOND SPECTRAL POWER" CONTRADICTS THE LAW AND FACTS
        (RESPONDING TO D.I. 352; D.I. 355 §§ IV.A-B; D.I. 366) ...................................... 18

A.    TVision's Attempt to Limit the Claims To Prohibit Any Comparison of Spectral Powers from Different Frames Should Be Rejected .............................. 18

    1.    TVision's Proposal Is Inconsistent with the Use "Comprising" in the Claims, Which Permits Additional Steps ............................................ 19

    2.    TVision's Proposal Is Inconsistent with the Doctrine of Claim Differentiation, Which Presumes That the Dependent Claims Are Narrower Than the Independent Claims .................................................... 20

    3.    TVision Cannot Show That The '889 Patent Disavowed Claim Scope ......................................................................................................... 22

B.    Nielsen has Not "Waived" Any Argument Regarding the Meaning of The Limitation ....................................................................................................... 23

    1.    Nielsen's Position Has Never Changed ..................................................... 23

    2.    Nielsen Has Not "Waived a Contrary Argument" .................................... 25

IV.    NIELSEN PROVED INFRINGEMENT (RESPONDING TO D.I. 352; D.I. 355 § V; D.I. 366) ................................................................................................................ 27

V.    DAUBERT MOTION REGARDING DR. KEELEY'S OPINIONS .............................. 28

A.    DR. KEELEY PROPERLY CONSIDERED NIELSEN'S FOREGONE PROFITS IN CONNECTION WITH HIS REASONABLE ROYALTY ANALYSIS (RESPONDING TO D.I. 353; D.I. 355 § VI.D; D.I. 358) ............ 28

    1.    Dr. Keeley Appropriately Relied Only on Future Foregone Profits Information Available at the Time of the Hypothetical Negotiation ....... 28

    2.    Dr. Keeley Properly Considered the Unavailability of Acceptable Non-Infringing Alternatives in Opining About Nielsen's Foregone Profits ........................................................................................................ 29

    3.    Dr. Keeley Was Not Required to Set Forth a Full Lost Profits Analysis or Opine on the Individual *Panduit* Factors .............................. 30

B.    DR. KEELEY'S REASONABLE ROYALTY OPINION IS NOT "████████████████████████" DUE TO ████████████ ████████████ (RESPONDING TO D.I. 353; D.I. 355 § VI.E; D.I. 359) ............ 31

C.    DR. KEELEY PROPERLY APPLIED THE NASH BARGAINING SOLUTION (RESPONDING TO D.I. 353; D.I. 355 § VI.F; D.I. 360) ............. 32

D.      DR. KEELEY BOTH APPORTIONED DAMAGES AND UTILIZED DOCTRINES THAT DO NOT REQUIRE APPORTIONMENT (RESPONDING TO D.I. 353; D.I. 355 § VI.G; D.I. 361) .................................. 35

     1.      Dr. Keeley Directly Apportioned in His Damages Analysis ................... 35

     2.      Dr. Keeley Also Apportioned Through His Considerations of the *Georgia-Pacific* Factors ........................................................................ 36

     3.      Dr. Keeley Also Used the Convoyed Sales Approach, Which Does Not Require Apportionment .................................................................. 38

E.      DR. KEELEY PROPERLY ASSUMED ███████████████████ ██████████████████████ (RESPONDING TO D.I. 353; D.I. 355 § VI.H; D.I. 362) ....................................................................... 39

VI.     TVISION OFFERS NO BASIS TO EXCLUDE NIELSEN'S EXPERTS' OPINIONS REGARDING THE LACK OF ACCEPTABLE, NON-INFRINGING ALTERNATIVES (RESPONDING TO D.I. 353; D.I. 355 § VII; D.I. 363) ............................................................................................... 40

A.      TVision Does Not Have Evidence to Show That Supposed Alternatives Recommended by ██████ Were Available, Acceptable, and Non-Infringing ............................................................................................... 41

     1.      No Evidence Supports the ████ Alternative .......................................... 43

     2.      No Evidence Supports the ████ Alternative.......................................... 44

     3.      No Evidence Supports the ████████ Alternative ............................ 46

B.      TVision Does Not Have Sufficient Evidence to Show That a ████████ Product Was Available, Acceptable, and Non-Infringing ................................ 46

C.      TVision Does Not Have Sufficient Evidence to Show That an ██████ Product Was Available, Acceptable, and Non-Infringing ................................ 46

D.      The '889 Patent Does Not "Admit" There Are Available, Acceptable, and Non-Infringing Alternatives............................................................... 47

VII.    DR. MARTIN'S AND DR. KYRIAKAKIS'S OPINIONS ABOUT THE SIMULATION ARE PROPER (RESPONDING TO D.I. 353; D.I. 355 § VIII; D.I. 364) ............................................................................................... 47

VIII.   CONCLUSION........................................................................................ 49

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*AI Visualize, Inc. v. Nuance Commc'ns, Inc.*,
    97 F.4th 1371 (Fed. Cir. 2024) ......................................................................................12

*Alice Corp. v. CLS Bank Int'l*,
    573 U.S. 208 (2014).................................................................................................. *passim*

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*,
    841 F.3d 1288 (Fed. Cir. 2016)......................................................................................17

*Amgen Inc. v. Hospira, Inc.*,
    C.A. No. 18-1064-CFC-CJB, 2021 WL 4935868 (D. Del. May 20, 2021)............................28

*Asetek Danmark A/S v. CMI USA Inc.*,
    852 F.3d 1352 (Fed. Cir. 2017)................................................................................29, 30

*AstraZeneca AB v. Apotex Corp.*,
    782 F.3d 1324 (Fed. Cir. 2015).......................................................................................36

*Bascom Global Int't Servs. v. AT&T Mobility*,
    827 F.3d 1341 (Fed. Cir. 2016)......................................................................................17

*Bd. of Regents UT Sys. v. Boston Sci. Corp.*,
    645 F. Supp. 3d 324 (D. Del. 2022)................................................................................37

*In re Bd. Trs. of Leland Stanford Junior Univ.*,
    991 F.3d 1245 (Fed. Cir. 2021).......................................................................................14

*Berkheimer v. HP Inc.*,
    881 F.3d 1360 (Fed. Cir. 2018).....................................................................................6, 15

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
    C.A. No. 15-152-RGA, 2018 WL 4691047 (D. Del. Sept. 28, 2018) ....................................30

*Blackboard, Inc. v. Desire2Learn, Inc.*,
    574 F.3d 1371 (Fed. Cir. 2009)........................................................................................27

*Cal. Inst. of Tech. v. Broadcom Ltd.*,
    25 F.4th 976 (Fed. Cir. 2022) ...............................................................................7, 8, 10, 13

*CardioNet, LLC v. InfoBionic, Inc.*,
    955 F.3d 1358 (Fed. Cir. 2020)................................................................................7, 10, 12

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)........................................................................................................28

*Cent. Admixture Pharm. Servs., Inc. v. Advanced Cardiac Sols., P.C.*,
    482 F.3d 1347 (Fed. Cir. 2007)..................................................................................25, 26

*ChargePoint, Inc. v. SemaConnect, Inc.*,
    920 F.3d 759 (Fed. Cir. 2019).......................................................................................12

*Cias, Inc. v. Alliance Gaming Corp.*,
    504 F.3d 1356 (Fed. Cir. 2007).....................................................................................19

*Cooperative Entnmn't, Inc. v. Kollective Tech., Inc.*,
    50 F.4th 127 (Fed. Cir. 2022) .......................................................................................17

*Correct Transmission, LLC v. Nokia of Am. Corp.*,
    No. 22-cv-00343, 2024 WL 1289821 (E.D. Tex. Mar. 26, 2024) ...........................41

*Curtiss-Wright Flow Control Corp. v. Velan, Inc.*,
    438 F.3d 1374 (Fed. Cir. 2006)......................................................................................20

*Daedalus Blue, LLC v. Microstrategy Inc.*,
    No. 2:20-CV-551, 2023 WL 5598456 (E.D. Va. Aug. 29, 2023) .....................................38, 39

*DDR Holdings, LLC v. Priceline.com LLC*,
    122 F.4th 911 (Fed. Cir. 2024) ......................................................................................23

*Diamond v. Diehr*,
    450 U.S. 175 (1981)........................................................................................................14

*Digitech Image Techs., LLC v. EFI, Inc.*,
    758 F.3d 1344 (Fed. Cir. 2014)......................................................................................14

*Dippin' Dots, Inc. v. Mosey*,
    476 F.3d 1337 (Fed. Cir. 2007)......................................................................................20

*Eagle View Techs., Inc v. Roofr, Inc.*,
    651 F. Supp. 3d 729 (D. Del. 2023)...............................................................................14

*El v. Southeastern Pennsylvania Transp. Auth.*,
    479 F.3d 232 (3d Cir. 2007)...........................................................................................16

*Elec. Power Grp., LLC v. Alstom S.A.*,
    830 F.3d 1350 (Fed. Cir. 2016)......................................................................................14

*Enfish, LLC v. Microsoft Corp.*,
    822 F.3d 1327 (Fed. Cir. 2016)..................................................................................7, 13

*Exmark Mfg. Co. v. Briggs & Stratton Power Prods.*,
  879 F.3d 1332 (Fed. Cir. 2018)............................................................................................37

*FloodBreak, LLC v. Art Metal Indus., LLC*,
  No. 3:18-CV-503 (SRU), 2020 WL 6060974 (D. Conn. Oct. 13, 2020)................................29

*G-I Holdings, Inc. v. Reliance Ins. Co.*,
  586 F.3d 247 (3d Cir. 2009)..................................................................................................26

*Genentech, Inc. v. Chiron Corp.*,
  112 F.3d 495 (Fed. Cir. 1997)...............................................................................................19

*Genuine Enabling Tech. LLC v. Sony Corp.*,
  C.A. No. 17-cv-135, 2022 WL 17325656 (D. Del. Nov. 28, 2022) ............................29, 31, 34

*Gottschalk v. Benson*,
  409 U.S. 63 (1972).................................................................................................................14

*Grain Processing Corp. v. Am. Maize-Prods. Co.*,
  185 F.3d 1341 (Fed. Cir. 1999)..............................................................................................30

*Hybrid Audio, LLC v. Asus Comput. Int'l*,
  No. 17-cv-6947, 2019 WL 3037540 (N.D. Cal. Jul. 11, 2019) ................................................13

*Int'l Bus. Machines Corp. v. The Priceline Grp. Inc.*,
  C.A. No. 15-137-LPS-CJB, 2016 WL 626495 (D. Del. Feb. 16, 2016)....................................6

*Interactive Pictures Corp. v. Infinite Pictures, Inc.*,
  274 F.3d 1371 (Fed. Cir. 2001)..............................................................................................32

*Knauf Insulation, LLC v. Johns Manville Corp.*,
  772 F. Supp. 3d 946 (S.D. Ind. 2024) ....................................................................................19

*KOM Software Inc. v. NetApp Inc.*,
  C.A. No. 18-160-WCB, 2023 WL 6460025 (D. Del. Oct. 4, 2023) .......................................17

*Liebel-Flarsheim Co. v. Medrad, Inc.*,
  358 F.3d 898 (Fed. Cir. 2004)................................................................................................20

*Luminara Worldwide, LLC v. Liown Elecs. Co.*,
  814 F.3d 1343 (Fed. Cir. 2016)..........................................................................................22, 23

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
  837 F.3d 1299 (Fed. Cir. 2016)................................................................................................8

*MiiCs & Partners, Inc. v. Funai Elec. Co., Ltd.*,
  C.A. No. 14-804-RGA, 2017 WL 6268072 (D. Del. Dec. 7, 2017) ......................................30

*Paltalk Holdings, Inc. v. Cisco Sys., Inc.*,
 No. 21-cv-757, 2025 WL 2581690 (W.D. Tex. Aug. 27, 2025)..............................................41

*Panduit Corp. v. Stahlin Bros*,
 575 F.2d 1152 (6th Cir. 1978) .......................................................................................30, 40

*Parker v. Flook*,
 437 U.S. 584 (1978)........................................................................................................13, 14

*Performance Aftermarket Parts Grp., LTD. v. TI Group Auto. Sys., Inc.*,
 C.A. No. H-05-4251, 2008 WL 169826 (S.D. Tex. Jan. 16, 2008).........................................49

*PersonalWeb Techs. LLC v. Google LLC*,
 8 F.4th 1310 (Fed. Cir. 2021) ..................................................................................................14

*Phillips v. AWH Corp.*,
 415 F.3d 1303 (Fed. Cir. 2005).................................................................................................20

*Powell v. Home Depot USA, Inc.*,
 663 F.3d 1221 (Fed. Cir. 2011).................................................................................................31

*Prolitec Inc. v. ScentAir Techs, LLC*,
 770 F. Supp.3d 730 (D. Del. 2025).................................................................................. *passim*

*Recentive Analytics, Inc. v. Fox Corp.*,
 134 F.4th 1205 (Fed. Cir. 2025) ...............................................................................................14

*RecogniCorp, LLC v. Nintendo Co.*,
 855 F.3d 1322 (Fed. Cir. 2017).................................................................................................14

*Retractable Techs., Inc. v. Becton, Dickinson & Co.*,
 653 F.3d 1296 (Fed. Cir. 2011).................................................................................................22

*Rite-Hite Corp. v. Kelley Co.*,
 56 F.3d 1538 (Fed. Cir. 1995) (*en banc*) .................................................................................30

*Roche Diagnostics Operations, Inc. v. Abbott Diabetes Care, Inc.*,
 C.A. No. 07-753-RGA, 2014 U.S. Dist. LEXIS 168613 (D. Del. Dec. 5, 2014) ....................26

*SAP Am., Inc. v. InvestiPic, LLC*,
 898 F.3d 1161 (Fed. Cir. 2018).................................................................................................14

*Siemens Mobility Inc. v. Westinghouse Air Brake Tech. Corp.*,
 C.A. No. 16-284-LPS, 2019 WL 9698520 (D. Del., Jan. 2, 2019).........................................30

*Smart Skins LLC v. Microsoft Corp.*,
 No. C15-544, 2016 WL 4148091 (W.D. Wash. July 1, 2016) .................................................41

*Sound View Innovations, LLC v. Hulu, LLC*,
   33 F.4th 1326 (Fed. Cir. 2022) ....................................................................................44

*St. Paul Fire and Marine Ins. Co. v. Nolen Grp., Inc.*,
   No. CIV.A.02-8601, 2005 WL 1168380 (E.D. Pa. May 13, 2005) ........................................48

*SUMMIT 6, LLC v. Samsung Elecs. Co., Ltd.*,
   802 F.3d 1283 (Fed. Cir. 2015)....................................................................................32

*Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*,
   C.A. No. 17-1390-LPS-CJB, 2019 WL 4466766 (D. Del. Sep. 18, 2019)..........................6, 11

*SunRace Roots Enter. Co. v. SRAM Corp.*,
   336 F.3d 1298 (Fed. Cir. 2003)................................................................................20, 21

*Thales Visionix Inc. v. US*,
   850 F.3d 1343 (Fed. Cir. 2017)................................................................................10, 13

*The Nielsen Co. (US), LLC v. TVision Insights, Inc.*,
   C.A. No. 21-1592-CJB, 2022 WL 3226318 (D. Del. Aug. 10, 2022) ...................................12

*Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*,
   750 F.2d 1552 (Fed. Cir. 1984)....................................................................................38

*VirnetX, Inc. v. Cisco Sys.*,
   767 F.3d 1308 (Fed. Cir. 2014)....................................................................................32

*VLSI Technology LLC v. Intel Corp.*,
   C.A. No. 18-966-CFC-CJB, 2022 WL 2304112 (D. Del. June 27, 2022)..............................48

*Voiceage Evs LLC v. HMD Glob. Oy*,
   C.A. No. 19-1945-GBW, 2025 WL 1397239 (D. Del. May 14, 2025) .......................... *passim*

*Wirtgen Am., Inc. v. Caterpillar, Inc.*,
   746 F. Supp. 3d 218 (D. Del. 2024)..............................................................................26

*XY, LLC v. Trans Ova Genetics, LC*,
   968 F.3d 1323 (Fed. Cir. 2020)....................................................................................17

## Other Authorities

Fed. R. Civ. P. 56(c)(1)(A) ...........................................................................................16

Fed. R. Civ. P. 56(f)(1) ................................................................................................15

Fed. R. Evid. 702 ...................................................................................................41, 48

Fed. R. Evid. 703 ...................................................................................................41, 46

**TABLE OF EXHIBITS[1]**

| Ex. No. | Description |
|---|---|
| 1. | U.S. Patent No. 7,783,889 |
| 2. | Anderson Supplemental Opening Report (July 7, 2025) |
| 3. | Anderson Supplemental Rebuttal Report (August 1, 2025) |
| 4. | Anderson Supplemental Reply Report (August 18, 2025) |
| 5. | Johnson Rebuttal Report (November 21, 2023) |
| 6. | Kyriakakis Opening Report (July 7, 2025) |
| 7. | Kyriakakis Rebuttal Report (July 28, 2025) |
| 8. | Kyriakakis Reply Report (August 18, 2025) |
| 9. | Keeley Opening Report (July 7, 2025) |
| 10. | Johnson Supplemental Report (July 28, 2025) |
| 11. | Transcript of Deposition of Yan Liu (August 29, 2023, continued September 8, 2025) |
| 12. | Transcript of Deposition of Joanne Johnson (January 24, 2024) |
| 13. | Transcript of Deposition of Daniel Schiffman (September 8, 2023) |
| 14. | Anderson Rebuttal Report (November 21, 2023) |
| 15. | Keeley Reply Report (August 18, 2025) |
| 16. | U.S. Patent No. 6,990,453 |
| 17. | Keeley Supplemental Report (October 3, 2025) |
| 18. | Screen print of https://www.businesswire.com/news/home/20150412005036/en/Axwave's-Unique-Viewership-Numbers-Show-30-TV#.VTXuj_CLMdV) |
| 19. | Transcript of Deposition of Inderbir Sidhu (August 31, 2023, continued September 9, 2025) |
| 20. | TVSN_NLSN_00662112-39 |
| 21. | TVSN_NLSN_00660739-72 |
| 22. | Screen print of https://beatgrid.co/platform/acr-automatic-content-recognition-technology |
| 23. | TVSN_NLSN_00399618-19 |
| 24. | Screen print of https://www.audiblemagic.com/ |
| 25. | Screen print of https://lookup.icann.org/en/lookup of www.dat-track.com |

---

[1] Exhibits 1-45 refer to the Exhibits attached to the Declaration of Douglas Lewis in Support of Nielsen's *Daubert* and Summary Judgment Motions. (D.I. 351.) Exhibits 46-54 are attached to the Declaration of Douglas Lewis in Opposition to TVision's *Daubert* and Summary Judgment Motions filed concurrently herewith.

| 26. | Screen print of https://www.soundhound.com |
|-----|---------------------------------------------|
| 27. | Screen print of https://www.civolution.com/ |
| 28. | U.S. Patent No. 8,468,183 |
| 29. | TVision's Supplemental Initial Invalidity Contentions, served April 10, 2023 |
| 30. | TVision's Final Invalidity Contentions, served September 18, 2023 |
| 31. | TVSN_NLSN_00645277-95 |
| 32. | Comparison of Asserted Claims of '889 Patent and Claims of PCT/US05/29623 |
| 33. | TVSN_NLSN_00269606 |
| 34. | Transcript of Deposition of Dr. David Anderson (August 29, 2025) |
| 35. | Screen print of document family (showing that the May 2018 forecast was attached to a May 26, 2018 email to an investor) |
| 36. | Screen print of https://www.mufin.com/ |
| 37. | Screen print of https://sourcedigital.com/ |
| 38. | Screen print of https://sourcedigital.com/solutions/for-acr/whisper/ |
| 39. | MRL webpage; Liu Dep. Ex. 41 |
| 40. | TVSN_NLSN_00952341-56 |
| 41. | TVSN_NLSN_00725382-86 |
| 42. | NLSN_TVISION0002762-65 |
| 43. | NLSN_TVISION0001326-46 |
| 44. | TVision's Supplemental Final Invalidity Contentions, served June 21, 2025 |
| 45. | *Gamon Plus, Inc. v. The Campbell's Co.*, No. 15-cv-8940, D.I. No. 600 at 5-7 (N.D. Ill. Sep. 5, 2025) |
| 46. | Excerpts of Kyriakakis Opening Report (July 7, 2025) |
| 47. | Excerpts of Kyriakakis Rebuttal Report (July 28, 2025) |
| 48. | Excerpts of Kyriakakis Reply Report (August 18, 2025) |
| 49. | Excerpts of Expert Report of Paul Martin (July 7, 2025) |
| 50. | Excerpts of Anderson Supplemental Rebuttal Report (August 1, 2025) |
| 51. | Excerpts of Anderson Supplemental Reply Report (August 18, 2025) |
| 52. | Keeley Opening Report (July 7, 2025) |
| 53. | Keeley Reply Report (August 18, 2025) |
| 54. | 9/4/2025 service email for Mufin proposal |

## I.    SUMMARY OF ARGUMENT

TVision has not carried its burden to show that it is entitled to summary judgment under Federal Rule of Civil Procedure 56 or that Nielsen's experts' opinions should be excluded under Federal Rule of Evidence 702.

**First**, on the issue of ineligibility, TVision has not met its burden at steps one or two of the *Alice* inquiry. At step one, TVision's proposed abstract idea fails to account for the most important features of the asserted claims. Claims directed to a specific technological process that improves upon the prior art—like the claims of the '889 Patent—are eligible at *Alice* step one. TVision's motion also is based on the premise that algorithms are *per se* ineligible, but Federal Circuit precedent says otherwise. Should the Court even reach *Alice* step two, which it need not do, TVision identifies no evidence to show that the claims lack an inventive step. *See* § II, *infra*.

**Second**, TVision argues that it is entitled to summary judgment based on its new claim construction. TVision argues—for the first time—that the asserted claims of the '889 Patent prohibit ***any*** interframe processing. This construction is contrary to the claims' open-ended language and the doctrine of claim differentiation. It also is inconsistent with the patent's specification. TVision's related argument that Nielsen is barred from contesting this incorrect claim construction is based on TVision's mischaracterization of statements in Nielsen's prior briefing and their legal effect. *See* § III, *infra*.

**Third**, TVision argues that it is entitled to summary judgment on the issue of non-infringement based on its proposed claim construction. Because its proposed construction is wrong, this motion fails as well. In particular, TVision fails to address Nielsen's expert testimony demonstrating that ██████████████████████████████████████ ████████████████████████ *See* § IV, *infra.*

**Fourth**, TVision attempts to exclude Dr. Keeley's damages opinions based on five

scattershot arguments—all of which fail to follow applicable law and improperly rely on disputed facts. TVision's argument that Dr. Keeley improperly considered future foregone profits is based on a lost profits analysis, which does not apply to Dr. Keeley's reasonable royalty analysis. TVision's argument that Dr. Keeley improperly considered ███████████ ███████████ ignores Federal Circuit precedent and ignores that ███████████ ███████████████████████████████████████████. TVision's arguments that Dr. Keeley applied an "abstract 50% rule of thumb" and failed to apportion in determining a reasonable royalty cannot be squared with the detailed analysis in his report. And TVision's final argument that Dr. Keeley failed to assume that ███████████████ ██████ overlooks his express adoption of that assumption in his report. *See* § V, *infra*.

**Fifth**, TVision seeks to exclude opinions of Dr. Keeley and Nielsen's technical expert Dr. Kyriakakis, that no acceptable non-infringing alternatives were available to TVision. These opinions are supported by ample facts, and TVision's attempt to exclude them simply because Nielsen's experts disagree with TVision's view of those facts is improper. Moreover, TVision bears the burden of proof on this issue, yet it offers no evidence to suggest that its proposed alternatives were, in fact, suitable. It is appropriate for Dr. Kyriakakis and Dr. Keeley to cite this lack of evidence in support of their opinions. *See* § VI, *infra*.

**Sixth**, and finally, TVision attempts to exclude opinions of both of Nielsen's technical experts—Dr. Kyriakakis and Dr. Paul Martin—relating to a simulation of the infringing program. Dr. Martin, who created the simulation, opined that the simulation operates in exactly the same way and provides the exact same results as the infringing program. TVision's experts are silent on the simulation, and courts have found simulations admissible under similar circumstances. *See* § VII, *infra*.

For these reasons and others set forth in this opposition, TVision's summary judgment and *Daubert* motions all should be denied.

## II. TVISION'S MOTION FOR SUMMARY JUDGMENT OF INELIGIBILITY FAILS BECAUSE TVISION FAILS TO SATISFY ITS BURDEN ON *ALICE* STEPS ONE AND TWO (RESPONDING TO D.I. 352; D.I. 355 § III; D.I. 365)

### A. Factual Background

#### 1. Automatic Content Recognition ("ACR") and Problems in the Prior Art

ACR identifies media—such as advertisements or television shows—from the media's audio or other characteristics. Ex. 1, '889 Patent at 1:21-23, 3:34-36. TVision and Nielsen employ audio ACR to identify the content playing at a monitored site (*e.g.*, a home television in a panelist's home) to measure viewing audiences. *Id.* at 1:21-25, 1:39-44. ACR generally uses a short segment of the content, often on the order of a few seconds. *Id.* at 8:22-28.

To perform ACR using signature matching, signatures must be generated at two locations: the monitored site and the reference site. *See id.* at 1:20-44. The monitored site is where media content is playing (*e.g.*, a home television). *See id.* at 3:22-29. The reference site is a central location with a database containing reference signatures for known media content that are frequently updated as new media content is released. *Id.* at 3:30-37. Matching occurs by comparing signatures generated at the monitored site with signatures in the central database. *See id.* at 1:33-43, 3:29-47. When a monitored signature matches a reference signature, the monitored content can be identified from the identity of the reference content. *See id.* at 3:29-39.

To ensure that a monitored signature and a reference signature that correspond to the same content will match—as they must for a system to operate properly—two conditions must be met. First, the same technique must be used to generate the monitored and reference signatures. *See id.* at 8:5-17. Second, the monitored and reference signature must be

3

synchronized. In other words, a monitored signature and a reference signature will match only if they correspond to the same point in time in the media content. *See id.* at 8:36-64. For example, a signature generated 10 seconds after the beginning of the content will not match a signature generated 50 seconds into the same content. *See id.*

The asserted claims of the '889 Patent concern ACR signatures generated using signal processing. In particular, a signature is generated by performing a spectral transform, of which a Fourier Transform is one example, on samples from a short audio time window (which is called a "frame"). *See id.* at 2:65-3:21. To generate frame descriptors upon which signatures are based, the patented ACR system compares a pair of frequency components. *See id.* at 2:56-3:5. *Intra*frame processing involves at least a comparison of two frequency components from the same frame. *Id.* at 8:1-4. Statement of Additional Facts ("SAF") ¶20. *Inter*frame processing is a comparison of two frequency components from different frames. Ex. 1, '889 Patent at 2:55-57.

All claims of the '889 patent require at least one intraframe processing operation, but not all are limited to *solely* intraframe operations. SAF ¶¶1-2. More specifically, the '889 Patent claims (1) embodiments that create signatures using *at least* an intraframe operation (*i.e.,* that are still infringed if an accused process also uses interframe operations) (*e.g.*, Claims 1 and 8); and (2) other embodiments that use only intraframe operations (*i.e.,* that do not allow for the use of interframe operations) (*e.g.*, Claim 5). *Id.* The '889 Patent contrasted prior art systems that did not utilize intraframe processing at all and instead relied on interframe processing operations. *See* Ex. 1, '889 Patent at 2:55-59.

### 2.    The '889 Patent's Real-World Solutions to Prior Art Problems

The invention recited in the asserted claims solves several problems in the prior art. One such problem was that signal interference—known as "noise"—could render signatures inaccurate. *See* SAF ¶¶7-8; Ex. 47, Kyriakakis Rebuttal ¶1428. The asserted claims recite basing

signatures on descriptors obtained by comparing pairs of frequency components (*i.e.*, comparing one frequency component to another frequency component).[2] *See* SAF ¶¶7, 12, 19. This approach (sometimes called a "sign-based" approach) creates signatures that are resistant to noise (*i.e.*, they are "robust"). *See id.* ¶¶7-8. Noise might impact the magnitudes of the frequency components, but that impact will not be great enough to change the outcome of a comparison between two frequency components. *Id.* In contrast, prior art systems employed other methods, such as using actual differences between magnitudes or the total power of groups of frequency components. *See id.* ¶¶18, 21. Thus, the asserted claims recite signatures that are more robust and far more likely to result in accurate matching than prior art systems. *See id.* ¶¶7-8.

Another problem in the prior art was the difficulty in synchronizing the monitored signatures with the reference signatures. *Id.* ¶¶9-11. The asserted claims solve this problem by using overlapping frames to generate both monitored and reference signatures.[3] Using overlapping frames—as opposed to successive, non-overlapping frames—produces signatures that are very close together in time. *Id.* Generating signatures that are offset from each other by small amounts of time makes it very likely that at least one monitored signature will be synchronized with (and match) at least one reference signature. This allows more successful identification of the monitored content than in the prior art. *Id.*

---

[2] For example, Claim 1 contains the limitation "determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power." Ex. 1, '889 Patent at Claim 1.

[3] For example, Claim 1 contains the limitation "identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples." *See* Ex. 1, '889 Patent at Claim 1. *See also id.* at Claim 8 ("the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples.").

### B.    The Claims Recite Patentable Subject Matter

To meet *Alice* step one, TVision must show that the asserted claims of the '889 Patent are directed to an abstract idea or other patent-ineligible subject matter. *See Sunoco Partners Mktg. & Terminals L.P. v. Powder Springs Logistics, LLC*, C.A. No. 17-1390-LPS-CJB, 2019 WL 4466766, at *10 (D. Del. Sep. 18, 2019); *Int'l Bus. Machines Corp. v. The Priceline Grp. Inc.*, C.A. No. 15-137-LPS-CJB, 2016 WL 626495, at *10 (D. Del. Feb. 16, 2016). The Court need only reach *Alice* step two if TVision proves that the asserted claims fail at step one. If so, TVision must show by clear and convincing evidence that there are ***no*** disputed factual issues regarding whether the asserted claims are well-understood, routine, and conventional. *Berkheimer v. HP Inc.*, 881 F.3d 1360, 1368-69 (Fed. Cir. 2018).

### 1.    Nielsen's Defense of the '889 Patent's Patentability Is Not Precluded by Prior Briefing

Contrary to TVision's assertion and as explained in § III, *infra*, Nielsen has not "reversed its position" on claim construction or anything else. *See* D.I. 355 at 2-3; *infra* § III. Nor does TVision identify any legal doctrine that would prevent Nielsen from construing the claim as it does herein. *Id.* As explained below, the asserted claims are patentable, and no prior Nielsen statement changes that.

### 2.    TVision Has Not Shown the Claims Are Patent Ineligible Under Step One of the *Alice* Test

Under *Alice* step one, the asserted claims are directed to patent-eligible subject matter as a matter of law because they are directed to a specific technological solution that improves upon the prior art.

### a.    The Claims Are Directed to Patent-Eligible Improvements in Signal Processing and Computer Technology That Solve Problems in the Prior Art

The Federal Circuit and this District hold that claims directed to improvements in signal

6

processing and computer technology—as opposed to claims directed to an idea that uses computers only as a tool—are patent eligible. *See, e.g.*, *Cal. Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 984, 988 (Fed. Cir. 2022) (encoding signals); *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020) (determining variability in timing of electrical signals of heartbeat); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-37 (Fed. Cir. 2016) (software for a self-referential table enabling an improved database); *Voiceage Evs LLC v. HMD Glob. Oy*, C.A. No. 19-1945-GBW, 2025 WL 1397239, at *7-8 (D. Del. May 14, 2025) (estimating tonal stability of a sound signal).

Here, the '889 patent claims solve prior art technical problems and offer real-world solutions to improve signal processing and computer technology. First, all asserted claims recite a solution to the prior art problem of signature robustness against noise, thereby improving the accuracy of matching monitored signatures with reference signatures in the database. This improvement in signal processing and computer technology is accomplished by the claims' recitation of a sign-based approach that compares a pair of frequency components to each other—producing a noise-resistant signature. And the claims recitation of using overlapping frames of audio samples also aids robustness. SAF ¶8. Second, all asserted claims recite a solution to the prior art problem of synchronizing monitored and reference signatures. This, too, improves computer technology, as it enables improved signature matching. The asserted claims recite achieving this synchronization with overlapping frames of audio samples—producing signatures spaced closely together in time and thus more likely to match.

Because the '889 patent claims recite improvements in computer and signal processing technology, they are as a matter of law not abstract.

### b. The Asserted Claims Recite Specific Solutions, Not Results

The Federal Circuit holds that claims that recite specific technological solutions to prior

art problems, rather than merely claiming a desired result, are patent-eligible at *Alice* step one. *McRO, Inc. v. Bandai Namco Games Am. Inc.*, 837 F.3d 1299, 1312-14 (Fed. Cir. 2016). The '889 patent claims provide such specific solutions. In addition to reciting a sign-based approach that improves robustness and accuracy of the computer matching process, the claims recite the use of overlapping frames to solve prior art issues with synchronization of monitored and reference signatures. *See* § II.A.2, *supra*.

In accordance with *McRO*, the asserted claims do **not** impermissibly recite a result. The desired result of practicing the invention recited in the asserted claims is a robust, synchronized signature. SAF ¶¶7, 11, 13. Rather than reciting only these results, the claims recite **the steps that must be performed** to achieve the desired inventive results and are therefore directed to patent-eligible subject matter. *See McRO*, 837 F.3d at 1312-14.

The asserted claims of the '889 Patent also do not preempt the entire field of signature generation for ACR (SAF ¶14), which further confirms the claims are sufficiently specific to pass muster under *Alice* step one. *See Alice Corp. v. CLS Bank Int'l*, 573 U.S. 208, 216 (2014). The asserted claims do not cover other signature generation techniques, such as using solely interframe operations, non-overlapping frames, or non-sign-based approaches.

### c. Courts Have Found Similar Claims Patent-Eligible

The Federal Circuit and this District have found analogous claims not directed to an abstract idea and thus patent eligible. The table below shows the similarity between the first five elements of claim 1 of the '889 Patent and claims the Federal Circuit found patent-eligible in *California Institute of Technology v. Broadcom Ltd.*, 25 F.4th 976 (Fed. Cir. 2022):

8

| '889 Patent Claim 1 | *Broadcom* Claim 13 | How the Claims Are Similar |
|---|---|---|
| A method for generating signatures implemented using an apparatus comprising a processor, the method comprising: | A method of encoding a signal, comprising: | Both claims relate to signal processing methods |
| obtaining a first frame of media samples; | receiving a block of data in the signal to be encoded, the block of data including information bits; | Both claims recite ingestion of data samples/bits. |
| identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples; determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; | performing an encoding operation using the information bits as an input, the encoding operation including an accumulation of mod-2 or exclusive-OR sums of bits in subsets of the information bits; | Both claims recite the performance of an operation on the ingested information (in the '889 claim, a spectral transform is performed and a comparison is made; in *Broadcom*, an encoding operation is performed that includes an accumulation of mod-2 or exclusive-OR sums). |
| generating a first signature based on the first descriptor; | the encoding operation generating at least a portion of a codeword; | Both claims generate a result from the operation that was performed on the ingested samples/bits (the '889 claim generates a signature from the earlier transform operation, and the *Broadcom* claim generates a codeword portion from the encoding operation). |
| identifying a second frame of media samples by extracting a common plurality of media samples and appending another plurality of media samples to the common plurality of media samples; | wherein the information bits appear in a variable number of subsets. | Both claims specify a way in which portions of data samples/bits are used more than once. |

9

*Broadcom*, 25 F.4th at 984; Ex. 1, '889 Patent at 26:5-15.[4]

As shown above, both Claim 1 of the '889 patent and the *Broadcom* claim recite processing a signal (media samples or another block of data) to generate a useable output (an ACR signature or a codeword) by performing operations on data (a spectral transform or an encoding operation). And both claims recite an improved technological process. SAF ¶¶7-11, 18-19; *Broadcom*, 25 F.4th at 988 ("Claim 13 … claims more than a mathematical formula because it is directed to an ***efficient, improved method of encoding data*** that relies in part on irregular repetition.") (emphasis added). Furthermore, both claims recite a specific process for achieving a result, rather than just the result itself. *See* SAF ¶12. *Broadcom*, 25 F.4th at 988; *see also CardioNet*, 955 F.3d at 1368.

TVision's attempt to distinguish *Broadcom* fails. Courts have rejected similar attempts to distinguish *Broadcom* on the basis that it was decided on "cursory" briefing. *See Voiceage*, 2025 WL 1397239, at *15 (finding that "the Court is not convinced by [d]efendant's contention that the *Broadcom* case is distinguishable because it involved cursory briefing."). In *Voiceage*, Judge Williams, in reliance on cases like *Broadcom* and *Thales*, rejected a similar § 101 challenge directed at claims that recited a signal processing method for estimating a tonal stability of a sound signal. *Id.* at *7, 12-13, 15. TVision's proffered distinction of *Broadcom* on the basis that the '889 Patent's improvements over the prior art are not in the specification or claims also fails. As demonstrated above, the asserted claims' improvements over the prior art are recited in both the '889 Patent claim language ***and*** the specification. *See* §§ II.A.1-2, *supra*; SAF ¶¶12, 19.

---

[4] The remaining elements repeat the processing shown on the second frame. *See, e.g.*, Ex. 1, '889 Patent at Claim 1.

10

### d.    TVision Fails to Meet Its Burden to Show That the Claims Are "Directed to" an Abstract Idea

TVision has not identified an appropriate concept the claims are "directed to," and this deficiency alone warrants denial. To meet its burden at *Alice* step one, TVision must propose an abstract idea that "fairly characterizes" what the claims are "directed to." *Voiceage*, 2025 WL 1397239, at \*10 (quotation omitted). Yet the technical solutions to the prior art problems described above—which are recited in the asserted claims—are missing from TVision's proposal of what the claims are supposedly directed to. D.I. 355 at 10. Because TVision fails to identify an appropriate alleged abstract idea and instead over-simplifies the claims, its motion should be denied.

In particular, TVision asserts "[t]he claims are directed solely to an abstract idea of using a spectral transformation to generate a descriptor and signature from a simple comparison operation." D.I. 355 at 10. This characterization is too broad and ignores key claimed inventive elements. TVision's "directed to" statement does not include the asserted claims' recitation of overlapping frames, which solves the prior art problem with signature synchronization and matching. Ex. 1, '889 Patent at 9:9-12, 9:36-39, 10:3-8, 11:24-40, 12:47-51, 13:2-5; Ex. 47, Kyriakakis Rebuttal Rep. ¶¶1421-23; Ex. 48, Kyriakakis Reply Rep. ¶¶128-29. Likewise, it ignores that the asserted claims recite comparing pairs of frequency components, which solves the prior art problem of signature robustness. Ex. 1, '889 Patent at 2:55-3:5; Ex. 47, Kyriakakis Rebuttal Rep. ¶¶1421-22, 1428. In electing to "aim for a much broader and much more vague articulation of what the claims [are] purportedly directed to," TVision has failed to properly articulate an abstract idea. *Sunoco*, 2019 WL 4466766, at \*10.

TVision's impermissible overgeneralization and failure to account for the particular way the asserted claims solve the above-described prior art problems are sufficient grounds to deny

its motion. *See CardioNet*, 955 F.3d at 1371 (instructing courts to "be careful to avoid oversimplifying the claims by looking at them generally and failing to account for the specific requirements of the claims.") (quotation omitted). TVision made the same error before this Court in *The Nielsen Co. (US), LLC v. TVision Insights, Inc.*, C.A. No. 21-1592-CJB, 2022 WL 3226318, at *4 (D. Del. Aug. 10, 2022). In *Nielsen*, this Court denied TVision's motion to dismiss for lack of patent-eligible subject matter because TVision's proposed abstract idea oversimplified the claims and failed to account for their specific requirements. 2022 WL 3226318, at *2. This Court found the proposed abstract idea—"detecting people using two different, specific methods and then counting them"— "ignore[d] the thrust of the invention" because the claims specified "a ***particular*** way" of using the methods to achieve the desired results. *Id.* at *4 (emphasis in original). The Court explained TVision's failure to satisfy its "burden to articulate an abstract idea that correctly characterizes the claim at issue. . . . alone is a sufficient basis to deny [] its motion." *Id.* at *4. TVision repeats that misstep here. The Court should again find TVision failed to satisfy its burden and deny its motion on that basis.

**e.    The Asserted Claims Do Not Recite Mere Mathematical Formulae, Nor Are Algorithms *Per Se* Unpatentable**

TVision incorrectly argues that the asserted claims recite only mathematical formulae or an algorithm and are therefore patent ineligible. *See* D.I. 355 at 2, 7. To the contrary, the asserted claims recite a series of specific steps of a technological method to improve signal processing computing technology.

First, the ***claims*** of the '889 patent do not recite a mathematical formula. TVision improperly relies on formulas recited in the specification. *See AI Visualize, Inc. v. Nuance Commc'ns, Inc.*, 97 F.4th 1371, 1379 (Fed. Cir. 2024) ("we refuse to import details from the specification if those details are themselves not claimed."); *ChargePoint, Inc. v. SemaConnect,*

12

*Inc.*, 920 F.3d 759, 769 (Fed. Cir. 2019) ("'[t]he § 101 inquiry must focus on the language of the Asserted Claims themselves,' and the specification cannot be used to import details from the specification if those details are not claimed.") (citations omitted).

And even claims containing a mathematical formula—which Nielsen's claims do not— only are unpatentable if they contain **only** a mathematical formula. *See Broadcom*, 25 F.4th at 988 (an "improvement is not patent ineligible simply because it employs a mathematical formula."); *Thales Visionix Inc. v. US*, 850 F.3d 1343, 1349 (Fed. Cir. 2017). Claims that utilize mathematics as a means to improve signal processing and computing technology are patent eligible. *See id.*; *Voiceage*, 2025 WL 1397239, at *7, 15; *Hybrid Audio, LLC v. Asus Comput. Int'l,* No. 17-cv-6947, 2019 WL 3037540, at *4, 6 (N.D. Cal. Jul. 11, 2019) ("[A] specific and tangible improvement to computer functionality, namely the processing of audio data … is not abstract.").[5]

Second, even if the claims of the '889 patent recite an algorithm, general algorithms are not *per se* unpatentable. *See* D.I. 355 at 12-14. For example, in *Enfish*, the Federal Circuit described the patent-eligible claims at issue as being directed to an "algorithm." *Enfish*, 822 F.3d at 1336-38. And a case in this District recently noted algorithms are **not** *per se* ineligible. *See Voiceage*, 2025 WL 1397239, at *12 ("Some, but not all, claims that involve algorithms are invalid under the *Alice/Mayo* test."). TVision cites no cases finding that algorithms are *per se* ineligible. *See* D.I. 355 at 12-16.

TVision relies heavily on pre-*Alice* cases *Benson* and *Flook.* But those cases are distinguishable because the plaintiff attempted to claim a mathematical formula, rather than a

---

[5] TVision also is incorrect that Nielsen's claims are patent-ineligible because they can run on a general-purpose computer. *See* D.I. 355 at 17; *Enfish*, 822 F.3d at 1336-38 ("[The Court is] not persuaded that the invention's ability to run on a general-purpose computer dooms the claims.").

patent eligible application. *Gottschalk v. Benson*, 409 U.S. 63, 72-73 (1972) (holding a method of converting binary-coded decimals into pure binary numerals was patent ineligible); *Parker v. Flook*, 437 U.S. 584, 594-96 (1978) (holding a formula for updating the value of an alarm limit ineligible). Indeed, the Supreme Court distinguished these cases for just that reason in *Diamond v. Diehr*, 450 U.S. 175, 185-87 (1981). TVision's reliance on *Recentive Analytics, Inc. v. Fox Corp.* is misplaced because there, the plaintiff attempted to claim using well-understood machine learning technology to generate a new data set. 134 F.4th 1205, 1213 (Fed. Cir. 2025). Such claims are entirely different from Nielsen's asserted claims, which recite improvements to computer and signal processing technology.

Finally, TVision cites inapposite cases that concern claims reciting (a) only a mathematical algorithm; or (b) simple automation of a traditional manual process. *See Digitech Image Techs., LLC v. EFI, Inc.*, 758 F.3d 1344, 1350-51 (Fed. Cir. 2014) (claiming "a process of organizing information through mathematical correlations" to generate a "device profile" for digital imaging devices); *SAP Am., Inc. v. InvestiPic, LLC*, 898 F.3d 1161, 1164-65 (Fed. Cir. 2018) (claiming "statistical analysis of investment information"); *RecogniCorp, LLC v. Nintendo Co.*, 855 F.3d 1322, 1324-26 (Fed. Cir. 2017) ("claiming the use of a mathematical formula" to translate facial images from one display to another); *Elec. Power Grp., LLC v. Alstom S.A.*, 830 F.3d 1350, 1355 (Fed. Cir. 2016) (claiming "the selection and manipulation of information" to automatically monitor an electric power grid); *PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1313, 1318 (Fed. Cir. 2021) (claiming the automation of a manual process for granting access to, denying access to, or deleting data in response to a request); *In re Bd. Trs. of Leland Stanford Junior Univ.*, 991 F.3d 1245, 1250 (Fed. Cir. 2021) ("generic steps of implementing and processing calculations with a regular computer"); *Eagle View Techs., Inc v. Roofr, Inc.*, 651

14

F. Supp. 3d 729, 738-40 (D. Del. 2023) (claiming the automation of a method for "estimating roofing area using an image of a roof"). Nielsen's asserted claims do not share having those characteristics.

### 3.    TVision Fails to Carry Its Burden on *Alice* Step Two

*Alice* step two "is satisfied when the claim limitations involve more than performance of well understood, routine, and conventional activities previously known to the industry." *Berkheimer*, 881 F.3d at 1367 (quotation omitted). "Whether something is well-understood, routine, and conventional to a skilled artisan at the time of the patent is a factual determination" that TVision must prove by clear and convincing evidence. *Id.* at 1368. The Scheduling Order also requires TVision to provide a SOF to support its motion, which it has failed to do on this issue. *See* D.I. 24 at 15.

TVision offers no evidence that the claims lack an inventive step and cannot overcome the presumption of validity with no evidence. *See Prolitec Inc. v. ScentAir Techs, LLC*, 770 F. Supp.3d 730, 746-47 (D. Del. 2025) (denying summary judgment where plaintiff "fail[ed] to identify any record evidence in its opening brief suggesting that it was well understood, routine, and conventional to use a database to control the operation of devices.").

Should the Court find it necessary to address step two of the *Alice* inquiry, Nielsen presents unrebutted evidence regarding the inventiveness of the '889 Patent's claims. *See infra* § II.B.3.a; SAF ¶¶7-11, 18-19. TVision provides no evidence at all, relies entirely on attorney argument, and fails to provide a SOF regarding the factual issues under step two. Summary judgment of patent *eligibility* should be granted. *See* Fed. R. Civ. P. 56(f)(1) ("After giving notice and a reasonable time to respond, the court may: (1) grant summary judgment for a nonmovant[.]"). At a minimum, the Court should find that Nielsen's evidence creates disputed issues of material fact as to whether the claims were well-understood, routine, and conventional.

15

### a.        TVision Fails to Rebut Nielsen's Evidence of Inventiveness

Nielsen has presented unrebutted expert evidence that as of the August 18, 2004 priority date of the '889 Patent, it was not well-understood, routine, or conventional among those of skill in the art to generate digital signatures using the methods and apparatus recited in the claims of the '889 Patent. SAF ¶18. Specifically, Nielsen's technical expert, Dr. Kyriakakis, opines that it was not well-understood, routine, or conventional among those of skill in the art to generate digital signatures of overlapping frames via intraframe processing and by comparing pairs of spectral powers. *Id.* ¶18. Indeed, Dr. Kyriakakis identifies specific inventive steps in the claim language. Ex. 47, Kyriakakis Rebuttal Rep. ¶¶1421-23, 1428; Ex. 48, Kyriakakis Reply Rep. ¶¶128-29. Moreover, the specification of the '889 Patent explains that this approach was inventive. SAF ¶19. And as shown above, these inventive elements are tied to specific claim limitations. *See supra* § II.B.2.a.

TVision responds with attorney argument but no evidence. *See* D.I. 355 at 16-18. TVision cannot get summary judgment on a disputed issue of fact on which it bears the burden of proof while identifying no evidence. *See El v. Southeastern Pennsylvania Transp. Auth.*, 479 F.3d 232, 237-38 (3d Cir. 2007) (when movant "would bear the burden of proof at trial[, it] therefore must show that it has produced enough evidence to support the findings of fact necessary to win"); Fed. R. Civ. P. 56(c)(1)(A). Nor is it proper for TVision to ignore Nielsen's expert's identification of facts. *See Prolitec*, 770 F. Supp.3d at 746-47 (finding defendant's "offer[ed] . . . reasons for rejecting the evidence offered by [plaintiff]'s technical expert. . . . underscore[d] that the dispute over whether the two-table aspect of the claimed invention was well understood, routine, and conventional require[d] resolution of a question of fact."). TVision offers no facts that would support its motion, either in its motion or its SOF. *See generally* D.I. 354; D.I. 355 at 2-3, 6-19. TVision cannot overcome the presumption of validity with no

16

evidence. *See Prolitec*, 770 F. Supp.3d at 746-47.

### b.    TVision Fails to Show No Claim Element Is Inventive

To carry its burden on *Alice* step two, TVision must show that ***no claim elements*** contain an inventive concept. *See Cooperative Entnmn't, Inc. v. Kollective Tech., Inc.*, 50 F.4th 127, 131-32 (Fed. Cir. 2022). But TVision identifies ***no*** record evidence regarding the inventiveness of comparing frequency components or using overlapping frames, which are recited in the claims. D.I. 355 at 16-18; *see generally* SOF (none on inventiveness). In fact, far from showing that no elements of the claims contain an inventive concept, TVision ignores every claim element except "spectral transform" and "processor." TVision cannot carry its burden by cherry picking elements from the asserted claims. *See Cooperative Entnmn't*, 50 F.4th at 131-32.

Even if TVision's cherry picking were permissible, the use of a spectral transform operation—even if well known—does not render the claims patent ineligible because that is a single element in a multi-element claim. *See* § II.B.2.c, *supra*; *see also Voiceage*, 2025 WL 1397239, at *22. Nor are all claims that recite a "processor" patent ineligible. *See, e.g.*, *XY, LLC v. Trans Ova Genetics, LC*, 968 F.3d 1323, 1328-29 (Fed. Cir. 2020); *KOM Software Inc. v. NetApp Inc.*, C.A. No. 18-160-WCB, 2023 WL 6460025, at *2 (D. Del. Oct. 4, 2023). The Federal Circuit has repeatedly held that inventive use of conventional computer technology—such as a processor—does not preclude finding an inventive step. *See, e.g.*, *Cooperative Entnmn't*, 50 F.4th at 135; *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.*, 841 F.3d 1288, 1300 (Fed. Cir. 2016); *Bascom Global Int't Servs. v. AT&T Mobility*, 827 F.3d 1341, 1349-50 (Fed. Cir. 2016).

17

III.   **TVISION'S CONSTRUCTION OF THE LIMITATION "DETERMIN[ING] A FIRST DESCRIPTOR OF THE FIRST FRAME OF MEDIA SAMPLES BASED ON A COMPARISON OF THE FIRST SPECTRAL POWER AND THE SECOND SPECTRAL POWER" CONTRADICTS THE LAW AND FACTS (RESPONDING TO D.I. 352; D.I. 355 §§ IV.A-B; D.I. 366)**

TVision advances a claim interpretation with which Nielsen disagrees—that in addition to the recited intraframe processing to determine a descriptor, the claims do not cover *any system that performs any interframe processing at any point*. TVision's construction is contrary to elementary principles of claim construction, inconsistent with the plain language of the claims, and unsupported by the specification of the '889 Patent. TVision's new construction should therefore be rejected.

TVision also contends that Nielsen's disagreement with its construction is a "reversal" of Nielsen's prior reading of the claims. Nielsen has not "waived or forfeited" any argument regarding the construction of the claims. Nielsen's reading of the claims has remained consistent, and Nielsen made no prior statement that could support limiting the claims to prohibit also performing interframe processing.

A.   **TVision's Attempt to Limit the Claims To Prohibit Any Comparison of Spectral Powers from Different Frames Should Be Rejected**

TVision argues that all asserted claims of the '889 Patent contain a negative limitation that *prohibits* any comparison of spectral powers from different frames (*i.e.*, interframe comparison) at any point in the processing, even if a descriptor is also determined based on the recited comparison of two spectral powers from the same frame (*i.e.*, an intraframe comparison). D.I. 355 at 23-30. This proposal should be rejected because such a construction would be (1) contrary to the claims' open-ended language, (2) contrary to the doctrine of claim differentiation, and (3) inconsistent with the specification.

18

### 1. TVision's Proposal Is Inconsistent with the Use "Comprising" in the Claims, Which Permits Additional Steps

It is well-settled that the claim term "comprising" (which appears in most of the asserted claims) is an open-ended phrase that requires only performance of *at least* the recited steps to infringe. *Cias, Inc. v. Alliance Gaming Corp.*, 504 F.3d 1356, 1360 (Fed. Cir. 2007); *see also Genentech, Inc. v. Chiron Corp.*, 112 F.3d 495, 501 (Fed. Cir. 1997) ("'Comprising' is a term of art used in the claim language which means that the named elements are essential, but other elements may be added and still form a construct within the scope of the claim."). Stated differently, "the term 'comprising' indicates that the recited claim elements are not exhaustive, and an *accused method cannot escape infringement by including additional steps not recited in the claims*." *Knauf Insulation, LLC v. Johns Manville Corp.*, 772 F. Supp. 3d 946, 1016 (S.D. Ind. 2024) (emphasis added) (internal quotations omitted).

Here, Claim 1 recites "[a] method for generating signatures implemented using an apparatus comprising a processor, *the method comprising*." Ex. 1, '889 Patent, Claim 1 (emphasis added).[6] The steps recited in the body of the claim are therefore "essential" for infringement, but TVision cannot defeat an infringement claim by doing other things as well. *Genentech*, 112 F.3d at 501. TVision's proposed construction would violate this fundamental principle by allowing TVision to avoid infringement by showing that even though its systems perform the recited steps, they also perform *additional* steps (*i.e.*, ███████████ ███████████████████████████).[7]

---

[6] Claim 8 also uses the term "comprising." Ex. 1, '889 Patent at Claim 1. Although Claim 14 does not use that term, its language is similarly open-ended: "A tangible machine accessible medium having instructions stored thereon that, when executed, cause a machine to..." *Id.* at Claim 14.

[7] TVision wrongly contends that Nielsen took the position that the claims "encompass either intraframe *or* interframe processing." D.I. 355 at 22. But Nielsen's position has always been that the claims require intraframe processing and permit (but do not require) interframe processing.

In arguing that "the word 'comprising' in Claim 1 does not support Nielsen's argument," (D.I. 355 at 26), TVision misapplies a Federal Circuit case that states the term "comprising" "is not a weasel word with which to abrogate claim limitations." *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1343 (Fed. Cir. 2007). The *Dippin' Dots* court made that statement to emphasize the point that any recited (*i.e.*, specifically listed) steps must "be practiced as recited in the claim for a process to infringe." *Id*. Unlike in *Dippin Dots*, where the defendant failed to practice one of the recited steps entirely, here, TVision practices all of the steps recited in Claim 1, as Nielsen's experts opine. Ex. 46, Kyriakakis Op. Rep. ¶¶151-264, 303-408.

### 2. TVision's Proposal Is Inconsistent with the Doctrine of Claim Differentiation, Which Presumes That the Dependent Claims Are Narrower Than the Independent Claims

As TVision's expert acknowledged, "a dependent claim must be narrower in scope than the claim from which it depends." Ex. 51, Anderson Supp. Reply Rep. ¶7. Indeed, there is a "presumption that each claim in a patent has a different scope," and an "independent claim should not be construed as requiring a limitation added by a dependent claim." *Curtiss-Wright Flow Control Corp. v. Velan, Inc.*, 438 F.3d 1374, 1380 (Fed. Cir. 2006) (internal quotation marks omitted); *also Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) ("[T]he presence of a dependent claim that adds a particular limitation gives rise to a presumption that the limitation in question is not present in the independent claim."). "[W]here the limitation that is sought to be 'read into' an independent claim already appears in a dependent claim, the doctrine of claim differentiation is at its strongest." *Liebel-Flarsheim Co. v. Medrad, Inc.*, 358 F.3d 898, 910 (Fed. Cir. 2004); *see also SunRace Roots Enter. Co. v. SRAM Corp.*, 336 F.3d 1298, 1303 (Fed. Cir. 2003) (similar).

This presumption is at its strongest here. Dependent claims 5, 11, and 15 (dependent on independent claims 1, 8, and 14) each recite the further limitation "wherein the first descriptor is

20

associated with **only** the first frame of media samples." *See* Ex. 1, '889 Patent, Claims 5, 11, and 15 (emphasis added). Nielsen has explained, and TVision agrees, that the use of interframe comparisons at any point in the process of generating the first descriptor is outside dependent claims 5, 11, and 15. D.I. 355 at 27. Given that the "only" limitation is the only additional limitation recited in these dependent claims, claim differentiation strongly supports a finding that the intraframe "only" limitation is not incorporated into the independent claims. *See SunRace Roots*, 336 F.3d at 1303.

Without addressing this presumption, TVision responds that "Claim 5 cannot form the basis of a claim differentiation argument" because "under Claim 1, the first descriptor is, by definition, created solely from a comparison of two spectral powers within the first frame." D.I. 355 at 27. According to TVision, that means "Claim 5 is nothing more than redundant of Claim 1." *Id*. TVision, however, makes this bare assertion that Claim 1 has the same scope as Claim 5 "by definition" and cites no facts or support and offers no explanation. TVision's bare assertion is insufficient to overcome the strong presumption that the claims do **not** share the same scope. Moreover, on its face, Claim 1 recites no limitations that would limit the claim to intraframe processing only.

Finally, TVision asserts that "the inventor's disavowal[8] and the plain language of the specification and claims overrides the doctrine of claim differentiation." D.I. 355 at 27-28. But TVision's cited cases all require a threshold finding that the written description mandates a narrow reading of the independent claim (*i.e.,* that the specification makes a clear and unmistakable disavowal of claim scope). *See id.* at 27-28. As explained below, TVision has not

---

8 █████████, the inventor was never deposed. TVision appears to be referring to the specification.

(and cannot) make such a showing here. *See* § III.A.3, *infra*. TVision's cited cases therefore do not support its argument that Claims 5, 11, and 15 are "nothing more than redundant" of the independent claims. D.I. 355 at 27.

**3.      TVision Cannot Show That The '889 Patent Disavowed Claim Scope**

Disavowal of claim scope limits claims beyond their ordinary meaning, so the standards for finding disavowal are "exacting." *Luminara Worldwide, LLC v. Liown Elecs. Co.*, 814 F.3d 1343, 1353 (Fed. Cir. 2016). Disavowal is not appropriate unless it is "clear and unmistakable." *Id*. As TVision's own cases hold, "[t]o disavow claim scope, the specification must contain expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Retractable Techs., Inc. v. Becton, Dickinson & Co.*, 653 F.3d 1296, 1306 (Fed. Cir. 2011) (quotation omitted).

TVision cites only two portions of the specification, neither of which meets the exacting standards for a finding of disavowal of claim scope. First, TVision asserts that the specification "contrasts the claimed invention, which uses only intraframe operations, with the prior art that used interframe operations." D.I. 355 at 25-26, citing Ex. 1, '889 Patent at 2:55-60. But that portion of the specification says nothing about using "only" intraframe operations; instead, it says that—unlike the prior art—the methods described in the patent "may be implemented using intraframe operations." *Id.* at 2:55-59. In other words, the specification states only that the contrasted prior art methods did not use intraframe operations at all. That is not a "clear and unmistakable" disavowal of interframe processing ***in addition to*** the recited intraframe processing.

Second, TVision cites the '889 Patent at 11:16-23, which says that "intraframe operations . . . are performed using data exclusive to a single audio frame and are not dependent on sample data collected over other audio frames." D.I. 355 at 25. The specification contains no language

22

that identifies this section as describing "the present invention" or the like. Moreover, this citation defines and describes using "intraframe operations"; it does not exclude anything else. Thus, this section also is not a "clear and unmistakable" disavowal of claim scope. *See Luminara*, 814 F.3d at 1353 ("We have found disavowal or disclaimer based on clear and unmistakable statements by the patentee that limit the claims, such as 'the present invention includes ...' or 'the present invention is ...' or 'all embodiments of the present invention are[.]'"). Far from mandating a narrow reading of the asserted claims, this section merely sets forth one embodiment of the invention, which is claimed separately in dependent Claims 5, 11, and 15.

TVision's remaining arguments are based on Nielsen's statements in its prior summary judgment briefing. D.I. 355 at 25-26. Those statements all are irrelevant, as disavowal of claim scope may only be based on the patent's intrinsic record. *See DDR Holdings, LLC v. Priceline.com LLC*, 122 F.4th 911, 915 (Fed. Cir. 2024) ("Claim terms are generally given their plain and ordinary meanings to one of skill in the art when read in the context of the specification and prosecution history. There are only two exceptions to this general rule: 1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term ***either in the specification or during prosecution***.") (internal quotations omitted) (emphasis added). As discussed below, Nielsen did not disavow its construction, and disavowal cannot occur unless Nielsen prevailed previously. *See* Section III.B.

**B.      Nielsen has Not "Waived" Any Argument Regarding the Meaning of The Limitation**

**1.      Nielsen's Position Has Never Changed**

TVision wrongly accuses Nielsen of previously arguing that the claims "require ***only*** intraframe processing" and prohibit performing any interframe processing. D.I. 355 at 22 (emphasis added). Nielsen never argued that the currently-asserted claims are so limited.

23

TVision cites three statements in support of its argument, but each statement confirms only that Nielsen has consistently read the claims to require intraframe processing, *i.e.*, comparing spectral powers from the same frame. None of Nielsen's prior statements, however, *exclude* a process where comparing spectral powers from different frames may *also* occur.

> **Statement 1**: "Nielsen agrees that claim 1 is representative *provided* that there is no dispute that all claims recite intraframe processing … And there should not be any such dispute, as all the claims recite determining a descriptor of an individual, single frame." D.I. 201 at 8 (emphasis in original).

In its prior summary judgment motion, TVision argued that Claim 1 is a representative claim for its assertion of invalidity under 35 U.S.C. § 101. In response, Nielsen agreed that Claim 1 is representative for the purposes of the motion only if the parties agreed that the claims recite intraframe processing. D.I. 201 at 8. This statement merely shows that the parties always have agreed that all claims of the '889 Patent require intraframe processing. It says nothing about *excluding* interframe processing from the claims.

> **Statement 2**: "TVision's four-step algorithm is so broad that it covers *systems that the asserted claims of the '889 Patent do not cover.* For example, TVision's four-step algorithm covers *systems . . . that use interframe (i.e., multiple frame) processing*." D.I. 201 at 18 (emphasis added by TVision).

In its prior summary judgment motion, TVision argued that the claims of the '889 Patent are directed to a four-step algorithm including the following steps: "(1) Selecting two frames of media sample data; (2) Performing a mathematical spectral transform operation that results in the generation of spectral components having spectral powers; (3) Comparing spectral powers to determine a descriptor; and (4) Calculating a signature based on the descriptor." D.I. 186 at 7. Nielsen pointed out that TVision's oversimplified algorithm is wrong because it ignores claim limitations and as a result covers systems that the '889 Patent does not cover—in particular, systems that *only* compare spectral powers from different frames and never compare spectral powers from the same frame (*i.e.*, systems that never perform intraframe processing). D.I. 201 at

24

18. Nielsen's statement says nothing about prohibiting interframe comparisons.

> **Statement 3**: "[T]he claims recite *processing a single frame of audio samples* and the use of as few as two frequency components in generating a signature. … As Nielsen's technical expert Dr. Pierre Moulin explains, this *single-frame,* two-component-comparison approach is an improvement in computer technology that reduces required computational resources, allows faster computation of signatures, and allows easier hardware and software implementation. [D.I. 203 ¶¶5-9, 28]. These benefits are particularly helpful in large-scale audience measurement systems, which have sizable reference libraries and underpowered devices placed in panelist households." D.I. 201 at 10-11 (emphasis added by TVision).

This statement merely reflects that intraframe processing offers certain advantages. Nielsen did not state that such advantages are never present in a system that also uses interframe processing—let alone that the claims of the '889 patent prohibit interframe processing. Indeed, paralleling Nielsen's statement, the claims recite "processing a single frame of audio samples," even if other unclaimed processing (such as interframe processing) can occur as well. And even if TVision were correct that the advantages Nielsen identified are present only in systems that prohibit interframe processing, there is no dispute that then-asserted dependent Claims 5, 11, and 15 recite just such a system—*i.e.*, they require *only* intraframe processing. Thus, even (wrongly) accepting TVision's incorrect interpretation of Nielsen's prior statement, the statement describes advantages that are associated with Claims 5, 11, and 15, even if not also associated with the corresponding independent claims.

For the foregoing reasons, all TVision citations confirm that Nielsen's position is unchanged. Nielsen's prior statements therefore cannot form the basis of any purported waiver.

### 2. Nielsen Has Not "Waived a Contrary Argument"

Even accepting TVision's mischaracterization of Nielsen's prior statements—that is, even if Nielsen's prior statements somehow argued that the claims cannot cover systems that also perform interframe processing—no legal authority supports finding that "Nielsen has waived a contrary argument," and TVision cites none. D.I. 355 at 22. The two cases TVision cites—*Cent.*

*Admixture* and *Roche Diagnostics* (*see id.*)—hold only that a court may decline to engage in claim construction at a later stage of the case but say nothing about precluding a party from making arguments regarding the meaning of the claims. *See Cent. Admixture Pharm. Servs., Inc. v. Advanced Cardiac Sols., P.C.*, 482 F.3d 1347, 1355-66 (Fed. Cir. 2007); *Roche Diagnostics Operations, Inc. v. Abbott Diabetes Care, Inc.*, C.A. No. 07-753-RGA, 2014 U.S. Dist. LEXIS 168613, at *10 (D. Del. Dec. 5, 2014).

In addition, Nielsen made all three statements that TVision identified as purported examples of Nielsen's advancing a different construction in prior summary judgment briefing. Those motions were denied without prejudice, pending Nielsen's motion to amend. D.I. 268. Any argument made in the course of that briefing is not binding because the Court never reached a decision relying on that argument. *See, e.g.*, *G-I Holdings, Inc. v. Reliance Ins. Co.*, 586 F.3d 247, 262 (3d Cir. 2009) (judicial estoppel "is generally not appropriate where the defending party did not convince the District Court to accept its earlier position."); *Wirtgen Am., Inc. v. Caterpillar, Inc.*, 746 F. Supp. 3d 218, 223-24 (D. Del. 2024) (judicial estoppel "is only appropriate when there were (a) irreconcilably inconsistent positions, (b) adopted in bad faith, and (c) a showing that estoppel addresses the harm and no lesser sanction is sufficient."). TVision identifies no authority that would limit Nielsen's construction, even if it was different.

Moreover, while TVision acknowledges that Nielsen moved to amend the schedule in June of 2024, it wrongly asserts that Nielsen "said nothing" about the claims requiring intraframe processing without prohibiting some interframe processing. D.I. 355 at 23. This is factually incorrect because Nielsen filed an expert declaration in support of its motion that ███████████ ████████████████████████████████████████████████. D.I. 260 at ¶¶ 5, 11; D.I. 257 at 3. And TVision has long agreed that ███████████████████████

26

██████████████████████████████████████████████████████████████████████████

███████" D.I. 355 at 23; Ex. 50, Anderson Rebuttal Rep. ¶61. TVision has therefore been on notice since at least Nielsen's motion to amend (D.I. 250) that the claims of the '889 Patent do not prohibit performing interframe processing. Since Nielsen "made its position on that issue clear sufficiently in time to not mislead its adversary or the [C]ourt," a finding of waiver is inappropriate. *Blackboard, Inc. v. Desire2Learn, Inc.*, 574 F.3d 1371, 1378 (Fed. Cir. 2009). Similarly, TVision's assertion that Nielsen's construction violates the scheduling order is equally unfounded.

## IV.    NIELSEN PROVED INFRINGEMENT (RESPONDING TO D.I. 352; D.I. 355 § V; D.I. 366)

Based on its proposed claim construction, TVision asserts that it does not infringe because "████████████████████████████████████████████████████████████████

████████████████████████" D.I. 354 ¶19; D.I. 355 at 29-30. TVision does not address (and thus does not dispute) that Nielsen's expert reports clearly show that ████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████. *See* SAF ¶¶3-6; Ex. 46, Kyriakakis Op. Rep. ¶¶120-33, 196-216, 346-78; Ex. 49, Martin Rep. ¶¶142-44.[9] Under the proper construction of the claims, ████████████████████████████████████████████████████████████████

████████████████████████████████████ *See* Section III.

Nielsen has thus properly identified facts showing that ████████████████████

████████████████████████████████, which TVision disputes (albeit not in its motion). TVision's motion does not identify the absence of a genuine issue of material fact sufficient to

---

[9] To be clear, ████████████████████████████████████████████████████████████████
████████████████████████████████████████████████████████████ *See*
Response to TVision's SOF ¶19.

support its motion and thus should be denied. *See generally* SOFs; *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (movant must identify that "which it believes demonstrate the absence of a genuine issue of material fact.").

In addition, ███████████████████████████████ D.I. 354 at ¶19. Because TVision has failed to identify supposedly undisputed facts in its SOF relating to independent Claims 8 and 14, its motion must be denied at least with respect to those claims and their corresponding dependent claims (*i.e.*, claims 8, 9, 12-14, 16, 17). *See Amgen Inc. v. Hospira, Inc.,* C.A. No. 18-1064-CFC-CJB, 2021 WL 4935868, at *1 (D. Del. May 20, 2021) (failure to comply with the Scheduling Order and provide a statement of facts is reason to deny the motion).

## V.    DAUBERT MOTION REGARDING DR. KEELEY'S OPINIONS

Each of TVision's *Daubert* motions regarding Nielsen's damages expert Dr. Keeley fail to follow applicable law and improperly rely on disputed facts. *See* D.I. 355 at 5, 30-41.

### A.    DR. KEELEY PROPERLY CONSIDERED NIELSEN'S FOREGONE PROFITS IN CONNECTION WITH HIS REASONABLE ROYALTY ANALYSIS (RESPONDING TO D.I. 353; D.I. 355 § VI.D; D.I. 358)

#### 1.    Dr. Keeley Appropriately Relied Only on Future Foregone Profits Information Available at the Time of the Hypothetical Negotiation

TVision incorrectly contends that Nielsen's foregone profits are not relevant to the 2018 hypothetical negotiation because Nielsen would have earned those profits after the hypothetical negotiation. D.I. 355 at 33; *see also id.* (attempting to exclude Dr. Keeley's consideration of business Nielsen lost to VideoAmp and iSpot after hypothetical negotiation date). Dr. Keeley properly determined that Nielsen knew *at the time of the hypothetical negotiation* that it would forgo substantial profits by licensing the '889 Patent to TVision. Ex. 52, Keeley Op. Rep. ¶¶53-57; Ex. 53, Keeley Reply Rep. ¶¶51-56, 65. Based on that, Dr. Keeley opined that Nielsen

"████████████████████████████████████████████████████

█████████████████████████████████" Ex. 52, Keeley Op. Rep. ¶61. There is no basis to

preclude Dr. Keeley from offering this opinion, which accords with Federal Circuit case law.

*Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362 (Fed. Cir. 2017) ("As we have

recognized, a patent owner participating in a hypothetical negotiation would consider the profits

on sales it might lose as a result of granting a license.") (quotation omitted); *also FloodBreak,*

*LLC v. Art Metal Indus., LLC*, No. 3:18-CV-503 (SRU), 2020 WL 6060974, at *16 (D. Conn.

Oct. 13, 2020) (allowing damages expert who "weighed lost profits more heavily than other

factors in her hypothetical negotiation" to testify at trial where "the patented invention ha[d] led

to millions of dollars in profits" for both parties).

### 2. Dr. Keeley Properly Considered the Unavailability of Acceptable Non-Infringing Alternatives in Opining About Nielsen's Foregone Profits

TVision complains that Dr. Keeley does not account for any alleged acceptable non-

infringing alternatives available to TVision at the time of the hypothetical negotiation. D.I. 355

at 33. On the contrary, Dr. Keeley explicitly considered the analysis of Nielsen's technical expert

Dr. Kyriakakis, who opined that TVision had *no* available alternatives in May 2018. Ex. 52,

Keeley Op. Rep. ¶¶17, 51, 59, 105; Ex. 53, Keeley Reply Rep. ¶¶4, 18-21, 23. As explained in

Nielsen's opening *Daubert* brief, TVision's experts have no facts to support their assertions that

any such alternatives existed. *See* D.I. 350 at 14-45. At most, TVision has pointed to a purported

factual dispute regarding the availability of acceptable non-infringing alternatives. Courts do not

exclude expert opinions for taking a particular view of disputed facts. *See, e.g.*, *Genuine*

*Enabling Tech. LLC v. Sony Corp.*, C.A. No. 17-cv-135, 2022 WL 17325656, at *18 (D. Del.

Nov. 28, 2022) ("These factual disputes cannot be resolved on a motion to exclude testimony.").

29

### 3.    Dr. Keeley Was Not Required to Set Forth a Full Lost Profits Analysis or Opine on the Individual *Panduit* Factors

Dr. Keeley does not opine on—and Nielsen does not seek—lost profits damages. On the contrary, Dr. Keeley only considers forgone profits to understand the parties' relative bargaining positions in connection with his ***reasonable royalty*** analysis. Thus, he is not required to "account for the alternative actions [TVision] would foreseeably have undertaken had it not infringed[,]" establish "but for" causation, or analyze the factors set forth in *Panduit Corp. v. Stahlin Bros*, 575 F.2d 1152 (6th Cir. 1978), as TVision contends. *See* D.I. 355 at 33-34; Ex. 53, Keeley Reply Rep. ¶¶ 61-63.[10]

Indeed, the Federal Circuit has rejected the precise argument TVision makes here, holding that the "but for" causation requirement and the *Panduit* factors are inapplicable in a reasonable royalty analysis—even where the patent owner's lost profits inform the parties' relative bargaining positions. *See Asetek Danmark*, 852 F.3d at 1362-63; *MiiCs & Partners, Inc. v. Funai Elec. Co., Ltd.*, C.A. No. 14-804-RGA, 2017 WL 6268072, at *4 (D. Del. Dec. 7, 2017). Each of the cases that TVision cites are inapposite because, unlike here, the patent holders sought to recover lost profits. *Siemens Mobility Inc. v. Westinghouse Air Brake Tech. Corp.,* C.A. No. 16-284-LPS, 2019 WL 9698520, at *14 (D. Del., Jan. 2, 2019); *Grain Processing Corp. v. Am. Maize-Prods. Co.,* 185 F.3d 1341, 1350-51 (Fed. Cir. 1999); *Rite-Hite Corp. v. Kelley Co.*, 56 F.3d 1538, 1545-46 (Fed. Cir. 1995) (*en banc*); *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, C.A. No. 15-152-RGA, 2018 WL 4691047, at *5-6 (D. Del. Sept. 28, 2018); *see* D.I. 355 at 33-34.

---

[10] Dr. Keeley does account for alternative actions TVision would have undertaken had it not infringed. Specifically, he opines that "TVision would have made no sales because it did not have available an acceptable, non-infringing alternative." Ex. 53, Keeley Reply Rep. ¶44. He also acknowledges *Panduit* but indicates his correct understanding that it is "not relevant to the reasonable royalty or hypothetical negotiation." *Id.*, ¶63.

**B.**     **DR. KEELEY'S REASONABLE ROYALTY OPINION IS NOT "███████████████████████" DUE TO ███████████████ ███████ (RESPONDING TO D.I. 353; D.I. 355 § VI.E; D.I. 359)**

TVision asserts that Dr. Keeley's reasonable royalty opinion is "███████████████" because TVision ████████████████████████████ at the time of the hypothetical negotiation. But ██████████ do not render Dr. Keeley's analysis unreliable or "████████" just disputed. Dr. Keeley noted that TVision's losses "███████████████████████ ████████████████████████████████████████████████" Ex. 53, Keeley Reply Rep. ¶41. Accordingly, he reasonably opined—based on ████████████████████ ████—that ███████████████████████████████. Ex. 52, Keeley Op. Rep. ¶50. At most, TVision's criticism of Dr. Keeley's opinions amounts to a fact dispute about ████████████████████████████████. This is not a basis for exclusion of his testimony. *See Genuine Enabling*, 2022 WL 17325656, at *18; *Powell v. Home Depot USA, Inc.*, 663 F.3d 1221, 1238 (Fed. Cir. 2011) ("[I]t is settled law that an infringer's net profit margin is not the ceiling by which a reasonable royalty is capped.").

TVision also criticizes Dr. Keeley for considering "████████████████████ ██████████████████████" in his analysis of the hypothetical negotiation. D.I. 355 at 35. As explained in Nielsen's opening *Daubert* brief, the ████████████ was TVision's ████████ ████████████ as of the May 2018 hypothetical negotiation. D.I. 350 at 5. TVision provided the ████████████████ to ████████████ and ██████████████████████████████ ██████████████████████. For example, in May 2018, TVision CEO Yan Liu sent the ████ ████████ to ███████████████████████████████████████████████ ████████████████████████████" Ex. 33, TVSN_NLSN_00269606; Ex. 12, Johnson Dep. 37:2-7, 40:1-41:4. The reliability of the ████████████ also is substantiated by TVision's former Chief Revenue Officer, Daniel Schiffman, who was ████████████████████

31

██████████. Mr. Schiffman testified that ████████████████████████████

████████████████████████████████████. Ex. 13, Schiffman Dep. 21:4-6.

Thus, the ████████████ appropriately informed Dr. Keeley's understanding of TVision's negotiating posture, state of mind, and willingness to agree to the reasonable royalty that he calculates. D.I. 350 at 4-5; Ex. 52, Keeley Op. ¶¶76-78, 84. Even if disputed, his reliance on the ██████ is not grounds to exclude his testimony. *See Interactive Pictures Corp. v. Infinite Pictures, Inc.*, 274 F.3d 1371, 1384-85 (Fed. Cir. 2001) (affirming damages award where expert relied on projections for future sales, even though defendant failed to meet those projections).

### C.    DR. KEELEY PROPERLY APPLIED THE NASH BARGAINING SOLUTION (RESPONDING TO D.I. 353; D.I. 355 § VI.F; D.I. 360)

Dr. Keeley tied his Nash Bargaining analysis to the facts of this case.[11] Courts routinely permit use of the Nash Bargaining Solution to calculate damages in a patent case when it fits the facts of the case. *See, e.g., SUMMIT 6, LLC v. Samsung Elecs. Co., Ltd.*, 802 F.3d 1283, 1297-98 (Fed. Cir. 2015). Courts reject Nash Bargaining only when there has been no showing that it fits the circumstances of the hypothetical negotiation. *See, e.g., VirnetX, Inc. v. Cisco Sys.*, 767 F.3d 1308, 1332-33 (Fed. Cir. 2014).

Far from applying "an abstract 50% rule of thumb," Dr. Keeley demonstrates how the Nash Bargaining Solution fits the facts of this case and results in a 50/50 split of the profits resulting from TVision's use of Nielsen's patented technology. Dr. Keeley begins by identifying three criteria for *equal* profit sharing in the hypothetical negotiation between the parties:

> (1) "Nielsen and TVision are identical (in terms of how they value profits and their negotiating ability and negotiating position)";

---

[11] The Nash Bargaining Solution solves a profit-sharing problem that exists when two parties negotiate an agreement to collaborate for their mutual benefit. Ex. 1, Keeley Op. Rep. ¶¶65-69. Dr. Nash proved that, so long as certain criteria are met that place the parties in equal bargaining positions, the parties will negotiate a 50/50 split of any profits. *Id.* ¶¶68-69.

> (2) "[I]f Nielsen and TVision cannot reach a licensing agreement, then TVision earns zero profits"; and
>
> (3) "Nielsen would not lose any business by licensing the patented technology[.]"

Ex. 52, Keeley Op. Rep. ¶71. Citing multiple academic sources, Dr. Keeley explains that if some or all of these criteria are *not* met, but instead favor one of the parties, "the Nash Bargaining Solution assigns a larger share to the bargainer who has little to lose if the negotiation fails, which, in this case, is Nielsen." *Id.* ¶72.

Dr. Keeley first finds that factor (2) is satisfied. Relying on Dr. Kyriakakis's opinion that TVision had no available, acceptable non-infringing alternatives, Dr. Keeley concludes that TVision would not be in business (and would earn zero profits) without a license to the '889 patent. *Id.* ¶73; *see also id.* ¶¶17, 51, 59, 105; Ex. 53, Keeley Reply Rep. ¶¶4, 18-21, 23. Dr. Keeley next finds that neither factor (1) nor (3) is satisfied, and both *favor Nielsen*. As to factor (1), Dr. Keeley concludes that the two companies are not equal in their negotiating positions or how they view profits: "Nielsen is a large, well-established firm, and TVision is a startup." Ex. 52, Keeley Op. Rep. ¶72. As to factor (3), Dr. Keeley concludes that "██████████████

█████████████████████████████████████████████████

████████████████████████████████████

████████████████████████████████" *Id*. ¶¶33, 49, 53, 73.

Given that factor (2) is met (*i.e.,* indicates an even split) and factors (1) and (3) favor Nielsen, Dr. Keeley concludes that the Nash Bargaining Solution would assign *no less than* "a 50/50 split of the net present value of TVision's expected incremental profits" to Nielsen. *Id.* ¶74. Accordingly, Dr. Keeley's 50/50 split is well-supported and indeed beneficial to TVision.

Despite this detailed analysis, TVision improperly seeks to exclude Dr. Keeley's Nash Bargaining opinion based on disputed facts. For example, ████████████████████████

33

████████████████████████████████████████████████████████████████

████████████████" D.I. 355 at 36. But Dr. Keeley cites substantial evidence showing just that. TVision's CEO Yan Liu testified that "███████████████████████████████████████

██████" Ex. 11, Liu Dep, 183:20-184:2; Ex. 52, Keeley Op. Rep. ¶¶34, 40, 51, 102, 104, 109. And Dr. Kyriakakis—on whom Dr. Keeley relies—opines that TVision had no acceptable non-infringing alternatives to the patented ACR technology in suit. Ex. 52, Keeley Op. Rep. ¶¶17, 51, 59, 105; Ex. 53, Keeley Reply Rep. ¶¶4, 18-21, 23.[12] As Dr. Keeley notes, ███████████

██████████████████████████████████████████████████████████

█████████████████████" Ex. 53, Keeley Op. Rep. ¶51. At most, TVision points to factual disputes, which are not a proper basis to exclude an expert's testimony. *See Genuine Enabling*, 2022 WL 17325656, at *18.

Finally, TVision identifies certain facts that it contends Dr. Keeley "does not take into account in his Nash Bargaining analysis," including that TVision considers its accused product to be "unique" because it "measures 'eyes on TV'"[13] and that "██████████████████████████

██████████████████████████████" D.I. 355 at 36, 37. But TVision does not explain how these facts are material to Dr. Keeley's analysis or do not merely present a factual dispute. TVision has not shown that Dr. Keeley failed to identify facts sufficient to support his Nash Bargaining analysis, even if TVision disputes certain facts or believes that other facts are relevant as well.

---

[12] TVision confuses existing ACR systems with available ACR systems. For example, the fact that "████████████████████████████████████████████████████" (D.I. 355 at 36) does not prove that an alternative was available to TVision. To the contrary, ████████████ ██████████████████████

[13] *See* § V.D regarding TVision's attention metrics.

**D.    DR. KEELEY BOTH APPORTIONED DAMAGES AND UTILIZED DOCTRINES THAT DO NOT REQUIRE APPORTIONMENT (RESPONDING TO D.I. 353; D.I. 355 § VI.G; D.I. 361)**

TVision improperly seeks to preclude Dr. Keeley's reasonable royalty analysis on the grounds that he supposedly failed to apportion the value of the patent-in-suit. D.I. 355 at 37-40. TVision's accused product (1) identifies the program a viewer is watching using the infringing ACR process; and (2) performs a process to determine whether the viewer is paying attention. Ex. 52, Keeley Op. Rep. ¶34. TVision's argument that Dr. Keeley did not account for the supposed separate value of the "attention" portion of the product is unsupported.

### 1.    Dr. Keeley Directly Apportioned in His Damages Analysis

Dr. Keeley properly apportioned in his analysis. He opined that "absent practicing the patent-in-suit TVision would have made no sales because it did not have available an acceptable, non-infringing alternative. Thus, all of TVision's expected profit should be credited to the invention." Ex. 53, Keeley Reply Rep. ¶44. In other words, Dr. Keeley opined that a 100% apportionment to the claimed invention is appropriate and that, accordingly, *all* of TVision's projected profits are subject to a split between the parties.

Dr. Keeley's opinion is based on ████████████     ████████████████████ ███████████████████████████████. Ex. 11, Liu Dep, 184:1-2 (" █████████████ ██████████████████████████"); Ex. 52, Keeley Op. Rep. ¶¶34, 40, 51, 102, 104, 109. TVision's customers buy its products (which in some cases include attention data) because of the underlying ACR data. Ex. 11, Liu Dep, 62:1-8, 62:19-63:1; Ex. 52, Keeley Op. Rep. ¶¶51, 102, 106; Ex. 53, Keeley Reply Rep. ¶¶10, 39. Yet TVision had no acceptable non-infringing alternative available at the time of the hypothetical negotiation, such that TVision could not provide ACR data without a license to the '889 Patent. Ex. 52, Keeley Op. Rep. ¶¶17, 51, 59, 105; Ex. 53, Keeley Reply Rep. ¶¶4, 18-21, 23. Without a license to the '889 Patent, TVision

35

would have no product that customers would buy (regardless of whether that product included attention metrics). Ex. 52, Keeley Op. Rep. ¶¶34, 40, 51, 102, 104, 109; Ex. 53, Keeley Reply Rep. ¶¶10, 39.

Features of TVision's product not covered by the '889 patent, such as attention metrics, do not affect Dr. Keeley's analysis because those features offer no value if the product itself is not sellable—which requires using the infringing ACR technology. For example, while TVision touts its attention metrics, it could not produce or sell that product if it did not use the patented ACR technology to identify *which program* a viewer is paying attention to. *See* Ex. 52, Keeley Op. Rep. ¶51. As TVision's own CEO testified, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 11, Liu Dep, 37:21-38:4 (emphasis added). Thus, Dr. Keeley's 100% apportionment is appropriate. *See AstraZeneca AB v. Apotex Corp.*, 782 F.3d 1324, 1338-40 (Fed. Cir. 2015) ("the district court did not clearly err in concluding that the [patented] subcoating is so important to the viability of the commercial omeprazole product that it was substantially responsible for the value of the product").

Dr. Keeley's view is that TVision could not offer a sellable product without a license to the '889 patent and that no acceptable non-infringing alternatives were available. This leads to his conclusion that 100% apportionment is appropriate. In contrast, TVision's (unsupported) view is that such alternatives were available and that the only value of the '889 patent is the decrease in computational complexity it provides. Such a factual dispute should be decided by the jury and not resolved through a *Daubert* motion. *Prolitec*, 770 F. Supp. 3d at 758.

### 2. Dr. Keeley Also Apportioned Through His Considerations of the *Georgia-Pacific* Factors

Dr. Keeley also apportioned damages to the incremental value of the invention—*i.e.,* he

showed that ***all*** of TVision's projected profits should be subject to a split between the parties—through his analysis of the *Georgia Pacific* factors. Both the Federal Circuit and this District have held that an expert's application of the *Georgia Pacific* factors can satisfy the apportionment requirement. *See Exmark Mfg. Co. v. Briggs & Stratton Power Prods.*, 879 F.3d 1332, 1348-49 (Fed. Cir. 2018) ("[T]he standard *Georgia-Pacific* reasonable royalty analysis takes account of the importance of the inventive contribution in determining the royalty rate that would have emerged from the hypothetical negotiation."); *Bd. of Regents UT Sys. v. Boston Sci. Corp.*, 645 F. Supp. 3d 324, 330 (D. Del. 2022).

Dr. Keeley evaluated each of the *Georgia Pacific* factors and used them to calculate his proposed royalty. Relevant here, with regard to Factor No. 9,[14] Dr. Keeley explained:

> I understand … that the record does not show that there were acceptable non-infringing alternatives available to TVision. I have accounted for this in my royalty calculation by determining that the benefit to TVision of obtaining a license to the patent-in-suit is TVision's net present value of its expected incremental profits until the '889 Patent expires. As discussed above, TVision would be willing to pay more than half of the present value of TVision's net incremental profits to practice the patent-in-suit, making a 50/50 split of the expected incremental profits favorable to TVision.

Ex. 52, Keeley Op. Rep. ¶105. Similarly, for Factor No. 10,[15] Dr. Keeley explained:

> [T]he patented invention would allow TVision to use ACR technology from ▮▮▮▮▮, which is crucial to TVision's business as ACR is a necessary and integral part of its product and service offerings. TVision, in fact, has practiced the patent-in suit (by infringing) and needed to practice the patent-in-suit to stay in business.

---

[14] Factor No. 9 is "The utility and advantages of the patent property over the old modes or devices, if any, that had been used for working out similar results."

[15] Factor No. 10 is "The nature of the patented invention; the character of the commercial embodiment of it as owned and produced by the licensor; and the benefits to those who have used the invention."

37

Ex. 52, Keeley Op. Rep. ¶106. And, for Factor No. 13,[16] Dr. Keeley opined:

> All of TVision profits [SIC] from the time of first infringement to patent expiration result from practicing the '889 Patent because absent practicing the patented invention and utilizing ACR technology in its products … TVision would have had no product and therefore would not have made any revenues or profits.

Ex. 52, Keeley Op. Rep. ¶109. Thus, in addition to his direct apportionment analysis, Dr. Keeley addressed apportionment in his consideration of the *Georgia Pacific* factors.

### 3. Dr. Keeley Also Used the Convoyed Sales Approach, Which Does Not Require Apportionment

Finally, Dr. Keeley used the "convoyed sales" approach, which does not require—and is an alternative to—apportionment. *Daedalus Blue, LLC v. Microstrategy Inc.*, No. 2:20-CV-551, 2023 WL 5598456, at *5 (E.D. Va. Aug. 29, 2023) ("[T]he convoyed sales analysis does not require a showing that the accused features of the patented product drives demand for the unpatented product sold alongside."). The convoyed sales doctrine allows damages from both "patented and non-patented products if they are functionally inseparable." *Id.* at *5; *see, e.g.*, *Trans-World Mfg. Corp. v. Al Nyman & Sons, Inc.*, 750 F.2d 1552, 1568-69 (Fed. Cir. 1984). Here, the "non-patented product" is whether the viewer was paying attention to the program identified through the patented ACR process (*i.e.* attention metrics).

Dr. Keeley opined that TVision's attention metrics are built upon, and inseparable from, the infringing ACR process. Indeed, TVision's attention metrics are worthless unless they can be applied to an identified program. *See* Ex. 52, Keeley Op. Rep. ¶¶34, 36-37, 51; Ex. 53, Keeley Reply Rep. ¶¶39, 42; Ex. 5, Johnson Rep. ¶¶75-77; Ex. 11, Liu Dep, 38:1-4. TVision monetizes the infringing ACR process by combining the program identification data resulting from the

---

[16] Factor No. 13 is "The portion of the realizable profit that should be credited to the invention as distinguished from non-patented elements, the manufacturing process, business risks, or significant features or improvements added by the infringer."

38

infringing process with other data (not generated using a patented process) to create the products that it sells. *See* Ex. 52, Keeley Op. Rep. ¶¶37, 51; Ex. 5, Johnson Rep. ¶¶75-79, 81-82. In other words, TVision's products are an integrated combination of data resulting from the infringing process (*i.e.*, program identification data) with other data (*e.g.*, attention metrics) sold as a "functionally inseparable" whole. *See Daedalus Blue*, 2023 WL 5598456, at *5; Ex. 52, Keeley Op. Rep. ¶¶37, 51-52, 102, 104; Ex. 53, Keeley Reply Rep. ¶¶39, 42; Ex. 11, Liu Dep, 184:1-2; Ex. 5, Johnson Rep. ¶¶75-79, 81-82. Thus, all TVision's profits arise from sales of data generated through the infringing process and sales of data convoyed by that. *Id*.

**E.    DR. KEELEY PROPERLY ASSUMED NIELSEN WAS WILLING TO LICENSE THE PATENT-IN-SUIT (RESPONDING TO D.I. 353; D.I. 355 § VI.H; D.I. 362)**

TVision attempts to exclude Dr. Keeley's entire opinion based on his observation that Nielsen would prefer not to license the '889 patent to TVision. D.I. 355 at 40-41. According to TVision, this observation is inconsistent with the hypothetical negotiation construct, which "requires that an expert assume a willing licensor and a willing licensee." *Id.* at 41. This argument ignores Dr. Keeley's express assumption that Nielsen *was* willing to grant a license to TVision, notwithstanding ███████████████████████.

Dr. Keeley observed that Nielsen would not have wanted to license the '889 patent in the context of *Georgia Pacific* Factor No. 4, which instructs Dr. Keeley to consider "[t]he licensor's established policy and marketing program to maintain his patent monopoly by not licensing others to use the invention or by granting licenses under special circumstances designed to preserve that monopoly." In his analysis of that factor, Dr. Keeley opines:

> This illustrates the very different bargaining situations of Nielsen and TVision. As mentioned above, Nielsen did not want to grant a license to a competitor or a firm that helped others compete with Nielsen because doing so would cause Nielsen to lose profits exceeding any royalty it could hope to receive. In contrast, TVision needed a license to stay in business. According to bargaining theory,

given these facts, if Nielsen were forced to (hypothetically) grant a license to TVision to which TVision would agree, Nielsen would agree to more than half of TVision's expected incremental profits from practicing the patent-in-suit (the highest possible royalty to which TVision would agree but a royalty that would still leave Nielsen the least worse off compared to not granting a license because it was required under the hypothetical negotiation to grant such a license).

Ex. 52, Keeley Op. Rep. ¶94.

These observations not only align with *Georgia Pacific* Factor No. 4, but they also align with the hypothetical negotiation construct—which "conjures a willing licensor and licensee" who are "dimly seen as negotiating a license" even though there is "no actual willingness on either side." *Panduit*, 575 F.2d at 1159 (quotation omitted). As Dr. Keeley unequivocally states in his report, "for the purposes of . . . the hypothetical negotiation construct, ***I must assume that Nielsen would have been a willing licensor and granted a license to the patent-in-suit to TVision at a royalty TVision would accept***." Ex. 52, Keeley Op. Rep. ¶19 (emphasis added); *see also* ¶62 ("patent law requires the assumption that the patent owner would hypothetically license the infringer for the purposes of determining damages.").

Dr. Keeley expressly adopted the hypothetical negotiation's predicate of willing parties. In arguing otherwise, TVision relies on selective citations to his report and ignores his assumption that Nielsen would have willingly licensed the '889 Patent and his explanation of why Nielsen's real-world motivations would lead to a higher royalty in that negotiation.

## VI.   TVISION OFFERS NO BASIS TO EXCLUDE NIELSEN'S EXPERTS' OPINIONS REGARDING THE LACK OF ACCEPTABLE, NON-INFRINGING ALTERNATIVES (RESPONDING TO D.I. 353; D.I. 355 § VII; D.I. 363)

TVision seeks to exclude the opinions of Dr. Kyriakakis and Dr. Keeley that no acceptable non-infringing alternatives were available to TVision at the time of the hypothetical negotiation. Although TVision's rationale is not entirely clear, TVision appears to argue that there is no evidence to support these opinions. TVision also appears to argue that Nielsen's experts are not

40

qualified to render these opinions because they do not have personal knowledge of the supposed

alternatives on which TVision relies. Finally, TVision points to a purported "admission" in the

asserted patent that acceptable non-infringing alternatives would have been available to TVision.

There is ample evidence that TVision's proposed alternatives were ***not*** available and ***not***

suitable. Moreover, TVision bears the burden of proof on this issue.[17] Thus, Nielsen's experts

can base their opinions on TVision's failure to proffer sufficient (or indeed any) evidence to

carry this burden. Nor must Nielsen's experts have personal knowledge of TVision's alleged

alternatives. Dr. Kyriakakis and Dr. Keeley are experts offering opinions under Fed. R. Evid.

702; they are not percipient witnesses and are not required to have personal knowledge of the

facts they analyze. Fed. R. Evid. 703 ("An expert may base an opinion on facts or data in the

case that the expert has been made aware of or personally observed"). Both experts properly

analyze facts of which they were "made aware," *id.*, and TVision does not dispute that they are

qualified in their relevant fields to give the opinions that resulted from that analysis. And

TVision's argument that the asserted patent contains an "admission" that suitable alternatives

exist is equally unsupported.

A.    **TVision Does Not <u>Have Evidence to Show That Supposed Alternatives Recommended by</u> ▊▊▊ <u>Were Available, Acceptable, and Non-Infringing</u>**

TVision's claim that it offered irrefutable evidence of suitable alternatives based on

▊▊▊ recommendation of certain ACR products—and that Nielsen's experts are precluded

---

[17] *See Correct Transmission, LLC v. Nokia of Am. Corp.*, No. 22-cv-00343, 2024 WL 1289821, at *4 (E.D. Tex. Mar. 26, 2024) (holding that the "non-infringing alternative analysis … burden is upon the defendant."); *Paltalk Holdings, Inc. v. Cisco Sys., Inc.*, No. 21-cv-757, 2025 WL 2581690, at *10 (W.D. Tex. Aug. 27, 2025) ("Several courts have determined that the alleged infringer has the burden to establish that non-infringing alternatives were acceptable and available under a reasonable royalty analysis to get the benefit of a lower calculation."); *Smart Skins LLC v. Microsoft Corp.*, No. C15-544, 2016 WL 4148091, at * 2 (W.D. Wash. July 1, 2016) ("[T]he alleged infringer has the burden of showing that non-infringing alternatives were both available to it and were acceptable to its customers during the damages period.").

from opining otherwise—is baseless. *See* D.I. 355 at 42-46.

TVision offers no evidence that these products are suitable alternatives. In fact, TVision offers no more than the bare names of the companies ▮▮▮▮▮ recommended: ▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮. That is not proof that those companies had products that would be available, acceptable, and non-infringing for use in TVision's technical environment.[18] Indeed, Dr. Kyriakakis's review of the record shows there is no evidence that these companies' products would operate in TVision's technical environment. Ex. 46, Kyriakakis Op. Rep. ¶¶475-80; Ex. 48, Kyriakakis Reply Rep. ¶¶176-82. Nor does TVision identify any evidence that the companies' products would be acceptably accurate in TVision's panelists' noisy homes. *See* Ex. 34, Anderson Dep. 178:13-179:8 (testifying that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮); Ex. 19, Sidhu Dep, at 138:8-19 (▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮). Thus, it is perfectly appropriate for Dr. Kyriakakis to opine that TVision has not identified sufficient evidence of available, acceptable non-infringing alternatives (and for Dr. Keeley to rely on that opinion).

TVision's argument boils down to a request that the Court bar Nielsen and its experts from taking a contrary view of the evidence. TVision's view of the evidence, while insufficient to prove any alternatives were available, *see* D.I. 350 at 33-35, 37-40, does not prohibit Nielsen and its experts from looking to different evidence or differently interpreting the same evidence. *Prolitec*, 770 F. Supp. 3d at 758 ("When, as here, the parties' experts rely on conflicting sets of facts, it is not the role of the trial court to evaluate the correctness of facts underlying one

---

[18] TVision also argues that as part of this recommendation, ▮▮▮▮▮ said that ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. D.I. 355 at 44. But that is not evidence that those companies' products were capable of accurately generating monitoring fingerprints in panelists' homes.

expert's testimony.") (quotation omitted).

Each supposed alternative recommended by ▮▮▮▮ is discussed below.

### 1.    No Evidence Supports the ▮▮▮ Alternative

Dr. Kyriakakis correctly identified a lack of evidence that ▮▮▮ offered an acceptable non-infringing alternative for TVision at the time of the hypothetical negotiation. As explained in his report, there is no evidence that ▮▮▮ product would work in TVision's environment. In particular, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *See* Ex. 46, Kyriakakis Op. Rep. ¶479. Thus, switching to ▮▮▮ "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" *Id.* As Dr. Kyriakakis further found, "▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮" Ex. 48, Kyriakakis Reply ¶177. TVision's argument that Dr. Kyriakakis somehow is not qualified to offer this opinion is based on its misguided position that an expert must have personal knowledge of underlying facts. *See* D.I. 355 at 44. As discussed *supra*, that position is contrary to the Federal Rules of Evidence.

Dr. Kyriakakis could have simply pointed to TVision's lack of evidence, but he did not stop there. Dr. Kyriakakis also relied on ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. TVision's argument that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮, D.I. 355 at 44, is speculative—and importantly for present purposes, not any reason to exclude Dr. Kyriakakis's contrary opinion. Moreover, Dr. Kyriakakis's opinion is consistent with Mr. Liu's admission that ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

██████████████. Ex. 11, Liu Dep, 301:19-302:20. TVision's disagreement with Dr. Kyriakakis's opinion is no basis to exclude that opinion.

TVision's reliance on *Sound View Innovations, LLC v. Hulu, LLC*, 33 F.4th 1326 (Fed. Cir. 2022), is misplaced. D.I. 355 at 45. In *Sound View*, the plaintiff's expert "did not account for substantial differences between the circumstances studied [] and the circumstances of [the] accused streaming services." *Id.* at 1337. Here, to the contrary, Dr. Kyriakakis opined that the differences between the mobile environment in which the ████ product was studied and the non-mobile environment in which TVision deploys its products would have not made a difference. In particular, he explained that TVision provided no proof that t████████████████████ ████████████████████████████. *See* Ex. 48, Kyriakakis Reply ¶176-77 ("██████████ ████████████████████████████████████████████████ ████████████████████"); *see also* Ex. 11, Liu Dep, 301:19-302:20. Moreover, in *Sound View*, the excluded opinion concerned an issue on which the ***plaintiff*** bore the burden of proof: damages. 33 F.4th at 1329, 1337-38. Here, TVision bears the burden of proving that ████████ product would have been acceptable—yet ████████████████████████████.[19]

### 2. No Evidence Supports the ████ Alternative

Dr. Kyriakakis appropriately opined that there is no evidence that ████ would have been an acceptable non-infringing alternative available for TVision at the time of the hypothetical negotiation. TVision's argument that Dr. Kyriakakis needed personal knowledge to render such an opinion is wrong for the same reasons explained above.

As Dr. Kyriakakis noted, TVision's expert Dr. David Anderson has not identified any

---

[19] TVision also cites the *Sound View* court's exclusion of an amended damages opinion that relied on a press release rather than the source material for the press release. D.I. 355 at 45. Dr. Kyriakakis did not rely on a press release summarizing the test of ████ product; he relied on ████████.

"evidence that would show that ███ technology would work in TVision's environment." Ex. 48, Kyriakakis Reply Rep. ¶178. In responding to Dr. Anderson's report, Dr. Kyriakakis could say no more because Dr. Anderson did not say whether or how ███ would work in TVision's technical environment or whether it would provide acceptable results. Indeed, Dr. Anderson's *entire* opinion about ███ was: "████████████████████████████████ ████████████████████████████████████████████████████ ████████████████████████████" Ex. 50, Anderson Rebuttal Rep. ¶132. Dr. Kyriakakis is not required to prove that ███ did not work in TVision's environment, especially given Dr. Anderson's failure to opine that it would or provide any details about ███ ACR product.[20]

TVision further argues that Dr. Kyriakakis "ignores" ████████████████ ████████████████. D.I. 355 at 46. But TVision failed to produce this ███ in a timely fashion, doing so only *after* Dr. Kyriakakis's reports were served. *Compare* Ex. 54, 9/4/2025 service email for ████████), *with* Ex. 48, Kyriakakis Reply Rep. (served 8/18/2025). And ████████ has a glaring hole that renders it irrelevant. As Mr. Liu admitted, ████████ ████████████████████. Ex. 11, Liu Dep., 317:16-20 ("████████████████ ████████████████████████████████████████████████████ ████████████████████████████"). The ███ thus is missing the

---

[20] TVision also asserts that "████████████████████████████████████ ████████████████████████████████████████████████████ ████████████'" D.I. 355 at 45-46. But TVision's expert, Dr. Anderson, did not base any of his opinions on this communication from ████████. Ex. 50, Anderson Supp. Rebuttal Rep. ¶132. In any event, ████████ communication does not provide sufficient information for TVision to meet its burden to prove ███ was available, acceptable, and non-infringing. *See* D.I. 355, Ex. 20 at TVSN_NLSN_00611702 ("████████████████████████████████████ ████████████████").

one thing that TVision needs for ▮▮▮ to be an alternative—the ACR software. Certainly, Dr. Kyriakakis was not required to consider a ▮▮▮ that does not include the relevant software.

### 3.    No Evidence Supports the ▮▮▮ Alternative

Dr. Kyriakakis appropriately pointed out that TVision does not provide sufficient evidence that ▮▮▮ had a product that was available, acceptable, and non-infringing. *See* Ex. 48, Kyriakakis Reply Rep. ¶¶181-82. TVision's entire argument regarding ▮▮▮ is based on ▮▮▮ recommendation of ▮▮▮ as a "▮▮▮" D.I. 355 at 43, 47. That is insufficient to carry TVision's burden, and Dr. Kyriakakis is entitled to opine as much.

### B.    TVision Does Not Have Sufficient Evidence to Show That a ▮▮▮ Product Was Available, Acceptable, and Non-Infringing

Dr. Kyriakakis opined from the factual record that there is no evidence that ▮▮▮ could offer an available, acceptable non-infringing alternative. Ex. 46, Kyriakakis Op. Rep. ¶¶471-73. Contrary to TVision's argument, there is nothing improper about the fact that Dr. Kyriakakis arrived at his opinion in part through his review of documents. *See* Fed. R. Evid. 703. Dr. Kyriakakis also formed his opinion based on evidence that ▮▮▮ did not exist at the time of the hypothetical negotiation, including evidence of when ▮▮▮ registered its Internet domain and the oldest version of its webpage on the Internet Archive. *Id.* ¶473. A company that did not exist could not provide a suitable alternative. And neither TVision nor its experts—who bear the burden here—claim that ▮▮▮ *did* exist. TVision's motion to exclude Dr. Kyriakakis's opinions regarding ▮▮▮ is therefore baseless.

### C.    TVision Does Not Have Sufficient Evidence to Show That an ▮▮▮ Product Was Available, Acceptable, and Non-Infringing

In its discussion of the purported ▮▮▮ alternative, TVision again confuses expert opinion and percipient testimony. D.I. 355 at 47; *see* Fed. R. Evid. 703. Dr. Kyriakakis analyzed

the record and provided his technical opinion, which is entirely proper for an expert. *See* Ex. 48, Kyriakakis Reply Rep. ¶¶172-73; Ex. 46, Kyriakakis Op. Rep. ¶¶481-85. Dr. Kyriakakis determined that no evidence showed that ████ was available in May 2018 or that it had a product in the technical ecosystem that TVision uses. *Id.* There is nothing improper about this.

### D. The '889 Patent Does Not "Admit" There Are Available, Acceptable, and Non-Infringing Alternatives

TVision's argument that Dr. Kyriakakis's opinion is contrary to a purported admission in the '889 patent (D.I. 355 at 42) is unsupported by the plain language of the patent. The quoted portion of the patent states only that other "signature-matching techniques" exist. *Id.* But whether other "signature-matching techniques" exist is a different question from whether any acceptable non-infringing alternatives were available to TVision at the time of the hypothetical negotiation. A "signature-matching technique" might not be productized and, even if it was, it might not work in TVision's technical environment. Indeed, TVision's chief technology officer, Mr. Sidhu, testified that ████████████████████████████████████████ ████████████████████████. *See* Ex. 11, Sidhu Dep, 138:8-19. Moreover, the fact that a technique exists does not mean that it is not patented or owned by a company that cannot or will not supply the technique to TVision—making the technique unavailable to TVision.[21] The passing reference to the existence of other signature-matching techniques does not relieve TVision of its burden to show that alternatives are available and acceptable in its environment.

### VII. DR. MARTIN'S AND DR. KYRIAKAKIS'S OPINIONS ABOUT THE SIMULATION ARE PROPER (RESPONDING TO D.I. 353; D.I. 355 § VIII; D.I. 364)

TVision seeks to exclude Dr. Martin's and Dr. Kyriakakis's opinions that rely on Dr.

---

[21] For example, ████████████████████, and thus, ████████ product is unavailable to TVision. *See* D.I. 355 at 32.

Martin's simulation, arguing that the simulation "is not the program at issue." D.I. 355 at 47. But Dr. Martin opined that his simulation provides the same results as the infringing program and that it operates in precisely the same way. No more is required under Fed. R. Evid. 702.

Courts in this District have found simulations to be admissible. *See, e.g.*, *VLSI Technology LLC v. Intel Corp.*, C.A. No. 18-966-CFC-CJB, 2022 WL 2304112, at *4 (D. Del. June 27, 2022) (denying motion to exclude opinions based on a simulation). Indeed, "a model or test is admissible if the evidence produced shows that it is 'substantially similar' to the conditions being modeled or tested." *See also St. Paul Fire and Marine Ins. Co. v. Nolen Grp., Inc.*, No. CIV.A.02-8601, 2005 WL 1168380, at *8 (E.D. Pa. May 13, 2005) (citing *Stecyk v Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002); *Glick v. White Motor Co.*, 458 F.2d 1287 (3d Cir. 1972)).

Here, Dr. Martin established that his simulation operates in exactly the same way and provides the exact same results as the infringing program. Dr. Martin ran the tested TV audio through the unmodified ████████████—*i.e.*, the accused program—and compared the results to the results of his simulation. Ex. 49, Martin Rep. ¶¶111, 120, 126 ("The simulation has two parts. The first calls ███████████ to process audio data in the same manner that TVision uses it."). In *every* case, the results matched. *Id.* ¶¶142-44. Having confirmed that the results of the simulation match those of the ███████████, Dr. Martin opined that the simulation accurately reproduced its functionality. *Id.* ¶¶109, 111, 123 ("the simulation correctly implements the same algorithms practiced by ████████ ███████████████████

██████████████████████████████████ ████████

████████████████████████████████████████████

████████████████████████████████ █████████ ██

48

███████████████████████████████████████████████████████████████████████ "),

138, 141. TVision's expert had the opportunity to dispute the results and/or functionality of the

simulation but did not do so. Dr. Martin has shown that his simulation is at least "substantially

similar" to the infringing ███████ program, and TVision makes no colorable argument

otherwise.

TVision's suggestion that the simulation is not needed, *see* D.I. 355 at 48, is equally

unfounded. As Dr. Martin explains, he generated the simulation because ██████ ██████

████████████████████████████████████████████████████████████████████████

██████████████ Ex. 49, Martin Rep. ¶¶ 105, 107-11, 135. Because such information

corresponds to claim limitations, Dr. Martin reproduced the functionality of part of the

████████ code and added █████████████████████████████████

████████████ . *Id.* ¶¶105, 130.

The sole case TVision cites in support of its motion to exclude Dr. Martin's simulation—

*Performance Aftermarket Parts Grp., LTD. v. TI Group Auto. Sys., Inc.*—is inapposite. C.A. No.

H-05-4251, 2008 WL 169826, at *2-3 (S.D. Tex. Jan. 16, 2008). There, the court excluded

simulations based on its finding that the simulations were "irrelevant to the material issues in the

case." *Id.* at *2. The court also found evidence that the simulations were "highly questionable,"

but no such evidence exists in the present case. Dr. Martin established that his simulation

operates in the same way and provides the same results as the infringing program—and

TVision's experts make no attempt to undermine his analysis.

## VIII.  CONCLUSION

For the reasons explained above, Nielsen respectfully requests the Court deny each of

TVision's Summary Judgment and Daubert Motions (D.I. 352-53, 358-66).

Respectfully submitted,

POTTER ANDERSON & CORROON LLP

OF COUNSEL:

By: */s/ David E. Moore*

    David E. Moore (#3983)

Steven Yovits
    Bindu A. Palapura (#5370)
Douglas Lewis
    Hercules Plaza, 6th Floor
Constantine Koutsoubas
    1313 N. Market Street
Jason P. Greenhut
    Wilmington, DE  19801
KELLEY DRYE & WARREN LLP
    Tel:  (302) 984-6000
333 West Wacker Drive
    dmoore@potteranderson.com
Chicago, IL 60606
    bpalapura@potteranderson.com
Tel:  (312) 857-7070

Clifford Katz
*Attorneys for Plaintiff The Nielsen Company*
KELLEY DRYE & WARREN LLP
*(US), LLC*
3 World Trade Center
175 Greenwich Street
New York, NY 10007
Tel:  (212) 808-7800

Dated: January 5, 2026
12632962 / 14944.00004


Public Version Dated: January 12, 2026