IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | **Redacted - Public Version** |
| | ) | |
| v. | ) | C.A. No. 22-057-CJB |
| | ) | |
| TVISION INSIGHTS, INC., | ) | ████████████ |
| | ) | ████████████ |
| Defendant. | ) | |

**REPLY BRIEF IN SUPPORT OF TVISION INSIGHTS, INC.'S
SUMMARY JUDGMENT AND DAUBERT MOTIONS PURSUANT TO D.I. 295**

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
4030 Wake Forest Road, Suite 300
Raleigh, NC 27609
(984) 960-2860

Steig D. Olson
Sami H. Rashid
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000

Patrick D. Curran
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
11 Huntington Avenue, Suite 5200
Boston, MA 02199
(617) 712-7100

Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Defendant Tvision Insights, Inc.*

Adam B. Wolfson
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Benjamin D. Brown
Richard A. Koffman
Daniel McCuaig
COHEN MILSTEIN SELLERS
 & TOLL PLLC
1100 New York Ave NW, Suite 800
Washington, DC  20005
(202) 408-4600

Dated: January 26, 2026

**TABLE OF CONTENTS**

I.    Introduction ................................................................................................................. 1

II.   THE ASSERTED CLAIMS ARE INVALID UNDER SECTION 101 ....................... 2

  A.  Response to Factual Background .................................................................... 2

  B.  *Alice* Step 1: The Claims Are Directed to An Abstract Idea ......................... 2

     1.  TVision Properly Identifies an Abstract Mathematical Algorithm in the Representative Claim ........................................................................ 2

     2.  The '889 Patent Claims Are Not Directed To Any Technological Improvement ...... 4

     3.  Case Law Confirms That the '889 Patent Claims Are Ineligible .............. 9

  C.  *Alice* Step 2: The Claims Fail to Recite an Inventive Concept ..................... 9

III.  Nielsen's Proposed Claim Construction Contradicts its Previous Position and is Incorrect ..... 11

  A.  The Claim Language and Specification Limit the Claims to Intraframe Processing, Notwithstanding Nielsen's Arguments Regarding "Comprising" and Claim Differentiation ...... 12

  B.  Nielsen's Litigation Waiver is Unmistakable ............................................... 17

IV.   Nielsen has not proved infringement ........................................................................ 18

V.    TVision's Daubert Motions Regarding Dr. Keeley's Opinions Should Be Granted ... 19

  A.  Dr. Keeley's Lost Profits Opinions Should Be Excluded ............................. 19

  B.  Dr. Keeley's Opinion Is Inherently Incredible ............................................. 21

  C.  Dr. Keeley's Nash Bargaining Solution Opinion Should Be Excluded ........ 22

  D.  Dr. Keeley's Opinion Should Be Excluded for Failure to Apportion .......... 22

  E.  Dr. Keeley Does Not Assume Nielsen Was a Willing Licensor .................... 23

VI.   Nielsen's Experts Should Be Excluded From offering Opinions reGARDING non-infringing alternatives ...... 23

VII.  Opinions regarding Dr. Martin's Simulation should be excluded ............................ 25

VIII. Conclusion ................................................................................................................ 25

## TABLE OF AUTHORITIES

**Cases**

*Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,*
   841 F.3d 1288 (Fed. Cir. 2016) ....................................................................... 11

*Amorgianos v. Amtrak,*
   303 F.3d 256 (2d Cir. 2002) ............................................................................ 24

*Ariosa Diagnostics, Inc. v. Sequenom, Inc.,*
   788 F.3d 1371 (Fed. Cir. 2015). ........................................................................ 9

*ART+COM Innovationpool GmbH v. Google Inc.,*
   155 F. Supp. 3d 489 (D. Del. 2016) ................................................................. 25

*Asetek Danmark A/S v. CMI USA Inc.,*
   852 F.3d 1352 (Fed. Cir. 2017) ....................................................................... 20

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.,*
   2018 U.S. Dist. LEXIS167104, 2018 WL 4691047 (D. Del. Sept. 28, 2018) ..................... 21

*Bot M8 LLC v. Sony Corp. of Am.,*
   465 F. Supp. 3d 1013 (N.D. Cal. 2020),
   *aff'd*, 4 F.4th 1342 (Fed. Cir. 2021) ............................................................... 10

*California Institute of Technology v. Broadcom Ltd.,*
   25 F.4th 976 (Fed. Cir. 2022), .......................................................................... 7

*CardioNet, LLC v. InfoBionic, Inc.,*
   955 F.3d 1358 (Fed. Cir. 2020) ...................................................................... 5, 9

*ChargePoint, Inc. v. SemaConnect, Inc.,*
   920 F.3d 759 (Fed. Cir. 2019) ........................................................................... 5

*ClearDoc, Inc. v. RiversideFM, Inc.,*
   2022 WL 6066798 (D. Del Feb. 22, 2022) ......................................................... 8

*Coffelt v. Nvidia Corp. et al.,*
    2016 WL 7507763 (C.D. Cal. June. 21. 2016),
   *aff'd*, 680 Fed.Appx. 1010 (Fed. Cir. 2017) ...................................................... 4

*Customedia Techs., LLC. v. Dish Network Corp.,*
   951 F.3d 1359 (Fed. Cir, 2020) ......................................................................... 4

*David Netzer Consulting Eng'r LLC v. Shell Oil Co.,*
   824 F.3d 989 (Fed. Cir. 2016) ......................................................................... 12

*Dippin' Dots, Inc. v. Mosey,*
   476 F.3d 1337 (Fed. Cir. 2007) ....................................................................... 12

*Enfish, LLC v. Microsoft Corp.*,
822 F.3d 1327 (Fed. Cir. 2016) .................................................................................5

*Ericsson, Inc. v. D-Link Sys.*,
773 F.3d 1201 (Fed. Cir. 2014) ...............................................................................22

*Fenner Invs., Ltd. V. Cellco P'ship*,
778 F.3d 1320 (Fed. Cir. 2015) ...............................................................................13

*Finjan, Inc. v. Blue Coat Sys., Inc.*,
879 F.3d 1299 (Fed. Cir. 2018) .................................................................................5

*Gibson v. Mayor and Council of Cty. of Wilmington*,
355 F.3d 215 (3d Cir. 2004) ......................................................................................9

*Hawk Tech. Sys., LLC v. Castle Retail, LLC*,
60 F.4th 1349 (Fed. Cir. 2023) ..................................................................................7

*In re Paoli R.R. Yard PCB Litig.*,
35 F.3d 717 (3rd Cir. 1994) .....................................................................................24

*In re TLI Commc'ns LLC Pat. Litig.*,
823 F.3d 607 (Fed. Cir. 2016) .................................................................................11

*KOM Software Inc. v. NetApp, Inc.*,
No. CV 23 18-160-WCB, 2023 WL 6460025 (D. Del. Oct. 4, 2023) ....................10

*McRO, Inc. v. Bandai Namco Games Am. Inc.*,
837 F.3d 1299 (Fed. Cir. 2016) .................................................................................7

*Mentor Graphics Corp. v. Eve-USA, Inc.*,
851 F.3d 1275 (Fed. Cir. 2017) ...............................................................................20

*MiiCS & Partners, Inc. v. Funai Elec. Co.*,
2017 U.S. Dist. LEXIS 201511, 2017 WL 6268072 (D. Del. December 7, 2017) ..............21

*MLC Intellectual Prop., LLC v. Micron Tech., Inc.*,
10 F.4th 1358 (Fed. Cir. 2021) ................................................................................22

*Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*,
811 F.3d 1314 (Fed. Cir. 2016) ...............................................................................10

*Padillas v. Stork—Gamco, Inc.*,
186 F.3d 412 (3d Cir. 1999). ...................................................................................24

*Parker v. Flook,*
437 U.S. 584 (1978) .............................................................................................4, 8

*Pavo Solutions LLC v. Kingston Tech. Co.*, 35 F.4th 1367 (Fed. Cir. 2022) ..........................22

*PersonalWeb Techs. LLC v. Google LLC*,
8 F.4th 1310 (Fed. Cir. 2021) ...................................................................................1

*Phillips v. AWH Corp.*,
415 F.3d 1303 (Fed. Cir. 2005) (en banc) ........................................................................14

*Poly-America, L.P. v. API Industries, Inc.*,
839 F.3d 1131 (Fed. Cir. 2016) ........................................................................................13

*Prolitec Inc. v. ScentAir Techs, LLC*,
770 F.Supp.3d 730 (D. Del. 2025) ....................................................................................10

*RecogniCorp, LLC v. Nintendo Co.*,
855 F.3d 1322 (Fed. Cir. 2017) ..........................................................................................8

*Regeneron Pharms., Inc. v. Mylan Pharms., Inc.*,
130 F.4th 1372 (Fed. Cir. 2025) .......................................................................................16

*Retractable Techs., Inc. v. Becton Dickinson & Co.*,
653 F.3d 1296 (Fed. Cir. 2011) ...................................................................................15, 16

*SAP Am., Inc. v. InvestPic, LLC*,
898 F.3d 1161 (Fed. Cir. 2018) ..........................................................................................8

*Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*,
2019 U.S.Dist. LEXIS 213, 2019 WL 9698520 (D. Del. Jan. 2, 2019) ..............................21

*Sound View Innovations, LLC v. Hulu, LLC*, 33 F. 4th 1326 (Fed. Cir. 2022) .........................16

*SynKloud Techs., LLC v. HP Inc.*,
490 F. Supp. 3d 806 (D. Del. 2020) ...................................................................................5

*TecSec, Inc. v. Adobe, Inc*,
978 F.3d 1278 (Fed. Cir. 2020) .......................................................................................4, 7

*The Nielsen Co. (US), LLC v. TVision Insights, Inc.*,
C.A. No. 21-1592-CJB, 2022 WL 3226318 (D. Del. Aug. 10, 2022) ...................................3

*ThroughTEK Co., Ltd. v. Reolink Innovation Inc.*,
C.A. No. 23-218-GBW, 2024 WL 1701841 (D. Del. Apr. 19, 2024) ...................................9

*Trading Techs Int'l, Inc. v. IBG LLC*,
921 F.3d 1084 (Fed. Cir. 2019) ........................................................................................11

*Trs. Of Columbia Univ. v. Symantec Corp.*,
811 F.3d 1359 (Fed. Cit. 2016) ........................................................................................16

**Rules**

Fed. R. Evid. 702 ..................................................................................................22, 24, 25

## I.    INTRODUCTION

Nielsen's opposition fails to identify a single genuine issue of material fact in its opposition to TVision's section 101 motion. *See PersonalWeb Techs. LLC v. Google LLC*, 8 F.4th 1310, 1314 (Fed. Cir. 2021) ("[N]ot every § 101 determination contains genuine disputes over the underlying facts material to the § 101 inquiry.  Indeed, that inquiry may be, and frequently has been, resolved on a [dispositive motion] where the undisputed facts … require a holding of ineligibility . . . .'").

Nielsen's proposed claim construction contradicts its previous position—one that this Court recited. "It is undisputed that the asserted claims of the patent-in-suit, United States Patent No. 7,783,889 (the ''889 patent'), require that frequency components be processed within a single frame (the 'single frame limitation'). ('889 patent, cols. 26:12-14, 62-64, 28:6-8;2 D.I. 250 at 3; D.I. 256 at 3)." D.I. 272 at 2.  Nielsen now seeks to remove that limitation and to permit infringement where frequency components are compared across any number of frames, as long as the multi-frame comparison involves at least two components from a single frame.  But the claim language is limited to single frame processing, and the specification distinguishes the invention over the prior art on that basis and provides only embodiments having single frame processing.  When the claims are properly construed, there can be no factual dispute that Nielsen fails to prove infringement.  Even assuming Nielsen's allegations about TVision's products are correct, the accused process determines a descriptor by comparing values in a window of 17 frames, not within a single frame.

With regard to TVisions's *Daubert* motions, this Court should exclude the reasonable royalty opinions of Nielsen's damages because: (1) he fails to tie ███████████████ to the alleged infringement; (2) he fails to provide any evidence that TVision would have been willing to pay a lump sum of ██████████ 2018 when TVision only had a few thousand dollars in its bank account and no way to obtain ██████████ to pay a royalty on a single component of

1

TVision's overall system; (3) his opinion on the so-called "Nash Bargaining System" is not supported by any evidence (if it is even a viable theory); and (4) his reasonable royalty opinion fails to apportion and should therefore be precluded entirely.

Finally, the Court should exclude the testimony of Nielsen's experts regarding the non-infringing alternatives that TVision actually considered and which were recommended to TVision by its vendor ███████ on the ground that neither expert has a sufficient factual basis for offering an opinion regarding the same.

## II.    THE ASSERTED CLAIMS ARE INVALID UNDER SECTION 101

Nielsen does not dispute that claim 1 is representative for the purpose of Section 101 analysis. *See, e.g.*, D.I.384 at 3-17.

### A. Response to Factual Background

Nielsen attempts a definition of ***intraframe*** processing that encompasses processing any number of frames, as long as it involves "***at least*** a comparison of two frequency components from the same frame." Br. at 4 (emphasis added). The term "at least" renders Nielsen's definition ambiguous, at best. As is explained in section III, below, The claims recite mathematical operations done on a "first frame" and then on a "second frame," *i.e.* only within a single frame, which is how the specification distinguishes the claimed invention from the prior art. Ex. 1, 2:56-61 (distinguishing "interframe operations" from "operations based on sample data within a single frame"). The so-called improvements over the prior art that Nielsen argues at pages 4-5 are not recited in the claims or discussed in the specification.

### B. *Alice* Step 1: The Claims Are Directed to An Abstract Idea

#### 1.    TVision Properly Identifies an Abstract Mathematical Algorithm in the Representative Claim

Nielsen incorrectly argues at page 11 that "TVision has not identified an appropriate concept the claims are directed to." In its opening brief, TVision explained in detail that representative claim 1 is directed to the abstract idea of,

> (1) performing an spectral transform operation on a first frame of media sample data, (2) comparing spectral powers of the two frequency components obtained from the transformation operation to determine a descriptor; (3) calculating a signature based on the descriptor; and (4) repeating the operation on a second frame, which is obtained by using data from the first frame and data from a second frame.

*See* D.I.355 at 11. If, as Nielsen argues, TVision's recitation of the abstract idea is too broad, then so are the asserted claims. Nielsen is not correct when it argues that the above-quoted recitation "ignores that the asserted claims recite comparing pairs of frequency components, which solves the prior art problem of signature robustness." D.I. 384 at 11. The above-quoted description of the abstract idea from TVision's opening brief recites "comparing spectral powers of the two frequency components." *Id.* Further, Nielsen is also mistaken when it argues that TVision's description does not include the "recitation of overlapping claims." *Id.* at 11. On the contrary, the above description of the abstract idea recites that the second frame "is obtained by using data from the first frame and data from a second frame." And in this regard, the claim language itself does not recite that the data is obtained from overlapping frames. It only recites "extracting a common plurality of media samples from the first frame and appending another plurality of media samples." Ex. 1, 26:16-20. Thus, contrary to Nielsen's contention, TVision did not "ma[k]e the same error" that the Court found in the *The Nielsen Co. (US), LLC v. TVision Insights, Inc.*, C.A. No. 21-1592-CJB, 2022 WL 3226318, at *4 (D. Del. Aug. 10, 2022). *See* D.I. 384 at 12.

Contrary to Nielsen's argument at page 12 of its brief, the intrinsic evidence in this case demonstrates that the claims are directed to an abstract mathematical algorithm. Indeed, representative claim 1 begins with the performance of a spectral transform operation on the first frame of media samples, then a comparison of two spectral powers resulting from the spectral transform operation, and determining a first descriptor based on the comparison, and then generating a signature based on the first descriptor—and then repeating this process on a

3

second frame. Ex. 1, claim 1.  The case law Nielsen relies on at pages 12-13 of its brief merely confirms that the *Alice* step 1 analysis concerns what a claim relates to and does not support Nielsen's allegation that *Alice* step 1 analysis cannot rely on patent specification.  In fact, the Federal Circuit has relied on intrinsic evidence, including the patent specification and prosecution history, to find patents ineligible.  *See Coffelt v. Nvidia Corp. et al.*, 2016 WL 7507763, at *1 (C.D. Cal. June. 21. 2016), *aff'd*, 680 Fed.Appx. 1010 (Fed. Cir. 2017).  *See also TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1292 (Fed. Cir. 2020) (at *Alice* step one, the court must focus on the language of the claim, read in light of the specification.).

Nielsen is wrong when it argues that "algorithms are not *per se* unpatentable." *See* D.I.384 at 13-14.  No Supreme Court decision has ever upheld a patent on a pure algorithm, which is all that the claims of the '889 patent recite.  *See* D.I.355 at 11-13.  In *Parker v. Flook,* 437 U.S. 584, 594-95 (1978),  the Court held that "if a claim is directed essentially to a method of calculating, using a mathematical formula, even if the solution is for a specific purpose, the claimed method is nonstatutory." In *Parker*, the claim was directed to a method for calculating and updating an alarm limit for monitored temperature, pressure and flow rates in a catalytic conversion process.  Here, claim 1 of the '889 patent is a method of calculating, using mathematical formula (even assuming it may be an improved one), for the purpose of generating signature information—which makes the claim ineligible.

### 2. The '889 Patent Claims Are Not Directed To Any Technological Improvement

There is no merit to Nielsen's argument that the '889 patent claims are directed to a patent-eligible improvement. *See* D.I.384 at 4-5, 6-10. The relevant inquiry is whether the claims recite a "specific technological improvement," *i.e.*, whether they enable computers to do something that they could not do before. *See, e.g., Customedia Techs., LLC. v. Dish Network Corp.*, 951 F.3d 1359, 1363 (Fed. Cir, 2020) (claims "directed to a patent-eligible improvement to computer functionality … must be directed to an improvement to the functionality of the

computer or network platform itself."); *Finjan, Inc. v. Blue Coat Sys., Inc.*, 879 F.3d 1299, 1305 (Fed. Cir. 2018); *SynKloud Techs., LLC v. HP Inc.*, 490 F. Supp. 3d 806, 819 (D. Del. 2020) (claims directed to unpatentable abstract idea where none of alleged computer improvements "'enables a computer . . . to do things it could not do before'"). Unlike the case law Nielsen relies on, Nielsen has not identified any claim language directed to improving the functioning of a computer that was not part of the prior art.[1] In fact, the '889 patent describes virtually all aspects of its claimed invention, other than single-frame processing, as being well known in the art. *See* Ex. 1 at 1:21-26, 2:55-60 (generating signatures based on spectral data is well known); 13:37-45 (an FFT is a well-known mathematical operation used to determine the energy, or "spectral power," of individual frequency components of a signal).

Moreover, none of the purported "improvements" argued by Nielsen are recited in the claims; instead, they are based on the conclusory statements of Nielsen's experts. *See* D.I. 384 at 10-11 ("First . . . improving the accuracy of matching monitored signatures with reference signatures in the database [and] [s]econd . . . enable[ing] improved signature matching."); *see also id*. at 4-5. Because they are not recited in the claims, none are relevant to the *Alice* step 1 analysis. *See ChargePoint, Inc. v. SemaConnect, Inc.*, 920 F.3d 759, 765-66 (Fed. Cir. 2019) (the focus of the claims must be reflected in the claim limitations).

Although Nielsen argues that the claims "recite a solution to the prior art problem of signature robustness against noise" (Br. at 7), the word "noise" is not found in the specification, and the claims do not recite any such "solution." The claims do not recite "a sign-based approach that compares a pair of frequency components to each other—producing a noise-resistant signature." *Id.* Moreover, although Nielsen argues that the claims "recit[e] a sign-

---

[1] *See, CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d 1358, 1368 (Fed. Cir. 2020) ("claim 1 of the '207 patent is directed to an improved **cardiac monitoring device**") (emphasis added); *Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1339 (Fed. Cir. 2016) (claiming "[a] self-referential table [that] is a specific type of data structure designed to improve the way **a computer stores and retrieves data in memory**") (emphasis added).

based approach," Nielsen does not explain what claim language supports its argument.  Indeed, a simple word search of the '889 patent reveals that the words "sign-based" are nowhere found in the claims or the specification of the '889 patent.

Nielsen claims that using overlapping frames solves the problem of the difficulty in synchronizing the monitored and reference signatures. *See* D.I.384 at 5, 7 (citing to Nielsen SAF ¶¶ 9-11, which in turn cite to '889 patent, Ex. 1, 12:47-51, 13:2-5).  But the parts of the '889 patent specification Nielsen cites say nothing about overlapping frames. Moreover, the '889 patent admits that overlapping frames are not new: they are part of the "sliding FFT," which was known in the art. Ex. 1, 13:46-67 ("As will be appreciated by one having ordinary skill in the art . . . a sliding FFT involves generating FFT data for an audio sample frame by updating the FFT data generated in connection with a previous audio sample frame."). The '889 patent itself cites to a prior art reference regarding the advantages of a sliding-mode Fourier transformation. *See* Ex. 1 at 2 (referring to Conner, Margery, "Advantages of the Sliding-Mode DFT, www.edn.com, Jan. 9, 2002 (1 page))."  Nielsen also claims that comparing two frequency components solves the problem of signature robustness against noise, but the patent specification itself does not characterize this as new; in fact, it admits that the only differentiation over the prior art is the single-frame processing that Nielsen now seeks to read out of the claim. *See* Ex. 1: 2:56-65 ("Unlike known methods in the prior art that use interframe operations (e.g., operations based on sample data within different data sample frames) to generate digital spectral signatures, the methods and apparatus described herein may be implemented using intraframe operations (e.g., operations based on sample data within a single frame). Intraframe operations may include, for example, comparison operations, determining percentage differences between values, etc. that are performed on two or more values (e.g., spectral power values) that are uniquely associated with or derived from a single frame."). In contrast to the specification, Nielsen's argument at pages 5-7, including the opinions of

Nielsens experts, is disconnected from the claims and specification. *TecSec, Inc. v. Adobe, Inc*, 978 F.3d 1278, 1292 (Fed. Cir. 2020); *Hawk Tech. Sys., LLC v. Castle Retail, LLC*, 60 F.4th 1349, 1358 (Fed. Cir. 2023) ("the analysis at step one 'must focus on' the claim language.").

*California Institute of Technology v. Broadcom Ltd.*, 25 F.4th 976 (Fed. Cir. 2022), cited by Nielsen at page 8, is distinguishable on its facts. First, the Court noted that the briefing on the ineligibility issue in that case was "cursory and relied solely that claim 13 is ineligible because it depends on mathematical operations." The Court found that the claim was directed to more than a mathematical formula "because it is directed to an efficient, improved method of encoding that relies in part on irregular repetition." Thus, TVision submits that *California Institute* should be cabined to its facts, which are not the same as the facts in this case. In that regard, there is no merit to Nielsen's argument at page 10 of its brief that the claims of the '889 patent recite "an improved technological process." In fact, the '889 patent admits that the only thing that distinguishes the claims over the prior art are the use of single frame processing and the use of overlapping frames, the latter being well-known. Ex. 1, 2:55-61.

Nielsen misses the mark when it argues that the asserted claims survive *Alice* step 1 because they recite specific solutions, rather than results. *See* D.I. 384 at 7-8. *McRO, Inc. v. Bandai Namco Games Am. Inc.,* 837 F.3d 1299, 1312-14 (Fed. Cir. 2016) does not support Nielsen's proposition that "claims that recite specific technological solutions to prior art problems, rather than merely claiming a desired result, are patent-eligible at *Alice* step one." *Id*. at 7-8. In *McRO*, the patent was found to be eligible because the patentee identified an alleged concrete technological improvement applicable to a computing device. 837 F.3d at 1313 (claiming the automatic use of particular rules to set morph weights and transitions between phonemes used for 3-D animation devices). As explained above, Nielsen has not identified a single improved computing device in representative claim 1. Moreover, the steps in representative claim 1 do not say *how* to do any of the following: (1) select two overlapping

frames of media sample data; (2) perform a mathematical spectral transform operation on a single frame that results in the generation of two frequency components having spectral powers; (3) compare spectral powers of the two frequency components to determine a descriptor; and (4) calculate a signature based on the descriptor.  Omitting *how* to perform these steps leaves only the abstract mathematical algorithms which, as demonstrated by TVision using intrinsic evidence, are invalid.  *See* D.I.335 at 7-11.

Even if the representative claim 1 did recite the steps of performing a solution, an abstract solution (*i.e.*, a mathematical algorithm) of calculating a signature still fails *Alice* step 1.  *See Parker*, 437 U.S. at 595 ("if a claim is directed essentially to a method of calculating, using a mathematical formula, even if the solution is for a specific purpose, the claimed method is nonstatutory"); *SAP Am., Inc. v. InvestPic, LLC,* 898 F.3d 1161, 1166 (Fed. Cir. 2018) ("mathematical calculations and formulas are not patent eligible").  In this regard, what Nielsen claims as improvement solution, *i.e.*, comparing two frequency components based on a single frame from overlapping frames, is merely the abstract idea of restricting the mathematical calculation of using two numbers from the same range – it amounts to no more than the details of the abstract mathematical algorithm of calculating signatures.  *See RecogniCorp, LLC v. Nintendo Co.,* 855 F.3d 1322, 1327 (Fed. Cir. 2017) ("Adding one abstract idea (math) to another abstract idea (encoding and decoding) does not render the claim non-abstract."); *ClearDoc, Inc. v. RiversideFM, Inc.,* 2022 WL 6066798, at *5 (D. Del Feb. 22, 2022) ("In sum, the recording, storing, delivering, and deleting of media content on a mobile device is an abstract idea".  Remote control is an abstract idea.  The piling of abstract ideas upon each other does not save the [patent at issue] at Alice step one.").

Lastly, Nielsen's argument that the '889 patent does not preempt the field, (D.I. 384 at 8), even if true, would not make the claims patent eligible.  "While preemption may signal patent ineligible subject matter, the absence of complete preemption does not demonstrate

8

patent eligibility.*" Ariosa Diagnostics, Inc. v. Sequenom, Inc.*, 788 F.3d 1371, 1379 (Fed. Cir. 2015). While preemption is a motivating concern for the Supreme Court's patentability analysis, preemption is not the test for patent eligibility. *See id.* ("Where a patent's claims are deemed only to disclose patent ineligible subject matter under the *Mayo* framework, as they are in this case, preemption concerns are fully addressed and made moot.").

### 3. Case Law Confirms That the '889 Patent Claims Are Ineligible

Nielsen's reliance on its expert's conclusory opinion is insufficient to demonstrate a technological improvement. "[S]tep one of the *Alice* framework does not require an evaluation of … facts outside of the intrinsic record." *CardioNet, LLC v. InfoBionic, Inc.*, 955 F.3d at 1374; *see also ThroughTEK Co., Ltd. v. Reolink Innovation Inc.*, C.A. No. 23-218-GBW, 2024 WL 1701841 at *6-9 (D. Del. Apr. 19, 2024) (granting defendants' motion to dismiss and rejecting plaintiff's proposed improvements not found in patent specification and claims). Nielsen's argument regarding the use of overlapping claims to solve the problem of signature synchronization and matching (Br. at 11) ignores the fact that, as the specification admits, this was a known function of a sliding FFT. Nielsen's sole reliance on the specification is taken out of context. *Compare* D.I.384 at 10 *with* '889 patent at 12:47-51, 13:2-5.

### C. *Alice* Step 2: The Claims Fail to Recite an Inventive Concept

Contrary to Nielsen's argument at page 15, TVision included the relevant material facts in its concise statement of facts ("CSOF") to support its § 101 motion: *i.e.*, the claim language (the focus of the Section 101 analysis) and routine/well-known claim elements.[2] *See* D.I. 354

---

[2] Nielsen's request of the Court to enter *sua sponte* summary judgment in its favor (Br. at 15) is contrary to law. "[T]he *sua sponte* grant of summary judgment, without giving notice to the parties, is not the preferred method by which to dispose of claims." *See Gibson v. Mayor and Council of Cty. of Wilmington*, 355 F.3d 215, 224 (3d Cir. 2004). Here, Nielsen did not move for summary judgment of validity, and the Court has not given notice to TVision that it would consider such a summary judgement. Further, Nielsen's request is based on its self-serving additional facts, mostly consisting of Nielsen's own expert's conclusory statements.

at ¶¶ 1-20; 60 F.4th at 1358 (Fed. Cir. 2023) ("the analysis at step one 'must focus on' the claim language."). Unlike *Prolitec Inc. v. ScentAir Techs, LLC*, 770 F.Supp.3d 730, 746-47 (D. Del. 2025), which Nielsen cites on page 15 of its brief, TVision's CSOF includes all of the necessary material facts regarding non-abstract claim elements. *See* D.I. 354 at ¶¶ 1-20.

At pages 16-17 of its brief, Nielsen recycles the same alleged improvement arguments. *See* D.I.384 at 16-17. Those arguments do not preclude summary judgment in view of the undisputed material facts. *See Bot M8 LLC v. Sony Corp. of Am.*, 465 F. Supp. 3d 1013, 1024 (N.D. Cal. 2020), *aff'd*, 4 F.4th 1342 (Fed. Cir. 2021) (holding claims ineligible at summary judgment and stating "the [patentee] experts' bare assertions that the steps recited [] were unconventional in the field … remain unsubstantiated conclusions entitled to no weight"). In fact, Nielsen's expert's conclusory statement cannot raise an issue of material fact under *Alice* step 2. *See Mortgage Grader, Inc. v. First Choice Loan Servs., Inc.*, 811 F.3d 1314, 1325-26 (Fed. Cir. 2016) (holding that expert declaration did not raise issue of fact under § 101 where expert analysis provided nonmaterial opinions not tied to specific limitations of the claims); *KOM Software Inc. v. NetApp, Inc.*, No. CV 23 18-160-WCB, 2023 WL 6460025, at *11 (D. Del. Oct. 4, 2023) (noting that under *Alice* step two, "what is required is for the patentee to point to the alleged improvement, consisting of an inventive concept that is embodied in the claims and described and enabled by the specification").

Nielsen claims that TVision's summary judgment motion should be denied because TVision does not address the portions of the claim elements related to the purported improvements. *See* D.I.384 at 17. The simple answer is that none of the claim limitations are directed to the purported "improvements." Nielsen's CSOAF nos. 7-8 and 11-14 relating to such "improvements" relies on its expert, but do not cite any parts of the claims or specifications. Further, the use of overlapping frames cited by Nielsen in CSOAF 9-10 was not new, as admitted in parts of the specification that Nielsen does not cite. *See,* Ex. 1, 13:47-

67 (stating that "a sliding FFT involves generating FFT data for an audio sample frame by updating the FFT data generated in connection with a previous audio sample frame," which the specification admits is "appreciated by one having ordinary skill in the art," meaning none of this was new).    Although Nielsen argues at page 17 that "inventive use of conventional computer technology does not preclude finding an inventive step," Nielsen provides no evidence that any technology is used in an unconventional manner. *See, e.g., In re TLI Commc'ns LLC Pat. Litig.*, 823 F.3d 607, 614 (Fed. Cir. 2016) (finding that a server was generic where "the server simply receives data, 'extract[s] classification information ... from the received data,' and 'stor[es] the digital images ... taking into consideration the classification information'").    Nielsen misplaces reliance on *Amdocs (Israel) Ltd. v. Openet Telecom, Inc.,* 841 F.3d 1288, 1300, 1306 (Fed. Cir. 2016). D.I.384 at 17. Unlike this case, the patent claims in *Amdocs* recited an "unconventional technological solution (enhancing data in a distributed fashion) to a technological problem (massive record flows which previously required massive databases)," specific to improving computer network functionality. Here, no technological improvement can be found in the recited generic processor.

Thus, there is no inventive concept under step 2 of *Alice.* The steps in representative claim 1 are nothing more than an abstract mathematical algorithm, which is insufficient to provide the requisite inventive concept.  *See Trading Techs Int'l, Inc. v. IBG LLC*, 921 F.3d 1084, 1093 (Fed. Cir. 2019).

### III.    NIELSEN'S PROPOSED CLAIM CONSTRUCTION CONTRADICTS ITS PREVIOUS POSITION AND IS INCORRECT

When Nielsen opposed TVision's prior motion for summary judgment for patent ineligibility under section 101, *Nielsen represented to this Court that its claims "do not cover . . . systems . . . that use interframe (i.e., multiple frame) processing*." (D.I. 201 at 18) (emphasis added). As a result, when it granted Nielsen's motion to substitute experts, this Court recognized in its opinion that it is "undisputed that the asserted claims of the patent-in-suit . . .

11

require that frequency components be processed within a single frame (the 'single frame limitation')." D.I. 272 at 2. Nielsen has now flipped its position, arguing that its claims do cover systems that use interframe processing, as long as those interframe comparisons may sometimes involve multiple frequency components from one or more frames. Nielsen's present position is illogical. It would mean that all interframe processing is also intraframe processing. Nielsen's present claim construction position should be rejected.

### A. The Claim Language and Specification Limit the Claims to Intraframe Processing, Notwithstanding Nielsen's Arguments Regarding "Comprising" and Claim Differentiation

The claim language itself requires processing spectral values to determine a descriptor within a single frame. The specification distinguishes the invention from the prior art because the invention is limited to single frame processing: "Unlike known methods in the prior art that use interframe operations (e.g., operations based on sample data within different data sample frames) to generate digital spectral signatures, the methods and apparatus described herein may be implemented using intraframe operations (e.g., operations based on sample data within a single frame)." Ex. 1, 2:56-3:5.

Nielsen now attempts to skate away from its prior stipulation, arguing that the word "comprising" in the preamble somehow expands the meaning of individual terms within the claims. Br. at 19-20. Not true. "[T]he word 'comprising' appearing at the beginning generally allows for additional, unclaimed steps in the accused process, but each claimed step must nevertheless be performed as written." *David Netzer Consulting Eng'r LLC v. Shell Oil Co.*, 824 F.3d 989, 998 (Fed. Cir. 2016) (cleaned up), quoting *Dippin' Dots, Inc. v. Mosey*, 476 F.3d 1337, 1443 (Fed. Cir. 2007). Thus, the "'enumerated steps must . . . all be practiced as recited in the claim for a process to infringe." *Id.* This means that the "presumption raised by the term 'comprising' does not . . . render every word and phrase [in each step] open-ended.'" *Id.*

Each step of each claim requires that the processing be done in a single frame. The first three steps of claim 1, for example, recite: "obtaining a first frame"; "identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform on the first frame," and "determining a first descriptor of the first frame." Ex. 1 26:5-15. The claim limitation at issue recites in its entirety, "determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power." *Id*., 26:12-14. The previous limitation recites that those two spectral powers come from "performing a spectral transform operation on the first frame." *Id.,* 26:8-11) (Thus, the claim requires that the descriptor be determine from a comparison of two spectral values from the same frame.

Nielsen's claim differentiation argument does not distinguish any of the Federal Circuit decisions cited in pages 27-28 of TVision's brief, each of which holds that claim differentiation cannot change the meaning of claim terms. At most, "claim differentiation is a useful analytic tool." *Fenner Invs., Ltd. V. Cellco P'ship*, 778 F.3d 1320, 1327 (Fed. Cir. 2015). But "it cannot enlarge the meaning of a claim beyond that which is supported by the patent documents." *Id.* Here, the claim term at issue can be construed in only one way in the context of the specification, *i.e.*, the descriptor is created from comparing two spectral powers in a single frame, which excludes a process that compares values across multiple frames. In *Poly-America, L.P. v. API Industries, Inc*., 839 F.3d 1131, 1137 (Fed. Cir. 2016), the Federal Circuit rejected a similar claim differentiation argument, stating that "claim differentiation does not serve to broaden claims beyond their meaning in light of the patent as a whole, and it cannot override clear statements of claim scope found in the specification and prosecution history." *Id.* Here, claim 5 recites that "the first descriptor is associated with only the first frame." The specification defines intraframe operations to be "operations based on sample data within a single frame," which include "comparison operations. . . that are performed on two or more

13

values (e.g., spectral power values) that are uniquely associated with . . . a single frame." Ex. 1, 2:59-65. Claim 1 defines the "first descriptor of the first frame" as being created from a comparison of two spectral powers from the first frame. Thus, the language of claim 1 defines the first descriptor as being "associated with" the first frame because the first descriptor is completely derived from the first frame. Thus, claim 5 does not add any meaningful limitation to claim 1, and is redundant of claim 1.

Nielsen's argument is precluded by other parts of the specification, which "is the primary basis for construing the claims." *Phillips v. AWH Corp.*, 415 F.3d 1303, 1315 (Fed. Cir. 2005) (en banc). The specification distinguishes the claimed invention from the prior art precisely because the claimed invention uses ***intraframe operations***, not ***interframe operations***:

> ***Unlike known methods in the prior art that use interframe operations*** (e.g., ***operations based on sample data within different data sample frames***) to generate digital spectral signatures, ***the methods and apparatus described herein may be implemented using intraframe operations*** (e.g., ***operations based on sample data within a single frame***). Intraframe operations may include, for example, comparison operations, determining percentage differences between values, etc. that are performed on two or more values (e.g., spectral power values) that are uniquely associated with or derived from a single frame. For example, ***using the methods and apparatus described herein, a digital spectral signature may be generated by obtaining a frame of media samples***, determining spectral power values by performing a spectral transform (e.g., a FFT, a wavelet transform, etc.) on the frame of media samples, ***and performing an intraframe operation (e.g., a comparison) based on two or more spectral power values that are uniquely associated with the frame of media samples***."

Ex. 1, 2:55-3:5 (emphasis added). Further, the specification discloses in pointed language that every single embodiment uses the ***single frame operations*** that Nielsen stipulated were covered by the claims:

> In one example, an N-bit monitored signature Sx(t) is formed using one or more M-bit descriptors Bx(t0), Bx(t0+1), Bx(t0+2), Bx(t0+3). For example, a32-bitmonitored signature Sx(t) ***includes four 8-bit descriptors*** Bx(t0), Bx(t0+1), Bx(t0+ 2), Bx(t0+3), ***each of which is generated based on a corresponding one of the audio sample frames*** 204,206,208, and 210. More specifically, ***each of the descriptors is generated using one or more intraframe operations*** (e.g.,

14

comparison operations) based on two or more spectral components *that are uniquely associated with a single audio sample frame*.

Ex. 1, 7:62-8:4 (emphasis added).

> As described below in connection with FIG. 5, each of the reference descriptors is generated using one or more operations (e.g., comparison operations) based on two or more spectral components that *are both associated with the same audio sample frame*. These operations are *referred to as intraframe operations because they are performed using data exclusive to a single audio frame and are not dependent on sample data collected over other audio frames*.  During an example sample acquisition process, the sample segments 312a-312e are collected and are used to form the first audio sample frame 304, which is subsequently used to determine a descriptor. This descriptor is then used to form part of a first reference signature.

Ex. 1, 11:16-28 (emphasis added).  *See also* 16:19-27 (determining each bit of the descriptor based on intraframe comparisons of the spectral powers); 16:32-34 ("the frequency components may be selected from any location in the frequency spectrum of an audio sample frame"); 17:53-57 ("the M-level wavelet decomposition is implemented as an intraframe operation").  Tellingly, there are no examples of interframe operations in the specification of the '889 patent, and Nielsen cites none.

At page 22 of its brief, Nielsen quotes but fails to distinguish *Retractable Techs., Inc. v. Becton Dickinson & Co.*, 653 F.3d 1296, 1306 (Fed. Cir. 2011). There, the court reversed the trial court and construed "body" to be limited to a one-piece body: "while the claims leave open the possibility that the recited 'body' may encompass a syringe body composed of more than one piece, the specifications tell us otherwise. They . . . expressly distinguish the invention from the prior art based on this feature and only disclose embodiments that are expressly limited to having a body that is a single piece." *Id.* at 1305. The Court concluded, "a construction of 'body' that limits the term to a one-piece body is required to tether the claims to what the specifications indicate the inventor actually invented." The same principle applies here.

Moreover, Nielsen does not distinguish *Trs. Of Columbia Univ. v. Symantec Corp.*, 811 F.3d 1359, 1363-64 (Fed. Cit. 2016), cited on page 25 of TVision's opening brief, where the Court emphasized that it "does not require explicit redefinition or disavowal" (*id.* at 1363), and "the patentee's choice of preferred embodiments can shed light on the intended scope of the claims." *Id.* at 1364. In *Columbia*, the Court construed "normal computer system usage" to mean "typical attack-free computer system usage," relying on the specification. *Id.* at 1367. The Court found that "according to the patentee's own words in the specification, claimed 'probabilistic model of normal computer system usage' the claim term is built using only attack-free data," noting that "[n]othing in the specification describes any embodiment which uses attack data to build the model." *Id.* at 1368. Both *Retractable Tech.* and *Columbia* demonstrate that the inventor's consistent description in the specification can limit the scope of a claim term. In this case, the claim language itself is limited to intraframe processing, which is consistent with the specification. *See also, Regeneron Pharms., Inc. v. Mylan Pharms., Inc.*, 130 F.4th 1372, 1383 (Fed. Cir. 2025) (affirming a narrower construction of a term, despite no clear disavowal, because the claim "arose from a specification that clearly and repeatedly describes" that term in a particular manner "and does not explain or suggest" the broader construction argued for (cleaned up)); *see also Sound View Innovations, LLC v. Hulu, LLC*, 33 F. 4th 1326, 1333 (Fed. Cir. 2022) (affirming a construction, at least in part, because "the specification nowhere says that the invention includes use of separate buffers . . ., and it nowhere illustrates or describes such embodiment"). The specification differentiates the invention from prior art systems that used inter-frame processing and includes no embodiments of the invention that employ inter-frame processing.

Nielsen also ignores a key point that is fatal to its argument: multiple frame processing is the polar opposite of the single frame processing recited in the claims. When a claim step

16

requires processing within a single frame, as the parties previously agreed the claims at issue do, it must necessarily exclude processes that engage in the same step over multiple frames.

### B.  Nielsen's Litigation Waiver is Unmistakable

Nielsen concedes that "the parties always have agreed that all claims of the '889 patent require intraframe processing." Nielsen Br. at 24.  Although Nielsen now contends that the parties' agreement "says nothing about ***excluding*** interframe processing," an interpretation of the claims "require intraframe processing" but do not exclude interframe processing makes no sense. Further, Nielsen previously argued that the claims "***do not cover . . . systems . . . that use interframe (i.e., multiple frame) processing***." (D.I. 201 at 18) (emphasis added).

First, there is no merit to Nielsen's attempt to cabin its prior agreement only for the purposes of TVision's § 101 motion. Claims are not construed one way for purposes of § 101 and another way for infringement. Second, Nielsen's attempts to explain its previous positions (Br. at 25) ignore the fact that Nielsen made those statements to tout the benefits of intraframe processing, when Nielsen incorrectly believed that the accused ACR system used intraframe processing.  Now that Nielsen understands that the accused system does not use intraframe processing, it sings a different tune.  Third, Nielsen essentially admits at pages 26-27 of its brief that it has taken inconsistent positions.  Nielsen argues that it should not be judicially estopped because this Court did not rule on the claim construction issue.  But TVision does not seek judicial estoppoel. It is the doctrine of *waiver* that precludes Nielsen from changing its claim construction position at this stage of the case.    Waiver is defined as the voluntary and intentional relinquishment or abandonment of a known legal right or advantage. *See Novartis Pharms. Corp. v. Eon Labs Mfg.*, 206 F.R.D. 396, 398 (D. Del. 2002). Waiver can also be "established by conduct inconsistent with claiming the waived right or any action or failure to act evincing an intent not to claim the right." *Evcco Leasing Corp. v. Ace Trucking Co.*, 828 F.2d 188, 195 (3d Cir. 1987).  When Nielsen thought that getRowMax processed only a single

frame and was attempting to avoid section 101 invalidity, it argued that the claims "do not cover . . . systems . . . that use interframe (*i.e.*, multiple frame) processing." (D.I. 201 at 18). If the claims potentially had a broader meaning, Nielsen waived it with that argument.

## IV.    NIELSEN HAS NOT PROVED INFRINGEMENT

Nielsen asserts, "[u]nder the proper construction of the claims, it does not matter if TVision elsewhere performs interframe comparisons in addition to performing the recited intraframe comparison."  As we have demonstrated, however, Nielsen's claim construction is wrong, and thus, its infringement argument fails.

But even if the Court were to agree with Nielsen's claim construction argument, Nielsen cannot prove infringement. In paragraph 70 of his rebuttal report, Dr. Anderson states, "███████

███████████████████████████████

███████████████████████████████

███████████████████. * * * Dr. Kyriakakis and Dr. Martin agree. Kyriakakis Report at ¶¶126 ("████████████████████

██████████████████████████████."); 127 ("█████████████████████████████

██████████████████ Martin Report at ¶71." Anderson Rebuttal Report ¶ 70.

In paragraph 143 of Dr. Martin's report, which Nielsen cites on page 27 of its brief, Dr. Martin says that ███████████████████████████████████████████████████████████████████████████████████" But neither Dr. Martin nor Dr. Kyriakakis disputes that, to find the single frame having the "local maxima," TVision's system processed ████████. What Dr. Martin's testimony really means is that ████████████████████████████████████████████████. That is not intraframe processing as required by the claim.  Nielsen is wrong

when it contends that the asserted claims cover TVision's process of determining a descriptor using data from ███████. Nielsen agrees that TVision's ACR software determines a ████████████████████████████████████████████████████████████. Nielsen concedes that the majority of descriptors are created using data from multiple frames. Nielsen contends that TVision infringes, however, because occasionally, as a function of the data being processed, the two highest values in the ████████ window may potentially come from within a single frame. However, properly considered, the descriptor still comes from a process that reviews data from ███████, not a single frame.

There is no merit to Nielsen's argument that TVision's SOF #19 only relates to claim 1. The same limitation regarding the descriptor permeates all of the asserted claims in this case. *See* independent claim 1 ("determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power"); independent claim 8 ("determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power"); independent claim 14 ("determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power"). Ex. 1.

## V.    TVISION'S DAUBERT MOTIONS REGARDING DR. KEELEY'S OPINIONS SHOULD BE GRANTED

### A. Dr. Keeley's Lost Profits Opinions Should Be Excluded

Nielsen inaccurately describes TVision's motion. TVision has moved to exclude Dr. Keeley's testimony relating to revenues that ██████████████████████████████. This is because the alleged ████████ occurred five years after the date of the hypothetical negotiation. First, Nielsen could not have contemplated in 2018 that ████████████████ ████████ that are the subject of Dr. Keeley's opinion. Second, there is no evidence that ████████ ████████████████ because TVision used the accused ACR software, instead of non-infringinging ACR Software. Third, ████████████████████████████████████████████████

██████    Fourth, Dr. Keeley fails to apportion the ████████ to the patented feature. In this regard, the cases Nielsen cites are inapposite.

At page 29 of its brief, Nielsen misinterprets *Asetek Danmark A/S v. CMI USA Inc.*, 852 F.3d 1352, 1362 (Fed. Cir. 2017). In *Asetek*, the plaintiff's damages expert relied in part on the plaintiff's per-unit profit margin under its license agreement on the patented product with another company to calculate a reasonable royalty. 852 F.3d at 1362. Here, in sharp contrast, ████████████████████████████████████. And in *Asetek*, the damages expert "adjusted her hypothetical-negotiation model to account for numerous considerations other than [plaintiff's] per unit profits, including 'the nature and scope of the license' at issue." *Id.* at 1363. Thus, *Asetek* does not support Nielsen's argument. Nor does the Connecticut case, which Nielsen cites on the same page, which this District is not required to follow.[3]

Nielsen's argument at page 29-30 to the effect that Dr. Keeley accounts for acceptable non-infringing alternatives ignores the fact that his testimony is based on the opinion of Dr. Kyriakakis, whose testimony should be excluded under Fed. R. Evid. 702(b) because Dr. Kyriakakis has not demonstrated any familiarity with the non-infringing alternatives that TVision considered before the date of the hypothetical negotiation. *See* D.I. 355 at 41-47.

There is no merit to Nielsen's argument on page 30 to the effect that the *Panduit* factors are not applicable to a reasonable royalty analysis. In *Mentor Graphics Corp. v. Eve-USA, Inc.,* 851 F.3d 1275, 1287-88 (Fed. Cir. 2017), cited at page 38 of TVision's opening brief, the Court left no doubt that the *Panduit* factors are relevant to apportionment: "Panduit's requirement that patentees prove demand for the product as a whole and the absence of non-infringing

---

[3] In *FloodBreak LLC v. Art Metal Indus., LLC*, No. 3:18-cv-503 (SRU), 2020 WL 6060974 at *16 (D. Conn. Oct. 13, 2020), the court permitted testimony of lost profits in connection with the expert's reasonable royalty analysis where there was evidence to support it. In this case, Dr. Keeley's "lost profits" analysis refers obliquely to ████████████████████████ and does not apportion the ████████████ due to the alleged infringement.

alternatives ties lost profit damages to specific claim limitations and ensures that damages are commensurate with the value of the patented features." *Id.* The cases cited by Nielsen on page 30 of its brief are not to the contrary. In *MiiCS & Partners, Inc. v. Funai Elec. Co.*, 2017 U.S. Dist. LEXIS 201511 at *10, 2017 WL 6268072 (D. Del. December 7, 2017), the Court excluded an expert's testimony for failure to apportion between the patented and unpatented feature. Although the case quotes *Asektek* at *13, it does not excuse a total lack of any analysis, such as in Dr. Keeley's report, separating the patented features from non-patented features. Dr. Keeley's report should be excluded for the same reasons expressed in *MiiCS.* In *Siemens Mobility, Inc. v. Westinghouse Air Brake Techs. Corp.*, 2019 U.S.Dist. LEXIS 213, 2019 WL 9698520, at *14 (D. Del. Jan. 2, 2019), the Court denied a motion for reconsideration, finding that the expert's "failure to account for the alternative actions[defendant] would foreseeably had undertaken had it not infringed is a fatal flaw in his application of *Panduit*." *Id.* The Court in *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 2018 U.S. Dist. LEXIS167104 *19, 2018 WL 4691047 (D. Del. Sept. 28, 2018),[4] excluded an expert's testimony regarding a two-supplier market because it was "divorced from any economic analysis" and excluded his testimony regarding a reasonable royalty for "failure to account for apportionment." *Id.* at *20. The Federal Circuit decisions cited by Nielsen were decided before *Mentor Graphics* and do not address the issue.

### B. Dr. Keeley's Opinion Is Inherently Incredible

Nielsen fails to explain why a start-up company that essentially had ▮▮▮▮▮▮ and no demonstrable means to make a payment of ▮▮▮▮▮▮ would have agreed to

---

[4] On appeal, the Federal Circuit affirmed the expert's royalty rate based on an analysis of comparable licenses, which "could reasonably be found to incorporate the required apportionment." *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, 967 F.3d 1353, 1377 (Fed. Cir. 2020).

make a ████████████████████████████████ at the time of the hypothetical negotiation.  Dr. Keeley's opinion should be excluded under Fed. R. Evid. 702(b), (d).

### C.  Dr. Keeley's Nash Bargaining Solution Opinion Should Be Excluded

There is no merit to Nielsen's argument regarding a "50/50 split of the profits resulting from TVision's use of the patented technology." Br. at 32.  Nielsen's assumption that 50% of TVision's profits resulted from TVision's use of the patented technology fails to apportion profits attributable to the infringement. Thus, Nielsen's argument, and Dr. Keeley's testimony are fatally flawed, and Dr. Keeley's Nash Bargaining Solution opinion should be excluded. Dr. Keeley's opinion is based on the false premise that TVision had no available, acceptable non-infringing alternatives. Nielsen is wrong on the facts and wrong on the law.  *See* D.I. 355 at 35-37.  Simply put, the '889 patent admits that non-infringing alternatives existed prior to the invention.  Ex. 1 at 1:20-28.  And contemporaneous evidence demonstrates that TVision had several other ACR systems available to it. D.I. 355 at 42-44.

### D.  Dr. Keeley's Opinion Should Be Excluded for Failure to Apportion

Contrary to Nielsen's arguments at pages 35-36, apportionment is a requirement, not an option.  "[W]here multicomponent products are involved, the governing rule is that the ultimate combination of royalty base and royalty rate must reflect the value attributable to the infringing features of the product, and no more." *Pavo Solutions LLC v. Kingston Tech. Co.*, 35 F.4th 1367, 1380 (Fed. Cir. 2022), quoting *Ericsson, Inc. v. D-Link Sys.*, 773 F.3d 1201, 1226 (Fed. Cir. 2014).  *See also*, *MLC Intellectual Prop., LLC v. Micron Tech., Inc.*, 10 F.4th 1358, 1373-74 (Fed. Cir. 2021), and cases cited therein, where the Court excluded an expert opinion on reasonable royalty for failure to apportion.  Here, TVision sells data derived from a device that includes a camera and microphone that tracks whether household members are paying attention to TV programming.  The ACR software at issue here merely identifies the program that the users are watching. At most, the '889 patent covers a minor improvement in ACR software. It

does not cover the device or the software TVision uses to collect and process the attention data that TVision markets. Dr. Keeley's failure to apportion is fatal.

Nielsen's reliance on Dr. Keeley's application of the *Georgia Pacific* factors at pages 36-38 is flawed. Dr. Keeley erroneously assumes that TVision had no non-infringing alternatives to the ACRCloud software. The '889 patent, itself, says otherwise. *See* Ex. 1 at 1:20-28; *see also*, D.I. 355 at 42. For the same reason, Nielsen's convoyed sales argument at 37-38 fails, as Dr. Keeley premises his convoyed sales discussion on the incorrect premise that TVision had no non-infringing alternatives. *See* Keeley Report at ¶ 102.

### E. Dr. Keeley Does Not Assume ███████████████████



Nielsen admits that "Dr. Keeley observed that ████████████████████ ██████████ but attempts to cabin it "in the context of *Georgia Pacific* Factor No. 4," citing paragraph 94 of Dr. Keeley's report. That is not the only part of Dr. Keeley's report where he states that ████████████████████. *See* Ex. 9, ¶ 18 ("████████████ ████████████████████████████████████████████."); *Id.* at ¶ 61 ("████████████████████████████████████████ ████████████████████████████████"). Dr. Keeley's opinion should be excluded under Fed. R. Evid. 702(c).

### VI.  NIELSEN'S EXPERTS SHOULD BE EXCLUDED FROM OFFERING OPINIONS REGARDING NON-INFRINGING ALTERNATIVES

Dr. Keeley relies on Dr. Kyriakakis for his opinion that there were no non-infringing alternatives available to TVision. Dr. Kyriakakis, however, fails to establish that he is sufficiently familiar with the systems that TVision actually considered during the time period in which TVision finally chose ████████ as its ACR software vendor, and his opinion should be excluded under Fed. R. Evid. 702(b). Nielsen's argument that "TVision offers no more than the bare names of the companies ████████ recommended" (Br. at 42), ignores the fact that ████████ CEO recommended those companies because she was familiar with them and

because she believed that ███████ could also use their ACR software.  *See* D.I. 355 at 42-44. In this regard, ███████ CEO testified that ███████ uses the same ACR software as TVision to generate the so-called reference fingerprints.  Ex. 2, Bolivar Dep. at 19:11-20:6. So, when ███████ recommends an ACR software vendor, it was because ███████ CEO, who had 20 years of experience in that industry, believed that they were available and would work. *Id.* 48:1-49:10). Because Dr. Kyriakakis does not establish any foundation that he is familiar with the software that those companies were offering at the time.

Nielsen is mistaken when it argues that an expert does not need to have sufficient knowledge to offer an opinion.  "[T]he district court must determine 'whether the proffered testimony has a sufficiently 'reliable foundation' to permit it to be considered.'" *Amorgianos v. Amtrak*, 303 F.3d 256, 265 (2d Cir. 2002), quoting *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 597 (1993) ("the Rules of Evidence—especially Rule 702—do assign to the trial judge the task of ensuring that an expert's testimony . . . rests on a reliable foundation").  "[T]he language of Rule 702 requiring the expert to testify to scientific knowledge means that the expert's opinion must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation.'" *In re Paoli R.R. Yard PCB Litig.*, 35 F.3d 717, 742 (3rd Cir. 1994) (quoting *Daubert*, 509 U.S. at 590). The proponent of the expert testimony has the burden of establishing its admissibility by a preponderance of the evidence. *Padillas v. Stork—Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir. 1999).  Dr. Kyriakakis's opinion is not based on any personal experience, supporting data, or evidence.  He has no personal experience with or knowledge of any of the alternative ACR systems that were recommended to TVision by ███████ *See* D.I. 355 at 44-47.  His opinion should be excluded under Fed. R. Evid. 702(b).

At page 47 of its brief, Nielsen fails in its attempt to minimize the admission in the '889 patent regarding prior art methods for generating fingerprints.  The '889 patent specifically states, "[i]dentifying media information and more specifically audio streams (e.g., audio

24

information) using signature-matching techniques is well known." Ex. 1, 1:21-23. Contrary to Nielsen's argument, the '889 patent makes it abundantly clear that such signature-matching methods were in use in the prior art:

> Known signature-matching techniques ***are often used in television and radio audience metering applications*** and are implemented using several known methods for generating and matching   signatures.

*Id.* 1:23-25. Even if an alternative ACR system would have needed to be tested, as Nielsen argues, that does not establish that the alternative was not available. "The absence of testing, by itself, is not a sufficient basis to exclude [an expert's] opinion relating to [a] non-infringing alternative"

## VII.   OPINIONS REGARDING DR. MARTIN'S SIMULATION SHOULD BE EXCLUDED

According to Nielsen, Dr. Martin "generated the simulation because ▆▆▆▆▆▆▆ infringing code does not return information about whether intraframe comparisons occur in consecutive and overlapping frames." Br. at 49. Nielsen's justification is a non-sequitur; an "intraframe comparison" must occur in a single frame. Thus, any results from Dr. Martin's simulation are irrelevant. *ART+COM Innovationpool GmbH v. Google Inc.,* 155 F. Supp. 3d 489, 510 (D. Del. 2016) (Andrews, J.), and cases cited therein.

## VIII.   CONCLUSION

For the reasons set forth above and in TVision's opening brief, TVision's motions for summary judgment and to exclude evidence should be granted.

25

Respectfully submitted,

/s/ Andrew E. Russell
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Defendant Tvision Insights, Inc.*

OF COUNSEL:
Jason Xu
RIMÔN LAW P.C.
1990 K. Street, NW, Suite 420
Washington, DC 20006
(202) 470-2141

Eric C. Cohen
RIMÔN LAW P.C.
4030 Wake Forest Road, Suite 300
Raleigh, NC 27609
(984) 960-2860

Steig D. Olson
Sami H. Rashid
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
295 Fifth Avenue
New York, NY 10016
(212) 849-7000

Patrick D. Curran
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
11 Huntington Avenue, Suite 5200
Boston, MA 02199
(617) 712-7100

Adam B. Wolfson
QUINN EMANUEL URQUHART
 & SULLIVAN LLP
865 S. Figueroa Street, 10th Floor
Los Angeles, CA 90017
(213) 443-3000

Benjamin D. Brown
Richard A. Koffman
Daniel McCuaig
COHEN MILSTEIN SELLERS
 & TOLL PLLC
1100 New York Ave NW, Suite 800
Washington, DC  20005
(202) 408-4600

Dated: January 26, 2026

26

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on January 26, 2026, this document was served on the persons

listed below in the manner indicated:

**<u>BY EMAIL:</u>**

David E. Moore
Bindu A. Palapura
Malisa C. Dang
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
mdang@potteranderson.com

Clifford Katz
Nithya Damodharan
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800
ckatz@kelleydrye.com
ndamodharan@kelleydrye.com

Steven Yovits
Jason P. Greenhut
Douglas Lewis
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
(312) 857-7070
syovits@kelleydrye.com
jgreenhut@kelleydrye.com
dlewis@kelleydrye.com

Matthew Chakmakian
KELLEY DRYE & WARREN LLP
One Jefferson Road 2nd Floor
Parsippany, NJ 07054
(973) 503-5900
mchakmakian@kelleydrye.com

*/s/ Andrew E. Russell*
Andrew E. Russell (No. 5382)
Emily S. DiBenedetto (No. 6779)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
edibenedetto@shawkeller.com
*Attorneys for Defendant Tvision Insights, Inc.*

27

Ex. 1

# EXHIBIT 1

**Ex. 1**

US007783889B2

## (12) United States Patent
### Srinivasan

(10) **Patent No.:**     **US 7,783,889 B2**
(45) **Date of Patent:**     **Aug. 24, 2010**

(54) **METHODS AND APPARATUS FOR GENERATING SIGNATURES**

(75) Inventor: **Venugopal Srinivasan**, Palm Harbor, FL (US)

(73) Assignee: **The Nielsen Company (US), LLC**, Schaumburg, IL (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 199 days.

(21) Appl. No.: **11/676,452**

(22) Filed: **Feb. 19, 2007**

(65) **Prior Publication Data**

US 2007/0274537 A1     Nov. 29, 2007

**Related U.S. Application Data**

(63) Continuation of application No. PCT/US2005/029623, filed on Aug. 18, 2005.

(60) Provisional application No. 60/603,024, filed on Aug. 18, 2004.

(51) **Int. Cl.**
*H04L 9/00*     (2006.01)
(52) **U.S. Cl.** ......................... **713/179**; 713/176; 725/19; 725/20; 380/202; 380/239; 381/94.3
(58) **Field of Classification Search** ................. 713/160, 713/176, 179; 380/202, 206, 207, 239, 253, 380/229; 382/100, 232, 240, 191; 381/94.3; 375/134; 704/268, 273; 725/19, 20
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,230,990 A     10/1980  Lert, Jr. et al.

(Continued)

FOREIGN PATENT DOCUMENTS

AU     718227     11/1997

(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office, "PCT International Search Report," issued by the International Searching Authority of the United States Patent and Trademark Office on Feb. 6, 2008, in connection with a counterpart international application No. PCT/US2005/029623 (3 pages).

(Continued)

*Primary Examiner*—Nasser Moazzami
*Assistant Examiner*—Shanto M Abedin
(74) *Attorney, Agent, or Firm*—Hanley, Flight and Zimmerman, LLC

(57) **ABSTRACT**

Methods, apparatus, and articles of manufacture for media monitoring are disclosed. In particular, the example methods, apparatus, and articles of manufacture generate digital spectral signatures for use in identifying media information. Initially, a frame of media samples is obtained. A first frequency component having a first spectral power and a second frequency component having a second spectral power are identified by performing a spectral transform operation on the frame of media samples. A descriptor of the first frame of media samples is determined based on a comparison of the first spectral power and the second spectral power. A first signature is then generated based on the descriptor.

**17 Claims, 12 Drawing Sheets**



**Ex. 1**

## US 7,783,889 B2

Page 2

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,450,531 A | | 5/1984 | Kenyon et al. |
| 4,677,466 A | * | 6/1987 | Lert et al. ..................... 725/22 |
| 4,697,209 A | * | 9/1987 | Kiewit et al. .................. 725/19 |
| 4,739,398 A | | 4/1988 | Thomas et al. |
| 4,843,562 A | | 6/1989 | Kenyon et al. |
| 4,931,871 A | | 6/1990 | Kramer |
| 4,945,412 A | | 7/1990 | Kramer |
| 4,947,436 A | | 8/1990 | Greaves et al. |
| 5,019,899 A | | 5/1991 | Boles et al. |
| 5,436,653 A | | 7/1995 | Ellis et al. |
| 5,437,050 A | | 7/1995 | Lamb et al. |
| 5,450,490 A | * | 9/1995 | Jensen et al. ................ 380/253 |
| 5,481,294 A | | 1/1996 | Thomas et al. |
| 5,485,518 A | | 1/1996 | Hunter et al. |
| 5,504,518 A | | 4/1996 | Ellis et al. |
| 5,572,246 A | | 11/1996 | Ellis et al. |
| 5,581,658 A | | 12/1996 | O'Hagan et al. |
| 5,612,729 A | | 3/1997 | Ellis et al. |
| 5,621,454 A | | 4/1997 | Ellis et al. |
| 5,809,160 A | | 9/1998 | Powell et al. |
| 5,822,436 A | | 10/1998 | Rhoads |
| 5,826,164 A | | 10/1998 | Weinblatt |
| 5,875,122 A | | 2/1999 | Acharya |
| 5,909,518 A | | 6/1999 | Chui |
| 5,918,223 A | | 6/1999 | Blum et al. |
| 6,061,793 A | * | 5/2000 | Tewfik et al. ............... 713/176 |
| 6,072,888 A | | 6/2000 | Powell et al. |
| 6,122,392 A | | 9/2000 | Rhoads |
| 6,175,627 B1 | | 1/2001 | Petrovic et al. |
| 6,226,387 B1 | * | 5/2001 | Tewfik et al. ............... 382/100 |
| 6,230,176 B1 | | 5/2001 | Mizutani |
| 6,240,062 B1 | | 5/2001 | Kozaki et al. |
| 6,253,182 B1 | * | 6/2001 | Acero ........................ 704/268 |
| 6,266,430 B1 | | 7/2001 | Rhoads |
| 6,272,176 B1 | * | 8/2001 | Srinivasan .................. 375/240 |
| 6,330,335 B1 | | 12/2001 | Rhoads |
| 6,366,937 B1 | | 4/2002 | Shridhar et al. |
| 6,385,330 B1 | | 5/2002 | Powell et al. |
| 6,404,898 B1 | | 6/2002 | Rhoads |
| 6,421,445 B1 | | 7/2002 | Jensen et al. |
| 6,459,803 B1 | | 10/2002 | Powell et al. |
| 6,466,670 B1 | | 10/2002 | Tsuria et al. |
| 6,469,749 B1 | | 10/2002 | Dimitrova et al. |
| 6,496,591 B1 | | 12/2002 | Rhoads |
| 6,504,870 B2 | * | 1/2003 | Srinivasan .................. 375/240 |
| 6,513,161 B2 | * | 1/2003 | Wheeler et al. ............... 725/14 |
| 6,542,620 B1 | | 4/2003 | Rhoads |
| 6,560,349 B1 | | 5/2003 | Rhoads |
| 6,560,350 B2 | | 5/2003 | Rhoads |
| 6,567,780 B2 | | 5/2003 | Rhoads |
| 6,574,594 B2 | | 6/2003 | Pitman et al. |
| 6,597,405 B1 | | 7/2003 | Iggulden |
| 6,604,072 B2 | | 8/2003 | Pitman et al. |
| 6,614,915 B2 | | 9/2003 | Powell et al. |
| 6,633,651 B1 | | 10/2003 | Hirzalla et al. |
| 6,647,129 B2 | | 11/2003 | Rhoads |
| 6,647,130 B2 | | 11/2003 | Rhoads |
| 6,675,383 B1 | | 1/2004 | Wheeler et al. |
| 6,678,392 B2 | | 1/2004 | Powell et al. |
| 6,714,683 B1 | | 3/2004 | Tian et al. |
| 6,757,407 B2 | * | 6/2004 | Bruckstein et al. .......... 382/100 |
| 6,799,274 B1 | * | 9/2004 | Hamlin ....................... 713/176 |
| 6,839,673 B1 | * | 1/2005 | Choi et al. .................. 704/273 |
| 6,959,386 B2 | | 10/2005 | Rhoads |
| 6,968,337 B2 | | 11/2005 | Wold |
| 6,971,010 B1 | * | 11/2005 | Abdel-Mottaleb .......... 713/176 |
| 7,006,555 B1 | * | 2/2006 | Srinivasan .................. 375/133 |
| 7,073,065 B2 | * | 7/2006 | Stone ......................... 713/176 |
| 7,120,562 B1 | * | 10/2006 | Wilson ....................... 702/189 |
| 7,221,902 B2 | * | 5/2007 | Kopra et al. ............... 455/3.05 |
| 7,269,338 B2 | * | 9/2007 | Janevski ..................... 386/96 |
| 7,284,128 B2 | * | 10/2007 | Sako ......................... 713/176 |
| 7,512,801 B1 | | 3/2009 | Akiyama et al. |
| 7,562,012 B1 | | 7/2009 | Wold et al. |
| 2001/0005823 A1 | | 6/2001 | Fischer et al. |
| 2001/0029580 A1 | | 10/2001 | Moskowitz |
| 2002/0178410 A1 | | 11/2002 | Haitsma et al. |
| 2002/0186768 A1 | | 12/2002 | Dimitrova et al. |
| 2003/0005430 A1 | | 1/2003 | Kolessar |
| 2003/0036910 A1 | * | 2/2003 | Van Der Veen et al. ..... 704/500 |
| 2003/0086341 A1 | | 5/2003 | Wells et al. |
| 2003/0131350 A1 | | 7/2003 | Peiffer et al. |
| 2003/0156827 A1 | * | 8/2003 | Janevski ...................... 386/96 |
| 2003/0223584 A1 | * | 12/2003 | Bradley et al. .............. 380/229 |
| 2004/0122679 A1 | | 6/2004 | Neuhauser et al. |
| 2004/0210922 A1 | | 10/2004 | Peiffer et al. |
| 2005/0257064 A1 | * | 11/2005 | Boutant et al. .............. 713/180 |
| 2006/0107057 A1 | * | 5/2006 | Lewis et al. ................. 713/176 |
| 2006/0184961 A1 | | 8/2006 | Lee et al. |
| 2006/0195861 A1 | * | 8/2006 | Lee ............................. 725/19 |

### FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| AU | 747044 | 9/2000 |
| EP | 0887958 | 12/1998 |
| EP | 0987855 A2 | 3/2000 |
| JP | 3173291 | 7/1991 |
| WO | WO0079709 | 12/2000 |
| WO | WO02065782 | 8/2002 |
| WO | 2005/006768 | 1/2005 |

### OTHER PUBLICATIONS

Graps, Amara, "An Introduction to Wavelets," Institute of Electrical and Electronics Engineers, Inc., Summer 1995, Los Alamitos, USA (18 pages).

Haitsma et al., "Robust Audio Hashing for Content Identification," Philips Research, Eindhoven, NL, http://cite.seer.ist.psu.edu/haitsma01robust.html, 2001 (8 pages).

Conner, Margery, "Advantages of the Sliding-Mode DFT," www.edn.com, Jan. 9, 2002 (1 page).

International Preliminary Examining Authority, "PCT International Preliminary Examination Report," issued by the United States Patent and Trademark Office on May 6, 2008, in connection with a counterpart international applicaton No. PCT/US2005/029623 (9 pages).

Mexican Institute of Industrial Property issued on Jul. 16, 2009, The result of Substantive Examination (including English Translation) in Mexican patent application No. MX/a/2007/002071, 3 pages with 3 pages English Translation.

Jeffrey D. Taft, PhD., "DSP Design Performance—Breaking barriers in Digital Signal Processing...with new design tools," 2001, [retrieved from http://www.nauticom.net/www.jdtaft/DFT_increm.htm, accessed on Jan. 19, 2004], 1 page.

Schneider et al., "A Robust Content Based Digital Signature for Image Authentication," Columbia University, 1996, 4 pages.

* cited by examiner

**Ex. 1**



FIG. 1A

Ex. 1



FIG. 1B

**Ex. 1**



FIG. 2



FIG. 3

Ex. 1



FIG. 4

**Ex. 1**



FIG. 5

**Ex. 1**

U.S. Patent    Aug. 24, 2010    Sheet 6 of 12    US 7,783,889 B2



FIG. 6

Ex. 1

U.S. Patent        Aug. 24, 2010        Sheet 7 of 12        US 7,783,889 B2



FIG. 7

**Ex. 1**



FIG. 8

**Ex. 1**



FIG. 9

**Ex. 1**



FIG. 10

**Ex. 1**



FIG. 11

Ex. 1

Case 1:22-cv-00057-CJB    Document 405    Filed 02/02/26    Page 48 of 211 PageID #: 12445



FIG. 12

**Ex. 1**

US 7,783,889 B2

# METHODS AND APPARATUS FOR GENERATING SIGNATURES

## RELATED APPLICATIONS

This patent is a continuation of International Patent Application Ser. No. PCT/US2005/029623, filed Aug. 18, 2005, which claims priority to U.S. Provisional Application 60/603,024, filed on Aug. 18, 2004, both of which are hereby incorporated herein by reference in their entireties.

## FIELD OF THE DISCLOSURE

The present disclosure relates generally to media monitoring and, more particularly, to methods and apparatus for generating signatures for use in identifying media information.

## BACKGROUND

Identifying media information and more specifically audio streams (e.g., audio information) using signature-matching techniques is well known. Known signature-matching techniques are often used in television and radio audience metering applications and are implemented using several known methods for generating and matching signatures. For example, in television audience metering applications, signatures are generated at monitoring sites (e.g., monitored households) and reference sites. Monitoring sites typically include locations such as, for example, households where the media consumption of audience members is monitored. For example, at a monitoring site, monitored signatures may be generated based on audio streams associated with a selected channel, radio station, etc. The monitored signatures may then be sent to a central data collection facility for analysis. At a reference site, signatures, typically referred to as reference signatures, are generated based on known programs that are provided within a broadcast region. The reference signatures may be stored at the reference site and/or a central data collection facility and compared with monitored signatures generated at monitoring sites. A monitored signature may be found to match with a reference signature and the known program corresponding to the matching reference signature may be identified as the program that was presented at the monitoring site.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIGS. 1A and 1B illustrate example audio stream identification systems for generating digital spectral signatures and identifying audio streams.

FIG. 2 is a time-domain representation of an example monitored audio stream and a plurality of audio sample frames acquired from the monitored audio stream.

FIG. 3 is a time-domain representation of an example reference audio stream and a plurality of audio sample frames acquired from the example reference audio stream.

FIG. 4 is a flow diagram of an example method for generating digital spectral signatures based on spectral decompositions.

FIG. 5 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 4.

FIG. 6 is a flow diagram of another example method for generating digital spectral signatures based on spectral decompositions.

FIG. 7 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 6.

FIG. 8 is a flow diagram of an example method for comparing the digital spectral signatures generated using the example methods of FIGS. 4-7.

FIG. 9 is a block diagram of an example signature generation system for generating digital spectral signatures based on audio streams.

FIG. 10 is a block diagram of another example signature generation system for generating digital spectral signatures based on audio streams.

FIG. 11 is a block diagram of an example signature comparison system for comparing digital spectral signatures.

FIG. 12 is a block diagram of an example processor system that may be used to implement the methods and apparatus described herein.

## DETAILED DESCRIPTION

Although the following discloses example systems including, among other components, software executed on hardware, it should be noted that such systems are merely illustrative and should not be considered as limiting. For example, it is contemplated that any or all of these hardware and software components could be embodied exclusively in hardware, exclusively in software, or in any combination of hardware and software. Accordingly, while the following describes example systems, persons of ordinary skill in the art will readily appreciate that the examples provided are not the only way to implement such systems.

The methods and apparatus described herein generally relate to generating digital spectral signatures, which may be used to identify media information. In particular, the disclosed methods and apparatus are described with respect to generating digital spectral signatures based on audio streams (e.g., audio information). However, the methods and apparatus described herein may also be used to generate digital spectral signatures based on any other type of media information such as, for example, video information, web pages, still images, computer data, etc. Further, the media information may be associated with broadcast information (e.g., television information, radio information, etc.), information reproduced from any storage medium (e.g., compact discs (CD), digital versatile discs (DVD), etc.), or any other information that is associated with an audio stream, a video stream, or any other media information for which the digital spectral signatures are generated. In one particular example, the audio streams are identified based on digital spectral signatures that include monitored digital signatures generated at a monitoring site (e.g., a monitored household) and reference digital signatures generated and/or stored at a reference site and/or a central data collection facility.

As described in detail below, the methods and apparatus described herein identify media information including audio streams based on digital spectral signatures. The digital spectral signatures may be formed using digital descriptors that are generated based on the spectral components of an audio stream and that may be analyzed using frequency transforms and/or wavelet transforms.

Unlike known methods in the prior art that use interframe operations (e.g., operations based on sample data within different data sample frames) to generate digital spectral signatures, the methods and apparatus described herein may be implemented using intraframe operations (e.g., operations based on sample data within a single frame). Intraframe operations may include, for example, comparison operations, determining percentage differences between values, etc. that are performed on two or more values (e.g., spectral power values) that are uniquely associated with or derived from a single frame. For example, using the methods and apparatus described herein, a digital spectral signature may be generated by obtaining a frame of media samples, determining

**Ex. 1**

US 7,783,889 B2

3

spectral power values by performing a spectral transform (e.g., a FFT, a wavelet transform, etc.) on the frame of media samples, and performing an intraframe operation (e.g., a comparison) based on two or more spectral power values that are uniquely associated with the frame of media samples.

Frequency components of an audio signal are typically generated by transforming the audio signal data (e.g., an audio stream) from the time domain to the frequency domain using, for example, a Fourier Transform. The Fourier Transform can be used to analyze the frequency components in an audio stream and identify the spectral power of each frequency component. The spectral powers may then be used to generate digital spectral signatures.

Digital spectral signatures may also be generated based on wavelet transforms which transform audio data from the time domain to the wavelet domain. In general, wavelet transforms may be used to decompose blocks or frames of data (e.g., time domain audio samples) into multiple sub-bands, thereby allowing data sets to be analyzed at various scales and/or resolutions. By separating data into multiple sub-bands, a wavelet transform may be used to analyze each time interval of data at a desired scale or resolution.

Monitored signatures may be generated at a monitoring site based on audio streams associated with media information (e.g., a monitored audio stream) that is consumed by an audience. For example, a monitored signature may be generated based on the audio track of a television program presented at a monitoring site. The monitored signature may then be communicated to a central data collection facility for comparison to one or more reference signatures.

Reference signatures are generated at a reference site and/ or a central data collection facility based on audio streams associated with known media information. The known media information may include media that is broadcast within a region, media that is reproduced within a household, media that is received via the internet, etc. Each reference signature is stored in a memory with media identification information such as, for example, a song title, a movie title, etc. When a monitored signature is received at the central data collection facility, the monitored signature is compared with one or more reference signatures until a match is found. This match information may then be used to identify the media information (e.g., monitored audio stream) from which the monitored signature was generated. For example, a look-up table or a database may be referenced to retrieve a media title, a program identity, an episode number, etc. that corresponds to the media information from which the monitored signature was generated.

As described below in connection with FIGS. 2 and 3, more reference signatures are generated at a reference site and/or a central data collection facility for a given audio stream than monitored signatures generated for a given audio stream at a monitoring site. In particular, the reference signatures generated for an audio stream (i.e., a reference audio stream) overlap in time. More specifically, the starting reference time or timestamp of each reference signature is shifted by a relatively small amount of time from the starting reference time or timestamp of a previous reference signature. In this manner, a monitored signature generated at a monitoring site and having a substantially arbitrary reference time may be aligned and/or matched with at least one of the reference signatures generated for a reference audio stream. As a result of the relatively fewer number of monitored signatures generated at the monitoring site, monitored signatures may be generated by processor systems and/or hardware devices having relatively less computing power and/or memory than processor systems and/or hardware devices used to generate reference signatures.

FIGS. 1A and 1B illustrate example audio stream identification systems 100 and 150 for generating digital spectral

4

signatures and identifying audio streams. The example audio stream identification systems 100 and 150 may be implemented as a television broadcast information identification system and a radio broadcast information identification system, respectively. The example audio stream identification system 100 includes a monitoring site 102 (e.g., a monitored household), a reference site 104, and a central data collection facility 106.

Monitoring television broadcast information involves generating monitored signatures at the monitoring site 102 based on the audio data of television broadcast information and communicating the monitored signatures to the central data collection facility 106 via a network 108. Reference signatures may be generated at the reference site 104 and may also be communicated to the central data collection facility 106 via the network 108. The audio content represented by a monitored signature that is generated at the monitoring site 102 may be identified at the central data collection facility 106 by comparing the monitored signature to one or more reference signatures until a match is found. Alternatively, monitored signatures may be communicated from the monitoring site 102 to the reference site 104 and compared one or more reference signatures at the reference site 104. In another example, the reference signatures may be communicated to the monitoring site 102 and compared with the monitored signatures at the monitoring site 102.

The monitoring site 102 may be, for example, a household for which the media consumption of an audience is monitored. In general, the monitoring site 102 may include a plurality of media delivery devices 110, a plurality of media presentation devices 112, and a signature generator 114 that is used to generate monitored signatures associated with media presented at the monitoring site 102.

The plurality of media delivery devices 110 may include, for example, set top box tuners (e.g., cable tuners, satellite tuners, etc.), DVD players, CD players, radios, etc. Some or all of the media delivery devices 110 such as, for example, set top box tuners may be communicatively coupled to one or more broadcast information reception devices 116, which may include a cable, a satellite dish, an antenna, and/or any other suitable device for receiving broadcast information. The media delivery devices 110 may be configured to reproduce media information (e.g., audio information, video information, web pages, still images, etc.) based on, for example, broadcast information and/or stored information. Broadcast information may be obtained from the broadcast information reception devices 116 and stored information may be obtained from any information storage medium (e.g., a DVD, a CD, a tape, etc.). The media delivery devices 110 are communicatively coupled to the media presentation devices 112 and configurable to communicate media information to the media presentation devices 112 for presentation. The media presentation devices 112 may include televisions having a display device and/or a set of speakers by which audience members consume, for example, broadcast television information, music, movies, etc.

The signature generator 114 may be used to generate monitored digital signatures based on audio information as described in greater detail below. In particular, at the monitoring site 102, the signature generator 114 may be configured to generate monitored signatures based on monitored audio streams that are reproduced by the media delivery devices 110 and/or presented by the media presentation devices 112. The signature generator 114 may be communicatively coupled to the media delivery devices 110 and/or the media presentation devices 112 via an audio monitoring interface 118. In this manner, the signature generator 114 may obtain audio streams associated with media information that is reproduced by the media delivery devices 110 and/or presented by the media presentation devices 112. Additionally or alternatively,

**Ex. 1**

US 7,783,889 B2

5

the signature generator **114** may be communicatively coupled to microphones (not shown) that are placed in proximity to the media presentation devices **112** to detect audio streams. The signature generator **114** may also be communicatively coupled to the central data collection facility **106** via the network **108**.

The network **108** may be used to communicate signatures (e.g., digital spectral signatures), control information, and/or configuration information between the monitoring site **102**, the reference site **104**, and the central data collection facility **106**. Any wired or wireless communication system such as, for example, a broadband cable network, a DSL network, a cellular telephone network, a satellite network, and/or any other communication network may be used to implement the network **108**.

As shown in FIG. **1A**, the reference site **104** may include a plurality of broadcast information tuners **120**, a reference signature generator **122**, a transmitter **124**, a database or memory **126**, and broadcast information reception devices **128**. The reference signature generator **122** and the transmitter **124** may be communicatively coupled to the memory **126** to store reference signatures therein and/or to retrieve stored reference signatures therefrom.

The broadcast information tuners **120** may be communicatively coupled to the broadcast information reception devices **128**, which may include a cable, an antenna, a satellite dish, and/or any other suitable device for receiving broadcast information. Each of the broadcast information tuners **120** may be configured to tune to a particular broadcast channel. In general, the number of tuners at the reference site **104** is equal to the number of channels available in a particular broadcast region. In this manner, reference signatures may be generated for all of the media information transmitted over all of the channels in a broadcast region. The audio portion of the tuned media information may be communicated from the broadcast information tuners **120** to the reference signature generator **122**.

The reference signature generator **122** may be configured to obtain the audio portion of all of the media information that is available in a particular broadcast region. The reference signature generator **122** may then generate a plurality of reference signatures (as described in greater detail below) based on the audio information and store the reference signatures in the memory **126**. Although one reference signature generator is shown in FIG. **1**, a plurality of reference signature generators may be used in the reference site **104**. For example, each of the plurality of signature generators may be communicatively coupled to a respective one of the broadcast information tuners **120**.

The transmitter **124** may be communicatively coupled to the memory **126** and configured to retrieve signatures therefrom and communicate the reference signatures to the central data collection facility **106** via the network **108**.

The central data collection facility **106** may be configured to compare monitored signatures received from the monitoring site **102** to reference signatures received from the reference site **104**. In addition, the central data collection facility **106** may be configured to identify monitored audio streams by matching monitored signatures to reference signatures and using the matching information to retrieve television program identification information (e.g., program title, broadcast time, broadcast channel, etc.) from a database. The central data collection facility **106** includes a receiver **130**, a signature analyzer **132**, and a memory **134**, all of which are communicatively coupled as shown.

The receiver **130** may be configured to receive monitored signatures and reference signatures via the network **108**. The receiver **130** is communicatively coupled to the memory **134** and configured to store the monitored signatures and the reference signatures therein.

6

The signature analyzer **132** may be used to compare reference signatures to monitored signatures. The signature analyzer **132** is communicatively coupled to the memory **134** and configured to retrieve the monitored signatures and the reference signatures from the same. The signature analyzer **132** may be configured to retrieve reference signatures and monitored signatures from the memory **134** and compare the monitored signatures to the reference signatures until a match is found. The memory **134** may be implemented using any machine accessible information storage medium such as, for example, one or more hard drives, one or more optical storage devices, etc.

Although the signature analyzer **132** is located at the central data collection facility **106** in FIG. **1A**, the signature analyzer **132** may instead be located at the reference site **104**. In such a configuration, the monitored signatures may be communicated from the monitoring site **102** to the reference site **104** via the network **108**. Alternatively, the memory **134** may be located at the monitoring site **102** and reference signatures may be added periodically to the memory **134** via the network **108** by transmitter **124**. Additionally, although the signature analyzer **132** is shown as a separate device from the signature generators **114** and **122**, the signature analyzer **132** may be integral with the reference signature generator **122** and/or the signature generator **114**. Still further, although FIG. **1** depicts a single monitoring site (i.e., the monitoring site **102**) and a single reference site (i.e., the reference site **104**), multiple such sites may be coupled via the network **108** to the central data collection facility **106**.

The audio stream identification system **150** of FIG. **1B** may be configured to monitor and identify audio streams associated with radio broadcast information. In general, the audio stream identification system **150** is used to monitor the content that is broadcast by a plurality of radio stations in a particular broadcast region. Unlike the audio stream identification system **100** used to monitor television content consumed by an audience, the audio stream identification system **150** may be used to monitor music, songs, etc. that are broadcast within a broadcast region and the number of times that they are broadcast. This type of media tracking may be used to determine royalty payments, proper use of copyrights, etc. associated with each audio composition. The audio stream identification system **150** includes a monitoring site **152**, a central data collection facility **154**, and the network **108**.

The monitoring site **152** is configured to receive all radio broadcast information that is available in a particular broadcast region and generate monitored signatures based on the radio broadcast information. The monitoring site **152** includes the plurality of broadcast information tuners **120**, the transmitter **124**, the memory **126**, and the broadcast information reception devices **128**, all of which are described above in connection with FIG. **1A**. In addition, the monitoring site **152** includes a signature generator **156**. When used in the audio stream identification system **150**, the broadcast information reception devices **128** are configured to receive radio broadcast information and the broadcast information tuners **120** are configured to tune to the radio broadcast stations. The number of broadcast information tuners **120** at the monitoring site **152** may be equal to the number of radio broadcasting stations in a particular broadcast region.

The signature generator **156** is configured to receive the tuned to audio information from each of the broadcast information tuners **120** and generate monitored signatures for the same. Although one signature generator is shown (i.e., the signature generator **156**), the monitoring site **152** may include multiple signature generators, each of which may be communicatively coupled to one of the broadcast information tuners **120**. The signature generator **156** may store the monitored signatures in the memory **126**. The transmitter **124** may

**Ex. 1**

US 7,783,889 B2

7

retrieve the monitored signatures from the memory **126** and communicate them to the central data collection facility **154** via the network **108**.

The central data collection facility **154** is configured to receive monitored signatures from the monitoring site **152**, generate reference signatures based on reference audio streams, and compare the monitored signatures to the reference signatures. The central data collection facility **154** includes the receiver **130**, the signature analyzer **132**, and the memory **134**, all of which are described in greater detail above in connection with FIG. **1A**. In addition, the central data collection facility **154** includes a reference signature generator **158**.

The reference signature generator **158** is configured to generate reference signatures based on reference audio streams. The reference audio streams may be stored on any type of machine accessible medium such as, for example, a CD, a DVD, a digital audio tape (DAT), etc. In general, artists and/or record producing companies send their audio works (i.e., music, songs, etc.) to the central data collection facility **154** to be added to a reference library. The reference signature generator **158** may read the audio data from the machine accessible medium and generate a plurality of reference signatures based on each audio work (e.g., the reference audio stream **302** of FIG. **3**). The reference signature generator **158** may then store the reference signatures in the memory **134** for subsequent retrieval by the signature analyzer **132**. Identification information (e.g., song title, artist name, track number, etc.) associated with each reference audio stream may be stored in a database and may be indexed based on the reference signatures. In this manner, the central data collection facility **154** includes a database of reference signatures and identification information corresponding to all known and available song titles.

The receiver **130** is configured to receive monitored signatures from the network **108** and store the monitored signatures in the memory **134**. The monitored signatures and the reference signatures are retrieved from the memory **134** by the signature analyzer **132** for use in identifying the monitored audio streams broadcast within a broadcast region. The signature analyzer **132** may identify the monitored audio streams by first matching a monitored signature to a reference signature. The match information and/or the matching reference signature is then used to retrieve identification information (e.g., a song title, a song track, an artist, etc.) from a database stored in the memory **134**.

Although one monitoring site (e.g., the monitoring site **152**) is shown in FIG. **1B**, multiple monitoring sites may be communicatively coupled to the network **108** and configured to generate monitored signatures. In particular, each monitoring site may be located in a respective broadcast region and configured to monitor the content of the broadcast stations within a respective broadcast region.

FIG. **2** is a time-domain representation **200** of an example monitored audio stream **202** and a plurality of audio sample frames **204**, **206**, **208**, and **210** acquired from the monitored audio stream **202**. A monitored digital spectral signature is generated at a monitoring site (e.g., the monitoring site **102** of FIG. **1A** or the monitoring site **152** of FIG. **1B**) based on audio samples acquired from the example monitored audio stream **202**. The time-domain representation **200** illustrates the time relationship between the example monitored audio stream **202** and the audio sample frames **204**, **206**, **208**, and **210**, which are used to generate monitored signatures.

In one example, an N-bit monitored signature $S_x(t)$ is formed using one or more M-bit descriptors $B_x(t_0)$, $B_x(t_0+1)$, $B_x(t_0+2)$, $B_x(t_0+3)$. For example, a 32-bit monitored signature $S_x(t)$ includes four 8-bit descriptors $B_x(t_0)$, $B_x(t_0+1)$, $B_x(t_0+2)$, $B_x(t_0+3)$, each of which is generated based on a corresponding one of the audio sample frames **204**, **206**, **208**, and

8

**210**. More specifically, each of the descriptors is generated using one or more intraframe operations (e.g., comparison operations) based on two or more spectral components that are uniquely associated with a single audio sample frame.

The four descriptors may be generated based on spectral decompositions (e.g., frequency decompositions or wavelet decompositions) of the audio sample frames **204**, **206**, **208**, and **210** as described in detail below in connection with FIGS. **4-7**. The spectral decompositions are used to extract features that are uniquely characteristic of the example monitored audio stream **202**. In this manner, a reference signature and a monitored signature that are generated based on the same audio stream using the same signature generation method (e.g., the same spectral decomposition-based method) will include similar features, and, thus can be used to reliably identify the monitored audio stream **202** using a matching algorithm. A monitored signature may be generated by sampling the example monitored audio stream **202** to generate the audio sample frames **204**, **206**, **208**, and **210**, generating the descriptors $B_x(t_0)$, $B_0(t_0+1)$, $B_x(t_0+2)$, $B_x(t_0+3)$ based on spectral decompositions of the audio sample frames **204**, **206**, **208**, and **210**, and concatenating the descriptors.

The audio sample frames **204**, **206**, **208**, and **210** are generated by sampling the example monitored audio stream **202** during four time intervals at a sampling frequency $f_s$. For example, a sampling frequency $f_s$ of 6000 Hz will generate 6000 samples of audio data for each of the audio sample frames **204**, **206**, **208**, and **210** (assuming the sample frames are collected over one second intervals). However, any other suitable sampling frequency $f_s$ may instead be selected. As shown in FIG. **2**, the duration of each of the audio sample frames **204**, **206**, **208**, and **210** is one second (e.g., 0 to $t_0$, $t_0$ to $t_0+1$, $t_0+1$ to $t_0+2$, and $t_0+2$ to $t_0+3$). However, the duration may instead be set to any other length of time. The times within the monitored audio stream **202** during which monitored signatures are generated are substantially similar or identical to the times within a reference audio stream during which corresponding reference signatures are generated. By acquiring audio sample frames for monitored signatures and reference signatures at substantially the same times, the features extracted from a monitored audio stream (e.g., the example monitored audio stream **202**) and a corresponding reference audio stream (e.g., the example reference audio stream **302** of FIG. **3**) are substantially similar or identical. Although the audio sample frames **204**, **206**, **208**, and **210** are shown in FIG. **2** as occurring consecutively in time, the audio sample frames **204**, **206**, **208**, and **210** may occur at any time and in any sequence within the example monitored audio stream **202**.

To ensure that the monitored signature is compared with a reference signature that is generated at substantially the same time within respective audio streams, the monitored signatures may be generated relative to a reference time that is used during the signature comparison process to align a monitored signature with a reference signature. More specifically, during the generation of a monitored signature, the example monitored audio stream **202** is sampled starting at a time indicated by a reference time to, which may be selected relative to a time stamp embedded within the example audio stream **202**, a system startup time, a daily recurring time (e.g., midnight), and/or any other reference time that may be indicative of the time at which a signature is generated. A signature matching system (e.g., the signature analyzer **132** of FIGS. **1A** and **1B**) uses the reference time $t_0$ to retrieve one or more reference signatures that correspond to substantially the same time within reference audio streams as indicated by the reference time $t_0$.

Additionally, one or more monitored signatures may be generated using the example monitored audio stream **202** so that multiple signatures are matched to identify the example

**Ex. 1**

US 7,783,889 B2

9

monitored audio stream **202**. For example, it is possible that one or more monitored signatures generated using the example monitored audio stream **202** are substantially similar or identical to one or more reference signatures of a reference audio stream (e.g., the example reference audio stream **302** of FIG. **3**) that does not correspond to the example monitored audio stream **202**. In this case, to decrease the possibility of erroneously identifying the wrong reference audio stream, more than one monitored signature is generated for the monitored audio stream **202**. More specifically, the signatures may be generated at multiple times throughout the example monitored audio stream **202**. In addition, a comparison algorithm may be configured to match two or more monitored signatures with corresponding reference signatures to accurately identify the example monitored audio stream **202**.

FIG. **3** is a time-domain representation **300** of an example reference audio stream **302** and a plurality of audio sample frames **304**, **306**, **308**, and **310** that may be acquired from the example reference audio stream **302**. The time-domain representation **300** shows two one second time intervals (e.g., 0 to $t_0$ and $t_0$ to $t_0+1$) and the plurality of audio sample frames **304**, **306**, **308**, and **310** that are collected during the time intervals and that are subsequently used to generate a plurality of reference signatures that are staggered in time (i.e., time shifted relative to one another). The example reference audio stream **302** is sampled at a sampling frequency $f_s$ to collect the audio sample frames **304**, **306**, **308**, and **310**, which are used to generate M-bit descriptors $B_{Rn}(t)$. One or more of the descriptors $B_{Rn}(t)$ may then be concatenated to form an N-bit reference signature $S_{Rn}(t)$. Typically, the number of descriptors in a reference signature is equal to the number of descriptors in a monitored signature. Additionally, each of the M-bit descriptors $B_{Rn}(t)$ includes the same number of bits as a corresponding M-bit descriptor $B_x(t)$ associated with the example monitored audio stream **202** (FIG. **2**) and, thus, each N-bit reference signature $S_{Rn}(t)$ includes the same number of bits as a corresponding N-bit monitored signature $S_x(t)$.

Multiple reference signatures are generated for the example reference audio stream **302** in a manner that causes the reference signatures to be time-shifted relative to each other and to overlap in time with one another. More specifically, the start time at which a first audio sample frame (e.g., the audio sample frame **304**) of a first reference signature is collected is offset, or shifted, by an amount of time

$$\frac{1}{T_s}$$

from the start time at which a first audio sample frame (e.g., the audio sample frame **308**) of a second reference signature is collected. The value $T_S$ is associated with a number of equal segments ("sample segments") into which each time interval (e.g., $t_0$ to $t_0+1$) is divided. For example, if the number of sample segments $T_S$ in a time interval of one second is set equal to thirty, the collection of a new data set will begin every

$$\frac{1}{30}\text{-}th$$

of a second. In addition, if the sampling frequency $f_s$ is set equal to 6000 Hz, each sample segment will include 200 samples.

Each audio sample frame is used to generate a single signature. More specifically, an audio sample frame is collected using a predetermined number of sample segments (e.g., the

10

sample segments **312a**-**312e**), which are concatenated to form the audio sample frame (e.g., the audio sample frame **304**). To achieve overlap among consecutively generated signatures, each signature is formed using an audio sample frame that partially overlaps with an audio sample frame used to form the previously generated signature. More specifically, two audio sample frames that overlap include a common set of sample segments. For example, the audio sample frames **304** and **308** include a common set of sample segments comprising the sample segments **312b**-**312e**. The audio sample frame **308** may be formed by extracting a common plurality of media samples or the common set of sample segments **312b**-**312e** from the audio sample frame **304** and appending a recently acquired sample segment (e.g., the sample segment **312f**) to the common set of sample segments **312b**-**312e**. In addition, two audio sample frames that overlap also contain sample segments that are exclusive to one or the other of the audio sample frames (i.e., audio sample frames that overlap also contain sample segments that occur in one or the other of the audio sample frames but do not occur in both frames).

To further illustrate the generation of reference signatures that are time shifted and overlapped, each reference signature is formed by four reference descriptors

$$B_{Rn}\!\left(t_0 + \frac{k}{T_s}\right),\ B_{Rn}\!\left(t_0 + \frac{k}{T_s} + 1\right),\ B_{Rn}\!\left(t_0 \frac{k}{T_s} + 2\right),\ B_{Rn}\!\left(t_0 + \frac{k}{T_s} + 3\right).$$

The four reference descriptors are separated by one-second time intervals and are shifted by

$$\frac{k}{T_s}$$

seconds with respect to the reference time $T_0$, where $0 \leqq k < T_S$. For example, the audio sample frames **304** and **306** (generated at

$$t_0 + \frac{0}{T_s}\ \text{and}\ t_0 + \frac{0}{T_s} + 1\Big),$$

respectively, in combination with two other audio sample frames generated at

$$t_0 + \frac{0}{T_s} + 2\ \text{and}\ t_0 + \frac{0}{T_s} + 3$$

(not shown), are used to generate four descriptors that form a first reference signature. Additionally, the audio sample frames **308** and **310** (generated at

$$\left(t_0 + \frac{1}{T_s}\right)\text{and}\left(t_0 + \frac{1}{T_s} + 1\right)\Big),$$

respectively, are used with two other audio sample frames generated at

**Ex. 1**

US 7,783,889 B2

11

$$\left(t_0 + \frac{1}{T_s} + 2\right) \text{and} \left(t_0 + \frac{1}{T_s} + 3\right)$$

(not shown) to generate four descriptors that form a second reference signature that is time shifted relative to the first reference signature by

$$\frac{1}{T_s}$$

seconds. As described below in connection with FIG. 5, each of the reference descriptors is generated using one or more operations (e.g., comparison operations) based on two or more spectral components that are both associated with the same audio sample frame. These operations are referred to as intraframe operations because they are performed using data exclusive to a single audio frame and are not dependent on sample data collected over other audio frames.

During an example sample acquisition process, the sample segments $312a$-$312e$ are collected and are used to form the first audio sample frame $304$, which is subsequently used to determine a descriptor. This descriptor is then used to form part of a first reference signature. Then, a new sample segment $312f$ is collected and a second audio sample frame $308$ is formed using sample segments $312b$-$312f$. The second audio sample frame $308$ is then used to determine a reference descriptor which is used to form part of a second reference signature. Thus, the first and second audio sample frames $304$ and $308$ include a common set of sample segments $312b$-$312e$ and each of the first and second audio sample frames additionally include a sample segment not included in the other (i.e., the first audio sample frame $304$ includes sample segment $312a$ and the second audio sample frame $308$ includes sample segment $312f$). In this manner, the first and second reference signatures are generated using data collected at points in the audio stream that are staggered or shifted in time by

$$\frac{1}{T_s}$$

seconds and are generated using data that overlaps. In addition, the amount by which the first and second signatures are shifted can be adjusted by changing the value of $T_S$ thereby permitting the resolution of the signatures to vary as desired. Specifically, if a set of signatures that represents an audio stream with a greater resolution is desired, $T_S$ can be increased accordingly. Likewise, if less resolution is desired, $T_S$ can be decreased. As will be appreciated by one having ordinary skill in the art, the value of $T_S$ may affect the quantity of signatures that can be generated for a given audio stream. For example, if the number of sample segments used to form a signature remains constant, a larger value of $T_S$ will result in forming more audio sample frames than a smaller value of $T_S$. Therefore, the amount of memory available to store the signature data may be a factor in determining the desired value of $T_S$.

As described above, in order to identify the title of a song or the title of a program associated with a particular audio stream, a set of monitored signatures generated for a monitored audio stream are compared to a database of reference

12

signatures associated with a plurality of reference audio streams. In one example system, a signature generator (e.g., the signature generator $114$ of FIG. 1A) may be configured to monitor the audio emitted by a specific television (e.g., one of the presentation devices $112$ of FIG. 1A) located in the home of a specific panelist. Signatures are generated for the audio emitted by the television in the manner described above. In addition, the time at which the audio corresponding to each signature was emitted is recorded and stored as a reference time $t_0$ with the corresponding monitored signature in a memory device. A timing device (e.g., the timing device $903$ of FIGS. 9 and 10) located at the monitoring site may be used to trigger the collection of the audio data for the subsequent generation of monitored signatures and to provide the corresponding data collection times (e.g., reference times $t_0$, timestamps, etc.) to the memory for storage with the corresponding signature. To enable the subsequent identification of the emitted audio, a reference site (e.g., the reference site $104$ of FIG. 1A) located within the same broadcast region as a monitoring site (e.g., the monitoring site $102$ of FIG. 1A) is configured to generate reference signatures corresponding to the audio broadcast on all television broadcast channels at all times of the day. A timing device (e.g., the timing device $903$ of FIGS. 9 and 10) located at the reference site may be used to trigger the collection of the audio data at a set of equally spaced intervals corresponding to the time period

$$\frac{1}{T_s}$$

for the subsequent generation of the reference signatures and to provide a corresponding set of data collection times to a reference memory (e.g., the memory $126$ of FIG. 1A) for storage. Thus, each reference signature is stored in a memory device located at the reference site along with timestamp data indicating the time at which the underlying audio data was collected. In one example, the timing devices (e.g., the timing device $903$ of FIG. 9) located at the monitoring site and the reference site are synchronized such that the timestamps can be used to align the reference signatures with the monitored signatures to facilitate the signature matching process. Likewise, because a plurality of monitoring sites are likely to be located in the same broadcast region as a single reference site, in the same example, each of the timing devices $903$ located in each such monitoring site may be synchronized with the timing device $903$ located in the single reference site. However, due to the staggered arrangement of the reference signatures described above in connection with FIG. 3, the timing devices $903$ at the monitoring site and the reference site do not have to be synchronized.

To compensate for offsets between the timing devices located at the monitoring sites and the reference site, the value of $T_s$ may be adjusted. The value of $T_s$ is generally selected to incrementally time shift a reference signature from a previous reference signature so that a monitored signature generated at an arbitrary reference time is highly likely to align with one of the staggered or time-shifted reference signatures. More specifically, increasing the value of $T_s$ causes the number of sample segments (e.g., the sample segments $312a$-$312f$) to increase and the offset or time shift from one reference signature to the next reference signature to decrease. This, in turn, increases the likelihood that the times at which reference signatures are generated for a given audio stream correspond to substantially similar or identical reference times at which monitored signatures are generated for the same audio stream. Signatures generated at the same times for the same program are expected to be identical or at least similar enough

**Ex. 1**

US 7,783,889 B2

**13**

to cause a match to be detected. Thus, increasing the value of $T_s$ increases the likelihood of a match between a set of reference signatures and a set of monitored signatures corresponding to the same audio program. Additionally, assuming the timing devices located at the reference site and the monitoring site are synchronized with sufficient precision, a monitored signature generated for data collected at a time T need only be compared to each reference signature associated with the same timestamp T instead of all reference signatures generated during the same twenty-four hour period. This reduction in comparisons reduces the processing time required to find a match. Similarly, assuming there is a known error, E, between the timing devices located at a monitoring site and a reference site, each monitored signature generated at the monitoring site at a time T need only be compared to all reference signatures generated from data collected within a window of the time spanning from T−E to T+E.

In another example system (e.g., the example audio identification system **150** of FIG. **1**B), a set of monitored signatures are generated for a monitored audio stream and then compared to a database of reference signatures associated with a set of reference audio streams that, ideally, represent the universe of currently available audio streams. For example, as described above, in connection with FIG. **1**B, reference signatures corresponding to reference audio streams may be stored in a database that is stored in, for example, the memory **134**. For each reference signature that is matched to a monitored signature, the matching information and/or the reference signature may be used to retrieve identification information (e.g., song title, song track, artist, etc.) from the database. The identification information is then used to identify the monitored audio stream. In one example, reference times $t_0$ or timestamps associated with each monitored signature may be used to identify the time (of day) at which the monitored audio streams were broadcast.

FIG. **4** is a flow diagram of an example method for generating digital spectral signatures based on spectral decompositions. In particular, the example method of FIG. **4** may be used to generate digital spectral signatures (e.g., reference signatures and/or monitored signatures) based on frequency decomposition methods using a sliding Fast Fourier transform (FFT). As is known by one having ordinary skill in the art, an FFT may be used to convert a time domain signal (e.g., the example audio streams **202** and **302** of FIGS. **2** and **3**) into a frequency domain representation of the same signal which may then be used to analyze the frequency components of the converted signal.

As will be appreciated by one having ordinary skill in the art, a sliding FFT provides advantages over a conventional non-sliding FFT for generating the digital spectral signatures. Unlike a conventional non-sliding FFT, a sliding FFT can be used to incrementally compute an FFT. For example, one example approach to processing the audio streams **202** and **302** involves generating FFT data for each audio sample frame independent of any data associated with previous audio sample frames. In contrast, a sliding FFT involves generating FFT data for an audio sample frame by updating the FFT data generated in connection with a previous audio sample frame. Updating the previous frame's FFT data is less computationally expensive than generating FFT data anew for each frame causing the sliding FFT technique to be more efficient than the non-sliding conventional FFT approach. Additionally, the number of samples forming each audio sample frame (e.g., the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or **304**, **306**, **308**, and **310** of FIG. **3**) need not be a power of two, as is required of the non-sliding FFT approach. Thus, when using a sliding FFT, the digital spectral signatures can be generated using audio sample frames of any arbitrary size (i.e., any number of samples) that are acquired using any sampling frequency $f_s$.

**14**

Now turning in detail to the example method of FIG. **4**, initially the example method involves obtaining an audio stream (block **402**) (e.g., the example monitored audio stream **202** of FIG. **2** or the example reference audio stream **302** of FIG. **3**). A reference time to described above in connection with FIGS. **2** and **3** is determined (block **404**) to indicate the time within an audio stream at which a signature is generated. An initial audio sample set is then obtained (block **406**). The audio samples may be obtained by sampling an analog audio stream at a sampling frequency $f_s$ and performing an analog-to-digital conversion. Alternatively, the audio samples may be obtained by extracting or acquiring samples from a digital audio stream at a sampling frequency $f_s$. The initial audio sample set may be a complete audio sample frame (e.g., one of the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or **304**, **306**, **308**, and **310** of FIG. **3**) or a portion thereof. An initial FFT operation is performed on the initial audio sample set to establish an initial frequency spectrum (block **408**). The method of performing a FFT is well known in the art and, thus, is not discussed in detail herein.

After the initial frequency spectrum is determined (block **408**), a next set of audio samples is obtained (block **410**). The sliding FFT may then be used to update the initial frequency spectrum (generated at block **408**) based on two most recently collected samples $v_{N_s-2}$ and $v_{N_s-1}$ according to Equation 1 below.

$$a_1[J] \times \exp(\varphi_1[J]) = \qquad\qquad \text{Equation 1}$$

$$a_0[J] \times \exp(\varphi_0[J]) \times \exp\left(-\frac{i2\pi J(2)}{N_S}\right) +$$

$$\left(v_{N_{S-2}} \times \exp\left(\frac{i2\pi J(N_S - 2)}{N_S}\right)\right) +$$

$$\left(v_{N_{S-1}} \times \exp\left(\frac{i2\pi J(N_S - 1)}{6000}\right)\right) -$$

$$\left(v_0 \times \exp\left(-\frac{i2\pi J(2)}{N_S}\right)\right) - \left(v_1 \times \exp\left(-\frac{i2\pi J}{N_S}\right)\right)$$

Equation 1 may be used to update the frequency spectrum of an audio sample frame having a sample quantity $N_S$. The spectral amplitude $a_0[J]$ and phase value $\phi_0[J]$ form the existing frequency spectrum $a_0[J] \times \exp(\phi_0[J])$, which includes the frequencies indexed by the frequency index J. When the two most recently collected audio samples $v_{N_s-2}$ and $v_{N_s-1}$ are obtained, the existing frequency spectrum $a_0[J] \times \exp(\phi_0[J])$ may be updated to determine a new frequency spectrum $a_1[J] \times \exp(\phi_1[J])$. The two most recently collected audio samples $v_{N_s-2}$ and $v_{N_s-1}$ are inserted into the audio sample frame to replace the two earliest collected samples $v_0$ and $v_1$.

As shown in Equation 1, the updated frequency spectrum $a_1[J] \times \exp(\phi_1[J])$ is determined using one or more multiplication operations, addition operations, and subtraction operations based on complex exponents, the two earliest collected samples $v_0$ and $v_1$, and the two most recently collected samples $v_{N_s-2}$ and $v_{N_s-1}$. Initially, the existing frequency spectrum $a_0[J] \times \exp(\phi_0[J])$ is multiplied by a first complex exponential value

$$\exp\left(-\frac{i2\pi J(2)}{N_S}\right).$$

The product of the multiplication is added to a product determined by multiplying the first most recently collected audio sample $v_{N_s-2}$ by a second complex exponential value

**Ex. 1**

US 7,783,889 B2

15

$$\exp\left(\frac{i2\pi J(N_S - 2)}{N_S}\right).$$

The result is then added to a product determined by multiplying the second most recently collected audio sample $v_{N_s-1}$ by a third complex exponential value

$$\exp\left(\frac{i2\pi J(N_S - 1)}{N_S}\right).$$

The first earliest collected audio sample $v_0$ is then multiplied by the first complex exponential value

$$\exp\left(-\frac{i2\pi J(2)}{N_S}\right)$$

and subtracted from the previous addition result. The second earliest collected audio sample $v_1$ is then multiplied by a fourth complex exponential value

$$\exp\left(-\frac{i2\pi J}{N_S}\right)$$

and subtracted from the previous subtraction result.

It is well known in the art that instabilities such as, for example, oscillation or data overflow can be substantially minimized when implementing a sliding FFT by multiplying most recently collected audio samples (e.g., the most recently collected audio samples $v_{Ns-2}$ and $v_{N_s-1}$) by a first stability factor $sf_1$ and earliest collected audio samples (e.g., the earliest collected audio samples $v_0$ and $v_1$) by a second stability factor $sf_2$. The first stability factor $sf_1$ may be set equal to a value as close as possible to one. In the case of an audio sample frame having 6000 samples, the first stability factor $sf_1$ may be set equal to 0.99995. The second stability factor $sf_2$ may be set equal to $(sf_1)^{p-1}$, where the value p is equal to the number of sample shifts required to process an audio sample frame using the sliding FFT. For example, a two-sample shift is required to update an audio sample frame based on the two most recently collected audio samples $v_{N_s-2}$ and $v_{N_s-1}$. In the case of the audio sample frame having 6000 samples, the value p may be set equal to 3000.

After the sliding FFT is determined or calculated at block 412, it is determined if a complete audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or one of the audio sample frames 304, 306, 308, and 310 of FIG. 3) has been obtained (block 414). At the monitoring sites 102 (FIG. 1A) and 152 (FIG. 1B), a complete audio sample frame is obtained when a plurality of most recently collected $N_S$ samples is obtained. For example, if an audio sample frame includes 6000 samples, a complete audio sample frame is obtained after 6000 new samples are obtained. At the reference site 104 (FIG. 1A) or the central data collection facility 154 (FIG. 1B), a complete audio sample frame is obtained when a most recently collected sample segment (e.g., one of the sample segments 312a-312f of FIG. 3) is obtained and a current audio sample frame is formed as described in greater detail above in connection with FIG. 3. If it is determined at block 414 that a complete audio sample frame has not been obtained, control is passed back to block 410. However, if it is

16

determined at block 414 that a complete audio sample frame has been obtained, a descriptor is generated (block 416). An example method for generating descriptors based on frequency components is described in greater detail below in connection with FIG. 5.

It is then determined if a complete descriptor set has been obtained (block 418). A descriptor set includes a predetermined number of descriptors that are used to form a signature. For example, if a 32-bit signature is formed by 8-bit descriptors, then a descriptor set includes four descriptors. If it is determined at block 418 that a complete descriptor set has not been obtained, control is passed back to block 410. However, if it is determined at block 418, that a complete descriptor set has been obtained, a digital spectral signature is generated by concatenating the descriptors of the descriptor set (block 420). After the digital spectral signature is generated (block 420), it is determined if another signature is to be generated (block 422). If another signature is to be generated, control is passed back to block 404.

FIG. 5 is a flow diagram of an example method for generating descriptors associated with the example method of FIG. 4. In particular, the example method of FIG. 5 may be used to implement block 416 of FIG. 4. An M-bit descriptor is generated by selecting M pairs of frequency components $f_{lb}$ that are uniquely associated with an audio sample frame and determining each bit of the descriptor based on intraframe comparisons of the spectral powers $P_{lb}$ of the frequency components $f_{lb}$. The frequency components $f_{lb}$ and the spectral powers $P_{lb}$ are indexed by a frequency component index l and a bit index b, where $0 \leq l < f\ index_{max}$ and $0 \leq b < M$.

The example method initially selects a first pair of frequency components $f_{00}$ and $f_{10}$ (block 502). Although consecutive frequency components are selected (i.e., $f_{0b}$ and $f_{1b}$, $f_{2b}$ and $f_{3b}$, etc.) in the example method, the frequency components may be selected from any location in the frequency spectrum of an audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or one of the audio sample frames 304, 306, 308, and 310 of FIG. 3). However, the frequency component indexes l used to select pairs of frequency components for generating a monitored signature are the same frequency component indexes l used to select pairs of frequency components for generating a corresponding reference signature.

After the first pair of frequency components $f_{00}$ and $f_{10}$ is selected, the spectral powers $P_{00}$ and $P_{10}$ corresponding to the selected frequency components are determined (block 504). One of ordinary skill in the art will readily appreciate that the spectral power for each frequency component can be obtained based on the results of the sliding FFT performed at block 412 of FIG. 4.

A descriptor bit is determined based on the frequency components $f_{00}$ and $f_{10}$ by comparing the first spectral power $P_{00}$ with the second spectral power $P_{10}$ (block 506). If the first spectral power is greater than the second spectral power (i.e., $P_{00} > P_{10}$), the descriptor bit is set equal to one. If, instead, the first spectral power is less than or equal to the second spectral power (i.e., $P_{00} \leq P_{10}$), the descriptor bit is set equal to zero.

It is then determined if another descriptor bit is to be determined (block 508). If another descriptor bit is to be determined, another pair of frequency components is selected (e.g., $f_{21}$ and $f_{31}$) (block 510) and control is passed back to block 504. If, instead, another descriptor bit is not to be determined, the example method of FIG. 5 may be stopped.

FIG. 6 is a flow diagram of another example method for generating digital spectral signatures based on spectral decompositions. In particular, the example method of FIG. 6 may be used to generate digital spectral signatures (e.g., reference signatures and monitored signatures) based on wavelet decompositions of audio sample frames (e.g., the audio sample frames 204, 206, 208, and 210 of FIG. 2 or 304,

**Ex. 1**

US 7,783,889 B2

17

**306**, **308**, and **310** of FIG. **3**) using wavelet transforms. As described above, wavelet transforms may be employed to analyze data using different scales and/or resolutions by separating blocks or frames of data (e.g., the audio sample frames **204**, **206**, **208**, **210**, **304**, **306**, **308**, and **310**) into multiple sub-bands.

Initially, the example method obtains an audio stream (block **602**) (e.g., the example monitored audio stream **202** of FIG. **2** or the example reference audio stream **302** of FIG. **3**). A reference time to described above in connection with FIGS. **2** and **3** is determined (block **604**) to indicate the time within an audio stream at which a signature is generated. An audio sample frame is then obtained (block **606**). The audio sample frame may be obtained by sampling an analog audio stream at a sampling frequency $f_s$ and performing an analog-to-digital conversion. Alternatively, the audio sample frame may be obtained by extracting or acquiring samples from a digital audio stream at a sampling frequency $f_s$. Based on the Nyquist Theorem, aliasing is avoided by sampling the audio samples at frequencies ranging from zero to

$$\frac{f_s}{2}.$$

A descriptor is then determined (block **608**) based on wavelet decomposition performed using a wavelet transform. An example method for generating descriptors based on one or more wavelet decompositions is described in greater detail below in connection with FIG. **7**.

After the descriptor is generated, it is determined if a complete descriptor set has been obtained (block **610**). If a complete descriptor set has not been obtained, a next audio sample frame is obtained (block **612**) and control is passed back to block **608**. However, if a complete descriptor set has been obtained, a digital spectral signature is generated (block **614**) by concatenating the descriptors of the descriptor set. After the digital spectral signature is generated, it is determined if another signature is to be generated (block **616**). If another signature is to be generated, control is passed back to block **604**. Otherwise, the example method is stopped.

FIG. **7** is a flow diagram of an example method for generating descriptors associated with the example method of FIG. **6**. In particular, the example method of FIG. **7** may be used to implement block **608** of FIG. **6**. An M-bit descriptor is generated by performing an M-level wavelet decomposition on an audio sample frame (e.g., one of the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or one of the audio sample frames **304**, **306**, **308**, and **310** of FIG. **3**). For each level wavelet decomposition, the energy of the audio signal for each sub-band is determined and descriptors are generated based on comparisons of the sub-band energies. For each descriptor, the M-level wavelet decomposition is implemented as an intraframe operation that is performed on spectral energies that are uniquely associated with an audio sample frame. Additionally, the M-level wavelet decomposition may be implemented using any wavelet transform. For purposes of clarity, the example method of FIG. **7** is described in terms of the well-known Daubechies wavelet transform.

Initially, the example method performs a first-level wavelet decomposition (block **702**) by applying the Daubechies wavelet transform to an audio sample frame. The first application of the Daubechies wavelet transform results in a low-frequency sub-band block of filtered values $L_0$ and a high-frequency sub-band block of filtered values $H_0$, each of which includes

18

$$\frac{N_S}{2}$$

filtered values.

Turning in greater detail to the Daubechies wavelet transform implementation, the Daubechies coefficients $c_0$, $c_1$, $c_2$, and $c_3$ are used to generate an $N_S \times N_S$ transformation matrix in which the coefficients are arranged as shown below.

$$\begin{bmatrix} c_0 & c_1 & c_2 & c_3 & & & & & \\ c_3 & -c_2 & c_1 & -c_0 & & & & & \\ & & c_0 & c_1 & c_2 & c_3 & & & \\ & & c_3 & -c_2 & c_1 & -c_0 & & & \\ & & & & & & c_0 & c_1 & c_2 & c_3 \\ & & & & & & c_3 & -c_2 & c_1 & -c_0 \\ c_2 & c_3 & & & & & & & c_0 & c_1 \end{bmatrix}$$

The coefficients are ordered in the transformation matrix, as shown above, using two dominant patterns. The odd rows include the first pattern, which is an ordering of the coefficients that functions as a smoothing filter (e.g., similar to a moving filter). The even rows include the second pattern, which is an ordering of the coefficients that functions to bring out the details of data (e.g., the audio sample frame). The transformation matrix is first applied to the entire audio sample frame (e.g., all of the $N_S$ samples) to generate filtered values that include low-frequency sub-band filtered values alternated with high-frequency sub-band filtered values. The values are de-interleaved to generate the two sub-band blocks $L_0$ and $H_0$, each of which includes

$$\frac{N_S}{2}$$

samples. The low-frequency sub-band block $L_0$ includes filtered values that are associated with sub-band frequencies ranging from zero to

$$\frac{f_s}{4}.$$

The high-frequency sub-band block $H_0$ includes filtered values that are associated with sub-band frequencies ranging from

$$\frac{f_s}{4} \text{ to } \frac{f_s}{2}.$$

An

$$\frac{N_S}{2} \times \frac{N_S}{2}$$

transformation matrix of the Daubechies coefficients is then applied to the low-frequency sub-band block $L_0$ to generate

**Ex. 1**

US 7,783,889 B2

19

two additional sub-band blocks $L_1$ and $H_1$. For each transformation, the number of filtered values in each sub-band block is halved. Additionally, for each transformation, a descriptor is generated based on a high-frequency sub-band block (e.g., $H_0, H_1, H_2$, etc.). Further details related to the implementation of wavelet transforms are well known in the art and are not described herein.

After the first-level wavelet transform is applied, the high-frequency sub-band block $H_0$ is parsed by separating the filtered values into a first half and a second half (block 704). Next, at a block 706, a first energy value $E_0$ is determined by squaring and summing the filtered values of the first half of the high-frequency sub-band block $H_0$ and a second energy value $E_1$ is also determined (block 706) by squaring and summing the filtered values of the second half of the high-frequency sub-band block $H_0$.

A descriptor bit is determined by comparing the first energy value $E_0$ with the second energy value $E_1$ (block 708). For example, if the first energy value $E_0$ is greater than the second energy value $E_1$ (i.e., $E_0 > E_1$), the first descriptor bit is set equal to one. If the first energy value $E_0$ is less than or equal to the second energy value $E_1$ (i.e., $E_0 \leqq E_1$), the first descriptor bit is set equal to zero. It is then determined if another descriptor bit is to be determined (block 710). If another descriptor bit is to be determined, a next-level wavelet decomposition is performed (block 712). For example, as described above, if a second-level wavelet decomposition is performed, an

$$\frac{N_S}{2} \times \frac{N_S}{2}$$

transformation matrix is applied to the filtered values of the low-frequency sub-band block $L_0$ to determine filtered sub-band blocks $L_1$ and $H_1$. If it is determined at block 710 that another descriptor bit is not to be determined, the example method of FIG. 7 may be stopped.

FIG. 8 is a flow diagram of an example method for comparing the digital spectral signatures (e.g., monitored signatures and reference signatures) generated using the example methods of FIGS. 4-7. In particular, the example method may be used to compare a monitored signature with a reference signature, both of which are generated based on a sliding FFT or a wavelet transform. In general, the example method of FIG. 8 may be used to match a monitored signature with a reference signature by comparing the monitored signature with a plurality of reference signatures. Identification information (e.g., channel, program title, episode number, etc.) associated with a matching reference signature may then be retrieved from, for example, a database and used to generate media ratings information. The comparisons may be performed by comparing any number of bits from a monitored signature with the same number of bits from a reference signature such as, for example, a bit-by-bit comparison, a byte-by-byte comparison, a word-by-word comparison, etc. Due to the large number of reference signatures available for comparison, a Hamming distance may be used for the comparisons to eliminate mismatches rapidly, thereby significantly decreasing the time required to compare a monitored signature with the reference signatures.

As is known to one of ordinary skill in the art, a Hamming distance between two values may be identified by determining how many bits, numbers, characters, etc. need to be changed to make the two values equal. For example, a first binary value of 0110 and a second binary value of 0101 have

20

a Hamming distance of two because bit location zero and bit location one need to be changed to make the first binary value equal to the second binary value.

Now turning in detail to the example method of FIG. 8, the example method involves first obtaining a monitored signature (block 802). A reference time to for the monitored signature is then obtained (block 804). A first reference signature corresponding to a time within a reference audio stream indicated by the reference time to is obtained from, for example, the memory 134 of FIGS. 1A and 1B (block 806). The first descriptor of the monitored signature and the first descriptor of the reference signature are then obtained (block 808).

The first descriptor of the monitored signature is compared to the first descriptor of the reference signature to determine if the descriptors match (block 810). If a match is detected, it is determined if all of the descriptors of the monitored signature and the reference signature have been compared (block 812). If it is determined at block 812 that all of the descriptors have not been compared, the next descriptors are obtained from the monitored signature and the reference signature (block 816) and control is passed back to block 810. If it is determined at block 812 that all of the descriptors have been compared, the monitored audio stream is identified based on the matching reference signature (block 814). Alternatively, the example method may be implemented so that multiple monitored signatures of a single audio stream need to be matched to multiple signatures of a reference audio stream prior to identifying the monitored audio stream.

If it is determined at block 810 that the descriptors do not match, then it is determined if all of the reference signatures has been compared (block 818). If all of the reference signatures have not been compared, the next reference signature is obtained (block 820) and control is passed to block 808. However, if it is determined at block 818 that all of the reference signatures have been compared, the media, channel, radio station, etc. associated with the monitored audio stream may be unidentifiable and the example method is stopped. A flag may be set to indicate that the monitored audio stream is unidentifiable.

Although, the example method of FIG. 8 is described as comparing one reference signature at a time, the example method can be adapted to compare multiple reference signatures with one monitored signature in parallel (i.e., at the same time). For example, the operation of block 806 may be configured to obtain a plurality of reference signatures at one time, each of which corresponds to a different reference audio stream. The operation of block 808 may be configured to obtain the first descriptor of each of the plurality of reference signatures retrieved at block 806. The descriptors of each of the reference signatures may be compared with the each descriptor of the monitored signature until a match is found or until the plurality of reference signatures obtained at block 806 is eliminated, after which time another plurality of reference signatures may be obtained at block 820.

One of ordinary skill in the art can readily appreciate that applying the Hamming distance to the comparison process may significantly reduce the time required to match all of the available reference signatures. For example, after the first descriptor of each of a plurality of reference signatures are compared to the first descriptor of a monitored signature, the first descriptor of each of the reference signatures is associated with a Hamming distance. Only reference signatures having first descriptors associated with a Hamming distance less than a predetermined Hamming distance threshold are further compared with the monitored signature based on the next descriptor of each of the reference signatures and the monitored signature. Reference signatures having descriptors

**Ex. 1**

US 7,783,889 B2

21

associated with a Hamming distance greater than a predetermined threshold are discarded. The number of reference signatures to be compared based on the next descriptors is reduced from the number of reference signatures compared to the monitored signature based on the first descriptor. In this manner, with each iteration of the comparison process, the number of reference signatures that remain to be compared in subsequent iterations of the signature comparison process quickly diminishes until it is determined that all of the descriptors of a single reference signature are associated with a Hamming distance below the predetermined Hamming distance threshold.

In instances where all of the descriptors of more than one reference signature are associated with a Hamming distance below the predetermined Hamming distance threshold, more than one monitored signature may need to be matched with respective reference signatures of the possible matching reference audio streams. It will be relatively unlikely that all of the monitored signatures generated based on the monitored audio stream will match all of the reference signatures of more than one reference audio stream, and, thus erroneously matching more than one reference audio stream to the monitored audio stream can be prevented.

The example methods described above in connection with FIGS. 4-8 may be implemented by hardware, software, and/or any combination thereof. More specifically, the example methods may be executed in hardware defined by the block diagrams of FIGS. 9-11. The example methods may also be implemented by software executed on a processor system such as, for example, the processor system 1210 of FIG. 12.

FIG. 9 is a block diagram of an example signature generation system 900 for generating digital spectral signatures. In particular, the example signature generation system 900 may be used to generate monitored signatures and/or reference signatures based on a sliding FFT as described above in connection with the example methods of FIGS. 4 and 5. For example, the example signature generation system 900 may be used to implement the signature generators 114 and 122 of FIG. 1A or the signature generators 156 and 158 of FIG. 1B. Additionally, the example signature generation system 900 may be used to implement the example methods of FIGS. 4 and 5.

As shown in FIG. 9, the example signature generation system 900 includes a sample generator 902, a timing device 903, a reference time generator 904, a sliding FFT module 906, a frequency identifier 908, a spectral power value identifier 910, a comparator 912, a descriptor generator 914, a concatenator 916, and a data communication interface 918, all of which may be communicatively coupled as shown. The example signature generation system 900 may be configured to obtain an example audio stream 920, acquire a plurality of audio samples from the example audio stream 920, and generate digital spectral signatures based on the audio samples.

The sample generator 902 may be configured to obtain the example audio stream 920, which may be any analog or digital audio stream. If the example audio stream 920 is an analog audio stream, the sample generator 902 may be implemented using an analog-to-digital converter. If the example audio stream 920 is a digital audio stream, the sample generator 902 may be implemented using a digital signal processor. Additionally, the sample generator 902 may be configured to acquire and/or extract audio samples at any desired sampling frequency $f_s$ and notify the reference time generator 904 when an audio sample acquisition process begins. The sample generator 902 communicates samples to the sliding FFT module 906. The sample generator 902 may also be configured to notify the frequency identifier 908 when an

22

audio sample frame (e.g., one of the audio sample frames 204, 206, 208, and 210 of FIG. 2 or 304, 306, 308, and 310 of FIG. 3) or a sample segment (e.g., one of the sample segments 312a-f of FIG. 3) has been generated.

The timing device 903 may be configured to generate time data and/or timestamp information and may be implemented by a clock, a timer, a counter, and/or any other suitable device. The timing device 903 may be communicatively coupled to the reference time generator 904 and may be configured to communicate time data and/or timestamps to the reference time generator 904. The timing device 903 may also be communicatively coupled to the sample generator 902 and may assert a start signal or interrupt to instruct the sample generator 902 to begin collecting or acquiring audio sample data. In one example, the timing device 903 may be implemented by a real-time clock having a 24-hour period that tracks time at a resolution of milliseconds. In this case, the timing device 903 may be configured to reset to zero at midnight and track time in milliseconds with respect to midnight.

The reference time generator 904 may initialize a reference time to when a notification is received from the sample generator 902. As described above in connection with FIGS. 2 and 3, the reference time $t_0$ may be used to indicate the time within an audio stream at which a signature is generated. In particular, the reference time generator 904 may be configured to read time data and/or a timestamp value from the timing device 903 when notified of the beginning of a sample acquisition process by the sample generator 902. The reference time generator 904 may then store the timestamp value as the reference time to.

The sliding FFT module 906 may be configured to perform a sliding FFT using the audio samples obtained from the sample generator 902. As described above in connection with FIG. 4, a sliding FFT may update frequency spectrum data each time two samples (e.g., the two most recently acquired samples $v_{N_s-2}$ and $v_{N_s-1}$) are obtained from the sample generator 902.

The frequency identifier 908 may be configured to identify one or more frequency pairs from frequency spectrum data in response to a notification from the sample generator 902 that a new audio sample frame or a new sample segment has been generated. For example, if the example signature generation system 900 is configured to generate monitored signatures, the frequency identifier 908 identifies frequency pairs from the frequency spectrum data in response to a new audio sample frame notification. Alternatively, if the example signature generation system 900 is configured to generate reference signatures, an audio sample frame of data is formed with each new sample segment as described above in connection with FIG. 3. Therefore, the frequency identifier 908 identifies frequency pairs from the frequency spectrum data in response to a new sample segment notification. The frequency identifier 908 may then be configured to communicate indexes identifying the frequency components of the frequency pairs to the spectral power value identifier 910.

The spectral power value identifier 910 may be configured to obtain the indexes associated with the frequency components of the frequency pairs from the frequency identifier 908. The spectral power value identifier 910 may then determine or identify the spectral power of each frequency component of the frequency pairs by retrieving the spectral power value for each frequency component from the frequency spectrum data generated by the sliding FFT module 906. The spectral power values may then be communicated to the comparator 912.

As described above in connection with FIG. 5, the comparator 912 and the descriptor generator 914 may work coop-

**Ex. 1**

US 7,783,889 B2

23

eratively to generate M-bit descriptors. The comparator **912** may obtain the spectral power values and compare the spectral power values for each frequency pair. The descriptor generator **914** may be configured to obtain comparison results from the comparator **912** and generate the descriptor bits of an M-bit descriptor based on the comparison results.

The concatenator **916** may obtain descriptor values from the descriptor generator **914**. When a complete set of descriptors is obtained, the concatenator **916** may concatenate the descriptors **916** to form a digital spectral signature. The data communication interface **918** may obtain the digital spectral signatures from the concatenator **916** and the reference time to corresponding to the digital spectral signature and communicate the same to a memory and/or a reference site. For example, if the example signature generation system **900** is configured to generate monitored signatures at the monitoring site **102** (FIG. **1A**), the monitored signatures may be communicated to the central data collection facility (FIG. **1A**) via the network **108** (FIG. **1A**). Alternatively, if the example signature generation system **900** is configured to generate reference signatures, the reference signatures may be communicated to the central data collection facility **154** (FIG. **1B**) and/or stored in the memory **134** (FIG. **1B**).

FIG. **10** is a block diagram of another example signature generation system **1000** for generating digital signatures based on audio streams. In particular, the example signature generation system **1000** may be used to generate monitored signatures and/or reference signatures based on wavelet transforms as described above in connection with the example methods of FIGS. **6** and **7**. For example, the example signature generation system **1000** may be used to implement the signature generators **114** and **122** of FIG. **1A** and generate monitored signatures. Additionally or alternatively, the example signature generation system **1000** may be used to implement the signature generators **156** and **158** of FIG. **1B**. In addition, the example signature generation system **1000** may be used to implement the example methods of FIGS. **6** and **7**.

The example signature generation system **1000** includes the sample generator **902**, the timing device **903**, the reference time generator **904**, the comparator **912**, the descriptor generator **914**, the concatenator **916**, and the data communication interface **918** of the example signature generation system **900** described above in connection with FIG. **9**. Additionally, the example signature generation system **1000** includes a wavelet transform module **1002**, a sub-band block identifier **1004**, and an energy value generator **1006**, all of which may be communicatively coupled as shown.

The wavelet transform module **1002** may be configured to apply wavelet transforms to audio samples obtained from the sample generator **902**. For example, the wavelet transform module **1002** may obtain an audio sample frame (e.g., one of the audio sample frames **204**, **206**, **208**, and **210** of FIG. **2** or **304**, **306**, **308**, and **310** of FIG. **3**) from the sample generator **902** and perform an M-level wavelet decomposition on the audio samples to generate filtered data values using, for example, the Daubechies wavelet transform as described in connection with FIGS. **6** and **7**. The filtered data values may then be communicated to the sub-band block identifier **1004**.

The sub-band block identifier **1004** may be configured to obtain the filtered data values from the wavelet transform module **1002** and generate a low-frequency sub-band block $L_x$ and a high-frequency sub-band block $H_x$. As described in greater detail above in connection with FIG. **7**, the sub-band blocks $L_x$ and $H_x$ may be identified by de-interleaving the filtered data values. The low-frequency sub-band block may then be communicated to the wavelet transform module **1002**

24

to perform another wavelet decomposition and the high-frequency sub-band filtered block may be communicated to the energy value generator **1006**.

The energy value generator **1006** may be configured to generate energy values $E_x$ based on the high-frequency sub-band block. The energy value generator **1006** may be configured to parse or separate the high-frequency sub-band block into a first half of filtered data values and a second half of filtered data values as described in greater detail above in connection with FIG. **7**. The energy value generator **1006** may then generate a first energy value $E_0$ by squaring and summing the first half of filtered data values. A second energy value $E_1$ may be generated by squaring and summing the second half of filtered data values.

The comparator **912** and the descriptor generator **914** may be configured to generate descriptors based on energy values. For example, the comparator **912** may obtain energy values from the energy value generator **1006** and compare a first energy to a second energy value. The descriptor generator **914** may obtain comparison results from the comparator **912** and generate the bits of an M-bit descriptor based on the comparison results.

The concatenator **916** may obtain descriptors from the descriptor generator **914** and generate digital spectral signatures by concatenating a plurality of descriptors as described above in connection with FIG. **9**. The data communication interface **918** may then store or transmit signatures obtained from the concatenator **916** with corresponding reference times obtained from the reference time generator **904**.

FIG. **11** is a block diagram of an example signature comparison system **1100** for comparing digital spectral signatures. In particular, the example signature comparison system **1100** may be used to compare monitored signatures with reference signatures. For example, the example signature comparison system **1100** may be used to implement the signature analyzer **132** of FIG. **1** to compare monitored signatures with reference signatures. Additionally, the example signature comparison system **1100** may be used to implement the example method of FIG. **8**.

The example signature comparison system **1100** includes a monitored signature receiver **1102**, a reference signature receiver **1104**, a comparator **1106**, a Hamming distance filter **1108**, a media identifier **1110**, and a media identification look-up table interface **1112**, all of which may be communicatively coupled as shown.

The monitored signature receiver **1102** may be configured to obtain monitored signatures via the network **106** (FIG. **1**) and communicate the monitored signatures to the comparator **1106**. The reference signature receiver **1104** may be configured to obtain reference signatures from the memory **134** (FIGS. **1A** and **1B**) and communicate the reference signatures to the comparator **1106**.

The comparator **1106** and the Hamming distance filter **1108** may be configured to compare reference signatures to monitored signatures using Hamming distances. In particular, the comparator **1106** may be configured to compare descriptors of monitored signatures with descriptors from a plurality of reference signatures and to generate Hamming distance values for each comparison. The Hamming distance filter **1108** may then obtain the Hamming distance values from the comparator **1106** and filter out non-matching reference signatures based on the Hamming distance values as described above in connection with FIG. **8**.

After a matching reference signature is found, the media identifier **1110** may obtain the matching reference signature and in cooperation with the media identification look-up table interface **1112** may identify the media information associated

**Ex. 1**

US 7,783,889 B2

25

with an unidentified audio stream (e.g., the example monitored audio stream 202 of FIG. 2). For example, the media identification look-up table interface 1112 may be communicatively coupled to a media identification look-up table or a database that is used to cross-reference media identification information (e.g., movie title, show title, song title, artist name, episode number, etc.) based on reference signatures. In this manner, the media identifier 1110 may retrieve media identification information from the media identification database based on the matching reference signatures.

FIG. 12 is a block diagram of an example processor system 1210 that may be used to implement the apparatus and methods described herein. As shown in FIG. 12, the processor system 1210 includes a processor 1212 that is coupled to an interconnection bus or network 1214. The processor 1212 includes a register set or register space 1216, which is depicted in FIG. 12 as being entirely on-chip, but which could alternatively be located entirely or partially off-chip and directly coupled to the processor 1212 via dedicated electrical connections and/or via the interconnection network or bus 1214. The processor 1212 may be any suitable processor, processing unit or microprocessor. Although not shown in FIG. 12, the system 1210 may be a multi-processor system and, thus, may include one or more additional processors that are identical or similar to the processor 1212 and that are communicatively coupled to the interconnection bus or network 1214.

The processor 1212 of FIG. 12 is coupled to a chipset 1218, which includes a memory controller 1220 and an input/output (I/O) controller 1222. As is well known, a chipset typically provides I/O and memory management functions as well as a plurality of general purpose and/or special purpose registers, timers, etc. that are accessible or used by one or more processors coupled to the chipset. The memory controller 1220 performs functions that enable the processor 1212 (or processors if there are multiple processors) to access a system memory 1224 and a mass storage memory 1225.

The system memory 1224 may include any desired type of volatile and/or non-volatile memory such as, for example, static random access memory (SRAM), dynamic random access memory (DRAM), flash memory, read-only memory (ROM), etc. The mass storage memory 1225 may include any desired type of mass storage device including hard disk drives, optical drives, tape storage devices, etc.

The I/O controller 1222 performs functions that enable the processor 1212 to communicate with peripheral input/output (I/O) devices 1226 and 1228 via an I/O bus 1230. The I/O devices 1226 and 1228 may be any desired type of I/O device such as, for example, a keyboard, a video display or monitor, a mouse, etc. While the memory controller 1220 and the I/O controller 1222 are depicted in FIG. 12 as separate functional blocks within the chipset 1218, the functions performed by these blocks may be integrated within a single semiconductor circuit or may be implemented using two or more separate integrated circuits.

The methods described herein may be implemented using instructions stored on a computer readable medium that are executed by the processor 1212. The computer readable medium may include any desired combination of solid state, magnetic and/or optical media implemented using any desired combination of mass storage devices (e.g., disk drive), removable storage devices (e.g., floppy disks, memory cards or sticks, etc.) and/or integrated memory devices (e.g., random access memory, flash memory, etc.).

Although certain methods, apparatus, and articles of manufacture have been described herein, the scope of coverage of this patent is not limited thereto. To the contrary, this patent

26

covers all methods, apparatus, and articles of manufacture fairly falling within the scope of the appended claims either literally or under the doctrine of equivalents.

What is claimed is:

1. A method for generating signatures implemented using an apparatus comprising a processor, the method comprising:
obtaining a first frame of media samples;
identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;
determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;
generating a first signature based on the first descriptor;
identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples;
identifying a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples;
determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and
generating a second signature based on the second descriptor.

2. A method as defined in claim 1, further comprising identifying media information based on the first signature.

3. A method as defined in claim 2, wherein a Hamming distance is used to identify the media information based on the first signature.

4. A method as defined in claim 2, wherein the media information is associated with at least one of audio information or video information.

5. A method as defined in claim 1, wherein the first descriptor is associated with only the first frame of media samples.

6. A method as defined in claim 1, wherein the second descriptor is of the second frame of media samples.

7. A method as defined in claim 1, wherein the spectral transform operation is a sliding Fast Fourier Transform.

8. An apparatus for generating signatures, comprising:
a processor system including a memory; and
instructions stored in the memory that enable the processor system to:
obtain a first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;
identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;
identify a third spectral power and a fourth spectral power; determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;
determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

**Ex. 1**

US 7,783,889 B2

27

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

9. An apparatus as defined in claim 8, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature.

10. An apparatus as defined in claim 9, wherein a Hamming distance is used to identify the media information based on the first signature.

11. An apparatus as defined in claim 8, wherein the first descriptor is associated with only the first frame of media samples.

12. An apparatus as defined in claim 8, wherein the instructions stored in the memory enable the processor system to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

13. An apparatus as defined in claim 8, wherein the third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

14. A tangible machine accessible medium having instructions stored thereon that, when executed, cause a machine to:

obtain a first frame first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples;

28

identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples;

identify a third spectral power and a fourth spectral power;

determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power;

determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and

generate a first signature based on the first descriptor and a second signature based on the second descriptor.

15. A tangible machine accessible medium as defined in claim 14, wherein the first descriptor is associated with only the first frame of media samples.

16. A tangible machine accessible medium as defined in claim 14 having instructions stored thereon that, when executed, cause the machine to:

obtain a first plurality of media samples; and

identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples.

17. A tangible machine accessible medium as defined in claim 14, wherein third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples.

*    *    *    *    *

**Ex. 1**

# EXHIBIT 2

**Ex. 2**

9/15/2023     The Nielsen Company (US), LLC v. TVision Insights, Inc.     ▉▉▉▉ 30(b)(6)
Highly Confidential - Attorneys' Eyes Only - Under the Protective Order

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

-----------------------------x
THE NIELSEN COMPANY (US), LLC,:
                              :
          Plaintiff,     :     C.A. No.
     vs.                      :
                              :     22-57-CJB
TVISION INSIGHTS, INC.,       :
                              :
          Defendant.     :
-----------------------------x

        **  HIGHLY CONFIDENTIAL  **
      **  OUTSIDE ATTORNEYS' EYES ONLY  **
      **  UNDER THE PROTECTIVE ORDER  **
   VIRTUAL VIDEOTAPED 30(b)(6) DEPOSITION
   OF VIDVITA CORPORATE REPRESENTATIVE

            ▉▉▉▉▉▉▉
        Friday, September 15, 2023
      10:07 a.m. Eastern Daylight Time

   REPORTER:   Dawn A. Jaques, CSR, CLR

_____
          DIGITAL EVIDENCE GROUP
       1730 M Street, NW, Suite 812
          Washington, D.C. 20036
             (202) 232-0646

Page 2

APPEARANCES:

On behalf of the Plaintiff, The Nielsen Company:

     KELLEY DRYE & WARREN LLP
     By:  Constantine "Dino" Koutsoubas, ESQ.
     333 West Wacker Drive, 26th Floor
     Chicago, Illinois  60606
     (312) 857-2321
     ckoutsoubas@kelleydrye.com

On behalf of the Defendant, TVision Insights:

     RIMON LAW
     By: Jason Xu, ESQ.
     1990 K Street, NW
     Suite 420
     Washington, D.C.  20006
     (202) 470-2141
     jason.xu@rimonlaw.com

Page 3

APPEARANCES (Continued):

On behalf of VidVita and the witness:

     HOLLAND & KNIGHT
     By:  Mark Francis, ESQ.
     31 West 52nd Street
     12th Floor
     New York, New York  10019
     (212) 513-3572
     mark.francis@hklaw.com


VIDEOGRAPHER AND DIGITAL EXHIBIT TECHNICIAN:
     Daniel Holmstock, Digital Evidence Group

Page 4

          I-N-D-E-X
WITNESS:                    PAGE:
▉▉▉▉▉▉
   Examination by Mr. Koutsoubas       11

          E-X-H-I-B-I-T-S
VIDVITA DEPOSITION EXHIBIT:          PAGE:
▉▉▉▉▉

1  (Pages 1 to 4)

**Ex. 2**

9/15/2023           The Nielsen Company (US), LLC v. TVision Insights, Inc.           ███████ 30(b)(6)
Highly Confidential - Attorneys' Eyes Only - Under the Protective Order



Page 5

E-X-H-I-B-I-T-S, CON'T

VIDVITA DEPOSITION EXHIBIT:        PAGE:

Page 7

E-X-H-I-B-I-T-S, CON'T

VIDVITA DEPOSITION EXHIBIT:        PAGE:

Page 8

PROCEEDINGS

THE VIDEOGRAPHER: We are now on the record. This is Video No. 1 in the 30(b)(6) video-recorded deposition of VidVita, today being represented by ███████ taken in the matter of The Nielsen Company (US), LLC, v. TVision Insights, Inc. The case is pending before the United States District Court for the District of Delaware, Case No. 22-57-CJB.

This deposition is being conducted by Zoom Video Remote Conferencing on September 15th, 2023. The time on the video screen is 10:07 a.m. Eastern Daylight Time.

My name is Daniel Holmstock; I am the legal videographer and digital exhibit technician from Digital Evidence Group. The court reporter today is Dawn Jaques, also in association with Digital Evidence Group.

All parties have stipulated to the witness being sworn in remotely.

Counsel, will you now please state your appearances and whom you represent,

2  (Pages 5 to 8)

**Ex. 2**

9/15/2023    The Nielsen Company (US), LLC v. TVision Insights, Inc.    ▮▮▮▮▮ 30(b)(6)
Highly Confidential - Attorneys' Eyes Only - Under the Protective Order

Page 9

followed by the court reporter administering the oath.

MR. KOUTSOUBAS:  This is Constantine Koutsoubas, Kelley Drye & Warren, representing The Nielsen Company, Plaintiff in this action.

MR. FRANCIS:  This is Mark Francis from Holland & Knight, representing VidVita, the deponent in this deposition.

MR. XU:  This is Jason Xu from Rimon on behalf of the Defendant, TVision, in this case.

THE REPORTER:  Ms. Bolivar, if you'll raise your right hand to be sworn, please.

(The witness was administered the oath.)

MR. FRANCIS:  And, Dino, just before we get started, just a couple of the quick usual items.

I just want to note for the record that the whole testimony, at least preliminarily, should be designated



3  (Pages 9 to 12)

**Ex. 2**

4 (Pages 13 to 16)

**Ex. 2**

9/15/2023          The Nielsen Company (US), LLC v. TVision Insights, Inc.          30(b)(6)
Highly Confidential - Attorneys' Eyes Only - Under the Protective Order

5 (Pages 17 to 20)

**Ex. 2**

9/15/2023          The Nielsen Company (US), LLC v. TVision Insights, Inc.              30(b)(6)
Highly Confidential - Attorneys' Eyes Only - Under the Protective Order

**Ex. 2**



`10 (Pages 37 to 40)`

**Ex. 2**

9/15/2023    The Nielsen Company (US), LLC v. TVision Insights, Inc.    30(b)(6)
Highly Confidential - Attorneys' Eyes Only - Under the Protective Order

12 (Pages 45 to 48)

**Ex. 2**

9/15/2023        The Nielsen Company (US), LLC v. TVision Insights, Inc.        30(b)(6)
Highly Confidential - Attorneys' Eyes Only - Under the Protective Order

**Ex. 2**

Ex. 3

# EXHIBIT 3

**Ex. 3**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 22-057-CJB |
| | ) | |
| v. | ) | **HIGHLY CONFIDENTIAL** |
| | ) | **OUTSIDECOUNSEL ONLY** |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |
| | ) | |

## <u>SUPPLEMENTAL REBUTTAL EXPERT REPORT OF</u>
## <u>DR. DAVID ANDERSON REGARDING U.S. PATENT NO. 7,783,889</u>

**HIGHLY CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

**Ex. 3**

## TABLE OF CONTENTS

I.      INTRODUCTION.................................................................................................1

II.     QUALIFICATIONS AND BACKGROUND ...................................................2

III.    METHODOLOGY USED....................................................................................5

      1.      Infringement.......................................................................................6

      2.      The Reverse Doctrine of Equivalents ........................................6

IV.     LEVEL OF ORDINARY SKILL ......................................................................7

V.      THE PATENT-IN-SUIT AND RELATED TECHNOLOGY .......................7

      1.      Overview..............................................................................................7

      2.      The Asserted Claims .......................................................................9

      3.      Spectral Transform Operations and Fast Fourier Transform ("FFT") Operations ...................................................12

VI.     CLAIM CONSTRUCTION ..............................................................................16

VII.    SUMMARY OF OPINIONS.............................................................................17

VIII.   NON-INFRINGEMENT ANALYSIS .............................................................17

      1.      Summary of the Accused Product Features ............................17

      2.      Independent Claim 1 ....................................................................21

            a)      "Reference Fingerprints" ....................................................21

            b)      "determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power" ...................................................22

            c)      "generating a first signature based on the first descriptor".......................32

            d)      "identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples" ........................................35

            e)      "determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power"................................37

**HIGHLY CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

Ex. 3

    f)  "generating a second signature based on the second descriptor" ...............37

  3.  Claim 1 Dependent Claims .......................................................................38

  4.  Independent Claim 8 ................................................................................39

  5.  Claim 8 Dependent Claims .......................................................................39

  6.  Independent Claim 14 ..............................................................................40

  7.  Claim 14 Dependent Claims .....................................................................41

**IX.**  **OTHER ANALYSIS** ........................................................................................**42**

  1.  Alleged Innovations of the '889 Patent ....................................................42

  2.  Non-infringing Alternatives......................................................................49

  3.  Comparability of Gracenote License ........................................................53

**X.**  **MISCELLANEOUS** ........................................................................................**55**

**CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

**Ex. 3**

## I.      INTRODUCTION

1.      I understand that The Nielsen Company (US), LLC ("Nielsen") has alleged that TVision Insights, Inc. ("TVision") infringes claims 1, 2, 4, 6, 8, 9, 12-14, 16, 17 ("asserted claims") of U.S. Patent No. 7,783,889 ("the '889 Patent" or "patent-in-suit").

2.      I have been retained by TVision as an expert in this case to provide opinions and conclusions regarding the asserted claims of the patents-in-suit and to evaluate and address the infringement opinions of Dr. Chris Kyriakakis, who has been engaged by Nielsen, as set forth in his report dated July 7, 2025 ("Kyriakakis Report").  Dr. Kyriakakis relies on the report of Dr. Paul Martin dated July 7, 2025 ("Martin Report").  To the extent my opinion applies differently to the Kyriakakis Report and the Martin Report, I will address them separately.  Otherwise, my opinions apply to both reports.

3.      This report provides the bases for my conclusion that accused TVision product(s) do not infringe any of the asserted claims.  I have reviewed the patent-in-suit, the respective prosecution histories for the patent-in-suit, the accused TVision product(s), and other documents in forming the opinions expressed in this report.  The materials I reviewed and/or relied upon are listed below.

4.      If Dr. Kyriakakis, Dr. Martin, or Nielsen is permitted to offer any additional or different opinions regarding infringement in reply or for any other reason, I reserve the right to supplement my report or to otherwise address such opinions and to provide any rebuttal opinions in response.  To the extent Dr. Kyriakakis or Dr. Martin is permitted to supplement or amend his reports to provide any such information, I reserve the right to address any such information or opinions and to supplement my report to the extent necessary.

**HIGHLY CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

**Ex. 3**

-23-



CONFIDENTIAL, OUTSIDE COUNSEL ONLY

Ex. 3



**CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

-25-



CONFIDENTIAL, OUTSIDE COUNSEL ONLY

**Ex. 3**

-26-



**CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

Ex. 3



Ex. 3

---

[4] Note, for the tmpZ and maxInfo arrays, I have used re-centered indices for this example. In the actual code, the data is copied into a larger array and padded with zeros for convenience in comparing samples around the borders in the sample indices are offset accordingly.

**CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

-27-



Freq_Size (1025)
x
Frame_Num (depending on audio

other potential **blue** points.

CONFIDENTIAL, OUTSIDE COUNSEL ONLY

-28-

Ex. 3



**CONFIDENTIAL, OUTSIDE COUNSEL ONLY**

I declare under penalty of perjury that the foregoing is true and correct.


Dated:  August 1, 2025

_____
David Anderson, Ph.D.

CONFIDENTIAL, OUTSIDE COUNSEL ONLY

**Ex. 3**

## Schedule A

**Table 1**

**FFT**

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 50 | 67 | 6 | 34 | 14 | 49 | 23 | 22 | 8 | 41 | 38 | 66 | 22 | 25 | 49 | 18 | 34 | 67 | 13 | 29 | 26 | 37 | 68 | 10 | 22 |
| 1950 | 61 | 37 | 52 | 9 | 6 | 23 | 17 | 22 | 8 | 13 | 0 | 5 | 13 | 7 | 19 | 8 | 27 | 23 | 17 | 39 | 24 | 35 | 91 | 36 | 28 |
| 1900 | 73 | 53 | 4 | 35 | 7 | 22 | 16 | 45 | 4 | 31 | 0 | 57 | 12 | 56 | 55 | 3 | 12 | 34 | 4 | 20 | 0 | 32 | 68 | 11 | 26 |
| 1850 | 0 | 48 | 56 | 60 | 12 | 10 | 20 | 36 | 9 | 39 | 4 | 63 | 25 | 3 | 33 | 22 | 17 | 61 | 51 | 29 | 9 | 20 | 38 | 49 | 21 |
| 1800 | 12 | 54 | 14 | 0 | 0 | 12 | 29 | 18 | 17 | 12 | 28 | 44 | 19 | 10 | 69 | 18 | 28 | 68 | 14 | 8 | 25 | 16 | 35 | 41 | 21 |
| 1750 | 40 | 38 | 42 | 7 | 10 | 18 | 57 | 35 | 19 | 15 | 24 | 29 | 0 | 35 | 9 | 41 | 35 | 40 | 24 | 34 | 26 | 32 | 68 | 58 | 36 |
| 1700 | 40 | 30 | 28 | 26 | 17 | 22 | 4 | 47 | 4 | 6 | 78 | 69 | 21 | 35 | 59 | 29 | 36 | 15 | 41 | 7 | 58 | 30 | 24 | 10 | 24 |
| 1650 | 33 | 71 | 46 | 43 | 2 | 49 | 56 | 28 | 15 | 21 | 71 | 64 | 6 | 12 | 24 | 38 | 9 | 5 | 51 | 11 | 33 | 3 | 93 | 26 | 58 |
| 1600 | 56 | 77 | 34 | 18 | 8 | 47 | 6 | 40 | 15 | 29 | 25 | 57 | 10 | 59 | 7 | 42 | 11 | 20 | 32 | 38 | 44 | 11 | 6 | 7 | 6 |
| 1550 | 3 | 27 | 28 | 55 | 11 | 13 | 55 | 5 | 11 | 39 | 63 | 52 | 16 | 41 | 51 | 30 | 7 | 65 | 37 | 9 | 34 | 25 | 71 | 3 | 1 |
| 1500 | 73 | 57 | 18 | 12 | 13 | 8 | 38 | 13 | 11 | 0 | 57 | 7 | 7 | 28 | 23 | 48 | 4 | 50 | 40 | 29 | 57 | 30 | 74 | 14 | 41 |
| 1450 | 35 | 71 | 45 | 17 | 17 | 19 | 20 | 40 | 4 | 58 | 28 | 52 | 22 | 48 | 30 | 31 | 7 | 14 | 4 | 34 | 10 | 11 | 75 | 6 | 25 |
| 1400 | 69 | 25 | 18 | 52 | 16 | 32 | 20 | 47 | 4 | 45 | 48 | 39 | 26 | 39 | 22 | 23 | 15 | 31 | 39 | 27 | 53 | 33 | 60 | 26 | 16 |
| 1350 | 23 | 49 | 33 | 12 | 8 | 19 | 11 | 35 | 15 | 17 | 38 | 31 | 23 | 20 | 27 | 6 | 17 | 4 | 22 | 16 | 56 | 8 | 20 | 33 | 23 |
| 1300 | 40 | 63 | 26 | 16 | 3 | 23 | 29 | 35 | 19 | 48 | 62 | 6 | 18 | 56 | 29 | 7 | 17 | 47 | 27 | 27 | 41 | 43 | 13 | 2 | 36 |
| 1250 | 70 | 35 | 39 | 46 | 12 | 37 | 59 | 30 | 7 | 47 | 4 | 3 | 17 | 20 | 68 | 29 | 37 | 56 | 23 | 10 | 9 | 48 | 59 | 3 | 9 |
| 1200 | 15 | 56 | 20 | 16 | 10 | 12 | 31 | 47 | 19 | 59 | 74 | 46 | 14 | 37 | 28 | 35 | 17 | 66 | 3 | 33 | 66 | 0 | 9 | 6 | 44 |
| 1150 | 13 | 48 | 53 | 48 | 16 | 35 | 23 | 28 | 12 | 43 | 0 | 7 | 20 | 17 | 2 | 33 | 18 | 56 | 33 | 36 | 10 | 22 | 66 | 53 | 21 |
| 1100 | 50 | 20 | 4 | 42 | 18 | 19 | 42 | 8 | 0 | 24 | 45 | 4 | 17 | 54 | 38 | 23 | 27 | 26 | 1 | 32 | 68 | 41 | 39 | 24 | 14 |
| 1050 | 14 | 63 | 45 | 62 | 4 | 9 | 0 | 22 | 4 | 7 | 29 | 42 | 5 | 5 | 8 | 27 | 20 | 64 | 28 | 13 | 5 | 37 | 78 | 51 | 28 |
| 1000 | 35 | 69 | 42 | 7 | 10 | 10 | 1 | 23 | 11 | 8 | 40 | 21 | 21 | 17 | 56 | 40 | 1 | 57 | 10 | 13 | 56 | 4 | 69 | 19 | 40 |
| 950 | 4 | 65 | 59 | 35 | 19 | 8 | 55 | 14 | 12 | 26 | 14 | 42 | 9 | 4 | 19 | 32 | 23 | 67 | 1 | 38 | 50 | 49 | 12 | 27 | 49 |
| 900 | 61 | 53 | 29 | 45 | 3 | 49 | 50 | 26 | 10 | 22 | 8 | 62 | 2 | 55 | 45 | 14 | 20 | 11 | 31 | 30 | 13 | 14 | 56 | 44 | 29 |
| 850 | 14 | 41 | 54 | 48 | 15 | 0 | 29 | 33 | 4 | 17 | 34 | 68 | 20 | 59 | 65 | 9 | 29 | 23 | 25 | 22 | 71 | 31 | 10 | 37 | 14 |
| 800 | 1 | 18 | 15 | 13 | 12 | 21 | 9 | 29 | 1 | 6 | 11 | 40 | 0 | 58 | 65 | 43 | 0 | 51 | 24 | 8 | 73 | 40 | 47 | 44 | 13 |
| 750 | 30 | 10 | 10 | 33 | 1 | 8 | 21 | 37 | 7 | 51 | 6 | 63 | 18 | 5 | 42 | 20 | 4 | 34 | 29 | 2 | 37 | 21 | 65 | 19 | 58 |
| 700 | 25 | 56 | 18 | 51 | 16 | 46 | 27 | 5 | 3 | 56 | 54 | 66 | 26 | 10 | 68 | 20 | 37 | 60 | 18 | 8 | 67 | 14 | 34 | 2 | 4 |
| 650 | 45 | 46 | 52 | 41 | 13 | 38 | 52 | 29 | 14 | 33 | 13 | 54 | 4 | 18 | 39 | 33 | 9 | 6 | 15 | 16 | 1 | 8 | 83 | 28 | 32 |
| 600 | 38 | 42 | 27 | 46 | 2 | 3 | 52 | 29 | 1 | 40 | 47 | 36 | 16 | 58 | 43 | 17 | 6 | 14 | 40 | 26 | 37 | 49 | 1 | 46 | 35 |
| 550 | 17 | 70 | 19 | 50 | 12 | 6 | 43 | 10 | 19 | 11 | 79 | 32 | 24 | 43 | 61 | 45 | 32 | 29 | 53 | 38 | 10 | 41 | 66 | 35 | 40 |
| 500 | 25 | 46 | 27 | 14 | 8 | 13 | 55 | 20 | 2 | 23 | 37 | 44 | 7 | 60 | 61 | 30 | 9 | 16 | 46 | 31 | 41 | 13 | 25 | 0 | 18 |
| 450 | 62 | 6 | 18 | 4 | 7 | 22 | 16 | 34 | 3 | 39 | 1 | 63 | 27 | 18 | 35 | 21 | 21 | 32 | 1 | 6 | 41 | 46 | 33 | 8 | 35 |
| 400 | 61 | 53 | 5 | 8 | 14 | 6 | 38 | 6 | 10 | 26 | 34 | 43 | 5 | 46 | 24 | 6 | 29 | 35 | 48 | 6 | 10 | 17 | 92 | 12 | 43 |
| 350 | 59 | 68 | 27 | 39 | 14 | 20 | 47 | 12 | 18 | 12 | 18 | 26 | 10 | 52 | 22 | 28 | 11 | 67 | 36 | 23 | 10 | 26 | 41 | 23 | 59 |
| 300 | 20 | 45 | 10 | 52 | 3 | 7 | 39 | 4 | 5 | 46 | 54 | 56 | 14 | 49 | 28 | 14 | 2 | 12 | 24 | 39 | 7 | 17 | 88 | 23 | 34 |
| 250 | 0 | 12 | 54 | 5 | 1 | 39 | 58 | 32 | 0 | 9 | 79 | 24 | 6 | 46 | 37 | 14 | 38 | 49 | 49 | 19 | 0 | 6 | 43 | 38 | 36 |
| 200 | 58 | 39 | 9 | 15 | 11 | 48 | 14 | 45 | 12 | 2 | 34 | 16 | 21 | 35 | 8 | 13 | 14 | 59 | 43 | 11 | 69 | 43 | 17 | 39 | 2 |
| 150 | 4 | 69 | 1 | 0 | 19 | 30 | 34 | 16 | 19 | 18 | 44 | 52 | 28 | 61 | 54 | 46 | 14 | 12 | 24 | 22 | 43 | 1 | 68 | 56 | 32 |
| 100 | 12 | 45 | 49 | 18 | 18 | 29 | 47 | 15 | 10 | 47 | 62 | 0 | 25 | 9 | 27 | 10 | 4 | 51 | 49 | 24 | 25 | 35 | 93 | 38 | 20 |
| 50 | 37 | 58 | 39 | 39 | 18 | 34 | 32 | 29 | 12 | 32 | 14 | 34 | 25 | 50 | 49 | 26 | 24 | 34 | 0 | 23 | 13 | 35 | 17 | 23 | 3 |

**Ex. 3**

**Table 2**

**getRowMax** - maxInfo

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| 1950 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 52 | 52 | 39 | 39 | 39 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 |
| 1900 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 57 | 57 | 57 | 57 | 57 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| 1850 | 60 | 60 | 60 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 61 | 61 | 61 | 61 | 61 | 61 |
| 1800 | 54 | 54 | 54 | 54 | 54 | 54 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 68 | 68 |
| 1750 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| 1700 | 47 | 47 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 69 | 59 | 59 | 59 | 58 | 58 |
| 1650 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 |
| 1600 | 77 | 77 | 77 | 77 | 77 | 77 | 77 | 77 | 77 | 77 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 44 | 44 | 44 |
| 1550 | 55 | 55 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 65 | 65 | 65 | 65 | 65 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 |
| 1500 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 57 | 57 | 57 | 57 | 57 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 |
| 1450 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 58 | 58 | 58 | 58 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 |
| 1400 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 52 | 52 | 52 | 53 | 53 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| 1350 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 38 | 38 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 |
| 1300 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 56 | 56 | 56 | 47 | 47 |
| 1250 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 59 | 59 |
| 1200 | 56 | 59 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 66 | 66 | 66 | 66 | 66 | 66 |
| 1150 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 56 | 56 | 56 | 56 | 56 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 |
| 1100 | 50 | 50 | 50 | 50 | 50 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| 1050 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 64 | 64 | 64 | 64 | 64 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 |
| 1000 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 57 | 57 | 57 | 57 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 |
| 950 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 |
| 900 | 61 | 61 | 61 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 56 | 56 | 56 | 56 | 56 |
| 850 | 54 | 54 | 54 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 |
| 800 | 29 | 29 | 29 | 40 | 40 | 58 | 65 | 65 | 65 | 65 | 65 | 65 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 |
| 750 | 37 | 51 | 51 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 |
| 700 | 56 | 56 | 56 | 66 | 66 | 66 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 67 | 67 |
| 650 | 52 | 52 | 52 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 |
| 600 | 52 | 52 | 52 | 52 | 52 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 49 | 49 |
| 550 | 70 | 70 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 66 | 66 | 66 | 66 | 66 | 66 |
| 500 | 55 | 55 | 55 | 55 | 55 | 60 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 46 | 46 |
| 450 | 62 | 62 | 62 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 46 | 46 | 46 | 46 | 46 | 46 |
| 400 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 53 | 48 | 48 | 48 | 48 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 |
| 350 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 |
| 300 | 52 | 52 | 54 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 |
| 250 | 58 | 58 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 49 | 49 | 49 | 49 | 49 | 49 |
| 200 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 59 | 59 | 59 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 |
| 150 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 61 | 61 | 61 | 61 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| 100 | 49 | 49 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 |
| 50 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 49 | 35 | 35 |

**Ex. 3**

**Table 3**

`if( maxInfo[i_f][i_t] == tmpZ[i_f][i_t] ) {`

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| 1950 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 52 | 52 | 39 | 39 | 39 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 |
| 1900 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 57 | 57 | 57 | 57 | 57 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| 1850 | 60 | 60 | 60 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 61 | 61 | 61 | 61 | 61 |
| 1800 | 54 | 54 | 54 | 54 | 54 | 54 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 68 | 68 |
| 1750 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| 1700 | 47 | 47 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 69 | 59 | 59 | 59 | 58 | 58 |
| 1650 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 |
| 1600 | 77 | 77 | 77 | 77 | 77 | 77 | 77 | 77 | 77 | 77 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 44 | 44 | 44 |
| 1550 | 55 | 55 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 65 | 65 | 65 | 65 | 65 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 |
| 1500 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 57 | 57 | 57 | 57 | 57 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 |
| 1450 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 58 | 58 | 58 | 58 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 |
| 1400 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 52 | 52 | 52 | 53 | 53 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| 1350 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 38 | 38 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 |
| 1300 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 56 | 56 | 56 | 47 | 47 | 47 |
| 1250 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 59 | 59 |
| 1200 | 56 | 59 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 66 | 66 | 66 | 66 | 66 | 66 |
| 1150 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 56 | 56 | 56 | 56 | 56 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 |
| 1100 | 50 | 50 | 50 | 50 | 50 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| 1050 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 64 | 64 | 64 | 64 | 64 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 |
| 1000 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 57 | 57 | 57 | 57 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 |
| 950 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 |
| 900 | 61 | 61 | 61 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 56 | 56 | 56 | 56 | 56 |
| 850 | 54 | 54 | 54 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 |
| 800 | 29 | 29 | 29 | 40 | 40 | 58 | 65 | 65 | 65 | 65 | 65 | 65 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 |
| 750 | 37 | 51 | 51 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 |
| 700 | 56 | 56 | 56 | 66 | 66 | 66 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 67 | 67 |
| 650 | 52 | 52 | 52 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 |
| 600 | 52 | 52 | 52 | 52 | 52 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 49 | 49 | 49 |
| 550 | 70 | 70 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 66 | 66 | 66 | 66 | 66 | 66 |
| 500 | 55 | 55 | 55 | 55 | 55 | 60 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 46 | 46 |
| 450 | 62 | 62 | 62 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 46 | 46 | 46 | 46 | 46 |
| 400 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 53 | 48 | 48 | 48 | 48 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 |
| 350 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 |
| 300 | 52 | 52 | 54 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 |
| 250 | 58 | 58 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 49 | 49 | 49 | 49 | 49 | 49 | 49 |
| 200 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 59 | 59 | 59 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 |
| 150 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 61 | 61 | 61 | 61 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| 100 | 49 | 49 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 |
| 50 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 49 | 35 | 35 |

**Ex. 3**

**Table 4**

`if(isListMax(maxInfo, &i_f, &i_t, s->opt_.deltaF_)) {`

| | 1 | 2 | 3 | 4 | 5 | 6 | 7 | 8 | 9 | 10 | 11 | 12 | 13 | 14 | 15 | 16 | 17 | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 2000 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| 1950 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 52 | 52 | 39 | 39 | 39 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 | 91 |
| 1900 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 57 | 57 | 57 | 57 | 57 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| 1850 | 60 | 60 | 60 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 61 | 61 | 61 | 61 | 61 |
| 1800 | 54 | 54 | 54 | 54 | 54 | 54 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 68 | 68 |
| 1750 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 57 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| 1700 | 47 | 47 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 69 | 59 | 59 | 59 | 58 | 58 |
| 1650 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 |
| 1600 | 77 | 77 | 77 | 77 | 77 | 77 | 77 | 77 | 77 | 77 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 59 | 44 | 44 | 44 |
| 1550 | 55 | 55 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 65 | 65 | 65 | 65 | 65 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 |
| 1500 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 57 | 57 | 57 | 57 | 57 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 |
| 1450 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 58 | 58 | 58 | 58 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 | 75 |
| 1400 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 52 | 52 | 52 | 53 | 53 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 | 60 |
| 1350 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 49 | 38 | 38 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 |
| 1300 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 56 | 56 | 56 | 47 | 47 | 47 |
| 1250 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 70 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 59 | 59 |
| 1200 | 56 | 59 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 74 | 66 | 66 | 66 | 66 | 66 | 66 |
| 1150 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 53 | 56 | 56 | 56 | 56 | 56 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 | 66 |
| 1100 | 50 | 50 | 50 | 50 | 50 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| 1050 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 64 | 64 | 64 | 64 | 64 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 | 78 |
| 1000 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 57 | 57 | 57 | 57 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 |
| 950 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 |
| 900 | 61 | 61 | 61 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 56 | 56 | 56 | 56 | 56 |
| 850 | 54 | 54 | 54 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 | 71 |
| 800 | 29 | 29 | 29 | 40 | 40 | 58 | 65 | 65 | 65 | 65 | 65 | 65 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 | 73 |
| 750 | 37 | 51 | 51 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 | 65 |
| 700 | 56 | 56 | 56 | 66 | 66 | 66 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 67 | 67 |
| 650 | 52 | 52 | 52 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 54 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 | 83 |
| 600 | 52 | 52 | 52 | 52 | 52 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 49 | 49 | 49 |
| 550 | 70 | 70 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 66 | 66 | 66 | 66 | 66 | 66 |
| 500 | 55 | 55 | 55 | 55 | 55 | 60 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 46 | 46 |
| 450 | 62 | 62 | 62 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 63 | 46 | 46 | 46 | 46 | 46 | 46 |
| 400 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 61 | 53 | 48 | 48 | 48 | 48 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 | 92 |
| 350 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 | 67 |
| 300 | 52 | 52 | 54 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 56 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 | 88 |
| 250 | 58 | 58 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 79 | 49 | 49 | 49 | 49 | 49 | 49 |
| 200 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 59 | 59 | 59 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 |
| 150 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 69 | 61 | 61 | 61 | 61 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 | 68 |
| 100 | 49 | 49 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 62 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 | 93 |
| 50 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 58 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 50 | 49 | 35 | 35 |

**Ex. 3**

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on Auguts 1, 2025, this document was served on the persons listed

below in the manner indicated:

**<u>BY EMAIL:</u>**

David E. Moore
Bindu A. Palapura
Andrew M. Moshos
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
amoshos@potteranderson.com

Steven Yovits
Jason P. Greenhut
Douglas Lewis
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
(312) 857-7070
syovits@kelleydrye.com
jgreenhut@kelleydrye.com
dlewis@kelleydrye.com

**Ex. 3**

*/s/ Andrew E. Russell*

Andrew E. Russell (No. 5382)
Lindsey M. Gellar (No. 7202)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
lgellar@shawkeller.com
*Attorneys for Defendant*

2

**Ex. 3**

Ex. 4


# EXHIBIT 4

**Ex. 4**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 22-057-CJB |
| | ) | |
| v. | ) | |
| | ) | **CONFIDENTIAL -** |
| TVISION INSIGHTS, INC., | ) | **OUTSIDE ATTORNEYS'** |
| | ) | **EYES ONLY** |
| Defendant. | ) | |
| | ) | |
| | ) | |

**OPENING SUPPLEMENTAL EXPERT REPORT OF DR. DAVID ANDERSON
REGARDING INVALIDITY OF U.S. PATENT NO. 7,783,889**

**Ex. 4**

## TABLE OF CONTENTS

I.    QUALIFICATIONS AND BACKGROUND ........................................................1

II.   SUMMARY OF THE PATENT-IN-SUIT AND RELATED TECHNOLOGY.... 4

      A.    The '889 Patent ..................................................................................4

      B.    Fast Fourier Transform ("FFT") Operations ...................................6

      C.    Signal Analysis using Overlapping Frames ...................................11

      D.    Content Recognition ........................................................................14

III.  Level of Skill of One of Ordinary Skill in the Art ....................................16

IV.   Summary of Opinions ................................................................................17

V.    CLAIM CONSTRUCTION ........................................................................17

VI.   LEGAL FRAMEWORK ............................................................................18

      A.    Anticipation ....................................................................................18

      B.    Obviousness ....................................................................................19

      C.    Written Description .........................................................................20

      D.    Priority Date ...................................................................................20

VII.  SUMMARY OF ANTICIPATION AND OBVIOUSNESS ..........................21

      A.    Summary of Prior Art ......................................................................21

      B.    Haitsma US .....................................................................................23

      C.    Wang 2002 .......................................................................................28

      D.    Cheung ............................................................................................34

      E.    Secondary Indications of Obviousness ...........................................41

VIII. OTHER GROUNDS OF INVALIDITY .....................................................43

      A.    Lack of Written Description ............................................................43

      B.    Unpatentable Subject Matter ...........................................................45

IX.   MATERIALS CONSIDERED ....................................................................46

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 4**

My name is David Anderson.  The following is my report summarizing the subjects, background, facts, and opinions regarding the invalidity of U.S. Patent No. 7,783,889 ("the '889 Patent") about which I expect to testify in this case if called upon to do so.

## I.    QUALIFICATIONS AND BACKGROUND

1.    I am a professor in the School of Electrical and Computer Engineering at the Georgia Institute of Technology ("Georgia Tech") in Atlanta, Georgia. I have been a professor at Georgia Tech since 1999. In 2009 I served as a visiting professor in the Department of Computer Science at Korea University in Seoul, South Korea.

2.    I received my Ph.D. in Electrical and Computer Engineering from Georgia Tech in 1999. I received my B.S. and M.S. in Electrical Engineering from Brigham Young University in 1993 and 1994, respectively.

3.    In my employment prior to Georgia Tech as well as in my subsequent studies and research, I have worked extensively in areas related to the research, design, and implementation of speech and audio processing systems, as well as in signal processing, including work on face recognition, optical flow (analysis of movement in video images), and imaging. I have also taught graduate and undergraduate level courses at Georgia Tech on the implementation of human-centered computing applications. For example, I have taught courses on machine learning for speech, pattern recognition, multimedia processing and systems, software design, real-time signal processing systems, and applications of signal processing (covering topics in audio processing and speech recognition). I have also designed and taught a course on signal processing in the context of human perception. These courses and my research have covered many topics relevant to the subject matter of the patents at issue and the prior art cited therein.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY          **Ex. 4**

of the '889 Patent and therefore is prior art.  To the extent Nielsen contests that the priority date of the '889 Patent is earlier than the filing date of the provisional application No. 60/603,024, I reserve the right to supplement my report in rebuttal.

61.    I understand that it is Nielsen's burden to prove that a reference that predates the filing date of the '889 Patent is not prior art.  If Nielsen contests whether any of the references I have relied upon are indeed prior art, I reserve the right to supplement my report in rebuttal.

## VII.    SUMMARY OF ANTICIPATION AND OBVIOUSNESS

### A.    Summary of Prior Art

62.    US Patent Application Publication No. 2002/0178410 A1 (Haitsma US) was published on November 28, 2002 and thus is prior art under at least 35 U.S.C. §102(a) and/or 102(b) to the '889 Patent.  Haitsma US is titled "Generating and matching hashes of multimedia content" and describes a method for generating robust hashes for multimedia content, for example, audio clips.  The audio clip is divided into successive (preferably overlapping) frames. For each frame, the frequency spectrum is divided into bands. A robust property of each band (*e.g.*, energy) is computed and represented by a respective hash bit. An audio clip is thus represented by a concatenation of binary hash words, one for each frame. To identify a possibly compressed audio signal, a block of hash words derived therefrom is matched by a computer with a large database.  (Haitsma US at Abstract)

63.    U.S. Patent Application Publication No. 2002/0083060 A1 (Wang 2002) was published on July 27, 2002 and thus is prior art under at least 35 U.S.C. § 102(a) and/or 102(b) to the '889 Patent.  Wang 2002 is titled "System and methods for recognizing sound

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**    **Ex. 4**

and music signals in high noise and distortion" and describes a method for recognizing an audio sample locates an audio file that most closely matches the audio sample from a database indexing a large set of original recordings. Each audio file is characterized by fingerprints which represent features of the signal at or near the landmark timepoints. To perform recognition, landmarks and fingerprints are computed for the unknown sample and used to retrieve matching fingerprints from the database. (Wang 2002 at Abstract)

64.     U.S. Patent No. 8,468,183 (Cheung) was filed February 16, 2005 and claims priority to a provisional application filed February 26, 2004 and thus is prior art under at least 35 U.S.C. § 102(e) to the '889 Patent. Cheung presents a method for identifying audio signals by comparing signatures against a database of known signal signatures. A known program is registered by deriving a numerical code for each of many short time segments during the program and storing the sequence of numerical codes and a reference to the identity of the program. Detection and identification of an input signal occurs by similarly extracting the numerical codes from it and comparing the sequence of detected numerical codes against the stored sequences. (Cheung at Abstract)

65.     European Patent 1387514 (Zheng) was filed July 24, 2003 and issued/published April 4, 2004 and thus is prior art under at least 35 U.S.C. § 102(a) to the '889 Patent. Zheng provides a method and an apparatus for determining whether two audio signals contain the same audio content. A comparison of the two audio signals is carried out using a low-bit representation of each signal that is generated using the dominant frequency within successive portions or frames of the signal. (Zheng at Abstract)

66.     U.S. Patent Application Publication No. 2002/0023020 A1 (Kenyon) was published on February 21, 2002 and thus is prior art under at least 35 U.S.C. § 102(a) and/or

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY     **Ex. 4**

102(b) to the '889 Patent. Kenyon discloses a method and system for capturing audio samples, extracting features, and using these features of the audio signals to recognizing audio data streams, for example, of musical recordings. (Kenyon at ¶ 0013)

67. U.S. Patent No. 5,313,531 (Jackson) was filed November 5, 1990, issued May 17, 1994 and thus is prior art under at least 35 U.S.C. § 102(a) and/or 102(b) to the '889 Patent. Jackson is directed at analyzing and comparing audio speech signals using signatures generated based on peaks in the power values in a spectrum. (Jackson at Abstract)

**B.    Haitsma US**

68. It is my opinion that claims 1, 2, 4–6, 8, 9, and 11–17 of the '889 Patent are invalid as anticipated by Haitsma US.

69. It is my opinion that claims 1, 2, 4–6, 8, 9, and 11–17 of the '889 Patent are invalid as obvious over Haitsma US in view of admitted prior art, and/or knowledge of one of skill in the art.

70. It is my opinion that claims 1, 2, 4–6, 8, 9, and 11–17 of the '889 Patent are invalid as obvious over Haitsma US in view of admitted prior art, knowledge of one of skill in the art, and/or Zheng, and/or Kenyon.

71. A detailed summary of my above-referenced opinion regarding Haitsma US in connection with the '889 Patent is provided in the associated chart attached to this Report as Exhibit 1.

72. I also provide some additional opinion regarding Haitsma US below.

73. A POSITA would have been motivated to combine Haitsma US in view of admitted prior art, knowledge of one of skill in the art., and/or Zheng, and/or Kenyon with

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY    Ex. 4

a reasonable expectation of success.

74.     Haitsma US and Zheng are from the same field of endeavor: systems that can be used to compare and match audio contents for content recognition and identification. Haitsma US and Zheng are directed to the same problem of audio content recognition based on unique signatures. Haitsma US and Zheng reference using FFT operation as part of the audio content recognition process. Haitsma US and Zheng both address the same esoteric problem in substantially the same way. Comparing and matching audio content for content recognition and identification is a specialized, narrow field, and audio content recognition and identification algorithms share a common basic structure. Thus, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Haitsma US with Zheng because both were directed to the problem of audio content recognition based upon unique signatures.

75.     A POSITA would further have understood that the audio processing circuits described in Haitsma US (e.g., [0028] – [0033]) could be implemented using the processor described in Zheng. Because the '889 Patent does not require a specific processor, a POSITA would have understood that the processor disclosed in Zheng can be used in the similar audio content recognition system disclosed in Haitsma US in lieu of the audio processing circuits. See Nelsen Depo. Tr. at 130:11-20 ("Q Yeah. Is it true that anything you program on a DSP you could perform -- you could also program using a CPU and memory? A Pretty much, yeah. Q And that was true as of the priority date? A I believe so."). Further, a processor described in Zheng is a common component in an audio recognition system that uses computers, such as the one in both Zheng and Haitsma US. A POSITA would be aware of the suitability of using a processor described in Zheng for an

24

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Ex. 4

audio recognition system due to the availability, speed, and ease-of-use of such processor in Zheng. A processor in a computer system such as the one in Zheng is common in the field and its functioning is not subject to unexpected results. Accordingly, a POSITA would have been motivated to use Zheng's processor in Haitsma US's system to process the audio recognition process, and the combination of Haistma US and Zheng would have been obvious and predictable.

76. A POSITA would further have understood that Zheng discloses the use of a second signature based upon a second descriptor extracted from a second frame which overlaps the first. (Zheng at Page 3 Lines 20-30). Zheng explains that its uses overlapping frames in part to avoid difficulties with audio synchronization. (*Id.*) Zheng also discloses that a separate signature is generated for each overlapping frame. (*Id.* at Fig. 3). Because the compatibility and similarity between Haitsma US and Zheng as I opined above, a POSITA looking to solve the problem of synchronizing signatures with overlapping frames structure would have been motivated to combine Haitsma US with Zheng. A POSITA would know that it would be advantageous to use the signature generation process in Zheng because Zheng discloses that using overlapping frames provides greater tolerance against synchronization problems and quickly varying audio content. A POSITA would know that creating a separate signature based on a separate frame is a natural and routine extension of creating a signature based on a single frame by leveraging the same creation process, which is not subject to unexpected results. Accordingly, a POSITA would have been motivated to use Zheng's signature creation process in Haitsma US's system to process the audio recognition process, and the combination of Haistma US and Zheng would have been obvious and predictable.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY    **Ex. 4**

77.    Similarly, Haitsma US and Kenyon are from the same field of endeavor: systems that can be used to compare and match audio contents for content recognition and identification. Haitsma US and Kenyon are directed to the same problem of audio content recognition based on unique signatures. Haitsma US and Kenyon reference using FFT operation as part of the audio content recognition process. Haitsma US and Kenyon reference using FFT operation as part of the audio content recognition process. Haitsma US and Kenyon both address the same esoteric problem in substantially the same way. Comparing and matching audio content for content recognition and identification is a specialized, narrow field, and audio content recognition and identification algorithms share a common basic structure. Thus, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Haitsma US with Kenyon because both were directed to the problem of audio content recognition based upon unique signatures.

78.    A POSITA would further have understood that the audio processing circuits described in Haitsma US (*e.g.*, [0028] – [0033]) could be implemented using the processor described in Kenyon. Because the '889 Patent does not require a specific processor, a POSITA would have understood that the processor disclosed in Kenyon can be used in the similar audio content recognition system disclosed in Haitsma US in lieu of the audio processing circuits. *See* Nelsen Depo. Tr. at 130:11-20. Further, a processor described in Kenyon is a common component in an audio recognition system that uses computers, such as the one in both Kenyon and Haitsma US. A POSITA would be aware of the suitability of using a processor described in Kenyon for an audio recognition system due to the availability, speed, and ease-of-use of such processor in Kenyon. A processor in a computer system such as the one in Kenyon is common in the field and its functioning is

26

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY    **Ex. 4**

not subject to unexpected results. Accordingly, a POSITA would have been motivated to use Kenyon's processor in Haitsma US's system to process the audio recognition process, and the combination of Haistma US and Kenyon would have been obvious and predictable.

79. A POSITA would further have understood that Kenyon teaches that instructions for carrying out the method may be stored on a program memory. (Kenyon, ¶0063). Because the compatibility and similarity between Haitsma US and Kenyon as I opined above, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Haitsma US with Kenyon. Because the '889 Patent does not require any specific memory to store instructions, a POSITA would have understood that the program memory disclosed in Kenyon to store instructions can be used in the similar audio content recognition system disclosed in Haitsma US. *See* Nelsen Depo. Tr. at 106:25-107:22 ("Q And the servers, you said, have CPUs; right? A Correct. Q And they have short-term memory, like RAM; right? And they would long-term memory, such as a hard drive? A Correct. Q And there would be software stored on the hard drive; right? … A That's correct. Yes. Q And the server would load the software off of the hard drive into the RAM; right? A Correct. Q And that software would control how the fingerprints are created from the tuner cards; right? A Correct. Q And that's the conventional way of doing it; right? A Correct.") Further, the program memory described in Kenyon is a common component in computers in an audio recognition system, such as the one in both Kenyon and Haitsma US. A POSITA would be aware of the suitability of using program memory described in Kenyon for an audio recognition system due to the availability and commonality of such program memory in Kenyon. A program memory in a computer system such as the one in Kenyon is common in the field and its functioning is not subject

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

**Ex. 4**

to unexpected results.    Accordingly, a POSITA would have been motivated to use Kenyon's program memory to store instruction in Haitsma US's system to process the audio recognition process, and the combination of Haistma US and Kenyon would have been obvious and predictable.

### C.    Wang 2002

80.    It is my opinion that claims 1, 2, 4–6, 8, 9, and 11–17 of the '889 Patent are invalid as obvious over Wang 2002 in view of admitted prior art, and/or knowledge of one of skill in the art.

81.    It is my opinion that claims 1, 2, 4–6, 8, 9, and 11–17 of the '889 Patent are invalid as obvious over Wang 2002 in view of admitted prior art, and/or knowledge of one of skill in the art, and/or Haitsma US, Kenyon, and/or Zheng.

82.    A detailed summary of my above-referenced opinion regarding Wang 2002 in connection with the '889 Patent is provided in the associated chart attached to this Report as Exhibit 2.

83.    I also provide some additional opinion regarding Wang 2002 below.

84.    A POSITA would have been motivated to combine Wang 2002 in view of admitted prior art, and/or knowledge of one of skill in the art, and/or Haitsma US, Kenyon, and/or Zheng with a reasonable expectation of success.

85.    Wang 2002 and Haitsma US are from the same field of endeavor: systems that can be used to compare and match audio contents for content recognition and identification.   Wang 2002 and Haitsma US are directed to the same problem of audio content recognition based on unique signatures. Wang 2002 and Haitsma US reference using FFT operation as part of the audio content recognition process.   Wang 2002 and

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**    **Ex. 4**

Haitsma US both address the same esoteric problem in substantially the same way. Comparing and matching audio content for content recognition and identification is a specialized, narrow field, and audio content recognition and identification algorithms share a common basic structure. Thus, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Wang 2002 and Haitsma US because both were directed to the problem of audio content recognition based upon unique signatures.

86.     A POSITA would further have understood that Haitsma US discloses a frame composed of media samples. (Haitsma US at [0007], [0025-0026], [0028], Claim1). Because the compatibility and similarity between Wang 2002 and Haitsma US as I opined above, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Wang 2002 and Haitsma US. A POSITA would know that it would be advantageous to use the structure and process of a frame composed of media samples in Haitsma US because a POSITA would know that such a structure promotes the efficiency of dividing large size media samples into manageable frame sizes. A POSITA would know that the structure and process of a frame composed of media is a routine method of managing and processing large media samples, which is not subject to unexpected results. Accordingly, a POSITA would have been motivated to use Haitsma US's frame of media samples structure in Wang 2002's system to process the audio recognition process, and the combination of Wang 2002 and Haitsma US would have been obvious and predictable. In fact, Haitsma US is identical to WO02/065782A1 (Haitsma), which is cited in Avery Wang, *An Industrial Strength Audio Search Algorithm*, Proceeding of 4th International Conference on Music Information Retrieval, Baltimore (2003)

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY    **Ex. 4**

("Wang") at citation [3]. Haitsma US and Haitsma are from the same inventor for the same invention. Wang 2002 and Wang are also from the same inventor for the same invention.

87.    A POSITA would further have understood that Haitsma US discloses finding the largest energy level in the neighborhood of a frame (a descriptor of a frame based on a comparison of at least two spectral powers of the frame). (Haitsma US at [0032-0033]). Because the compatibility and similarity between Wang 2002 and Haitsma US as I opined above, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Wang 2002 and Haitsma US. A POSITA would know that it would be advantageous to use the intraframe process of finding the largest energy level in the neighborhood of a frame in Haitsma US because a POSITA would know that such a process promotes the efficiency of less computing complexity. A POSITA would also understand that common signal quality issues, such as background noise or non-ideal speaker/microphone responses, can affect many signal features but the locations of the peak spectral values is fairly robust to such issues. *See, e.g.*, Wang at p2 ("The peaks in each time-frequency locality are also chosen according amplitude, with the justification that the highest amplitude peaks are most likely to survive the distortions listed above.") A POSITA would know that the intraframe process of finding the largest energy level in the neighborhood of a frame is a generic and routine method of calculating the descriptor of a frame, which is not subject to unexpected results. Because the '889 Patent does not require a specific type of descriptor, a POSITA would have understood that the process of finding the largest energy level in the neighborhood of a frame disclosed in Haitsma US can be used in lieu of similar calculation disclosed in Wang 2002. In fact, Haitsma US is identical to WO02/065782A1 (Haitsma), which is cited in Wang at citation [3]. Haitsma US and

30

**CONFIDENTIAL** - OUTSIDE ATTORNEYS' EYES ONLY    **Ex. 4**

Haitsma are from the same inventor for the same invention. Wang 2002 and Wang are also from the same inventor for the same invention. Accordingly, a POSITA would have been motivated to use Haitsma US's intraframe process of creating a descriptor of a frame in Wang 2002's system to process the audio recognition process, and the combination of Wang 2002 and Haitsma US would have been obvious and predictable.

88.    Similarly, Wang 2002 and Kenyon are from the same field of endeavor: systems that can be used to compare and match audio contents for content recognition and identification. Wang 2002 and Kenyon S are directed to the same problem of audio content recognition based on unique signatures. Wang 2002 and Kenyon reference using FFT operation as part of the audio content recognition process. Wang 2002 and Kenyon both address the same esoteric problem in substantially the same way. Comparing and matching audio content for content recognition and identification is a specialized, narrow field, and audio content recognition and identification algorithms share a common basic structure. Thus, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Wang 2002 and Kenyon because both were directed to the problem of audio content recognition based upon unique signatures.

89.    A POSITA would further have understood that Kenyon discloses a frame composed of media samples. (Kenyon at ¶¶0041, 0064, 0066, Fig. 8). Because the compatibility and similarity between Wang 2002 and Kenyon as I opined above, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Wang 2002 and Kenyon. A POSITA would know that it would be advantageous to use the structure and process of a frame composed of media samples in Kenyon because a POSITA would know that such a structure promotes the efficiency of dividing large size

31
CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY    Ex. 4

media samples into manageable frame sizes.  A POSITA would know that the structure and process of a frame composed of media is a routine method of managing and processing large media samples, which is not subject to unexpected results.  Accordingly, a POSITA would have been motivated to use Kenyon's frame of media samples structure in Wang 2002's system to process the audio recognition process, and the combination of Wang 2002 and Kenyon would have been obvious and predictable.

90.     Furthermore, Wang 2002 and Jackson are from the same field of endeavor: systems that can be used to compare and match audio contents for content/speech recognition and identification.  Wang 2002 and Jackson are directed to the same problem of audio content recognition based on unique signatures.  Wang 2002 and Jackson reference using FFT operation as part of the audio content recognition process.  Wang 2002 and Jackson reference using FFT operation as part of the audio content recognition process.  Wang 2002 and Jackson both address the same esoteric problem in substantially the same way.  Comparing and matching audio content for content recognition and identification is a specialized, narrow field, and audio content recognition and identification algorithms share a common basic structure.  Thus, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Wang 2002 and Jackson because both were directed to the problem of audio content recognition based upon unique signatures.

91.     A POSITA would further have understood that Jackson discloses finding the highest power of a frame (descriptor of a frame based on a comparison of at least two spectral powers of the frame). (Jackson at 6:65-7:3, Fig. 6, Claim 1).  Because the compatibility and similarity between Wang 2002 and Jackson as I opined above, a POSITA

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY    **Ex. 4**

looking to solve the problem of synchronizing signatures would have been motivated to combine Wang 2002 and Jackson.  A POSITA would know that it would be advantageous to use the intraframe process of finding the highest power of a frame in Jackson because a POSITA would know that such a process promotes the efficiency of less computing complexity.  A POSITA would know that the intraframe process of finding the highest power of a frame is a generic and routine method of calculating the descriptor of a frame, which is not subject to unexpected results.  Because the '889 Patent does not require a specific type of descriptor, a POSITA would have understood that the process of finding the highest power of a frame disclosed in Jackson can be used in lieu of similar calculation disclosed in Wang 2002.  Accordingly, a POSITA would have been motivated to use Jackson's intraframe process of creating a descriptor of a frame in Wang 2002's system to process the audio recognition process, and the combination of Wang 2002 and Jackson would have been obvious and predictable.

92.    Further, Wang 2002 and Zheng are from the same field of endeavor: systems that can be used to compare and match audio contents for content recognition and identification.  Wang 2002 and Zheng are directed to the same problem of audio content recognition based on unique signatures.  Wang 2002 and Zheng reference using FFT operation as part of the audio content recognition process.  Wang 2002 and Zheng both address the same esoteric problem in substantially the same way.  Comparing and matching audio content for content recognition and identification is a specialized, narrow field, and audio content recognition and identification algorithms share a common basic structure.  Thus, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Wang 2002 and Zheng because both were directed to the

33

Ex. 4

problem of audio content recognition based upon unique signatures.

93.    A POSITA would further have understood that Zheng discloses the use of a second signature based upon a second descriptor extracted from a second frame which overlaps the first. (Zheng at Page 3 Lines 20-30). Zheng explains that its uses overlapping frames in part to avoid difficulties with audio synchronization. (*Id.*) Zheng also discloses that a separate signature is generated for each overlapping frame. (*Id.* at Fig. 3). Because the compatibility and similarity between Wang 2002 and Zheng as I opined above, a POSITA looking to solve the problem of synchronizing signatures with overlapping frames structure would have been motivated to combine Wang 2002 and Zheng. A POSITA would know that it would be advantageous to use the signature generation process in Zheng because Zheng discloses that using overlapping frames provides greater tolerance against synchronization problems and quickly varying audio content. A POSITA would know that creating a separate signature based on a separate frame is a natural and routine extension of creating a signature based on a single frame by leveraging the same creation process, which is not subject to unexpected results. Accordingly, a POSITA would have been motivated to use Zheng's signature creation process in Wang 2002's system to process the audio recognition process, and the combination of Wang 2002 and Zheng would have been obvious and predictable.

**D.    Cheung**

94.    It is my opinion that claims 1, 2, 4–6, 8, 9, and 11–17 of the '889 Patent are invalid as anticipated by Cheung.

95.     It is my opinion that claims 1, 2, 4–6, 8, 9, and 11–17 of the '889 Patent are invalid as obvious over Cheung in view of admitted prior art, and/or knowledge of one

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Ex. 4

of skill in the art.

96.    It is my opinion that claims 1, 2, 4–6, 8, 9, and 11–17 of the '889 Patent are invalid as obvious over Cheung in view of admitted prior art, and/or knowledge of one of skill in the art, and/or Haitsma US, Wang 2002, Jackson, and/or Kenyon.

97.    A detailed summary of my above-referenced opinion regarding Cheung in connection with the '889 Patent is provided in the associated chart attached to this Report as Exhibit 3.

98.    I also provide some additional opinion regarding Cheung below.

99.    A POSITA would have been motivated to combine Cheung in view of admitted prior art, and/or knowledge of one of skill in the art, and/or Haitsma US, Wang 2002, Jackson, and/or Kenyon with a reasonable expectation of success.

100.    Cheung and Kenyon are from the same field of endeavor: systems that can be used to compare and match audio contents for content recognition and identification. Cheung and Kenyon are directed to the same problem of audio content recognition based on unique signatures. Cheung and Kenyon reference using FFT operation as part of the audio content recognition process. Comparing and matching audio content for content recognition and identification is a specialized, narrow field, and audio content recognition and identification algorithms share a common basic structure. Thus, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Cheung and Kenyon because both were directed to the problem of audio content recognition based upon unique signatures.

101.    A POSITA would further have understood that Kenyon teaches that instructions for carrying out the method may be stored on a program memory. (Kenyon,

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**    **Ex. 4**

P0063). Because the compatibility and similarity between Cheung and Kenyon as I opined above, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Cheung and Kenyon. Because the '889 Patent does not require any specific memory to store instructions, a POSITA would have understood that the computer memory disclosed in Kenyon to store instructions can be used in the similar audio content recognition system disclosed in Cheung. Further, the computer memory described in Kenyon is a common component of computers in an audio recognition system, such as the one in both Cheung and Kenyon. A POSITA would be aware of the suitability of using computer memory described in Kenyon for an audio recognition system due to the availability and commonality of such program memory in Kenyon. A computer memory in a computer system such as the one in Kenyon is common in the field and its functioning is not subject to unexpected results. Accordingly, a POSITA would have been motivated to use Kenyon's program memory to store instruction in Cheung's system to process the audio recognition process, and the combination of Cheung and Kenyon would have been obvious and predictable.

102.    Similarly, Cheung and Haitsma US are from the same field of endeavor: systems that can be used to compare and match audio contents for content recognition and identification. Cheung and Haitsma US are directed to the same problem of audio content recognition based on unique signatures. Cheung and Haitsma US reference using FFT operation as part of the audio content recognition process. Comparing and matching audio content for content recognition and identification is a specialized, narrow field, and audio content recognition and identification algorithms share a common basic structure. Thus, a POSITA looking to solve the problem of synchronizing signatures would have been

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY    **Ex. 4**

motivated to combine Cheung and Haitsma US because both were directed to the problem of audio content recognition based upon unique signatures.

103.    A POSITA would further have understood that Haitsma US discloses finding the largest energy level in the neighborhood of a frame (a descriptor of a frame based on a comparison of at least two spectral powers of the frame). (Haitsma US at [0032-0033]).  Because the compatibility and similarity between Cheung and Haitsma US as I opined above, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Cheung and Haitsma US.  A POSITA would know that it would be advantageous to use the intraframe process of finding the largest energy level in the neighborhood of a frame in Haitsma US because a POSITA would know that such a process promotes the efficiency of less computing complexity.  A POSITA would also understand that common signal quality issues, such as background noise or non-ideal speaker/microphone responses, can affect many signal features but the locations of the peak spectral values is fairly robust to such issues.  *See, e.g.*, Wang 2003[5] at p2 ("The peaks in each time-frequency locality are also chosen according amplitude, with the justification that the highest amplitude peaks are most likely to survive the distortions listed above.")  A POSITA would know that the intraframe process of finding the largest energy level in the neighborhood of a frame is a generic and routine method of calculating the descriptor of a frame, which is not subject to unexpected results.  Because the '889 Patent does not require a specific type of descriptor, Cheung's disclosures are not limited to the use of a

---

[5] Avery Wang, *An Industrial Strength Audio Search Algorithm*, Proceeding of 4th International Conference on Music Information Retrieval, Baltimore (2003) ("Wang 2003").

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**    **Ex. 4**

centroid, but rather encompass any descriptor and signature[6], a POSITA would have understood that the process of finding the largest energy level in the neighborhood of a frame disclosed in Haitsma US can be used in lieu of calculating centroid in the similar audio content recognition system disclosed in Cheung. A POSITA would have understood that a centroid can be influenced by background noise and by the speaker/system characteristics while the location of the largest energy spectral peak is known to be more robust. A POSITA further would have understood that computing centroid and computing largest energy within the neighborhood of a frame share many similarly equivalent math operations. Accordingly, a POSITA would have been motivated to use Haitsma US's intraframe process of creating a descriptor of a frame in Cheung's system to process the audio recognition process, and the combination of Cheung and Haitsma US would have been obvious and predictable.

104.    Further, Cheung and Wang 2002 are from the same field of endeavor: systems that can be used to compare and match audio contents for content recognition and identification. Cheung and Wang 2002 are directed to the same problem of audio content recognition based on unique signatures. Cheung and Wang 2002 reference using FFT operation as part of the audio content recognition process. Comparing and matching audio content for content recognition and identification is a specialized, narrow field, and audio content recognition and identification algorithms share a common basic structure. Thus, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Cheung and Wang 2002 because both were directed to the problem

---

[6] Cheung at Claim 1 ("a set of numbers derived from a pre-determined number of spectral magnitude values detected during the time frame").

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY    Ex. 4

of audio content recognition based upon unique signatures.

105.    A POSITA would further have understood that Wang 2002 discloses a finding the highest power of a frame (descriptor of a frame based on a comparison of at least two spectral powers of the frame). (Wang 2002 at ¶0062).  Because the compatibility and similarity between Cheung and Wang 2002 as I opined above, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Cheung and Wang 2002.  A POSITA would know that it would be advantageous to use the intraframe process of finding the highest power of a frame in Wang 2002 because a POSITA would know that such a process promotes the efficiency of less computing complexity.  A POSITA would know that the intraframe process of finding the highest power of a frame is a generic and routine method of calculating the descriptor of a frame, which is not subject to unexpected results.  Because the '889 Patent does not require a specific type of descriptor, Cheung's disclosures are not limited to the use of a centroid, but rather encompass any descriptor and signature[7], a POSITA would have understood that the process of finding the highest power of a frame disclosed in Wang 2002 can be used in lieu of calculating centroid in the similar audio content recognition system disclosed in Cheung.  A POSITA would have understood that a centroid can be influenced by background noise and by the speaker/system characteristics while the location of the highest power spectral peak is known to be more robust.  A POSITA would have understood that computing centroid and computing highest power of a frame are share many similarly equivalent math equations.  Accordingly, a POSITA would have been

---

[7] Cheung at Claim 1 ("a set of numbers derived from a pre-determined number of spectral magnitude values detected during the time frame").

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**    **Ex. 4**

motivated to use Wang 2002's intraframe process of creating a descriptor of a frame in Cheung's system to process the audio recognition process, and the combination of Cheung and Wang 2002 would have been obvious and predictable.

106.    Furthermore, Cheung and Jackson are from the same field of endeavor: systems that can be used to compare and match audio contents for content/speech recognition and identification.  Cheung and Jackson are directed to the same problem of audio content recognition based on unique signatures.   Cheung and Jackson reference using FFT operation as part of the audio content recognition process.  Comparing and matching audio content for content recognition and identification is a specialized, narrow field, and audio content recognition and identification algorithms share a common basic structure.  Thus, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Cheung and Jackson because both were directed to the problem of audio content recognition based upon unique signatures.

107.    A POSITA would further have understood that Jackson discloses finding the highest power of a frame (descriptor of a frame based on a comparison of at least two spectral powers of the frame). (Jackson at 6:65-7:3, Fig. 6, Claim 1).   Because the compatibility and similarity between Cheung and Jackson as I opined above, a POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Cheung and Jackson.  A POSITA would know that it would be advantageous to use the intraframe process of finding the highest power of a frame in Jackson because a POSITA would know that such a process promotes the efficiency of less computing complexity.  A POSITA would know that the intraframe process of finding the highest power of a frame is a generic and routine method of calculating the descriptor of a frame,

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY    **Ex. 4**

which is not subject to unexpected results.  Because the '889 Patent does not require a specific type of descriptor, Cheung's disclosures are not limited to the use of a centroid, but rather encompass any descriptor and signature[8], a POSITA would have understood that the process of finding the highest power of a frame disclosed in Jackson can be used in lieu of calculating centroid in the similar audio content recognition system disclosed in Cheung. A POSITA would have understood that a centroid can be influenced by background noise and by the speaker/system characteristics while the location of the highest power spectral peak is known to be more robust.  A POSITA would have understood that computing centroid and computing highest power of a frame share many similarly equivalent math operations.  Accordingly, a POSITA would have been motivated to use Jackson's intraframe process of creating a descriptor of a frame in Cheung's system to process the audio recognition process, and the combination of Cheung and Jackson would have been obvious and predictable.

## E. Secondary Indications of Obviousness

108.    I have been informed that Nielsen bears the burden to present objective evidence of secondary indicia of non-obviousness to support any contention that the asserted claims of the patents-in-suit are not obvious.

109.    I understand that a nexus must accompany any assertion of such indicia between the merits of the alleged invention and the evidence offered, and that otherwise any such "evidence" does not actually tend to show that the alleged invention was not obvious.  Further, I understand that even where evidence of non-obviousness exists, it may

---

[8] Cheung at Claim 1 ("a set of numbers derived from a pre-determined number of spectral magnitude values detected during the time frame").

**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**    **Ex. 4**

not be compelling enough to overcome the strong showing of obviousness in light of the prior art.

110.    I have not seen any such specific evidence and requisite nexus provided by Nielsen.

- Commercial Success – Nielsen provided no evidence that the '889 patent contributed to any of the alleged success of Nielsen's products.  *See* Nielsen's Response to TVision's Interrogatory No. 8 at 4-5.  In fact, ████████████ ███████████████████████████████████████████  *See* Nielsen's Supplemental Response to Interrogatory No. 2. ("████████████ █████████████████████████████████████████████████████ █████████████████████████████████████████████████████ ██████████████████████████████").

- Long-Felt, Unmet Need. – Nielsen alleges the '889 patent uniquely claims intra-frame-based operations.  *See* Nielsen's Response to TVision's Interrogatory No. 8 at 5-6.  Nielsen also alleges that the '889 patent claims a novel approach for generating signatures based on descriptors based on comparing power levels of frequency components.  *See id*. at 6-7.  Because all of these are disclosed in prior art as I explained in my report and associated exhibits, they are not long-felt and unmet need.

- Industry Praise – Nielsen provided no evidence that there is any industry praise for the '889 patent invention.  *See* Nielsen's Response to TVision's Interrogatory No. 8 at 7-8.  In fact, ███████████████████████████.  *See* Nelsen Depo Tr. at 205:15-21 ("█████████████████████████████████████████

42

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Ex. 4

██████████████████████████████████████████████

██████████████████████████████████████████████

████ ")

- Copying – Nielsen provided no evidence of copying relating to the '889 patent. *See* 2022.12.09 Nielsen's Response to TVision's Interrogatory No. 8 at 8.

- Skepticism – Nielsen provided no evidence of copying relating to the '889 patent. *See* 2022.12.09 Nielsen's Response to TVision's Interrogatory No. 8 at 8.

- Teaching Away – Nielsen provided no evidence of teaching away relating to the '889 patent. *See* 2022.12.09 Nielsen's Response to TVision's Interrogatory No. 8 at 8-9.

111.    Should Nielsen properly present any such specific evidence and requisite nexus in the future, I reserve the right to address any such evidence and/or supplement my opinion to the extent necessary or appropriate.

## VIII.    OTHER GROUNDS OF INVALIDITY

### A.    Lack of Written Description

112.    The asserted claims of the '889 patent all recite "identify[ing] a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples." The patents specification, however, does not provide sufficient support for this claim limitation.

113.    A POSITA would have understood that an FFT is a mathematical operation. It does not choose or select frequency components. Instead, it results in a frequency spectrum showing the contribution of the frequency components of the underlying signal

43

Ex. 4

corresponding to predetermined bins.  This is consistent with the '889 patent specification which discloses that the identification of the spectral power of each frequency component happens by retrieving the spectral power values for each frequency component that are already generated by an FFT module.

114.    As the '889 patent specification makes clear, the method is divided into two steps.  First, "[a]n initial FFT operation is performed on the initial audio sample set to establish an initial **frequency spectrum** (block 408)."  '889 patent, 14:15-17 (emphasis added); *see id.*, 22:31- 37 (similarly describing how an FFT results in a frequency spectrum).  Second, "[t]he example method . . . **selects** a first pair of frequency components [which] **may be selected from any location in the frequency spectrum** of an audio sample frame."  *Id.*, 16:30-35 (emphasis added); *see id.*, 22:50-53 ("the frequency identifier 908 identifies frequency pairs **from the frequency spectrum data**.") (emphasis added).  The spectral power of each of those frequency components is then "obtained based on the results of the sliding FFT."  *Id.*, 16:45-48; *see id.*, 22:59-62 ("The spectral power value identifier 910 may then determine or identify the spectral power of each frequency component of the frequency pairs . . . from the frequency spectrum data").  Because the specification only discloses a two-step approach (*i.e.*, identifying the spectral power of each frequency component by retrieving the spectral power values for each frequency component that are already generated by an FFT module), but the claim requires a one-step approach (*i.e.*, identifying the spectral power of each frequency component by directly running the FFT module), the above-mentioned claim limitation lacks written description support.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Ex. 4

**B.      Unpatentable Subject Matter**

115.    The asserted claims of the '889 patent are directed to an abstract idea.  The entirety of the asserted claims involves a highly genericized abstract algorithm that can be performed entirely in one's head or with a pencil and paper.  The asserted claims generally require: (1) selecting two frames of media samples, which are merely two collections of data; and (2) performing a spectral transform operation is simply a mathematical operation (e.g., Fourier transform—a well-known mathematical operation) that results in the generation of spectrum components having spectral powers.  Notably, the claims provide no specific guidance on *how* to select the frames, frequencies, or spectral powers.  The claims generally require "determining descriptors" and "generating signatures"—without specifying in any way how to determine the descriptors or signatures.  Such broad claim limitations can be performed by purely mental operations.  Accordingly, all of the asserted claims simply require the performance of certain mental operations, without even specifying which particular mental operations need be performed.

116.    Also, Nielsen's 30b6 witness has testified that



**CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY**      Ex. 4



Nelsen Depo. Tr. at 69:19-70:11.

117.    Further, Nielsen's 30b6 witness has testified that ███████████

Nelsen Depo. Tr. at 70:17-71:10.

## IX.    MATERIALS CONSIDERED

118.    In addition to the documents referenced above and referenced in the claim charts that form part of the basis for my analysis and opinions in this report, I have reviewed the following documents and materials.  I am also relying on my expert qualifications and experience for my analysis and opinions.

- • U.S. Patent No. 7,783,889 and prosecution history

- • Nielsen's Responses to Interrogatories

- • TVision's Responses to Interrogatories

- • Transcript of claim construction hearing

- • Court's claim construction order

46

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Ex. 4

- Nielsen's technical tutorial

- Transcript and exhibits to deposition of Nielsen's witnesses

- Transcript and exhibits to deposition of TVision's witnesses

- TVision's Invalidity Contentions and associated charts

- TVison's Supplemental Invalidity Contentions and associated charts

- Nielsen's Supplemental Final Infringement Contentions and associated chart(s)

119.    If I am called upon to testify about this report by deposition or at a hearing before the Court, I may cite other documents or information similar to that specifically identified in this report.  I may also use graphics, animations, pictures, demonstrations, and/or other audio/visual aids to explain my analysis and opinions.

47

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Ex. 4

I declare under penalty of perjury that the foregoing is true and correct.

Date:  July 5, 2025

_____

David Anderson, Ph.D.

CONFIDENTIAL - OUTSIDE ATTORNEYS' EYES ONLY

Ex. 4

# EXHIBIT 1

**Exhibit 1 - US 2002/0178410 A1 (Haitsma US)**

| '889 Patent Issue Date | August 24, 2010 | | Prior Art | U.S. Patent Application Publication US 2002/0178410 A1 ("Haitsma US") |
|---|---|---|---|---|
| '889 Patent Filing Date | February 19, 2007 | | Effective Date | November 28, 2002 |
| Priority Claim | August 18, 2004 | | Statutory Section | §102(a), 102(b), 103 (Pre-AIA) |

| Claim 1 | Haitsma US |
|---|---|
| (Pre) A method for generating signatures implemented using an apparatus comprising a processor, the method comprising: | Haitsma US teaches a method and system for creating "**signatures** of data files which can be used to identify the file." (Haitsma US at Abstract). A POSITA would have known that Haitsma US further teaches that this method is implemented via an apparatus comprising a processor within a computer, the operation of which is described in, e.g., Figures 1, 6, and 7. |
| | Fig. 1 is a schematic diagram of an embodiment of an arrangement for extracting a hash signal from an audio signal in accordance with the invention … Fig. 6 is a flow chart of operations carried out by a **computer** which is shown in Fig. 1 in accordance with the invention. Fig. 7 is a diagram to illustrate the operation of a **computer** which is shown in Fig. 1. |
| | (Page 1 ¶¶ 0010, 0015, 0016) |
| | A POSITA would have known that a processor is a necessary and generic component of a computer that is used to generate signature. |
| | To the extent Nielsen argues that the use of a processor is not disclosed in Haitsma US, that element would have been rendered obvious in light of the following prior art: |

**Ex. 4**

| Claim 1 | Haitsma US |
|---|---|
|  | **Zheng discloses the use of an apparatus comprising a processor to generate signatures for media files**<br><br>The input audio source of the programme originator is first received at an input terminal 102, connected to a server or computer **processor** 104 at the programme originator's location 106, and also to an audio network 108. The signal is passed to the computer **processor 104 which generates the audio signature of the master or original signal** and transmits it on IT network 110 to the location 112 of the destination transmitter. At the same time, the audio source signal is transmitted on the private circuits of audio network 108 to the same destination 112<br><br>(Zheng, Page 6 Lines 53-59)<br><br><br><br>Fig. 10<br><br>**Kenyon discloses the use of an apparatus comprising a processor to generate signatures for media files**<br><br>It further teaches that a method implemented via an apparatus comprising a processor<br><br>In one aspect of the present invention, recognizing free-field audio signals is accomplished by Structure and/or Steps whereby a hand-held device having a microphone captures free-field audio signals. **A local** |

2

**Ex. 4**

| Claim 1 | Haitsma US |
|---|---|
|  | **processor**, coupleable to the hand-held device, transmits audio signal features corresponding to the captured free-field audio Signals to a recognition site. One of the hand-held device and the local processor includes circuitry which extracts a time Series of Spectrally distinct audio signal features from the captured free-field audio Signals. A recognition processor and a recognition memory are disposed at the recognition site.<br><br>(Page 2 ⁋ 0014) (emphasis added)<br><br>This apparatus is claimed<br><br>1. Apparatus for recognizing free-field audio signals, comprising: a hand-held device having a microphone to capture free field audio signals, **a local processor,** coupleable to said hand-held device, to transmit audio signal features corresponding to the captured free-field audio signals to a recognition site; one of said hand-held device and said local processor including circuitry which extracts a time series of spectrally distinct audio signal features from the captured free-field audio signals, and a recognition processor and a recognition memory at the recognition site, said recognition memory storing data corresponding to a plurality of audio templates, said recognition processor correlating the audio signal features transmitted from said local processor with at least one of the audio templates Stored in Said recognition processor memory, said recognition processor providing a recognition signal based on the correlation.<br><br>(Page 10 Claim 1)<br><br>In addition, Kenyon teaches that instructions may be stored on a memory<br><br>The output of the analog to digital converter 21 is transmitted to a programmable digital Signal processor 22 that performs the digital processing of the audio time series waveforms to extract features and construct the feature packets that are to be recognized. Digital signal processor 22 may comprise |

Ex. 4

| Claim 1 | Haitsma US |
|---|---|
|  | a special purpose microprocessor that is optimized for signal processing applications. **It is connected to a program memory 24 (where programs and constants are stored)** and a data memory 23 for storage of variables and data arrays. The digital signal processor 22 also connects to the host computer bus 26 using an interface such as the PCI bus interface 25 for exchange of data between the digital signal processor and the host computer. Note that in cases where digitized audio is available for feature extraction, these data are transferred directly from the host computer bus 26 via the PCI bus interface 25 to the digital signal processor 22, bypassing anti-alias lowpass filters 19, channel multiplexer 20, and analog to digital converter 21.<br><br>(Page 7 ⟧ 0063)<br><br>A POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Haitsma US with Zheng or Kenyon because all three were directed to the problem of audio content recognition based upon unique signatures. A POSITA would further have understood that the audio processing circuits described at, e.g., Haitsma US page 5 line 9 to page 6 line 22 could be implemented using the processors described in Zheng and Kenyon, and that it would be advantageous to do so due to the availability, speed, and ease-of-use of such processors. Because the '889 Patent does not recite a specific processor, a POSITA would have understood that the processor disclosed in Zheng and Kenyon are generic ones that can be used in computer disclosed in Haitsma US in lieu of the audio processing circuits. |
| a. obtaining a first frame of media samples; | Haitsma US discloses obtaining a first frame of media samples:<br><br>**The first object is achieved by dividing the information signal into successive (preferably overlapping) frames**, computing a hash word for each frame, and concatenating 20 successive hash words to constitute a hash signal (or hash in short).<br><br>(Page 1 ⟧ 0007) |

4

**Ex. 4**

| Claim 1 | Haitsma US |
|---|---|
|  | Even if we only have a short piece of audio (of the order of seconds), we would like to determine which song it is. **As audio can be seen as an endless stream of audio-samples, it is necessary to subdivide audio signals into time intervals or frames and to calculate a hash word for every frame**. <br><br> Very often, when trying to match hashes in a database, it is impossible to determine the frame boundaries. This synchronization problem is particularly applicable to audio hashing. **This problem is solved by dividing the signal into overlapping frames**. Overlapping also ensures that hash words of contiguous frames have a certain amount of correlation. In other words, the hashes change slowly over time. <br><br> (Page 2 ¶¶ 0025-0026) <br><br> In a framing circuit 12, **the audio signal is divided into frames. The frames** are weighed by a Hanning window having a length of **16384 samples** (~0.4 seconds) <br><br> (Page 2 ¶ 0028) <br><br> 1. A method of generating a hash signal identifying an information signal, the method comprising the steps of: <br> - **dividing the information signal into frames**, <br><br> (Claim 1) |
| b. identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples; | Haitsma US teaches that a Fourier transform may be used to create a spectral representation of the frame that is divided into spectral bands corresponding to the claimed first and second frequency components: <br><br> **The spectral representation of every frame is computed by a Fourier transform circuit 13.** In the next block **14,** the absolute values (magnitudes) of the (complex) Fourier coefficients are computed. **A band division stage 15 divides the frequency spectrum into a number (e.g. 33) of bands**. |

5

**Ex. 4**

| Claim 1 | Haitsma US |
|---|---|
| | (Page 2 ¶¶ 0028-0029)<br><br>This procedure is illustrated in Figure 1 and 2 below<br><br><br><br>(Fig. 1)<br><br>(Fig. 2)<br><br>**A band division stage 15 divides the frequency spectrum into a number (e.g. 33) of bands. In Fig.** |

6

| Claim 1 | Haitsma US |
|---|---|
| | **1, this is schematically shown by selectors 151, each of which selects the Fourier coefficients of the respective band.** In a preferred embodiment of the arrangement, the bands have a logarithmic spacing, because the HAS also operates on approximately logarithmic bands. By choosing the bands in this manner, the hash will be less susceptible to processing changes such as compression and filtering. In the preferred embodiment, the first band starts at 300Hz and every band has a bandwidth of one musical tone (i.e. the bandwidth increases by a factor of 21112 ~1.06 per band). **Fig. 2 shows an example of a spectrum 201 of a frame and the subdivision thereof into logarithmically spaced bands 202.**<br><br>(Page 2 ¶ 0029)<br><br>Because Haitsma US does not require a particular band width, a POSITA would appreciate that any appropriate width may be used. This includes a width corresponding to a single frequency bin (see, e.g., Claim 2). Furthermore, if Nielsen asserts that only band widths corresponding to the human-auditory system (HAS) are taught by Haitsma US, a POSITA would know that there are spectral transforms that have single bins corresponding to typical HAS frequency spacing. Examples of such HAS-inspired spectral transforms include the Morlet or Gabor wavelet transform, the constant-Q transform, and others. Haitsma US further teaches that there is a spectral power, as well as several other characteristics, associated with the first and second frequency component:<br><br>Subsequently, for every band a certain (not necessarily scalar) characteristic property is calculated. **Examples of properties are energy**, tonality and standard deviation of the power spectral density. In general, the chosen property can be an arbitrary function of the Fourier coefficients. Experimentally it has been verified **that the energy of every band is a property that is most robust to many kinds of processing**.<br><br>(Page 2 ¶ 0030) (emphasis added) |

7

**Ex. 4**

| Claim 1 | Haitsma US |
|---|---|
| | Haitsma US teaches that each frame is divided into frequency components, called bands:<br><br>**For each frame, the frequency spectrum is divided (15) into bands. A robust property of each band (e.g. energy)** is computed (16) and represented (17) by a respective hash bit.<br><br>(Page 6 ¶ 0062)<br><br>The method of claim 1, wherein said computing step comprises the steps of:<br><br>- **dividing each frame of the information signal into disjoint bands or blocks**;<br><br>-calculating a property of the signal in each of said bands or blocks;<br><br>-comparing the properties in the bands or blocks with respective thresholds;<br><br>-representing the results of said comparisons by respective bits of the hash word.<br><br>. . .<br><br>The method as claimed in claim 5, **wherein said property is the energy** of a frequency band.<br><br>(Claim 7) (emphasis added)<br><br>Thus, a POSITA would understand that Haitsma US discloses this claim element under TVision's proposed construction – Each "frequency component" is a "single band of frequencies," and each band is exclusive (disjoint) of each other.<br><br>Under Nielsen's proposed construction, a POSITA would understand that Haitsma US discloses frequency bands (frequency components), each of which is the result of Fourier transform that is transformed from the time domain to the frequency domain.<br><br>To the extent that Nielsen argues that Haitsma US does not disclose the identification of a first and second frequency component with associated spectral powers, a POSITA would have understood that the method disclosed in Haitsma US could |

8

**Ex. 4**

| Claim 1 | Haitsma US |
|---|---|
| | be able to identify frequency components consisting of only a single frequency bin.  This would require only a change to the parameters of the band division stage, which would be understood to be adjustable.  A POSITA would understand that such a small change of parameters is a routine adjustment expected to be successful.  Thus, a POSITA would understand that Haitsma US in view of knowledge of a POSITA discloses this claim element under Nielsen's proposed construction.<br><br>Additionally, a POSITA would understand that the HAS transformation disclosed by Haitsma's specification which combines bins of an FFT output to form disjoint bands is a spectral transform as required by the '889 claims.  The energies of the bands thus produced are energies corresponding to specific frequency bands and are thus spectral in nature.  Furthermore, a POSITA would know that the use of an FFT as an intermediate computational step in computing a particular spectral transform is common.  For example, the discrete cosine transforms may be efficiently implemented using the FFT as an intermediate step; the mel-spectrogram and mel-spectrum use the FFT as an intermediate step, combining frequency bins into bands to produce the final spectral representation; and the Gabor (Morlet) wavelet can also be computed with an FFT. |
| c. determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; | Haitsma US teaches that the first spectral power, or "energy," of the first frequency component, a "band," is compared to the second spectral power, that of the band's neighbor, to determine a first descriptor, which Haitsma US refers to as a hash bit. Haitsma US further teaches an additional method that involves comparing a hash bit to its neighbor and also incorporating information from the previous frame.  Haitsma US further teaches the generation of a "hash word" that is based on "hash bits":<br><br>Alternatively, **a band is assigned a hash bit '1' if its energy level is larger than the energy level of its neighbor, otherwise the hash bit is '0'.** The present embodiment uses an even improved version of the latter alternative.  To prevent a major single frequency in the audio signal from producing identical hash words for successive frames, variations of the amplitude over time are also taken into account. **More particularly, a band is assigned a hash bit '1' if its energy level is larger than the energy level of its neighbor and if that was also the case in the previous frame, otherwise the hash** |

| Claim 1 | Haitsma US |
|---|---|
| | **bit is '0'**. If we denote the energy of a band m of frame n by EB(n,m) and the m-th bit of the hash word H of frame n by H(n,m), the bit derivation circuit 17 generates the bits of the hash word in the following manner: $$H(n,m) = \begin{cases} 1 & \text{if } EB(n,m) - EB(n,m+1) - (EB(n-1,m) - EB(n-1,m+1)) > 0 \\ 0 & \text{if } EB(n,m) - EB(n,m+1) - (EB(n-1,m) - EB(n-1,m+1)) \leq 0 \end{cases}$$ To this end, the **bit derivation circuit 17 comprises**, for each band, a first subtractor 171, a frame delay 172, a second subtractor 173, and a **comparator 174**. **The 33 energy levels of the spectrum of an audio frame are thus converted into a 32-bit hash word**. The hash words of successive frames are finally stored in a buffer 18, which is accessible by a computer 20. The computer stores the robust hashes of a large number of original songs in a database 21. (Page 3 ¶¶ 0032-0033) **For each frame, the frequency spectrum is divided (15) into bands. A robust property of each band (e.g. energy) is computed (16) and represented (17) by a respective hash bit**. (Page 6 ¶ 0062) The use of the comparison to generate the descriptor is specifically claimed in Claim 3. 1. A method of generating a hash signal identifying an information signal, the method comprising the steps of: - dividing the information signal into frames, **- computing a hash word for each frame**, and - concatenating successive hash words to constitute the hash signal. 2. The method of claim 1, wherein said computing step comprises the steps of: |

10

**Ex. 4**

| Claim 1 | Haitsma US |
|---|---|
| | - dividing each frame of the information signal into disjoint bands or blocks;<br><br>- calculating a property of the signal in each of said bands or blocks;<br><br>- **comparing the properties in the bands or blocks with respective thresholds**;<br><br>- representing the results of said comparisons by respective bits of the hash word.<br><br>3. The method as claimed in claim 2, wherein **the property of a neighboring band or block constitutes said threshold**.<br><br>(Claim 3)<br><br>To the extent that Nielsen argues that Haitsma US does not disclose comparing single frequency component with associated spectral power, a POSITA would have understood that the method disclosed in Haitsma US could be able to identify frequency components consisting of only a single frequency bin. This would require only a change to the parameters of the band division stage, which would be understood to be adjustable. A POSITA would understand that such a small change of parameters is a routine adjustment expected to be successful. Thus, a POSITA would understand that Haitsma US in view of knowledge of a POSITA would still disclose this claim element.<br><br>To the extent Nielsen argues that one variation of embodiment of Haitsma US does not disclose determining a first descriptor of the first frame based on the comparison of the first spectral power and second spectral power from the same first frame, a POSITA would have understood that one embodiment of Haitsma US's disclosure of an algorithm that locates a spectral peak is consistent with the manner in which Nielsen appears to allege infringement of this claim element. *See* Nielsen's Supplemental Final Infringement Contentions, Appendix A (claim chart) at pp. 21-27 (Nielsen alleges that determining a maximum energy point of a window spanning over multiple frames meets this claim limitation.) |
| d. generating a first signature based on the first descriptor; | Haitsma US teaches the generation of a "hash word" that represents each frame, based on the first "hash bit" descriptor: |

11

**Ex. 4**

| Claim 1 | Haitsma US |
|---|---|
| | **In the present arrangement, a bit derivation circuit 17 converts the energy levels of the bands into a binary hash word.** In a simple embodiment, the bit derivation stage 5 generates one bit for each band, for example, a ' 1' if the energy level is above a threshold and a '0' if the energy level is below said threshold. The thresholds may vary from band to band. Alternatively, **a band is assigned a hash bit '1' if its energy level is larger than the energy level of its neighbor, otherwise the hash bit is '0'.** The present embodiment uses an even improved version of the latter alternative. To prevent a major single frequency in the audio signal from producing identical hash words for successive frames, variations of the amplitude over time are also taken into account. More particularly, a band is assigned a hash bit '1' if its energy level is larger than the energy level of its neighbor and if that was also the case in the previous frame, otherwise the hash bit is '0'. If we denote the energy of a band m offran1e n by EB(n,m) and the m-th bit of the hash word H of frame n by H(n,m), the bit derivation circuit 17 generates the bits of the hash word in the following manner: $$H(n,m) = \begin{cases} 1 & \text{if } EB(n,m) - EB(n,m+1) - (EB(n-1,m) - EB(n-1,m+1)) > 0 \\ 0 & \text{if } EB(n,m) - EB(n,m+1) - (EB(n-1,m) - EB(n-1,m+1)) \leq 0 \end{cases}$$ To this end, the bit derivation circuit 17 comprises, for each band, a first subtractor 171, a frame delay 172, a second subtractor 173, and a comparator 174. The 33 energy levels of the spectrum of an audio frame are thus converted into a 32-bit hash word. The hash words of successive frames are finally stored in a buffer 18, which is accessible by a computer 20. The computer stores the robust hashes of a large number of original songs in a database 21. (Page 3 ₧₧ 0032-0033) Haitsma US further teaches the generation of a "hash signal (or hash in short)" by concatenating the hash words generated for each frame, as described in section c above. (*See* Page 1 ₧ 0007). Both the hash word and "hash signal" may be used to identify |

**Ex. 4**

| Claim 1 | Haitsma US |
|---|---|
| | media information and art thus synonymous with the "signature" discussed in the '889 patent.<br><br>The 33 energy levels of the spectrum of an audio frame are thus converted into a 32-bit hash word. The hash words of successive frames are finally stored in a buffer **18,** which is accessible by a computer **20**<br><br>(Page 3  P 0033)<br><br>**A robust property of each band (e.g. energy) is computed (16) and represented (17) by a respective hash bit. An audio clip is thus represented by a concatenation of binary hash words, one for each frame**.<br><br>(Page 6 PP 0062)<br><br>For instance, in order to verify correct reception of a large file, it suffices to send the **hash value (also referred to as a signature)** of that file.<br><br>(Page 1 ¶ 0002)<br><br>The creation of the hash word and hash signal is claimed in claim 1.<br><br>1. A method of generating a hash signal identifying an information signal, the method comprising the steps of:<br><br>- dividing the information signal into frames,<br><br>- **computing a hash word for each frame**, and<br><br>- **concatenating successive hash words to constitute the hash signa**l. |
| e. identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality | Haitsma US teaches that the second frame of media samples should overlap with the first such that both contain a common plurality of media samples.<br><br>Very often, when trying to match hashes in a database, it is impossible to determine the frame boundaries. This synchronization problem is |

13

**Ex. 4**

| Claim 1 | Haitsma US |
|---|---|
| of media samples to the common plurality of media samples; | particularly applicable to audio hashing. **This problem is solved by dividing the signal into overlapping frames.**<br><br>(Page 2 ¶ 0026)<br><br>**In a framing circuit 12, the audio signal is divided into frames. The frames are weighed by a Hanning window having a length of 16384 samples (~0.4 seconds) and an overlap factor of 31/32. The overlap is chosen in such a way that a high correlation of the hash words between subsequent frames is ensured**.<br><br>(Page 2 ¶ 0028)<br><br>In summary, the disclosed method generates robust hashes for multimedia content, for example, audio clips. **The audio clip is divided (12) into successive (preferably overlapping) frames**.<br><br>(Page 6 ¶ 0062)<br><br>Haitsma US specifically claims the use of overlapping frames:<br><br>9. The method of claim 1, wherein said information signal is divided into **overlapping frames**.<br><br>(Claim 9) |
| f. identifying a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples; | Haitsma US teaches that the same procedure used upon the first frame – spectral transform, identification of frequency components and associated spectral powers – should be used upon the second frame and each frame thereafter.<br><br>For each frame, the frequency spectrum is divided (15) into bands. A robust property of each band (e.g. energy) is computed (16) and represented (17) by a respective hash bit.<br><br>(Page 6 ¶ 0062)<br><br>The discussion regarding element 1c. above is thus incorporated herein by reference. |

14

**Ex. 4**

| Claim 1 | Haitsma US |
|---|---|
| g. determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and | Haitsma US teaches that the descriptor for the second frame (and each following frame) may be generated in the same manner as the descriptor for the first frame discussed in section d above.<br><br>For each frame, the frequency spectrum is divided (15) into bands. A robust property of each band (e.g energy) is computed (16) and represented (17) by a respective hash bit.<br><br>(Page 6 ¶ 0062)<br><br>The discussion regarding element 1d. above is thus incorporated by reference. |
| h. generating a second signature based on the second descriptor. | Haitsma US teaches that a second signature, or "hash word," is generated to describe the second frame of media samples in the same manner as in section d, above, which is incorporated by reference.<br><br>Very often, when trying to match hashes in a database, it is impossible to determine the frame boundaries. This synchronization problem is particularly applicable to audio hashing. This problem is solved by dividing the signal into overlapping frames. Overlapping also ensures that hash words of contiguous frames have a certain amount of correlation. In other words, the hashes change slowly over time.<br><br>(Page 2 ¶ 0026)<br><br>In a framing circuit 12, the audio signal is divided into frames. The frames are weighed by a Hanning window having a length of 16384 samples (~0.4 seconds) and an overlap factor of 31/32. The overlap is chosen in such a way that a high correlation of the hash words between subsequent frames is ensured.<br><br>(Page 2 ¶ 0028)<br><br>The hash words of successive frames are finally stored in a buffer **18,** which is accessible by a computer **20.** The computer stores the robust hashes of a large number of original songs in a database **21.** |

15

**Ex. 4**

| Claim 1 | Haitsma US |
|---|---|
|  | (Page 3 ¶ 0033)<br><br>Reference numeral 31 in Fig. 3 shows the hash words of 256 successive overlapping audio frames (~3 seconds) of the audio clip as stored in the database **21**.<br><br>(Page 3 ¶ 0034)<br><br>A POSITA would have known that use of a second signature based upon a second descriptor extracted from a second frame which overlaps the first is a natural extension creating a first signature based upon a first descriptor extract from a first frame, especially given that the '889 patent describes both interframe and intraframe operations.<br><br>To the extent Nielsen argues that this element is not disclosed by Haitsma US, it would have been obvious in light of the following:<br><br>**Zheng discloses the use of a second signature based upon a second descriptor extracted from a second frame which overlaps the first**.<br><br>As in Haitsma US and the '889 patent, Zheng uses overlapping frames in part to avoid difficulties with audio synchronization.<br><br>Thus, in the preferred system, the **audio data is broken down into a larger number of overlapping frames**, **as this provides greater tolerance against synchronisation problems and quickly varying audio content**. Figure 3 shows an illustration of the audio data broken down into overlapping frames. Four overlapping frames each containing 1024 samples are shown, displaced from each other by 256 samples. **As a result, the audio data of 17408 samples is in fact broken down into 65 frames**, and is therefore represented by 65 dominant frequency data points. **An example signature is illustrated in Figure 4 for the first audio signal, that is the one which is being compared to the master signal**. The signature contains M signature points. In practice, it is preferred if M is of the order of 2000. It should be remembered that in this diagram, the x axis represents |

16

**Ex. 4**

| Claim 1 | Haitsma US |
|---|---|
|  | time, measured in frame number, and the y axis represents the dominant frequency.<br><br>(Zheng, Page 3 Lines 20-30).<br><br>As is clearly shown in figure 3 of Zheng, a separate signature is generated for each overlapping frame.<br><br><br><br>Fig. 3<br><br>A POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Haitsma US with Zheng because both were directed to the problem of audio content recognition based upon unique signatures, and because Zheng discloses that using overlapping frames provides greater tolerance against synchronization problems and quickly varying audio content.  A POSITA would have understood that combining Haitsma US and Zheng would render successful result because creating a separate signature based on a separate frame is a natural and routine extension of creating a signature based on a single frame as disclosed in Haitsma US with only a minor adjustment in routine procedure known to a POSITA. |

| Claim 2 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| A method as defined in claim 1, further comprising identifying media information based on the first signature. | Haitsma US teaches that media information may be identified based on the first signature. |

17

**Ex. 4**

| Claim 2 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
|  | The process for matching extracted hash blocks to a database of known signatures to identify mediation information is described at, e.g., pages 8 line 3 to 13 line 3.<br><br>Broadcast Monitoring: A broadcast monitoring system consists of two parts: a central database containing the hashes of a large number of songs, and monitoring stations that extract a hash block from the audio that is broadcast by, for instance, radio stations. **The monitoring station will send the extracted hash block to the central database and then the database will be able to determine which song has been broadcast**.<br><br>(Page 5 ¶ 0056)<br><br>Mobile Phone Audio Info: Imagine that you are in a bar and hear a song of which you want to know the title. **You then just pick up your mobile telephone and call an audiohash database. The audio hash database will then hear the song and extract a hash block. If it then finds the hash block in the database, it will report back the title of the song**.<br><br>(Page 5 ¶ 0057)<br><br>*See also* the discussion regarding claim 1. |

| Claim 4 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| A method as defined in claim 2, wherein the media information is associated with at least one of audio information or video information. | *See* discussion regarding claims 1 and 2 above.<br><br>For example, in connection with claim 2, Haitsma US disclose that the media information can be the title of the song (audio information). |

18

**Ex. 4**

| Claim 5 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| A method as defined in claim 1, wherein the first descriptor is associated with only the first frame of media samples. | As discussed in section 1.d. above, Haitsma US teaches that the first descriptor may be based only on the first frame of media samples. |
| | In the present arrangement, a bit derivation circuit **17** converts the energy levels of the bands into a binary hash word. In a simple embodiment, **the bit derivation stage generates one bit for each band**, for example, a ' 1' if the energy level is above a threshold and a '0' if the energy level is below said threshold. The thresholds may vary from band to band. Alternatively, **a band is assigned a hash bit '1'** if its energy level is larger than the energy level of its neighbor, otherwise **the hash bit is '0'** |
| | (Page 3 ⁋ 0032) |

| Claim 6 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| A method as defined in claim 1, wherein the second descriptor is of the second frame of media samples. | Haitsma US teaches that the descriptor for the second frame (and each following frame) may be generated based only on the second frame, and without reference to the first. |
| | For each frame, the frequency spectrum is divided (15) into bands. **A robust property of each band (e.g energy) is computed (16) and represented (17) by a respective hash bit.** |
| | (Page 6 ⁋ 0062) |
| | The discussion regarding element 1.g above is thus incorporated by reference. |

| Claim 8 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| An apparatus for generating signatures, comprising: | *See* discussion of claim 1 (pre) above. |
| a. a processor system including a memory; and instructions stored in the | As discussed in Claim 1 (pre), incorporated herein by reference, Haitsma US teaches the use of a processor to create the reference signal. To the extent Haitsma US does not disclose the use of a |

19

**Ex. 4**

| Claim 8 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| memory that enable the processor system to: | processor, that element is rendered obvious by the combination of Haitsma US and Zheng and/or Kenyon.<br><br>In addition, Haitsma US discloses the use of instructions stored in a memory. The instructions stored in the memory are laid out, among other places, in the figures below.<br><br>Fig.1<br><br>Fig.4<br><br>A POSITA would have understood that operations as illustrated in figures 1 and 4 are carried out by computers comprising memories to store operation instructions, where the operation of which is described in, e.g., Figures 1, 6, and 7. |

**Ex. 4**

| Claim 8 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| | Fig. 1 is a schematic diagram of an embodiment of an arrangement for extracting a hash signal from an audio signal in accordance with the invention … Fig. 6 is a flow chart of operations carried out by a **computer** which is shown in Fig. 1 in accordance with the invention. Fig. 7 is a diagram to illustrate the operation of a **computer** which is shown in Fig. 1. <br><br> (Page 1 ¶¶ 0010, 0015, 0016) <br><br> To the extent Nielsen argues the Haitsma US does not disclose the use of instructions stored on memory, it would have been obvious in light of the following: <br><br> **Kenyon teaches that instructions for carrying out the method may be stored on a memory** <br><br> The output of the analog to digital converter 21 is transmitted to a programmable digital Signal processor 22 that performs the digital processing of the audio time series waveforms to extract features and construct the feature packets that are to be recognized. Digital signal processor 22 may comprise a special purpose microprocessor that is optimized for Signal processing applications. **It is connected to a program memory 24 (where programs and constants are stored)** and a data memory 23 for storage of variables and data arrays. The digital signal processor 22 also connects to the host computer bus 26 using an interface such as the PCI bus interface 25 for exchange of data between the digital signal processor and the host computer. Note that in cases where digitized audio is available for feature extraction, these data are transferred directly from the host computer bus 26 via the PCI bus interface 25 to the digital signal processor 22, bypassing anti-alias lowpass filters 19, channel multiplexer 20, and analog to digital converter 21. <br><br> (Page 7 ¶0063) <br><br> A POSITA would have been motivated to combine Haitsma US with Kenyon because both were directed to the problem of audio |

21

**Ex. 4**

| Claim 8 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| | content recognition based upon unique signatures. A POSITA would further have understood that the audio processing method described in Haitsma US could be implemented using instructions stored on a memory as in Kenyon because both systems using computers (that necessarily have memories to store instructions) to carry out operations of creating signatures. |
| b. obtain a first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples | *See* discussion above for elements 1.a. and 1.e, which are incorporated by reference. |
| c. identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples; | *See* discussion above for element 1.b., which is incorporated by reference. |
| d. identify a third spectral power and a fourth spectral power; | *See* discussion above for element 1.f., which is incorporated by reference. |
| e. determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; | *See* discussion above for element 1.c., which is incorporated by reference. |
| f. determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and | *See* discussion above for element 1.g., which is incorporated by reference. |

22

**Ex. 4**

| Claim 8 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| the fourth spectral power; and | |
| g. generate a first signature based on the first descriptor and a second signature based on the second descriptor. | *See* discussion above for elements 1.d. and 1.h., which are incorporated by reference. |

| Claim 9 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| An apparatus as defined in claim 8, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature. | *See* discussion above for claims 1, 2, and 8, which are incorporated by reference. |

| Claim 11 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| An apparatus as defined in claim 8, wherein the first descriptor is associated with only the first frame of media samples. | *See* discussion above for claims 1, 4, and 8, which are incorporated by reference. |

| Claim 12 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| An apparatus as defined in claim 8, wherein the instructions stored in the memory enable the processor system to: obtain a first plurality of media samples; and identify the second frame of media samples by extracting a common plurality of media | *See* discussion above for claims 1 and 8, which are incorporated by reference.<br><br>*See also* discussion above for elements 1.a. and 1.e, which are incorporated by reference. |

23

**Ex. 4**

| Claim 12 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples. | |

| Claim 13 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| An apparatus as defined in claim 8, wherein the third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples | *See* discussion above for claims 1 and 8, which are incorporated by reference. *See also* discussion above for element 1.f., which is also incorporated by reference. |

| Claim 14 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| Pre. A tangible machine accessible medium having instructions stored thereon that, when executed, cause a machine to: | *See* discussion above for claims 1 and 8, which are incorporated by reference. |
| a. obtain a first frame first and second frames of media samples, the first and | *See* discussion above for elements 1.a., 1.e, and 8.b., which are incorporated by reference. |

24

**Ex. 4**

| Claim 14 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples; | |
| b. identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples; | *See* discussion above for elements 1.b. and 8.c., which are incorporated by reference. |
| c. identify a third spectral power and a fourth spectral power; | *See* discussion above for element 1.f. and 8.d., which are incorporated by reference. |
| d. determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; | *See* discussion above for element 1.c. and 8.e., which are incorporated by reference. |
| e. determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and | *See* discussion above for element 1.g. and 8.f., which are incorporated by reference. |
| f. generate a first signature based on the first descriptor and a second signature based on the second descriptor. | *See* discussion above for elements 1.d., 1.h., and 8.g., which are incorporated by reference. |

25

**Ex. 4**

| Claim 15 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| A tangible machine accessible medium as defined in claim 14, wherein the first descriptor is associated with only the first frame of media samples. | *See* discussion above for claims 1, 4, 8, 11, and 14, which are incorporated by reference. |

| Claim 16 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| A tangible machine accessible medium as defined in claim 14 having instructions stored thereon that, when executed, cause the machine to: obtain a first plurality of media samples; and identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples. | *See* discussion above for claims 1, 8, 12, and 14, which are incorporated by reference.<br><br>*See also* discussion above for elements 1.a. and 1.e, which are incorporated by reference. |

| Claim 17 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| A tangible machine accessible medium as defined in claim 14, wherein third spectral power is associated with a third frequency component and | *See* discussion above for claims 1, 8, 13, and 14, which are incorporated by reference.<br><br>*See also* discussion above for element 1.f., which is also incorporated by reference. |

26

**Ex. 4**

| Claim 17 | US 2002/0178410 A1 (Haitsma US) |
|---|---|
| the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples | |

Ex. 4

# EXHIBIT 2

Ex. 4

**Exhibit 2 - U.S. Patent Application Publication 2002/0083060 A1 ("Wang 2002")**

| '889 Patent Issue Date | August 24, 2010 | | Prior Art | U.S. Patent Application Publication US 2002/0083060 A1 ("Wang 2002") |
|---|---|---|---|---|
| '889 Patent Filing Date | February 19, 2007 | | Effective Date | June 27, 2002 |
| Priority Claim | August 18, 2004 | | Statutory Section | §102(a), 102(b), 103 (Pre-AIA) |

| Claim 1 | Wang 2002 |
|---|---|
| (Pre) A method for generating signatures implemented using an apparatus comprising a processor, the method comprising: | Wang 2002 teaches a method of generating signatures ("fingerprints") using an apparatus comprising a processor.<br><br>Each indexed audio file is represented in the database index by a set of landmark timepoints and associated fingerprints. . . . To perform recognition, landmarks and **fingerprints** are computed for the unknown sample and used to retrieve matching fingerprints from the database.<br><br>(Abstract)<br><br>Wang 2002 further teaches that the signatures are generated using an apparatus comprising a processor:<br><br>In a preferred embodiment, the method is implemented by a networked cluster of central **processing units (CPUs)**, in which different software objects are executed by different processors in order to distribute the computational load.<br><br>(Page 4 ¶0042)<br><br>Although the invention is not limited to any particular hardware system, an example of a preferred embodiment of a distributed computer system 30 is illustrated schematically in FIG. 2. System 30 contains a cluster of Linux-based **processors 32a-32f** connected by a multiprocessing bus architecture 34 or a networking protocol Such as |

**Ex. 4**

| Claim 1 | Wang 2002 |
|---|---|
|  | the Beowulf cluster computing protocol, or a mixture of the two.<br><br>(Page 4 ¶0043) |
| a. obtaining a first frame of media samples; | Wang 2002 discloses obtaining a first frame of media samples in order to generate a spectrogram:<br><br>In one implementation of the embodiment of FIG.6, landmarks and fingerprints are computed from a spectrogram of the Sound recording. A spectrogram is a time-frequency analysis of a sound **recording in which windowed and overlapped frames of sound samples are spectrally analyzed**, typically using a Fast Fourier Transform (FFT)<br><br>(Page 6 ¶0062)<br><br>A POSITA would have known that Page 6 ¶0062 discloses obtaining a first frame of media samples because the paragraph discloses "overlapped frames of sound samples."<br><br>To the extent Nielsen argues that this element is not disclosed, it would have been obvious in light of the following:<br><br>**Haitsma US discloses a first frame composed of media samples**<br><br>**The first object is achieved by dividing the information signal into successive (preferably overlapping) frames**, computing a hash word for each frame, and concatenating 20 successive hash words to constitute a hash signal (or hash in short).<br><br>(Page 1 ¶0007)<br><br>Even if we only have a short piece of audio (of the order of seconds), we would like to determine which song it is. A**s audio can be seen as an endless stream of audio-samples, it is necessary to subdivide audio signals into time intervals or frames and to calculate a hash word for every frame**. |

2

**Ex. 4**

| Claim 1 | Wang 2002 |
|---------|-----------|
| | Very often, when trying to match hashes in a database, it is impossible to determine the frame boundaries. This synchronization problem is particularly applicable to audio hashing. **This problem is solved by dividing the signal into overlapping frames**. Overlapping also ensures that hash words of contiguous frames have a certain amount of correlation. In other words, the hashes change slowly over time.<br><br>(Page 2 ¶¶ 0025-0026)<br><br>In a framing circuit 12, **the audio signal is divided into frames. The frames** are weighed by a Hanning window having a length of **16384 samples** (~0.4 seconds)<br><br>(Page 2 ¶ 0028)<br><br>1. A method of generating a hash signal identifying an information signal, the method comprising the steps of:<br>- **dividing the information signal into frames**,<br><br>(Claim 1)<br><br>**Kenyon also discloses a first frame of media samples**<br><br>In this process, audio signals are digitized and processed to extract sequences of important features these features generally represent measurements of energy present in different portions of the audio spectrum. sequences of these measurements comprise time series data streams that indicate the dynamic structure of the signal. The multiple feature streams are then **broken into overlapping time intervals or segments of several seconds each that cover the entire recording.**<br><br>(Kenyon, Page 4 ¶ 0041)<br><br>**Digitized audio samples from one of the signal sources are grouped into a sample set 27** and merged with one or more previous sample sets 28 to |

3

**Ex. 4**

| Claim 1 | Wang 2002 |
|---|---|
| | form a window into the audio time series for periodic spectral analysis.<br><br>(Kenyon, Pages 7-8 ¶ 0064)<br><br>    In the case of the signal recognition process, a set of 64 consecutive samples is collected from each feature waveform to construct recognition feature packets. In constructing reference patterns, each feature waveform is broken into segments that are 128 samples long and are overlapped by 64 samples. This ensures that an unknown input sample feature packet will be completely contained in at least one of the feature reference segments. The overlapping segmentation of a single feature is illustrated in FIG. 8. This segmentation is applied to all available features<br><br>(Kenyon, Page 8 ¶ 0066)<br><br><br><br>Figure 8: Reference Feature Waveform Segmentation<br>(Kenyon, Fig. 8)<br><br>A POSITA would be motivated to combine the teachings of Wang 2002 with the knowledge of a POSITA, and/or Haitsma US and/or Kenyon.  First, all three references are directed to the field of audio content recognition and the creation of signatures. Second, a POSITA would be particularly drawn and natural to |

Ex. 4

| Claim 1 | Wang 2002 |
|---|---|
| | refer to Haitsma US because Haitsma US identical to WO02/065782A1 (Haitsma), which is cited in Avery Wang, *An Industrial Strength Audio Search Algorithm*, Proceeding of 4th International Conference on Music Information Retrieval, Baltimore (2003) ("Wang") at citation [3]. Wang 2002 and Wang are from Avery Wang and describe the same algorithm. Third, a POSITA would have understood that because using overlapped frames of sound samples is a generic process in the audio content recognition process, adapting the process in Wang to using the corresponding process in Haitsma US and/or Kenyon would be routine and generate success. |
| b. identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples; | Wang 2002 discloses that a spectral transform, and in particular a fast-Fourier transform ("FFT"), may be performed on the first frame to generate frequency components with known spectral powers.<br><br>In one implementation of the embodiment of FIG. 6, landmarks and fingerprints are computed from a spectrogram of the sound recording. A spectrogram is a time-frequency analysis of a Sound recording in which windowed and **overlapped frames of sound samples** are spectrally analyzed, typically **using a Fast Fourier Transform (FFT)**.<br><br>**Each sequential FFT frame** is stacked vertically at corresponding evenly-spaced intervals along the time axis. **A spectrogram plot depicts the energy density at each time-frequency point**; **darker areas on the plot represent higher energy density**. Spectrograms are well-known in the art of audio signal processing. For the present invention, landmarks and **fingerprints can be obtained from Salient points Such as local maxima of the spectrogram**, circled in the spectrogram of FIG. 7B.<br><br>(Page 6 ¶0062)<br><br>As illustrated in figure 7a, the spectral power of each frequency component is known, and indicated by the relative darkness of each point. |

5

**Ex. 4**

| Claim 1 | Wang 2002 |
|---------|-----------|
| | <br><br>(Fig. 7A)<br><br>As shown in Figure 7B, the relevant frequency components and their respective spectral powers are selected, as illustrated by the circles.<br><br>(Fig. 7B) |

6

**Ex. 4**

| Claim 1 | Wang 2002 |
|---|---|
| | Under Nielsen's proposed construction, a POSITA would understand that Wang 2002 discloses "time-frequency points" (frequency components), each of which is the result of Fourier transform that is transformed from the time domain to the frequency domain.

Under TVision's proposed construction, Wang 2002 discloses the division of the frame into frequency bins representing frequencies or bands of frequencies -- "frequency components" – by FFT and further discloses that each component has an associated spectral power, represented by the darker coloration in the figures above, and is each "time-frequency point" that is exclusive of each other. Although Wang 2002 may not explicitly disclose the selection of frequency components to the exclusion of others before calculating the descriptor of fingerprint, a POSITA would have known that this calculation could be done using only 2 or more of the frequency components to the exclusion of others. |
| c. determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; | Wang 2002 teaches the comparison of first and second spectral powers in order to determine "landmarks" and "fingerprints" – both of which ultimately form part of the signature and correspond to the claimed descriptors.

collection is subjected to a **landmarking and fingerprinting analysis** that generates an index set for each audio file. FIG. 4 Schematically illustrates a Segment of a Sound recording for which **landmarks (LM) and fingerprints (FP) have been computed**. **Landmarks occur at specific timepoints of the sound and have values in time units offset from the beginning of the file, while fingerprints characterize the sound at or near a particular landmark**.

(Page 5 ‖ 0049)

Wang 2002 teaches that the landmark descriptors may be determined based on a comparison of spectral powers of the frequencies within a frame in order to determine a spectral peak or "local maxima":

**landmarks and fingerprints are computed from a spectrogram of the sound recording**. . . . Each sequential FFT frame is stacked vertically at corresponding evenly-spaced intervals along the |

7

**Ex. 4**

| Claim 1 | Wang 2002 |
| --- | --- |
| | time axis. A spectrogram plot depicts the energy density at each time-frequency point; darker areas on the plot represent higher energy density. Spectrograms are well-known in the art of audio signal processing. For the present invention, **landmarks and fingerprints can be obtained from salient points such as local maxima of the spectrogram**, circled in the spectrogram of FIG. 7B. For example, **time and frequency coordinates of each peak are obtained**, the time taken to be the landmark, and the frequency used to compute the corresponding fingerprint.<br><br>(Page 6 ¶ 0062)<br><br>Notably, in the example above both the landmark descriptor and the fingerprint descriptor are obtained by comparing the spectral powers to determine a spectral peak.  The process by which these powers are compared is described below:<br><br>For example, **a point at coordinate $(t_0, f_0)$ is selected if it is the maximum energy point within a rectangle** with corners $(t_0-T, f_0-F)$, $(t_0-T, f_0+F)$, $(t_0+T, f_0-F)$, and $(t_0+T, f_0+F)$ i.e., a rectangle with sides of length 2T and 2F, **with T and F chosen to provide a suitable number of constellation points**.<br><br>(Page 6 ¶ 0063)<br><br>Other methods of computing the fingerprint descriptor by comparing the spectral powers within a frame are also disclosed, such as the spectral splice fingerprint:<br><br>Once the landmarks have been computed, a fingerprint is computed at each landmark timepoint in the recording in step 44. The fingerprint is generally a value or set of values that summarizes a set of features in the recording at or near the timepoint. In a currently preferred embodiment, each fingerprint is a single numerical value that is a hashed function of multiple features. Possible types of fingerprints include spectral slice fingerprints, multi-slice fingerprints, LPC coefficients, and cepstral coefficients. Of course, any type of |

8

| Claim 1 | Wang 2002 |
|---|---|
| | fingerprint that characterizes the signal or features of the signal near a landmark is within the scope of the present invention. Fingerprints can be computed by any type of digital signal processing or frequency analysis of the signal.<br><br>(Page 5 ¶ 0055)<br><br>To generate spectral slice fingerprints, a frequency analysis is performed in the neighborhood of each landmark timepoint to extract the **top several spectral peak**s. A simple fingerprint value is just the Single frequency value of the strongest spectral peak. A simple fingerprint value is just the single frequency value of the strongest spectral peak. The use of such a simple peak results in surprisingly good recognition in the presence of noise; however, single-frequency spectral slice fingerprints tend to generate more false positives than other fingerprinting schemes because they are not unique. The number of false positives can be reduced by using fingerprints consisting of a function of the two or three strongest spectral peaks. However, there may be a higher susceptibility to noise if the second-strongest spectral peak is not sufficiently strong enough to distinguish it from its competitors in the presence of noise. That is, the calculated fingerprint value may not be sufficiently robust to be reliably reproducible. Despite this, the performance of this case is also good.<br><br>(Page 5 ¶ 0056)<br><br>To the extent Nielsen argues that Wang 2002 does not disclose determining a first descriptor of the first frame based on the comparison of the first spectral power and second spectral power from the same first frame, a POSITA would have understood that Wang 2002's disclosure of an algorithm that locates a spectral peak is consistent with the manner in which Nielsen appears to allege infringement of this claim element. *See* Nielsen's Supplemental Final Infringement Contentions, Appendix A (claim chart) at pp. 21-27 (Nielsen alleges that determining a maximum energy point of a window spanning over multiple frames meets this claim limitation.) |

**Ex. 4**

| Claim 1 | Wang 2002 |
|---|---|
|  | Further, to the extent Nielsen argues that Wang 2002 does not disclose this element, it would have been obvious to one of skill in the art in light of the knowledge of a POSITA and the disclosures of Jackson and/or Haitsma US. A POSITA would have been motivated to combine these teachings because all of 3 references are directed to the creation of signatures for audio content recognition. <br><br> For instance, it would have been obvious to a POSITA that the methods disclosed in Jackson, wherein the component with the highest power is used as a descriptor could be used. A POSITA would have understood that such a substitution is merely a routine process with reasonably expected success because both computing centroid and computing highest power share many similarly equivalent math operations and similarly find the most prominent frequency content in a signal. <br><br> Block 130 now illustrates the **selection of the highest power frequency bin from the selected frequency bins.** This frequency bin number is then plotted and stored, as depicted in block 132 and becomes a point on a power content signature which is to be created utilizing the method and apparatus of the present invention. <br><br> (Jackson at 6:65-7:3) |

10

**Ex. 4**

| Claim 1 | Wang 2002 |
|---|---|
|  | <br><br>(*Id.*, Fig. 6)<br><br>Jackson claims this process of generating a descriptor based on the frequency component (bin) with the highest power.<br><br>1. A method for analyzing human speech, said method comprising the steps of:<br><br>. . .<br><br>analyzing each frame of acoustic parameters to obtain a plurality of spectral parameters, **each of said plurality of spectral parameters representing an energy level at one of a series of different frequency bins;**<br><br>identifying a spectral parameter within each **frame having the highest energy level within that frame** . . . . |

11

**Ex. 4**

| Claim 1 | Wang 2002 |
|---------|-----------|
|  | (Claim 1) (emphasis added)<br><br>For the same reason, it would have been obvious that the method employed in Haitsma US could be used.<br><br>Alternatively, **a band is assigned a hash bit '1' if its energy level is larger than the energy level of its neighbor, otherwise the hash bit is '0'**. The present embodiment uses an even improved version of the latter alternative. To prevent a major single frequency in the audio signal from producing identical hash words for successive frames, variations of the amplitude over time are also taken into account. More particularly, a band is assigned a hash bit '1' if its energy level is larger than the energy level of its neighbor and if that was also the case in the previous frame, otherwise the hash bit is '0'. If we denote the energy of a band m of frame n by EB(n,m) and the m-th bit of the hash word H of frame n by H(n,m), the bit derivation circuit 17 generates the bits of the hash word in the following manner:<br><br>$$H(n,m) = \begin{cases} 1 & \text{if } EB(n,m) - EB(n,m+1) - (EB(n-1,m) - EB(n-1,m+1)) > 0 \\ 0 & \text{if } EB(n,m) - EB(n,m+1) - (EB(n-1,m) - EB(n-1,m+1)) \le 0 \end{cases}$$<br><br>To this end, the bit derivation circuit 17 comprises, for each band, a first subtractor 171, a frame delay 172, a second subtractor 173, and a comparator 174. The 33 energy levels of the spectrum of an audio frame are thus converted into a 32-bit hash word. The hash words of successive frames are finally stored in a buffer 18, which is accessible by a computer 20. The computer stores the robust hashes of a large number of original songs in a database 21.<br><br>(Haitsma US, Page 3 ¶¶ 0032-0033) |
| d. generating a first signature based on the first descriptor; | Wang 2002 teaches the generation of several different potential signatures based upon the descriptors. |

12

**Ex. 4**

| Claim 1 | Wang 2002 |
|---|---|
| | To begin, the "fingerprint" described in element 1.c. above is itself a signature which "characterize[s] the sound at or near" a particular landmark (first descriptor) (*See* Page 4 ⁋ 0049)<br><br>More involved signatures are also disclosed which are based on a combination of several landmark and/or fingerprint descriptors. These are sometimes referred to as "constellations" or indexes.<br><br>    landmarking and fingerprinting analyses by any of the above methods result in **an index set** for each Sound ID, as shown in FIG. 8A. **An index set for a given sound recording is a list of pairs of values (fingerprint, landmark). Each indexed recording typically has on the order of one thousand (fingerprint, landmark) pairs in its index set**.<br><br>(Page 8 ⁋ 0074)<br><br>Several methods for generating these signatures are also disclosed.<br><br>    This spectrogram landmarking and fingerprinting method is a special case of feature analysis methods that compute a multidimensional function of the sound signal, in which one of the dimensions is time, and locate salient points in the function values. Salient points can be local maxima, local minima, zero crossings, or other distinctive features. The landmarks are taken to be the time coordinates of the salient points, and the corresponding fingerprints are computed from at least one of the remaining coordinates. For example, the non-time coordinate(s) of the multidimensional salient point can be hashed together to form a multidimensional functional fingerprint.<br><br>(Page 7 ⁋ 0066)<br><br>    In this case, **points in a constellation are linked together to form linked points**, as illustrated in the Spectrogram shown in FIG. 7C. **Each point in the constellation serves as an anchor point defining the landmark time, and the remaining coordinate values of the other points are combined to form the linked fingerprint**. Points that are near each |

13

**Ex. 4**

| Claim 1 | Wang 2002 |
|---|---|
|  | other, for example, as defined below, are linked together to form more complex aggregate feature fingerprints that may be more easily distinguished and searched.<br><br>(Page 7 ⁋ 0067) |
| e. identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the common plurality of media samples; | Wang 2002 discloses the use of overlapping frames or "time slices":<br><br>In one implementation of the embodiment of FIG. 6, landmarks and fingerprints are computed from a spectrogram of the sound recording. A spectrogram is a time-frequency analysis of a Sound recording in which windowed and **overlapped frames of sound samples** are spectrally analyzed, typically using a Fast Fourier Transform (FFT).<br><br>(Page 6 ⁋ 0062)<br><br>It further discloses a preferred amount of overlap for each frame:<br><br>A preferred embodiment uses a sampling rate of 8000 Hz, an FFT frame size of 1024 samples, and a stride of 64 samples for each time slice.<br><br>(Page 5 ⁋ 0052; *see also* Page 6 ⁋ 0062 (same))<br><br>This element would also be obvious in view of Wang 2002 and Kenyon for the reasons discussed in claim element 1a. above. In addition, it would have been obvious in light of Zheng, which also teaches the use of overlapping frames, and discloses that they help to avoid synchronization issues with the resultant signatures.<br><br>Thus, in the preferred system, the **audio data is broken down into a larger number of overlapping frames**, **as this provides greater tolerance against synchronisation problems and quickly varying audio content**. Figure 3 shows an illustration of the audio data broken down into overlapping frames. Four overlapping frames each containing 1024 samples are shown, displaced from each other by 256 samples. **As a result, the audio data of 17408 samples is in fact broken down into 65 frames**, and is therefore represented by 65 dominant frequency data points. **An example signature is illustrated in** |

14

**Ex. 4**

| Claim 1 | Wang 2002 |
|---|---|
|  | **Figure 4 for the first audio signal, that is the one which is being compared to the master signal**. The signature contains M signature points. In practice, it is preferred if M is of the order of 2000. It should be remembered that in this diagram, the x axis represents time, measured in frame number, and the y axis represents the dominant frequency.<br><br>(Zheng, Page 3 Lines 20-30).<br><br><br>Fig. 3<br><br>(Zheng, Fig. 3)<br><br>A POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Wang 2002 with Zheng because both were directed to the problem of audio content recognition based upon unique signatures, and because Zheng discloses that using overlapping frames provides greater tolerance against synchronization problems and quickly varying audio content. A POSITA would have understood that combining Wang 2002 and Zheng would render successful result because identifying a second frame that overlaps with the first frame is a natural and minor adjustment in routine procedure known to a POSITA. |
| f. identifying a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency | *See* discussion in element 1c. above, incorporated herein by reference. |

15

**Ex. 4**

| Claim 1 | Wang 2002 |
|---|---|
| component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples; | |
| g. determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and | Wang 2002 teaches that that the descriptor for each frame may be generated in the same manner as the descriptor for the first frame discussed in claim 1d, above, which is incorporated by reference.<br><br>Moreover, Wang 2002 specifically discloses that a "spectral slice fingerprint" descriptor may be separately generated for consecutive "time slices"<br><br>> In order to take advantage of the time evolution of many sounds, a set of timeslices is determined by adding a set of time offsets to a landmark timepoint. **At each resulting timeslice, a spectral slice fingerprint is calculated.** The resulting set of fingerprint information is then combined to form one multitone or multi-slice fingerprint.<br><br>(Page 6 ⁋ 0057) |
| h. generating a second signature based on the second descriptor. | Wang 2002 teaches that a second signature, or "fingerprint hash" is generated to describe the second frame of media samples in the same manner as in section d, above, which is incorporated by reference.<br><br>A POSITA would have known that use of a second signature based upon a second descriptor extracted from a second frame which overlaps the first is a natural extension creating a first signature based upon a first descriptor extract from a first frame, especially given that the '889 Patent describes both interframe and intraframe operations.<br><br>To the extent Nielsen argues that this element is not disclosed by Wang 2002, it would have been obvious in light of the following:<br><br>**Zheng discloses the use of a second signature based upon a second descriptor extracted from a second frame which overlaps the first**. |

16

**Ex. 4**

| Claim 1 | Wang 2002 |
|---|---|
|  | Zheng uses overlapping frames in part to avoid difficulties with audio synchronization. |
|  | Thus, in the preferred system, the **audio data is broken down into a larger number of overlapping frames**, **as this provides greater tolerance against synchronisation problems and quickly varying audio content**. Figure 3 shows an illustration of the audio data broken down into overlapping frames. Four overlapping frames each containing 1024 samples are shown, displaced from each other by 256 samples. **As a result, the audio data of 17408 samples is in fact broken down into 65 frames**, and is therefore represented by 65 dominant frequency data points. **An example signature is illustrated in Figure 4 for the first audio signal, that is the one which is being compared to the master signal**. The signature contains M signature points. In practice, it is preferred if M is of the order of 2000. It should be remembered that in this diagram, the x axis represents time, measured in frame number, and the y axis represents the dominant frequency. |
|  | (Zheng, Page 3 Lines 20-30). |
|  | As is clearly shown in figure 3 of Zheng, a separate signature is generated for each overlapping frame. |
|  | Fig. 3 |
|  | A POSITA looking to solve the problem of synchronizing signatures would have been motivated to combine Wang 2002 with Zheng because both were directed to the problem |

17

**Ex. 4**

| Claim 1 | Wang 2002 |
|---|---|
| | of audio content recognition based upon unique signatures, and because Zheng discloses that using overlapping frames provides greater tolerance against synchronization problems and quickly varying audio content. A POSITA would have understood that combining Wang 2002 and Zheng would render successful result because creating a separate signature based on a separate frame is a natural and routine extension of creating a signature based on a single frame as disclosed in Wang 2002 with only a minor adjustment in routine procedure known to a POSITA. |

| Claim 2 | Wang 2002 |
|---|---|
| A method as defined in claim 1, further comprising identifying media information based on the first signature. | Wang 2002 teaches that media information may be identified based on the first signature<br><br>**A method for recognizing an audio sample locates an audio file that most closely matches the audio sample from a database indexing a large set of original recordings. Each indexed audio file is represented in the database index by a set of landmark timepoints and associated fingerprints. Landmarks occur at reproducible locations within the file, while fingerprints represent features of the signal at or near the landmark timepoints.** To perform recognition, landmarks and fingerprints are computed for the unknown sample and used to retrieve matching fingerprints from the database. For each file containing matching fingerprints, the landmarks are compared with landmarks of the sample at which the same fingerprints were computed. If a large number of corresponding landmarks are linearly related, i.e., if equivalent fingerprints of the sample and retrieved file have the same time evolution, then the file is identified with the sample. The method can be used for any type of sound or music, and is particularly effective for audio signals subject to linear and nonlinear distortion such as background noise, compression artifacts, or transmission dropouts. The sample can be identified in a time proportional to the logarithm of the number of entries in the database; given sufficient computational power, recognition |

18

**Ex. 4**

| Claim 2 | Wang 2002 |
|---|---|
| | can be performed in nearly real time as the sound is being sampled.<br><br>(Abstract)<br><br>it is a primary object of the present invention to provide a method for recognizing an audio signal Subject to a high level of noise and distortion<br><br>(Page 2 ¶ 0012)<br><br>It is a further object of the invention to provide a **recognition method that can be performed in real time based on only a few seconds of the signal to be identified**.<br><br>(Page 2 ¶ 0013)<br><br>Any type of audio, including sound, voice, music, or combinations of types, can be recognized by the present invention. Example audio Samples include recorded music, radio broadcast programs, and advertisements.<br><br>(Page 3 ¶ 0037)<br><br>The reported results can include identifying information of the sound such as the name and artist of a song; the composer, name, and recording attributes (e.g., performers, conductor, venue) of a classical piece; the company and product of an advertisement; or any other suitable identifiers<br><br>(Page 12 ¶ 0105)<br><br>*See also* the discussion regarding claim 1. |

| Claim 4 | Wang 2002 |
|---|---|
| A method as defined in claim 2, wherein the media information is associated with at least one of audio | *See* discussion regarding claims 1 and 2 above. |

19

**Ex. 4**

| Claim 4 | Wang 2002 |
| --- | --- |
| information or video information. | |

| Claim 5 | Wang 2002 |
| --- | --- |
| A method as defined in claim 1, wherein the first descriptor is associated with only the first frame of media samples. | As discussed in section 1.d. above, Wang 2002 teaches that the landmark descriptor is associated with a particular time, while the fingerprint descriptor may be associated with the sound at that time alone:<br><br>Landmarks occur at specific timepoints of the sound and have values in time units offset from the beginning of the file, while fingerprints characterize the sound at or near a particular landmark.<br><br>(Page 5 ℙ 0049)<br><br>Specifically, Wang 2002 teaches that a spectral slice fingerprint may consist of the frequency component with the greatest spectral power for a particular frame:<br><br>To generate spectral slice fingerprints, a frequency analysis is performed in the neighborhood of each landmark timepoint to extract the top several spectral peaks. A simple fingerprint value is just the single frequency value of the strongest spectral peak.<br><br>(Page 5 ℙ 0056)<br><br>*See also* the discussion regarding element 1d. above, incorporated herein by reference. |

| Claim 6 | Wang 2002 |
| --- | --- |
| A method as defined in claim 1, wherein the second descriptor is of the second frame of media samples. | Wang 2002 discloses this feature as described in section 1.h and in reference to claim 5 above. Moreover, Wang 2002 specifically traces the use of "multi-slice fingerprints" in which a second fingerprint descriptor is based only upon the second frame:<br><br>In order to take advantage of the time evolution of many sounds, a set of timeslices is determined by |

20

**Ex. 4**

| Claim 6 | Wang 2002 |
|---|---|
| | adding a set of time offsets to a landmark timepoint. At each resulting timeslice, a spectral slice fingerprint is calculated.<br><br>(Page 6 ¶ 0057) |

| Claim 8 | Wang 2002 |
|---|---|
| An apparatus for generating signatures, comprising: | See discussion of claim 1 (pre) above. |
| a. a processor system including a memory; and instructions stored in the memory that enable the processor system to: | As discussed in Claim 1 (pre), incorporated herein by reference, Wang 2002 teaches the use of a processor to create the reference signal.<br><br>Wang 2002 further discloses the use of a memory and instructions stored in the memory:<br><br>In the case of Sequential landmarking and fingerprinting, the landmarking and fingerprinting object can be considered to be distinct landmarking and fingerprinting objects. **Computer instruction code for the different objects is stored in a memory of one or more computers and executed by one or more computer processors**.<br><br>(Page 4 ¶ 0042)<br><br>Also provided is a program storage device accessible by a computer, tangibly embodying a program of instructions executable by the computer to perform method steps for the above method<br><br>(Page 2 ¶ 0023) |
| b. obtain a first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a | *See* discussion above for elements 1.a. and 1.e, which are incorporated by reference. |

21

**Ex. 4**

| Claim 8 | Wang 2002 |
|---|---|
| portion of the second frame of media samples | |
| c. identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples; | *See* discussion above for element 1.b., which is incorporated by reference. |
| d. identify a third spectral power and a fourth spectral power; | *See* discussion above for element 1.f., which is incorporated by reference. |
| e. determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; | *See* discussion above for element 1.c., which is incorporated by reference. |
| f. determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and | *See* discussion above for element 1.g., which is incorporated by reference. |
| g. generate a first signature based on the first descriptor and a second signature based on the second descriptor. | *See* discussion above for elements 1.d. and 1.h., which are incorporated by reference. |

| Claim 9 | Wang 2002 |
|---|---|
| An apparatus as defined in claim 8, wherein the instructions stored in the | *See* discussion above for claims 1, 2, and 8, which are incorporated by reference. |

22

**Ex. 4**

| Claim 9 | Wang 2002 |
|---|---|
| memory enable the processor system to identify media information based on the first signature. | |

| Claim 11 | Wang 2002 |
|---|---|
| An apparatus as defined in claim 8, wherein the first descriptor is associated with only the first frame of media samples. | *See* discussion above for claims 1, 4, and 8, which are incorporated by reference. |

| Claim 12 | Wang 2002 |
|---|---|
| An apparatus as defined in claim 8, wherein the instructions stored in the memory enable the processor system to: obtain a first plurality of media samples; and identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples. | *See* discussion above for claims 1 and 8, which are incorporated by reference.<br><br>*See also* discussion above for elements 1.a. and 1.e, which are incorporated by reference. |

23

Ex. 4

| Claim 13 | Wang 2002 |
|---|---|
| An apparatus as defined in claim 8, wherein the third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples | *See* discussion above for claims 1 and 8, which are incorporated by reference.<br><br>*See also* discussion above for element 1.f., which is also incorporated by reference. |

| Claim 14 | Wang 2002 |
|---|---|
| Pre. A tangible machine accessible medium having instructions stored thereon that, when executed, cause a machine to: | *See* discussion above for claims 1 and 8, which are incorporated by reference. |
| a. obtain a first frame first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples; | *See* discussion above for elements 1.a., 1.e, and 8.b., which are incorporated by reference. |
| b. identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation | *See* discussion above for elements 1.b. and 8.c., which are incorporated by reference. |

24

**Ex. 4**

| Claim 14 | Wang 2002 |
| --- | --- |
| on the first frame of media samples; | |
| c. identify a third spectral power and a fourth spectral power; | *See* discussion above for element 1.f. and 8.d., which are incorporated by reference. |
| d. determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; | *See* discussion above for element 1.c. and 8.e., which are incorporated by reference. |
| e. determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and | *See* discussion above for element 1.g. and 8.f., which are incorporated by reference. |
| f. generate a first signature based on the first descriptor and a second signature based on the second descriptor. | *See* discussion above for elements 1.d., 1.h., and 8.g., which are incorporated by reference.<br><br> permethrin. |

| Claim 15 | Wang 2002 |
| --- | --- |
| A tangible machine accessible medium as defined in claim 14, wherein the first descriptor is associated with only the first frame of media samples. | *See* discussion above for claims 1, 4, 8, 11, and 14, which are incorporated by reference. |

Ex. 4

| Claim 16 | Wang 2002 |
|---|---|
| A tangible machine accessible medium as defined in claim 14 having instructions stored thereon that, when executed, cause the machine to: obtain a first plurality of media samples; and identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples. | *See* discussion above for claims 1, 8, 12, and 14, which are incorporated by reference.<br><br>*See also* discussion above for elements 1.a. and 1.e, which are incorporated by reference. |

| Claim 17 | Wang 2002 |
|---|---|
| A tangible machine accessible medium as defined in claim 14, wherein third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples | *See* discussion above for claims 1, 8, 13, and 14, which are incorporated by reference.<br><br>*See also* discussion above for element 1.f., which is also incorporated by reference. |

26

**Ex. 4**

# EXHIBIT 3

Ex. 4

**Exhibit 3 - U.S. Patent No. 8,468,183 ("Cheung")**

| | | | | |
|---|---|---|---|---|
| '889 Patent Issue Date | August 24, 2010 | | Prior Art | U.S. Patent No. 8,468,183 ("Cheung") |
| '889 Patent Filing Date | February 19, 2007 | | Effective Date | February 26, 2004 |
| Priority Claim | August 18, 2004 | | Statutory Section | §102(e), 103 (Pre-AIA) |

| Claim 1 | Cheung |
|---|---|
| (Pre) A method for generating signatures implemented using an apparatus comprising a processor, the method comprising: | Cheung teaches a method of generating signatures of audio content<br><br>The pattern recognition method generally relies on the spectral characteristics of the content itself to produce a **unique identifying code or signature**. Thus, the technique of identifying content consists of two steps: the first being extracting a signature from a known piece of content for insertion into a database, and the second being extracting a signature from a detected piece of content and searching for a signature match in the database in order to identify the detected content. In this way, t**he preferred approach relies on characteristics of the broadcast content itself to create a signature unique to that content**.<br><br>(2:54-60)<br><br>Cheung claims a method for generating signatures:<br><br>A method executed by a signal processing system for determining whether a portion of a detected audio signal of a pre-determined number of sequential time frame duration is substantially the same signal as a portion of at least one known signal out of a plurality of known audio signals . . .<br><br>**Calculating for at least one of the time frames of at least one of the known audio signals a first signature** comprised of a set of numbers derived |

**Ex. 4**

| Claim 1 | Cheung |
|---|---|
| | from a pre-determined number of spectral magnitude values detected during the time frame<br><br>(Claim 1)<br><br>Cheung further teaches that the signatures or fingerprints are generated using an apparatus comprising a processor:<br><br>    In the preferred embodiment, **a computer containing a central processing unit** is connected to a sound card or interface device into which audio programming is presented. During the registration phase, the **CPU fetches the audio or video data from the sound card, calculates the pattern vector data**, and then, along with timing data and the identity of the program, these results are stored in a database, as further described below.<br><br>(4:51-58)<br><br>Cheung claims this use of a processor:<br><br>    A method executing by an audio signal processing system . . .<br><br>(Claim 19) |
| a. obtaining a first frame of media samples; | Cheung discloses obtaining a first frame of media samples<br><br>    The invention organizes **the samples into a series of time frames, which consist of a predetermined number of samples**. The time frames are stored in sequence.<br><br>(5:66-6:02)<br><br>    A method executed by a signal processing system for determining whether a portion of a detected audio signal of a pre-determined number of sequential time frame duration is substantially the same signal as a portion of at least one known signal out of a plurality of known audio signals, **each portion of the plurality of known signals comprised of a plurality of sequential time frame duration** |

2

**Ex. 4**

| Claim 1 | Cheung |
|---|---|
| | (Claim 1) |
| b. identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples; | Cheung teaches that the method is performed by performing a Fast Fourier Transform ("FFT") on a frame of media samples, transforming them to the frequency domain. <br><br> 1. **The Fourier transform of x is calculated with the number of points equal to the number of samples in the frame**, in order to get the spectrum vector. <br><br> (9:46-49) <br><br> <br><br> (Fig. 3) <br><br> Cheung discloses that performing the FFT results in a first and second frequency component having associated spectral powers ("frequency magnitude values") |

3

**Ex. 4**

| Claim 1 | Cheung |
|---|---|
|  | 19. A method executed by an audio signal processing system for determining whether a portion of a detected audio signal of a pre-determined number of sequential time frame duration is substantially the same signal as a portion of at least one known audio signal out of a plurality of a known signals, each portion of the plurality of known signals comprised of a plurality of sequential time frame duration and each time frame of the known signal having an identification index and a time frame index, comprising:<br><br>Calculating for at least one of the time frames of at least one of the known signals a first signature comprised of a set of numbers **derived from a pre-determined number of frequency magnitude values detected during the time frame** . . .<br><br>(Claim 19; *see also* Claim 1)<br><br>Under Nielsen's proposed construction, a POSITA would understand that Cheung discloses "frequency magnitude values" (frequency components), each of which is the result of Fourier transform that is transformed from the time domain to the frequency domain.<br><br>Under TVision's proposed construction, Cheung discloses The FFT divides the frame into a series of frequency bins representing a frequency or band or frequencies – a frequency component, and further discloses that each component has an associated spectral power or "frequency magnitude value." Although Cheung may not explicitly disclose the selection of frequency components to the exclusion of others before calculating the centroid, a POSITA would have known that this calculation could be done using only 2 or more of the frequency components to the exclusion of others. |
| c. determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; | Cheung teaches that spectral powers ("FFT coefficients") within frequency bands are compared to create a descriptor known as a "centroid" |

4

**Ex. 4**

| Claim 1 | Cheung |
|---|---|
| | 2. Compute the centroid (or center-of-gravity COG) of each band: $$p_k = \frac{\sum_{m=1}^{131} m \times X_{131k+m}}{\sum_{m=1}^{131} X_{131k+m}}$$ (9:02-10) A POSITA would appreciate that the result of this comparison is a frequency bin which corresponds to the highest density of spectral power within a frame, as compared to the other frequency bins. A POSITA would have understood that Cheung's disclosure of an algorithm of calculating "centroid" is consistent with the manner in which Nielsen appears to allege infringe of this claim element. To the extent Nielsen argues that Cheung does not disclose this element, it would have been obvious to one of skill in the art in light of the knowledge of a POSITA and the disclosures of Haitsma US and/or Jackson and/or Wang 2002. A POSITA would have been motivated to combine these teachings because all of 3 references are directed to the creation of signatures for audio content recognition. Cheung would encourage a POSITA to review these other references because the Claims are not limited to the use of a centroid, but rather encompass any descriptor and signature: comprised of "a set of numbers derived from a pre-determined number of spectral magnitude values detected during the time frame (Claim 1); For instance, it would have been obvious to a POSITA that the methods disclosed in Jackson and Wang 2002, wherein the component with the highest power (rather than the centroid) is used as a descriptor could be used. A POSITA would have understood that such a substituation is merely a routine process with reasonably expected success because both computing centroid and computing highest power share many similarly equivalent math operations. Block 130 now illustrates the **selection of the highest power frequency bin from the selected** |

Ex. 4

| Claim 1 | Cheung |
|---|---|
| | **frequency bins.** This frequency bin number is then plotted and stored, as depicted in block 132 and becomes a point on a power content signature which is to be created utilizing the method and apparatus of the present invention.<br><br>(Jackson at 6:65-7:3)<br><br><br><br>*Fig. 6*<br><br>(*Id.*, Fig. 6)<br><br>Jackson claims this process of generating a descriptor based on the frequency component (bin) with the highest power.<br><br>1. A method for analyzing human speech, said method comprising the steps of:<br><br>. . . |

6

**Ex. 4**

| Claim 1 | Cheung |
|---------|--------|
| | analyzing each frame of acoustic parameters to obtain a plurality of spectral parameters, **each of said plurality of spectral parameters representing an energy level at one of a series of different frequency bins;** identifying a spectral parameter within each **frame having the highest energy level within that frame** . . . . (Claim 1) (emphasis added) landmarks and fingerprints are computed from a spectrogram of the sound recording. . . . Each sequential FFT frame is stacked vertically at corresponding evenly-spaced intervals along the time axis. **A spectrogram plot depicts the energy density at each time-frequency point; darker areas on the plot represent higher energy density. Spectrograms are well-known in the art of audio signal processing.** For the present invention, **landmarks and fingerprints can be obtained from salient points such as local maxima of the spectrogram**, circled in the spectrogram of FIG. 7B. For example, time and frequency coordinates of each peak are obtained, the time taken to be the landmark, and the frequency used to compute the corresponding fingerprint. (Wang 2002 at Page 6 ⊪ 0062) (describing use of local maxima as descriptor) For the same reason, it would have been obvious that the method employed in Haitsma US could be used. Alternatively, **a band is assigned a hash bit '1' if its energy level is larger than the energy level of its neighbor, otherwise the hash bit is '0'**. The present embodiment uses an even improved version of the latter alternative. To prevent a major single frequency in the audio signal from producing identical hash words for successive frames, variations of the amplitude over time are also taken into account. More particularly, a band is assigned a hash bit '1' if its energy level is larger than the energy |

7

**Ex. 4**

| Claim 1 | Cheung |
|---|---|
|  | level of its neighbor and if that was also the case in the previous frame, otherwise the hash bit is '0'. If we denote the energy of a band m of frame n by EB(n,m) and the m-th bit of the hash word H of frame n by H(n,m), the bit derivation circuit 17 generates the bits of the hash word in the following manner:<br><br>$$H(n,m) = \begin{cases} 1 & \text{if } EB(n,m) - EB(n,m+1) - (EB(n-1,m) - EB(n-1,m+1)) > 0 \\ 0 & \text{if } EB(n,m) - EB(n,m+1) - (EB(n-1,m) - EB(n-1,m+1)) \le 0 \end{cases}$$<br><br>To this end, the bit derivation circuit 17 comprises, for each band, a first subtractor 171, a frame delay 172, a second subtractor 173, and a comparator 174. The 33 energy levels of the spectrum of an audio frame are thus converted into a 32-bit hash word. The hash words of successive frames are finally stored in a buffer 18, which is accessible by a computer 20. The computer stores the robust hashes of a large number of original songs in a database 21.<br><br>(Haitsma US, Page 3 ¶¶ 0032-0033) |
| d. generating a first signature based on the first descriptor; | Cheung teaches that a signature is generated based on the first descriptor<br><br>During the registration phase, known programming content is registered with the system by sending the program, as digital data, into the system. **A series of signatures, in the case here, a pattern vector and more generally in the art a "fingerprint" or "signature", are stored** as a sequence of data records in a database, with the identity of the program content cross referenced to them as a group.<br><br>(4:27-34)<br><br>The PG module operating during the detection phase, (2), fetches the stored digital audio or video samples that were detected and stored by the SA Module. Once a frame of the samples is received, the PG module will compute the pattern vector of the frame.<br><br>(6:30-35) |

8

**Ex. 4**

| Claim 1 | Cheung |
|---|---|
| | Cheung discloses that this signature takes the form of a "pattern vector", and describes how it is computed from the descriptor: |
| | After Step 3, a 31-element vector is obtained: $c = [p_2\ p_3\ \ldots\ p_{32}] = [c_1\ c_2\ \ldots\ c_{31}]$. In the preferred embodiment, a further step converts c to an unsigned integer. The unsigned format is used because all the elements in c are positive in the interval of (1, 131). A further calculation on c normalizes each element to a value between 0 and 1 by exercising the division by 131, the number of FFT components within each band: |
| | $$0 \leq c_i = \frac{c_i}{131} \leq 1$$ |
| | In the preferred embodiment, each element is then converted to the unsigned 16-bit integer format for convenient storage and further processing. In order to decrease the compute time downstream, each FFT coefficient or $c_i$, is tested relative to a minimum threshold value. The downstream processes are set to ignore these elements, for example, by not including these elements in downstream sets that are collected for further calculation. FIG. 3 shows a flowchart of this module. In the preferred embodiment, both the FFT in step 1 and the centroid (COG) computation in step 3 are typically calculated using double precision floating point instructions. Speed Compensation Scheme |
| | (9:42-65) |
| | Cheung claims this signature generation: |
| | Calculating for at least one of the time frames of at least one of the known audio signals **a first signature comprised of a set of numbers derived from a pre-determined number of spectral magnitude values detected during the time frame**; |
| | (Claim 1) |
| e. identifying a second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending another plurality of media samples to the | Cheung discloses the use of overlapping frames. |
| | **For each incremental audio sample, a new frame can be started. That is, each audio sample may be the constituent of N overlapping frames when N is the number of samples in a frame**. The distance between these overlapping frames is the inter-frame distance. The shorter inter-frame distance for pattern generation mitigates the problem of program start- |

9

**Ex. 4**

| Claim 1 | Cheung |
|---|---|
| common plurality of media samples; | time uncertainty. Shorter inter-frame distances produce better results when the start time is unknown. In the preferred embodiment, the value of 4,000, around ¼ of a frame, is used during the audio program registration phase. Other distances may be used either to increase accuracy or reduce compute time and storage overhead. Thus, in the preferred embodiment, **the first frame in the database of known audio programs corresponds to audio samples 1 to 16,384, the second corresponds to samples 4001 to 20,384, and so on**. During the detection phase, the inter-frame distance is set to be equal to one frame length. Thus, the first frame of the detected audio program contains samples 1 to 16,384, the second frame contains samples 16,385 to 32,768, and so on.<br><br>(6:42-60) |
| f. identifying a third spectral power associated with a third frequency component and a fourth spectral power associated with a fourth frequency component, wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples; | *See* discussion in element 1c. above, incorporated herein by reference. |
| g. determining a second descriptor based on a comparison of the third spectral power and the fourth spectral power; and | Cheung teaches that the descriptor for each frame may be generated in the same manner as the descriptor for the first frame discussed in claim 1d, above, which is incorporated by reference. |
| h. generating a second signature based on the second descriptor. | Cheung teaches generating a second signature based on the second descriptor. Cheung teaches that a signature is generated for each frame. |

10

**Ex. 4**

| Claim 1 | Cheung |
|---|---|
| | (Fig. 2) Cheung teaches that that the second signature is generated in the same manner as the first discussed in claim 1e, above, which is incorporated by reference. |

| Claim 2 | Cheung |
|---|---|
| A method as defined in claim 1, further comprising identifying media information based on the first signature. | Cheung teaches that media information may be identified based on the signature. Identification mode: in this mode, the module logs all the reference information of the detected program, including title, songwriter, artist, record label, publishing company or any other information input during the registration phase of the system, along with the time when the program is detected, and the time into the program that the detection was made. (7:59-64) This invention relates to the automatic detection and identification of broadcast programming, for example music, speech or video that is broadcast over radio, television, the Internet or other media. "Broadcast" means any readily available source of content, whether now known or hereafter devised, including streaming, peer to peer delivery or detection of network traffic. A known program is registered by deriving a numerical code for each of many short time segments during the program and storing the sequence of numerical codes and a reference to the identity of the program. Detection |

11

**Ex. 4**

| Claim 2 | Cheung |
|---|---|
|  | and identification of an input signal occurs by similarly extracting the numerical codes from it and comparing the sequence of detected numerical codes against the stored sequences. Testing criteria is applied that optimizes the rate of correct detections of the registered programming. Other optimizations in the comparison process are used to expedite the comparison process.<br><br>(Abstract)<br><br>Cheung is titled "method and apparatus for automatic detection and **identification** of broadcast audio and video signals" |

| Claim 4 | Cheung |
|---|---|
| A method as defined in claim 2, wherein the media information is associated with at least one of audio information or video information. | See discussion regarding claims 1 and 2 above. |

| Claim 5 | Cheung |
|---|---|
| A method as defined in claim 1, wherein the first descriptor is associated with only the first frame of media samples. | As discussed in section 1.d. above, incorporated herein by reference Cheung teaches that the centroid descriptor is performed on only a single frame at a time and refers to only that frame. This can be seen in Figure 2, which clearly shows a separate pattern for each frame. |

12

**Ex. 4**

| Claim 5 | Cheung |
|---|---|
|  | |

| Claim 6 | Cheung |
|---|---|
| A method as defined in claim 1, wherein the second descriptor is of the second frame of media samples. | *See* discussion of claim 5 above, incorporated herein by reference. |

| Claim 8 | Cheung |
|---|---|
| An apparatus for generating signatures, comprising: | See discussion of claim 1 (pre) above. |
| a. a processor system including a memory; and instructions stored in the memory that enable the processor system to: | As discussed in Claim 1 (pre), incorporated herein by reference, Cheung teaches the use of a processor. Cheung further teaches that the method includes memory The time frames are stored in sequence. Alternatively, data structures, stored in the **computer memory** (which includes the hard drive if the operating system sup- ports paging and swapping), may be used where the time frames are not physically stored in sequence, but logically may be referenced or indexed in the sequence that they were detected by means of memory addressing. (6:01-08) It is appreciated that any of the Software components of the present invention may, if desired, be implemented in ROM (read-only memory) form or |

13

**Ex. 4**

| Claim 8 | Cheung |
|---|---|
| | stored on any kind of computer readable media, including CD-ROM, magnetic media, or transmitted as digital data files stored in a computers memory. The Software components may, generally, be implemented in hardware, if desired, using conventional techniques.<br><br>(25:17-25)<br><br>A POSITA would have understood that operations as carried out by a processor (CPU) in a computer would necessarily and commonly be stored in memory as instruction at the time of the '889 patent. *See* Wang 2002 at ℙ 0042.<br><br>To the extent Nielsen argues the Cheung does not disclose the use of instructions stored on memory, it would have been obvious in light of the following:<br><br>**Kenyon teaches that instructions for carrying out the method may be stored on a memory**<br><br>The output of the analog to digital converter 21 is transmitted to a programmable digital Signal processor 22 that performs the digital processing of the audio time series waveforms to extract features and construct the feature packets that are to be recognized. Digital signal processor 22 may comprise a special purpose microprocessor that is optimized for Signal processing applications. **It is connected to a program memory 24 (where programs and constants are stored)** and a data memory 23 for storage of variables and data arrays. The digital signal processor 22 also connects to the host computer bus 26 using an interface such as the PCI bus interface 25 for exchange of data between the digital signal processor and the host computer. Note that in cases where digitized audio is available for feature extraction, these data are transferred directly from the host computer bus 26 via the PCI bus interface 25 to the digital signal processor 22, bypassing anti-alias lowpass filters 19, channel multiplexer 20, and analog to digital converter 21. |

14

**Ex. 4**

| Claim 8 | Cheung |
|---|---|
| | (Kenyon Page 7 ¶0063)<br><br>A POSITA would have been motivated to combine Cheung with Kenyon because both were directed to the problem of audio content recognition based upon unique signatures. A POSITA would further have understood that the audio processing method described in Cheung could be implemented using instructions stored on a memory as in Kenyon because both systems using computers (that necessarily have memories to store instructions) to carry out operations of creating signatures. |
| b. obtain a first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples | *See* discussion above for elements 1.a. and 1.e, which are incorporated by reference. |
| c. identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples; | *See* discussion above for element 1.b., which is incorporated by reference. |
| d. identify a third spectral power and a fourth spectral power; | *See* discussion above for element 1.f., which is incorporated by reference. |
| e. determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; | *See* discussion above for element 1.c., which is incorporated by reference. |

15

**Ex. 4**

| Claim 8 | Cheung |
|---|---|
| f. determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and | *See* discussion above for element 1.g., which is incorporated by reference. |
| g. generate a first signature based on the first descriptor and a second signature based on the second descriptor. | *See* discussion above for elements 1.d. and 1.h., which are incorporated by reference. |

| Claim 9 | Cheung |
|---|---|
| An apparatus as defined in claim 8, wherein the instructions stored in the memory enable the processor system to identify media information based on the first signature. | *See* discussion above for claims 1, 2, and 8, which are incorporated by reference. |

| Claim 11 | Cheung |
|---|---|
| An apparatus as defined in claim 8, wherein the first descriptor is associated with only the first frame of media samples. | *See* discussion above for claims 1, 4, and 8, which are incorporated by reference. |

| Claim 12 | Cheung |
|---|---|
| An apparatus as defined in claim 8, wherein the instructions stored in the memory enable the | *See* discussion above for claims 1 and 8, which are incorporated by reference. |

16

**Ex. 4**

| Claim 12 | Cheung |
|---|---|
| processor system to: obtain a first plurality of media samples; and identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples. | *See also* discussion above for elements 1.a. and 1.e, which are incorporated by reference. |

| Claim 13 | Cheung |
|---|---|
| An apparatus as defined in claim 8, wherein the third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples | *See* discussion above for claims 1 and 8, which are incorporated by reference. <br><br> *See also* discussion above for element 1.f., which is also incorporated by reference. |

| Claim 14 | Cheung |
|---|---|
| Pre. A tangible machine accessible medium having instructions stored thereon | *See* discussion above for claims 1 and 8, which are incorporated by reference. |

17

**Ex. 4**

| Claim 14 | Cheung |
|---|---|
| that, when executed, cause a machine to: | |
| a. obtain a first frame first and second frames of media samples, the first and second frames of media samples consecutively located in an audio stream, a portion of the first frame of media samples overlapping with a portion of the second frame of media samples; | *See* discussion above for elements 1.a., 1.e, and 8.b., which are incorporated by reference. |
| b. identify a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing a spectral transform operation on the first frame of media samples; | *See* discussion above for elements 1.b. and 8.c., which are incorporated by reference. |
| c. identify a third spectral power and a fourth spectral power; | *See* discussion above for element 1.f. and 8.d., which are incorporated by reference. |
| d. determine a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power; | *See* discussion above for element 1.c. and 8.e., which are incorporated by reference. |
| e. determine a second descriptor of the second frame of media samples based on a comparison of the third spectral power and the fourth spectral power; and | *See* discussion above for element 1.g. and 8.f., which are incorporated by reference. |

18

**Ex. 4**

| Claim 14 | Cheung |
|---|---|
| f. generate a first signature based on the first descriptor and a second signature based on the second descriptor. | *See* discussion above for elements 1.d., 1.h., and 8.g., which are incorporated by reference.<br><br> permethrin. |

| Claim 15 | Cheung |
|---|---|
| A tangible machine accessible medium as defined in claim 14, wherein the first descriptor is associated with only the first frame of media samples. | *See* discussion above for claims 1, 4, 8, 11, and 14, which are incorporated by reference. |

| Claim 16 | Cheung |
|---|---|
| A tangible machine accessible medium as defined in claim 14 having instructions stored thereon that, when executed, cause the machine to: obtain a first plurality of media samples; and identify the second frame of media samples by extracting a common plurality of media samples from the first frame of media samples and appending the first plurality of media samples to the common plurality of media samples, the common plurality of media samples including the overlapping portions of the first and second frames of media samples. | *See* discussion above for claims 1, 8, 12, and 14, which are incorporated by reference.<br><br>*See also* discussion above for elements 1.a. and 1.e, which are incorporated by reference. |

19

**Ex. 4**

Ex. 4

| Claim 17 | Cheung |
|---|---|
| A tangible machine accessible medium as defined in claim 14, wherein third spectral power is associated with a third frequency component and the fourth spectral power is associated with a fourth frequency component, and wherein the third frequency component and the fourth frequency component are associated with performing the spectral transform operation on the second frame of media samples | *See* discussion above for claims 1, 8, 13, and 14, which are incorporated by reference.<br><br>*See also* discussion above for element 1.f., which is also incorporated by reference. |

Ex. 4

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 7, 2025, this document was served on the persons listed

below in the manner indicated:

**<u>BY EMAIL:</u>**

David E. Moore
Bindu A. Palapura
Malisa C. Dang
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
mdang@potteranderson.com

Clifford Katz
Nithya Damodharan
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800
ckatz@kelleydrye.com
ndamodharan@kelleydrye.com

Steven Yovits
Constantine Koutsoubas
Jason P. Greenhut
Douglas Lewis
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
(312) 857-7070
syovits@kelleydrye.com
ckoutsoubas@kelleydrye.com
jgreenhut@kelleydrye.com
dlewis@kelleydrye.com

Matthew Chakmakian
KELLEY DRYE & WARREN LLP
One Jefferson Road 2nd Floor
Parsippany, NJ 07054
(973) 503-5900
mchakmakian@kelleydrye.com

Joshua B. Long
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd. Suite 900
Houston, TX 77027
(713) 355-5054
jlong@kelleydrye.com

**Ex. 4**

/s/ Lindsey M. Gellar
Andrew E. Russell (No. 5382)
Lindsey M. Gellar (No. 7202)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
lgellar@shawkeller.com
*Attorneys for Defendant*

2

**Ex. 4**

Ex. 5

# EXHIBIT 5

Ex. 5

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | C.A. No. 22-057-CJB |
| | ) | |
| v. | ) | |
| | ) | |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

**SUPPLEMENTAL REPLY EXPERT REPORT OF DR. DAVID ANDERSON**
**REGARDING INVALIDITY OF U.S. PATENT NO. 7,783,889**

**Ex. 5**

Ex. 5

## TABLE OF CONTENTS

I.    SUMMARY OF ANTICIPATION AND OBVIOUSNESS ....................................1

    A.    Haitsma US ...........................................................................................1

        1.    Spectral Transform Operation...........................................2

        2.    Descriptor.........................................................................5

        3.    Other Issues......................................................................7

    B.    Wang 2002 ............................................................................................8

    C.    Cheung .................................................................................................10

II.    OTHER GROUNDS OF INVALIDITY ..................................................................10

1. My name is David Anderson. The following is my supplemental Reply Report in Invalidity of U.S. Patent No. 7,783,889 ("the '889 Patent") in response to Dr. Chris Kyriakakis ("Kyriakakis Validity Report") and Mr. Jaap Haitsma ("Haitsma Validity Report"), both of which dated July 28, 2025.

2. My analysis and opinions are summarized in my Opening Supplemental Invalidity Expert Report of July 7, 2025 ("Opening Supp Invalidity Report"), and my supplemental Reply Report further sets forth information and opinions about which I may testify in this case if called upon to do so. If I am called upon to testify about this report by deposition or at a hearing before the Court, I may cite other documents or information similar to that specifically identified in this report or in my Opening Invalidity Report. I may also use graphics, animations, pictures, demonstrations, and/or other audio/visual aids to explain my analysis and opinions.

3. I am addressing Dr. Kyriakakis's report mainly because, aside from personal perspective, Mr. Haitsma's report is largely duplicated in Dr. Kyriakakis's report. To the extent there are differences between Dr. Kyriakakis's and Mr. Haitsma's reports, I will address them.

## I.    SUMMARY OF ANTICIPATION AND OBVIOUSNESS

### A.    Haitsma US

4. Dr. Kyriakakis's and Mr. Haitsma's reports primarily argue that Haitsma US does not discloses "determining a first descriptor of the first frame of media samples based on a comparison of the first spectral power and the second spectral power" element which in turn implicates "identifying a first frequency component having a first spectral power and a second frequency component having a second spectral power by performing

1

Ex. 5

hardware and/or software). In addition, only a small number of frequency components need to be processed.  This allows for a reduction (as compared to the prior art) in computational resources needed for signature generation."  *See* Kyriakakis Validity Report at ¶ 1427. Although the '889 patent specification describes a method of generating signatures based on the comparison of a few pre-determined frequency bins within a single frame (intraframe descriptors), the claims, as construed by the court, do not limit the processing to a few predetermined frequency bins, and the infringement contentions accuse a method that processes all frequency bins.  Thus, the purported computational advantage of only processing a small number of frequency components is irrelevant because that feature is not claimed.

30.    Dr. Kyriakakis argues that "Specifically, the claimed approach provides robustness because it is a sign-based approach based on comparisons of power levels, as explained above in Paragraph 1422 And the claimed approach provides discriminativeness because signatures are derived from descriptors based on a few key frequencies, as explained above in Paragraph 1423." *See* Kyriakakis Validity Report at ¶ 1428.  However, this argument has multiple flaws.

31.    First, the "few key frequency" argument is not the "claimed approach" as Dr. Kyriakakis states.  The court has not construed the claim language to be restricted to a few key frequencies.

32.    Second, Dr. Kyriakakis has stated "[…] only a small number of frequency components need to be processed.  This allows for a reduction (as compared to the prior art) in computational resources needed for signature generation." *See* Kyriakakis Validity Report at ¶ 1427.  However, the use of only a small number of frequency components

11

**Ex. 5**

would have been known to those in the art to *reduce* the discriminativeness of signatures. As Wang 2003 discusses, there are multiple factors to be considered when choosing signatures or fingerprints. In particular, there is a trade-off with in which simple fingerprints may provide many false matches because they do not capture sufficient amounts of unique information in a signal. *See* Wang 2003 section 2, pages 2-3. In operation, the key frequencies in the '889 specification must be chosen to be the same frequencies for all waveforms to be identified so that the fingerprints in the waveform to be identified correspond to the fingerprints in the database. Operating on a small number of key frequencies is more efficient computationally (*e.g.*, it allows the efficient use of the sliding FFT as is proposed in the '889 specification, 13:46-15:33), but a few key frequencies cannot represent or capture waveform characteristics at other frequencies and so trade specificity for efficiency. The difficulty could be compared to the task of recognizing a person with only a view of an eye and a hand. While these two features may be somewhat discriminative, the chances of a false identification are significantly higher than if more features were allowed.

33.    Third, the "claimed approach" is not sign-based—the claims have no limitations pertaining to "signs." While there is claim language pertaining to a comparison of spectral powers, the results are not constrained to be signs or sign-based. Not only are the claims absent of any "sign-based" limitations, the patent itself does not contain the word "sign."

34.    Fourth, inasmuch as Dr. Kyriakakis intended the term "sign-based" to refer to the method described in the '889 patent specification of generating a 1 or a 0 depending

12

Ex. 5

on which selected spectral component was larger, this was well known in the art and not an innovation. *See, e.g.,* Haitsma US ¶ 0032.

35. Lastly, "sign-based" approaches to generating fingerprints can result in fragile performance. I have seen nothing in the art prior to the '889 patent or since that time that suggests that "sign-based" approaches are necessarily more robust than other state-of-the-art approaches. The actual performance would depend on a variety of factors, such as how the signs or sign bits are generated and how they are used to generate fingerprints. A sign-based approach is just one of many known methods for generating fingerprints. *See, e.g.,* '889 patent at 2:60-3:21, 19:8-39; Kyriakakis Validity Report at ¶ 73; Wang 2002 ¶¶ 0021, 0055-0060; Haitsma US ¶ 0032; Jackson Fig. 9, ¶ 0067.

13

**Ex. 5**

I declare under penalty of perjury that the foregoing is true and correct.


Date:  August 18, 2025

David Anderson, Ph.D.

14

**Ex. 5**

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2025, this document was served on the persons listed below in the manner indicated:

**BY EMAIL:**

David E. Moore
Bindu A. Palapura
Malisa C. Dang
POTTER ANDERSON & CORROON LLP
Hercules Plaza, 6th Floor
1313 N. Market Street
Wilmington, DE  19801
(302) 984-6000
dmoore@potteranderson.com
bpalapura@potteranderson.com
mdang@potteranderson.com

Clifford Katz
Nithya Damodharan
KELLEY DRYE & WARREN LLP
3 World Trade Center
175 Greenwich Street
New York, NY 10007
(212) 808-7800
ckatz@kelleydrye.com
ndamodharan@kelleydrye.com

Steven Yovits
Constantine Koutsoubas
Jason P. Greenhut
Douglas Lewis
KELLEY DRYE & WARREN LLP
333 West Wacker Drive
Chicago, IL 60606
(312) 857-7070
syovits@kelleydrye.com
ckoutsoubas@kelleydrye.com
jgreenhut@kelleydrye.com
dlewis@kelleydrye.com

Matthew Chakmakian
KELLEY DRYE & WARREN LLP
One Jefferson Road 2nd Floor
Parsippany, NJ 07054
(973) 503-5900
mchakmakian@kelleydrye.com

Joshua B. Long
KELLEY DRYE & WARREN LLP
515 Post Oak Blvd. Suite 900
Houston, TX 77027
(713) 355-5054
jlong@kelleydrye.com

Ex. 5

*/s/ Andrew E. Russell*
Andrew E. Russell (No. 5382)
Lindsey M. Gellar (No. 7202)
SHAW KELLER LLP
I.M. Pei Building
1105 North Market Street, 12th Floor
Wilmington, DE 19801
(302) 298-0700
arussell@shawkeller.com
lgellar@shawkeller.com
*Attorneys for Defendant*

2

**Ex. 5**