## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF DELAWARE

| | | |
|---|---|---|
| THE NIELSEN COMPANY (US), LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 22-57-CJB |
| | ) | |
| TVISION INSIGHTS, INC., | ) | |
| | ) | |
| Defendant. | ) | |

David E. Moore and Bindu A. Palapura, POTTER ANDERSON & CORROON LLP, Wilmington, DE; Steven Yovits, Douglas Lewis, Constantine Koutsoubas and Jason P. Greenhut, KELLEY DRYE & WARREN LLP, Chicago, IL; Clifford Katz, KELLEY DRYE & WARREN LLP, New York, NY, Attorneys for Plaintiff The Nielsen Company (US), LLC.

Andrew E. Russell and Nathan R. Hoeschen, SHAW KELLER LLP, Wilmington, DE; Jason Xu, RIMÔN LAW P.C., Washington, DC; Eric C. Cohen, RIMÔN LAW P.C., Raleigh, NC; Bejamin D. Brown, Richard A. Koffman and Daniel McCuaig, COHEN MILSTEIN SELLERS & TOLL PLLC, Washington, DC; Steig D. Olson and Sami H. Rashid, QUINN EMANUEL URQUHART & SULLIVAN LLP, New York, NY; Patrick D. Curran, QUINN EMANUEL URQUHART & SULLIVAN LLP, Boston, MA; Adam B. Wolfson, QUINN EMANUEL URQUHART & SULLIVAN LLP, Los Angeles, CA, Attorneys for Defendant TVision Insights, Inc.

## <u>MEMORANDUM OPINION</u>

May 29, 2026
Wilmington, Delaware

*Christopher J. Burke*

**BURKE, United States Magistrate Judge**

In this patent infringement action filed by Plaintiff The Nielsen Company (US), LLC ("Nielsen" or "Plaintiff"), Nielsen asserts that Defendant TVision Insights, Inc. ("TVision" or "Defendant") infringes claim 8 of United States Patent No. 7,783,889 (the "'889 patent"). (D.I. 1 at ¶ 44; D.I. 414 at 5; D.I. 415 at 1) Presently pending before the Court is TVision's motion for summary judgment that the patent-in-suit is ineligible for patent protection under 35 U.S.C. § 101 ("Section 101") (the "Motion"). (D.I. 365) Nielsen opposes the Motion. For the reasons set forth below, the Motion is DENIED.[1]

1.      TVision argues that the asserted claim of the '889 patent is invalid under Section 101. (D.I. 355 at 6-19)[2] For brevity's sake, the Court assumes familiarity with the intrinsic record of the '889 patent, as well as the parties' briefs on the Motion, (*id.*; D.I. 384 at 3-17; D.I. 396 at 2-11), TVision's Notice of Subsequent Authority, (D.I. 412), and Nielsen's response thereto, (D.I. 413).[3]

2.      The Court has previously set out the relevant legal standards for review of a summary judgment motion brought on Section 101 grounds in *S.I.SV.EL. Societa Italiana per lo Sviluppo Dell'Elettronica S.p.A v. Rhapsody Int'l Inc.*, Civil Action No. 18-69-MN-CJB, Civil

---

[1]      The parties have jointly consented to the Court's jurisdiction to conduct all proceedings in this case, including trial, the entry of final judgment and all post-trial proceedings. (D.I. 18)

[2]      Although at the time the Motion was briefed, Nielsen was asserting claims 1-2, 4-6, 8-9 and 11-17 of the '889 patent (the "asserted claims"), (D.I. 1 at ¶ 44; D.I. 350 at 1), Nielsen has since represented that it will assert only claim 8 at trial, (*see* D.I. 414 at 5; D.I. 415 at 1).

[3]      The Court incorporates by reference the Background section of its May 27, 2026 Memorandum Opinion resolving TVision's motion for summary judgment that TVision does not infringe the asserted claims of the patent-in-suit. (D.I. 471 at 2-5)

Action No. 18-70-MN-CJB, 2019 WL 1102683, at *2-4 (D. Del. Mar. 8, 2019).  The Court hereby incorporates its discussion of these legal standards in *S.I.SV.EL.* and will follow those standards herein.

3.    In its briefing, TVision argued that claim 1 is representative for the eligibility analysis.  (D.I. 355 at 6-7)  Nielsen does not dispute that claim 1 is representative, and in fact, seems to treat it as representative itself.  (*See, e.g.*, D.I. 384 at 8-10; D.I. 396 at 2)  In light of that, even though Nielsen now asserts only claim 8 of the '889 patent in this case, the Court will address claim 1 as representative (i.e., of asserted claim 8, for purposes of the eligibility analysis at issue herein).

4.    At step one of the *Alice* test, the Court must "determine whether the claims at issue are directed to a patent-ineligible concept" such as an abstract idea.  *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 218 (2014).  TVision argues that claim 1 is directed to the abstract idea of "(1) performing an spectral transform operation on a first frame of media sample data[;] (2) comparing spectral powers of the two frequency components obtained from the transformation operation to determine a descriptor; (3) calculating a signature based on the descriptor; and (4) repeating the operation on a second frame, which is obtained by using data from the first frame and data from a second frame."  (D.I. 355 at 11; *see also* D.I. 396 at 2-3)  According to TVision, this all simply amounts to an abstract mathematical algorithm, and claims reciting a "pure mathematical algorithm" such as this are *per se* unpatentable.  (D.I. 355 at 8; *see also id.* at 6, 11-15; D.I. 396 at 3-4)[4]  For its part, Nielsen retorts that claim 1 is patent eligible because it

_____

[4]    As for the specific mathematical operations that are utilized in the claim, TVision asserts that:  (1) performing a spectral transform operation is described in the specification as a "purely mathematical operation called a Fast Fourier Transform" ("FFT") that was well-known

"recite[s] a series of specific steps of a technological method to improve signal processing computing technology." (D.I. 384 at 12)

5.      In this type of a case, the Court's step one inquiry considers whether the claim is directed to an improvement in computing devices or other technology (in which case the claim would be patent-eligible), or whether it is simply directed to a "process that qualifies as an 'abstract idea' for which computers are invoked merely as a tool" (in which case it would be directed to an abstract idea, and the Court would then proceed to *Alice*'s step two). *See Enfish, LLC v. Microsoft Corp.*, 822 F.3d 1327, 1335-36 (Fed. Cir. 2016); *see also Two-Way Media Ltd. v. Comcast Cable Commc'ns, LLC*, 874 F.3d 1329, 1337 (Fed. Cir. 2017) ("We look to whether the claims in the patent focus on a specific means or method, or are instead directed to a result or effect that itself is the abstract idea and merely invokes generic processes and machinery."). And with regard to TVision's particular Section 101 argument here, it is well-settled that claims reciting "mathematical algorithms for performing calculations, without more, are patent ineligible" under Section 101. *In re Bd. of Trs. of Leland Stanford Junior Univ.*, 991 F.3d 1245, 1250 (Fed. Cir. 2021); *see also Optis Cellular Tech., LLC v. Apple Inc.*, 139 F.4th 1363, 1379 (Fed. Cir. 2025). However, claims that implement or apply mathematical formulas "in a structure or process which, when considered as a whole, is performing a function which the patent laws were designed to protect" *are* patent eligible. *XY, LLC v. Trans Ova Genetics, LC*, 968 F.3d 1323, 1332 (Fed. Cir. 2020) (internal quotation marks and citations omitted). For example, a claim that "incorporates applied mathematics in a purported improvement to an

---

in the art at the time of the invention; and (2) the comparison done to determine a descriptor is a "mathematical 'greater-than' operation[.]" (D.I. 355 at 10-11)

otherwise-known method to yield an improved result" will satisfy the requirements of Section 101. *Id.*

6.      Below, the Court will explain why it ultimately agrees with Nielsen that claim 1 is not directed to a pure mathematical algorithm and instead is directed to patent-eligible subject matter.

7.      In order to determine what a patent claim is really directed to at step one, the United States Court of Appeals for the Federal Circuit has indicated that a court may consider the content of the patent's specification.[5] The specification of the '889 patent explains that employing signature-matching techniques to identify audio information was well known at the time of the invention. ('889 patent, col. 1:21-23)[6] The audio information would be identified by comparing a monitored signature generated at a monitoring site where media content is playing (e.g., a home television) with a signature generated at a reference site (i.e., a central location data collection facility with a database containing reference signatures generated based on known media information). (*Id.*, cols. 1:25-39, 3:30-39) When a monitored signature matched a reference signature, the known media information that corresponds to a reference signature would then be identified as the program that was presented at the monitored site. (*Id.*, cols. 1:40-

---

[5]      *Cf. Enfish*, 822 F.3d at 1337 (indicating that it is appropriate to look to a patent's specification to determine whether a claim of the patent is "directed to" a particular concept, and that if a claim contains an element that is described by the patent's specification as what the "present invention comprises[,]" this suggests that the claim may be directed to that element or concept) (internal quotation marks and citation omitted); *Internet Patents Corp. v. Active Network, Inc.*, 790 F.3d 1343, 1348 (Fed. Cir. 2015) (same, and noting that if a concept is described in the patent as being "the innovation over the prior art" or the "the essential, most important aspect" of the patented invention, that suggests that the claim is directed to that concept) (internal quotation marks and citation omitted).

[6]      The '889 patent is located on the docket in more than one place; herein, the Court will simply cite to the patent by its number.

44, 3:36-43)  The claimed methods and apparatuses also generally relate to generating digital signatures to identify audio information.  But the specification explains that unlike known methods in the prior art that exclusively used *inter*frame operations (i.e., operations based on data within different frames) to generate the descriptors that are used to create such signatures, the claimed invention uses *intra*frame operations (i.e., operations based on data within a single frame) to do so.  (*Id.*, col. 2:56-60)  The specification also explains that the claimed method of utilizing overlapping frames of media samples in the generation of descriptors that are then used to create multiple signatures "increases the likelihood of a match between a set of reference signatures and a set of monitored signatures corresponding to the same audio program."  (*Id.*, cols. 9:36-51, 10:3-6, 13:1-4; *see also id*. at col. 26:53-55 (claim 8, claiming "a portion of the first frame of media samples overlapping with a portion of the second frame of media samples"))

8.      The specification makes clear that the advance over the prior art is not purely the use of mathematical operations in determining a descriptor and then generating a signature—indeed, the specification acknowledges that the prior art identified digital signatures using just such operations.  (*See, e.g.*, *id.*, cols. 2:56-58, 13:40-45)  Instead, the patent explains that the claimed advance is the use of *particular ways of obtaining the descriptors* that will be utilized to generate the signatures.  The specification thus signals that the claims will not simply be directed to an abstract mathematical formula, but instead to a more specific way of generating signatures that may happen to utilize mathematical operations—all as part of an improved computer-based process.  *Compare Optis Cellular Tech., LLC*, 139 F.4th at 1379 (determining that the asserted claims were directed to the abstract idea of a "mathematical formula[,]" where the purported advance of the patent over the prior art was "the use of the claimed equation"), *with Thales Visionix Inc. v. United States*, 850 F.3d 1343, 1349 (Fed. Cir. 2017) ("Far from claiming the

equations themselves, the claims seek to protect only the application of physics to the unconventional configuration of sensors as disclosed."); *OrthoPediatrics Corp. v. WishBone Med., Inc.*, Case No. 3:20-CV-929 JD, 2023 WL 11944713, at *5 (N.D. Ind. June 13, 2023) (explaining that "the calculations listed in the '377 Patent, including eighteen simultaneous nonlinear equations, are merely the means by which the '377 Patent's method more accurately calculates the desired adjustment of the external fixator's struts; they are not the subject of the patent itself").

9.      Turning back to the method of claim 1, to be sure, it has to do with generating signatures based on descriptors.  But the claim does not simply set out the method in a broad way that ultimately claims merely this end result.  Instead, claim 1 spells out the specific steps that are required to obtain the descriptors that will be used to generate signatures, including that: (a) a first descriptor will be determined based on a comparison of two frequency components from the *same* frame (i.e., *intra*frame processing); and (b) a second descriptor will be generated based on a comparison of frequency components from a second frame of media samples (i.e., another example of *intra*frame processing) that was identified by *extracting media samples from the first frame and appending additional media samples* thereto (i.e., what Nielsen refers to as "using overlapping frames to generate" signatures).  ('889 patent, col. 26:5-32; D.I. 384 at 5 & n.3; *see also id*. at col. 26:53-55 (claim 8, more explicitly claiming the use of "overlapping" frames))  In the Court's view, this specificity of the claim in detailing how the descriptors are generated takes the claim out of the realm of abstractness.  *See, e.g.*, *OrthoPediatrics Corp.*, 2023 WL 11944713, at *7 (finding that a claim reciting a method for bone adjustment using an external fixator system that employed calculations was not directed to an abstract idea, where the patent "does not state merely that one should move the fixator struts by use of a computer;

instead, the patent limits itself to a point and click method, relies on the taking of multiple images, describes the input from the physician, and then describes how the method operates the framework to make the adjustment" thus "inform[ing] the reader of specific steps necessary to achieve the end result by specific means").[7]

10.    The Court agrees with Nielsen that claim 1 is similar in nature to a claim ("claim 13") that the Federal Circuit deemed patent eligible in *Cal. Inst. of Tech. v. Broadcom Ltd.*, 25 F.4th 976, 988 (Fed. Cir. 2022).  (D.I. 384 at 8-10)  In *Broadcom*, claim 13 recited a method of encoding a signal that entailed:  (1) receiving a block of data in the signal to be encoded that included information bits; (2) performing a specific encoding operation using the information bits as an input that generates a portion of a codeword; and (3) wherein the information bits were required to appear in a "variable number of subsets" (a term construed to in turn, require "irregular information bit repetition").  25 F.4th at 984.  The *Broadcom* Court rejected the defendant's assertion that because the claim depended on mathematical operations, the claim was ineligible.  In doing so, it explained that claim 13 "claims more than a mathematical formula because it is directed to an efficient, improved method of encoding data that *relies in part on irregular repetition*."  *Id.* at 988 (emphasis added).  Similarly, here, claim 1 recites a specific method of obtaining a particular form of data, performing operations on that data, and generating results from that operation.  (D.I. 384 at 9-10)  The result in *Broadcom* underscores the eligibility

---

[7]    The United States Supreme Court has explained that the concern that drives the notion that abstract ideas are not patentable is "one of pre-emption[,]" where permitting a patent on an abstract idea would effectively grant a monopoly over that idea.  *Alice*, 573 U.S. at 216. Nielsen notes that claim 1 does not pre-empt the entire field of signature generation, as it does not cover many other techniques for the generation of signatures.  (D.I. 384 at 8 (citing D.I. 387 at ¶ 14 (citing D.I. 385, ex. 47 at ¶ 1426)))

of claim 1 here.[8]  *See also, e.g.*, *Nokia Techs. Oy v. Warner Bros. Ent. Inc.*, — F. Supp. 3d —, 2026 WL 622650, at \*2, \*12-13 (D. Del. Mar. 5, 2026) (finding that claims reciting a method of interpolation in video coding that "outlin[ed], mathematically, how to interpolate the values of the sub-pixels more selectively[,] such that the number of calculations required to obtain the needed values are reduced" were patent eligible, because they recited "a sufficiently specific implementation (i.e., [selectively interpolating sub-pixel values]) of an existing [method] (i.e., [video encoding]) that improves the functioning of the overall technological process of encoding and decoding video sequences") (internal quotation marks and citation omitted).

11.    As was noted above, the specifications do state that the claimed method amounts to a new way of generating digital signatures.  That said, the patent doesn't say a lot in terms of explaining *why or how* this method constitutes a *technological improvement* in digital signature generation.  However, Nielsen's expert, Chris Kyriakakis, fills in these gaps by opining that the claimed method improves upon the prior art in several ways.  *Cf. TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1297 (Fed. Cir. 2020) (noting that to the extent, if any, that extrinsic evidence is

---

[8]    According to TVision, claim 1 "is an abstract idea under well-settled precedents that 'a process that employs mathematical algorithms to manipulate existing information to generate information is not patent eligible.'"  (D.I. 355 at 13 (quoting *Digitech Image Techs., LLC v. Elecs. for Imaging, Inc.*, 758 F.3d 1344, 1351 (Fed. Cir. 2014)).  The *Broadcom* district court grappled with this proposition from *Digitech*, which at first blush might suggest that claims like claim 1 here and claim 13 from *Broadcom* are patent ineligible.  The district court noted that while *Digitech* seems to "set forth a bright-line rule[ that if a claim includes] mathematical algorithms that transform data, the claim is not [patent eligible,]" that cannot be what *Digitech* means, because such a take would essentially "eviscerate all software patents" as the "essence of software is manipulating existing data and generating additional data through algorithms."  *Cal. Inst. of Tech. v. Broadcom Ltd.*, Case No. CV 16-3714-GW (AGRx), 2019 WL 11828211, at \*15-16 (C.D. Cal. Jan. 18, 2019) (internal citation omitted), *aff'd*, 25 F.4th 976 (Fed. Cir. 2022).  The district court noted that in comparison to claim 13, which was directed to a "specific method of encoding, including the actual steps that must be performed to achieve the desired result[,]" the issue with the claims in *Digitech* "w[as] their result-oriented nature and large breadth."  *Id.* at \*16.  Here too, the claim is directed to a specific method of signal processing, as explained above.

relevant to the summary judgment analysis at step one, the plaintiff had submitted an expert declaration asserting that the claimed invention amounted to an improvement in computer network functionality); *Cal. Inst. of Tech. v. Broadcom Ltd.*, Case No. CV 16-3714-GW (AGRx), 2019 WL 11828211, at *15 (C.D. Cal. Jan. 18, 2019) (finding that the claims included technological improvements sufficient to pass muster under Section 101 in reliance on both the specification and the testimony of the plaintiff's experts); *Verint Sys. Inc. v. Red Box Recorders Ltd.*, 226 F. Supp. 3d 190, 200 (S.D.N.Y. 2016) (relying in part on an expert declaration in confirming that the patent's improvements over the prior art rendered the invention patent eligible). These include that:

- The claimed method solves the prior art problem of noise interference, via creating signatures by generating descriptors based on a comparison of frequency components and by utilizing overlapping and consecutive frames of media samples. (D.I. 385, ex. 48 at ¶¶ 127-29)

- The use of generating descriptors from overlapping frames produces signatures that are very close together in time, which makes it more likely that at least one of the monitored signatures will be synchronized with at least one of the reference signatures; this in turn solves a problem in the prior art, wherein the use of misaligned reference and monitored signatures sometimes hindered content recognition. (*Id.* at ¶ 130); and

- Using at least some intraframe comparisons improves content recognition (in that it allows for better capturing of characteristics of the spectral signature at the time instant represented by the frame, and increases robustness to speed variations which increase the chances of identification of such content). (*Id.* at ¶ 132)

Mr. Kyriakakis' opinions, therefore, further highlight that claim 1 is directed to a specific implementation of a method that amounts to a technological improvement—and thus is patent

10

eligible.  TVision points to essentially no facts of record contradicting Mr. Kyriakakis' analysis here.

12.     Instead, TVision suggests that these purported improvements should be ignored in the Section 101 inquiry because they are not "recited in the claims" and instead are based on "the conclusory statements" of Nielsen's expert.  (D.I. 396 at 5; *see also* D.I. 412 at 1 (TVision asserting that the claims of the '889 patent are "directed to an abstract idea because the alleged improvements Nielsen points to, noise resistance and improved synchronization, are not required by the claims"))  As for the assertion that Plaintiff's expert's statements are conclusory, the Court does not agree.  Mr. Kyriakakis does not simply say that, for example, "the claimed method reduces noise"—but instead explains in real detail how that is so.  Beyond that, claims are not required to recite, for example "that noise be reduced" in order to be said to amount to an improvement over the prior art in that way.  Rather, they must recite the "steps necessary to make the improvement[,]" *Trs. of Columbia Univ. in City of N.Y. v. Gen Digit. Inc.*, 169 F.4th 1320, 1331 (Fed. Cir. 2026), which they do here.[9]

13.     Because the Court finds that the representative claim 1 of the '889 patent is directed to patent-eligible subject matter (and that summary judgment is therefore not warranted), it need not reach step two of the *Alice* test.

14.     An appropriate Order will issue.

---

[9]     TVision also suggests that "overlapping frames are not new[,]" citing to a portion of the specification that explains that "a sliding FFT provides advantages over a conventional non-sliding FFT for generating the digital spectral signatures" as "[u]nlike a conventional non-sliding FFT, a sliding FFT can be used to incrementally compute an FFT."  (D.I. 396 at 6 (citing '889 patent, col. 13:46-67); *see also id.* at 9)  But it is not clear at all from this portion of the specification that prior art methods of generating digital signatures utilized overlapping frames in the exact same way as the claimed method of the '889 patent.